**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **JUAN BALDERAS,** | § | |
| *Petitioner*, | § | |
| | § | |
| **v.** | § | **ACTION NO.: 4:20-CV-4262** |
| | § | **JUDGE ALFRED H. BENNETT** |
| | § | |
| **BOBBY LUMPKIN,** | § | |
| | § | **DEATH PENALTY CASE** |
| **Director, Texas Department of Criminal Justice,** | § | |
| **Institutional Division,** | § | |
| *Respondent*. | § | |

## MOTION FOR DISCOVERY

### I.     INTRODUCTION

Petitioner Juan Balderas was convicted and sentenced to death in 2014 for the murder of Eduardo "Powder" Hernandez—a murder he did not commit.  He was framed by two leaders of his street gang (La Tercera Crips ("LTC"))—Israel "Cookie" Diaz and Victor "Gumby" Arevalo—who conspired to murder Powder and to pin the crime on Mr. Balderas because Powder had "snitched" on Cookie.  Despite Mr. Balderas being at the home of a family friend on the night of the murder (corroborated by three witnesses with him at the time), and despite no physical evidence linking Mr. Balderas to the crime, the State charged and arrested Mr. Balderas based solely on an eye-witness photograph identification, which was only procured after that witness was twice unable to identify the shooter and only after the officers supposedly told the eye-witness to put her finger over portions of the photographs to partially cover their faces.  The key testimony at trial consisted of the faulty eye-witness testimony, self-serving testimony from Cookie himself, and the fact that Mr. Balderas was arrested while carrying a box of weapons that contained the murder

weapon, which Gumby had given to Mr. Balderas earlier that morning. These three pieces of evidence were the only evidence used to secure a conviction and death sentence for Mr. Balderas.

In its zealousness in securing the conviction, the State withheld a mountain of exculpatory evidence on each of these three pillars. The State withheld impeachment evidence of its notes with "Cookie" where he gave multiple differing accounts of Mr. Balderas's "confession" throughout the years, including one where Mr. Balderas never made any confession at all. The State withheld evidence that another LTC gang member who was supposedly at the "confession" told investigators that Mr. Balderas never made any confession. The State also withheld evidence that LTC members, including Cookie, told investigators that Mr. Balderas was tasked with disposing of LTC's weapons. Finally, the State withheld evidence that the officers who secured the photographic identification were accused of playing "Where's Waldo" with eyewitnesses and putting their fingers on photographs to coerce a positive identification. While a small portion of this information was adjudicated during the state habeas proceeding, the majority is unadjudicated evidence that could not have been obtained through diligence—for the simple reason that the State hid the evidence.

Mr. Balderas's conviction was also secured through, in part, his trial counsel's ineffective assistance of counsel including, among others, trial counsel's failure to conduct an adequate investigation into Mr. Balderas's innocence that included a refusal of counsel to secure testimony from Mr. Balderas's alibi witnesses (who specifically offered to help but were rejected), counsel's failure to present an expert on eyewitness identification, failure to investigate juror misconduct, and counsel's failure to investigate and present readily available mitigation evidence. During Mr. Balderas's state habeas proceedings, the court denied Mr. Balderas the opportunity to introduce evidence on many of these failures. While the issue of ineffective assistance was adjudicated by

the state court, the court severely limited Mr. Balderas's ability to introduce evidence and allowed the State to present affidavits from Mr. Balderas's trial counsel but denied him the opportunity to confront and cross examine them on their assertions. Mr. Balderas has thus presented a prima facie case of ineffective assistance of counsel and the state court's adjudication was contrary to federal law and unreasonable, and thus discovery is necessary to adequately address these claims.

Accordingly, Mr. Balderas brings this Motion for Discovery before this Court and requests discovery in support of six claims (Claims I, II, III, IV, and VI).

## II. BACKGROUND

### A. La Tercera Crips ("LTC") Street Gang

LTC is a street gang based in southwest Houston with a neighborhood subgroup in the Alief neighborhood. Petition for Writ of Habeas Corpus ("Pet.") ¶ 56, ECF No. 2. Gumby was the leader of LTC Alief in 2004 and 2005, and Cookie was his close friend and right-hand man. *Id.* ¶¶ 57-58. While Gumby and Cookie were involved in the more violent side of LTC's business, Mr. Balderas's role was to hold onto and transport LTC's shared guns and generally did not agree with "bringing on heat to" LTC. *Id.* ¶¶ 58-59.

### B. Powder "Snitches" On Cookie and Implicates Him in a Murder

On December 3, 2004, Powder was arrested by the Houston Police Department with a stolen vehicle. *Id.* ¶ 62. A shell casing found in the vehicle matched ballistics evidence in a murder. *Id.* In conversations with investigators, Powder revealed that Cookie had been bragging about committing the murder. *Id.* ¶ 63.

Following this incident, Powder was considered a "snitch" by Cookie. *Id.* ¶ 65. At the same time, Mr. Balderas had angered Cookie and Gumby by continuing to remain friends with

Powder.  *Id.*  Also during this time, Mr. Balderas had already expressed desires to leave LTC because he "wanted a better life."  *Id.* ¶ 71.

On or about December 3, 2005, Cookie called an LTC meeting to discuss Powder's snitching.  Cookie argued that Powder should be killed on account of the snitching and his involvement with a rival gang, MS-13.  *Id*. ¶ 67.  Mr. Balderas disagreed in front of the entire gang and said that Powder should not be killed.  *Id.* ¶¶ 68-69.  Cookie was furious at Mr. Balderas for what he saw as disloyalty to him.  He was also angry with Mr. Balderas for trying to leave the gang.  To quiet Powder and protect himself, Cookie convinced Gumby to murder Powder and to frame Mr. Balderas.  *Id.* ¶¶ 70-71.

### C.  Powder's Murder

On December 6, 2005, Powder was with his girlfriend Karen Bardales and her sister Wendy Bardales, along with several associates of the gang MS-13.  *Id.* ¶ 73.  That evening, a gunman entered the apartment with a black hoodie and shot and killed Powder.  *Id*. ¶ 77.

On the night of the murder, Mr. Balderas was at the home of Oralia McCrary with three of her children, Anali Garcia, Octavio Cortes, and Ileana Cortes.  *Id*. ¶ 78.  Anali, Ileana, and Octavio all independently recall that Mr. Balderas spent all afternoon and evening of December 6, 2005, with them at their family's apartment.  *Id*. ¶ 80.

### D.  The State's Investigation

On the night of the murder, Wendy Bardales told officers that she "got a good look at [the shooter's] face," but that she had "never seen him before."  *Id*. ¶ 82(d).  The next day, HPD Sergeant Norman Thomas Ruland presented Wendy with a photograph array which did not include Mr. Balderas's photograph. *Id.* ¶ 83.  Wendy did not identify anyone as the shooter but did identify

one of the photographs as Cookie, who she had known from a year-long sexual relationship with him. *Id.* ¶ 84.

On December 12, 2005, officers received an anonymous tip that identified Mr. Balderas as the shooter. Sgt. Ruland then presented Wendy with a second photograph array including a photograph of Mr. Balderas. Wendy indicated that Mr. Balderas "could" be the shooter but did not positively identify him. Unsatisfied, Sgts. Ruland and Brian Harris visited Wendy again on December 13, 2005, and had her look at the same photographic array and allegedly told her to cover the top portion of each photograph. Wendy was then suddenly able to identify Mr. Balderas.

On December 16, 2005, HPD officers arrested seven members of LTC including Cookie and Mr. Balderas. *Id.* ¶ 89. Mr. Balderas was arrested while carrying a green plastic container that Gumby had brought to Mr. Balderas earlier that morning. *Id.* ¶ 90. It was later discovered a weapon in the container was the firearm used to kill Powder. *Id.* Mr. Balderas told investigators that LTC had framed him. *Id.* ¶ 91.

### E. Trial Counsel Fails to Conduct an Investigation for Eight Years

Over the course of the next eight years following his arrest, Mr. Balderas's case was reset for trial more than fifty times. *Id.* ¶ 95. During that period, trial counsel almost solely focused their efforts on persuading Mr. Balderas to plead guilty to a crime he did not commit. *Id.* ¶ 99. Trial counsel did, however, repeatedly request disclosure of exculpatory evidence. *Id.* ¶¶ 237-238. Trial counsel only attempted to investigate Mr. Balderas's innocence in the final month prior to his trial and after jury selection had already begun. *Id.* ¶¶ 109-119. Even then, the investigation was largely conducted by Gloria Poa, a legal secretary, whose inexperience in homicide investigation contributed to an inadequate investigation. And trial counsel rejected efforts by alibis who offered to testify that they were with Mr. Balderas on the night of the murder. *Id.*

### F. The Trial of Mr. Balderas

After a jury selection that resulted in a disproportionately white jury, Mr. Balderas's trial was set to begin on February 18, 2014. *Id.* ¶¶ 120-122. On the eve of the trial, Cookie secured a plea deal with the State in exchange for his testimony that Mr. Balderas "confessed" to killing Powder. *Id.* ¶¶ 125-130, 133-135. The State also presented the tainted photo identification, and the murder weapon found in the green box—though did not present any evidence that Mr. Balderas's fingerprints were on the weapon. *Id.* ¶ 286. The defense case rested on the theory that Gumby killed Powder. *Id.* ¶¶ 142-146. However, the defense case reflected the deficient investigation that preceded it and the defense presented no evidence from the (readily available) alibi witnesses that Mr. Balderas was watching movies with them on the night of the murder. On the third day of deliberations, the jury returned a verdict of guilty. *Id.* ¶¶ 168-170.

### G. State Appellate and State Habeas Proceedings

Mr. Balderas's motion for a mistrial/new trial was denied without hearing on April 21, 2014. *See id*. On April 27, 2015, Mr. Balderas filed an appeal with the Texas Court of Criminal Appeals ("TCCA"). *Id.* ¶ 184. The TCCA denied Mr. Balderas's appeal on November 2, 2016. *Id.* ¶ 185.

The trial court appointed the Office of Capital and Forensic Writs ("OCFW") to represent Mr. Balderas in post-conviction state-habeas proceedings. *Id.* ¶ 186. In October 2015, OCFW filed a Motion for Disclosure of Exculpatory and Impeachment Evidence. *Id.* ¶1 87. Thereafter, the State produced its file to OCFW including undisclosed notes of interviews with Cookie from 2007 and 2008 with contradictory accounts of Mr. Balderas's alleged confession to Cookie. *Id.* ¶ 187-191. It would later be revealed that the State had not produced its full file and had withheld

documents on the basis of privilege and otherwise without any notice or production of a privilege log.

OCFW interviewed Cookie in light of the new evidence, and he recanted his trial testimony and indicated that Mr. Balderas had *not* confessed to killing Powder. *Id.* ¶ 192. Inexplicably at the hearing, however, Cookie recanted this recantation. *Id.* ¶ 197.

In May 2018, the State issued *Brady* disclosures for the first time just days before the state habeas evidentiary hearing, including prosecution notes of interviews with Cookie that undermined his testimony and 561 copies of jail calls made by Cookie that contained further impeachment material. *Id.* ¶¶ 193-195. The state habeas court rejected OCFW's request for a continuance to review this material. *Id.* ¶ 41.

In August 2018, two months after the state habeas proceedings, the State again issued *Brady* disclosures containing further exculpatory information, including a statement that the prosecution had interviewed a fellow gang member who was allegedly present at the "confession," who said no such confession occurred. *Id.* ¶¶ 216. The State has continued to make new disclosures to the undersigned counsel years after Mr. Balderas's trial that further undermined Cookie's testimony, and information that the investigating officers were accused of playing "Where's Waldo" with eyewitnesses to induce a positive identification. *Id.* ¶¶ 219-231.

During Mr. Balderas's state habeas proceedings, the court denied Mr. Balderas the opportunity to introduce evidence in multiple ways. *Id.* ¶¶ 1106-1115. The state habeas court only allowed factual development on two of the fourteen factual issues submitted by Mr. Balderas. *Id.* ¶ 1106. Even still, the state habeas court sharply limited Mr. Balderas's ability to expand the record on those two issues. For example, the state habeas court allowed the State to secure

affidavits from Mr. Balderas's trial counsel but denied him the opportunity to confront and cross examine them on their assertions. *Id.* ¶ 1107.

Ultimately, the state habeas court denied relief on July 20, 2018 and the TCCA denied Mr. Balderas's State Habeas Petition on December 18, 2019. *Id.* ¶¶ 202, 217. Mr. Balderas timely filed this petition on December 15, 2020.

## III. ARGUMENT

### A. Legal Standards

Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts provides that discovery is available upon a showing of "good cause." A petitioner establishes "good cause" when "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)). The Fifth Circuit has stated that the good cause is satisfied "upon a prima facie showing that the petition is entitled to relief." *Washington v. Davis*, 715 F. App'x 380, 385 (5th Cir. 2017).

In *Cullen v. Pinholster*, the Supreme Court held that review under Section 2254 is generally limited to the record that was before the state court. 563 U.S. 170 (2011). Some courts have extended the underlying logic of *Pinholster* to limit the district court's discretion under Rule 6. *See, e.g., Soffar v. Stephens*, No. H-12-3783, 2014 WL 12642575, at *1-2 (S.D. Tex. July 14, 2014). That extension is unwarranted in this case.

First, *Pinholster* makes no mention of the standard for discovery under Rule 6, and for that reason alone, its limitations do not apply. *See, e.g., Conway v. Houk*, No. 2:07-cv-947, 2011 WL 2119373, at *3 (S.D. Ohio May 26, 2011) ("*Pinholster* did not, strictly speaking, alter or even speak to the standards governing discovery set forth in Rule 6" and "[t]hat is reason enough to

refrain from invoking *Pinholster*'s restrictions at the discovery phase."); *Quezada v. Brown*, No. 08-CV-5088 (KAM), 2011 WL 4975343, at *2 (E.D.N.Y. Oct. 19, 2011) ("If the court were to adopt respondent's reading of *Pinholster*, it would render completely meaningless Rule 6 and require the court to determine that *Bracy v. Gramley* is no longer applicable to discovery determinations.").

Second, while *Pinholster* may limit the "federal court's *consideration* of new facts," it "did not clarify whether AEDPA also confined a federal habeas petitioner's *development* of new facts." *Cole v. Davis*, No. H-17-940, 2018 WL 6019165, at *3 (S.D. Tex. Nov. 16, 2018). As such, "[r]eading into Rule 6 a threshold requirement of *Pinholster* 'admissibility' is a heavy and premature burden." *Gibson v. Wetzel*, No. 11-4550, 2016 WL 1273626, at *3 (E.D. Pa. Mar. 31, 2016). The more prudent course is to allow a petitioner to develop the facts "now so that it is not lost forever." *Monroe v. Warden*, No. 2:07-cv-258, 2012 WL 4342890, at *10 (S.D. Ohio Sep. 21, 2012) ("Even if the Court does not yet know whether it will be able to consider the evidence generated by the depositions, prudence in the preservation of evidence suggests strongly that the evidence be taken now so that it is not lost forever.").

Indeed, allowing discovery prior to an evidentiary hearing has efficiency benefits as well: "[a]side from developing the factual basis for a petitioner's claims, discovery may also (1) enable the court to resolve habeas petitions without resorting to an evidentiary hearing; and (2) assist the court in the event that an evidentiary hearing is conducted." Federal Habeas Manual § 6:3; *see also Blackledge v. Allison*, 431 U.S. 63, 81 (1977) (including discovery among "a variety of measures in an effort to avoid the need for an evidentiary hearing"). On the other hand, foreclosing discovery provides a perverse incentive to the State to purposefully withhold exculpatory evidence during the state court proceedings that it knows will never see the light of day under an expansive

interpretation of *Pinholster*. *See Sample v. Colson*, 958 F. Supp. 2d 865, 889 (W.D. Tenn. 2013) ("[A]llowing a *Pinholster* bar on discovery would mean that the State could thwart any adjudication of facts underlying a federal claim simply by withholding the facts during the state-court proceedings.").

In addition, "[t]he very nature of [habeas proceedings] demands that [they] be administered with the initiative and flexibility essential to insure that miscarriages of justice within [their] reach are surfaced and corrected." *Harris*, 394 U.S. at 291. Capital cases in particular underscore the need for heightened procedural safeguards because the sentence is final and irreversible. *See, e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 422 (1995) (The "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case."). As such, limiting discovery at this time is contrary to the exploration of substantive justice, and the good cause standard should apply, as this Court has applied post-*Pinholster*. *See Wolf v. Davis*, 2019 WL 5864600, at *1-2 (S.D. Tex. Nov. 8, 2019) (Bennett, J.).

Nevertheless, even if *Pinholster* applies at this phase (and it does not), its limitations do not apply when: (1) for exhausted claims, the petitioner meets either exception in §2254(d) (the decision below is contrary to or is an unreasonable application of federal law or unreasonable decision); or, (2) for unexhausted claims, the petitioner meets either exception in §2254(e)(2) (new rule or factual predicate that could not have been previously discovered through the exercise of due diligence). *See, e.g.*, *Smith v. Cain*, 708 F.3d 628, 634, 635 (5th Cir. 2013) (holding that *Pinholster* "does not forbid" allowing an evidentiary hearing where the "judge determined on the basis of the state court record that the state court's *Batson* analysis 'was contrary to, or at least involved an unreasonable application of, clearly established Federal law'" and also describing that a hearing was not in error if the petitioner "develop[ed] the basis of his claim as required under 28

U.S.C. § 2254(e)(2)"); *id.* at 635 ("*Pinholster's* limitation on federal evidentiary hearings does not apply once the district court concluded, solely on the basis of the state court record, that the state trial court unreasonably applied federal law. Because the state court decision is no longer entitled to deference, the federal court is free to properly address the claim and grant appropriate relief.").[1]

Mr. Balderas's petition sufficiently alleges all of the necessary elements to make out a prima facie claim for relief with respect to each claim for which he seeks discovery. And with respect to each claim for which Mr. Balderas requests discovery, the petition sufficiently alleges, on the basis of specific factual allegations, that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1); that the state court decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254 (d)(2); or that the state court did not adjudicate the claim on the merits and the new evidence falls into an exception under §2254(e).

### B.     Mr. Balderas Has Good Cause for Discovery on Claim I

In Claim I, Mr. Balderas alleges that the State failed to disclose a tidal wave of exculpatory and impeachment evidence to defense counsel in violation of *Brady*. *See* Pet. ¶¶ 232-367. That evidence includes contradictory testimony from Cookie on the circumstances of the "confession," including a version where Mr. Balderas never confessed, evidence that another LTC gang member

---

[1] *See also Cole*, 2018 WL 6019165, at *4 ("*Pinholster* does not completely foreclose the discovery Cole seeks relevant to his exhausted claims. If Cole can meet § 2254(d)'s requirements, factual development may be appropriate."); *Soffar*, 2014 WL 12642575, at *2 ("*Pinholster*, however, does not completely foreclose all discovery in habeas cases. For instance, once a state prisoner meets section 2254(d)'s requirements, he must also conclusively prove that he 'is in custody in violation of the Constitution or laws or treaties of the United States.' In that case, factual development may be appropriate to determine whether the prisoner's constitutional rights have been violated." (internal cites omitted)).

supposedly present at the confession stated that Mr. Balderas never confessed, and evidence that the officers were playing "Where's Waldo" with witnesses and putting their fingers over suspects. Mr. Balderas has therefore made out a prima facie claim that he is entitled to relief and discovery is warranted.

While a portion of Cookie's contradictions were adjudicated in the State Habeas proceeding, much was not and it should therefore be considered a "new claim" as a whole for purposes of *Pinholster* (should the court apply it). In *Pinholster*, the Court explained that its ruling generally limiting evidence to the state court record did not apply where the petitioner meets an exception under §2254(e)(2). *Cullen*, 563 U.S. at 185–86. In doing so, the Court endorsed a hypothetical posed by Justice Sotomayor as an example of a "new claim." *Id.* at 186 n.10. Justice Sotomayor asked what if "a petitioner who diligently attempted in state court to develop the factual basis of a claim that prosecutors withheld exculpatory witness statements in violation of *Brady*," and "the state court denied relief on the ground that the withheld evidence then known did not rise to the level of materiality required under *Brady*" *Id.* at 214 (Sotomayor, J., dissenting). She continued that, what if "[b]efore the time for filing a federal habeas petition has expired," the "state court orders the State to disclose additional documents the petitioner had timely requested under the State's public records Act." *Id.* And, what if those "disclosed documents reveal that the State withheld other exculpatory witness statements, but state law would not permit the petitioner to present the new evidence in a successive petition." *Id.* at 214-15. The majority agreed this might present a new claim that would not be subject to the evidentiary limits. *Id.* at 185 n.10.

The nearly exact (and worse) situation has occurred here. Mr. Balderas made repeated, timely requests for all *Brady* material to the State, beginning in 2007, seven years before his trial. Pet. ¶ 237-246. It was not until the state habeas proceeding, and after three motions and a court

order, that the State disclosed for the first time, among others, prosecutor notes from interviews with Cookie that contradicted his testimony and 16 CDs of jail calls made by the star witness containing more impeachment material. *Id.* ¶¶ 244-246. The jail call disclosures were made just days before the state habeas hearing and the state court refused a continuance for habeas counsel to review the disclosures. As such, Mr. Balderas was unable to present evidence within the jail calls contradicting Cookie's testimony. Worse, the State withheld further exculpatory evidence until *after* the State Court habeas proceeding that was never allowed to be presented to the state court. After the state habeas proceeding, the State made a self-styled *Brady* disclosure that a fellow LTC gang member had told prosecutors in 2013 that that, contrary to Cookie's testimony, Mr. Balderas never "confessed" in front of him and others in the gang. *Id.* ¶ 247. Making matters even worse, it was not until federal habeas counsel was engaged that the State disclosed, in late 2020, further prosecutor notes undermining Cookie's testimony and provided evidence that the officers who procured a photo spread identification had been playing "Where's Waldo" with witnesses and directing witnesses to identify suspects. *Id.* ¶¶ 248-52. The newly disclosed evidence on the lineup identified a potential practice of the investigating officers of using suggestive tactics during photo lineups that trial counsel did not have an opportunity to investigate.

In addition, the State withheld evidence supporting the defense theory that Mr. Balderas was merely holding the LTC guns the day he was arrested. *Id.* ¶¶ 282-94. Notably, the State presented no testimony at trial regarding whether Mr. Balderas's fingerprints were found on the murder weapon. *Id.* ¶ 286. Moreover, the State withheld evidence that Mr. Balderas was simply getting rid of the guns on the day of his arrest, evidence that "everyone gave [Mr. Balderas] guns to hold," and evidence that Cookie gave contradictory testimony regarding the LTC's practice of sharing guns. *Id.* ¶¶ 287-94.

In sum, the petition demonstrates that the State engaged in a troubling pattern of withholding evidence in violation of *Brady*, and that there is good cause for discovery to adequately address Mr. Balderas's claims. As such, Mr. Balderas has shown that discovery related to this claim is more than likely to lead to relevant evidence. Accordingly, Mr. Balderas requests the following discovery at this time:

1. Production of any documents and communications regarding the State's fingerprint testing of the murder weapon.

2. Physical inspection of the murder weapon.

3. Leave to subpoena the Houston Police Department for documents and communications regarding misconduct or claims of misconduct, whether resulting in disciplinary action or supported by evidence, as to investigating officers Sgt. Norman Thomas Ruland and Sgt. Brian Harris related to witness identification of suspects through photographic arrays.

4. Leave to subpoena Sgt. Thomas Ruland and Sgt. Brian Harris for depositions regarding identification of suspects through photographic arrays.

5. Leave to subpoena state prosecutors Traci Bennett, Caroline Dozier, and Mary McFadden for depositions regarding their failure to disclose exculpatory and impeachment evidence to Mr. Balderas prior to his trial.

6. Leave to subpoena Israel "Cookie" Diaz for a deposition regarding contradictions in his testimony against Mr. Balderas and other evidence concerning Cookie uncovered by the subsequent disclosures of *Brady* materials by the State.

**C.    Mr. Balderas Has Good Cause for Discovery on Claims II, III, and IV**

In Claim II and Claim III, Mr. Balderas alleges ineffective assistance of his trial counsel at the guilt/innocence phase and punishment phase respectively. *See* Pet. ¶¶ 368-759. In Claim IV, Mr. Balderas also alleges ineffective assistance counsel on direct appeal. *Id.* ¶¶ 760-808. Good cause exists for discovery as to each of these claims.

Mr. Balderas specifically alleges that his trial counsel was ineffective on the basis of, among others, counsel's failure to address Mr. Balderas's primary migration theme during jury

selection, counsel's failure to timely assert Mr. Balderas's right to a speedy trial, counsel's failure to conduct an adequate investigation into Mr. Balderas's innocence, counsel's failure to fully investigate and present a readily available alibi defense, counsel's failure to present an expert on eyewitness identification, counsel's failure to investigate juror misconduct, counsel's failure to investigate evidence of extraneous offenses allegedly committed by Mr. Balderas, counsel's failure to investigate and present readily available mitigation evidence, and counsel's failure to preserve objections on the record. *Id.* ¶¶ 386-759.

While Mr. Balderas waited eight years to stand trial, his counsel opted to focus their efforts on convincing Mr. Balderas to take a plea deal for a crime which he did not commit. Trial counsel ignored Mr. Balderas's repeated pleas to investigate his innocence, which resulted in Mr. Balderas filing a *pro se* motion for substitute counsel in 2012. *Id.* ¶ 483. A month before trial, Mr. Balderas's counsel had not yet conducted a single interview relevant to Mr. Balderas's innocence. *Id* ¶ 484. When trial counsel did finally attempt an eleventh-hour investigation, it was conducted primarily by a legal secretary, Gloria Poa, who lacked the skills and expertise to sufficiently investigate Mr. Balderas's innocence. *Id.* ¶¶ 484, 500. But the duty of trial counsel to conduct a fulsome investigation, especially in the context of a capital murder, "may not be sloughed off" on someone else. *Butler v. State of Texas*, 716 S.W.2d 48, 55 (Tex. Crim. App. 1986); *see also Bell v. Georgia,* 554 F.2d 1360, 1361 (5th Cir. 1977) (concluding that attorney's performance was unreasonable where he knew of alibi witnesses and did not contact them because accused agreed to contact witnesses himself).

Post-conviction investigation uncovered a wealth of easily obtainable evidence pointing to Mr. Balderas's innocence, evidence demonstrating the guilt of alternate suspects, and evidence

supporting his alibi defense that those alibis offered to testify but were refused by trial counsel. Pet. ¶¶ 485-540.

Likewise, the petition specifically alleges the litany of ways in which trial counsel's investigation and presentation of mitigation evidence at the punishment phase was deficient. *Id.* ¶¶ 608-99. For example, trial counsel: failed to investigate the evidence of extraneous offenses the State alleged were attributable to Mr. Balderas leaving the allegations largely unrebutted; failed to investigate and present evidence that Mr. Balderas was dissociating from the LTC gang with hopes of furthering his education; failed to adequately investigate and present mitigating evidence regarding Mr. Balderas's lifelong exposure to violence, crime, and sexual abuse; failed to investigate and present Mr. Balderas's history of serious mental illness; and failed to investigate and present evidence of Mr. Balderas's good character. *Id.*

And, in perhaps the most disturbing example of trail counsel's apathy toward defending Mr. Balderas, Mr. Nunnery revealed to the jury in his punishment phase closing arguments that he was "going to pick up [his] stuff . . . and walk out of this courtroom" and that he would "not be here when you return your verdict." *Id.* ¶ 742. Mr. Nunnery did in fact leave before the jury finished deliberations to *join his wife on a vacation to Florida*—signaling to the jury and Mr. Balderas that his trip to Florida was more important than Mr. Balderas's life. *Id.* ¶¶ 742-43.

Mr. Balderas's also specifically alleges that appellate counsel was ineffective in a multitude of ways including the failure to present evidence to support ineffective assistance of trial counsel, failure to present evidence concerning the false testimony of Cookie, the failure to present an available alibi defense, the failure to raise trial counsel's failure to introduce mitigation evidence, the failure to raise the issue of the suggestive photo spread, the failure to raise *Brady* issues, and the failure to raise prosecutorial misconduct in the State's closing argument. *Id.* ¶¶ 760-808.

Worse, during the state habeas proceedings, the only direct factual development that the state habeas court permitted on this claim was state-procured affidavits of trial counsel limited to their failure to present alibi witnesses. *Id.* ¶ 1105. But Mr. Balderas was denied the right to confront and cross-examine his trial counsel, in violation of his right to due process. *Id.* ¶ 1107; *see also Goldberg v. Kelly*, 397 U.S. 254, 269 (1970) ("[A]lmost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses."); *Ellis v. Capps*, 500 F.2d 225, 227 (5th Cir. 1974) ("Cordoning off a highly relevant area of inquiry such as the bias and prejudice of a complainant is repugnant to the principle of a fair trial."); *Carter v. Morehouse Par. Sch. Bd.*, 441 F.2d 380, 382 (5th Cir. 1971) ("A ruling based on evidence which a party has not been allowed to confront or rebut is one which denies due process.").

As a result of the deficient process in the state habeas court, the record upon which the court based its findings of fact and conclusion of law was inadequate and the claim was not adjudicated on the merits. *See Winston v. Kelly*, 592 F.3d 535, 555-56 (4th Cir. 2010) ("If the record ultimately proves to be incomplete, deference to the state court's judgment would be inappropriate because judgment on a materially incomplete record is not an adjudication on the merits for purposes of § 2254(d)."). Accordingly, the court should give no deference to the state court decision and review this claim *de novo* without the limitations of §2254(d) and *Pinholster*. *See Cone v. Bell*, 556 U.S. 449, 472 (2009) (holding that where a state court "did not reach the merits" of a claim, "federal habeas review is not subject to the deferential standing that applies under AEDPA to 'any claim that was adjudicated on the merits in State court proceedings'" and "[i]nstead, the claim is reviewed *de novo*.").

Regardless, even if *Pinholster* applied, Mr. Balderas has presented a prima facie case that the state habeas court's denial of Mr. Balderas's ineffective assistance of counsel claims was both "contrary to, or involved an unreasonable application of, clearly established Federal law" and an "unreasonable determination of the facts in light of the evidence presented." *See* 28 U.S.C. § 2254(d)(1)-(2). Moreover, the specific allegations of Mr. Balderas's counsel's repeated failures demonstrate that the requested discovery is likely to lead to relevant evidence in further support of his claims. Accordingly, Mr. Balderas has "good cause" for discovery with respect to these claims. Specifically, Mr. Balderas requests the following discovery:

1. Leave to subpoena Alvin Nunnery, Jerome Godinich, Robert R. Scott, R. Scott Shearer, and Gloria Poa for all documents and communications in their possession related to the representation of Mr. Balderas.

2. Leave to subpoena Alvin Nunnery, Jerome Godinich, Robert R. Scott, R. Scott Shearer, and Gloria Poa for depositions regarding the representation of Mr. Balderas.

3. Production of all State documents and communications regarding Mr. Balderas's mental health.

## D. Mr. Balderas Has Good Cause for Discovery on Count VI

In Claim VI, Mr. Balderas alleges that African Americans were excluded from his jury in violation of his rights under the Equal Protection Clause. *See* Pet. ¶¶ 823-58. Mr. Balderas specifically alleges that 206 of the 273 prospective jurors were excused without examination. *Id.* ¶ 832. The discussion leading to those decisions were held off the record and there is no indication of either party's basis for the broad excusals. *Id.* In the end, Mr. Balderas's jury did not contain a single African American man and only one African American woman despite African Americans making up 23.6% of the venire. *Id.* ¶ 834. In contrast, white prospective jurors, overall and white men made up 52.3% and 27.0% of the venire respectively, but ultimately made up 71.4% and 42.9% of the jury respectively. *See id*.

Numerous African American veniremembers were not permitted to proceed to individual voir dire, even though they shared the same relevant characteristics gleaned from the juror questionnaire as those of other races who were permitted to proceed. *Id.* ¶¶ 839-40. This leaves only one possibility for their excusal without examination—race. Moreover, the Harris County District Attorney's Office has a documented history of discrimination in jury selection. *See, e.g., Rosales v. Quarterman,* No. H-03-1016, Mem. and Order at 47 (S.D. Tex. Dec. 12, 2008) (ECF No. 109); *Jones v. State,* 431 S.W.3d 149, 154-62 (Tex. App. 2013); *Moore v. State,* 265 S.W.3d 73, 86-90 (Tex. App. 2008); *State v. Thomas,* 209 S.W.3d 268, 275 (Tex. App. 2006).

While this claim was adjudicated on the merits, Mr. Balderas has made a prima facie case that the TCCA's decision was an unreasonable application of clearly established federal law of *Batson* and its progeny. *See* Pet. ¶¶ 846-58. Indeed, the makeup of Mr. Balderas's venire and jury are strikingly similar to the jury selection the Supreme Court found discriminatory in *Miller-El v. Dretke,* 545 U.S. 231, 240-241 (2005), where, out of twenty African Americans in a 108-person venire, only one ultimately served. *See also Price v. Cain*, 560 F.3d 284, 287 (5th Cir. 2009) (holding that the fact that "[t]he State used six of its twelve preemptory challenges to strike African-Americans from the venire, and the resulting jury was all white" was sufficient to infer racial discrimination).

The allegations further demonstrate that discovery with respect to this claim is likely to lead to relevant evidence supporting the claim, namely evidence related to the off-the-record collusion to strike African Americans from the jury without examination. Accordingly, Mr. Balderas has "good cause" for the requested discovery. Specifically, Mr. Balderas requests the following discovery:

1. Production of all State documents and communications related to the acceptance or exclusion of venire members or jurors.

2. Leave to subpoena state prosecutors Traci Bennett, Caroline Dozier, and Mary McFadden for depositions regarding the acceptance or exclusion of venire members or jurors.

3. Leave to subpoena Alvin Nunnery, Jerome Godinich, Robert R. Scott, and R. Scott Shearer for depositions regarding the acceptance or exclusion of venire members or jurors.

## IV.     CONCLUSION

For the reasons outlined above, Mr. Balderas respectfully requests that the Court grant his Motion for Discovery.

Dated: March 22, 2021                      Respectfully submitted,

                                           DLA PIPER LLP (US)

                            By:    *s/ Ashley Allen Carr*
                                   Ashley Allen Carr (Tex. Bar No. 24082619)*
                                   Jeffrey E. Tsai**
                                   Marc A. Silverman**
                                   Jonathan Berke***
                                   Jessica Park Wright**

                                   *Pro Bono Attorneys for Petitioner Juan Balderas*

*   *Attorney-in-charge as required by Local Rule 11.3*
** *Admitted Pro Hac Vice*
*** *Pro Hac Vice Motion Pending*

**AVERMENT OF CONFERENCE**

I hereby aver that I have conferred with counsel for Respondent, Assistant Attorney General Tomee Heining, who has indicated that the Respondent opposes this motion.


_s/ Marc A. Silverman_____
Marc A. Silverman


Dated: March 22, 2021

## CERTIFICATE OF SERVICE

I certify that on March 22, 2021, a true copy of the foregoing Request for Oral Argument on Petitioner's Motion for Discovery was served via the ECF/CM system and email to the following recipients:

Tomee Heining
Office of the Attorney General
300 W. 15th Street
Austin, Texas 78701
tomee.heining@oag.texas.gov

*s/ Marc A. Silverman*_____
Marc A. Silverman

Dated: March 22, 2021