# POST CONVICTION

FROM: 179TH DISTRICT COURT

OF

HARRIS COUNTY, TEXAS

RECEIVED IN
COURT OF CRIMINAL APPEALS

SEP 17 2018

Deana Williamson, Clerk

## JUAN BALDERAS
### 1412826-A

BEST COPY AVAILABLE

APPLICANT

VS.

THE STATE OF TEXAS

RESPONDENT

# VOLUME 10 OF 22

   REV. 01-02-04

CAUSE NO. 1412826-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 179th DISTRICT COURT |
| | § | OF |
| JUAN BALDERAS,<br>Applicant | § | HARRIS COUNTY, TEXAS |

## STATE'S PROPOSED FINDINGS OF FACT,
## CONCLUSIONS OF LAW AND ORDER

Having considered the applicant's application for writ of habeas corpus and associated exhibits; the State's Original Answer and associated exhibits; testimony presented at a post-conviction evidentiary hearing; arguments of counsel; and official court documents, filings, and records in cause nos. 1412826 and 1412826-A; the Court makes the following findings of fact and conclusions of law in cause no. 1412826-A:

## I.
## FINDINGS OF FACT

1. The applicant, Juan Balderas, was indicted and convicted of the felony offense of capital murder in cause no. 1412826[1] in the 179th District Court of Harris County, Texas, for the murder of Eduardo Hernandez, hereinafter called the complainant.

2. The applicant was represented during trial by attorneys Jerome Godinich, Jr., Alvin Nunnery, Robert Scott, and Scott Shearer.

3. On February 27, 2014, the jury found the applicant guilty as charged in the indictment (XXXII R.R. at 11).

4. On March 14, 2014, after the jury affirmatively answered the first special issue and negatively answered the mitigation special issue, the trial court assessed the applicant's punishment at death by lethal injection (XLIV R.R. at 8-12).

5. On November 2, 2016, the Court of Criminal Appeals affirmed the applicant's conviction in a published opinion. *Balderas v. State*, 517 S.W.3d 756 (Tex. Crim. App. 2016)(reh'g dism'd).

---

[1] This offense was originally indicted as cause no. 1064857, then re-indicted as cause no. 1299912, and ultimately re-indicted as cause no. 1412826.

6.  Israel Diaz is a self-admitted former member of the La Tercera Crips ("LTC") criminal street gang, who at the time of the applicant's trial had been in the Harris County Jail for over seven years on unrelated aggravated robbery and capital murder charges (XXVI R.R. at 121-22, 126, 132-33).

7.  Between 2007 and the applicant's trial in 2014, Diaz spoke with prosecutors assigned to the applicant's case on multiple occasions in the presence of his attorneys (XXVI R.R. at 124-26).

8.  Attorney Roland Moore originally represented Diaz, but was forced to withdraw for health reasons, and Diaz was subsequently represented by Allen Isbell and David Bires (*Id.* at 163-65).

9.  The Court finds handwritten notes now marked as the Applicant's Exhibit 57, are 23 pages of handwritten notes from pretrial interviews prosecutors Caroline Dozier and George Weissfisch conducted with Diaz in 2007 and 2008. *Infra* at *Third Ground for Relief*, nos. 75, 82.

10. The Court finds prosecutor Traci Bennett created typed notes from pretrial interviews she conducted with Diaz on January 27, 2014 and February 14, 2014 (II Post-Conviction Writ Status Conference—May 2, 2018 at 58); *Applicant's Motion to Supplement the Record and to Expand the Evidentiary Hearing* at Exhibit B (p.10-12).

11. The Court finds former prosecutor Spence Graham prepared a capital murder summary in the applicant's case dated April 27, 2011 which was an in-house report summarizing "the essential facts of the case … and contemplat[ing] on … all those things that would go into the determination on whether to certify it as capital and seek the death penalty[,]" and which included proffered testimony from Israel Diaz (II Post-Conviction Writ Status Conference—May 2, 2018 at 9); *Applicant's Motion to Supplement the Record and to Expand the Evidentiary Hearing* at Exhibit B (p.1-9).

12. The Court finds the capital murder summary in the applicant's case does not incorporate any disclosures made by Diaz subsequent to April 27, 2011.

13. On February 19, 2014, Diaz testified as a State's witness in the applicant's trial (XXVI R.R. at 118-96).

02758

14. In exchange for Diaz's truthful testimony in the applicant's trial, as well as in future trials of LTC members Efrain Lopez and Jose Hernandez, the State agreed to reduce Diaz's capital murder charge to an aggravated robbery, and allow Diaz to concurrently plead guilty to the trial court on both charges without a recommendation on punishment from the State (*Id.* at 122-24).

15. Two days prior to his testimony in the applicant's case, Diaz pleaded guilty to both charges against him, and at the time of his trial testimony, was awaiting sentencing by the trial court judge (*Id.* at 122-23).

16. At trial, Diaz testified the applicant sponsored the complainant's membership in LTC, and the complainant was "cliqued in" as a member of LTC (*Id.* at 137-38).

17. At trial, Diaz testified that in 2004, he stole a car at gunpoint; loaned the stolen car to the complainant; the police stopped the complainant in the stolen car; the complainant told police he had gotten the car from Diaz; and Diaz was subsequently charged with aggravated robbery (*Id.* at 139-42).

18. At trial, Diaz testified he was released on bond in his aggravated robbery case in April 2005, and three weeks later, he spoke with the complainant and discouraged the complainant from cooperating with the police in the case (*Id.* at 143-44).

19. At trial, Diaz testified that although he believed he had the situation with his pending aggravated robbery charge and the complainant under control, Diaz and other LTC members were upset with the complainant for speaking with the police and no longer wanted the complainant in LTC (*Id.* at 141, 145).

20. At trial, Diaz testified the complainant's relationship with LTC members further deteriorated when the complainant was seen associating with rival gang members and photographs were discovered of the complainant "throwing" rival gang signs (*Id.* at 147-50).

21. At trial, Diaz testified that three to four days prior to the complainant's murder, LTC members held a meeting where they voiced their opinions about how to deal with the complainant's behavior (*Id.* at 151-53).

22. At trial, Diaz testified he did not care what happened to the complainant, but preferred that whatever happened be delayed until after the resolution of Diaz's aggravated robbery case so he would not be a suspect (*Id.* at 154).

02757

23. At trial, Diaz testified he first learned that something had happened to the complainant when Efrain Lopez called him at home (*Id.* at 155, 184).

24. At trial, Diaz testified that after receiving Lopez's call, he drove to the home of twins Pedro and Alejandro Garcia, where he met several other LTC members and associates, and learned the complainant had been killed (*Id.* at 151, 157).

25. At trial, Diaz testified that from the Garcia (or twins') house, he and several others drove to a location across the street from the crime scene, where he saw an ambulance and police vehicles, as well as the applicant standing several feet away (*Id.* at 157-59).

26. At trial, Diaz testified the applicant was wearing a dark blue or black sweater-like shirt and khaki pants at the crime scene (*Id.* at 159).

27. At trial, Diaz testified the applicant approached him and the other LTC members who had driven to the crime scene, hugged each of them in a joyful manner, and gave Diaz a kiss on the cheek, which Diaz considered unusual (*Id.* at 159).

28. At trial, Diaz testified that when the applicant gave him a kiss on the cheek, the applicant said something which "basically, just took credit for the whole thing… he said he got him, he finally got him" (*Id.* at 160).

29. At trial, Diaz testified the applicant had a silver handgun, which Diaz had seen on many occasions, and was exchanging the magazine when Diaz interacted with him across from the crime scene (*Id.* at 160-61).

30. The Court finds (a) the proffered testimony contained in the State's capital murder summary, (b) the information contained in the 23 pages of pretrial notes now marked as the Applicant's Exhibit 57, and (c) the information contained in Bennett's typed pretrial interview notes, are materially consistent with Diaz's testimony at the applicant's trial regarding the applicant's involvement in and the circumstances surrounding the complainant's murder. The Court further finds that any inconsistencies are immaterial.

31. Bennett's typed pretrial interview notes reflect that after the complainant's murder, the applicant hugged and kissed Diaz at the twins' house and said "I got him," whereas at trial Diaz testified the applicant hugged and kissed him and said the applicant "got him" across from the crime scene; the Court finds the location of the applicant's conduct is immaterial to the nature of the conduct and the

02758

substance of the disclosure (XXVI R.R. at 159-60); *Motion to Supplement the Record and to Expand the Evidentiary Hearing* at Exhibit B (p.9).

32. Contrary to the applicant's habeas assertions of a trial-day or forced fabrication, the Court finds Bennett's typed pretrial interview notes with Diaz reflect that prior to trial, Diaz informed the State of the applicant's confession; the applicant's embrace and kiss on the cheek; and that other LTC members wanted to drive through the apartment complex where the shooting had occurred. *Applicant's Motion to Supplement the Record and to Expand the Evidentiary Hearing* at Exhibit B (p.10-12).

33. On May 11, 2018, this Court held an evidentiary hearing to assist the Court in resolving the issue of whether the State either knowingly or unknowingly presented false testimony at trial through Israel Diaz, and with the intention of permitting the applicant to present the testimony of Israel Diaz specific to whether Diaz was recanting his trial testimony; whether Diaz was pressured by the State pretrial to change his testimony; and whether Diaz testified falsely under oath at the applicant's trial. *See State's Proposed Supplemental Order Designating Issues to Be Resolved Via Evidentiary Hearing.*

34. On May 11, 2018, Israel Diaz testified at a post-conviction evidentiary hearing in the applicant's case in the presence of his court-appointed attorney Genesis Draper (IV Post-Conviction Writ Evidentiary Hearing—May 11, 2018 at 126-217).

35. The Court finds that at no point during the post-conviction evidentiary hearing did Diaz recant his trial testimony (*Id.*).

36. The Court finds that at no point during the post-conviction evidentiary hearing did Diaz state he had previously recanted his trial testimony (*Id.*).

37. The Court finds that at the post-conviction evidentiary hearing, Diaz testified he had testified truthfully at the applicant's trial (*Id.* at 186).

38. At the post-conviction evidentiary hearing, Diaz testified he was not scared when he testified in the applicant's trial and was not concerned he himself would face the death penalty (*Id.* at 135-38).

39. The Court finds Diaz's post-conviction evidentiary testimony regarding the complainant's murder was materially consistent with his trial testimony and with the State's summation of Diaz's proffered testimony in the capital murder summary and pretrial interview notes with Diaz.

062755

40. At the post-conviction evidentiary hearing, Diaz provided the following testimony regarding his pretrial interactions with the State:

   a. the State reached out to him in regards to testifying in the applicant's trial, gave him the option of testifying, and put the final decision to testify in his hands (*Id.* at 132, 139, 160, 184, 189, 200-01);

   b. he went through a period where he did not want to cooperate with or testify for the State (*Id.* at 145-46);

   c. he reached back out to the State after the State contacted him (*Id.* at 132);

   d. the State never pressured him into testifying at the applicant's trial, nor did he feel forced to do it (*Id.* at 160-61, 189);

   e. the State never pressured or coerced him to testify to anything other than the truth at the applicant's trial (*Id.* at 186);

   f. the prosecutor told him he needed to "[c]hange the way I express myself verbally, like when I used profanity and slang" but that the prosecutor did not instruct him to change the content of his testimony (*Id.* at 145-46, 148); and

   g. prosecutors did not coach him on what to say at trial (*Id.* at 146-47).

41. At the post-conviction evidentiary hearing, the applicant sought to impeach Diaz's credibility by introducing evidence regarding: Diaz's alleged involvement in an extraneous offense; information Diaz gave the police regarding an individual named Jose Luviano; statements Diaz made during an interview with police Sergeant Edward Gonzalez; and statements Diaz allegedly made to an individual named Monica Esquivel (IV Post-Conviction Writ Evidentiary Hearing—May 11, 2018 at 175-81, 214-16).

42. The Court finds that at the post-conviction evidentiary hearing, the applicant misconstrued Diaz's statements to Sergeant Gonzalez and took them out of context in an attempt to unsuccessfully impeach Diaz, and that Diaz consistently told Sergeant Gonzalez he was not involved in the Loma Vista murder and was out of town at the time of that offense (*Id.* at 178-79, 207-10).

43. The Court finds the applicant failed to provide any post-conviction testimony (either live or via affidavit) from Monica Esquivel.

44. At the post-conviction evidentiary hearing, the applicant argued Jose Luviano was charged with murder as a result of statements Diaz made to the police; however,

02760

the Court finds the applicant's assertions regarding the State's charging decision are speculative and irrelevant (*Id.* at 175-81, 214-16).

45. At the post-conviction evidentiary hearing, Diaz provided the following testimony regarding his interaction with the applicant's habeas investigator Adrian de la Rosa:

    a. de la Rosa unexpectedly visited Diaz in custody (*Id.* at 134, 190);

    b. de la Rosa introduced himself as an attorney (*Id.* at 191, 204, 210-11);

    c. Diaz originally thought de la Rosa was an attorney assigned to help him with his parole (*Id.* at 204, 211);

    d. Diaz had a 15 minute conversation with de la Rosa which "was not enough to discuss a very serious case" (*Id.* at 158, 198);

    e. Diaz rushed the meeting with de la Rosa because Diaz wanted to go to his family visit (*Id.* at 135, 198-99);

    f. de la Rosa did not give Diaz anything to review (*Id.* at 204);

    g. towards the end of their meeting, de la Rosa took notes (*Id.* at 191, 203);

    h. at de la Rosa's insistence and instruction that Diaz "wasn't even going to be in trouble and it would help Balderas anyway" and believing that he would be paroled in a few months, Diaz wrote a short statement in his own words for de la Rosa (*Id.* at 142, 205-206);

    i. de la Rosa did not return for a second visit or bring an affidavit for Diaz to sign (*Id.* at 205, 212); and

    j. the words contained in de la Rosa's proffered affidavit (Applicant's Exhibit 7) are not Diaz's words (*Id.* at 142).

46. At the post-conviction evidentiary hearing, Diaz provided the following testimony relating to the handwritten statement he provided habeas investigator de la Rosa:

    a. in the statement, Diaz wrote he felt pressured to cooperate with the State, wanted to end the situation as soon as possible, and felt as if the prosecutors put him on the spot (*Id.* at 159);

    b. Diaz explained he "felt pressured by the circumstance, but I never mentioned the government pressured me or the prosecutors forced me. I just felt the pressure of not having any response for seven years, eight years" (*Id.* at 160);

. 02781

c. Diaz believed that after eight-and-half years of being in custody awaiting the resolution of his own charges, he "felt like [he] had a right to either go to trial and get a plea deal...instead of resetting and resetting" but that he was "not desperate" to get out of custody (*Id.* at 128, 130, 136);

d. Diaz expressed he never felt pressure to testify against the applicant because "that was just decision making," but that after spending so much time in custody awaiting the resolution of his own case, he just "felt the pressure of the case" and "the pressure of the unknown" waiting to know his own fate (*Id.* at 201-202, 213); and

e. Diaz clarified the State did not "put me on the spot to testify against [the applicant]," and his use of the phrase "put me on the spot" meant that he was caught off-guard "when I was not expecting their visit, they just showed up with my attorney" (*Id.* at 140, 160, 185, 199-200, 213).

47. At the post-conviction evidentiary hearing, Diaz testified he never made the following statements to habeas investigator de la Rosa:

a. that the applicant had not confessed to the complainant's murder (*Id.* at 182-83);

b. that he had not seen the applicant at the "Corporate projects" the day the complainant was killed (*Id.* at 183);

c. that he had lied (*Id.* at 183);

d. that he had lied because he felt pressured by the prosecutors (*Id.* at 183);

e. that had lied because he needed to get out of prison (*Id.* at 183);

f. that prosecutors told him to change his testimony to reflect that the applicant had confessed to committing the murder to Diaz (*Id.* at 146);

g. that prosecutors instructed him to testify at trial that the applicant confessed to murdering the complainant (*Id.* at 147);

h. that the reason he did not testify against Efrain Lopez was because he felt guilty about the testimony he gave against the applicant (*Id.* at 154);

i. that there were things he would not put into writing for de la Rosa (*Id.* at 157);

j. that he was afraid his statements would later be used against him (*Id.* at 157-58); and

02762

k. that he would not sign an affidavit because he wanted to speak with an attorney first (*Id.* at 212).

48. On May 11, 2018, Adrian de la Rosa testified at a post-conviction evidentiary hearing in the applicant's case (*Id.* at 218-78, 288-90);

49. Over the State's objection, de la Rosa testified at the post-conviction evidentiary hearing that Diaz told him the District Attorney's Office pressured him to lie at the applicant's trial and told him he needed to say the applicant killed the complainant (*Id.* at 223-24).

50. During de la Rosa's testimony, the Court clarified the purpose of the evidentiary hearing was "focused on whether or not there's an intent or desire to recant the [Israel Diaz] testimony" not whether what Diaz said at trial was truthful or untruthful (*Id.* at 228).

51. At the post-conviction evidentiary hearing, de la Rosa testified:

a. he is a post-conviction investigator with the Office of Capital and Forensic Writs, doing both mitigation and fact investigation, although he lacks any formalized training or certification as an investigator (*Id.* at 218, 236);

b. he has a law degree, but failed the State Bar Examination to become a licensed lawyer (*Id.* at 220, 236);

c. he "enjoy[s] building mitigation stories" (*Id.* at 220, 235-36);

d. he went to Pam Lychner State Jail to speak with Israel Diaz on October 23, 2015 without providing Diaz any advance notice (*Id.* at 221-22, 240-42);

e. he had not reviewed trial testimony prior to visiting Diaz and could not recall what he had reviewed or if he had reviewed the State's evidence presented against the applicant, despite previously stating his office had received the State's voluminous case file on October 21, 2015, and he was able to review the file, develop Diaz as a person of interest to the investigation, and arrange a jail visit with the requisite 24-hour notice by October 23, 2015 (*Id.* at 246-47, 249-51);

f. it would be important to become familiar with a case before interviewing a critical witness, but he did not do so (*Id.* at 249-51);

9

02763

g. he failed to tape-record his interview with Diaz, even though tape-recorded evidence is more useful in court compared to repeating what another person said, or relying on fragments of notes about what someone said (*Id.* at 252-53);

h. he did not tell Diaz he was a lawyer (*Id.* at 222);

i. it was not his job to care about Diaz's constitutional rights (*Id.* at 256-57);

j. he did not advise Diaz he could face legal consequences for perjury, nor did he advise Diaz of his right to consult with counsel prior to speaking with de la Rosa (*Id.* at 255-56);

k. he asked Diaz to make a written statement at the close of their first meeting, which Diaz resisted, but de la Rosa convinced him to do it immediately and provided Diaz pen and paper because de la Rosa he did not want to leave without something in hand (*Id.* at 229, 243, 278);

l. in the written statement Diaz provided de la Rosa, Diaz did not state he had lied at the applicant's trial, but de la Rosa claimed Diaz told him so orally (*Id.*);

m. de la Rosa returned to the jail the following week to substitute a formal statement he had written for the handwritten statement Diaz had previously given, but Diaz refused to sign de la Rosa's statement, and per de la Rosa, Diaz said he was afraid he would get in trouble for admitting he had lied at the applicant's trial (*Id.* at 231-32);

n. although it is the general practice of the Office of Capital and Forensic Writs to document every witness interaction, de la Rosa did not create a memorandum to document his purported visit to Diaz on October 30, 2015 (*Id.* at 259-60); and

o. in the affidavit he prepared regarding his interactions with Diaz, de la Rosa: put quotation marks around sentences he attributed to Diaz which were not Diaz's direct words and which did not appear in de la Roas's handwritten notes; filled in words from memory which he attributed to Diaz, but that did not appear in de la Roas's handwritten notes; and included information that did not appear in de la Roas's handwritten notes, but that he thought Diaz had said during the interview (*Id.* at 266-70).

52. The Court finds de la Rosa's practice of drawing from memory to prepare his habeas affidavit by attributing statements to Diaz from memory, which are not verbatim Diaz's own words, to be suspect and to cast doubt about his general credibility.

02764

53. The Court finds suspect that the applicant claims Diaz refused to sign an affidavit de la Rosa prepared and presented at a October 30, 2015 meeting, but this meeting goes unmentioned in de la Rosa's file and de la Rosa failed to produce the affidavit he claims to have written for Diaz to sign (*Id.* at 259-61); *Applicant's Ex. 7* at 4-5.

54. The Court finds de la Rosa gave conflicting testimony at the post-conviction evidentiary hearing regarding whether or not he told Diaz it would be helpful if Diaz gave de la Rosa an immediate written statement, namely:

    a. on direct examination, de la Rosa initially testified he did not tell Diaz he "needed [Diaz] to help [de la Rosa] out and it would help Juan Balderas if he wrote a statement" (IV Post-Conviction Writ Evidentiary Hearing—May 11, 2018 at 223);

    b. later on direct examination, de la Rosa admitted to telling Diaz that a written statement would be helpful, before immediately correcting himself, "[Diaz] initially said he'd like to sleep on it, but after – you know, I just said it would be helpful -- not helpful, it would be encompassing the conversation that we had right now" (*Id.* at 229); and

    c. on cross-examination, when confronted with his inconsistent responses, de la Rosa conceded he had instructed Diaz that providing a same-day statement would be helpful for the applicant (*Id.* at 244).

55. The Court finds de la Rosa's post-conviction testimony and habeas affidavit (Applicant's Exhibit 7) regarding his conversation with Diaz are disingenuous.

56. The Court finds both de la Rosa's post-conviction testimony and hearsay habeas affidavit (Applicant's Exhibit 7) to be unpersuasive evidence of Israel Diaz's alleged recantation or false testimony.

57. At the close of the post-conviction evidentiary hearing, the Court sustained the State's objections to the applicant's introduction into evidence of two affidavits from prison inmates Efrain Lopez and Jose Hernandez, purporting to contradict Diaz's trial testimony, which were notarized by de la Rosa; nevertheless, the Court permitted the applicant to include these affidavits as part of the record for appellate review (IV Post-Conviction Writ Evidentiary Hearing—May 11, 2018 at 280-88, 291-95; V Post-Conviction Writ Evidentiary Hearing—May 11, 2018 at Exhibits 2-3).

58. De la Rosa testified he met with inmates Lopez and Hernandez in prison; failed to record their interviews; did not ascertain whether either inmate was represented by

. 02765

counsel; did not apprise either inmate of their legal rights; did not bring his notes from either of those meetings to court with him; and that both affidavits were in de la Roas's handwriting (IV Post-Conviction Writ Evidentiary Hearing—May 11, 2018 at 280-90).

59. The Court finds the proffered habeas affidavits of Efrain Lopez and Jose Hernandez are unpersuasive impeachment or false testimony evidence against Diaz (V Post-Conviction Writ Evidentiary Hearing—May 11, 2018 at Exhibits 2-3).

60. The Court also denied the applicant's request to expand the evidentiary hearing to permit testimony on the potential dangers of informant testimony; nevertheless, the Court permitted the applicant to include a declaration from Professor Brandon L. Garrett regarding informant testimony as part of the record for appellate review (IV Post-Conviction Writ Evidentiary Hearing—May 11, 2018 at 300-02; V Post-Conviction Writ Evidentiary Hearing—May 11, 2018 at Exhibit 1).

61. The Court finds the post-conviction affidavit of Diaz's trial counsel Allen Isbell, State's Habeas Exhibit 1, credible and persuasive, and the facts asserted therein to be true.

62. Per Isbell's credible affidavit,

> [t]he meetings that I attended between Diaz and the prosecutors did not occur in the manner set forth in de la Rosa's affidavit. Specifically, there was never a time when I was present in a meeting between the prosecutors and Diaz where the prosecutors told Diaz to change any portion of his story. Additionally, I was present in the courtroom when Diaz testified at guilt/innocence during the Balderas' trial, and his testimony was consistent with what I expected it to be.

*State's Habeas Ex. 1, affidavit of Allen C. Isbell.*

63. The Court finds Isbell's credible affidavit refutes the applicant's habeas assertions that (a) prior to trial, prosecutors told Diaz to change his story regarding the primary offense, and that (b) Diaz never told prosecutors that the applicant admitted to killing the complainant. *Id.*

64. The Court finds the post-conviction affidavit of trial prosecutor Traci Bennett, State's Habeas Exhibit 2, credible and persuasive, and the fact alleged therein to be true.

02766

65. Per Bennett's credible affidavit, she, Caroline Dozier, Mary McFaden, and Allen Isbell met with the applicant on January 27, 2014, at which time Diaz (a) described the gathering of LTC members days before the complainant's murder, (b) stated the applicant came up to Diaz after the murder and hugged him as if he was happy to see him, and (c) kissed Diaz, which was unusual to Diaz and admitted to killing the complainant. *State's Habeas Ex. 2, affidavit of Traci Moore Bennett.*

66. Per Bennett's credible affidavit, assertions that prosecutors told Diaz to change his story regarding the complainant's murder are false. *Id.*

67. The Court finds Bennett's credible affidavit refutes the applicant's habeas assertions regarding Diaz's purported recantation and alleged statements Adrian to de la Rosa. *Id.*

68. The Court finds the applicant fails to present credible or persuasive testimony that Israel Diaz is presently recanting or previously recanted his trial testimony.

69. Given the totality of the record and the evidence, the Court finds the applicant fails to present credible or persuasive testimony that Israel Diaz testified falsely at the applicant's trial.

70. The Court finds the applicant fails to demonstrate Diaz's trial testimony left a false impression with the jury. *See* (XXVI R.R. at 118-96).

71. The Court finds the applicant fails to present credible or persuasive evidence that the State either intentionally or knowingly presented false testimony at trial through Israel Diaz.

72. The Court finds the applicant fails to demonstrate Diaz's trial testimony was material to the jury's verdict in light of the totality of the State's evidence of guilt against the applicant. *See infra* in *Fourth Ground for Relief* at no. 134

---

**THIRD GROUND FOR RELIEF:**
**STATE'S ALLEGED FAILURE TO DISCLOSE IMPEACHMENT INFORMATION REGARDING WITNESS ISRAEL DIAZ**

---

73. Former Harris County Assistant District Attorney Spence D. Graham was assigned to the applicant's cases from May 2009 through December 2011, and maintained custody and control of the State's prosecution files during this period (XXII R.R. at 9, 21-22); *State's Habeas Ex. 3, affidavit of Spence D. Graham.*

. 02767

74. The Court finds the post-conviction affidavit of former prosecutor Spence D. Graham, State's Habeas Exhibit 3, credible and persuasive, and the facts asserted therein to be true.

75. The Court finds according to Graham's credible affidavit:

   a. the handwritten notes now marked as the Applicant's Exhibit 57, are 23 pages of handwritten notes from pretrial interviews prosecutors Caroline Dozier and George Weissfisch conducted with Israel Diaz;

   b. during Graham's tenure over the applicant's case, the 23 pages of handwritten notes now marked as the Applicant's Habeas Exhibit 57 were located inside a manila folder labeled with Diaz's name along with transcripts from Diaz's police interviews, and kept in the State's prosecution files in Graham's office;

   c. the applicant's trial counsel were welcome to review the contents of the State's prosecution files, and did so;

   d. during Graham's tenure over the applicant's case, a copy of the State's capital murder summary was also included in the State's prosecution file and available for defense counsels' review; and

   e. the State's capital murder summary contained the following information regarding Israel Diaz:

      i. Diaz told police and prosecutors previously handling the case there was a hit out on the complainant and gang leaders had issued an "SOS" (or "shoot on Sight") [sic] for anyone in LTC that saw the complainant;

      ii. Diaz previously gave statements from jail with his lawyer to law enforcement that the applicant admitting to killing the complainant when they spoke that evening at Alejandro Garcia's house;

      iii. Diaz could assert that the hit out on the complainant was made by the leadership of the La Tercera Crips gang, and that it was because of not only the complainant's potential testimony, but because of his friendship with rival gang members and that the complainant would share LTC secrets with the rival gang; and

      iv. Diaz knew that the complainant's murder would occur.

*State's Habeas Ex. 3, affidavit of Spence D. Graham.*

14

02768

76. The Court finds according to Bennett's credible affidavit:

    a. when Bennett assumed responsibility of the applicant's case in early 2013, the 23 pages of Diaz notes now marked as the Applicant's Exhibit 57 were in a folder in the State's prosecution files not marked as work product, and which would have been available for defense counsel to review; and

    b. during Bennett's tenure over the applicant's case, trial counsel Jerome Godinich reviewed the State's prosecution files on multiple occasions.

    *State's Habeas Ex. 2, affidavit of Traci Moore Bennett.*

77. Godinich's out-of-court hours logs reflect over 70 hours reviewing the State's prosecution files and the discovery material provided to the defense by the State. *State's Habeas Ex. 4, Godinich hours logs submitted with payment vouchers.*

78. The Court finds the post-conviction affidavit of trial counsel Jerome Godinich, Jr. filed in cause no. 1412826-A credible and persuasive, and the facts asserted therein to be true.

79. The Court finds according to Godinich's credible affidavit:

    a. prior to trial, counsel reviewed the 23 pages of Diaz notes now marked as the Applicant's Exhibit 57 at the District Attorney's Office;

    b. Godinich took the 23 pages of Diaz notes now marked as the Applicant's Exhibit 57 as well as any inconsistencies in Diaz's statements into account during his trial preparation;

    c. Diaz's trial testimony was as Godinich expected.

    *Affidavit of Jerome Godinich, Jr. at 1.*

80. The Court finds the post-conviction affidavit of trial counsel Alvin Nunnery filed in cause no. 1412826-A credible and persuasive, and the facts asserted therein to be true.

81. The Court finds according to Nunnery's credible affidavit:

    a. prior to trial, Nunnery was aware of the 23 pages of Diaz notes now marked as Applicant's Exhibit 57; and

    b. Nunnery incorporated any information from the 23 pages of Diaz notes now marked as Applicant's Exhibit 57 he believed to be relevant,

helpful, and in accordance with the defense strategy, into account during his cross-examination of Diaz.

*Affidavit of Alvin Nunnery* at 1.

82. The Court finds the 23 pages of handwritten notes now marked as the Applicant's Exhibit 57 reflect the prosecutors' interpretations and impressions of what Diaz stated in pretrial witness meetings in 2007 and 2008, and potentially include gaps in the prosecutors' notation of information, inaccuracies, and the overlapping of information pertaining to multiple extraneous offenses.

83. The Court finds the 23 pages of Diaz notes now marked as the Applicant's Exhibit 57 contain much inculpatory information regarding the applicant's involvement in the complainant's death that is consistent with Diaz's trial testimony, including:

   a. the complainant was spending time with rival gang members (*Applicant's Exhibit 57* at 3, 7, 13, 22);

   b. there was concern among LTC members that the complainant would put LTC members in jeopardy and provide rival gangs with information concerning LTC (*Id.* at 3, 7, 13, 22);

   c. a photograph surfaced of the complainant with rival gang members where the complainant was displaying the rival gang's sign (*Id.* at 3, 13);

   d. there was a meeting of LTC members where they discussed shooting the complainant (*Id.* at 7, 13);

   e. after the meeting discussing shooting the complainant, anyone who saw the complainant could kill him (*Id.* at 3, 13, 22);

   f. the wall of the apartment on Corporate where the complainant was staying was tagged (*Id.* at 7);

   g. Jose Vazquez, also known as Chango, informed LTC members of the complainant's whereabouts (*Id.* at 7-8, 13, 22);

   h. Efrain Lopez, also known as Hairless, called Diaz and told Diaz that "they found him" and the complainant was killed soon after (*Id.* at 8, 14, 22);

   i. Diaz went to the twins' house on the night of the murder and the complainant's death was discussed amongst those present (*Id.* at 8, 13-14, 22);

   j. the applicant admitted to killing the complainant (*Id.* at 13-14, 22); and

02778

k. the applicant carried two handguns, a .40 caliber and a .357 caliber (*Id.* at 13).

84. In the 23 pages of Diaz notes now marked as Applicant's Exhibit 57, the Court finds multiple references to an LTC meeting held to discuss the complainant's murder, but no specific mention that this meeting was held three days prior to the murder. *Id.*

85. The Applicant's Exhibit 56, a February 14, 2014 email from Godinich to the defense team, reflects that during that morning's pretrial hearing, the defense learned more information about the State's trial theory, specifically pertaining to anticipated testimony from Israel Diaz and Alejandro Garcia. *Applicant's Exhibit 56.*

86. The Court finds the Applicant's Exhibit 56 does not contradict statements in trial counsels' affidavits that the defense had pretrial knowledge of the Diaz notes.

87. The Court finds trial counsel were made aware prior to trial, of the existence of an LTC meeting three days before the murder where it was decided the complainant would be killed and that another gathering occurred after the murder wherein the applicant took credit for the murder when speaking to Diaz (XXIII R.R. at 4-16).

88. The Court finds the record does not reflect that the applicant's counsel were surprised or hindered in any way during Diaz's trial testimony or cross-examination (XXVI R.R. at 118-96).

89. The record reflects the applicant's counsel thoroughly cross-examined Diaz, including questions regarding Diaz's previous interviews with the State; the punishment Diaz anticipated receiving as a result of his testimony and cooperation with the State; Diaz's anger with the complainant for "snitching" to the police in his case; Diaz's discussions with the complainant where Diaz emphasized the complainant should not cooperate with the police in Diaz's case; Diaz's admission that all he had to offer the jury was his word; and Diaz's apathy at the complainant's death (*Id.* at 165-92, 194-96).

90. The Court finds the applicant fails to present credible or persuasive evidence that the State failed to disclose favorable, material, or impeachment evidence to the defense prior to trial.

02771

**ALLEGED DEFICIENT PRETRIAL INVESTIGATION: FAILURE TO INVESTIGATE & PRESENT ALIBI DEFENSE OR EVIDENCE OF INNOCENCE**

91. The Court finds trial counsel conducted a thorough pretrial investigation pertaining to the guilt/innocence phase of trial, despite numerous obstacles created by the applicant and the applicant's friends and family. *See Affidavit of Jerome Godinich, Jr.; see also Affidavit of Alvin Nunnery.*

92. In preparing for trial and presenting the applicant's case, the defense retained a team of investigators and experts in the fields of fact investigations, mitigation investigations, ballistics, eyewitness identification, mental health, gangs, prison systems, child abuse and brain development (I C.R. at 34-44, 61-66, 75; VII C.R. at 1765-68; VIII C.R. at 2077-78; XII C.R. at 3346-47); *Affidavit of Jerome Godinich, Jr.; Affidavit of Alvin Nunnery.*

93. The totality of the record reflects that defense counsel filed and urged multiple motions; thoroughly voir dired prospective jurors; extensively cross-examined witnesses; made relevant objections and preserved error; exhibited comprehensive knowledge of the primary and extraneous offenses and applicable law; presented evidence on the applicant's behalf; made persuasive jury arguments; and objected to the court's charge and requested specific instructions.

94. The Court finds in preparation for trial, the applicant's trial counsel spoke with all witnesses who were identified by the defense team, investigators, mitigation experts, or who contacted counsel directly, and also interviewed all available State fact witnesses. *Affidavit of Alvin Nunnery at 2; see Affidavit of Jerome Godinich, Jr. at 2.*

95. The Court finds trial counsel intentionally did not present witnesses who counsel believed lacked credible accounts of the applicant's whereabouts for the date and time of the offense, or who only possessed information via hearsay or innuendo. *Affidavit of Alvin Nunnery at 2.*

96. The Court finds the defense's strategy of only presenting the testimony of witnesses who counsel deemed credible or beneficial for the defense was reasonable trial strategy. *See id.*

97. The Court finds counsel made a strategic decision not to present the testimony of Jesus Balderas at trial, due to concerns that Balderas would not appear credible

because of his criminal history, relationship with the applicant, gang affiliation, and photographs obtained through discovery. *Affidavit of Jerome Godinich, Jr.* at 2.

98. The Court finds trial counsels' decision to not present the testimony of Jesus Balderas at trial was reasonable trial strategy.

99. The Court finds that prior to trial, the defense had learned information by speaking to various potential witnesses pertaining to Diaz's motives for testifying against the applicant; the hierarchy and inner-workings of LTC; and Wendy Bardales' prior intimate relationship with Diaz, by speaking to various potential witnesses; but made strategic decisions regarding what evidence should be presented in which phase of trial. *Applicant's Exhibit 53; Affidavit of Jerome Godinich, Jr.* at 2; (XXVIII R.R. at 136-231; XXIX R.R. at 4-14; XXXVII R.R. at 170-206, 238-43; XXXVIII R.R. at 5-19, 35-37, 39-41; XL R.R. at 37-50, 59-60).

100. The Court finds according to Godinich's credible affidavit, despite previously telling the defense she would testify at the trial, Yancy Escobar informed counsel she wanted to be present for the entirety of the trial, and as a result, chose not to testify on the applicant's behalf. *Affidavit of Jerome Godinich, Jr.* at 2.

101. Detailed invoices included with Godinich's payment vouchers reflect that during the pendency of the applicant's case, the defense team conducted numerous witness interviews and conferences with the applicant, his immediate and extended family members, and his girlfriend. *State's Habeas Ex. 5, defense invoices.*

102. The Court finds according to Godinich's credible affidavit, it was only as trial approached that the applicant's family attempted to create or assist with the defense, despite the defense team's long-standing requests for continued communication. *Applicants' Ex. 53.*

103. The Court finds the applicant's trial counsel explored every defense available to the applicant, including a possible alibi defense, but that neither the applicant nor his family provided counsel with timely or credible alibi information. *Affidavit of Jerome Godinich, Jr.* at 1; *Affidavit of Alvin Nunnery* at 2.

104. The Court finds according to Godinich's credible affidavit, in 2014 the defense was made aware of Oralia McCrary, a potential alibi witness, but was not provided with any contact information for her and was informed McCrary did not want anything to do with the case. *Affidavit of Jerome Godinich, Jr.* at 1.

. 02773

105. The Court finds that in 2014, counsel conducted pretrial interviews of McCrary's daughters Anali Garcia and Ileana Cortes who were also identified as potential alibi witnesses, but following these respective interviews, counsel determined Garcia had no factual information about the applicant's case, and Cortes had no useful factual, alibi, or mitigation evidence for the applicant's defense. *Id.* at 2.

106. The Court finds several of the applicant's own exhibits, pretrial emails between various members of the defense team, substantiate the obstacles, challenges, and lack of cooperation the defense faced in exploring a potential alibi defense and securing witnesses, specifically:

   a. in the Applicant's Exhibit 25, a September 1, 2010, email from defense mitigation specialist Mary K. Poirier to members of the defense team, Poirier notes the applicant has put up a barrier and does not want the defense team speaking to his brother Jesus;

   b. in the Applicant's Exhibit 26, an undated email from Spanish speaking mitigation investigator Adriana Helenek to Godinich, Helenek writes the applicant's mother does not want the defense contacting her family in Mexico, nor does she want the family from Mexico visiting the applicant;

   c. in the Applicant's Exhibit 29, a November 7, 2010, email from Godinich to mitigation specialists Amy Martin and Mary K. Poirier, Godinich writes the applicant's mother is still visiting border towns under suspect circumstances, and denying it to the defense.

   d. in the Applicant's Exhibit 35, a September 21, 2010, email from Godinich to members of the defense team, Godinich writes the applicant's girlfriend Yancy Escobar came to his office yesterday to discuss the case; was informed that the defense will continue to pursue any leads that may be helpful in the guilt/innocence phase; was asked to directly communicate any information or leads that she, Jesus Balderas, or the applicant's mother receive to Godinich; and that Escobar did not have any leads or information at that time;

   e. in the Applicant's Exhibit 37, a November 5, 2012, email from Godinich to members of the defense team, Godinich writes he again met with Escobar and Jesus; asked for any witness information or information leads; and that they did not have any at that time;

   f. in the Applicant's Exhibit 38, a January 30, 2013, email from Godinich to members of the defense team, Godinich writes he met with the applicant who claimed to have two guilt/innocence witnesses, but was unable to provide

02774

names, addresses, or phone numbers, and claimed that Escobar and Jesus would have this information. Godinich further writes that in contacting Escobar for this information, Escobar stated she did not have any information regarding these witnesses, nor did she know who they are, how to contact them, or what they know. Escobar was reminded to contact Godinich upon receipt of any information;

g. in the Applicant's Exhibit 39, a February 11, 2013, email from Godinich to members of the defense team, Godinich writes he met with the applicant who wanted to know why the defense had not met with the witnesses he identified, and was told that despite his claims, neither Escobar nor Jesus knew these witnesses or how to contact them. Godinich further writes the applicant was still unable to provide these witnesses' names;

h. in the Applicant's Exhibit 52, a January 31, 2014, email from Godinich's legal assistant Gloria Poa to the defense team, Poa writes the applicant's mother and Escobar have identified alibi witnesses for the first time, specifically Oralia (Jesus' former mother-in-law), Celeste Munoz, Billy, Anale[2] (Oralia's daughter), Walter, and Daniela. Poa writes that the family was instructed to provide any additional contact information as soon as possible. Poa also writes that a mitigation witness did not want to travel to Houston to testify for the applicant for fear of being deported;

i. in the Applicant's Exhibit 53, a February 4, 2014, email from Poa to the defense team, Poa writes Escobar did not have names or contact information for any of the information she provided regarding LTC. Poa also writes Eiliana Cortez[3] came by the office at the request of Jesus, and spoke with Godinich, but could not remember anything from 2005, including whether or not she was with the applicant on December 6, 2005. Poa also writes she obtained a phone number for a potential witness named "Billy" from Jesus, and spoke to an individual who stated he would call back to set up an appointment; and

j. in the Applicant's Exhibit 54, a February 13, 2014, email from Poa to the defense team, Poa writes witness Celeste Munoz missed her appointment for an in-person meeting; witness Billy has not called back to set up an appointment; she and Godinich spoke to Anale on the phone and Anale had no factual information on the case; Oralia does not want to be involved with

---

[2] The proper spelling of this witness' name has since been established as Anali Garcia.

[3] According to the applicant's habeas exhibits, the proper spelling of this witness' name is Ileana Cortes.

. 02775

the applicant's case; Escobar has not provided any contact information for Walter or Daniela; and the applicant's father cancelled and rescheduled his appointment with Godinich. Poa also writes the defense is waiting for confirmation on witness Vianet Jaimes' travel plans, and Godinich has offered to pay for her ticket, but the witness and the applicant's mother want to pay for it themselves.

107. The Court finds a March 13, 2014, email sent by Godinich to the defense team during jury deliberation also corroborates the obstacles defense counsel experienced during trial as a result of the applicant's family, namely:

    a. counsel learned the applicant's family was attempting to influence the testimony of the witnesses in Mexico by calling the witnesses and telling them what to say, resulting in differing testimony than what counsel was anticipating;

    b. the family could not appreciate the importance of trial preparation; and

    c. the family could not appreciate counsels' unwillingness to substitute or add last minute defense witnesses, particularly those who had never been interviewed by counsel.

*Affidavit of Jerome Godinich, Jr.* at Exhibit 5.

108. Notwithstanding the untimeliness of potential alibi information provided to the defense, the Court finds defense counsel appropriately investigated the information provided to them.

109. The Court finds the applicant's counsel employed reasonable trial strategy in choosing not to present the testimony of either Anali Garcia or Ileana Cortes during the guilt/innocence phase, after counsel interviewed these witnesses and found these witnesses had no useful information about the case. *Id.* at 2.

110. The Court finds according to Godinich's credible affidavit, the defense had no information regarding Octavio Cortes or Jose Perez during the pendency of the case. *Id.* at 2.

111. The Court finds the proffered affidavits of Jesus Balderas (Applicant's Exhibit 2) and Jose Perez (Applicant's Exhibit 16) are unpersuasive on the issue of an alibi defense, as these witnesses do not claim to be present in the apartment where the applicant allegedly spent the evening of the primary offense.

22

02778

112. Octavio Cortes and Anali Garcia and Octavio Cortes provided sworn affidavits that were included in the applicant's habeas application as the Applicant's Exhibits 6 and 10, respectively, wherein both stated the applicant had been with them inside their apartment when the complainant was shot.

113. On May 11, 2018, this Court held an evidentiary hearing to assist the Court in assessing the credibility of Anali Garcia and Octavio Cortes, and in resolving the issue of whether trial counsel were ineffective for failing to present alibi testimony from these witnesses during guilt/innocence. *See State's Proposed Supplemental Order Designating Issues to Be Resolved Via Evidentiary Hearing.*

114. On May 11, 2018, Anali Garcia testified under oath at a post-conviction evidentiary hearing in the applicant's case (IV Post-Conviction Writ Evidentiary Hearing—May 11, 2018 at 19-80).

115. At the post-conviction evidentiary hearing, Garcia testified to the following regarding the night the complainant was murdered:

   a. she lived in a small, two-bedroom apartment at Wood Creek on the Bayou, off of Corporate Drive with her mother, two sisters, two brothers, and niece, all of whom were present when shots were heard (*Id.* at 21, 32-34);

   b. she does not remember if anyone else, including the applicant's brother Jesus, was in the apartment that night, but it was very crowded (*Id.* at 33-34);

   c. her apartment was within four minutes walking distance to the apartment complex where the shooting occurred which she considered "real close" (*Id.* at 39-40);

   d. she remembers the applicant being with her because Hernandez was close to all of them (*Id.* at 21);

   e. the applicant arrived at her apartment in the afternoon (*Id.* at 21);

   f. she was at home "burning DVD's and watching movies and looking at the covers from the DVD's that [the applicant] would sell" (*Id.* at 20-21);

   g. "[s]omeone at the house heard shootings" (*Id.* at 19-20);

   h. she and her family learned of the shooting when "[s]omeone around the apartment spread the word" but could not remember if anyone came to the door to tell the news (*Id.* at 43);

i. "the only thing I remember" was her mother "panicking" and saying someone heard a gunshot, so no one could go outside, "not even" the applicant (*Id.* at 22);

j. her mother immediately "panicked" at the sound of a shot, even though gunshots were frequently heard in the neighborhood" (*Id.* at 37);

k. unlike the other times gunshots were heard, "we weren't allowed to go nowhere that night" (*Id.* at 37-38);

l. she believed the shots were heard after 10 pm (*Id.* at 23);

m. she does not remember if she personally heard the gunshots or how many shots she may have heard (*Id.* at 42-43);

n. the applicant spent the night in her living room because her mother would not allow him to leave (*Id.* at 23-24);

o. she does not remember whether she, Octavio, or Ileana had a cell phone, or whether they had a land line at that time (*Id.* at 46-47);

p. she does not remember if the applicant had a cell phone, received any calls, or if he could have gone somewhere to have a private conversation (*Id.*); and

q. she stayed awake until 2 or 3 in the morning because she was scared and was wondering what had happened, and the applicant was still at her apartment at this point (*Id.* at 23-24).

116. At the post-conviction evidentiary hearing, Garcia provided alternative timelines for when she learned the applicant zad been charged with the complainant's murder:

a. "once he was arrested, after -- after a while" (*Id.* at 25-26);

b. "around 2000", before this time, she thought he was jailed for aggravated assault because several of his fellow gang members had been arrested during a raid for similar charges (*Id.* at 26-27, 52);

c. "on his trial date" (*Id.* at 26-27); and

d. when she watched part of trial (*Id.* at 54).

02775

117. At the post-conviction evidentiary hearing, Garcia testified:

    a.  she was good friends with the applicant and knew he was in a gang (*Id.* at 32, 36, 52);

    b.  she knew the complainant from middle school (*Id.* at 24-26);

    c.  she knew the applicant was arrested soon after the murder (*Id.* at 51);

    d.  she was in disbelief that the applicant was charged with the complainant's murder because he had been with her that night (*Id.* at 24-26);

    e.  she took no steps to help the applicant because she "was scared" and "didn't want to be involved in any of this" (*Id.* at 26);

    f.  she was given a phone number to call trial counsel Jerome Godinich "two or three days before trial" and she called him from her car to say "I'm a character witness and he was with us" (*Id.* at 27);

    g.  Godinich rushed her and told her he had enough witnesses and didn't need anything else (*Id.* at 27);

    h.  she attended trial once or twice, and thought maybe she would be called as a "surprise witness" like in the movies, but that did not happen (*Id.* at 28);

    i.  she could not recall the number of times she visited the applicant in jail while he awaited trial, but she and the applicant never discussed her having knowledge that could possibly lead to a dismissal of the charges against him (*Id.* at 70);

    j.  she blamed her years-long failure to come forward with her information on being in fear for her life from the "real" killer, who she believed would track her down and kill her and her entire family if she tried to clear the applicant's name (*Id.* at 28-29, 56);

    k.  she and insisted she could not be held accountable for her decisions at age 17 because she was not permitted to think for herself or make any decisions including choosing her own clothing at that age (*Id.* at 29, 44-46);

    l.  prior to the applicant's trial, she posted a petition on Facebook about his case, but failed to mention anything about his innocence or her alibi because "that's something you wouldn't post on there, especially if I'm scared of [*sic*] my life" (*Id.* at 54-55, 62);

62779

m. she does not know a lot of the evidence or facts presented against the applicant at trial, including the fact that he was in possession of the gun that killed the complainant when he was arrested (*Id.* at 61);

n. although she believed her alibi evidence would make a difference at the applicant's trial, she thought his lawyers had other evidence and she did not, and still does not, wish to be involved (*Id.* at 28-29, 63-64);

o. it took the applicant's habeas counsel multiple efforts to convince her to provide her belated alibi testimony (*Id.* at 64);

p. she does not remember whether she or habeas investigator de la Rosa prepared her affidavit, or how many times she spoke with him before signing the affidavit ten years after the murder occurred (*Id.* at 65-68); and

q. although she knows the applicant's mother, she cannot remember if she ever told his mother she had exculpatory evidence (*Id.* at 69).

118. At the post-conviction evidentiary hearing, Garcia never said "I don't remember" during direct examination, but gave this response more than 45 times during cross-examination (*Id.* at 19-79, *passim*).

119. At the post-conviction evidentiary hearing, Garcia denied knowing the meaning of perjury, stated the applicant's habeas counsel never advised her about perjury, and became visibly distraught when the consequences of being convicted of aggravated perjury were explained to her and asked to stop participating in the hearing (*Id.* at 73-78).

120. At the post-conviction evidentiary hearing, Garcia admitted she refused to meet with representatives of the State prior to the hearing, and twice denied memory of a phone call with the District Attorney's Office Investigator Hartman in February 2018, before admitting to these conversations (*Id.* at 48-50).

121. The Court finds Anali Garcia's habeas affidavit and post-conviction evidentiary hearing testimony to be unpersuasive. *See* (*id.* at 19-80); *see Applicant's Ex. 10.*

122. Given the totality of evidence, including the demeanor and presentation of the witness during the post-conviction evidentiary hearing, the Court finds trial counsels' decision to not present the testimony of Anali Garcia at trial was reasonable trial strategy.

123. On May 11, 2018, Octavio Cortes testified under oath at a post-conviction evidentiary hearing in the applicant's case (*Id.* at 81-124).

124. At the post-conviction evidentiary hearing, Cortes testified:

   a. growing up, he viewed the applicant has a father-figure and he still looks up to and respects the applicant (*Id.* at 95, 99);

   b. he and the applicant are both uncles to Ileana Cortes' daughter with Jesus Balderas (*Id.* at 94);

   c. he was first contacted on behalf of the applicant in 2015, by someone whose role was unclear to him, but who he believed was named Daniel de la Rosa, and with whom he spoke on the phone more times than he was able to count (*Id.* at 87-88);

   d. he had spoken to the applicant's habeas counsel in person and on the phone several times over the past two months, despite initially denying any communication (*Id.* at 88-90);

   e. over the past 13 years, he, his mother, and sisters had discussed that the applicant was accused of shooting Eduardo Hernandez and had spent time "trying to recollect what happened" (*Id.* at 91-94);

   f. the last night the applicant stayed at his house was December 6, but failed to specify the year (*Id.* at 81);

   g. he was aware the applicant was a gang member and there were multiple gangs in their neighborhood in 2005 (*Id.* at 96-97);

   h. on the night of the shooting, he and the applicant were in his bedroom "picking out movie covers to put on a page" (*Id.* Hearing at 81);

   i. at some point, his mom heard "something had happened" and his sister came and told Cortes and the applicant "that whatever happened" and "they were shocked...pretty much just panicked a little" and his mom told them all to stay inside (*Id.* at 82);

   j. the evening of December 6th was "[e]xtremely unusual" because the only other memory he has of his mother acting this way and "locking down the house" was on the morning of 9/11, yet Cortes later admitted that shootings happened regularly in the neighborhood and his mother did not lock the door in those instances (*Id.* at 81-82, 111-15);

62781

k. he went to bed by 10:30 and does not know what the applicant did after that (*Id.* at 117);

l. he would remember if the applicant had made or received a phone call on the evening of the shooting, but Cortes has no memory of that happening (*Id.* at 116-17);

m. he later learned from his sister Ileana that Eduardo Hernandez had been shot that night, although he did not personally know Hernandez (*Id.* 83-84);

n. the affidavit Cortes submitted on the applicant's behalf, which de la Rosa helped compose, was the first time Cortes told anyone that the applicant had been at his home the night of Hernandez's murder (*Id.* at 100-102);

o. although Cortes and his mother visited the applicant in jail throughout Cortes' high school years, the applicant never told Cortes to contact his lawyers with the alleged alibi information nor provided Cortes with his attorneys' information (*Id.* at 105, 108);

p. when visiting the applicant in jail, Cortes asked his mom why the applicant was in custody and she told him it was for " a murder, a shooting" (*Id.* at 93);

q. at the time of the applicant's trial, Cortes was 21 years old and in the Marines, and did not know the applicant was going to trial, charged with killing the complainant, or who the applicant's attorneys were (*Id.* at 84-85, 102-104);

r. he "was too busy, in the Marines" to want to know the details of why the applicant was in custody and made no effort to contact the applicant's lawyers (*Id.* at 102-104, 108-109); and

s. although he commented on Facebook in 2014 about the applicant's case, he did not mention the applicant's alleged innocence or any alibi information (*Id.* at 110-11).

125. In the post-conviction evidentiary hearing, Octavio Cortes gave multiple conflicting responses as to whether or not he was aware the applicant was charged with the complainant's murder, and the timeframe of when he learned this information. (*Id.* at 84, 91-93, 106-109, 119).

126. The Court finds Octavio Cortes' habeas affidavit and post-conviction evidentiary hearing testimony to be unpersuasive. *See* (*Id.* at 81-124); *see Applicant's Ex. 6.*

28

127. The applicant failed to present any post-conviction testimony (either live or via affidavit) from Oralia McCrary or Ileana Cortes.

128. Given the totality of the evidence, the Court finds trial counsels' decision not to present an alibi defense was reasonable trial strategy.

129. Based on counsels' credible affidavits, the Court finds neither the applicant nor his family informed the defense team prior to trial that Israel Diaz had attempted to intimidate the applicant, and that had there been any admissible evidence of such, it would only have come from the applicant's own testimony, which the applicant was adamant he would not provide at trial. *Affidavit of Jerome Godinich, Jr.* at 2; *Affidavit of Alvin Nunnery* at 2.

130. The Court finds according to Godinich's credible affidavit, the applicant did not provide information that assisted the defense team with an innocence strategy. *Affidavit of Jerome Godinich, Jr.* at 2.

131. Contrary to the applicant's habeas assertions and notwithstanding the applicant's lack of assistance, trial counsel were nevertheless able to present evidence of the applicant's innocence and an alternate shooter during guilt/innocence, namely:

   a. trial counsel attacked the reliability and credibility of Wendy Bardales' identification, and explored her prior history and bias towards the applicant (XXVI R.R. at 12-70, 77-80);

   b. during cross-examination, Karen Bardales testified the complainant had concerns about Diaz and what Diaz may do to him (*Id.* at 98-99);

   c. during cross-examination, Diaz testified he let the complainant know on more than one occasion that he was mad at him for snitching on him to the police (*Id.* at 172, 181-82);

   d. during cross-examination, Diaz testified he told other LTC members the complainant had snitched on him (*Id.* at 179-80);

   e. during cross-examination, Diaz testified that as far as he knew, he was the only person on whom the complainant had snitched to the police (*Id.* at 185-86);

   f. during cross-examination, Diaz testified the complainant's death did not bother or affect Diaz (*Id.* at 191);

29

. 02783

g. during direct examination, Benitez testified to Diaz's bias against the complainant and call for an LTC meeting to discuss and urge the complainant's murder days before his death (XXVIII R.R. at 136-87, 221-29, 231); and

h. during direct examination, Benitez testified Arevalo confessed to him that he had taken care of the complainant, and Benitez's opinion that Arevalo meant he had killed the complainant himself (*Id.* at 225-26).

132. Although the applicant complains of trial counsels' failure to present the testimony of Jose Perez during trial, the record reflects that during the guilt/innocence phase of trial, the defense presented testimony via Walter Benitez consistent with the information recited in Jose Perez's habeas affidavit; namely:

a. Benitez saw Victor "Gumby" Arevalo on December 6, 2005, after the complainant's murder (XXVIII R.R. at 174-75);

b. Arevalo confessed to Benitez that he took care of the complainant, which Benitez interpreted as Arevalo killed the complainant himself (*Id.* at 225-26);

c. Arevalo was the leader of LTC and made all the decisions, while the applicant had no leadership role (*Id.* at 155, 226);

d. there was trouble between Diaz and the complainant because the complainant had snitched on Diaz to the police (*Id.* at 160); and

e. at the meeting of LTC gang members to discuss the issue of the complainant, Diaz tried to get permission from Arevalo to take care of or kill the complainant while the applicant attempted to intercede on behalf of the complainant (*Id.* at 169, 171).

133. The Court also finds portions of Benitez's trial testimony corroborate and are consistent with Diaz's trial testimony and information contained in the pretrial interview notes with Diaz now marked as Applicant's Exhibit 57, namely: multiple members of LTC were upset the complainant had snitched on Diaz, and an LTC meeting took place where plans for the complainant's murder were discussed (XXVIII R.R. at 160, 169, 171; XVI R.R. at 141, 145, 147-53).

134. Notwithstanding the defense's efforts to undermine the State's case, the Court finds the State presented compelling evidence of guilt against the applicant at trial, specifically:

02784

a. LTC is a criminal street gang with no hierarchy in leadership, who values loyalty among its members, and where disrespect or disloyalty can get a member killed (XXVI R.R. at 129; XXVII R.R. at 90-99; XXVIII R.R. at 206-207);

b. the applicant was a documented member of LTC (XXVI R.R. at 227);

c. the complainant was a "cliqued in" member of LTC whose membership had been sponsored by the applicant (XXIV R.R. at 40; XXVI R.R. at 137-38); XXVIII R.R. at 105-106);

d. in December 2004, the complainant was arrested by the police and cooperated with the police's investigation into Diaz, and after which the complainant became scared of Diaz and of LTC (XXVI R.R. at 13-41, 139-41; XXVIII R.R. at 107-110; XXIV R.R. at 120);

e. LTC members were upset with the complainant for speaking to the police, spending time with rival gangs, "throwing" rival gang signs, and wanted the complainant out of LTC (XXVI R.R. at 141-145, 147-53);

f. an LTC meeting was held three to four days before the complainant's death to discuss the complainant and how to address his behavior (XXVI R.R. at 151-53);

g. on the day of his murder, the complainant was in the company of individuals associated with the gangs MS-13 and Cholos (XXIV R.R. at 41, 234-37; XXV R.R. at 36);

h. the complainant was killed inside Durjan "Rata" Decorado's apartment, which the complainant and the Bardales sisters had permission to be inside (XXIV R.R. at 37, 42, 119; XXV R.R. at 41);

i. several hours before the complainant's murder, an LTC gang member (later identified as Jose "Chango" Vasquez) wearing a red HEB shirt came to Decorado's apartment, spoke with the complainant in a back bedroom for quite some time, unsuccessfully tried to take the complainant with him, got into a heated confrontation with a Bardales sister, and left upset (XXIV R.R. at 46-48, 234, 238-40; XXVI R.R. at 162, 241-44, 248-50);

j. the complainant seemed worried after Vasquez left Decorado's apartment (XXIV R.R. at 48, 119);

02785

k. on the evening of the complainant's murder, witnesses noticed graffiti on one of the apartment walls near Decorado's apartment referencing LTC (*Id.* 50-53, 262-64);

l. the shooter entered Decorado's apartment without consent (*Id.* at 53-55, 241-42, 267);

m. the shooter scanned the room, pointed a gun at the complainant's head, and shot the complainant multiple times (*Id.* at 55-59, 242-52; XXV R.R. at 183-86);

n. multiple witnesses stated the shooter was wearing khakis and a dark hoodie (*Id.* at 56, 253; XXV R.R. at 50, 180; XXVI R.R. at 159);

o. the shooter's hood fell off his head briefly during the shooting (XXV R.R. at 25-26, 183);

p. Wendy Bardales got a good look at the shooter (*Id.* at 189);

q. after the complainant was shot, the scene at the apartment complex was chaotic, paramedics were on scene, and a crowd formed outside (XXIV R.R. at 129-33, 257; XXVI R.R. at 157-59);

r. the applicant was seen at Decorado's apartment complex shortly after the murder with a silver handgun (XXVI R.R. at 160-61);

s. the applicant took credit for the complainant's murder, stating he "finally got him," and hugged and kissed other LTC members on the cheek shortly after the murder (*Id.* at 159-60);

t. police recovered eight - .40 caliber spent casings inside Decorado's apartment and two - .40 caliber spent casings outside the apartment door, all of which were manufactured by Smith & Wesson (*Id.* at 185-87, 200);

u. police recovered three fired bullet fragments from Decorado's apartment (*Id.* at 201);

v. police observed two bullet strikes to the front door of Decorado's apartment (*Id.* at 177-78);

w. Vasquez and Diaz were eliminated as the shooter (*Id.* at 255; XXV R.R. at 192-94; XXVI R.R. at 218-21, 243);

02788

x. the shooter's physical description was consistent with the applicant (XV R.R. at 31-32; XXVI R.R. at 213);

y. the applicant was identified as the shooter in a photo array by Wendy Bardales, who in making her positive identification wrote "I'm positive that he's the one that killed Eduardo" in Spanish (XXV R.R. at 195-97; XXVI R.R. at 228-40);

z. the applicant was arrested ten days after the complainant's murder following a foot chase, during which the applicant discarded a green box and a black bag he had been carrying, jumped a fence, ran across a major intersection, and hid under a parked car (XXV R.R. at 212-18, 233; XXVI R.R. at 93-108);

aa. police obtained the applicant's cell phone following his arrest, and the cell phone records show calls made by the applicant to Vasquez on the night of the complainant's murder at 7:41 pm and again at 9:56 pm (near the time of the offense), and again after the murder (XXVI R.R. at 252-53; XXVII R.R. at 9-13);

bb. the medical examiner identified 11 gunshot wounds to the complainant's body, and recovered firearms evidence during the autopsy (*Id.* at 154, 158);

cc. the applicant claimed responsibility for all of the items (ammunition, magazines, bulletproof vests, firearms, cases and holsters) contained in the boxes and black bag that he and his friend had in their possession when they were arrested, which included a .40 caliber Smith & Wesson handgun (XXV R.R. at 220-22, 238, 245; XXVII R.R at 16);

dd. all ten-.40 caliber Smith & Wesson spent casings recovered from the crime scene had been fired from the .40 caliber Smith & Wesson firearm that was in the applicant's possession at the time of his arrest (XXVII R.R. at 36, 38-39);

ee. three fired bullets recovered from the crime scene had been fired from the .40 caliber Smith & Wesson firearm that was in the applicant's possession at the time of his arrest (*Id.* at 36, 40); and

ff. of the firearms evidence recovered during the autopsy by the medical examiner's office that was suitable for comparison, six bullets had been fired from the .40 caliber Smith & Wesson firearm that was in the applicant's possession at the time of his arrest (*Id.* at 36, 41, 53-54).

135. According to Godinich's credible affidavit, after trial Godinich learned members of the jury saw Benitez flash an LTC gang sign to the applicant during the testimony,

02787

and the applicant responded back in kind, undercutting Benitez's testimony. *Affidavit of Jerome Godinich, Jr.* at 2-3, Exhibit 4.

**FAILURE TO PRESENT EYEWITNESS IDENTIFICATION EXPERT TESTIMONY TO JURY**

136. The record reflects defense counsels' intent to avoid the introduction of evidence pertaining to the applicant's extraneous offenses during guilt/innocence (XXIX R.R. at 10-14).

137. Outside the presence of the jury, the defense presented the testimony of eyewitness identification expert Dr. Roy Malpass during a hearing to suppress the identification of the applicant by State's witness Wendy Bardales (XXV R.R. at 122-51, 172-74).

138. During the suppression hearing, Dr. Malpass testified there was a substantial likelihood of misidentification; the photo spread was impermissibly suggestive; the progression of Bardales' identification caused concerns of memory contamination and social influence; and Bardales' emotional reaction when ultimately identifying the applicant as the shooter was not a valid and reliable indicator (*Id.* at 134, 144-45, 149-50).

139. During his cross-examination in the suppression hearing, Dr. Malpass conceded the limited information he considered in arriving at his opinion on Bardales' identification; admitted scientific studies on the reliability of eyewitness identification do not include individuals who experience violent events such as those witnessed by Bardales; conceded he would not offer the jury an ultimate opinion on the accuracy or reliability of Bardales' identification; and backtracked on his prior statements of the suggestibility of the photo array (*Id.*. at 151-171).

140. The record reflects the applicant's trial counsel also conducted an *ex parte* in-camera review of anticipated testimony from Celeste Munoz and Officer Thomas Cunningham in order to seek a preliminary ruling from the trial court as to the potential ramifications of presenting testimony from these witnesses and from Dr. Malpass to the jury during guilt/innocence (XXIX R.R. at 4-14).

141. The record reflects that during the *ex parte* in-camera hearing, counsel proffered testimony from Celeste Munoz regarding Wendy Bardales (including Bardales' character and a prior altercation between Bardales and an applicant), and the trial court ruled Munoz's testimony would open the door to the applicant's extraneous capital murder during guilt/innocence (*Id.* at 4-13).

62788

142. The Court finds the trial court made several statements during the *ex parte* in-camera discussion with the defense pertaining to the possibility of opening the door to the applicant's extraneous offenses, which could have reasonably affected the defense's strategy of which witnesses were called to testify during guilt/innocence, namely:

   a. "I mean, certainly, I am open to arguments, but given what you have proffered, my initial ruling would be…" (*Id.* at 12);

   b. "Because I know there are extraneouses that I'm not familiar with, that could possibly come in once we…" (*Id.* at 12);

   c. "I don't mind y'all dotting your i's and crossing your t's if we get there, but that would be my initial ruling based on my understanding of case law and the rules of evidence" (*Id.* at 13); and

   d. "I used that analysis without necessarily being familiar with that particular case" (*Id.* at 14).

143. The Court finds trial counsel made a strategic decision not to present Dr. Malpass' expert testimony to the jury, fearing it would open the door to the applicant's prejudicial extraneous conduct during the guilt/innocence phase. *Affidavit of Jerome Godinich, Jr.* at 3; *Affidavit of Alvin Nunnery* at 2-3.

144. Given the totality of the record and evidence, the Court finds trial counsels' decision not to present the testimony of eyewitness identification expert Roy Malpass to the jury was reasonable trial strategy.

145. The Court finds that although the defense did not present expert eyewitness identification testimony to the jury, the defense incorporated key aspects of this witness' proffered testimony in the cross-examination of other witnesses, and highlighted testimony of a suggestive, improper, and deficient photo array and eyewitness identification to the jury (XXVI R.R. at 12-70, 77-80; XXVII R.R. at 26-57, 69-70; XXVIII R.R. at 15-36, 58).

146. Given the totality of record and evidence, including the trial court's in-camera ruling that portions of Celeste Munoz's testimony would open the door to the applicant's prejudicial extraneous conduct, the Court finds trial counsels' decision not to present Munoz's testimony during guilt/innocence was reasonable trial strategy. *See* (XXIX R.R. at 4-14).

02789

**ALLEGED FAILURE TO INVESTIGATE JUROR MISCONDUCT**

147. The Court finds trial counsel investigated the effect on the jury of the incident involving the applicant's brother waving at the jury on the evening of February 26, 2014, by questioning the implicated deputy and jurors, and counsel exhibited reasonable strategy in preserving any potential error by moving for a mistrial (XXXII R.R. at 12-28).

**TOTALITY OF THE REPRESENTATION**

148. The Court does not find the proffered affidavits of Dr. Roy Malpass (Applicant's Exhibit 1), Jesus Balderas (Applicant's Exhibit 2), Walter Benitez (Applicant's Exhibit 4), Daniella Chaves (Applicant's Exhibit 5), Octavio Cortes (Applicant's Exhibit 6), Adrian de la Rosa (Applicant's Exhibit 7), Yancy Escobar (Applicant's Exhibit 9), Anali Garcia (Applicant's Exhibit 10), Celeste Munoz (Applicant's Exhibit 15), or Jose Perez (Applicant's Exhibit 16) to be persuasive evidence of ineffective representation of counsel at trial.

149. The Court finds the defense exhibited a reasonable defensive strategy during the guilt/innocence phase of the applicant's trial.

---

### FIFTH GROUND FOR RELIEF:
### ALLEGED VIOLATION OF RIGHT TO FAIR TRIAL AS A RESULT OF JUROR MISCONDUCT AND EXPOSURE TO OUTSIDE INFLUENCES

---

**HOTEL ACCOMMODATIONS**

150. On February 25, 2014, jurors began deliberating guilt/innocence (XXX R.R. at 72-75).

151. The Court finds the post-conviction affidavit of Vickie Long, State's Habeas Exhibit 6, credible and persuasive, and the facts contained therein to be true. *State's Habeas Ex. 6, Affidavit of Vickie Long.*

152. Long, a Business Process Manager with the Administrative Office of the District Courts of Harris County, experienced "a great deal of difficulty in locating a hotel for the applicant's jury for the evening of February 25, 2014" due to events associated with Rodeo Houston, as "[m]any hotels were full...including the downtown hotels where the Harris County criminal courts normally accommodate their sequestered juries." *Id.* at 1.

02750

153. According to the independent recollection of court reporter Renee Reagan, which this Court finds to be credible and persuasive, in looking for accommodations for the applicant's jury "[t]hey went all the way past Clear Lake. They looked everywhere" (I Writ Hearing—August 17, 2017 at 24).

154. Ultimately, jury accommodations for the evening of February 25, 2014, were located at the Motel 6 Houston-Westchase at 2900 West Sam Houston Parkway South. *State's Habeas Ex. 6, Affidavit of Vickie Long* at 1.

155. Long had no knowledge of the location of the underlying capital offense when making hotel accommodations for the applicant's jury. *Id.* at 2.

156. On the morning of February 26, 2014, the trial court told the jury "I want to sincerely apologize for your accommodations last evening and would like to tell you that that was beyond my control. But to the extent I have any control, I can assure you that if you are in need of accommodations this evening, you will not be staying at that hotel. The drive might be a little longer, but we will find you more suitable accommodations. I did not have any control over that and I apologize on behalf of the county" (XXXI R.R. at 7).

157. After the jury spent the entirety of the February 26, 2014, workday deliberating guilt/innocence, the trial court informed the jury that "[w]e have secured better accommodations for you this evening" (*Id.* at 27).

158. Jury accommodations for the second evening of guilt/innocence deliberations were located at the Holiday Inn NW Willowbrook at 18818 SH 249, Tomball Parkway. *State's Habeas Ex. 6, Affidavit of Vickie Long at 2.*

159. On the morning of February 27, 2014, the trial court told the jury, "I hope you found last night's accommodations to be more suited. I didn't book your first night's accommodations so, not my fault" (XXXII R.R. at 4-5).

160. The Court finds factors beyond the trial court's control caused difficulty in finding hotel accommodations for the jury on the evening of February 25, 2014.

**BUS-WAVING INCIDENT**

161. On direct appeal, the applicant asserted he was deprived due process and the right to an impartial jury as a result of an outside influence on the jury, namely an incident involving his brother standing near the street and waving at the jury's bus as jurors departed the courthouse, and that the trial court abused its discretion by

02791

overruling the defense's motion for mistrial; the applicant's claim was overruled by the Texas Court of Criminal Appeals. *Balderas*, 517 S.W.3d at 782-91.

162. In overruling the applicant's claim on direct appeal, the Court of Criminal Appeals held:

> [w]e doubt that Balderas' brother's conduct of waving and smirking at the jurors as their bus passed him on a public street constituted 'contact...about the matter pending before the jury.' The fact that some jurors recognized Balderas's brother because he had been a spectator in the courtroom did not necessarily transform his conduct of waving and smirking into a communication about the case....Further, the contact at issue was not particularly threatening or intrusive, and the evidence before the trial court rebutted any presumption of harm...Moreover, the record does not support Balderas' speculation that the jurors were deadlocked before the incident, but then, on the morning after the incident, those who favored a not-guilty verdict were so fearful that they abandoned their positions and returned a guilty verdict to 'escape the situation.'

*Id.* at 789-90 (internal citations omitted).

163. On the morning of February 27, 2014, the trial court was notified by Harris County Sheriff's Office Deputy Patrick Henning that as the jury was loading the bus to go to dinner the night before, members of the jury notified him an individual they believed to be the applicant's brother was waving at them (XXXIII R.R. at 12).

164. After the jury returned a guilty verdict on February 27, 2014, the trial court explored the bus-waving incident on the record with Deputy Henning and several jurors in the presence of both parties (*Id.* at 12-28).

165. Deputy Henning testified he did not personally see the incident, nor did he know what the applicant's brother looked like, but he saw an individual who matched the jurors' description of a person they believed was smirking and waving at them, and asked the bus to stop so he could follow or identify this person, but the person was too far away and Deputy Henning could not leave the jury (*Id.* at 12-13).

166. Deputy Henning testified approximately five or six jurors identified the individual who had waved at them as the applicant's brother based on the man's presence at the courthouse and in the courtroom; that several jurors seemed very alarmed by

02752

the incident; and that he informed the jurors not to discuss the incident among themselves (*Id.* at 14).

167. The record reflects Deputy Henning identified "A.B." and "D.T." as two jurors who had discussed the bus-waving incident with him, and that the trial court questioned and permitted both parties to question these two jurors regarding their reactions to the incident (*Id.* at 16-28).

168. Juror "A.B." testified she did not see the bus-waving incident, but was made aware of it by other jurors at the time it occurred (*Id.* at 17-18).

169. Juror "A.B." testified the bus-waving incident made her feel "cautious" but this "feeling of cautiousness" did not weigh into her deliberations (*Id.* at 17-19, 21).

170. Juror "D.T." testified she heard another juror say "Oh, my god, there's his brother" and when she turned she saw a man "standing on the curb with this smirk on his face and he just kind of was waving" (*Id.* at 23-24).

171. Juror "D.T." testified she was not certain the individual was in fact the applicant's brother, but that "[w]e just figured that that's who that was" and that she had seen the individual in the courtroom during the trial (*Id.* at 24).

172. Juror "D.T." testified there was "[n]ot very much [discussion about the incident on the bus] other than, oh, my god, there he is" and no discussion of the incident at dinner (*Id.* at 25-26).

173. Juror "D.T." testified she informed the two deputies at breakfast that morning she was "concerned" about the bus-waving incident because she "thought they were supposed to keep people away from us", but after speaking to the deputy, he put her "mind at ease" and said "it's perfectly normal for [her] to be jumpy" (*Id.* at 26-27).

174. Juror "D.T." testified "irregardless [*sic*] of what [the waving man] did and what I saw, it's not going to change my decision in this case" (*Id.* at 27).

175. The record reflects both jurors "A.B" and "D.T" testified the bus waiving incident would not affect or influence them as they continued to serve on the jury (*Id.* at 17-28).

176. The record reflects after jurors "A.B" and "D.T" were questioned by the court and the defense, the defense moved for a mistrial alleging the jury's verdict was reached

62793

as a result of an outside influence and the applicant was denied his right to an impartial jury, due process, and a fair trial; the trial court denied the defense's motion (*Id.* at 28-29).

177. The Court finds to the extent the proffered affidavits of jurors Armstrong, Birney, Norwood, Orosz, and alternate juror Browning-McCauley concern the deliberation process, and because they do not establish that jurors considered any impermissible extraneous influences or impropriety in their deliberations, they cannot be considered pursuant to TEX. R. EVID. 606(b). *See Applicant's Exs. 18-22.*

178. The Court finds the proffered affidavit of alternate juror Browning-McCauley unpersuasive and irrelevant to all the applicant's claims given that she did not deliberate in the applicant's case. *See Applicant's Ex. 20.*

179. Notwithstanding the preclusion of jurors Armstrong, Birney, Norwood, and Orosz's proffered affidavits per TEX. R. EVID. 606(b), the Court finds these affidavits are not dispositive on the merits of the applicant's habeas claims that he was denied the right to a fair trial or that the jury was subjected to an improper outside influence as a result of the first-night accommodations or bus-waving incident. *See Applicant's Exs. 18-19, 21-22.*

180. Notwithstanding the preclusion of jurors Armstrong, Birney, Norwood, and Orosz's proffered affidavits per TEX. R. EVID. 606(b), the Court finds these affidavits are speculative as to the effect of the jury's first-night accommodations and the bus-waving incident on the jury's deliberations. *See id.*

181. The Court finds the applicant fails to present credible, persuasive, or admissible evidence that the jury accommodations hampered his due process right to a fair trial or impartial jury.

182. The Court finds the applicant fails to present credible, persuasive, or admissible evidence that the bus-waving incident hampered his due process right to a fair trial or impartial jury.

**FACEBOOK ENTRIES**

183. Juror John R. Armstrong made 17 entries on his Facebook page between January 11, 2014 and March 14, 2014, specifically:

  a. the first entry was on January 11, 2014, two days before Armstrong's selection for jury service;

40

62794

b. the second and third entries were on February 17 and February 20, 2014, respectively, and made during guilt/innocence;

c. the fourth entry was made wade on February 27, 2014 after the jury reached a guilt/innocence verdict;

d. the fifth through fifteenth entries were made between March 1 and March 12, 2014, during punishment; and

e. the last two entries were made on March 14, 2014, after Armstrong completed jury service.

*Applicant's Ex. 68.*

184. Generally, Armstrong's Facebook posts consist of statements regarding: his difficulty in getting to jury service; the jury selection process; updates on the stages of trial; the length of time the trial lasted; the emotionally draining aspects of jury service; and the fact that some jurors were missing vacations due to jury service. *Id.*

185. Individuals who posted in response to Armstrong's Facebook entries generally made comments that they missed him or told him to "hang in there." *Id.*

186. In response to Armstrong's February 27, 2014, post, one individual commented, "Give them the chair!" with no response from Armstrong. *Id.* at 6.

187. On March 10, 2014 Armstrong posted he was on his fourth week of jury duty to which an individual commented, "Were any white Ford Broncos part of the testimony?" and Armstrong responded "No white cars…just never ending testimony of 'expert' witnesses…" *Id.* at 15.

188. The Court finds Armstrong's comment regarding "never ending testimony of 'expert' witnesses" is ambiguous and could have referenced experts presented by either or both parties. *See id.* at 15.

189. The Court finds in Armstrong's Facebook entries and responses to commentators from January 11, 2014 through March 14, 2014, Armstrong did not discuss the facts of the applicant's case, the jury's deliberation process, nor make any comment indicating bias or partiality. *Id.*

190. The Court finds there is no evidence Armstrong was influenced by commentators' responses to his Facebook entries from January 11 through March 14, 2014. *Id.*

02795

191. The Court finds the applicant fails to demonstrate he was prejudiced by Armstrong's Facebook postings from January 11 through March 14, 2014, or that he was denied a fair and impartial trial.

**ALLEGED PREMATURE DISCUSSION OF EVIDENCE & RELIANCE ON OWN EXPERTISE**

192. The Court finds to the extent the proffered affidavits of jurors Armstrong, Norwood, Sullivan, and Orosz concern juror deliberations and do not establish that jurors impermissibly considered an "outside influence" during in their deliberations, they cannot be considered pursuant to TEX. R. EVID. 606(b). *Applicant's Exs. 18, 21-23.*

193. In the alternative, the Court finds the proffered affidavits of jurors Armstrong, Norwood, Sullivan, and Orosz are not dispositive on the merits of the applicant's habeas claims that the jury allegedly engaged in misconduct by prematurely discussing evidence and relying on juror expertise on guns, ballistics, and Spanish translations. *See id.*

194. The applicant fails to establish the jury received any additional or impermissible evidence for consideration during deliberations.

195. The record reflects that during the punishment phase, the trial court was informed one or more jurors had concerns about the interpreter's translations of Spanish-speaking witness testimony (XXXIX R.R. at 26).

196. The record reflects the trial court questioned two jurors, identified as "D.T." and "L.M.", who had concerns about the accuracy of Spanish translations, overruled the defense's motion for a mistrial, and instructed the entire jury that each translator was certified in proficiency for translation; each translator had taken an oath to truly and correctly interpret; the interpreter's translation was the official testimony from the witness; and the jury was not to discuss the case until after the court's charge following closing arguments (*Id.* at 25-35).

**ALLEGED FAILURE TO FOLLOW TRIAL COURT INSTRUCTIONS**

197. Notwithstanding the preclusion of jurors Armstrong, Birney, and Orosz's proffered affidavits per TEX. R. EVID. 606(b), the Court finds these affidavits are not dispositive on the merits of the applicant's claims that the jury allegedly engaged in misconduct by: shifting the burden of proof to the applicant during the guilt/innocence phase; convicting the applicant despite not being convinced beyond a reasonable doubt; considering potential punishment when deciding guilt;

02796

and determining their verdicts before hearing all the evidence. *See Applicant's Exs. 18-19, 20.*

198. Notwithstanding the preclusion of jurors Armstrong, Birney, Norwood, and Orosz's proffered affidavits per TEX. R. EVID. 606(b), the Court finds these affidavits do not refute a presumption that the jury followed the trial court's instructions. *Id; see Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005).

---

## SIXTH GROUND FOR RELIEF:
## ALLEGED INEFFECTIVE ASSISTANCE OF COUNSEL IN PUNISHMENT PHASE

---

### ALLEGED FAILURE TO INVESTIGATE & PRESENT MITIGATING EVIDENCE

199. Prior to trial, the State filed four notices of intent to use extraneous offenses and prior convictions for impeachment and/or punishment purposes, detailing more than 100 hundred offenses and bad acts, including *inter alia*, four capital murders, four aggravated assaults, an aggravated kidnapping, an aggravated robbery, and an arson committed by the applicant (II C.R. at 505-516; V C.R. at 1130; VII C.R. at 1911; XI C.R. at 3169).

200. Based on the credible affidavits of trial counsel, the Court finds counsel:

   a. conducted a thorough pretrial mitigation investigation. *Affidavit of Jerome Godinich, Jr. at 3-4; Affidavit of Alvin Nunnery at 3*;

   b. retained multiple expert witnesses including fact investigators, seven mitigation experts, and four expert witnesses. *Affidavit of Jerome Godinich, Jr. at 3; Affidavit of Alvin Nunnery at 3*;

   c. sent defense experts to Mexico and New York on multiple occasions to develop mitigation information, evidence, and testimony. *Affidavit of Jerome Godinich, Jr. at 3*;

   d. investigated the applicant's childhood, background, and familial history of mental illness. *Id.* at 3;

   e. investigated whether the applicant was disassociating from LTC. *Id.* at 3;

   f. explored various avenues for presenting the different types of mitigation evidence available. *Affidavit of Alvin Nunnery at 3*; and

   g. made reasoned, strategic choices in the manner and witnesses through which mitigation evidence was to be presented. *Id.; Affidavit of Alvin Nunnery at 3.*

Ø2797

201. The Court finds the defense team sought pretrial assistance and information from the applicant's family to aid in the applicant's mitigation case, but that instead of assisting the defense team, the family created obstacles and tried to undermine the defense's efforts, namely:

   a. the applicant's mother did not want sexual abuse information about the applicant presented in trial. *Affidavit of Jerome Godinich, Jr. at 4;*

   b. the applicant's mother told her relatives in Mexico not to come to Houston, or testify for the applicant. *Id.;*

   c. because of statements made by the applicant's mother, none of the applicant's relatives were going to testify, until the defense forced the applicant's mother to go to Mexico and apologize to them. *Id.;* and

   d. the applicant's relatives in Mexico could not coordinate which of them would come to Houston. *Id.*

202. Despite any challenges arising from the applicant and his family, the Court finds that based on the entirety of the record, trial counsel conducted an expansive and thorough pretrial punishment and mitigation investigation.

203. During the punishment phase of trial, trial counsel presented the testimony of 18 defense witnesses, including seven experts, the applicant's juvenile caseworker, a guard at the Harris County Jail, and friends and family of the applicant (XXXVII R.R. at 170-243; XXXVIII R.R. at 5-19, 35-37, 39-95, 105-178; XXXIX R.R. at 6-21, 103-09, 112-28, 135-59; XL R.R. at 50-58, 60-68, 96-106, 115-47, 163-70, 174-82, 176, 182, 193-218, 242-52, 256-58; XLI R.R. at 37-50, 59-72, 75-109, 148-76, 186-201, 208-24, 246-70; XLII R.R. at 6-64, 87-96, 107-115, 123).

204. Contrary to the applicant's habeas assertions, the Court finds trial counsel presented evidence of the applicant's positive characteristics and role as a protector:

   a. the applicant's mother Vicky Reyes testified since his arrest, the applicant has changed and become a God-seeking, good, and different person who deserves to live (XXXVIII R.R. at 83-84);

   b. the applicant's cousin Vianet Reyes testified once the applicant adjusted to life after moving to Mexico, he was respectful, well-mannered, and happy (XXXIX R.R. at 119);

44

· 02798

c. psychiatrist Dr. Mathew Brams testified the applicant has matured during his incarceration and shown he is better able to cope than he was before (*Id.* at 154-59);

d. the applicant's friend Daniella Chavez testified the applicant did not influence or force her to take part in any activities documented in the gang photographs shown at trial, and that she was not aware of the applicant forcing any female to do anything they did not want to do (XLI R.R. at 48-49);

e. the applicant's friend Judy Gallegos testified the applicant was over-protective of women, took care of women, and never forced women to do anything (*Id.* at 41);

f. psychologist Dr. Jolie Brams testified the applicant's graduation from high ·school demonstrated determination, and that the people she interviewed saw potential in the applicant, including his teacher who believed he had a good heart and that he got along with others (XLII R.R. at 58, 62-63); and

g. retired prison chaplain Carroll Pickett testified that during their meetings, he and the applicant discussed scriptures, and the applicant was repentant, asked for forgiveness, confessed to various things, and indicated things he would have done differently in his life (*Id.* at 96-98, 101-05).

205. Contrary to the applicant's habeas assertions, the Court finds trial counsel presented evidence of the applicant's familial history of mental illness:

a. Vicky Reyes testified she and Eleazar Hernandez had two sons together: Alejandro who committed suicide on July 22, 2011 at age 18, and Ivan who was diagnosed as schizophrenic and suicidal, and who had attempted suicide in July 2013 (XXXVIII R.R. at 53-55). Reyes also testified Hernandez visited a psychiatrist in Mexico in 1996 after attempting suicide (*Id.* at 57, 61);

b. the applicant's aunt Marina Reyes testified Eleazar Hernandez saw a psychiatrist about three times in Mexico (XXXIX R.R. at 19); and

c. Dr. J. Brams testified the applicant likely had nine of the ten risk factors from the ACES 10-point checklist predictive of health behavior, and that the effect from trauma was his major mental health issue (XLII R.R. at 44, 51).

206. Contrary to the applicant's habeas assertions, the Court finds trial counsel presented substantial evidence of the applicant's violent, abusive, and unstable childhood environment and upbringing through multiple witnesses:

45

· 62799

a. Vicky Reyes testified she and the applicant's father fought because neither wanted to be responsible for the children (XXXVIII R.R. at 47); the applicant would hide under the bed, in a closet or in corners when his parents fought (*id.* at 48-48); on three occasions, the applicant saw his father physically hit her (*id.* at 48); she and the applicant's father separated when the applicant was three years old and the applicant's father did not actively seek to see the children (*id.* at 48-49); the applicant was affected by his father's leaving and was always sad, but she did not care how the applicant felt (*id.* at 49-50); she and Eleazar Hernandez had physical fights which the applicant witnessed (*id.* at 52-53); Hernandez punished the applicant by hitting him with a clothes hanger (*id.*); Hernandez called the applicant names (*id.* at 56); the applicant did not want to move to Veracruz with Reyes and Hernandez because Hernandez was sexually abusing the applicant (*id.* at 63); the applicant ran away because he did not want to move with Reyes and Hernandez, and three or four days later was found selling popsicles in the street (*id.* at 61-62); she did not believe Hernandez was sexually abusing the applicant, ignored what she was told, and did nothing because she was obsessed with Hernandez (*id.* at 64); she moved back to Houston with her kids when Hernandez tried to strangle her (*id.* at 64-66); it did not bother her when Hernandez abused the applicant (*id.* at 66); and upon returning to Houston, she and the children lived in a number of different places in search of the cheapest apartments (*id.* at 68-69);

b. Marina Reyes testified that when Vicky Reyes left the applicant in Mexico, the applicant missed his mother and initially had difficulty adjusting (XXXIX R.R. at 12-14); when Vicky and Eleazar Hernandez came to get the children in Mexico, the applicant ran away (*id.* at 15-17); Hernandez would sit next to the applicant on the sofa, caress the applicant, and touch "on his little parts" (*id.* at 17-18); and when she told Vicky about Hernandez's sexual conduct towards the applicant, Vicky said it was just because Hernandez loved the applicant (*id.* at 18);

c. Vianet Reyes testified that for several months after Vicky Reyes left the applicant in Mexico, he would sit on the roof and wait for his mother to return because he did not understand why she had left (XXXIX R.R. at 117-18); the applicant ran away for several days after learning he was leaving with Vicky and Hernandez because he did not want to be near Hernandez (*id.* at 123-24); and she told Vicky that Hernandez was touching the applicant, but Vicky did not believe her (*id.* at 123-25);

d. the applicant's father Juan Balderas, Sr. testified he and Vicky Reyes had problems and argued because she was seeing other men (XXXVIII R.R. at 87-91); he did not see the applicant for a long time after he separated from Reyes

02800

because he did not know where they lived (*id.* at 91); he re-connected with the applicant when the applicant was around 14 or 15 years old, but was not aware the applicant was involved with gang activity until after the applicant was arrested (*id.* at 93-94);

e. forensic psychologist Dr. Matthew Mendel testified Eleazar Hernandez's sexual abuse of the applicant started at age five, had a long duration, and was coupled with the applicant's emotional abuse and physical abuse such as being punched and placed in chokeholds (*id.* at 157-59, 161); the applicant reported sexual abuse at the hands of Hernandez as well as three females and another male (*id.* at 144); when the applicant was eight years old, a 16-year old girl kissed and touched him (*id.* at 146-47); when the applicant was 13, the applicant had sex with his mother's friend who was in her mid-20s (*id.* at 148); while in Mexico, the applicant had a sexual experience with his aunt's girlfriend (*id.* at 147-48); and the applicant reported a male neighbor abused him when he was young (*id.* at 145);

f. geographic information system analyst Amy Nguyen testified that using census data from the 1980s through 2000, she created several maps of southwest Houston where the applicant grew up to demonstrate the higher poverty rates, signs of community disorganization and lower educational level of Hispanics in the area compared to other groups and the county at large (XL R.R. at 125-65);

g. Dr. J. Brams testified the applicant was used by Eleazar Hernandez and his friends as a participant in human cockfights (XLII R.R. at 26); and

h. the applicant's former juvenile probation officer, Sofia Nolte testified that at the time the applicant attended boot camp, it was a militaristic, secured facility without many therapeutic services, but that if it had been known that the applicant had suffered trauma or sexual abuse, he would have been referred for treatment (XLI R.R. at 194).

207. Contrary to the applicant's habeas assertions, the Court find trial counsel presented substantial evidence of the applicant's "unstable, impetuous mother"[4]:

a. Vicky Reyes, testified she and the applicant's father were not ready to have a child (XXXVIII R.R. at 45); she was young when she had the applicant and did not want to be a mother (*id.* at 45); she felt it was a nuisance to be a mother and the applicant prevented her from living her life (*id.* at 46); when

---

[4] *Applicant's Writ Application* at 227.

. 02881

she separated from the applicant's father she began drinking and smoking and became careless with the children (*id.* at 50); after work, she would go out drinking and smoking with her friends, instead of going home (*id.* at 46); she would leave her children with neighbors or with the person she was dating and go out (*id.* at 46, 50); once she went to a dance after work, stayed out until 5:00 am, changed clothes, went to work without checking on her children, and did not care (*id.* at 51); after marrying Eleazar Hernandez, she would sometimes leave the applicant and his brother Jesus alone and in Hernandez's care (*id.* at 51-52); she did not object to Hernandez's method of punishing the applicant because she was afraid Hernandez would leave her (*id.* at 53); when she was married to Hernandez she did not worry about how the applicant felt about their household environment (*id.* at 56); when the applicant was beginning the second grade, she left him and his brother with relatives in Mexico so she could be alone with Hernandez (*id.* at 57-58); it was only when she was called to the applicant's school after he was in a fight, that she realized the applicant was hanging around the wrong people (*id.* at 69-70); she knew the applicant was in a gang, but ignored it (*id.* at 70-72); she made mistakes raising the applicant (*id.* at 82-83); neither she nor the applicant's father were good role models (*id.* at 85); and she left the applicant to himself and to find his own role models when he was growing up (*id.* at 85);

b. Marina Reyes, testified that when Vicky Reyes initially left Mexico, the family did not hear from her for nine years, and Vicky only returned to leave the eight-year old applicant and his brother Jesus in Mexico (XXXIX R.R. at 6-9);

c. Vianet Reyes testified the family was surprised when Vicky Reyes left the applicant and Jesus in Mexico because the family assumed she was dead (*Id.* at 116); and

d. Dr. J. Brams testified Vicky Reyes was an alcoholic who chose her abuser over the applicant; was ill-prepared to be a parent, or to connect and care about others; and was unable to bond with the applicant as a baby (XLII R.R. at 12-15, 21).

208. The Court finds trial counsel presented extensive expert testimony to explain the impact, consequences, and ramifications of the applicant's violent, abusive, and unstable childhood surroundings and upbringing (XXXVIII R.R. at 125-78; XXXIX R.R. at 103-109, 143-59; XL R.R. at 50-58, 60-63, 195-218, 242-52, 256; XLI R.R. at 251-70; XLII R.R. at 6-63, 87-94).

02802

209. Forensic psychologist Dr. Matthew Mendel evaluated the applicant to determine the impact of childhood trauma or abuse the applicant experienced (XXXVIII R.R. at 125-78; XXXIX R.R. at 103-09).

210. Dr. Mendel testified to the wide scope of information he gathered, considered, and reviewed as part of his evaluation, which included his own interviews with the applicant and the applicant's friends and family (XXXVIII R.R. at 125-30, 170-73).

211. Dr. Mendel testified the applicant's sexual abuse at the hands of Eleazar Hernandez "was about as severe as it gets" and that sexual abuse predicts a worse outcome if it happens several times, begins at a young age, and the abuser is in a close relationship with the victim (XXXVIII R.R. at 140, 156-57); victims of sexual abuse suffer from a sense of powerlessness which may explain the importance of the applicant's being tough and hypermasculine (*id.* at 149-51); victims of sexual abuse suffer from betrayal which the applicant felt from his mother and Hernandez (*id.* at 151-51); victims of sexual abuse suffer from stigmatization which is more pronounced in male sexual abuse victims (*id.* at 149-50, 152); victims of sexual abuse are more likely to suffer sexual dysfunction – something the applicant reported (*id.* at 149-50, 153-54); many of the applicant's behaviors (such as drug and alcohol abuse and intentionally putting himself in emotionally painful situations) were forms of emotional suppression stemming from a sense of powerlessness that is common in victims of sexual abuse (XXXVIII R.R. at 163-68); and the applicant expressed rage, anger, and aggression when discussing past sexual abuse (*id.* at 162).

212. Dr. Mendel ultimately diagnosed the applicant with post-traumatic stress disorder (XXXVIII R.R. at 125-78); (XXXIX R.R. at 103-09).

213. Psychiatrist Dr. Matthew Brams testified that in evaluating the results of the Personality Assessment Inventory administered the applicant, he exhibited many trauma symptoms and experiences much anxiety stemming from his upbringing (XXXIX R.R. at 153-54).

214. Psychologist Dr. Jolie Brams evaluated the applicant to determine the correlation between the applicant's history and functioning, and whether his life influences affected his behavior (XLI R.R. at 251-70; XLII R.R. at 6-63, 87-94).

215. Dr. J. Brams testified that in the course of her evaluation, she interviewed the applicant, his friends, his family, and State witnesses; reviewed an extensive amount of background and diagnostic information; and ultimately concluded the pervasive trauma the applicant experienced as a child markedly impacted his functioning

02883

during his childhood and adolescence, and affected his behavior choices (XLI R.R. at 261-63, 268).

216. Dr. J. Brams testified the applicant suffered an extreme level of trauma of the type that studies show has a significant effect on brain development, behavior, and mental health functioning; the applicant's exposure to domestic violence and lack of good role models resulted in his inability to deal with emotions or solve problems; the applicant was the victim of a generational history of sexual abuse in Eleazar Hernandez's family; the applicant's life was filled with abandonment and abuse; and the applicant lived in a social environment of survival of the fittest where his poverty limited the available resources causing him to have to take care of himself (XLI R.R. at 268, XLII R.R. at 17-18, 20-24, 29-30, 45-46);

217. Dr. J. Brams testified the applicant was not properly assessed and diagnosed as a child or adolescent and consequently he was not given treatment from which he could have benefitted (XLI R.R. at 269-70).

218. Dr. J. Brams found the applicant showed signs of depression during his childhood and displayed symptoms of post-traumatic stress disorder, but was not exhibiting any meaningful signs of anti-social behaviors or antisocial personality disorder (XLII R.R. at 47-49).

219. The Court finds trial counsel used expert testimony to highlight the correlation between the applicant's childhood circumstances and upbringing to his gang affiliation:

   a. Dr. Mendel identified a number of traumatic events during applicant's childhood and found that the applicant's childhood abuse and trauma were central to his gang activity, with the gang serving as the applicants' family (XXXVIII R.R. at 135-39, 162);

   b. Dr. J. Brams testified the profound trauma suffered by the applicant directly related to his gang involvement, because he experienced emotional detachment which led to his participation in gang/criminal activities, and that the gang gave him a sense of safety and an outlet for his anger (XLI R.R. at 268-69; XLII R.R. at 26, 28-30, 40-41).

   c. criminology and criminal justice professor Dr. John Rodriguez testified that a review of the applicant's life history, police reports, and school records, revealed the applicant was the failed product of his society and environment (low education rates, high unemployment rates, and high property crimes); the applicant had a higher propensity to join a gang; and the gang gave the

50

02804

applicant an identity, environment, family, outlet for stress, and coping mechanisms (XL R.R. at 201-205, 208, 213-14, 252).

220. The Court finds trial counsel presented additional mitigation evidence that the applicant had family and friends who loved and supported him:

    a. Vicky Reyes testified she supported the applicant (XXXVIII R.R. at 83-84);

    b. Marina Reyes testified she had a close relationship with the applicant and loved him very much (XXXIX R.R. at 15);

    c. Vianet Reyes testified she would be emotionally available for the applicant if he spent the rest of his life in prison (*Id.* at 128);

    d. the applicant's cousin Paloma Reyes testified she loved the applicant like a brother and that he was very important to her (*Id.* at 193-95); and

    e. Juan Balderas, Sr. testified that he would emotionally support the applicant if the applicant spent the rest of his life in prison (XXXVIII R.R. at 94-95).

221. The Court finds trial counsel presented lack of future danger evidence in the form of the applicant's generally positive behavior and performance while in custody or under court supervision, namely:

    a. Dr. M. Brams testified that according to the Personality Assessment Inventory, which allows for comparisons between aggressiveness and mental health issues between individual inmates, he believed the applicant is less aggressive, more submissive, and less dominant than other inmates (XXXIX R.R. at 150-51, 153); the applicant would not be the aggressor, leader, or predator in an inmate population (*id.* at 151-53); the applicant may avoid rather than start conflict (*id.*); and the applicant would continue to mature while incarcerated and adjust to incarceration better than most inmates (*id.* at 154-59);

    b. prison consultant and former warden Terry Pelz testified an inmate's past institutional behavior indicates his future institutional behavior, and that after interviewing the applicant and reviewing his juvenile records, jail records, and some police reports, Peltz was optimistic for the applicant and believed the applicant would do fine in prison given his non-serious juvenile history, and propensity towards religion (XLI R.R. at 201-13, 215-17, 246);

    c. Harris County Sheriff's Office Deputy Oscar Gonzalez testified he never had any problems with the applicant at the jail, and the applicant once helped calm

02805

a difficult inmate who was placed in the cell next to the applicant (XLII R.R. at 112-13);

d. Sofia Nolte testified that when the applicant was on her caseload as a juvenile, he was well-behaved, she had no problems with him, and wanted to work with him (XLI R.R. at 194, 199); the applicant was once referred to court because of a physical altercation, but was sent back to boot camp instead of TYC[5] (*id.* at 197); and the types of write-ups the applicant received during boot camp - constantly talking and leaving the assigned area - were not real offenses in the grand scheme of things she dealt with (*id.* R.R. at 199).

222. The Court finds trial counsel also presented lack of future danger evidence in the form of prison experts:

a. retired prison administrator Frank Aubuchon testified extensively concerning the prison classification system for inmates who receive a life sentence without parole for capital murder, and that LTC is not considered a security threat group in prison (*Id.* at 78-103); and

b. Pelz testified he believed there would be no incentive for the applicant to join a prison gang; prison gangs did not associate with or tolerate street gangs like LTC; and that inmates doing life without parole can be managed by prison (*Id.* at 220-21, 224).

223. Notwithstanding the defense's efforts to mitigate the applicant's punishment and show a lack of future danger at trial, the Court finds the State aggressively cross-examined defense experts and presented overwhelming and compelling punishment evidence against the applicant, specifically:

a. his juvenile criminal history, including theft, evading arrest, unauthorized use of a motor vehicle, and assault offenses (XXXIII R.R. at 11-44);

b. his disobedience, behavior problems, and violations while on juvenile probation (*Id.* at 11-44);

c. his truancy from school, substance abuse, and disrespect towards his mother (*Id.* at 11-44, 50);

d. his failed attempts at gang disassociation and substance abuse rehabilitation (*Id.* at 11-44);

---

[5] Texas Youth Commission.

e. his gang membership, leadership role, participation in activities/meetings, and tattoos (XXVI R.R. at 126-62, 192; XXVII R.R. at 75-75, 87-99, 114-19, 121; XXXIII R.R. at 11-44, 54-55; XXXIV R.R. at 14-253; XXXV R.R. at 10-44; XXXVI R.R. at 257-82);

f. his psychological screening results showing he had an average IQ, a supportive family, and no history of reported abuse (XXXIII R.R. at 48-67);

g. his psychological screening results showing he exhibited adolescent onset conduct disorder, cannabis abuse, inhalant abuse, cocaine abuse, and alcohol abuse (*Id.* at 48-67);

h. his participation as a gunman and shooter in the capital murder of Daniel Zamora and the aggravated assault of Guadalupe Sepulveda on September 12, 2005 (XXXIII R.R. at 69-100, 106-28; XXXIV R.R. at 5-44, 68-120, 198-246; XXXV R.R. at 10-44; XLII R.R. at 278-80);

i. his participation as a gunman and shooter in the murder of Eric Romero on December 3, 2005 (XXXV R.R. at 10-31, 116-37, 140-72, 178-224);

j. his participation as a gunman and shooter in the aggravated assault of Luis Garcia on November 14, 2005 (*Id.* at 8-26, 31-49; XXXVI R.R. at 158-76);

k. his participation as gunman and shooter in the capital murder of Jose Garcia on December 15, 2005 (XXXVI R.R. at 55-89, 95-111, 152-58; XXXVII R.R. at 9-32; XL R.R. at 276);

l. the intentional arson of the applicant's car, which had been identified in the commission of multiple offenses via its license plate (XXXV R.R. at 12-14; XXXVI R.R. at 20-24, 35-40, 104-105 109-111, 123-47, 169-71);

m. his possession of a variety of different firearms, ammunition and firearm paraphernalia upon his arrest, including items traditionally sold only to law enforcement (XXXVI R.R. at 225-45, 248-65);

n. the discovery of various weapons, ammunition, drugs, drug paraphernalia, cell phones, large amounts of cash, bandanas, face masks, and gang-related items in his apartment by law enforcement (XXXVII R.R. at 34-82);

o. his propensity to carry firearms with him at all times, specifically a .357 caliber and a .40 caliber handgun (XXXIV R.R. at 195-98; XXXV R.R. at 19-20);

p. the .40 caliber Smith & Wesson handgun consistent with ballistics evidence from Eduardo Hernandez's murder was specifically identified as one of the

02807

applicant's two personal firearms he always kept with him (XXV R.R. at 238, 245; XXVII R.R at 16; XXXVII R.R. at 36-41, 53-54; XXXIV R.R. at 197);

q. two-.40 caliber Smith & Wesson fired cartridge casings recovered from the Zamora murder/Sepulveda aggravated assault crime scene had been fired from the .40 caliber Smith & Wesson handgun that was in the applicant's possession at the time of his arrest and which was specifically identified as one of the applicant's two personal firearms he always kept with him (XXV R.R. at 238, 245; XXVII R.R at 16; XXXVII R.R. at 118-19);

r. .40 caliber Smith & Wesson cartridge casings that had been "necked down" to .357 caliber from the Luis Garcia aggravated assault crime scene had been fired from the .357 Sig handgun that was in the applicant's possession at the time of his arrest (XXXVI R.R. at 231; XXXVII R.R. at 120-26);

s. eight-.357 caliber Sig cartridge casings; one-.40 caliber Smith & Wesson cartridge casing that had been necked down to .357 caliber; two fired bullet jackets; and a jacketed lead bullet from the Eric Romero murder scene had been fired from the .357 Sig handgun that was in the applicant's possession at the time of his arrest (XXXVI R.R. at 231; XXXVII R.R. at 127-131, 143);

t. three-.40 caliber Smith & Wesson cartridge casings that had been "necked down" to .357 caliber, and three fired jacketed lead bullet from the Jose Garcia murder scene had been fired from the .357 Sig handgun that was in the applicant's possession at the time of his arrest (XXXVI R.R. at 231; XXXVII R.R. at 143-49);

u. the 9mm cartridge case recovered from the applicant's pocket when he was arrested matched the 9mm Luger handgun found in the applicant's residence (XXV R.R. at 230-32; XXXVII R.R. at 34-82, 159);

v. his assault on Houston Police Department Officer Woodrow Tompkins and another inmate on November 20, 2005 while in the city jail (XLII R.R. at 133-44);

w. his classification, housing and disciplinary history while in the Harris County Jail, which included being housed in a segregated cell since April 2007 and being found guilty of destroying, altering, or damaging county property; tattooing or possession of tattoo paraphernalia; possession of contraband; fighting; tampering; possession or manufacture of a weapon; and misuse of medication, (XLII R.R. at 149-87, 204-209, 212-22, 227-40, 242-53); and

02808

x. an incident in the Harris County Jail on May 10, 2009, where the applicant grabbed a pocketknife from Detention Officer Chris Aguero and threatened Aguero with it (XLII R.R. at 256-67).

224. Given the totality of the evidence, the Court finds trial counsels' decisions to present lack of future danger and mitigation evidence in the manner presented at trial was reasonable trial strategy.

## ALLEGED FAILURE TO INVESTIGATE & PRESENT EVIDENCE REBUTTING EXTRANEOUS OFFENSES

225. The Court finds trial counsel cross-examined State's witnesses as rebuttal evidence to the State's presentation of extraneous offenses (XXXIII R.R. at 100-105; XXXIV R.R. at 45-67, 121-37, 145-46; XXXV R.R. at 45-115, 128-30, 138-40, 172-76, 198, 224-231; XXXVI R.R. at 27-30, 50-54, 89-94, 112-22, 148-51, 176-207, 218-24, 232, 245-46, 263, 283; XXXVII R.R. at 32-34, 82-85, 149-59, 167-69; XLII R.R. at 131-33, 145-49, 188-203, 210-11, 220-223, 225-26, 235, 240-42, 245-47, 254, 268-75, 280-83).

226. The Court finds trial counsel presented testimony regarding the hierarchy and operations of LTC as rebuttal to the State's presentation of extraneous offenses:

a. Celeste Munoz testified Wendy Bardales was "messing around" with the applicant, Israel Diaz and the complainant (XXXVIII R.R. at 14-15);

b. Daniella Chavez testified she knew the applicant and identified Alejandro Garcia, Jose, Efrain Lopez, Cookie, Chango, and the applicant as members of LTC (XLI R.R. at 44-46); and

c. Judy Gallegos testified Victor "Gumby" Arevalo was the leader of LTC in Alief (XXXVII R.R. at 175-82); gang members would vote on important matters, but Arevalo made the ultimate decisions (*id.* at 184-85); a person must be a fully "cliqued in" LTC member in order to commit offenses with other members (*id.* at 195); other people used the guns Arevalo would distribute (*id.* at 196-98, 200-02, 205); and Gallegos identified Arevalo's guns (*id.* at 196-98, 200-02, 205).

227. The Court finds according to Godinich's credible affidavit,

a. Celeste Munoz and Daniella Chavez testified as the defense expected and hoped. *Affidavit of Jerome Godinich, Jr.* at 2; and

02669

    b. counsel presented all the evidence available to them to rebut the State's extraneous offense allegations against the applicant. *Id.* at 3.

228. The Court finds trial counsel employed reasonable trial strategy to rebut the State's presentation of extraneous offense evidence.

**ALLEGED FAILURE TO OBJECT TO & PRESERVE TRIAL COURT'S DENIAL OF FUNDING TO TRANSPORT WITNESSES TO THE UNITED STATES FROM MEXICO**

229. Per Godinich's credible affidavit, the trial court would have paid for the transportation and housing of the defense witnesses from Mexico once these witnesses were inside the United States, and counsel was prepared to cover the fees associated with the witnesses leaving Mexico, but the witnesses were unable to coordinate among themselves who would come to Houston. *Id.* at 3-4.

230. Arrangements were made for several defense witnesses in Mexico to testify in the applicant's trial via Skype (XXXIX R.R. at 5).

231. During the testimony of the defense's Mexico witnesses, technical issues occurred with the Skype technology, which ultimately prompted the Court to take a break from Skype testimony in order to resolve the issue (*Id.* at 25, 35).

232. Ultimately, the parties successfully used speakerphone instead of Skype to finish questioning the applicant's witnesses in Mexico (XL R.R. at 173-75).

233. The Court finds that despite the distance and technological shortcomings of Skype, the parties were nevertheless able to present direct and cross-examination testimony from the applicant's witnesses for the jury's consideration.

234. Based on Godinich's credible affidavit, the Court finds the applicant's friends and family created obstacles and tried to undermine the defense's efforts during the punishment phase, namely:

    a. mitigation expert Adriana Helenek learned that Yancy Escobar was telephoning the witnesses in Mexico and instructing them how to respond to Godinich's questions. *Affidavit of Jerome Godinich, Jr.* at 4; and

    b. due to Escobar's interference with witness testimony, witnesses responded to Godinich's questions much differently than expected, and Godinich was unable to question the witnesses in Mexico as he had intended. *Id.*

02810

235. The Court finds any obstacle the defense faced as a result of witness tampering with its witnesses in Mexico, was a result of the applicant's friends and family, and not the trial court's failure to fund travel expenses from Mexico. *See id.*

236. The Court finds that the applicant's witnesses in Mexico were outside the subpoena power of the Court, but that these witnesses voluntarily agreed to testify via Skype (I Writ Hearing—February 22, 2018 at 38).

237. The Court finds the applicant fails to show the trial court erred in denying the defense funding to transport witnesses from Mexico to the United States.

**ALLEGED BAD BEHAVIOR & JURY ALIENATION BY TRIAL COUNSEL**

238. Per Nunnery's credible affidavit, he has no personal recollection of calling the State's counsel "a bitch" or saying that someone "doesn't like me because I'm black." *Affidavit of Alvin Nunnery* at 4.

239. The Court finds the record does not reflect Nunnery referring to the State's prosecutor as a "bitch", nor does it reflect Nunnery making a comment to the effect that "so and so doesn't like me because I'm black."

240. The Court finds the applicant fails to show the complained-of remarks attributed to Nunnery affected trial counsels' representation or the outcome of the proceeding.

241. Per Nunnery's credible affidavit, because of juror notes sent out during the jury's guilt/innocence deliberations, Nunnery made a strategic decision to remind the jurors during his punishment closing argument of the importance of the oath they took as jurors to have individual votes, to keep to their personal convictions, and that if they changed their votes because of peer pressure, that they had violated their oaths. *Id.*

242. The Court finds that in his closing argument, Nunnery noted the attention given by the jury during the trial; expressed his appreciation and respect for the jury's efforts; respectfully disagreed with the jury's guilty verdict; reminded the jury of their commitment during jury selection; summarized the evidence; argued the lack of credibility of the State's witnesses; made reasonable inferences from the evidence; argued a lack of future dangerousness and the presence of mitigation evidence such that the jury's answers on the special issues should lead to a life sentence for the applicant; asked the jury not to abandon common sense; and pleaded the jury to show the applicant mercy (XLIII R.R. at 5-36).

062811

243. Given the entirety of Nunnery's closing argument, the Court finds the content was reasonable trial strategy.

**FAILURE TO OBJECT & PRESERVE ERROR ON STATE'S QUESTIONING AND CLOSING ARGUMENT ALLEGEDLY ATTACKING APPLICANT'S FAILURE TO TESTIFY**

244. According to the credible affidavits of trial counsel, counsel did not object to portions of the State's cross-examination of Dr. Matthew Mendel and Dr. Matthew Brams regarding the failure to record conversations with the applicant, or the associated portions of the State's closing argument because counsel did not construe these as comments on the applicant's failure to testify, and believed these were fair points for cross-examination and attacks on the credibility of the experts. *Affidavit of Jerome Godinich, Jr.* at 3; *Affidavit of Alvin Nunnery* at 3-4.

245. The Court does not find the State's argument and cross-examination of experts Matthew Mendel and Matthew Brams constituted a comment on the applicant's failure to testify, but rather appropriately raised questions concerning the credibility of the defense's sexual abuse evidence. *See* (XXXIX R.R. at 53-58; XL R.R. at 13-16; XLII R.R. at 66).

---

## SEVENTH GROUND FOR RELIEF:
## STATE'S ALLEGED PRESENTATION OF FALSE EVIDENCE
## THROUGH WITNESS CHRISTOPHER POOL

---

246. On March 12, 2014, during the State's rebuttal punishment case, former Harris County Sheriff's Office ("HCSO") detention officer Christopher Pool testified regarding contraband he found during a search of the applicant's cell in the Harris County Jail (XL R.R. at 247-48).

247. Pool testified that on March 29, 2010 he was assigned to conduct a search of the applicant's single-man cell in the 1200 Baker Street jail, and during the search he found 34 Seroquel and Klonopin pills, two razor blades, and a pen (*Id.* at 248-49).

248. The applicant's false testimony allegations do not pertain to Pool's discovery of contraband in the applicant's cell, but rather the truthfulness of Pool's responses regarding the circumstances of his termination from the HCSO.

249. At trial, Pool testified he was currently employed by the Splendora Police Department but had previously worked for the HCSO for three and half years (*Id.* at 247-48).

250. On cross-examination and in response to defense counsel's questioning regarding why Pool left the HCSO, Pool testified that on August 22, 2012 he was terminated for a violation of policies, specifically "it was a round sheet, there was a failure to render aid and deception" (*Id.* at 254).

251. Pool concurred with defense counsel that the incident spurring his termination involved the death of an inmate (*Id.* at 254).

252. In response to the State's redirect examination question of "what happened yesterday in regard to that termination?" Pool testified that he was "cleared of all wrongdoing" in the incident spurring his termination and was eligible for rehire by the HCSO within 75 days (*Id.* at 255).

253. According to a March 12, 2014 letter from the Harris County Sheriff's Civil Service Commission, the commission

   a. modified Pool's termination to a suspension with time served from the termination date to the date of reinstatement and no award of back pay;

   b. stated "Pool is to be reinstated within 75 days from March 11, 2014, to his former pay grade but without seniority, from August 21, 2012 through the date of reinstatement"; and

   c. mandated the HCSO "immediately expunge from Christopher Pool's records any reference to a Dishonorable Discharge and/or termination and/or indefinite suspension arising from this incident at issue and immediately report to the Texas Commission on Law Enforcement that the previous determination as to Officer Pool's separate from duty has been modified to reflect the suspension referred to above."

*Applicant's Ex. 72.*

254. The Court finds the applicant fails to demonstrate Pool's testimony, when examined in its entirety, left a false impression with the jury (XL R.R. at 247-48); *see Applicant's Exs. 70-72..*

255. The Court finds the applicant fails to demonstrate materiality in Pool's testimony regarding his termination from the HCSO, or that such testimony affected the jury's consideration of the special issues, in light of Pool's testimony about the contraband in the applicant's cell.

256. The Court finds the applicant fails to demonstrate materiality in Pool's testimony regarding his termination from the HCSO, or that such testimony affected the

02813

jury's consideration of the special issues, in light of the State's other extraneous punishment evidence including the applicant's juvenile history; murders of Daniel Zamora, Eric Romero and Jose Garcia; aggravated assaults of Luis Garcia and Guadalupe Sepulveda; vehicular arson; possession of firearms and firearm paraphernalia; and other bad behavior while in the city and county jails.

---

## EIGHTH GROUND FOR RELIEF:
### ALLEGED INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILURE TO TIMELY AND COMPETENTLY ASSERT APPLICANT'S RIGHT TO A SPEEDY TRIAL

---

257. The applicant was arrested in connection with the underlying capital murder on December 16, 2005 (XXV R.R. at 230).

258. Jury selection began in the applicant's case on January 13, 2014 (XII C.R. at 3417).

259. On January 17, 2014, the fifth day of jury selection, the applicant filed a *pro se* motion asserting his right to a speedy trial, but seeking no particular relief other than the trial court "grant this Motion for Speedy Trail [*sic*] in all things sought therein"; the trial court made no ruling on this motion (II C.R. at 496).

260. On January 29, 2014, the eleventh day of jury selection, defense counsel filed a "Motion to Dismiss the Indictment for Lack of a Speedy Trial" (IX C.R. at 3121).

261. The trial court held a speedy trial hearing on February 12, 2014, wherein the State presented the testimony of Spence Graham and Paula Hartman, former chief prosecutors of the 179th District Court, who had worked on the applicant's case, and the defense presented the applicant's testimony (XXII R.R. at 5-81).

262. During the February 12, 2014, speedy trial hearing, Spence Graham testified:

   a. he was assigned to the applicant's case in May 2009 when he became the chief prosecutor of the 179th District Court (*Id.* at 9);

   b. the applicant's case was several years old when it was assigned to Graham, but it was not the oldest capital murder on the court's docket, as the court had a backlog of approximately 21 capital murder cases and over 1000 pending cases, many predating the applicant's case (*Id.* at 27, 33);

   c. the applicant was charged with the underlying capital murder case, as well as another capital murder and an assault on a peace officer (*Id.* at 9);

02814

d. the State's file pertaining to the applicant's case was voluminous, consisting of six to eight boxes and a minimum of 11 large offense reports concerning homicides linked to the applicant and a larger police investigation into LTC (*Id.* at 10);

e. when Graham was assigned to the applicant's case, the District Attorney had not yet made a decision of whether or not to seek the death penalty against the applicant (*Id.*);

f. the applicant's cases were regularly on the trial court's docket every month or two, and Graham routinely spoke with defense counsel Nunnery and Godinich about their submittal of a mitigation packet for the District Attorney's consideration (*Id.* at 11-13, 31);

g. even after submitting a mitigation packet, Godinich asked Graham to wait before making a decision or presenting the applicant's case to the District Attorney, in hopes that Godinich could persuade the applicant to accept a plea bargain and avoid the death penalty (*Id.* at 13-16);

h. the District Attorney ultimately decided to seek the death penalty in the applicant's case and on April 28, 2011, the State filed a notice of intent to seek the death penalty (*Id.* at 17-18, 32);

i. part of the delay in the District Attorney's decision as to whether or not to seek the death penalty was the applicant's commission of an aggravated assault on a public servant while incarcerated, which was not immediately relayed to the State, and which required further investigation (*Id.* at 36);

j. even after the State's decision to seek the death penalty, defense counsel tried to persuade the applicant to plead to life without parole, but never presented Graham with an offer to plead (*Id.* at 19);

k. Nunnery never sought a trial setting (*Id.* at 16-17); and

l. prior to Graham's departure from the 179th District Court in late December 2011 or early January 2012, the applicant's case was set for a pretrial conference on May 10, 2012, and jury trial on August 9, 2012, due to the trial court's insistence (*Id.* at 20-22, 30).

263. During the February 12, 2014, speedy trial hearing, Paula Hartman testified:

a. she was assigned to the applicant's case in January 2012 when she followed Graham as the chief prosecutor of the 179th District Court (*Id.* at 43);

61

b. Godinich wanted the District Attorney's Office to consider a different resolution to the applicant's case other than the death penalty (*Id.* at 52);

c. she was prepared to start trial in August 2012, but on May 10, 2012, the defense filed a motion for a continuance asserting that the defense's guilt/innocence and punishment investigation would not be complete in anticipation of the August trial date (*Id.* at 45-47);

d. the trial court granted the defense's motion for continuance over "strong opposition of the State" and reset the trial for February 2013 (*Id.* at 48-49);

e. the State was prepared for trial in February 2013, but the case was removed from the trial docket because a new judge had assumed the bench (*Id.* at 49);

f. the parties agreed to set the case for trial in September 2013 (*Id.* at 50); and

g. Hartman left the 179th District Court in January 2013, at which time Traci Bennett was assigned as the chief prosecutor of the court and assumed responsibility of the applicant's case (*Id.* at 50-51).

264. During the February 12, 2014, speedy trial hearing, the applicant testified that during his extended incarceration, his ability to continue his education and earn an income were adversely affected; he lost a family member; and suffered strained relationships and severe stress (*Id.* at 62-64).

265. Following a hearing on February 12, 2014, the trial court denied the applicant's motion to dismiss the indictment for lack of a speedy trial (*Id.* at 811; XI C.R. at 3133).

266. On direct appeal, the applicant asserted the trial court erred in denying his motion to dismiss the indictment for lack of speedy trial, but his claim was denied by the Texas Court of Criminal Appeals after the Court balanced the four *Barker v. Wingo*, 407 U.S. 514, 530 (1972), factors. *Balderas*, 517 S.W.3d at 767, 767-73.

267. The Court of Criminal Appeals found that from 2009 to 2013, "defense counsel consistently sought additional time for investigation and negotiation." *Id.* at 771.

268. According to the credible affidavits of trial counsel, the Court finds:

a. the massive volume of discovery in the applicant's case, the State's evidence; the applicant's criminal history; and his continued bad behavior in the jail

02816

required extensive investigation by the defense. *Affidavit of Jerome Godinich, Jr.* at 3; *Affidavit of Alvin Nunnery* at 4;

b. the defense purposefully engaged in prolonged ongoing negotiations with the State regarding whether the State would consider a guilty plea to a life sentence in lieu of seeking the death penalty. *Affidavit of Jerome Godinich, Jr.* at 3; *Affidavit of Alvin Nunnery* at 4;

c. the defense's timing in filing its motion to dismiss the indictment for lack of a speedy trial was rooted in trial strategy based on "the totality of circumstances at play[.]" *Affidavit of Alvin Nunnery* at 4.

d. defense counsel informed the applicant of every reset and continuance sought in his case and the reason for the request, and the applicant never objected to any of these request until the eve of trial. *Affidavit of Jerome Godinich, Jr.* at 3.

e. the applicant never indicated his desire for a *speedy* trial. *Affidavit of Alvin Nunnery* at 4-5 (emphasis added); and

f. the defense filed a motion to dismiss the indictment for lack of speedy trial solely to preserve the applicant's appellate rights on the issue, not because there were beneficial defense witnesses who were unavailable due to the delay or because the applicant's defense was hampered in any way due to the passage of time. *Id.* at 5.

269. Although the Court of Criminal Appeals "presume[d] that the lengthy delay here adversely affected [the applicant's] ability to defend himself," the Court finds trial counsels' affidavits credibly rebut this presumption. *See Balderas*, 517 S.W.3d at 772-73; *see also Affidavit of Jerome Godinich, Jr.* at 3; *Affidavit of Alvin Nunnery* at 4-5.

270. The Court finds the defense's delay in filing a motion to dismiss the indictment for lack of speedy trial was reasonable trial strategy.

271. The Court finds the applicant fails to establish that trial counsel were ineffective in the timing of their motion to dismiss the indictment for lack of a speedy trial, or that counsel incompetently asserted his right to a speedy trial.

### NINTH GROUND FOR RELIEF:
### ALLEGED INEFFECTIVE ASSISTANCE OF COUNSEL DURING JURY SELECTION

272. The Court finds that because the proffered affidavits of jurors Armstrong, Norwood and Orosz concern mental processes, and because they do not establish

002817

that jurors considered any impermissible extraneous influences or impropriety in their deliberations, they cannot be considered pursuant to Tex. R. Evid. 606(b). *See Applicant's Exs. 18, 21-22.*

273. Notwithstanding the preclusion of jurors Armstrong, Norwood and Orosz's proffered affidavits per Tex. R. Evid. 606(b), the Court finds these affidavits are not dispositive on the merits of the applicant's claims that trial counsel were ineffective for not addressing sexual abuse as mitigation during jury selection. *See Applicant's Exs. 18, 21-22.*

274. The record reflects that in conducting jury selection, defense counsel addressed issues that had arisen during the State's questioning of prospective jurors; questioned jurors about matters of concern on the juror questionnaires; and thoroughly examined individual jurors concerning their ability to answer the special issues, particularly the mitigation special issue – the avenue through which jurors could consider evidence of sexual abuse (IV R.R. at 111-29, 181-94; VI R.R. at 146-59; VIII R.R. at 60-82, 112-33; XI R.R. at 58-81; XII R.R. at 63-86; XIII R.R. at 60-88; XVI R.R. at 71-84; XVI R.R. at 115-33; XVII R.R. at 164-89; XIX R.R. at 63-85; XX R.R. at 77-106; XXI R.R. at 61-84).

275. According to the credible affidavits of trial counsel, the Court finds:

    a. counsel strategically employed the Colorado method of jury selection. *Affidavit of Jerome Godinich, Jr.* at 3;

    b. counsel strategically did not qualify jurors on the issue of sexual abuse because counsel believed it "inappropriate and not in accordance with the law." *Affidavit of Alvin Nunnery* at 5;

    c. counsel strategically chose to globally discuss mitigation with prospective jurors to ascertain whether prospective jurors could keep an open mind to mitigation evidence as a whole. *Id.; Affidavit of Jerome Godinich, Jr.* at 3.

    d. counsel did not believe it was appropriate to expound upon the details of their counsel and conversations with the applicant on the record, regarding strategic reasons for agreeing to excuse each agreed-upon prospective juror. *Affidavit of Alvin Nunnery* at 5.

276. The Court finds the trial counsels' avoidance of committing prospective jurors as to whether or not they would consider sexual abuse as mitigating evidence was reasonable trial strategy.

02818

277. The record reflects the applicant was consulted on every potential juror the parties agreed to excuse without examination, and the applicant affirmatively stated he had no objections (IV R.R. at 22-23; V R.R. at 28-29; VI R.R. at 53, 167-68; VII R.R. at 28-29; VIII R.R. at 28; IX R.R. at 136; X R.R. at 27; XI R.R. at 28; XII R.R. at 32-33; XIII R.R. at 26-27; XIV R.R. at 5-6, 31-32; XV R.R. at 6, 30-31, 130-31; XVI R.R. at 29-30, 217; XVII R.R. at 29, 193-94; XVIII R.R. at 6, 30-31, 168; XIX R.R. at 29, 200-01; XX R.R. at 28-29, 159; XXI R.R. at 26).

278. The Court finds trial counsels' failure to detail their counsel and conversations with the applicant on the record regarding the reason(s) for excusing each agreed-upon prospective juror was reasonable strategy and in accord with the principles of privileged attorney-client communications.

279. Notwithstanding trial counsels' strategy during jury selection, at the conclusion of the punishment phase, the trial court instructed the jury:

   a. to consider all the evidence presented during the whole trial when determining the answer to the special issues;

   b. to consider all evidence as to the defendant's background or character or the circumstances of the offense that militates for or mitigates against the death penalty;

   c. a mitigating circumstance "may include, but is not limited to, any aspect of Juan Balderas also known as Apache's character, background, the personal moral culpability of the defendant or circumstances of the crime which you believe could make a death sentence inappropriate in this case;"

   d. they need not agree on what particular evidence supports a "yes" answer to the mitigation special issue; and

   e. in answering the mitigation issue, the jury "shall consider mitigating evidence to be evidence that a juror might regard as reducing Juan Balderas also known as Apache's moral blameworthiness, including evidence of the defendant's background, character, or the circumstances of the offense that mitigates against the imposition of the death penalty."

(XII C.R. at 3334-36, 3338).

62819

280. According to Traci Bennett's credible affidavit, the parties' agreement to excuse certain jurors without examination were based on the jurors' responses to juror questionnaires, and not based on race or gender. *State's Habeas Ex. 3, Affidavit of Traci Moore Bennett.*

281. According to the credible affidavits of trial counsel, the Court finds:

    a. the decision to excuse prospective jurors was rooted in trial strategy and based on the information provided in juror questionnaires and in accordance with the defense's method of jury selection, not race. *Affidavit of Jerome Godinich, Jr.* at 3; *Affidavit of Alvin Nunnery* at 5-6.

    b. the defense strategy for agreeing to excuse prospective jurors was also rooted in keeping "one eye down the road in terms of which jurors are coming down the line next and what we needed to anticipate" and the attempt "to use our strikes effectively…so as to preserve future strikes for potential jurors coming down the road." *Affidavit of Alvin Nunnery* at 5-6; and

    c. the applicant was fully informed of counsels' reasons for seeking strikes on the agreed-upon prospective jurors and he consented to the strikes. *Id.*; *Affidavit of Jerome Godinich, Jr.* at 3.

282. The Court finds the practice of reaching mutual agreements to excuse certain jurors without examination was reasonable strategy by both parties, and a means for parties to avoid using limited peremptory strikes.

283. The Court finds the manner in which trial counsel conducted jury selection was reasonable trial strategy.

284. The Court finds the applicant fails to present credible or persuasive evidence that trial counsel were deficient or harmful in the manner in which they conducted jury selection.

02820

285. On January 3, 2014, the applicant filed a pretrial motion to preclude the death penalty as a sentencing option, arguing it was arbitrarily imposed because the decision as to which defendant is subject to the death penalty varies between counties in Texas; the trial court denied the applicant's motion on February 12, 2014 (IV C.R. at 920, 928).

286. The applicant did not reurge his argument that the death penalty is arbitrarily imposed by county as point of error on direct appeal.

287. The Court finds the applicant's reliance on the findings of the Scott Phillips report *Continued Racial Disparities in the Capital of Capital Punishment: the Rosenthal Era* are misplaced and that the findings are irrelevant to the applicant's case because: the time frame of the Phillips report is inapplicable to the applicant's case; the victim in the applicant's case is neither white nor female; and the Phillips report does not take into account the egregious facts of the applicant's case and the applicant's multiple violent extraneous offenses.

288. The Court finds the applicant's reliance on the findings of the Raymond Paternoster report *Racial Disparity in the Case of Duane Edward Buck* are misplaced and that the findings are irrelevant to the applicant's case because: the time frame of the Paternoster report is inapplicable to the applicant's case; and the evidence presented at the applicant's trial was markedly different from that in Buck's.

289. The Court finds the applicant fails to show the Texas death penalty scheme is unconstitutional as applied to him based on his arguments of a long-past prior racial segregation in the Harris County public school system; the Klu Klux Klan successfully sponsoring political candidates in the 1920's; a 1900 case in which a defendant's motion to quash was improperly denied because African-Americans were excluded from jury service; African-American attorneys allegedly being excluded from the Houston Bar Association almost six decades ago; the alleged display of "Jim Crow art" or artwork with slavery images in a Harris County District Court jury room and the federal courthouse; pretrial incarceration statistics for Hispanics and African-Americans in Harris County; and purported personal indiscretions of former District Attorney Chuck Rosenthal.

. 02821

290. The Court finds that despite the applicant's arguments of discrimination claims arising from *Batson v. Kennedy*, 476 U.S. 79 (1986), in other Harris County death penalty cases, the applicant neither pleads nor proves a *Batson* error in his own case.

291. The Court finds the applicant fails to show the exercise of prosecutorial discretion in the Harris County District Attorney's Office's decision to seek the death penalty in his case violated his constitutional rights.

292. The Court finds the applicant fails to show disparate treatment between himself and other similarly situated defendants in Harris County.

293. The Court finds the applicant fails to show the Texas death penalty scheme is facially unconstitutional or unconstitutional as applied to him, based on the bare allegation that the Harris County District Attorney's Office sought the death penalty against the applicant because he is Hispanic or that he received the death penalty because he is Hispanic.

294. The Court finds the applicant fails to prove the Texas death scheme was enacted or maintained because of any anticipated discriminatory effect in violation of equal protection, and fails to prove the sentencing scheme, as applied to him, was discriminatory in violation of equal protection.

295. The Court finds the Court of Criminal Appeals has repeatedly held the Texas death penalty scheme constitutional under both U.S. CONST. amends. VIII and XIV and TEX. CONST. art. I, §§ 10, 13, and 19. *See Saldano v. State*, 232 S.W.3d 77, 107-8, n.30 (Tex. Crim. App. 2007)(declining to revisit previous holdings of constitutionality of Texas death penalty scheme under United States and Texas Constitutions)(citing *Perry v. State*, 158 S.W.3d 438, 446-9 (Tex. Crim. App. 2004)); *Russell v. State*, 155 S.W.3d 176, 183 (Tex. Crim. App. 2005); *Escamilla v. State*, 143 S.W.3d 814, 827-9 (Tex. Crim. App. 2004); *Rayford v. State*, 125 S.W.3d 521, 532 (Tex. Crim. App. 2003); *Hughes v. State*, 24 S.W.3d 833, 844 (Tex. Crim. App. 2000); *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000); *Chamberlain v. State*, 998 S.W.3d 230, 238 (Tex. Crim. App. 1999); *Pondexter v. State*, 942 S.W.2d 577, 587 (Tex. Crim. App. 1996)).

---

## TWELFTH GROUND FOR RELIEF:
### ALLEGED VIOLATION OF CONSTITUTIONAL RIGHTS AS A RESULT OF 10-12 RULE

---

296. On January 3, 2014, the applicant filed a pretrial motion to hold the Texas death penalty scheme unconstitutional and complained about the 10-12 rule which

02822

prohibits the trial court from instructing the jury as to the effect of a single "no" vote; the applicant's motion was overruled by the trial court on February 12, 2014 (IV C.R. at 941-56, 1005-27).

297. The Court finds the applicant did not present his complaint about the 10-12 rule on direct appeal.

298. The Court finds the Court of Criminal Appeals has repeatedly rejected a capital defendant's challenge to the constitutionality of art. 37.071 §(2)(a), based on allegations it misled the jury on the effect of a single "no" vote. *See Williams v. State,* 301 S.W.3d 675, 694 (Tex. Crim. App. 2009); *Druery v. State,* 225 S.W.3d 491, 509 (Tex. Crim. App. 2007); *Prystash v. State,* 3 S.W.3d 522, 536 (Tex. Crim. App. 1999).

299. The Court finds the Court of Criminal Appeals has held Texas' death penalty scheme is critically different from the unconstitutional capital sentencing schemes in *Mills v. Maryland,* 486 U.S. 367 (1988), and *McKoy v. North Carolina,* 494 U.S. 433 (1990). *Hughes v. State,* 897 S.W.2d 285, 300-301 (Tex. Crim. App. 1994).

300. The Court finds the applicant fails to show the Court of Criminal Appeals' interpretation of *Mills* and *McKoy* is unconstitutional.

301. The record reflects that during his punishment argument to the jury, Nunnery explained the effect of the jury's failure to agree on the special issues despite the State's objections (XLIII R.R. at 7-9).

302. The record reflects that during the trial court's general voir dire, each venire panel was informed by the trial court of their failure to agree on the special issues, and specifically that if a jury answered the special issues in any other way than "yes" and "no", a life sentence would result (IV R.R. at 17; V R.R. at 20; VII R.R. at 23; VIII R.R. at 21; IX R.R. at 24; X R.R. at 20; XI R.R. at 21; XII R.R. at 26-27; XIII R.R. at 21; XIV R.R. at 25; XV R.R. at 24; XVI R.R. at 23; XVII R.R. at 23; XVIII R.R. at 24; XIX R.R. at 22; XX R.R. at 22-23; XXI R.R. at 20).

303. The Court finds the proffered affidavits of jurors Armstrong, Birney, Norwood and Sullivan are not dispositive on the merits of the applicant's claims regarding the effect of the 10-12 rule. *See Applicant's Exs. 18-19, 21, 23.*

304. The Court finds the proffered affidavits of jurors Armstrong, Birney, Norwood and Sullivan cannot be considered pursuant to TEX. R. EVID. 606(b) because they concern mental processes and do not establish that jurors considered any impermissible extraneous influences or impropriety in their deliberations. *Id.*

69

02823

305. Notwithstanding the preclusion of jurors Birney and Sullivan's proffered affidavits per TEX. R. EVID. 606(b), the record reflects the trial court specifically instructed these jurors that if the defendant were found guilty of capital murder, there were only two possible punishments: life without parole or the death penalty, and that if the jury returned any answer other than a unanimous "yes" to the first special issue and "no" to the second special issue, then a life sentence would result (XIII R.R. at 30; XVI R.R. at 30-31).

---

### THIRTEENTH GROUND FOR RELIEF:
### DEATH SENTENCE ALLEGEDLY ARBITRARILY AND CAPRICIOUSLY ASSIGNED BASED ON JURY'S ANSWER TO FIRST SPECIAL ISSUE AND THE LACK OF DEFINITIONS FOR KEY TERMS

---

306. On January 3, 2014, the applicant filed a pretrial motion to declare the Texas death penalty scheme unconstitutional, in part, based on the absence of definitions for terms in the first special issue and the alleged failure to narrow the class of death-eligible defendants; the applicant's motion was overruled by the trial court on February 12, 2014 (IV C.R. at 933-34, 940).

307. The Court finds that on direct appeal, the applicant did not complain the first special issue allegedly failed to narrow the class of death-eligible defendants, or that his sentence was arbitrary and capricious because of allegedly unconstitutionally vague definitions of key terms in the first special issue.

308. The Court finds the Court of Criminal Appeals has consistently and repeatedly held the terms "deliberately," "probability," "criminal acts of violence" and "continuing threat to society" require no special definitions, and TEX. CODE CRIM. PROC. art. 37.071 is not unconstitutional for lack of such definitions. *See Blue v. State*, 125 S.W.3d 491, 503 (Tex. Crim. App. 2003).

309. The Court finds the Texas death penalty scheme properly narrows the class of death-eligible defendants at guilt, rather than through the special issues at punishment. *See Bell v. State*, 938 S.W.2d 35, 53-54 (Tex. Crim. App. 1996).

---

### FOURTEENTH GROUND FOR RELIEF:
### DEATH SENTENCE ALLEGEDLY UNCONSTITUTIONAL FOR LIMITING THE EVIDENCE THE JURY COULD CONSIDER MITIGATING

---

310. On January 3, 2014, the applicant filed a pretrial motion to declare the Texas death penalty scheme unconstitutional, in part, based on an impermissible limitation of

· 02824

evidence the jury could consider mitigating; the applicant's motion was overruled by the trial court on February 12, 2014 (IV C.R. at 941-56).

311. The Court finds on direct appeal, the applicant did not complain his sentence was unconstitutional due to an impermissible limitation of the evidence the jury could consider mitigating.

312. At the conclusion of the punishment phase, the trial court gave the jury thorough instructions on what the jury could consider in their deliberations of the special issues (XII C.R. at 3334-36, 3338).

313. At the conclusion of the punishment phase, the trial court charged the jury with the statutory mitigation issue, specifically asking the jury whether it found "from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Juan Balderas also known as Apache, that there is sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a sentence of death be imposed?" (*Id.* at 3343).

314. The Court finds the Court of Criminal Appeals has previously rejected the argument that TEX. CODE CRIM. PROC. art. 37.071 unconstitutionally narrows a jury's discretion to consider as mitigating only those factors concerning moral blameworthiness. *Shannon v. State,* 942 S.W.2d 591 (Tex. Crim. App. 1996); *Williams,* 301 S.W.3d at 694.

315. The Court finds that at trial, the applicant did not object to the punishment charge on the basis that it unconstitutionally limited the evidence the jury could consider as mitigating.

316. The Court finds the applicant fails to show the Texas death penalty scheme unconstitutionally prevented his jury from considering as mitigating only evidence that reduces moral blameworthiness.

317. The Court finds the applicant also fails to show the Texas death penalty scheme is unconstitutional as applied to him.

02825

## II.
## CONCLUSIONS OF LAW

**FIRST AND SECOND GROUNDS FOR RELIEF: STATE'S ALLEGED PRESENTATION OF FALSE EVIDENCE THROUGH WITNESS ISRAEL DIAZ**

1. The applicant fails to demonstrate by a preponderance of evidence that the State presented false testimony at trial via Israel Diaz, or that Diaz's testimony as a whole left a false impression with the jury. *See Ex parte Weinstein,* 421 S.W.3d 656, 665-67 (Tex. Crim. App. 2014)(citing *Chavez,* 371 S.W.3d 200, 207-10 (Tex. Crim. App. 2012)).

2. In the alternative, the applicant fails to demonstrate by a preponderance of the evidence that Diaz's trial testimony was material to the jury's verdict, in light of the totality of the State's guilt evidence against the applicant. *Id.* at 665-69.

3. The applicant fails to demonstrate by a preponderance of the evidence that his constitutional rights were violated because the prosecution obtained his guilty verdict through the knowing use of false evidence via Israel Diaz. *Giglio v. United States,* 405 U.S. 150 (1972); *Napue v. Illinois,* 360 U.S. 264 (1959).

4. The applicant fails to demonstrate by a preponderance of the evidence that his constitutional rights were violated because the prosecution obtained his guilty verdict through the unknowing use of false evidence via Israel Diaz. *See Ex parte Chabot,* 300 S.W.3d 768 (Tex. Crim. App. 2009); *see Chavez,* 371 S.W.3d 200.

**THIRD GROUND FOR RELIEF: STATE'S ALLEGED FAILURE TO DISCLOSE IMPEACHMENT INFORMATION REGARDING WITNESS ISRAEL DIAZ**

5. The applicant fails to demonstrate by a preponderance of the evidence that the State violated the precepts of *Brady v. Maryland,* 373 U.S. 863 (1963) as he fails demonstrate: (1) the State suppressed the 23-pages of Diaz pretrial interview notes now marked as Applicant's Exhibit 57 from the defense prior to trial; (2) that the notes contained in Applicant's Exhibit 57 were favorable to the defense; or (3) that the notes contained in Applicant's Exhibit 57 were material. *See Little v. State,* 991 S.W.2d 864, 866 (Tex. Crim. App. 1999).

**FOURTH GROUND FOR RELIEF: ALLEGED INEFFECTIVE ASSISTANCE OF COUNSEL IN GUILT/INNOCENCE PHASE**

6. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance during either phase of trial, such that their

62826

performance was not in accord with prevailing professional norms, when their pretrial investigation included more than 70 hours reviewing the State's prosecution files; speaking with the applicant; interviewing witnesses; filing pretrial motions; and retaining a team of investigators and experts in the fields of criminal investigations, mitigation investigations, ballistics, eyewitness identification, mental health, gangs, prison systems, child abuse and brain development; and keeping in continued communication with these experts. *See Strickland v. Washington*, 466 U.S. 668, 700 (1984)(ineffective assistance of counsel claim denied for failure to demonstrate deficient performance); *Ex parte McFarland*, 163 S.W.3d 743, 754-60 (Tex. Crim. App. 2005)(ineffective assistance of counsel claim denied for failure to demonstrate deficient performance; trial counsel conducted an adequate pretrial investigation when he read a leading treatise, reviewed the State's files, filed multiple pretrial motions, hired an investigator, and consulted with other attorneys).

7.    The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance during either phase of trial, such that their performance was not in accord with prevailing professional norms, when their trial performance included conducting individual voir dire examinations on prospective jurors; extensively cross-examining witnesses; making relevant objections; preserving error; pursuing a motion to suppress the eyewitness identification; presenting evidence on the applicant's behalf; making persuasive jury arguments; objecting to the court's charge; and requesting specific jury instructions. *See Strickland*, 466 U.S. at 694, 700.

8.    The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance by failing to present testimony at trial from Anali Garcia, Jesus Balderas, or Ileana Cortes, such that counsels' performance was not in accord with prevailing professional norms or that there is a reasonable probability the outcome of the trial would have been different had these witnesses testified, when: (a) counsel interviewed these witnesses prior to trial; (b) counsel determined the testimony of these witnesses would not be beneficial or useful for the defense; and (c) counsel believed the State could thrive on the weaknesses and biases of these witnesses. *Id., see also Ex parte Kunkle*, 852 S.W.2d 499, 506 (Tex. Crim. App. 1993)(holding counsel's strategic choices made after thorough investigation of law and facts virtually unchallengeable under Sixth Amendment); *see Ex parte White*, 160 S.W.3d 46, 52 (Tex. Crim. App. 2004)(applicant must show the witness' testimony would have benefitted the defense).

9.    The applicant fails to demonstrate by a preponderance of evidence that trial counsel rendered ineffective assistance by failing to investigate and present an alibi defense during guilt/innocence, such that counsels' performance was not in accord

02827

with prevailing professional norms or that there is a reasonable probability the outcome of the trial would have been different had the defense pursued an alibi defense, when: (a) the applicant himself never provided alibi information for counsel to pursue; (b) the alibi information presented by the applicant's family on the eve of trial revealed either uncooperative witnesses or those who counsel believed lacked credible or personal knowledge; (c) the proffered affidavits from Jose Perez and Jesus Balderas fail to provide personal accounts of the applicant's whereabouts on the night of the offense; (d) Anali Garcia and Octavio Cortes did not provide persuasive alibi testimony in the post-conviction evidentiary hearing; and (e) trial counsels made a strategic decision to only present testimony from witnesses counsel "deemed credible or beneficial" and not those "who could not account for the date and time of the offense in any credible way, or who only possessed information by means of hearsay or innuendo." *See Strickland*, 466 U.S. at 694, 700; *Kunkle*, 852 S.W.2d at 506; *see White*, 160 S.W.3d at 52.

10. The applicant fails to demonstrate by a preponderance of evidence that trial counsel rendered ineffective assistance by failing to present the testimony of Jose Perez, such that counsels' performance was not in accord with prevailing professional norms or that there is a reasonable probability the outcome of the trial would have been different had Perez's testimony been presented, when: (a) Perez fails to account for the applicant's whereabouts in his proffered habeas affidavit; and (b) counsel elicited substantially similar testimony from Walter Benitez compared to what Perez proffered in his habeas affidavit. *See Strickland*, 466 U.S. at 694, 700; *see White*, 160 S.W.3d at 52.

11. The applicant fails to demonstrate by a preponderance of evidence that trial counsel rendered ineffective assistance by failing to present the testimony of Yancy Escobar, such that counsels' performance was not in accord with prevailing professional norms or that there is a reasonable probability the outcome of the trial would have been different had Escobar's testimony been presented, when: (a) Escobar chose to watch the proceedings, instead of testifying on the applicant's behalf; and (b) counsel elicited substantially similar testimony from other witnesses compared to what Escobar proffered in her habeas affidavit. *See Strickland*, 466 U.S. at 694, 700; *see White*, 160 S.W.3d at 52.

12. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance by failing to investigate and present evidence of the applicant's innocence, such that counsels' performance was not in accord with prevailing professional norms, when: (a) the applicant did not provide information that assisted the defense with an innocence strategy; (b) counsel cross-examined the credibility and reliability of State's eyewitnesses; (c) counsel attacked

028ZB

the credibility and highlighted the bias of Israel Diaz; and (d) counsel presented the testimony of the applicant's innocence and an alternate shooter via Walter Benitez. *See Strickland*, 466 U.S. at 694, 700; *see also Kunkle*, 852 S.W.2d at 506.

13. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance by failing to call Celeste Munoz as a guilt/innocence witness, such that counsels' performance was not in accord with professional norms or that there is a reasonable probability the outcome of the trial would have been different had Munoz's testimony been presented, when the trial court ruled that Munoz's testimony would open the door to the applicant's extraneous offenses during guilt/innocence. *See Strickland*, 466 U.S. at 694, 700; *see Busby v. State*, 990 S.W.2d 263, 268 (Tex. Crim. App. 1999)(holding appellate court's judicial scrutiny of counsel's performance must be highly deferential when reviewing claim of ineffective assistance and representation not to be judged by hindsight).

14. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance by failing to call Dr. Roy Malpass to testify as an eyewitness identification expert in front of the jury, such that counsels' performance was not in accord with professional norms, when the record is abundantly clear counsel was cautiously avoiding opening the door to the applicant's extraneous offenses during guilt/innocence; counsels' decision to not present Dr. Malpass' testimony to the jury despite the court's preliminary ruling is indicative of a strategic decision that to present such testimony would not be in the applicant's best interest. *See Strickland*, 466 U.S. at 694, 700; *see Garcia v. State*, 57 S.W.3d at 436, 440 (Tex. Crim. App. 2001)(holding that reviewing court "commonly will assume a strategic motivation if any can possibly be imagined," and will not find challenged conduct constitutes deficient performance "unless conduct was so outrageous that no competent attorney would have engaged in it.").

15. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance, such that counsels' performance was not in accord with professional norms, in the manner by which they challenged the State's eyewitness identification evidence. *See Busby*, 990 S.W.2d at 268.

16. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance by failing to investigate juror misconduct as a grounds for a motion for new trial, such that counsels' performance was not in accord with professional norms or that there is a reasonable probability the results of the proceeding would have been different, when: (a) the record reflects trial counsel questioned a deputy and two jurors on the record as to any potential

Ø2825

outside influences stemming from the bus-waving incident, moved for a mistrial, and were overruled by the trial court; and (b) the Court of Criminal Appeals ruled the bus-waving incident was not an improper outside influence. *See Ex parte Maldonado*, 688 S.W.2d 114, 116 (Tex. Crim. App. 1985)(applicant in post-conviction habeas proceeding has the burden of proving facts that would entitle him to relief).

17. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance in any way, such that counsels' performance was not in accord with professional norms or that there is a reasonable probability the results of the proceeding would have been different, given the totality State's evidence of guilt against the applicant during guilt/innocence.

## FIFTH GROUND FOR RELIEF: ALLEGED VIOLATION OF RIGHT TO FAIR TRIAL AS A RESULT OF JUROR MISCONDUCT AND EXPOSURE TO OUTSIDE INFLUENCES

18. The applicant fails to demonstrate by a preponderance of the evidence that he was prejudiced or that the results of his trial were affected in any way by the hotel accommodations secured for the jurors. *See Maldonado*, 688 S.W.2d at 116.

19. Because the applicant's claim regarding the alleged improper outside influence stemming from the bus-waving incident was raised and rejected on direct appeal, the applicant is procedurally barred from asserting the same ground in the instant proceeding. *Ex parte Schuessler*, 846 S.W.2d 850, 852-53 (Tex. Crim. App. 1993)(recognizing "law of the case" doctrine such that once a specific question of law has been finally resolved in a case, it will not be reconsidered in subsequent proceedings of the same case).

20. The applicant fails to demonstrate by a preponderance of the evidence that he was prejudiced or that the results of his trial were affected in any way by Juror Armstrong's Facebook entries before, during, or after trial. *See Maldonado*, 688 S.W.2d at 116; *see Ocon v. State*, 284 S.W.3d 880, 885 (Tex. Crim. App. 2009)(defendant not entitled to mistrial after defense attorney overheard juror's telephone conversation with unknown person because there was no evidence the juror was biased as the result of the improper conversation).

21. The applicant's proffered juror affidavits are irrelevant, speculative, inadmissible, and have no bearing on the applicant's instant habeas claims. *See* TEX. R. EVID. 606(b)(prohibiting a juror from testifying about "any matter or statement occurring during the jury's deliberations" except that a juror may testify about "whether any outside influence was improperly brought to bear upon any juror" or "to rebut a

claim that the juror was not qualified to serve"); *see McQuarrie v. State*, 380 S.W.3d 145, 154 (Tex. Crim. App. 2012)("outside influence" is something originating from source outside of jury room and other than from jurors themselves); *see also Coyler v. State*, 428 S.W.3d 117 (Tex. Crim. App. 2014)(external events or information, unrelated to the trial which cause jurors to feel personal pressure or hasten deliberations are not "outside influences" because those pressures are caused by a juror's personal and emotional reaction to information that is irrelevant to trial issues).

22. The applicant fails to demonstrate by a preponderance of the evidence that he was denied the right to a fair and impartial jury because the jury received or considered evidence other than what was presented at trial. *See* TEX. R. APP. P. 21.3(f)(a defendant must be granted a new trial "when after retiring to deliberate, the jury has received other evidence"); *Bustamante v. State*, 106 S.W.3d 738, 743 (Tex. Crim. App. 2003)(to establish juror misconduct, applicant must show the evidence was received by the jury, and the evidence was detrimental or adverse to the defendant).

23. The applicant fails to demonstrate by a preponderance of evidence facts rebutting the presumption that jury followed the trial court's instructions. *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005).

**SIXTH GROUND FOR RELIEF: ALLEGED INEFFECTIVE ASSISTANCE OF COUNSEL IN PUNISHMENT PHASE**

24. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance during the punishment phase, such that their performance was not in accord with prevailing professional norms, when counsel retained multiple expert and mitigation witnesses, presented 18 defense witnesses, cross-examined the State's punishment witnesses, made relevant objections, preserved error, made persuasive jury arguments, and presented extensive mitigation evidence, much of which is the same evidence the applicant now claims was lacking. *See Strickland*, 466 U.S. at 694.

25. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance of counsel by failing to investigate and present testimony from Jesus Balderas, Anali Garcia, Octavio Cortes, German Enriquez, Yancy Escobar, Ivan Hernandez, Jose Perez, or Maria Guadalupe Francisco Reyes during the punishment phase, such that their performance was not in accord with prevailing professional norms or that there is a reasonable probability the outcome of the trial would have been different had counsel presented these witnesses, when: (a) their respective social history testimonies

02831

would have been cumulative of the testimony presented through other witnesses; (b) the State's punishment evidence of extraneous capital murders, aggravated assault, assault on a public servant, aggravated kidnapping, arson, and juvenile criminal history, and multiple bad acts was particularly strong; (c) counsel interviewed at least five of these witnesses and determined their testimony would not be beneficial to the applicant's defense; and (d) the applicant and his family hampered counsels' investigation and preparation. *See Strickland*, 466 U.S. at 694, 700; *see McFarland*, 163 S.W.3d at 754-60; *see Kunkle*, 852 S.W.2d at 506; *see also Tucker v. Johnson*, 242 F.3d 617, 622-24 (5ᵗʰ Cir. 2001)(rejecting claim of ineffective assistance of counsel where defendant argued that counsel should have presented additional evidence of abuse; recognizing that defendant essentially arguing counsel should have presented *stronger* mitigating case; distinguishing *Williams v. Taylor*, 529 U.S. 362, 369-72 (2000)).

26. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance by failing to question Vicky Reyes, Juan Balderas, Sr., Walter Benitez, Daniella Chavez, Marina Reyes Mirafuentes, Paloma Reyes Mirafuentes, or Celeste Munoz more extensively, such that counsels' performance was not in accord with prevailing professional norms or that there is a reasonable probability the outcome of the trial would have been different with more extensive questioning, when counsel presented substantial testimony through these and other witnesses of the applicant's violent and abusive childhood surroundings, familial history of mental health illness, impetuous and unstable mother, positive character, support system, positive behavior while in custody or under supervision, and role as a "protector." *See Strickland*, 466 U.S. at 694, 700; *see McFarland*, 163 S.W.3d at 754-60; *see Kunkle*, 852 S.W.2d at 506; *see also Tucker*, 242 F.3d at 622-24.

27. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance during the punishment phase, such that their performance was not in accord with prevailing professional norms, when counsel presented expert testimony to explain the impact and ramifications of the applicant's childhood and upbringing on the applicant, his mental health, and his behaviors, and to correlate this evidence to the mitigation special issue. *See Blott*, 588 S.W.2d 588, 592 (Tex. Crim. App. 1979)(reviewing court will not "second-guess through hindsight" the strategy of counsel, nor will fact that another attorney might have pursued different course support finding of ineffectiveness); *see also Solis v. State*, 792 S.W.2d 95, 100 (Tex. Crim. App. 1990)(reviewing court will not use "hindsight to second guess a tactical decision" made by trial counsel that does not fall below objective standard of reasonableness).

02832

28. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance during the punishment phase, such that their performance was not in accord with prevailing professional norms, when counsel presented both expert testimony and lay testimony of people who positively interacted with the applicant while he was in custody or under court supervision to show a lack of future danger. *See Blott*, 588 S.W.2d at 592; *see also Solis*, 792 S.W.2d at 100.

29. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance by failing to present evidence that the applicant was in the process of disassociating from LTC, such that their performance was not in accord with prevailing professional norms, when: (a) counsels' investigation showed the only evidence of disassociation was the applicant's own uncorroborated statement; and (b) the applicant did not want to testify at trial. *See Kunkle*, 852 S.W.2d at 506; *see Harris v. Cockrell*, 313 F.3d 238 (5th Cir. 2002), *cert. denied*, 494 U.S. 1090 (holding counsel not ineffective for allegedly failing to investigate and present mitigation evidence in light of weakness of evidence defendant argues should have been presented).

30. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance by failing to investigate and present evidence rebutting the extraneous offense evidence presented by the State, such that their performance was not in accord with prevailing professional norms, when: (a) counsel did conduct a thorough punishment investigation; (b) counsel interviewed witnesses and presented testimony regarding LTC membership, hierarchy, and operations; and (c) counsel extensively cross-examined State's witnesses. *See Kunkle*, 852 S.W.2d at 506; *see Solis*, 792 S.W.2d at 100.

31. In the alternative, the State is not required to prove extraneous offenses beyond a reasonable doubt, and the applicant fails to demonstrate by a preponderance of the evidence the specific effect of any of the extraneous evidence on the outcome of his proceedings. *See Ladd v. State*, 3 S.W.3d 547, 574-5 (Tex. Crim. App. 1999)(State is not required to prove extraneous offenses beyond a reasonable doubt); *see McFarland*, 163 S.W.3d at 754-60.

33. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance by failing to object to and preserve error on portions of the State's cross-examinations of Dr. Matthew Mendel and Dr. Matthew Brams and closing argument that the applicant now claims were comments on the applicant's failure to testify, when counsel did not construe the State's questioning or argument to be as such, and believed them to be appropriate

62833

attacks on the witness' credibility. *See Johnson v. State,* 629 S.W.2d 731 (Tex. Crim. App. 1981)(holding isolated instances of failure to object do not constitute ineffective assistance of counsel); *see Howard v. State,* 153 S.W.3d 382, 385-6 (Tex. Crim. App. 2004)(State's argument that defendant did not show remorse was proper summation of evidence and not a comment on the defendant's failure to testify when evidence showed defendant had told officer he had no remorse).

34. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance by failing to object to and preserve error on the trial court's denial of funding to transport defense witnesses from Mexico to the United States, such that counsels' performance was not in accord with prevailing professional norms or that there is a reasonable probability the outcome of the trial would have been different had counsel preserved the alleged error, when: (a) the trial court had no subpoena power over these witnesses; (b) telecommunication technology was made available and used to present the testimony of theses witnesses to the jury; (c) both parties were able to question the witnesses presented via telecommunication; and (d) defense counsel offered to pay the expenses to transport the witnesses from Mexico to the United States, but the witnesses could not coordinate plans amongst themselves. *See Johnson,* 629 S.W.2d 731; *see White,* 160 S.W.3d at 53-55 (applicant must show trial judge would have committed error in overruling trial counsel's objection to prevail on ineffective assistance claim for failure to object); *see also Vaughn v. State,* 931 S.W.2d 564, 566-67 (Tex. Crim. App. 1996).

35. Although trial counsel learned trial testimony from witnesses in Mexico was being skewed by interference from the applicant's girlfriend, counsel was able to present the intended evidence of the applicant's childhood, his mother, and his mistreatment and sexual abuse by his mother's boyfriend through witnesses apart from those in Mexico, and as such, the applicant fails to show harm necessary to warrant relief on his claim that trial counsel should have preserved the court's refusal to grant funds for witnesses to travel from Mexico. *See Strickland,* 466 U.S. at 694, 700.

36. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel Alvin Nunnery rendered ineffective assistance by allegedly engaging in bad behavior that alienated the jury, was not in accord with professional norms, or affected the outcome of the proceeding, when: (a) the record does not reflect that Nunnery made any derogatory comments to the State's prosecutor or racially-motivated comment within earshot of the jury; (b) when looked at in its entirety, Nunnery's jury argument properly summarized the evidence, made deductions from evidence, argued the special issues, and gave deference to the jury; (c)

Nunnery made a strategic decision to remind jurors of their oaths given the juror notes sent out during guilt/innocence; (d) the applicant's proffered juror affidavits are speculative and inadmissible; and (e) in light of the totality of the State's punishment evidence against the applicant. *See Garcia,* 57 S.W.3d at 440; *see Orona v. State,* 791 S.W.2d 125, 130 (Tex. Crim. App. 1990)( any error in argument had no impact in light of other evidence); *see* Tex. R. Evid. 606(b); *see Coyler,* 428 S.W.3d 117.

37. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance in any way, such that counsels' performance was not in accord with professional norms or that there is a reasonable probability the results of the proceeding would have been different, given the State's overwhelming punishment evidence against the applicant. *See Strickland,* 466 U.S. at 694, 700; *see Busby,* 990 S.W.2d at 268.

**SEVENTH GROUND FOR RELIEF: STATE'S ALLEGED PRESENTATION OF FALSE EVIDENCE THROUGH WITNESS CHRISTOPHER POOL**

38. The applicant fails to demonstrate by a preponderance of the evidence that Christopher Pool's testimony as a whole left a false impression with the jury. *See Weinstein,* 421 S.W.3d at 665-67.

39. In light of the totality of the State's evidence of guilt against the applicant, the applicant fails to demonstrate by a preponderance of the evidence that Pool's trial testimony was material to the jury's verdict. *Id.* at 665-69; *see also Ex parte Ghahremani,* 332 S.W.3d 470, 478 (Tex. Crim. App. 2011)(testimony is material if there is "a reasonable likelihood" the false testimony affected jury's judgment).

**EIGHTH GROUND FOR RELIEF: ALLEGED INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILURE TO TIMELY AND COMPETENTLY ASSERT APPLICANT'S RIGHT TO A SPEEDY TRIAL**

40. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance by failing to employ reasonable strategy in the timing of their assertion of the applicant's right to a speedy trial, such that counsels' performance was not in accord with prevailing professional norms, given the totality of the circumstances and evidence, including the assignment of different State's prosecutors to the case, changes to who presided as trial court judge, ongoing negotiations between the parties, voluminous records, and the applicant's own behavior. *See Strickland,* 466 U.S. at 694; *see White,* 160 S.W.3d at 55.

02835

41. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance in the timing of their motion to dismiss the indictment for lack of a speedy trial, such that there is a reasonable probability the outcome of the proceeding would have been different had the motion been urged earlier, in light of the credible affidavits of trial counsel and counsels' assertions that no intended, beneficial defense witnesses were rendered unavailable due to the passage of time. *Id.* at 700.

42. The applicant's post-conviction displeasure with counsels' strategy and timing in filing the motion to dismiss the indictment for lack of speedy trial does not warrant a finding of ineffective assistance. *See Blott,* 588 S.W.2d at 592; *see also Solis,* 792 S.W.2d at 100.

**NINTH GROUND FOR RELIEF: ALLEGED INEFFECTIVE ASSISTANCE OF COUNSEL DURING JURY SELECTION**

43. The applicant fails to demonstrate by a preponderance of evidence that trial counsel rendered ineffective assistance, such that counsels' performance was not in according with prevailing professional norms, by failing to commit prospective jurors to whether they would consider evidence of sexual abuse as mitigation. *See Moore v. State,* 999 S.W.2d 385 (Tex. Crim. App. 1999)(holding defense counsel improperly attempted to bind juror as to whether she would consider age of defendant as mitigating); *Curry v. State,* 910 S.W.2d 490 (Tex. Crim. App. 1995)(holding jury need not agree as to what evidence is mitigating, only that jury be given adequate vehicle to consider and give effect to mitigating evidence).

44. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance by failing to employ reasonable strategy during jury selection, such that counsels' performance was not in accord with prevailing professional norms or that there is a reasonable probability the outcome of the proceeding would have been different had counsel questioned individual jurors on their views of sexual abuse evidence as potential mitigation. *Strickland,* 466 U.S. at 700; *see Solis,* 792 S.W.2d at 100.

45. The applicant's post-conviction displeasure with the strategy and manner in which trial counsel conducted voir dire employed does not warrant a finding of ineffective assistance of counsel. *See Blott,* 588 S.W.2d at 592; *see also Solis,* 792 S.W.2d at 100.

46. In light of the trial court's thorough jury instructions at the conclusion of the punishment phase regarding the evidence the jury is to consider during their deliberation, the applicant fails to demonstrate by a preponderance of the evidence

02836

that he suffered any harm as a result of trial counsels' voir dire strategy. *See Strickland,* 466 U.S. at 700.

47. The applicant's proffered juror affidavits are not admissible evidence of any improper outside influence and have no bearing on the applicant's instant claim. *See* TEX. R. EVID. 606(b).

**TENTH GROUND FOR RELIEF: ALLEGED VIOLATION OF APPLICANT'S EQUAL PROTECTION RIGHTS DUE TO COUNSELS' AGREEMENTS TO EXCLUDE AFRICAN-AMERICAN JURORS**

48. Because the applicant affirmatively stated he had no objection to the release of every potential juror the parties agreed to excuse without examination, he is procedurally barred from asserting the instant ground for relief. *See* Tex. R. App. P. 33.1(a); *Hodge,* 631 S.W.2d at 757; *see also Hughes,* 191 F.3d at 614 (holding that defendant's failure to comply with Texas contemporaneous objection rule constituted adequate and independent state-law procedural ground sufficient to bar federal habeas).

49. In the alternative, the applicant's instant ground lacks merit as the decisions of trial counsel during jury selection were clearly a matter of strategy, and irrespective of the race of the potential jurors. *But c.f. Mata v. Johnson,* 99 F.3d 1261, 1269-1270 (5th Cir. 1996), *vacated on other grounds,* 105 F.3d 209 (5th Cir. 1997)(equal protection violation where all eight prospective black jurors were excused from the venire panel by agreement of parties); *see White,* 160 S.W.3d at 55.

**ELEVENTH GROUND FOR RELIEF: DEATH SENTENCE'S ALLEGED VIOLATION OF EQUAL PROTECTION, DUE PROCESS, AND CRUEL & UNUSUAL PUNISHMENT CLAUSES**

50. Given that the applicant complained in a pretrial motion that the death penalty was arbitrarily imposed because the decision as to which defendant is subject to the death penalty varies between Texas counties, but was overruled by the trial court and subsequently failed to re-urge this argument on direct appeal, he is now procedurally barred from asserting the instant ground for relief. *See Ex parte Banks,* 769 S.W.2d 539, 540 (Tex. Crim. App. 1989).

51. In the alternative, the applicant fails to demonstrate by a preponderance of the evidence that his death sentence was unconstitutional under U.S. CONST. amends. VI, VIII and XIV, based on an alleged arbitrary system of administering death penalties in various Texas counties - specifically in Harris County rather than other counties. *See Cantu v. State,* 842 S.W.2d 667, 691-92 (Tex. Crim. App. 1992), *cert.*

02837

*denied*, 509 U.S. 926 (1993)(holding prosecutorial discretion does not render death penalty unconstitutional); *Allen v. State,* 108 S.W.3d 281, 286 (Tex. Crim. App. 2003)(citing *Bell v. State,* 938 S.W.2d 35, 55 (Tex. Crim. App. 1996); *King v. State,* 953 S.W.2d 266, 274 (Tex. Crim. App. 1997)(declining to reach merits of claim of disparate treatment based on cases being held in different counties; noting there was no empirical data, case law, or other factual basis to support claim)); *see and cf. Morris v. State,* 940 S.W.2d 610, 613-4 (Tex. Crim. App. 1996)(noting possibility of two defendants, who have committed identical murder, receiving different sentences based on differing degrees of mitigating character and background evidence).

52. The applicant fails to demonstrate by a preponderance of the evidence that his death sentence was unconstitutionally based on alleged racial bias. *See Cockrell v. State,* 933 S.W.2d 73, 92-93 (Tex. Crim. App. 1996)(rejecting defendant's claim that certain statistical studies allegedly establish Texas death penalty disproportionately imposed in racially discriminatory manner).

53. The applicant fails to demonstrate by a preponderance of the evidence that the Texas death penalty scheme is unconstitutional as applied to him. *Id.* (holding defendant must show scheme unconstitutional as applied to him to gain relief from death sentence).

54. The applicant fails to demonstrate by a preponderance of the evidence that the Texas death penalty scheme was enacted or maintained because of any anticipated discriminatory effect in violation of equal protection, and that the sentencing scheme, as applied to him, was racially discriminatory in violation of equal protection. *See and cf. McCleskey v. Kemp,* 482 U.S. 920 (1987)(holding a state's legitimate reasons for adopting and maintaining capital punishment precluded inference of discriminatory purpose on part of the state in adopting death penalty sentencing scheme and allowing it to remain in force despite allegedly discriminatory impact and statistical study showing death penalty imposed more often on black defendants and killers of white victims than on white defendants and killers of black victims).

## TWELFTH GROUND FOR RELIEF: ALLEGED VIOLATION OF CONSTITUTIONAL RIGHTS AS A RESULT OF 10-12 RULE

55. Because the applicant complained about the 10-12 Rule in a pretrial motion, but was overruled by the trial court, and subsequently failed to re-urge this argument on direct appeal, he is now procedurally barred from asserting the instant ground for relief. *See Banks,* 769 S.W.2d at 540.

02838

56. In the alternative, the applicant fails to demonstrate by a preponderance of the evidence the unconstitutionality of art. 37.071 §(2)(a) based on the allegation it misled the jury as to the effect of a single "no" vote. *See Williams*, 301 S.W.3d at 694; *Druery*, 225 S.W.3d at 509; *Prystash*, 3 S.W.3d at 536.

57. The applicant fails to demonstrate by a preponderance of the evidence that the 10-12 jury instruction violates the United States and Texas Constitutions and the "Supreme Court precedent" of *Mills* and *McKoy*. *See Hughes*, 897 S.W.2d at 300-01(citing *Rousseau v. State*, 855 S.W.2d 666, 687 (Tex. Crim. App. 1993)(rejecting contention that 37.071 violates decisions in *McKoy* and *Mills*)).

58. The applicant's proffered juror affidavits are not admissible evidence of any improper outside influence and have no bearing on the applicant's instant claim. *See* TEX. R. EVID. 606(b).

59. In light of the trial court's explanation of the effect of the jury's voting during general voir dire and Nunnery's statements to the jury during closing argument, the applicant fails to show that he suffered any harm as a result the 10-12 Rule. *See Maldonado*, 688 S.W.2d at 116.

**THIRTEENTH GROUND FOR RELIEF: DEATH SENTENCE ALLEGEDLY ARBITRARILY AND CAPRICIOUSLY ASSIGNED BASED ON JURY'S ANSWER TO FIRST SPECIAL ISSUE AND THE LACK OF DEFINITIONS FOR KEY TERMS**

60. Because the applicant complained about the unconstitutionality of the death penalty due to the absence of definitions for terms in the first special issue in a pretrial motion, but was overruled by the trial court, and subsequently failed to re-urge this argument on direct appeal, he is now procedurally barred from asserting the instant ground for relief. *See Banks*, 769 S.W.2d at 540.

61. In the alternative, the applicant fails to show the unconstitutionality of TEX. CODE CRIM. PROC. art. 37.071, due to the lack of special definitions for "deliberately," "probability," "criminal acts of violence" and "continuing threat to society." *See Blue*, 125 S.W.3d at 503 (Tex. Crim. App. 2003)(re-affirming holdings where lack of following definitions not error: "continuing threat to society," "criminal acts of violence," "probability," "society," "personal moral culpability," and "moral blameworthiness").

62839

**FOURTEENTH GROUND FOR RELIEF: DEATH SENTENCE ALLEGEDLY UNCONSTITUTIONAL FOR LIMITING THE EVIDENCE THE JURY COULD CONSIDER MITIGATING**

62. Because the applicant complained about the unconstitutionality of the death penalty based on an alleged limiting of evidence the jury could consider mitigating in a pretrial motion, but was overruled by the trial court, and subsequently failed to re-urge this argument on direct appeal, the applicant is now procedurally barred from asserting the instant ground for relief. *See Banks*, 769 S.W.2d at 540.

63. The trial court properly denied the applicant's pretrial motion objecting to the Texas death penalty scheme on the ground that the instruction concerning "moral blameworthiness" allegedly prevented the jury from considering and giving effect to all mitigating evidence; TEX. CODE CRIM. PROC. art. 37.071 does not unconstitutionally narrow a jury's discretion to consider as mitigating only those factors concerning moral blameworthiness. *See Williams*, 301 S.W.3d at 694 (rejecting claim that Texas death penalty scheme unconstitutional based on its definition of mitigating evidence allegedly limiting Eighth Amendment concept of "mitigation" to factors that render defendant less morally blameworthy for commission of capital murder); *see Shannon*, 942 S.W.2d 591 (holding that because consideration of mitigation evidence is open-ended subjective determination by each individual juror, art. 37.071 does not unconstitutionally narrow jury's discretion to factors concerning only moral blameworthiness).

64. In the alternative, the applicant fails to demonstrate by a preponderance of the evidence that the Texas death penalty scheme is unconstitutional as applied to him. *See Cockrell*, 933 S.W.2d at 93 (holding defendant has to show scheme unconstitutional as applied to him to gain relief from death sentence).

## III.

In all things, the applicant fails to demonstrate his conviction was improperly obtained or that he is being improperly confined. Accordingly, it is recommended to the Texas Court of Criminal Appeals that habeas relief be **DENIED.**

02848

CAUSE NO. 1412826-A

EX PARTE                          §    IN THE 179[th]DISTRICT COURT

                                           §    OF

JUAN BALDERAS,                    §    HARRIS COUNTY, TEXAS
    Applicant

## ORDER

THE CLERK IS HEREBY **ORDERED** to prepare a transcript of all papers in

cause no. 1412826-A and transmit same to the Court of Criminal Appeals, as provided

by Article 11.071 of the Texas Code of Criminal Procedure. The transcript shall include

certified copies of the following documents:

1. the applicant's writ application and exhibits filed in cause no. 1412826-A;

2. the State's original answer and exhibits filed in cause no. 1412826-A;

3. any and all filings including but not limited to motions, proposed orders,
disclosures, notices, objections, and findings of fact and conclusions of law filed
in cause no. 1412826-A;

4. all Court orders in cause no. 1412826-A;

5. all sealed exhibits in cause no. 1412826-A;

6. the affidavits of Jerome Godinich, Jr. and Alvin Nunnery filed in cause no.
1412826-A;

7. the Court's findings of fact, conclusions of law and order in cause no. 1412826-A;

8. the reporter's records in all post-conviction hearings in cause no. 1412826-A
(March 31, 2015; October 27, 2015; December 1, 2015; September 8, 2016;
August 17, 2017; February 22, 2018; May 2, 2018; and May 11, 2018);

9. the reporter's record in cause no. 1412826;

10. the appellate opinion in no. AP-77,036;

11. the clerk's record in cause no. 1412826; and

12. the indictment, judgment, sentence, and docket sheets in cause no. 1412826 and 1412826-A.

THE CLERK IS FURTHER **ORDERED** to send a copy of the court's findings of fact and conclusions of law, including its order, to applicant's habeas counsel: Katherine Black, Natalie Corvington, and Erin Eckhoff, Office of Capital and Forensic Writs; 1700 North Congress Ave., Suite 460; Austin, Texas 78701 and to the State: Farnaz Faiaz Hutchins; Harris County District Attorney's Office, 1301 Prairie, 5th floor, Houston, Texas 77002.

**BY THE FOLLOWING SIGNATURE, THE COURT ADOPTS THE STATE'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN CAUSE NO. 1412826-A.**

SIGNED this _____ day of _____, 2018.


_____
The Honorable Baylor Wortham
179th District Court, By Assignment
Harris County, Texas

02842

CAUSE NO. 1412826-A

| EX PARTE | § | IN THE 179[th]DISTRICT COURT |
| | § | OF |
| JUAN BALDERAS, Applicant | § | HARRIS COUNTY, TEXAS |

## CERTIFICATE OF SERVICE

Service has been accomplished on this the 12th day of July, 2018, by e-mailing a copy of foregoing State's Proposed Findings of Fact, Conclusions of Law and Order to habeas counsel for the applicant Erin Eckhoff, Katherine Black, and Natalie Corvington of the Office of Capital and Forensic Writs as follows: Erin.Eckhoff@ocfw.texas.gov, Katherine.Black@ocfw.texas.gov, and Natalie.Corvington@ocfw.texas.gov.

A courtesy copy has been emailed to the Honorable Baylor Wortham at 136judge@co.jefferson.tx.us.

SIGNED this 12th day of July, 2018.

Respectfully submitted,

/s/ *Farnaz Faiaz Hutchins*

Farnaz Faiaz Hutchins
Assistant District Attorney
Harris County, Texas
1310 Prairie, 5th Floor
Houston, Texas 77002
Texas Bar ID #24063791

89

CAUSE NO. 1412826-A

| EX PARTE | § | IN THE 179<sup>th</sup>DISTRICT COURT |
|---|---|---|
| | § | OF |
| JUAN BALDERAS,<br>Applicant | § | HARRIS COUNTY, TEXAS |

### COURT'S FINDINGS OF FACT &
### CONCLUSIONS OF LAW, AND ORDER

The Court, having considered the applicant's application for writ of habeas corpus and associated exhibits; the State's Original Answer and associated exhibits; testimony presented at a post-conviction evidentiary hearing; arguments of counsel; and official court documents, filings, and records in cause nos. 1412826 and 1412826-A; makes the following findings of fact and conclusions of law in cause no. 1412826-A:

### I.
### FINDINGS OF FACT

1.  The applicant, Juan Balderas, was indicted and convicted of the felony offense of capital murder in cause no. 1412826[1] in the 179th District Court of Harris County, Texas, for the murder of Eduardo "Powder" Hernandez, hereinafter called the complainant.

2.  The applicant was represented during trial by attorneys Jerome Godinich, Jr., Alvin Nunnery, Robert Scott, and Scott Shearer.

3.  Voir dire commenced on January 13, 2014, and concluded on February 7, 2014. (IV R.R. to XXI R.R.) On February 12, 2014, the trial court held a hearing on the applicant's motion for speedy trial. The Court denied the applicant's motion that same day. (XXII R.R.) Mr. Balderas was arraigned on February 17, 2014, and he entered a plea of not guilty. (XXIV R.R. 11). The guilt/innocence phase of the applicant's trial began later that same day. (XXIV R.R. 16). On February

---

[1] This offense was originally indicted as cause no. 1064857, then re-indicted as cause no. 1299912, and ultimately re-indicted as cause no. 1412826.

25, 2014, both sides presented closing arguments, and the case was submitted to the jury for guilt/innocence determination. (XXX R.R. 5-64).

4. On February 27, 2014, the jury found the applicant guilty as charged in the indictment (XXXII R.R. at 11).

5. On March 14, 2014, after the jury affirmatively answered the first special issue and negatively answered the mitigation special issue, the trial court assessed the applicant's punishment at death by lethal injection (XLIV R.R. at 8-12).

6. On November 2, 2016, the Court of Criminal Appeals affirmed the applicant's conviction in a published opinion. *Balderas v. State*, 517 S.W.3d 756 (Tex. Crim. App. 2016)(reh'g dism'd).

---

**FIRST AND SECOND GROUNDS FOR RELIEF:**
**STATE'S ALLEGED PRESENTATION OF FALSE EVIDENCE**
**THROUGH WITNESS ISRAEL DIAZ**

---

7. Israel "Cookie" Diaz is a self-admitted former member of the La Tercera Crips ("LTC") criminal street gang, who at the time of the applicant's trial had been in the Harris County Jail for over seven years on unrelated aggravated robbery and capital murder charges (XXVI R.R. at 121-22, 126, 132-33).

8. Between 2007 and the applicant's trial in 2014, Diaz spoke with prosecutors assigned to the applicant's case on multiple occasions in the presence of his attorneys (XXVI R.R. at 124-26).

9. Attorney Roland Moore originally represented Diaz, but was forced to withdraw for health reasons, and Diaz was subsequently represented by Allen Isbell and David Bires (*Id.* at 163-65).

10. The Court finds handwritten notes now marked as the Applicant's Exhibit 57, are 23 pages of handwritten notes from pretrial interviews prosecutors Caroline Dozier and George Weissfisch conducted with Diaz in 2007 and 2008. *Infra* at *Third Ground for Relief*, nos. 75, 82.

02845

11. The Court finds prosecutor Traci Bennett created typed notes from pretrial interviews she conducted with Diaz on January 27, 2014 and February 14, 2014 (II Post-Conviction Writ Status Conference—May 2, 2018 at 58); *Applicant's Motion to Supplement the Record and to Expand the Evidentiary Hearing* at Exhibit B (p.10-12).

12. The Court finds former prosecutor Spence Graham prepared a capital murder summary in the applicant's case dated April 27, 2011 which was an in-house report summarizing "the essential facts of the case ... and contemplat[ing] on ... all those things that would go into the determination on whether to certify it as capital and seek the death penalty[,]" and which included proffered testimony from Israel Diaz (II Post-Conviction Writ Status Conference—May 2, 2018 at 9); *Applicant's Motion to Supplement the Record and to Expand the Evidentiary Hearing* at Exhibit B (p.1-9).

13. The Court finds the capital murder summary in the applicant's case does not incorporate any disclosures made by Diaz subsequent to April 27, 2011.

14. On February 19, 2014, Diaz testified as a State's witness in the applicant's trial (XXVI R.R. at 118-96).

15. In exchange for Diaz's truthful testimony in the applicant's trial, as well as in future trials of LTC members Efrain Lopez and Jose Hernandez, the State agreed to reduce Diaz's capital murder charge to an aggravated robbery, and allow Diaz to concurrently plead guilty to the trial court on both charges without a recommendation on punishment from the State (*Id.* at 122-24).

16. Two days prior to his testimony in the applicant's case, Diaz pleaded guilty to both charges against him, and at the time of his trial testimony, was awaiting sentencing by the trial court judge (*Id.* at 122-23).

17. At trial, Diaz testified the applicant sponsored the complainant's membership in LTC, and the complainant was "cliqued in" as a member of LTC (*Id.* at 137-38).

18. At trial, Diaz testified that in 2004, he stole a car at gunpoint; loaned the stolen car to the complainant; the police stopped the complainant in the stolen car; the complainant told police he had gotten the car from Diaz; and Diaz was subsequently charged with aggravated robbery (*Id.* at 139-42).

3

02846

19. At trial, Diaz testified he was released on bond in his aggravated robbery case in April 2005, and three weeks later, he spoke with the complainant and discouraged the complainant from cooperating with the police in the case (*Id.* at 143-44).

20. At trial, Diaz testified that although he believed he had the situation with his pending aggravated robbery charge and the complainant under control, Diaz and other LTC members were upset with the complainant for speaking with the police and no longer wanted the complainant in LTC (*Id.* at 141, 145).

21. At trial, Diaz testified the complainant's relationship with LTC members further deteriorated when the complainant was seen associating with rival gang members and photographs were discovered of the complainant "throwing" rival gang signs (*Id.* at 147-50).

22. At trial, Diaz testified that three to four days prior to the complainant's murder, LTC members held a meeting where they voiced their opinions about how to deal with the complainant's behavior (*Id.* at 151-53).

23. At trial, Diaz testified he did not care what happened to the complainant, but preferred that whatever happened be delayed until after the resolution of Diaz's aggravated robbery case so he would not be a suspect (*Id.* at 154).

24. At trial, Diaz testified he first learned that something had happened to the complainant when Efrain Lopez called him at home (*Id.* at 155, 184).

25. At trial, Diaz testified that after receiving Lopez's call, he drove to the home of twins Pedro and Alejandro Garcia, where he met several other LTC members and associates, and learned the complainant had been killed (*Id.* at 151, 157).

26. At trial, Diaz testified that from the Garcia (or twins') house, he and several others drove to a location across the street from the crime scene, where he saw an ambulance and police vehicles, as well as the applicant standing several feet away (*Id.* at 157-59).

27. At trial, Diaz testified the applicant was wearing a dark blue or black sweater-like shirt and khaki pants at the crime scene (*Id.* at 159).

4

62847

28. At trial, Diaz testified the applicant approached him and the other LTC members who had driven to the crime scene, hugged each of them in a joyful manner, and gave Diaz a kiss on the cheek, which Diaz considered unusual (*Id.* at 159).

29. At trial, Diaz testified that when the applicant gave him a kiss on the cheek, the applicant said something which "basically, just took credit for the whole thing… he said he got him, he finally got him" (*Id.* at 160).

30. At trial, Diaz testified the applicant had a silver handgun, which Diaz had seen on many occasions, and was exchanging the magazine when Diaz interacted with him across from the crime scene (*Id.* at 160-61).

31. The Court finds (a) the proffered testimony contained in the State's capital murder summary, (b) the information contained in the 23 pages of pretrial notes now marked as the Applicant's Exhibit 57, and (c) the information contained in Bennett's typed pretrial interview notes, are materially consistent with Diaz's testimony at the applicant's trial regarding the applicant's involvement in and the circumstances surrounding the complainant's murder. The Court further finds that any inconsistencies are immaterial.

32. Bennett's typed pretrial interview notes reflect that after the complainant's murder, the applicant hugged and kissed Diaz at the twins' house and said "I got him," whereas at trial Diaz testified the applicant hugged and kissed him and said the applicant "got him" across from the crime scene; the Court finds the location of the applicant's conduct is immaterial to the nature of the conduct and the substance of the disclosure (XXVI R.R. at 159-60); *Motion to Supplement the Record and to Expand the Evidentiary Hearing* at Exhibit B (p.9).

33. Contrary to the applicant's habeas assertions of a trial-day or forced fabrication, the Court finds Bennett's typed pretrial interview notes with Diaz reflect that prior to trial, Diaz informed the State of the applicant's confession; the applicant's embrace and kiss on the cheek; and that other LTC members wanted to drive through the apartment complex where the shooting had occurred. *Applicant's Motion to Supplement the Record and to Expand the Evidentiary Hearing* at Exhibit B (p.10-12).

02845

34. On May 11, 2018, this Court held an evidentiary hearing to assist the Court in resolving the issue of whether the State either knowingly or unknowingly presented false testimony at trial through Israel Diaz, and with the intention of permitting the applicant to present the testimony of Israel Diaz specific to whether Diaz was recanting his trial testimony; whether Diaz was pressured by the State pretrial to change his testimony; and whether Diaz testified falsely under oath at the applicant's trial. *See State's Proposed Supplemental Order Designating Issues to Be Resolved Via Evidentiary Hearing.*

35. On May 11, 2018, Israel Diaz testified under oath at a post-conviction evidentiary hearing in the applicant's case in the presence of Diaz's court-appointed attorney, Genesis Draper (IV Post-Conviction Writ Evidentiary Hearing—May 11, 2018 at 126-217).

36. The Court finds that at no point during the post-conviction evidentiary hearing did Diaz recant his original trial testimony (*Id.*).

37. The Court finds that at no point during the post-conviction evidentiary hearing did Diaz admit to previously recanting his trial testimony (*Id.*).

38. The Court finds that at the post-conviction evidentiary hearing, Diaz testified he had testified truthfully at the applicant's trial (*Id.* at 186).

39. At the post-conviction evidentiary hearing, Diaz testified he was not scared when he testified in the applicant's trial and was not concerned that he himself would face the death penalty (*Id.* at 135-38).

40. The Court finds Diaz's post-conviction evidentiary testimony regarding the complainant's murder was credible, was materially consistent with his trial testimony, and with the State's summation of Diaz's proffered testimony in the capital murder summary and pretrial interview notes with Diaz.

41. At the post-conviction evidentiary hearing, Diaz provided the following testimony regarding his pretrial interactions with the State:

    a. the State reached out to him in regards to testifying in the applicant's trial, gave him the option of testifying, and put the final decision to testify in his hands (*Id.* at 132, 139, 160, 184, 189, 200-01);

. 02849

b. he went through a period where he did not want to cooperate with or testify for the State (*Id.* at 145-46);

c. he reached back out to the State after the State contacted him (*Id.* at 132);

d. the State never pressured him into testifying at the applicant's trial, nor did he feel forced to do it (*Id.* at 160-61, 189);

e. the State never pressured or coerced him to testify to anything other than the truth at the applicant's trial (*Id.* at 186);

f. the prosecutor told him he needed to "[c]hange the way I express myself verbally, like when I used profanity and slang" but that the prosecutor did not instruct him to change the content of his testimony (*Id.* at 145-46, 148); and

g. prosecutors did not coach him on what to say at trial (*Id.* at 146-47).

42. At the post-conviction evidentiary hearing, the applicant sought to impeach Diaz's credibility by introducing evidence regarding: Diaz's alleged involvement in an extraneous offense; information Diaz gave the police regarding an individual named Jose Luviano; statements Diaz made during an interview with police Sergeant Edward Gonzalez; and statements Diaz allegedly made to an individual named Monica Esquivel (IV Post-Conviction Writ Evidentiary Hearing—May 11, 2018 at 175-81, 214-16).

43. The Court finds that at the post-conviction evidentiary hearing, the applicant misconstrued Diaz's statements to Sergeant Gonzalez in an attempt to unsuccessfully impeach Diaz, and that Diaz consistently told Sergeant Gonzalez he was not involved in the Loma Vista murder because he was out of town at the time of that offense (*Id.* at 178-79, 207-10).

44. The Court finds the applicant failed to provide any post-conviction testimony (either live or via affidavit) from Monica Esquivel.

45. At the post-conviction evidentiary hearing, the applicant argued Jose Luviano was charged with murder as a result of statements Diaz made to the police; however, the Court finds the applicant's assertions regarding the State's charging decision are speculative and irrelevant (*Id.* at 175-81, 214-16).

02850

46. At the post-conviction evidentiary hearing, Diaz provided the following testimony regarding his interaction with the applicant's habeas investigator Adrian de la Rosa:

    a. de la Rosa unexpectedly visited Diaz in custody (*Id.* at 134, 190);

    b. de la Rosa allegedly introduced himself as an attorney (*Id.* at 191, 204, 210-11);

    c. Diaz originally thought de la Rosa was an attorney assigned to help him with his parole (*Id.* at 204, 211);

    d. Diaz had a 15 minute conversation with de la Rosa which "was not enough to discuss a very serious case" (*Id.* at 158, 198);

    e. Diaz rushed the meeting with de la Rosa because Diaz wanted to go to his family visit (*Id.* at 135, 198-99);

    f. de la Rosa did not give Diaz anything to review (*Id.* at 204);

    g. towards the end of their meeting, de la Rosa took notes (*Id.* at 191, 203);

    h. at de la Rosa's insistence and instruction that Diaz "wasn't even going to be in trouble and it would help Balderas anyway" and believing that he would be paroled in a few months, Diaz wrote a short statement in his own words for de la Rosa (*Id.* at 142, 205-206);

    i. de la Rosa did not return for a second visit or bring an affidavit for Diaz to sign (*Id.* at 205, 212); and

    j. the words contained in de la Rosa's proffered affidavit (Applicant's Exhibit 7) are not Diaz's words (*Id.* at 142).

47. At the post-conviction evidentiary hearing, Diaz provided the following testimony relating to the handwritten statement he provided habeas investigator De la Rosa:

    a. in the statement, Diaz wrote he felt pressured to cooperate with the State, wanted to end the situation as soon as possible, and felt as if the prosecutors put him on the spot (*Id.* at 159);

02851

b. Diaz explained he "felt pressured by the circumstance, but I never mentioned the government pressured me or the prosecutors forced me. I just felt the pressure of not having any response for seven years, eight years" (*Id.* at 160);

c. Diaz believed that after eight-and-half years of being in custody awaiting the resolution of his own charges, he "felt like [he] had a right to either go to trial and get a plea deal…instead of resetting and resetting" but that he was "not desperate" to get out of custody (*Id.* at 128, 130, 136);

d. Diaz expressed he never felt pressure to testify against the applicant because "that was just decision making," but that after spending so much time in custody awaiting the resolution of his own case, he just "felt the pressure of the case" and "the pressure of the unknown" waiting to know his own fate (*Id.* at 201-202, 213); and

e. Diaz clarified the State did not "put me on the spot to testify against [the applicant]," and his use of the phrase "put me on the spot" meant that he was caught off-guard "when I was not expecting their visit, they just showed up with my attorney" (*Id.* at 140, 160, 185, 199-200, 213).

48. At the post-conviction evidentiary hearing, Diaz denied and refuted making the following statements to habeas investigator de la Rosa:

a. that the applicant had not confessed to the complainant's murder (*Id.* at 182-83);

b. that he had not seen the applicant at the "Corporate projects" the day the complainant was killed (*Id.* at 183);

c. that he had lied (*Id.* at 183);

d. that he had lied because he felt pressured by the prosecutors (*Id.* at 183);

e. that had lied because he needed to get out of prison (*Id.* at 183);

f. that prosecutors told him to change his testimony to reflect that the applicant had confessed to committing the murder to Diaz (*Id.* at 146);

g. that prosecutors instructed him to testify at trial that the applicant confessed to murdering the complainant (*Id.* at 147);

9

h. that the reason he did not testify against Efrain Lopez was because he felt guilty about the testimony he gave against the applicant (*Id.* at 154);

i. that there were things he would not put into writing for de la Rosa (*Id.* at 157);

j. that he was afraid his statements would later be used against him (*Id.* at 157-58); and

k. that he would not sign an affidavit because he wanted to speak with an attorney first (*Id.* at 212).

49. On May 11, 2018, Adrian de la Rosa testified at a post-conviction evidentiary hearing in the applicant's case (*Id.* at 218-78, 288-90);

50. Over the State's objection, de la Rosa testified at the post-conviction evidentiary hearing that Diaz told him the District Attorney's Office pressured him to lie at the applicant's trial and told him he needed to say the applicant killed the complainant (*Id.* at 223-24).

51. During de la Rosa's testimony, the Court clarified the purpose of the evidentiary hearing was "focused on whether or not there's an intent or desire to recant the [Israel Diaz] testimony" not whether what Diaz said at trial was truthful or untruthful (*Id.* at 228).

52. At the post-conviction evidentiary hearing, de la Rosa testified:

a. he is a post-conviction investigator with the Office of Capital and Forensic Writs, doing both mitigation and fact investigation, although he lacks any formalized training and is not certified by the Texas Commission on Law Enforcement ("TCOLE") as an investigator (*Id.* at 218, 236);

b. he has a law degree, but is not a licensed lawyer (*Id.* at 220, 236);

c. he "enjoy[s] building mitigation stories" (*Id.* at 220, 235-36);

d. he went to Pam Lychner State Jail to speak with Israel Diaz on October 23, 2015 without providing Diaz any advance notice (*Id.* at 221-22, 240-42);

e. he had not reviewed the trial testimony prior to visiting Diaz and could not recall what he had reviewed or if he had reviewed the State's evidence presented against the applicant, despite previously stating his office had

10

ᴏ2853

received the State's voluminous case file on October 21, 2015, and he was able to review the file, develop Diaz as a person of interest to the investigation, and arrange a jail visit with the requisite 24-hour notice by October 23, 2015 (*Id.* at 246-47, 249-51);

f.  he conceded it would be important to become familiar with a case before interviewing a critical witness, however he had not do so (*Id.* at 249-51);

g.  he failed to tape-record his interview with Diaz (*Id.* at 252-53);

h.  he did not represent to Diaz that he was a lawyer (*Id.* at 222);

i.  he did not advise Diaz he could face legal consequences for perjury, nor did he advise Diaz of his right to consult with counsel prior to speaking with de la Rosa (*Id.* at 255-56);

j.  he asked Diaz to make a written statement at the close of their first meeting (*Id.* at 229, 243, 278);

k.  in the written statement Diaz provided to de la Rosa, Diaz did not state he had lied at the applicant's trial, although de la Rosa claimed that Diaz told him so orally (*Id.*);

l.  When de la Rosa returned to the jail the following week to substitute a formal statement he had written for the handwritten statement Diaz had previously given, Diaz refused to sign de la Rosa's statement. Per de la Rosa, Diaz said he was afraid he would get in trouble for admitting he had lied at the applicant's trial (*Id.* at 231-32);

m. although it is the general practice of the Office of Capital and Forensic Writs to document every witness interaction, de la Rosa did not create a memorandum to document his purported visit to Diaz on October 30, 2015 (*Id.* at 259-60); and

n.  in the affidavit he prepared regarding his interactions with Diaz, de la Rosa: put quotation marks around sentences he attributed to Diaz which were not Diaz's direct words and which did not appear in de la Roas's handwritten notes; filled in words from memory which he attributed to Diaz, but that did not appear in de la Roas's handwritten notes; and included information that did not appear in de la Roas's handwritten notes, but that he thought Diaz had said during the interview (*Id.* at 266-70).

ð2854

53. Having heard the testimony of De la Rosa, the Court does not find his claim that Diaz recanted his trial testimony to be credible nor otherwise supported by the evidence before the Court.

54. The Court finds de la Rosa gave conflicting testimony at the post-conviction evidentiary hearing regarding whether or not he told Diaz it would be helpful if Diaz gave de la Rosa an immediate written statement, namely:

    a. on direct examination, de la Rosa initially testified he did not tell Diaz he "needed [Diaz] to help [de la Rosa] out and it would help Juan Balderas if he wrote a statement" (IV Post-Conviction Writ Evidentiary Hearing—May 11, 2018 at 223);

    b. later on direct examination, de la Rosa admitted to telling Diaz that a written statement would be helpful, before immediately correcting himself, "[Diaz] initially said he'd like to sleep on it, but after – you know, I just said it would be helpful -- not helpful, it would be encompassing the conversation that we had right now" (*Id.* at 229); and

    c. on cross-examination, when confronted with his inconsistent responses, de la Rosa conceded he had instructed Diaz that providing a same-day statement would be helpful for the applicant (*Id.* at 244).

55. The Court finds de la Rosa's post-conviction testimony and habeas affidavit (Applicant's Exhibit 7) regarding his conversation with Diaz to be unpersuasive and not supported by the other evidence before the Court.

56. The Court finds both de la Rosa's post-conviction testimony and hearsay habeas affidavit (Applicant's Exhibit 7) to be unpersuasive evidence of Israel Diaz's alleged recantation or false testimony.

57. At the close of the post-conviction evidentiary hearing, the Court sustained the State's objections to the applicant's introduction into evidence of two affidavits from prison inmates Efrain Lopez and Jose Hernandez, purporting to contradict Diaz's trial testimony, which were notarized by de la Rosa; nevertheless, the Court permitted the applicant to include these affidavits as part of the record for appellate review (IV Post-Conviction Writ Evidentiary Hearing—May 11, 2018 at 280-88, 291-95; V Post-Conviction Writ Evidentiary Hearing—May 11, 2018 at Exhibits 2-3).

02855

58. De la Rosa testified he met with inmates Lopez and Hernandez in prison; failed to record their interviews; did not ascertain whether either inmate was represented by counsel; did not apprise either inmate of their legal rights; did not bring his notes from either of those meetings to court with him; and that both affidavits were in de la Roas's handwriting (IV Post-Conviction Writ Evidentiary Hearing—May 11, 2018 at 280-90).

59. The Court finds the proffered habeas affidavits of Efrain Lopez and Jose Hernandez are unpersuasive impeachment or false testimony evidence against Diaz (V Post-Conviction Writ Evidentiary Hearing—May 11, 2018 at Exhibits 2-3).

60. The Court also denied the applicant's request to expand the evidentiary hearing to permit testimony on the potential dangers of informant testimony; nevertheless, the Court permitted the applicant to include a declaration from Professsor Brandon L. Garrett regarding informant testimony as part of the record for appellate review (IV Post-Conviction Writ Evidentiary Hearing— May 11, 2018 at 300-02; V Post-Conviction Writ Evidentiary Hearing—May 11, 2018 at Exhibit 1).

61. The Court finds the post-conviction affidavit of Diaz's trial counsel Allen Isbell, State's Habeas Exhibit 1, credible and persuasive, and the facts asserted therein to be true.

62. Per Isbell's affidavit,

> [t]he meetings that I attended between Diaz and the prosecutors did not occur in the manner set forth in de la Rosa's affidavit. Specifically, there was never a time when I was present in a meeting between the prosecutors and Diaz where the prosecutors told Diaz to change any portion of his story. Additionally, I was present in the courtroom when Diaz testified at guilt/innocence during the Balderas' trial, and his testimony was consistent with what I expected it to be.

*State's Habeas Ex. 1, affidavit of Allen C. Isbell.*

63. The Court finds Isbell's affidavit refutes the applicant's habeas assertions that (a) prior to trial, prosecutors told Diaz to change his story regarding the primary offense, and that (b) Diaz never told prosecutors that the applicant admitted to killing the complainant. *Id.*

· 02856

64. The Court finds the post-conviction affidavit of trial prosecutor Traci Bennett, State's Habeas Exhibit 2, credible and persuasive, and the fact alleged therein to be true.

65. Per Bennett's affidavit, she, Caroline Dozier, Mary McFaden, and Allen Isbell met with the applicant on January 27, 2014, at which time Diaz (a) described the gathering of LTC members days before the complainant's murder, (b) stated the applicant came up to Diaz after the murder and hugged him as if he was happy to see him, and (c) kissed Diaz, which was unusual to Diaz and admitted to killing the complainant. *State's Habeas Ex. 2, affidavit of Traci Moore Bennett.*

66. Per Bennett's affidavit, the applicant's assertions that prosecutors told Diaz to change his story regarding the complainant's murder are false. *Id.*

67. The Court finds that Bennett's affidavit refutes the applicant's habeas assertions regarding Diaz's purported recantation and alleged statements Adrian to de la Rosa. *Id.*

68. The Court finds the applicant fails to present credible or persuasive testimony that Israel Diaz is presently recanting or previously recanted his trial testimony.

69. Given the totality of the record and the evidence, the Court finds the applicant fails to present credible or persuasive testimony that Israel Diaz testified falsely at the applicant's trial.

70. The Court finds the applicant fails to demonstrate Diaz's trial testimony left a false impression with the jury. *See* (XXVI R.R. at 118-96).

71. The Court finds the applicant fails to present credible or persuasive evidence that the State either intentionally or knowingly presented false testimony at trial through Israel Diaz.

72. The Court finds the applicant fails to demonstrate Diaz's trial testimony was material to the jury's verdict in light of the totality of the State's evidence of guilt against the applicant. *See infra* in *Fourth Ground for Relief* at no. 134

---

**THIRD GROUND FOR RELIEF:**
**STATE'S ALLEGED FAILURE TO DISCLOSE IMPEACHMENT INFORMATION REGARDING WITNESS ISRAEL DIAZ**

---

02857

73. Former Harris County Assistant District Attorney Spence D. Graham was assigned to the applicant's cases from May 2009 through December 2011, and maintained custody and control of the State's prosecution files during this period (XXII R.R. at 9, 21-22); *State's Habeas Ex. 3, affidavit of Spence D. Graham.*

74. The Court finds the post-conviction affidavit of former prosecutor Spence D. Graham, State's Habeas Exhibit 3, credible and persuasive, and the facts asserted therein to be true.

75. The Court finds according to Graham's affidavit:

   a. the handwritten notes now marked as the Applicant's Exhibit 57, are 23 pages of handwritten notes from pretrial interviews prosecutors Caroline Dozier and George Weissfisch conducted with Israel Diaz;

   b. during Graham's tenure over the applicant's case, the 23 pages of handwritten notes now marked as the Applicant's Habeas Exhibit 57 were located inside a manila folder labeled with Diaz's name along with transcripts from Diaz's police interviews, and kept in the State's prosecution files in Graham's office;

   c. the applicant's trial counsel were provided the opportunity to review the contents of the State's prosecution files, and did so;

   d. during Graham's tenure over the applicant's case, a copy of the State's capital murder summary was also included in the State's prosecution file and available for defense counsels' review; and

   e. the State's capital murder summary contained the following information regarding Israel Diaz:

      i. Diaz told police and prosecutors previously handling the case there was a hit out on the complainant and gang leaders had issued an "SOS" (or "shoot on Sight") [*sic*] for anyone in LTC that saw the complainant;

      ii. Diaz previously gave statements from jail with his lawyer to law enforcement that the applicant admitting to killing the complainant when they spoke that evening at Alejandro Garcia's house;

      iii. Diaz could assert that the hit out on the complainant was made by the leadership of the La Tercera Crips gang, and that it was because

15

of not only the complainant's potential testimony, but because of his friendship with rival gang members and that the complainant would share LTC secrets with the rival gang; and

    iv. Diaz knew that the complainant's murder would occur.

*State's Habeas Ex. 3, affidavit of Spence D. Graham.*

76. The Court finds according to Bennett's credible affidavit:

    a. when Bennett assumed responsibility of the applicant's case in early 2013, the 23 pages of Diaz notes now marked as the Applicant's Exhibit 57 were in a folder in the State's prosecution files not marked as work product, and which would have been available for defense counsel to review; and

    b. during Bennett's tenure over the applicant's case, trial counsel Jerome Godinich reviewed the State's prosecution files on multiple occasions.

*State's Habeas Ex. 2, affidavit of Traci Moore Bennett.*

77. Godinich's out-of-court hours logs reflect over 70 hours reviewing the State's prosecution files and the discovery material provided to the defense by the State. *State's Habeas Ex. 4, Godinich hours logs submitted with payment vouchers.*

78. The Court finds the post-conviction affidavit of trial counsel Jerome Godinich, Jr. filed in cause no. 1412826-A to be credible and persuasive, and the facts asserted therein to be true.

79. The Court finds according to Godinich's affidavit:

    a. prior to trial, counsel reviewed the 23 pages of Diaz notes now marked as the Applicant's Exhibit 57 at the District Attorney's Office;

    b. Godinich took the 23 pages of Diaz notes now marked as the Applicant's Exhibit 57 as well as any inconsistencies in Diaz's statements into account during his trial preparation;

    c. Diaz's trial testimony was as Godinich expected.

*Affidavit of Jerome Godinich, Jr. at 1.*

02859

80. The Court finds the post-conviction affidavit of trial counsel Alvin Nunnery filed in cause no. 1412826-A credible and persuasive, and the facts asserted therein to be true.

81. The Court finds according to Nunnery's affidavit:

    a. prior to trial, Nunnery was aware of the 23 pages of Diaz notes now marked as Applicant's Exhibit 57; and

    b. Nunnery incorporated any information from the 23 pages of Diaz notes now marked as Applicant's Exhibit 57 he believed to be relevant, helpful, and in accordance with the defense strategy, into account during his cross-examination of Diaz.

*Affidavit of Alvin Nunnery* at 1.

82. The Court finds the 23 pages of handwritten notes now marked as the Applicant's Exhibit 57 reflect the prosecutors' interpretations and impressions of what Diaz stated in pretrial witness meetings in 2007 and 2008, and potentially include gaps in the prosecutors' notation of information, inaccuracies, and the overlapping of information pertaining to multiple extraneous offenses.

83. The Court finds the 23 pages of Diaz notes now marked as the Applicant's Exhibit 57 contain much inculpatory information regarding the applicant's involvement in the complainant's death that is consistent with Diaz's trial testimony, including:

    a. the complainant was spending time with rival gang members (*Applicant's Exhibit 57* at 3, 7, 13, 22);

    b. there was concern among LTC members that the complainant would put LTC members in jeopardy and provide rival gangs with information concerning LTC (*Id.* at 3, 7, 13, 22);

    c. a photograph surfaced of the complainant with rival gang members where the complainant was displaying the rival gang's sign (*Id.* at 3, 13);

    d. there was a meeting of LTC members where they discussed shooting the complainant (*Id.* at 7, 13);

. 02860

e. after the meeting discussing shooting the complainant, anyone who saw the complainant could kill him (*Id.* at 3, 13, 22);

f. the wall of the apartment on Corporate where the complainant was staying was tagged (*Id.* at 7);

g. Jose Vazquez, also known as Chango, informed LTC members of the complainant's whereabouts (*Id.* at 7-8, 13, 22);

h. Efrain Lopez, also known as Hairless, called Diaz and told Diaz that "they found him" and the complainant was killed soon after (*Id.* at 8, 14, 22);

i. Diaz went to the twins' house on the night of the murder and the complainant's death was discussed amongst those present (*Id.* at 8, 13-14, 22);

j. the applicant admitted to killing the complainant (*Id.* at 13-14, 22); and

k. the applicant carried two handguns, a .40 caliber and a .357 caliber (*Id.* at 13).

84. In the 23 pages of Diaz notes now marked as Applicant's Exhibit 57, the Court finds multiple references to an LTC meeting held to discuss the complainant's murder, but no specific mention that this meeting was held three days prior to the murder. *Id.*

85. The Applicant's Exhibit 56, a February 14, 2014 email from Godinich to the defense team, reflects that during that morning's pretrial hearing, the defense learned more information about the State's trial theory, specifically pertaining to anticipated testimony from Israel Diaz and Alejandro Garcia. *Applicant's Exhibit 56.*

86. The Court finds the Applicant's Exhibit 56 does not contradict statements in trial counsels' affidavits that the defense had pretrial knowledge of the Diaz notes.

87. The Court finds trial counsel were made aware prior to trial, of the existence of an LTC meeting three days before the murder where it was decided the complainant would be killed and that another gathering occurred after the murder wherein the applicant took credit for the murder when speaking to Diaz (XXIII R.R. at 4-16).

. 02881

88. The Court finds the record does not reflect that the applicant's counsel were surprised or hindered in any way during Diaz's trial testimony or cross-examination (XXVI R.R. at 118-96).

89. The record reflects the applicant's counsel thoroughly cross-examined Diaz, including questions regarding Diaz's previous interviews with the State; the punishment Diaz anticipated receiving as a result of his testimony and cooperation with the State; Diaz's anger with the complainant for "snitching" to the police in his case; Diaz's discussions with the complainant where Diaz emphasized the complainant should not cooperate with the police in Diaz's case; Diaz's admission that all he had to offer the jury was his word; and Diaz's apathy at the complainant's death (*Id.* at 165-92, 194-96).

90. The Court finds the applicant fails to present credible or persuasive evidence that the State failed to disclose favorable, material, or impeachment evidence to the defense prior to trial.

---

### FOURTH GROUND FOR RELIEF:
### ALLEGED INEFFECTIVE ASSISTANCE OF COUNSEL IN GUILT/INNOCENCE PHASE

---

**ALLEGED DEFICIENT PRETRIAL INVESTIGATION: FAILURE TO INVESTIGATE & PRESENT ALIBI DEFENSE OR EVIDENCE OF INNOCENCE**

91. The Court finds trial counsel conducted an adequate and thorough pretrial investigation pertaining to the guilt/innocence phase of trial, despite numerous obstacles created by the applicant and the applicant's friends and family. *See Affidavit of Jerome Godinich, Jr.; see also Affidavit of Alvin Nunnery.*

92. In preparing for trial and presenting the applicant's case, the defense retained a team of investigators and experts in the fields of fact investigations, mitigation investigations, ballistics, eyewitness identification, mental health, gangs, prison systems, child abuse and brain development (I C.R. at 34-44, 61-66, 75; VII C.R. at 1765-68; VIII C.R. at 2077-78; XII C.R. at 3346-47); *Affidavit of Jerome Godinich, Jr.; Affidavit of Alvin Nunnery.*

93. The totality of the record reflects that defense counsel filed and urged multiple motions; thoroughly voir dired prospective jurors; extensively cross-examined witnesses; made relevant objections and preserved error; exhibited

02882

comprehensive knowledge of the primary and extraneous offenses and applicable law; presented evidence on the applicant's behalf; made persuasive jury arguments; and objected to the court's charge and requested specific instructions.

94. The Court finds in preparation for trial, the applicant's trial counsel spoke with all witnesses who were identified by the defense team, investigators, mitigation experts, or who contacted counsel directly, and also interviewed all available State fact witnesses. *Affidavit of Alvin Nunnery* at 2; *see Affidavit of Jerome Godinich, Jr.* at 2.

95. The Court finds trial counsel intentionally did not present witnesses who counsel believed lacked credible accounts of the applicant's whereabouts for the date and time of the offense, or who only possessed information via hearsay or innuendo. *Affidavit of Alvin Nunnery* at 2.

96. The Court finds the defense's strategy of only presenting the testimony of witnesses who counsel deemed credible or beneficial for the defense was reasonable trial strategy. *See id.*

97. The Court finds counsel made a strategic decision not to present the testimony of Jesus Balderas at trial, due to concerns that Balderas would not appear credible because of his criminal history, relationship with the applicant, gang affiliation, and photographs obtained through discovery. *Affidavit of Jerome Godinich, Jr.* at 2.

98. The Court finds trial counsels' decision to not present the testimony of Jesus Balderas at trial was reasonable trial strategy.

99. The Court finds that prior to trial, the defense had learned information by speaking to various potential witnesses pertaining to Diaz's motives for testifying against the applicant; the hierarchy and inner-workings of LTC; and Wendy Bardales' prior intimate relationship with Diaz, by speaking to various potential witnesses; but made strategic decisions regarding what evidence should be presented in which phase of trial. *Applicant's Exhibit 53*; *Affidavit of Jerome Godinich, Jr.* at 2; (XXVIII R.R. at 136-231; XXIX R.R. at 4-14; XXXVII R.R. at 170-206, 238-43; XXXVIII R.R. at 5-19, 35-37, 39-41; XL R.R. at 37-50, 59-60).

02863

100. The Court finds according to Godinich's credible affidavit, despite previously telling the defense she would testify at the trial, Yancy Escobar informed counsel she wanted to be present for the entirety of the trial, and as a result, chose not to testify on the applicant's behalf. *Affidavit of Jerome Godinich, Jr.* at 2.

101. Detailed invoices included with Godinich's payment vouchers reflect that during the pendency of the applicant's case, the defense team conducted numerous witness interviews and conferences with the applicant, his immediate and extended family members, and his girlfriend. *State's Habeas Ex. 5, defense invoices.*

102. The Court finds according to Godinich's credible affidavit, it was only as trial approached that the applicant's family attempted to create or assist with the defense, despite the defense team's long-standing requests for continued communication. *Applicants' Ex. 53.*

103. The Court finds the applicant's trial counsel explored every defense available to the applicant, including a possible alibi defense, but that neither the applicant nor his family provided counsel with timely or credible alibi information. *Affidavit of Jerome Godinich, Jr.* at 1; *Affidavit of Alvin Nunnery* at 2.

104. The Court finds according to Godinich's credible affidavit, in 2014 the defense was made aware of Oralia McCrary, a potential alibi witness, but was not provided with any contact information for her and was informed McCrary did not want anything to do with the case. *Affidavit of Jerome Godinich, Jr.* at 1.

105. The Court finds that in 2014, counsel conducted pretrial interviews of McCrary's daughters Anali Garcia and Ileana Cortes who were also identified as potential alibi witnesses, but following these respective interviews, counsel determined Garcia had no factual information about the applicant's case, and Cortes had no useful factual, alibi, or mitigation evidence for the applicant's defense. *Id.* at 2.

106. The Court finds several of the applicant's own exhibits, pretrial emails between various members of the defense team, substantiate the obstacles, challenges, and lack of cooperation the defense faced in exploring a potential alibi defense and securing witnesses, specifically:

02884

a. in the Applicant's Exhibit 25, a September 1, 2010, email from defense mitigation specialist Mary K. Poirier to members of the defense team, Poirier notes the applicant has put up a barrier and does not want the defense team speaking to his brother Jesus;

b. in the Applicant's Exhibit 26, an undated email from Spanish speaking mitigation investigator Adriana Helenek to Godinich, Helenek writes the applicant's mother does not want the defense contacting her family in Mexico, nor does she want the family from Mexico visiting the applicant;

c. in the Applicant's Exhibit 29, a November 7, 2010, email from Godinich to mitigation specialists Amy Martin and Mary K. Poirier, Godinich writes the applicant's mother is still visiting border towns under suspect circumstances, and denying it to the defense.

d. in the Applicant's Exhibit 35, a September 21, 2010, email from Godinich to members of the defense team, Godinich writes the applicant's girlfriend Yancy Escobar came to his office yesterday to discuss the case; was informed that the defense will continue to pursue any leads that may be helpful in the guilt/innocence phase; was asked to directly communicate any information or leads that she, Jesus Balderas, or the applicant's mother receive to Godinich; and that Escobar did not have any leads or information at that time;

e. in the Applicant's Exhibit 37, a November 5, 2012, email from Godinich to members of the defense team, Godinich writes he again met with Escobar and Jesus; asked for any witness information or information leads; and that they did not have any at that time;

f. in the Applicant's Exhibit 38, a January 30, 2013, email from Godinich to members of the defense team, Godinich writes he met with the applicant who claimed to have two guilt/innocence witnesses, but was unable to provide names, addresses, or phone numbers, and claimed that Escobar and Jesus would have this information. Godinich further writes that in contacting Escobar for this information, Escobar stated she did not have any information regarding these witnesses, nor did she know who they are, how to contact them, or what they know. Escobar was reminded to contact Godinich upon receipt of any information;

22

g. in the Applicant's Exhibit 39, a February 11, 2013, email from Godinich to members of the defense team, Godinich writes he met with the applicant who wanted to know why the defense had not met with the witnesses he identified, and was told that despite his claims, neither Escobar nor Jesus knew these witnesses or how to contact them. Godinich further writes the applicant was still unable to provide these witnesses' names;

h. in the Applicant's Exhibit 52, a January 31, 2014, email from Godinich's legal assistant Gloria Poa to the defense team, Poa writes the applicant's mother and Escobar have identified alibi witnesses for the first time, specifically Oralia (Jesus' former mother-in-law), Celeste Munoz, Billy, Anale[2] (Oralia's daughter), Walter, and Daniela. Poa writes that the family was instructed to provide any additional contact information as soon as possible. Poa also writes that a mitigation witness did not want to travel to Houston to testify for the applicant for fear of being deported;

i. in the Applicant's Exhibit 53, a February 4, 2014, email from Poa to the defense team, Poa writes Escobar did not have names or contact information for any of the information she provided regarding LTC. Poa also writes Eiliana Cortez[3] came by the office at the request of Jesus, and spoke with Godinich, but could not remember anything from 2005, including whether or not she was with the applicant on December 6, 2005. Poa also writes she obtained a phone number for a potential witness named "Billy" from Jesus, and spoke to an individual who stated he would call back to set up an appointment; and

j. in the Applicant's Exhibit 54, a February 13, 2014, email from Poa to the defense team, Poa writes witness Celeste Munoz missed her appointment for an in-person meeting; witness Billy has not called back to set up an appointment; she and Godinich spoke to Anale on the phone and Anale had no factual information on the case; Oralia does not want to be involved with the applicant's case; Escobar has not provided any contact information for Walter or Daniela; and the applicant's father cancelled and rescheduled his appointment with Godinich. Poa also writes the defense is waiting for confirmation on witness Vianet Jaimes' travel plans, and Godinich has offered to pay for her ticket, but the witness and the applicant's mother want to pay for it themselves.

---

[2] The proper spelling of this witness' name has since been established as Anali Garcia.

[3] According to the applicant's habeas exhibits, the proper spelling of this witness' name is Ileana Cortes.

02866

107. The Court finds a March 13, 2014, email sent by Godinich to the defense team during jury deliberation also corroborates the obstacles defense counsel experienced during trial as a result of the applicant's family, namely:

    a. counsel learned the applicant's family was attempting to influence the testimony of the witnesses in Mexico by calling the witnesses and telling them what to say, resulting in differing testimony than what counsel was anticipating;

    b. the family could not appreciate the importance of trial preparation; and

    c. the family could not appreciate counsels' unwillingness to substitute or add last minute defense witnesses, particularly those who had never been interviewed by counsel.

*Affidavit of Jerome Godinich, Jr.* at Exhibit 5.

108. Notwithstanding the untimeliness of potential alibi information provided to the defense, the Court finds defense counsel adequately and appropriately investigated the information provided to them.

109. The Court finds the applicant's counsel employed reasonable trial strategy in choosing not to present the testimony of either Anali Garcia or Ileana Cortes during the guilt/innocence phase, after counsel interviewed these witnesses and found these witnesses had no useful information about the case. *Id.* at 2.

110. The Court finds according to Godinich's credible affidavit, the defense had no information regarding Octavio Cortes or Jose Perez during the pendency of the case. *Id.* at 2.

111. The Court finds the proffered affidavits of Jesus Balderas (Applicant's Exhibit 2) and Jose Perez (Applicant's Exhibit 16) are unpersuasive on the issue of an alibi defense, as these witnesses do not claim to be present in the apartment where the applicant allegedly spent the evening of the primary offense.

112. Octavio Cortes and Anali Garcia and Octavio Cortes provided sworn affidavits that were included in the applicant's habeas application as the Applicant's Exhibits 6 and 10, respectively, wherein both stated the applicant had been with them inside their apartment when the complainant was shot.

24

· 02867

113. On May 11, 2018, this Court held an evidentiary hearing to assist the Court in assessing the credibility of Anali Garcia and Octavio Cortes, and in resolving the issue of whether trial counsel were ineffective for failing to present alibi testimony from these witnesses during guilt/innocence. *See State's Proposed Supplemental Order Designating Issues to Be Resolved Via Evidentiary Hearing.*

114. On May 11, 2018, Anali Garcia testified under oath at a post-conviction evidentiary hearing in the applicant's case (IV Post-Conviction Writ Evidentiary Hearing—May 11, 2018 at 19-80).

115. At the post-conviction evidentiary hearing, Garcia testified to the following regarding the night the complainant was murdered:

    a. she lived in a small, two-bedroom apartment at Wood Creek on the Bayou, off of Corporate Drive with her mother, two sisters, two brothers, and niece, all of whom were present when shots were heard (*Id.* at 21, 32-34);

    b. she does not remember if anyone else, including the applicant's brother Jesus, was in the apartment that night, but it was very crowded (*Id.* at 33-34);

    c. her apartment was within four minutes walking distance to the apartment complex where the shooting occurred which she considered "real close" (*Id.* at 39-40);

    d. she remembers the applicant being with her because Hernandez was close to all of them (*Id.* at 21);

    e. the applicant arrived at her apartment in the afternoon (*Id.* at 21);

    f. she was at home "burning DVD's and watching movies and looking at the covers from the DVD's that [the applicant] would sell" (*Id.* at 20-21);

    g. "[s]omeone at the house heard shootings" (*Id.* at 19-20);

    h. she and her family learned of the shooting when "[s]omeone around the apartment spread the word" but could not remember if anyone came to the door to tell the news (*Id.* at 43);

25

02868

i. "the only thing I remember" was her mother "panicking" and saying someone heard a gunshot, so no one could go outside, "not even" the applicant (*Id.* at 22);

j. her mother immediately "panicked" at the sound of a shot, even though gunshots were frequently heard in the neighborhood" (*Id.* at 37);

k. unlike the other times gunshots were heard, "we weren't allowed to go nowhere that night" (*Id.* at 37-38);

l. she believed the shots were heard after 10 pm (*Id.* at 23);

m. she does not remember if she personally heard the gunshots or how many shots she may have heard (*Id.* at 42-43);

n. the applicant spent the night in her living room because her mother would not allow him to leave (*Id.* at 23-24);

o. she does not remember whether she, Octavio, or Ileana had a cell phone, or whether they had a land line at that time (*Id.* at 46-47);

p. she does not remember if the applicant had a cell phone, received any calls, or if he could have gone somewhere to have a private conversation (*Id.*); and

q. she stayed awake until 2 or 3 in the morning because she was scared and was wondering what had happened, and the applicant was still at her apartment at this point (*Id.* at 23-24).

116. At the post-conviction evidentiary hearing, Garcia provided alternative timelines for when she learned the applicant had been charged with the complainant's murder:

a. "once he was arrested, after -- after a while" (*Id.* at 25-26);

b. "around 2000", before this time, she thought he was jailed for aggravated assault because several of his fellow gang members had been arrested during a raid for similar charges (*Id.* at 26-27, 52);

c. "on his trial date" (*Id.* at 26-27); and

d. when she watched part of trial (*Id.* at 54).

02869

117. At the post-conviction evidentiary hearing, Garcia testified:

a. she was good friends with the applicant and knew he was in a gang (*Id.* at 32, 36, 52);

b. she knew the complainant from middle school (*Id.* at 24-26);

c. she knew the applicant was arrested soon after the murder (*Id.* at 51);

d. she was in disbelief that the applicant was charged with the complainant's murder because he had been with her that night (*Id.* at 24-26);

e. she took no steps to help the applicant because she "was scared" and "didn't want to be involved in any of this" (*Id.* at 26);

f. she was given a phone number to call trial counsel Jerome Godinich "two or three days before trial" and she called him from her car to say "I'm a character witness and he was with us" (*Id.* at 27);

g. Godinich rushed her and told her he had enough witnesses and didn't need anything else (*Id.* at 27);

h. she attended trial once or twice, and thought maybe she would be called as a "surprise witness" like in the movies, but that did not happen (*Id.* at 28);

i. she could not recall the number of times she visited the applicant in jail while he awaited trial, but she and the applicant never discussed her having knowledge that could possibly lead to a dismissal of the charges against him (*Id.* at 70);

j. she blamed her years-long failure to come forward with her information on being in fear for her life from the "real" killer, who she believed would track her down and kill her and her entire family if she tried to clear the applicant's name (*Id.* at 28-29, 56);

k. she and insisted she could not be held accountable for her decisions at age 17 because she was not permitted to think for herself or make any decisions including choosing her own clothing at that age (*Id.* at 29, 44-46);

l. prior to the applicant's trial, she posted a petition on Facebook about his case, but failed to mention anything about his innocence or her alibi because "that's something you wouldn't post on there, especially if I'm scared of [*sic*] my life" (*Id.* at 54-55, 62);

27

02870

m. she does not know a lot of the evidence or facts presented against the applicant at trial, including the fact that he was in possession of the gun that killed the complainant when he was arrested (*Id.* at 61);

n. although she believed her alibi evidence would make a difference at the applicant's trial, she thought his lawyers had other evidence and she did not, and still does not, wish to be involved (*Id.* at 28-29, 63-64);

o. it took the applicant's habeas counsel multiple efforts to convince her to provide her belated alibi testimony (*Id.* at 64);

p. she does not remember whether she or habeas investigator de la Rosa prepared her affidavit, or how many times she spoke with him before signing the affidavit ten years after the murder occurred (*Id.* at 65-68); and

q. although she knows the applicant's mother, she cannot remember if she ever told his mother she had exculpatory evidence (*Id.* at 69).

118. At the post-conviction evidentiary hearing, Garcia never said "I don't remember" during direct examination, but gave this response more than 45 times during cross-examination (*Id.* at 19-79, *passim*).

119. At the post-conviction evidentiary hearing, Garcia denied knowing the meaning of perjury, stated the applicant's habeas counsel never advised her about perjury, and became visibly distraught when the consequences of being convicted of aggravated perjury were explained to her and asked to stop participating in the hearing (*Id.* at 73-78).

120. At the post-conviction evidentiary hearing, Garcia admitted she refused to meet with representatives of the State prior to the hearing, and twice denied memory of a phone call with the District Attorney's Office Investigator Hartman in February 2018, before admitting to these conversations (*Id.* at 48-50).

121. The Court finds Anali Garcia's habeas affidavit and post-conviction evidentiary hearing testimony to not be credible in its entirety and completely unpersuasive. *See* (*id.* at 19-80); *see Applicant's Ex. 10.*

122. Given the totality of evidence, including the demeanor and presentation of the witness during the post-conviction evidentiary hearing, the Court finds trial counsels' decision to not present the testimony of Anali Garcia at trial was entirely warranted and constituted a reasonable and ethical trial strategy.

02871

123. On May 11, 2018, Octavio Cortes testified under oath at a post-conviction evidentiary hearing in the applicant's case (*Id.* at 81-124).

124. At the post-conviction evidentiary hearing, Cortes testified:

   a. growing up, he viewed the applicant has a father-figure and he still looks up to and respects the applicant (*Id.* at 95, 99);

   b. he and the applicant are both uncles to Ileana Cortes' daughter with Jesus Balderas (*Id.* at 94);

   c. he was first contacted on behalf of the applicant in 2015, by someone whose role was unclear to him, but who he believed was named Daniel de la Rosa, and with whom he spoke on the phone more times than he was able to count (*Id.* at 87-88);

   d. he had spoken to the applicant's habeas counsel in person and on the phone several times over the past two months, despite initially denying any communication (*Id.* at 88-90);

   e. over the past 13 years, he, his mother, and sisters had discussed that the applicant was accused of shooting Eduardo Hernandez and had spent time "trying to recollect what happened" (*Id.* at 91-94);

   f. the last night the applicant stayed at his house was December 6, but failed to specify the year (*Id.* at 81);

   g. he was aware the applicant was a gang member and there were multiple gangs in their neighborhood in 2005 (*Id.* at 96-97);

   h. on the night of the shooting, he and the applicant were in his bedroom "picking out movie covers to put on a page" (*Id.* Hearing at 81);

   i. at some point, his mom heard "something had happened" and his sister came and told Cortes and the applicant "that whatever happened" and "they were shocked...pretty much just panicked a little" and his mom told them all to stay inside (*Id.* at 82);

   j. the evening of December 6th was "[e]xtremely unusual" because the only other memory he has of his mother acting this way and "locking down the house" was on the morning of 9/11, yet Cortes later admitted that shootings happened regularly in the neighborhood and his mother did not lock the door in those instances (*Id.* at 81-82, 111-15);

k. he went to bed by 10:30 and does not know what the applicant did after that (*Id.* at 117);

l. he would remember if the applicant had made or received a phone call on the evening of the shooting, but Cortes has no memory of that happening (*Id.* at 116-17);

m. he later learned from his sister Ileana that Eduardo Hernandez had been shot that night, although he did not personally know Hernandez (*Id.* 83-84);

n. the affidavit Cortes submitted on the applicant's behalf, which de la Rosa helped compose, was the first time Cortes told anyone that the applicant had been at his home the night of Hernandez's murder (*Id.* at 100-102);

o. although Cortes and his mother visited the applicant in jail throughout Cortes' high school years, the applicant never told Cortes to contact his lawyers with the alleged alibi information nor provided Cortes with his attorneys' information (*Id.* at 105, 108);

p. when visiting the applicant in jail, Cortes asked his mom why the applicant was in custody and she told him it was for " a murder, a shooting" (*Id.* at 93);

q. at the time of the applicant's trial, Cortes was 21 years old and in the Marines, and did not know the applicant was going to trial, charged with killing the complainant, or who the applicant's attorneys were (*Id.* at 84-85, 102-104);

r. he "was too busy, in the Marines" to want to know the details of why the applicant was in custody and made no effort to contact the applicant's lawyers (*Id.* at 102-104, 108-109); and

s. although he commented on Facebook in 2014 about the applicant's case, he did not mention the applicant's alleged innocence or any alibi information (*Id.* at 110-11).

125. In the post-conviction evidentiary hearing, Octavio Cortes gave multiple conflicting responses as to whether or not he was aware the applicant was charged with the complainant's murder, and the timeframe of when he learned this information. (*Id.* at 84, 91-93, 106-109, 119).

02873

126. The Court finds Octavio Cortes' habeas affidavit and post-conviction evidentiary hearing testimony to be not credible and unpersuasive. *See* (*Id.* at 81-124); *see Applicant's Ex. 6.*

127. The applicant failed to present any post-conviction testimony (either live or via affidavit) from Oralia McCrary or Ileana Cortes.

128. Given the totality of the evidence, the Court finds trial counsels' decision not to present an alibi defense was a reasonable trial strategy.

129. Based on counsels' credible affidavits, the Court finds neither the applicant nor his family informed the defense team prior to trial that Israel Diaz had attempted to intimidate the applicant, and that had there been any admissible evidence of such, it would only have come from the applicant's own testimony, which the applicant was adamant he would not provide at trial. *Affidavit of Jerome Godinich, Jr.* at 2; *Affidavit of Alvin Nunnery* at 2.

130. The Court finds according to Godinich's credible affidavit, the applicant did not provide information that assisted the defense team with an innocence strategy. *Affidavit of Jerome Godinich, Jr.* at 2.

131. Contrary to the applicant's habeas assertions and notwithstanding the applicant's lack of assistance, trial counsel were nevertheless able to present evidence of the applicant's alleged innocence and an alternate shooter during guilt/innocence, namely:

   a. trial counsel attacked the reliability and credibility of Wendy Bardales' identification, and explored her prior history and bias towards the applicant (XXVI R.R. at 12-70, 77-80);

   b. during cross-examination, Karen Bardales testified the complainant had concerns about Diaz and what Diaz may do to him (*Id.* at 98-99);

   c. during cross-examination, Diaz testified he let the complainant know on more than one occasion that he was mad at him for snitching on him to the police (*Id.* at 172, 181-82);

   d. during cross-examination, Diaz testified he told other LTC members the complainant had snitched on him (*Id.* at 179-80);

31

e. during cross-examination, Diaz testified that as far as he knew, he was the only person on whom the complainant had snitched to the police (*Id.* at 185-86);

f. during cross-examination, Diaz testified the complainant's death did not bother or affect Diaz (*Id.* at 191);

g. during direct examination, Benitez testified to Diaz's bias against the complainant and call for an LTC meeting to discuss and urge the complainant's murder days before his death (XXVIII R.R. at 136-87, 221-29, 231); and

h. during direct examination, Benitez testified Arevalo confessed to him that he had taken care of the complainant, and Benitez's opinion that Arevalo meant he had killed the complainant himself (*Id.* at 225-26).

132. Although the applicant complains of trial counsels' failure to present the testimony of Jose Perez during trial, the record reflects that during the guilt/innocence phase of trial, the defense presented testimony via Walter Benitez consistent with the information recited in Jose Perez's habeas affidavit; namely:

a. Benitez saw Victor "Gumby" Arevalo on December 6, 2005, after the complainant's murder (XXVIII R.R. at 174-75);

b. Arevalo confessed to Benitez that he took care of the complainant, which Benitez interpreted as Arevalo killed the complainant himself (*Id.* at 225-26);

c. Arevalo was the leader of LTC and made all the decisions, while the applicant had no leadership role (*Id.* at 155, 226);

d. there was trouble between Diaz and the complainant because the complainant had snitched on Diaz to the police (*Id.* at 160); and

e. at the meeting of LTC gang members to discuss the issue of the complainant, Diaz tried to get permission from Arevalo to take care of or kill the complainant while the applicant attempted to intercede on behalf of the complainant (*Id.* at 169, 171).

32

02875

133. The Court also finds portions of Benitez's trial testimony corroborate and are consistent with Diaz's trial testimony and information contained in the pretrial interview notes with Diaz now marked as Applicant's Exhibit 57, namely: multiple members of LTC were upset the complainant had snitched on Diaz, and an LTC meeting took place where plans for the complainant's murder were discussed (XXVIII R.R. at 160, 169, 171; XVI R.R. at 141, 145, 147-53).

134. Notwithstanding the defense's efforts to undermine the State's case, the Court finds the State presented compelling evidence of guilt against the applicant at trial, specifically:

   a. LTC is a criminal street gang with no hierarchy in leadership, who values loyalty among its members, and where disrespect or disloyalty can get a member killed (XXVI R.R. at 129; XXVII R.R. at 90-99; XXVIII R.R. at 206-207);

   b. the applicant was a documented member of LTC (XXVI R.R. at 227);

   c. the complainant was a "cliqued in" member of LTC whose membership had been sponsored by the applicant (XXIV R.R. at 40; XXVI R.R. at 137-38); XXVIII R.R. at 105-106);

   d. in December 2004, the complainant was arrested by the police and cooperated with the police's investigation into Diaz, and after which the complainant became scared of Diaz and of LTC (XXVI R.R. at 13-41, 139-41; XXVIII R.R. at 107-110; XXIV R.R. at 120);

   e. LTC members were upset with the complainant for speaking to the police, spending time with rival gangs, "throwing" rival gang signs, and wanted the complainant out of LTC (XXVI R.R. at 141-145, 147-53);

   f. an LTC meeting was held three to four days before the complainant's death to discuss the complainant and how to address his behavior (XXVI R.R. at 151-53);

   g. on the day of his murder, the complainant was in the company of individuals associated with the gangs MS-13 and Cholos (XXIV R.R. at 41, 234-37; XXV R.R. at 36);

   h. the complainant was killed inside Durjan "Rata" Decorado's apartment, which the complainant and the Bardales sisters had permission to be inside (XXIV R.R. at 37, 42, 119; XXV R.R. at 41);

33

. 62876

i. several hours before the complainant's murder, an LTC gang member (later identified as Jose "Chango" Vasquez) wearing a red HEB shirt came to Decorado's apartment, spoke with the complainant in a back bedroom for quite some time, unsuccessfully tried to take the complainant with him, got into a heated confrontation with a Bardales sister, and left upset (XXIV R.R. at 46-48, 234, 238-40; XXVI R.R. at 162, 241-44, 248-50);

j. the complainant seemed worried after Vasquez left Decorado's apartment (XXIV R.R. at 48, 119);

k. on the evening of the complainant's murder, witnesses noticed graffiti on one of the apartment walls near Decorado's apartment referencing LTC (*Id.* 50-53, 262-64);

l. the shooter entered Decorado's apartment without consent (*Id.* at 53-55, 241-42, 267);

m. the shooter scanned the room, pointed a gun at the complainant's head, and shot the complainant multiple times (*Id.* at 55-59, 242-52; XXV R.R. at 183-86);

n. multiple witnesses stated the shooter was wearing khakis and a dark hoodie (*Id.* at 56, 253; XXV R.R. at 50, 180; XXVI R.R. at 159);

o. the shooter's hood fell off his head briefly during the shooting (XXV R.R. at 25-26, 183);

p. Wendy Bardales got a good look at the shooter (*Id.* at 189);

q. after the complainant was shot, the scene at the apartment complex was chaotic, paramedics were on scene, and a crowd formed outside (XXIV R.R. at 129-33, 257; XXVI R.R. at 157-59);

r. the applicant was seen at Decorado's apartment complex shortly after the murder with a silver handgun (XXVI R.R. at 160-61);

s. the applicant took credit for the complainant's murder, stating he "finally got him," and hugged and kissed other LTC members on the cheek shortly after the murder (*Id.* at 159-60);

t. police recovered eight - .40 caliber spent casings inside Decorado's apartment and two - .40 caliber spent casings outside the apartment door, all of which were manufactured by Smith & Wesson (*Id.* at 185-87, 200);

34

062877

u. police recovered three fired bullet fragments from Decorado's apartment (*Id.* at 201);

v. police observed two bullet strikes to the front door of Decorado's apartment (*Id.* at 177-78);

w. Vasquez and Diaz were eliminated as the shooter (*Id.* at 255; XXV R.R. at 192-94; XXVI R.R. at 218-21, 243);

x. the shooter's physical description was consistent with the applicant (XV R.R. at 31-32; XXVI R.R. at 213);

y. the applicant was identified as the shooter in a photo array by Wendy Bardales, who in making her positive identification wrote "I'm positive that he's the one that killed Eduardo" in Spanish (XXV R.R. at 195-97; XXVI R.R. at 228-40);

z. the applicant was arrested ten days after the complainant's murder following a foot chase, during which the applicant discarded a green box and a black bag he had been carrying, jumped a fence, ran across a major intersection, and hid under a parked car (XXV R.R. at 212-18, 233; XXVI R.R. at 93-108);

aa. police obtained the applicant's cell phone following his arrest, and the cell phone records show calls made by the applicant to Vasquez on the night of the complainant's murder at 7:41 pm and again at 9:56 pm (near the time of the offense), and again after the murder (XXVI R.R. at 252-53; XXVII R.R. at 9-13);

bb. the medical examiner identified 11 gunshot wounds to the complainant's body, and recovered firearms evidence during the autopsy (*Id.* at 154, 158);

cc. the applicant claimed responsibility for all of the items (ammunition, magazines, bulletproof vests, firearms, cases and holsters) contained in the boxes and black bag that he and his friend had in their possession when they were arrested, which included a .40 caliber Smith & Wesson handgun (XXV R.R. at 220-22, 238, 245; XXVII R.R at 16);

dd. all ten-.40 caliber Smith & Wesson spent casings recovered from the crime scene had been fired from the .40 caliber Smith & Wesson firearm that was in the applicant's possession at the time of his arrest (XXVII R.R. at 36, 38-39);

02878

ee. three fired bullets recovered from the crime scene had been fired from the .40 caliber Smith & Wesson firearm that was in the applicant's possession at the time of his arrest (*Id.* at 36, 40); and

ff. of the firearms evidence recovered during the autopsy by the medical examiner's office that was suitable for comparison, six bullets had been fired from the .40 caliber Smith & Wesson firearm that was in the applicant's possession at the time of his arrest (*Id.* at 36, 41, 53-54).

135. According to Godinich's credible affidavit, after trial Godinich learned members of the jury saw Benitez flash an LTC gang sign to the applicant during the testimony, and the applicant responded back in kind, undercutting Benitez's testimony. *Affidavit of Jerome Godinich, Jr.* at 2-3, Exhibit 4.

**FAILURE TO PRESENT EYEWITNESS IDENTIFICATION EXPERT TESTIMONY TO JURY**

136. The record reflects defense counsels' intent to avoid the introduction of evidence pertaining to the applicant's extraneous offenses during guilt/innocence (XXIX R.R. at 10-14).

137. Outside the presence of the jury, the defense presented the testimony of eyewitness identification expert Dr. Roy Malpass during a hearing to suppress the identification of the applicant by State's witness Wendy Bardales (XXV R.R. at 122-51, 172-74).

138. During the suppression hearing, Dr. Malpass testified there was a substantial likelihood of misidentification; the photo spread was impermissibly suggestive; the progression of Bardales' identification caused concerns of memory contamination and social influence; and Bardales' emotional reaction when ultimately identifying the applicant as the shooter was not a valid and reliable indicator (*Id.* at 134, 144-45, 149-50).

139. During his cross-examination in the suppression hearing, Dr. Malpass conceded the limited information he considered in arriving at his opinion on Bardales' identification; admitted scientific studies on the reliability of eyewitness identification do not include individuals who experience violent events such as those witnessed by Bardales; conceded he would not offer the jury an ultimate opinion on the accuracy or reliability of Bardales' identification; and backtracked on his prior statements of the suggestibility of the photo array (*Id.* at 151-171).

36

62879

140. The record reflects the applicant's trial counsel also conducted an *ex parte* in-camera review of anticipated testimony from Celeste Munoz and Officer Thomas Cunningham in order to seek a preliminary ruling from the trial court as to the potential ramifications of presenting testimony from these witnesses and from Dr. Malpass to the jury during guilt/innocence (XXIX R.R. at 4-14).

141. The record reflects that during the *ex parte* in-camera hearing, counsel proffered testimony from Celeste Munoz regarding Wendy Bardales (including Bardales' character and a prior altercation between Bardales and an applicant), and the trial court ruled Munoz's testimony would open the door to the applicant's extraneous capital murder during guilt/innocence (*Id.* at 4-13).

142. The Court finds the trial court made several statements during the *ex parte* in-camera discussion with the defense pertaining to the possibility of opening the door to the applicant's extraneous offenses, which could have reasonably affected the defense's strategy of which witnesses were called to testify during guilt/innocence, namely:

    a. "I mean, certainly, I am open to arguments, but given what you have proffered, my initial ruling would be..." (*Id.* at 12);

    b. "Because I know there are extraneouses that I'm not familiar with, that could possibly come in once we..." (*Id.* at 12);

    c. "I don't mind y'all dotting your i's and crossing your t's if we get there, but that would be my initial ruling based on my understanding of case law and the rules of evidence" (*Id.* at 13); and

    d. "I used that analysis without necessarily being familiar with that particular case" (*Id.* at 14).

143. The Court finds trial counsel made a strategic decision not to present Dr. Malpass' expert testimony to the jury, fearing it would open the door to the applicant's prejudicial extraneous conduct during the guilt/innocence phase. *Affidavit of Jerome Godinich, Jr.* at 3; *Affidavit of Alvin Nunnery* at 2-3.

144. Given the totality of the record and evidence, the Court finds trial counsels' decision not to present the testimony of eyewitness identification expert Roy Malpass to the jury was reasonable trial strategy.

02888

145. The Court finds that although the defense did not present expert eyewitness identification testimony to the jury, the defense incorporated key aspects of this witness' proffered testimony in the cross-examination of other witnesses, and highlighted testimony of a suggestive, improper, and deficient photo array and eyewitness identification to the jury (XXVI R.R. at 12-70, 77-80; XXVII R.R. at 26-57, 69-70; XXVIII R.R. at 15-36, 58).

146. Given the totality of record and evidence, including the trial court's in-camera ruling that portions of Celeste Munoz's testimony would open the door to the applicant's prejudicial extraneous conduct, the Court finds trial counsels' decision not to present Munoz's testimony during guilt/innocence was reasonable trial strategy. *See* (XXIX R.R. at 4-14).

**ALLEGED FAILURE TO INVESTIGATE JUROR MISCONDUCT**

147. The Court finds trial counsel investigated the effect on the jury of the incident involving the applicant's brother waving at the jury on the evening of February 26, 2014, by questioning the implicated deputy and jurors, and counsel exhibited reasonable strategy in preserving any potential error by moving for a mistrial (XXXII R.R. at 12-28).

**TOTALITY OF THE REPRESENTATION**

148. The Court does not find the proffered affidavits of Dr. Roy Malpass (Applicant's Exhibit 1), Jesus Balderas (Applicant's Exhibit 2), Walter Benitez (Applicant's Exhibit 4), Daniella Chaves (Applicant's Exhibit 5), Octavio Cortes (Applicant's Exhibit 6), Adrian de la Rosa (Applicant's Exhibit 7), Yancy Escobar (Applicant's Exhibit 9), Anali Garcia (Applicant's Exhibit 10), Celeste Munoz (Applicant's Exhibit 15), or Jose Perez (Applicant's Exhibit 16) to be persuasive evidence of ineffective representation of counsel at trial.

149. The Court finds the defense exhibited a reasonable defensive strategy during the guilt/innocence phase of the applicant's trial.

---

**FIFTH GROUND FOR RELIEF:**
**ALLEGED VIOLATION OF RIGHT TO FAIR TRIAL AS A RESULT OF JUROR MISCONDUCT AND EXPOSURE TO OUTSIDE INFLUENCES**

---

. 02881

**HOTEL ACCOMMODATIONS**

150. On February 25, 2014, jurors began deliberating guilt/innocence (XXX R.R. at 72-75).

151. The Court finds the post-conviction affidavit of Vickie Long, State's Habeas Exhibit 6, credible and persuasive, and the facts contained therein to be true. *State's Habeas Ex. 6, Affidavit of Vickie Long.*

152. Long, a Business Process Manager with the Administrative Office of the District Courts of Harris County, experienced "a great deal of difficulty in locating a hotel for the applicant's jury for the evening of February 25, 2014" due to events associated with Rodeo Houston, as "[m]any hotels were full...including the downtown hotels where the Harris County criminal courts normally accommodate their sequestered juries." *Id.* at 1.

153. According to the independent recollection of court reporter Renee Reagan, which this Court finds to be credible and persuasive, in looking for accommodations for the applicant's jury "[t]hey went all the way past Clear Lake. They looked everywhere" (I Writ Hearing—August 17, 2017 at 24).

154. Ultimately, jury accommodations for the evening of February 25, 2014, were located at the Motel 6 Houston-Westchase at 2900 West Sam Houston Parkway South. *State's Habeas Ex. 6, Affidavit of Vickie Long* at 1.

155. Long had no knowledge of the location of the underlying capital offense when making hotel accommodations for the applicant's jury. *Id.* at 2.

156. On the morning of February 26, 2014, the trial court told the jury "I want to sincerely apologize for your accommodations last evening and would like to tell you that that was beyond my control. But to the extent I have any control, I can assure you that if you are in need of accommodations this evening, you will not be staying at that hotel. The drive might be a little longer, but we will find you more suitable accommodations. I did not have any control over that and I apologize on behalf of the county" (XXXI R.R. at 7).

157. After the jury spent the entirety of the February 26, 2014, workday deliberating guilt/innocence, the trial court informed the jury that "[w]e have secured better accommodations for you this evening" (*Id.* at 27).

02882

158. Jury accommodations for the second evening of guilt/innocence deliberations were located at the Holiday Inn NW Willowbrook at 18818 SH 249, Tomball Parkway. *State's Habeas Ex. 6, Affidavit of Vickie Long at 2.*

159. On the morning of February 27, 2014, the trial court told the jury, "I hope you found last night's accommodations to be more suited. I didn't book your first night's accommodations so, not my fault" (XXXII R.R. at 4-5).

160. The Court finds factors beyond the trial court's control caused difficulty in finding hotel accommodations for the jury on the evening of February 25, 2014.

**BUS-WAVING INCIDENT**

161. On direct appeal, the applicant asserted he was deprived due process and the right to an impartial jury as a result of an outside influence on the jury, namely an incident involving his brother standing near the street and waving at the jury's bus as jurors departed the courthouse, and that the trial court abused its discretion by overruling the defense's motion for mistrial; the applicant's claim was overruled by the Texas Court of Criminal Appeals. *Balderas*, 517 S.W.3d at 782-91.

162. In overruling the applicant's claim on direct appeal, the Court of Criminal Appeals held:

> [w]e doubt that Balderas' brother's conduct of waving and smirking at the jurors as their bus passed him on a public street constituted 'contact...about the matter pending before the jury.' The fact that some jurors recognized Balderas's brother because he had been a spectator in the courtroom did not necessarily transform his conduct of waving and smirking into a communication about the case....Further, the contact at issue was not particularly threatening or intrusive, and the evidence before the trial court rebutted any presumption of harm...Moreover, the record does not support Balderas' speculation that the jurors were deadlocked before the incident, but then, on the morning after the incident, those who favored a not-guilty verdict were so fearful that they abandoned their positions and returned a guilty verdict to 'escape the situation.'

*Id.* at 789-90 (internal citations omitted).

02883

163. On the morning of February 27, 2014, the trial court was notified by Harris County Sheriff's Office Deputy Patrick Henning that as the jury was loading the bus to go to dinner the night before, members of the jury notified him an individual they believed to be the applicant's brother was waving at them (XXXIII R.R. at 12).

164. After the jury returned a guilty verdict on February 27, 2014, the trial court explored the bus-waving incident on the record with Deputy Henning and several jurors in the presence of both parties (*Id.* at 12-28).

165. Deputy Henning testified he did not personally see the incident, nor did he know what the applicant's brother looked like, but he saw an individual who matched the jurors' description of a person they believed was smirking and waving at them, and asked the bus to stop so he could follow or identify this person, but the person was too far away and Deputy Henning could not leave the jury (*Id.* at 12-13).

166. Deputy Henning testified approximately five or six jurors identified the individual who had waved at them as the applicant's brother based on the man's presence at the courthouse and in the courtroom; that several jurors seemed very alarmed by the incident; and that he informed the jurors not to discuss the incident among themselves (*Id.* at 14).

167. The record reflects Deputy Henning identified "A.B." and "D.T." as two jurors who had discussed the bus-waving incident with him, and that the trial court questioned and permitted both parties to question these two jurors regarding their reactions to the incident (*Id.* at 16-28).

168. Juror "A.B." testified she did not see the bus-waving incident, but was made aware of it by other jurors at the time it occurred (*Id.* at 17-18).

169. Juror "A.B." testified the bus-waving incident made her feel "cautious" but this "feeling of cautiousness" did not weigh into her deliberations (*Id.* at 17-19, 21).

170. Juror "D.T." testified she heard another juror say "Oh, my god, there's his brother" and when she turned she saw a man "standing on the curb with this smirk on his face and he just kind of was waving" (*Id.* at 23-24).

028864

171. Juror "D.T." testified she was not certain the individual was in fact the applicant's brother, but that "[w]e just figured that that's who that was" and that she had seen the individual in the courtroom during the trial (*Id.* at 24).

172. Juror "D.T." testified there was "[n]ot very much [discussion about the incident on the bus] other than, oh, my god, there he is" and no discussion of the incident at dinner (*Id.* at 25-26).

173. Juror "D.T." testified she informed the two deputies at breakfast that morning she was "concerned" about the bus-waving incident because she "thought they were supposed to keep people away from us", but after speaking to the deputy, he put her "mind at ease" and said "it's perfectly normal for [her] to be jumpy" (*Id.* at 26-27).

174. Juror "D.T." testified "irregardless [*sic*] of what [the waving man] did and what I saw, it's not going to change my decision in this case" (*Id.* at 27).

175. The record reflects both jurors "A.B" and "D.T" testified the bus waiving incident would not affect or influence them as they continued to serve on the jury (*Id.* at 17-28).

176. The record reflects after jurors "A.B" and "D.T" were questioned by the court and the defense, the defense moved for a mistrial alleging the jury's verdict was reached as a result of an outside influence and the applicant was denied his right to an impartial jury, due process, and a fair trial; the trial court denied the defense's motion (*Id.* at 28-29).

177. The Court finds to the extent the proffered affidavits of jurors Armstrong, Birney, Norwood, Orosz, and alternate juror Browning-McCauley concern the deliberation process, and because they do not establish that jurors considered any impermissible extraneous influences or impropriety in their deliberations, they cannot be considered pursuant to TEX. R. EVID. 606(b). *See Applicant's Exs. 18-22.*

178. The Court finds the proffered affidavit of alternate juror Browning-McCauley unpersuasive and irrelevant to all the applicant's claims given that she did not deliberate in the applicant's case. *See Applicant's Ex. 20.*

02885

179. Notwithstanding the preclusion of jurors Armstrong, Birney, Norwood, and Orosz's proffered affidavits per Tex. R. Evid. 606(b), the Court finds these affidavits are not dispositive on the merits of the applicant's habeas claims that he was denied the right to a fair trial or that the jury was subjected to an improper outside influence as a result of the first-night accommodations or bus-waving incident. *See Applicant's Exs. 18-19, 21-22.*

180. Notwithstanding the preclusion of jurors Armstrong, Birney, Norwood, and Orosz's proffered affidavits per Tex. R. Evid. 606(b), the Court finds these affidavits are speculative as to the effect of the jury's first-night accommodations and the bus-waving incident on the jury's deliberations. *See id.*

181. The Court finds the applicant fails to present credible, persuasive, or admissible evidence that the jury accommodations hampered his due process right to a fair trial or impartial jury.

182. The Court finds the applicant fails to present credible, persuasive, or admissible evidence that the bus-waving incident hampered his due process right to a fair trial or impartial jury.

**FACEBOOK ENTRIES**

183. Juror John R. Armstrong made 17 entries on his Facebook page between January 11, 2014 and March 14, 2014, specifically:

    a. the first entry was on January 11, 2014, two days before Armstrong's selection for jury service;

    b. the second and third entries were on February 17 and February 20, 2014, respectively, and made during guilt/innocence;

    c. the fourth entry was made wade on February 27, 2014 after the jury reached a guilt/innocence verdict;

    d. the fifth through fifteenth entries were made between March 1 and March 12, 2014, during punishment; and

    e. the last two entries were made on March 14, 2014, after Armstrong completed jury service.

*Applicant's Ex. 68.*

· 02888

184. Generally, Armstrong's Facebook posts consist of statements regarding: his difficulty in getting to jury service; the jury selection process; updates on the stages of trial; the length of time the trial lasted; the emotionally draining aspects of jury service; and the fact that some jurors were missing vacations due to jury service. *Id.*

185. Individuals who posted in response to Armstrong's Facebook entries generally made comments that they missed him or told him to "hang in there." *Id.*

186. In response to Armstrong's February 27, 2014, post, one individual commented, "Give them the chair!" with no response from Armstrong. *Id.* at 6.

187. On March 10, 2014 Armstrong posted he was on his fourth week of jury duty to which an individual commented, "Were any white Ford Broncos part of the testimony?" and Armstrong responded "No white cars…just never ending testimony of 'expert' witnesses…" *Id.* at 15.

188. The Court finds Armstrong's comment regarding "never ending testimony of 'expert' witnesses" is ambiguous and could have referenced experts presented by either or both parties. *See id.* at 15.

189. The Court finds in Armstrong's Facebook entries and responses to commentators from January 11, 2014 through March 14, 2014, Armstrong did not discuss the facts of the applicant's case, the jury's deliberation process, nor make any comment indicating bias or partiality. *Id.*

190. The Court finds there is no evidence Armstrong was influenced by commentators' responses to his Facebook entries from January 11 through March 14, 2014. *Id.*

191. The Court finds the applicant fails to demonstrate he was prejudiced by Armstrong's Facebook postings from January 11 through March 14, 2014, or that he was denied a fair and impartial trial.

**ALLEGED PREMATURE DISCUSSION OF EVIDENCE & RELIANCE ON OWN EXPERTISE**

192. The Court finds to the extent the proffered affidavits of jurors Armstrong, Norwood, Sullivan, and Orosz concern juror deliberations and do not establish that jurors impermissibly considered an "outside influence" during in their

44

02887

deliberations, they cannot be considered pursuant to TEX. R. EVID. 606(b). *Applicant's Exs. 18, 21-23.*

193. In the alternative, the Court finds the proffered affidavits of jurors Armstrong, Norwood, Sullivan, and Orosz are not dispositive on the merits of the applicant's habeas claims that the jury allegedly engaged in misconduct by prematurely discussing evidence and relying on juror expertise on guns, ballistics, and Spanish translations. *See id.*

194. The applicant fails to establish the jury received any additional or impermissible evidence for consideration during deliberations.

195. The record reflects that during the punishment phase, the trial court was informed one or more jurors had concerns about the interpreter's translations of Spanish-speaking witness testimony (XXXIX R.R. at 26).

196. The record reflects the trial court questioned two jurors, identified as "D.T." and "L.M.", who had concerns about the accuracy of Spanish translations, overruled the defense's motion for a mistrial, and instructed the entire jury that each translator was certified in proficiency for translation; each translator had taken an oath to truly and correctly interpret; the interpreter's translation was the official testimony from the witness; and the jury was not to discuss the case until after the court's charge following closing arguments (*Id.* at 25-35).

**ALLEGED FAILURE TO FOLLOW TRIAL COURT INSTRUCTIONS**

197. Notwithstanding the preclusion of jurors Armstrong, Birney, and Orosz's proffered affidavits per TEX. R. EVID. 606(b), the Court finds these affidavits are not dispositive on the merits of the applicant's claims that the jury allegedly engaged in misconduct by: shifting the burden of proof to the applicant during the guilt/innocence phase; convicting the applicant despite not being convinced beyond a reasonable doubt; considering potential punishment when deciding guilt; and determining their verdicts before hearing all the evidence. *See Applicant's Exs. 18-19, 20.*

198. Notwithstanding the preclusion of jurors Armstrong, Birney, Norwood, and Orosz's proffered affidavits per TEX. R. EVID. 606(b), the Court finds these affidavits do not refute a presumption that the jury followed the trial court's instructions. *Id; see Thrift v. State,* 176 S.W.3d 221, 224 (Tex. Crim. App. 2005).

02888

## ALLEGED FAILURE TO INVESTIGATE & PRESENT MITIGATING EVIDENCE

199. Prior to trial, the State filed four notices of intent to use extraneous offenses and prior convictions for impeachment and/or punishment purposes, detailing more than 100 hundred offenses and bad acts, including *inter alia*, four capital murders, four aggravated assaults, an aggravated kidnapping, an aggravated robbery, and an arson committed by the applicant (II C.R. at 505-516; V C.R. at 1130; VII C.R. at 1911; XI C.R. at 3169).

200. Based on the credible affidavits of trial counsel, the Court finds counsel:

    a. conducted a thorough pretrial mitigation investigation. *Affidavit of Jerome Godinich, Jr. at 3-4; Affidavit of Alvin Nunnery at 3*;

    b. retained multiple expert witnesses including fact investigators, seven mitigation experts, and four expert witnesses. *Affidavit of Jerome Godinich, Jr. at 3; Affidavit of Alvin Nunnery at 3*;

    c. sent defense experts to Mexico and New York on multiple occasions to develop mitigation information, evidence, and testimony. *Affidavit of Jerome Godinich, Jr. at 3*;

    d. investigated the applicant's childhood, background, and familial history of mental illness. *Id.* at 3;

    e. investigated whether the applicant was disassociating from LTC. *Id.* at 3;

    f. explored various avenues for presenting the different types of mitigation evidence available. *Affidavit of Alvin Nunnery at 3*; and

    g. made reasoned, strategic choices in the manner and witnesses through which mitigation evidence was to be presented. *Id.; Affidavit of Alvin Nunnery at 3.*

201. The Court finds the defense team sought pretrial assistance and information from the applicant's family to aid in the applicant's mitigation case, but that instead of assisting the defense team, the family created obstacles and tried to undermine the defense's efforts, namely:

02885

a. the applicant's mother did not want sexual abuse information about the applicant presented in trial. *Affidavit of Jerome Godinich, Jr. at 4;*

b. the applicant's mother told her relatives in Mexico not to come to Houston, or testify for the applicant. *Id.;*

c. because of statements made by the applicant's mother, none of the applicant's relatives were going to testify, until the defense forced the applicant's mother to go to Mexico and apologize to them. *Id.;* and

d. the applicant's relatives in Mexico could not coordinate which of them would come to Houston. *Id.*

202. Despite any challenges arising from the applicant and his family, the Court finds that based on the entirety of the record, trial counsel conducted an expansive and thorough pretrial punishment and mitigation investigation.

203. During the punishment phase of trial, trial counsel presented the testimony of 18 defense witnesses, including seven experts, the applicant's juvenile caseworker, a guard at the Harris County Jail, and friends and family of the applicant (XXXVII R.R. at 170-243; XXXVIII R.R. at 5-19, 35-37, 39-95, 105-178; XXXIX R.R. at 6-21, 103-09, 112-28, 135-59; XL R.R. at 50-58, 60-68, 96-106, 115-47, 163-70, 174-82, 176, 182, 193-218, 242-52, 256-58; XLI R.R. at 37-50, 59-72, 75-109, 148-76, 186-201, 208-24, 246-70; XLII R.R. at 6-64, 87-96, 107-115, 123).

204. Contrary to the applicant's habeas assertions, the Court finds trial counsel presented evidence of the applicant's positive characteristics and role as a protector:

a. the applicant's mother Vicky Reyes testified since his arrest, the applicant has changed and become a God-seeking, good, and different person who deserves to live (XXXVIII R.R. at 83-84);

b. the applicant's cousin Vianet Reyes testified once the applicant adjusted to life after moving to Mexico, he was respectful, well-mannered, and happy (XXXIX R.R. at 119);

c. psychiatrist Dr. Mathew Brams testified the applicant has matured during his incarceration and shown he is better able to cope than he was before (*Id.* at 154-59);

02898

d. the applicant's friend Daniella Chavez testified the applicant did not influence or force her to take part in any activities documented in the gang photographs shown at trial, and that she was not aware of the applicant forcing any female to do anything they did not want to do (XLI R.R. at 48-49);

e. the applicant's friend Judy Gallegos testified the applicant was over-protective of women, took care of women, and never forced women to do anything (*Id.* at 41);

f. psychologist Dr. Jolie Brams testified the applicant's graduation from high school demonstrated determination, and that the people she interviewed saw potential in the applicant, including his teacher who believed he had a good heart and that he got along with others (XLII R.R. at 58, 62-63); and

g. retired prison chaplain Carroll Pickett testified that during their meetings, he and the applicant discussed scriptures, and the applicant was repentant, asked for forgiveness, confessed to various things, and indicated things he would have done differently in his life (*Id.* at 96-98, 101-05).

205. Contrary to the applicant's habeas assertions, the Court finds trial counsel presented evidence of the applicant's familial history of mental illness:

a. Vicky Reyes testified she and Eleazar Hernandez had two sons together: Alejandro who committed suicide on July 22, 2011 at age 18, and Ivan who was diagnosed as schizophrenic and suicidal, and who had attempted suicide in July 2013 (XXXVIII R.R. at 53-55). Reyes also testified Hernandez visited a psychiatrist in Mexico in 1996 after attempting suicide (*Id.* at 57, 61);

b. the applicant's aunt Marina Reyes testified Eleazar Hernandez saw a psychiatrist about three times in Mexico (XXXIX R.R. at 19); and

c. Dr. J. Brams testified the applicant likely had nine of the ten risk factors from the ACES 10-point checklist predictive of health behavior, and that the effect from trauma was his major mental health issue (XLII R.R. at 44, 51).

206. Contrary to the applicant's habeas assertions, the Court finds trial counsel presented substantial evidence of the applicant's violent, abusive, and unstable childhood environment and upbringing through multiple witnesses:

48

. 02891

a. Vicky Reyes testified she and the applicant's father fought because neither wanted to be responsible for the children (XXXVIII R.R. at 47); the applicant would hide under the bed, in a closet or in corners when his parents fought (*id.* at 48-48); on three occasions, the applicant saw his father physically hit her (*id.* at 48); she and the applicant's father separated when the applicant was three years old and the applicant's father did not actively seek to see the children (*id.* at 48-49); the applicant was affected by his father's leaving and was always sad, but she did not care how the applicant felt (*id.* at 49-50); she and Eleazar Hernandez had physical fights which the applicant witnessed (*id.* at 52-53); Hernandez punished the applicant by hitting him with a clothes hanger (*id.*); Hernandez called the applicant names (*id.* at 56); the applicant did not want to move to Veracruz with Reyes and Hernandez because Hernandez was sexually abusing the applicant (*id.* at 63); the applicant ran away because he did not want to move with Reyes and Hernandez, and three or four days later was found selling popsicles in the street (*id.* at 61-62); she did not believe Hernandez was sexually abusing the applicant, ignored what she was told, and did nothing because she was obsessed with Hernandez (*id.* at 64); she moved back to Houston with her kids when Hernandez tried to strangle her (*id.* at 64-66); it did not bother her when Hernandez abused the applicant (*id.* at 66); and upon returning to Houston, she and the children lived in a number of different places in search of the cheapest apartments (*id.* at 68-69);

b. Marina Reyes testified that when Vicky Reyes left the applicant in Mexico, the applicant missed his mother and initially had difficulty adjusting (XXXIX R.R. at 12-14); when Vicky and Eleazar Hernandez came to get the children in Mexico, the applicant ran away (*id.* at 15-17); Hernandez would sit next to the applicant on the sofa, caress the applicant, and touch "on his little parts" (*id.* at 17-18); and when she told Vicky about Hernandez's sexual conduct towards the applicant, Vicky said it was just because Hernandez loved the applicant (*id.* at 18);

c. Vianet Reyes testified that for several months after Vicky Reyes left the applicant in Mexico, he would sit on the roof and wait for his mother to return because he did not understand why she had left (XXXIX R.R. at 117-18); the applicant ran away for several days after learning he was leaving with Vicky and Hernandez because he did not want to be near Hernandez (*id.* at 123-24); and she told Vicky that Hernandez was touching the applicant, but Vicky did not believe her (*id.* at 123-25);

02852

d. the applicant's father Juan Balderas, Sr. testified he and Vicky Reyes had problems and argued because she was seeing other men (XXXVIII R.R. at 87-91); he did not see the applicant for a long time after he separated from Reyes because he did not know where they lived (*id.* at 91); he re-connected with the applicant when the applicant was around 14 or 15 years old, but was not aware the applicant was involved with gang activity until after the applicant was arrested (*id.* at 93-94);

e. forensic psychologist Dr. Matthew Mendel testified Eleazar Hernandez's sexual abuse of the applicant started at age five, had a long duration, and was coupled with the applicant's emotional abuse and physical abuse such as being punched and placed in chokeholds (*id.* at 157-59, 161); the applicant reported sexual abuse at the hands of Hernandez as well as three females and another male (*id.* at 144); when the applicant was eight years old, a 16-year old girl kissed and touched him (*id.* at 146-47); when the applicant was 13, the applicant had sex with his mother's friend who was in her mid-20s (*id.* at 148); while in Mexico, the applicant had a sexual experience with his aunt's girlfriend (*id.* at 147-48); and the applicant reported a male neighbor abused him when he was young (*id.* at 145);

f. geographic information system analyst Amy Nguyen testified that using census data from the 1980s through 2000, she created several maps of southwest Houston where the applicant grew up to demonstrate the higher poverty rates, signs of community disorganization and lower educational level of Hispanics in the area compared to other groups and the county at large (XL R.R. at 125-65);

g. Dr. J. Brams testified the applicant was used by Eleazar Hernandez and his friends as a participant in human cockfights (XLII R.R. at 26); and

h. the applicant's former juvenile probation officer, Sofia Nolte testified that at the time the applicant attended boot camp, it was a militaristic, secured facility without many therapeutic services, but that if it had been known that the applicant had suffered trauma or sexual abuse, he would have been referred for treatment (XLI R.R. at 194).

207. Contrary to the applicant's habeas assertions, the Court find trial counsel presented substantial evidence of the applicant's "unstable, impetuous mother"[4]:

---

[4] *Applicant's Writ Application* at 227.

a. Vicky Reyes, testified she and the applicant's father were not ready to have a child (XXXVIII R.R. at 45); she was young when she had the applicant and did not want to be a mother (*id.* at 45); she felt it was a nuisance to be a mother and the applicant prevented her from living her life (*id.* at 46); when she separated from the applicant's father she began drinking and smoking and became careless with the children (*id.* at 50); after work, she would go out drinking and smoking with her friends, instead of going home (*id.* at 46); she would leave her children with neighbors or with the person she was dating and go out (*id.* at 46, 50); once she went to a dance after work, stayed out until 5:00 am, changed clothes, went to work without checking on her children, and did not care (*id.* at 51); after marrying Eleazar Hernandez, she would sometimes leave the applicant and his brother Jesus alone and in Hernandez's care (*id.* at 51-52); she did not object to Hernandez's method of punishing the applicant because she was afraid Hernandez would leave her (*id.* at 53); when she was married to Hernandez she did not worry about how the applicant felt about their household environment (*id.* at 56); when the applicant was beginning the second grade, she left him and his brother with relatives in Mexico so she could be alone with Hernandez (*id.* at 57-58); it was only when she was called to the applicant's school after he was in a fight, that she realized the applicant was hanging around the wrong people (*id.* at 69-70); she knew the applicant was in a gang, but ignored it (*id.* at 70-72); she made mistakes raising the applicant (*id.* at 82-83); neither she nor the applicant's father were good role models (*id.* at 85); and she left the applicant to himself and to find his own role models when he was growing up (*id.* at 85);

b. Marina Reyes, testified that when Vicky Reyes initially left Mexico, the family did not hear from her for nine years, and Vicky only returned to leave the eight-year old applicant and his brother Jesus in Mexico (XXXIX R.R. at 6-9);

c. Vianet Reyes testified the family was surprised when Vicky Reyes left the applicant and Jesus in Mexico because the family assumed she was dead (*Id.* at 116); and

d. Dr. J. Brams testified Vicky Reyes was an alcoholic who chose her abuser over the applicant; was ill-prepared to be a parent, or to connect and care about others; and was unable to bond with the applicant as a baby (XLII R.R. at 12-15, 21).

51

ö2ö94

208. The Court finds trial counsel presented extensive expert testimony to explain the impact, consequences, and ramifications of the applicant's violent, abusive, and unstable childhood surroundings and upbringing (XXXVIII R.R. at 125-78; XXXIX R.R. at 103-109, 143-59; XL R.R. at 50-58, 60-63, 195-218, 242-52, 256; XLI R.R. at 251-70; XLII R.R. at 6-63, 87-94).

209. Forensic psychologist Dr. Matthew Mendel evaluated the applicant to determine the impact of childhood trauma or abuse the applicant experienced (XXXVIII R.R. at 125-78; XXXIX R.R. at 103-09).

210. Dr. Mendel testified to the wide scope of information he gathered, considered, and reviewed as part of his evaluation, which included his own interviews with the applicant and the applicant's friends and family (XXXVIII R.R. at 125-30, 170-73).

211. Dr. Mendel testified the applicant's sexual abuse at the hands of Eleazar Hernandez "was about as severe as it gets" and that sexual abuse predicts a worse outcome if it happens several times, begins at a young age, and the abuser is in a close relationship with the victim (XXXVIII R.R. at 140, 156-57); victims of sexual abuse suffer from a sense of powerlessness which may explain the importance of the applicant's being tough and hypermasculine (*id.* at 149-51); victims of sexual abuse suffer from betrayal which the applicant felt from his mother and Hernandez (*id.* at 151-51); victims of sexual abuse suffer from stigmatization which is more pronounced in male sexual abuse victims (*id.* at 149-50, 152); victims of sexual abuse are more likely to suffer sexual dysfunction – something the applicant reported (*id.* at 149-50, 153-54); many of the applicant's behaviors (such as drug and alcohol abuse and intentionally putting himself in emotionally painful situations) were forms of emotional suppression stemming from a sense of powerlessness that is common in victims of sexual abuse (XXXVIII R.R. at 163-68); and the applicant expressed rage, anger, and aggression when discussing past sexual abuse (*id.* at 162).

212. Dr. Mendel ultimately diagnosed the applicant with post-traumatic stress disorder (XXXVIII R.R. at 125-78); (XXXIX R.R. at 103-09).

213. Psychiatrist Dr. Matthew Brams testified that in evaluating the results of the Personality Assessment Inventory administered the applicant, he exhibited many trauma symptoms and experiences much anxiety stemming from his upbringing (XXXIX R.R. at 153-54).

02895

214. Psychologist Dr. Jolie Brams evaluated the applicant to determine the correlation between the applicant's history and functioning, and whether his life influences affected his behavior (XLI R.R. at 251-70; XLII R.R. at 6-63, 87-94).

215. Dr. J. Brams testified that in the course of her evaluation, she interviewed the applicant, his friends, his family, and State witnesses; reviewed an extensive amount of background and diagnostic information; and ultimately concluded the pervasive trauma the applicant experienced as a child markedly impacted his functioning during his childhood and adolescence, and affected his behavior choices (XLI R.R. at 261-63, 268).

216. Dr. J. Brams testified the applicant suffered an extreme level of trauma of the type that studies show has a significant effect on brain development, behavior, and mental health functioning; the applicant's exposure to domestic violence and lack of good role models resulted in his inability to deal with emotions or solve problems; the applicant was the victim of a generational history of sexual abuse in Eleazar Hernandez's family; the applicant's life was filled with abandonment and abuse; and the applicant lived in a social environment of survival of the fittest where his poverty limited the available resources causing him to have to take care of himself (XLI R.R. at 268, XLII R.R. at 17-18, 20-24, 29-30, 45-46);

217. Dr. J. Brams testified the applicant was not properly assessed and diagnosed as a child or adolescent and consequently he was not given treatment from which he could have benefitted (XLI R.R. at 269-70).

218. Dr. J. Brams found the applicant showed signs of depression during his childhood and displayed symptoms of post-traumatic stress disorder, but was not exhibiting any meaningful signs of anti-social behaviors or antisocial personality disorder (XLII R.R. at 47-49).

219. The Court finds trial counsel used expert testimony to highlight the correlation between the applicant's childhood circumstances and upbringing to his gang affiliation:

   a. Dr. Mendel identified a number of traumatic events during applicant's childhood and found that the applicant's childhood abuse and trauma were central to his gang activity, with the gang serving as the applicants' family (XXXVIII R.R. at 135-39, 162);

02896

b. Dr. J. Brams testified the profound trauma suffered by the applicant directly related to his gang involvement, because he experienced emotional detachment which led to his participation in gang/criminal activities, and that the gang gave him a sense of safety and an outlet for his anger (XLI R.R. at 268-69; XLII R.R. at 26, 28-30, 40-41).

c. criminology and criminal justice professor Dr. John Rodriguez testified that a review of the applicant's life history, police reports, and school records, revealed the applicant was the failed product of his society and environment (low education rates, high unemployment rates, and high property crimes); the applicant had a higher propensity to join a gang; and the gang gave the applicant an identity, environment, family, outlet for stress, and coping mechanisms (XL R.R. at 201-205, 208, 213-14, 252).

220. The Court finds trial counsel presented additional mitigation evidence that the applicant had family and friends who loved and supported him:

a. Vicky Reyes testified she supported the applicant (XXXVIII R.R. at 83-84);

b. Marina Reyes testified she had a close relationship with the applicant and loved him very much (XXXIX R.R. at 15);

c. Vianet Reyes testified she would be emotionally available for the applicant if he spent the rest of his life in prison (*Id.* at 128);

d. the applicant's cousin Paloma Reyes testified she loved the applicant like a brother and that he was very important to her (*Id.* at 193-95); and

e. Juan Balderas, Sr. testified that he would emotionally support the applicant if the applicant spent the rest of his life in prison (XXXVIII R.R. at 94-95).

221. The Court finds trial counsel presented lack of future danger evidence in the form of the applicant's generally positive behavior and performance while in custody or under court supervision, namely:

a. Dr. M. Brams testified that according to the Personality Assessment Inventory, which allows for comparisons between aggressiveness and mental health issues between individual inmates, he believed the applicant is less aggressive, more submissive, and less dominant than other inmates (XXXIX R.R. at 150-51, 153); the applicant would not be the aggressor, leader, or predator in an inmate population (*id.* at 151-53); the applicant

. 02897

may avoid rather than start conflict (*id.*); and the applicant would continue to mature while incarcerated and adjust to incarceration better than most inmates (*id.* at 154-59);

b. prison consultant and former warden Terry Pelz testified an inmate's past institutional behavior indicates his future institutional behavior, and that after interviewing the applicant and reviewing his juvenile records, jail records, and some police reports, Peltz was optimistic for the applicant and believed the applicant would do fine in prison given his non-serious juvenile history, and propensity towards religion (XLI R.R. at 201-13, 215-17, 246);

c. Harris County Sheriff's Office Deputy Oscar Gonzalez testified he never had any problems with the applicant at the jail, and the applicant once helped calm a difficult inmate who was placed in the cell next to the applicant (XLII R.R. at 112-13);

d. Sofia Nolte testified that when the applicant was on her caseload as a juvenile, he was well-behaved, she had no problems with him, and wanted to work with him (XLI R.R. at 194, 199); the applicant was once referred to court because of a physical altercation, but was sent back to boot camp instead of TYC[5] (*id.* at 197); and the types of write-ups the applicant received during boot camp - constantly talking and leaving the assigned area - were not real offenses in the grand scheme of things she dealt with (*id.* R.R. at 199).

222. The Court finds trial counsel also presented lack of future danger evidence in the form of prison experts:

a. retired prison administrator Frank Aubuchon testified extensively concerning the prison classification system for inmates who receive a life sentence without parole for capital murder, and that LTC is not considered a security threat group in prison (*Id.* at 78-103); and

b. Pelz testified he believed there would be no incentive for the applicant to join a prison gang; prison gangs did not associate with or tolerate street gangs like LTC; and that inmates doing life without parole can be managed by prison (*Id.* at 220-21, 224).

---

[5] Texas Youth Commission.

02898

223. Notwithstanding the defense's efforts to mitigate the applicant's punishment and show a lack of future danger at trial, the Court finds the State aggressively cross-examined defense experts and presented overwhelming and compelling punishment evidence against the applicant, specifically:

    a. his juvenile criminal history, including theft, evading arrest, unauthorized use of a motor vehicle, and assault offenses (XXXIII R.R. at 11-44);

    b. his disobedience, behavior problems, and violations while on juvenile probation (*Id.*. at 11-44);

    c. his truancy from school, substance abuse, and disrespect towards his mother (*Id.* at 11-44, 50);

    d. his failed attempts at gang disassociation and substance abuse rehabilitation (*Id.* at 11-44);

    e. his gang membership, leadership role, participation in activities/meetings, and tattoos (XXVI R.R. at 126-62, 192; XXVII R.R. at 75-75, 87-99, 114-19, 121; XXXIII R.R. at 11-44, 54-55; XXXIV R.R. at 14-253; XXXV R.R. at 10-44; XXXVI R.R. at 257-82);

    f. his psychological screening results showing he had an average IQ, a supportive family, and no history of reported abuse (XXXIII R.R. at 48-67);

    g. his psychological screening results showing he exhibited adolescent onset conduct disorder, cannabis abuse, inhalant abuse, cocaine abuse, and alcohol abuse (*Id.* at 48-67);

    h. his participation as a gunman and shooter in the capital murder of Daniel Zamora and the aggravated assault of Guadalupe Sepulveda on September 12, 2005 (XXXIII R.R. at 69-100, 106-28; XXXIV R.R. at 5-44, 68-120, 198-246; XXXV R.R. at 10-44; XLII R.R. at 278-80);

    i. his participation as a gunman and shooter in the murder of Eric Romero on December 3, 2005 (XXXV R.R. at 10-31, 116-37, 140-72, 178-224);

    j. his participation as a gunman and shooter in the aggravated assault of Luis Garcia on November 14, 2005 (*Id.* at 8-26, 31-49; XXXVI R.R. at 158-76);

02899

k. his participation as gunman and shooter in the capital murder of Jose Garcia on December 15, 2005 (XXXVI R.R. at 55-89, 95-111, 152-58; XXXVII R.R. at 9-32; XL R.R. at 276);

l. the intentional arson of the applicant's car, which had been identified in the commission of multiple offenses via its license plate (XXXV R.R. at 12-14; XXXVI R.R. at 20-24, 35-40, 104-105 109-111, 123-47, 169-71);

m. his possession of a variety of different firearms, ammunition and firearm paraphernalia upon his arrest, including items traditionally sold only to law enforcement (XXXVI R.R. at 225-45, 248-65);

n. the discovery of various weapons, ammunition, drugs, drug paraphernalia, cell phones, large amounts of cash, bandanas, face masks, and gang-related items in his apartment by law enforcement (XXXVII R.R. at 34-82);

o. his propensity to carry firearms with him at all times, specifically a .357 caliber and a .40 caliber handgun (XXXIV R.R. at 195-98; XXXV R.R. at 19-20);

p. the .40 caliber Smith & Wesson handgun consistent with ballistics evidence from Eduardo Hernandez's murder was specifically identified as one of the applicant's two personal firearms he always kept with him (XXV R.R. at 238, 245; XXVII R.R at 16; XXXVII R.R. at 36-41, 53-54; XXXIV R.R. at 197);

q. two-.40 caliber Smith & Wesson fired cartridge casings recovered from the Zamora murder/Sepulveda aggravated assault crime scene had been fired from the .40 caliber Smith & Wesson handgun that was in the applicant's possession at the time of his arrest and which was specifically identified as one of the applicant's two personal firearms he always kept with him (XXV R.R. at 238, 245; XXVII R.R at 16; XXXVII R.R. at 118-19);

r. .40 caliber Smith & Wesson cartridge casings that had been "necked down" to .357 caliber from the Luis Garcia aggravated assault crime scene had been fired from the .357 Sig handgun that was in the applicant's possession at the time of his arrest (XXXVI R.R. at 231; XXXVII R.R. at 120-26);

s. eight-.357 caliber Sig cartridge casings; one-.40 caliber Smith & Wesson cartridge casing that had been necked down to .357 caliber; two fired bullet jackets; and a jacketed lead bullet from the Eric Romero murder scene had been fired from the .357 Sig handgun that was in the applicant's

possession at the time of his arrest (XXXVI R.R. at 231; XXXVII R.R. at 127-131, 143);

t. three-.40 caliber Smith & Wesson cartridge casings that had been "necked down" to .357 caliber, and three fired jacketed lead bullet from the Jose Garcia murder scene had been fired from the .357 Sig handgun that was in the applicant's possession at the time of his arrest (XXXVI R.R. at 231; XXXVII R.R. at 143-49);

u. the 9mm cartridge case recovered from the applicant's pocket when he was arrested matched the 9mm Luger handgun found in the applicant's residence (XXV R.R. at 230-32; XXXVII R.R. at 34-82, 159);

v. his assault on Houston Police Department Officer Woodrow Tompkins and another inmate on November 20, 2005 while in the city jail (XLII R.R. at 133-44);

w. his classification, housing and disciplinary history while in the Harris County Jail, which included being housed in a segregated cell since April 2007 and being found guilty of destroying, altering, or damaging county property; tattooing or possession of tattoo paraphernalia; possession of contraband; fighting; tampering; possession or manufacture of a weapon; and misuse of medication, (XLII R.R. at 149-87, 204-209, 212-22, 227-40, 242-53); and

x. an incident in the Harris County Jail on May 10, 2009, where the applicant grabbed a pocketknife from Detention Officer Chris Aguero and threatened Aguero with it (XLII R.R. at 256-67).

224. Given the totality of the evidence, the Court finds trial counsels' decisions to present lack of future danger and mitigation evidence in the manner presented at trial was reasonable trial strategy.

**ALLEGED FAILURE TO INVESTIGATE & PRESENT EVIDENCE REBUTTING EXTRANEOUS OFFENSES**

225. The Court finds trial counsel cross-examined State's witnesses as rebuttal evidence to the State's presentation of extraneous offenses (XXXIII R.R. at 100-105; XXXIV R.R. at 45-67, 121-37, 145-46; XXXV R.R. at 45-115, 128-30, 138-40, 172-76, 198, 224-231; XXXVI R.R. at 27-30, 50-54, 89-94, 112-22, 148-51, 176-207, 218-24, 232, 245-46, 263, 283; XXXVII R.R. at 32-34, 82-85,

62561

149-59, 167-69; XLII R.R. at 131-33, 145-49, 188-203, 210-11, 220-223, 225-26, 235, 240-42, 245-47, 254, 268-75, 280-83).

226. The Court finds trial counsel presented testimony regarding the hierarchy and operations of LTC as rebuttal to the State's presentation of extraneous offenses:

   a. Celeste Munoz testified Wendy Bardales was "messing around" with the applicant, Israel Diaz and the complainant (XXXVIII R.R. at 14-15);

   b. Daniella Chavez testified she knew the applicant and identified Alejandro Garcia, Jose, Efrain Lopez, Cookie, Chango, and the applicant as members of LTC (XLI R.R. at 44-46); and

   c. Judy Gallegos testified Victor "Gumby" Arevalo was the leader of LTC in Alief (XXXVII R.R. at 175-82); gang members would vote on important matters, but Arevalo made the ultimate decisions (*id.* at 184-85); a person must be a fully "cliqued in" LTC member in order to commit offenses with other members (*id.* at 195); other people used the guns Arevalo would distribute (*id.* at 196-98, 200-02, 205); and Gallegos identified Arevalo's guns(*id.* at 196-98, 200-02, 205).

227. The Court finds according to Godinich's credible affidavit,

   a. Celeste Munoz and Daniella Chavez testified as the defense expected and hoped. *Affidavit of Jerome Godinich, Jr.* at 2; and

   b. counsel presented all the evidence available to them to rebut the State's extraneous offense allegations against the applicant. *Id.* at 3.

228. The Court finds trial counsel employed reasonable trial strategy to rebut the State's presentation of extraneous offense evidence.

**ALLEGED FAILURE TO OBJECT TO & PRESERVE TRIAL COURT'S DENIAL OF FUNDING TO TRANSPORT WITNESSES TO THE UNITED STATES FROM MEXICO**

229. Per Godinich's credible affidavit, the trial court would have paid for the transportation and housing of the defense witnesses from Mexico once these witnesses were inside the United States, and counsel was prepared to cover the fees associated with the witnesses leaving Mexico, but the witnesses were unable to coordinate among themselves who would come to Houston. *Id.* at 3-4.

02982

230. Arrangements were made for several defense witnesses in Mexico to testify in the applicant's trial via Skype (XXXIX R.R. at 5).

231. During the testimony of the defense's Mexico witnesses, technical issues occurred with the Skype technology, which ultimately prompted the Court to take a break from Skype testimony in order to resolve the issue (*Id.* at 25, 35).

232. Ultimately, the parties successfully used speakerphone instead of Skype to finish questioning the applicant's witnesses in Mexico (XL R.R. at 173-75).

233. The Court finds that despite the distance and technological shortcomings of Skype, the parties were nevertheless able to present direct and cross-examination testimony from the applicant's witnesses for the jury's consideration.

234. Based on Godinich's credible affidavit, the Court finds the applicant's friends and family created obstacles and tried to undermine the defense's efforts during the punishment phase, namely:

    a. mitigation expert Adriana Helenek learned that Yancy Escobar was telephoning the witnesses in Mexico and instructing them how to respond to Godinich's questions. *Affidavit of Jerome Godinich, Jr.* at 4; and

    b. due to Escobar's interference with witness testimony, witnesses responded to Godinich's questions much differently than expected, and Godinich was unable to question the witnesses in Mexico as he had intended. *Id.*

235. The Court finds any obstacle the defense faced as a result of witness tampering with its witnesses in Mexico, was a result of the applicant's friends and family, and not the trial court's failure to fund travel expenses from Mexico. *See id.*

236. The Court finds that the applicant's witnesses in Mexico were outside the subpoena power of the Court, but that these witnesses voluntarily agreed to testify via Skype (I Writ Hearing—February 22, 2018 at 38).

237. The Court finds the applicant fails to show the trial court erred in denying the defense funding to transport witnesses from Mexico to the United States.

60

02903

## ALLEGED BAD BEHAVIOR & JURY ALIENATION BY TRIAL COUNSEL

238. Per Nunnery's credible affidavit, he has no personal recollection of calling the State's counsel "a bitch" or saying that someone "doesn't like me because I'm black." *Affidavit of Alvin Nunnery* at 4.

239. The Court finds the record does not reflect Nunnery referring to the State's prosecutor as a "bitch", nor does it reflect Nunnery making a comment to the effect that "so and so doesn't like me because I'm black."

240. The Court finds the applicant fails to show the complained-of remarks attributed to Nunnery affected trial counsels' representation or the outcome of the proceeding.

241. Per Nunnery's credible affidavit, because of juror notes sent out during the jury's guilt/innocence deliberations, Nunnery made a strategic decision to remind the jurors during his punishment closing argument of the importance of the oath they took as jurors to have individual votes, to keep to their personal convictions, and that if they changed their votes because of peer pressure, that they had violated their oaths. *Id.*

242. The Court finds that in his closing argument, Nunnery noted the attention given by the jury during the trial; expressed his appreciation and respect for the jury's efforts; respectfully disagreed with the jury's guilty verdict; reminded the jury of their commitment during jury selection; summarized the evidence; argued the lack of credibility of the State's witnesses; made reasonable inferences from the evidence; argued a lack of future dangerousness and the presence of mitigation evidence such that the jury's answers on the special issues should lead to a life sentence for the applicant; asked the jury not to abandon common sense; and pleaded the jury to show the applicant mercy (XLIII R.R. at 5-36).

243. Given the entirety of Nunnery's closing argument, the Court finds the content was reasonable trial strategy.

## FAILURE TO OBJECT & PRESERVE ERROR ON STATE'S QUESTIONING AND CLOSING ARGUMENT ALLEGEDLY ATTACKING APPLICANT'S FAILURE TO TESTIFY

244. According to the credible affidavits of trial counsel, counsel did not object to portions of the State's cross-examination of Dr. Matthew Mendel and Dr. Matthew Brams regarding the failure to record conversations with the applicant, or the associated portions of the State's closing argument because counsel did

61

. 02904

not construe these as comments on the applicant's failure to testify, and believed these were fair points for cross-examination and attacks on the credibility of the experts. *Affidavit of Jerome Godinich, Jr.* at 3; *Affidavit of Alvin Nunnery* at 3-4.

245. The Court does not find the State's argument and cross-examination of experts Matthew Mendel and Matthew Brams constituted a comment on the applicant's failure to testify, but rather appropriately raised questions concerning the credibility of the defense's sexual abuse evidence. *See* (XXXIX R.R. at 53-58; XL R.R. at 13-16; XLII R.R. at 66).

---

### SEVENTH GROUND FOR RELIEF:
### STATE'S ALLEGED PRESENTATION OF FALSE EVIDENCE
### THROUGH WITNESS CHRISTOPHER POOL

---

246. On March 12, 2014, during the State's rebuttal punishment case, former Harris County Sheriff's Office ("HCSO") detention officer Christopher Pool testified regarding contraband he found during a search of the applicant's cell in the Harris County Jail (XL R.R. at 247-48).

247. Pool testified that on March 29, 2010 he was assigned to conduct a search of the applicant's single-man cell in the 1200 Baker Street jail, and during the search he found 34 Seroquel and Klonopin pills, two razor blades, and a pen (*Id.* at 248-49).

248. The applicant's false testimony allegations do not pertain to Pool's discovery of contraband in the applicant's cell, but rather the truthfulness of Pool's responses regarding the circumstances of his termination from the HCSO.

249. At trial, Pool testified he was currently employed by the Splendora Police Department but had previously worked for the HCSO for three and half years (*Id.* at 247-48).

250. On cross-examination and in response to defense counsel's questioning regarding why Pool left the HCSO, Pool testified that on August 22, 2012 he was terminated for a violation of policies, specifically "it was a round sheet, there was a failure to render aid and deception" (*Id.* at 254).

251. Pool concurred with defense counsel that the incident spurring his termination involved the death of an inmate (*Id.* at 254).

62

62905

252. In response to the State's redirect examination question of "what happened yesterday in regard to that termination?" Pool testified that he was "cleared of all wrongdoing" in the incident spurring his termination and was eligible for rehire by the HCSO within 75 days (*Id.* at 255).

253. According to a March 12, 2014 letter from the Harris County Sheriff's Civil Service Commission, the commission

   a. modified Pool's termination to a suspension with time served from the termination date to the date of reinstatement and no award of back pay;

   b. stated "Pool is to be reinstated within 75 days from March 11, 2014, to his former pay grade but without seniority, from August 21, 2012 through the date of reinstatement"; and

   c. mandated the HCSO "immediately expunge from Christopher Pool's records any reference to a Dishonorable Discharge and/or termination and/or indefinite suspension arising from this incident at issue and immediately report to the Texas Commission on Law Enforcement that the previous determination as to Officer Pool's separate from duty has been modified to reflect the suspension referred to above."

*Applicant's Ex. 72.*

254. The Court finds the applicant fails to demonstrate Pool's testimony, when examined in its entirety, left a false impression with the jury (XL R.R. at 247-48); *see Applicant's Exs. 70-72.*

255. The Court finds the applicant fails to demonstrate materiality in Pool's testimony regarding his termination from the HCSO, or that such testimony affected the jury's consideration of the special issues, in light of Pool's testimony about the contraband in the applicant's cell.

256. The Court finds the applicant fails to demonstrate materiality in Pool's testimony regarding his termination from the HCSO, or that such testimony affected the jury's consideration of the special issues, in light of the State's other extraneous punishment evidence including the applicant's juvenile history; murders of Daniel Zamora, Eric Romero and Jose Garcia; aggravated assaults of Luis Garcia and Guadalupe Sepulveda; vehicular arson; possession of firearms and firearm paraphernalia; and other bad behavior while in the city and county jails.

02906

257. The applicant was arrested in connection with the underlying capital murder on December 16, 2005 (XXV R.R. at 230).

258. Jury selection began in the applicant's case on January 13, 2014 (XII C.R. at 3417).

259. On January 17, 2014, the fifth day of jury selection, the applicant filed a *pro se* motion asserting his right to a speedy trial, but seeking no particular relief other than the trial court "grant this Motion for Speedy Trail [*sic*] in all things sought therein"; the trial court made no ruling on this motion (II C.R. at 496).

260. On January 29, 2014, the eleventh day of jury selection, defense counsel filed a "Motion to Dismiss the Indictment for Lack of a Speedy Trial" (IX C.R. at 3121).

261. The trial court held a speedy trial hearing on February 12, 2014, wherein the State presented the testimony of Spence Graham and Paula Hartman, former chief prosecutors of the 179th District Court, who had worked on the applicant's case, and the defense presented the applicant's testimony (XXII R.R. at 5-81).

262. During the February 12, 2014, speedy trial hearing, Spence Graham testified:

    a. he was assigned to the applicant's case in May 2009 when he became the chief prosecutor of the 179th District Court (*Id.* at 9);

    b. the applicant's case was several years old when it was assigned to Graham, but it was not the oldest capital murder on the court's docket, as the court had a backlog of approximately 21 capital murder cases and over 1000 pending cases, many predating the applicant's case (*Id.* at 27, 33);

    c. the applicant was charged with the underlying capital murder case, as well as another capital murder and an assault on a peace officer (*Id.* at 9);

    d. the State's file pertaining to the applicant's case was voluminous, consisting of six to eight boxes and a minimum of 11 large offense reports concerning homicides linked to the applicant and a larger police investigation into LTC (*Id.* at 10);

e.  when Graham was assigned to the applicant's case, the District Attorney had not yet made a decision of whether or not to seek the death penalty against the applicant (*Id.*);

f.  the applicant's cases were regularly on the trial court's docket every month or two, and Graham routinely spoke with defense counsel Nunnery and Godinich about their submittal of a mitigation packet for the District Attorney's consideration (*Id.* at 11-13, 31);

g.  even after submitting a mitigation packet, Godinich asked Graham to wait before making a decision or presenting the applicant's case to the District Attorney, in hopes that Godinich could persuade the applicant to accept a plea bargain and avoid the death penalty (*Id.* at 13-16);

h.  the District Attorney ultimately decided to seek the death penalty in the applicant's case and on April 28, 2011, the State filed a notice of intent to seek the death penalty (*Id.* at 17-18, 32);

i.  part of the delay in the District Attorney's decision as to whether or not to seek the death penalty was the applicant's commission of an aggravated assault on a public servant while incarcerated, which was not immediately relayed to the State, and which required further investigation (*Id.* at 36);

j.  even after the State's decision to seek the death penalty, defense counsel tried to persuade the applicant to plead to life without parole, but never presented Graham with an offer to plead (*Id.* at 19);

k.  Nunnery never sought a trial setting (*Id.* at 16-17); and

l.  prior to Graham's departure from the 179th District Court in late December 2011 or early January 2012, the applicant's case was set for a pretrial conference on May 10, 2012, and jury trial on August 9, 2012, due to the trial court's insistence (*Id.* at 20-22, 30).

263. During the February 12, 2014, speedy trial hearing, Paula Hartman testified:

a.  she was assigned to the applicant's case in January 2012 when she followed Graham as the chief prosecutor of the 179th District Court (*Id.* at 43);

b.  Godinich wanted the District Attorney's Office to consider a different resolution to the applicant's case other than the death penalty (*Id.* at 52);

02908

c. she was prepared to start trial in August 2012, but on May 10, 2012, the defense filed a motion for a continuance asserting that the defense's guilt/innocence and punishment investigation would not be complete in anticipation of the August trial date (*Id.* at 45-47);

d. the trial court granted the defense's motion for continuance over "strong opposition of the State" and reset the trial for February 2013 (*Id.* at 48-49);

e. the State was prepared for trial in February 2013, but the case was removed from the trial docket because a new judge had assumed the bench (*Id.* at 49);

f. the parties agreed to set the case for trial in September 2013 (*Id.* at 50); and

g. Hartman left the 179th District Court in January 2013, at which time Traci Bennett was assigned as the chief prosecutor of the court and assumed responsibility of the applicant's case (*Id.* at 50-51).

264. During the February 12, 2014, speedy trial hearing, the applicant testified that during his extended incarceration, his ability to continue his education and earn an income were adversely affected; he lost a family member; and suffered strained relationships and severe stress (*Id.* at 62-64).

265. Following a hearing on February 12, 2014, the trial court denied the applicant's motion to dismiss the indictment for lack of a speedy trial (*Id.* at 811; XI C.R. at 3133).

266. On direct appeal, the applicant asserted the trial court erred in denying his motion to dismiss the indictment for lack of speedy trial, but his claim was denied by the Texas Court of Criminal Appeals after the Court balanced the four *Barker v. Wingo*, 407 U.S. 514, 530 (1972), factors. *Balderas*, 517 S.W.3d at 767, 767-73.

267. The Court of Criminal Appeals found that from 2009 to 2013, "defense counsel consistently sought additional time for investigation and negotiation." *Id.* at 771.

268. According to the credible affidavits of trial counsel, the Court finds:

a. the massive volume of discovery in the applicant's case, the State's evidence; the applicant's criminal history; and his continued bad behavior

66

02909

in the jail required extensive investigation by the defense. *Affidavit of Jerome Godinich, Jr.* at 3; *Affidavit of Alvin Nunnery* at 4;

b. the defense purposefully engaged in prolonged ongoing negotiations with the State regarding whether the State would consider a guilty plea to a life sentence in lieu of seeking the death penalty. *Affidavit of Jerome Godinich, Jr.* at 3; *Affidavit of Alvin Nunnery* at 4;

c. the defense's timing in filing its motion to dismiss the indictment for lack of a speedy trial was rooted in trial strategy based on "the totality of circumstances at play[.]" *Affidavit of Alvin Nunnery* at 4.

d. defense counsel informed the applicant of every reset and continuance sought in his case and the reason for the request, and the applicant never objected to any of these request until the eve of trial. *Affidavit of Jerome Godinich, Jr.* at 3.

e. the applicant never indicated his desire for a ***speedy*** trial. *Affidavit of Alvin Nunnery* at 4-5 (emphasis added); and

f. the defense filed a motion to dismiss the indictment for lack of speedy trial solely to preserve the applicant's appellate rights on the issue, not because there were beneficial defense witnesses who were unavailable due to the delay or because the applicant's defense was hampered in any way due to the passage of time. *Id.* at 5.

269. Although the Court of Criminal Appeals "presume[d] that the lengthy delay here adversely affected [the applicant's] ability to defend himself," the Court finds trial counsels' affidavits credibly rebut this presumption. *See Balderas*, 517 S.W.3d at 772-73; *see also Affidavit of Jerome Godinich, Jr.* at 3; *Affidavit of Alvin Nunnery* at 4-5.

270. The Court finds the defense's delay in filing a motion to dismiss the indictment for lack of speedy trial was reasonable trial strategy.

271. The Court finds the applicant fails to establish that trial counsel were ineffective in the timing of their motion to dismiss the indictment for lack of a speedy trial, or that counsel incompetently asserted his right to a speedy trial.

. 02910

272. The Court finds that because the proffered affidavits of jurors Armstrong, Norwood and Orosz concern mental processes, and because they do not establish that jurors considered any impermissible extraneous influences or impropriety in their deliberations, they cannot be considered pursuant to TEX. R. EVID. 606(b). *See Applicant's Exs. 18, 21-22.*

273. Notwithstanding the preclusion of jurors Armstrong, Norwood and Orosz's proffered affidavits per TEX. R. EVID. 606(b), the Court finds these affidavits are not dispositive on the merits of the applicant's claims that trial counsel were ineffective for not addressing sexual abuse as mitigation during jury selection. *See Applicant's Exs. 18, 21-22.*

274. The record reflects that in conducting jury selection, defense counsel addressed issues that had arisen during the State's questioning of prospective jurors; questioned jurors about matters of concern on the juror questionnaires; and thoroughly examined individual jurors concerning their ability to answer the special issues, particularly the mitigation special issue -- the avenue through which jurors could consider evidence of sexual abuse (IV R.R. at 111-29, 181-94; VI R.R. at 146-59; VIII R.R. at 60-82, 112-33; XI R.R. at 58-81; XII R.R. at 63-86; XIII R.R. at 60-88; XVI R.R. at 71-84; XVI R.R. at 115-33; XVII R.R. at 164-89; XIX R.R. at 63-85; XX R.R. at 77-106; XXI R.R. at 61-84).

275. According to the credible affidavits of trial counsel, the Court finds:

    a. counsel strategically employed the Colorado method of jury selection. *Affidavit of Jerome Godinich, Jr.* at 3;

    b. counsel strategically did not qualify jurors on the issue of sexual abuse because counsel believed it "inappropriate and not in accordance with the law." *Affidavit of Alvin Nunnery* at 5;

    c. counsel strategically chose to globally discuss mitigation with prospective jurors to ascertain whether prospective jurors could keep an open mind to mitigation evidence as a whole. *Id.; Affidavit of Jerome Godinich, Jr.* at 3.

    d. counsel did not believe it was appropriate to expound upon the details of their counsel and conversations with the applicant on the record, regarding

strategic reasons for agreeing to excuse each agreed-upon prospective juror. *Affidavit of Alvin Nunnery* at 5.

276. The Court finds the trial counsels' avoidance of committing prospective jurors as to whether or not they would consider sexual abuse as mitigating evidence was reasonable trial strategy.

277. The record reflects the applicant was consulted on every potential juror the parties agreed to excuse without examination, and the applicant affirmatively stated he had no objections (IV R.R. at 22-23; V R.R. at 28-29; VI R.R. at 53, 167-68; VII R.R. at 28-29; VIII R.R. at 28; IX R.R. at 136; X R.R. at 27; XI R.R. at 28; XII R.R. at 32-33; XIII R.R. at 26-27; XIV R.R. at 5-6, 31-32; XV R.R. at 6, 30-31, 130-31; XVI R.R. at 29-30, 217; XVII R.R. at 29, 193-94; XVIII R.R. at 6, 30-31, 168; XIX R.R. at 29, 200-01; XX R.R. at 28-29, 159; XXI R.R. at 26).

278. The Court finds trial counsels' failure to detail their counsel and conversations with the applicant on the record regarding the reason(s) for excusing each agreed-upon prospective juror was reasonable strategy and in accord with the principles of privileged attorney-client communications.

279. Notwithstanding trial counsels' strategy during jury selection, at the conclusion of the punishment phase, the trial court instructed the jury:

a. to consider all the evidence presented during the whole trial when determining the answer to the special issues;

b. to consider all evidence as to the defendant's background or character or the circumstances of the offense that militates for or mitigates against the death penalty;

c. a mitigating circumstance "may include, but is not limited to, any aspect of Juan Balderas also known as Apache's character, background, the personal moral culpability of the defendant or circumstances of the crime which you believe could make a death sentence inappropriate in this case;"

d. they need not agree on what particular evidence supports a "yes" answer to the mitigation special issue; and

e. in answering the mitigation issue, the jury "shall consider mitigating evidence to be evidence that a juror might regard as reducing Juan Balderas

also known as Apache's moral blameworthiness, including evidence of the defendant's background, character, or the circumstances of the offense that mitigates against the imposition of the death penalty."

(XII C.R. at 3334-36, 3338).

---

## TENTH GROUND FOR RELIEF:
### ALLEGED VIOLATION OF APPLICANT'S EQUAL PROTECTION RIGHTS DUE TO COUNSELS' AGREEMENTS TO EXCLUDE AFRICAN-AMERICAN JURORS

---

280. According to Traci Bennett's credible affidavit, the parties' agreement to excuse certain jurors without examination were based on the jurors' responses to juror questionnaires, and not based on race or gender. *State's Habeas Ex. 3, Affidavit of Traci Moore Bennett.*

281. According to the credible affidavits of trial counsel, the Court finds:

    a. the decision to excuse prospective jurors was rooted in trial strategy and based on the information provided in juror questionnaires and in accordance with the defense's method of jury selection, not race. *Affidavit of Jerome Godinich, Jr.* at 3; *Affidavit of Alvin Nunnery* at 5-6.

    b. the defense strategy for agreeing to excuse prospective jurors was also rooted in keeping "one eye down the road in terms of which jurors are coming down the line next and what we needed to anticipate" and the attempt "to use our strikes effectively…so as to preserve future strikes for potential jurors coming down the road." *Affidavit of Alvin Nunnery* at 5-6; and

    c. the applicant was fully informed of counsels' reasons for seeking strikes on the agreed-upon prospective jurors and he consented to the strikes. *Id.*; *Affidavit of Jerome Godinich, Jr.* at 3.

282. The Court finds the practice of reaching mutual agreements to excuse certain jurors without examination was reasonable strategy by both parties, and a means for parties to avoid using limited peremptory strikes.

283. The Court finds the manner in which trial counsel conducted jury selection was reasonable trial strategy.

70

02913

284. The Court finds the applicant fails to present credible or persuasive evidence that trial counsel were deficient or harmful in the manner in which they conducted jury selection.

---

## ELEVENTH GROUND FOR RELIEF:
### DEATH SENTENCE'S ALLEGED VIOLATION OF EQUAL PROTECTION, DUE PROCESS, AND CRUEL & UNUSUAL PUNISHMENT CLAUSES

---

285. On January 3, 2014, the applicant filed a pretrial motion to preclude the death penalty as a sentencing option, arguing it was arbitrarily imposed because the decision as to which defendant is subject to the death penalty varies between counties in Texas; the trial court denied the applicant's motion on February 12, 2014 (IV C.R. at 920, 928).

286. The applicant did not reurge his argument that the death penalty is arbitrarily imposed by county as point of error on direct appeal.

287. The Court finds the applicant's reliance on the findings of the Scott Phillips report *Continued Racial Disparities in the Capital of Capital Punishment: the Rosenthal Era* are misplaced and that the findings are irrelevant to the applicant's case because: the time frame of the Phillips report is inapplicable to the applicant's case; the victim in the applicant's case is neither white nor female; and the Phillips report does not take into account the egregious facts of the applicant's case and the applicant's multiple violent extraneous offenses.

288. The Court finds the applicant's reliance on the findings of the Raymond Paternoster report *Racial Disparity in the Case of Duane Edward Buck* are misplaced and that the findings are irrelevant to the applicant's case because: the time frame of the Paternoster report is inapplicable to the applicant's case; and the evidence presented at the applicant's trial was markedly different from that in Buck's.

289. The Court finds the applicant fails to show the Texas death penalty scheme is unconstitutional as applied to him based on his arguments of a long-past prior racial segregation in the Harris County public school system; the Klu Klux Klan successfully sponsoring political candidates in the 1920's; a 1900 case in which a defendant's motion to quash was improperly denied because African-Americans were excluded from jury service; African-American attorneys allegedly being excluded from the Houston Bar Association almost six decades

. 62914

ago; the alleged display of "Jim Crow art" or artwork with slavery images in a Harris County District Court jury room and the federal courthouse; pretrial incarceration statistics for Hispanics and African-Americans in Harris County; and purported personal indiscretions of former District Attorney Chuck Rosenthal.

290. The Court finds that despite the applicant's arguments of discrimination claims arising from *Batson v. Kennedy*, 476 U.S. 79 (1986), in other Harris County death penalty cases, the applicant neither pleads nor proves a *Batson* error in his own case.

291. The Court finds the applicant fails to show the exercise of prosecutorial discretion in the Harris County District Attorney's Office's decision to seek the death penalty in his case violated his constitutional rights.

292. The Court finds the applicant fails to show disparate treatment between himself and other similarly situated defendants in Harris County.

293. The Court finds the applicant fails to show the Texas death penalty scheme is facially unconstitutional or unconstitutional as applied to him, based on the bare allegation that the Harris County District Attorney's Office sought the death penalty against the applicant because he is Hispanic or that he received the death penalty because he is Hispanic.

294. The Court finds the applicant fails to prove the Texas death scheme was enacted or maintained because of any anticipated discriminatory effect in violation of equal protection, and fails to prove the sentencing scheme, as applied to him, was discriminatory in violation of equal protection.

295. The Court finds the Court of Criminal Appeals has repeatedly held the Texas death penalty scheme constitutional under both U.S. CONST. amends. VIII and XIV and TEX. CONST. art. I, §§ 10, 13, and 19. *See Saldano v. State*, 232 S.W.3d 77, 107-8, n.30 (Tex. Crim. App. 2007)(declining to revisit previous holdings of constitutionality of Texas death penalty scheme under United States and Texas Constitutions)(citing *Perry v. State*, 158 S.W.3d 438, 446-9 (Tex. Crim. App. 2004)); *Russell v. State*, 155 S.W.3d 176, 183 (Tex. Crim. App. 2005); *Escamilla v. State*, 143 S.W.3d 814, 827-9 (Tex. Crim. App. 2004); *Rayford v. State*, 125 S.W.3d 521, 532 (Tex. Crim. App. 2003); *Hughes v. State*, 24 S.W.3d 833, 844 (Tex. Crim. App. 2000); *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000); *Chamberlain v. State*, 998 S.W.3d 230, 238 (Tex.

02915

Crim. App. 1999); *Pondexter v. State,* 942 S.W.2d 577, 587 (Tex. Crim. App. 1996)).

---

## TWELFTH GROUND FOR RELIEF:
### ALLEGED VIOLATION OF CONSTITUTIONAL RIGHTS AS A RESULT OF 10-12 RULE

---

296. On January 3, 2014, the applicant filed a pretrial motion to hold the Texas death penalty scheme unconstitutional and complained about the 10-12 rule which prohibits the trial court from instructing the jury as to the effect of a single "no" vote; the applicant's motion was overruled by the trial court on February 12, 2014 (IV C.R. at 941-56, 1005-27).

297. The Court finds the applicant did not present his complaint about the 10-12 rule on direct appeal.

298. The Court finds the Court of Criminal Appeals has repeatedly rejected a capital defendant's challenge to the constitutionality of art. 37.071 §(2)(a), based on allegations it misled the jury on the effect of a single "no" vote. *See Williams v. State,* 301 S.W.3d 675, 694 (Tex. Crim. App. 2009); *Druery v. State,* 225 S.W.3d 491, 509 (Tex. Crim. App. 2007); *Prystash v. State,* 3 S.W.3d 522, 536 (Tex. Crim. App. 1999).

299. The Court finds the Court of Criminal Appeals has held Texas' death penalty scheme is critically different from the unconstitutional capital sentencing schemes in *Mills v. Maryland,* 486 U.S. 367 (1988), and *McKoy v. North Carolina,* 494 U.S. 433 (1990). *Hughes v. State,* 897 S.W.2d 285, 300-301 (Tex. Crim. App. 1994).

300. The Court finds the applicant fails to show the Court of Criminal Appeals' interpretation of *Mills* and *McKoy* is unconstitutional.

301. The record reflects that during his punishment argument to the jury, Nunnery explained the effect of the jury's failure to agree on the special issues despite the State's objections (XLIII R.R. at 7-9).

302. The record reflects that during the trial court's general voir dire, each venire panel was informed by the trial court of their failure to agree on the special issues, and specifically that if a jury answered the special issues in any other way than "yes" and "no", a life sentence would result (IV R.R. at 17; V R.R. at

62916

20; VII R.R. at 23; VIII R.R. at 21; IX R.R. at 24; X R.R. at 20; XI R.R. at 21; XII R.R. at 26-27; XIII R.R. at 21; XIV R.R. at 25; XV R.R. at 24; XVI R.R. at 23; XVII R.R. at 23; XVIII R.R. at 24; XIX R.R. at 22; XX R.R. at 22-23; XXI R.R. at 20).

303. The Court finds the proffered affidavits of jurors Armstrong, Birney, Norwood and Sullivan are not dispositive on the merits of the applicant's claims regarding the effect of the 10-12 rule. *See Applicant's Exs. 18-19, 21, 23.*

304. The Court finds the proffered affidavits of jurors Armstrong, Birney, Norwood and Sullivan cannot be considered pursuant to TEX. R. EVID. 606(b) because they concern mental processes and do not establish that jurors considered any impermissible extraneous influences or impropriety in their deliberations. *Id.*

305. Notwithstanding the preclusion of jurors Birney and Sullivan's proffered affidavits per TEX. R. EVID. 606(b), the record reflects the trial court specifically instructed these jurors that if the defendant were found guilty of capital murder, there were only two possible punishments: life without parole or the death penalty, and that if the jury returned any answer other than a unanimous "yes" to the first special issue and "no" to the second special issue, then a life sentence would result (XIII R.R. at 30; XVI R.R. at 30-31).

---

### THIRTEENTH GROUND FOR RELIEF:
### DEATH SENTENCE ALLEGEDLY ARBITRARILY AND CAPRICIOUSLY ASSIGNED BASED ON JURY'S ANSWER TO FIRST SPECIAL ISSUE AND THE LACK OF DEFINITIONS FOR KEY TERMS

---

306. On January 3, 2014, the applicant filed a pretrial motion to declare the Texas death penalty scheme unconstitutional, in part, based on the absence of definitions for terms in the first special issue and the alleged failure to narrow the class of death-eligible defendants; the applicant's motion was overruled by the trial court on February 12, 2014 (IV C.R. at 933-34, 940).

307. The Court finds that on direct appeal, the applicant did not complain the first special issue allegedly failed to narrow the class of death-eligible defendants, or that his sentence was arbitrary and capricious because of allegedly unconstitutionally vague definitions of key terms in the first special issue.

74

308. The Court finds the Court of Criminal Appeals has consistently and repeatedly held the terms "deliberately," "probability," "criminal acts of violence" and "continuing threat to society" require no special definitions, and TEX. CODE CRIM. PROC. art. 37.071 is not unconstitutional for lack of such definitions. *See Blue v. State,* 125 S.W.3d 491, 503 (Tex. Crim. App. 2003).

309. The Court finds the Texas death penalty scheme properly narrows the class of death-eligible defendants at guilt, rather than through the special issues at punishment. *See Bell v. State,* 938 S.W.2d 35, 53-54 (Tex. Crim. App. 1996).

---

### FOURTEENTH GROUND FOR RELIEF:
### DEATH SENTENCE ALLEGEDLY UNCONSTITUTIONAL FOR LIMITING THE EVIDENCE THE JURY COULD CONSIDER MITIGATING

---

310. On January 3, 2014, the applicant filed a pretrial motion to declare the Texas death penalty scheme unconstitutional, in part, based on an impermissible limitation of evidence the jury could consider mitigating; the applicant's motion was overruled by the trial court on February 12, 2014 (IV C.R. at 941-56).

311. The Court finds on direct appeal, the applicant did not complain his sentence was unconstitutional due to an impermissible limitation of the evidence the jury could consider mitigating.

312. At the conclusion of the punishment phase, the trial court gave the jury thorough instructions on what the jury could consider in their deliberations of the special issues (XII C.R. at 3334-36, 3338).

313. At the conclusion of the punishment phase, the trial court charged the jury with the statutory mitigation issue, specifically asking the jury whether it found "from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Juan Balderas also known as Apache, that there is sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a sentence of death be imposed?" (*Id.*. at 3343).

75

314. The Court finds the Court of Criminal Appeals has previously rejected the argument that TEX. CODE CRIM. PROC. art. 37.071 unconstitutionally narrows a jury's discretion to consider as mitigating only those factors concerning moral blameworthiness. *Shannon v. State,* 942 S.W.2d 591 (Tex. Crim. App. 1996); *Williams,* 301 S.W.3d at 694.

315. The Court finds that at trial, the applicant did not object to the punishment charge on the basis that it unconstitutionally limited the evidence the jury could consider as mitigating.

316. The Court finds the applicant fails to show the Texas death penalty scheme unconstitutionally prevented his jury from considering as mitigating only evidence that reduces moral blameworthiness.

317. The Court finds the applicant also fails to show the Texas death penalty scheme is unconstitutional as applied to him.

## II.
## CONCLUSIONS OF LAW

**FIRST AND SECOND GROUNDS FOR RELIEF: STATE'S ALLEGED PRESENTATION OF FALSE EVIDENCE THROUGH WITNESS ISRAEL DIAZ**

1.  The applicant fails to demonstrate by a preponderance of evidence that the State presented false testimony at trial via Israel Diaz, or that Diaz's testimony as a whole left a false impression with the jury. *See Ex parte Weinstein,* 421 S.W.3d 656, 665-67 (Tex. Crim. App. 2014)(citing *Chavez,* 371 S.W.3d 200, 207-10 (Tex. Crim. App. 2012)).

2.  In the alternative, the applicant fails to demonstrate by a preponderance of the evidence that Diaz's trial testimony was material to the jury's verdict, in light of the totality of the State's guilt evidence against the applicant. *Id.* at 665-69.

3.  The applicant fails to demonstrate by a preponderance of the evidence that his constitutional rights were violated because the prosecution obtained his guilty verdict through the knowing use of false evidence via Israel Diaz. *Giglio v. United States,* 405 U.S. 150 (1972); *Napue v. Illinois,* 360 U.S. 264 (1959).

4.  The applicant fails to demonstrate by a preponderance of the evidence that his constitutional rights were violated because the prosecution obtained his guilty

verdict through the unknowing use of false evidence via Israel Diaz. *See Ex parte Chabot*, 300 S.W.3d 768 (Tex. Crim. App. 2009); *see Chavez*, 371 S.W.3d 200.

### THIRD GROUND FOR RELIEF: STATE'S ALLEGED FAILURE TO DISCLOSE IMPEACHMENT INFORMATION REGARDING WITNESS ISRAEL DIAZ

5. The applicant fails to demonstrate by a preponderance of the evidence that the State violated the precepts of *Brady v. Maryland*, 373 U.S. 863 (1963) as he fails demonstrate: (1) the State suppressed the 23-pages of Diaz pretrial interview notes now marked as Applicant's Exhibit 57 from the defense prior to trial; (2) that the notes contained in Applicant's Exhibit 57 were favorable to the defense; or (3) that the notes contained in Applicant's Exhibit 57 were material. *See Little v. State*, 991 S.W.2d 864, 866 (Tex. Crim. App. 1999).

### FOURTH GROUND FOR RELIEF: ALLEGED INEFFECTIVE ASSISTANCE OF COUNSEL IN GUILT/INNOCENCE PHASE

6. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance during either phase of trial, such that their performance was not in accord with prevailing professional norms, when their pretrial investigation included more than 70 hours reviewing the State's prosecution files; speaking with the applicant; interviewing witnesses; filing pretrial motions; and retaining a team of investigators and experts in the fields of criminal investigations, mitigation investigations, ballistics, eyewitness identification, mental health, gangs, prison systems, child abuse and brain development; and keeping in continued communication with these experts. *See Strickland v. Washington*, 466 U.S. 668, 700 (1984)(ineffective assistance of counsel claim denied for failure to demonstrate deficient performance); *Ex parte McFarland*, 163 S.W.3d 743, 754-60 (Tex. Crim. App. 2005)(ineffective assistance of counsel claim denied for failure to demonstrate deficient performance; trial counsel conducted an adequate pretrial investigation when he read a leading treatise, reviewed the State's files, filed multiple pretrial motions, hired an investigator, and consulted with other attorneys).

7. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance during either phase of trial, such that their performance was not in accord with prevailing professional norms, when their trial performance included conducting individual voir dire examinations on prospective jurors; extensively cross-examining witnesses; making relevant objections; preserving error; pursuing a motion to suppress the eyewitness

02920

identification; presenting evidence on the applicant's behalf; making persuasive jury arguments; objecting to the court's charge; and requesting specific jury instructions. *See Strickland*, 466 U.S. at 694, 700.

8. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance by failing to present testimony at trial from Anali Garcia, Jesus Balderas, or Ileana Cortes, such that counsels' performance was not in accord with prevailing professional norms or that there is a reasonable probability the outcome of the trial would have been different had these witnesses testified, when: (a) counsel interviewed these witnesses prior to trial; (b) counsel determined the testimony of these witnesses would not be beneficial or useful for the defense; and (c) counsel believed the State could thrive on the weaknesses and biases of these witnesses. *Id., see also Ex parte Kunkle*, 852 S.W.2d 499, 506 (Tex. Crim. App. 1993)(holding counsel's strategic choices made after thorough investigation of law and facts virtually unchallengeable under Sixth Amendment); *see Ex parte White*, 160 S.W.3d 46, 52 (Tex. Crim. App. 2004)(applicant must show the witness' testimony would have benefitted the defense).

9. The applicant fails to demonstrate by a preponderance of evidence that trial counsel rendered ineffective assistance by failing to investigate and present an alibi defense during guilt/innocence, such that counsels' performance was not in accord with prevailing professional norms or that there is a reasonable probability the outcome of the trial would have been different had the defense pursued an alibi defense, when: (a) the applicant himself never provided alibi information for counsel to pursue; (b) the alibi information presented by the applicant's family on the eve of trial revealed either uncooperative witnesses or those who counsel believed lacked credible or personal knowledge; (c) the proffered affidavits from Jose Perez and Jesus Balderas fail to provide personal accounts of the applicant's whereabouts on the night of the offense; (d) Anali Garcia and Octavio Cortes did not provide persuasive alibi testimony in the post-conviction evidentiary hearing; and (e) trial counsels made a strategic decision to only present testimony from witnesses counsel "deemed credible or beneficial" and not those "who could not account for the date and time of the offense in any credible way, or who only possessed information by means of hearsay or innuendo." *See Strickland*, 466 U.S. at 694, 700; *Kunkle*, 852 S.W.2d at 506; *see White*, 160 S.W.3d at 52.

02321

10. The applicant fails to demonstrate by a preponderance of evidence that trial counsel rendered ineffective assistance by failing to present the testimony of Jose Perez, such that counsels' performance was not in accord with prevailing professional norms or that there is a reasonable probability the outcome of the trial would have been different had Perez's testimony been presented, when: (a) Perez fails to account for the applicant's whereabouts in his proffered habeas affidavit; and (b) counsel elicited substantially similar testimony from Walter Benitez compared to what Perez proffered in his habeas affidavit. *See Strickland*, 466 U.S. at 694, 700; *see White*, 160 S.W.3d at 52.

11. The applicant fails to demonstrate by a preponderance of evidence that trial counsel rendered ineffective assistance by failing to present the testimony of Yancy Escobar, such that counsels' performance was not in accord with prevailing professional norms or that there is a reasonable probability the outcome of the trial would have been different had Escobar's testimony been presented, when: (a) Escobar chose to watch the proceedings, instead of testifying on the applicant's behalf; and (b) counsel elicited substantially similar testimony from other witnesses compared to what Escobar proffered in her habeas affidavit. *See Strickland*, 466 U.S. at 694, 700; *see White*, 160 S.W.3d at 52.

12. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance by failing to investigate and present evidence of the applicant's innocence, such that counsels' performance was not in accord with prevailing professional norms, when: (a) the applicant did not provide information that assisted the defense with an innocence strategy; (b) counsel cross-examined the credibility and reliability of State's eyewitnesses; (c) counsel attacked the credibility and highlighted the bias of Israel Diaz; and (d) counsel presented the testimony of the applicant's innocence and an alternate shooter via Walter Benitez. *See Strickland*, 466 U.S. at 694, 700; *see also Kunkle*, 852 S.W.2d at 506.

13. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance by failing to call Celeste Munoz as a guilt/innocence witness, such that counsels' performance was not in accord with professional norms or that there is a reasonable probability the outcome of the trial would have been different had Munoz's testimony been presented, when the trial court ruled that Munoz's testimony would open the door to the applicant's extraneous offenses during guilt/innocence. *See Strickland*, 466 U.S. at 694, 700; *see Busby v. State,* 990 S.W.2d 263, 268 (Tex. Crim. App.

02322

1999)(holding appellate court's judicial scrutiny of counsel's performance must be highly deferential when reviewing claim of ineffective assistance and representation not to be judged by hindsight).

14. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance by failing to call Dr. Roy Malpass to testify as an eyewitness identification expert in front of the jury, such that counsels' performance was not in accord with professional norms, when the record is abundantly clear counsel was cautiously avoiding opening the door to the applicant's extraneous offenses during guilt/innocence; counsels' decision to not present Dr. Malpass' testimony to the jury despite the court's preliminary ruling is indicative of a strategic decision that to present such testimony would not be in the applicant's best interest. *See Strickland,* 466 U.S. at 694, 700; *see Garcia v. State,* 57 S.W.3d at 436, 440 (Tex. Crim. App. 2001)(holding that reviewing court "commonly will assume a strategic motivation if any can possibly be imagined," and will not find challenged conduct constitutes deficient performance "unless conduct was so outrageous that no competent attorney would have engaged in it.").

15. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance, such that counsels' performance was not in accord with professional norms, in the manner by which they challenged the State's eyewitness identification evidence. *See Busby,* 990 S.W.2d at 268.

16. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance by failing to investigate juror misconduct as a grounds for a motion for new trial, such that counsels' performance was not in accord with professional norms or that there is a reasonable probability the results of the proceeding would have been different, when: (a) the record reflects trial counsel questioned a deputy and two jurors on the record as to any potential outside influences stemming from the bus-waving incident, moved for a mistrial, and were overruled by the trial court; and (b) the Court of Criminal Appeals ruled the bus-waving incident was not an improper outside influence. *See Ex parte Maldonado,* 688 S.W.2d 114, 116 (Tex. Crim. App. 1985)(applicant in post-conviction habeas proceeding has the burden of proving facts that would entitle him to relief).

17. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance in any way, such that counsels' performance was not in accord with professional norms or that there is a

62923

reasonable probability the results of the proceeding would have been different, given the totality State's evidence of guilt against the applicant during guilt/innocence.

**FIFTH GROUND FOR RELIEF: ALLEGED VIOLATION OF RIGHT TO FAIR TRIAL AS A RESULT OF JUROR MISCONDUCT AND EXPOSURE TO OUTSIDE INFLUENCES**

18. The applicant fails to demonstrate by a preponderance of the evidence that he was prejudiced or that the results of his trial were affected in any way by the hotel accommodations secured for the jurors. *See Maldonado*, 688 S.W.2d at 116.

19. Because the applicant's claim regarding the alleged improper outside influence stemming from the bus-waving incident was raised and rejected on direct appeal, the applicant is procedurally barred from asserting the same ground in the instant proceeding. *Ex parte Schuessler*, 846 S.W.2d 850, 852-53 (Tex. Crim. App. 1993)(recognizing "law of the case" doctrine such that once a specific question of law has been finally resolved in a case, it will not be reconsidered in subsequent proceedings of the same case).

20. The applicant fails to demonstrate by a preponderance of the evidence that he was prejudiced or that the results of his trial were affected in any way by Juror Armstrong's Facebook entries before, during, or after trial. *See Maldonado*, 688 S.W.2d at 116; *see Ocon v. State*, 284 S.W.3d 880, 885 (Tex. Crim. App. 2009)(defendant not entitled to mistrial after defense attorney overheard juror's telephone conversation with unknown person because there was no evidence the juror was biased as the result of the improper conversation).

21. The applicant's proffered juror affidavits are irrelevant, speculative, inadmissible, and have no bearing on the applicant's instant habeas claims. *See* TEX. R. EVID. 606(b)(prohibiting a juror from testifying about "any matter or statement occurring during the jury's deliberations" except that a juror may testify about "whether any outside influence was improperly brought to bear upon any juror" or "to rebut a claim that the juror was not qualified to serve"); *see McQuarrie v. State*, 380 S.W.3d 145, 154 (Tex. Crim. App. 2012)("outside influence" is something originating from source outside of jury room and other than from jurors themselves); *see also Coyler v. State*, 428 S.W.3d 117 (Tex. Crim. App. 2014)(external events or information, unrelated to the trial which cause jurors to feel personal pressure or hasten deliberations are not "outside

influences" because those pressures are caused by a juror's personal and emotional reaction to information that is irrelevant to trial issues).

22. The applicant fails to demonstrate by a preponderance of the evidence that he was denied the right to a fair and impartial jury because the jury received or considered evidence other than what was presented at trial. *See* TEX. R. APP. P. 21.3(f)(a defendant must be granted a new trial "when after retiring to deliberate, the jury has received other evidence"); *Bustamante v. State*, 106 S.W.3d 738, 743 (Tex. Crim. App. 2003)(to establish juror misconduct, applicant must show the evidence was received by the jury, and the evidence was detrimental or adverse to the defendant).

23. The applicant fails to demonstrate by a preponderance of evidence facts rebutting the presumption that jury followed the trial court's instructions. *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005).

**SIXTH GROUND FOR RELIEF: ALLEGED INEFFECTIVE ASSISTANCE OF COUNSEL IN PUNISHMENT PHASE**

24. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance during the punishment phase, such that their performance was not in accord with prevailing professional norms, when counsel retained multiple expert and mitigation witnesses, presented 18 defense witnesses, cross-examined the State's punishment witnesses, made relevant objections, preserved error, made persuasive jury arguments, and presented extensive mitigation evidence, much of which is the same evidence the applicant now claims was lacking. *See Strickland*, 466 U.S. at 694.

25. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance of counsel by failing to investigate and present testimony from Jesus Balderas, Anali Garcia, Octavio Cortes, German Enriquez, Yancy Escobar, Ivan Hernandez, Jose Perez, or Maria Guadalupe Francisco Reyes during the punishment phase, such that their performance was not in accord with prevailing professional norms or that there is a reasonable probability the outcome of the trial would have been different had counsel presented these witnesses, when: (a) their respective social history testimonies would have been cumulative of the testimony presented through other witnesses; (b) the State's punishment evidence of extraneous capital murders, aggravated assault, assault on a public servant, aggravated kidnapping, arson, and juvenile criminal history, and multiple bad acts was particularly strong; (c) counsel

interviewed at least five of these witnesses and determined their testimony would not be beneficial to the applicant's defense; and (d) the applicant and his family hampered counsels' investigation and preparation. *See Strickland*, 466 U.S. at 694, 700; *see McFarland*, 163 S.W.3d at 754-60; *see Kunkle*, 852 S.W.2d at 506; *see also Tucker v. Johnson*, 242 F.3d 617, 622-24 (5th Cir. 2001)(rejecting claim of ineffective assistance of counsel where defendant argued that counsel should have presented additional evidence of abuse; recognizing that defendant essentially arguing counsel should have presented *stronger* mitigating case; distinguishing *Williams v. Taylor*, 529 U.S. 362, 369-72 (2000)).

26. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance by failing to question Vicky Reyes, Juan Balderas, Sr., Walter Benitez, Daniella Chavez, Marina Reyes Mirafuentes, Paloma Reyes Mirafuentes, or Celeste Munoz more extensively, such that counsels' performance was not in accord with prevailing professional norms or that there is a reasonable probability the outcome of the trial would have been different with more extensive questioning, when counsel presented substantial testimony through these and other witnesses of the applicant's violent and abusive childhood surroundings, familial history of mental health illness, impetuous and unstable mother, positive character, support system, positive behavior while in custody or under supervision, and role as a "protector." *See Strickland*, 466 U.S. at 694, 700; *see McFarland*, 163 S.W.3d at 754-60; *see Kunkle*, 852 S.W.2d at 506; *see also Tucker*, 242 F.3d at 622-24.

27. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance during the punishment phase, such that their performance was not in accord with prevailing professional norms, when counsel presented expert testimony to explain the impact and ramifications of the applicant's childhood and upbringing on the applicant, his mental health, and his behaviors, and to correlate this evidence to the mitigation special issue. *See Blott*, 588 S.W.2d 588, 592 (Tex. Crim. App. 1979)(reviewing court will not "second-guess through hindsight" the strategy of counsel, nor will fact that another attorney might have pursued different course support finding of ineffectiveness); *see also Solis v. State*, 792 S.W.2d 95, 100 (Tex. Crim. App. 1990)(reviewing court will not use "hindsight to second guess a tactical decision" made by trial counsel that does not fall below objective standard of reasonableness).

62926

28. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance during the punishment phase, such that their performance was not in accord with prevailing professional norms, when counsel presented both expert testimony and lay testimony of people who positively interacted with the applicant while he was in custody or under court supervision to show a lack of future danger. *See Blott*, 588 S.W.2d at 592; *see also Solis*, 792 S.W.2d at 100.

29. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance by failing to present evidence that the applicant was in the process of disassociating from LTC, such that their performance was not in accord with prevailing professional norms, when: (a) counsels' investigation showed the only evidence of disassociation was the applicant's own uncorroborated statement; and (b) the applicant did not want to testify at trial. *See Kunkle*, 852 S.W.2d at 506; *see Harris v. Cockrell*, 313 F.3d 238 (5th Cir. 2002), *cert. denied*, 494 U.S. 1090 (holding counsel not ineffective for allegedly failing to investigate and present mitigation evidence in light of weakness of evidence defendant argues should have been presented).

30. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance by failing to investigate and present evidence rebutting the extraneous offense evidence presented by the State, such that their performance was not in accord with prevailing professional norms, when: (a) counsel did conduct a thorough punishment investigation; (b) counsel interviewed witnesses and presented testimony regarding LTC membership, hierarchy, and operations; and (c) counsel extensively cross-examined State's witnesses. *See Kunkle*, 852 S.W.2d at 506; *see Solis*, 792 S.W.2d at 100.

31. In the alternative, the State is not required to prove extraneous offenses beyond a reasonable doubt, and the applicant fails to demonstrate by a preponderance of the evidence the specific effect of any of the extraneous evidence on the outcome of his proceedings. *See Ladd v. State*, 3 S.W.3d 547, 574-5 (Tex. Crim. App. 1999)(State is not required to prove extraneous offenses beyond a reasonable doubt); *see McFarland*, 163 S.W.3d at 754-60.

33. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance by failing to object to and preserve error on portions of the State's cross-examinations of Dr. Matthew Mendel and Dr. Matthew Brams and closing argument that the applicant now claims were comments on the applicant's failure to testify, when counsel did not construe the

State's questioning or argument to be as such, and believed them to be appropriate attacks on the witness' credibility. *See Johnson v. State,* 629 S.W.2d 731 (Tex. Crim. App. 1981)(holding isolated instances of failure to object do not constitute ineffective assistance of counsel); *see Howard v. State,* 153 S.W.3d 382, 385-6 (Tex. Crim. App. 2004)(State's argument that defendant did not show remorse was proper summation of evidence and not a comment on the defendant's failure to testify when evidence showed defendant had told officer he had no remorse).

34. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance by failing to object to and preserve error on the trial court's denial of funding to transport defense witnesses from Mexico to the United States, such that counsels' performance was not in accord with prevailing professional norms or that there is a reasonable probability the outcome of the trial would have been different had counsel preserved the alleged error, when: (a) the trial court had no subpoena power over these witnesses; (b) telecommunication technology was made available and used to present the testimony of theses witnesses to the jury; (c) both parties were able to question the witnesses presented via telecommunication; and (d) defense counsel offered to pay the expenses to transport the witnesses from Mexico to the United States, but the witnesses could not coordinate plans amongst themselves. *See Johnson,* 629 S.W.2d 731; *see White,* 160 S.W.3d at 53-55 (applicant must show trial judge would have committed error in overruling trial counsel's objection to prevail on ineffective assistance claim for failure to object); *see also Vaughn v. State,* 931 S.W.2d 564, 566-67 (Tex. Crim. App. 1996).

35. Although trial counsel learned trial testimony from witnesses in Mexico was being skewed by interference from the applicant's girlfriend, counsel was able to present the intended evidence of the applicant's childhood, his mother, and his mistreatment and sexual abuse by his mother's boyfriend through witnesses apart from those in Mexico, and as such, the applicant fails to show harm necessary to warrant relief on his claim that trial counsel should have preserved the court's refusal to grant funds for witnesses to travel from Mexico. *See Strickland,* 466 U.S. at 694, 700.

36. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel Alvin Nunnery rendered ineffective assistance by allegedly engaging in bad behavior that alienated the jury, was not in accord with professional norms, or affected the outcome of the proceeding, when: (a) the record does not reflect that Nunnery made any derogatory comments to the State's prosecutor or

· 02928

racially-motivated comment within earshot of the jury; (b) when looked at in its entirety, Nunnery's jury argument properly summarized the evidence, made deductions from evidence, argued the special issues, and gave deference to the jury; (c) Nunnery made a strategic decision to remind jurors of their oaths given the juror notes sent out during guilt/innocence; (d) the applicant's proffered juror affidavits are speculative and inadmissible; and (e) in light of the totality of the State's punishment evidence against the applicant. *See Garcia,* 57 S.W.3d at 440; *see Orona v. State,* 791 S.W.2d 125, 130 (Tex. Crim. App. 1990)( any error in argument had no impact in light of other evidence); *see* TEX. R. EVID. 606(b); *see Coyler,* 428 S.W.3d 117.

37. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance in any way, such that counsels' performance was not in accord with professional norms or that there is a reasonable probability the results of the proceeding would have been different, given the State's overwhelming punishment evidence against the applicant. *See Strickland,* 466 U.S. at 694, 700; *see Busby,* 990 S.W.2d at 268.

**SEVENTH GROUND FOR RELIEF: STATE'S ALLEGED PRESENTATION OF FALSE EVIDENCE THROUGH WITNESS CHRISTOPHER POOL**

38. The applicant fails to demonstrate by a preponderance of the evidence that Christopher Pool's testimony as a whole left a false impression with the jury. *See Weinstein,* 421 S.W.3d at 665-67.

39. In light of the totality of the State's evidence of guilt against the applicant, the applicant fails to demonstrate by a preponderance of the evidence that Pool's trial testimony was material to the jury's verdict. *Id.* at 665-69; *see also Ex parte Ghahremani,* 332 S.W.3d 470, 478 (Tex. Crim. App. 2011)(testimony is material if there is "a reasonable likelihood" the false testimony affected jury's judgment).

**EIGHTH GROUND FOR RELIEF: ALLEGED INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILURE TO TIMELY AND COMPETENTLY ASSERT APPLICANT'S RIGHT TO A SPEEDY TRIAL**

40. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance by failing to employ reasonable strategy in the timing of their assertion of the applicant's right to a speedy trial, such that counsels' performance was not in accord with prevailing professional norms, given the totality of the circumstances and evidence, including the assignment of

different State's prosecutors to the case, changes to who presided as trial court judge, ongoing negotiations between the parties, voluminous records, and the applicant's own behavior. *See Strickland,* 466 U.S. at 694; *see White,* 160 S.W.3d at 55.

41. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance in the timing of their motion to dismiss the indictment for lack of a speedy trial, such that there is a reasonable probability the outcome of the proceeding would have been different had the motion been urged earlier, in light of the credible affidavits of trial counsel and counsels' assertions that no intended, beneficial defense witnesses were rendered unavailable due to the passage of time. *Id.* at 700.

42. The applicant's post-conviction displeasure with counsels' strategy and timing in filing the motion to dismiss the indictment for lack of speedy trial does not warrant a finding of ineffective assistance. *See Blott,* 588 S.W.2d at 592; *see also Solis,* 792 S.W.2d at 100.

NINTH GROUND FOR RELIEF: ALLEGED INEFFECTIVE ASSISTANCE OF COUNSEL DURING JURY SELECTION

43. The applicant fails to demonstrate by a preponderance of evidence that trial counsel rendered ineffective assistance, such that counsels' performance was not in according with prevailing professional norms, by failing to commit prospective jurors to whether they would consider evidence of sexual abuse as mitigation. *See Moore v. State,* 999 S.W.2d 385 (Tex. Crim. App. 1999)(holding defense counsel improperly attempted to bind juror as to whether she would consider age of defendant as mitigating); *Curry v. State,* 910 S.W.2d 490 (Tex. Crim. App. 1995)(holding jury need not agree as to what evidence is mitigating, only that jury be given adequate vehicle to consider and give effect to mitigating evidence).

44. The applicant fails to demonstrate by a preponderance of the evidence that trial counsel rendered ineffective assistance by failing to employ reasonable strategy during jury selection, such that counsels' performance was not in accord with prevailing professional norms or that there is a reasonable probability the outcome of the proceeding would have been different had counsel questioned individual jurors on their views of sexual abuse evidence as potential mitigation. *Strickland,* 466 U.S. at 700; *see Solis,* 792 S.W.2d at 100.

02930

45. The applicant's post-conviction displeasure with the strategy and manner in which trial counsel conducted voir dire employed does not warrant a finding of ineffective assistance of counsel. *See Blott*, 588 S.W.2d at 592; *see also Solis*, 792 S.W.2d at 100.

46. In light of the trial court's thorough jury instructions at the conclusion of the punishment phase regarding the evidence the jury is to consider during their deliberation, the applicant fails to demonstrate by a preponderance of the evidence that he suffered any harm as a result of trial counsels' voir dire strategy. *See Strickland*, 466 U.S. at 700.

47. The applicant's proffered juror affidavits are not admissible evidence of any improper outside influence and have no bearing on the applicant's instant claim. *See* TEX. R. EVID. 606(b).

**TENTH GROUND FOR RELIEF: ALLEGED VIOLATION OF APPLICANT'S EQUAL PROTECTION RIGHTS DUE TO COUNSELS' AGREEMENTS TO EXCLUDE AFRICAN-AMERICAN JURORS**

48. Because the applicant affirmatively stated he had no objection to the release of every potential juror the parties agreed to excuse without examination, he is procedurally barred from asserting the instant ground for relief. *See* Tex. R. App. P. 33.1(a); *Hodge*, 631 S.W.2d at 757; *see also Hughes*, 191 F.3d at 614 (holding that defendant's failure to comply with Texas contemporaneous objection rule constituted adequate and independent state-law procedural ground sufficient to bar federal habeas).

49. In the alternative, the applicant's instant ground lacks merit as the decisions of trial counsel during jury selection were clearly a matter of strategy, and irrespective of the race of the potential jurors. *But c.f. Mata v. Johnson*, 99 F.3d 1261, 1269-1270 (5th Cir. 1996), *vacated on other grounds*, 105 F.3d 209 (5th Cir. 1997)(equal protection violation where all eight prospective black jurors were excused from the venire panel by agreement of parties); *see White*, 160 S.W.3d at 55.

**ELEVENTH GROUND FOR RELIEF: DEATH SENTENCE'S ALLEGED VIOLATION OF EQUAL PROTECTION, DUE PROCESS, AND CRUEL & UNUSUAL PUNISHMENT CLAUSES**

50. Given that the applicant complained in a pretrial motion that the death penalty was arbitrarily imposed because the decision as to which defendant is subject to

. 02931

the death penalty varies between Texas counties, but was overruled by the trial court and subsequently failed to re-urge this argument on direct appeal, he is now procedurally barred from asserting the instant ground for relief. *See Ex parte Banks*, 769 S.W.2d 539, 540 (Tex. Crim. App. 1989).

51. In the alternative, the applicant fails to demonstrate by a preponderance of the evidence that his death sentence was unconstitutional under U.S. CONST. amends. VI, VIII and XIV, based on an alleged arbitrary system of administering death penalties in various Texas counties - specifically in Harris County rather than other counties. *See Cantu v. State,* 842 S.W.2d 667, 691-92 (Tex. Crim. App. 1992), *cert. denied,* 509 U.S. 926 (1993)(holding prosecutorial discretion does not render death penalty unconstitutional); *Allen v. State,* 108 S.W.3d 281, 286 (Tex. Crim. App. 2003)(citing *Bell v. State,* 938 S.W.2d 35, 55 (Tex. Crim. App. 1996); *King v. State,* 953 S.W.2d 266, 274 (Tex. Crim. App. 1997)(declining to reach merits of claim of disparate treatment based on cases being held in different counties; noting there was no empirical data, case law, or other factual basis to support claim)); *see and cf. Morris v. State,* 940 S.W.2d 610, 613-4 (Tex. Crim. App. 1996)(noting possibility of two defendants, who have committed identical murder, receiving different sentences based on differing degrees of mitigating character and background evidence).

52. The applicant fails to demonstrate by a preponderance of the evidence that his death sentence was unconstitutionally based on alleged racial bias. *See Cockrell v. State,* 933 S.W.2d 73, 92-93 (Tex. Crim. App. 1996)(rejecting defendant's claim that certain statistical studies allegedly establish Texas death penalty disproportionately imposed in racially discriminatory manner).

53. The applicant fails to demonstrate by a preponderance of the evidence that the Texas death penalty scheme is unconstitutional as applied to him. *Id.* (holding defendant must show scheme unconstitutional as applied to him to gain relief from death sentence).

54. The applicant fails to demonstrate by a preponderance of the evidence that the Texas death penalty scheme was enacted or maintained because of any anticipated discriminatory effect in violation of equal protection, and that the sentencing scheme, as applied to him, was racially discriminatory in violation of equal protection. *See and cf. McCleskey v. Kemp,* 482 U.S. 920 (1987)(holding a state's legitimate reasons for adopting and maintaining capital punishment precluded inference of discriminatory purpose on part of the state in adopting death penalty sentencing scheme and allowing it to remain in force despite

allegedly discriminatory impact and statistical study showing death penalty imposed more often on black defendants and killers of white victims than on white defendants and killers of black victims).

**TWELFTH GROUND FOR RELIEF: ALLEGED VIOLATION OF CONSTITUTIONAL RIGHTS AS A RESULT OF 10-12 RULE**

55. Because the applicant complained about the 10-12 Rule in a pretrial motion, but was overruled by the trial court, and subsequently failed to re-urge this argument on direct appeal, he is now procedurally barred from asserting the instant ground for relief. *See Banks,* 769 S.W.2d at 540.

56. In the alternative, the applicant fails to demonstrate by a preponderance of the evidence the unconstitutionality of art. 37.071 §(2)(a) based on the allegation it misled the jury as to the effect of a single "no" vote. *See Williams,* 301 S.W.3d at 694; *Druery,* 225 S.W.3d at 509; *Prystash,* 3 S.W.3d at 536.

57. The applicant fails to demonstrate by a preponderance of the evidence that the 10-12 jury instruction violates the United States and Texas Constitutions and the "Supreme Court precedent" of *Mills* and *McKoy. See Hughes,* 897 S.W.2d at 300-01(citing *Rousseau v. State,* 855 S.W.2d 666, 687 (Tex. Crim. App. 1993)(rejecting contention that 37.071 violates decisions in *McKoy* and *Mills)).*

58. The applicant's proffered juror affidavits are not admissible evidence of any improper outside influence and have no bearing on the applicant's instant claim. *See* TEX. R. EVID. 606(b).

59. In light of the trial court's explanation of the effect of the jury's voting during general voir dire and Nunnery's statements to the jury during closing argument, the applicant fails to show that he suffered any harm as a result the 10-12 Rule. *See Maldonado,* 688 S.W.2d at 116.

**THIRTEENTH GROUND FOR RELIEF: DEATH SENTENCE ALLEGEDLY ARBITRARILY AND CAPRICIOUSLY ASSIGNED BASED ON JURY'S ANSWER TO FIRST SPECIAL ISSUE AND THE LACK OF DEFINITIONS FOR KEY TERMS**

60. Because the applicant complained about the unconstitutionality of the death penalty due to the absence of definitions for terms in the first special issue in a pretrial motion, but was overruled by the trial court, and subsequently failed to re-urge this argument on direct appeal, he is now procedurally barred from asserting the instant ground for relief. *See Banks,* 769 S.W.2d at 540.

90

. 02933

61. In the alternative, the applicant fails to show the unconstitutionality of TEX. CODE CRIM. PROC. art. 37.071, due to the lack of special definitions for "deliberately," "probability," "criminal acts of violence" and "continuing threat to society." *See Blue,* 125 S.W.3d at 503 (Tex. Crim. App. 2003)(re-affirming holdings where lack of following definitions not error: "continuing threat to society," "criminal acts of violence," "probability," "society," "personal moral culpability," and "moral blameworthiness").

## FOURTEENTH GROUND FOR RELIEF: DEATH SENTENCE ALLEGEDLY UNCONSTITUTIONAL FOR LIMITING THE EVIDENCE THE JURY COULD CONSIDER MITIGATING

62. Because the applicant complained about the unconstitutionality of the death penalty based on an alleged limiting of evidence the jury could consider mitigating in a pretrial motion, but was overruled by the trial court, and subsequently failed to re-urge this argument on direct appeal, the applicant is now procedurally barred from asserting the instant ground for relief. *See Banks,* 769 S.W.2d at 540.

63. The trial court properly denied the applicant's pretrial motion objecting to the Texas death penalty scheme on the ground that the instruction concerning "moral blameworthiness" allegedly prevented the jury from considering and giving effect to all mitigating evidence; TEX. CODE CRIM. PROC. art. 37.071 does not unconstitutionally narrow a jury's discretion to consider as mitigating only those factors concerning moral blameworthiness. *See Williams,* 301 S.W.3d at 694 (rejecting claim that Texas death penalty scheme unconstitutional based on its definition of mitigating evidence allegedly limiting Eighth Amendment concept of "mitigation" to factors that render defendant less morally blameworthy for commission of capital murder); *see Shannon,* 942 S.W.2d 591 (holding that because consideration of mitigation evidence is open-ended subjective determination by each individual juror, art. 37.071 does not unconstitutionally narrow jury's discretion to factors concerning only moral blameworthiness).

64. In the alternative, the applicant fails to demonstrate by a preponderance of the evidence that the Texas death penalty scheme is unconstitutional as applied to him. *See Cockrell,* 933 S.W.2d at 93 (holding defendant has to show scheme unconstitutional as applied to him to gain relief from death sentence).

. 02934

### III.

In all things, the applicant fails to demonstrate his conviction was improperly obtained or that he is being improperly confined. Accordingly, it is recommended to the Texas Court of Criminal Appeals that habeas relief be **DENIED.**

SIGNED this 20th day of July, 2018.

The Honorable Baylor Wortham
179th District Court, By Assignment
Harris County, Texas

CAUSE NO. 1412826-A

| EX PARTE | § | IN THE 179[th]DISTRICT COURT |
| | § | OF |
| JUAN BALDERAS,<br>Applicant | § | HARRIS COUNTY, TEXAS |

## ORDER

THE CLERK IS HEREBY **ORDERED** to prepare a transcript of all papers in

cause no. 1412826-A and transmit same to the Court of Criminal Appeals, as

provided by Article 11.071 of the Texas Code of Criminal Procedure. The transcript

shall include certified copies of the following documents:

1. the applicant's writ application and exhibits filed in cause no. 1412826-A;

2. the State's original answer and exhibits filed in cause no. 1412826-A;

3. any and all filings including but not limited to motions, proposed orders,
   disclosures, notices, objections, and findings of fact and conclusions of law
   filed in cause no. 1412826-A;

4. all Court orders in cause no. 1412826-A;

5. all sealed exhibits in cause no. 1412826-A;

6. the affidavits of Jerome Godinich, Jr. and Alvin Nunnery filed in cause no.
   1412826-A;

7. the Court's findings of fact, conclusions of law and order in cause no.
   1412826-A;

8. the reporter's records in all post-conviction hearings in cause no. 1412826-A
   (March 31, 2015; October 27, 2015; December 1, 2015; September 8, 2016;
   August 17, 2017; February 22, 2018; May 2, 2018; and May 11, 2018);

9. the reporter's record in cause no. 1412826;

62936

10. the appellate opinion in no. AP-77,036;

11. the clerk's record in cause no. 1412826; and

12. the indictment, judgment, sentence, and docket sheets in cause no. 1412826 and 1412826-A.

THE CLERK IS FURTHER **ORDERED** to send a copy of the court's findings of fact and conclusions of law, including its order, to applicant's habeas counsel: Katherine Black, Natalie Corvington, and Erin Eckhoff, Office of Capital and Forensic Writs; 1700 North Congress Ave., Suite 460; Austin, Texas 78701 and to the State: Farnaz Faiaz Hutchins; Harris County District Attorney's Office, 1301 Prairie, 5th floor, Houston, Texas 77002.

SIGNED this 20th day of July, 2018.

The Honorable Baylor Wortham
179th District Court, By Assignment
Harris County, Texas

94

. 02937



# CHRIS DANIEL
## HARRIS COUNTY DISTRICT CLERK

July 20, 2018

KIM OGG
DISTRICT ATTORNEY
HARRIS COUNTY, TEXAS

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1412826-A in the 179th District Court.

☐ State's Original Answer Filed

☐ Affidavit ,

☐ Court Order Dated ,

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order ,

☒ Other

Sincerely,

L. Hernandez, Deputy
Criminal Post Trial

Enclosure(s) – COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW, AND ORDER



# CHRIS DANIEL
## HARRIS COUNTY DISTRICT CLERK

July 20, 2018

KATHERINE BLACK
OFFICE OF CAPITAL AND FORENSIC WRITS
1700 NORTH CONGRESS AVE., SUITE 460
AUSTIN, TEXAS 78701

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1412826-A in the 179th District Court.

☐ State's Original Answer Filed

☐ Affidavit                    ,

☐ Court Order Dated            ,

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order            ,

☒ Other

Sincerely,

L. Hernandez, Deputy
Criminal Post Trial

Enclosure(s) – COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW, AND ORDER



# CHRIS DANIEL
## HARRIS COUNTY DISTRICT CLERK

July 20, 2018

NATALIE CORVINGTON
OFFICE OF CAPITAL AND FORENSIC WRITS
1700 NORTH CONGRESS AVE., SUITE 460
AUSTIN, TEXAS 78701

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1412826-A in the 179th District Court.

☐ State's Original Answer Filed

☐ Affidavit                ,

☐ Court Order Dated                ,

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order                ,

☒ Other

Sincerely,

L. Hernandez, Deputy
Criminal Post Trial

Enclosure(s) – COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW, AND ORDER



# CHRIS DANIEL
## HARRIS COUNTY DISTRICT CLERK

July 20, 2018

ERIN ECKHOFF
OFFICE OF CAPITAL AND FORENSIC WRITS
1700 NORTH CONGRESS AVE., SUITE 460
AUSTIN, TEXAS 78701

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1412826-A in the 179th District Court.

☐ State's Original Answer Filed

☐ Affidavit ,

☐ Court Order Dated ,

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order .

☒ Other

Sincerely,

L. Hernandez, Deputy
Criminal Post Trial

Enclosure(s) – COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW, AND ORDER

Filed 18 July 31 P1:26
Chris Daniel - District Clerk
Harris County
EA001_148547
By: L HERNANDEZ

CAUSE NO. 1412826-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 179th DISTRICT COURT |
| | § | OF |
| JUAN BALDERAS,<br>Applicant | § | HARRIS COUNTY, TEXAS |

## AGREED MOTION TO SUPPLEMENT THE HABEAS RECORD

Comes now, the State of Texas, by and through the undersigned assistant district attorney, and the applicant, by and through his habeas counsel the Office of Capital and Forensic Writs, and files this agreed motion to supplement the habeas record with electronic communications made between the parties and the Court. In support thereof, the parties would show the following:

On December 28, 2017, the Honorable Baylor Wortham was appointed to preside over the applicant's post-conviction habeas proceedings. Since that time, numerous electronic communications have occurred between the parties and the Court; these communications have included rulings made by the Court. In order to preserve a complete habeas record, the parties respectfully request that the habeas record be supplemented with these communications.

On May 11, 2018, the Court granted the parties' joint oral motion to supplement the record with this electronic correspondence; communications dated up to May 11, 2018 were added to the habeas record as the Court's Exhibit 1 (5 PCW Evidentiary Hearing—May 11, 2018 at Court's Exhibit 1). The parties now seek to supplement the habeas record with electronic

02942

communications occurring between May 11, 2018 and the present. These communications are attached as Exhibits A – E.

Wherefore, premises considered, the parties pray this Honorable Court will grant this agreed motion to supplement the habeas record.

Respectfully submitted,


/s/ *Farnaz F. Hutchins*
FARNAZ F. HUTCHINS
Assistant District Attorney
Harris County District Attorney's Office
500 Jefferson St, Suite 600
Houston, Texas 77002
713-274-5990
TBN: 24063791
Hutchins_Farnaz@dao.hctx.net

/s/ *Erin M. Eckhoff*
ERIN M. ECKHOFF
Attorney for Juan Balderas, Applicant
Office of Capital & Forensic Writs
1700 N. Congress Avenue, Ste 460
Austin, Texas 78701
512-463-8600
TBN: 24090910
Erin.Eckhoff@ocfw.texas.gov

CAUSE NO. 1412826-A

EX PARTE                        §        IN THE 179<sup>th</sup>DISTRICT COURT

                                §        OF

JUAN BALDERAS,                  §        HARRIS COUNTY, TEXAS
Applicant

## ORDER

On this the _____ day of _____, 2018, came to be heard the Agreed

Motion to Supplement the Habeas record, and having duly considered same, this

Court **GRANTS** the motion.

**SIGNED** and **ENTERED** this _____ day of _____, 2018.

_____
Hon. Baylor Wortham
Judge Presiding by Assignment
179th District Court
Harris County, Texas

**Hutchins, Farnaz**

| | |
|---|---|
| **From:** | Baylor Wortham <136judge@co.jefferson.tx.us> |
| **Sent:** | Monday, July 09, 2018 3:45 PM |
| **To:** | Hutchins, Farnaz |
| **Cc:** | 'Dana Marshburn'; 'Katherine Black'; 'Erin Eckhoff'; 'Natalie Corvington'; Reagin, Shawna |
| **Subject:** | RE: Ex parte Juan Balderas |

Everyone,

The rule requires that the "transcript of the hearing" itself be prepared within 30 days, which is apparently what the court reporter did in the June 12th filing. The supplement contained the sealed exhibits and not the transcript itself, so I don't believe that it should have any impact on the original timeline. Once both sides have submitted their proposed findings, the Court will subsequently issue its findings within 15 days.

Sincerely,
Baylor Wortham

**From:** Hutchins, Farnaz [mailto:HUTCHINS_FARNAZ@dao.hctx.net]
**Sent:** Monday, July 09, 2018 3:25 PM
**To:** 'Baylor Wortham' (136judge@co.jefferson.tx.us)
**Cc:** Dana Marshburn (136clerk@co.jefferson.tx.us); Katherine Black (Katherine.Black@ocfw.texas.gov); Erin Eckhoff (Erin.Eckhoff@ocfw.texas.gov); Natalie Corvington (Natalie.Corvington@ocfw.texas.gov); Reagin, Shawna
**Subject:** Ex parte Juan Balderas

Good afternoon Your Honor,

I was writing to seek a point of clarification regarding the due date of our proposed findings of fact and conclusions of law ("FoF/CoL"). According to Your Honor's order in our May 11th evidentiary hearing, in accordance with Article 11.071, the court reporter was to prepare the transcript within 30 days of the hearing, and the parties would have 30 days after the completion of the transcript to prepare our proposed FoF/CoL.

According to the clerk's office, the transcript was filed on June 12th. This would make our FoF/CoL due by the end of the business day this Thursday, July 12th.

Today, I noticed that a second transcript was filed on July 2nd. I reached out to Ms. Fox for clarification, and she stated the July 2nd filing contained the sealed volume (Volume 3), and that the parties would not be able to access this volume without a court order. Ms. Fox stated another court reporter filed the June 12th records in her place because she was out of town. Ms. Fox did not want the sealed records confused with the rest of the transcript, so she filed them separately.

The June 12th filings consist of the Master Index, the May 2nd discovery hearing, the May 11th evidentiary hearing, and the applicant's proffered exhibits.

Since the pertinent portion of the transcript was filed on June 12th and because the sealed record filed on July 2nd would have no bearing on either party's FoF/CoL, our belief is that our due date is still this Thursday, July 12th.

We just wanted to make sure our understanding is correct, and that we are all on the same page.

Thank you.

Sincerely,

**Farnaz Faiaz Hutchins**
Assistant District Attorney – Post Conviction Writs
Harris County District Attorney's Office
1310 Prairie St., 5th floor
Houston, Texas 77002
Tel: 713.274.5990

| Exhibit A |
|---|

62945

| | |
|---|---|
| **From:** | Natalie Corvington <Natalie.Corvington@ocfw.texas.gov> |
| **Sent:** | Wednesday, July 11, 2018 12:39 PM |
| **To:** | Hutchins, Farnaz; 'Baylor Wortham' (136judge@co.jefferson.tx.us) |
| **Cc:** | Dana Marshburn (136clerk@co.jefferson.tx.us); Reagin, Shawna; Erin Eckhoff; Katherine Black |
| **Subject:** | RE: Ex parte Juan Balderas, 1412826-A |

Your Honor:

To clarify the last paragraph of ADA Hutchins's email: I addressed my courtesy copies of the motion and exhibits to Your Honor and ADAs Hutchins and Reagin this morning, but their email server bounced the email back, so I had to create a Dropbox folder for them to access the exhibits. They have courtesy copies of the motion and exhibits, and they were not left off of the original email; their server just would not accept the attachments. I forwarded the bounced email to ADAs Hutchins and Reagin, and any reply all to the original email will include them, as their email addresses are included in the To line of the original email sent this morning.

Sincerely,

Natalie Corvington
Post-Conviction Attorney
Office of Capital & Forensic Writs
1700 Congress Avenue, Suite 460
Austin, Texas 78701
512.463.8571
natalie.corvington@ocfw.texas.gov



Office of Capital and Forensic Writs

**From:** Hutchins, Farnaz [mailto:HUTCHINS_FARNAZ@dao.hctx.net]
**Sent:** Wednesday, July 11, 2018 12:17 PM
**To:** 'Baylor Wortham' (136judge@co.jefferson.tx.us) <136judge@co.jefferson.tx.us>
**Cc:** Dana Marshburn (136clerk@co.jefferson.tx.us) <136clerk@co.jefferson.tx.us>; Reagin, Shawna <REAGIN_SHAWNA@dao.hctx.net>; Natalie Corvington <Natalie.Corvington@ocfw.texas.gov>; Erin Eckhoff <Erin.Eckhoff@ocfw.texas.gov>; Katherine Black <Katherine.Black@ocfw.texas.gov>
**Subject:** Ex parte Juan Balderas, 1412826-A

Your Honor,

It is the day before findings are due. We are working on our findings and intend to file them tomorrow per the Court's order.

This morning, we were served with the applicant's Motion to Supplement the Record and to Expand the Evidentiary Hearing. We intend to file a responsive document to this motion tomorrow.

> **Exhibit B**

In the interim, the State is adamantly opposed to applicant's motion to expand the evidentiary hearing, and we will respond to the specific documents addressed in the motion to supplement the record in the responsive filing tomorrow.

The State did not receive a CC'ed copy of the applicant's submission of their motion to the Court. As such, I am unaware if there has been an email chain or a ruling on the motion thus far this morning.

Sincerely,

**Farnaz Faiaz Hutchins**
Assistant District Attorney – Post Conviction Writs
Harris County District Attorney's Office
1201 Franklin, Ste. 600
Houston, Texas 77002
Tel: 713.274.5990

## Erin Eckhoff

| | |
|---|---|
| **From:** | Baylor Wortham <136judge@co.jefferson.tx.us> |
| **Sent:** | Wednesday, July 11, 2018 4:39 PM |
| **To:** | Natalie Corvington; 'HUTCHINS_FARNAZ' |
| **Cc:** | 'Dana Marshburn'; 'Reagin, Shawna'; Erin Eckhoff |
| **Subject:** | RE: Motion to Supplement the Record and Expand the Evidentiary Hearing |

Everyone,

I have reviewed the motion to expand the evidentiary hearing, however the motion is denied. The issues raised in this motion have already been argued by the parties and properly considered by the Court. The record already reflects the basis for each of those rulings, so I will not re-hash them again now. As to the matter of closing arguments, the Court allotted both sides a reasonably adequate time to probe the evidence and examine the witnesses. Considerable leeway was also extended during the hearing into matters that were arguably outside the scope of the hearing or were excessively cumulative. The attorneys were on notice that the hearing would conclude at 5 pm, and I elected to give everyone the discretion to utilize their time however they saw fit. The lawyers were never precluded from submitting written arguments to the court post-hearing if anyone wished to do so, however this is the first time since the May hearing that the issue of an oral argument has been raised. At this point in the case, I find the request for oral arguments to be untimely and therefore your request/objection is overruled.

Sincerely,
Baylor Wortham

**From:** Natalie Corvington [mailto:Natalie.Corvington@ocfw.texas.gov]
**Sent:** Wednesday, July 11, 2018 9:53 AM
**To:** Baylor Wortham; HUTCHINS_FARNAZ (HUTCHINS_FARNAZ@dao.hctx.net)
**Cc:** 'Dana Marshburn'; 'Reagin, Shawna'; Erin Eckhoff
**Subject:** Motion to Supplement the Record and Expand the Evidentiary Hearing

Good morning, Judge Wortham and ADA Hutchins,

Attached is a courtesy copy of the Motion to Supplement the Record and to Expand the Evidentiary Hearing, with exhibits, filed today.

Sincerely,

Natalie Corvington
Post-Conviction Attorney
Office of Capital & Forensic Writs
1700 Congress Avenue, Suite 460
Austin, Texas 78701
512.463.8571
natalie.corvington@ocfw.texas.gov



Office of Capital and Forensic Writs

---

**Exhibit C**

. 02948

| From: | Baylor Wortham <136judge@co.jefferson.tx.us> |
|---|---|
| Sent: | Thursday, July 12, 2018 10:24 AM |
| To: | Reagin, Shawna |
| Cc: | Erin.Eckhoff@ocfw.texas.gov; Natalie.Corvington@ocfw.texas.gov; Katherine.Black@ocfw.texas.gov; Hutchins, Farnaz |
| Subject: | RE: State's Motion filed this morning |

Counselors,

In my email yesterday, I did neglect to rule on the portion of Mr. Balderas' motion that requested to supplement the record with certain exhibits. I have reviewed the State's response and I believe that their objection has merit. First, the request is certainly untimely given that the evidence has closed, and there has been no showing of good cause as to why these exhibits could not have been timely offered into evidence during our May evidentiary hearing. Second, in order for an exhibit to be supplemented into the record as evidence, it must have first been properly authenticated and in admissible form. The items that you are requesting to supplement as exhibits were never properly authenticated on the record, nor have they been shown to qualify for an established hearsay exception. Third, Israel Diaz's handwritten letters were already used repeatedly by Mr. Balderas during the hearing to impeach Diaz's testimony, and therefore supplementing the letters as exhibits, as well as any other exhibit being offered for impeachment purposes, would be unnecessarily cumulative. Fourth, as to the State's capital murder summary and the pretrial interview notes, the Court's prior ruling on those items addressed only the disclosure of those items, but not the admissibility. Again, there has been no showing on the record of authentication or an established exception to hearsay. Likewise, the same issues of timeliness, authentication, and hearsay would still apply to Diaz's police statement and any statement by Diaz pertaining to Jose Luviano. As to the remaining three proposed supplemental items, these exhibits were already offered into evidence during the May evidentiary hearing and the Court has already issued a ruling on their admissibility. Accordingly, the request to supplement the record with these additional exhibits/materials is denied.

Sincerely,
Baylor Wortham

**From:** Reagin, Shawna [mailto:REAGIN_SHAWNA@dao.hctx.net]
**Sent:** Thursday, July 12, 2018 9:16 AM
**To:** '136judge@co.jefferson.tx.us'
**Cc:** 'Erin.Eckhoff@ocfw.texas.gov'; 'Natalie.Corvington@ocfw.texas.gov'; 'Katherine.Black@ocfw.texas.gov'; Hutchins, Farnaz
**Subject:** State's Motion filed this morning

Dear Judge Wortham – Attached is the State's motion to which Ms. Hutchins referred in yesterday's email. We realize you addressed and denied the requests to expand the hearing and to permit additional argument, so our motion concerns only the requested supplementation of the record.

Please let us know if you have any questions or concerns,

Shawna L. Reagin
Assistant District Attorney
Post-Conviction Writs
1201 Franklin, Suite 600
Houston, Texas 77002
713-274-5990

**Exhibit D**

## Erin Eckhoff

| From: | Erin Eckhoff |
|---|---|
| Sent: | Thursday, July 19, 2018 3:27 PM |
| To: | 'Hutchins, Farnaz'; 'Baylor Wortham'; Natalie Corvington |
| Cc: | 'Dana Marshburn'; Reagin, Shawna |
| Subject: | RE: Ex parte Juan Balderas |
| Attachments: | Mr. Balderas's Proposed Findings of Fact and Conclusions of Law.docx |

Please find attached a Word version of Mr. Balderas's Proposed Findings of Fact and Conclusions of Law.

Erin M. Eckhoff
Post-Conviction Attorney
Office of Capital & Forensic Writs
1700 N. Congress Avenue, Suite 460
Austin, Texas 78701
512-463-8503
erin.eckhoff@ocfw.texas.gov

**From:** Hutchins, Farnaz [mailto:HUTCHINS_FARNAZ@dao.hctx.net]
**Sent:** Thursday, July 19, 2018 2:37 PM
**To:** 'Baylor Wortham'; Erin Eckhoff; Natalie Corvington; Katherine Black
**Cc:** 'Dana Marshburn'; Reagin, Shawna
**Subject:** RE: Ex parte Juan Balderas

Good afternoon,

Attached is a copy of the State's findings of fact and conclusions of law in Word format.

Sincerely,
Farnaz Hutchins

**From:** Baylor Wortham [mailto:136judge@co.jefferson.tx.us]
**Sent:** Thursday, July 19, 2018 10:51 AM
**To:** Hutchins, Farnaz; 'Erin Eckhoff'; 'Natalie Corvington'; 'Katherine Black'
**Cc:** 'Dana Marshburn'; Reagin, Shawna
**Subject:** RE: Ex parte Juan Balderas

Counsel,

If possible, would the attorneys please email my office a copy of their respective proposed findings of fact and conclusions of law in an edit-able word processing format (ie. MS Word, etc.)?

Sincerely,
Baylor Wortham

> ## Exhibit E

8/1/2018 11:20 AM
Chris Daniel - District Clerk Harris County
Envelope No. 26425355
By: L Garcia
Filed: 8/1/2018 11:20 AM

CAUSE NO. 1412826-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 179th DISTRICT COURT |
| | § | OF |
| JUAN BALDERAS,<br>Applicant | § | HARRIS COUNTY, TEXAS |

## ORDER

On this the _1st_ day of _August_, 2018, came to be heard the Agreed

Motion to Supplement the Habeas record, and having duly considered same, this

Court **GRANTS** the motion.

**SIGNED** and **ENTERED** this _1st_ day of _August_, 2018.


_Baylor Wortham_
Hon. Baylor Wortham
Judge Presiding by Assignment
179th District Court
Harris County, Texas

02951

| From: | Baylor Wortham <136judge@co.jefferson.tx.us> |
| Sent: | Monday, July 09, 2018 3:45 PM |
| To: | Hutchins, Farnaz |
| Cc: | 'Dana Marshburn'; 'Katherine Black'; 'Erin Eckhoff'; 'Natalie Corvington'; Reagin, Shawna |
| Subject: | RE: Ex parte Juan Balderas |

Everyone,

The rule requires that the "transcript of the hearing" itself be prepared within 30 days, which is apparently what the court reporter did in the June 12th filing. The supplement contained the sealed exhibits and not the transcript itself, so I don't believe that it should have any impact on the original timeline. Once both sides have submitted their proposed findings, the Court will subsequently issue its findings within 15 days.

Sincerely,
Baylor Wortham

From: Hutchins, Farnaz [mailto:HUTCHINS_FARNAZ@dao.hctx.net]
Sent: Monday, July 09, 2018 3:25 PM
To: 'Baylor Wortham' (136judge@co.jefferson.tx.us)
Cc: Dana Marshburn (136clerk@co.jefferson.tx.us); Katherine Black (Katherine.Black@ocfw.texas.gov); Erin Eckhoff (Erin.Eckhoff@ocfw.texas.gov); Natalie Corvington (Natalie.Corvington@ocfw.texas.gov); Reagin, Shawna
Subject: Ex parte Juan Balderas

Good afternoon Your Honor,

I was writing to seek a point of clarification regarding the due date of our proposed findings of fact and conclusions of law ("FoF/CoL"). According to Your Honor's order in our May 11th evidentiary hearing, in accordance with Article 11.071, the court reporter was to prepare the transcript within 30 days of the hearing, and the parties would have 30 days after the completion of the transcript to prepare our proposed FoF/CoL.

According to the clerk's office, the transcript was filed on June 12th. This would make our FoF/CoL due by the end of the business day this Thursday, July 12th.

Today, I noticed that a second transcript was filed on July 2nd. I reached out to Ms. Fox for clarification, and she stated the July 2nd filing contained the sealed volume (Volume 3), and that the parties would not be able to access this volume without a court order. Ms. Fox stated another court reporter filed the June 12th records in her place because she was out of town. Ms. Fox did not want the sealed records confused with the rest of the transcript, so she filed them separately.

The June 12th filings consist of the Master Index, the May 2nd discovery hearing, the May 11th evidentiary hearing, and the applicant's proffered exhibits.

Since the pertinent portion of the transcript was filed on June 12th and because the sealed record filed on July 2[rd] would have no bearing on either party's FoF/CoL, our belief is that our due date is still this Thursday, July 12th.

We just wanted to make sure our understanding is correct, and that we are all on the same page.

Thank you.

Sincerely,

**Farnaz Faiaz Hutchins**
Assistant District Attorney – Post Conviction Writs
Harris County District Attorney's Office
1310 Prairie St., 5th floor
Houston, Texas 77002
Tel: 713.274.5990

Exhibit A

**Hutchins, Farnaz**

| | |
|---|---|
| **From:** | Natalie Corvington <Natalie.Corvington@ocfw.texas.gov> |
| **Sent:** | Wednesday, July 11, 2018 12:39 PM |
| **To:** | Hutchins, Farnaz; 'Baylor Wortham' (136judge@co.jefferson.tx.us) |
| **Cc:** | Dana Marshburn (136clerk@co.jefferson.tx.us); Reagin, Shawna; Erin Eckhoff; Katherine Black |
| **Subject:** | RE: Ex parte Juan Balderas, 1412826-A |

Your Honor:

To clarify the last paragraph of ADA Hutchins's email: I addressed my courtesy copies of the motion and exhibits to Your Honor and ADAs Hutchins and Reagin this morning, but their email server bounced the email back, so I had to create a Dropbox folder for them to access the exhibits. They have courtesy copies of the motion and exhibits, and they were not left off of the original email; their server just would not accept the attachments. I forwarded the bounced email to ADAs Hutchins and Reagin, and any reply all to the original email will include them, as their email addresses are included in the To line of the original email sent this morning.

Sincerely,

Natalie Corvington
Post-Conviction Attorney
Office of Capital & Forensic Writs
1700 Congress Avenue, Suite 460
Austin, Texas 78701
512.463.8571
natalie.corvington@ocfw.texas.gov



Office of Capital and Forensic Writs

**From:** Hutchins, Farnaz [mailto:HUTCHINS_FARNAZ@dao.hctx.net]
**Sent:** Wednesday, July 11, 2018 12:17 PM
**To:** 'Baylor Wortham' (136judge@co.jefferson.tx.us) <136judge@co.jefferson.tx.us>
**Cc:** Dana Marshburn (136clerk@co.jefferson.tx.us) <136clerk@co.jefferson.tx.us>; Reagin, Shawna <REAGIN_SHAWNA@dao.hctx.net>; Natalie Corvington <Natalie.Corvington@ocfw.texas.gov>; Erin Eckhoff <Erin.Eckhoff@ocfw.texas.gov>; Katherine Black <Katherine.Black@ocfw.texas.gov>
**Subject:** Ex parte Juan Balderas, 1412826-A

Your Honor,

It is the day before findings are due. We are working on our findings and intend to file them tomorrow per the Court's order.

This morning, we were served with the applicant's Motion to Supplement the Record and to Expand the Evidentiary Hearing. We intend to file a responsive document to this motion tomorrow.

**Exhibit B**

In the interim, the State is adamantly opposed to applicant's motion to expand the evidentiary hearing, and we will respond to the specific documents addressed in the motion to supplement the record in the responsive filing tomorrow.

The State did not receive a CC'ed copy of the applicant's submission of their motion to the Court. As such, I am unaware if there has been an email chain or a ruling on the motion thus far this morning.

Sincerely,

**Farnaz Faiaz Hutchins**
Assistant District Attorney – Post Conviction Writs
Harris County District Attorney's Office
1201 Franklin, Ste. 600
Houston, Texas 77002
Tel: 713.274.5990

**Erin Eckhoff**

| | |
|---|---|
| From: | Baylor Wortham <136judge@co.jefferson.tx.us> |
| Sent: | Wednesday, July 11, 2018 4:39 PM |
| To: | Natalie Corvington; 'HUTCHINS_FARNAZ' |
| Cc: | 'Dana Marshburn'; 'Reagin, Shawna'; Erin Eckhoff |
| Subject: | RE: Motion to Supplement the Record and Expand the Evidentiary Hearing |

Everyone,

I have reviewed the motion to expand the evidentiary hearing, however the motion is denied. The issues raised in this motion have already been argued by the parties and properly considered by the Court. The record already reflects the basis for each of those rulings, so I will not re-hash them again now. As to the matter of closing arguments, the Court allotted both sides a reasonably adequate time to probe the evidence and examine the witnesses. Considerable leeway was also extended during the hearing into matters that were arguably outside the scope of the hearing or were excessively cumulative. The attorneys were on notice that the hearing would conclude at 5 pm, and I elected to give everyone the discretion to utilize their time however they saw fit. The lawyers were never precluded from submitting written arguments to the court post-hearing if anyone wished to do so, however this is the first time since the May hearing that the issue of an oral argument has been raised. At this point in the case, I find the request for oral arguments to be untimely and therefore your request/objection is overruled.

Sincerely,
Baylor Wortham

**From:** Natalie Corvington [mailto:Natalie.Corvington@ocfw.texas.gov]
**Sent:** Wednesday, July 11, 2018 9:53 AM
**To:** Baylor Wortham; HUTCHINS_FARNAZ (HUTCHINS_FARNAZ@dao.hctx.net)
**Cc:** 'Dana Marshburn'; 'Reagin, Shawna'; Erin Eckhoff
**Subject:** Motion to Supplement the Record and Expand the Evidentiary Hearing

Good morning, Judge Wortham and ADA Hutchins,

Attached is a courtesy copy of the Motion to Supplement the Record and to Expand the Evidentiary Hearing, with exhibits, filed today.

Sincerely,

Natalie Corvington
Post-Conviction Attorney
Office of Capital & Forensic Writs
1700 Congress Avenue, Suite 460
Austin, Texas 78701
512.463.8571
natalie.corvington@ocfw.texas.gov



Office of Capital and Forensic Writs

Exhibit C

. 62955

| | |
|---|---|
| **From:** | Baylor Wortham <136judge@co.jefferson.tx.us> |
| **Sent:** | Thursday, July 12, 2018 10:24 AM |
| **To:** | Reagin, Shawna |
| **Cc:** | Erin.Eckhoff@ocfw.texas.gov; Natalie.Corvington@ocfw.texas.gov; Katherine.Black@ocfw.texas.gov; Hutchins, Farnaz |
| **Subject:** | RE: State's Motion filed this morning |

Counselors,

In my email yesterday, I did neglect to rule on the portion of Mr. Balderas' motion that requested to supplement the record with certain exhibits. I have reviewed the State's response and I believe that their objection has merit. First, the request is certainly untimely given that the evidence has closed, and there has been no showing of good cause as to why these exhibits could not have been timely offered into evidence during our May evidentiary hearing. Second, in order for an exhibit to be supplemented into the record as evidence, it must have first been properly authenticated and in admissible form. The items that you are requesting to supplement as exhibits were never properly authenticated on the record, nor have they been shown to qualify for an established hearsay exception. Third, Israel Diaz's handwritten letters were already used repeatedly by Mr. Balderas during the hearing to impeach Diaz's testimony, and therefore supplementing the letters as exhibits, as well as any other exhibit being offered for impeachment purposes, would be unnecessarily cumulative. Fourth, as to the State's capital murder summary and the pretrial interview notes, the Court's prior ruling on those items addressed only the disclosure of those items, but not the admissibility. Again, there has been no showing on the record of authentication or an established exception to hearsay. Likewise, the same issues of timeliness, authentication, and hearsay would still apply to Diaz's police statement and any statement by Diaz pertaining to Jose Luviano. As to the remaining three proposed supplemental items, these exhibits were already offered into evidence during the May evidentiary hearing and the Court has already issued a ruling on their admissibility. Accordingly, the request to supplement the record with these additional exhibits/materials is denied.

Sincerely,
Baylor Wortham

---

**From:** Reagin, Shawna [mailto:REAGIN_SHAWNA@dao.hctx.net]
**Sent:** Thursday, July 12, 2018 9:16 AM
**To:** '136judge@co.jefferson.tx.us'
**Cc:** 'Erin.Eckhoff@ocfw.texas.gov'; 'Natalie.Corvington@ocfw.texas.gov'; 'Katherine.Black@ocfw.texas.gov'; Hutchins, Farnaz
**Subject:** State's Motion filed this morning

Dear Judge Wortham – Attached is the State's motion to which Ms. Hutchins referred in yesterday's email. We realize you addressed and denied the requests to expand the hearing and to permit additional argument, so our motion concerns only the requested supplementation of the record.

Please let us know if you have any questions or concerns,

Shawna L. Reagin
Assistant District Attorney
Post-Conviction Writs
1201 Franklin, Suite 600
Houston, Texas 77002
713-274-5990

**Exhibit D**

02956

## Erin Eckhoff

| | |
|---|---|
| **From:** | Erin Eckhoff |
| **Sent:** | Thursday, July 19, 2018 3:27 PM |
| **To:** | 'Hutchins, Farnaz'; 'Baylor Wortham'; Natalie Corvington |
| **Cc:** | 'Dana Marshburn'; Reagin, Shawna |
| **Subject:** | RE: Ex parte Juan Balderas |
| **Attachments:** | Mr. Balderas's Proposed Findings of Fact and Conclusions of Law.docx |

Please find attached a Word version of Mr. Balderas's Proposed Findings of Fact and Conclusions of Law.

Erin M. Eckhoff
Post-Conviction Attorney
Office of Capital & Forensic Writs
1700 N. Congress Avenue, Suite 460
Austin, Texas 78701
512-463-8503
erin.eckhoff@ocfw.texas.gov

**From:** Hutchins, Farnaz [mailto:HUTCHINS_FARNAZ@dao.hctx.net]
**Sent:** Thursday, July 19, 2018 2:37 PM
**To:** 'Baylor Wortham'; Erin Eckhoff; Natalie Corvington; Katherine Black
**Cc:** 'Dana Marshburn'; Reagin, Shawna
**Subject:** RE: Ex parte Juan Balderas

Good afternoon,

Attached is a copy of the State's findings of fact and conclusions of law in Word format.

Sincerely,
Farnaz Hutchins

**From:** Baylor Wortham [mailto:136judge@co.jefferson.tx.us]
**Sent:** Thursday, July 19, 2018 10:51 AM
**To:** Hutchins, Farnaz; 'Erin Eckhoff'; 'Natalie Corvington'; 'Katherine Black'
**Cc:** 'Dana Marshburn'; Reagin, Shawna
**Subject:** RE: Ex parte Juan Balderas

Counsel,

If possible, would the attorneys please email my office a copy of their respective proposed findings of fact and conclusions of law in an edit-able word processing format (ie. MS Word, etc.)?

Sincerely,
Baylor Wortham

> ## Exhibit E



# CHRIS DANIEL
## HARRIS COUNTY DISTRICT CLERK

August 1, 2018

KIM OGG
DISTRICT ATTORNEY
HARRIS COUNTY, TEXAS

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1412826-A in the 179th District Court.

☐ State's Original Answer Filed                ,

☐ Affidavit                ,

☐ Court Order Dated                ,

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order                ,

☒ Other

Sincerely,

L. Hernandez, Deputy
Criminal Post Trial

Enclosure(s) – ORDER AGREED MOTION TO SUPPLEMENT THE HABEAS RECORD



# CHRIS DANIEL
## HARRIS COUNTY DISTRICT CLERK

August 1, 2018

ERIN M. ECKHOFF
OFFICE OF CAPITAL AND FORENSIC WRITS
1700 N. CONGRESS AVENUE, STE 460
AUSTIN, TEXAS 78701

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1412826-A in the 179th District Court.

☐ State's Original Answer Filed

☐ Affidavit

☐ Court Order Dated

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order

☒ Other

Sincerely,

L. Hernandez, Deputy
Criminal Post Trial

Enclosure(s) – ORDER AGREED MOTION TO SUPPLEMENT THE HABEAS RECORD

Filed 18 August 20 P3:55
Chris Daniel - District Clerk
Harris County
EA001_155408
By: R GARCIA

CAUSE NO. 1412826-A

| EX PARTE | § | IN THE 179TH DISTRICT COURT |
| V. | § | OF |
| JUAN BALDERAS,<br>Applicant | § | HARRIS COUNTY, TEXAS |

## STATE'S DISCLOSURE PURSUANT TO
## TEX. CODE CRIM. PROC. ART. 39.14(h), (k)

COMES NOW the State of Texas, by and through its undersigned Assistant District Attorney, and makes the following disclosures in an abundance of caution pursuant to TEX. CODE CRIM. PROC. ART. 39.14(h), (k), without acknowledging that these disclosures are in fact exculpatory, mitigating, or impeachment, and recognizing that the substance of these disclosures may have previously been disclosed to trial counsel:

- On January 9, 2014, prosecutor Traci Bennett met with Kelly Barron, a probation officer who had supervised the applicant in 2003. Barron informed Bennett that as a juvenile, the applicant had participated in a leadership program, Project Spotlight, which taught positive life and leadership skills. Barron informed Bennett that the applicant's mother was supportive and got him where he needed to be. Barron also informed Bennett that the Alief area suffers from chronic poverty and immigration issues and lacks strong ties or trust in the government.

- On January 6, 2014, prosecutor Traci Bennett met with Jo Doddy Chenier, a probation officer who had supervised the applicant as a juvenile. Chenier told Bennett she had previously met and spoken to the defense. Chenier told Bennett, the applicant was charismatic and a leader. On January 10, 2014, Bennet met with Chenier again. Chenier informed Bennett that the applicant was on juvenile probation for unauthorized use of a motor vehicle, not aggravated assault deadly weapon, and that she liked the applicant.

- On January 9, 2014, prosecutor Traci Bennett met with Dr. Matthew Shelton, staff psychologist with the Mental Health and Mental Retardation Authority of Harris County, Child and Adolescent Services Forensic Unit, who conducted a psychological screening of the applicant on May 7, 2002. Dr. Shelton informed

62960

Bennett that he had previously spoken with the defense and Dr. Jolie Brams. Dr. Shelton told Bennett that the applicant was typical of a gang involved juvenile, but more intelligent. Dr. Shelton stated personality disorders cannot be diagnosed under age 18 and that he believed it would be a stretch to say the applicant had traits of anti-social personality disorder. Dr. Shelton believed the applicant's behavior was consistent with conduct disorder.

- On December 10, 2013, prosecutors Traci Bennet, Caroline Dozier, and Mary McFaden met with witness Alejandro Garcia and Garcia's counsel Bob Loper. At this meeting, Garcia stated that at school, Eduardo "Powder" Hernandez's brother told Garcia that MS had killed Hernandez.

- On December 19, 2013, prosecutors Traci Bennett, Caroline Dozier, and Mary McFaden met with witness Alejandro Garcia and Garcia's counsel Bob Loper. At this meeting, Garcia stated: he did not suspect that the applicant killed Eduardo "Powder" Hernandez; the applicant did not talk to Garcia about killing Hernandez; and Garcia thought MS killed Hernandez.


### Service

On August 20, 2018, service was accomplished by emailing a copy of this instrument

to habeas counsel for the applicant, Erin Eckhoff and Natalie Corvington, respectively at

Erin.Eckhoff@ocfw.texas.gov and Natalie.Corvington@ocfw.texas.gov.


Respectfully submitted,

/s/ *Farnaz Faiaz Hutchins*

Farnaz Faiaz Hutchins
Assistant District Attorney
500 Jefferson, 6th floor
Houston, Texas 77002
Texas Bar No. 24063791
Tel: (713) 274-5990
Fax: (832) 927-0181

FILE COPY



# TEXAS COURT OF CRIMINAL APPEALS

### Austin, Texas

FILED

Chris Daniel
District Clerk

JUN 0 8 2017

Time:_____
Harris County, Texas

By_____ Deputy

## M A N D A T E

**THE STATE OF TEXAS,**

**TO THE 179TH DISTRICT COURT OF HARRIS COUNTY** — **GREETINGS:**

Before our **COURT OF CRIMINAL APPEALS**, on **November 2, 2016**, the cause upon appeal to revise or reverse your Judgment between:

### JUAN BALDERAS

### VS.

### THE STATE OF TEXAS

**CCRA NO. AP-77,036**

**TRIAL COURT NO. 1412826**

was determined; and therein our said **COURT OF CRIMINAL APPEALS** made its order in these words:

"This cause came on to be heard on the record of the Court below, and the same being considered, because it is the Opinion of this Court that there was no error in the judgment, it is **ORDERED, ADJUDGED AND DECREED** by the Court that the judgment be **AFFIRMED**, in accordance with the Opinion of this Court, and that this Decision be certified below for observance."

Motion for rehearing denied June 7, 2017.

**WHEREFORE,** We command you to observe the Order of our said **COURT OF CRIMINAL APPEALS** in this behalf and in all things have it duly recognized, obeyed and executed.

WITNESS, **THE HONORABLE SHARON KELLER,**

Presiding Judge of our said **COURT OF CRIMINAL APPEALS,**

with the Seal thereof annexed, at the City of Austin,

on this day **June 7, 2017.**

**ABEL ACOSTA,** Clerk
By: Deana Williamson,
Chief Deputy Clerk



**FILED**
Chris Daniel
District Clerk

NOV 0 3 2016

Time: _____
Harris County, Texas

By _____
Deputy

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-77,036

### JUAN BALDERAS, Appellant

### v.

### THE STATE OF TEXAS

## ON DIRECT APPEAL FROM CAUSE NO. 1412826
## IN THE 179TH DISTRICT COURT
## HARRIS COUNTY

KEASLER, J., delivered the opinion of the Court, in which MEYERS, HERVEY, RICHARDSON, YEARY, and NEWELL, JJ., join. KELLER, P.J., concurred in point of error three and otherwise joined. RICHARDSON, J., filed a concurring opinion, in which MEYERS, JOHNSON, and NEWELL, JJ., join. ALCALA, J., filed a dissenting opinion.

## O P I N I O N

In February 2014, a jury convicted Juan Balderas of capital murder committed in December 2005.[1] Based upon the jury's answers to the special issues set forth in Texas Code of Criminal Procedure article 37.071, sections 2(b) and 2(e), the trial judge sentenced

---

[1] TEX. PENAL CODE § 19.03(a)(2).

Balderas to death.[2] Direct appeal to this Court is automatic.[3] After reviewing Balderas's nine points of error, we find them to be without merit. Consequently, we affirm the trial court's judgment and sentence of death.

## STATEMENT OF FACTS

In 2004, the victim, Eduardo Hernandez, became a member of the Barrio Tres Alief ("BTA"), a regional subset of the La Tercera Crips ("LTC") street gang in Houston. Balderas, a long-time member of the LTC gang and one of the founding members of the BTA subset, had introduced Hernandez to the gang. Initially, the other LTC members liked Hernandez, and Hernandez was proud to be part of the gang. LTC member Israel Diaz befriended Hernandez, and for a while Hernandez lived with Diaz. However, in late 2004, this friendship soured after Diaz let Hernandez borrow a vehicle that Diaz had stolen the week before. Police officers stopped and arrested Hernandez while he was driving the stolen vehicle. After Hernandez informed them that he had borrowed the vehicle from Diaz, they arrested Diaz for aggravated robbery.

Diaz bonded out of jail in April 2005. He was angry with Hernandez for "snitching" on him. He "lectured" Hernandez about giving his name to the police, and Hernandez promised that he would not testify against Diaz in the aggravated robbery case. Balderas's defense counsel argued at trial that Hernandez's snitching gave Diaz a motive for murder,

---

[2] TEX. CODE CRIM. PROC. art. 37.071, § 2(g).

[3] *Id.* at § 2(h).

but Diaz denied that he wanted to kill Hernandez. Diaz testified that he knew that two other witnesses could identify him as the thief and that police had found his fingerprints on the stolen vehicle; therefore, preventing Hernandez from testifying would not have helped him avoid the robbery conviction. Also, because of the pending robbery case, Diaz knew that he would be the first suspect if anything happened to Hernandez. Diaz testified that even though he personally did not want to kill Hernandez, other LTC members viewed Hernandez's conduct as being disrespectful of the gang and thought that Hernandez needed to be punished. Diaz testified that he asked those members to wait until his trial was over before they took action against Hernandez.

After the snitching incident, Hernandez stopped associating with other LTC gang members. He also moved out of his family home so that LTC members could not easily locate him. In August or September 2005, he began dating Karen Bardales ("Karen"). Hernandez and Karen spent much of their time "hanging out" in an apartment belonging to one of Karen's friends, Durjan Decorado, who was not in a gang. Karen's older sister, Wendy Bardales ("Wendy"), and Wendy's boyfriend, Edgar Ferrufino, also spent much of their time in that apartment. Karen and Wendy's friends, including members of several rival gangs, would visit them there. Hernandez socialized with those friends.

Over the next few months, LTC gang members heard rumors that Hernandez was associating with members of rival gangs and flashing rival gangs' hand signs, which constituted acts of disloyalty and disrespect against the LTC gang. After seeing images of

Hernandez on social media confirming these rumors, some indignant LTC members urged the gang to take action against him. Three or four days before Hernandez's killing, senior members of the gang called a meeting. Those in attendance agreed to shoot and kill Hernandez. Although they did not expressly select an individual to kill him, everyone understood that Hernandez was Balderas's responsibility because he had introduced Hernandez to the gang.

On the afternoon of December 6, 2005, Wendy, Ferrufino, Karen, and Hernandez were hanging out in Decorado's apartment. Jose Vazquez, a senior LTC gang member, stopped by to talk to Hernandez. Karen began saying disrespectful things about the LTC gang, which upset Vazquez. Vasquez wanted Hernandez to leave the apartment with him, but Hernandez refused. Hernandez was visibly upset after Vazquez left. He told Karen that he was worried that something was going to happen. Later, Hernandez left with his sister to go shopping and have dinner. He and Karen reunited at the apartment complex that night.

Around 9:45 p.m., Wendy, Ferrufino, Decorado, and Decorado's cousin were in Decorado's apartment. Ferrufino and Wendy were playing a video game in the living room. As Karen and Hernandez approached the apartment, Karen noticed fresh LTC gang graffiti on the exterior wall. Immediately after entering the apartment, they heard gunshots, and then the front door opened and a gunman ran into the apartment. Hernandez dropped to the floor and pulled Karen down with him, positioning himself between Karen and the gunman. Decorado and his cousin fled to the bedrooms, and Ferrufino crouched next to the television

stand. Wendy, who was sitting on the floor between the couch and the television, froze. She could see the gunman as he entered the apartment, and her eyes followed him until he left.

The gunman fired his gun as he ran around the living room. Wendy saw that he was wearing khaki pants and a black hoodie, with the hood pulled up over his head. She got a good look at his face when his hood fell down as he passed her. The gunman paused in front of Ferrufino, who asked him not to shoot. He did not shoot Ferrufino and began to move back toward the entryway, but then he stopped and stood over Hernandez. He shot Hernandez in the back and head multiple times. Karen, who was lying face-down next to Hernandez, did not see the gunman's face, but when the gunman extended his arm toward Hernandez, Karen could see that he was wearing a black sweater. After shooting Hernandez at least nine times, the gunman left. Ferrufino called 9-1-1.

Around that time, Diaz heard from another LTC gang member that "they" had "found [Hernandez,]" which Diaz understood to mean that Hernandez was about to be (or had just been) killed. He and other LTC members gathered across the street from the apartment complex. They could see an ambulance and police cars in the parking lot. Diaz saw Balderas waiting near the apartment complex. Balderas was wearing a dark blue or black sweater-like top and khakis. When Balderas noticed Diaz and the others, he crossed the street to join them. Balderas hugged everyone and seemed "joyful" as he reported that he "finally got him." Diaz saw Balderas change the magazine of a silver handgun. Diaz recognized the handgun as one of two silver guns that Balderas regularly carried.

That night, law enforcement officials took Wendy, Karen, and Ferrufino to the police station to give witness statements. In the early morning hours of December 7, Wendy gave a statement that was committed to writing by Officer Thomas Cunningham. Wendy stated that she had never seen the gunman before, and she described him as a "skinny Hispanic guy dressed in a black hooded sweatshirt type jacket." She also stated that he had a "dark birth mark" on his face but she could not remember where.

Around 10:30 p.m., Sergeant Norman Ruland drove to Wendy's apartment to show her a photo array of six suspects that included Diaz but not Balderas. Wendy did not identify the gunman, but she recognized Diaz. She stated that he was a friend of Hernandez who went by the street name "Cookie," and that she was sure he was not the gunman. She told Ruland that the gunman had a dark mark on his cheek that did not resemble the scars that were visible on Diaz's face.

On December 12, Ruland returned to Wendy's apartment with a second photo array that included Balderas's photograph. Wendy immediately pointed to Balderas, saying that she recognized him as a friend of Hernandez and Diaz who went by the street name "Apache." She also stated that he "looked like the shooter." When Ruland asked Wendy if Balderas was the shooter, she reiterated that Balderas's "face looked exactly like the shooter's face." She signed and dated Balderas's photograph to confirm her identification. Although Ruland felt that Wendy was confident in her identification of Balderas as the gunman, he was confused by her verbal phrasing in making the identification. Therefore, the

following day, he returned to Wendy's apartment to seek clarification. On this occasion, Wendy expressly identified Balderas as the gunman, stating that she was positive in her identification. She wrote a sentence in Spanish on the back of the lineup to confirm her positive identification. Based on this identification, police obtained a warrant for Balderas's arrest.

On December 16, Officer Rick Moreno drove to an apartment complex where he watched for Balderas and another LTC gang member, Rigalado Silder, and waited for the assistance of a SWAT team. After Moreno had been watching the complex for about 25 minutes, he observed Balderas and Silder leave an upstairs apartment and start down the stairs. Each man was carrying a large box, and Balderas had a black bag slung over his shoulder. When they saw the SWAT team arriving, Balderas and Silder set everything down and started running. Moreno caught Silder in the apartment complex, while the SWAT team pursued Balderas into the neighborhood and caught him as he tried to hide under a car. Moreno saw that the boxes and bag contained firearms and other weapons, bullet-proof vests, identification holders, magazines, and ammunition. One of the weapons recovered from the box that Balderas had been carrying was a handgun that was later identified, through ballistics testing, as the murder weapon in Hernandez's killing. A shell casing from a semiautomatic handgun was recovered from Balderas's right rear pants pocket.

## SUFFICIENCY OF THE EVIDENCE

In his first point of error, Balderas asserts that the evidence is insufficient to prove his guilt. Specifically, he argues that Wendy Bardales, the only eyewitness who identified him as the gunman, was not credible and testified falsely. He points to inconsistencies between her statements to police and her trial testimony, as well as ways in which her description of the gunman did not accurately describe Balderas. Balderas also alleges that Wendy's statements to police evolved over time: first, she did not recognize the gunman and had never seen him before; then, upon viewing the photo array, she immediately recognized Balderas, whom she had known for several months, but she was not sure that he was the gunman; and finally, she confidently identified Balderas as the gunman.

In assessing the legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, any rational juror could have found the essential elements of the crime beyond a reasonable doubt.[4] "Our review of 'all of the evidence' includes evidence that was properly and improperly admitted."[5] "The reviewing court must give deference to 'the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'"[6] Each fact need not point directly and independently to a defendant's guilt, as long as the

---

[4] *Gardner v. State,* 306 S.W.3d 274, 285 (Tex. Crim. App. 2009).

[5] *Clayton v. State,* 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

[6] *Hooper v. State,* 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (quoting *Jackson v. Virginia,* 443 U.S. 307, 318-19 (1979)).

cumulative force of all the incriminating circumstances is sufficient to support the conviction.[7]

The State may prove a defendant's identity and criminal culpability by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence.[8] The jury is the sole judge of the credibility and weight to be attached to witness testimony.[9] When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict, and we defer to that determination.[10] Because we will not second-guess the jury's assessment of the credibility and weight of witness testimony, and because we defer to the jury's resolution of conflicting inferences, Balderas's allegations that Wendy's testimony was false and not credible play no part in our review of the sufficiency of the evidence.

In this case, Balderas was tried under an indictment that alleged, in relevant part, that he, on or about December 6, 2005, "while in the course of committing or attempting to commit the burglary of a habitation owned by Durjan 'Rata' Decorado and Wendy Bardales, intentionally cause[d] the death of Eduardo Hernandez by shooting Eduardo Hernandez with

---

[7] *Id.*

[8] *Gardner*, 306 S.W.3d at 285.

[9] *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012) (citing *Jackson*, 443 U.S. at 319).

[10] *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014).

a deadly weapon, namely a firearm."[11] A person commits murder when he "intentionally or knowingly causes the death of an individual." A person commits burglary if, without the effective consent of the owner, he enters a building not then open to the public or a habitation with intent to commit a felony, theft, or assault; or he enters a building or habitation and commits or attempts to commit a felony, theft, or an assault.[12] An "owner" is a person who has possession of a property or a greater right to possession of a property than the actor.[13]

"An unlawful entry into a habitation with the intent to commit murder will satisfy the burglary element of a capital murder charge."[14] Further, "[i]t is both a common-sense inference and an appellate presumption that a person intends the natural consequences of his acts, . . . and that the act of pointing a loaded gun at someone and shooting it toward that person at close range demonstrates an intent to kill."[15]

Viewed in the light most favorable to the verdict, Wendy's eyewitness testimony and other evidence established that Balderas committed a burglary when he entered Decorado's apartment without Decorado's or Wendy's effective consent with the intent to murder Hernandez, and he committed murder when he intentionally caused Hernandez's death by

---

[11] *See* TEX. PENAL CODE § 19.03(a)(2).

[12] TEX. PENAL CODE § 30.02(a)(1), (3).

[13] *Id.* at § 1.07(a)(35)(A).

[14] *Whitaker v. State,* 977 S.W.2d 595, 598-99 (Tex. Crim. App. 1998).

[15] *Ex parte Thompson,* 179 S.W.3d 549, 556 n.18 (Tex. Crim. App. 2005); *see also Medina v. State,* 7 S.W.3d 633, 637 (Tex. Crim. App. 1999).

shooting him with a firearm. Wendy identified Balderas as the gunman who opened the front door, entered the apartment, and shot Hernandez. Karen's testimony, together with the medical examiner's testimony, the autopsy, and the ballistics evidence, established that the gunman shot Hernandez in the head and back at least nine times. Karen's description of the gunman's clothing, and Diaz's description of Balderas's clothing immediately after the offense, were consistent with Wendy's description of the gunman's clothing.

Further, Diaz testified that while the ambulance was still at the apartment complex, Balderas approached him and other LTC gang members near the complex, stating that he had "finally got him" as he changed the magazine of his handgun. Ballistics evidence and Officer Moreno's testimony confirmed that the murder weapon was recovered from the box that Balderas discarded when he ran from the police ten days after the offense.[16] A rational jury could have determined from all of this evidence that Balderas, in the course of committing the offense of burglary, intentionally caused Hernandez's death. Thus, the evidence was sufficient to prove that Balderas was guilty of capital murder. Point of error one is overruled.

## DENIAL OF SPEEDY TRIAL

In point of error two, Balderas asserts that the trial court reversibly erred when it denied his motion to dismiss the indictment for lack of a speedy trial. Specifically, he

---

[16] *See Clay v. State,* 240 S.W.3d 895, 905 & n.11 (Tex. Crim. App. 2007) (noting that evidence of flight evinces a consciousness of guilt).

complains that the case "languished on the docket for eight years" following his arrest and indictment.

"The Sixth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment, guarantees a speedy trial to an accused."[17] The Supreme Court has listed four factors that a court should consider in addressing a speedy-trial claim: (1) the length of delay, (2) the State's reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) prejudice to the defendant because of the length of delay.[18] If the defendant can make a threshold showing that the interval between accusation and trial is "presumptively prejudicial," then a court must consider each of the remaining *Barker* factors and weigh them.[19]

When reviewing the trial court's application of the *Barker* test, we give almost total deference to the trial court's historical findings of fact that the record supports, and we draw reasonable inferences from those facts necessary to support the trial court's findings.[20] A reviewing court should not consider in its deliberations record evidence that was not before the trial court when it made its ruling.[21] Review of the individual *Barker* factors necessarily involves fact determinations and legal conclusions, but the balancing test as a whole is a

---

[17] *Gonzales v. State*, 435 S.W.3d 801, 808 (Tex. Crim. App. 2014).

[18] *Id.* (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)).

[19] *State v. Munoz*, 991 S.W.2d 818, 821-22 (Tex. Crim. App. 1999).

[20] *Gonzales*, 435 S.W.3d at 808-09.

[21] *Id.* at 809 (citing *Dragoo v. State*, 96 S.W.3d 308, 313 (Tex. Crim. App. 2003)).

purely legal question that we review *de novo*.[22] The record does not contain any written fact findings.

In general, courts deem delay approaching one year to be "unreasonable enough to trigger the *Barker* enquiry."[23] The extent to which the delay exceeded the minimum needed to trigger judicial examination factors into our assessment of the first *Barker* factor.[24] For example, an interval of three and one-half years "stretched far beyond the minimum needed to trigger the enquiry" and weighed heavily in favor of finding a violation of the speedy trial right.[25]

In this case, Balderas was arrested in December 2005 and tried in March 2014—an interval of more than eight years. The length of this delay is sufficient to trigger the *Barker* inquiry.[26] Further, because this delay stretched far beyond the minimum needed to trigger the inquiry, the first *Barker* factor weighs heavily in favor of finding a violation of Balderas's speedy-trial right.[27]

---

[22] *Johnson v. State*, 954 S.W.2d 770, 771 (Tex. Crim. App. 1997).

[23] *Dragoo*, 96 S.W.3d at 314 (quoting *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992)).

[24] *See id.*

[25] *Id.*

[26] *See id.*

[27] *See id.*

When we assess the second *Barker* factor—the State's reason for the delay—we assign different weights to different reasons.[28] Some reasons are valid and serve to justify an appropriate delay.[29] Deliberate delay intended to "hamper the defense" weighs heavily against the State, while more neutral reasons, such as negligence or overcrowded courts, weigh less heavily.[30] Additionally, we consider "whether the government or the criminal defendant is more to blame for th[e] delay."[31] Delay caused by either the defendant or his counsel weighs against the defendant.[32] "In the absence of an assigned reason for the delay, a court may presume neither a deliberate attempt on the part of the State to prejudice the defense nor a valid reason for the delay."[33]

At the hearing on Balderas's motion to dismiss for lack of a speedy trial, former prosecutor Spence Graham testified that he assumed responsibility for this case when he became the felony chief prosecutor for the 179th District Court in May 2009. His caseload included three cases against Balderas: this case, a second capital murder, and an assault. Balderas's file included six to eight banker's boxes full of offense reports, documents, and photographs. Through his review of the State's investigation of the LTC gang's activities,

---

[28] *Id.*

[29] *Id.*

[30] *Vermont v. Brillon*, 556 U.S. 81, 90 (2009).

[31] *Id.* (quoting *Doggett*, 505 U.S. at 651).

[32] *Id.* at 90-91.

[33] *Dragoo*, 96 S.W.3d at 314.

Graham was aware that Balderas was connected in some way to at least eleven homicides. The District Attorney had not yet decided whether to seek the death penalty in this case.

Graham did not know the details of the State's efforts to take this case to trial before he took responsibility for it. However, the paperwork he received when he assumed responsibility for the case reflected that the State's attorneys and investigators had done quite a bit of work on it. Someone had prepared charts of various LTC gang-related cases, including this one, that mapped out the different offenses, how the different pieces of evidence tied in with them, and which defendants were associated with which offenses.

In addition, the clerk's record reflects activity in this case from December 16, 2005 to May 2009—when Balderas was arrested to when Graham became the prosecutor, respectively. Specifically, the probable cause hearing took place on April 12, 2006. The magistrate found probable cause for further detention and set no bond, and Balderas requested the appointment of counsel. The initial indictment was also handed down on that date. Defense counsel signed "Agreed Settings" concerning the three charges pending against Balderas in August 2006 and January 2007, as well as two Agreed Settings in 2008.

Graham noted that, when he became the prosecutor in May 2009, this case was not the oldest case on the trial court's docket, which included 21 capital murders and over 1,000 pending cases, approximately 200 of which were already set for trial. The trial judge took judicial notice that, when her predecessor took the bench on January 1, 2009, the court's docket had 1,091 cases, with a jury trial docket of 155 cases.

Graham testified that, shortly after he became the prosecutor, he contacted defense counsel and sent them a "mitigation letter," requesting any mitigating information that might assist the District Attorney in deciding whether to seek the death penalty. He stated that the parties appeared in the trial court for status hearings every couple of months. At these hearings, defense counsel never indicated that they were ready for trial. Rather, they represented that they were still obtaining statements from Balderas's family members in Mexico and investigating Balderas's background. In addition, defense counsel told Graham that they were trying to persuade Balderas to let them offer a guilty plea in exchange for a sentence of life without parole.

According to Graham, defense counsel never indicated that they were ready to set this case for trial. Rather, counsel repeatedly asked Graham to hold off presenting the case to the District Attorney for a decision concerning the death penalty until they could deliver a mitigation packet and persuade Balderas to let them offer a plea deal.[34] Sometime in 2009, the trial court pressed for a resolution of the case, and a trial date was set. However, that date passed with no trial. Defense counsel delivered a mitigation packet to Graham in late 2009 or early 2010, but counsel also reported that they were still investigating mitigating evidence and negotiating with Balderas.

The trial court set this case for a second trial date of April 15, 2011, but the trial did not begin on that date. Our review of the clerk's record reflects that on that date, the parties

---

[34] See, e.g., Munoz, 991 S.W.2d at 824-25 (deciding that delay caused by good faith plea negotiations should not weigh against the State).

agreed to a new setting of June 2, 2011. Graham stated that he could have taken this case to trial "as a nondeath" on April 15, 2011, because his two main witnesses were ready and the facts of the offense were "very simple." However, Graham "did not think it was appropriate to go to trial on th[is] case as a nondeath." This decision was due, in part, to a discovery that Graham made while preparing for the April 15 trial date. Specifically, he obtained Balderas's disciplinary records which revealed that, in 2010, Balderas had been disciplined for an aggravated assault on a public servant that he committed while confined in maximum security at the Harris County Jail. Graham testified that he did not discover this incident until he obtained Balderas's jail records in 2011 because the reporting officer did not contact him about it and it had not resulted in criminal charges. Graham needed additional time to investigate that incident and to communicate the situation to his supervisors in the District Attorney's Office who would make the "decision to ultimately seek death." Graham testified that the 2010 assault "really changed things for the wors[e]" for Balderas and "weighed heavily" in the District Attorney's decision to seek the death penalty. On April 28, 2011, Graham filed a notice of the State's intention to seek the death penalty.

Our review of the clerk's record shows that on June 2, 2011, the parties agreed to a new trial date of August 9, 2012. Graham stated that defense counsel continued to represent that they were urging Balderas to let them propose a guilty plea in exchange for a life sentence, but they never made such a proposal to Graham. Graham was reassigned to the Public Integrity Division of the District Attorney's Office in late 2011.

In January 2012, when Paula Hartman replaced Graham as the felony chief prosecutor for the 179th District Court, this case was still set for an August 2012 trial date. Hartman testified that she spent several months "get[ting] up to speed on the case in order to be ready for trial," and she would have been prepared to try this case by August 2012. However, in May 2012, defense counsel filed a motion for a continuance, asserting that the defense's investigation into both the guilt and punishment-phase issues could not be concluded by August, and that, without a continuance, the defense would be "substantially prejudiced in its ability to present a defense" at both phases of the trial. Although the typed order granting the continuance was titled, "Order on Unopposed Motion for Continuance," the trial judge made a hand-written note under his signature, stating that Balderas's motion was "granted over strong opposition of the State." The trial date was reset to February 2013.

The trial judge left the bench in December 2012, and the judge who ultimately presided over the trial took the bench in January 2013. Further, Hartman was reassigned to the Consumer Fraud Section of the District Attorney's Office in January 2013, and the prosecutor who ultimately took this case to trial assumed responsibility for it at that time. When the new judge took the bench, the 179th District Court's docket had 425 cases, with 44 jury trials set. With the agreement of both parties, the judge reset this case to September 2013. The case was reset again from September 2013 to January 2014 due to the illness of defense counsel, and the State did not agree to that continuance.

The State's inability to fully explain the delay from December 2005 until Graham became the chief prosecutor in May 2009 is troublesome, but the fact that defense counsel, even in 2009, requested additional time to investigate the case and negotiate with Balderas is some evidence that the defense played a role in the pre-2009 delay and would not have been ready for trial before then.[35] Further, Graham perceived that other State's attorneys and investigators had done a substantial amount of work on this case before he was assigned to it. The investigation of this offense was intertwined with the investigation of Balderas's other offenses, as well as other LTC gang-related offenses.

From May 2009 until the final resetting to the January 2014 trial date, defense counsel repeatedly urged the prosecutors and the trial court to delay the trial. Defense counsel represented as late as May 2012 that the defense's investigation was incomplete and that the defense would be "substantially prejudiced in its ability to present a defense" if the court did not grant a continuance. It appears that the State had acquiesced in the defense's previous requests for delays, but the State strongly opposed this motion for continuance. Further, although the State acquiesced in a delay in January 2013 because the newly-assigned judge and prosecutor were unfamiliar with the case, the State opposed the defense's request for a continuance in September 2013.[36] This factor weighs in favor of the State.

---

[35] See Dragoo, 96 S.W.3d at 314 (quoting Harris v. State, 827 S.W.2d 949, 957 (Tex. Crim. App. 1992)) (stating that a defendant's lack of a timely demand for a speedy trial "indicates strongly that he did not really want a speedy trial").

[36] Cf. Zamorano v. State, 84 S.W.3d 643, 650 (Tex. Crim. App. 2002) (finding
(continued...)

The third *Barker* factor—the defendant's assertion of his right to a speedy trial—is entitled to strong evidentiary weight in determining whether the defendant has been deprived of that right.[37] A defendant's lack of a timely demand for a speedy trial indicates strongly that he did not really want one.[38] The longer the delay becomes, "the more likely a defendant who wished a speedy trial would be to take some action to obtain it."[39] Thus, "inaction weighs more heavily against a violation the longer the delay becomes."[40] In this case, defense counsel expressly requested a substantial portion of the delay.[41] From 2009 to 2013, defense counsel consistently sought additional time for investigation and negotiation.

Not until January 29, 2014—after the jury had been selected—did defense counsel

---

[36](...continued)
that, in simple DWI case, defense counsel's single announcement of "not ready," seeking a delay of three days to file pretrial motions and obtain the State's witness list, did not make appellant responsible for the preceding delay of approximately eight months and the subsequent delay of approximately three years).

[37] *Gonzales,* 435 S.W.3d at 810-11.

[38] *Dragoo,* 96 S.W.3d at 314.

[39] *Id.*

[40] *Id.*

[41] *Cf. Barker,* 407 U.S. at 532 (emphasizing that a defendant's failure to assert his right to a speedy trial will make it difficult for him to prove that he was denied a speedy trial); *see also Cantu v. State,* 253 S.W.3d 273, 284 (Tex. Crim. App. 2008) ("Under *Barker,* appellant's failure to diligently and vigorously seek a rapid resolution is entitled to strong evidentiary weight.") (internal quotation marks omitted).

assert the right to a speedy trial by filing a "Motion to Dismiss for Lack of a Speedy Trial."[42]

It is also significant that defense counsel sought to dismiss the indictment rather than hasten

the trial.[43] This factor weighs in favor of the State.

The fourth *Barker* factor focuses on prejudice to the defendant because of the length

of delay. To analyze prejudice, we consider three interests of defendants that the Speedy

Trial Clause was designed to protect: (1) preventing oppressive pretrial incarceration; (2)

minimizing the anxiety and concern of the accused; and (3) limiting the possibility that the

defense will be impaired.[44] The last interest is the most important because the fairness of the

criminal-justice system is distorted when a defendant is unable to adequately prepare his

defense.[45] A defendant has the burden to make some showing of prejudice, but a showing

---

[42] *See, e.g., Amos v. Thornton,* 646 F.3d 199, 207 (5th Cir. 2011) (noting that the third *Barker* factor can cut against a defendant when there was a lengthy delay between his arrest or indictment and his assertion of his speedy-trial right).

[43] *See, e.g., Barker,* 407 U.S. at 535 (observing that, when defense counsel responded to a State's motion for a continuance by moving to dismiss the indictment, without moving in the alternative for an immediate trial, "the record strongly suggests that while [appellant] hoped to take advantage of the delay in which he had acquiesced, and thereby obtain a dismissal of the charges, he definitely did not want to be tried"); *see also Cantu,* 253 S.W.3d at 283 ("Filing for a dismissal instead of a speedy trial will generally weaken a speedy-trial claim because it shows a desire to have no trial instead of a speedy one").

[44] *Gonzales,* 435 S.W.3d at 812.

[45] *Id.*

of actual prejudice is not required.[46]  Excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or identify.[47]

At the hearing on his motion to dismiss for lack of a speedy trial, Balderas testified concerning the fourth *Barker* factor. He noted that he had been in continuous custody since his arrest on December 16, 2005, and he had never been granted bond. Balderas asserted that he did not know that he had the right to a speedy trial until he read about his case in the newspaper in April 2013, but he also acknowledged that he had not filed his *pro se* motion for speedy trial until January 17, 2014, after the jury had been selected.

Balderas testified that, if he had not been in custody, he would have continued his education. He stated that he graduated from high school in the summer of 2005, and before his arrest, he had begun completing financial aid paperwork so that he could enroll in 2006 in an architectural drafting program at Westwood College. Since his arrest, he had been taken to court once or twice a month. He testified that the extended incarceration had negatively affected his mental, physical, emotional, and spiritual well-being. He had lost several family members while in jail and had been unable to attend their funerals. He had not been employed or earning income. He had lost contact with family members who did not want to "visit an inmate accused of multiple capital murders." Balderas testified that there were nights when he could not sleep, and he had been "put on medication." He had

---

[46] *Munoz,* 991 S.W.2d at 826.

[47] *See, e.g., Shaw v. State,* 117 S.W.3d 883, 890 (Tex. Crim. App. 2003).

062984

considered suicide. He still had a girlfriend who he had been dating since 2002, but they did not have contact visits.

Balderas testified that his brother passed away in 2012. His brother "would be here to testify for [him]" if he were alive. Balderas acknowledged that he had two other brothers living in the Houston area. However, his deceased brother "had certain knowledge about [Balderas's] past that [his] other brothers did not have," having experienced "some of the same abuse from family members that [Balderas] did." That abuse led his brother to commit suicide in 2012.

We presume that the lengthy delay here adversely affected Balderas's ability to defend himself.[48] The evidence of the disruption to Balderas's educational plans and personal life caused by his lengthy pretrial incarceration, as well as his anxiety and concern over the pending charges, is also probative of prejudice.[49] On the other hand, Balderas's argument regarding the disruption of his life plans is undercut by the fact that he was being held on other serious charges.[50] Also, Balderas testified that his brother could have testified about the sexual abuse that he and Balderas had suffered if the trial had taken place sooner.

---

[48] See Shaw, 117 S.W.3d at 890.

[49] See, e.g., Moore v. Arizona, 414 U.S. 25, 27 (1973).

[50] See, e.g., Russell v. State, 598 S.W.2d 238, 248 (Tex. Crim. App. 1980) (declining to find that a defendant had a right to be tried on a 1974 charge prior to being tried on a 1972 charge in another county); Easley v. State, 564 S.W.2d 742, 745 (Tex. Crim. App. 1978) (stating that prosecution on other charges constituted a valid reason for delay in bringing the defendant to trial, and that "whatever anxiety or concern he has experienced is not solely attributable to the delay in this case").

However, when the trial court made its ruling, the sexual nature of abuse was not before it; thus, we will not consider it on appeal because it was not at issue before the trial court.[51] With that being said, however, the fourth *Barker* factor arguably weighs in favor of Balderas.

Having addressed the four *Barker* factors, we must now balance them. "[C]ourts must apply the *Barker* balancing test with common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's actual and asserted interest in a speedy trial has been infringed."[52] Weighing in favor of finding a violation of Balderas's speedy trial right are the facts that the delay was excessive and that Balderas offered some evidence of prejudice resulting from the delay. Weighing against finding a violation is the fact that the defense, citing the need for additional time to conduct investigations and negotiations, requested most of the delay.[53] Any prejudice to Balderas was extenuated by his role in requesting the delay.[54] Further, Balderas did not assert his speedy trial right until after jury selection, indicating that he really did not want a speedy trial.[55] We hold that the weight

---

[51] *See Gonzales,* 435 S.W.3d at 809.

[52] *Cantu,* 253 S.W.3d at 281.

[53] *See, e.g., Munoz,* 991 S.W.2d at 825 (noting that the fact that the defendant was "in large part responsible" for the delay was "probably dispositive" of his speedy trial claim).

[54] *See Barker,* 407 U.S. at 534 ("More important than the absence of serious prejudice, is the fact that Barker did not want a speedy trial.").

[55] *See id.; Shaw,* 117 S.W.3d at 890-91.

of the four factors, balanced together, is against finding a violation of Balderas's right to a speedy trial.[56] Point of error two is overruled.

## ASSISTANCE OF INTERPRETER

In point of error three, Balderas asks: "Does a criminal defendant have a Sixth Amendment right under the United States Constitution to confront his accuser in the English language where the witness speaks, understands, and is fluent in English?" He asserts in his supporting argument that the appointment of a Spanish-language interpreter during his cross-examination of Wendy was improper under Article 38.30 and denied him his Sixth Amendment right to confront his accuser because Wendy spoke "perfect English." Balderas's entire point of error is multifarious because he bases it on several legal theories, and we could reject it for that reason. However, we will address it in the interest of justice.

Balderas argues that the appointment of an interpreter was improper because Article 38.30 does not allow a trial court to appoint an interpreter when a witness understands and speaks English. However, Balderas reads too much into Article 38.30. Article 38.30(a) describes the circumstances in which a trial court must appoint an interpreter, but it does not proscribe the appointment of interpreters in other situations:

> When a motion for appointment of an interpreter is filed by any party or on motion of the court, in any criminal proceeding, [and] it is determined that a person charged or a witness does not understand and speak the English

---

[56] *See Dragoo,* 96 S.W.3d at 315-16.

language, an interpreter must be sworn to interpret for the person charged or the witness.[57]

Article 38.30 is silent regarding situations in which a person charged or a witness arguably understands and speaks some English. Balderas does not direct us to any cases that support construing Article 38.30's silence as a prohibition on the appointment of an interpreter in such situations, and we have found none. We decline to adopt such a construction of Article 38.30 in this case. Thus, the trial court's appointment of an interpreter in this case was not improper under Article 38.30(a).

Balderas also argues that, if a trial court does not abuse its discretion by refusing to appoint an interpreter when the record shows that a witness or defendant possesses sufficient fluency in English to understand and participate in the proceedings, then the trial court necessarily abuses its discretion by appointing an interpreter under the same circumstances. In support of his assertion, Balderas relies on cases applying Article 38.30(a), in which appellate courts have concluded that a trial court did not abuse its discretion by declining to appoint an interpreter.[58] Balderas's all-or-nothing reasoning is not only logically unsound,

---

[57] TEX. CODE CRIM. PROC. art. 38.30(a); *see also* TEX. GOV'T CODE § 57.002 (a) (stating that the court "shall" appoint an interpreter for an individual who does not comprehend or communicate in English if a party files a motion for appointment of an interpreter or if a witness requests it) *and* (b) (the court "may" on its own motion appoint an interpreter for an individual who does not comprehend or communicate in English).

[58] *See, e.g., Flores v. State,* 509 S.W.2d 580, 581 (Tex. Crim. App. 1974).

but also misapprehends the abuse-of-discretion standard of review.[59] It is unreasonable to conclude that the trial court abused its discretion by appointing an interpreter simply because the court might not have abused its discretion if it had refused to do so.

Balderas devotes most of his supporting argument to his assertion that the trial court's appointment of an interpreter violated his Sixth Amendment right to confrontation. He reasons that Wendy "spoke perfect English," and therefore the interpreter served as a "shield" between the witness, the parties, and the jury. Balderas alleges that, because Wendy was allowed to testify in Spanish, the jury could not adequately assess her demeanor and manner. He further complains that the State used the interpreter "to hide [Wendy's] biased and untruthful demeanor and to explain the inconsistencies in her testimony as compared to the physical evidence." In oral argument before this Court, Balderas added that the use of an interpreter prevented defense counsel from employing cross-examination tactics such as "rapid-fire questioning."

Balderas asserts that the use of an unnecessary interpreter was particularly harmful in this case because the jury's assessment of Wendy's credibility "meant the difference

---

[59] *See, e.g., Johnson v. State,* 433 S.W.3d 546, 557 n.53 (Tex. Crim. App. 2014) (explaining that, although the trial court did not abuse its discretion or violate the Confrontation Clause by prohibiting appellant from cross-examining witnesses charged with felonies concerning the particular ranges of punishment they faced, the trial court was not under any obligation to prevent such questioning); *see also United States v. Campbell,* 544 F.3d 577, 582 (5th Cir. 2008) (noting that the trial court, in light of its concerns, "was well within its discretion to deny the use of an interpreter" for a juror, and declining to resolve the question of whether the court nevertheless "could have ordered an interpreter").

between a guilty verdict and an acquittal." In support of this argument, Balderas notes that Wendy was the sole witness who identified him as the gunman. He also points out that, during deliberations, the jury twice requested a "read back" of Officer Ruland's testimony concerning his opinion of Wendy's credibility. Balderas appears to mean that the jury's repeated requests for this testimony signify that Wendy's credibility was a very important issue to the jury.

The Confrontation Clause gives a criminal defendant the right "to be confronted with the witnesses against him."[60] "[I]t is that personal presence of the defendant and the right to ask probing, adversarial cross-examination questions that lies at the core of an American criminal trial's truth-seeking function."[61] An attack on a witness's credibility may be "effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand."[62] Defense counsel should be permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, can appropriately draw inferences relating to the reliability of the witness.[63]

---

[60] *Coronado v. State,* 351 S.W.3d 315, 319 (Tex. Crim. App. 2011).

[61] *Id.* at 325.

[62] *Davis v. Alaska,* 415 U.S. 308, 316-17 (1974).

[63] *Id.* at 318.

Wendy, who was twenty-four years old at the time of trial, testified on direct examination that she began learning English when, at the age of twelve, she moved with her mother and sister to the United States from Honduras. She and her family spoke Spanish at home. Wendy learned English in some of her classes at school, but she did not attend school regularly. She dropped out in the ninth grade, when she was sixteen or seventeen years old. At the time of trial, Wendy still lived with her mother. They worked together, cleaning houses. Wendy testified that she thought in Spanish, so she had to translate "in [her] mind" when speaking English. She stated that she was sometimes unable to communicate "exactly what [she] mean[t]" in English.

Balderas filed a "Motion to Compel Witness to Provide Cross-Examination Testimony in the English Language," asserting that Wendy would use the interpreter as a shield to cover up her deception and that the use of an interpreter violated his rights to confrontation, cross-examination, and due process. The trial court held a hearing on this motion outside the jury's presence. During the hearing, the prosecutor acknowledged that Wendy could speak English but also stated that Wendy would be "more comfortable" testifying in Spanish. Balderas offered an audio recording of the conversation in which Wendy identified Balderas as the gunman for the second time. Balderas asserted that this recording would demonstrate Wendy's fluency in the English language. The court admitted this recording "for the limited purposes of this hearing."

The judge agreed with Balderas that Wendy's "comfort" in testifying did not outweigh his right to confrontation, but she concluded that the jury would get a "more accurate view" of Wendy's testimony if she testified through an interpreter. Specifically, the judge stated:

> [T]he record, I think, will speak for itself that there is an inherent language barrier that was evident to the Court, just in phrasings on the hearing that was conducted outside the presence of the jury yesterday [on Balderas's motion to suppress Wendy's identification of him] and it is my view that the jury will get an accurate—a more accurate view of Ms. Bardales'[s] testimony if allowed through a translator. So the motion is overruled.

The day before Balderas filed his motion to compel cross-examination without an interpreter, Wendy had testified through an interpreter at the hearing on Bardales's motion to suppress her identification of him as the gunman. She testified that, even though she positively identified Balderas as the gunman the first time that Ruland showed her the lineup containing his photograph, Ruland told her that he wanted to show her the lineup a second time "to make sure that [she] was sure." Wendy stated that she thought that there was a lack of communication between them and that they could not understand each other very well. When they met again, she told Ruland that she knew she had identified the right person from the photo lineup. Wendy also testified that, when she described the gunman in her statement to Cunningham, she did not know how to say "mole" or "birth mark" in English, and she would not have been able to distinguish between these terms without the aid of an interpreter. She did not recall using either term in her description of the gunman.

In addition, Sergeant Ruland testified at that hearing that it appeared to him that English was Wendy's second language. Also, although he had not noticed a language barrier

during most of their conversations, he came to suspect that his confusion over what Wendy

said when she first identified Balderas as the gunman was the result of a language barrier:

> Q You stated that you were a little unclear or confused about what she had told you. Did you ever consider the fact that she may not have been a fluent English speaker?
>
> A I did.
>
> Q Did you?
>
> A Somewhat.
>
> Q Did you do anything to ascertain whether or not she spoke English well?
>
> A Just by conversing with her. We could hold a conversation. I could tell -- it appeared to me that maybe it was her second language.
>
> Q And why do you say it appeared to be her second language?
>
> A Just accent and some of the, the phrasings I would say.
>
> Q Did you ever ask her if she felt that she needed an interpreter?
>
> A I did not.

* * *

> Q Is it common that -- in your experience have you -- well, have you had the opportunity to speak to few or many people for whom English is a second language?
>
> A Many.
>
> Q And has it been your experience that people who have English as a second language often will not want to admit that they're not as fluent as you might believe them to be?
>
> A Yes.

Q And I believe that Ms. Bardales was a 15-year-old teenager at the time of this interview?

A Something like that, yes.

Q Did she seem like she felt completely comfortable with the fact that she was talking to the police?

A I would say no. I think she was apprehensive about speaking to the police.

\* \* \*

Q You stated that you could tell that English was her second language. What was it about her demeanor when she was speaking and listening to you that made you believe that?

A Well, again, as I said, I think it was -- be the accent. Sometimes she would think about what she was going to say and I think maybe she was maybe trying to translate certain things in her head. I'm not sure.

Q When she asked to write in Spanish, did you feel that perhaps there had been a communication problem that would explain why her statements in regards to the photo spread the day before were so odd to you?

A Yes. I thought that that might assist us because I told her we were trying to clarify her statements. So then it was her idea to write this in Spanish; and I thought that she was attempting to do just what I had asked, clarify what she meant.

Courts have generally regarded the use of an interpreter for a material witness who has difficulty communicating in English as a requirement of the Confrontation Clause, rather than an encroachment on face-to-face confrontation, because the use of an interpreter enables a defendant to conduct a meaningful cross-examination.[64] "[T]he appointment of an

---

[64] See, e.g., Miller v. State, 177 S.W.3d 1, 5-8 (Tex. App.—Houston [1st Dist.] 2004, no pet.).

interpreter for a material witness is required by the [C]onfrontation [C]lause and by article I, section 10, and must be implemented unless expressly waived if the trial judge is aware that the witness has difficulty understanding the English language."[65] The trial court abuses its discretion when it fails to appoint an interpreter for a material witness whose English skills are so poor that the defendant cannot conduct a meaningful cross-examination.[66]

In cases such as this one, in which the trial court appointed an interpreter for a witness, appellate courts have not imposed a requirement that the record affirmatively establish that the witness's English skills were so poor that, without the interpreter, the defendant would have been deprived of the ability to conduct an effective cross-examination. We decline Balderas's invitation to impose such a requirement now.

This Court has not previously defined the standard of review applicable specifically to the trial court's decision to appoint an interpreter. However, in considering challenges to the adequacy of interpretive services, this Court and other appellate courts have deferred to the wide discretion of the trial judge, who had direct contact with the witness, the parties, and the interpreter, to make decisions.[67] We see no reason to apply a different standard when considering the trial court's initial decision to appoint an interpreter. As with other decisions

---

[65] *Id.* at 5-6; *see also Garcia v. State,* 149 S.W.3d 135, 144-45 (Tex. Crim. App. 2004).

[66] *See Miller,* 177 S.W.3d at 5-8.

[67] *See, e.g., Linton v. State,* 275 S.W.3d 493, 503 (Tex. Crim. App. 2009); *see also United States v. Bell,* 367 F.3d 452, 463 (5th Cir. 2004) (quoting *Valladares v. United States,* 871 F.2d 1564, 1566 (11th Cir. 1989)).

regarding interpretive services, we conclude that the trial court's decision to provide an interpreter should not be reversed absent a clear abuse of discretion—that is, when the ruling lies outside the zone of reasonable disagreement.[68]

Balderas analogizes the assistance of an interpreter to the placement of a screen between a defendant and the witnesses who testify against him.[69] However, unlike the use of a physical barrier such as a screen or a disguise, the assistance of an interpreter does not interfere with the parties', witness's, or jurors' ability to observe each other. Thus, we are skeptical of Balderas's characterization of the assistance of an interpreter as an encroachment on face-to-face confrontation.[70]

Even if we assume *arguendo* that the use of an interpreter constituted an encroachment on face-to-face confrontation, we must still consider whether it was necessary to further an important public interest and whether the reliability of Wendy's testimony was otherwise assured.[71] The use of an interpreter for a witness whose primary language is not

---

[68] *Cf. Linton,* 275 S.W.3d at 503.

[69] *See Coy v. Iowa,* 487 U.S. 1012, 1016-22 (1988).

[70] *Cf. Coy,* 487 U.S. at 1016 ("the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact"); *Romero v. State,* 173 S.W.3d 502, 505-06 (Tex. Crim. App. 2005) (emphasizing that jurors' ability to view a witness's face is traditionally regarded as one of the most important factors in assessing credibility).

[71] *See Romero,* 173 S.W.3d at 505 ("An encroachment upon face-to-face confrontation is permitted only when necessary to further an important public interest and when the reliability of the testimony is otherwise assured.").

English is necessary to further an important public interest when it ensures that the defendant can conduct an effective cross-examination and that the jury has an accurate understanding of the witness's testimony. The trial judge's finding of "an inherent language barrier," and her determination that the jury would get "a more accurate view of [Wendy's] testimony if allowed through a translator," signaled that an interpreter was necessary to further this interest. We will defer to the trial court's wide discretion on this matter.

In determining whether the reliability of Wendy's testimony was otherwise assured, we examine the extent to which the proceedings respected the four elements of confrontation: physical presence, oath, cross-examination, and observation of demeanor by the trier of fact.[72] Physical presence and oath are not at issue in this case. The record shows that Wendy testified in person in the courtroom, and before she testified, she swore an oath to tell the truth. The trial court reminded her of that oath before cross-examination began.[73]

Balderas's allegations on appeal implicate only the elements of cross-examination and observation of demeanor. Concerning cross-examination, Balderas does not assert that, because of the interpreter, he was prevented from asking Wendy, or obtaining her response to, any particular question.[74] The Confrontation Clause guarantees only an opportunity for

---

[72] *See id.*

[73] *See id.*

[74] *See Bell,* 367 F.3d at 464 (finding no violation of a defendant's confrontation rights when he was able to cross-examine the complaining witness through an interpreter).

effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, a defendant might wish.[75] "[A] 'less than optimal' opportunity for cross-examination does not, of itself, violate the Sixth Amendment."[76] Further, although the cross-examiner is permitted to "delve into the witness's story to test the witness's perceptions and memory" and to impeach or discredit the witness, he remains subject to the broad discretion of the trial judge to preclude repetitive and unduly harassing interrogation.[77] Without more, Balderas's generalizations about potential hindrances to the truth-testing function of cross-examination, and his inability to employ particular cross-examination tactics such as "rapid-fire questioning," do not show that the assistance of the interpreter in this case adversely affected the cross-examination element.

Concerning the fourth element of confrontation, Balderas alleges that the use of the interpreter enabled the State "to hide [Wendy's] biased and untruthful demeanor." Balderas asserts, "The jury could not notice or detect Wendy Bardales's voice inflection, facial expressions, speech patterns, etc. when the jury spoke English and the witness testified in Spanish through an interpreter." However, Balderas does not assert, and nothing in the record suggests, that he and the jurors were unable to view Wendy, or that Wendy was unable to view them, at any time during cross-examination. Wendy's speaking Spanish would not

---

[75] *Johnson,* 433 S.W.3d at 557 & n.48.

[76] *Id.*

[77] *Cf. Davis,* 415 U.S. at 316.

"hide" her demeanor from jurors, notwithstanding any arguable detriment to an English-speaking juror's ability to accurately assess nuances such as voice inflection and speech patterns. Because the jurors were able to view Wendy throughout the examination, they could discern for themselves whether Wendy's demeanor was "biased and untruthful."

Balderas also argues that the use of the interpreter enabled the State to "explain the inconsistencies in [Wendy's] testimony as compared to the physical evidence." We understand Balderas to argue that the assistance of an interpreter could impede a defendant's efforts to show that inconsistencies between the witness's statements and other evidence were the result of dishonesty rather than a language barrier. We find no such impediment under the facts of this case. The jury was presented with evidence that Wendy understood and spoke English fairly well. Wendy testified that she could speak English and she acknowledged that, in the weeks before the trial, she communicated with the District Attorney's staff in English. She also acknowledged that, by the time of the trial, she had learned to read English. During cross-examination, she occasionally answered a question in English without waiting for the interpreter, and she acknowledged that she understood some of the questions in English. Cunningham and Ruland, who interviewed Wendy in the days after the offense, both testified that they did not perceive the need for an interpreter and that they had no difficulty communicating with Wendy in English. The jury learned that, during Ruland's third interview with Wendy, she wrote a sentence in Spanish indicating that she understood, but could not write, English.

In addition, the use of an interpreter did not deprive Balderas of an opportunity to effectively cross-examine Wendy about the inconsistencies between her statements and the other evidence. Specifically, Wendy acknowledged that, although she had described the suspect as having a dark mark on his face, no such mark was visible on the photograph of Balderas's face in the photo array, and when she viewed Balderas in the courtroom, he had only a mole on his face. She also acknowledged that she had described the murder weapon as a black handgun, while the weapon the State presented as the murder weapon was gray or silver with a black handle. In addition, Wendy had claimed in her statement to police that the gunman shot at her until his gun was empty, but at trial, Balderas pointed out that the crime scene evidence and Ferrufino's testimony indicated that no shots had been fired toward Wendy.

When confronted with such inconsistencies, Wendy sometimes suggested that they were misunderstandings arising from a language barrier, but she frequently testified that she did not remember what she said or why. She acknowledged that her memory would have been better when she gave her statement to police in 2005 than it was at the time of trial in 2014.

The record shows that Balderas argued to the jury that Wendy did not need an interpreter because she spoke English well, and that the use of the interpreter cast doubt on Wendy's credibility. Balderas also argued that the discrepancies between Wendy's statements and the other evidence established that her testimony was not credible. The trial

court and the jury were in the best position to draw their own conclusions based on their

personal observations of the proceedings. We will not second-guess those conclusions on

appeal.

We conclude that the trial court did not abuse its discretion under Article 38.30 by

appointing an interpreter for Wendy and denying Balderas's motion to compel cross-

examination in the English language. We also conclude that the assistance of the interpreter

did not deprive Balderas of his Sixth Amendment right to confront Wendy. Point of error

three is overruled.

In point of error four, Balderas asks:

> If a criminal defendant does not have a Sixth Amendment right . . . to confront
> his accuser in English, does he at least have the right to cross-examine and
> impeach his accuser concerning her ability to speak English so that the jury
> might be made aware of her attempt to mask the extent of her fluency?

Although Balderas's stated point of error appears to complain of a limitation on cross-

examination, his argument focuses on the trial court's evidentiary ruling that excluded the

audio recording of the conversation in which Wendy identified Balderas as the gunman for

the second time. Because Balderas's argument is unclear and relies, apparently, on multiple

legal theories, we could reject this point of error as inadequately briefed and multifarious.[78]

Nevertheless, in the interest of justice, we will address Balderas's argument as we understand

it.

---

[78] TEX. R. APP. P. 38.1.

Balderas appears to argue that the trial court's exclusion of the audio recording violated the Sixth Amendment by preventing him from effectively cross-examining Wendy concerning her English fluency. He asserts that the audio recording could have impeached Wendy by demonstrating to the jury that: (1) Wendy lied about her English-language proficiency, and (2) the apparent inaccuracies and discrepancies in her statements to police stemmed from her personal animosity toward Balderas rather than a language barrier.

At the end of the trial, Balderas attempted to offer the audio recording into evidence. The trial court asked Balderas why the recording was not hearsay. Balderas stated that he was offering it to show Wendy's ability to communicate in English. He argued that Wendy's ability to speak English was subject to cross-examination and that the audio recording was impeaching of her testimony that she had trouble communicating in English when she spoke with the police. The prosecutor objected to the admission of the audio recording on grounds that it was hearsay, irrelevant, and improper impeachment evidence because no one had claimed that Wendy could not speak English. The trial court excluded the audio recording without making any express reference to Balderas's arguments or the State's objections, instead simply noting that the jury could draw conclusions about Wendy's ability to speak English from the testimony of the live witnesses. In post-submission briefing, Balderas argues that the trial court should have admitted the audio recording as demonstrative

evidence. To the extent that he means to assert a separate ground for admission, Balderas did not urge this ground, or obtain a ruling on it, at trial.[79]

Evidentiary rulings rarely rise to the level of denying fundamental constitutional rights to present a meaningful defense.[80] A ruling might rise to this level if it is "clearly erroneous" and if it excludes "otherwise relevant, reliable evidence which forms such a vital portion of the case" that the ruling "effectively precludes the defendant from presenting a defense."[81]

The record does not support Balderas's complaint that the trial court's exclusion of the audio recording prevented him from effectively cross-examining Wendy concerning her English fluency. As discussed in point of error three, Balderas did effectively cross-examine Wendy concerning her ability to speak English. Through Wendy's testimony, as well as the testimony of the police investigators who interviewed her, the jury learned that Wendy understood and spoke English fairly well.

Further, the audio recording conveys an impression of Wendy's ability to understand and speak English that is generally consistent with the impression given by the witnesses' trial testimony, which was that Wendy understood and spoke some English but that English was her second language. As discussed in point of error three, the Sixth Amendment did not

---

[79] See TEX. R. APP. P. 33.1; see also Yazdchi v. State, 428 S.W.3d 831, 844 (Tex. Crim. App. 2014) ("For a party to preserve a complaint for appellate review, the complaining party must make a specific objection and obtain a ruling on the objection.").

[80] Williams v. State, 273 S.W.3d 200, 232 (Tex. Crim. App. 2008).

[81] Id.

entitle Balderas to cross-examine Wendy in whatever way, and to whatever extent, he wished.[82] The trial judge had broad discretion to preclude repetitive and unduly harassing interrogation.[83] The trial court did not violate the Sixth Amendment by excluding the audio recording. Point of error four is overruled.

In point of error five, Balderas asks: "Did the trial court abuse its discretion by allowing Wendy Bardales to testify in Spanish?" We resolved this question against Balderas in our discussion of point of error three; therefore, we answer Balderas's question in the negative. Point of error five is overruled.

## *GASKIN* RULE VIOLATION

In point of error six, Balderas asserts that the trial court violated the *Gaskin*[84] Rule by improperly denying him the opportunity to impeach Wendy with her prior audio recorded statement to police. Balderas misunderstands the *Gaskin* Rule, which entitles a defendant to inspect a State's witness's prior statements, if they relate to the subject matter of the witness's testimony, for use in cross-examination and impeachment.[85] Balderas acknowledges, and the record reflects, that he had a copy of the recorded statement. Thus, there was no violation of the *Gaskin* Rule. Point of error six is overruled.

---

[82] *See Johnson*, 433 S.W.3d at 557 & n.48.

[83] *Cf. Davis*, 415 U.S. at 316.

[84] *Gaskin v. State*, 353 S.W.2d 467 (Tex. Crim. App. 1961).

[85] *See, e.g., Enos v. State*, 889 S.W.2d 303, 305 (Tex. Crim. App. 1994); *see also* TEX R. EVID. 615.

## OUTSIDE INFLUENCE ON THE JURY'S DELIBERATIONS

In point of error seven, Balderas asks, "Was the appellant deprived of due process of law and an impartial jury by an outside influence acting upon the jury during their deliberations?" Balderas explains that this "outside influence" was his brother's act of standing near the street and waving at a bus that carried the jurors from the courthouse to their hotel. Balderas asserts that there is a reasonable probability that this incident had a prejudicial effect on the verdict because jurors who were questioned by the judge acknowledged that they were fearful as a result of this incident. He theorizes that this fear motivated jurors who had doubts about his guilt to abandon their reservations in order to reach a verdict quickly "and escape the situation." In support of this theory, Balderas asserts that the jury reached a guilty verdict the morning following the incident after just two hours of deliberation, although the jury foreman had reported that the jury was deadlocked when deliberations ended the previous day.

Any private communication, contact, or tampering with a juror, directly or indirectly, during a trial about the matter pending before the jury is presumptively prejudicial, if such contact is not authorized by the court and is made without the knowledge of the parties.[86] The United States Supreme Court in *Remmer v. United States* remanded that case to the trial court for a hearing, stating that the State had the burden to show that such contact was

---

[86] *See Remmer v. United States,* 347 U.S. 227, 229 (1954).

harmless to the defendant.[87]  However, the Supreme Court later cited *Remmer* as one case

in a long line of cases which concluded that the proper remedy for allegations of juror bias

was a hearing in which the defendant had the opportunity to prove actual bias.[88]  In *Smith v.*

*Phillips,* the Court observed that it is "virtually impossible to shield jurors from every contact

or influence that might theoretically affect their vote."[89]  Thus, due process did not require

a new trial every time a juror was placed in a potentially compromising situation, but instead

required a jury able and willing to decide the case solely on the evidence before it.[90]  Since

*Phillips,* the Supreme Court has framed the "ultimate inquiry" as: "[d]id the intrusion affect

the jury's deliberations and thereby its verdict?"[91]

Similarly, this Court has held, "When a juror converses with an unauthorized person

about the case, 'injury to the accused is presumed' and a new trial may be warranted."[92]

However, this presumption is rebuttable.[93]  When determining whether the State sufficiently

rebutted this presumption, we view the evidence in the light most favorable to the trial

court's ruling and defer to the trial court's resolution of historical facts and its determinations

---

[87]  *Id.*

[88]  *Smith v. Phillips,* 455 U.S. 209, 215 (1982).

[89]  *Id.* at 217.

[90]  *Id.*

[91]  *See United States v. Olano,* 507 U.S. 725, 739 (1993).

[92]  *Quinn v. State,* 958 S.W.2d 395, 401 (Tex. Crim. App. 1997).

[93]  *Ocon v. State,* 284 S.W.3d 880, 885 (Tex. Crim. App. 2009).

concerning credibility and demeanor.[94] We consider only those arguments that were before the court at the time of the ruling.[95] We review a trial court's denial of a mistrial for an abuse of discretion.[96]

In this case, the record does not reveal precisely when the behavior of Balderas's brother was first brought to the trial court's and the parties' attention. The first mention of this incident on the record appears after the jury found Balderas guilty, but in the hearing that ensued, it was apparent that the trial court had been apprised earlier that day of the incident. Specifically, after the foreman announced the verdict and the parties declined to have the jury polled, the trial court excused the jury. The judge then asked counsel to approach the bench, and following an off-the-record discussion, she presided over a hearing concerning this incident.

The judge first called Deputy Patrick Henning, who had accompanied jurors to their hotel on the previous evening:

> THE COURT: For efficiency['s] sake, Deputy Henning, if you would, just give a summation of what it was that you told me this morning in chambers regarding the jury as you left last night to go to their sequestered hotel.
>
> DEPUTY HENNING: Approximately 6:30 as we were leaving on the bus on Commerce Street, just across San Jacinto when several of the jurors started saying, He's waving at us. He's waving at us.

---

[94] *Quinn*, 958 S.W.2d at 401-02.

[95] *Ocon*, 284 S.W.3d at 884.

[96] *Id.*

And I said, who? And they said, the defendant's brother. I advised the bus driver to stop. I got off. I didn't know what the brother looked like. They just gave me an ID of he's wearing a white hoodie, he's going down the street. He was already on the other side of San Jacinto and the bayou, pretty much across the bridge. I couldn't leave the jury. I stayed with the jury and I went to the hotel.

THE COURT: Did you see him waving at the jury?

DEPUTY HENNING: I did not see him. I was on the opposite side of the bus. They were on the right side of the bus when they saw him.

THE COURT: Did any of the jurors repeat or report anything other than a wave?

DEPUTY HENNING: A smirk on his face as he did it. They said he stood there, waved with a smirk on his face until the bus was all the way past.

THE COURT: Do you have any questions, [defense counsel]?

[DEFENSE COUNSEL]: You said that y'all stopped? You stopped and what?

DEPUTY HENNING: I had the bus driver stop so I could ID him, but I didn't know what he looked like. And by the time I stepped off the bus, he was already across the bridge. So I didn't leave the jury. I stayed with the jury and we left.

[DEFENSE COUNSEL]: And the jurors were all together on the bus?

DEPUTY HENNING: All together on the bus, everybody was on the bus with Deputy Dearmon and myself.

[DEFENSE COUNSEL]: So whatever happened, everybody at least heard?

DEPUTY HENNING: Everybody on the bus heard and understood what happened.

[DEFENSE COUNSEL]: And who made the identification that that was the accused's brother?

DEPUTY HENNING: I will say about five or six of the jurors at least. I can't tell you which ones right now but everybody that was on that side of the bus was probably five, six people identified that's the brother, that's the brother, he's waving.

[DEFENSE COUNSEL]: And was there any discussion about why they knew that was his brother, i.e., did they recognize him from court?

DEPUTY HENNING: They said I've seen him in the courthouse and in the courtroom, that's the brother. There was no doubt in their mind it was the brother.

[DEFENSE COUNSEL]: Okay.

DEPUTY HENNING: And then at that point, I advised them not to discuss it, not bring it up.

[DEFENSE COUNSEL]: And whatever gesture, contact, whatever you want to call it, did they seem to be alarmed or offended by it?

DEPUTY HENNING: Several of them were very alarmed.

[DEFENSE COUNSEL]: And how was that alarm expressed to you or how did you discern that they were alarmed?

DEPUTY HENNING: Once we got to the hotel, got them in their rooms, two of the ladies commented about it. I advised them, don't worry, don't think about it, it'll be brought up with the Judge tomorrow. Deputy Dearmon called me, one of the female jurors was in somewhat of a panic. She wanted to call her family because she was worried that somebody knew where she lived in her mind. [sic]

[DEFENSE COUNSEL]: Okay.

DEPUTY HENNING: Now, when she came to the room, she at that time told me she did not see the person wave, she was on the bus. Of course everybody said it but she didn't see the person wave. But she believed all the other jurors because they said it was the brother.

[DEFENSE COUNSEL]: So she was responding to what they --

03005

DEPUTY HENNING: She was worried, yes.

[DEFENSE COUNSEL]: And you say she was worried that -- at that point about not only potentially her safety but the safety of her family?

DEPUTY HENNING: Yes.

[DEFENSE COUNSEL]: Okay. Nothing further.

THE COURT: State have anything?

[PROSECUTOR]: No.

THE COURT: Just for whoever may be reading this record in the future, Deputy Henning, members of the State prosecution team and defense are acquainted with Deputy Henning but he is not the normal bailiff or process server assigned to the 179th. He was on loan to us yesterday so he doesn't know any of the family members and he's not acquainted with the jury although he did escort them to their hotel last night. So that that's clear.

Thank you, Deputy Henning.

Do you-all still want to speak to the juror?

[DEFENSE COUNSEL]: I do, Your Honor.

Deputy Henning, I'm sorry. Before you go, are you able to identify who the other jurors were?

DEPUTY HENNING: I'd have to look at their faces because it was on the bus. It was dark, and when the bus driver stopped, [the] door opened, the light came on. I could see who was on that side of the bus, but I didn't individually go up and say, did you see it, did you see it.

THE COURT: Can you just go back there and ask, would you recognize them and what's your name. Don't say who saw anything on the bus. Just ask their names so you can report back to us.

At defense counsel's request, the judge then called the juror who had been "in somewhat of a panic" at the hotel. The following exchange ensued:

THE COURT: It's been reported to me that there might have been an incident last night while you-all were on the bus going to --

[DEFENSE COUNSEL]: Your Honor, I'm sorry. Before you -- just identify her for the record by a number or something?

THE COURT: Yes. This is Juror, first initial A. last initial B, she's the only one on the jury with those initials. It has been reported to us that there was an incident last night as the jury was being transported to the hotel from the courthouse. Did you see it?

[JUROR A.B.]: I did not see it.

THE COURT: It's my understanding that you were made aware of that incident; is that right?

[JUROR A.B.]: Yes.

THE COURT: And how were you made aware of that? Did other jurors tell you?

[JUROR A.B.]: The other juror said -- the ones who saw it said, oh, he waved at us. That's when they stopped the bus and both deputies got off.

THE COURT: But you didn't see that?

[JUROR A.B.]: I didn't see this.

THE COURT: Did that affect you in any way?

[JUROR A.B.]: I felt like it potentially was a tactic to intimidate or threaten perhaps.

THE COURT: Did you feel intimidated or threatened?

[JUROR A.B.]: I felt cautious.

THE COURT: Did any of that feeling of cautiousness weigh in your deliberations this morning when you came back to return to deliberations?

[JUROR A.B.]: No.

THE COURT: Okay. Do you have any further questions from either side?

[PROSECUTOR]: No, ma'am.

[DEFENSE COUNSEL]: Just very briefly, I understand that it was to an extent on a level that you asked to call your family; is that correct?

[JUROR A.B.]: That is correct.

[DEFENSE COUNSEL]: And you wanted to make that phone call for what purpose?

[JUROR A.B.]: Again, out of caution. Because he's home with my 9-year-old and 3-year-old.

[DEFENSE COUNSEL]: And when you say out of caution, at that point are you -- did you entertain some fear perhaps from the accused['s] family? Is that what the caution was?

[JUROR A.B.]: I don't know. The person who did it is in the courtroom.

THE COURT: Hold on. You guys have to talk in here.

[JUROR A.B.]: I assumed that he is somehow related to, somehow associated with the defendant, the family or acquaintance. Not knowing the jury process, I didn't know if there was any way in public record that we could ever be identified by name, knowing that if I could be identified by name, anyone can look up our address or our personal information.

[DEFENSE COUNSEL]: Really just two other questions, either on the bus or at the hotel or when you returned to the jury room to today [sic] --

[JUROR A.B.]: Yes.

[DEFENSE COUNSEL]: -- was there any further discussion about that incident?

[JUROR A.B.]: There was this morning.

[DEFENSE COUNSEL]: In the jury deliberation room?

[JUROR A.B.]: As we first entered before we began deliberating.

[DEFENSE COUNSEL]: Who brought it up?

[JUROR A.B.]: I think I said something to another juror.

[DEFENSE COUNSEL]: Okay. And I don't want to invade the deliberation process --

[JUROR A.B.]: Not at all.

[DEFENSE COUNSEL]: -- but what I want to know is why did you bring it up this morning in the jury room? It was still something that you were concerned about?

[JUROR A.B.]: I think my question was, I wonder if that person would be in court today.

[DEFENSE COUNSEL]: Okay. And in fact, I was told during one of the read outs -- and obviously I wasn't here this morning. During those read outs, that as the readings were being done, you were kind of leaning over looking into the audience. Is that right, trying to see if you could find him?

[JUROR A.B.]: I've looked into the audience throughout the process. I looked in the audience today.

[DEFENSE COUNSEL]: Did you see that person?

[JUROR A.B.]: I did not notice him.

[DEFENSE COUNSEL]: Okay.

[JUROR A.B.]:  But I'm not sure of his specific physical characteristics because I didn't see him.

[DEFENSE COUNSEL]:  And the final question I have for you is:  How, if at all -- a, did that affect or going forward, will it affect your ability to continue to serve as a juror in this case?

[JUROR A.B.]:  I don't believe it affects my ability at all, but if you're uncomfortable with it, I'm not going to take it personally.

[DEFENSE COUNSEL]:  And unfortunately, that's not the issue whether I'm comfortable with it or not.  The bottom line is are you saying that whatever that was, whatever it was, it will in no way affect you as you continue to serve in this case?

[JUROR A.B.]:  No, sir.

[DEFENSE COUNSEL]:  And you're certain about that?

[JUROR A.B.]:  I am certain about that.

[DEFENSE COUNSEL]:  Okay.

THE COURT:  Any questions?

[PROSECUTOR]:  No, ma'am.

THE COURT:  Thank you very much.  You may go back to the jury room.

(Juror left courtroom.)

Defense counsel then stated that he wanted to talk to one of the jurors who had seen the incident.  He asked Deputy Henning if he could identify such a juror, and Henning identified "Darlene" as "the main one" who had been "adamant that it was the brother":

THE COURT:  Anything else from the defense?

[DEFENSE COUNSEL]:  Yes, sir, I think he was trying --

DEPUTY HENNING: Two of our regular jurors and one alternate.

[DEFENSE COUNSEL]: Since she heard about it, I wanted to talk to one of those who actually saw this person, saw what they were doing. Can you distinguish?

DEPUTY HENNING: I know which -- Darlene was the main one. She was sitting on the left side next to the right. [sic] She actually was the one who made it adamant that it was the brother.

[DEFENSE COUNSEL]: Judge, I would like for her to be brought out just so you can question her.

THE COURT: Okay.

[PROSECUTOR]: Judge, while we're having her brought out, I would just like to note for the record that this was a Thursday morning when the jurors were brought out for that other read back and it is the Court's heavy docket day and there were substantially more people in the courtroom than there generally are and that could have been the reason for some of the looking around.

THE COURT: That is true. The Court had well over a hundred cases on our docket this morning, easily over 45 defendants and family members still sitting in the audience at the time when the read back was read.

As requested by defense counsel, the judge called the juror that Henning had

identified:

THE COURT: Come on up, up here. For the record, this Juror will be identified by her first and last initials as D. T.

So, we're -- I understand that there was an incident last night on the bus.

* * *

THE COURT: There was an incident on the bus as the jury was traveling from the courthouse to the restaurant where you went to eat for dinner. Can you briefly explain what that was.

[JUROR D.T.]: Well --

THE COURT: And for the record, you saw it?

[JUROR D.T.]: Yes, I saw it.

THE COURT: Explain what you saw, please.

[JUROR D.T.]: We were right there by where the construction is where the bayou is where the coffee company, I guess, is. And somebody had said, Oh, my god, there's his brother. And I turned and he was standing on the curb with this smirk on his face and he just kind of was waving. And I was like, Oh, my god, that's him. He's waving at us.

And so, Pat --

THE COURT: Deputy Henning.

[JUROR D.T.]: He told the driver to stop and he got off the bus. Then the lady deputy got off the bus and then the driver stood and guarded the door while they chased him down the street. But by then, he had already taken off.

THE COURT: And outside the smirk and the wave, was there any additional behavior on his part?

[JUROR D.T.]: Not that I saw, because I didn't see him leave.

THE COURT: And I'm just a little confused. How did you know it was the defendant's brother?

[JUROR D.T.]: We just figured that that's who that was.

THE COURT: So you don't even know that that's who that was.

[JUROR D.T.]: No.

THE COURT: Have you seen him in the courtroom during the trial?

[JUROR D.T.]: Yes, uh-huh.

THE COURT: And what was he wearing?

[JUROR D.T.]: Yesterday?

THE COURT: Yes, ma'am.

[JUROR D.T.]: Like a white sweatshirt, a large white sweatshirt.

THE COURT: Anything else, [defense counsel]?

[DEFENSE COUNSEL]: You had indicated that seeing him at the bus stop [sic] and you said that that individual was chased by the deputy?

[JUROR D.T.]: He went down the street after him.

[DEFENSE COUNSEL]: Did that person appear to be running or fleeing?

[JUROR D.T.]: I didn't see him.

[DEFENSE COUNSEL]: You didn't see him. Okay. After -- how much discussion of this incident occurred on the bus?

[JUROR D.T.]: Not very much other than, oh, my god, there he is. And then --

[DEFENSE COUNSEL]: And by the way, when one says that, Oh, my god, what was going on in your mind at that time? You think he was following you guys, stalking you, or what?

[JUROR D.T.]: To be honest, I was, like, why is he there. And I thought -- I thought, they were supposed to --

THE REPORTER: I can't hear.

[JUROR D.T.]: I was like, I thought they were supposed to keep people away from us and there he was on the street.

[DEFENSE COUNSEL]: After -- during the dinner, I assume, was there any discussion of this at all?

[JUROR D.T.]: No.

[DEFENSE COUNSEL]: When you got back today, was there any discussion in the jury room at any part of the beginning or middle or anything, was there any discussion of this?

[JUROR D.T.]: I did. The two deputies sat with me at breakfast this morning, and I just said that I was concerned.

[DEFENSE COUNSEL]: Okay. Let's stop there for a minute. What was the nature of your concern?

[JUROR D.T.]: Because, like I said, I thought they were supposed to keep people away from us. And I don't know what kind of information that he has of us. Due to the nature of the case, I just told them that I was going to hold my gun closer at night.

[DEFENSE COUNSEL]: You were going to hold your gun closer at night?

[JUROR D.T.]: Uh-huh. And I don't think that's funny at all.

[DEFENSE COUNSEL]: No, no, no. I am not saying it for that. That suggests to me that you were more than just a little concerned.

[JUROR D.T.]: Uh-huh.

[DEFENSE COUNSEL]: How do you feel right now?

[JUROR D.T.]: I feel better after talking to the deputy. He kind of put my mind at ease, that it's because of the circumstance that we're in and the things that are going on kind of makes you jumpy. And he said it's perfectly normal for you to be jumpy.

[DEFENSE COUNSEL]: Going forward, is that incident going to or do you think it may influence how you listen to witnesses in this case and what decisions that you may have to make or not at this phase of the trial?

[JUROR D.T.]: No. Because I even told the deputies, I said irregardless [sic] of what he did and what I saw, it's not going to change my decision in this case.

[DEFENSE COUNSEL]: Well, as to one decision you've already made; but I guess I'm more concerned now about any decision that you have to make moving forward, it's not going to influence that either?

[JUROR D.T.]: Has nothing to do with him.

[DEFENSE COUNSEL]: Then the final thing I need to ask and I need to make sure, because when you said, It's not funny, I didn't mean to convey that. I want to make absolutely sure that you're not going to hold your perception that I --

[JUROR D.T.]: No.

[DEFENSE COUNSEL]: -- against Juan?

[JUROR D.T.]: No. No. I mean, you interviewed me during whatever you call the voir dire or whatever and you know perfectly well I don't have a problem expressing my opinion at all.

[DEFENSE COUNSEL]: That's why we put you on here.

[JUROR D.T.]: Okay. Thank you.

THE COURT: Thank you very much.

(Juror left courtroom.)

Defense counsel then moved for a mistrial, arguing that the incident influenced jurors who were "holding out for the defense" to change their vote:

[DEFENSE COUNSEL]: At this time the defense would move for a mistrial. We believe that the verdict was reached as a result of an outside influence, that it influenced the jurors to -- if that [sic] were holding out for the defense, to change their vote. We'd argue that the verdict is not made in a vacuum, that this was not a fair expression of the jurors' opinion. It violates the defendant's

right to a impartial jury. It violates his right to due process and to a fair trial. And we would cite Granados v. State and -- which is 85 S.W.3d 217 and O'Con [sic] v. State -- O-C-O-N, which is 284 S.W.3d 880, which states that the jurors must use information obtained only in the courtroom, from the law, the evidence, and the Trial Court's mandates. We'd ask the Court at this time to declare the mistrial.

THE COURT: That will be denied.

[DEFENSE COUNSEL]: Your Honor, may I add to that. We'd also argue that it denies the defendant a fair and impartial jury under Section 1.05 of the Code of Criminal Procedure.

THE COURT: That is noted.

[DEFENSE COUNSEL]: And also denied, I'm assuming?

THE COURT: And is denied as well, yes, sir.

Although the parties had earlier stated that they did not want a jury poll, the judge nevertheless polled the jury after this hearing. Each juror affirmed the verdict as his or her own.

We doubt that Balderas's brother's conduct of waving and smirking at the jurors as their bus passed him on a public street constituted "contact . . . about the matter pending before the jury."[97] The fact that some jurors recognized Balderas's brother because he had been a spectator in the courtroom did not necessarily transform his conduct of waving and

---

[97] *Cf. Romo v. State,* 631 S.W.2d 504, 506 (Tex. Crim. App. 1982), *overruled on other grounds by Cockrell v. State,* 933 S.W.2d 73, 89 (Tex. Crim. App. 1996) (describing police officer's joking comment to juror, "They're all guilty," as a "rank generality directed towards all defendants" that did not merit a new trial).

smirking into a communication about the case.[98] Thus, the testimony presented at the hearing did not establish that the contact at issue was "about the matter pending before the jury."

Further, the contact at issue was not particularly threatening or intrusive, and the evidence before the trial court rebutted any presumption of harm. Deputy Henning informed the court and the parties that five or six jurors had seen Balderas's brother waving, and they had made everyone on the bus aware of this incident. Nevertheless, defense counsel questioned only two jurors, "A.B." and "D.T." Both jurors indicated that their feelings about the incident did not affect their deliberations at the guilt phase and would not affect their deliberations at the punishment phase. In light of the evidence and arguments presented at the hearing, the trial court did not abuse its discretion by overruling the motion for mistrial.

Moreover, the record does not support Balderas's speculation that the jurors were deadlocked before the incident, but then, on the morning after the incident, those who favored a not-guilty verdict were so fearful that they abandoned their positions and returned a guilty verdict "to escape the situation." Rather, the record reflects that before the incident, around 3:30 p.m. during jury deliberations, the court received a note from the jury that stated, "We agreed that we are not to 'strongarm' each other to change votes and have exhausted our questions over testimony and evidence. Now what?" The trial judge stated that she would

---

[98] *See, e.g., Maldonado v. State,* 507 S.W.2d 206, 208 (Tex. Crim. App. 1974) (noting that co-defendant's testimony that he saw two jurors speaking with deceased's brother did not signify that a juror had "conversed with any person in regard *to the case*").

give the jury an *Allen* charge.[99]  Balderas objected, stating that the jury had been deliberating

for about fourteen hours and had sent out numerous notes requesting "read backs" of the trial

testimony, which indicated that the jury had already given "careful attention" to "this matter."

Defense counsel asserted that the *Allen* charge would "have a coercive effect and violate

[Balderas's] due process right and his right to a fair trial, . . . under the State Constitution,

under the Code of Criminal Procedure, and . . . under the U.S. Constitution, under the Sixth

and Fourteenth Amendments."  Despite his objections at trial, Balderas does not complain

about the *Allen* charge in this appeal.  At 3:50 p.m., the judge read the *Allen* charge to the

jury.  The jury resumed deliberations at 3:55 p.m. and continued deliberating until 5:00 p.m.

At 5:00 p.m., the jury entered the courtroom.  In response to a written request the jury

had submitted, the trial court provided the jury with a typed list of the witnesses in their order

of appearance.  The judge also read back witness testimony in response to two previously

submitted jury notes.  These read backs included Karen Bardales's description of the gunman

and his clothing, and Officer Cunningham's testimony concerning Wendy's statement to the

effect that she had never seen the gunman before.  After providing this testimony, the judge

excused the jury for the day.  The incident involving Balderas's brother occurred as the jurors

were traveling by bus to the hotel where they were sequestered.

---

[99] *See Allen v. United States,* 164 U.S. 492 (1896) (permitting a supplemental jury instruction that reminds the jury that if it is unable to reach a verdict, a mistrial will result, the case will still be pending, and there is no guarantee that a second jury would find the issue any easier to resolve); *Barnett v. State,* 189 S.W.3d 272, 277 (Tex. Crim. App. 2006).

The jury resumed deliberations at 8:50 the following morning. At 10:00 a.m., the jury entered the courtroom and the judge read back testimony in response to three jury notes. These read backs included Diaz's testimony concerning: (1) the LTC gang's practice of sharing guns before its members learned that they could buy weapons at gun shows, the identities of the gang members who purchased weapons at a gun show, and the types of guns purchased for Balderas; (2) whether the gun identified as the murder weapon was the gun that Balderas regularly carried; and (3) Diaz's and Balderas's roles in founding the BTA subset of the LTC gang. After these read backs, the jury continued deliberating. It returned a verdict around 11:20 a.m.

Thus, the record shows that, after the jury announced that it had exhausted its questions over testimony and evidence, the trial court provided read backs in response to five jury notes and the jury deliberated for approximately three hours before reaching a verdict. This record does not support Balderas's speculation that, as the result of fears generated by an outside influence, jurors abandoned their views in order to reach a verdict quickly.[100] The trial court did not abuse its discretion by overruling Balderas's motion for a mistrial. Point of error seven is overruled.

## WITNESS'S IDENTIFICATION OF BALDERAS

---

[100] *Cf. Howard,* 941 S.W.2d at 121-22 (stating that the jury's request for transcript information and its inquiry about other evidence "rationally indicated ongoing deliberation.").

In point of error eight, Balderas asserts that the trial court's failure to suppress Wendy's in-court and out-of-court identifications of him deprived him of due process of law. Specifically, Balderas complains that the photo lineup containing his photograph was improperly suggestive and that Wendy's identifications of him that resulted from that lineup were unreliable.

Balderas notes that, in a hearing on his motion to suppress Wendy's identifications, Dr. Roy Malpass testified as an eyewitness identification expert and expressed concerns about the identification procedures employed in this case. Balderas also identifies inconsistencies between Wendy's statements and other evidence concerning the details of the offense. Further, he asserts that, because he and Wendy were acquainted before the offense, it is not plausible that she would fail to recognize the shooter when she spoke with police on the night of the offense but would then recognize Balderas and identify him as the shooter when shown a photo lineup containing his picture a few days later. Balderas also complains that Wendy's confident identification of Balderas when she viewed that lineup a second time was the result of impermissible police "prompting."

Generally, the Constitution protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting its introduction, but by affording the defendant the means to persuade the jury that the evidence should be discounted as unworthy of credit.[101] The Due Process Clause bars the admission of identification evidence only when

---

[101] *Perry v. New Hampshire,* 132 S. Ct. 716, 723 (2012).

the introduction of such evidence "is so extremely unfair that its admission violates fundamental conceptions of justice."[102]

The defendant has the burden to establish by clear and convincing evidence that the pretrial procedure was impermissibly suggestive.[103] Further, an unnecessarily suggestive pretrial identification procedure does not, in itself, intrude upon a constitutionally protected interest.[104] If the court determines that a pretrial identification procedure was impermissibly suggestive, it then assesses the reliability of the identification under the totality of the circumstances.[105] The court assesses reliability by weighing five non-exclusive factors against the corrupting effect of any suggestive identification procedure: (1) the opportunity of the witness to view the suspect at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.[106]

On appeal, in reviewing the trial judge's assessment of reliability, we consider these factors, which are issues of historical fact, deferentially in a light favorable to the trial court's

---

[102] *Id.* at 723 (quoting *Dowling v. United States,* 493 U.S. 342, 352 (1990)).

[103] *See Barley v. State,* 906 S.W.2d 27, 33-34 (Tex. Crim. App. 1995).

[104] *Jackson v. State,* 657 S.W.2d 123, 130 (Tex. Crim. App. 1983).

[105] *Luna v. State,* 268 S.W.3d 594, 605 (Tex. Crim. App. 2008).

[106] *Id.*

ruling.[107] We then weigh them *de novo* against any "corrupting effect" of the suggestive

pretrial identification procedure.[108] We review the evidence adduced at the admissibility

hearing as well as the evidence adduced at trial.[109]

In Wendy's statement to Officer Cunningham, before she viewed any photo array, she

described her observations of the gunman as follows:

> I got a good look at his face. I have never seen him before. He was Hispanic
> and about 16-17 years old. He was around 5 foot 5 inches to 5 foot 7 inches
> tall. I remember him having a dark birth mark on his face but I can't
> remember exactly where. He was very skinny and clean shaven. He had black
> hair, it was short. He had a fade type haircut. He was wearing a black sweat
> shirt hooded jacket and khaki pants.

In the same statement, Wendy also described the gunman as "a skinny Hispanic guy dressed

in a black hooded sweatshirt type jacket."

Based on Wendy's description and information obtained during an ongoing police

investigation of other LTC-related offenses, Ruland initially showed Wendy a photo array

of six suspects that included Diaz but not Balderas. Wendy recognized Diaz as an

acquaintance, but she stated that he was not the gunman. She did not identify anyone in that

array as the gunman.

Following a tip from a confidential informant, Ruland obtained a photo array that

included Balderas. This array had been prepared by a different police officer, based on a

---

[107] *Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999).

[108] *Loserth v. State*, 963 S.W.2d 770, 773-74 (Tex. Crim. App. 1998).

[109] *Webb v. State*, 760 S.W.2d 263, 272 n.13 (1988).

different witness's description, during the investigation of another offense in which Balderas was a suspect. While it might have been a better practice to create a new photo array that was specific to Wendy's description of the gunman, Ruland's use of a pre-existing photo array did not, by itself, render the identification procedure unnecessarily or impermissibly suggestive.

On December 12, five days after Wendy viewed the first photo lineup containing Diaz's photograph, Ruland showed her this second photo array containing Balderas's photograph. Wendy recognized Balderas as an acquaintance and stated that "his face looked like" the gunman's face. Ruland asked her what she meant, and she reiterated that Balderas's "face looked exactly like the shooter's face." Seeking clarification, Ruland asked Wendy specifically if Balderas was the shooter, but she repeated that Balderas's face "looked exactly like," and was the "exact same face," as the shooter's face. She added that Balderas "could be the shooter." Wendy confirmed her identification of Balderas as the gunman by signing and dating his photograph.

Based on Wendy's demeanor, Ruland felt that she was positive in her identification of Balderas as the gunman, but he remained confused by her phrasing, a result he believed was based on his impression that English was Wendy's second language. It was department practice to make a written note classifying the witness's identification of a suspect as "negative," "tentative," or "positive" after showing a witness a lineup. However, after

Ruland left Wendy's apartment, he did not make a written classification because he did not feel comfortable classifying Wendy's identification as an "absolute positive identification."

After speaking with someone in the district attorney's office about his conversation with Wendy, Ruland returned to her apartment on December 13, seeking to further clarify her confidence level in her identification of the gunman. Upon viewing the photo array again, Wendy reiterated that Balderas and the gunman had the "same face." She explained that she was describing the photo as the "same face" because the gunman had been wearing a hood. Ruland asked her to look at the photos again, this time using her hands to cover the hair of each subject. Wendy complied and moved her hands from photo to photo as she viewed them. Ruland observed that, when Wendy covered Balderas's hair with her hands, her eyes "grew wide" and "began to water." She covered her mouth and said that she was absolutely positive that the man in the photograph was the man who killed Hernandez. Ruland asked her to note her positive identification by writing on the back of the photograph. Wendy explained that she could write better in Spanish than in English and asked Ruland if she could write in Spanish. Ruland assented, and Wendy wrote two sentences on the back of the photo: "Yo estoy positiva que el es que mato a Eduardo," and "Yo si puedo entender el Ingles pero no lo puedo escrivir." The reporter's record reflects that, translated into English, these sentences read, "I'm positive that he's the one that killed Eduardo," and, "I can understand English but I can't write it." From Wendy's request to write in Spanish, Ruland surmised that his confusion over the certainty of her December 12 identification

could have been due to her lack of English proficiency. After the December 13 conversation, Ruland felt confident that Wendy had positively identified Balderas as Hernandez's killer.

Dr. Malpass testified that the photo array was suggestive because, unlike the other individuals in the array, Balderas had a "distinct mark" on his left cheek. He noted that "the most egregious problem" was that Balderas was the only person in the array who was wearing a black hoodie. Malpass also stated that three of the other individuals had haircuts that were "very much shorter, very distinct from [Balderas's]."

Concerning Wendy's ability to identify a suspect, Malpass testified that it was "a possibility" that Wendy's prior acquaintance with Balderas could have caused her to make an honest mistake in identifying the gunman "because of facial similarities." Malpass also noted that a possible "weapon focus" during the offense might have "interrupt[ed]" Wendy's "attention to the face," thus adversely affecting her ability to form a memory of the gunman's face. Similarly, Wendy described herself as being "in shock" during and immediately after the offense, and Malpass theorized that the stress that Wendy was under could have reduced her ability to form a clear memory.

Malpass also expressed concern about the fact that Wendy's identification of Balderas evolved over time. Malpass stated that earlier identifications tend to be more reliable than later ones. He testified that viewings of successive photo arrays would increase the possibility of "memory contamination." Such contamination would interfere with a witness's

ability to recall an accurate picture of the suspect, and, as a result, would undermine the reliability of her later identification.

Malpass testified that Wendy's first identification was "no identification." Malpass was concerned about the fact that Wendy was more certain in her identification of Balderas the second time she viewed the array containing his photograph. He theorized that Ruland's act of returning with the array a second time would have conveyed a signal to Wendy that her first identification was not good enough, so that she might have felt pressured to provide a more positive response.

On cross-examination, Malpass acknowledged that he did not know what was going through Wendy's mind the second time she viewed the array containing Balderas's photo. He also clarified that he did not purport to opine on the accuracy or reliability of Wendy's identification of Balderas as the gunman. Rather, he described factors affecting the accuracy or reliability of a witness's identification, and he discussed more specifically the factors that were in play in this case.

At the end of the hearing on the motion to suppress, the trial court found that the photo array was not impermissibly suggestive. Specifically, the trial court observed: "[T]he suspect did not stand out in the six-photo photo array, all subjects were male, they were all light-skinned Hispanic males, they were all of the same general build, all of the same general age range, all had short haircuts."

On appeal, Balderas complains specifically that the photo array was impermissibly suggestive because he was the only person in the photo array with a mark on his face, and he was the only person wearing a hoodie. As such, Balderas asserts, he was the only person in the array who closely resembled Wendy's description of the suspect.

A pretrial lineup may be impermissibly suggestive if the suspect is the only individual in the array who closely resembles the pre-procedure description.[110] However, lineup participants need not be identical to satisfy due process requirements.[111] In *Luna*, we rejected the complaint that a photo lineup was unnecessarily suggestive, where Luna asserted that other men in the lineup had "notably fuller faces" than him and that "[t]he one glaring difference is that [the appellant] appears to be either totally bald, or to have had his head clean shaven."[112] We reasoned that, because the witness described the suspect as wearing a cap, hair length was not necessarily a determinative factor.[113] By contrast, in *Bell v. State* we seemingly acknowledged that a live lineup was unnecessarily or impermissibly suggestive where the appellant was the only person in the six-member lineup wearing bright white pants,

---

[110] *Barley,* 906 S.W.2d at 33.

[111] *Luna,* 268 S.W.3d at 607-08.

[112] *Id.* (alterations in original).

[113] *Id.* at 608.

he was the tallest of the group, and, unlike the other subjects' number cards, appellant's number card featured a number that was underlined and had a triangle mark over it.[114]

In this case, the photo array containing Balderas's photograph more closely resembles the lineup in *Luna* than the lineup in *Bell*. All of the photographs are "head shots" depicting Hispanic males who could be about 16 or 17 years old. Nothing in the photographs reveals the men's relative heights and weights. Four men are wearing black or dark grey shirts: one has a black t-shirt, another has a black sweatshirt or polo shirt, another has a grey hoodie, and Balderas has a black hoodie. Balderas's and the other man's hoodies are clearly off of their heads and behind their necks. All of the mens' faces are clearly visible. The men in the photographs are generally clean shaven, although one has a sparse mustache. No one in the array appears to have a "dark birth mark" on his face. Balderas has a mark on his cheek that appears to be a scratch, and two other men have marks on their faces that appear to be scratches or scars. All of the men have very short hair, and two men in addition to Balderas have haircuts that can fairly be described as "fade type."

Thus, notwithstanding Malpass's testimony detailing problems in the composition of the photo array, as well as possible adverse influences on Wendy's memory, Balderas has not established that the procedure that led to Wendy's initial identification of him as the gunman was unnecessarily or impermissibly suggestive.[115] The record supports the trial court's

---

[114] *Bell v. State,* 724 S.W.2d 780, 798-99 (Tex. Crim. App. 1986).

[115] *See Luna,* 268 S.W.3d at 607-08.

determination that the pretrial identification procedure leading to Wendy's initial identification of Balderas was not impermissibly suggestive.[116]

After finding that the identification procedure was not impermissibly suggestive, the trial court stated, in the alternative, that there was no substantial likelihood of misidentification: "[T]he Court further finds that the totality of the circumstances reveals no substantial likelihood of misidentification . . . and that the identification testimony is deemed reliable after reviewing the five factors set out in *Webb* [*v. State*] . . . ."

The *Biggers* factors—used to determine the reliability and admissibility of an in-court identification after an impermissibly suggestive initial identification—are historical facts and should be viewed deferentially to the trial court's ultimate conclusion.[117] When the trial court does not make express findings of historical facts, we view the facts in a light favorable to the court's ruling.[118] "The factors, viewed in this light, should then be weighed *de novo* against the 'corrupting effect' of the suggestive pretrial identification procedure."[119] An appellate court does not consider each *Biggers* factor *de novo*.

In considering the five factors, we note that Wendy testified that her eyes followed the gunman the entire time he was in the apartment, and she was focused on him throughout the

---

[116] *See Perry,* 132 S. Ct. at 728.

[117] *Loserth*, 963 S.W.2d at 773.

[118] *Id.* at 774.

[119] *Id.* at 773-74.

offense. Although the living room light was off, the television in the living room was on and the kitchen light illuminated the area. Wendy testified that she could see the gunman as he ran through the apartment. The gunman initially wore a hood pulled up over his head, but the hood fell as he passed Wendy, and she got a good look at his face. Wendy's description of the gunman in the statement she provided to Cunningham was generally consistent with Balderas's appearance, but unlike her description, he did not have a "dark birth mark" on his face. Wendy did not recognize the gunman on the night of the offense, but she identified Balderas as soon as she saw the photo array containing his picture and stated that his face "looked exactly like" the gunman's face. She first viewed this photo array five days after the offense. Weighing these factors against any corrupting effect of the identification procedure, if any, we agree with the trial court's conclusions in light of its implied factual findings.

Arguably, these five factors are not a perfect fit for a situation like this one, where the eyewitness initially stated that she did not recognize the gunman, but later, upon viewing a lineup, recognized an acquaintance and identified him as the gunman. However, Balderas's broad assertions that this scenario is simply not plausible, and therefore Wendy must have been telling the truth when she initially failed to recognize the gunman and must have been lying when she later identified Balderas as the gunman, do not persuade us that the identification was, under the totality of the circumstances, unreliable.[120] The trial court did

---

[120] *See Perry*, 132 S. Ct. at 723, 728 (favoring admission of evidence so that the jury rather than the judge may determine its reliability).

not err by determining that Wendy's initial identification of Balderas in the pretrial lineup was admissible.

To the extent that Balderas asserts that Wendy's certainty in her second identification of him was the product of police "prompting," we observe that Wendy had already identified Balderas as the gunman by that time. Her greater certainty in her second identification did not undermine its reliability. However, to the extent that Balderas means to say that Wendy's second pretrial identification of him tainted her in-court identification, we will address the matter more thoroughly.

Due process requires the suppression of an in-court identification only if (1) an impermissibly suggestive out of court procedure (2) gave rise to a very substantial likelihood of irreparable misidentification.[121] It may be that showing Wendy the photo lineup a second time was potentially suggestive, but it did not present a substantial likelihood of misidentification because Wendy had already identified Balderas as the gunman by then.[122]

During her trial testimony, Wendy pointed to Balderas when she identified him, based on their previous acquaintance, as someone she knew to be a member of the LTC gang. When she recounted the offense, she related that "someone" wearing a black hoodie ran

---

[121] *Williams v. State*, 937 S.W.2d 479, 488 (Tex. Crim. App. 1996).

[122] *Cf. Luna*, 268 S.W.3d at 608 (noting that officer's comment that witness identified "the right guy" may have been suggestive, but it was not so suggestive as to present a very substantial likelihood of misidentification with respect to the witness's in-court identification).

around the apartment, shooting. She acknowledged that she did not recognize that person during the offense or later that evening when she spoke with police.

Wendy also testified that she recognized the gunman when she viewed the photo array containing Balderas's photograph. She stated that she signed and dated the photograph of "the one that killed Eduardo [Hernandez]." Wendy testified that the person in that photograph was Balderas, who was the same person she had pointed out earlier in the courtroom. She then confirmed that Balderas was "the one who shot Eduardo [Hernandez]."

Because Wendy had identified Balderas as the gunman before Ruland showed her the photo array a second time, and because Wendy's in-court identification of Balderas was based on, and cumulative of, her observations of the gunman at the crime scene as well as her previous identifications, the trial court did not err by admitting Wendy's in-court identification of Balderas. Point of error eight is overruled.

## JURY'S REQUESTS TO HAVE TESTIMONY READ BACK

In point of error nine, Balderas asks, "Did the trial court abuse its discretion by failing to have testimony read back in response to two jury notes?" Balderas observes that the jury sent two notes requesting to hear a portion of Ruland's testimony concerning Wendy's credibility, but the trial court responded to both notes by instructing the jury to be specific as to the point in dispute. After the court's second response, the jury did not submit a third note concerning the matter. Balderas appears to argue that, by failing to read back the requested testimony, the trial court violated Article 36.28, thereby depriving the jury of the

means to resolve their dispute in his favor and unnecessarily bolstering the State's case. Balderas states that, because Wendy was the only eyewitness who saw the gunman's face, her credibility was of the utmost importance, and it was crucial that jurors be provided the means to settle their dispute regarding Ruland's opinion of Wendy's credibility.

Article 36.28 provides: "In the trial of a criminal case in a court of record, if the jury disagree as to the statement of any witness they may, upon applying to the court, have read to them from the court reporter's notes that part of such witness testimony or the particular point in dispute, and no other."[123] This statute seeks to balance the concern that the trial court not comment on the evidence with the need to provide the jury with the means to resolve any factual disputes it may have.[124]

When the jury asks that certain testimony be re-read, the judge must first determine if the request is proper under Article 36.28.[125] A simple request for testimony is not, by itself, a proper request under Article 36.28.[126] Instead, the jury's "request must reflect that the jurors disagree about a specified part of the testimony."[127] Article 36.28 does not require that

---

[123] TEX. CODE CRIM. PROC. art. 36.28; *see Moore v. State,* 874 S.W.2d 671, 673 (Tex. Crim. App. 1994).

[124] *Howell v. State,* 175 S.W.3d 786, 790 (Tex. Crim. App. 2005).

[125] *Id.* at 790.

[126] *DeGraff v. State,* 962 S.W.2d 596, 598 (Tex. Crim. App. 1998).

[127] *Howell,* 175 S.W.3d at 790.

the jury use any particular words to express its disagreement.[128] Whether a disagreement exists will depend upon the particular facts of each case, and the judge's inference of a dispute need only have some basis other than mere speculation.[129] After determining that the jury's request is proper under Article 36.38, the trial court must then interpret the communication; decide, in its discretion what sections of the testimony will best answer the query; and limit the testimony accordingly.[130]

The record reflects that the jury initially sent the following note: "We would like to hear when the defense asked Officer Rutland if he would question Wendy's credibility if she knew [Balderas] prior to the incident. [We] Would like the question and the officer's answer." The trial court responded: "There is no testimony in the record that is specifically responsive to the question you have asked. If you can explain the dispute that you have amongst yourselves, we may be able to find a responsive answer."

The jury later sent the following note: "We are trying to hear testimony where the witness was asked if Wendy's credibility would be different if there was evidence that her relationship with [Balderas] was more involved." The trial judge stated that she would instruct the jury to be specific as to the point in dispute. Defense counsel objected, arguing that the court should read back the following exchange between defense counsel and Ruland:

---

[128] *Id.* at 793.

[129] *Id.* at 792-93.

[130] *Iness v. State,* 606 S.W.2d 306, 314 (Tex. Crim. App. 1980).

Q When you talked with Wendy, when did she say it was the last time she'd seen [Balderas] before this incident?

A I believe that it was approximately six months before.

Q Okay. But if she had later said to investigators or testified that it was two weeks prior to the incident, would that cause you to question her credibility or her veracity?

A Yes.

The prosecutor argued that this testimony was not responsive to the jury's question because it did not concern the nature of Wendy's and Balderas's prior relationship but instead merely concerned the last time Wendy saw him. She stated that reading back this testimony could cause confusion. The trial court overruled the defense's objection and provided the following written response to the jury: "Please be specific as to your point in dispute." The jury did not follow up with a third note concerning the matter.

On appeal, we review the trial judge's conclusion as to whether there is a factual dispute between the jurors for an abuse of discretion.[131] We apply this same standard in reviewing the trial court's selection of testimony responsive to the jury's request.[132] "A trial judge abuses his discretion when his decision is so clearly wrong as to lie outside the zone within which reasonable persons might disagree."[133] The test for abuse of discretion is not

---

[131] *Howell,* 175 S.W.3d at 790.

[132] *See, e.g., Brown v. State,* 870 S.W.2d 53, 56 (Tex. Crim. App. 1994); *see also Iness,* 606 S.W.2d at 314.

[133] *Howell,* 175 S.W.3d at 790.

whether, in our opinion, the facts present an appropriate case for the trial court's action; rather, the question is whether the trial court acted without reference to any guiding rules or principles.[134] Further, we will not disturb the trial court's decision without a showing of both a clear abuse of discretion and harm.[135]

Our review of the record reveals that the trial court's initial response to the jury, to the effect that there was no testimony responsive to the jury's request but that the court would attempt to find responsive testimony if the jury would explain the dispute, was reasonable. Ruland did not testify to whether his opinion of Wendy's credibility would have been affected by knowledge of a prior relationship between Wendy and Balderas. The jury's second note, "We are trying to hear testimony where the witness was asked if Wendy's credibility would be different if there was evidence that her relationship with [Balderas] was more involved," reiterated the jury's request for testimony that was not in the record. Ruland did not testify that his opinion of Wendy's credibility would have been different if he had known that her relationship with Balderas was "more involved." Further, the jury's second note did not clarify the nature of any disagreement concerning Ruland's testimony.[136]

---

[134] *Id.* at 792.

[135] *Brown,* 870 S.W.2d at 55.

[136] *Cf. Robison v. State,* 888 S.W.2d 473, 481 (Tex. Crim. App. 1994) (concluding that, after the jury made three separate requests for testimony on same topic, each becoming increasingly narrow in scope, the trial court did not abuse its discretion in determining that a dispute existed and submitting transcript of requested testimony).

On the facts of this case, the trial judge did not abuse her discretion by determining that Ruland's testimony was not responsive to the jury's request, by instructing the jury to explain its dispute, and by declining to read back Ruland's testimony. Point of error nine is overruled.

We affirm the trial court's judgment.

DELIVERED: November 2, 2016

PUBLISH



FILED
Chris Daniel
District Clerk

NOV 03 2016

Time:_____
By_____
Harris County, Texas
Deputy

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-77,036

### JUAN BALDERAS, Appellant

v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL FROM CAUSE NO. 1412826
### IN THE 179TH DISTRICT COURT
### HARRIS COUNTY

ALCALA, J., filed a dissenting opinion.

### DISSENTING OPINION

This Court's majority opinion upholds the conviction against Juan Balderas, appellant, despite the facts that his photo was the sole one in the photo array matching the physical description of the shooter; that it took the eyewitness two days of discussions with a police officer who showed her the array for her to make a positive identification of appellant, even though she had previously known appellant as "Apache"; and that the in-court identification of appellant at his trial that took place over eight years after the offense appears to have been

tainted by the procedures used to obtain the earlier identification from the photo array. I disagree with this Court's majority opinion's conclusion that the pretrial identification procedure in this case was not impermissibly suggestive. I also disagree that the in-court identification that was made over eight years later was reliable. I would sustain appellant's eighth issue, find the error harmful, reverse appellant's conviction and death sentence, and remand for a new trial.

### I. The Highly Suggestive Photo Spread Violated Appellant's Due-Process Rights

After reviewing the applicable law for eyewitness-identification evidence, I explain why I conclude that the photo-spread lineup that was used in this case was extremely unfair in that it included only one photo that matched the description of the shooter, and I will show that there was a substantial likelihood of misidentification in the later in-court identification of appellant.

#### A. Applicable Law

The Due Process Clause bars the admission of identification evidence when the introduction of that evidence is "so extremely unfair that its admission violates fundamental conceptions of justice." *Perry v. New Hampshire*, 132 S. Ct. 716, 723 (2012) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). Admission of an in-court identification after pretrial identification procedures that are so impermissibly suggestive as to be conducive to misidentification constitutes a denial of due process. *Simmons v. United States*, 390 U.S. 377, 384 (1968). Accordingly, "[a]n in-court identification is inadmissible when

it has been tainted by an impermissibly suggestive pretrial photographic identification."

*Gamboa v. State,* 296 S.W.3d 574, 581 (Tex. Crim. App. 2009); *see also Luna v. State,* 268

S.W.3d 594, 605 (Tex. Crim. App. 2008); *Ibarra v. State,* 11 S.W.3d 189, 195 (Tex. Crim.

App. 1999). A pretrial identification procedure may be impermissibly suggestive if the

suspect is the only individual in a photo array who closely resembles the pre-procedure

description. *Barley v. State,* 906 S.W.2d 27, 33 (Tex. Crim. App. 1995). The test for

determining whether an identification is admissible under these circumstances is "whether,

considering the totality of the circumstances, the photographic identification procedure was

so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable

misidentification." *Loserth v. State,* 963 S.W.2d 770, 772 (Tex. Crim. App. 1998) (quoting

*Simmons,* 390 U.S. at 384). Reliability is the "critical question":

> If the totality of the circumstances reveals no substantial likelihood of
> misidentification despite a suggestive pretrial procedure, subsequent
> identification testimony will be deemed reliable, reliability being the linchpin
> in determining the admissibility of identification testimony.

*Id.* (citations and quotations omitted). In assessing reliability under the totality of the

circumstances, the following five non-exclusive factors should be "weighed against the

corrupting effect of" the suggestive pretrial procedure: (1) the opportunity of the witness to

view the suspect at the time of the crime, (2) the witness's degree of attention, (3) the

accuracy of the witness's prior description of the criminal, (4) the level of certainty

demonstrated by the witness at the confrontation, and (5) the length of time between the

crime and the confrontation. *Id.* (citing *Neil v. Biggers,* 409 U.S. 188, 199 (1972)). The

party challenging the identification bears the burden to prove, by clear and convincing evidence, that the in-court identification has been irreparably tainted before a court will reverse a conviction on that basis. *Barley*, 906 S.W.2d at 34.

### B. The Pretrial Identification Procedure Was Impermissibly Suggestive

Wendy Bardales was present at the time of the December 2005 shooting of Eduardo Hernandez. Hernandez was killed when he was shot at least nine times in the back and head by a gunman who entered the apartment where Hernandez was socializing with several friends. Wendy was one of the several witnesses present at the time of the shooting, but she was the only one who claimed that she could identify the gunman. Wendy was later interviewed at the police station on the night of the shooting.

On the night of the shooting, police officers obtained a description of the shooter from Wendy before she was shown any photo spread. Wendy said that she saw the gunman enter the apartment, that her eyes followed him until he left, and that he wore a black jacket with a hood pulled over his head, but that, at one point, when his hood fell down, she got a good look at his face. She said that she had never seen the gunman before, and that he had a mark on his face but she did not recall where it was. She stated,

> I got a good look at his face. I have never seen him before. He was Hispanic and about 16-17 years old. He was around 5 foot 5 inches to 5 foot 7 inches tall. I remember him having a dark birth mark on his face but I can't remember exactly where. He was very skinny and clean shaven. He had black hair, it was short. He had a fade type haircut. He was wearing a black sweat shirt hooded jacket and khaki pants.

Also on the night of the shooting, a police officer showed Wendy a photo-spread array

65045

that did not include appellant's photo. Wendy did not identify anyone as the shooter, but she said that she recognized one of the people shown, Israel Diaz, who was a friend of Hernandez's. At that time, Wendy changed her earlier description of the shooter by claiming that the gunman had a dark mark on his cheek, which was different from her prior claim that she did not know where the facial mark was located.

Six days after the shooting, a police officer showed Wendy a different photo array with six photos, one of which was appellant's photo. Rather than create a unique photo spread for this particular case, the officer used a photo spread from a prior investigation that had included appellant's photo. Appellant's photo was the only one depicting a person with a dark mark on his cheek, wearing a black hooded sweatshirt, and matching Wendy's physical description of the shooter. When she saw the photo spread, Wendy immediately pointed at appellant's photo and identified him as "Apache," describing him as a friend of Hernandez's and Diaz's. Wendy did not positively identify appellant as the shooter at that time. Rather, she made more tentative statements that appellant "could be the shooter," that he "looked like the shooter," and that his "face looked exactly like the shooter's face." Wendy's indefinite remarks about appellant's photo left the officer unable to characterize her identification as "positive" when he left from his meeting with her.

Unsatisfied with his not having obtained a positive identification from Wendy, the officer visited her again the next day to further discuss the same photo spread. Wendy again told the officer that appellant's photo had the same face as the shooter, but she did not

positively identify him as the shooter. The officer then told her to use her hands to cover the hair of each subject because the gunman had worn a hood over his head. Wendy placed her hands over the hair on each of the photos. When she put her hands over appellant's hair, her eyes "grew wide" and "began to water." She then said she was absolutely positive in her identification of appellant as the shooter.

I conclude that the pretrial identification procedure in this case was impermissibly suggestive, and I, therefore, disagree with the trial court's assessment that, because all subjects were light-skinned, short-haired Hispanic males of the same general age and build, appellant's photo did not stand out in the six-photo array. Appellant's photo was the sole one in the photo spread that matched Wendy's description of the shooter as having a dark mole or birthmark on his face or cheek, a fade-style haircut, and wearing a black sweatshirt or jacket with a hood. The fact that appellant's photo was the only one in the photo spread possessing two of the distinctive characteristics of the shooter—a dark birth mark or mole and a black hooded sweatshirt—coupled with the suggestive nature of the procedure itself that involved the officer showing Wendy the same photo array twice to obtain a positive identification, rendered the procedure impermissibly suggestive. *See Barley*, 906 S.W.2d at 33-34 (explaining that suggestiveness "may be created by the manner in which the pre-trial identification procedure is conducted, for example by police pointing out the suspect or suggesting that a suspect is included in the line-up or photo array," by the "content of the line-up or photo array itself if the suspect is the only individual closely resembling the pre-

procedure description," or by the "cumulative effect" of the suggestive procedures).

### C. The In-Court Identification Was Unreliable Under the Totality of the Circumstances

Having concluded that the pretrial identification procedure in this case was impermissibly suggestive, it is necessary to determine whether Wendy's in-court identification of appellant that occurred over eight years after the offense was nevertheless reliable under the totality of the circumstances. *See Loserth*, 963 S.W.2d at 772 (explaining that the relevant inquiry is whether the procedure was so impermissibly suggestive as to give rise "to a very substantial likelihood of irreparable misidentification") (quoting *Simmons*, 390 U.S. at 384). As explained above, this inquiry requires a weighing of the five non-exclusive factors established by *Biggers*, 409 U.S. at 199. "The underlying *Biggers* factors are, taken individually, historical facts and, as such, should be viewed deferentially." *Loserth*, 963 S.W.2d at 773. The reviewing court should therefore consider the historical facts underlying the five *Biggers* factors in a light favorable to the trial court's ruling. *Id.* The factors, viewed in this light, are then weighed de novo against "the corrupting effect" of the suggestive pretrial identification procedure. *Id.* at 773-74; *see also Gamboa*, 296 S.W.3d at 581 (explaining that this Court "review[s] de novo a trial court's ruling on how the suggestiveness of a pre-trial photo array may have influenced an in-court identification").

Here, although I acknowledge that we owe deference to the trial court's determination of historical facts underlying its ruling, the relevant facts are largely undisputed. *See Loserth*, 963 S.W.2d at 773. Thus, the primary question before this Court is one of law—that is,

whether adequate indicia of reliability exist to outweigh the suggestiveness of the pre-trial photo array. *Id.* at 773-74. After addressing each factor below, I conclude, based on a de novo weighing of the factors, that appellant has satisfied his burden of showing by clear and convincing evidence that, under the totality of the circumstances, the impermissibly suggestive pre-trial identification procedure in this case gave rise to a substantial likelihood of misidentification. *Barley*, 906 S.W.2d at 33-34.

My conclusion that Wendy's eyewitness identification of appellant was wholly unreliable is based in large part on the same considerations as those addressed by Dr. Malpass, the eyewitness-identification expert who testified in this case. Dr. Malpass said that Wendy's identification of appellant is problematic because it evolved over time. Additionally, he explained that the viewing of successive photo spreads increases the possibility of memory contamination. Dr. Malpass determined that the officer's act of returning with the same photo array the day after Wendy had been unable to positively identify appellant would have conveyed a signal to Wendy that she needed to provide a more positive identification, which is exactly what she did in this case.

I note here that historically Texas has had a significant problem with the misidentification of suspects based on flawed pretrial identification procedures. Misidentification of people has been a large part of the reason for the high number of innocent people who have been wrongfully convicted in Texas. The problem with suggestive identifications was significant enough that it was recently addressed by the Texas Legislature

though legislation that came into effect after this offense. For example, Article 38.20 of the Code of Criminal Procedure now requires law enforcement agencies to adopt policies for photograph and live lineup identification procedures that would require, if possible, that the photospread be shown to an eyewitness by someone unfamiliar with the identity of the suspect in the case so as to prevent opportunities to influence the witness. *See* TEX. CODE CRIM. PROC. Art. 38.20, § 3. It is highly unlikely that the manner in which the identification procedures were conducted in this case would comply with the requirements of this statute, even if the identification were otherwise admissible in a trial court. *See id.* § 5. Until this Court disallows tainted identifications based on suggestive photo spreads, as occurred in this case, Texas will continue to be a leader in the wrongful convictions of innocent people. Although I do not suggest that appellant is innocent of this offense, I conclude, as explained more fully below, that he is entitled to a new trial that should be conducted absent the tainted identification that occurred in this case.

Applying the relevant legal standard to the instant facts, here there were no factors that would make Wendy's identification otherwise reliable. The Supreme Court has determined that an identification based on a suggestive photo spread may be admitted if there is evidence that shows that the corrupting effect of the suggestive identification procedure was ameliorated by five other circumstances that are weighed for their persuasive value. *See Biggers*, 409 U.S. at 199. But these circumstances are unpersuasive in this case.

First, Wendy's opportunity to view the shooter at the time of the crime was impeded

by the hoodie worn during the entire event, except for a short time during which the hood fell down. Although it may be true, as Wendy claimed, that she watched the shooter the whole time that he was in the apartment, the shooter wore a hoodie covering his head the entire time that he was there, except for the moment when his hood fell down. The length of Wendy's entire observation of the shooter, therefore, is immaterial because it has little value in discerning the reliability of her identification of appellant's face in a photo array. What is pertinent is the amount of time that Wendy had an unobstructed view of the shooter's face, which only occurred during the brief moment when his hood fell down. Because the shooter's face was obstructed by the hood he wore over his head during most of the offense, that fact weighs against the reliability of Wendy's identification of appellant's photo. Furthermore, Wendy knew appellant by the name of "Apache" prior to the night of the shooting, but she did not mention that to police officers when she gave a physical description of the shooter before she was shown a photo spread; instead she represented to police officers that she had never seen the shooter before. If her opportunity to view the shooter was adequate to give rise to a reliable identification, it would be reasonable to expect that Wendy, at a minimum, would have told police officers that she believed she had seen the shooter before, even if she could not recall that his name was "Apache." Thus, this factor weighs against a determination of reliability.

Second, regarding Wendy's degree of attention, although she was focused on the events and shooter during the crime, this does not necessarily correlate with a reliable

identification in this case in which the facts show that the shooter's head was covered by a hood during most of the events and that Wendy was in a state of shock over the events. Wendy claimed to have fixated on the shooter, but, as explained above, she could only see his entire face during the instance when his hood fell off. It is reasonable to believe that Wendy's attention was not focused on the shooter because, on the night of the offense, Wendy did not tell police that she recognized the shooter as a person she knew as "Apache," the name that she used to refer to appellant. Even a week later, when Wendy was shown the photospread that contained appellant's photo, she did not immediately identify him as the shooter; instead it took her two viewings of the photo spread, along with a suggestion from the police officer that she manipulate the photos by placing her hands over the individuals' hair, before she made a positive identification. Other circumstances that suggest that Wendy's degree of attention was minimal are that she misdescribed the murder weapon and misstated that she had been shot at. Dr. Malpass explained why an identification by an eyewitness can be impeded or degraded by the shock of the criminal events. In sum, despite Wendy's claim that she fixated on the shooter, the record fairly demonstrates that, when she spoke to police officers on the night of the offense, she did not identify appellant as the shooter even though she knew him as "Apache," it took her two days of looking at the same photo spread before the officer showing her the photo spread would characterize her identification as a positive one, and she misdescribed other key aspects of the shooting including the color of the weapon and who had been shot at. Thus, this factor also weighs

against a finding of reliability.

Third and fourth, Wendy lacked accuracy in her prior description of the shooter, and her level of certainty in her identification of appellant is unconvincing. As the chart below demonstrates, Wendy's claims about her ability to identify the shooter lacked consistency. At first, Wendy said that she had never seen the gunman before, but when she first saw appellant's photo in the photo spread, she identified appellant as a friend of Hernandez and Diaz rather than as the shooter. At first, Wendy said that the shooter had a mark on his face but she did not know where on his face. Later, Wendy specified that the mark was on the shooter's cheek. At first, Wendy could not positively identify appellant as the shooter when she was shown the second photo spread, but the next day when the same officer returned to her with the same photo spread asking her to be more definitive in her identification, she positively identified appellant as the shooter. These questionable aspects of Wendy's identification are summarized in the chart below:

| Issue | Wendy's First Statements | Wendy's Later Statements |
|---|---|---|
| Whether she had seen the gunman before. | She initially told police before she saw the photo spread that she had never seen the gunman before. | She identified appellant in the second photo spread as a friend of her friend. |
| Whether she could identify the mark on the gunman's face. | She initially said the gunman had a mark on his face but she could not say where on his face. | She later said that the mark was on the gunman's cheek. |
| Whether the identification of appellant in the second photo spread was positive. | When she first saw the photo spread, she said appellant's photo "could be the shooter" and that he looked exactly like the shooter. | When she saw the same photo spread the next day, she was positive that appellant was the shooter. |

As the chart above illustrates, Wendy's identification of appellant as the shooter is unreliable because she said she had never seen the shooter before, and yet when she saw appellant's photo she recognized him as someone she knew who was called "Apache." She picked the only person who matched her description of the shooter: the photo of the person with a facial mark on his cheek and wearing a hoodie. And her level of certainty was weak in that it took the officer two days to elicit from her a positive identification of appellant as the shooter.

Fifth, although the length of time between the crime and Wendy's identification of appellant in the photo spread was minimal, with Wendy picking appellant's photo out of the photo array at seven days after the offense, the in-court identification is totally unreliable as it occurred more than eight years after Wendy witnessed the crime. After such a long period, it is highly unlikely that Wendy's in-court identification was completely independent from

the photo spread. That is, eight years after the murder, Wendy was not likely truly identifying appellant as the shooter based on her independent memory of that night, but rather was simply identifying appellant in court because he was the person sitting at counsel table who had been arrested and charged for this offense based on her prior photo spread identification of him.

Weighing the relevant factors and considering the totality of the circumstances, I conclude that appellant has demonstrated by clear and convincing evidence that the corrupting effect of the suggestive pre-trial identification procedure in this case created a substantial risk that Wendy misidentified appellant as the shooter due to the lack of any factors to show that her identification of him in court was reliable. Consequently, Wendy's in-court identification of appellant as the gunman should not have been admissible. *See Ibarra*, 11 S.W.3d at 195. In light of the highly suggestive identification procedures that occurred in this case and irreparably tainted in-court identification by Wendy, I would hold that the trial court erred by permitting this identification and that this violated appellant's federal due-process rights.

## II. Harm Analysis

Because appellant's complaint is premised on a violation of his due-process rights, the constitutional-error harm standard applies here. *See Stovall v. Denno*, 388 U.S. 293, 301-02 (1972); *Hernandez v. State*, 60 S.W.3d 106, 108 (Tex. Crim. App. 2001). Under that standard, "[i]f the appellate record in a criminal case reveals constitutional error that is

subject to harmless error review, the court of appeals must reverse a judgment of conviction

or punishment unless the court determines beyond a reasonable doubt that the error did not

contribute to the conviction or the punishment." TEX. R. APP. P. 44.2(a). Constitutional error

may be harmless if there is "overwhelming" untainted evidence to support the conviction.

*See Harrington v. California*, 395 U.S. 250, 254 (1969); *see also Wesbrook v. State*, 29

S.W.3d 103, 119 (Tex. Crim. App. 2000). Conversely, the error was not harmless if there

is a reasonable likelihood that it "materially affected the jury's deliberations." *Neal v. State*,

256 S.W.3d 264, 284 (Tex. Crim. App. 2008). Thus, the court must evaluate the reasonable

possibility that the "constitutional error was actually a contributing factor in the jury's

deliberations in arriving at [its] verdict—whether, in other words, the error adversely affected

'the integrity of the process leading to the conviction.'" *Scott v. State*, 227 S.W.3d 670, 690

(Tex. Crim. App. 2007).

A constitutional-error harm analysis does not focus on the propriety of the outcome of

the trial, that is, whether the jury verdict was supported by the evidence. *Id.* Rather the focus

is on the probable impact of the constitutional error on the conviction in light of the

existence of other evidence. *See Wesbrook*, 29 S.W.3d at 119. The entire record must be

evaluated in a neutral, impartial, and even-handed manner—not in the light most favorable

to the prosecution. *Harris v. State,* 790 S.W.2d 568, 586 (Tex. Crim. App. 1989). In

analyzing harm, the court must assess whether there was a reasonable possibility that the

error, either alone or in context, "moved the jury from a state of non-persuasion to one of

persuasion." *Scott*, 227 S.W.3d at 690. This examination may consider (1) the nature of the error, (2) the extent to which the error was emphasized by the State, (3) the probable implications of the error, and (4) the weight the jury would likely have assigned to it in the course of deliberations. *Snowden v. State*, 353 S.W.3d 815, 817 (Tex. Crim. App. 2011); *see also Scott*, 227 S.W.3d at 690 (noting that "how weighty the jury may have found the erroneously admitted evidence [should] be compared to the balance of the evidence with respect to the element or defensive issue to which it is relevant"). This list is not exclusive, and the harm analysis for constitutional error should account for "any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt [that particular error] did not contribute to the conviction or punishment.'" *Snowden*, 353 S.W.3d at 822 (quoting TEX. R. APP. P. 44.2(a)). Accordingly, given my conclusion that appellant's due-process rights were violated by Wendy's tainted identification, I would reverse his conviction unless the record establishes, beyond a reasonable doubt, that admitting Wendy's identification of him as the shooter did not contribute to his conviction.

The first factor requires consideration of the nature of the error, but to understand that matter, a review of the record as a whole is required. *See Snowden*, 353 S.W.3d at 822. It is necessary to review the untainted evidence admitted against appellant, as well as the evidence produced by the defense in response to the State's case. Excluding Wendy's identification, the State's case consisted primarily of circumstantial evidence that appellant

had motive to kill Hernandez, that appellant was at the crime scene moments after the shooting occurred, and that appellant was in possession of the murder weapon when he was arrested days after the shooting occurred. But without Wendy's identification, the State was left with evidence supplied by Israel Diaz, a gang member with significant motives to testify falsely, and appellant's possession of the murder weapon over a week after the shooting, making it much less persuasive as a meaningful link to the crime.

To establish motive and opportunity, prosecutors called Israel Diaz to testify that Hernandez had betrayed their gang, La Tercera Crips ("LTC"), by affiliating with other gangs and cooperating with police. Diaz testified that certain LTC members agreed that Hernandez should be killed for his disloyalty. To explain why appellant would undertake to kill Hernandez, Diaz stated that appellant bore an unspoken responsibility for Hernandez as his sponsor into the LTC gang. Diaz further testified that he and appellant met minutes after the shooting just across the street from where it had occurred. Diaz said that, during that meeting, appellant remarked that he "finally got him," and that appellant reloaded a silver semi-automatic handgun that looked similar to the handgun that was later proven to be the murder weapon.

The defense's cross-examination, however, showed that Diaz's testimony arguably lacked credibility for two reasons. First, Diaz also had a motive to kill Hernandez. Prior to Hernandez's death, Diaz had stolen a car at gunpoint. He later loaned that car to Hernandez. Police stopped Hernandez while he was driving the stolen car. When police questioned

Hernandez about the car, Hernandez implicated Diaz in its theft, and Diaz was ultimately charged with aggravated robbery. Thus, jurors were presented with evidence that Diaz had a motive to kill Hernandez, either to prevent Hernandez from testifying against him for the robbery or to retaliate for the betrayal of gang loyalty. Second, Diaz's testimony at trial was procured by the State on the eve of appellant's trial in exchange for the State reducing Diaz's pending capital-murder charge in another case to aggravated robbery. Diaz, therefore, had an incentive to testify against appellant to secure a reduced charge. Moreover, the defense offered the testimony of Walter Benitez, another LTC member, who contradicted much of Diaz's testimony. Benitez testified that, in fact, it was an LTC member named Victor Arevalo who had killed Hernandez and that appellant actually advocated against killing Hernandez when LTC members discussed his disloyalty. In light of Diaz's motive to have committed this offense, the fact that his testimony was given in exchange for reduced charges on another offense, and the testimony that a different gang member killed Hernandez, the State's evidence from Diaz weakly connected appellant to Hernandez's murder.

It is true that evidence connects appellant to the murder weapon. But this connection to the murder weapon was not exclusive of other LTC members, who would have had similar motive to kill Hernandez and who had access to the same cache of weapons during the ten-day interval of time between the shooting and seizure of the weapon. Police officers testified that ten days after the shooting, appellant was arrested pursuant to a warrant. At that time, appellant and another individual were holding boxes when police arrived to make the arrest.

When he saw police approaching him, appellant set the box down before both he and the other individual ran from the police. After the officers arrested appellant, they inspected the contents of the box that appellant had been holding moments earlier. Inside the box were various firearms, one of which was later identified as the murder weapon through ballistics testing. However, the defense introduced testimony that LTC was not a well-armed gang, and it was common for gang members to pool and share weapons. This is evidenced by the number of weapons in the box. Thus, while finding the murder weapon in appellant's possession at the time of his arrest ten days after the shooting is some evidence of appellant's guilt, its weight is less significant because it establishes only a loose connection between appellant and the murder weapon under these particular circumstances.

Additional circumstantial evidence admitted at trial suggested that Hernandez was killed due to his LTC gang association. The day he was murdered, Hernandez and an LTC gang member had a private discussion after which Hernandez was worried because he knew something was wrong or something bad was going to happen. Also, the day that Hernandez was killed, LTC-themed graffiti had been spray painted near the apartment where he was killed. Karen Bardales, Wendy's sister who was also present at the time of the murder, testified that Hernandez "knew something was going to happen" upon seeing the graffiti.

While the State's case showed that, in all likelihood, Hernandez was killed by an LTC member, the only evidence admitted to persuasively show appellant to be the specific LTC member who shot Hernandez was Wendy's identification. Without Wendy's eyewitness

identification, it cannot be said beyond a reasonable doubt that the jury's deliberation upon the rest of the State's evidence would have remained unchanged and would still have produced the same guilty verdict.

The second factor requires consideration of the extent to which the error was emphasized by the State. Here, the State relied heavily on Wendy's identification, which was the sole piece of evidence directly linking a specific LTC gang member, appellant, to this offense. In the absence of this evidence, the State would have been forced to concede that other LTC gang members had a similar motive to kill Hernandez and also had access to the murder weapon.

The third factor requires consideration of the probable implications of the error. I conclude there is a reasonable likelihood that the jury believed the testimony of Diaz and disregarded the testimony of Benitez because the jury had heard from Wendy—the only eyewitness to the murder who claimed to have seen the killer's face—that appellant was the shooter. Wendy's identification corroborated Diaz's testimony that appellant was present near the crime scene shortly after the killing and that he was carrying a handgun that appeared similar to the murder weapon. Additionally, Wendy's identification of appellant as the shooter provided the context for Diaz's testimony that appellant's remark that he "finally got him" was a reference to appellant having killed Hernandez.

Furthermore, Wendy's identification supports the inference that appellant had been in possession of the murder weapon since the night of the shooting, and, therefore, appellant

had killed Hernandez. Absent Wendy's identification of appellant as the shooter, the jury would have likely attributed less weight to appellant's possession of a box with numerous weapons, one of which was the murder weapon, and would have given more weight to the testimony that LTC members pooled and shared their weapons. Appellant's possession of the box containing weapons while he was with another individual would have had little persuasive value absent Wendy's identification testimony. Because ten days had passed between the shooting and appellant's arrest while in possession of the murder weapon, the shooter would have had ample opportunity to either dispose of the murder weapon or to re-deposit the murder weapon in the LTC cache. Given this fact, appellant's possession of the murder weapon at the time of his arrest is only weak evidence of his guilt under these circumstances.

The fourth factor requires consideration of the weight the jury would likely have assigned to Wendy's identification in the course of deliberations. Although other evidence supports the conviction, the quality of that evidence was weak because it included the bartered-for testimony of Diaz, a fellow gang member with strong motives to kill Hernandez who was near the apartment where Hernandez was shot at the time of the shooting, and appellant's possession of the murder weapon over a week after the offense. Wendy's eyewitness identification is the only evidence directly connecting appellant to the murder. Without her testimony, the strength of the State's case was significantly undermined.

While a jury could have rationally reached a guilty verdict without Wendy's

identification of appellant as the killer, that is not dispositive in finding that the constitutional error at trial was harmless. After applying the correct standard under Rule 44.2(a) and weighing the factors in view of the record in its entirety, I cannot conclude beyond a reasonable doubt that the jury's deliberation would have been unaltered and that the tainted identification did not contribute to the conviction. The State relied heavily on Wendy's identification of appellant as the shooter because there were no other eyewitnesses who could identify the shooter and no forensic evidence linking appellant to the murder scene. Diaz's testimony that appellant was near the location where Hernandez was killed shortly after the murder, that appellant had a handgun at that time, and that appellant alluded to having shot Hernandez would likely have been credited by the jury based on Wendy's identification that may have served as a basis for the jury to not only minimize Diaz's bias but also to disregard Benitez's identification of another person as Hernandez's killer. Moreover, the jury may have seized upon Wendy's identification to support the inference that, because appellant was arrested while carrying a number of weapons, one of which was the murder weapon, appellant had used the weapon to shoot Hernandez.

Because I cannot conclude beyond a reasonable doubt that the admission of Wendy's identification testimony did not lend significant support to the State's other circumstantial evidence of appellant's guilt, and because Wendy's testimony might have provided a reason for the jury to discount appellant's defensive evidence, I cannot say beyond a reasonable doubt that its admission did not contribute to the guilty verdict. I, therefore, would hold that

the admission of this evidence at trial was not harmless error.

### III. Conclusion

Because most of the facts surrounding the procedures that led to the identification of appellant are undisputed, this is not a case that requires deference to the trial court's decision to admit identification evidence. Rather, this is a case that requires this Court to apply the law to the largely undisputed facts. By appropriately applying the law to the facts, I conclude that the pretrial identification procedure in this case was so impermissibly suggestive as to give rise to a substantial likelihood of misidentification, and I further conclude that appellant has shown that there are no circumstances to show that Wendy's identification of him in court eight years after the offense was reliable so as to diminish the corrupting effect of the procedure. Because I cannot conclude that the error was harmless, I respectfully dissent from this Court's judgment that affirms appellant's conviction for capital murder and sentence of death. Accordingly, I would reverse the judgment of the trial court and remand for a new trial.

Filed: November 2, 2016

PUBLISH

F I L E D
Chris Daniel
District Clerk

NOV 0 3 2016

Time:_____
Harris County, Texas
By_____
Deputy



# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-77,036

### JUAN BALDERAS, Appellant

v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL FROM CAUSE NO. 1412826
### IN THE 179TH DISTRICT COURT
### HARRIS COUNTY

RICHARDSON, J., filed a concurring opinion in which MEYERS, JOHNSON, and NEWELL, JJ. joined.

### CONCURRING OPINION

I join the majority's decision to affirm the judgment of the trial court.

### A.    Speedy Trial

Among his points of error, Juan Balderas claims that the trial court erred by not granting his motion to dismiss for lack of a speedy trial. Balderas was arrested for Eduardo Hernandez's murder in December of 2005. General voir dire began eight years later on January 13, 2014. However, Balderas did not file his Motion For A Speedy Trial until

January 17, 2014. In this motion, Balderas (1) claimed that the State has not made a diligent effort to pursue a trial for the eight years he has been incarcerated; (2) asserted that he "has at all times been ready for trial;" and (3) "requested that the above entitled matter be brought to trial." The trial court held a hearing on Balderas's motion on February 12, 2014. Although Balderas filed his motion for speedy trial after trial had begun, his attorney explained to the court that Balderas was seeking a dismissal based on lack of a speedy trial. At the hearing, the State presented evidence that, early on, the defense sought additional time to create a mitigation packet in an effort to persuade the State to not seek the death penalty. The trial court's docket sheet reflects that on May 12, 2010, trial was reset at the request of the defense. From January 2008 through December 2014, the court's docket sheet reflects seven trial resets "by agreement of both parties." At the hearing, the State presented testimony that, on May 10, 2012, the trial court granted a motion for continuance filed by the defense "over strong objection by the State," and in August of 2012, another defense motion for continuance was granted over strenuous objection by the State. The trial court denied Balderas's motion. This Court evaluated the trial court's decision, applying the *Barker v. Wingo*[1] factors. I agree with the majority's conclusion that Balderas's right to a speedy trial was not violated.

## B.    Sufficiency of the Evidence

Balderas also claimed that the evidence was insufficient to support his conviction. I agree with the majority that the evidence linking Balderas to the shooting of Eduardo

---

[1] 407 U.S. 514, 530 (1972).

Hernandez, both of whom were members of the La Tercera Crips street gang, was sufficient to support the jury's verdict. Officers received an anonymous tip that caused them to suspect Balderas of killing Eduardo. After eyewitness Wendy Bardelas viewed a photo lineup, she identified Balderas as the shooter. The officers obtained an arrest warrant, and went to where they believed Balderas was residing. When he saw the officers approaching, Balderas dropped a large black bag and green tote box he'd been carrying and fled on foot. The officers pursued Balderas and eventually spotted him hiding under a parked vehicle. The murder weapon, a silver .40 caliber handgun, was recovered by police from one of the containers Balderas had dropped. A magazine clip that fit the handgun was found in Balderas's rear pocket.

Israel Diaz, who was also a La Tercera Crips gang member, testified to the following: (1) About three to four days before the killing, gang members met to discuss Eduardo's disloyalty to the gang. (2) They decided that Eduardo needed to be killed. (3) It was "understood" by the gang members that, although any member could do the killing, the most likely one was Balderas since he had brought Eduardo into the gang. (4) Diaz became aware Eduardo was killed three days later when "one of the guys" called him. (5) Diaz went to the crime scene on the night of the offense. He saw police vehicles and an ambulance. Diaz saw Balderas "a few steps away from the apartments." Balderas was wearing a dark sweater-like shirt and khaki pants. (6) Diaz said that Balderas approached Diaz and the other gang members who were there and "he just hugged everyone like sort of when you haven't seen

nobody in a long time, like joyful, and he gave each individual a hug and when he got towards me, he gave me a hug and a kiss on the cheek," which was unusual. (7) Diaz testified that Balderas "basically just took credit for the whole thing," and that Balderas said "he got him, he finally got him." Diaz said that Balderas "had his [silver] handgun and he was just exchanging the magazine, the clip."

According to officer testimony, earlier on the day of the offense, Eduardo was visited by Jose Vasquez, a fellow gang member who, on that day, was wearing a red H.E.B. shirt. After Vasquez talked to Eduardo, Eduardo became very upset and concerned that he might be in trouble with his fellow gang members for socializing with members of other gangs and prioritizing his girlfriend, Karen Bardelas. In the course of their investigation, the police looked at Balderas's phone records. On the date of the offense, Balderas called Jose Vasquez at 7:41 p.m. and again at 9:56 p.m., which is near the time that Eduardo was killed. The investigating officers believed this evidence to be a significant link between Balderas and Eduardo.

## C.    The Pre-trial Identification Procedure

Balderas claims that the photo lineup shown to Wendy Bardelas—the only eyewitness to identify Balderas as the shooter—was impermissibly suggestive. He claims that, as a result of the improperly suggestive photo array, Wendy's in-court and out-of-court identifications of him should have been suppressed.

"Due process requires the suppression of an in-court identification only if (1) an impermissibly suggestive out of court procedure (2) gave rise to a very substantial likelihood of irreparable misidentification."[2] In *Barley v. State,* this Court held that a pre-trial identification procedure may be suggestive, "but not *impermissibly* so."[3] Suggestiveness may be created "by the content of the line-up or the photo array itself if the suspect is the only individual closely resembling the pre-procedure description."[4] That is what we have in this case. Wendy described the shooter as wearing a black hooded sweatshirt and having a dark birthmark on his face. She was shown a photo array in which Balderas was the only person fitting this description. He was the only one in the photo array wearing a black hoodie (although one other man was in a dark grey hoodie) and the only one with a dark mark on his left cheek. Even though it was established through testimony that this mark was not a birthmark, but was a scratch, Balderas was still the only person in the lineup with this distinctive type of mark on his face.

Nevertheless, "a suggestive identification procedure does not, in itself, intrude upon a constitutionally protected interest."[5] Even if the pretrial identification procedure was

---

[2] *Williams v. State,* 937 S.W.2d 479, 488 (Tex. Crim. App. 1996) (citing *Neil v. Biggers,* 409 U.S. 188, 198 (1972)).

[3] 906 S.W.2d 27, 33 (Tex. Crim. App. 1995).

[4] *Id.*

[5] *See Jackson v. State,* 657 S.W.2d 123, 130 (Tex. Crim. App. 1983) ("[I]t is well established that, even where the pre-trial identification procedure is impermissibly suggestive, in-court testimony of an identification witness will still be admissible as long as the record clearly reveals that the witness' prior observation of the accused was sufficient to serve as an independent origin for the in-court

impermissibly suggestive, Wendy's identification of Balderas as the shooter could still be considered reliable under the totality of the circumstances.[6] We assess reliability by weighing five factors against the corrupting effect of any suggestive identification procedure: (1) the opportunity of the witness to view the suspect at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at that confrontation; and (5) the length of time between the crime and the confrontation.[7] While I would view the pre-trial identification procedure as suggestive, and perhaps impermissibly so, I agree that Wendy's identification of Balderas as the shooter was reliable under the totality of the circumstances.

1.    The opportunity of the witness to view the suspect at the time of the crime

Wendy testified that she was sitting in front of the couch in the small apartment when the shooter entered. She said that he was in the apartment for what seemed like "an eternity," and she was watching him the whole time he was there.

2.    The witness's degree of attention

Wendy testified that the entire time that the shooter was in the apartment, she was looking at him. She said her eyes followed him everywhere. She did not move from the spot where she was sitting because she "was frozen." When Wendy was taken to the police

---

identification.").

[6] *Luna v. State*, 268 S.W.3d 594, 605 (Tex. Crim. App. 2008).

[7] *Id.*

station on the night of the offense, she told the police that she had seen the shooter's face.

Wendy testified that, although she was "in shock" during the shooting, she was able to get

a good look at the shooter's face. Wendy said that she saw the shooter's face when his hood

fell down off of his head.

At the time, Wendy did not immediately recognize Balderas. It did not register with

her that she had met him before. Wendy explained that, "At that moment, [her] mind was

not all put together, and [she] just couldn't think. [They] were just playing, doing nothing,

he arrived. And then, just all the sudden, this happens." She said that she was "in shock,"

and that she was "frozen" because she had just "seen someone killing [her] friend." The

following exchange took place during the suppression hearing outside of the jury's presence:

Q.   You didn't think at the time to tell the police, I know who this guy is
     and I've seen him four weeks ago?

A.   At that minute, I couldn't even think right.

Q.   If you couldn't think right, then how did you give a statement to the
     police?

A.   Because he asked me to tell him what I had remembered and I was
     trying to remember what had happened right there and then.

Q.   And after they asked you this, you said you had never seen him before,
     right?

A.   Yes.

Q.   But now you're telling us that that was not true, right?

A.   Now and before. Later on when I gathered all my thoughts that I was
     thinking everything over, right? Then I remember him.

3.  The accuracy of the witness's prior description of the criminal

In the statement Wendy gave to the officers on the night of the shooting, she described the shooter as "Hispanic and about 16-17 years old." She said he was about 5'5" to 5'7" tall, and he had "a dark birth mark on his face."[8] Wendy described him as "clean shaven" and "very skinny." She said he had short black hair in a "fade type haircut," and "he was wearing a black sweat shirt hooded jacket and khaki pants." This was an accurate description of Balderas.

4.  The level of certainty demonstrated by the witness at the confrontation

Wendy said that, when the officer showed her the photo lineup with Balderas in it, she was able to identify Balderas. Pointing to Balderas's photo, Wendy told the officer that, "he's the one that was running around, and he's the one that killed Eduardo." Wendy testified that when she saw Balderas's photo in the photo spread, she "went back to that night and it was him, the person that [she] saw." Wendy said that she did not even notice that he was wearing a black hoodie in that photograph. When testifying at trial, Wendy made an in-court identification of Balderas as "the one who shot Eduardo." When asked if the person she picked out in the photo spread as the shooter is the defendant, Wendy replied, "yes."

---

[8] Much was made of Wendy's statement to the police on the night of the killing that the shooter had a dark birthmark on his face. But, at the suppression hearing, she agreed that the mark on the left side of Balderas's face in the photo lineup was a scratch, not a birthmark. Likewise, the police officer who showed Wendy the photo lineup six days after the shooting testified that he would agree that whatever mark that was on Balderas's cheek in the photo lineup was not a birthmark or any kind of permanent mark, and that there was no dark birthmark on Balderas's cheek at trial similar to the one on his face in the photo lineup. At trial it was shown that Balderas does have a mole on his right cheek that is not visible on the photo in the lineup.

The officer testified that, when he first showed Wendy the photo lineup, Wendy "immediately pointed to the male in Position No. 5, Juan Balderas, and said that she knew him as Apache. . . . She told me that he looked like the shooter." He said that Wendy told him she had not seen Apache for six months, but that "his face looked exactly like the shooter's face." He confirmed that Wendy seemed certain in her identification, that she did not hesitate or stare at the photo spread for any length of time before she picked him out and said that she was positive that Balderas's face was the same face as the shooter.

Because the officer was somewhat "confused" about the words Wendy used to identify Balderas as the shooter, he decided to meet with Wendy the next day to get clarification on her identification. He said that, when he showed Wendy the same photo spread he had shown her the day before, she confirmed that Balderas was the shooter. "She then said Apache did the killing. She stated she was absolutely positive the male in the picture was the same male that killed Eduardo." Wendy then asked the officer if she could write in Spanish on the back of the photo array that she was positive about her identification of Balderas as the shooter. The officer also agreed that English was Wendy's second language and that perhaps there had been a communication problem that would explain why her statements regarding the photo spread the day before confused him.

5.   The length of time between the crime and the confrontation

The officer showed Wendy the photo lineup with Balderas's photo on December 12, 2005, six days after the offense occurred. The photo of Balderas in the photo array was an

H.P.D. booking photo that was probably taken in November of 2005. Although the trial took place several years after the offense occurred, Wendy's identification of Balderas as the shooter occurred only days after the offense.

**D.**   **Conclusion**

Therefore, even if the photo array might have been suggestive, I agree with the trial court's conclusion that the totality of the circumstances reveals no substantial likelihood of misidentification. Therefore, I concur in the majority's disposition to affirm the judgment of the trial court.

FILED:        November 2, 2016

PUBLISH

THE STATE OF TEXAS
VS.
**JUAN BALDERAS aka APACHE**
**11490 HARWIN**
**HOUSTON, TX**

SPN: 2190432
DOB: 9/7/1986
DATE PREPARED: 12/26/2013

D.A. LOG NUMBER: 2020192
CJIS TRACKING NO.: 9036989981D001
BY: DA NO: 50788045 AGENCY:HOUSTON
**POLICE DEPARTMENT**
O/R NO: 1843617050
ARREST DATE: 12/16/2005

NCIC CODE: 90710

RELATED CASES:

FELONY CHARGE: **CAPITAL MURDER**
CAUSE NO: 1412826 ✓
HARRIS COUNTY DISTRICT COURT NO: 179 ✓
FIRST SETTING DATE: 1/10/2014

BAIL: $0
PRIOR CAUSE NO: 1299912 ✓

---

**IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:**

The duly organized Grand Jury of Harris County, Texas, presents in the District Court of Harris County, Texas, that in Harris County, Texas, **JUAN BALDERAS aka APACHE**, hereafter styled the Defendant, heretofore on or about **DECEMBER 6, 2005**, did then and there unlawfully, while in the course of committing and attempting to commit the burglary of a habitation owned by Durjan "Rata" Decorado and Wendy Bardales, intentionally cause the death of Eduardo Hernandez by shooting Eduardo Hernandez with a deadly weapon, namely a firearm.

**FILED**
Chris Daniel
District Clerk

DEC 30 2013

Time: 11:00
Harris County, Texas
By _____

**AGAINST THE PEACE AND DIGNITY OF THE STATE.**

Foreman                        248th

_____
FOREMAN OF THE GRAND JURY

**INDICTMENT**

**RECORDER'S MEMORANDUM**
This instrument is of poor quality
at the time of imaging



## Harris County Criminal District Docket Sheet

| | |
|---|---|
| **THE STATE OF TEXAS VS. BALDERAS, JUAN**<br>**Cause No.:** 141282601010-3  **Court:** 179th<br>**Offense:** CAPITAL MURDER                    **Level:** C Level Felony<br>**Charging Instrument:** On Appeal CCA<br><br>**GENERAL ORDERS OF THE COURT** | **Bond:** $0<br>**Next Setting:**<br>**Case Disposition:** Disposed<br>**Case Status:** Appeal<br>**Defendant Status:** JAIL |

| Docket Sheet Entries | |
|---|---|
| **Date** | **Comment** |
| 11/18/2013 | MOTION FILED: ST MTN DISCL EXPERTS |
| 12/30/2013 | GRAND JURY ACTION: Reindictment GJ COURT: 248<br>OFFENSE: CAPITAL MURDER          C level Felony<br>BOND AMOUNT: $0<br>Previous Case Number: 1299912 |
| 12/30/2013 | CAPIAS ISSUED—INDICTMENT<br>BOND AMOUNT: $0 |
| 12/30/2013 | Precept issued to serve copy of indictment |
| 1/2/2014 | MOTION FILED: ST MTN TRANSFER MTNS |
| 1/2/2014 | ORDER: GRNTD ST MTN DISCL EXPERTS |
| 1/2/2014 | ORDER: GRNTD ST MTN TRANFER MTNS |
| 1/3/2014 | MOTION FILED: FIND CRIM PROC UNCON |
| 1/3/2014 | MOTION FILED: CRT FIND UNCONSTITUT |
| 1/3/2014 | MOTION FILED: HLD CRIMCODPRO UNCON |
| 1/3/2014 | MOTION FILED: DECLARE TX COD UNCON |
| 1/3/2014 | MOTION FILED: DECLARE UNCONST ARTI |
| 1/3/2014 | MOTION FILED: HLD UNCONSTI TX CRIM |
| 1/3/2014 | MOTION FILED: HLD UNCONST BURDEN |
| 1/3/2014 | MOTION FILED: TXCODCRIM UNCONSTITU |
| 1/3/2014 | MOTION FILED: DECLARE RUL UNCONSTI |
| 1/3/2014 | MOTION FILED: DECL ART37.071 UNCON |
| 1/3/2014 | MOTION FILED: DECL SECTION UNCONST |
| 1/3/2014 | MOTION FILED: PRECLUDE DEATH PEN |
| 1/3/2014 | MOTION FILED: HLD STAT DEFINISTION |
| 1/3/2014 | MOTION FILED: DECL CAP SENT UNCONS |
| 1/3/2014 | MOTION FILED: DECL DEATG PEN UNCON |
| 1/3/2014 | MOTION FILED: DECL TXCRIMCOD UNCON |
| 1/3/2014 | MOTION FILED: PRECLU DEATH PENALTY |

| 1/3/2014 | MOTION FILED: HLD CRIMCOD UNCONSTI |
|---|---|
| 1/3/2014 | ORDER: GRNTD DEF MTN INVESTIGATOR |
| 1/6/2014 | BENCH WARRANT ISSUED<br>ISSUED FOR SPN: 02250402 FERRUFINO, EDGAR, Bench Warrant Material Witness For Prosecution |
| 1/6/2014 | MOTION FILED: DEF MTN DISCL EXPERT |
| 1/6/2014 | MOTION FILED: DEF MTN DISC RULE404 |
| 1/6/2014 | MOTION FILED: DEF MTN DISCOV/PRODU |
| 1/10/2014 | Defendant BALDERAS, JUAN appeared without counsel |
| 1/10/2014 | ORDER: GRNTD CRIM HIST RECORD INFO |
| 1/10/2014 | Reset By Court, 1/13/2014 08:30 AM Jury Trial |
| 1/13/2014 | Defendant BALDERAS, JUAN appeared without counsel |
| 1/13/2014 | The defendant filed a sworn pauper's oath, and JUDGE GUINEY, KRISTIN MELISSA<br>ordered SCOTT, ROBERT R.                          ppointed as Appointed Defense Attorney |
| 1/13/2014 | The defendant filed a sworn pauper's oath, and JUDGE GUINEY, KRISTIN MELISSA<br>ordered NUNNERY, A. E. appointed as Appointed Defense Attorney |
| 1/13/2014 | The defendant filed a sworn pauper's oath, and JUDGE GUINEY, KRISTIN MELISSA<br>ordered GODINICH, JEROME JR. appointed as Appointed Defense Attorney |
| 1/13/2014 | Defendant BALDERAS, JUAN appeared in person with Counsel GODINICH, JEROME W/ NUNNERY, ALVIN & SCOTT, ROBERT.<br>Interpreter:N/A<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, MARY appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: SHAVER, DOUG<br><br>AT 9:17AM A PANEL OF 8 PROSPECTIVE JURORS WERE SEATED AND WELCOMED AND ADMONISHED AS TO THE LAW. AT 9:39AM THE PANEL RETIRED TO THE JURY ROOM BEFORE COMMENCE OF INDIVIDUAL VOIR DIRE. AT 9:59AM BOTH SIDES AGREED TO EXCUSE JUROR#2 STAFFORD AND JUROR#5 CATES. AT 10:02AM JUROR#1 WAS SEATED FOR INDIVIDUAL VOIR DIRE. AT 10:10AM STATE STARTED ITS VOIR DIRE. AT 10:30AM THE DEFENSE STARTED ITS VOIR DIRE. AT 10:33AM COURT GRANTED DEFENSE MOTION TO EXCUSE JUROR#1 ABEY. AT 10:36AM JUROR#8 CHOPRA TOOK THE STAND FOR INDIVIDUAL VOIR DIRE. AT 10:40AM THE STATE BEGAN ITS VOIR DIRE. AT 11:12AM THE DEFENSE BEGAN ITS VOIR DIRE WITH JUROR#8 CHOPRA. AT 11:22AM COURT GRANTED DEFENSE MTN TO STRIKE JUROR#8 FOR CAUSE. AT 11:23AM JUROR#3 ARMSTRONG WAS SEATED FOR VOIR DIRE. AT 11:29AM STATE BEGAN ITS VOIR DIRE. AT 11:50AM DEFENSE GAVE VOIR DIRE. AT 12:12PM BOTH SIDES ACCEPTED PROSPECTIVE JUROR#3 ARMSTRONG AS A JUROR FOR TRIAL; AT THIS TIME THE COURT TOOK A BREAK. AT 12:52PM PROSPECTIVE JUROR#4 WILLIAMS WAS SEATED FOR INDIVIDUAL VOIR DIRE. AT 12:59PM STATE BEGAN INDIVIDUAL VOIR DIRE WITH JUROR#4 WILLIAMS. AT 1:23PM DEFENSE BEGAN VOIR DIRE. AT 1:28PM THE COURT GRANTED DEFENSE MTN TO DISMISS JUROR#4 WILLIAMS FOR CAUSE; AT THIS TIME PROSPECTIVE JUROR#6 CYBULSKI TOOK THE STAND FOR INDIVIDUAL VOIR DIRE. AT 1:55PM THE DEFENSE STARTED ITS VOIR DIRE. AT 2:15PM JUROR#6 CYBULSKI WAS SELECTED TO BE A JUROR FOR TRIAL; AT THIS TIME THE COURT TOOK A BREAK. AT 2:36PM PROSPECTIVE JUROR#7 ANDREWS WAS SEATED FOR INDIVIDUAL VOIR DIRE. AT 2:46PM THE STATE STARTED ITS VOIR DIRE. AT 3:14PM THE DEFENSE BEGAN ITS VOIR DIRE. AT 3:50PM THE DEFENSE USED THEIR FIRST PEREMPTORY STRIKE ON JUROR#7 ANDREWS; AT THIS TIME COURT RECESSED UNTIL 01-14-2014 @1PM. |
| 1/13/2014 | MOTION FILED: MTN COMM SUPERVISION |
| 1/13/2014 | JURY EXAMINED ON VOIR DIRE |
| 1/13/2014 | Continued 1/14/2014 08:30 AM Jury Trial |
| 1/14/2014 | Defendant BALDERAS, JUAN appeared without counsel |
| 1/14/2014 | MOTION FILED: MTN APPELLATE COUNSL |

| | |
|---|---|
| 1/14/2014 | JURY EXAMINED ON VOIR DIRE |
| 1/14/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $4,700 |
| 1/14/2014 | ORDER: GRNTD MTN APPELLATE COUNSEL |
| 1/14/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $3,575 |
| 1/14/2014 | Precept issued to serve copy of veniremen |
| 1/14/2014 | Defendant BALDERAS, JUAN appeared in person with Counsel GODINICH, JEROME W/ NUNNERY, ALVIN & SCOTT, ROBERT.<br>Interpreter:N/A<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, MARY appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: SHAVER, DOUG<br><br>AT 1:05PM A PANEL OF 16 PROSPECTIVE JURORS WERE SEATED AND WELCOMED AND ADMONISHED AS TO GENERAL PRINCIPLES OF THE LAW. AT 1:39PM THE PANEL RETIRED TO THE JURY ROOM BEFORE THE COMMENCE OF INDIVIDUAL VOIR DIRE. AT 2:06PM AGREEMENTS TO EXCUSE POTENTIAL JURORS #9 NGUYEN, #10 SRAMEK, #11 PHAM, #14 MEDINA, #16 CRUZ, #20 CLAYPOOL, #22 ALANIS. #23 OGLESBY AND #24 DEHOYOS. AT 2:25PM THE COURT EXCUSED THE JURORS THAT WERE STRUCK BY AGREEMENT AND INSTURCTED THE REMAINDER OF THE PANEL TO RETURN ON TOMORROW WEDNESDAY 1-15-2014 SO THAT INDIVIDUAL VOIR DIRE CAN COMMENCE @9:30AM; AT THIS TIME COURT ADJOURNED. |
| 1/14/2014 | Continued 1/15/2014 08:30 AM Jury Trial |
| 1/15/2014 | Defendant BALDERAS, JUAN appeared in person with Counsel GODINICH, JEROME W/ NUNNERY, ALVIN & SCOTT, ROBERT.<br>Interpreter:N/A<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, MARY appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: SHAVER, DOUG<br><br>AT 9:28AM ALL PARTIES PRESENT AND READY FOR INDIVIDUAL VOIR DIRE, AT THIS TIME JUROR#12 RIGGS TOOK THE STAND. AT 9:35AM STATE BEGAN INDIVIDUAL VOIR DIRE. AT 10:04AM DEFENSE BEGAN VOIR DIRE OF JUROR#12 RIGGS. AT 10:29AM DEFENSE USED PEREMPTORY STRIKE AGAINST JUROR#12 RIGGS, AT THIS TIME THE COURT TOOK A SHORT BREAK. AT 10:45AM ALL PARTIES AGREED TO DISMISS JUROR#15 THRASHER AND JUROR#21 THOMAS. AT 10:47AM JUROR#13 GARRETT WAS SEATED FOR INDIVIDUAL VOIR DIRE. AT 10:55AM STATE BEGAN ITS VOIR DIRE. AT 11:16AM ALL PARTIES AGREED TO STRIKE JUROR# 13 GARRETT, AT THIS TIME JUROR#17 REINOLD TOOK THE STAND FOR INDIVIDUAL VOIR DIRE. AT 11:25AM STATE BEGAN VOIR DIRE. AT 11:48AM DEFENSE BEGAN ITS VOIR DIRE OF JUROR#17 REINOLD. AT 12:17PM DEFENSE EXERCISED A PEREMPTORY STRIKE ON JUROR#17 REINOLD, AT THIS TIME THE COURT TOOK A BREAK. AT 1:31PM JUROR#18 GANGLUFF WAS SEATED FOR INDIVIDUAL VOIR DIRE. AT 1:39PM THE STATE BEGAN VOIR DIRE. AT 2:10 PM DEFENSE BEGAN VOIR DIRE. AT 2:30PM ALL PARTIES ACCEPTED JUROR#18 AS A JUROR FOR TRIAL; AT THIS TIME THE COURT TOOK A BREAK. AT 2:40PM JUROR#19 STANLEY TOOK THE STAND FOR VOIR DIRE. AT 2:48PM ALL PARTIES AGREED TO EXCUSE JUROR#19 STANLEY. AT 2:51PM ALL PARTIES AGREED TO EXCUSE JURORS #25 SMITH, #31 ARD, AND #33 FRINSCO. AT 2:58PM COURT ADJOURNED. |
| 1/15/2014 | Continued 1/16/2014 08:30 AM Jury Trial |
| 1/16/2014 | The defendant filed a sworn pauper's oath, and JUDGE GUINEY, KRISTIN MELISSA ordered SHEARER, R. SCOTT appointed as Appointed Atty On Appeal |



## Harris County Criminal District Docket Sheet

| 1/16/2014 | Defendant BALDERAS, JUAN appeared in person with Counsel GODINICH, JEROME W/ NUNNERY, ALVIN & SCOTT, ROBERT.<br>Interpreter:N/A<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, MARY appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: SHAVER, DOUG<br><br>AT 10:00AM A PANEL OF 9 PROSPECTIVE JURORS WERE SEATED AND WELCOMED AND ADMONISHED AS TO GENERAL PRINCIPLES OF THE LAW. AT 10:31AM THE JUROR RETIRED TO THE JURY ROOM BEFORE INDIVIDUAL VOIR DIRE COMMENCED. AT 10:54AM AGREEMENTS TO EXCUSE JURORS #26 MILES, #30 CHE, #32 PARSONS, AND #36 LESTER. AT 11:03AM JUROR#27 ANDERSON WAS SEATED FOR INDIVIDUAL VOIR DIRE. AT 11:04AM ALL PARTIES AGREED TO EXCUSE JUROR# 27 ANDERSON; AT THIS TIME JUROR#28 MOLINA TOOK THE STAND FOR VOIR DIRE. AT 11:12AM STATE BEGAN VOIR DIRE. AT 11:23AM JUROR#28 MOLINA WAS EXCUSED BY AGREEMENT; AT THIS TIME THE COURT TOOK A BREAK. AT 1:00PM JUROR#29 GILL WAS SEATED FOR VOIR DIRE. AT 1:05PM STATE BEGAN VOIR DIRE. AT 1:38PM DEFENSE BEGAN VOIR DIRE. AT 2:10PM JUROR#29 GILL WAS EXCUSED FOR DEFENSE CAUSE, AT THIS TIME THE COURT TOOK A BREAK. AT 2:17PM JUROR#34 WILGANOWSKI TOOK THE STAND FOR VOIR DIRE. AT 2:24PM STATE BEGAN VOIR DIRE. AT 2:40PM ALL PARTIES AGREED TO EXCUSE JUROR#34 WILGANOWSKI, AT THIS TIME JUROR#35 BRAGG WAS SEATED FOR INDIVIDUAL VOIR DIRE. AT 2:50PM ALL PARTIES AGREED TO EXCUSE JUROR#35 BRAGG; AT THIS TIME COURT ADJOURNED UNTIL TOMORROW 1-16-14 @9AM. |
| 1/16/2014 | JURY EXAMINED ON VOIR DIRE |
| 1/16/2014 | Continued 1/17/2014 08:30 AM Jury Trial |
| 1/17/2014 | Defendant BALDERAS, JUAN appeared in person with Counsel GODINICH, JEROME W/ NUNNERY, ALVIN & SCOTT, ROBERT.<br>Interpreter:N/A<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, MARY appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: SHAVER, DOUG<br><br>AT 9:35AM A PANEL OF 12 PROSPECTIVE JURORS WERE SEATED AND WELCOMED AND ADMONISHED AS TO GENERAL PRINCIPLES OF THE LAW. AT 10:09AM THE JURORS RETIRED TO THE JURY ROOM BEFORE INDIVIDUAL VOIR DIRE COMMENCED. AT 10:32AM ALL PARTIES AGREED TO STRIKE JURORS #37 TINE, #40 SANCHEZ, #41 PARTIN, #42 HARRISON, #43 DARILEK, #44 REED, #45 HERNANDEZ, #47 QUIZON AND #48 OBETA. AT 10:36AM JUROR#38 BIRNEY WAS SEATED FOR INDIVIDUAL VOIR DIRE. AT 10:44AM THE STATE BEGAN ITS VOIR DIRE. AT 11:11AM THE DEFENSE BEGAN ITS VOIR DIRE OF JUROR#38 BIRNEY. AT 11:39AM ALL PARTIES ACCEPTED JUROR#38 BIRNEY FOR TRIAL. AT 11:41AM THE COURT TOOK A BREAK. AT 11:53AM JUROR#39 TRUJILLO WAS SEATED FOR VOIR DIRE. AT 12:00PM STATE BEGAN VOIR DIRE. AT 12:32PM DEFENSE BEGAN VOIR DIRE. AT 1:04PM ALL PARTIES ACCEPTED JUROR#39 TRUJILLO FOR TRIAL, AT THIS TIME THE COURT TOOK A BREAK. AT 1:12PM ALL PARTIES AGREED TO EXCUSE JUROR#46 HERNANDEZ; AT THIS TIME JURORS #49 JONES, #53 BOSLEY, #56 WASHINGTON, AND #59 WHITCOMB WERE EXCUSED WITHOUT FURTHER QUESTIONING FROM EITHER PARTIES ON TUESDAY 1-21-2014. AT 1:20PM COURT ADJOURNED UNTIL 1-21-2014 @9AM. |
| 1/17/2014 | JURY EXAMINED ON VOIR DIRE |
| 1/17/2014 | ORDER: GRNTD DEF MTN INVESTIG FEES |
| 1/17/2014 | ORDER: GRNTD DEF MTN INVESTIGATOR |
| 1/17/2014 | Continued 1/21/2014 08:30 AM Jury Trial |
| 1/21/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |



# Harris County Criminal District Docket Sheet

| | |
|---|---|
| 1/21/2014 | Defendant BALDERAS, JUAN appeared in person with Counsel GODINICH, JEROME W/ NUNNERY, ALVIN & SCOTT, ROBERT.<br>Interpreter:N/A<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, MARY appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: SHAVER, DOUG<br><br>AT 9:25AM ALL PARTIES PRESENT AND READY FOR VOIR DIRE TO COMMENCE; AT THIS TIME A PANEL OF 7 PROSPECTIVE JURORS WAS SEATED, WELCOMED AND ADMONISHED AS TO GENERAL PRIPCILES OF THE LAW. AT 9:56AM THE PANEL RETIRED TO THE JURY ROOM BEFORE INDIVIDUAL VOIR DIRE COMMENCED; AT THIS TIME THE COURT TOOK A BREAK. AT 10:23AM ALL PARTIES AGREED TO EXCUSE JURORS #50 HOLLEY, #54 ASPREC, #55 SANCHEZ, AND #60 BOLIO WITHOUT INDIVIDUAL VOIR DIRE. AT 10:29AM JUROR#51 WARD TOOK THE STAND FOR INDIVIDUAL VOIR DIRE. AT 10:36AM THE STATE BEGAN ITS VOIR DIRE. AT 10:59AM BOTH SIDES AGREED TO EXCUSE JUROR#51 WARD. AT 11:15AM JUROR#52 MEDINA WAS SEATED FOR VOIR DIRE. AT 11:22AM BOTH SIDES AGREED TO EXCUSE JUROR#52 MEDINA; AT THIS TIME THE COURT TOOK A BREAK. AT 1:00PM JUROR#57 BURNETT TOOK THE STAND FOR INDIVIDUAL VOIR DIRE. AT 1:06PM THE STATE BEGAN VOIR DIRE. AT 1:38PM THE DEFENSE BEGAN ITS VOIR DIRE. AT 1:57PM THE DEFENSE USED A PEREMPTORY STRIKE TO EXCUSE JUROR#57 BURNETT. AT 2:00PM JUROR#58 PIERCE TOOK THE STAND FOR VOIR DIRE. AT 2:05PM STATE BEGAN VOIR DIRE. AT 2:31PM DEFENSE BEGAN VOIR DIRE. AT 2:34PM BOTH SIDES AGREED TO EXCUSE JUROR#58 PIERCE. AT 2:50PM COURT ADJOURNED. |
| 1/21/2014 | MOTION FILED: DEF PUNISH ELECT JRY |
| 1/21/2014 | JURY EXAMINED ON VOIR DIRE |
| 1/21/2014 | Continued 1/22/2014 09:00 AM Jury Trial |
| 1/22/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |
| 1/22/2014 | Defendant BALDERAS, JUAN appeared in person with Counsel GODINICH, JEROME W/ NUNNERY, ALVIN & SCOTT, ROBERT.<br>Interpreter:N/A<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, MARY appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: SHAVER, DOUG<br><br>AT 9:25AM ALL PARTIES PRESENT AND READY FOR VOIR DIRE TO COMMENCE; AT THIS TIME A PANEL OF 12 PROSPECTIVE JURORS WAS SEATED, WELCOMED AND ADMONISHED AS TO GENERAL PRICIPLES OF THE LAW. AT 9:54AM THE PANEL RETIRED TO THE JURY ROOM SO THAT AGREEMENTS COULD BE MADE BEFORE THE COMMENCE OF INDIVIDUAL VOIR DIRE. AT 10:15AM BOTH SIDES AGREED TO EXCUSE WITHOUT QUESTIONING JURORS #62 ZAMORA, #63 BERRY, #64 BROWN, #65 BUTLER, #66 CARRENS, #67 STANLEY, #68 NGUYEN, #70 BARRY, #71 LAU AND #72 MITCHELL. AT 10:21AM JUROR#61 KEEBLE WAS SEATED FOR INDIVIDUAL VOIR DIRE. AT 10:27AM THE STATE BEGAN ITS VOIR DIRE. AT 10:53AM DEFENSE BEGAN ITS VOIR DIRE. AT 11:02AM THE STATE USED A PEREMPTORY STRIKE TO EXCUSE JUROR#61 KEEBLE, AT THIS TIME JUROR#69 SCHROEDER TOOK THE STAND FOR INDIVIDUAL VOIR DIRE. AT 11:10AM THE STATE BEGAN VOIR DIRE. AT 11:48AM THE DEFENSE STARTED VOIR DIRE. AT 12:20PM THE DEFENSE USED A PEREMPTORY STRIKE TO EXCUSE JUROR#69 SCHROEDER. AT 12:33PM COURT ADJOURNED UNTIL TOMORROW 1-23-2014 @9AM. |
| 1/22/2014 | JURY EXAMINED ON VOIR DIRE |
| 1/22/2014 | Precept issued to serve copy of veniremen |
| 1/22/2014 | Continued 1/23/2014 08:30 AM Jury Trial |
| 1/23/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |

| | |
|---|---|
| 1/23/2014 | Defendant BALDERAS, JUAN appeared in person with Counsel GODINICH, JEROME W/ NUNNERY, ALVIN & SCOTT, ROBERT.<br>Interpreter:N/A<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, MARY appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: SHAVER, DOUG<br><br>AT 9:25AM ALL PARTIES PRESENT AND READY FOR VOIR DIRE TO COMMENCE; AT THIS TIME A PANEL OF 12 PROSPECTIVE JURORS WAS SEATED, WELCOMED AND ADMONISHED AS TO GENERAL PRIPLES OF THE LAW. AT 9:56AM THE PANEL RETIRED TO THE JURY ROOM SO THAT AGREED STRIKES COULD BE MADE BEFORE THE COMMENCE OF INDIVIDUAL VOIR DIRE. AT 10:19AM BOTH PARTIES AGREED TO EXCUSE JURORS #73 STUEWE, #75 JARRELL, #76 LAWS, #77 MATHIS, #80 AUSTIN, #81 MIXON, #82 MARTIN, #83 GUERRERO, #84 BROOKS WITHOUT FURTHER QUIESTIONING. AT 10:24AM JUROR#74 WATSON WAS SEATED FOR INDIVIDUAL VOIR DIRE. AT 10:31AM THE STATE BEGAN VOIR DIRE. AT 10:59AM THE DEFENSE BEGAN ITS VOIR DIRE. AT 11:32AM BOTH PARTIES ACCEPTED JUROR#74 WATSON AS A JUROR FOR TRIAL. AT 11:33AM THE COURT TOOK A BREAK. AT 11:40AM JUROR#78 VLASKAMP WAS SEATED FOR INDIVIDUAL VOIR DIRE. AT 11:47AM STATE BEGAN ITS VOIR DIRE. AT 12:14PM THE DEFENSE GAVE ITS VOIR DIRE. AT 12:37PM THE STATE EXERCISED A PEREMPTORY STRIKE TO EXCUSE JUROR#78 VLASKAMP; AT THIS TIME THE COURT TOOK A BREAK. AT 1:00PM JUROR#79 GUIDRY TOOK THE STAND FOR VOIR DIRE. AT 1:06PM THE STATE GAVE ITS VOIR DIRE. AT 1:38PM BOTH SIDES AGREED TO EXCUSE JUROR#79 GUIDRY. AT 1:45PM THE COURT ADJOURNED UNTIL TOMORROW 1-24-2014 @10:30AM. |
| 1/23/2014 | MOTION FILED: DEF MTN SUPPRESS |
| 1/23/2014 | MOTION FILED: DEF MTN SUPPRESS ID |
| 1/23/2014 | MOTION FILED: DEF RQST RULE HRNG |
| 1/23/2014 | JURY EXAMINED ON VOIR DIRE |
| 1/23/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $2,220 |
| 1/23/2014 | Continued 1/24/2014 08:30 AM Jury Trial |
| 1/24/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |
| 1/24/2014 | Defendant BALDERAS, JUAN appeared in person with Counsel GODINICH, JEROME W/ NUNNERY, ALVIN & SCOTT, ROBERT.<br>Interpreter:N/A<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, MARY appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: SHAVER, DOUG<br>Court Clerk: SPINKS, EDWIN<br><br>COURT CONVENED AT 11:00AM. AT THIS TIME THE COURT WELCOMED 13 ADDITIONAL MEN AND WOMEN INTO THE COURTROOM AND INSTRUCTED THEM AS TO THE LAW. DURING ADMONISHMENTS JUROR#87 COLLINS WAS DISMISSED BY THE JUDGE AFTER SHE TOLD THE JUDGE SHE HAD ALREADY FORMED AN OPINION. AT 11:40AM THE JUDGE CONLCUDED AND COURT RECESSED BRIEFLY.<br><br>COURT RECONVENED AT 12:00PM. AT THIS TIME THE COURT EXCUSED THE FOLLOWING JURORS BY AGREEMENT: #'S 86,90,91,93,94,95,96, AND 98. THEREAFTER THE COURT EXCUSED THE FOLLOWING ADDITIONAL JURORS FOR THE FOLLOWING DAY, MONDAY 1-27-14: #'S 102,103,104,106, AND 107. AT 12:05PM #85 NORWOOD TOOK THE STAND. AT 1:25PM HE WAS SWORN AS OUR 7TH JUROR. COURT THEN TOOK A BRIEF LUNCH BREAK.<br><br>COURT RECONVENED AT 2:00PM. AT THIS TIME #88, SANDRA GARRISON, TOOK THE STAND. AT 2:15PM THE DEFENSE EXERCISED THEIR 6TH PEREMPTORY STRIKE. NEXT CAME #92 CURRY. AT 2:30PM HE WAS EXCUSED BY AGREEMENT. COURT THEN ADJOURNED UNTIL 9:00AM MONDAY, 1-27-2014. |
| 1/24/2014 | Continued 1/27/2014 08:30 AM Jury Trial |
| 1/27/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |



| 1/27/2014 | Defendant BALDERAS, JUAN appeared in person with Counsel GODINICH, JEROME W/ NUNNERY, ALVIN & SCOTT, ROBERT.<br>Interpreter:N/A<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, MARY appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: SHAVER, DOUG<br>Court Clerk: SPINKS, EDWIN<br><br>AT 9:35AM THE COURT WELCOMED 7 MEN AND WOMEN INTO THE COURTROOM AND INSTRUCTED THEM AS TO THE LAW. AT 10:00AM THE JUDGE CONCLUDED AND COURT TOOK A BRIEF RECESS.<br><br>COURT RECONVENED AT 10:25AM. AT THIS TIME COURT EXCUSED BY AGREEMENT: #'S 97,99,100,105, AND 108. NO.89, JANICE WEBB TOOK THE STAND, THEREAFTER. AT 10:40AM SHE WAS EXCUSED BY AGREEMENT. NEXT CAME #101, MATLYN SMITH. AT 11:50SM SHE WAS ACCEPTED AS OUR 8TH JUROR. COURT ADJOURNED UNTIL 9:00AM, TUES., 1-28-14. |
| 1/27/2014 | Continued 1/29/2014 09:00 AM Jury Trial |
| 1/29/2014 | Defendant BALDERAS, JUAN appeared in person with Counsel GODINICH, JEROME W/ NUNNERY, ALVIN & SCOTT, ROBERT.<br>Interpreter:N/A<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, MARY appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: SHAVER, DOUG<br><br>AT 9:30AM ALL PARTIES WERE PRESENT AND READY TO PROCEED. AT 9:35AM A PANEL OF 14 POTENTIAL JURORS WERE SEATED, WELCOMED AND ADMONISHED AS TO GENERAL PRINCIPLES OF THE LAW. AT 10:09AM THE PANEL RETIRED TO THE JURY ROOM SO THAT AGREEMENTS COULD BE MADE PRIOR TO COMMENCIGN INDIVIDUAL VOIR DIRE, AT THIS TIME THE COURT TOOK A BREAK. AT 10:34AM JURORS #109/661 BANKS, #110/662 LOGAN, #113/665 BYRD #114/666 PRICE, #115/667 PALS, #116/668 ANDREWS, #117/669 HANCOCK, #118/670 CHOU, #121/673 SCHEFFER, #122/674 COCKERELL AND #123/675 MORALES WERE EXCUSED BY AGREEMENT WITHOUT FURTHER QUESTIONING. AT 10:42AM JUROR#111/663 CUNNINGHAM TOOK THE STAND FOR INDIVIDUAL VOIR DIRE. AT 10:48AM STATE BEGAN ITS VOIR DIRE. AT 11:25AM THE DEFENSE BEGAN ITS VOIR DIRE. AT 11:36AM BOTH SIDES AGREED TO EXCUSE JUROR#111/663 CUNNINGHAM. AT 11:38AM JUROR#112/664 SHIPMAN WAS SEATED FOR VOIR DIRE. AT 11:44AM BOTH SIDES AGREED TO EXCUSE JUROR#112/664 SHIPMAN WITHOUT ADDITIONAL QUESTIONING; AT THIS TIME THE COURT TOOK A SHORT BREAK. AT 11:53AM JUROR#120/672 ELLETT TOOK THE STAND FOR VOIR DIRE. AT 12:00PM THE STATE BEGAN ITS VOIR DIRE OF JUROR#120/672 ELLETT. AT 12:19PM THE COURT GRANTED STATE'S MTN TO EXCUSE JUROR#120/672 ELLETT, AT THIS TIME THE COURT TOOK A BREAK. AT 1:23PM JUROR#119/671 WILLIAMS WAS SEATED FOR INDIVIDUAL VOIR DIRE. AT 1:29PM THE STATE BEGAN ITS VOIR DIRE. AT 1:49PM JUROR#119/671 WILLIAMS WAS EXCUSED BY AGREEMENT OF BOTH PARTIES, AT THIS TIME THE COURT TOOK A BREAK. AT 2:19PM JUROR#124/676 HANSON WAS SEATED FOR VOIR DIRE. AT 3:05PM THE DEFENSE GAVE ITS VOIR DIRE. AT 3:12PM THE COURT GRANTED DEF MTN TO EXCUSE JUROR# 124/676 HANSON. AT 3:10PM COURT ADJOURNED FOR THE DAY. |
| 1/29/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |
| 1/29/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |
| 1/29/2014 | MOTION FILED: DEF MTN DISM INDICTM |
| 1/29/2014 | Precept issued to serve copy of veniremen |
| 1/29/2014 | Continued 1/30/2014 08:30 AM Jury Trial |



## Harris County Criminal District Docket Sheet

| | |
|---|---|
| 1/30/2014 | Defendant BALDERAS, JUAN appeared in person with Counsel GODINICH, JEROME W/ NUNNERY, ALVIN & SCOTT, ROBERT.<br>Interpreter:N/A<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, MARY appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: SHAVER, DOUG<br><br>AT 9:41AM ALL PARTIES READY; AT THIS TIME JUROR#127/803 VAUGHAN WAS EXCUSED WITHOUT QUESTIONING DUE TO HIS TARDINESS, A PANEL OF 15 PROSPETIVE JURORS WERE SEATED, WELCOMED, AND ADMONISHED AS TO GENERAL PRINCIPLES OF THE LAW. AT 10:15AM THE PANEL RETIRED TO THE JURY ROOM SO THAT AGREED STRIKES COULD BE MADE PRIOR TO COMMENCING INDIVIDUAL VOIR DIRE, AT THIS TIME THE COURT TOOK A BREAK. AT 10:41AM ALL PARTIES AGREED TO EXCUSE WITHOUT FURTHER QUESTIONING JURORS #125/801 CAMPBELL AKA NICKS, #126/802 PRESLEY, #128/804 LEE, #129/805 HENDRIX, #130/806 YABUT, #131/807 RAMIREZ, #132/808 OCAMPO, #133/809 BIRKLINE, #135/811 SAMPSON, #136/812 RYAN, #138/814 TAYLOR, AND #140/816 TUCKER. AT 10:44AM JUROR#134/810 COX WAS SEATED FOR INDIVIDUAL VOIR DIRE. AT 11:05AM THE STATE GAVE ITS VOIR DIRE. AT 11:24AM THE DEFENSE GAVE ITS VOIR DIRE. AT 11:47AM THE COURT DENIED DEFENSE MTN TO EXCUSE JUROR#134/810 COX AND AT THIS TIME VOIR DIRE CONTINUED. AT 12:04PM THE COURT DENIED THE DEFENSE MTN TO EXCUSE JUROR#134/810 COX AND VOIR DIRE CONTINUED. AT 12:07PM THE DEFENSE USED A PEREMPTORY STRIKE TO EXCUSE JUROR#134/810 COX AND AT THIS TIME THE COURT TOOK A BREAK. AT 12:17PM JUROR#137/813 WORKMAN TOOK THE STAND FOR INDIVIDUAL VOIR DIRE. AT 12:22PM THE STATE BEGAN ITS VOIR DIRE. AT 12:48PM THE DEFENSE BEGAN ITS VOIR DIRE. AT 1:02PM THE COURT GRANTED DEFENSE MTN TO EXCUSE JUROR#137/813 WORKMAN, AT THIS TIME THE COURT TOOK A BREAK. AT 1:28PM ALL PARTIES AGREED TO EXCUSE ,WITHOUT FURTHER QUESTIONING, FROM THE PANEL SCHEDULED TO RETURN 1-31-14 THE FOLLOWING JURORS: #141 PARKER, #147 JOHNSON, #150 MAGALLON, AND #154 DEBOSE AT 1:31PM JUROR#139/815 JONES WAS SEATED FOR VOIR DIRE. AT 1:40PM THE STATE BEGAN ITS VOIR DIRE. AT 2:23PM BOTH PARTIES AGREED TO EXCUSE JUROR#139/815 JONES. AT 2:29PM THE COURT ADJOURNED UNTIL 1-31-2014@9AM. |
| 1/30/2014 | MOTION FILED: ST MTN IN LIMINE |
| 1/30/2014 | MOTION FILED: ST APPLIC PHOTOGRAPH |
| 1/30/2014 | ORDER: GRNTD DEF MTN INVESTIG FEE |
| 1/30/2014 | Continued 1/31/2014 08:30 AM Jury Trial |
| 1/31/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |
| 1/31/2014 | Defendant BALDERAS, JUAN appeared in person with Counsel GODINICH, JEROME W/ NUNNERY, ALVIN & SCOTT, ROBERT.<br>Interpreter:N/A<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, MARY appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: SHAVER, DOUG<br>Clerk: SPINKS, EDWIN<br><br>COURT CONVENED AT 9:20AM. AT THIS TIME COURT WELCOMED 20 ADDITIONAL VENIREMEN INTO THE COURTROOM AND INSTRUCTED THEM AS TO THE LAW. AT 9:50AM COURT CONCLUDED AND TOOK A BRIEF RECESS.<br><br>COURT RECONVENED AT 10:10AM. AT THIS TIME THE COURT EXCUSED BY AGREEMENT THE FOLLOWING JURORS: #'S 142, 143, 144, 145, 146, 151, 153, 155, 156, AND 158. AT 10:20AM #152, CHAD SULLIVAN WAS CALLED TO THE STAND OUT OF ORDER BY AGREEMENT. AT 11:30AM HE WAS ACCEPTED AS OUR 9TH JUROR. COURT THEN TOOK BRIEF BREAK. COURT RECONVENED AT 11:35AM AT WHICH TIME #157, CARLOS HERRERA TOOK THE STAND. AT 12:45PM HE WAS ACCEPTED AS OUR 10TH JUROR. COURT THEN RECESSED FOR LUNCH.<br><br>COURT RECONVENED AT 1:30PM AT WHICH TIME #148, KLINGER TOOK THE STAND. AT 1:35PM HE WAS STRUCK BY THE DEFENSE FOR CAUSE. NEXT CAME #149, NATALY DIAZ. SHE WAS DISMISSED BY THE DEFENSE (8TH PEREMPORY). THE DEFENSE ASLO EXERCISED THE 9TH PERAMPTORY ON OUR NEXT PERSON, #159 CHRISTOPHER REYES. NEXT CAME #160, SHARON STRIPLING. SHE WAS DISMISSED BY AGREEMENT AT 3:20PM AND COURT ADJOURNED UNTIL 9:00AM MONDAY, 2-3-14. |
| 1/31/2014 | Continued 2/03/2014 08:45 AM Jury Trial |
| 2/3/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |

03083



**Harris County Criminal District Docket Sheet**

| | |
|---|---|
| 2/3/2014 | Defendant BALDERAS, JUAN appeared in person with Counsel GODINICH, JEROME W/ NUNNERY, ALVIN & SCOTT, ROBERT.<br>Interpreter:N/A<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, MARY appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: SHAVER, DOUG<br>Clerk: SPINKS, EDWIN<br><br>ON 1-31-2014 ALL PARTIES AGREED TO EXCUSE, WITHOUT QUESTIONING, JURORS #161 ALVARADO, #162 RAMIREZ, #164 ROMERO, #165 SANDERS, #166 SIMS, #167 WILLIAMS, #173 PIGTAIN, #174 SCHULER, #175 ANDERSON, #176 SPATES, AND #178 BLACK FROM THE PANEL SCHEDULED FOR MONDAY, 2-3-2014. |
| 2/3/2014 | Defendant BALDERAS, JUAN appeared in person with Counsel GODINICH, JEROME W/ NUNNERY, ALVIN & SCOTT, ROBERT.<br>Interpreter:N/A<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, MARY appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: SHAVER, DOUG<br><br>AT 9:36AM ALL PARTIES PRESENT AND READY FOR VOIR DIRE. AT 9:39AM A PENEL OF 9 PROSPECTIVE JURORS WERE SEATED, WELCOMED AND ADMONISHED AS TO GENERAL PRINCIPLES OF THE LAW. AT 10:10AM THE PANEL RETIRED TO THE JURY ROOM SO THAT AGREEMENT STRIKES COULD BE MADE, AT THIS TIME THE COURT TOOK A SHORT RECESS. AT 10:32AM BOTH SIDES AGREED TO EXCUSE JURORS #169 BAKKEN, #172 CEASAR, AND #177 UBA WITHOUT FURTHER QUESTIONING. AT 10:42AM JUROR#163 DEADMON TOOK THE STAND FOR INDIVIDUAL VOIR DIRE. AT 10:48AM THE STATE BEGAN VOIR DIRE. AT 11:19AM THE DEFENSE BEGAN ITS VOIR DIRE. AT 11:28AM THE COURT DENIED DEFENSE CHALLENGE TO EXCUSE JUROR#163 DEADMON. AT 11:42AM THE COURT GRANTED DEFENSE CHALLENGE AND EXCUSED JUROR#163 DEADMON; AT THIS TIME JUROR#168 BALLARD WAS SEATED FOR VOIR DIRE. AT 11:45AM THE STATE BEGAN ITS VOIR DIRE. AT 12:10PM THE DEFENSE STARTED ITS VOIR DIRE. AT 12:32PM THE COURT DENIED DEFENSE MTN TO EXCUSE JUROR#168 BALLARD. AT 12:38PM THE COURT GRANTED DEFENSE'S MTN AND EXCUSED JUROR#168 BALLARD, AT THIS TIME THE COURT TOOK A RECESS. AT 1:14PM JUROR#170 HENDRICKS WAS SEATED FOR VOIR DIRE. AT 1:18PM BOTH SIDES AGREED TO RETIRE JUROR#170 HENDRICKS BACK TO THE JURY ROOM AND TAKE JUROR#171 CHAMBERS OUT OF TURN. AT 1:21PM JUROR#171 CHAMBERS WAS SEATED FOR VOIR DIRE. AT 1:26PM THE STATE BEGAN VOIR DIRE. AT 1:57PM THE DEFENSE STARTED VOIR DIRE. AT 2:29PM BOTH SIDES AGREED TO ACCEPT JUROR#171 CHAMBERS AS THE 11TH JUROR FOR TRIAL; AT THIS TIME THE COURT TOOK A SHORT RECESS. AT 2:40PM ALL PARTIES AGREED TO EXCUSE JUROR#170 HENDRICKS WITHOUT FURTHER QUESTIONING; AT THIS TIME JUROR#179 MANGUM TOOK THE STAND FOR VOIR DIRE. AT 2:43PM BOTH PARTIES AGREED TO EXCUSE JUROR#179 MANGUM. AT 2:48PM THE DEFENSE USED THEIR 10TH PEREMPTORY STRIKE TO EXCUSE JUROR#180 PETTERSON WITHOUT FURTHER QUESTIONING. AT 3:18PM ALL PARTIES AGREED TO EXCUSE, WITHOUT ANY QUESTIONING, JURORS FROM TOMORROW'S PANEL AS FOLLOW: #182 ORTIZ, #183 WALL, #184 BASSETT, #185 JOHNSON, #187 TORRES, #190 SCHIRO, #192 UNDERWOOD, #193 GARCIA, #194 HALVORSEN, #195 COLLINS, #197 MA, #199 HALL, #201 SWEENEY, #204 TORRES. AT 3:30PM COURT ADJOURNED. |
| 2/3/2014 | Continued 2/04/2014 09:00 AM Jury Trial |
| 2/4/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |

63084



| 2/4/2014 | Defendant BALDERAS, JUAN appeared in person with Counsel GODINICH, JEROME W/ NUNNERY, ALVIN & SCOTT, ROBERT.<br>Interpreter:N/A<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, MARY appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: SHAVER, DOUG<br>Clerk: SPINKS, EDWIN<br><br>COURT CONVENED AT 9:45AM. AT THIS TIME THE COURT WELCOMED 10 ADDITIONAL VENIREMEN INTO THE COURTROOM AND INSTRUCTED THEM AS TO THE LAW. AT 10:20AM THE COURT CONCLUDED AND RECESSED.<br><br>COURT RECONVENED AT 10:45AM AT WHICH TIME THE COURT DISMISSED THE FOLLOWING VENIREMEN *: NO.'S 189, 191, 196, 198, 200, AND 202. AT 10:55AM #181 SHEREE GRIFFIN TOOK THE STAND. AT 11:45AM SHE WAS EXCUSED BY AGREEMENT. NEXT CAME #186, LYDIA STURGIS. AT 12:15PM SHE WAS DISMISSED BY AGREEMENT AND COURT RECESSED FOR LUNCH.<br><br>COURT RECONVENED AT 1:30PM. AT THIS TIME #188 SHERYL CARNES TOOK THE STAND. AT 2:35PM THE DEFENSE EXERCISED THEIR 11TH PEREMPTORY. COURT THEN RECESSED, BRIEFLY.<br><br>COURT RECONVENED AT 2:40PM AND #203, STEVEN RHOADS TOOK THE STAND. AT 3:00PM HE WAS STRUCK BY THE DEFENSE (12TH PEREMPTORY). COURT ADJOURNED UNTIL 9:00AM THE FOLLOWING DAY.<br><br>*(JURORS #192-UNDERWOOD, #201-SWEENEY & #204-VALENTIN TORRES WERE DISMISSED ON 2-3-14 BUT DID NOT RECEIVE THE COMMUNIQUE, AND SO APPEARED AND WERE PAID ON 2-4-14.) |
| 2/4/2014 | MOTION FILED: ST AMD APP PHOTO DEF |
| 2/4/2014 | ORDER: TO KEEP SEPARATE |
| 2/4/2014 | Reset By Court, 2/05/2014 08:30 AM Jury Trial |
| 2/5/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |
| 2/5/2014 | Defendant BALDERAS, JUAN appeared in person with Counsel GODINICH, JEROME W/ NUNNERY, ALVIN.<br>Interpreter:N/A<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, MARY appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: SHAVER, DOUG<br><br>AT 9:30AM PARTIES PRESENT AND READY; AT THIS TIME A PANEL OF 15 POTENTIAL JURORS WERE SEATED, WELCOMED, AND ADMONISHED BY THE COURT AS TO GENERAL PRICINPLES OF THE LAW. AT 9:59AM THE PANEL RETIRED TO THE JURY ROOM SO THAT AGREED STRIKES COULD BE MADE; AT THIS TIME THE COURT TOOK A BRIEF RECESS. AT 10:17AM BOTH PARTIES AGREED TO EXCUSE JURORS #212 JOHNSON, #216 SULLIVAN, #217 BIRKHEAD, #219 DUDLEY, #221 BERTRAND, #223 ROSSER, #224 GUERRA, #225 MEDRANO, AND #226 STEVENSON WITHOUT FURTHER QUESTIONING. AT 10:28AM JUROR#205 OROSZ WAS SEATED FOR INDIVIDUAL VOIR DIRE. AT 10:33AM THE STATE BEGAN ITS VOIR DIRE. AT 11:13AM THE STATE CONCLUDED AND AT THIS TIME THE DEFENSE BEGAN ITS VOIR DIRE. AT 11:48AM BOTH SIDES ACCEPTED JUROR#205 OROSZ AS THE 12TH JUROR FOR TRIAL; AT THIS TIME THE COURT TOOK A BREAK. AT 12:09PM JUROR#209 RODRIGUEZ WAS SEATED FOR VOIR DIRE. AT 12:15PM THE STATE BEGAN ITS VOIR DIRE. AT 12:42PM THE DEFENSE BEGAN ITS VOIR DIRE. AT 12:52PM THE COURT GRANTED DEFENSE CHALLENGE AND EXCUSED JUROR#209 RODRIGUEZ; AT THIS TIME THE COURT TOOK A BREAK. AT 1:33PM COURT RECONVENED AND JUROR#211 FLECK TOOK THE STAND FOR VOIR DIRE. AT 1:38PM THE STATE BEGAN VOIR DIRE. AT 2:25PM BOTH SIDES AGREED TO EXCUSE JUROR#211 FLECK WITHOUT FURTHER QUESTIONING. AT 2:29PM JUROR#213 KEMSLEY WAS SEATED FOR VOIR DIRE. AT 2:57PM ALL PARTIES AGREED TO EXCUSE JUROR#213 KEMSLEY WITHOUT FURTHER QUESTIONING; AT THIS TIME THE COUR TOOK A BRIEF RECESS. AT 3:07PM COURT RECONVENED AND JUROR#215 REEDER WAS SEATED FOR VOIR DIRE. AT 3:10PM BOTH SIDES AGREED TO EXCUSE JUROR#215 REEDER WITHOUT FURTHER QUESTIONING; AT THIS TIME JUROR#228 MATULA TOOK THE STAND FOR VOIR DIRE. AT 3:15PM BOTH SIDES AGREED TO EXCUSE JUROR#228 MATULA WITHOUT QUESTIONING; AT THIS TIME AGREEMENTS TO EXCUSE POTENTIAL JURORS FROM THE PANEL ORDERED TO RETURN THURSDAY 2-5-2014. AT 3:33PM BOTH PARTIES AGREED TO EXCUSE FROM TOMORROWS PANEL: JURORS #229 TO, #231 ESCOBEDO, #233 NGUYEN, #235 MOTLEY, #236 HANCOCK, #237 WACHSMANN, #238 PEREZ, #240 ARDOIN, #241 PIERSON, #243 BANDA, #246 ORIANI, AND #248 PRINCE. AT 3:40PM COURT ADJOURNED. |
| 2/5/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $5,240 |
| 2/5/2014 | JURY EXAMINED ON VOIR DIRE |

| | |
|---|---|
| 2/5/2014 | Precept issued to serve copy of veniremen |
| 2/5/2014 | Continued 2/06/2014 08:30 AM Jury Trial |
| 2/6/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |
| 2/6/2014 | Defendant BALDERAS, JUAN appeared in person with Counsel GODINICH, JEROME W/ NUNNERY, ALVIN. Interpreter:N/A<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, MARY appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: SHAVER, DOUG<br><br>AT 9:40AM ALL PARTIES READY; AT THIS TIME A PANEL OF 12 POTENTIAL JURORS WAS SEATED, WELCOMED AND ADMONISHED AS TO GENERAL PRINCIPLES OF THE LAW. AT 10:11AM THE PANEL RETIRED TO THE JURY ROOM; AT THIS TIME THE COURT TOOK A BRIEF RECESS. AT 10:29AM COURT RECONVENED, AT THIS TIME ALL PARTIES AGREED TO EXCUSE, WITHOUT QUESTIONING, JURORS: #230 LILES, #234 POMERANTZ, #239 LOPEZ, #244 MATHIASON, #247 RATCLIFFE, #250 BURCH, AND #251 MOHAMMED. AT 10:40AM JUROR#232 ONEAL TOOK THE STAND FOR INDIVIDUAL VOIR DIRE. AT 10:41AM BOTH PARTIES AGREED TO EXCUSE JUROR#232 ONEAL WITHOUT QUESTIONING. AT 10:43AM JUROR#242 PEREZ WAS SEATED FOR VOIR DIRE. AT 10:51AM JUROR#242 WAS EXCUSED BY AGREEMENT. AT 10:53AM JUROR#245 BROWNING-MCCAULEY WAS SEATED AND VOIR DIRE BEGAN. AT 10:59AM THE STATE BEGAN ITS VOIR DIRE. AT 11:33AM THE DEFENSE BEGAN ITS VOIR DIRE. AT 12:13PM BOTH SIDES ACCEPTED JUROR#245 BROWNING-MCCAULEY AS THE 1ST ALTERNATE JUROR FOR TRIAL; AT THIS TIME THE COURT TOOK A BRIEF BREAK. AT 1:33PM COURT RECONVENED, AT THIS TIME JUROR#249 DAVIS TOOK THE STAND FOR VOIR DIRE. AT 1:38PM THE STATE BEGAN VOIR DIRE. AT 2:12PM THE DEFESE BEGAN VOIR DIRE. AT 2:19PM THE DEFENSE USED THEIR ONLY ALTERNATE PEREMPORY STRIKE TO EXCUSE JUROR#249 DAVIS. AT 2:21PM JUROR#252 JOHNSON TOOK THE STAND FOR VOIR DIRE. AT 2:25PM THE STATE BEGAN ITS VOIR DIRE. AT 2:36PM BOTH SIDES AGREED TO EXCUSE JUROR#252 JOHNSON WITHOUT FURTHER QUESTIONING. AT 2:53PM BOTH PARTIES AGREED TO STRIKE, FROM TOMORROW'S PANEL 2-7-14, JURORS: #253 JACOBI, #254 FISHER, #255 ORTIZ, #257 CASTRO, #259 RUDA, #260 DUPAS, #262 NGUYEN, #265 HAMILTON, #266 DUNNAGAN, #268 CARROLL, #269 ANTOINE, #270 GEBREHIWOT, #273 KNIGHT, AND #274 HAVERT. AT 3:00PM THE COURT ADJOURNED FOR THE DAY. |
| 2/6/2014 | JURY EXAMINED ON VOIR DIRE |
| 2/6/2014 | Continued 2/07/2014 08:30 AM Jury Trial |
| 2/7/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |
| 2/7/2014 | Defendant BALDERAS, JUAN appeared in person with Counsel GODINICH, JEROME W/ NUNNERY, ALVIN & SCOTT, ROBERT.<br>Interpreter:N/A<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, MARY appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: SHAVER, DOUG<br>Clerk: SPINKS, EDWIN<br><br>AT 9:25AM COURT WELCOMED 10 ADDITIONAL VENIREMEN INTO THE COURTROOM AND INSTRUCTED THEM AS TO THE LAW. AT 10:55AM THE COURT CON CONCLUDED AND RECESSED, BRIEFLY. (#'S 262, NGUYEN, #265, HAMILTON, & 270 GABREHIWOT DID NOT RECEIVE THE COMMUNIQUE TELLING THEM NOT TO SHOW UP AND APPEARED AND WERE PAID FOR 2 DAYS.)<br><br>COURT RECONVENED AT 10:15AM. AT THIS TIME THE COURT EXCUSED BY AGREEMENT: #'S 256, 258, 261, 264, 275 & 276. AT 10:25AM #272-LIANNA MENCHACA WAS CALLEDTO THE STAND OUT OF ORDER BY AGREEMENT. AT 11:40AM SHE WAS ACCEPTED AS OUR 2ND ALTERNATE. COURT THEN ADJOURNED UNTIL 9:00AM, 2-17-14 IN THE 179TH. (REMAINING JURORS #'S 263, 267, & 271 WERE DISMISSED.) |
| 2/7/2014 | Continued 2/12/2014 09:00 AM Pre-Trial Motions |
| 2/10/2014 | ORDER: GRNTD DEFENSE MTN INVESTIG |
| 2/12/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |

03086



**Harris County Criminal District Docket Sheet**

| | |
|---|---|
| 2/12/2014 | Defendant BALDERAS, JUAN appeared in person with Counsel SHEARER, R. SCOTT & GODINICH, JEROME & NUNNERY,ALVIN & SCOTT, ROBERT.<br>Interpreter:N/A<br>BENNETT, TRACI appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: GUINEY, KRISTIN MELISSA<br><br>On this day came to be held Defendant's PRE-TRIAL MOTIONS Hearing. After hearing argument and evidence from both State and Defense the Court rendered its decision: COURT OVERRULED DEF MTN SPEEDY TRIAL/DISMISS CASE. |
| 2/12/2014 | MOTION FILED: DEF MTN PRECLU DEATH |
| 2/12/2014 | ORDER: GRNTD DEF MTN DISCOV/PRODUC |
| 2/12/2014 | ORDER: GRNTD DEF MTN DISC RULE404 |
| 2/12/2014 | ORDER: GRNTD DEF MTN 705B HEARING |
| 2/12/2014 | ORDER: GRNTD DEF MTN DISCL EXPERTS |
| 2/12/2014 | ORDER: DENIED DEF MTN PRECL DEATH |
| 2/12/2014 | ORDER: DENIED DEF MTN DELCAR UNCON |
| 2/12/2014 | ORDER: DENIED DEF MTN DECL TX STAT |
| 2/12/2014 | ORDER: DENIED DEF MTN DECLAR CAPIT |
| 2/12/2014 | ORDER: DENIED DEF MTN HOLD DEFINIT |
| 2/12/2014 | ORDER: DENIED DEF MTN PRECLUDE PEN |
| 2/12/2014 | ORDER: DENIED MTN DECL PENAL CODE |
| 2/12/2014 | ORDER: DENIED DEF MTN DECLAR ARTIC |
| 2/12/2014 | ORDER: DENIED DEF MTN RULE UNCONST |
| 2/12/2014 | ORDER: DENIED DEF MTN DECLAR UNCON |
| 2/12/2014 | ORDER: DENIED DEF MTN BURDEN PROOF |
| 2/12/2014 | ORDER: DENIED DEF MTN UNCONSTITUTI |
| 2/12/2014 | ORDER: DENIED DECL ART UNCONSTITUT |
| 2/12/2014 | ORDER: DENIED DECLARATION OF ARTIC |
| 2/12/2014 | ORDER: DENIED HOLD TEX COD UNCONST |
| 2/12/2014 | ORDER: DENIED DEF MTN HOLD UNCONST |
| 2/12/2014 | ORDER: DENIED DEF MTN FIND UNCONST |
| 2/12/2014 | ORDER: DENIED DEF MTN ART 37.071 |
| 2/12/2014 | ORDER: OVERRULED DEF MTN DISM INDI |
| 2/12/2014 | Reset By Court 2/14/2014 09:00 AM Pre-Trial Motions |
| 2/14/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |

03087



**Harris County Criminal District Docket Sheet**

| | |
|---|---|
| 2/14/2014 | Defendant BALDERAS, JUAN appeared in person with Counsel SHEARER, R. SCOTT & GODINICH, JEROME & NUNNERY,ALVIN & SCOTT, ROBERT.<br>Interpreter:N/A<br>BENNETT, TRACI & DOZIER, CAROLINE appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: GUINEY, KRISTIN MELISSA<br><br>On this day came to be held Defendant's PRE-TRIAL MOTION Hearing. After hearing argument and evidence from both State and Defense the Court rendered its decision: THE COURT OVERRULED DEFENSE'S MTN AND GRNTD STATE'S MTN. |
| 2/14/2014 | MOTION FILED: DEF OBJECTION ST APP |
| 2/14/2014 | MOTION FILED: DEF OBJECT ST ATTEMP |
| 2/14/2014 | ORDER: GRNTD ST MTN IN LIMINE |
| 2/14/2014 | ORDER: INFORM OTHER COURTS TRIAL |
| 2/14/2014 | ORDER: OVERRULED DEF OBJECT ST APP |
| 2/14/2014 | ORDER: OVERRULED DEF OBJECT ST ATT |
| 2/14/2014 | ORDER: GRNTD ST AMD APP PHOTO DEF |
| 2/14/2014 | Reset By Court, 2/17/2014 09:00 AM Jury Trial |
| 2/17/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |
| 2/17/2014 | Defendant BALDERAS, JUAN appeared in person with Counsels: NUNNERY, ALVIN W/ GODINICH, JEROME & SCOTT, ROBERT W SHEARER, R. SCOTT.<br>Interpreter/N/A<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADEN, AMY. appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: GUINEY, KRISTIN MELISSA<br><br>AT 9:21AM ALL PARTIES PRESENT AND READY FOR TRIAL. AT 9:23AM THE DEFENSE HAD AN ORAL MTN OF LIMINE OUTSIDE OF THE PRESENCE OF THE JURY. AT 9:25AM THE COURT MADE ITS RULING ON THE RECORD. AT 9:27AM THE STATE ARRAIGNED THE DEFENDANT IN OPEN COURT OUTSIDE THE PRESENCE OF THE JURY TO WHICH HE PLED: "NOT GUILTY." AT 9:28AM THE COURT TOOK A SHORT RECESS. AT 9:42AM ALL PARTIES READY, AT THIS TIME THE JURY WAS SWORN, ADMONISHED AS TO THE LAW AND SEATED. AT 9:47AM THE DEFENDANT WAS ARRAIGNED IN THE PRESENCE OF THE JURY TO WHICH HE PLED, "NOT GUILTY,".<br><br>AT 9:48AM THE STATE GAVE ITS OPENING STATEMENT. AT 10:00AM THE DEFENSE GAVE ITS OPENING STATEMENT.<br><br>AT 10:11AM THE STATE CALLED THEIR FIRST WITNESS TO THE STAND AND TESTIMONY BEGAN. AT 10:42AM THE JURY RETIRED TO THE JURY ROOM FOR A BRIEF RECESS. AT 11:01AM THE JURY WAS SEATED AND STATE WITNESS TESTIMONY CONTINUED. AT 12:30PM THE JURY RETIRED TO THE JURY ROOM FOR LUNCH; AT THIS TIME THE COURT TOOK A BRIEF RECESS FROM TRIAL. AT 1:25PM COURT RECONVENED AND THE JURY WAS SEATED; AT THIS TIME STATE WITNESS TESTIMONY CONTINUED. AT 1:34PM THE JURY RETIRED TO THE JURY ROOM SO THAT MATTERS COULD BE HELD OUTSIDE OF THEIR PRESENCE. AT 1:39PM THE JURY RETURNED TO OPEN COURT AND TESTIMONY CONTINUED. AT 2:32PM THE JURY RETIRED TO THE JURY ROOM AND MATTERS WERE DISCUSSED OUTSIDE OF THEIR PRESENCE. AT 2:55PM THE JURY WAS SEATED AND TESTIMONY CONTINUED. AT 4:58PM THE JURY WAS REMINDED OF THEIR ADMONISHMENTS BEFORE BEING RELEASED FOR THE DAY. AT 5:00PM COURT ADJOURNED. |
| 2/17/2014 | JURY SWORN |
| 2/17/2014 | EVIDENCE PRESENTED AFTER JURY SWORN |
| 2/17/2014 | ORDER: GRNTD DEF MTN SUPPRESS |
| 2/17/2014 | Continued 2/18/2014 09:00 AM Jury Trial |
| 2/18/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |

05088



| 2/18/2014 | Defendant BALDERAS, JUAN appeared in person with Counsels: NUNNERY, ALVIN W/ GODINICH, JEROME & SCOTT, ROBERT W/ SHEARER, SCOTT.<br>Interpreter: HERNANDEZ, BERTA & FLORES, MARILU<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADEN, MARY. appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: GUINEY, KRISTIN MELISSA<br><br>AT 9:43AM ALL PARTIES PRESENT AND READY TO CONTINUE TRIAL. AT 9:45AM THE JURY WAS SEATED IN OPEN COURT; AT THIS TIME STATE WITNESS TESTIMONY CONTINUED. AT 10:35AM THE JURY RETIRED TO THE JURY ROOM SO THAT MATTERS COULD BE HELD OUTSIDE OF THEIR PRESENCE. AT 11:42PM THE COURT TOOK A BREIF BREAK FROM THE HEARING HELD OUTSIDE OF THE PRESENCE OF THE JURY. AT 11:55AM DEFENSE HEARING OUTSIDE OF THE PRESENCE OF THE JURY CONTINUED. AT 1:00PM THE COURT TOOK A BRIEF RECESS. AT 1:33PM COURT RECONVENED AND HEARING CONTINUED. AT 2:45PM THE COURT MADES ITS RULINGS ON HEARINGS HELD OUTSIDE THE PRESENCE OF THE JURY. AT 2:48PM THE COURT TOOK A SHORT RECESS. AT 2:55PM THE JURY WAS SEATED AND STATE WITNESS TESTIMONY CONTINUED. AT 3:36PM THE JURY RETIRED TO THE JURY ROOM FOR A SHORT BREAK. AT 3:42PM THE JURY RETURNED TO OPEN COURT AND TESTIMONY CONTINUED. AT 4:43PM THE COURT REMINDED THE JURY AS TO THEIR ADMONISHMENTS BEFORE RELEASING THEM FOR THE DAY WITH INSTRUCTIONS TO RETURN TOMORROW, WEDNESDAY 2-19-2014 @9:30AM. AT 4:51PM COURT ADJOURNED. |
| 2/18/2014 | ORDER: GRNTD DEF MTN INVESTIG FEES |
| 2/18/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $7,650 |
| 2/18/2014 | ORDER: DENIED DEF MTN SUPPRESS ID |
| 2/18/2014 | ORDER: GRNTD CRT REPRTR TRANSCRIBE |
| 2/18/2014 | Continued 2/19/2014 09:00 AM Jury Trial |
| 2/19/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |
| 2/19/2014 | Defendant BALDERAS, JUAN appeared in person with Counsels: NUNNERY, ALVIN W/ GODINICH, JEROME & SCOTT, ROBERT W SHEARER, R. SCOTT.<br>Interpreter: FLEICHER, RAQUEL & HERNANDEZ, BERTA<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, AMY. appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: GUINEY, KRISTIN MELISSA<br><br>AT 9:50AM ALL PARTIES PRESENT AND READY TO CONTINUE TRIAL; AT THIS TIME DEF MTN WAS HELD OUTSIDE THE PRESENCE OF THE JURY. AT 9:57AM AFTER BOTH SIDES PRESNTED EVIDENCE AND ARGUMENT, THE COURT RENDERED ITS DECISION: DEF MTN WAS OVERRULED.<br><br>AT 10:00AM THE JURY WAS SEATED AND STATE WITNESS TESTIMONY CONTINUED. AT 11:05AM THE JURY RETIRED TO THE JURY ROOM FOR A BREAK AND AT THIS TIME COURT RECESSED BRIEFLY FROM TRIAL TO HANDLE DOCKET MATTERS. AT 11:27AM THE JURY WAS SEATED AND STATE WITNESS TESTIMONY CONTINUED. AT 12:27PM THE JURY RETIRED TO THE JURY ROOM FOR LUNCH, AT THIS TIME THE COURT TOOK CARE OF DOCKET MATTERS. AT 1:08PM THE JURY RETURNED TO OPEN COURT AND STATE WITNESS TESTIMONY CONTINUED. AT 2:00PM THE JURY RETIRED TO THE JURY ROOM AND MATTERS WERE DISCUSSED OUTSIDE OF THEIR PRESENCE. AT 2:07PM THE JURY WAS SEATED AND STATE WITNESS TESTIMONY CONTINUED. AT 3:41PM THE JURY RETIRED TO THE JURY ROOM FOR A BRIEF BREAK. AT 3:51PM THE JURY WAS SEATED AND WITNESS TESTIMONY CONTINUED. AT 4:59PM THE COURT REMINDED THE JURY AS TO THEIR ADMONITIONS BEFORE GIVING THEM INSTRUCTIONS TO RETURN TOMORROW, THURSDAY 2-20-2014 @1PM, AND RELEASING THEM FOR THE DAY. |
| 2/19/2014 | MOTION FILED: DEF MTN COMPEL WITNS |
| 2/19/2014 | ORDER: OVERRULED DEF MTN COMPL WIT |
| 2/19/2014 | Continued 2/20/2014 09:00 AM Jury Trial |
| 2/20/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |



| | |
|---|---|
| 2/20/2014 | Defendant BALDERAS, JUAN appeared in person with Counsels: NUNNERY, ALVIN W/ GODINICH, JEROME & SCOTT, ROBERT W SHEARER, R. SCOTT.<br>Interpreter: FLEICHER, RAQUEL & HERNANDEZ, BERTA<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, AMY. appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: GUINEY, KRISTIN MELISSA<br><br>AT 1:05PM ALL PARTIES PRESENT AND READY FOR TRIAL. AT 1:08PM THE JURY WAS SEATED AND STATE WITNESS TESTIMONY CONTINUED. AT 2:43PM THE JURY RETIRED TO THE JURY ROOM AND MATTERS WERE ADDRESSED OUTSIDE OF THE PRESENCE OF THE JURY. AT 3:04PM THE JURY WAS SEATED AND STATE WITNESS TESTIMONY CONTINUED. AT 5:10PM THE JURY WAS REMINDED OF THEIR ADMONITIONS AND GIVEN INSTRUCTIONS TO RETURN TOMORROW, FRIDAY 2-21-2014 @9:30AM, BEFORE EXCUSING THEM FOR THE DAY. AT 5:21PM COURT ADJOURNED. |
| 2/20/2014 | Continued 2/21/2014 09:00 AM Jury Trial |
| 2/21/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |
| 2/21/2014 | Defendant BALDERAS, JUAN appeared in person with Counsels: NUNNERY, ALVIN W/ GODINICH, JEROME & SCOTT, ROBERT W SHEARER, R. SCOTT.<br><br>Interpreter: FLEICHER, RAQUEL & HERNANDEZ, BERTA<br><br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, MARY appeared for the State.<br><br>Court Reporter: REAGAN, RENEE<br><br>Judge Presiding: GUINEY, KRISTIN MELISSA<br><br>ALL PARTIES PRESENT, BOTH SIDES READY TO PROCEED.<br>@10:00AM Jury seated. Testimony began.<br>@11:45AM Jury retired.<br>@12:03PM Jury seated and was advised they will now be releaesed for lunch<br>@12:05PM Jury retired for lunch.<br>Witnesses WALTER BENITEZ and CELESTE MUNOZ sworn in and given instructions to report as instructed by either parties of the court or any officer of the court.<br>@1:40PM Jury seated, testimony resumed.<br>@3:10PM Jury retired.<br>@3:20PM Jury seated. testimony resumed.<br>@4:18PM Jury retired while parties approached.<br>@4:25PM Jury seated, testimony continued.<br>@4:35PM Jury retired for the evening and was instructed to return Monday. |
| 2/21/2014 | Reset By Court, 2/24/2014 09:00 AM Jury Trial |
| 2/24/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |
| 2/24/2014 | Defendant BALDERAS, JUAN appeared in person with Counsels: NUNNERY, ALVIN W/ GODINICH, JEROME & SCOTT, ROBERT W SHEARER, R. SCOTT.<br>Interpreter:N/A<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, AMY. appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: GUINEY, KRISTIN MELISSA<br><br>AT 10:35AM ALL PARTIES PRESENT AND READY FOR TRIAL, AT THIS TIME THE JURY WAS SEATED AND DEFENSE WITNESS TESTIMONY CONTINUED. AT 11:38AM THE JURY RETIRED TO THE JURY ROOM FOR A BREAK. AT 11:54AM MATTERS WERE HELD OUTSIDE THE PRESENCE OF THE JURY. AT 12:08PM THE JURY RETURNED TO OPEN COURT; AT THIS TIME THE DEFENSE RESTED. AT 12:09PM BOTH SIDES RESTED AND CLOSED; AT THIS TIME THE COURT REMINDED THE JURY AS TO THEIR ADMONITIONS AND IN STRUCTED THEM TO RETURN TOMORROW TUESDAY 2-25-2014 @9AM, BEFORE RELEASING THEM FOR THE DAY. AT 12:20PM THE COURT TOOK A BREAK BEFORE HANDLING MATTERS OUTSIDE OF THE PRESENCE OF THE JURY.<br><br>AT 1:00PM COUNSEL FOR THE STATE AND COUNSEL FOR DEFENDANT PRESENT AND DISCUSSED CHARGE ISSUES OUTSIDE OF THE PRESENCE OF THE JURY. AT 1:30PM COURT ADJOURNED. |
| 2/24/2014 | Continued 2/25/2014 09:00 AM Jury Trial |
| 2/25/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |



| 2/25/2014 | Defendant BALDERAS, JUAN appeared in person with Counsels: NUNNERY, ALVIN W/ GODINICH, JEROME & SCOTT, ROBERT W SHEARER, R. SCOTT.<br>Interpreter:N/A<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, AMY. appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: GUINEY, KRISTIN MELISSA<br><br>AT 9:11AM ALL PARTIES READY FOR TRIAL. AT 9:14AM THE JURY WAS SEATED IN OPEN COURT. AT 9:16AM THE COURT READ THE CHARGE TO THE JURY. AT 9:25AM THE STATE WAIVED OPENING ARGUMENT AND RESERVED ITS RIGHT TO CLOSE; AT THIS TIME THE DEFENSE GAVE ITS CLOSING ARGUMENT. AT 10:11AM THE DEFENSE RESTED AND AT THIS TIME THE JURY RETIRED TO THE JURY ROOM FOR A BREAK. AT 10:20AM THE JURY RETURNED TO OPEN COURT; AT THIS TIME, THE STATE GAVE ITS CLOSING ARGUMENT. AT 11:07AM THE STATE RESTED AND AT THIS TIME THE JURY RETIRED TO THE JURY ROOM FOR DELIBERATION OF GUILT/INNOCENCE. AT 11:45AM THE COURT ADDRESSED A QUESTION FROM THE JURY WHILE THE JURY WAS STILL IN THE JURY ROOM. AT 1:29PM THE JURY WAS SEATED AND THE COURT ADDRESSED QUESTIONS IN REGARDS TO EVIDENCE. AT 1:32PM THE JURY RETIRED TO THE JURY ROOM AND CONTINUED DELIBERATION. AT 2:44PM THE JURY WAS SEATED SO THAT THE COURT COULD ADDRESS THEIR QUESTIONS. AT 2:47PM THE JURY RETURNED TO THE JURY ROOM AND CONTINUED DELIBERATION. AT 4:28PM THE COURT ADDRESSED A QUESTION THE JURY HAD WHILE THEY REMAINED IN THE JURY ROOM. AT 4:52 THE JURY WAS SEATED FOR TESTIMONY READ BACK. AT 4:54PM THE JURY RETIRED TO THE JURY ROOM AND CONTINUED DELIBERATIONS. AT 5:03PM THE COURT ADDRESSED JURY QUESTION WHILE THEY REMAINED IN JURY ROOM. AT 6:40PM THE COURT ADDRESSED THE JURY'S QUESTION; THE JURY REMAINED IN THE JURY ROOM. AT 6:47PM THE JURY RETURNED TO OPEN COURT; AT THIS TIME THE COURT REMINDED THE JURY AS TO THEIR LEGAL ADMONITIONS AND INSTRUCTIONS IN REGARDS TO THEIR SEQUESTRATION. AT 6:50PM THE JURY WAS EXCUSED FOR THE DAY. AT 7:00PM COURT ADJOURNED. |
| 2/25/2014 | Continued 2/26/2014 09:00 AM Jury Trial |
| 2/26/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |
| 2/26/2014 | Defendant BALDERAS, JUAN appeared in person with Counsels: NUNNERY, ALVIN W/ GODINICH, JEROME & SCOTT, ROBERT W SHEARER, R. SCOTT.<br>Interpreter:N/A<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, AMY. appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: GUINEY, KRISTIN MELISSA<br><br>AT 9:25AM ALL PARTIES PRESENT AND READY TO CONTINUE WITH GUILT/INNOCENCE DELIBERATION; AT THIS TIME THE COURT ADDRESSED THE JURY'S QUESTIONS WHILE THEY REMAINED IN THE JURY ROOM. AT 9:35AM THE JURY WAS SEATED IN OPEN COURT AND WITNESS TESTIMONY WAS READ BACK TO THEM. AT 9:36AM THE JURY RETIRED TO THE JURY ROOM TO CONTINUE DELIBERATIONS. AT 9:46AM THE COURT ADDRESSED THE JURY'S QUESTIONS WHILE THEY REMAINED IN THE JURY ROOM DELIBERATING. AT 10:24AM THE JURY WAS SEATED SO THAT THEIR QUESTIONS COULD BE ADDRESSED BY THE COURT. AT 10:26AM AFTER TESTIMONY READ BACK, THE JURY RETIRED TO THE JURY ROOM TO CONTINUE DELIBERATIONS. AT 11:11AM THE JURY WAS SEATED AND THE COURT ADDRESSED THEIR QUESTIONS WITH TESTIMONY READ BACK. AT 11:13AM THE JURY RETURNED TO THE JURY ROOM AND CONTINUED WITH DELIBERATIONS. AT 12:57PM THE JURY RETURNED TO OPEN COURT AND THEIR QUESTIONS WERE ADDRESSED WITH TESTIMONY READ BACK. AT 1:05PM THE JURY RETIRED TO THE JURY ROOM AND CONTINUED WITH THEIR DELIBERATIONS. AT 2:22PM THE JURY WAS SEATED AND THE COURT ADDRESSED THEIR QUESTIONS WITH TESTIMONY READ BACK. AT 2:25PM THE JURY RETURNED TO DELIBERATIONS IN THE JURY ROOM. AT 2:55PM THE JURY WAS SEATED AND THE COURT ADDRESSED THEIR QUESTIONS WITH TESTIMONY READ BACK.AT 2:57PM THE JURY RETURNED TO DELIBERATIONS IN THE JURY ROOM.AT 3:38PM OUT OF THE JURORS PRESENCE MOTION FOR MISTRIAL WAS DENIED.AT 3:54 THE JURY WAS SEATED AND THE COURT ADDRESSED THEIR QUESTIONS. AT 3:58PM THE JURY WAS INSTRUCTED TO CONTINUE DELIBERATIONS IN THE JURY ROOM. AT 5:03PM THE JURY WAS SEATED AND THE COURT ADDRESSED THEIR QUESTIONS WITH TESTIMONY READ BACK. AT 5:06PM THE JURY REMAINED TO OPEN COURT; AT THIS TIME THE COURT REMINDED THE JURY AS TO THEIR LEGAL ADMONITIONS AND INSTRUCTIONS IN REGARDS TO THEIR SEQUESTRATION. AT 5:09PM THE JURY WAS EXCUSED FOR THE DAY. AT 5:10PM COURT ADJOURNED WILL RETURN AT 9:00AM. |
| 2/26/2014 | BENCH WARRANT RETURN<br>ISSUED FOR SPN: 02250402 FERRUFINO, EDGAR, Previous Bench Warrant Witness For The Prosecution |
| 2/26/2014 | MOTION FILED: INVESTIG/EXPERT FEES |
| 2/26/2014 | MOTION FILED: AMD MTN PRECLUDE PEN |
| 2/26/2014 | MOTION FILED: AMD DEF MTN EVIDENT |
| 2/26/2014 | ORDER: GRNTD MTN INVEST/EXPRT FEES |

63031



## Harris County Criminal District Docket Sheet

| 2/26/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $2,925 |
|-----------|---------------------------------------------------|
| 2/26/2014 | ORDER: GRNTD DEF MTN PMT TRAVEL |
| 2/26/2014 | ORDER: GRNTD DEF MTN INVESTIGATOR |
| 2/26/2014 | Continued 2/27/2014 09:00 AM Jury Trial |
| 2/27/2014 | Defendant BALDERAS, JUAN appeared in person with Counsels: NUNNERY, ALVIN W/ GODINICH, JEROME & SCOTT, ROBERT W SHEARER, R. SCOTT.<br>Interpreter:N/A<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, AMY. appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: GUINEY, KRISTIN MELISSA<br><br>AT 8:51AM ALL JURORS WERE PRESENT IN THE JURY ROOM AND AT THIS TIME GUITL/INNOCENCE DELIBERATIONS CONTINUED. AT 10:01AM THE JURY WAS SEATED IN OPEN COURT SO THAT THEIR QUESTIONS COULD BE ADDRESSED WITH TESTIMONY READ BACK. AT 10:07AM THE JURY RETIRED TO THE JURY ROOM AND CONTINUED DELIBERATIONS. AT 11:23AM THE JURY RETURNED TO OPEN COURT WITH A VERDICT OF: "GUILTY". AT 11:25AM THE JURY WAS EXCUSED BACK TO THE JURY ROOM. AT 1:23PM THE COURT HANDLED MATTERS OUTSIDE OF THE PRESENCE OF THE JURY. AT 1:29PM SEVERAL JURORS WERE BROUGHT IN TO COURT AND QUESTIONED INDIVIDUALLY IN REGARDS TO MATTERS THAT OCCURED ONCE COURT HAD AJOURNED YESTERDAY 2-26-2014.<br>AT 1:57PM JURY WAS SEATED AND POLLED AS TO THE VERDICT OF GUILTY. AT 1:58PM ADA MADE OPENING STATEMENT.<br>AT 2:01PM DEFENSE MADE OPENING STATEMENT.<br>@2:05PM TESTIMONY BEGAN.<br>AT 3:13PM JURY RETIRED FOR A SHORT BREAK.<br>AT 3:23PM JURY SEATED, TESTIMONY RESUMED.<br>@4:40PM JURY RETIRED AND INSTRUCTED TO RETURN AT 9:30AM |
| 2/27/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |
| 2/27/2014 | Jury Conviction, 2/28/2014 09:00 AM Jury Trial |
| 2/28/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |
| 2/28/2014 | Defendant BALDERAS, JUAN appeared in person with Counsels: NUNNERY, ALVIN W/ GODINICH, JEROME & SCOTT, ROBERT W SHEARER, R. SCOTT.<br>Interpreter: DODSON, GLEN<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, AMY. appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: GUINEY, KRISTIN MELISSA<br><br>AT 9:38AM ALL PARTIES PRESENT AND READY TO CONTINUE PUNISHMENT PHASE OF TRIAL; AT THIS TIME THE JURY WAS SEATED AND STATE WITNESS TESTIMONY CONTINUED. AT 10:50AM THE JURY RETIRED TO THE JURY ROOM FOR A BREAK. AT 11:08AM THE JURY RETURNED TO OPEN COURT AND TESTIMONY CONTINUED. AT 12:42PM THE JURY RETIRED TO THE JURY ROOM FOR LUNCH. AT 1:37PM THE JURY WAS SEATED AND STATE WITNESS TESTIMONY CONTINUED. AT 2:42PM THE JURY RETIRED TO THE JURY ROOM FOR A BRIEF BREAK. AT 3:07PM THE JURY WAS SEATED AND STATE TESTIMONY CONTINUED. AT 4:55PM THE JURY WAS REMINDED OF THEIR ADMONITIONS AND GIVEN INSTRUCTIONS TO RETURN MONDAY 3/3/2014@9:30AM BEFORE BEING EXCUSED FOR THE DAY. AT 5:00PM COURT ADJOURNED. |
| 2/28/2014 | ORDER: GRNTD EXPARTE MTN PAYMENT |
| 2/28/2014 | ORDER: GRNTD EXPARTE MTN PAYMENT |
| 2/28/2014 | Continued 3/03/2014 09:00 AM Jury Trial |

03092



## Harris County Criminal District Docket Sheet

| | |
|---|---|
| 3/3/2014 | Defendant BALDERAS, JUAN appeared in person with Counsels: NUNNERY, ALVIN W/ GODINICH, JEROME & SCOTT, ROBERT W SHEARER, R. SCOTT.<br>Interpreter:N/A<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, AMY. appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: GUINEY, KRISTIN MELISSA<br><br>AT 9:43AM ALL PARTIES PRESENT AND READY FOR TRIAL, AT THIS TIME THE JURY WAS SEATED AND STATE WITNESS TESTIMONY CONTINUED. AT 11:02AM THE JURY RETIRED TO THE JURY ROOM FOR A BREAK. AT 11:21AM THE JURY WAS SEATED AND TESTIMONY CONTINUED. AT 12:31PM THE JURY RETIRED TO THE JURY ROOM FOR LUNCH, AT THIS TIME THE COURT TOOK A SHORT RECESS. AT 1:52PM THE JURY RETURNED TO OPEN COURT AND STATE WITNESS TESTIMONY FOR PUNISHMENT PHASE OF TRIAL CONTINUED. AT 3:39PM THE JURY RETIRED TO THE JURY ROOM FOR A BREAK. AT 3:57PM THE JURY WAS SEATED AND THE STATE CONTINUED WITH WITNESS TESTIMONY. AT 4:42PM THE JURY WAS REMINDED OF THEIR ADMONITIONS BEFORE INSTRUCTING THEM TO RETURN TOMORROW TUESDAY 3-4-14 @9:30AM AND THEN RELEASED FOR THE DAY. AT 4:45PM COURT ADJOURNED. |
| 3/3/2014 | ORDER: GRNTD DEF MTN REIMB TRAVEL |
| 3/3/2014 | ORDER: GRNTD DEF MTN REIMBURSEMNT |
| 3/3/2014 | Continued 3/04/2014 09:00 AM Jury Trial |
| 3/4/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |
| 3/4/2014 | Defendant BALDERAS, JUAN appeared in person with Counsels: NUNNERY, ALVIN W/ GODINICH, JEROME & SCOTT, ROBERT W SHEARER, R. SCOTT.<br>Interpreter:N/A<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, AMY. appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: GUINEY, KRISTIN MELISSA<br><br>AT 9:47AM ALL PARTIES PRESENT AND READY TO CONTINUE PUNISHMENT PHASE OF TRIAL; AT THIS TIME THE JURY WAS SEATED AND STATE WITNESS TESTIMONY CONTINUED. AT 11:24AM THE JURY RETIRED TO THE JURY ROOM FOR A BREAK. AT 11:38AM THE JURY WAS SEATED AND WITNESS TESTIMONY CONTINUED. AT 12:22PM THE JURY RETIRED TO THE JURY ROOM FOR LUNCH; AT THIS TIME THE COURT HANDLED DOCKET MATTERS. AT 1:26PM THE JURY WAS SEATED AND AT THIS TIME STATE WITNESS TESTIMONY CONTINUED. AT 3:34PM THE JURY RETIRED TO THE JURY ROOM FOR A BREAK. AT 3:45PM THE JURY WAS SEATED AND STATE WITNESS TESTIMONY CONTINUED. AT 5:09PM THE JURY WAS REMINDED OF THEIR ADMONITIONS THEN INSTRUCTED TO REPORT TOMORROW 3-5-2014 BY 9:30AM AND EXCUSED FOR THE DAY. |
| 3/4/2014 | MOTION FILED: DEF MTN INVESTIG FEE |
| 3/4/2014 | MOTION FILED: DEF MTN REIMBURSEMNT |
| 3/4/2014 | MOTION FILED: EXPARTE MTN PAYMENT |
| 3/4/2014 | MOTION FILED: EXPARTE MTN PAYMENT |
| 3/4/2014 | MOTION FILED: DEF MTN INVESTIG FEE |
| 3/4/2014 | ORDER: GRNTD DEF MTN INVESTIG FEES |
| 3/4/2014 | Continued 3/05/2014 09:00 AM Jury Trial |
| 3/5/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |



# Harris County Criminal District Docket Sheet

| | |
|---|---|
| 3/5/2014 | Defendant BALDERAS, JUAN appeared in person with Counsels: NUNNERY, ALVIN W/ GODINICH, JEROME & SCOTT, ROBERT W SHEARER, R. SCOTT.<br>Interpreter: HERNANDEZ, ROLANDO<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, AMY. appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: GUINEY, KRISTIN MELISSA<br><br>AT 9:36AM ALL PARTIES PRESENT AND READY TO CONTINUE PUNISHMENT PHASE OF TRIAL. AT 9:37AM THE JURY WAS SEATED AND STATE WITNESS TESTIMONY CONTINUED. AT 12:00PM THE JURY RETIRED TO THE JURY ROOM FOR LUNCH WHILE THE COURT HANDLED MATTERS OUTSIDE OF THEIR PRESENCE. AT 12:04PM THE COURT TOOK A BRIEF RECESS. AT 1:10PM THE COURT HANDLED MATTERS OUTSIDE OF THE PRESENCE OF THE JURY. AT 1:19PM THE JURY WAS SEATED AND STATE WITNESS TESTIMONY CONTINUED. AT 2:45PM THE JURY RETIRED TO THE JURY ROOM FOR A BREAK. AT 2:57PM THE JURY WAS SEATED AND STATE WITNESS TESTIMONY CONTINUED. AT 3:17PM THE STATE RESTED; AT THIS TIME THE DEFENSE CALLED THEIR FIRST WITNESS TO THE STAND AND TESTIMONY STARTED. AT 4:45PM THE COURT REMINDED THE JURY OF THEIR ADMONITIONS AND INSTRUCTED THEM TO RETURN TOMORROW, THURSDAY 3-6-2014 @ 10:30AM. AT 4:49PM THE JURY WAS EXCUSED FOR THE DAY. AT 4:55PM COURT ADJOURNED. |
| 3/5/2014 | Continued 3/06/2014 09:00 AM Jury Trial |
| 3/6/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |
| 3/6/2014 | Defendant BALDERAS, JUAN appeared in person with Counsels: NUNNERY, ALVIN W/ GODINICH, JEROME & SCOTT, ROBERT W SHEARER, R. SCOTT.<br>Interpreter: HERNANDEZ, ROLANDO<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, AMY. appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: GUINEY, KRISTIN MELISSA<br>AT 10:39AM ALL PARTIES PRESENT AND READY TO CONTINUE PUNISHMENT PHASE OF TRIAL; AT THIS TIME THE JURY WAS SEATED AND DEFENSE WITNESS TESTIMONY CONTINUED. AT 12:32PM THE JURY RETIRED TO THE JURY ROOM FOR LUNCH. AT 1:30PM THE JURY RETURNED TO OPEN COURT AND DEFENSE WITNESS TESTIMONY CONTINUED. AT 2:52PM THE JURY RETIRED TO THE JURY ROOM SO THAT A HEARING COULD BE HELD OUTSIDE OF THEIR PRESENCE. AT 3:12PM AFTER THE DEFENSE PRESENTED EVIDENCE THE COURT MADE ITS RULING AS TO DEFENSE EXPERT WITNESS TESTIMONY AND GRANTED DEFENSE EXPERT WITNESS TESTIMONY BE ALLOWED. AT 3:14PM THE COURT TOOK A BRIEF RECESS. AT 3:19PM THE JURY WAS SEATED AND DEFENSE WITNESS TESTIMONY CONTINUED. AT 4:31PM THE JURY RETIRED TO THE JURY ROOM FOR A BREAK. AT 4:39PM THE JURY WAS SEATED AND DEFENSE WITNESS TESTIMONY CONTINUED. AT 5:00PM THE COURT REMINDED THE JURY AS TO THEIR ADMONITIONS AND GAVE THEM INSTRUCTIONS TO REPORT TOMORROW FRIDAY 3/7/2014 @9:30AM BEFORE EXCUSING THEM FOR THE DAY. AT 5:15PM COURT ADJOURNED. |
| 3/6/2014 | Continued 3/07/2014 09:00 AM Jury Trial |
| 3/7/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |
| 3/7/2014 | Defendant BALDERAS, JUAN appeared in person with Counsels: NUNNERY, ALVIN W/ GODINICH, JEROME & SCOTT, ROBERT W SHEARER, R. SCOTT.<br>Interpreter: HERNANDEZ, ROLANDO & DODSON, GLENN<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, AMY. appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: GUINEY, KRISTIN MELISSA<br><br>AT 9:45AM ALL PARTIES PRESENT AND READY FOR TO CONTINUE TRIAL; AT THIS TIME THE JURY WAS SEATED AND DEFENSE WITNESS TESTIMONY CONTINUED. AT 10:36AM THE JURY RETIRED TO THE JURY ROOM FOR A SHORT BREAK WHILE THE COURT HANDLED TECHNICAL ISSUES. AT 11:23AM THE JURY WAS SEATED AND DEFENSE WITNESS TESTIMONY CONTINUED. AT 12:12PM THE JURY WAS EXCUSED FOR LUNCH; AT THIS TIME THE COURT HANDLED DOCKET MATTERS AND TRIAL TOOK A RECESS. AT 1:43PM THE JURY WAS SEATED AND TESTIMONY CONTINUED. AT 2:41PM THE JURY RETIRED TO THE JURY ROOM FOR A BREAK. AT 2:46PM THE JURY RETURNED TO OPEN COURT AND DEFENSE WITNESS TESTIMONY CONTINUED. AT 3:53PM THE JURY RETIRED TO THE JURY ROOM SO THAT MATTERS COULD BE HEARD OUTSIDE OF THEIR PRESENCE. AT 4:04PM THE JURY WAS SEATED AND TESTIMONY CONTINUED. AT 4:30PM THE COURT REMINDED THE JURY OF THEIR ADMONITIONS AND INSTRUCTED THEM TO RETURN MONDAY 3-10-2014@9:30AM BEFORE EXCUSING THEM FOR THE DAY. AT 4:55pm COURT ADJOURNED. |
| 3/7/2014 | MOTION FILED: DEF MTN REIMB TRAVEL |
| 3/7/2014 | MOTION FILED: DEF MTN INVESTIG FEE |
| 3/7/2014 | MOTION FILED: DEFENSE MTN INVESTIG |

063094



| 3/7/2014 | MOTION FILED: DEF MTN INVESTIG FEE |
|---|---|
| 3/7/2014 | MOTION FILED: DEF MTN EXPERT FEE |
| 3/7/2014 | MOTION FILED: DEF MTN EXPERT FEE |
| 3/7/2014 | MOTION FILED: DEF MTN INVEST/EXPRT |
| 3/7/2014 | MOTION FILED: DEF MTN INV/EXPT FEE |
| 3/7/2014 | MOTION FILED: DEF MTN INVESTIGATOR |
| 3/7/2014 | ORDER: GRNTD DEF MTN INV/EXPRT FEE |
| 3/7/2014 | ORDER: GRNTD DEF MTN INVEST/EXPRT |
| 3/7/2014 | ORDER: GRNTD DEF MTN EXPERT FEE |
| 3/7/2014 | ORDER: GRNTD DEF MTN EXPERT FEE |
| 3/7/2014 | ORDER: GRNTD DEF MTN INVESTIG FEE |
| 3/7/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $8,707 |
| 3/7/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $5,782 |
| 3/7/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $35,000 |
| 3/7/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $35,000 |
| 3/7/2014 | Continued 3/10/2014 09:00 AM Jury Trial |
| 3/10/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |
| 3/10/2014 | Defendant BALDERAS, JUAN appeared in person with Counsels: NUNNERY, ALVIN W/ GODINICH, JEROME & SCOTT, ROBERT W SHEARER, R. SCOTT.<br>Interpreter: HERNANDEZ, ROLANDO & DODSON, GLENN<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, AMY. appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: GUINEY, KRISTIN MELISSA<br>Clerk: A. Vaughn<br><br>AT 9:41AM ALL PARTIES PRESENT, THE JURY WAS SEATED AND DEFENSE WITNESS TESTIMONY CONTINUED. AT 10:47AM THE COURT TOOK A BREAK. AT 11:16AM TESTIMONY CONTINUED. AT 12:15PM THE JURY TOOK A BREAK FOR LUNCH. AT 1:28PM TESTIMONY RESUMED. AT 2:31PM THE COURT TOOK A BREAK. AT 2:39PM TESTIMONY RESUMED. AT 2:45PM THE COURT TOOK A BREAK. AT 3:18PM TESTIMONY RESUMED. AT 4:38PM THE COURT RECESSED FOR THE DAY. |
| 3/10/2014 | MOTION FILED: DEF IN LIMINE |
| 3/10/2014 | ORDER: OVERRULED DEF IN LIMINE |
| 3/10/2014 | Continued 3/11/2014 09:00 AM Jury Trial |
| 3/11/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |



| 3/11/2014 | Defendant BALDERAS, JUAN appeared in person with Counsels: NUNNERY, ALVIN W/ GODINICH, JEROME & SCOTT, ROBERT W SHEARER, R. SCOTT.<br>Interpreter: HERNANDEZ, ROLANDO & DODSON, GLENN<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, AMY. appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: GUINEY, KRISTIN MELISSA<br><br>AT 9:21AM ALL PARTIES PRESENT AND A HEARING COMMENCED OUTSIDE OF THE PRESENCE OF THE JURY. AT 9:56AM THE COURT MADE ITS RULINGS AND THE HEARING CONCLUDED; AT THIS TIME THE COURT TOOK A BREAK FROM TRIAL. AT 12:42PM TRIAL RECONVENED WITH ALL PARTIES PRESENT; AT THIS TIME THE JURY WAS SEATED AND DEFENSE WITNESS TESTIMONY CONTINUED. AT 3:00PM THE JURY RETIRED TO THE JURY ROOM FOR A BREAK. AT 3:22PM THE JURY RETURNED TO OPEN COURT AND WITNESS TESTIMONY CONTINUED. AT 5:57PM THE COURT REMINDED THE JURY OF THEIR ADMONITIONS AND GAVE THEM INSTRUCTIONS TO RETURN TOMORROW WEDNESDAY 3-12-2014 @9:30AM BEFORE EXCUSING THEM FOR THE DAY. AT 5:58PM THE COURT HELD A HEARING OUTSIDE OF THE PRESENCE OF THE JURY. AT 6:21PM THE COURT MADE ITS RULINGS. AT 6:23PM THE COURT RECESSED FOR THE DAY. |
| --- | --- |
| 3/11/2014 | Continued 3/12/2014 09:00 AM Jury Trial |
| 3/12/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |
| 3/12/2014 | Defendant BALDERAS, JUAN appeared in person with Counsels: NUNNERY, ALVIN W/ GODINICH, JEROME & SCOTT, ROBERT W SHEARER, R. SCOTT.<br>Interpreter: HERNANDEZ, ROLANDO & DODSON, GLENN<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, AMY. appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: GUINEY, KRISTIN MELISSA<br><br>AT 9:33AM ALL PARTIES PRESENT AND READY FOR TRIAL; AT THIS TIME THE JURY WAS SEATED AND DEFENSE WITNESS TESTIMONY RESUMED. AT 10:47AM THE JURY RETIRED TO THE JURY ROOM FOR A BREAK. AT 11:05AM THE JURY RETURNED TO OPEN COURT AND TESTIMONY CONTINUED. AT 11:42AM THE JURY WAS EXCUSED FOR LUNCH; AT THIS TIME THE COURT RECESSED FROM TRIAL AND HANDLED DOCKET MATTERS. AT 12:43PM ALL PARTIES PRESENT AND READY TO CONTINUE PUNISHMENT PHASE OF TRIAL. AT 12:55 THE JURY WAS SEATED AND DEFENSE WITNESS TESTIMONY CONTINUED. AT 1:33PM THE DEFENSE RESTED; AT THIS TIME THE STATE CALLED THEIR FIRST WITNESS TO THE STAND AND TESTIMONY BEGAN. AT 2:25PM THE JURY RETIRED TO THE JURY ROOM FOR A BREAK. AT 2:40PM THE JURY WAS SEATED AND STATE WITNESS TESTIMONY CONTINUED. AT 4:37PM THE JURY RETIRED TO THE JURY ROOM FOR A BREAK. AT 4:44PM THE JURY WAS SEATED AND STATE WITNESS TESTIMONY CONTINUED. AT 5:17PM THE STATE RESTED. AT 5:18PM THE DEFENSE RESTED; AT THIS TIME BOTH SIDES RESTED AND CLOSED. AT 5:19PM THE COURT REMINDED THE JURY AS TO THEIR ADMONITIONS AND INSTRUCTED THEM TO RETURN TOMORROW THURSDAY 3-13-2014 BY 9:30; THE JURY WAS THEN EXCUSED FOR THE DAY. AT 5:20PM THE COURT TOOK UP CHARGE ISSUES OUTSIDE OF THE PRESENCE OF THE JURY. AT 5:40PM COURT ADJOURNED. |
| 3/12/2014 | Continued 3/13/2014 09:00 AM Jury Trial |
| 3/13/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |
| 3/13/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $7,200 |
| 3/13/2014 | ORDER: OVERRULED DEF MTN EVID HEAR |
| 3/13/2014 | ORDER: OVERRULED MTN PRECLUD DEATH |

03098



## Harris County Criminal District Docket Sheet

| Date | Entry |
|---|---|
| 3/13/2014 | Defendant BALDERAS, JUAN appeared in person with Counsels: NUNNERY, ALVIN W/ GODINICH, JEROME & SCOTT, ROBERT W SHEARER, R. SCOTT.<br>Interpreter: HERNANDEZ, ROLANDO & DODSON, GLENN<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADDEN, MARY appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: GUINEY, KRISTIN MELISSA<br>AT 9:46AM ALL PARTIES PRESENT AND READY TO RESUME PUNISHMENT PHASE OF TRIAL; AT THIS TIME JUDGE RULED ON DEFENSE MOTION OUTSIDE OF THE PRESENCE OF THE JURY. AT 9:48AM THE JURY WAS SEATED IN OPEN COURT; AT THIS TIME THE COURT READ THE CHARGE TO THE JURY. AT 9:57AM STATE WAIVED ITS RIGHT TO OPEN AND RESERVED ITS RIGHT TO CLOSE; AT THIS TIME THE DEFENSE GAVE ITS CLOSING ARGUMENT. AT 11:00AM THE DEFENSE CONCLUDED AND AT THIS TIME THE JURY RETIRED TO THE JURY ROOM FOR A BREAK. AT 11:20AM THE JURY RETURNED TO OPEN COURT AND AT THIS TIME THE STATE GAVE ITS CLOSING ARGUMENT. AT 12:23PM THE STATE CONCLUDED ITS CLOSING ARGUMENT AND AT THIS TIME THE JURY RETIRED TO THE JURY ROOM FOR DELIBERATION. AT 4:00PM JURY'S QUESTION WAS ADDRESSED. AT 4:31PM THE COURT ADDRESSED THE JURY'S QUESTIONS; AT THIS TIME THE JURY WAS SEATED AND TESTIMONY WAS READ BACK TO THEM. AT 4:36PM THE JURY RETIRED TO THE JURY ROOM AND CONTINUED DELIBERATION. AT 4:57PM THE COURT RESPONDED TO JURY QUESTION WHILE THEY STAYED IN THE JURY ROOM. AT 5:58PM THE JURY WAS SEATED AND THE COURT REMINDED THEM OF THEIR SEQUESTRATION ADMONITIONS; AT THIS TIME THE COURT INSTRUCTED THE JURY TO RETURN TOMORROW FRIDAY 3-14-2014 @9:30AM AND THEN EXCUSED THEM FOR THE DAY. AT 6:00PM COURT ADJOURNED. |
| 3/13/2014 | Continued 3/14/2014 09:00 AM Jury Trial |
| 3/14/2014 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |
| 3/14/2014 | DEFENDANT SENTENCED TO DEATH |
| 3/14/2014 | MOTION FILED: DEF MTN FOR PAYMENT |
| 3/14/2014 | ORDER: JURY VERDICT RENDERED |
| 3/14/2014 | ORDER: PREP STMT FACT APPEAL GRNTD |
| 3/14/2014 | ORDER: GRANTED DEF MTN FOR PAYMENT |
| 3/14/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $50,000 |
| 3/14/2014 | Delivery Order Issued<br>Location: Texas Department of Criminal Justice awaiting mandate |
| 3/14/2014 | Notice of Appeal Filed |
| 3/14/2014 | Defendant BALDERAS, JUAN appeared in person with Counsels: NUNNERY, ALVIN/ GODINICH, JEROME & SCOTT, ROBERT/ SHEARER, R. SCOTT.<br>Interpreter: HERNANDEZ, ROLANDO & DODSON, GLENN<br>BENNETT, TRACI W/ DOZIER, CAROLINE & MCFADEN, MARY appeared for the State.<br>Court Reporter: REAGAN, RENEE<br>Judge Presiding: GUINEY, KRISTIN MELISSA<br><br>AT 8:50AM THE JURY GATHERED DIRECTLY IN THE JURY ROOM AND CONTINUED DELIBERATIONS IN THE PUNISHMENT PHASE OF TRIAL. AT 9:39AM THE COURT ADDRESSED JURY'S QUESTIONS WHILE THEY REMAINED IN THE JURY ROOM. AT 10:02AM THE COURT ADDRESSED JURY QUESTIONS WHILE THEY REMAINED IN THE JURY ROOM. AT 10:50AM THE COURT ADDRESSED THE JURY'S REQUEST WHILE THEY REMAINED IN THE JURY ROOM. AT 11:22AM THE COURT ADDRESSED AN ISSUE INVOLVING JUROR C.S.. AT 11:32AM THE JURY CONTINUED WITH DELIBERATIONS. AT 11:37AM THE COURT ADDRESSED THE JURY'S REQUEST. AT 12:18PM THE COURT ADDRESSED THE JURY'S REQUEST WHILE THEY REMAINED IN THE JURY ROOM. AT 2:10PM THE JURY BUZZED INDICATING A VERDICT WAS REACHED. AT 2:20PM THE JURY WAS SEATED IN OPEN COURT. AT 2:21PM THE COURT READ THE JURY'S VERDICT ON SPECIAL ISSUE NO.1: "YES" AND THE JURY'S VERDICT TO SPECIAL ISSUE NO.2: "NO". AT: 2:24PM COURT SENTENCED JUAN BALDERAS TO: DEATH, INSTITUTIONAL DIVISION, TDCJ. AT 2:30PM THE JURY WAS THANKED FOR THEIR SERVICE AND EXCUSED. AT 3:10PM COURT ADJOURNED. |
| 3/14/2014 | Continued 3/31/2015 09:00 AM Motion Hearing |
| 3/20/2014 | Assigned to Court of Criminal Appeals |

03097

| 3/24/2014 | ORDER: BRAD LEVENSON APPNTD 11.071 |
|-----------|-------------------------------------|
| 3/25/2014 | MOTION FILED: EX PARTE MTN PAYMENT |
| 3/25/2014 | MOTION FILED: EX PARTE MTN PAYMENT |
| 3/25/2014 | ORDER: GRNTD EX PARTE MTN PAYMENT |
| 3/25/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $40,000 |
| 3/25/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $40,000 |
| 3/25/2014 | ORDER: GRNTD EX PARTE MTN PAYMENT |
| 3/25/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $240 |
| 4/1/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $6,450 |
| 4/7/2014 | MOTION FILED: DEF MTN REIMBURSEMNT |
| 4/7/2014 | MOTION FILED: DEF MTN INVESTIGATOR |
| 4/7/2014 | MOTION FILED: DEF MTN INVESTIGATOR |
| 4/7/2014 | MOTION FILED: DEF MTN INVESTIGATOR |
| 4/7/2014 | MOTION FILED: DEF MTN INVESTIGATOR |
| 4/7/2014 | ORDER: GRNTD DEF MTN INVESTIGATOR |
| 4/7/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $5,070 |
| 4/7/2014 | ORDER: GRNTD DEF MTN REIMBURSEMNT |
| 4/7/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $2,102 |
| 4/7/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $6,375 |
| 4/7/2014 | ORDER: GRNTD DEF MTN INVESTIGATOR |
| 4/7/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $175 |
| 4/11/2014 | MOTION FILED: DEF MTN PMT TRAVEL |
| 4/11/2014 | MOTION FILED: DEF MTN INVESTIG FEE |
| 4/11/2014 | MOTION FILED: DEF MTN EXPERT FEE |
| 4/11/2014 | MOTION FILED: DEF MTN PMT TRAVEL |
| 4/11/2014 | MOTION FILED: DEF MTN INVEST/EXPRT |
| 4/11/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $461 |
| 4/11/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $4,955 |
| 4/11/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $923 |
| 4/11/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $11,260 |
| 4/11/2014 | ORDER: GRNTD DEF MTN PMT TRAVEL |



| 4/11/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $11,213 |
|---|---|
| 4/11/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $2,519 |
| 4/11/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $7,988 |
| 4/11/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $13,875 |
| 4/11/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $9,431 |
| 4/14/2014 | MOTION FILED: DEF MTN NEW TRIAL |
| 4/14/2014 | ORDER: GRNTD DEF MTN EXPERT FEE |
| 4/14/2014 | ORDER: GRNTD DEF MTN INVESTIG FEE |
| 4/14/2014 | ORDER: GRNTD DEF MTN INVEST/EXPRT |
| 4/21/2014 | ORDER: DENIED DEF MTN NEW TRIAL |
| 4/23/2014 | ORDER: GRNTD DEF MTN IVESTIG FEES |
| 4/23/2014 | ORDER: GRNTD DEF MTN EXPERT FEES |
| 4/25/2014 | MOTION FILED: DEF MTN IVESTIG FEES |
| 4/25/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $938 |
| 5/6/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $4,060 |
| 5/8/2014 | MOTION FILED: INVESTIG/EXPERT FEES |
| 5/8/2014 | MOTION FILED: MTN REIMBURSE TRAVEL |
| 5/12/2014 | ORDER: GRNTD MTN REIMBURSE TRAVEL |
| 5/12/2014 | ORDER: GRNTD MTN INVESTIGATOR FEES |
| 5/12/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $31,041 |
| 5/13/2014 | MOTION FILED: DEF MTN INVESTIG FEE |
| 5/13/2014 | MOTION FILED: DEF MTN EXPERT FEES |
| 5/13/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $4,570 |
| 5/13/2014 | ORDER: GRNTD MTN REIBMENT TRAVEL |
| 5/16/2014 | MOTION FILED: DEF MTN INVESTIE FEE |
| 5/16/2014 | MOTION FILED: DEF MTN INVESTIE FEE |
| 5/16/2014 | MOTION FILED: MTN FOR REIMENT EXPE |
| 5/16/2014 | ORDER: GRNTD MTN FOR INVESTIVE FEE |
| 5/16/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $17,900 |



| | |
|---|---|
| 5/21/2014 | Defendant BALDERAS, JUAN appeared in person with Counsel SHEARER, R. SCOTT.<br>Interpreter:N/A<br>BENNETT, TRACI appeared for the State.<br>Court Reporter: REAGAN, RENEE.<br>Judge Presiding: GUINEY, KRISTIN MELISSA<br><br>At 10:43AM both sides argued proposed findings of facts and conclusions of law with the Court. |
| 6/6/2014 | ORDER: GRNTD DEF MTN INVESTIGATOR |
| 6/25/2014 | MOTION FILED: ST MTN RLS EVIDENCE |
| 6/25/2014 | MOTION FILED: ST'S MTN RLS EVIDENC |
| 6/25/2014 | ORDER: GRNTD ST'S MTN RLS EVIDENCE |
| 6/25/2014 | ORDER: GRNTD ST MTN RLS EVIDENCE |
| 7/8/2014 | MOTION FILED: DEF MTN FOR INVESTIG |
| 7/8/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $1,410 |
| 7/21/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $14,800 |
| 7/28/2014 | MOTION FILED: ST MTN RELEASE EVIDE |
| 7/28/2014 | ORDER: GRNTD ST MTN RELEASE EVIDEN |
| 8/21/2014 | MOTION FILED: ST'S REL OF EVIDENCE |
| 8/21/2014 | ORDER: ST'S REL OF EVIDEMCE GRANTD |
| 8/22/2014 | MOTION FILED: ST MTN RLS EVIDENCE |
| 8/22/2014 | ORDER: GRNTD ST MTN RLS EVIDENCE |
| 10/17/2014 | MOTION FILED: S/M REL EVIDENCE |
| 2/10/2015 | MOTION FILED: COPY JUROR QUEST&INF |
| 3/31/2015 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |
| 3/31/2015 | ORDER: GRNTD MTN FOR JUROR COPIES |
| 3/31/2015 | Motion Granted, 8/17/2017 09:00 AM Appeal Hearing |
| 6/15/2015 | MOTION FILED: EXPARTE MTN PAYMENT |
| 6/15/2015 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $27,415 |
| 6/15/2015 | ORDER: GRNTD DEF MTN PAYMENT |
| 7/13/2015 | MOTION FILED: 90DAY EXT 11.071 APP |
| 7/13/2015 | MOTION FILED: 90D EXT:FILE ST HABS |
| 7/23/2015 | ORDER: GRANT 90D EXT:FILE ST HABS |
| 8/14/2015 | MOTION FILED: VIEW & PHOTOEXHIBITS |
| 10/27/2015 | MOTION FILED: 11.071 SEAL EXT CCA |
| 11/6/2015 | ORDER: CCA GRT OWC 11.071EXT011516 |

03100



**Harris County Criminal District Docket Sheet**

| | |
|---|---|
| 12/1/2015 | Defendant BALDERAS, JUAN appeared in person with Counsel SHEARER, R. SCOTT (HABEAS CORPUS APPLICATION ATTORNEY: DERK VERHAGEN).<br>Interpreter N/A<br>LYNN HARDAWAY appeared for the State.<br>Court Reporter: RENEE REAGAN<br>Judge Presiding: GUINEY, KRISTIN MELISSA<br><br>On the record the court heard matters with regard to work product notes. Court to give ruling on Dec 18 of 2015 as recorded in reporters notes. |
| 12/21/2015 | ORDER: DENY DISC AND SEAL NOTES |
| 1/28/2016 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $9,835 |
| 9/13/2016 | MOTION FILED: ST DISCLOSURE NOTICE |
| 11/3/2016 | Opinion Filed |
| 11/22/2016 | ORDER: MTNEXT FILE MTN HEARING GRA |
| 12/20/2016 | ORDER: ATTORNEY FEE VOUCHER |
| 1/26/2017 | ORDER: PROSE MTN FOR EXT GRANTED |
| 2/15/2017 | ORDER: PROSE MTN REHRNG RCVD |
| 2/15/2017 | ORDER: PROSE EXT FILE BRIEF GRNTD |
| 3/1/2017 | MOTION FILED: MOTI WITHDR PET WRIT |
| 3/1/2017 | MOTION FILED: MOT EXTEND TIME FILE |
| 3/14/2017 | ORDER: ATTORNEY FEE VOUCHER |
| 4/4/2017 | MOTION FILED: DNA BRADY NOTICE |
| 6/8/2017 | ORDER: MANDATE AFFIRM MTN REHRNG |
| 6/8/2017 | ORDER: MTN REHRNG DISM |
| 7/25/2017 | BENCH WARRANT ISSUED<br>ISSUED FOR SPN: 02190432 BALDERAS, JUAN MANUEL, Bench Warrant Defendant |
| 7/25/2017 | MOTION FILED: BENCH WARRANT |
| 8/17/2017 | Reset By Court 12/08/2017 01:00 PM Appeal Hearing |
| 9/14/2017 | MOTION FILED: 10-DAY EXTENSION |
| 9/14/2017 | ORDER: 10-DAY EXTENSION GRANTED |
| 12/8/2017 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |
| 12/8/2017 | Reset By Court 12/15/2017 01:00 PM Appeal Hearing |
| 12/15/2017 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |
| 12/15/2017 | Reset By Court, 2/22/2018 01:00 PM Appeal Hearing |
| 12/27/2017 | BENCH WARRANT RETURN<br>BOND AMOUNT: $0<br>ISSUED FOR SPN: 02190432 BALDERAS, JUAN MANUEL, Defendant  - CRIMINAL |
| 2/9/2018 | BENCH WARRANT ISSUED<br>ISSUED FOR SPN: 02190432 BALDERAS, JUAN MANUEL, Bench Warrant Defendant |
| 2/22/2018 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |

63181

| 2/22/2018 | Reset By Court, 5/11/2018 09:00 AM Appeal Hearing |
|---|---|
| 2/27/2018 | BENCH WARRANT RETURN<br>ISSUED FOR SPN: 02190432 BALDERAS, JUAN MANUEL, Bench Warrant Defendant |
| 4/10/2018 | BENCH WARRANT ISSUED<br>ISSUED FOR SPN: 02190432 BALDERAS, JUAN MANUEL, Witness For Prosecution |
| 4/25/2018 | BENCH WARRANT ISSUED<br>ISSUED FOR SPN: 02190432 BALDERAS, JUAN MANUEL, Bench Warrant Defendant |
| 5/2/2018 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |
| 5/2/2018 | Continued 5/11/2018 09:00 AM Writ of Habeas Corpus Hearing |
| 5/11/2018 | Defendant BALDERAS, JUAN appeared with counsel SHEARER, R. SCOTT. |
| 5/29/2018 | BENCH WARRANT RETURN<br>ISSUED FOR SPN: 02190432 BALDERAS, JUAN MANUEL, Bench Warrant Defendant |

03102

 

CASE NO. 141282601010
INCIDENT NO./TRN: 9036989981D003

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 179TH DISTRICT |
| | § | |
| vs. | § | COURT |
| | § | |
| BALDERAS, JUAN | § | COUNTY, TEXAS |
| AKA APACHE | § | |
| | § | |
| SID: TX06664436 | § | |

## JUDGMENT OF CONVICTION BY JURY – CAPITAL MURDER

| | | | |
|---|---|---|---|
| Judge Presiding: | HON. KRISTIN M. GUINEY | Date Judgment Entered: | 3/14/2014 |
| Attorney for State: | BENNETT, TRACI/DOZIER, CAROLINE/MCFADDEN, MARY | Attorney for Defendant: | GODINICH, JEROME/NUNNERY, ALVIN/SCOTT, ROBERT |

Offense for Which Defendant Convicted:
**CAPITAL MURDER**

| Charging Instrument: | Statute for Offense: |
|---|---|
| **INDICTMENT** | |

Date of Offense:
**12/6/2005**

| Degree of Offense: | Plea to Offense: |
|---|---|
| **CAPITAL MURDER** | **NOT GUILTY** |

| Verdict of Jury: | Findings on Deadly Weapon: |
|---|---|
| **GUILTY** | **YES, A FIREARM** |

| Plea to 1st Enhancement Paragraph: | N/A | Plea to 2nd Enhancement/Habitual Paragraph: | N/A |
|---|---|---|---|
| Findings on 1st Enhancement Paragraph: | N/A | Findings on 2nd Enhancement/Habitual Paragraph: | N/A |

| Punished Assessed by: | Date Sentence Imposed: | | Date Sentence to Commence: |
|---|---|---|---|
| **JURY** | **3/14/2014** | | **3/14/2014** |

Punishment and Place of Confinement: **DEATH, INSTITUTIONAL ~~DIVISOIN~~ DIVISION, TDCJ**

| Fine: | Court Costs: | Restitution: | Restitution Payable to: |
|---|---|---|---|
| $ N/A | $ 744 | $ N/A | N/A |

| Time Credited: | If Defendant is to serve sentence in TDCJ, enter incarceration periods in chronological order. |
|---|---|
| | From 12/16/2005 to 3/14/2014   From   to   From   to |
| | From   to   From   to   From   to |
| | If Defendant is to serve sentence in county jail or is given credit toward fine and costs, enter days credited below. |
| | N/A DAYS   NOTES: N/A |

All pertinent information, names and assessments indicated above are incorporated into the language of the judgment below by reference.

This cause was called for trial in Harris County, Texas. The State appeared by her District Attorney.

**Counsel / Waiver of Counsel (select one)**

☒ Defendant appeared in person with Counsel.

☐ Defendant knowingly, intelligently, and voluntarily waived the right to representation by counsel in writing in open court.

It appeared to the Court that defendant was mentally competent and had pleaded as shown above to the charging instrument. Both parties announced ready for trial. A jury of twelve individuals was selected, impaneled, and sworn. The INDICTMENT was read to the jury, and defendant entered a plea to the charged offense. The Court received the plea and entered it of record.

The jury heard the evidence submitted and argument of counsel. The Court charged the jury as to its duty to determine the guilt or innocence of defendant, and the jury retired to consider the evidence. Upon returning to open court, the jury delivered its verdict in the presence of Defendant and defense counsel.

The Court received the verdict and ORDERED it entered upon the minutes of the Court.

**RECORDER'S MEMORANDUM**
This instrument is of poor quality
at the time of imaging

B Judgment of Conviction by Jury--Capital Murder (State seeks Death).doc Page 1 of 3

03103



The jury heard evidence relative to the question of punishment. The Court charged the jury and it retired to consider the special issues set out in the jury charge. After due deliberation, the jury was brought into Court, and, in open court, it returned its answers to the special issues as indicated below.

The jury found beyond a REASONABLE DOUBT that there is a probability that defendant would commit criminal acts of violence that would constitute a continuing threat to society.

☒ Yes (unanimous)
☐ No (by at least 10 jurors)

The jury found beyond a REASONABLE DOUBT that considering all the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed?

☐ Yes (by at least 10 jurors)
☒ No (unanimous)

Special Issues to be included if necessary:

**(If defendant is found GUILTY as a party under TEX. PEN. CODE §§ 7.01, 7.02)**
☐ The jury found beyond a REASONABLE DOUBT that the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken.

☐ Yes (unanimous)
☐ No (by at least 10 jurors)

**(If defendant has a mental impairment or defect)**
The jury found from a PREPONDERANCE OF THE EVIDENCE that defendant is a person with:
☐ Mental illness
☐ Mental retardation

The Court FINDS Defendant committed the above offense and ORDERS, ADJUDGES AND DECREES that Defendant is GUILTY of the above offense.

The Court ORDERS Defendant punished as indicated above. The Court ORDERS that the State of Texas shall recover all costs of the prosecution from the Defendant and that execution will issue.

**Punishment Options**

☐ **Confinement in Institutional Division.** The Court ORDERS the authorized agent of the State of Texas or the Sheriff of this County to take, safely convey, and deliver Defendant to the Director, Institutional Division, TDCJ. The Court ORDERS Defendant to be confined for the period and in the manner indicated above. The Court ORDERS TDCJ to make withdrawals from the Defendant's inmate account as such funds become available. The Court ORDERS TDCJ to pay such funds to the individual / agency cited above until the ordered restitution, court fees, costs, and fines are paid in full. TEX. GOV'T CODE § 501.014. The Court ORDERS Defendant remanded to the custody of the Sheriff of this county until the Sheriff can obey the directions of this sentence.

☒ **Death.** The Court ORDERS the authorized agent of the State of Texas or the Sheriff of this County to take, safely convey, and deliver Defendant to the **Director, Institutional Division, TDCJ.** Defendant shall be confined in said Institutional Division in accordance with the provisions of the law governing the Texas Department of Criminal Justice, Institutional Division until a date of execution of the said Defendant is imposed by this Court after receipt in this Court of mandate of affirmance from the Court of Criminal Appeals of the State of Texas. The Court **Orders** Defendant remanded to the custody of the Sheriff of this county until the Sheriff can obey the directions of this sentence.

**Execution**

☐ The Court ORDERS Defendant's sentence EXECUTED.

The Court ORDERS that Defendant is given credit noted above on this sentence for the time spent incarcerated.

The Court further ORDERS Defendant to pay restitution to the person(s) named above in the amount specified.

## Furthermore, the following special findings or orders apply:

**Deadly Weapon.**
The Court FINDS Defendant used or exhibited a deadly weapon, namely, a firearm, during the commission of a felony offense or during immediate flight therefrom or was a party to the offense and knew that a deadly weapon would be used or exhibited. TEX. CODE CRIM. PROC. art. 42.12 §3g.

**Signed and entered on March 14, 2014**

X _____
**KRISTIN M. GUINEY**
JUDGE PRESIDING

Ntc Appeal Filed: ___03/14/2014___ Mandate Rec'd: _____

After Mandate Received, Sentence to Begin Date is: _____

Right thumbprint



Received on _____ at _____ AM / PM

By:_____, Deputy Sheriff of Harris County

Clerk: J. OCHOA

EN/KR04 _999_  LCBT ⟨⟩  LCB4 ⟨⟩  EN/KR18 _999//R_

EN/KR02 _999//R0_

03105

Juan Balderas

Cause # 1462826

179 District Court.


(1 CD) Reporters Record

Volume 1-49

Exhibits: CX03, SX015 &
SX436


Trial Court Record

Juan Balderas

Cause # 1412896-A

179th District Court


(1CD) Reporter's Record

Post Conviction Writ

5/2/2018 &

5/11/2018


Vols 1-2 & 4-5

Juan Balderas

Cause # 1462826-A
174th District Court

(1 CD) Reporter's Record

Post Conviction Writ

5/11/18

Vol 3.
Seal Volume

Juan Balderas

Cause# 1412826-A

179th District Court


(1 CD) Reporter's Record

Post Conviction writ 8/17/2017


1 Volume

Juan Balderas

Cause # 1429896-A

174th District Court


(1 CD) Reporters Record

Post Conviction Writ  9/8/2016


1 Volume

Juan Balderas

Cause # 1412826-A

179th District Court

(1 CD) Reporter's Record

Post Conviction Writ 12/1/2015

1 Volume

Juan Balderas

Cause # 1428296-A

179th District court

(1 CD) Reporter's Record

Post Conviction Writ 10/27/2015

1 volume

Juan Balderas

Cause # 1412826-A

179th District Court


(1CD) Reporters Record.

Post Conviction Writ  3-31-2015


1 Volume

# JUAN BALDERAS

# CAUSE # 1412826-A

# 179ᵀᴴ DISTRICT COURT

# (1 CD REPORTER'S RECORD 1 VOLUME)

# POST CONVICTION WRIT 3-3-15

# JUAN BALDERAS

# CAUSE # 1412826-A

# 179TH DISTRICT COURT

# (1 CD REPORTER'S RECORD 1 VOLUME)

# POST CONVICTION WRIT 10-27-15

# JUAN BALDERAS

# CAUSE # 1412826-A

# 179TH DISTRICT COURT

# (1 CD REPORTER'S RECORD 1 VOLUME)

# POST CONVICTION WRIT 12-01-15

# JUAN BALDERAS

# CAUSE # 1412826-A

# 179TH DISTRICT COURT

# (1 CD REPORTER'S RECORD 1 VOLUME)

# POST CONVICTION WRIT 09/08/16

# JUAN BALDERAS

# CAUSE # 1412826-A

# 179TH DISTRICT COURT

# (1 CD REPORTER'S RECORD 1 VOLUME)

# POST CONVICTION WRIT 08-17-17

03110

# JUAN BALDERAS

# CAUSE # 1412826-A

# 179TH DISTRICT COURT

(1 CD REPORTER'S RECORD)

POST CONVICTION WRIT 5/2/18  (1-2 VOLUMES)

POST CONVICTION WRIT 5/11/18 (4-5 VOLUMES)

# JUAN BALDERAS

# CAUSE # 1412826-A

# 179TH DISTRICT COURT

# **SEAL VOLUME**

**(1 CD REPORTER'S RECORD)**

**POST CONVICTION WRIT (SEAL VOLUME 3)**

# JUAN BALDERAS

# CAUSE # 1412826

# 179TH DISTRICT COURT

# TRIAL COURT REPORTER'S RECORD

## (1 CD REPORTER'S RECORD)

## 1 THRU 9 VOLUMES

## EXHIBITS CX03, SX015 & SX436