# POST CONVICTION

FROM:                  179TH DISTRICT COURT.

RECEIVED IN
COURT OF CRIMINAL APPEALS

SEP 17 2018

Deana Williamson, Clerk

OF

BEST COPY AVAILABLE

HARRIS COUNTY, TEXAS

## JUAN BALDERAS
### 1412826-A

APPLICANT

VS.

THE STATE OF TEXAS

RESPONDENT

# VOLUME 5 OF 22

# IN THE 179TH DISTRICT COURT
# HARRIS COUNTY, TEXAS

| | | |
|---|---|---|
| **EX PARTE**<br>Juan Balderas,<br>    **APPLICANT** | )<br>)<br>)<br>)<br>)<br>) | **Trial Cause No.**<br>**1412826-A** |

## APPLICANT'S MOTION FOR RECONSIDERATION OF
## VERIFIED MOTION FOR RECUSAL

BENJAMIN WOLFF (No. 24091608)
Director, Office of Capital and Forensic Writs
(E-Mail: Benjamin.Wolff@ocfw.texas.gov)
DEREK VERHAGEN (No. 24090535)
(E-Mail: Derek.VerHagen@ocfw.texas.gov)
ERIN ECKHOFF (No. 24090910)
(E-Mail: Erin.Eckhoff@ocfw.texas.gov)
GRETCHEN S. SWEEN (24041996)
Office of Capital and Forensic Writs
1700 N. Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

**Attorneys for Applicant**

**FILED**
Chris Daniel
District Clerk

MAR 1 5 2016

Time: 10:25
By _____
Harris County, Texas
Deputy

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging.

# IN THE 179TH DISTRICT COURT
# HARRIS COUNTY, TEXAS

|  |  |
|---|---|
| EX PARTE<br>Juan Balderas,<br>APPLICANT | ) Trial Cause No.<br>) 1412826-A<br>)<br>)<br>) |

## APPLICANT'S MOTION FOR RECONSIDERATION OF
## VERIFIED MOTION FOR RECUSAL

Applicant Juan Balderas ("Applicant"), through his attorneys, the Office of Capital and Forensic Writs ("OCFW"), respectfully files this Motion for Reconsideration of his Verified Motion for Recusal. Reconsideration is warranted because (1) the Motion for Recusal was denied without holding a hearing as mandated by the Texas Rules of Civil Procedure; (2) the Motion for Recusal was denied based on a misapprehension of the legal and factual bases for which recusal was sought; and (3) the standard described in the Order denying the Motion for Recusal does not apply to the bases for recusal articulated in the motion.

## BACKGROUND RELEVANT TO RECONSIDERATION

On February 8, 2016, Applicant filed a Motion for Recusal under the Texas Rules of Civil Procedure, Rules 18a & 18b. (*See* Exhibit A.[1]) Rule 18a(f)(1)

---

[1] The facts and legal argument in that motion are incorporated here by reference.

describes the "Duties of the Respondent Judge" in the wake of a recusal motion. The Rule required the Honorable Judge Kristin Guiney "within three business days after the motion is filed" to "either: (A) sign and file with the clerk an order of recusal or disqualification; or (B) sign and file with the clerk an order referring the motion to the regional presiding judge." TEX. R. CIV. P. 18a(f)(1).

On February 12, 2016, four days after the Motion for Recusal was filed, Judge Guiney informed the OCFW via e-mail that she intended to deny the motion, thus declining to voluntarily recuse herself under Rule 18a(f)(1)(A). Applicant received no formal notice of that decision or a copy of a signed "order referring the motion to the regional presiding judge" from the district clerk's office.

At some point, the Motion for Recusal was seemingly referred to the Honorable Judge Olen Underwood, Administrative Judge for the Second Administrative Judicial Region of Texas.

On March 3, 2016, nearly a month after the Motion for Recusal was filed, Judge Underwood signed an "Order Denying Applicant's Verified Motion for Recusal." (*See* Exhibit B (hereafter "Order").) The Motion for Recusal was denied without a hearing. (*See id.*) The OCFW received a copy of the Order by fax that same day.

The Order contends that the Motion for Recusal "complains of the trial judge's rulings and actions in the case, but does not allege extra-judicial conduct on the part

3

of the trial judge that would constitute a basis for a recusal[,]" citing Texas Rule of Civil Procedure 18a(a)(3). (*Id.*) The Order further states that "[a] judge's conduct during a case does not constitute a basis for recusal unless it indicates a high degree of favoritism or antagonism that renders fair judgment impossible[,]" citing cases. (*Id.*)

Because the Motion for Recusal was summarily denied without a hearing, because the basis described in the Order for rejecting the motion is contrary to the relevant facts, and because the standard described in the Order does not apply to the bases for recusal urged, Applicant respectfully files this Motion for Reconsideration.

## REASONS JUSTIFYING RECONSIDERATION

The Order should be reconsidered because it rests on the following misapprehensions of fact and law:

First, the Order was issued without the Court first holding a hearing as mandated by statute.

Second, the Order incorrectly states that the motion fails to allege conduct on the part of the trial judge that could constitute the basis for a recusal.

Third, the Order relies on a standard that is contrary to the statutory grounds for recusal argued in the motion. The motion was based on two statutory grounds that require recusal. The primary basis for recusal is found in Rule 18b(b)(1): "A judge must recuse in any proceeding in which . . . [her] impartiality might reasonably

4

be questioned[.]" TEX. R. CIV. PROC. 18b(b)(1). The second basis for recusal is found in Rule 18b(b)(3): "A judge must recuse in any proceeding in which . . . the judge has personal knowledge of disputed evidentiary facts concerning the proceeding[.]" TEX. R. CIV. PROC. 18b(b)(3).

For each of these distinct reasons, as explained further below, reconsideration of the Order denying the Motion for Recusal is warranted.

### ARGUMENT & AUTHORITIES

### I. Reconsideration Is Warranted Because the Motion for Recusal Was Denied Without the Requisite Hearing.

Applicant's Motion for Recusal was denied without a hearing. (*See* Exhibit B.) The rules, however, require that the administrative judge hold a hearing on a recusal motion and "[t]he motion must be heard as soon as practicable and may be heard immediately after it is referred to the regional presiding judge or an assigned judge." TEX. R. CIV. P. 18a(g)(6)(A). Notice of the hearing must be given to all parties in the case. TEX. R. CIV. P. 18a(g)(6)(B). Only a noncompliant recusal motion "may be denied without an oral hearing." TEX. R. CIV. P. 18a(g)(3)(A). But an order denying a recusal motion without a hearing "must state the nature of the noncompliance." *Id.*

The statutory language regarding a hearing is mandatory: "the motion *must be heard*[.]" TEX. R. CIV. P. 18a(g)(6)(A) (emphasis added). The motion was indisputably denied without a hearing. Moreover, the Order denying the motion

5

01318

does not suggest that the Motion for Recusal was somehow noncompliant. To summarily deny a recusal motion, the judge to whom it has been referred "*must* state the nature of the noncompliance." TEX. R. CIV. P. 18a(g)(3)(A) (emphasis added).

Because the Motion for Recusal was denied without a hearing and without suggesting or demonstrating "noncompliance," the Court had no discretion to deny the motion without a hearing. Therefore, doing so was erroneous as a matter of law. On this basis alone, the decision to deny the Motion for Recusal should be reconsidered.

## II. Reconsideration Is Warranted Because the Order Incorrectly States That the Motion for Recusal Fails to Allege Conduct on the Part of the Trial Judge That Could Constitute the Basis for a Recusal.

The Order states that Applicant failed to provide a valid basis for recusal. The Order does not mention either of the two statutory bases for recusal urged in the Motion for Recusal. Instead, the Order cites *Grider v. Boston Co.*, 773 S.W.2d 338 (Tex. App.—Dallas 1989, writ denied), *disapproved of on other grounds by Texas Commerce Bank, N.A. v. Grizzle*, 96 S.W.3d 240 (Tex. 2002) and Texas Rule of Civil Procedure 18a(a)(3). Neither of these authorities is relevant to the Motion for Recusal.

### A. *Grider* Is Inapposite Authority.

For multiple reasons, *Grider* is not helpful authority.

6

First, the plaintiffs in *Grider*, in appealing the trial court's decision to enter judgment against them notwithstanding the jury's verdict, also suggested on appeal that there had been an error for failing to recuse the trial judge. 773 S.W.2d at 346. But because the plaintiffs "did not file the statement of facts from the recusal hearing, providing no record on appeal that might enable [the court of appeals] to weigh the evidence leading to the denial of the motion," the recusal issue had not been preserved. *Id.* In other words, *Grider*'s brief discussion of the recusal issue is all dicta because the issue had not been preserved for appeal.

Second, the only basis the *Grider* plaintiffs had seemingly offered for the recusal was "that the trial judge [had] exhibited an antagonistic attitude toward them and that his rulings were consistently unfair." *Id.* This argument bears no resemblance to the arguments made in Applicant's Motion for Recusal. Applicant has neither alleged an actual bias on Judge Guiney's part nor sought recusal based on a perception that her rulings all reflected a bias. Rather, Applicant's Motion for Recusal is based on Judge Guiney's extra-record conduct with respect to extraneous influences on the jury, which were only fully discovered during the post-conviction investigation and now form the basis for constitutional claims that Applicant's right to due process was violated.

Third, the standard invoked in the nonbinding *Grider* is not the correct one. *Grider* correctly asserts that recusal based on ***actual bias*** requires that "a judge's

7

bias must be extrajudicial and not based upon in-court rulings," citing *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966); but that dicta misses the mark. Far more recently, the Supreme Court has emphasized that, in the interest of due process, recusal may be required "whether or not actual bias exists or can be proved." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 886 (2009). An adjudicator must apply an objective standard to determine whether the facts could reasonably give rise to a *suspicion* of bias or partiality. Thus, instead of *Grider*, the Court should have looked to *Caperton* and other helpful and binding U.S. Supreme Court precedents.[2]    As the Supreme Court noted decades ago "it is difficult if not

---

[2] Indeed, this very term, the Supreme Court is looking at whether a state appellate judge, who had been the elected prosecutor in a death case when it was tried, could be expected to assess whether his former office's conduct had somehow violated the defendant's due process rights. *See Williams v. Pennsylvania*, 15-5040, argued Feb. 29, 2016. The issues certified and argued in *Williams* are: (1) Whether the Eighth and Fourteenth Amendments are violated where a state supreme court justice declines to recuse himself in a capital case in which he had personally approved the decision to pursue capital punishment against the defendant in his prior capacity as an elected prosecutor and continued to head the prosecutors' office that defended the death verdict on appeal, and where he had publicly expressed strong support for capital punishment during his judicial election campaign by referencing the number of defendants he had "sent" to death row, including the defendant in the case now before the court; and (2) whether the Eighth and Fourteenth Amendments are violated by the participation of a potentially biased jurist on a multimember tribunal deciding a capital case, regardless of whether his vote is ultimately decisive. In other words, *Williams* is far more instructive than the inapposite *Grider*. But here we have an even more palpable conflict of interest. We are not dealing with a prosecutor (who did not try the case) assessing the prosecution's conduct as an appellate judge; we are dealing with a less tenuous conflict where the trial judge being asked to assess her *own* conduct in a post-conviction appeal.

. 01321

impossible for a judge to free [herself] from the influence of what took place" and objectively judge her own conduct. *In re Murchison*, 349 U.S. 133, 136 (1955) (finding judge violated due process by sitting in the criminal trial of defendant whom he had indicted).

### B. The Motion for Recusal Is Not at Odds with Rule 18a(a)(3).

Rule 18a(a)(3) states that a recusal motion "must not be based *solely* on the judge's ruling in the case." TEX. R. CIV. P. 18a(a)(3) (emphasis added). As explained at length in the Motion for Recusal, the motion was not based "solely" on any of Judge Guiney's rulings—including her decision to deny a motion for mistrial made after the sequestered jury perceived an innocuous wave by Applicant's brother as an effort to intimidate, sparking fear and panic. The Motion for Recusal was based on a whole series of actions only uncovered through the post-conviction investigation and thus not reflected in the trial record. The totality of incidents that warrant Judge Guiney's recusal are the basis for a due process claim described and amply supported in the Application for habeas relief. (*See* Application, Claim Five at 135-63 (explaining that "Mr. Balderas's Due Process Rights Were Violated By The Court's Failure To Address Prejudicial, Extraneous Influences On The Jury").) By definition, habeas relief is not based "solely" on rulings that can be addressed through a direct appeal; habeas claims require recourse to extra-record evidence. *See* TEX. CODE CRIM. PRO., art. 11.071.

**III.** **Reconsideration Is Warranted Because a Standard Was Applied That Is Inapplicable to the Actual Bases for Recusal Urged in the Motion for Recusal.**

The dispositive facts relevant to the Motion for Recusal are that the substance of Claim Five is such that (1) a reasonable person knowing the relevant facts and circumstances would conclude that Judge Guiney's "impartiality might reasonably be questioned" with respect to adjudicating that claim; and (2) she "has personal knowledge of disputed evidentiary facts concerning" that claim. TEX. R. CIV. PROC. 18b(b)(1) & (3). Each of these is an independent legal basis for recusal. Therefore, the cases cited in the Order suggesting that Applicant must show a "high degree of favoritism or antagonism" are not relevant because Applicant has not alleged actual bias.

The Order cites *Sommers v. Concepcion*, 20 S.W.3d 27 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). In *Sommers*, the appellant had argued that recusal was required because (1) the judge was actually biased and (2) the judge was a witness in the proceeding. Again, Applicant here did not allege actual bias, which, as *Sommers* explains, does require proof of "a high degree of favoritism or antagonism that renders fair judgment impossible." *Id.* at 41. That is not the standard for recusal under Rule 18b(b)(1). As for the second basis for recusal at issue in *Sommers*, it was rejected because the judge was not in fact a material witness in the proceeding in question but had instead been called as a witness in another

10

proceeding, a disciplinary proceeding. *Id.* at 42. As explained below, the nature of Claim Five is such that Judge Guiney would be a witness in the very same proceeding in which that claim must be adjudicated.

The Order also cites *Ludlow v. Deberry*, 959 S.W.2d 265 (Tex. App.— Houston [14th Dist.] 1997, no pet.), which is similarly in apposite. In *Ludlow*, the problem was that recusal was sought *solely* based on "judicial statements regarding the case and made during the course of the proceedings." *Id.* at 283. "A judge's opinion, produced properly and necessarily during the course of the proceedings, does not render the trial judge recusable for bias or impartiality." *Id.* at 284 (citing *Liteky v. United States*, 510 U.S. 540, 550-552 (1994)). But Applicant does not seek Judge Guiney's recusal because of any opinions she produced "during the course of the proceedings." *Id.* at 283. Instead, recusal is based on the objective conclusion that, in light of the facts raised in the habeas Application, her "impartiality might reasonably be questioned" and because she "has personal knowledge of disputed evidentiary facts concerning" this habeas proceeding. TEX. R. CIV. PROC. 18b(b)(1) & (3).

## A. Recusal Is Mandated Because Judge Guiney's Impartiality Might Reasonably Be Questioned.

One of the two legal bases Applicant invoked in seeking recusal is that Judge Guiney's "impartiality might reasonably be questioned" under Rule 18b(b)(1) because, to adjudicate one of the claims in the habeas Application, Judge Guiney

11

will have to pass judgment on her own conduct. (*See* Exhibit A.) The appearance of impartiality, not actual bias, is the standard. *See* TEX. R. CIV. PROC. 18b(b)(1);[3] *see also Rosas v. State*, 76 S.W.3d 771 (Tex. App.– Houston [1st District] 2002, no pet.) (explaining "[r]ecusal is appropriate if the movant has provided enough facts to establish that a reasonable person, knowing all the circumstances involved, would harbor doubts as to the impartiality of the trial court" such that the movant would be denied due process); *accord In Potashnick v. Port City Constr. Co.*, 609 F.2d 1101, 1111 (5th Cir. 1980) (ordering recusal and stating "a judge faced with a potential ground for disqualification ought to consider how his participation in a given case looks to the average person on the street.").[4]

Moreover, Rule 18b states that judges *must* recuse themselves in any proceeding in which their impartiality might reasonably be questioned: "A judge must recuse in any proceeding in which . . . the judge's impartiality might reasonably be questioned.'" TEX. R. CIV. PROC. 18b(b)(1). That is, "[t]he language is

---

[3] Texas Code of Criminal Procedure Article 30.01 provides grounds for disqualification in criminal matters, while the grounds and procedures for recusal are covered by Texas Rules of Civil Procedure 18a and 18b. *See Arnold v. State*, 853 S.W.2d 543, 544 (Tex. Crim. App. 1993).

[4] Texas courts have recognized that the language of Texas Rule of Civil Procedure 18b(2)(a) is substantially identical to that of 28 U.S.C. § 455(a), the federal recusal statute; thus Texas courts have relied on cases interpreting Section 455(a) when considering motions for recusal and disqualification. *See, e.g., Ludlow v. Deberry*, 959 S.W.2d 265, 271 n.3 (Tex. App.—Houston [14th Dist.] 1997, no pet.) (citing *Eckerdt v. Frostex Foods, Inc.*, 802 S.W.2d 70, 72 (Tex. App.—Austin 1990, no writ)).

01325

imperative and mandatory, not permissive or discretionary." *Rogers v. Bradley*, 909 S.W. 2d 872, 873 (Tex. 1995).

Texas courts have repeatedly emphasized the compelling public policy interest—as distinct from any constitutional, statutory, or common law grounds—in ensuring the appearance of an impartial judiciary. "After all[,] the impartial standard has been adopted in order that the public, *i.e.*, the person on the street, might have confidence in the judiciary and to protect judges from unjustified complaints about their being partial in their decision." *Aguilar v. Anderson*, 855 S.W.2d 799, 804-805 (Tex. App.—El Paso 1997, writ denied) (Osborn, C.J., concurring). This appearance-of-impartiality standard is not unique to Texas because it is grounded in fundamental public policy rationales about how best to preserve the integrity of the judicial process under the federal Constitution.[5]

---

[5] *See, e.g., Watson v. State*, 934 A.2d 901, 907 (Del. Super 2007) (holding "the appearance of bias . . . was sufficient to doubt the Family Court judge's ability to weigh the truthfulness of the two contending antagonists' testimony impartially"); *Love v. State*, 569 So.2d 807, 810 (Fla. App. 1990) (finding ex parte communications violates appearance of impartiality); *Scott v. United States*, 559 A.2d 745, 754 (D.C. App. 1989) ("The appearance of partiality, and not only actual partiality, constitutes a statutory" basis for recusal); *People v. DelVecchio*, 544 N.E.2d 312, 317 (Ill. App. 1989) (identifying a "guiding principle is whether the average person, acting as judge, could not hold nice, clear, and true balance between the State and the accused"); *Giralt v. Vail Village Inn Assoc.*, 759 P.2d 801, 804 (Colo. App. 1988) (explaining trial court has duty "to eliminate every semblance of reasonable doubt or suspicion that a trial by a fair and impartial tribunal may be denied"); *Commonwealth v. Lemanski*, 529 A.2d 1085, 1088 (Pa. Super. 1987) ("Recusal is required whenever there is a substantial doubt as to a jurist's ability to preside impartially."); *Isaacs v. State*, 355 S.E.2d 644, 645 (Ga. 1987) ("The fact that a

Due process requires that a judge be neutral and free from bias. *See, e.g.,* *Johnson v. Pumjani*, 56 S.W.3d 670, 672 (Tex. App.—Houston [14th Dist.] 2001, no pet.) ("One of the most fundamental components of a fair trial is 'A neutral and detached judge.'") (quoting *Metzger v. Sebek*, 892 S.W.2d 20, 37 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (quoting *Ward v. Village of Monroeville*, 409 U.S. 57, 62 (1972)). The impartiality of a judge has two components: a judge must both *be* impartial and *appear to be* impartial so that no doubts or suspicions exist as to the fairness or integrity of the court. *See, e.g., Sun Exploration and Prod. Co. v. Jackson*, 783 S.W.2d 202, 206 (Tex. 1989) ("The judiciary must be extremely diligent in avoiding any appearance of impropriety and must hold itself to exacting standards lest it lose its legitimacy and suffer a loss of public confidence."); *CNA Ins. Co. v. Scheffey*, 828 S.W.2d 785, 792 (Tex. App.—Texarkana 1992, writ denied) ("Judicial decisions rendered under circumstances that suggest bias, prejudice or favoritism undermine the integrity of the courts, breed skepticism and mistrust, and thwart the principles on which the judicial system is based.") (citation omitted). *See also* 46 AM JUR. 2D, Judges § 86.

---

judge's impartiality might reasonably be questioned is sufficient for disqualification."); *Wiedemann v. Wiedemann*, 36 N.W.2d 810, 812 (Minn. 1949) ("The controlling principle is that no judge, when other judges are available, ought ever to try the cause of any citizen, Even though he be entirely free from bias in fact, if circumstances have arisen which give a bona fide appearance of bias to litigants.").

14

As explained in the Motion for Recusal, Judge Guiney cannot reasonably be expected to pass judgment with respect to her own extra-record conduct (not her rulings) that is at issue here. (*See* Exhibit A at "Facts Relevant to Recusal.") Judges must be recused when they become part of the "accusatory process." *In re Murchison*, 349 U.S. 133, 137 (1955). This course comports with common sense as well as with the foundational legal values described above.

In other words, as explained in the Motion for Recusal, Judge Guiney's "impartiality might reasonably be questioned" by an objective observer because her own conduct is a subject to be adjudicated in the Article 11.071 proceedings. TEX. R. CIV. PROC. 18b(b)(1). The Order on the Motion for Recusal does not, however, address this legal ground mandating recusal. Therefore, reconsideration is warranted.

### B. Recusal Is Mandated Because Judge Guiney Has Personal Knowledge of Disputed Evidentiary Facts Concerning a Claim Asserted in the Application.

The second distinct legal basis Applicant invoked in seeking recusal is that Judge Guiney "has personal knowledge of disputed evidentiary facts concerning the proceeding." (*See* Exhibit A at 16 (quoting under Rule 18b(b)(3)).) In other words, Applicant also seeks recusal because Judge Guiney is a material witness with respect to the facts that give rise to Claim Five. (*See id.* at 2-16.)

15

When a judge "has personal knowledge of disputed evidentiary facts concerning the proceeding," recusal is required. TEX. R. CIV. P. 18b(b)(3). In part, this is because the Rules of Evidence prohibit a presiding judge from testifying as a witness; thus not requiring the judge to recuse herself could deprive a party of a necessary witness. TEX. R. EVID. 605.

Judge Guiney is a witness with respect to key facts underlying Claim Five in this habeas proceeding, including, but not limited to:

- What knowledge, if any, Judge Guiney or her staff had about where the jurors would be accommodated on the first night of sequestration;

- When she or her staff became aware of the conditions of the accommodation and/or its proximity to the crime scene;

- How she became aware of the conditions and proximity;

- What was the content of the apparent off-the-record conversations regarding the accommodation;

- What reasons, if any, Judge Guiney had for not inquiring further into the effect the accommodations had on the jury;

- When she or her staff became aware of the incident involving Mr. Balderas's brother waving at the jury's bus;

- How she found out about the incident and what she was told about it;

- To the extent she was aware of the incident before the guilty verdict was returned, why she did not address the matter until hours after the verdict was returned; and

- When she first informed trial counsel of the incident.

16

In other words, as explained in the Motion for Recusal, Judge Guiney "has personal knowledge of disputed evidentiary facts concerning the proceeding[.]" TEX. R. CIV. PROC. 18b(b)(3). The Order on the Motion for recusal does not, however, address this legal ground mandating recusal. Therefore, reconsideration is warranted.

## CONCLUSION AND PRAYER FOR RELIEF

For the foregoing reasons, Applicant respectfully asks that this Court reconsider the Order denying the Motion for Recusal without a hearing. The Applicant further asks that the Court schedule a hearing on the Motion for Recusal forthwith and thereafter grant the motion as well as any further relief the Applicant shows that justice requires.

Respectfully submitted,

DATED: March 9, 2016

By _____

DEREK VERHAGEN
Post-Conviction Attorney

17

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Motion for Reconsideration to:

Paula Gibson
Criminal Post-Trial
Harris County District Clerk
1201 Franklin Street, 3rd Floor
Suite 3180
Houston, TX 77002

Judge Olen Underwood
Presiding Judge
Second Administrative Judicial
Region of Texas
301 North Thompson
Suite 102
Conroe, TX 77301

Harris County District Attorney
c/o Lynn Hardaway
1201 Franklin
Suite 600
Houston, TX 77002

Judge Kristin M Guiney
179th District Court
1201 Franklin Street
15th Floor
Houston, TX 77002

Juan Balderas
TDCJ # 999590
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, TX 77351

This certification is executed on March 9, 2016, at Austin, Texas.

_____
DEREK VERHAGEN

18

# Exhibit A

# IN THE 179TH DISTRICT COURT
# HARRIS COUNTY, TEXAS

|  | |  |
|---|---|---|
| EX PARTE<br>Juan Balderas,<br>APPLICANT | )<br>)<br>)<br>)<br>)<br>) | Cause No.<br>1412826-A |

## APPLICANT'S VERIFIED MOTION FOR RECUSAL

BENJAMIN WOLFF (No. 24091608)
Director, Office of Capital and Forensic Writs
(E-Mail: Benjamin.Wolff@ocfw.texas.gov)
DEREK VERHAGEN (No. 24090535)
(E-Mail: Derek.VerHagen@ocfw.texas.gov)
ERIN ECKHOFF (No. 24090910)
(E-Mail: Erin.Eckhoff@ocfw.texas.gov)
Post-Conviction Attorneys

Office of Capital and Forensic Writs
1700 N. Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

# IN THE 179TH DISTRICT COURT
## HARRIS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| EX PARTE | ) | Cause No. |
| Juan Balderas, | ) | 1412826-A |
| APPLICANT | ) | |
|  | ) | |
|  | ) | |

## APPLICANT'S VERIFIED MOTION FOR RECUSAL

Applicant Juan Balderas, through his attorneys, the Office of Capital and Forensic Writs ("OCFW"), respectfully files this Verified Motion for Recusal under the Texas Rules of Civil Procedure, Rules 18a & 18b(b). Mr. Balderas asks that Judge Kristin Guiney recuse herself from presiding over this cause because, in light of the factual circumstances, her impartiality might reasonably be questioned with respect to adjudicating the Initial Application for Writ of Habeas Corpus ("Application") now pending before her, and because she has personal knowledge of disputed evidentiary facts.

Specifically, the Application requires adjudicating a due process claim arising from Judge Guiney's failure to timely and properly address prejudicial, extraneous influences on the jury. Although Mr. Balderas does not contend that Judge Guiney harbors actual bias or prejudice concerning any party, the specific circumstances at

1

issue here require recusal. In support of this motion, Mr. Balderas respectfully shows the following:

## FACTS RELEVANT TO RECUSAL

Mr. Balderas is confined under a sentence of death pursuant to this Court's judgment, which was rendered on March 14, 2014. (CR at 3355-57.)[1] Judge Guiney presided over the capital trial and pronounced judgment.

Thereafter, Judge Guiney appointed the OCFW to represent Mr. Balderas in his state post-conviction habeas proceedings. (CR at 3363.) The OCFW investigated the basis for claims and then filed his Application, raising constitutional challenges to the legitimacy of his conviction and death sentence, pursuant to Code of Criminal Procedure Article 11.071. The Application contains, *inter alia*, the following claim:

> Mr. Balderas's Due Process Rights Were Violated By The Court's Failure To Address Prejudicial, Extraneous Influences On The Jury.

*See* Application,[2] Claim Five at pp. 135-63.[3]

---

[1] "CR" refers to the Clerk's Record in Mr. Balderas's trial. "RR" refers to the Reporter's Record in Mr. Balderas's trial. All RR excerpts cited here are found in Exhibit A. All CR excerpts cited are found in Exhibit B.

[2] An excerpted form of Claim Five of the Application can be found in Exhibit K.

[3] The State's Answer to the Application is currently due on May 14, 2016. The instant motion is, therefore, filed before the Application is ripe for adjudication and thus is timely. *See* TEX. R. CIV. PROC. 18a(b).

In Claim Five of the Application, Mr. Balderas alleges that Judge Guiney violated Mr. Balderas's due process rights in two respects. First, the Court made no effort to determine whether the jury was improperly influenced by their overnight stay near the crime scene on the first night of sequestration during guilt/innocence phase deliberations. Second, the Court did not timely and properly inquire into the jurors' ability to remain impartial following an event on the second night of sequestration where the jurors felt that a third-party had threatened them. Claim Five is based on the following facts:

### First Night of Jury Sequestration

During the guilt/innocence phase of Mr. Balderas's trial, the jury deliberated for more than two days before finally reaching a verdict. The jury began deliberating on Tuesday, February 25, 2014, at around 11:10 a.m. and continued until 6:45 p.m., at which point they were sequestered until deliberations could continue the next day. (30 RR at 64, 72-75.) The following morning, Judge Guiney apologizes to the jury on the record for their accommodations the night before. (31 RR at 7.) Judge Guiney denied having any responsibility for selecting the accommodations, asserting that it "was beyond [her] control." (*Id.*) She then promised the jury that she would ensure that they would not stay at that particular establishment again if deliberations continued. (*Id.*) She noted that "the drive might be a little longer, but we will find you more suitable accommodations." (*Id.*)

3

Despite acknowledging that the juror accommodations had been problematic, Judge Guiney did not inquire into whether and how the accommodations may have affected the jurors' ability to remain impartial. Had Judge Guiney made the proper inquiry, she would have discovered that the frightening experience the night before had influenced them profoundly.

Post-conviction investigation revealed that on the first night of sequestration, the jury had been bused to a "terrible, seedy" Motel 6 more than ten miles from the courthouse. (Ex. D at ¶ 4 [Aff. of Juror Birney].) As they arrived, the jurors "were talking about how they thought the place was scary or dangerous," to the point where "[n]o one seemed comfortable there." (Ex. D at ¶ 4 [Aff. of Juror Birney]; Ex. C at ¶ 5 [Aff. of Juror Armstrong].) The bailiffs even visited the jurors in their rooms, telling them "to keep our doors closed and locked" and "not to come out." (Ex. D at ¶ 4 [Aff. of Juror Birney].)

Even more significant than the "terrible" condition of the motel itself was its location in Southwest Houston. (Ex. D at ¶ 4 [Aff. of Juror Birney]; Ex. E at ¶ 5 [Aff. of Juror Browning-McCauley].) There are two Motel 6 locations that fit the jurors' descriptions: one on West Sam Houston Parkway (also known as "Beltway 8"), and the other on South Loop West. (*See* Ex. J [State's Exhibit 8].) Significantly, both locations were situated near the crime scene in gang territory discussed during Mr. Balderas's trial. The West Sam Houston Parkway Motel 6—located near the

4

intersection of Sam Houston Parkway and Westheimer Road—was only 3.5 miles due north from the crime scene—located near the intersection of Sam Houston Parkway and Bellaire Boulevard—where the victim, Eduardo Hernandez, was killed. (*See id.*; 24 RR at 127-29.) This Motel 6 was only 1.5 miles from 11490 Harwin Drive—where, as the jury learned during testimony, Mr. Balderas lived and was arrested. (*See* Ex. J [State's Exhibit 8]; 25 RR at 205-10; 26 RR at 83-88.) The other Motel 6, located near the intersection of I-610 and South Main Street/Hwy. 90 on South Loop West, was situated south of South Braeswood Boulevard and just one block north of West Bellfort Avenue—names familiar to the jurors after hearing Israel Diaz's testimony regarding the Braeswood and West Bellfort barrios of the La Tercera Crips street gang only days before. (*See, e.g.*, Ex. J [State's Exhibit 8]; 26 RR 127-135.)

Many jurors immediately realized that they were staying "near the murder scene," *see* Ex. D at ¶ 4 [Aff. of Juror Birney]; Ex. F at ¶ 4 [Aff. of Juror Norwood]; Ex. H at ¶ 4 [Aff. of Juror Sullivan]; Ex. E at ¶ 5 [Aff. of Juror Browning-McCauley], and the next morning, the jurors discussed the motel's proximity to the crime scene at breakfast. (Ex. C at ¶ 6 [Aff. of Juror Armstrong]; Ex. G at ¶ 5 [Aff. of Juror Orosz]; Ex. H at ¶ 5 [Aff. of Juror Sullivan].)

The motel location was so important to the jurors that they raised it with the bailiffs the next day and, in turn, the bailiffs seemed to have informed the Court at

. 01338

some point. Two or three of the other jurors "gave a big sigh of relief when we were told they would move us to a different hotel because they all struggled with it." (Ex. G at ¶ 5 [Aff. of Juror Orosz].) One juror felt it was "freaky that we were down in that area" near the crime scene discussed in trial testimony and "would have preferred to be elsewhere." (Ex. F at ¶ 4 [Aff. of Juror Norwood].) Another juror found it "unnerving" that the jury was sequestered near the crime scene. (Ex. H at ¶ 5 [Aff. of Juror Sullivan].) Indeed, one juror wondered whether "any of us jurors slept that night." (Ex. E at ¶ 5 [Aff. of Juror Browning-McCauley].) Unsurprisingly, at least one juror stated that staying near the crime scene that night "*made me think of the crime.*" (Ex. C at ¶ 5 [Aff. of Juror Armstrong] (emphasis added).) None of this information was uncovered at the time of trial, however, because Judge Guiney failed to question jurors about this extraneous influence and its effect.

### Second Night of Jury Sequestration

After spending the first night of sequestration near the crime scene, the jury continued their deliberations the next morning. (31 RR at 4.) That afternoon, the jury sent a note to the Court indicating that they were deadlocked. (*Id.* at 20.) Trial counsel moved for a mistrial, noting that the jury had been deliberating for fourteen hours at that point, but the Court denied that motion. (*Id.* at 21-23.) Instead, the Court read the jury an *Allen* charge at around 3:50 p.m. that day. (*Id.* at 24.) The

6

jury then continued to deliberate until about 5 p.m. that evening, at which point they were again sequestered for the night. (*Id.* at 27.)

The following morning, the jury deliberated for two hours before returning a guilty verdict. ***Then, hours after the jury had delivered its verdict***, Judge Guiney finally went on the record to acknowledge that the bailiff had told her "this morning in chambers" about a second incident that had occurred with the jurors the night before. (32 RR at 12.) At that point, the Court asked the bailiff who had reported the incident, to provide "a summation" of what he had told the Court earlier "[f]or efficiency [sic] sake." (*Id.*) The bailiff explained that as the jury was leaving the courthouse the afternoon before they saw a man, whom they recognized as Mr. Balderas's brother, wave and smirk at them as they drove by. Several of the jurors were "very alarmed" by the situation and one juror even demanded that she be able to call home to her family. (*Id.* at 12-16.)

The Court asked the bailiff to go back to the jury room and bring out jurors he thought the Court should hear from: "Can you just go back there and ask, would you recognize them and what's your name. Don't say who saw anything on the bus. Just ask their names so you can report back to us." (32 RR at 16-17.) The next event captured on the record is Juror Birney's testimony regarding the waving incident and its effect on her. (*Id.* at 17-21.)

7

Juror Birney testified that she herself did not see the man wave, that another juror alerted her to it on the bus, and that "they stopped the bus and both deputies got off." (32 RR at 17.) She testified that she "felt cautious" and saw the event "potentially was a tactic to intimidate or threaten," but claimed that the event did not weigh in her deliberation earlier that morning. (*Id.* at 18.)

After being informed by the bailiff that Juror Trujillo "was the main one" of the jurors who saw the wave, trial counsel asked to speak with her on the record as well, and the Court agreed. (32 RR at 22.) Juror Trujillo testified that she saw the wave after someone else on the bus pointed it out, and that someone else identified the person waving as Mr. Balderas's brother. (*Id.* at 23-24.) Juror Trujillo then testified that she did not understand how Mr. Balderas's brother was able to wave at them because the bailiffs "were supposed to keep people away from us." (32 RR at 26.) She further testified that she was still "concerned" and had raised her concerns with the bailiffs again that morning. (*Id.*) Finally, she claimed that, regardless of her concern, the event did not weigh in her guilt/innocence deliberation. (*Id.*)

Trial counsel again moved for a mistrial, arguing that "the verdict was reached as a result of an outside influence, that it influenced the jurors to—if that [sic] were holding out for the defense, to change their vote." (32 RR at 28.) As a result, counsel argued, the verdict "violates the defendant's right to a [sic] impartial jury" and "due

8

process and to a fair trial." (*Id.*) The Court summarily denied the motion, without explanation. (*Id.* at 29.)

Post-conviction investigation revealed that Judge Guiney was actually aware of the highly inflammatory extraneous influence *before* the jury reached its guilty verdict, yet did not address the issue with jurors until hours after the verdict was returned.[4] Courtroom witness Yancy Escobar recalled that "Judge Guiney, the judge presiding over Juan's trial, often handled other cases during trial breaks and jury deliberations, and she had a full courtroom of people that morning." (Ex. I at ¶ 11 [Aff. of Escobar].) For its part, the Court agreed, noting that there were "easily over 45 defendants and family members still sitting in the audience" at around 10 a.m. (32 RR at 22-23.)

Escobar recalled:

Shortly after Judge Guiney started hearing cases at the bench, I noticed that one of the bailiffs came into the courtroom through the door used by the jury. The bailiff was an African American man in his 40s. The bailiff went straight up to the judge. I could not hear exactly what they were talking about, but I could tell from their body language that something had happened. Immediately after Judge Guiney was done

---

[4] There is also indication in the record that Judge Guiney was likely aware of the incident before the jury returned its verdict. The Court had informed jurors at the close of the second day of deliberations that it would be in contact with the bailiffs as needed while the jurors were sequestered. "If there is an emergency this evening, I will be contacted." (31 RR at 27.) It seems unlikely that "hysteria" amongst jurors—which compelled the bailiffs to stop the bus in order to give chase, which in turn prompted a juror to demand to call home in contravention of the Court's admonishments—would not constitute an "emergency" about which the Court would have been apprised.

01342

talking to the bailiff, she called both the prosecutors and Juan's attorneys up to the bench to speak with her.

As soon as it was done, one of Juan's attorneys, Jerome Godinich, headed out of the courtroom. He had an angry and upset look on his face. As he walked by us in the courtroom, he gestured that we should meet him in the hallway, and Juan's family and I followed him out.

In the hallway, Mr. Godinich informed us that *the judge had said the jury had been scared the night before after seeing Juan's brother Ivan waving toward them on the bus with a smirk on his face, and that the jury was very frightened by it.*

(Ex. I at ¶¶ 11-13 [Aff. of Escobar] (emphasis added).) Notably, Escobar recalled

that all of this occurred before the Court brought the jury out at 10 a.m. for a read-

back of trial testimony. After the read-back, the Court allowed the jury to resume

deliberations while she "continued to hear other cases." (*Id.* at ¶ 15; CR at 3432.)

Judge Guiney's failure to address the issue with the jurors before they returned

a verdict was immensely prejudicial. Several jurors have since given statements

detailing the "hysteria" that surrounded the incident. According to the jury foreman,

"some of the jurors flipped out and were vocalizing their concern" after the incident

and "some of the jurors were really creeped out." (Ex. F at ¶ 5 [Aff. of Juror

Norwood].) Juror Orosz agreed that some of the jurors "flipped out" on the bus after

seeing the wave, and that "[t]hey seemed alert and afraid." (Ex. G at ¶ 6 [Aff. of

Juror Orosz].)

One juror recalled that, after seeing Mr. Balderas's brother wave at the bus,

"[t]he bailiffs yelled to stop the bus, and they got off and chased him." (Ex. D at ¶

5 [Aff. of Juror Birney].) The jurors reported that the bailiffs attempted to "look for" and "confront" the brother, but they "could not find him." (Ex. F at ¶ 5 [Aff. of Juror Norwood]; Ex. G at ¶ 6 [Aff. of Juror Orosz].) The bailiffs' reactions to the incident only inflamed the jurors' anxiety. According to Juror Birney, she "was not too concerned about the wave until the bailiffs stopped the bus and went after him," as that made her "realize[] that they perceived it as a threat." (Ex. D at ¶ 5 [Aff. of Juror Birney]; *see also* Ex. H at ¶ 6 [Aff. of Juror Sullivan].) After that, Juror Birney "felt like [the wave] potentially was a tactic to intimidate or threaten perhaps." (32 RR at 18.) Juror Orosz, who was not questioned on the record following the verdict, agreed that the incident "smacked of intimidation." As he explained:

> I believe it was an attempt to intimidate the jurors, and all the jurors agreed that it was an attempt to intimidate us. [Juror Trujillo] saw him waving and was the first person to call it an act of intimidation. We talked about the incident and I believe some people were very afraid and everyone was concerned. Up until that point, the proceedings were seen by the jury as an everyday thing. *In that moment, when the waving incident occurred, it became so real to us that our lives could be in jeopardy that the gang activity and frame of mind could actually be interjected into our personal lives and we could become victims in one way or another.*
>
> We started watching our backs and began to be more concerned about where we were staying and who was watching us. We would watch the women on the jury go [to] the parking lots before the incident, but after we would make sure they got into their cars safely. Each morning, we would check in with each other, asking how people slept or if anything strange happened overnight. It was uncomfortable. *We were concerned with our personal safety.*

11

· 01344

> Although the brother was never in court again after that, *those feelings never went away.* I thought that if the brother had the same temperament as the people in the gang being discussed in testimony, something could happen. *I thought we could be killed—the fear of it feeling like a mob strike, or the potential of a drive-by shooting.* At that point, things became so real. *We came to the realization that these people were capable of anything, including murder of jurors, innocent people, lawyers, others. We thought members of the gang or someone related to Juan Balderas could have upped the ante and taken out a slew of us.*

(Ex. G at ¶¶ 7-9 [Aff. of Juror Orosz] (emphasis added).) Juror Armstrong described

the aftermath thus: "*It was hysteria.*" (Ex. C at ¶ 7 [Aff. of Juror Armstrong]

(emphasis added).)

The jurors "were still talking about it" the next day in the jury room. Even

though the bailiffs said "it should not be part of our deliberations," Juror Birney was

"still scared" and the jurors "still discussed it." (Ex. D at ¶ 7 [Aff. of Juror Birney].)

Other jurors confirmed that jurors continued to discuss the incident the next morning

when they returned to their deliberations—mere hours before they found Mr.

Balderas guilty. (*See* Ex. C at ¶ 8 [Aff. of Juror Armstrong]; Ex. F at ¶ 5 [Aff. of

Juror Norwood]; Ex. G at ¶ 6 [Aff. of Juror Orosz].) As Juror Orosz explained: "The

next day, the jury talked about the waving incident in the jury room. We

discussed *how the incident sounded like what we were hearing about in the

courtroom during trial.*" (Ex. G at ¶ 6 [Aff. of Juror Orosz] (emphasis added).) The

level of distress surrounding the incident is notably absent from the record due to

12

Judge Guiney's failure to timely and fully inquire into the incident and its effect on the jurors.

Based on the foregoing facts, Mr. Balderas alleges in his Application for habeas relief that Judge Guiney failed to timely and properly inquire into frightening extraneous influences on the jury during guilt/innocence phase deliberations, thereby prejudicing Mr. Balderas's constitutional right to a fair trial. Because adjudicating the Application will require Judge Guiney to judge her own conduct, the OCFW, on Mr. Balderas's behalf, files the instant motion.

## LEGAL STANDARD

The Texas Rules of Civil Procedure governing recusal apply to both civil and criminal proceedings. *See Fuelberg v. State*, 410 S.W.3d 498, 508-09 (Tex. App.— Austin 2013). The relevant Rules are 18a & 18b.

Rule 18a provides:

A party in a case in any trial court . . . may seek to recuse or disqualify a judge who is sitting in the case by filing a motion with the clerk of the court in which the case is pending. The motion:

(1) must be verified;

(2) must assert one or more of the grounds listed in Rule 18b;

(3) must not be based solely on the judge's ruling in the case; and

(4) must state with detail and particularity facts that:

13

01346

(A) are within the affiant's personal knowledge, except that facts may be stated on information and belief if the basis for that belief is specifically stated;

(B) would be admissible in evidence; and

(C) if proven, would be sufficient to justify recusal or disqualification.

The primary basis for recusal at issue here is found in Rule 18b(b)(1): "A judge shall recuse themselves in all proceeding in which . . . [their] impartiality might reasonably be questioned[.]" TEX. R. CIV. PROC. 18b(b)(1). Texas appellate courts have interpreted this subsection (and its predecessor) as requiring an inquiry into "whether a reasonable member of the public at large, knowing all the facts in the public domain concerning the judge's conduct, would have a reasonable doubt that the judge is actually impartial." *See Kirby v. Chapman*, 917 S.W.2d 902, 908 (Tex. App.—Fort Worth 1996, no writ) (applying *Rogers v. Bradley*, 909 S.W.2d 872, 879 (Tex. 1995)); *Duffey v. State*, 428 S.W.3d 319, 325 (Tex. App.—Texarkana Feb. 21, 2014, no pet. h.) (finding trial judge's *ex parte* meeting with family members without attorneys present would have caused a reasonable member of the public at large to "have a reasonable doubt as to the trial judge's impartiality"). Texas law does not require proof of actual bias. That is, "beyond the demand that a judge be impartial is the requirement that a judge *appear* to be impartial so that no doubts or suspicions exist as to the fairness or integrity of the court." *Sears v. Olivarez*, 28 S.W.3d 611,

14

613–14 (Tex. App.—Corpus Christi 2000, no pet.) (citing *Aetna Life Ins. v. Lavoie*, 475 U.S. 813 (1986) (emphasis added)).

The Supreme Court of the United States has likewise underscored that, in the interest of due process, "[o]bjective standards may also require recusal whether or not actual bias exists or can be proved." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 886 (2009). In short, even absent evidence of actual bias, recusal is nevertheless warranted if the facts, viewed objectively, could reasonably give rise to a suspicion of bias or partiality.

In addition to Rule 18b(b)(1), recusal is warranted here under Rule 18b(b)(3): "the judge has personal knowledge of disputed evidentiary facts concerning the proceeding[.]" TEX. R. CIV. PROC. 18b(b)(3).

<u>**ARGUMENT**</u>

I.  <u>**Recusal Is Required under Rule 18b(b)(1) and/or Rule 18b(b)(3)**</u>

**A. In View of the Facts Judge Guiney Must Assess in Adjudicating the Application, Recusal Is Required**

Because Judge Guiney is alleged to have violated Mr. Balderas's due process rights, her "impartiality might reasonably be questioned" with respect to adjudicating the claim against herself. TEX. R. CIV. PROC. 18b(b)(1). Likewise, Judge Guiney is a witness with respect to key facts underlying Claim Five, including, but not limited to:

15

01348

- What knowledge, if any, Judge Guiney or her staff had about where the jurors would be accommodated on the first night of sequestration;

- When she or her staff became aware of the conditions of the accommodation and/or its proximity to the crime scene;

- How she became aware of the conditions and proximity;

- What was the content of the apparent off-the-record conversations regarding the accommodation;

- What reasons, if any, Judge Guiney had for not inquiring further into the effect the accommodations had on the jury;

- When she or her staff became aware of the incident involving Mr. Balderas's brother waving at the jury's bus;

- How she found out about the incident and what she was told about it;

- To the extent she was aware of the incident before the guilty verdict was returned, why she did not address the matter until hours after the verdict was returned; and

- When she first informed trial counsel of the incident.

In other words, Judge Guiney "has personal knowledge of disputed evidentiary facts concerning the proceeding[.]" TEX. R. CIV. PROC. 18b(b)(3).

The face of the record sufficiently illustrates the factual basis for a recusal. Following both evenings of sequestration, Judge Guiney had to take to the record to discuss potentially prejudicial extraneous influences. However, on neither occasion did Judge Guiney timely and properly inquire into the extraneous influences and how they affected the jurors' deliberation. Post-conviction investigation further fleshes out the basis for recusal, establishing that the jurors were "unnerv[ed]" by

16

their proximity to crime scene on the first night and genuinely feared for their lives after the waving incident on the second night. Moreover, there is credible evidence that Judge Guiney was aware of the waving incident hours before the jury returned its guilty verdict but did not address the issue until after the verdict—a decision that has not yet been explained.

### B. In View of the Law that Judge Guiney Must Apply in Adjudicating the Application, Recusal Is Required

Judge Guiney cannot, objectively, assess whether her own conduct with respect to her failures to timely and properly inquire into highly prejudicial extraneous influences deprived Mr. Balderas of due process—yet that conduct is at the heart of one of his claims. To adjudicate the Application, Judge Guiney will have to assess whether her failure to question jurors about their proximity to the crime scene on the first night of sequestration and her failure to question jurors about the waving incident until *after* the verdict was returned amounted to constitutional violations that prejudiced Mr. Balderas.

Sixth Amendment jurisprudence "demonstrate[s] that the Supreme Court has clearly established a constitutional rule forbidding a jury from being exposed to an external influence." *Oliver v. Quarterman*, 541 F.3d 329, 336 (5th Cir. 2008); *see Parker v. Gladden*, 385 U.S. 363, 364 (1966) (stating that "the evidence developed against a defendant shall come from the witness stand in a public courtroom where

there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel" (internal quotation marks omitted)).[5]

When confronted with concerns about extraneous influence or juror misconduct, a trial court's best practice is "to promptly inform" the parties of the concern so that the concerns may, in turn, be addressed. *See Gomez v. State*, 991 S.W.2d 870, 873 (Tex. Ct. App.—Houston [1st Dist.] 1999) (finding no reversible error because defendant provided no affidavits or other record to show that his substantial rights had been affected by trial court's failure to inform counsel of possible juror misconduct until after the jury was dismissed). To do so, a trial court should hold a hearing to determine the facts and assess the impact on the jurors' impartiality. *See, e.g., Remmer*, 347 U.S. 230 (finding defendant entitled to hearing to determine effect of extraneous remark on juror and whether defendant was prejudiced thereby); *United States v. Rutherford*, 371 F.3d 634 (9th Cir. 2004) (remanding for hearing on defendants' claim that jurors were intimidated by the presence of numerous government agents in courtroom during trial); *United States v. Forrest*, 620 F.2d 446 (5th Cir. 1980) (remanding for hearing to determine

---

[5] *See also Turner v. Louisiana*, 379 U.S. 466, 472 (1965) ("The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury."); *Mattox v. United States*, 146 U.S. 140, 149 (1892) (stating that "in capital cases [] the jury should pass upon the case free from external causes tending to disturb the exercise of deliberated and unbiased judgment").

18

whether defendant had been convicted by improperly influenced jury); *New Jersey v. Bisaccia*, 724 A.2d 836 (N.J. Super. Ct. Law Div. 1999) (finding trial court erred for failing to inquire into possible extraneous influence on jury and remanding for interviews with jurors to determine whether jury was tainted).

That a trial court makes some effort to address an extraneous influence or juror misconduct does not, in and of itself, protect a defendant's due process rights. The timing of the trial court's effort matters. A trial court must hold a hearing to investigate as soon as it becomes aware of the problem. For example, where the trial court is apprised before the end of trial—that is, before a verdict is returned—the hearing must also be held before the end of trial. *See Gomez v. State*, 991 S.W.2d 870, 873 (Tex. App.—Houston [1st Dist.] 1999). Certainly a trial court, put on notice that extraneous influence or misconduct may have occurred, should not allow a potentially prejudiced jury to deliberate to verdict without first probing the issue.

The breadth of a trial court's effort and investigation into potential incidents affecting the jury also impacts a defendant's due process rights. The trial court's inquiry should not be limited to interviewing some jurors; rather, the trial court should interview *all* members of the panel. *See, e.g., Forrest*, 620 F.2d 446; *New Jersey v. Loftin*, 922 A.2d 1210 (N.J. Super. Ct. Law. Div. 2007) (criticizing trial court for failing to ensure all members of jury panel not irreparably tainted); *Minnesota v. Erickson*, 597 N.W.2d 897 (Minn. 1999) (finding trial court

19

erred in not questioning all jurors regarding bailiff's improper communication with jury). At such a hearing, a trial court must establish that any prejudice resulting from the potential extraneous influence or juror misconduct did not infect any other jurors sitting in judgment of the defendant. (*Id.*)

As the Court of Criminal Appeals recently held, a trial court must not rely on jurors' "subjective thought processes and reactions"—including any assertion that their verdict was impartial and unbiased—to determine whether extraneous influence or misconduct has disturbed a defendant's right to a fair and impartial jury.[6] *See McQuarrie v. State*, 380 S.W.3d 145, 154 (Tex. Crim. App. 2012) (reversing judgment where juror's self-directed internet research shared with jury constituted "outside influence"). That is, "a trial court should be able to inquire as to whether jurors received such outside information and the impact it had on their verdict without delving into their actual deliberations." *Id.* Instead, a trial court should make "an objective determination as to whether the outside influence likely resulted in injury to the complaining party" by asking the jurors

---

[6] *See, e.g., Sassounian v. Roe*, 230 F.3d 1097, 1109 (9th Cir. 2000) (noting "although we may consider testimony concerning whether the improper evidence was considered, we may not consider the jurors' testimony about the subjective impact of the improperly admitted evidence"); *Hunley v. Godinez*, 975 F.2d 316 (7th Cir. 1999) (holding juror's claims that burglary of hotel rooms during sequestration would not affect verdict not dispositive given previously divided jury quickly voted to convict after burglary occurred); *Kelley v. Indiana*, 555 N.E.2d 140 (Ind. 1990) (declaring mistrial after jurors' improper contact with prosecution witness despite jurors' assertions of impartiality).

. 01333

about the nature of the incident and then assessing "whether there is a reasonable possibility that it had a prejudicial effect on the 'hypothetical average juror.'" *Id.* (internal citations omitted).

Objectively speaking, Judge Guiney cannot be expected to assess whether the timing and degree of her own inquiry into the extraneous influences in fact satisfied due process requirements. This is not to suggest that Judge Guiney is actually biased. Due process "may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties." *In re Murchison*, 349 U.S. 133, 136 (1955). This is because "it is difficult if not impossible for a judge to free [herself] from the influence of what took place" and her own memory and interpretation of events. *Id.* at 138. That objectively difficult-to-impossible circumstance is why recusal is warranted here. Additionally, it has been established that Judge Guiney has personal knowledge of disputed evidentiary facts that are necessary to the disposition of Mr. Balderas's Application—facts that may not be available through other witnesses.

### C. All Components of Rule 18a and 18b Are Satisfied

This motion is "not based solely on" one of Judge Guiney's rulings, *e.g.*, her decision to deny Mr. Balderas's motion for mistrial following the perceived intimidation incident. *See* TEX. R. CIV. PROC. 18a(3). Instead, this motion focuses on Mr. Balderas's right to due process in the adjudication of a habeas claim based

21

on the entirety of Judge Guiney's conduct with respect to the extraneous influences on the jury.

Further, this motion details with particularity facts, supported by affidavits and other documentary evidence, that are "sufficient to justify recusal or disqualification." TEX. R. CIV. PROC. 18a(4). These facts support the conclusion that Judge Guiney's "impartiality might reasonably be questioned" and that she "has personal knowledge of disputed evidentiary facts." TEX. R. CIV. PROC. 18b(b)(1) & (3). Therefore, recusal is mandatory. *See id.* 18b(b)(1) ("A judge *shall* recuse themselves in all proceeding in which . . . [their] impartiality might reasonably be questioned"); *id.* 18b(b)(3) ("A judge *shall* recuse themselves in all proceeding in which . . . the judge has personal knowledge of disputed evidentiary facts concerning the proceeding") (emphasis added).

Pursuant to Rule 18a(f)(1), within three business days after the filing of this motion, Judge Guiney should either recuse herself or forward this matter to the Presiding Judge of the 2nd Administrative Judicial Region. *See* TEX. R. CIV. PROC. 18a(f)(1).

22

·ö1ö55

## PRAYER FOR RELIEF

For the foregoing reasons, Mr. Balderas asks that the Court grant his Verified

Motion for Recusal.

Respectfully submitted,

DATED:     February 1, 2016          By _____

DEREK VERHAGEN
Post-Conviction Attorney

VERIFICATION

State of Texas    §
County of Travis  §

BEFORE ME, the undersigned notary public, on February 1, 2016, personally appeared Derek VerHagen, who being by me duly sworn, stated under oath that he is attorney-in-charge for Juan Balderas in the Article 11.071 proceeding arising from cause no. 1412826-A; that he has read this motion; and that every statement contained in it is either within his personal knowledge and is true and correct, or is based on information and belief, based on the sworn affidavits attached to this motion; and that all exhibits to this motion are true and correct copies of the record excerpts as they purport to be.



_____
Derek VerHagen

     SUBSCRIBED AND SWORN TO before me on February 1, 2016, to certify which witness my hand and seal of office.

_____
Notary Public in and for the State of Texas

My Commission Expires: June 30, 2018

ADRIAN DE LA ROSA
Notary Public, State of Texas
My Commission Expires
JUNE 30, 2018

Notary without Bond

24

I, the undersigned, declare and certify that I have served the foregoing Verified Motion for Recusal to:

Paula Gibson
Criminal Post-Trial
Harris County District Clerk
1201 Franklin Street, 3rd Floor
Suite 3180
Houston, TX 77002

Harris County District Attorney
c/o Lynn Hardaway
1201 Franklin
Suite 600
Houston, TX 77002

Juan Balderas
TDCJ # 999590
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, TX 77351

Judge Kristin M. Guiney
179th District Court
1201 Franklin Street
15th Floor
Houston, TX 77002

This certification is executed on February 1, 2016, at Austin, Texas.

_____
DEREK VERHAGEN

# IN THE 179TH DISTRICT COURT
## HARRIS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| _____ | ) | **Cause No.** |
| **EX PARTE** | ) | **1412826-A** |
| **Juan Balderas,** | ) | |
| **APPLICANT** | ) | |
| | ) | |
| _____ | ) | |

## ORDER ANNOUNCING VOLUNTARY RECUSAL AND
## REQUEST TO ASSIGN ANOTHER JUDGE

 Having considered Applicant's Verified Motion for Recusal, the Court finds that the motion is well-taken and thus hereby GRANTS that motion. The undersigned judge recuses herself from presiding over this cause. In accordance with Rule 18a of the Texas Rules of Civil Procedure, the undersigned judge refers this case to the Presiding Judge of the 2nd Administrative Judicial Region of Texas and requests another judge be appointed to preside over this case.

          _____

          The Honorable Kristin M. Guiney
          Presiding Judge, 179th District Court

# Exhibit B



# Second Administrative Judicial Region of Texas

## Olen Underwood
### Presiding Judge

*Melanie Sipes*
*Administrative Assistant*

*Rebecca Brite*
*Administrative Assistant*

March 3, 2016

Derek Verhagen; Erin Eckhoff
VIA FACSIMILE
Fax: 512-463-8590

Lynn Hardaway ADA
VIA FACSIMILE
Fax: 713-755-1839

179th District Court
VIA FACSIMILE
Fax: 713-368-9224

---

Attached please find Order Denying Applicant's Verified Motion for Recusal that was signed March 3, 2016 in Cause No.1412826-A; State of Texas vs Juan Balderas; 179th District Court, Harris County, Texas.

cc:    District Clerk
        Office of Court Administration

## No. 1412826-A

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| VS | § | HARRIS COUNTY, TEXAS |
| | § | |
| JUAN BALDERAS | § | 179TH JUDICIAL DISTRICT |

### ORDER DENYING APPLICANT'S VERIFIED MOTION FOR RECUSAL

The Court considered the Motion to Recuse the Honorable **Kristin Guiney** filed by **Juan Balderas** in the above captioned case. Judge Guiney chose to decline to recuse voluntarily and referred the motion to the Presiding Judge of the Second Administrative Region pursuant to Rule 18a of the Texas Rules of Civil Procedure.

The Court has reviewed the motion and determined that it complains of the trial judge's rulings and actions in the case, but does not allege extra-judicial conduct on the part of the trial judge that would constitute a basis for a recusal. A party's remedy for unfair rulings is to assign error regarding the adverse rulings. See *Grider v. Boston Co*,, 773 S.W.2d 338, 346 (Tex. App.-Dallas 1989, writ denied). The Rule unambiguously indicates that a motion to recuse "must not be based solely on the judge's rulings in the case." *See* TEX. R. CIV. P. 18a(a)(3). A judge's conduct during a case does not constitute a basis for recusal unless it indicates a high degree of favoritism or antagonism that renders fair judgment impossible. *See Sommers v. Concepcion*, 20 S.W.3d 27,41 (Tex. App. – Houston [14th Dist.] 2000, pet. denied); *Ludlow v. DeBerry*, 959 S.W.2d 265, 270-72 (Tex. App. – Houston [14th Dist.] 1997, no writ). The motion does not meet this standard.

The Court ORDERS the motion DENIED without hearing.

The Court ORDERS the Clerk of the Court to transmit a certified copy of this order to

Olen Underwood, Presiding Judge
Second Administrative Judicial Region of Texas
301 North Thompson, Suite 102
Conroe, Texas 77301
Fax: (936)538-8167

Date signed: 3/3/2016          *Olen Underwood*
                             Judge Presiding

# IN THE 179TH DISTRICT COURT
# HARRIS COUNTY, TEXAS

|  |  |
|---|---|
| EX PARTE<br>Juan Balderas,<br>　　　　APPLICANT | )<br>)<br>)<br>)<br>)<br>) |

Trial Cause No.
1412826-A

## APPLICANT'S MOTION FOR RECONSIDERATION OF VERIFIED MOTION FOR RECUSAL

BENJAMIN WOLFF (No. 24091608)
Director, Office of Capital and Forensic Writs
(E-Mail: Benjamin.Wolff@ocfw.texas.gov)
DEREK VERHAGEN (No. 24090535)
(E-Mail: Derek.VerHagen@ocfw.texas.gov)
ERIN ECKHOFF (No. 24090910)
(E-Mail: Erin.Eckhoff@ocfw.texas.gov)
GRETCHEN S. SWEEN (24041996)
Office of Capital and Forensic Writs
1700 N. Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

**Attorneys for Applicant**

**FILED**
Chris Daniel
District Clerk
MAR 1 5 2016
Time:_____
Harris County, Texas
By_____
Deputy

141998

01383

# IN THE 179TH DISTRICT COURT
# HARRIS COUNTY, TEXAS

|  |  |
|---|---|
| EX PARTE<br>Juan Balderas,<br>    APPLICANT | ) Trial Cause No.<br>) 1412826-A<br>)<br>)<br>)<br>) |

## APPLICANT'S MOTION FOR RECONSIDERATION OF
## VERIFIED MOTION FOR RECUSAL

Applicant Juan Balderas ("Applicant"), through his attorneys, the Office of Capital and Forensic Writs ("OCFW"), respectfully files this Motion for Reconsideration of his Verified Motion for Recusal. Reconsideration is warranted because (1) the Motion for Recusal was denied without holding a hearing as mandated by the Texas Rules of Civil Procedure; (2) the Motion for Recusal was denied based on a misapprehension of the legal and factual bases for which recusal was sought; and (3) the standard described in the Order denying the Motion for Recusal does not apply to the bases for recusal articulated in the motion.

### BACKGROUND RELEVANT TO RECONSIDERATION

On February 8, 2016, Applicant filed a Motion for Recusal under the Texas Rules of Civil Procedure, Rules 18a & 18b. (*See* Exhibit A.[1]) Rule 18a(f)(1)

---

[1] The facts and legal argument in that motion are incorporated here by reference.

describes the "Duties of the Respondent Judge" in the wake of a recusal motion. The Rule required the Honorable Judge Kristin Guiney "within three business days after the motion is filed" to "either: (A) sign and file with the clerk an order of recusal or disqualification; or (B) sign and file with the clerk an order referring the motion to the regional presiding judge." TEX. R. CIV. P. 18a(f)(1).

On February 12, 2016, four days after the Motion for Recusal was filed, Judge Guiney informed the OCFW via e-mail that she intended to deny the motion, thus declining to voluntarily recuse herself under Rule 18a(f)(1)(A). Applicant received no formal notice of that decision or a copy of a signed "order referring the motion to the regional presiding judge" from the district clerk's office.

At some point, the Motion for Recusal was seemingly referred to the Honorable Judge Olen Underwood, Administrative Judge for the Second Administrative Judicial Region of Texas.

On March 3, 2016, nearly a month after the Motion for Recusal was filed, Judge Underwood signed an "Order Denying Applicant's Verified Motion for Recusal." (*See* Exhibit B (hereafter "Order").) The Motion for Recusal was denied without a hearing. (*See id.*) The OCFW received a copy of the Order by fax that same day.

The Order contends that the Motion for Recusal "complains of the trial judge's rulings and actions in the case, but does not allege extra-judicial conduct on the part

3

01365

of the trial judge that would constitute a basis for a recusal[,]" citing Texas Rule of Civil Procedure 18a(a)(3). (*Id.*) The Order further states that "[a] judge's conduct during a case does not constitute a basis for recusal unless it indicates a high degree of favoritism or antagonism that renders fair judgment impossible[,]" citing cases. (*Id.*)

Because the Motion for Recusal was summarily denied without a hearing, because the basis described in the Order for rejecting the motion is contrary to the relevant facts, and because the standard described in the Order does not apply to the bases for recusal urged, Applicant respectfully files this Motion for Reconsideration.

## REASONS JUSTIFYING RECONSIDERATION

The Order should be reconsidered because it rests on the following misapprehensions of fact and law:

First, the Order was issued without the Court first holding a hearing as mandated by statute.

Second, the Order incorrectly states that the motion fails to allege conduct on the part of the trial judge that could constitute the basis for a recusal.

Third, the Order relies on a standard that is contrary to the statutory grounds for recusal argued in the motion. The motion was based on two statutory grounds that require recusal. The primary basis for recusal is found in Rule 18b(b)(1): "A judge must recuse in any proceeding in which . . . [her] impartiality might reasonably

4

01388

be questioned[.]" Tex. R. Civ. Proc. 18b(b)(1). The second basis for recusal is found in Rule 18b(b)(3): "A judge must recuse in any proceeding in which . . . the judge has personal knowledge of disputed evidentiary facts concerning the proceeding[.]" Tex. R. Civ. Proc. 18b(b)(3).

For each of these distinct reasons, as explained further below, reconsideration of the Order denying the Motion for Recusal is warranted.

<u>**ARGUMENT & AUTHORITIES**</u>

I. <u>**Reconsideration Is Warranted Because the Motion for Recusal Was Denied Without the Requisite Hearing.**</u>

Applicant's Motion for Recusal was denied without a hearing. (*See* Exhibit B.) The rules, however, require that the administrative judge hold a hearing on a recusal motion and "[t]he motion must be heard as soon as practicable and may be heard immediately after it is referred to the regional presiding judge or an assigned judge." Tex. R. Civ. P. 18a(g)(6)(A). Notice of the hearing must be given to all parties in the case. Tex. R. Civ. P. 18a(g)(6)(B). Only a noncompliant recusal motion "may be denied without an oral hearing." Tex. R. Civ. P. 18a(g)(3)(A). But an order denying a recusal motion without a hearing "must state the nature of the noncompliance." *Id.*

The statutory language regarding a hearing is mandatory: "the motion *must* be heard[.]" Tex. R. Civ. P. 18a(g)(6)(A) (emphasis added). The motion was indisputably denied without a hearing. Moreover, the Order denying the motion

5

does not suggest that the Motion for Recusal was somehow noncompliant. To summarily deny a recusal motion, the judge to whom it has been referred "*must* state the nature of the noncompliance." TEX. R. CIV. P. 18a(g)(3)(A) (emphasis added).

Because the Motion for Recusal was denied without a hearing and without suggesting or demonstrating "noncompliance," the Court had no discretion to deny the motion without a hearing. Therefore, doing so was erroneous as a matter of law. On this basis alone, the decision to deny the Motion for Recusal should be reconsidered.

## II. Reconsideration Is Warranted Because the Order Incorrectly States That the Motion for Recusal Fails to Allege Conduct on the Part of the Trial Judge That Could Constitute the Basis for a Recusal.

The Order states that Applicant failed to provide a valid basis for recusal. The Order does not mention either of the two statutory bases for recusal urged in the Motion for Recusal. Instead, the Order cites *Grider v. Boston Co.*, 773 S.W.2d 338 (Tex. App.—Dallas 1989, writ denied), *disapproved of on other grounds by Texas Commerce Bank, N.A. v. Grizzle*, 96 S.W.3d 240 (Tex. 2002) and Texas Rule of Civil Procedure 18a(a)(3). Neither of these authorities is relevant to the Motion for Recusal.

### A. *Grider* Is Inapposite Authority.

For multiple reasons, *Grider* is not helpful authority.

6

001388

First, the plaintiffs in *Grider*, in appealing the trial court's decision to enter judgment against them notwithstanding the jury's verdict, also suggested on appeal that there had been an error for failing to recuse the trial judge. 773 S.W.2d at 346. But because the plaintiffs "did not file the statement of facts from the recusal hearing, providing no record on appeal that might enable [the court of appeals] to weigh the evidence leading to the denial of the motion," the recusal issue had not been preserved. *Id.* In other words, *Grider*'s brief discussion of the recusal issue is all dicta because the issue had not been preserved for appeal.

Second, the only basis the *Grider* plaintiffs had seemingly offered for the recusal was "that the trial judge [had] exhibited an antagonistic attitude toward them and that his rulings were consistently unfair." *Id.* This argument bears no resemblance to the arguments made in Applicant's Motion for Recusal. Applicant has neither alleged an actual bias on Judge Guiney's part nor sought recusal based on a perception that her rulings all reflected a bias. Rather, Applicant's Motion for Recusal is based on Judge Guiney's extra-record conduct with respect to extraneous influences on the jury, which were only fully discovered during the post-conviction investigation and now form the basis for constitutional claims that Applicant's right to due process was violated.

Third, the standard invoked in the nonbinding *Grider* is not the correct one. *Grider* correctly asserts that recusal based on ***actual bias*** requires that "a judge's

061369

bias must be extrajudicial and not based upon in-court rulings," citing *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966); but that dicta misses the mark. Far more recently, the Supreme Court has emphasized that, in the interest of due process, recusal may be required "whether or not actual bias exists or can be proved." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 886 (2009). An adjudicator must apply an objective standard to determine whether the facts could reasonably give rise to a *suspicion* of bias or partiality. Thus, instead of *Grider*, the Court should have looked to *Caperton* and other helpful and binding U.S. Supreme Court precedents.[2] As the Supreme Court noted decades ago "it is difficult if not

---

[2] Indeed, this very term, the Supreme Court is looking at whether a state appellate judge, who had been the elected prosecutor in a death case when it was tried, could be expected to assess whether his former office's conduct had somehow violated the defendant's due process rights. *See Williams v. Pennsylvania*, 15-5040, argued Feb. 29, 2016. The issues certified and argued in *Williams* are: (1) Whether the Eighth and Fourteenth Amendments are violated where a state supreme court justice declines to recuse himself in a capital case in which he had personally approved the decision to pursue capital punishment against the defendant in his prior capacity as an elected prosecutor and continued to head the prosecutors' office that defended the death verdict on appeal, and where he had publicly expressed strong support for capital punishment during his judicial election campaign by referencing the number of defendants he had "sent" to death row, including the defendant in the case now before the court; and (2) whether the Eighth and Fourteenth Amendments are violated by the participation of a potentially biased jurist on a multimember tribunal deciding a capital case, regardless of whether his vote is ultimately decisive. In other words, *Williams* is far more instructive than the inapposite *Grider*. But here we have an even more palpable conflict of interest. We are not dealing with a prosecutor (who did not try the case) assessing the prosecution's conduct as an appellate judge; we are dealing with a less tenuous conflict where the trial judge being asked to assess her *own* conduct in a post-conviction appeal.

8

01370

impossible for a judge to free [herself] from the influence of what took place" and objectively judge her own conduct. *In re Murchison*, 349 U.S. 133, 136 (1955) (finding judge violated due process by sitting in the criminal trial of defendant whom he had indicted).

### B. The Motion for Recusal Is Not at Odds with Rule 18a(a)(3).

Rule 18a(a)(3) states that a recusal motion "must not be based *solely* on the judge's ruling in the case." TEX. R. CIV. P. 18a(a)(3) (emphasis added). As explained at length in the Motion for Recusal, the motion was not based "solely" on any of Judge Guiney's rulings—including her decision to deny a motion for mistrial made after the sequestered jury perceived an innocuous wave by Applicant's brother as an effort to intimidate, sparking fear and panic. The Motion for Recusal was based on a whole series of actions only uncovered through the post-conviction investigation and thus not reflected in the trial record. The totality of incidents that warrant Judge Guiney's recusal are the basis for a due process claim described and amply supported in the Application for habeas relief. (*See* Application, Claim Five at 135-63 (explaining that "Mr. Balderas's Due Process Rights Were Violated By The Court's Failure To Address Prejudicial, Extraneous Influences On The Jury").) By definition, habeas relief is not based "solely" on rulings that can be addressed through a direct appeal; habeas claims require recourse to extra-record evidence. *See* TEX. CODE CRIM. PRO., art. 11.071.

9

01371

### III. Reconsideration Is Warranted Because a Standard Was Applied That Is Inapplicable to the Actual Bases for Recusal Urged in the Motion for Recusal.

The dispositive facts relevant to the Motion for Recusal are that the substance of Claim Five is such that (1) a reasonable person knowing the relevant facts and circumstances would conclude that Judge Guiney's "impartiality might reasonably be questioned" with respect to adjudicating that claim; and (2) she "has personal knowledge of disputed evidentiary facts concerning" that claim. TEX. R. CIV. PROC. 18b(b)(1) & (3). Each of these is an independent legal basis for recusal. Therefore, the cases cited in the Order suggesting that Applicant must show a "high degree of favoritism or antagonism" are not relevant because Applicant has not alleged actual bias.

The Order cites *Sommers v. Concepcion*, 20 S.W.3d 27 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). In *Sommers*, the appellant had argued that recusal was required because (1) the judge was actually biased and (2) the judge was a witness in the proceeding. Again, Applicant here did not allege actual bias, which, as *Sommers* explains, does require proof of "a high degree of favoritism or antagonism that renders fair judgment impossible." *Id.* at 41. That is not the standard for recusal under Rule 18b(b)(1). As for the second basis for recusal at issue in *Sommers*, it was rejected because the judge was not in fact a material witness in the proceeding in question but had instead been called as a witness in another

10

proceeding, a disciplinary proceeding. *Id.* at 42. As explained below, the nature of Claim Five is such that Judge Guiney would be a witness in the very same proceeding in which that claim must be adjudicated.

The Order also cites *Ludlow v. Deberry*, 959 S.W.2d 265 (Tex. App.— Houston [14th Dist.] 1997, no pet.), which is similarly in apposite. In *Ludlow*, the problem was that recusal was sought *solely* based on "judicial statements regarding the case and made during the course of the proceedings." *Id.* at 283. "A judge's opinion, produced properly and necessarily during the course of the proceedings, does not render the trial judge recusable for bias or impartiality." *Id.* at 284 (citing *Liteky v. United States*, 510 U.S. 540, 550-552 (1994)). But Applicant does not seek Judge Guiney's recusal because of any opinions she produced "during the course of the proceedings." *Id.* at 283. Instead, recusal is based on the objective conclusion that, in light of the facts raised in the habeas Application, her "impartiality might reasonably be questioned" and because she "has personal knowledge of disputed evidentiary facts concerning" this habeas proceeding. TEX. R. CIV. PROC. 18b(b)(1) & (3).

## A. Recusal Is Mandated Because Judge Guiney's Impartiality Might Reasonably Be Questioned.

One of the two legal bases Applicant invoked in seeking recusal is that Judge Guiney's "impartiality might reasonably be questioned" under Rule 18b(b)(1) because, to adjudicate one of the claims in the habeas Application, Judge Guiney

01373

will have to pass judgment on her own conduct. (*See* Exhibit A.) The appearance of impartiality, not actual bias, is the standard. *See* TEX. R. CIV. PROC. 18b(b)(1);[3] *see also Rosas v. State*, 76 S.W.3d 771 (Tex. App.– Houston [1st District] 2002, no pet.) (explaining "[r]ecusal is appropriate if the movant has provided enough facts to establish that a reasonable person, knowing all the circumstances involved, would harbor doubts as to the impartiality of the trial court" such that the movant would be denied due process); *accord In Potashnick v. Port City Constr. Co.*, 609 F.2d 1101, 1111 (5th Cir. 1980) (ordering recusal and stating "a judge faced with a potential ground for disqualification ought to consider how his participation in a given case looks to the average person on the street.").[4]

Moreover, Rule 18b states that judges *must* recuse themselves in any proceeding in which their impartiality might reasonably be questioned: "A judge must recuse in any proceeding in which . . . the judge's impartiality might reasonably be questioned.'" TEX. R. CIV. PROC. 18b(b)(1). That is, "[t]he language is

---

[3] Texas Code of Criminal Procedure Article 30.01 provides grounds for disqualification in criminal matters, while the grounds and procedures for recusal are covered by Texas Rules of Civil Procedure 18a and 18b. *See Arnold v. State*, 853 S.W.2d 543, 544 (Tex. Crim. App. 1993).

[4] Texas courts have recognized that the language of Texas Rule of Civil Procedure 18b(2)(a) is substantially identical to that of 28 U.S.C. § 455(a), the federal recusal statute; thus Texas courts have relied on cases interpreting Section 455(a) when considering motions for recusal and disqualification. *See, e.g., Ludlow v. Deberry*, 959 S.W.2d 265, 271 n.3 (Tex. App.—Houston [14th Dist.] 1997, no pet.) (citing *Eckerdt v. Frostex Foods, Inc.*, 802 S.W.2d 70, 72 (Tex. App.—Austin 1990, no writ)).

. 01374

imperative and mandatory, not permissive or discretionary." *Rogers v. Bradley*, 909 S.W. 2d 872, 873 (Tex. 1995).

Texas courts have repeatedly emphasized the compelling public policy interest—as distinct from any constitutional, statutory, or common law grounds—in ensuring the appearance of an impartial judiciary. "After all[,] the impartial standard has been adopted in order that the public, *i.e.*, the person on the street, might have confidence in the judiciary and to protect judges from unjustified complaints about their being partial in their decision." *Aguilar v. Anderson*, 855 S.W.2d 799, 804-805 (Tex. App.—El Paso 1997, writ denied) (Osborn, C.J., concurring). This appearance-of-impartiality standard is not unique to Texas because it is grounded in fundamental public policy rationales about how best to preserve the integrity of the judicial process under the federal Constitution.[5]

---

[5] *See, e.g., Watson v. State*, 934 A.2d 901, 907 (Del. Super 2007) (holding "the appearance of bias . . . was sufficient to doubt the Family Court judge's ability to weigh the truthfulness of the two contending antagonists' testimony impartially"); *Love v. State*, 569 So.2d 807, 810 (Fla. App. 1990) (finding ex parte communications violates appearance of impartiality); *Scott v. United States*, 559 A.2d 745, 754 (D.C. App. 1989) ("The appearance of partiality, and not only actual partiality, constitutes a statutory" basis for recusal); *People v. DelVecchio*, 544 N.E.2d 312, 317 (Ill. App. 1989) (identifying a "guiding principle is whether the average person, acting as judge, could not hold nice, clear, and true balance between the State and the accused"); *Giralt v. Vail Village Inn Assoc.*, 759 P.2d 801, 804 (Colo. App. 1988) (explaining trial court has duty "to eliminate every semblance of reasonable doubt or suspicion that a trial by a fair and impartial tribunal may be denied"); *Commonwealth v. Lemanski*, 529 A.2d 1085, 1088 (Pa. Super. 1987) ("Recusal is required whenever there is a substantial doubt as to a jurist's ability to preside impartially."); *Isaacs v. State*, 355 S.E.2d 644, 645 (Ga. 1987) ("The fact that a

01375

Due process requires that a judge be neutral and free from bias. *See, e.g.,* *Johnson v. Pumjani*, 56 S.W.3d 670, 672 (Tex. App.—Houston [14th Dist.] 2001, no pet.) ("One of the most fundamental components of a fair trial is 'A neutral and detached judge.'") (quoting *Metzger v. Sebek*, 892 S.W.2d 20, 37 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (quoting *Ward v. Village of Monroeville*, 409 U.S. 57, 62 (1972)). The impartiality of a judge has two components: a judge must both *be* impartial and *appear to be* impartial so that no doubts or suspicions exist as to the fairness or integrity of the court. *See, e.g., Sun Exploration and Prod. Co. v. Jackson*, 783 S.W.2d 202, 206 (Tex. 1989) ("The judiciary must be extremely diligent in avoiding any appearance of impropriety and must hold itself to exacting standards lest it lose its legitimacy and suffer a loss of public confidence."); *CNA Ins. Co. v. Scheffey*, 828 S.W.2d 785, 792 (Tex. App.—Texarkana 1992, writ denied) ("Judicial decisions rendered under circumstances that suggest bias, prejudice or favoritism undermine the integrity of the courts, breed skepticism and mistrust, and thwart the principles on which the judicial system is based.") (citation omitted). *See also* 46 AM JUR. 2D, Judges § 86.

---

judge's impartiality might reasonably be questioned is sufficient for disqualification."); *Wiedemann v. Wiedemann*, 36 N.W.2d 810, 812 (Minn. 1949) ("The controlling principle is that no judge, when other judges are available, ought ever to try the cause of any citizen, Even though he be entirely free from bias in fact, if circumstances have arisen which give a bona fide appearance of bias to litigants.").

01375

As explained in the Motion for Recusal, Judge Guiney cannot reasonably be expected to pass judgment with respect to her own extra-record conduct (not her rulings) that is at issue here. (*See* Exhibit A at "Facts Relevant to Recusal.") Judges must be recused when they become part of the "accusatory process." *In re Murchison*, 349 U.S. 133, 137 (1955). This course comports with common sense as well as with the foundational legal values described above.

In other words, as explained in the Motion for Recusal, Judge Guiney's "impartiality might reasonably be questioned" by an objective observer because her own conduct is a subject to be adjudicated in the Article 11.071 proceedings. TEX. R. CIV. PROC. 18b(b)(1). The Order on the Motion for Recusal does not, however, address this legal ground mandating recusal. Therefore, reconsideration is warranted.

**B. Recusal Is Mandated Because Judge Guiney Has Personal Knowledge of Disputed Evidentiary Facts Concerning a Claim Asserted in the Application.**

The second distinct legal basis Applicant invoked in seeking recusal is that Judge Guiney "has personal knowledge of disputed evidentiary facts concerning the proceeding." (*See* Exhibit A at 16 (quoting under Rule 18b(b)(3)).) In other words, Applicant also seeks recusal because Judge Guiney is a material witness with respect to the facts that give rise to Claim Five. (*See id.* at 2-16.)

15

01377

When a judge "has personal knowledge of disputed evidentiary facts concerning the proceeding," recusal is required. TEX. R. CIV. P. 18b(b)(3). In part, this is because the Rules of Evidence prohibit a presiding judge from testifying as a witness; thus not requiring the judge to recuse herself could deprive a party of a necessary witness. TEX. R. EVID. 605.

Judge Guiney is a witness with respect to key facts underlying Claim Five in this habeas proceeding, including, but not limited to:

- What knowledge, if any, Judge Guiney or her staff had about where the jurors would be accommodated on the first night of sequestration;

- When she or her staff became aware of the conditions of the accommodation and/or its proximity to the crime scene;

- How she became aware of the conditions and proximity;

- What was the content of the apparent off-the-record conversations regarding the accommodation;

- What reasons, if any, Judge Guiney had for not inquiring further into the effect the accommodations had on the jury;

- When she or her staff became aware of the incident involving Mr. Balderas's brother waving at the jury's bus;

- How she found out about the incident and what she was told about it;

- To the extent she was aware of the incident before the guilty verdict was returned, why she did not address the matter until hours after the verdict was returned; and

- When she first informed trial counsel of the incident.

16

In other words, as explained in the Motion for Recusal, Judge Guiney "has personal knowledge of disputed evidentiary facts concerning the proceeding[.]" TEX. R. CIV. PROC. 18b(b)(3). The Order on the Motion for recusal does not, however, address this legal ground mandating recusal. Therefore, reconsideration is warranted.

## CONCLUSION AND PRAYER FOR RELIEF

For the foregoing reasons, Applicant respectfully asks that this Court reconsider the Order denying the Motion for Recusal without a hearing. The Applicant further asks that the Court schedule a hearing on the Motion for Recusal forthwith and thereafter grant the motion as well as any further relief the Applicant shows that justice requires.

Respectfully submitted,

DATED:     March 9, 2016

By _____
DEREK VERHAGEN
Post-Conviction Attorney

17

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Motion for Reconsideration to:

Paula Gibson
Criminal Post-Trial
Harris County District Clerk
1201 Franklin Street, 3rd Floor
Suite 3180
Houston, TX 77002

Harris County District Attorney
c/o Lynn Hardaway
1201 Franklin
Suite 600
Houston, TX 77002

Juan Balderas
TDCJ # 999590
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, TX 77351

Judge Olen Underwood
Presiding Judge
Second Administrative Judicial
Region of Texas
301 North Thompson
Suite 102
Conroe, TX 77301

Judge Kristin M Guiney
179th District Court
1201 Franklin Street
15th Floor
Houston, TX 77002

This certification is executed on March 9, 2016, at Austin, Texas.

DEREK VERHAGEN

18

# Exhibit A

01381

# IN THE 179TH DISTRICT COURT
## HARRIS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| EX PARTE | ) | Cause No. |
| Juan Balderas, | ) | 1412826-A |
| APPLICANT | ) |  |
|  | ) |  |
|  | ) |  |

## APPLICANT'S VERIFIED MOTION FOR RECUSAL

BENJAMIN WOLFF (No. 24091608)
Director, Office of Capital and Forensic Writs
(E-Mail: Benjamin.Wolff@ocfw.texas.gov)
DEREK VERHAGEN (No. 24090535)
(E-Mail: Derek.VerHagen@ocfw.texas.gov)
ERIN ECKHOFF (No. 24090910)
(E-Mail: Erin.Eckhoff@ocfw.texas.gov)
Post-Conviction Attorneys

Office of Capital and Forensic Writs
1700 N. Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

# IN THE 179TH DISTRICT COURT
## HARRIS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| | ) | Cause No. |
| EX PARTE | ) | 1412826-A |
| Juan Balderas, | ) | |
|     APPLICANT | ) | |
| | ) | |
| | ) | |

## APPLICANT'S VERIFIED MOTION FOR RECUSAL

Applicant Juan Balderas, through his attorneys, the Office of Capital and Forensic Writs ("OCFW"), respectfully files this Verified Motion for Recusal under the Texas Rules of Civil Procedure, Rules 18a & 18b(b). Mr. Balderas asks that Judge Kristin Guiney recuse herself from presiding over this cause because, in light of the factual circumstances, her impartiality might reasonably be questioned with respect to adjudicating the Initial Application for Writ of Habeas Corpus ("Application") now pending before her, and because she has personal knowledge of disputed evidentiary facts.

Specifically, the Application requires adjudicating a due process claim arising from Judge Guiney's failure to timely and properly address prejudicial, extraneous influences on the jury. Although Mr. Balderas does not contend that Judge Guiney harbors actual bias or prejudice concerning any party, the specific circumstances at

1

01383

issue here require recusal. In support of this motion, Mr. Balderas respectfully shows the following:

<div align="center">

**FACTS RELEVANT TO RECUSAL**

</div>

Mr. Balderas is confined under a sentence of death pursuant to this Court's judgment, which was rendered on March 14, 2014. (CR at 3355-57.)[1] Judge Guiney presided over the capital trial and pronounced judgment.

Thereafter, Judge Guiney appointed the OCFW to represent Mr. Balderas in his state post-conviction habeas proceedings. (CR at 3363.) The OCFW investigated the basis for claims and then filed his Application, raising constitutional challenges to the legitimacy of his conviction and death sentence, pursuant to Code of Criminal Procedure Article 11.071. The Application contains, *inter alia*, the following claim:

> Mr. Balderas's Due Process Rights Were Violated By The Court's Failure To Address Prejudicial, Extraneous Influences On The Jury.

*See* Application,[2] Claim Five at pp. 135-63.[3]

---

[1] "CR" refers to the Clerk's Record in Mr. Balderas's trial. "RR" refers to the Reporter's Record in Mr. Balderas's trial. All RR excerpts cited here are found in Exhibit A. All CR excerpts cited are found in Exhibit B.

[2] An excerpted form of Claim Five of the Application can be found in Exhibit K.

[3] The State's Answer to the Application is currently due on May 14, 2016. The instant motion is, therefore, filed before the Application is ripe for adjudication and thus is timely. *See* TEX. R. CIV. PROC. 18a(b).

. 01384

In Claim Five of the Application, Mr. Balderas alleges that Judge Guiney violated Mr. Balderas's due process rights in two respects. First, the Court made no effort to determine whether the jury was improperly influenced by their overnight stay near the crime scene on the first night of sequestration during guilt/innocence phase deliberations. Second, the Court did not timely and properly inquire into the jurors' ability to remain impartial following an event on the second night of sequestration where the jurors felt that a third-party had threatened them. Claim Five is based on the following facts:

**First Night of Jury Sequestration**

During the guilt/innocence phase of Mr. Balderas's trial, the jury deliberated for more than two days before finally reaching a verdict. The jury began deliberating on Tuesday, February 25, 2014, at around 11:10 a.m. and continued until 6:45 p.m., at which point they were sequestered until deliberations could continue the next day. (30 RR at 64, 72-75.) The following morning, Judge Guiney apologizes to the jury on the record for their accommodations the night before. (31 RR at 7.) Judge Guiney denied having any responsibility for selecting the accommodations, asserting that it "was beyond [her] control." (*Id.*) She then promised the jury that she would ensure that they would not stay at that particular establishment again if deliberations continued. (*Id.*) She noted that "the drive might be a little longer, but we will find you more suitable accommodations." (*Id.*)

3

Despite acknowledging that the juror accommodations had been problematic, Judge Guiney did not inquire into whether and how the accommodations may have affected the jurors' ability to remain impartial. Had Judge Guiney made the proper inquiry, she would have discovered that the frightening experience the night before had influenced them profoundly.

Post-conviction investigation revealed that on the first night of sequestration, the jury had been bused to a "terrible, seedy" Motel 6 more than ten miles from the courthouse. (Ex. D at ¶ 4 [Aff. of Juror Birney].) As they arrived, the jurors "were talking about how they thought the place was scary or dangerous," to the point where "[n]o one seemed comfortable there." (Ex. D at ¶ 4 [Aff. of Juror Birney]; Ex. C at ¶ 5 [Aff. of Juror Armstrong].) The bailiffs even visited the jurors in their rooms, telling them "to keep our doors closed and locked" and "not to come out." (Ex. D at ¶ 4 [Aff. of Juror Birney].)

Even more significant than the "terrible" condition of the motel itself was its location in Southwest Houston. (Ex. D at ¶ 4 [Aff. of Juror Birney]; Ex. E at ¶ 5 [Aff. of Juror Browning-McCauley].) There are two Motel 6 locations that fit the jurors' descriptions: one on West Sam Houston Parkway (also known as "Beltway 8"), and the other on South Loop West. (*See* Ex. J [State's Exhibit 8].) Significantly, both locations were situated near the crime scene in gang territory discussed during Mr. Balderas's trial. The West Sam Houston Parkway Motel 6—located near the

4

01388

intersection of Sam Houston Parkway and Westheimer Road—was only 3.5 miles due north from the crime scene—located near the intersection of Sam Houston Parkway and Bellaire Boulevard—where the victim, Eduardo Hernandez, was killed. (*See id.*; 24 RR at 127-29.) This Motel 6 was only 1.5 miles from 11490 Harwin Drive—where, as the jury learned during testimony, Mr. Balderas lived and was arrested. (*See* Ex. J [State's Exhibit 8]; 25 RR at 205-10; 26 RR at 83-88.) The other Motel 6, located near the intersection of I-610 and South Main Street/Hwy. 90 on South Loop West, was situated south of South Braeswood Boulevard and just one block north of West Bellfort Avenue—names familiar to the jurors after hearing Israel Diaz's testimony regarding the Braeswood and West Bellfort barrios of the La Tercera Crips street gang only days before. (*See, e.g.*, Ex. J [State's Exhibit 8]; 26 RR 127-135.)

Many jurors immediately realized that they were staying "near the murder scene," *see* Ex. D at ¶ 4 [Aff. of Juror Birney]; Ex. F at ¶ 4 [Aff. of Juror Norwood]; Ex. H at ¶ 4 [Aff. of Juror Sullivan]; Ex. E at ¶ 5 [Aff. of Juror Browning-McCauley], and the next morning, the jurors discussed the motel's proximity to the crime scene at breakfast. (Ex. C at ¶ 6 [Aff. of Juror Armstrong]; Ex. G at ¶ 5 [Aff. of Juror Orosz]; Ex. H at ¶ 5 [Aff. of Juror Sullivan].)

The motel location was so important to the jurors that they raised it with the bailiffs the next day and, in turn, the bailiffs seemed to have informed the Court at

01387

some point. Two or three of the other jurors "gave a big sigh of relief when we were told they would move us to a different hotel because they all struggled with it." (Ex. G at ¶ 5 [Aff. of Juror Orosz].) One juror felt it was "freaky that we were down in that area" near the crime scene discussed in trial testimony and "would have preferred to be elsewhere." (Ex. F at ¶ 4 [Aff. of Juror Norwood].) Another juror found it "unnerving" that the jury was sequestered near the crime scene. (Ex. H at ¶ 5 [Aff. of Juror Sullivan].) Indeed, one juror wondered whether "any of us jurors slept that night." (Ex. E at ¶ 5 [Aff. of Juror Browning-McCauley].) Unsurprisingly, at least one juror stated that staying near the crime scene that night "*made me think of the crime*." (Ex. C at ¶ 5 [Aff. of Juror Armstrong] (emphasis added).) None of this information was uncovered at the time of trial, however, because Judge Guiney failed to question jurors about this extraneous influence and its effect.

**Second Night of Jury Sequestration**

After spending the first night of sequestration near the crime scene, the jury continued their deliberations the next morning. (31 RR at 4.) That afternoon, the jury sent a note to the Court indicating that they were deadlocked. (*Id.* at 20.) Trial counsel moved for a mistrial, noting that the jury had been deliberating for fourteen hours at that point, but the Court denied that motion. (*Id.* at 21-23.) Instead, the Court read the jury an *Allen* charge at around 3:50 p.m. that day. (*Id.* at 24.) The

6

01388

jury then continued to deliberate until about 5 p.m. that evening, at which point they were again sequestered for the night. (*Id.* at 27.)

The following morning, the jury deliberated for two hours before returning a guilty verdict. ***Then, hours after the jury had delivered its verdict***, Judge Guiney finally went on the record to acknowledge that the bailiff had told her "this morning in chambers" about a second incident that had occurred with the jurors the night before. (32 RR at 12.) At that point, the Court asked the bailiff who had reported the incident, to provide "a summation" of what he had told the Court earlier "[f]or efficiency [sic] sake." (*Id.*) The bailiff explained that as the jury was leaving the courthouse the afternoon before they saw a man, whom they recognized as Mr. Balderas's brother, wave and smirk at them as they drove by. Several of the jurors were "very alarmed" by the situation and one juror even demanded that she be able to call home to her family. (*Id.* at 12-16.)

The Court asked the bailiff to go back to the jury room and bring out jurors he thought the Court should hear from: "Can you just go back there and ask, would you recognize them and what's your name. Don't say who saw anything on the bus. Just ask their names so you can report back to us." (32 RR at 16-17.) The next event captured on the record is Juror Birney's testimony regarding the waving incident and its effect on her. (*Id.* at 17-21.)

7

Juror Birney testified that she herself did not see the man wave, that another juror alerted her to it on the bus, and that "they stopped the bus and both deputies got off." (32 RR at 17.) She testified that she "felt cautious" and saw the event "potentially was a tactic to intimidate or threaten," but claimed that the event did not weigh in her deliberation earlier that morning. (*Id.* at 18.)

After being informed by the bailiff that Juror Trujillo "was the main one" of the jurors who saw the wave, trial counsel asked to speak with her on the record as well, and the Court agreed. (32 RR at 22.) Juror Trujillo testified that she saw the wave after someone else on the bus pointed it out, and that someone else identified the person waving as Mr. Balderas's brother. (*Id.* at 23-24.) Juror Trujillo then testified that she did not understand how Mr. Balderas's brother was able to wave at them because the bailiffs "were supposed to keep people away from us." (32 RR at 26.) She further testified that she was still "concerned" and had raised her concerns with the bailiffs again that morning. (*Id.*) Finally, she claimed that, regardless of her concern, the event did not weigh in her guilt/innocence deliberation. (*Id.*)

Trial counsel again moved for a mistrial, arguing that "the verdict was reached as a result of an outside influence, that it influenced the jurors to—if that [sic] were holding out for the defense, to change their vote." (32 RR at 28.) As a result, counsel argued, the verdict "violates the defendant's right to a [sic] impartial jury" and "due

8

01390

process and to a fair trial." (*Id.*) The Court summarily denied the motion, without explanation. (*Id.* at 29.)

Post-conviction investigation revealed that Judge Guiney was actually aware of the highly inflammatory extraneous influence *before* the jury reached its guilty verdict, yet did not address the issue with jurors until hours after the verdict was returned.[4] Courtroom witness Yancy Escobar recalled that "Judge Guiney, the judge presiding over Juan's trial, often handled other cases during trial breaks and jury deliberations, and she had a full courtroom of people that morning." (Ex. I at ¶ 11 [Aff. of Escobar].) For its part, the Court agreed, noting that there were "easily over 45 defendants and family members still sitting in the audience" at around 10 a.m. (32 RR at 22-23.)

Escobar recalled:

Shortly after Judge Guiney started hearing cases at the bench, I noticed that one of the bailiffs came into the courtroom through the door used by the jury. The bailiff was an African American man in his 40s. The bailiff went straight up to the judge. I could not hear exactly what they were talking about, but I could tell from their body language that something had happened. Immediately after Judge Guiney was done

---

[4] There is also indication in the record that Judge Guiney was likely aware of the incident before the jury returned its verdict. The Court had informed jurors at the close of the second day of deliberations that it would be in contact with the bailiffs as needed while the jurors were sequestered. "If there is an emergency this evening, I will be contacted." (31 RR at 27.) It seems unlikely that "hysteria" amongst jurors—which compelled the bailiffs to stop the bus in order to give chase, which in turn prompted a juror to demand to call home in contravention of the Court's admonishments—would not constitute an "emergency" about which the Court would have been apprised.

9

. 01391

talking to the bailiff, she called both the prosecutors and Juan's attorneys up to the bench to speak with her.

As soon as it was done, one of Juan's attorneys, Jerome Godinich, headed out of the courtroom. He had an angry and upset look on his face. As he walked by us in the courtroom, he gestured that we should meet him in the hallway, and Juan's family and I followed him out.

In the hallway, Mr. Godinich informed us that *the judge had said the jury had been scared the night before after seeing Juan's brother Ivan waving toward them on the bus with a smirk on his face, and that the jury was very frightened by it.*

(Ex. I at ¶¶ 11-13 [Aff. of Escobar] (emphasis added).) Notably, Escobar recalled that all of this occurred before the Court brought the jury out at 10 a.m. for a read-back of trial testimony. After the read-back, the Court allowed the jury to resume deliberations while she "continued to hear other cases." (*Id.* at ¶ 15; CR at 3432.)

Judge Guiney's failure to address the issue with the jurors before they returned a verdict was immensely prejudicial. Several jurors have since given statements detailing the "hysteria" that surrounded the incident. According to the jury foreman, "some of the jurors flipped out and were vocalizing their concern" after the incident and "some of the jurors were really creeped out." (Ex. F at ¶ 5 [Aff. of Juror Norwood].) Juror Orosz agreed that some of the jurors "flipped out" on the bus after seeing the wave, and that "[t]hey seemed alert and afraid." (Ex. G at ¶ 6 [Aff. of Juror Orosz].)

One juror recalled that, after seeing Mr. Balderas's brother wave at the bus, "[t]he bailiffs yelled to stop the bus, and they got off and chased him." (Ex. D at ¶

10

5 [Aff. of Juror Birney].) The jurors reported that the bailiffs attempted to "look for" and "confront" the brother, but they "could not find him." (Ex. F at ¶ 5 [Aff. of Juror Norwood]; Ex. G at ¶ 6 [Aff. of Juror Orosz].) The bailiffs' reactions to the incident only inflamed the jurors' anxiety. According to Juror Birney, she "was not too concerned about the wave until the bailiffs stopped the bus and went after him," as that made her "realize[] that they perceived it as a threat." (Ex. D at ¶ 5 [Aff. of Juror Birney]; *see also* Ex. H at ¶ 6 [Aff. of Juror Sullivan].) After that, Juror Birney "felt like [the wave] potentially was a tactic to intimidate or threaten perhaps." (32 RR at 18.) Juror Orosz, who was not questioned on the record following the verdict, agreed that the incident "smacked of intimidation." As he explained:

> I believe it was an attempt to intimidate the jurors, and all the jurors agreed that it was an attempt to intimidate us. [Juror Trujillo] saw him waving and was the first person to call it an act of intimidation. We talked about the incident and I believe some people were very afraid and everyone was concerned. Up until that point, the proceedings were seen by the jury as an everyday thing. *In that moment, when the waving incident occurred, it became so real to us that our lives could be in jeopardy that the gang activity and frame of mind could actually be interjected into our personal lives and we could become victims in one way or another.*

> We started watching our backs and began to be more concerned about where we were staying and who was watching us. We would watch the women on the jury go [to] the parking lots before the incident, but after we would make sure they got into their cars safely. Each morning, we would check in with each other, asking how people slept or if anything strange happened overnight. It was uncomfortable. *We were concerned with our personal safety.*

11

Although the brother was never in court again after that, *those feelings never went away.* I thought that if the brother had the same temperament as the people in the gang being discussed in testimony, something could happen. *I thought we could be killed—the fear of it feeling like a mob strike, or the potential of a drive-by shooting.* At that point, things became so real. *We came to the realization that these people were capable of anything, including murder of jurors, innocent people, lawyers, others. We thought members of the gang or someone related to Juan Balderas could have upped the ante and taken out a slew of us.*

(Ex. G at ¶¶ 7-9 [Aff. of Juror Orosz] (emphasis added).) Juror Armstrong described the aftermath thus: "*It was hysteria.*" (Ex. C at ¶ 7 [Aff. of Juror Armstrong] (emphasis added).)

The jurors "were still talking about it" the next day in the jury room. Even though the bailiffs said "it should not be part of our deliberations," Juror Birney was "still scared" and the jurors "still discussed it." (Ex. D at ¶ 7 [Aff. of Juror Birney].) Other jurors confirmed that jurors continued to discuss the incident the next morning when they returned to their deliberations—mere hours before they found Mr. Balderas guilty. (*See* Ex. C at ¶ 8 [Aff. of Juror Armstrong]; Ex. F at ¶ 5 [Aff. of Juror Norwood]; Ex. G at ¶ 6 [Aff. of Juror Orosz].) As Juror Orosz explained: "The next day, the jury talked about the waving incident in the jury room. We discussed *how the incident sounded like what we were hearing about in the courtroom during trial.*" (Ex. G at ¶ 6 [Aff. of Juror Orosz] (emphasis added).) The level of distress surrounding the incident is notably absent from the record due to

12

Judge Guiney's failure to timely and fully inquire into the incident and its effect on the jurors.

Based on the foregoing facts, Mr. Balderas alleges in his Application for habeas relief that Judge Guiney failed to timely and properly inquire into frightening extraneous influences on the jury during guilt/innocence phase deliberations, thereby prejudicing Mr. Balderas's constitutional right to a fair trial. Because adjudicating the Application will require Judge Guiney to judge her own conduct, the OCFW, on Mr. Balderas's behalf, files the instant motion.

## LEGAL STANDARD

The Texas Rules of Civil Procedure governing recusal apply to both civil and criminal proceedings. *See Fuelberg v. State*, 410 S.W.3d 498, 508-09 (Tex. App.—Austin 2013). The relevant Rules are 18a & 18b.

Rule 18a provides:

A party in a case in any trial court . . . may seek to recuse or disqualify a judge who is sitting in the case by filing a motion with the clerk of the court in which the case is pending. The motion:

(1) must be verified;

(2) must assert one or more of the grounds listed in Rule 18b;

(3) must not be based solely on the judge's ruling in the case; and

(4) must state with detail and particularity facts that:

13

01395

(A) are within the affiant's personal knowledge, except that facts may be stated on information and belief if the basis for that belief is specifically stated;

(B) would be admissible in evidence; and

(C) if proven, would be sufficient to justify recusal or disqualification.

The primary basis for recusal at issue here is found in Rule 18b(b)(1): "A judge shall recuse themselves in all proceeding in which . . . [their] impartiality might reasonably be questioned[.]" TEX. R. CIV. PROC. 18b(b)(1). Texas appellate courts have interpreted this subsection (and its predecessor) as requiring an inquiry into "whether a reasonable member of the public at large, knowing all the facts in the public domain concerning the judge's conduct, would have a reasonable doubt that the judge is actually impartial." *See Kirby v. Chapman*, 917 S.W.2d 902, 908 (Tex. App.—Fort Worth 1996, no writ) (applying *Rogers v. Bradley*, 909 S.W.2d 872, 879 (Tex. 1995)); *Duffey v. State*, 428 S.W.3d 319, 325 (Tex. App.—Texarkana Feb. 21, 2014, no pet. h.) (finding trial judge's *ex parte* meeting with family members without attorneys present would have caused a reasonable member of the public at large to "have a reasonable doubt as to the trial judge's impartiality"). Texas law does not require proof of actual bias. That is, "beyond the demand that a judge be impartial is the requirement that a judge *appear* to be impartial so that no doubts or suspicions exist as to the fairness or integrity of the court." *Sears v. Olivarez*, 28 S.W.3d 611,

14

`613–14 (Tex. App.—Corpus Christi 2000, no pet.) (citing *Aetna Life Ins. v. Lavoie*, 475 U.S. 813 (1986) (emphasis added)).

The Supreme Court of the United States has likewise underscored that, in the interest of due process, "[o]bjective standards may also require recusal whether or not actual bias exists or can be proved." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 886 (2009). In short, even absent evidence of actual bias, recusal is nevertheless warranted if the facts, viewed objectively, could reasonably give rise to a suspicion of bias or partiality.

In addition to Rule 18b(b)(1), recusal is warranted here under Rule 18b(b)(3): "the judge has personal knowledge of disputed evidentiary facts concerning the proceeding[.]" TEX. R. CIV. PROC. 18b(b)(3).

## ARGUMENT

### I. Recusal Is Required under Rule 18b(b)(1) and/or Rule 18b(b)(3)

#### A. In View of the Facts Judge Guiney Must Assess in Adjudicating the Application, Recusal Is Required

Because Judge Guiney is alleged to have violated Mr. Balderas's due process rights, her "impartiality might reasonably be questioned" with respect to adjudicating the claim against herself. TEX. R. CIV. PROC. 18b(b)(1). Likewise, Judge Guiney is a witness with respect to key facts underlying Claim Five, including, but not limited to:

15

- What knowledge, if any, Judge Guiney or her staff had about where the jurors would be accommodated on the first night of sequestration;

- When she or her staff became aware of the conditions of the accommodation and/or its proximity to the crime scene;

- How she became aware of the conditions and proximity;

- What was the content of the apparent off-the-record conversations regarding the accommodation;

- What reasons, if any, Judge Guiney had for not inquiring further into the effect the accommodations had on the jury;

- When she or her staff became aware of the incident involving Mr. Balderas's brother waving at the jury's bus;

- How she found out about the incident and what she was told about it;

- To the extent she was aware of the incident before the guilty verdict was returned, why she did not address the matter until hours after the verdict was returned; and

- When she first informed trial counsel of the incident.

In other words, Judge Guiney "has personal knowledge of disputed evidentiary facts concerning the proceeding[.]" TEX. R. CIV. PROC. 18b(b)(3).

The face of the record sufficiently illustrates the factual basis for a recusal. Following both evenings of sequestration, Judge Guiney had to take to the record to discuss potentially prejudicial extraneous influences. However, on neither occasion did Judge Guiney timely and properly inquire into the extraneous influences and how they affected the jurors' deliberation. Post-conviction investigation further fleshes out the basis for recusal, establishing that the jurors were "unnerv[ed]" by

16

their proximity to crime scene on the first night and genuinely feared for their lives after the waving incident on the second night. Moreover, there is credible evidence that Judge Guiney was aware of the waving incident hours before the jury returned its guilty verdict but did not address the issue until after the verdict—a decision that has not yet been explained.

### B. In View of the Law that Judge Guiney Must Apply in Adjudicating the Application, Recusal Is Required

Judge Guiney cannot, objectively, assess whether her own conduct with respect to her failures to timely and properly inquire into highly prejudicial extraneous influences deprived Mr. Balderas of due process—yet that conduct is at the heart of one of his claims. To adjudicate the Application, Judge Guiney will have to assess whether her failure to question jurors about their proximity to the crime scene on the first night of sequestration and her failure to question jurors about the waving incident until *after* the verdict was returned amounted to constitutional violations that prejudiced Mr. Balderas.

Sixth Amendment jurisprudence "demonstrate[s] that the Supreme Court has clearly established a constitutional rule forbidding a jury from being exposed to an external influence." *Oliver v. Quarterman*, 541 F.3d 329, 336 (5th Cir. 2008); *see Parker v. Gladden*, 385 U.S. 363, 364 (1966) (stating that "the evidence developed against a defendant shall come from the witness stand in a public courtroom where

17

01399

there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel" (internal quotation marks omitted)).[5]

When confronted with concerns about extraneous influence or juror misconduct, a trial court's best practice is "to promptly inform" the parties of the concern so that the concerns may, in turn, be addressed. *See Gomez v. State*, 991 S.W.2d 870, 873 (Tex. Ct. App.—Houston [1st Dist.] 1999) (finding no reversible error because defendant provided no affidavits or other record to show that his substantial rights had been affected by trial court's failure to inform counsel of possible juror misconduct until after the jury was dismissed). To do so, a trial court should hold a hearing to determine the facts and assess the impact on the jurors' impartiality. *See, e.g., Remmer*, 347 U.S. 230 (finding defendant entitled to hearing to determine effect of extraneous remark on juror and whether defendant was prejudiced thereby); *United States v. Rutherford*, 371 F.3d 634 (9th Cir. 2004) (remanding for hearing on defendants' claim that jurors were intimidated by the presence of numerous government agents in courtroom during trial); *United States v. Forrest*, 620 F.2d 446 (5th Cir. 1980) (remanding for hearing to determine

---

[5] *See also Turner v. Louisiana*, 379 U.S. 466, 472 (1965) ("The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury."); *Mattox v. United States,* 146 U.S. 140, 149 (1892) (stating that "in capital cases [] the jury should pass upon the case free from external causes tending to disturb the exercise of deliberated and unbiased judgment").

whether defendant had been convicted by improperly influenced jury); *New Jersey v. Bisaccia*, 724 A.2d 836 (N.J. Super. Ct. Law Div. 1999) (finding trial court erred for failing to inquire into possible extraneous influence on jury and remanding for interviews with jurors to determine whether jury was tainted).

That a trial court makes some effort to address an extraneous influence or juror misconduct does not, in and of itself, protect a defendant's due process rights. The timing of the trial court's effort matters. A trial court must hold a hearing to investigate as soon as it becomes aware of the problem. For example, where the trial court is apprised before the end of trial—that is, before a verdict is returned—the hearing must also be held before the end of trial. *See Gomez v. State*, 991 S.W.2d 870, 873 (Tex. App.—Houston [1st Dist.] 1999). Certainly a trial court, put on notice that extraneous influence or misconduct may have occurred, should not allow a potentially prejudiced jury to deliberate to verdict without first probing the issue.

The breadth of a trial court's effort and investigation into potential incidents affecting the jury also impacts a defendant's due process rights. The trial court's inquiry should not be limited to interviewing some jurors; rather, the trial court should interview *all* members of the panel. *See, e.g., Forrest*, 620 F.2d 446; *New Jersey v. Loftin*, 922 A.2d 1210 (N.J. Super. Ct. Law. Div. 2007) (criticizing trial court for failing to ensure all members of jury panel not irreparably tainted); *Minnesota v. Erickson*, 597 N.W.2d 897 (Minn. 1999) (finding trial court

19

erred in not questioning all jurors regarding bailiff's improper communication with jury). At such a hearing, a trial court must establish that any prejudice resulting from the potential extraneous influence or juror misconduct did not infect any other jurors sitting in judgment of the defendant. (*Id.*)

As the Court of Criminal Appeals recently held, a trial court must not rely on jurors' "subjective thought processes and reactions"—including any assertion that their verdict was impartial and unbiased—to determine whether extraneous influence or misconduct has disturbed a defendant's right to a fair and impartial jury.[6] *See McQuarrie v. State*, 380 S.W.3d 145, 154 (Tex. Crim. App. 2012) (reversing judgment where juror's self-directed internet research shared with jury constituted "outside influence"). That is, "a trial court should be able to inquire as to whether jurors received such outside information and the impact it had on their verdict without delving into their actual deliberations." *Id.* Instead, a trial court should make "an objective determination as to whether the outside influence likely resulted in injury to the complaining party" by asking the jurors

---

[6] *See, e.g., Sassounian v. Roe*, 230 F.3d 1097, 1109 (9th Cir. 2000) (noting "although we may consider testimony concerning whether the improper evidence was considered, we may not consider the jurors' testimony about the subjective impact of the improperly admitted evidence"); *Hunley v. Godinez*, 975 F.2d 316 (7th Cir. 1999) (holding juror's claims that burglary of hotel rooms during sequestration would not affect verdict not dispositive given previously divided jury quickly voted to convict after burglary occurred); *Kelley v. Indiana*, 555 N.E.2d 140 (Ind. 1990) (declaring mistrial after jurors' improper contact with prosecution witness despite jurors' assertions of impartiality).

about the nature of the incident and then assessing "whether there is a reasonable possibility that it had a prejudicial effect on the 'hypothetical average juror.'" *Id.* (internal citations omitted).

Objectively speaking, Judge Guiney cannot be expected to assess whether the timing and degree of her own inquiry into the extraneous influences in fact satisfied due process requirements. This is not to suggest that Judge Guiney is actually biased. Due process "may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties." *In re Murchison*, 349 U.S. 133, 136 (1955). This is because "it is difficult if not impossible for a judge to free [herself] from the influence of what took place" and her own memory and interpretation of events. *Id.* at 138. That objectively difficult-to-impossible circumstance is why recusal is warranted here. Additionally, it has been established that Judge Guiney has personal knowledge of disputed evidentiary facts that are necessary to the disposition of Mr. Balderas's Application—facts that may not be available through other witnesses.

### C. All Components of Rule 18a and 18b Are Satisfied

This motion is "not based solely on" one of Judge Guiney's rulings, *e.g.*, her decision to deny Mr. Balderas's motion for mistrial following the perceived intimidation incident. *See* TEX. R. CIV. PROC. 18a(3). Instead, this motion focuses on Mr. Balderas's right to due process in the adjudication of a habeas claim based

21

. 01463

·on the entirety of Judge Guiney's conduct with respect to the extraneous influences on the jury.

Further, this motion details with particularity facts, supported by affidavits and other documentary evidence, that are "sufficient to justify recusal or disqualification." TEX. R. CIV. PROC. 18a(4). These facts support the conclusion that Judge Guiney's "impartiality might reasonably be questioned" and that she "has personal knowledge of disputed evidentiary facts." TEX. R. CIV. PROC. 18b(b)(1) & (3). Therefore, recusal is mandatory. *See id.* 18b(b)(1) ("A judge *shall* recuse themselves in all proceeding in which . . . [their] impartiality might reasonably be questioned"); *id.* 18b(b)(3) ("A judge *shall* recuse themselves in all proceeding in which . . . the judge has personal knowledge of disputed evidentiary facts concerning the proceeding") (emphasis added).

Pursuant to Rule 18a(f)(1), within three business days after the filing of this motion, Judge Guiney should either recuse herself or forward this matter to the Presiding Judge of the 2nd Administrative Judicial Region. *See* TEX. R. CIV. PROC. 18a(f)(1).

## PRAYER FOR RELIEF

For the foregoing reasons, Mr. Balderas asks that the Court grant his Verified

Motion for Recusal.

Respectfully submitted,

DATED:     February 1, 2016          By _____

DEREK VERHAGEN
Post-Conviction Attorney

23

. 01405

·VERIFICATION

State of Texas      §
County of Travis    §

BEFORE ME, the undersigned notary public, on February 1, 2016, personally appeared Derek VerHagen, who being by me duly sworn, stated under oath that he is attorney-in-charge for Juan Balderas in the Article 11.071 proceeding arising from cause no. 1412826-A; that he has read this motion; and that every statement contained in it is either within his personal knowledge and is true and correct, or is based on information and belief, based on the sworn affidavits attached to this motion; and that all exhibits to this motion are true and correct copies of the record excerpts as they purport to be.

_____
Derek VerHagen

     SUBSCRIBED AND SWORN TO before me on February 1, 2016, to certify which witness my hand and seal of office.

_____
Notary Public in and for the State of Texas

My Commission Expires: June 30, 2018



ADRIAN DE LA ROSA
Notary Public, State of Texas
My Commission Expires
JUNE 30, 2018

Notary without Bond

24

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Verified Motion for Recusal to:

Paula Gibson
Criminal Post-Trial
Harris County District Clerk
1201 Franklin Street, 3rd Floor
Suite 3180
Houston, TX 77002

Judge Kristin M. Guiney
179th District Court
1201 Franklin Street
15th Floor
Houston, TX 77002

Harris County District Attorney
c/o Lynn Hardaway
1201 Franklin
Suite 600
Houston, TX 77002

Juan Balderas
TDCJ # 999590
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, TX 77351

This certification is executed on February 1, 2016, at Austin, Texas.

_____
DEREK VERHAGEN

# IN THE 179TH DISTRICT COURT
# HARRIS COUNTY, TEXAS

13PP7

|  | ) | Cause No. |
| --- | --- | --- |
| **EX PARTE** | ) | **1412826-A** |
| **Juan Balderas,** | ) | |
| **APPLICANT** | ) | |
|  | ) | |
|  | ) | |

## ORDER ANNOUNCING VOLUNTARY RECUSAL AND
## REQUEST TO ASSIGN ANOTHER JUDGE

Having considered Applicant's Verified Motion for Recusal, the Court finds that the motion is well-taken and thus hereby GRANTS that motion. The undersigned judge recuses herself from presiding over this cause. In accordance with Rule 18a of the Texas Rules of Civil Procedure, the undersigned judge refers this case to the Presiding Judge of the 2nd Administrative Judicial Region of Texas and requests another judge be appointed to preside over this case.

_____

The Honorable Kristin M. Guiney
Presiding Judge, 179th District Court

Denied

3·20·16

# Exhibit B



# Second Administrative Judicial Region of Texas

## Olen Underwood
### Presiding Judge

*Melanie Sipes*
*Administrative Assistant*

*Rebecca Brite*
*Administrative Assistant*

March 3, 2016

Derek Verhagen; Erin Eckhoff
VIA FACSIMILE
Fax: 512-463-8590

Lynn Hardaway ADA
VIA FACSIMILE
Fax: 713-755-1839

179th District Court
VIA FACSIMILE
Fax: 713-368-9224

---

Attached please find Order Denying Applicant's Verified Motion for Recusal that was signed March 3, 2016 in Cause No.1412826-A; State of Texas vs Juan Balderas; 179th District Court, Harris County, Texas.

cc:    District Clerk
       Office of Court Administration

No. 1412826-A

| STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| VS | § | HARRIS COUNTY, TEXAS |
| | § | |
| JUAN BALDERAS | § | 179TH JUDICIAL DISTRICT |

### ORDER DENYING APPLICANT'S VERIFIED MOTION FOR RECUSAL

The Court considered the Motion to Recuse the Honorable Kristin Guiney filed by **Juan Balderas** in the above captioned case. Judge Guiney chose to decline to recuse voluntarily and referred the motion to the Presiding Judge of the Second Administrative Region pursuant to Rule 18a of the Texas Rules of Civil Procedure.

The Court has reviewed the motion and determined that it complains of the trial judge's rulings and actions in the case, but does not allege extra-judicial conduct on the part of the trial judge that would constitute a basis for a recusal. A party's remedy for unfair rulings is to assign error regarding the adverse rulings. See *Grider v. Boston Co,*, 773 S.W.2d 338, 346 (Tex. App.-Dallas 1989, writ denied). The Rule unambiguously indicates that a motion to recuse "must not be based solely on the judge's rulings in the case." *See* TEX. R. CIV. P. 18a(a)(3). A judge's conduct during a case does not constitute a basis for recusal unless it indicates a high degree of favoritism or antagonism that renders fair judgment impossible. *See Sommers v. Concepcion*, 20 S.W.3d 27,41 (Tex. App. – Houston [14th Dist.] 2000, pet. denied); *Ludlow v. DeBerry*, 959 S.W.2d 265, 270-72 (Tex. App. – Houston [14th Dist.] 1997, no writ). The motion does not meet this standard.

The Court ORDERS the motion DENIED without hearing.

The Court ORDERS the Clerk of the Court to transmit a certified copy of this order to

Olen Underwood, Presiding Judge
Second Administrative Judicial Region of Texas
301 North Thompson, Suite 102
Conroe, Texas 77301
Fax: (936)538-8167

Date signed: 3/3/2016          _Olen Underwood_
                               Judge Presiding

Office of Capital and Forensic Writs
Stephen F. Austin Building
1700 N. Congress Ave., Ste. 460
Austin, TX 78701

OFFICIAL BUSINESS
STATE OF TEXAS
PENALTY FOR
PRIVATE USE

PRESORTED
FIRST CLASS

US POSTAGE)
ZIP 78701 $ 002.62
02 1R
0001401603 MAR 11 2016

MAR 15 2016

Paula Gibson
Criminal Post-Trial
Harris County District Clerk
1201 Franklin Street, 3rd Floor
Suite 3180
Houston, TX 77002

11201 FRANKLIN ST #700 77002

B1ZEAB3 77002

01412





# OFFICE OF CAPITAL & FORENSIC WRITS

April 15, 2016

The Honorable Olen Underwood
Presiding Judge, Second Administrative Judicial Region
301 N. Thompson, Suite 102
Conroe, TX 77301

Re:    *Ex parte Obel Cruz-Garcia* (Cause No. 1384794-A)
       *Ex parte Juan Balderas* (Cause No. 1412826-A)

Dear Judge Underwood:

The Office of Capital and Forensic Writs ("OCFW") represents Obel Cruz-Garcia and Juan Balderas in their post-conviction state writs of habeas corpus. The OCFW filed a motion for recusal in Mr. Cruz-Garcia's case on January 21, 2016 that was denied by written order on January 28, 2016. The OCFW also filed a motion for recusal in Mr. Balderas's case on February 8, 2016 that was denied by written order on March 3, 2016.

The OCFW then filed motions for reconsideration in both cases, on February 16, 2016 for Mr. Cruz-Garcia and on March 15, 2016 for Mr. Balderas. The Court has not yet ruled on these motions. As these are both capital cases that will ultimately be reviewed by the Texas Court of Criminal Appeals and by the federal courts, the OCFW respectfully requests that orders be signed and entered on the motions for reconsideration in the interest of finality and clarity of the record. To facilitate this request, we are enclosing draft orders for your consideration. **The OCFW agrees to these orders only as to form.**

Respectfully,

Erin Eckhoff
Post-Conviction Attorney

cc: Lynn Hardaway, Harris County District Attorney
    Judge Kristin M. Guiney, 179th District Court
    Judge Renee Magee, 337th District Court
    Paula Gibson, Harris County District Clerk

# FILED
Chris Daniel
District Clerk

APR 2 2 2016

Time: 8:15

Harris County, Texas

By

Deputy

Stephen F. Austin Building
1700 N. Congress Avenue, Suite 460 • Austin, Texas 78711
Phone (512) 463-8600 • Fax (512) 463-8590

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging.

# IN THE 337th JUDICIAL DISTRICT COURT
# HARRIS COUNTY, TEXAS

_____  )    Cause No.
                         )    1384794-A
EX PARTE                 )
Obel Cruz-Garcia,        )
         APPLICANT       )
                         )
_____  )

## ORDER

By this order, Applicant's Motion for Reconsideration is GRANTED / DENIED.

ORDERED AND SIGNED on this _____ day of April, 2016.

_____
The Honorable Olen Underwood
Presiding Judge
Second Administrative Judicial Region




# OFFICE OF CAPITAL & FORENSIC WRITS

April 15, 2016

The Honorable Olen Underwood
Presiding Judge, Second Administrative Judicial Region
301 N. Thompson, Suite 102
Conroe, TX 77301

Re:     *Ex parte Obel Cruz-Garcia* (Cause No. 1384794-A)
        *Ex parte Juan Balderas* (Cause No. 1412826-A)

Dear Judge Underwood:

The Office of Capital and Forensic Writs ("OCFW") represents Obel Cruz-Garcia and Juan Balderas in their post-conviction state writs of habeas corpus. The OCFW filed a motion for recusal in Mr. Cruz-Garcia's case on January 21, 2016 that was denied by written order on January 28, 2016. The OCFW also filed a motion for recusal in Mr. Balderas's case on February 8, 2016 that was denied by written order on March 3, 2016.

The OCFW then filed motions for reconsideration in both cases, on February 16, 2016 for Mr. Cruz-Garcia and on March 15, 2016 for Mr. Balderas. The Court has not yet ruled on these motions. As these are both capital cases that will ultimately be reviewed by the Texas Court of Criminal Appeals and by the federal courts, the OCFW respectfully requests that orders be signed and entered on the motions for reconsideration in the interest of finality and clarity of the record. To facilitate this request, we are enclosing draft orders for your consideration. **The OCFW agrees to these orders only as to form.**

Respectfully,

Erin Eckhoff
Post-Conviction Attorney

cc: Lynn Hardaway, Harris County District Attorney
    Judge Kristin M. Guiney, 179th District Court
    Judge Renee Magee, 337th District Court
    Paula Gibson, Harris County District Clerk

Stephen F. Austin Building
1700 N. Congress Avenue, Suite 460 • Austin, Texas 78711
Phone (512) 463-8600 • Fax (512) 463-8590

01415

**IN THE 337th JUDICIAL DISTRICT COURT**
**HARRIS COUNTY, TEXAS**

|                          |   |                  |
|--------------------------|---|------------------|
|                          | ) | Cause No.        |
| EX PARTE                 | ) | 1384794-A        |
| Obel Cruz-Garcia,        | ) |                  |
|          APPLICANT       | ) |                  |
|                          | ) |                  |
|                          | ) |                  |

## ORDER

By this order, Applicant's Motion for Reconsideration is GRANTED / DENIED.

ORDERED AND SIGNED on this _____ day of April, 2016.

The Honorable Olen Underwood
Presiding Judge
Second Administrative Judicial Region

# IN THE 179TH DISTRICT COURT
# HARRIS COUNTY, TEXAS

EX PARTE       )   Cause No.
JUAN BALDERAS,      )   1412826-A
    APPLICANT    )

## ORDER

By this order, Applicant's Motion for Reconsideration is GRANTED / DENIED.

   ORDERED AND SIGNED on this _____ day of April, 2016.

         _____
         The Honorable Olen Underwood
         Presiding Judge
         Second Administrative Judicial Region

01417



Office of Capital and Forensic Writs
1700 N. Congress Avenue, Ste. 460
Austin, Texas 78701

OFFICIAL BUSINESS
STATE OF TEXAS
PENALTY FOR
PRIVATE USE

PRESORTED
FIRST CLASS



U.S. POSTAGE >> PITNEY BOWES

ZIP 78701
02 1W
0001401682 APR 18 2016
$ 000.39⁹

228 CQW-N3B 77002

Judge Renee Magee
337th District Court
1201 Franklin Street
15th Floor
Houston, TX 77002



# OFFICE OF CAPITAL & FORENSIC WRITS

May 4, 2016

The Honorable Olen Underwood
Presiding Judge, Second Administrative Judicial Region
301 N. Thompson, Suite 102
Conroe, TX 77301

F I L E D
Chris Daniel
District Clerk

MAY 0 5 2016

Time:_____
Harris County, Texas
By_____
Deputy

Re:    *Ex parte Obel Cruz-Garcia* (Cause No. 1384794-A)
       *Ex parte Juan Balderas* (Cause No. 1412826-A)

Dear Judge Underwood:

The Office of Capital and Forensic Writs ("OCFW") represents Obel Cruz-Garcia and Juan Balderas in their post-conviction state writs of habeas corpus. The OCFW filed a motion for recusal in Mr. Cruz-Garcia's case on January 21, 2016 that was denied by written order on January 28, 2016. The OCFW also filed a motion for recusal in Mr. Balderas's case on February 8, 2016 that was denied by written order on March 3, 2016.

The OCFW then filed motions for reconsideration in both cases, on February 16, 2016 for Mr. Cruz-Garcia and on March 15, 2016 for Mr. Balderas. The Court did not rule on these motions. On April 15, 2016, the OCFW respectfully requested that written orders be signed and entered on the motions in the interest of finality and clarity of the record, as these are both capital cases that will ultimately be reviewed by the Texas Court of Criminal Appeals and by the federal courts. To facilitate this request, the OCFW provided draft orders for the Court's consideration, which the OCFW agreed to only as to form.

Stephen F. Austin Building
1700 N. Congress Avenue, Suite 460 • Austin, Texas 78711
Phone (512) 463-8600 • Fax (512) 463-8590

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging.

Despite the OCFW's motions to recuse pending for months and the OCFW's request for written orders more than two weeks ago, the Court has not issued written orders on these motions to date. **Please be advised that if written orders on Mr. Balderas's and Mr. Cruz-Garcia's pending motions for reconsideration are not entered by Monday, May 9, 2016, the OCFW will consider them denied.**

Respectfully,

Erin Eckhoff
Post-Conviction Attorney

cc: Lynn Hardaway, Harris County District Attorney
    Judge Kristin M. Guiney, 179th District Court
    Judge Renee Magee, 337th District Court
    Paula Gibson, Harris County District Clerk



# OFFICE OF CAPITAL & FORENSIC WRITS

May 4, 2016

Criminal Post-Conviction Division
Attn: Paula Gibson
Harris County District Clerk
1201 Franklin Street, 3rd Floor
Houston, TX 77002

Re:    *Ex parte Obel Cruz-Garcia* (Cause No. 1384794-A)
        *Ex parte Juan Balderas* (Cause No. 1412826-A)

Dear Ms. Gibson,

Enclosed please find a copy of correspondence sent to Judge Olen Underwood regarding Mr. Cruz-Garcia and Mr. Balderas's pending motions for reconsideration. I have enclosed an extra copy of the face page of the correspondence and a self-addressed, stamped envelope. Please stamp the correspondence for the record, along with the extra face page and return it to my office via the enclosed envelope.

Please contact me at (512) 463-8503 should you have any questions or concerns about this request.

Thank you,

Erin M. Eckhoff
Post-Conviction Attorney

Stephen F. Austin Building
1700 N. Congress Avenue, Suite 460 • Austin, Texas 78711
Phone (512) 463-8600 • Fax (512) 463-8590

01421



Do not ship liquids, blood, or clinical specimens in this packaging.

FedEx Express

FedEx TRK# 0200 8070 5078 1655

THU - 05 MAY AA
STANDARD OVERNIGHT

AB EIXA

77002
TX-US
IAH

FID 115366 04MAY16 AUSA 539C1/6323/6A08

A 1655 05.05 8 16:00 RT 458 FZ

Package Airbill

FedEx Tracking Number 8070 5078 1655

Form ID No. 0200

fedex.com 1.800.GoFedEx 1.800.463.3339

**1 From**

Date 05/04/16 [redacted]

Sender's Name Erin Eckhoff Phone 512 463 2503

Company The Office of Capital & Forensic Writs

Address 1700 N Congress Ave Ste 460

City Austin State TX ZIP 78701

**2 Your Internal Billing Reference**

**3 To**

Recipient's Name Paula Gibson Phone 713 755-3981

Company Harris Co. District Clerk

Address 1201 Franklin St 3rd Floor

We cannot deliver to P.O. boxes or P.O. ZIP codes.

☐ HOLD Weekday

☐ HOLD Saturday

Address

Use this line for the HOLD location address or for continuation of your shipping address.

City Houston State TX ZIP 77002

**4 Express Package Service**

Next Business Day

☐ FedEx First Overnight

☐ FedEx Priority Overnight

☒ FedEx Standard Overnight

2 or 3 Business Days

☐ FedEx 2Day A.M.

☐ FedEx 2Day

☐ FedEx Express Saver

**5 Packaging**

☒ FedEx Envelope* ☐ FedEx Pak* ☐ FedEx Box ☐ FedEx Tube ☐ Other

**6 Special Handling and Delivery Signature Options**

☐ SATURDAY Delivery

☐ No Signature Required ☐ Direct Signature ☐ Indirect Signature

Does this shipment contain dangerous goods?

☒ No ☐ Yes As per attached Shipper's Declaration ☐ Yes Shipper's Declaration not required ☐ Dry Ice

☐ Cargo Aircraft Only

**7 Payment** Bill to:

☒ Sender ☐ Recipient ☐ Third Party ☐ Credit Card ☐ Cash/Check

Obtain Recip. Acct. No. ☐

[redacted]

Total Packages Total Weight [redacted] Credit Card Auth.

644

8070 5078 1655

Insert shipping document here.

Cause No. 1412826-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 179th DISTRICT COURT |
| | § | OF |
| JUAN BALDERAS, | § | HARRIS COUNTY, TEXAS |
| Applicant | | |

## RESPONDENT'S MOTION REQUESTING EXTENSION OF TIME

Respondent, the State of Texas, by and through its Assistant District Attorney for Harris County, Texas, respectfully requests, pursuant to TEX. CODE CRIM. PRO. art. 11.071, an extension of time in which to file the Respondent's answer in the above-styled styled case and for good cause shows the following:

### I.

On January 15, 2016, the applicant filed the instant application for writ of habeas corpus in *Ex parte Balderas,* cause number 1412826-A. Respondent received notice that the applicant had filed the instant writ on January 19, 2016. According to TEX. CODE CRIM. PRO. ANN. art. 11.071, the Respondent has 120 days to file its answer and may request an extension of time so that the Respondent's answer shall be filed no later than the 180th day after the date the Respondent received the writ.

### II.

The undersigned Assistant District Attorney is presently assigned approximately 40 postconviction capital cases in various stages of litigation. Also, factual investigation may be required to resolve the allegations contained in the instant habeas application.

FILED
Chris Daniel
District Clerk

MAY 13 2016

Time: 11:22

Harris County, Texas

By_____ Deputy

## III.

THEREFORE, the Respondent respectfully requests that the trial court GRANT the Respondent's Motion Requesting Extension of Time and ORDER that the Respondent file its answer in the above-captioned cause on or before the 18th day of July, 2016.

Respectfully submitted,

LYNN HARDAWAY
Assistant District Attorney
1201 Franklin, Suite 600
Houston, Texas 77002
(713) 274-5990
TBC No. 08948520
Hardaway_lynn@dao.hctx.net

## IV. Certificate of Service

The undersigned Assistant District Attorney certifies that this instrument was e-mailed and mailed to habeas counsel on Friday, May 13, 2016:

Benjamin B. Wolff
Derek Verhagen
Office of Capital and Forensic Writs
1700 N. Congress Avenue, St. 460
Austin, Texas 78711

LYNN HARDAWAY
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas 77002
(713) 274-5990
TBC No. 08948520
Hardaway_lynn@dao.hctx.net

2

Cause No. 1412826-A

| EX PARTE | § | IN THE 179th DISTRICT COURT |
| | § | OF |
| JUAN BALDERAS,<br>Applicant | § | HARRIS COUNTY, TEXAS |

### ORDER

Having considered the Respondent's Motion Requesting Extension of Time, the Court **GRANTS** the Respondent's Motion and **ORDERS** that the Respondent file its answer in the above-captioned cause on or before the 18th day of July, 2016.

SIGNED on the 13th day of May, 2016.



_____
PRESIDING JUDGE
179th District Court

3

. 01425

# IN THE 179TH DISTRICT COURT
# HARRIS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| EX PARTE | ) | Cause No. |
| Juan Balderas, | ) | 1412826-A |
| APPLICANT | ) | |
|  | ) | |
|  | ) | |

## MOTION FOR ORDER DESIGNATING ISSUES AND LIVE EVIDENTIARY HEARING; PROPOSED ORDER DESIGNATING ISSUES

BENJAMIN WOLFF (No. 24091608)
Director, Office of Capital and Forensic Writs
(E-Mail: Benjamin.Wolff@ocfw.texas.gov)
DEREK VERHAGEN (No. 24090535)
(E-Mail: Derek.VerHagen@ocfw.texas.gov)
ERIN ECKHOFF (No. 24090910)
(E-Mail: Erin.Eckhoff@ocfw.texas.gov)
Post-Conviction Attorneys

Office of Capital and Forensic Writs
1700 N. Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

**FILED**
Chris Daniel
District Clerk

AUG 0 5 2016

Time: _____
Harris County, Texas
By _____
Deputy

14/99.5

01426

# IN THE 179TH DISTRICT COURT
# HARRIS COUNTY, TEXAS

|                          |   |                        |
|--------------------------|---|------------------------|
|                          | ) | Cause No.              |
| **EX PARTE**             | ) | **1412826-A**          |
| Juan Balderas,           | ) |                        |
|     **APPLICANT** | ) |          |
|                          | ) |                        |
|                          | ) |                        |

## MOTION FOR ORDER DESIGNATING ISSUES AND LIVE EVIDENTIARY HEARING; PROPOSED ORDER DESIGNATING ISSUES

Juan Balderas, through his attorneys the Office of Capital and Forensic Writs ("OCFW"), moves this Court to find that there are controverted, previously unresolved factual issues material to the legality of Mr. Balderas's confinement and issue an order designating those factual issues to be resolved. Mr. Balderas further moves this Court to grant a live evidentiary hearing in order to receive evidence regarding the controverted issues of fact.

On January 15, 2016, Mr. Balderas filed his Initial Application for Writ of Habeas Corpus ("Initial Application") alleging claims of State misconduct, ineffective assistance of counsel, and juror misconduct, among others. The State filed its Original Answer ("Answer") denying each of Mr. Balderas's claims on July 18, 2016. The allegations made in these pleadings raise numerous controverted issues of fact. Article 11.071 of the Texas Code of Criminal Procedure instructs the

2

Court to issue an order designating unresolved issues of fact which, if resolved in Mr. Balderas's favor, would entitle him to habeas corpus relief.

Further, Mr. Balderas requests that the Court order the controverted issues of fact be resolved by way of a live evidentiary hearing. Because Mr. Balderas bears the burden of proof at the post-conviction stage, he must be afforded the opportunity to present the evidence necessary to meet his burden, including but not limited to testimony from the witnesses whose affidavits were submitted as exhibits to the Initial Application. Indeed, due process requires that Mr. Balderas be provided the opportunity to present his evidence at a hearing and to challenge and respond to the State's evidence. *See Panetti v. Quarterman*, 551 U.S. 930, 952 (2007); *Ford v. Wainwright*, 477 U.S. 399, 414 (1986).

### A. This Court Must Issue an Order Designating Factual Issues Pursuant to Article 11.071, Section 9.

Under Article 11.071, an applicant must file an Initial Application alleging specific facts which, if proven true, may call for relief. TEX. CODE CRIM. PROC. art. 11.071 § 4; *see also Ex parte Medina*, 361 S.W.3d 633, 638 (Tex. Crim. App. 2011) (applicant must plead "specific facts" to support claims but is not required to plead "evidence"). The State may then Answer or rest upon a general denial. *See* TEX. CODE CRIM. PROC. art. 11.071 § 7. The convicting court must then determine "whether controverted, previously unresolved factual issues material to the legality of the applicant's confinement exist" based on the allegations in the Initial

3

Application and the State's Answer. *Id.* § 8(a). If an Applicant pleads facts, which, if true, might call for relief, and the State denies those allegations or rests on a general denial, those factual issues are "controverted." *See, e.g., Ex Parte Carnes*, 579 S.W.2d 249 (Tex. Crim. App. 1979) (holding the finding of the absence of controverted, previously unresolved facts material to the legality of confinement to be an abuse of discretion where the applicant pleaded a cognizable claim and the State admitted none of the facts alleged).[1]

When a court determines that controverted, previously unresolved factual issues exist, the court must then issue an order designating the issues of fact that are to be resolved and announce the manner by which those issues will be resolved.[2]

---

[1] *See also Ex Parte Ramirez*, No. WR-64076-01, 2006WL1173437 (Tex. Crim. App. May 3, 2006) (holding that the Applicant alleged unresolved factual issues material to confinement requiring resolution where the applicant alleged ineffective assistance of counsel due to a conflict of interest); *Ex Parte Newby*, No. WR-64060-01, 2006WL1173422 (Tex. Crim. App. May 3, 2006) (overruling the trial court holding that there were no controverted, previously-unresolved facts material to the legality of confinement, and holding that the applicant had stated facts requiring resolution where it was alleged that appellate counsel was ineffective for failing to inform the Applicant that he was entitled to file a petition for discretionary relief); *Ex Parte Karlson* ,282 S.W.3d 118, 130 (Tex.App.—Ft. Worth 2009) ("When faced with conflicting evidence... the trial court was required to resolve the conflict.").

[2] In the event that a convicting court determines, based on the pleadings, that previously unresolved factual issues material to confinement do not exist, Article 11.071, Section 8(b) governs. The procedure delineated in Section 8(b), however, is only appropriate when a court determines that the allegations of unconstitutional confinement may be resolved on the pleadings alone. Where, as here, the resolution of the factual issues raised by the claims requires extra-record evidence—whether by affidavit, deposition, live testimony, or the convicting judge's personal recollection of trial proceedings—Section 8(b) is inapplicable. Notably, the State's

4

TEX. CODE CRIM. PROC. art. 11.071 § 9(a). These two statutory steps are *mandatory*, as they provide an applicant notice, consistent with due process, of the issues to be resolved and the manner by which the court will receive evidence to resolve them.

In this case, Mr. Balderas alleged multiple constitutional violations, including State and juror misconduct and ineffective assistance of counsel. In support of these allegations, Mr. Balderas attached affidavits and other exhibits to his Initial Application. These affidavits and other exhibits do not constitute evidence. Rather, they merely support Mr. Balderas's factual allegations so that he may meet his pleading standard under *Ex parte Medina*. *See* 361 S.W.3d at 638.

The State's Answer denied the allegations in Mr. Balderas's Initial Application. The State denied some of the allegations directly and attached affidavits and other exhibits to support those denials. Like the affidavits and other exhibits attached by Mr. Balderas in his Initial Application, the State's affidavits and other exhibits do not constitute evidence. Further, to the extent that the State's Answer did not address other allegations by Mr. Balderas, the State is understood under Article 11.071, Section 7, to be resting on a general denial. In either case, the State's denials of Mr. Balderas's allegations create numerous controverted issues of

---

request that the Court conduct fact-finding beyond the pleadings by ordering trial counsel to submit affidavits conceded Section 8(b) is inapplicable in this case.

fact that, depending on what evidence this Court ultimately accepts and credits, may warrant habeas relief for Mr. Balderas. *See, e.g., Ex Parte Carnes*, 579 S.W.2d 249.

Though not an exhaustive list, some examples of the controverted issues of fact in this case include:

### *Claims One and Two*

Mr. Balderas alleges that the State knowingly or unknowingly sponsored false testimony. To support this allegation, Mr. Balderas offered a hearsay affidavit from an OCFW investigator stating that a State's witness, Israel Diaz, recanted his trial testimony and claimed to have been coerced by the State at a meeting in advance of Mr. Balderas's trial to provide false testimony against Mr. Balderas. If shown to be true, Mr. Balderas would be entitled to habeas relief.

The State denied the allegations. To support its denial, the State offered an affidavit from Mr. Diaz's trial attorney, Allen Isbell, claiming that he did not witness such a meeting between the State and Mr. Diaz if it occurred. The State also offered an affidavit from one of three prosecutors involved in Mr. Balderas's case, Traci Bennett, asserting that she did not tell Mr. Diaz to change his testimony.

The Court has before it two conflicting allegations of what happened with regard to Mr. Diaz's testimony. These allegations are clearly material to the resolution of Mr. Balderas's claims. Therefore, the Court must include it its order

6

designating issues whether the State knowingly or unknowingly sponsored false testimony.[3]

*Claim Three*

Mr. Balderas alleges that the State withheld notes from a pre-trial interview with Mr. Diaz (the "Diaz Notes") which show that Mr. Diaz's trial testimony differed significantly from what he originally told the State prosecutors; namely, that he did not see Mr. Balderas on the night of the shooting and therefore could not identify the clothing Mr. Balderas was wearing or place Mr. Balderas near the crime scene with the murder weapon. Mr. Balderas alleged that the Diaz Notes containing prior inconsistent statements were not included in discovery provided to trial counsel, and he attached the Diaz Notes to the Initial Application as an exhibit.

In response, the State claimed that the Diaz Notes were made available to trial counsel. In support, the State offered an affidavit from former prosecutor Spence Graham asserting that the Diaz Notes, along with the "Capital Murders Summary" in Mr. Balderas's case, were in the State's file and made available to trial counsel. The State also attached an affidavit from Ms. Bennett asserting the Diaz Notes were made available to trial counsel.

---

[3] Mr. Balderas has attached a proposed Order Designating Issues for the Court's consideration.

On more than one occasion, however, the State's post-conviction counsel, Lynn Hardaway, has made representations on the record before this Court that conflict with the State's position in its Answer. On two separate dates, Ms. Hardaway argued that both handwritten notes like the Diaz Notes and the Capital Murder Summary were protected by work-product privilege and thus not discoverable. *See* Oct. 27, 2015 Hearing Transcript, at 15-18; Dec. 1, 2015 Hearing Transcript, at 8-9. This Court also stated on the record that the Capital Murder Summary would be protected by the work-product privilege and therefore would not be turned over to the defense. *See* Oct. 27, 2015 Hearing Transcript, at 17. Notably, Ms. Hardaway specifically argued that the State's disclosure to the OCFW of the Diaz Notes was inadvertent and did not constitute waiver of the work-product privilege the State was still asserting as of December 2015 for other handwritten notes relating to witness interviews. *See* Dec. 1, 2015 Hearing Transcript, at 8-9.

Again, the Court has before it conflicting allegations regarding whether the notes from Mr. Diaz's interview were made available to trial counsel in advance of Mr. Balderas's trial. Thus, the Court must include in its ODI whether the State withheld the Diaz Notes from trial counsel.

### *Claims Four, Six, Eight, Nine, and Ten*

Mr. Balderas's Initial Application includes claims that he received ineffective assistance of counsel at the guilt, punishment, pre-trial, and jury selection phases of

his trial. Mr. Balderas alleged numerous facts within each of these claims and attached affidavits and other exhibits to support them.

The State's Answer denied these allegations. However, the State also requests that this Court order trial counsel to produce affidavits addressing these claims.[4] *See* State's Answer at 18, 25, 27, 28, 61, 62, 68, 75, 85, 87, 89. In so doing, the State conceded that controverted factual issues exist and require additional fact-finding.[5]

The Court has before it conflicting allegations regarding whether trial counsel provided ineffective assistance of counsel to Mr. Balderas. Consequently, the Court must include in its ODI whether trial counsel were ineffective at the guilt, punishment, pre-trial, and jury selection phases of trial.

### *Claim Five*

Mr. Balderas alleges that the jurors, while sequestered during trial and before coming to verdict at the guilt phase, were exposed to two separate experiences that constitute external influences, including sequestration near the crime scene and in the gang territory discussed in trial testimony; and an incident involving Mr. Balderas's brother that jurors interpreted as a threat and intent to intimidate. Mr.

---

[4] The State similarly requests that the Court order trial counsel affidavits regarding Mr. Balderas's allegations in Claim Three.

[5] As discussed further below, Mr. Balderas objects to the State's efforts to limit additional fact-finding to only one source: trial counsel. Not only would trial counsel affidavits addressing these claims alone be insufficient to resolve the many controverted issues of fact in this case, *trial counsel cannot ethically offer such testimony outside of a formal proceeding.*

9

Balderas attached affidavits from juror relaying these experiences. Mr. Balderas also alleged that the Court failed to timely and properly address these extraneous influences. Mr. Balderas also alleged that one juror engaged in misconduct when, in violation of the Court's admonishments, he regularly posted updates the trial on Facebook, inviting at least one of his Facebook "friends" to encourage the juror to give Mr. Balderas death. Mr. Balderas attached copies of the juror's Facebook page to support this allegation.

The State denied these allegations. To support its denial, the State offered an affidavit from Vickie Long, an employee of the Harris County District Court's administration, asserting that she made the sequestration accommodations for the jurors and was unaware she housed them near the crime scene. Because the State failed to directly address the allegation that the Court failed to timely and properly address these extraneous influences on the jury, it is deemed generally denied.

The Court has before it conflicting allegations regarding whether Mr. Balderas was prejudiced by the jury's exposure to extraneous influences and juror misconduct, and by the Court's failure to properly address the extraneous influences. Consequently, the Court must include in its ODI whether the jury was influenced by extraneous experiences and whether jurors engaged in misconduct.

. 01435

Accordingly, this Court must, pursuant to Article 11.07, Section 9, issue an order designating the issues of fact to be resolved so that the Court may rules on the legal claims raised in Mr. Balderas's Initial Application.

## B. Due Process Requires that the Controverted Issues of Fact Should be Resolved by Live Evidentiary Hearing.

Once a trial court has determined that controverted material facts exist—*i.e.*, if the State denies factual allegations made by the applicant that would support habeas relief if proven to be true—and enters an order designating issues, then the court shall hold an evidentiary hearing to accept evidence and resolve the controverted facts. TEX. CODE CRIM. PROC. art. 11.071 § 9. The court may accept evidence, for example, by affidavits, depositions, interrogatories, or live evidentiary hearing. *Id.* Although the court is granted discretion as to the method it receives evidence under Article 11.071, Section 9, it is still bound by the "basic requirements" of due process.[6]

A fundamental requisite of procedural due process is the opportunity to be heard. *Panetti*, 551 U.S. at 949; *Ford*, 477 U.S. at 413. This right applies any time

---

[6] For example, Section 9 gives the trial court the discretion to resolve factual issues via live evidentiary hearing. However, the trial court does not have the discretion to allow *only* the State to present witnesses at the live hearing and/or deny the applicant the opportunity to cross-examine those witnesses. Likewise, the trial court may choose to resolve factual issues via affidavit. However, the trial court may not choose to accept affidavits from *only* the State and/or deny the applicant the opportunity to challenge or rebut the information in the affidavits.

11

. 61466

a liberty interest is at stake, including during habeas corpus proceedings in a death penalty case. *Ford*, 477 U.S. at 414. Simply allowing a capital defendant to file pleadings and motions does not satisfy due process, however. A defendant must be given the opportunity to be heard in a meaningful manner so that the factfinder is provided with all possible relevant information about the defendant whose fate it must determine. *Id.* (citing *Jurek v. Texas*, 428 U.S. 262, 276 (1976)). This is especially true in a capital case when there is a heightened concern for fairness and accuracy. Indeed, "any procedure that precludes the prisoner or his counsel from presenting material relevant to his [claims] or bars consideration of that material by the factfinder is necessarily inadequate." *Id.* At a minimum, due process requires that a capital defendant be allowed to substantiate a claim with his own evidence and be given the opportunity to challenge and respond to the State's evidence against him before such a claim is rejected. *Panetti*, 551 U.S. at 952; *Ford*, 477 U.S. at 414-15 (citing *Solesbee v. Balkcom*, 339 U.S. 9, 23 (1950) (Frankfurter, J., dissenting)).

Thus, due process requires that an applicant for habeas relief be provided the opportunity to introduce evidence at a hearing, to challenge and respond to the State's evidence, and the right to judicial findings based on the evidence once it has been properly admitted. *See Ford*, 477 U.S. at 414; *Panetti*, 551 U.S. at 952; *see also In re Oliver*, 333 U.S. 257, 274 (1948) ("a right to be heard . . . [is] basic in our

12

system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel").

Again, though not an exhaustive list, some of controverted issues in this case that necessitate a live evidentiary hearing include:

### Claims One and Two

Mr. Balderas must have the opportunity to examine Mr. Diaz under oath regarding the veracity of his trial testimony and his subsequent admissions that he provided false testimony. If necessary, Mr. Balderas must have the opportunity to present testimony from Adrián de la Rosa, the investigator who interviewed Mr. Diaz. Mr. Balderas must also have the opportunity to cross-examine the witnesses whom the State is relying on to refute Mr. Balderas's claims. Specifically, Mr. Isbell must be examined on his knowledge of Mr. Diaz's dealings with the State, and Ms. Bennett must be examined on her involvement in dealing with Mr. Diaz and her memory of those dealings.[7] Because Ms. Bennett was not the only prosecutor working on Mr. Balderas's case, Mr. Balderas must also have the opportunity to examine another prosecutor, Caroline Dozier, who the State has previously

---

[7] Though the State specifically describes the affidavits provided by Mr. Isbell and Ms. Bennett as "credible" (see State's Answer at 7), it is, of course, the duty of the Court, not the State, to make such a determination. Notably, however, a witness's credibility cannot be determined from affidavits alone, and a court should "convene an evidentiary hearing to see and hear the witnesses" before evaluating their credibility. See Manzi v. State, 88 S.W.3d 240, 254-55 (Tex. Crim. App. 2002) (Cochran, J., concurring).

13

acknowledged participated in dealings with Mr. Diaz and took some of the Diaz Notes at issue. *See* Dec. 1, 2015 Hearing Transcript, at 8.

### *Claim Three*

Mr. Balderas must have the opportunity to examine trial counsel to determine whether they had access to the Diaz Notes. Mr. Balderas must also have the opportunity to confront the witnesses whom the State is relying on to refute this claim. Specifically, Mr. Graham and Ms. Bennett must be cross-examined regarding their memory of the materials contained in the file provided to trial counsel; how the State determined what material was protected by the work-product privilege at that time; whether the State's policy for determining when work-product privilege applied has changed; and, if so, when and how that policy changed.

### *Claims Four, Six, Eight, Nine, and Ten*

Mr. Balderas must have the opportunity to examine trial counsel regarding their representation of Mr. Balderas. For example, Mr. Balderas must have the opportunity to examine trial counsel regarding their guilt phase investigation, including whether they interviewed certain witnesses; whether they were aware that certain witnesses could provide an alibi for Mr. Balderas; if they were aware of alibi witnesses, why trial counsel did not present their testimony at trial; and why they did not present testimony from eyewitness expert Dr. Roy Malpass at trial. Mr.

01439

Balderas must also have the opportunity to present testimony from the witnesses that provided affidavits in support of his Initial Application.

Notably, trial counsel's ethical duties conflict with the State's preferred method of fact-finding on these issues, trial counsel affidavits. Rather, trial counsel's ethical duties further support Mr. Balderas's assertion that a live evidentiary hearing is necessary to resolve the controverted facts in this case.

Mr. Balderas's trial counsel owe him a continuing duty of loyalty. *See* Tex. Disciplinary Rules of Prof'l Conduct R. 1.9, *reprinted in* TEX. GOV'T CODE Ann., tit. 2, subtit. G, app. A (West 2013); ABA *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913 (2003) ("*ABA Guidelines*"), Guideline 10.13. Texas attorneys also have the ethical duty to their former clients to limit the disclosure of confidential privileged information only to the extent reasonably necessary to defend against the claim of ineffective assistance. Tex. Disciplinary Rules of Prof'l Conduct R. 1.05(c)(5); *see also* State Bar of Texas *Guidelines and Standards for Texas Capital Counsel*, 69 Tex. B.J. 966 (2006) ("*Texas Guidelines*"), Guideline 11.8 ("In accordance with professional norms, all persons who are or have been members of the defense team have a continuing duty to safeguard the interests of the client.")

Trial counsel's duty of confidentiality "applies not only to matters communicated in confidence by the client but also to all information relating to the

15

. 01440

representation, whatever its source." ABA Formal Opinion 10-456 at 1; *see also* ABA Model Rule of Disciplinary Conduct 1.05, 1.06. Ordinarily, trial counsel may disclose confidential client information only where "a lawyer is called as a witness in a deposition, a hearing or other formal proceeding" and "only if the court requires the lawyer to do so after adjudicating any claims of privilege or other objections raised by the client." *Id.* at 2. Even if information sought by the prosecution[8] is relevant and not privileged, "it does not follow that trial counsel may disclose such information outside the context of a formal proceeding, thereby eliminating the former client's opportunity to objection and obtain a judicial ruling." *Id.* Thus, to the extent the State asserts that trial counsel's input is necessary to resolve controverted issues of fact raised by Mr. Balderas, trial counsel must offer such input through a formal proceeding that allows Mr. Balderas the opportunity to object, such as a live evidentiary hearing.

---

[8] In some cases, a limited waiver of the attorney-client confidentiality may occur where a former client raises a claim of ineffective assistance of counsel against a former attorney. *Joseph v. State*, 3 S.W.3d 627, 637 (Tex. App.—Houston [14th Dist.] 1999, no pet.). However, an attorney may respond to such allegations only insofar as the lawyer reasonably believes it is *necessary* to do so. And when a lawyer does so, the lawyer "may not disclose all information relating to the representation, but only particular information that reasonably much be disclosed to avoid adverse legal consequences." ABA Formal Opinion 10-456 at 4.

. 01441

*Claim Five*

Mr. Balderas must have the opportunity to present testimony from jurors regarding their exposure to and the effects of the multiple extraneous influences they experienced during Mr. Balderas's trial. Mr. Balderas must also have the opportunity examine those jurors who engaged in misconduct regarding that misconduct and its effect on their partiality. Mr. Balderas must also have the opportunity to examine witnesses regarding the Court's knowledge of the multiple extraneous influences and the Court's procedure for addressing them.

Due process and United States Supreme Court precedent dictate that this Court should conduct an evidentiary hearing to investigate and address allegations of juror misconduct and bias. *See, e.g., Smith v. Phillips,* 455 U.S. 209, 215 (1982) ("[t]his Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias"); *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 551–52 & n. 3 (1984) (stating that proper resolution of whether juror's "unrevealed information" during voir dire showed juror bias is to remand case to district court to conduct a hearing to decide that factual question); *Remmer v. United States,* 347 U.S. 227, 230 (1954) (remanding case to district court to determine whether attempted bribery of juror influenced him and made him prejudiced). *See also Solis v. Cockrell,* 342 F.3d 392, 399 (5th Cir. 2003) (post-conviction hearing conducted by trial court which

17

turned up no prejudice toward defendant by juror protected habeas applicant's right to trial by impartial jury); *Tinsley v. Borg,* 895 F.2d 520, 524–26 (9th Cir. 1990) (citing *Phillips* and noting that post-trial hearing is appropriate mechanism to resolve constitutional claims of juror bias when juror fails to disclose material information during voir dire).

In sum, Mr. Balderas must be given the opportunity to present evidence necessary to support the factual allegations made in the Initial Application and to respond to any evidence presented or elicited by the State. *See Panetti*, 551 U.S. at 952; *Ford*, 477 U.S. at 414-15. Accordingly, Mr. Balderas requests the Court order a live evidentiary hearing and allow Mr. Balderas to provide testimony from witnesses, *including but not limited to* those whose affidavits were submitted as evidentiary proffers and attached as exhibits to the Initial Application.

01443

## PRAYER FOR RELIEF

For the foregoing reasons, Mr. Balderas requests this Court issue an order determining that controverted, unresolved factual issues that are material to the legality of Mr. Balderas's confinement exist in this case and must be resolved. Mr. Balderas further requests that, to resolve those controverted factual issues, this Court order a live evidentiary hearing to comply with due process and allow Mr. Balderas the opportunity to (1) present the evidence necessary to meet his burden of proof for habeas corpus relief, and (2) confront and challenge the State's evidence in response.

Respectfully submitted,

DATED:    August 5, 2016

By: _____
Erin M. Eckhoff
Post-Conviction Attorney

01444

# IN THE 179TH DISTRICT COURT
## HARRIS COUNTY, TEXAS

|  |  |  |
|---|---|---|
|  | ) | **Cause No.** |
| **EX PARTE** | ) | **1412826-A** |
| **Juan Balderas,** | ) |  |
| **APPLICANT** | ) |  |
|  | ) |  |
|  | ) |  |

## ORDER DESIGNATING ISSUES

Having reviewed Juan Balderas's Initial Application for Writ of Habeas Corpus ("Application"), filed on January 15, 2016, and the State's Response thereto, and pursuant to Article 11.071, Section 9(a), of the Code of Criminal Procedure, this Court determines that controverted, previously unresolved factual issues exist that are material to the legality of Mr. Balderas's confinement. This Court makes this determination with respect to Claims One through Fourteen of Mr. Balderas's Application.

The Court further orders that resolution of the issues of fact will occur by an evidentiary hearing held with this Court on a date to be determined by agreement of the parties and the Court. At this hearing, the parties will be allowed to present evidence, and the Court will accept testimony of lay and expert witnesses, either live or by affidavit. All pre-hearing issues will be considered at a status conference prior to the first day of the evidentiary hearing.

ORDERED AND SIGNED on this ___ day of August, 2016.

_____
The Honorable Kristin M. Guinney
Judge, 179th District Court

20

. 01445

# CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Motion for Order Designating Issues and Live Evidentiary Hearing and Proposed Order Designating Issues to:

Paula Gibson
Criminal Post-Trial
Harris County District Clerk
1201 Franklin Street, 3rd Floor
Suite 3180
Houston, TX 77002

Judge Kristin M. Guiney
179th District Court
1201 Franklin Street
15th Floor
Houston, TX 77002

Harris County District Attorney
c/o Lynn Hardaway
1201 Franklin
Suite 600
Houston, TX 77002

Juan Balderas
TDCJ # 999590
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, TX 77351

This certification is executed on August 5, 2016, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____
Erin M. Eckhoff

Cause No 1412826-A



EX PARTE § IN THE 179TH DISTRICT COURT

§ OF

JUAN BALDERAS, § HARRIS COUNTY, TEXAS
Applicant

## STATE'S MOTION TO DESIGNATE ISSUES

The State of Texas, by and through its Assistant District Attorney for Harris County,

Texas, respectfully requests that the Court designate that the applicant raised the following

issues in his application for writ of habeas corpus

### Applicant's First and Second Grounds

Alleged false testimony of State's guilt/innocence witness Israel Diaz

### Applicant's Third Ground

Alleged violation of the precepts of *Brady v Maryland*, 373 U S 83
(1963), and its progeny based on the State's alleged failure to disclose
impeachment information regarding witness Israel Diaz

### Applicant's Fourth Ground

Alleged ineffective assistance of trial counsel for failure to investigate and
present alibi evidence, failure to investigate and present other evidence of
innocence, failure to present testimony of an eyewitness identification
expert, and, failure to investigate alleged outside influences and juror
misconduct as grounds for motion for new trial

### Applicant's Fifth Ground

Alleged denial of right to fair trial due to jury's exposure to outside
influences and misconduct

### Applicant's Sixth Ground

Alleged ineffective assistance of trial counsel for failure to investigate and
present mitigating evidence, failure to investigate and present evidence
rebutting the applicant's extraneous offenses, failure to object and
preserve error concerning alleged comments on applicant's failure to
testify, failure to object and preserve error concerning the trial court's
denial of funds to produce witnesses from Mexico, and, engaging in
behavior that allegedly alienated the jury

**RECORDER'S MEMORANDUM**
This instrument is of poor quality
at the time of imaging

**FILED**
Chris Daniel
District Clerk

SEP - 7 2016

Time _____
Harris County, Texas

By _____
Deputy

. 01447

### Applicant's Seventh Ground
State's alleged presentation of false testimony through witness Christopher Pool

### Applicant's Eighth Ground
Alleged failure to timely and competently assert the applicant's right to a speedy trial

### Applicant's Ninth Ground
Alleged ineffective assistance of counsel during jury selection for failing to address the topic of sexual abuse during *voir dire* and failing to preserve the record

### Applicant's Tenth Ground
Alleged agreements between the State and defense to excuse prospective jurors without examination that allegedly violated the applicant's equal protection rights

### Applicant's Eleventh Ground
Alleged unconstitutionality of the applicant's death sentence based on purported discrimination by the district attorney's office,

### Applicant's Twelfth Ground
Alleged unconstitutionality of the 10-2 Rule

### Applicant's Thirteenth Ground
Alleged unconstitutionality of death sentence based on absence of definitions for key terms in the future danger special issue and failure to narrow the class of death-eligible defendants

### Applicant's Fourteenth Ground
The punishment charge allegedly limited the evidence that the jury could find mitigating

The State requests that the Court, pursuant to TEX CODE CRIM PROC art 11 071, resolve – based on the manner the Court deems appropriate – some of the designated issues by application of the applicable law, some by review of the appellate record and application of applicable law, some by review of the pleadings, some by review of affidavits submitted by trial counsel, some by recollection of the trial court, and some by review of submitted habeas exhibits

Service has been accomplished by emailing a copy of this instrument to counsel for the

applicant on the 7th day of September, 2016

Benjamin B Wolff, Director, or
Derek Verhagen or
Erin Eckhoff
Office of Capital and Forensic Writs
1700 North Congress Ave , Suite 460
Austin, Texas 78701

Respectfully submitted,

LYNN HARDAWAY
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas 77002
(713) 274-5990
(713) 755-5809 fax
TBC No 08948520
Hardaway_Lynn@dao hctx net

Cause No 1412826-A

| EX PARTE | § | IN THE 179TH DISTRICT COURT |
|---|---|---|
| | § | OF |
| JUAN BALDERAS, Applicant | § | HARRIS COUNTY, TEXAS |

## COURT'S ORDER DESIGNATING ISSUES

The Court designates that the applicant submitted the following issues in his application for writ of habeas corpus in the above-styled case

### Applicant's First and Second Grounds
Alleged false testimony of State's guilt/innocence witness Israel Diaz

### Applicant's Third Ground
Alleged violation of the precepts of *Brady v Maryland*, 373 U S 83 (1963), and its progeny based on the State's alleged failure to disclose impeachment information regarding witness Israel Diaz

### Applicant's Fourth Ground
Alleged ineffective-assistance of trial counsel for failure to investigate and present alibi evidence, failure to investigate and present other evidence of innocence, failure to present testimony of an eyewitness identification expert, and, failure to investigate alleged outside influences and juror misconduct as grounds for motion for new trial

### Applicant's Fifth Ground
Alleged denial of right to fair trial due to jury's exposure to outside influences and misconduct

### Applicant's Sixth Ground
Alleged ineffective assistance of trial counsel for failure to investigate and present mitigating evidence, failure to investigate and present evidence rebutting the applicant's extraneous offenses, failure to object and preserve error concerning alleged comments on applicant's failure to testify, failure to object and preserve error concerning the trial court's denial of funds to produce witnesses from Mexico, and, engaging in behavior that allegedly alienated the jury

### Applicant's Seventh Ground
State's alleged presentation of false testimony through witness Christopher Pool

### Applicant's Eighth Ground
Alleged failure to timely and competently assert the applicant's right to a speedy trial

**Applicant's Ninth Ground**
Alleged ineffective assistance of counsel during jury selection for failing to address the topic of sexual abuse during *voir dire* and failing to preserve the record

**Applicant's Tenth Ground**
Alleged agreements between the State and defense to excuse prospective jurors without examination that allegedly violated the applicant's equal protection rights

**Applicant's Eleventh Ground**
Alleged unconstitutionality of the applicant's death sentence based on purported discrimination by the district attorney's office,

**Applicant's Twelfth Ground**
Alleged unconstitutionality of the 10-2 Rule

**Applicant's Thirteenth Ground**
Alleged unconstitutionality of death sentence based on absence of definitions for key terms in the future danger special issue and failure to narrow the class of death-eligible defendants

**Applicant's Fourteenth Ground**
The punishment charge allegedly limited the evidence that the jury could find mitigating

The Court further finds that, pursuant to TEX CODE CRIM PROC art 11 071, the Court will resolve – based on the manner the Court deems appropriate – some of the designated issues by application of the applicable law, some by review of the appellate record and application of applicable law, some by review of the pleadings, some by review of affidavits submitted by trial counsel, some by recollection of the trial court, and some by review of submitted habeas exhibits

SIGNED this ___16___ day of September, 2016

Kristin M Guiney
Presiding Judge
179th District Court
Harris County, Texas



**CHRIS DANIEL**
**HARRIS COUNTY DISTRICT CLERK**

September 20, 2016

DEVON ANDERSON
DISTRICT ATTORNEY
HARRIS COUNTY, TX

To Whom It May Concern

Pursuant to Article 11 07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1412826-A in the 179th District Court

☐ State's Original Answer Filed  ,

☐ Affidavit  ,

☐ Court Order Dated  ,

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit

☐ Respondent's Proposed Findings of Fact and Order  ,

☒ Other

Sincerely,

Darian Ray, Deputy
Criminal Post Trial

Enclosure(s) – STATE'S MOTION TO DESIGNATE ISSUES/ COURTS ORDER DESIGNATING ISSUE

01452



# CHRIS DANIEL
## HARRIS COUNTY DISTRICT CLERK

September 20, 2016

KELLEY REYES
COURT OF CRIMINAL APPEALS
P O BOX 12308
CAPITOL STATION
AUSTIN, TEXAS 78711

To Whom It May Concern

Pursuant to Article 11 07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1412826-A in the 179th District Court

☐ State's Original Answer Filed                 ,

☐ Affidavit            ,

☐ Court Order Dated             ,

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit

☐ Respondent's Proposed Findings of Fact and Order              ,

☒ Other

Sincerely,

Darian Ray, Deputy
Criminal Post Trial

Enclosure(s) – STATE'S MOTION TO DESIGNATE ISSUES/ COURTS ORDER DESIGNATING ISSUE

81453



# CHRIS DANIEL
## HARRIS COUNTY DISTRICT CLERK

September 21, 2016

BENJAMIN B WOLFF
DEREK VERHAGEN OR ERIN ECKHOFF
OFFICE OF CAPITAL AND FORENSIC WRITS
1700 NORTH CONGRESS AVE , SUITE 460
AUSTIN, TEXAS 78701

To Whom It May Concern

Pursuant to Article 11 07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1412826-A in the 179th District Court

☐ State's Original Answer Filed            ,

☐ Affidavit            ,

☐ Court Order Dated            ,

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit

☐ Respondent's Proposed Findings of Fact and Order            ,

☒ Other

Sincerely,

Darian Ray, Deputy
Criminal Post Trial

Enclosure(s) – STATE'S MOTION TO DESIGNATE ISSUES / COURT'S ORDER DESIGNATING ISSUES



Cause No 1412826-A

| EX PARTE | § | IN THE 179TH DISTRICT COURT |
| | § | OF |
| JUAN BALDERAS, | § | HARRIS COUNTY, TEXAS |
| Applicant | | |

## STATE'S MOTION FOR AFFIDAVITS

Pursuant to TEX CODE CRIM PROC art 11 071 the convicting court may require affidavits to resolve factual issues material to the legality of the applicant's confinement that are alleged in an application for writ of habeas corpus  Accordingly, the State of Texas, by and through its Assistant District Attorney for Harris County, Texas, respectfully requests that the Court order defense counsel Jerome Godinich, Jr , and Alvin Nunnery to file /affidavits in the above-captioned cause responding to the applicant's habeas allegations

The State requests that the Court order counsel to file affidavits (1) summarizing the actions taken to represent the applicant in cause no  1412826, and (2) specifically responding to the following allegations

### Applicant's Third Ground
Alleged violation of the precepts of *Brady v Maryland* 373 U S 83 (1963), and its progeny based on the State's alleged failure to disclose impeachment information regarding witness Israel Diaz,

### Applicant's Fourth Ground
Alleged ineffective assistance of trial counsel for failure to investigate and present alibi evidence, failure to investigate and present other evidence of innocence, failure to present testimony of an eyewitness identification expert, and, failure to investigate alleged outside influences and juror misconduct as grounds for motion for new trial,

### Applicant's Sixth Ground
Alleged ineffective assistance of trial counsel for failure to investigate and present mitigating evidence, failure to investigate and present evidence rebutting the applicant's extraneous offenses, failure to object and preserve error concerning alleged comments on applicant's failure to testify, failure to object and preserve error concerning the trial court's denial of funds to

**RECORDER'S MEMORANDUM**
This instrument is of poor quality
at the time of imaging

**FILED**
Chris Daniel
District Clerk

SEP - 7 2016

Time _____ 11 / 05

Harris County Texas

By _____

Deputy

81455

produce witnesses from Mexico, and, engaging in behavior that allegedly alienated the jury,

**Applicant's Eighth Ground**
Alleged failure to timely and competently assert the applicant's right to a speedy trial, and

**Applicant's Ninth Ground**
Alleged ineffective assistance of counsel during jury selection for failing to address the topic of sexual abuse during *voir dire* and failing to preserve the record

**Applicant's Tenth Ground**
Alleged agreements between the State and defense to excuse prospective jurors without examination that allegedly violated the applicant s equal protection rights

Service has been accomplished by emailing a copy of the State's motion on September 7, 2016, to habeas counsel Benjamin B Wolff, Derek Verhagen or Erin Eckhoff, Office of Capital and Forensic Writs, 1700 North Congress Ave , Suite 460, Austin, Texas 78701

Respectfully submitted,

LYNN HARDAWAY
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas 77002
(713) 274-5990
(713) 755-5809 fax
TBC No 08948520
Hardaway_Lynn@dao hctx net

2

Cause No 1412826-A

EX PARTE

§ IN THE 179TH DISTRICT COURT

§ OF

JUAN BALDERAS,
Applicant

§ HARRIS COUNTY, TEXAS

## ORDER FOR AFFIDAVITS

Having considered the *State's Motion for Affidavits* the Court **ORDERS** counsel

Jerome Godinich, Jr , and Alvin Nunnery to file affidavits (1) summarizing the actions

taken to represent the applicant in cause no 1412826, and (2) specifically responding to

the following allegations

### Applicant's Third Ground
Alleged violation of the precepts of *Brady v Maryland*, 373 U S
83 (1963), and its progeny based on the State's alleged failure to
disclose impeachment information regarding witness Israel Diaz,

### Applicant's Fourth Ground
Alleged ineffective assistance of trial counsel for failure to
investigate and present alibi evidence, failure to investigate and
present other evidence of innocence, failure to present testimony
of an eyewitness identification expert, and, failure to investigate
alleged outside influences and juror misconduct as grounds for
motion for new trial,

### Applicant's Sixth Ground
Alleged ineffective assistance of trial counsel for failure to
investigate and present mitigating evidence, failure to investigate
and present evidence rebutting the applicant's extraneous
offenses, failure to object and preserve error concerning alleged
comments on applicant's failure to testify, failure to object and
preserve error concerning the trial court s denial of funds to
produce witnesses from Mexico, and, engaging in behavior that
allegedly alienated the jury,

### Applicant's Eighth Ground
Alleged failure to timely and competently assert the applicant's
right to a speedy trial, and

### Applicant's Ninth Ground
Alleged ineffective assistance of counsel during jury selection for
failing to address the topic of sexual abuse during *voir dire* and
failing to preserve the record

3

**Applicant's Tenth Ground**
Alleged agreements between the State and defense to excuse
prospective jurors without examination that allegedly violated the
applicant's equal protection rights

Counsel Jerome Godinich, Jr., and Alvin Nunnery are **ORDERED** to file said

affidavits with the Appellate Division of the District Clerk's Office within **SIXTY (60)**

**DAYS** of the signing of this order

THE CLERK IS **ORDERED** to send a copy of this order to applicant's habeas

counsel Benjamin B Wolff, Derek Verhagen or Erin Eckhoff, Office of Capital and

Forensic Writs, 1700 North Congress Ave , Suite 460, Austin, Texas 78701 and to the

State Lynn Hardaway, Harris County District Attorney's Office, 1201 Franklin, Suite

600, Houston, Texas 77002, and to serve copies of this order, the application for writ of

habeas corpus, and the State's answer to

| | |
|---|---|
| Jerome Godinich, Jr | Alvin Nunnery |
| Attorney at Law | Attorney at Law |
| 917 Franklin Street, Suite 320 | 909 Texas Street, Suite 205 |
| Houston, Texas 77002 | Houston, Texas 77002 |

When the affidavits of Jerome Godinich, Jr., and Alvin Nunnery are received, the

CLERK IS **ORDERED** to send a copies of said affidavits to applicant's counsel

Benjamin B Wolff, Derek Verhagen or Erin Eckhoff, Office of Capital and Forensic Writs,

1700 North Congress Ave , Suite 460, Austin, Texas 78701 and to the State Lynn

Hardaway, Harris County District Attorney's Office, 1201 Franklin, Suite 600, Houston,

Texas 77002

4

. 01458

The Clerk of the Court is **ORDERED NOT** to transmit at this time any documents in the above-styled case to the Court of Criminal Appeals until further ordered by this Court

SIGNED this ___16___ day of ___Sept___, 2016

Kristin M. Guiney
Presiding Judge
179th District Court
Harris County, Texas

5



**CHRIS DANIEL**
**HARRIS COUNTY DISTRICT CLERK**

September 21, 2016

DEVON ANDERSON
DISTRICT ATTORNEY
HARRIS COUNTY, TX

To Whom It May Concern

Pursuant to Article 11 07 of the Texas Code of Criminal Procedure, please find enclosed
copies of the documents indicated below concerning the Post Conviction Writ filed in
cause number 1412826-A in the 179th District Court

☐ State's Original Answer Filed ,

☐ Affidavit ,

☐ Court Order Dated ,

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit

☐ Respondent's Proposed Findings of Fact and Order ,

☒ Other

Sincerely,

Darian Ray, Deputy
Criminal Post Trial

Enclosure(s) – STATE'S MOTION FOR AFFIDAVITS AND ORDER FOR AFFIDAVITS



# CHRIS DANIEL
## HARRIS COUNTY DISTRICT CLERK

September 20, 2016

JEROME GODINICH, JR
ATTORNEY AT LAW
917 FRANKLIN STREET, SUITE 320
HOUSTON, TEXAS 77002

RE    JUAN BALDERAS
      CAUSE #1412826-A
      COURT  179TH

Dear Sir

Enclosed herewith please find a copy of the Court's Order wherein the court orders that JEROME GODINICH, JR, Attorney at Law, file an affidavit in response to allegations made in the petition for post conviction writ of habeas corpus in the above numbered and styled cause

Sincerely,

Darian Ray, Deputy
Criminal Post Trial
Harris County District Clerk's Office

Enclosure   Respondent's Proposed Order Designating Issues and Order for Filing Affidavit, Respondent's Original Answer, Application for Writ of Habeas Corpus

CC    Kelly Reyes



# CHRIS DANIEL
## HARRIS COUNTY DISTRICT CLERK

September 20, 2016

ALVIN NUNNERY
ATTORNEY AT LAW
909 TEXAS STREET, SUITE 205
HOUSTON, TEXAS 77002

RE    JUAN BALDERAS
      CAUSE #1412826-A
      COURT 179TH

Dear Sir

Enclosed herewith please find a copy of the Court's Order wherein the court orders that ALVIN NUNNERY, Attorney at Law, file an affidavit in response to allegations made in the petition for post conviction writ of habeas corpus in the above numbered and styled cause

Sincerely,

Danah Ray, Deputy
Criminal Post Trial
Harris County District Clerk's Office

Enclosure   Respondent's Proposed Order Designating Issues and Order for Filing Affidavit, Respondent's Original Answer, Application for Writ of Habeas Corpus

CC    Kelly Reyes

01462



# CHRIS DANIEL
## HARRIS COUNTY DISTRICT CLERK

September 21, 2016

BENJAMIN B WOLFF
DEREK VERHAGEN OR ERIN ECKHOFF
OFFICE OF CAPITAL AND FORENSIC WRITS
1700 NORTH CONGRESS AVE , SUITE 460
AUSTIN, TEXAS 78701

To Whom It May Concern

Pursuant to Article 11 07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1412826-A in the 179th District Court

☐ State's Original Answer Filed                ,

☐ Affidavit               ,

☐ Court Order Dated                ,

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit

☐ Respondent's Proposed Findings of Fact and Order                ,

☒ Other

Sincerely,

Darian Ray, Deputy
Criminal Post-Trial

Enclosure(s) – STATE S MOTION FOR AFFIDAVITS AND ORDER FOR AFFIDAVITS



FILED
Chris Daniel
MAR 3 0 2017
Time: 3·30·17
By
Harris County, Texas
Deputy

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. WR-84,066-01

### EX PARTE JUAN BALDERAS, Applicant

## ON APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS IN CAUSE NO. 1412826 IN THE 179TH DISTRICT COURT HARRIS COUNTY

*Per curiam*.

## O R D E R

In March 2014, a jury found applicant guilty of the offense of capital murder. *See* TEX. PENAL CODE § 19.03(a). Based on the jury's answers to the statutory punishment questions, the trial court sentenced him to death.[1] On June 24, 2015, the State filed in this Court its brief on applicant's direct appeal. Pursuant to Article 11.071 §§ 4(a) and (b),

---

[1] *See* Art. 37.071. Unless otherwise indicated all references to Articles refer to the Code of Criminal Procedure.

and because the trial court timely granted applicant an extension, applicant's initial application for a writ of habeas corpus was due to be filed in the trial court on or before November 6, 2015. However, counsel thereafter sought an extension from this Court pursuant to Article 11.071 § 4A. This Court determined that counsel had shown good cause for the request, and it granted applicant until January 15, 2016 to file the application in the trial court. *Ex parte Balderas*, No. WR-84,066-01 (Tex. Crim. App. Nov. 5, 2015)(not designated for publication).

It has now been more than a year since the application was due in the trial court. Accordingly, we order the trial court to resolve any remaining issues in the case within 180 days from the date of this order. The clerk shall then immediately transmit the complete writ record to this Court. Any extensions of time shall be requested by the trial judge, or on his or her behalf, and obtained from this Court.

IT IS SO ORDERED THIS THE 29TH DAY OF MARCH, 2017.

Do Not Publish



**COURT OF CRIMINAL APPEALS**
P.O. BOX 12308, CAPITOL STATION
AUSTIN, TEXAS 78711

SHARON KELLER
PRESIDING JUDGE

MIKE KEASLER
BARBARA P. HERVEY
ELSA ALCALA
BERT RICHARDSON
KEVIN P. YEARY
DAVID NEWELL
MARY LOU KEEL
SCOTT WALKER
JUDGES

ABEL ACOSTA
CLERK
(512) 463-1551

SIAN SCHILHAB
GENERAL COUNSEL
(512) 463-1597

March 29, 2017

**F I L E D**
Chris Daniel
District Clerk

MAR 3 0 2017

Time: _____
Harris County, Texas

By _____
Deputy

Presiding Judge
179th District Court
1201 Franklin, Rm 18040
Houston, TX 77002
\* DELIVERED VIA E-MAIL \*

Re: BALDERAS, JUAN
CCA No. WR-84,066-01
Trial Court Case No. 1412826

The Court has this day issued an order for the above referenced cause.

Sincerely,

Abel Acosta, Clerk

cc: District Clerk Harris County (DELIVERED VIA E-MAIL)
Benjamin Wolff (DELIVERED VIA E-MAIL)
Joni White (DELIVERED VIA E-MAIL)
Juan Balderas
Roe Meredith Wilson (DELIVERED VIA E-MAIL)
Edward L. Marshall (DELIVERED VIA E-MAIL)
Joni White (DELIVERED VIA E-MAIL)
District Attorney Harris County (DELIVERED VIA E-MAIL)

01466

No. 1412826-A

| EX PARTE | § | IN THE 179th DISTRICT COURT |
| | § | OF |
| JUAN BALDERAS,<br>Applicant | § | HARRIS COUNTY, TEXAS |

### STATE'S SCREENING NOTIFICATION

THE STATE OF TEXAS, by and through its undersigned Assistant District Attorney, notifies the Court regarding the following "screen" of Assistant District Attorney Ryan Kent.

I.

On May 15, 2017, Assistant District Attorney Ryan Kent became an employee of the Harris County District Attorney's Office. Previously, ADA Kent served as an attorney with the Office of Capital and Forensic Writs (OCFW). During his tenure at the OCFW, ADA Kent served as counsel for the applicant.

In accord with Tex. Disciplinary R. Prof'l Conduct 1.10(e)(1), ADA Kent has been "screened" from all matters involving OCFW clients, including the applicant in the above captioned cause. *See Exhibit 1, E-Mail to Post-Conviction Writs Division; Exhibit 2, Screening Acknowledgement.*

II.

Service has been accomplished by sending a copy of the instant notification to the applicant's counsel: Benjamin Wolff, Office of Capital and Forensic Writs, 1700 N. Congress Ave., Suite 460, Austin TX, 78701.

Respectfully submitted,

*[signature]*

Farnaz Faiaz Hutchins
Assistant District Attorney
Harris County District Attorney

**FILED**
Chris Daniel
District Clerk

MAY 16 2017

Time:_____
Harris County, Texas

By_____
Deputy

14\990

01457

| | |
|---|---|
| **From:** | Reiss, Josh |
| **Sent:** | Tuesday, May 16, 2017 9:32 AM |
| **To:** | Reagin, Shawna; Barr, David; Hutchins, Farnaz |
| **Cc:** | Durfee, Scott; Hartle, Barbara; Smith, Andrew; Kent, Ryan |
| **Subject:** | ADA Ryan Kent |
| **Attachments:** | Ryan.Kent Memo.pdf |

All:

Yesterday, ADA Ryan Kent joined the HCDAO as a Misdemeanor #3 in CCCL #6. Previously, Ryan served as an attorney at the Office of Capital and Forensic Writs (OCFW). During his tenure at the OCFW, Ryan served as counsel on the following applicant's with litigation being handled by our office: Teddrick Batiste, Jeffrey Prevost, George Curry, Harlem Lewis, Warren Rivers, Juan Balderas, Garland Harper, Brian Davis, Joseph Jean, Jaime Cole, Carl Buntion, Billy Mason, and Obel Cruz-Garcia.

Effective immediately, and in accord with Tex. Disciplinary R. Prof'l Conduct 1.10(e)(1), Ryan is "screened" from all litigation involving the aforementioned applicants. Please refer to the attached memo outlining the steps agreed to by the HCDAO and OCFW to implement this "screen".

JAR


**Joshua A. Reiss**
Assistant District Attorney
Harris County District Attorney

1



**STATE'S
EXHIBIT**
1

01468

**TOM BERG**
**FIRST ASSISTANT**

**VIVIAN KING**
**CHIEF OF STAFF**



CRIMINAL JUSTICE CENTER
1201 FRANKLIN, SUITE 600
HOUSTON, TEXAS 77002-1901

# COPY

## KIM OGG
### DISTRICT ATTORNEY
### HARRIS COUNTY, TEXAS

April 11, 2017

TO: Mr. Ryan Kent

Welcome to the Harris County District Attorney's Office. We hope this will be the beginning of a long and distinguished career for you as an assistant district attorney.

As we have previously discussed with you, your prior employment with the Office of Capital and Forensic Writs ("OCFW") has raised potential conflict issues for your employment with this Office as an assistant district attorney. Specifically, you have previously participated in the representation of **Teddrick Batiste, Jeffery Prevost, George Curry, Harlem Lewis, Warren Rivers, Juan Balderas, Garland Harper, Brian Davis, Joseph Jean, Jaime Cole, Carl Buntion, Billy Mason, and Obel Cruz-Garcia** (collectively "the OCFW Defendants"), all of whom are capital murder defendants sentenced to death and whose cases are being actively prosecuted by this Office.

These conflicts are not irreconcilable, however. The Office has consulted with the OCFW, and we believe that the following screening agreement is consistent with the Texas Disciplinary Rules of Professional Conduct and resolves all foreseeable legal or ethical conflicts from your employment with this Office. The screening agreement is as follows:

- In accord with TEX. DISCIPLINARY R. PROF'L CONDUCT 1.10(e)(1), you will be screened from all matters involving the OCFW Defendants. This means the following:

   o   You will not be permitted or asked to work on any litigation involving the OCFW Defendants.

   o   The Office's Post Conviction Writs Division has been told that you are screened from all litigation involving the OCFW Defendants and are not to discuss any matters pertaining to the OCFW Defendants with you.

   o   A copy of this screening policy will be placed in the District Attorney's file of each of the OCFW Defendants, as well as filed with the district clerk in each of the OCFW Defendants' cases

   o   All members of the Office's Post Conviction Writs Division will be told in writing that any violation of this screening policy must be reported immediately.

STATE'S
EXHIBIT
2

PERDUO 800-631-6989

01489

COPY

- You will not be permitted to have any assignment to the Post Conviction Writs Division so long as the OCFW Defendants remain on death row or litigation involving any of these clients exists in state or federal court.

- You will acknowledge by your signature below that (a) you understand that you are screened from all matters involving the OCFW Defendants and (b) you understand your obligation to comply with requirements of TEX. DISCIPLINARY R. PROF'L CONDUCT 1.05 to maintain the confidentiality of any information you possess related to the defense of the OCFW Defendants.

To be clear, compliance with these screening responsibilities falls most heavily upon you. For example, if there is turnover in the Office, the nature of this agreement may become unknown by your supervisors and the staff of the Post Conviction Writs Division. This does not absolve you of your continuing responsibility to screen yourself from the prosecution of the OCFW Defendants.

The consequences of any violation of this agreement could be significant. Your participation in the prosecution of any of these cases could disqualify the Office or result in judicial sanctions. As such, please be vigilant and diligent in making sure that you and the Office adhere to this agreement. If you have any questions about whether a particular matter involves the OCFW Defendants, please contact the chief of the Post Conviction Writs Division or the District Attorney's General Counsel and we will investigate the matter to ensure your compliance with this agreement.

Sincerely,

BARBARA HARTLE
Chief, Administrative Bureau
Office of the District Attorney
(713) 274-5816

I acknowledge and agree to comply with the obligations described in this letter. I understand that failure to do so may result in legal and ethical sanctions and disciplinary action by the District Attorney's Office.

RYAN KENT          4·11·17
                   DATE



## CAUSE NO. 1412826-A

| EX PARTE | § | IN THE 179th |
| | § | |
| vs. | § | DISTRICT COURT OF |
| | § | |
| JUAN BALDERAS | § | HARRIS COUNTY, TEXAS |
| Applicant | | |

**FILED**
Chris Daniel
District Clerk
AUG 09 2017
Time:_____
Harris County, Texas
By_____ Deputy

### A F F I D A V I T

Before me, the undersigned authority, on this day personally appeared Jerome Godinich Jr., who after being duly sworn stated the following:

I, Jerome Godinich Jr. was appointed to represent Mr. Balderas on March 28, 2011. Mr. Balderas was charged with capital murder. I was designated as second chair counsel. Early on, Mr. Nunnery and I discussed and agreed on the division of responsibilities for this case. Initially, Mr. Nunnery agreed to take responsibility for the investigation and review of evidence pertaining to the guilt/innocence portion of the trial. My responsibility focused on the investigation and review of possible mitigation evidence in anticipation of the punishment portion of the trial. Obviously, over the years, our responsibilities shifted and overlapped. I have reviewed the applicant's writ filed by Mr. Balderas. Response:

### Applicant's third ground

Prior to trial, counsel reviewed the 23 pages of notes referenced to in applicant's exhibit 57. These notes were reviewed at the district attorney's office. I took these notes and any potential inconstancies into account when preparing for trial. Mr. Diaz' testimony was as expected and Mr. Nunnery cross examined him appropriately.

### Applicant's fourth ground

Mr. Balderas never provided alibi information to the attorneys or the defense team. Neither applicant nor his family ever provided information which would allow the defense team to properly investigate and present alibi evidence. It was not until 2014 that the defense team became aware of a possible alibi defense. This possible alibi defense involved Oralia McCrary. However, on or about February 13, 2014, Jesus Balderas informed counsel that his ex-mother in law, Oralia McCrary did not want to have anything to do with the case.

271990

.01471

Jesus did not provide any contact information for Ms. McCrary. (See Exhibit 1) No additional alibi information was ever provided by anyone.

On or about February 13, 2014, Ms. Anali Garcia was interviewed and it was determined that she had no factual information about the case.

Prior to the filing of the writ, counsel had never heard of Octavo Cortes and Jose Perez. For eight years prior to trial, no one provided counsel or the defense team any information concerning Octavio Cortes nor Jose Perez.

Ileana Cortez met with counsel before trial. She is the mother of Jesus Balderas' child. She had no useful factual information and no alibi defense information. What little information she possessed was also not helpful for mitigation purposes.

Other than a blanket "I am not guilty" and "my co-defendants will not testify against me", Mr. Balderas never provided information that would assist the defense team with an innocence strategy. In preparation for trial, counsel and their investigators interviewed all available fact witnesses including Wendy Bardales with the goal of undercutting their probable trial testimony and making the prosecution witnesses appear less credible.

However, evidence of applicant's innocence was raised throughout trial. Please see cross examination of Wendy Bardales and Walter Benitez.

Counsel did conduct a reliable pretrial investigation for both guilt innocence and punishment portions of the trial. On February 4, 2014, Yancey Escobar and on February 13, 2014, Celeste Munoz informed counsel that Wendy Bardales had an intimate relationship with Diaz. (See Exhibits 2 & 3).

Applicant never conveyed to either Mr. Godinich or Mr. Nunnery, Ms. Behrana, Dr. J. Brahms, Dr. Brahms, Dr. Mendel, Dr. Rodriguez, Dr. Taylor, Investigator Carmen Laffey, Ms. Helenek, Ms. Short and Ms. Poirier that Israel Diaz attempted to intimidate him. His family never conveyed to any of the previously mentioned defense team members information pertaining to threats by Israel Diaz.

Ms. Escobar informed counsel that she wanted to be present in the court room during the whole trial. She chose not to testify during trial because she wanted to observe the proceedings.

It was trial strategy not to call Jesus Balderas as a witness in the guilt innocence phase of trial. We felt that Jesus Balderas would not appear credible because of criminal history, relationship with applicant, gang affiliation, and photographs obtained through discovery. As I recall, Jesus Balderas was ordered during trial to leave the courtroom by the judge as he could not control himself. Daniella Chavis and Celeste Munoz testified exactly as the defense wanted them to.

Walter Benitez testified well for the defense. However, in talking with the jurors after trial,

appellate counsel Scott Shearer discovered that Mr. Benitez flashed a LTC gang sign to applicant during his testimony and applicant responded in kind. The jurors were not impressed with this show of solidarity and it helped undercut his testimony. (See Exhibit 4).

Scott Shearer, Robert Scott, Alvin Nunnery and I agreed that during the trial if we were to call an eye witness identification expert to testify, the court could and probably would allow evidence of Balderas' extraneous conduct into the guilt innocence portion of the trial. This was basic trial strategy.

It was Scott Shearer who was appointed as appellate counsel and was responsible to investigate possible issues for a potential motion for new trial.

### Applicant's sixth ground

Counsel did present any and all mitigating evidence that was available. Other than the evidence presented during trial, counsel was unaware of any additional information that would rebut applicant's extraneous offenses.

For eight years and through seven mitigation experts, we attempted to obtain mitigation information in anticipation of a likely punishment phase of trial. The defense team presented the mitigation evidence in the best light possible for the jury. We made a strategic decision to present the experts and evidence as they were presented at trial.

Counsel attempted to present evidence of applicant's violent and abusive environment through the available witnesses. Counsel begged and cajoled applicant's mother and brothers for information pertaining to this issue. Rather than assist trial counsel, applicant's mother and other family members attempted to undermine the defense team's efforts.

Over the course of eight years, counsel retained seven mitigation experts and four expert witnesses and Rev. Pickett. They traveled to Mexico and New York City on numerous occasions in order to develop mitigation information, evidence and testimony. We investigated Juan's childhood background and we discovered a history of mental health illness in the family which was presented to the jury. Witnesses did testify at trial concerning Juan's positive character and role as a protector.

Counsel specifically investigated whether applicant was attempting to disassociate with LTC. Except for applicant, his attempts at dissociation could not be verified.

Counsel did not believe the prosecution was making a comment on the applicant's failure to testify during its cross examination of applicant's witnesses or closing arguments. The state appeared to be attempting to undercut the witnesses' testimony and credibility and not applicant's failure to testify.

The court was prepared to grant funds for the transportation and housing of the Mexican witnesses once they were in the United States. The court was not prepared to pay the funding which would allow the witnesses to leave Mexico. Counsel was prepared to foot the

cost of the visitation fees however, the witnesses were unable to coordinate among themselves who would be coming to Houston. Moreover, applicant's mother had previously communicated with her relatives in Mexico and told them not to come to Houston and testify for Juan Balderas. She did not want the sexual abuse information we had obtained used in trial. Prior to trial, none of his relative were going to testify. The mitigation team forced his mother to go to Mexico with them and apologize to the relatives.

Because of interference by Yancey Escobar who was contacting the Mexican witnesses by telephone during my examination, I was not able to question the witnesses on all the intended issues. During my direct questioning of the Mexican witnesses, it was discovered through our mitigation expert, Adriana Helenek that Ms. Escobar was telephoning the witnesses in Mexico and telling them how to respond to my questions. The witnesses were responding very differently than expected. (See Exhibit 5).

### Applicant's eighth ground

Until the eve of trial, applicant never raised an objection to any continuance or reset filed by his attorneys. Applicant was informed of each and every reset and continuance and the reason for each reset. The sheer volume of the guilt innocence and punishment discovery required extensive time consuming investigation. Moreover, there were ongoing negotiations with the prosecution pertaining to whether the state would consider a life sentence.

### Applicant's ninth ground

It was trial strategy to voir dire utilizing the Colorado method of jury selection. After trial, the jurors told appellant counsel they did believe that applicant was sexually assaulted but that mitigation was undercut by the extraneous offenses. (See Exhibit 5).

### Applicant's tenth ground

It was trial strategy to excuse prospective jurors based on the information that was provided in their questionnaires and in response to the Colorado method of jury selection. No one was excused based on race. Applicant was present and fully informed of the reasons for the strikes and he agreed to the strikes on the record. Based on the information Scott Shearer obtained from the jurors immediately after trial, it appears that we did indeed select as good a jury as possible. (See Exhibit 4).

Jerome Godinich, Jr.

**COUNTY OF HARRIS**

**STATE OF TEXAS**

Before me, the undersigned authority, on this day personally appeared Jerome Godinich Jr., known to me to be the person whose name is subscribed to the foregoing Affidavit, and acknowledge to me that he executed the same for the purpose and consideration therein expressed. Given under my hand and seal of office:

**SUBSCRIBED AND SWORN** to before me on this the ___8th___ day of ___August___, 2017.

GLORIA PESINA POA
My Commission Expires
April 9, 2019

_____
Notary Public State of Texas

My commission expires on ___4/9/19___

_____
Notary's printed name

From: jgodinich <jgodinich@aol.com>

To: jbrams <jbrams@insight.rr.com>; drmattbrams <drmattbrams@aol.com>; matt <matt@drmendel.com>; behranalawfirm <behranalawfirm@yahoo.com>; jjrodriguez <jjrodriguez@uta.edu>; alvinnunnery <alvinnunnery@aol.com>

Subject: Juan Balderas

Date: Thu, Feb 13, 2014 1:59 pm

---

Dear Team,

This is a follow up to my email dated January 31, 2014, where I referenced the last minute potential witnesses that Yancy has provided.

1. Celeste Munoz- missed her Saturday morning appointment even after we confirmed the appointment on Friday afternoon. Ms. Munoz specifically asked for an appointment on Saturday before 10:00 a.m. She emailed/texted me on Saturday night around 8:00 p.m. claiming she was outside the building trying to get in. I explained that the office was closed and her appointment was at 8:30 a.m. as she had requested. I rescheduled for Wednesday at 4:00 p.m. and then she requested an appointment at 11:30 a.m. She again failed to appear with no message. As of today, we have not heard from her.

2. Billy has not called me back about setting up an appointment.

3. I was informed by Jesus that Oralia, his ex-mother in law does not want to have anything to do with the case. I was not provided any contact information.

4. Anale who is Eilanna's sister has no factual information about the case. I spoke with her on the phone with Jerome present and he decided that we do not need her as a character witness.

5. Yancy has not yet provided Walter's contact information.

6. Yancy has not yet provided contact information for Daniela.

Ms. Reyes came into the office on Tuesday, February 12, 2014, and met with Jolie and Jerome. It appears that she is now totally cooperative and will tell the truth on the witness stand. Mr. Balderas canceled his appointment and he rescheduled for Sunday, February 16, 2014.

We are waiting for plan confirmation for Vianet Jaimes. It is still up in the air as to how long she wants to stay in Houston. Jerome has offered to purchase her ticket but she and Ms. Reyes would rather purchase the ticket themselves. We should have this nailed down by Monday.

Thank you Team,
Gloria

1.

01476

From: jgodinich <jgodinich@aol.com>
  To: alvinnunnery <alvinnunnery@aol.com>; shearerlegal <shearerlegal@yahoo.com>
  Date: Thu, Feb 13, 2014 4:04 pm

Gloria interviewed Celeste Munoz the afternoon of February 12, 2014. Yancy contacted Gloria by phone and told her that I have Celeste and will at the office in 20 minutes.

Celeste Munoz- D.O.B 7/9/90
10630 Beechnut, Apt# 207
Houston, Texas 77072

This is a summary of Gloria Poa's interview with Celeste Munoz. Jerome was at the court house during the interview.

Celeste met Juan in the spring of 2005. She was a friend and classmate with Jesus Balderas. She would skip school and hang out at Juan's apartment. She stated that she knew Juan was a gang member. She would see Juan take a fatherly role with his brothers. Juan was like the man of the house and took care of his brothers. Juan would make Jesus go to school.

Celeste also knew Eduardo Hernandez (victim/corporate). Celeste dated Eduardo for about two months. Eduardo was also a gang member. Jesus would associate with the LTC gang but was not a member.

Celeste also met Wendy Bardales in 2005. Wendy was a MS13 gang member. She recalls Wendy as being slutty. Wendy and Karen were friends with a girl named Gloria. Gloria went to Juan's apartment to get a tattoo and that is where Juan met Wendy. Wendy was messing around with Juan, Israel and Eduardo. Then Eduardo started dating her sister Karen. Wendy and Israel became close. Wendy who lived in the same apartment complex, hang out at Juan's apartment.

At some point, (the lawyers are going to have to inquire as to when), Juan didn't want Wendy around because of her MS13 gang affiliation . One day, Wendy would not leave the apartment and that is when Celeste witnessed Juan kick, punch, and pull Wendy's hair to get her out of his apartment. Wendy was upset and said that she would have MS13 kill Juan.

Celeste heard of Eduardo's murder through her sister. Rumors at school were that MS13 had killed Eduardo because of Karen.

Celeste stated that she lost contact with Jesus but recently began contact with Jesus through facebook. She knew Juan had been arrested but did not know why. She is still friends with Wendy and Karen Bardales through facebook. She recently met Yancy through Juan and Jesus.

I asked who also witnessed Wendy threaten Juan and she said Christian, Jorge Alcantar and her sister. Celeste said she is willing to testify even though she knows Wendy will be present.

**2.**

01477

P 3

**From:** Rodriguez, John <jjrodriguez@uta.edu>
**To:** jgodinich <jgodinich@aol.com>
**Subject:** RE: Juan Balderas Case
**Date:** Wed, Feb 5, 2014 1:31 pm

I would be interested in speaking with Yancy, Billy, and the other aforementioned gang members, if possible? It may add some insight into the group and individual dynamics (i.e. roles, identity, etc...).


John

John J. Rodriguez, PhD
Associate Professor/Assistant Chair
Department of Criminology & Criminal Justice
University of Texas at Arlington
JJRodriguez@uta.edu

---

**From:** jgodinich@aol.com [jgodinich@aol.com]
**Sent:** Tuesday, February 04, 2014 5:21 PM
**To:** behranalawfirm@yahoo.com; jbrams@insight.rr.com; drmattbrams@aol.com; Rodriguez, John; matt@drmendel.com; adrycat@yahoo.com; alvinnunnery@aol.com
**Subject:** Juan Balderas Case

Dear Team,

Juan's girlfriend Yancy says that she can testify at Juan's trial. She has been friends with the leaders of La Tecera Crip and knows their roles/ranks in the gang. She had been afraid to testify since allegedly Juan had been threatened by other gang members. She still believes that Alejandro, Juan's brother was killed by the gang.

A few years ago she went to visit Juan who already had a visitor so she decided to visit Israel Diaz. Israel told her that Juan needed to take the blame for everything since he did not have a family like everyone else.

Yancy claims that Israel began to plot against Juan after his girlfriend said hello to Juan in the jail. Israel Diaz and Jose Hernandez were in cells next to each other and spoke about plotting against Juan. Yancy believes this is Israel's motive for testifying against Juan.

I asked Yancy the roles/ranks of everyone in the gang. She said the leader was "Victor A." who is still

**3.**

01478

missing. I asked about Efrain's role since he was supposed to be the OG. She said she did not know much about Efrain. She said Israel was higher in rank than Juan. Yancy claims that they all began plotting against Juan when Victor's girlfriend cheated on Victor with Juan. Israel threatened Juan claiming he was going to tell Victor. Yancy also claims that Wendy Bardales and Israel Diaz had been friends with benefits. Yancy insinuates that by Victor selling Juan a lot of the guns he was arrested with, someone else used the gun in the corporate murder. I asked Yancy if there are any witnesses to any of this and she said maybe Victor's brother William or Judy the girlfriend. However, Yancy did not have their contact information or last names.

Celeste Munoz is scheduled to come into the office Saturday morning at 8:30 a.m. We have no idea what she is going to say.

Eiliana Cortez, Jesus' ex baby momma just dropped in to the office unannounced. Jesus had just gotten off the phone claiming she was one of Juan's alibi witnesses. Jerome invited her into his office and I took notes. She could not remember anything from 2005. She says that she and Juan were close but he had never discussed the corporate murder with her. She admitted that Jesus sent her over but she could not remember if Juan was with her on December 6, 2005. She claims its been 8 years and she can not remember that far back.

Jesus has also the provided the name of another possible witness, "Billy." Allegedly, he is a gang member with some information. I called his number and he returned the call saying he was going to call back to set up an appointment.

I also called Ms. Reyes and Yancy today and left a message requesting information updates. So far, we have not received any updated information.

It appears to Jerome that the family is really scrambling to create a defense now that the trial is here. We warned them that we were going to trial along time ago but they didn't believe it. Any observations or comments, please advise.

. 01479

Thank you,

Gloria

01480

**From:** jgodinich <jgodinich@aol.com>
**To:** behranalawfirm <behranalawfirm@yahoo.com>; jbrams <jbrams@insight.rr.com>; matt <matt@drmendel.com>; drmattbrams <drmattbrams@aol.com>; aubuchon <aubuchon@eastex.net>; pelzb <pelzb@uhd.edu>; tpelz <tpelz@sbcglobal.net>; budjane <budjane@hotmail.com>; jjrodriguez <jjrodriguez@uta.edu>; amy.nguyen <amy.nguyen@capitalmaps.com>; adrycat <adrycat@yahoo.com>
**Subject:** Balderas Trial
**Date:** Mon, Mar 17, 2014 2:07 pm

Dear Team,

On Friday afternoon the jury returned a punishment verdict on Juan. They assessed the death penalty. I did not speak with the jurors but Scott Shearer, our appeal attorney spent about two hours with them in the jury room.

I assumed that they had ignored all the information that we had provided to them for punishment. That was not the case.

The jurors were still concerned about guilt innocence. At the time they made contact with Ivan, the jury was dead locked 6/6 not 9/3 or 10/2 like we had thought. Whatever happened out on the street was enough to get six jurors to vote guilty by 10 a.m. the next morning. The jurors did say that they felt bad once they discovered Ivan's mental health issues but they claimed it did not affect their punishment decision. Why would they feel bad if it did not affect guilt innocence? The jurors also felt relieved that Juan was looking at other charges in punishment. Again, why would they be feeling relief if they did not have problems with guilt innocence?

The jurors said they listened very intently to all the mitigation and did believe that Juan had been sexually assaulted. However, the real problem with mitigation began in the guilt innocence phase of the trial. Four of the jurors claim that our star defense witness, Walter Benitez flashed a LTC gang sign when he took the witness stand and Juan responded accordingly. I did not see this but when Scott confronted the family about this, they were not surprised. Apparently, this undercut not only Walter's testimony but our efforts in punishment to show that Juan was a different person from where he was eight years ago.

Finally, as Jolie pointed out before jury selection, there were too many bodies let alone guns in this case. The jurors also claimed that while the knife testimony was a little strange, they could not get over the fact that Juan reached into the guard's pocket and brandished the blade.

The good news is that the jurors were interested in our mitigation but they claimed it was just not enough given everything else that was out there in the case.

Again, great job everyone.

Thank you,
Jerome

**From:** jgodinich <jgodinich@aol.com>
**To:** adrycat <adrycat@yahoo.com>; behranalawfirm <behranalawfirm@yahoo.com>; jbrams <jbrams@insight.rr.com>; drmattbrams <drmattbrams@aol.com>; matt <matt@drmendel.com>; fbecker7207 <fbecker7207@aol.com>; pelzb <pelzb@uhd.edu>; tpelz <tpelz@sbcglobal.net>; aubuchon <aubuchon@eastex.net>; budjane <budjane@hotmail.com>; jjrodriguez <jjrodriguez@uta.edu>; amy.nguyen <amy.nguyen@capitalmaps.com>
**Subject:** Balderas Trial
**Date:** Thu, Mar 13, 2014 4:00 pm

Dear Team,

Trial is over and the jury is out deliberating. Everyone did very well in either preparing for trial or testifying. This was the best team and combination of people I ever worked with on a capital case. Alvin and I agree that there was nothing more that could have been presented to this jury on behalf of Juan.

For future reference, we ran into some unexpected problems that will not take us by surprise the next time.

We found out that Juan's mother and that side of the family were attempting to influence the testimony of the witnesses in Mexico. We did not realize this until Marina, Juan's aunt in Puebla, Mexico testified differently from the reports we had received from our mitigation expert in Mexico. When we attempted to follow up on the discrepancies, we discovered that Houston was calling Mexico and telling Mexico what to say which in turn was confusing Mexico. We were never able to make Juan's family understand that this was totally improper. It almost wrecked the points we were trying to make in Marina's testimony.

Juan's family could never understand that trial preparation was important. Juan's father missed his last meeting and kept us waiting for an hour and a half. He then takes the witness stand and testifies well for Juan but for all the wrong reasons. He then wants his son and wife to take the witness stand right before the end of trial to correct, what he perceives are errors on his part. They all get upset when I said no.

Several years ago, we retained Rev. Carroll Pickett who had visited Juan on several occasions and formulated his own opinions. During trial, the family wanted us to have another minister testify who had recent contact with Juan. They refused to understand my preference for Rev. Pickett and my concern for this last minute request for substitution. Again, everyone got upset when I said no.

Like Juan's father who did not believe in trial preparation, the rest of the family could not understand or see the benefit of trial preparation. They wanted us to put on witnesses right before the end of trial who we had never met. That would include Ved Trikha.

Jesus Balderas was never going to testify with his prison history and gang affiliation.

The Balderas family never passed a T.V. reporter or camera they did not love either here or in Mexico. It was not until they were threatened with exclusion from the courtroom, that they stopped.

Juan provided two separate lists of jail personnel for witness testimony. I did not have to worry about the first list because the state of Texas subpoenaed those folks for Juan's conduct violations.

The second list was more problematic in that two of the deputies were female and we had to call in three female witnesses who testified that Juan was not a sexual predator. One deputy, Juan did not know but had been a potential juror on our capital voir dire was not called. Another deputy Juan knew for about seven months was not called. We did call Deputy Gonzalez who then testified that Juan was a very respectful inmate. Deputy Gonzalez testified that Juan told him to tell that to the jury. Because manipulation became an issue for Deputy Gonzalez during cross examination, we did not call any other deputies.

A number of months ago Juan was given the opportunity to transfer to general population from super max. Several of our experts begged Juan to transfer so that we could show the jury that he plays nice with other inmates. Juan refused. In punishment, we heard over and over again how Juan breaks the rules in solitary confinement.

Thank you again,

Jerome

01483



# CHRIS DANIEL
### HARRIS COUNTY DISTRICT CLERK

August 10, 2017

KIM OGG
DISTRICT ATTORNEY
HARRIS COUNTY, TEXAS

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post-Conviction Writ filed in cause number 1412826-A in the 179th District Court.

☐ State's Original Answer Filed　　　　　　,

☒ Affidavit Filed August 9, 2017

☐ Court Order Dated　　　　　,

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order　　　　　　,

☐ Other

Sincerely,

Leslie Hernandez, Deputy
Criminal Post Trial

Enclosure(s) – AFFIDAVIT OF JEROME GODINICH JR.



**CHRIS DANIEL**
HARRIS COUNTY DISTRICT CLERK

August 10, 2017

BENJAMIN B. WOLFF
DEREK VERHAGEN OR ERIN ECKHOFF
OFFICE OF CAPITAL AND FORENSIC WRITS
1700 NORTH CONGRESS AVE, SUITE 460
AUSTIN, TEXAS 78701

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post-Conviction Writ filed in cause number 1412826-A in the 179th District Court.

☐ State's Original Answer Filed ,

☒ Affidavit Filed August 9, 2017

☐ Court Order Dated ,

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order ,

☐ Other

Sincerely,

Leslie Hernandez, Deputy
Criminal Post Trial

Enclosure(s) – AFFIDAVIT OF JEROME GODINICH JR.

Cause No. 1412826-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 179th DISTRICT |
| | § | COURT OF |
| JUAN BALDERAS,<br>Applicant | § | HARRIS COUNTY, TEXAS |

## AFFIDAVIT OF ALVIN NUNNERY

BEFORE ME, the undersigned authority, personally appeared Alvin Nunnery, who having been duly sworn, deposed and stated the following:

My name is Alvin Nunnery. I am an attorney licensed to practice law in the State of Texas under Texas Bar Number 15141800 and have been practicing law for 35 years. I predominantly practice criminal defense.

I was appointed to represent Juan Balderas, who was charged with capital murder in cause no. 1412826. In response to this Court's order that I respond to Mr. Balderas' post-conviction habeas allegations contained in cause no. 1412826-A, I offer the following responses, with the understanding that co-counsel Jerome Godinich may be better suited to respond to some of the allegations given our responsibilities at trial.

### Applicant's Third Ground:

Prior to trial, I had been made aware of the existence of the notes in the State's file regarding the prior statements made by Israel Diaz. I incorporated any information that I thought was relevant and helpful in my cross-examination of Diaz, and disregarded the portions I did not think were useful. I believe I had adequate information to effectively cross-examine Israel Diaz on the issues that I believed were helpful to our defense strategy.

FILED
Chris Daniel
District Clerk

AUG 11 2017

Time: 11:56
Harris County, Texas
By_____ Deputy

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

1

<u>Applicant's Fourth Ground:</u>

The defense team and I investigated and/or discussed any possible defense available to Mr. Balderas, including but not limited to the defense of alibi. We spoke with everyone who was brought to our attention through our investigators, our mitigation experts, our defense team, or who have may have directly contacted us.

In accordance with my practice, we called all witnesses to testify at trial who we deemed were credible. If a witness was not called to testify after an interview or discussion, it was because we did not believe they had first-hand knowledge or information that we deemed helpful to either phase of the case. Such witnesses could not account for the date and time of the offense in any credible way and their knowledge came from innuendo or hearsay.

We presented Walter Benitez as a defense witness during guilt-innocence. Through Benitez, we presented evidence of an alternate shooter; evidence that multiple members of LTC were upset that the complainant had snitched on Israel Diaz regarding an aggravated robbery; that Diaz had called for the LTC meeting where plans for the complainant's murder were discussed; and that Diaz was pushing for the complainant's murder days before the murder occurred. As to the other information that Mr. Balderas now claims we should have presented, our investigation did not lead to any information on these issues that we believed we could use at trial. At best what we learned was speculative. Additionally, there was no admissible evidence that Diaz tried to intimate Mr. Balderas to take the blame for this offense other than if Mr. Balderas testified to it himself. Mr. Balderas made it very clear from the start that he was not going to testify.

We retained Dr. Roy Malpass as an expert in eyewitness identification. After discussion, co-counsel and I made a strategic decision not to present Dr. Malpass as a witness because we

2

believed it would open the door to evidence of prejudicial extraneous conduct. Even though we did not call Dr. Malpass at trial, we incorporated his findings in our other cross-examination to highlight what he indicated was suggestive, improper or deficient with the photo array.

At trial, we investigated the juror misconduct regarding Mr. Balderas' brother waving at the jury while they were seated on a bus on the second night of their deliberations. We and the judge questioned a bailiff as well as two of the jurors identified by the bailiff as having seen the incident on the record. The jurors both responded that the incident would not affect their ability to sit on the jury and judge the evidence. Nevertheless, we moved for a mistrial, which was denied by the court.

### Applicant's Sixth Ground:

We pursued an aggressive mitigation investigation. We engaged the services of a number of experts in various fields to assist with Mr. Balderas' case, including both fact and mitigation investigators and experts. We discussed different avenues we could take in presenting evidence, as well as the different types and levels of mitigation evidence we had. We presented the testimony of experts Dr. Matthew Mendel, Dr. Matthew Brams, Amy Nguyen, Dr. John Rodriguez, Terry Pelz, Frank AuBuchon, and Dr. Jolie Brams. We also presented the testimony of Mr. Balderas' juvenile caseworker Sofia Nolte and Reverend Carroll Pickett, in addition to testimony from friends, family members, and a guard at the Harris County Jail. Included in the testimony of these individuals are the areas that Mr. Balderas' now complains of: his abusive childhood, his unstable mother, family history of mental illness, and his positive characteristics.

We did not object to the State's cross-examination of Dr. Mendel and Dr. Brams on the issue of not recording conversations with the applicant, or on the State's closing argument regarding this point because we did not construe these as comments on Mr. Balderas' failure to

3

testify. I believe these were fair points for cross-examination. I believe the State was entitled to question the experts as to why the jury should believe their assessments of Mr. Balderas' reactions. The State's questioning and argument was a fair attack on the credibility of the experts.

I have no personal recollection of calling State's counsel "a bitch", or saying that someone "doesn't like me because I'm black." Trials are intense battles between adversaries and in the course of battle words are often spoken by both parties. In punishment closing argument, I did remind the jurors of our conversations during jury selection and the oaths they took as jurors to have individual votes and keep to their personal convictions. During guilt-innocence deliberations, the jurors had sent notes that they were deadlocked and ultimately minds must have been changed to reach a guilty verdict. In response and as a matter of strategy, I reminded the jury that they are individuals and are entitled to own vote, and that if they changed their vote because of pressures they felt, then they had violated the oath they took. I believed it was very important to remind them to stick to their beliefs.

### Applicant's Eighth Ground:

Our timing in filing the speedy trial motion was a matter of trial strategy based the totality of the circumstances at play in Mr. Balderas' case. Mr. Balderas was charged with two capital murders and an assault, and had extensive extraneous criminal conduct including three additional murders and continued bad behavior in the jail. This required a considerable amount of investigation on our part, relating not only to his guilt or innocence, but also to presenting a mitigation case. We also had ongoing negotiations with the State and with Mr. Balderas concerning a life plea for a number of years prior to the State making its decision to pursue death against Mr. Balderas. During the entirety of his case, Mr. Balderas never indicated his desire to

have a speedy trial. At the time we filed the speedy trial motion, we did not feel that there were any beneficial defense witnesses who were unavailable as a result of the delay or that our defense was hampered in any way due to the passage of time. Nevertheless, we filed the speedy trial motion to preserve his appellate rights.

### Applicant's Ninth Ground:

We did not specifically qualify jurors on the issue of sexual abuse because we saw it as inappropriate and not in accordance with the law. The law as we understood it was clear, there was no specific circumstance or fact that qualified as mitigation; it was for each juror to decide individually what they found to be mitigation. And so, we talked about mitigation globally and qualified jurors on whether or not they could keep any open mind to mitigation evidence, but did not discuss specific types of mitigation evidence.

### Applicant's Tenth Ground:

Any juror that we agreed to excuse was a matter of trial strategy in accordance with our method of jury selection, and was based on their responses in the juror questionnaire, not their race. It is routine practice in cases like these to have one eye down the road in terms of which jurors are coming down the line next and what we needed to anticipate. We discussed each juror that we agreed to excuse with Mr. Balderas prior to making the agreement, and explained our reasoning to him. We always asked Mr. Balderas if he had any objection, and he never expressed any disagreement or objection to a particular juror after receiving explanation from counsel. On the record, all we did was inform the Court that we had an agreement with the State and the Court would ask Mr. Balderas if this was his agreement as well. We did not see any reason to further explain on the record the details of our conversations with and our counsel to Mr. Balderas.

Likewise, we explained to Mr. Balderas the reasons why we believed that a particular juror needed to be interviewed. At times, as a matter of strategy in order to use our strikes effectively, we agreed to get rid of jurors who were either very strong defense or very strong State jurors, so as to preserve future strikes for potential jurors coming down the road.

The facts stated above are true and correct."



Alvin Nunnery
**Affiant**

SUBSCRIBED AND SWORN TO BEFORE ME this _11th_ day of August, 2017.

Notary Public In And For
The State Of Texas

THERESA A. LOPEZ
Notary Public
STATE OF TEXAS
Commission Exp. DEC. 15, 2020

6



# CHRIS DANIEL
## HARRIS COUNTY DISTRICT CLERK

August 11, 2017

KIM OGG
DISTRICT ATTORNEY
HARRIS COUNTY TEXAS

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1412826-A in the 179th District Court.

☐ State's Original Answer Filed                    ,  .

☒ Affidavit OF ALVIN NUNNERY, AUGUST 11, 2017

☐ Court Order Dated                    ,

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order                    ,

☐ Other

Sincerely,

Roxana Garcia, Deputy
Criminal Post Trial

rg  ·

Enclosure(s) –



# CHRIS DANIEL
### HARRIS COUNTY DISTRICT CLERK

August 11, 2017

BENJAMIN B. WOLFF
DEREK VERHAGEN OR ERIN ECKHOFF
OFFICE OF CAPITAL AND FORENSIC WRITS
1700 NORTH CONGRESS AVENUE, SUITE 460
AUSTIN, TX 78701

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1412826-A in the 179th District Court.

☐ State's Original Answer Filed          ,

☒ Affidavit OF ALVIN NUNNERY, August 11, 2017

☐ Court Order Dated          ,

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order          ,

☐ Other

Sincerely,

Roxana Garcia, Deputy
Criminal Post Trial

rg

Enclosure(s) –

# IN THE 179TH DISTRICT COURT
# HARRIS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| ———————————————— | ) | **Cause No.** |
| **EX PARTE** | ) | **1412826-A** |
| **Juan Balderas,** | ) | |
| **APPLICANT** | ) | |
| | ) | |
| ———————————————— | ) | |

## UNOPPOSED MOTION FOR 10-DAY EXTENSION OF TIME TO FILE MOTION AND OPPOSITION TO STATE'S MOTION

Juan Balderas, through his attorneys, the Office of Capital and Forensic Writs (OCFW), requests this Court grant a 10-day extension of time to file his Motion for Evidentiary Hearing and Opposition to the State's Motion for Trial Court to Order the Submission of Proposed Findings of Facts, filed with this Court on August 17, 2017.[1]

---

[1] The OCFW contacted Harris County Assistant District Attorneys Josh Reiss and Farnaz Hutchins regarding this Motion on September 7, 2017. On September 11, 2017, Ms. Hutchins indicated that her office does not oppose this request for a 10-day extension of time.

I

# I.

## PROCEDURAL HISTORY

Mr. Balderas was convicted of capital murder and sentenced to death on March 14, 2014. Judge Kristin Guiney presided over Mr. Balderas's trial. He is confined under a sentence of death pursuant to the judgment of this Court. On January 15, 2016, Mr. Balderas, through his counsel, the OCFW, filed an Initial Application for Writ of Habeas Corpus (Initial Application). The State filed its Original Answer (Answer) denying each of Mr. Balderas's claims on July 18, 2016. Mr. Balderas and the State then each filed motions asking the Court to enter an Order Designating Issues. Where Mr. Balderas requested that the Court designate each of his claims for further fact-finding, and that further fact-finding be conducted via evidentiary hearing, the State requested that the Court designate only Mr. Balderas's claims of ineffective assistance of counsel claims for further fact-finding, and that further fact-finding be conducted via trial counsel affidavits.

On September 16, 2017, the Court signed the State's proposed order designating issues and the State's proposed order for trial counsel affidavits. Pursuant to the Court's order, trial counsel affidavits were due on November 15, 2016. No affidavits were filed on that date. Trial counsel Jerome Godinich filed an affidavit on August 9, 2017, and trial counsel Alvin Nunnery filed an affidavit on August 11, 2017.

061495

On Thursday, August 17, 2017, this Court held a hearing in the case. Also on August 17, 2017, prior to the 1:00 p.m. hearing, the State filed a Motion for the Trial Court to Order the Submission of Proposed Findings of Fact. Referenced in the Motion were the affidavits of Mr. Balderas's trial counsel. Although the affidavits had been filed on August 9 and August 11, 2017, respectively, counsel for Mr. Balderas, the OCFW, had not received service copies of them prior to the August 17 hearing, and thus, had not had time to review and discuss these affidavits, in which trial counsel responded to many of the claims for relief Mr. Balderas presented in his Initial Application.

At the close of August 17 hearing, counsel for Mr. Balderas asked for time to file a written opposition to the State's Motion for the Trial Court to Order the Submission of Proposed Findings of Fact. The Court granted counsel's request and set a deadline of September 12, 2017, for a written Opposition to the Motion to be filed. In addition, counsel for Mr. Balderas asked for the opportunity to file a written Motion urging this Court to grant an evidentiary hearing and further factual development on claims raised in his Initial Application, which alleged State misconduct, ineffective assistance of counsel, and juror misconduct, among other constitutional violations. The Court granted counsel's request to file a written renewed Motion for Evidentiary Hearing and set September 12, 2017 as the due date for this Motion as well.

3

On August 25, 2017, Hurricane Harvey struck the Texas coast. Harris County was one of thirty counties preemptively declared a state of disaster prior to the storm. Prior to the arrival of the hurricane, counsel for Mr. Balderas did not have the opportunity to meet with Mr. Balderas, who is being housed at the Harris County Jail pursuant to a bench warrant, to review with him the State's Motion or to discuss the affidavits of his trial counsel. To date, counsel for Mr. Balderas still have not been able to confer with Mr. Balderas. Additionally, although counsel attempted to send Mr. Balderas copies of the recent filings in his case, the attempt was unsuccessful, as the documents were inexplicably returned to the OCFW by the Harris County Jail, even after the date when inmates were supposed to be receiving their legal correspondence again.

## II.

## STATEMENT OF FACTS

On August 28, 2017, the Texas Court of Criminal Appeals (CCA) and the Texas Supreme Court issued a miscellaneous order announcing that Hurricane Harvey provides good cause for the modification of deadlines in court proceedings throughout the state of Texas. In this emergency order, the Courts acknowledged that court proceedings in counties throughout the state might be affected by the disaster because of closures of courts and clerk's offices and difficulties with access, travel, and communication by lawyers, parties, and others. The Courts

4

further declared that, pursuant to Section 22.0035(b) of the Texas Government Code, all courts in Texas should consider disaster-caused delays as good cause for modifying or suspending all deadlines and procedures—whether prescribed by statute, rule, or order—in any case. This Order remains in effect and expires on September 27, 2017, unless extended by the Courts.

Harris County, one of the counties most severely affected by the hurricane, is where Mr. Balderas is currently in custody, pursuant to a bench warrant issued in connection with the August 17, 2017 hearing which remains in place, and is where the District Attorney's office and the Court itself reside. Accordingly, many of the factors that the CCA and the Supreme Court considered in authorizing modification and suspension of court procedures and deadlines are applicable in this case. The Harris County District Court closed on August 23, 2017, and only reopened on September 11, 2017, with extensive modifications to operations in light of damage to the criminal courts building. Likewise, the Harris County District Attorney's Offices have been closed and its attorneys displaced indefinitely from their offices due to damage from the hurricane.

Mr. Balderas's attorneys have been prevented from traveling to Harris County to confer with him about the State's Motion and the trial counsel affidavits. Additionally, the uncertainty and devastation caused by Hurricane Harvey have caused numerous disruptions and delays in other cases to which the OCFW is

appointed counsel and to which the attorneys handling Mr. Balderas's case are assigned. In the aftermath of the hurricane, counsel for Mr. Balderas have experienced difficulties with travel and communication and access to courts in other cases as well as Mr. Balderas's. For these reasons, among the others detailed in this Motion, counsel request an extension of time to file a renewed Motion for Evidentiary Hearing and an Opposition to the State's Motion, both of which are currently due on September 12, 2017.

## III.

## ARGUMENT

In light of the admonition from the CCA and Texas Supreme Court that Hurricane Harvey presents good cause for modification of deadlines in all cases, not only those in Harris County, because of court closures, lack of access to clerk's offices, difficulties with travel and communications by lawyers and parties—impediments which Mr. Balderas's counsel have experienced in this case, as well as in other cases within the OCFW—Mr. Balderas believes good cause exists in this case to allow an extension of time to file his Motion and his responsive pleading to the State's Motion, including a response to trial counsel's affidavits. The State does not oppose this request.

## IV.

## PRAYER FOR RELIEF

For the foregoing reasons, Mr. Balderas prays this Court grant his unopposed request and extend his deadline to file his Motion and his Opposition to the State's Motion to September 22, 2017.

Respectfully submitted,

DATED:     September 12, 2017     By *Katherine J. Black*
Katherine Froyen Black
Post-Conviction Attorney

ERIN M. ECKHOFF
(No. 24090910)
Erin.Eckhoff@ocfw.texas.gov
KATHERINE FROYEN BLACK
(No. 24099910)
Katherine.Black@ocfw.texas.gov
Post-Conviction Attorneys

Office of Capital and Forensic Writs
1700 N. Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Mr. Balderas

01500

# IN THE 179TH DISTRICT COURT
## HARRIS COUNTY, TEXAS

|                        |   |                      |
|------------------------|---|----------------------|
|                        | ) | **Trial Cause No.**  |
| **EX PARTE**           | ) | **1412826-A**        |
| **Juan Balderas,**     | ) |                      |
|     **APPLICANT** | ) |    |
|                        | ) |                      |
|                        | ) |                      |

## ORDER

On this date, the Court considered Mr. Balderas's Unopposed Motion for Extension of Time to File his Motion for Evidentiary Hearing and Opposition to the State's Motion. After due consideration, Mr. Balderas's Motion is GRANTED. Mr. Balderas's Motion and Opposition are due on September 22, 2017.

ORDERED AND SIGNED on this _____ day of September 2017.


_____
The Honorable Randy Roll
Judge, 179th Judicial District Court

8

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Unopposed Motion for Extension of Time to File Motion to:

Harris County District Clerk
Attn: Criminal Post-Trial
1201 Franklin Street, 3rd Floor
Houston, Texas 77002

Judge Randy Roll
179th Judicial District Court
1201 Franklin Street, 18th Floor
Houston, Texas 77002

Harris County District Attorney
Attn: Farnaz Hutchins

This certification is executed on September 12, 2017 at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

*Katherine J. Black*

Katherine Froyen Black

9

Filed 17 September 12 P3:24
Chris Daniel - District Clerk
Harris County
FAX16755229

# IN THE 179TH DISTRICT COURT
# HARRIS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| _____ | ) | **Trial Cause No.** |
| **EX PARTE** | ) | **1412826-A** |
| **Juan Balderas,** | ) | |
| **APPLICANT** | ) | |
| | ) | |
| _____ | ) | |

## ORDER

On this date, the Court considered Mr. Balderas's Unopposed Motion for Extension of Time to File his Motion for Evidentiary Hearing and Opposition to the State's Motion. After due consideration, Mr. Balderas's Motion is GRANTED. Mr. Balderas's Motion and Opposition are due on September 22, 2017.

ORDERED AND SIGNED on this _____ day of September 2017.


_____
The Honorable Randy Roll
Judge, 179th Judicial District Court

8

## IN THE 179TH DISTRICT COURT
## HARRIS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| | ) | **Cause No.** |
| **EX PARTE** | ) | **1412826-A** |
| **Juan Balderas,** | ) | |
| **APPLICANT** | ) | |
| | ) | |
| | ) | |

## VERIFIED MOTION TO RECUSE JUDGE RANDY ROLL FROM PROCEEDINGS CONNECTED TO JUAN BALDERAS'S INITIAL APPLICATION FOR WRIT OF HABEAS CORPUS

Applicant Juan Balderas, through his attorneys, the Office of Capital and Forensic Writs (OCFW), respectfully files this Verified Motion to Recuse Judge Randy Roll From Proceedings Connected to Juan Balderas's Initial Application for Writ of Habeas Corpus under the Texas Rules of Civil Procedure, Rules 18a & 18b(b). Mr. Balderas's trial counsel, Jerome Godinich and Alvin Nunnery, are the subjects of multiple ineffective assistance of counsel claims in Mr. Balderas's Initial Application for Writ of Habeas Corpus (Application). On August 17, 2017, during a hearing on these proceedings, Judge Randy Roll made a number of statements indicating that he held Mr. Godinich and Mr. Nunnery in high regard, thus indicating a prejudgment about their competence and effectiveness as counsel.

Because adjudicating the Initial Application requires consideration of claims that Mr. Godinich and Mr. Nunnery provided ineffective assistance of counsel at Mr.

I

Balderas's trial, Judge Roll's statements indicate his impartiality in adjudicating such claims against them may reasonably be questioned. Although Mr. Balderas does not contend that Judge Roll harbors actual bias or prejudice concerning any party, the specific circumstances here require recusal. Mr. Balderas asks that Judge Randy Roll recuse himself from presiding over this cause due to certain facts which might, to a reasonable member of the public at large, call his impartiality into question with respect to adjudicating the Initial Application now pending before him. In support of this motion, Mr. Balderas respectfully shows the following:

## FACTS RELEVANT TO RECUSAL

Mr. Balderas is confined under a sentence of death pursuant to this Court's judgment, which was rendered on March 14, 2014. (CR at 3355-57.)[1] Judge Kristin Guiney presided over the capital trial and pronounced judgment. Thereafter, Judge Guiney appointed the OCFW to represent Mr. Balderas in his state post-conviction habeas proceedings. (CR at 3363.) The OCFW investigated the basis for claims and then filed the instant Application, pursuant to Code of Criminal Procedure Article 11.071, raising constitutional challenges to the legitimacy of Mr. Balderas's conviction and death sentence. The Application contains, *inter alia*, the following claims:

---

[1] "CR" refers to the Clerk's Record in Mr. Balderas's trial. "RR" refers to the Reporter's Record in Mr. Balderas's trial.

01588

Claim Four: Trial Counsel Were Ineffective at the Guilt/Innocence Phase of Mr. Balderas's Trial.

Claim Six: Trial Counsel Were Ineffective During the Punishment Phase of Mr. Balderas's Trial.

Claim Eight: Trial Counsel Were Ineffective By Failing to Timely and Competently Assert Mr. Balderas's Right to a Speedy Trial.

Claim Nine: Trial Counsel Provided Ineffective Assistance of Counsel During the Jury Selection Phase of Mr. Balderas's Trial.

*See* Initial Application. Each of these claims alleges that Mr. Balderas's trial counsel, Mr. Godinich and Mr. Nunnery, performed deficiently at his trial, and that Mr. Balderas was prejudiced by their deficient performance. The State disputed each of Mr. Balderas's claims in its Original Answer (Answer), filed July 18, 2016.

On September 16, 2016, Judge Guiney entered an order designating each of Mr. Balderas's fourteen claims for further fact-finding and resolution. That same date, Judge Guiney also entered an order directing Mr. Balderas's trial counsel to submit affidavits responding to the allegations in Claims Three, Four, Six, Eight, Nine, and Ten of the Initial Application. Pursuant to that order, trial counsel affidavits were due November 15, 2016. Godinich and Nunnery submitted affidavits on August 9, 2017 and August 11, 2017, almost ten months after they were due.

Judge Roll, who assumed the bench of the 179th District Court in January 2017, conducted a status conference in Mr. Balderas's case on August 17, 2017. At

3

the first on-the-record mention of Mr. Balderas's ineffective assistance of counsel

claims, the following exchange occurred:

> Ms. Eckhoff: As we also discussed a bit off the record, trial counsel have submitted affidavits responding to some of Mr. Balderas' claims, specifically the ineffective assistance of counsel claims. We don't --
>
> The Court: And let me just say this. I'll make some notes while you're talking. I just want to interlineate, I know [Mr. Balderas] had Mr. Jerome Godinich and Alvin Nunnery [as his trial counsel].
>
> Ms. Eckhoff: Yes.
>
> The Court: *And these are two lawyers that have taken capital murder cases probably more than any other pair of lawyers in the county. I don't know of anybody that's had more than they.* So I'm just -- you may continue but I want you to know I know who the parties are.
>
> Ms. Eckhoff: Sure. I appreciate that.
>
> The Court: You may continue.
>
> Ms. Eckhoff: We're simply stating that the affidavits [provided by trial counsel] alone are not a sufficient form of fact finding here. They certainly add to the facts at issue but there are a number of problems with relying on affidavits and not doing an evidentiary hearing, the most common sense of which is that it's really difficult to cross-examine a written statement. You know, for better for worse, when these types of claims are raised, trial counsel often become adverse to their former clients. They have an interest in defending themselves from these claims and --
>
> The Court: Because right now you're claiming ineffective assistance of counsel, aren't you?
>
> Ms. Eckhoff: Correct, yes.
>
> The Court: I just want you to realize that *I know both parties well.* I know they've had probably dozens and dozens of cases --
>
> Ms. Eckhoff: Sure.

4

The Court: -- like this. *Those two pioneered capital murder [representation] in this county, at this level, at a very high level of sophistication.* You may continue.

Exhibit A, Writ Hearing Transcript, at 5-6 (Aug. 17, 2017) (emphasis added).

Later, Judge Roll returned to the topic of his high regard for trial counsel.

Significantly, he made these additional statements of support for trial counsel at the

point in the hearing when he was advising Mr. Balderas's counsel to limit any written

request for evidentiary hearing to certain of his claims, those Judge Roll termed

"strongest ones." Exhibit A at 81. Judge Roll specifically identified claims he

believed Mr. Balderas should not request an evidentiary hearing on, stating: "I've

given you my opinion already just on what I've heard today. Please don't spend

your wheels -- spin your wheels on the motel, the person waving, the translator."[2]

*Id.* He immediately continued:

> I know these attorneys, they've practiced before me, I've practiced alongside them for 25 years here. *And I've appointed Mr. Godinich before, in the past. So, I know that he's a good lawyer.*
>
> There are only -- we have 179 people on the first degree list, 79 people on the second degree list here, and 69 people on the third degree list here. But there are only, what, 40 or 50 people [on the capital list] out of the thousands that practice in this courthouse a day. They have to take a special CLE course and maintain their CLE on capital writs and capital cases. *These attorneys pioneered the way.*
>
> This county was one of the first and the best counties on requiring proper accreditation for capital crime [representation]. This -- I would

---

[2] Each of these—the motel, the person waving, and the translator—presumably refers to Claim Five of the Initial Application, wherein Mr. Balderas alleged his jury was exposed to extraneous influence. *See* Initial Application, pp. 135-189.

. 01509

say I don't know of a county that does a better job than Harris. Do you know of one? And we have the best attorneys that are appoint to capital crime. I only appoint people that have the highest accreditations.

*Id.* at 81-82 (emphasis added).

Notably, Judge Roll also expressed his high regard for local defense attorney Allen Isbell. Mr. Isbell represented Israel Diaz, a witness for the State at Mr. Balderas's trial, who gave conflicting statements to the State, testified against Mr. Balderas at trial in exchange for a deal, and later recanted his testimony. In response to Claims One, Two, and Three of the Initial Application, in which Mr. Balderas alleged that the State presented false testimony from Mr. Diaz and withheld impeachment material from the defense, the State attached an affidavit from Ms. Isbell to its Answer that purported to counter Mr. Balderas's allegations. Referencing Mr. Isbell's affidavit, Judge Roll stated: "I want you to realize Mr. Isbell is the highest caliber attorney that we have here. I hold him in incredibly high esteem and I believe him. I'm telling you that." *Id.* at 8.

Throughout the status conference, Judge Roll repeatedly opined on the worthiness of Mr. Balderas's claims. *See, e.g.*, Exh. A at 17, 26, 49, 56, 57, 63, 69, 79, 80, and 81.

6

## LEGAL STANDARD

The Texas Rules of Civil Procedure governing recusal apply to both civil and criminal proceedings. *See Fuelberg v. State*, 410 S.W.3d 498, 508-09 (Tex. App.—Austin 2013). The relevant Rules are 18a & 18b. Rule 18a provides:

> A party in a case in any trial court . . . may seek to recuse or disqualify a judge who is sitting in the case by filing a motion with the clerk of the court in which the case is pending. The motion:
>
> (1) must be verified;
>
> (2) must assert one or more of the grounds listed in Rule 18b;
>
> (3) must not be based solely on the judge's ruling in the case; and
>
> (4) must state with detail and particularity facts that:
>
> > (A) are within the affiant's personal knowledge, except that facts may be stated on information and belief if the basis for that belief is specifically stated;
> >
> > (B) would be admissible in evidence; and
> >
> > (C) if proven, would be sufficient to justify recusal or disqualification.

The primary basis for recusal at issue here is found in Rule 18b(b)(1): "A judge shall recuse themselves in all proceeding in which . . . [their] impartiality might reasonably be questioned[.]" TEX. R. CIV. PROC. 18b(b)(1) (emphasis added). Texas appellate courts have interpreted this subsection (and its predecessor) as requiring an inquiry into "whether a reasonable member of the public at large, knowing all the facts in the public domain concerning the judge's conduct, would have a reasonable

7

doubt that the judge is actually impartial." *See Kirby v. Chapman*, 917 S.W.2d 902, 908 (Tex. App.—Fort Worth 1996, no writ) (applying *Rogers v. Bradley*, 909 S.W.2d 872, 879 (Tex. 1995)); *Duffey v. State*, 428 S.W.3d 319, 325 (Tex. App.—Texarkana Feb. 21, 2014, no pet. h.) (finding trial judge's *ex parte* meeting with family members without attorneys present would have caused a reasonable member of the public at large to "have a reasonable doubt as to the trial judge's impartiality"). Texas law does not require proof of actual bias. That is, "beyond the demand that a judge be impartial is the requirement that a judge *appear* to be impartial so that no doubts or suspicions exist as to the fairness or integrity of the court." *Sears v. Olivarez*, 28 S.W.3d 611, 613–14 (Tex. App.—Corpus Christi 2000, no pet.) (citing *Aetna Life Ins. v. Lavoie*, 475 U.S. 813 (1986) (emphasis added)).

The Supreme Court of the United States has likewise underscored that, in the interest of due process, "[o]bjective standards may also require recusal whether or not actual bias exists or can be proved." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 886 (2009). In short, even absent evidence of actual bias, recusal is warranted if the facts, viewed objectively, could reasonably give rise to a suspicion of bias or partiality.

8

## I. Recusal Is Required under Rule 18b(b)(1)

### A. In View of the Facts Judge Roll Must Assess in Adjudicating the Application, Recusal Is Required

Because Judge Roll made numerous statements indicating his personal admiration of trial counsel Jerome Godinich and Alvin Nunnery—even going so far as to advise Mr. Balderas's current counsel to abandon efforts to further develop his ineffective assistance of counsel claims—his "impartiality might reasonably be questioned" with respect to adjudicating any claims in Mr. Balderas's Application that require an assessment of Mr. Godinich and Mr. Nunnery's performance at Mr. Balderas's trial. TEX. R. CIV. PROC. 18b(b)(1). As he stated with regard to the affidavit submitted by Allen Isbell, Judge Roll credits the written statements of these attorneys because of his personal experience with them, despite the self-serving nature of the trial counsel affidavits.

The record—specifically, the transcript of the August 17, 2017 status hearing—sufficiently establishes the factual basis for a recusal. In light of the circumstances present here, a reasonable person in possession of all the facts could question Judge Roll's impartiality in presiding over the writ proceedings in Mr. Balderas's case. Given Judge Roll's comments regarding Mr. Balderas's trial counsel, an appearance of impropriety plausibly could arise were Judge Roll to take part in proceedings adjudicating Mr. Balderas's ineffective assistance of counsel

9

claims. As the facts herein could jeopardize public trust in a "neutral and detached" judge, recusal is warranted. *Ward v. Village of Monroeville, Ohio*, 409 U.S. 57, 57 (1972).

## B. In View of the Law that Judge Roll Must Apply in Adjudicating the Application, Recusal Is Required

Clearly established Supreme Court law dictates the proper analysis a court must undertake when confronted with allegations that attorneys provided ineffective assistance of counsel. To adjudicate Mr. Balderas's Initial Application, Judge Roll will have to objectively assess Mr. Balderas's claims that his right to counsel under the Sixth Amendment to the United States Constitution was violated, and that assessment must comport with Supreme Court precedent. Specifically, Judge Roll will need to consider whether trial counsel's performance was deficient, and whether any deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).[3]

To establish deficient performance, Mr. Balderas must show his counsel's representation fell below an objective standard of reasonableness. *Porter v.*

---

[3] *See also Porter v. McCollum*, 558 U.S. 30, 38-39 (2009); *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Virgil v. Dretke*, 446 F.3d 598, 608 (5th Cir. 2006); *Ex parte Bryant*, 448 S.W.3d 29, 39 (Tex. Crim. App. 2014); *Ex parte Overton*, 444 S.W. 3d 632, 640 (Tex. Crim. App. 2014) (granting habeas relief pursuant to *Strickland*); *Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999) ("[A]ppellant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

. 01514

*McCollum*, 558 U.S. 30, 38-39 (2009) (quoting *Strickland*, 466 U.S. at 688); *Ex parte Bryant*, 448 S.W.3d 29, 39 (Tex. Crim. App. 2014). An applicant for habeas relief need only prove ineffective assistance of counsel by a preponderance of the evidence. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). This standard governs the claim as a whole, and does not replace the more lenient "reasonable probability" standard for the prejudice prong. The Supreme Court has reiterated that it applies a "case-by-case approach to determining whether an attorney's performance was unconstitutionally deficient under *Strickland*." *Rompilla v. Beard*, 545 U.S. 374, 393-94 (2005) (O'Connor, J., concurring) (citing *Strickland*, 466 U.S. 668).

Deficient performance is performance that is "inconsistent with the standard of professional competence in capital cases that prevailed [at the time of the trial]." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1407 (2011). The Supreme Court has repeatedly assessed the reasonableness of counsel's performance by looking to "[p]revailing norms of practice as reflected in [the] American Bar Association standards." *Strickland*, 466 U.S. at 688; *see also Padilla v. Kentucky*, 559 U.S. 356, 367 (2010) (noting that the *ABA Standards* "may be valuable measures of the prevailing professional norms of effective representation"); *Rompilla*, 545 U.S. at 387 ("'[W]e long have referred [to the ABA *Standards for Criminal Justice*] as

11

. 01515

"guides to determining what is reasonable."'" (quoting *Wiggins v. Smith*, 539 U.S. at 524)).

Capital counsel's obligations are governed by the "prevailing professional norms" at the time of the representation even if those norms did not align with a less rigorous defense based on "most common customs." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011). The Supreme Court instructs courts to look at the "norms of practice as reflected in the American Bar Association and the like" and to consider "all the circumstances" of a case. *Strickland*, 466 U.S. at 688. These sources of norms include the ABA *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 HOFSTRA L. REV. 913 (2003) ("*ABA Guidelines*"), the ABA *Standards for Criminal Justice* (3d ed. 1993) ("*ABA Standards*"), and the National Legal Aid & Legal Defender Association *Standards for the Appointment of Counsel in Death Penalty Cases* ("*NLADA Standards*"). *See also* State Bar of Tex., *Guidelines and Standards for Texas Capital Counsel*, 69 TEX. B.J. 966 (2006) ("*Texas Guidelines*").

Trial counsel have a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 690-91. "[The] Guidelines applied the clear requirements for investigation set forth in the earlier Standards to death penalty cases and imposed . . . similarly forceful directive[s]." *Rompilla*, 545 U.S. at 387 n.7.

12

Pursuant to the *ABA Guidelines*, counsel were required to conduct "thorough and independent investigations relating to the issues of both guilt and penalty." *ABA Guidelines*, Guideline 10.7. A court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. *Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005); *Wiggins*, 539 U.S. at 521. When trial counsel is not aware of the relevant mitigating evidence, "the issue is not whether he was ineffective for failing to present [the] evidence . . . , but rather whether he failed to conduct a reasonable investigation to uncover mitigating evidence." *Ex parte Gonzales*, 204 S.W.3d 391, 396 (Tex. Crim. App. 2006).

Similarly, the *ABA Standards* state that counsel "should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty." *ABA Standards*, Standard 4-4.1; *Texas Guidelines*, Guideline 11.1. Most significantly, "[t]he duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty." *Id.* Similarly, the duty to investigate may exist despite the accused's failure to mention potentially mitigating evidence or the accused's affirmative denial that such evidence exists. *Rompilla*, 545 U.S. at 377; *Ex parte Gonzales*, 204 S.W.3d at 396. The Texas Court of Criminal Appeals has held that "it is not sufficient to inquire

13

generally and leave it up to the defendant to raise topics or respond to open-ended questions. Like a doctor, [capital] defense counsel must be armed with a comprehensive check-list of possibilities, and forcefully inquire about each topic." *Ex parte Gonzales*, 204 S.W.3d at 400-01 (Cochran, J., concurring).

Once capital trial counsel completes the necessary pretrial investigation, he must then formulate a defense theory "that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies." *ABA Guidelines*, Guideline 10.10.1.

To establish prejudice, Mr. Balderas "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in [the] outcome." *Porter*, 558 U.S. at 44 (quoting *Strickland*, 466 U.S. at 693-94). Mr. Balderas need not show that counsel's deficient conduct "more likely than not altered the outcome" in his case, *Strickland*, 466 U.S. at 693, but he must demonstrate that "the likelihood of a different result [is] substantial, not just conceivable." *Richter*, 131 S. Ct. at 792. State courts "must decide whether the undiscovered and unoffered evidence would have created a reasonable probability that, had the jury heard it, the jury's verdict would have been different." *Ex parte Martinez*, 195 S.W.3d 713, 731 (Tex. Crim.

App. 2006); *see also, Wiggins*, 539 at 538 (citing *Williams v. Taylor*, 529 U.S. 362, 398 (2000)); *Kunkle v. Dretke*, 352 F.3d 980, 991 (5th Cir. 2003).

The Court should consider the cumulative effect of counsel's errors when establishing the ineffectiveness of counsel. *White v. Thaler*, 610 F.3d 890, 912 (5th Cir. 2010) (holding that "[t]he combined prejudicial effect of the post-arrest silence and the death of the unborn child inexorably leads us to conclude that White has shown that the state court's conclusion that there was no reasonable probability of a different outcome is objectively unreasonable"); *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009) ("We will address each aspect of Davis's performance the district court found deficient before considering whether Richards was cumulatively prejudiced thereby.").

Notably, neither the Court's prior knowledge of trial counsel nor trial counsel's reputation, whether as determined by the Court or in the community at large, has any bearing on the *Strickland* analysis. "[The] proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. Performance is not measured by the attorney's reputation within the community nor on the habeas judge's subjective opinion of their past performance. Mr. Balderas's case was unique, and under the Eighth Amendment, his attorneys' performance must be measured by whether or not it fell below an objective standard of reasonableness in his particular case.

15

. 01519

The present situation, in which Judge Roll indicated that he is bringing his life experiences, and preconceived notions about the credibility of essential witnesses and the merit of any ineffective assistance of counsel claims against them, to bear in assessing the merits of Mr. Balderas's habeas petition, is distinguishable from the types of "personal recollection" contemplated by Texas Code of Criminal Procedure Article 11.071 section 9(a).[4] Here, Judge Roll commented that Mr. Balderas's counsel "pioneered" capital representation in a county he believes is the "best" at conducting capital cases; that Mr. Balderas's counsel attained the "highest accreditation" to represent capital defendants; and that Mr. Balderas's current counsel should not "spin [their] wheels" briefing the need for a hearing on the ineffective assistance of counsel claims, because Judge Roll had "given [his] opinion already" on those claims. Judge Roll's statements regarding Mr. Balderas's trial counsel give the impression to a reasonable person that his opinions regarding their performance are fixed, and that Judge Roll will not undertake the necessary analysis established in *Strickland* and other Supreme Court cases. These comments, which are numerous, are not "personal recollections" of the type a trial court is permitted

---

[4] Article 11.071(9)(a) of the Texas Code of Criminal Procedure (procedure in death penalty cases) contemplates that the post-conviction judge might be the same judge who presided over a post-conviction applicant's trial, and that such a judge might rely on his or her personal recollections of what happened at the trial in resolving previously unresolved factual issues material to the legality of the applicant's confinement.

16

. 01520

to consider with regard to a post-conviction application filed under Article 11.071. Instead, they give the impression that Judge Roll's assessment of Mr. Balderas's multiple ineffective assistance of counsel claims will be based on his personal subjective opinion of Mr. Balderas's trial counsel, rather than a case-specific analysis of their performance.[5] This impression exists, even if the comments are not indicative of any actual bias by Judge Roll. Due process "may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties." *In re Murchison*, 349 U.S. 133, 136 (1955). Thus, recusal is warranted here.

## C. All Components of Rule 18a and 18b Are Satisfied

This motion is "not based solely on" one of Judge Roll's rulings. *See* TEX. R. CIV. PROC. 18a(3). Indeed, Judge Roll has not yet made any rulings in this case. Mr. Balderas requests recusal based on his right to due process in the adjudication of his habeas claim, and, in particular his right to habeas proceedings free of even an impression of bias.

The facts detailed with particularity in this motion are supported by the record and are "sufficient to justify recusal or disqualification." TEX. R. CIV. PROC. 18a(4). These facts establish that Judge Roll's "impartiality might reasonably be

---

[5] Notably, Judge Roll did not preside over Mr. Balderas's trial and thus has no firsthand personal knowledge of trial counsel's performance at trial.

17

questioned." TEX. R. CIV. PROC. 18b(b)(1).  Therefore, recusal is mandatory. *See id.* 18b(b)(1) ("A judge *shall* recuse themselves in all proceeding in which . . . [their] impartiality might reasonably be questioned").

Pursuant to Rule 18a(f)(1), within three business days after the filing of this motion, Judge Roll should either recuse himself or forward this matter to the Presiding Judge of the Second Administrative Judicial Region. *See* TEX. R. CIV. PROC. 18a(f)(1).

### PRAYER FOR RELIEF

For the foregoing reasons, Mr. Balderas asks that the Court grant his Verified Motion for Recusal.

Respectfully submitted,

DATED:  September 22, 2017     */s/ Erin Eckhoff*
ERIN ECKHOFF  (No. 24090910)
(Email: Erin.Eckhoff@ocfw.texas.gov)
KATHERINE FROYEN BLACK (No. 24099910)
(Email: Katherine.Black@ocfw.texas.gov)
Post-Conviction Attorneys

Office of Capital and Forensic Writs
1700 N. Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Mr. Balderas

VERIFICATION

State of Texas        §
County of Travis    §

BEFORE ME, the undersigned notary public, on September 22, 2017, personally appeared Erin M. Eckhoff, who being by me duly sworn, stated under oath that she is attorney-in-charge for Juan Balderas in the Article 11.071 proceeding arising from cause no. 1412826-A; that she has read this motion; and that every statement contained in it is either within her personal knowledge and is true and correct, or is based on information and belief, based on the sworn affidavits attached to this motion; and that all exhibits to this motion are true and correct copies of the record excerpts as they purport to be.

_____
Erin M. Eckhoff

SUBSCRIBED AND SWORN TO before me on September 22, 2017, to certify which witness my hand and seal of office.

_____
Notary Public in and for the State of Texas

My Commission Expires: _04/04/2021_

ASHLEY STEELE
NOTARY PUBLIC
ID# 129398185-4
State of Texas
Comm Exp 04-04-2021

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Verified Motion for Recusal to:

Criminal Post-Trial
Harris County District Clerk
1201 Franklin Street, 3rd Floor
Suite 3180
Houston, TX 77002

Judge Randy Roll
179th District Court
1201 Franklin Street
15th Floor
Houston, TX 77002

Harris County District Attorney
c/o Farnaz Hutchins
1201 Franklin
Suite 600
Houston, TX 77002

This certification is executed on September 22, 2017, at Austin, Texas.

/s/ Erin Eckhoff
ERIN M. ECKHOFF

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
TRIAL COURT CAUSE NO. 1412826-A

| | |
|---|---|
| THE STATE OF TEXAS | ) IN THE DISTRICT COURT OF |
| | ) |
| V. | ) HARRIS COUNTY, TEXAS |
| | ) |
| JUAN BALDERAS | ) 179TH JUDICIAL DISTRICT |

---

**WRIT HEARING**

---

On the 17th day of August, 2017, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Randy Roll, Judge Presiding, held in Houston, Harris County, Texas.

Proceedings reported by computerized stenotype machine.

Renee Reagan, Texas CSR No. 7573
Official Court Reporter, 179th District Court
1201 Franklin
Houston, Texas 77002

EXHIBIT A Page 1

1                          **APPEARANCES**

2     Ms. Farnaz Hutchins
      SBOT No. 24063791
3     Mr. Joshua Reiss
      SBOT No. 24053738
4     Ms. Shawna Reagin
      SBOT No. 16634900
5     Assistant District Attorneys
      Harris County District Attorney's Office
6     1201 Franklin
      Houston, Texas  77002
7     Telephone:  713.274.5800
      Attorneys for the State of Texas
8

9

10

11                   *  *  *  *  *  *  *  *  *  *

12

13

14    Ms. Erin Eckhoff
      SBOT No. 24090910
15    Ms. Katherine Black
      SBOT No. 24099910
16    Office of Capital and Forensic Writs
      1700 N. Congress Ave. Ste. 460
17    Austin, Texas 78701
      Telephone:  512.463.8503
18    Attorneys for the Defendant

19

20

21

22

23

24

25

EXHIBIT A Page 2

01526

1          *(Open court, defendant not present.)*

2          THE COURT:  On the record at this time --

3          MS. ECKHOFF:  Your Honor, my client.

4          THE COURT:  Yes.

5          *(Defendant present.)*

6          THE COURT:  Let's go on the record.

7   We're in Cause No. 1412826-A, and introduce yourselves

8   and tell us who you represent.

9          MS. ECKHOFF:  Your Honor, my name is Erin

10  Eckhoff.  I'm with the Office of Capital and Forensic

11  Writs and we represent Mr. Juan Balderas in his

12  post-conviction proceedings.

13         MS. BLACK:  Katherine Black, also from

14  the Office of Capital and Forensic Writs, also

15  representing Mr. Balderas, who is present.

16         THE COURT:  And for the State?

17         MS. HUTCHINS:  Farnaz Hutchins, that's

18  F-A-R-N-A-Z, representing the State along with.

19         MR. REISS:  Joshua Reiss, R-E-I-S-S,

20  Harris County District Attorney's Office.  Bar Card

21  No. 24053738.  Good afternoon, Your Honor.

22         THE COURT:  Good morning -- good

23  afternoon, yes.

24         All right.  You may continue.

25         MS. ECKHOFF:  Thank you, Your Honor.

01527

1   We've filed an initial application for writ of habeas
2   corpus on Mr. Balderas' behalf that raised a number of
3   claims that if established, would entitle him to habeas
4   relief.  These claims include that State's witnesses
5   provided false testimony at trial.  The impeachment --
6               THE COURT:  Mr. Diaz, Mr. -- okay.
7               MS. ECKHOFF:  Excuse me, sir?
8               THE COURT:  Go ahead.
9               MS. ECKHOFF:  That the State withheld
10  impeachment evidence and as we have discussed a bit off
11  the record, that the jurors were exposed to a -- an
12  extraneous influence and that the Court, when that
13  influence was brought to their attention, waited until
14  after they reached a verdict to actually address it on
15  the record.  Again, if these claims are proven as true,
16  then Mr. Balderas is entitled to habeas relief and I
17  think what's important to note at this point is that,
18  you know, we have the burden of proof.  Mr. Balderas has
19  the burden of proof at this stage.  Our application are
20  allegations that we are making.  The State obviously has
21  responded and denied those allegations and we are
22  requesting an opportunity to put on the evidence
23  necessary to prove our claims.  For that, we argue, an
24  evidentiary hearing is necessary.  We need the
25  opportunity to put on our own evidence but also

1 challenge the State's evidence to the contrary.  And we

2 urge that that's what due process requires in a death

3 penalty case like this.

4     As we also discussed a bit off the

5 record, trial counsel have submitted affidavits

6 responding to some of Mr. Balderas' claims, specifically

7 the ineffective assistance of counsel claims.  We

8 don't --

9     THE COURT:  And let me just say this.

10 I'll make some notes while you're talking.  I just want

11 to interlineate, I know he had Mr. Jerome Godinich and

12 Alvin Nunnery.

13     MS. ECKHOFF:  Yes.

14     THE COURT:  And these are two lawyers

15 that have taken capital murder cases probably more than

16 any other pair of lawyers in the county.  I don't know

17 of anybody that's had more than they.  So I'm just --

18 you may continue but I want you to know I know who the

19 parties are.

20     MS. ECKHOFF:  Sure.  I appreciate that.

21     THE COURT:  You may continue.

22     MS. ECKHOFF:  We're simply stating that

23 the affidavits alone are not a sufficient form of fact

24 finding here.  They certainly add to the facts at issue

25 but there are a number of problems with relying on

01525

1    affidavits and not doing an evidentiary hearing, the
2    most common sense of which is that it's really difficult
3    to cross-examine a written statement.  You know, for
4    better for worse, when these types of claims are raised,
5    trial counsel often become adverse to their former
6    clients.  They have an interest in defending themselves
7    from these claims and --
8              THE COURT:  Because right now you're
9    claiming ineffective assistance of counsel, aren't you?
10             MS. ECKHOFF:  Correct, yes.
11             THE COURT:  I just want you to realize
12   that I know both parties well.  I know they've had
13   probably dozens and dozens of cases --
14             MS. ECKHOFF:  Sure.
15             THE COURT:  -- like this.  Those two
16   pioneered capital murder in this county, at this level,
17   at a very high level of sophistication.  You may
18   continue.
19             MS. ECKHOFF:  I appreciate that.  And I
20   would just add that given the adverse dynamic that may
21   arise in these types of cases, it's fair for
22   Mr. Balderas to examine them and challenge them to the
23   extent necessary and if possible.  But -- and as we
24   discussed off the record, we have had some opportunity
25   to do a cursory review of what we believe are the

1   accurate affidavits that were submitted and we've done

2   our best to identify problems with them and objections

3   we have to them at this point.  We will be requesting

4   additional time to review them more thoroughly and

5   respond to the extent we have additional objections to

6   make but I'm happy to go through some of the initial

7   problems that I've noticed.  First of all --

8           THE COURT:  Why don't you do this for the

9   Court of Appeals, very quickly go through -- is it 10 or

10  11 errors that you're alleging?

11          MS. ECKHOFF:  There were 14 claims.

12          THE COURT:  Would you go through them

13  real quickly and summarize it?

14          MS. ECKHOFF:  Sure.  Okay.  So, Claims 1

15  and 2 pertain to the testimony of Israel Diaz who

16  testified on behalf of the State after making a deal

17  with the State on the eve of Mr. Balderas' trial.  And

18  in that deal, in exchange for his testimony, his own

19  capital murder charge was reduced to aggravated assault.

20  At the trial he gave an account of the night in

21  question, the night of the shooting, that he actually

22  had seen Mr. Balderas immediately after the shooting

23  take place and that Mr. Balderas confessed to him his

24  involvement.  Now, in our post-conviction investigation,

25  of course we go back and talk to Mr. Diaz about his

1    involvement in Mr. Balderas' trial and at that time he

2    recanted his testimony. He said that he actually did

3    not even see Mr. Balderas the night of the shooting and

4    that Mr. Balderas has never confessed to him.

5           THE COURT: Did he also say that he --

6    that the prosecutors at the time told him that his

7    statement that he didn't see that, the murder, that

8    wasn't acceptable and they told him he had to say that

9    he did see it? Is that right? Are you alleging that?

10          MS. ECKHOFF: That is what he reported to

11    our investigator.

12          THE COURT: Also Mr. Isbell has given a

13    statement, an affidavit, saying he was there every

14    moment that they were together with the prosecutors and

15    he never heard that.

16          MS. ECKHOFF: I understand.

17          THE COURT: I want you to realize

18    Mr. Isbell is the highest caliber attorney that we have

19    here. I hold him in incredibly high esteem and I

20    believe him. I'm telling you that.

21          MS. ECKHOFF: Okay.

22          THE COURT: So I'm just trying to say --

23    go ahead. You may continue summarizing.

24          MS. ECKHOFF: And I appreciate that and I

25    would just point out, though, for the first -- for Claim

1  1, that was brought under *Brady* and *Giglio*, that would
2  require the prosecutor knowing that it's false.  The
3  second claim is under *Ex Parte Chabot* and *Chavez* and
4  that doesn't require that the State actually know that
5  it was false testimony.  So to the extent that you've --
6  it is, you know, possible that in fact the State did not
7  do that as Mr. Diaz said but he still provided false
8  testimony, that still entitles Mr. Balderas to relief.

9            Claim 3 is a *Brady* claim where in post
10 conviction, the State turned over documents and within
11 those documents we found 23 pages of handwritten notes
12 of State meetings with Israel Diaz in the many years
13 leading up to this testimony that he gave where he gave
14 differing accounts of what happened the night of the
15 shooting and surrounding the shooting.  Those were notes
16 that we did not find in our review of trial counsel's
17 file and to the best of our ability, comparing it
18 against what we understood trial counsel to have in
19 their possession, raised a Brady claim that those had
20 not actually been turned over as impeachment evidence.
21 They were prior inconsistent statements that they could
22 have used to cross-examine Diaz.

23            THE COURT:  Would it help if after she
24 gives one, you could give your rebuttal to each one of
25 these?

1          MS. HUTCHINS:  If you'd like, Your Honor.
2     I was going to ask you at the end how you wanted me to
3     do it, if you wanted me to just do it very succinctly or
4     do them one by one.
5          THE COURT:  As she's doing it succinctly,
6     you can.  We'll go back.  I apologize.  I've not had a
7     death case before and I know this is different, but I
8     want to have all the information.  Only you were giving
9     your side of it.  I would like to have a rebuttal.  So,
10    let's back up to the first one.  And so, do you
11    remember?
12         MS. HUTCHINS:  Yes, Judge.  So, our
13    response to that, Judge, is that the Court can resolve
14    Grounds 1 and 2 based on --
15         THE COURT:  And what were they again?
16         MS. HUTCHINS:  The false testimony,
17    whether it was knowingly presented by the State or
18    unknowingly presented by the State, that that can be
19    resolved by this Court based off of the prevailing case
20    law that's noted in the State's answer as well as the
21    exhibits that were attached to the State's answer,
22    namely, the credible affidavit of Mr. Isbell who stated
23    that he was at each of the meetings, that the State did
24    not pressure Mr. Diaz to change his statement and that
25    Mr. Diaz testified as Mr. Isbell expected him to, as

1  well as the affidavit of Traci Bennett, the State's --
2  one of the State's prosecutors, that refutes Mr. Diaz's,
3  I guess -- if we're even going to attribute the
4  statement to Mr. Diaz's statements post-conviction.  The
5  reason I say if we're even going to attribute those to
6  Mr. Diaz are that the applicant now is relying on a
7  post-conviction affidavit from their habeas
8  investigator.  It's not actually an affidavit from
9  Mr. Diaz himself.
10              THE COURT:  I know.  It's a hearsay
11  document.
12              MS. HUTCHINS:  It's a hearsay document.
13  So there's plenty of case law along with those that say
14  hearsay documents are not dispositive and not worthy of
15  an evidentiary hearing especially in this situation
16  where Mr. Diaz himself refused to sign an affidavit.
17              THE COURT:  Okay.
18              MS. HUTCHINS:  Those would be our
19  responses succinctly, Judge, to the first two.
20              THE COURT:  That's the first two.
21              MS. HUTCHINS:  First two.
22              THE COURT:  Have you gone into the --
23              MS. ECKHOFF:  I was only starting on the
24  third but just to --
25              THE COURT:  Take your time.

01535

1          MS. ECKHOFF:   -- address that, we admit
2    that the affidavit that we submitted is a hearsay
3    affidavit and I understand that and that's why our
4    position is that it's very important to get Mr. Diaz in
5    here where everybody can hear him account for -- address
6    his recantation and the circumstances surrounding that
7    when he's here in person and under oath.

8          With Claim 3 we were discussing was the
9    *Brady* claim regarding the prior inconsistent statements
10   of Mr. Diaz that to our best information had not been
11   provided to trial counsel because they were not present
12   in trial counsel's file as they turned it over to us.
13   And at this point, it apparently -- the State has
14   actually taken contradictory positions on these notes at
15   various times.  Of course the State in their answer
16   state that these notes were made available to defense
17   counsel because they were in the trial file and
18   available to review at any time.  However, in the fall
19   of 2015 when we were actually in court on a motion that
20   we had made for disclosure of this type of evidence and
21   specifically these types of notes of witnesses, the
22   attorney representing the State at that time represented
23   at two different hearings before the Court that those
24   notes constituted work product and were privileged as
25   work product and had not been provided to trial counsel

01536

1   and would not be provided to trial counsel and that

2   their disclosure to us in post-conviction had been

3   inadvertent and therefore did not constitute a waiver of

4   access to other similarly situated notes.

5           So while the State's position now is that

6   they were always available to trial counsel, we have had

7   differing representations in the course of these

8   proceedings.

9           THE COURT:  And presumably you have a

10  trial transcript or post-trial transcript saying just

11  what you said?

12          MS. ECKHOFF:  I do.

13          THE COURT:  They were not provided and

14  that they were work product?

15          MS. ECKHOFF:  That's correct.

16          THE COURT:  Okay.

17          MS. ECKHOFF:  I have copies of that if

18  you would like to see it.

19          THE COURT:  You want to respond?

20          MS. HUTCHINS:  First off, Judge, the --

21  in terms of it being *Brady* information that was withheld

22  and not disclosed, in the State's answer there are

23  affidavits, credible affidavits, from Spence Graham who

24  handled the case early on in its stages and said that

25  the trial file was open.  Defense counsel could have

1    access to it and these notes were available and that the
2    content of the notes in Israel Diaz's statements were
3    included in the State's capital murder summary, which is
4    a document that is prepared by the District Attorney's
5    Office, a copy of which was given to defense counsel.

6                   Also, we have the affidavit of Traci
7    Bennett, who was one of the trial prosecutors, who says
8    that these notes were in the file and available for
9    review.  We also have the affidavits now of Jerome
10   Godinich and Alvin Nunnery, both of whom say that they
11   reviewed these notes in -- I think Jerome Godinich said
12   he personally reviewed these notes pretrial during his
13   review of the State's file at the DA's Office and he
14   took notes from any inconsistencies into account during
15   his trial prep.  His log hours reflect the time that he
16   spent reviewing the State's files here at the DA's
17   Office.  Mr. Nunnery says he was also aware of these
18   notes pretrial and used what he believed was beneficial
19   to the defense in his cross-examination.

20                  As pointed out in the State's answer,
21   these notes also have inculpatory information that's
22   consistent with Mr. Diaz's trial testimony.  The notes
23   are attached, I believe, as one of the exhibits to the
24   applicant's file.  I have reviewed the notes.  The
25   Court -- I'm not sure if the Court has or not but if the

1    Court wants to look at the notes, the Court will see or
2    may have already seen that these notes are basically a
3    long stream of consciousness.  There's no real division
4    of this event, this event, this event.  And so, I think
5    it's important to point out that it's their handwritten
6    notes taken by whoever was listening to the conversation
7    and we can't hold them as this giant gold standard.  We
8    can just say the defense was aware of them pretrial.

9              The trial record also does not reflect
10   that the defense attorneys were hindered or surprised in
11   any way during Israel Diaz's testimony, that they were
12   able do an effective and thorough examination.
13   Applicant's Exhibit No. 56 that they have attached is
14   actually an e-mail from Mr. Godinich to the defense team
15   that tells of some -- of a pretrial hearing that they
16   had with the State and that they actually learned some
17   of the State's case in that pretrial hearing and learned
18   some information that they did not know pretrial.  And
19   at that point, even before they started trial, he's now
20   memorialized that still before trial they've learned
21   even more of the State's case, some of the State's
22   theory of the case.  And so our argument would be that's
23   another example of how they did notice some of the
24   inconsistencies.

25             I think it's also important to point out

1    that there's a difference between the openness of a file

2    during the pendency of a case, as the case is pending in

3    the court, as trial is coming, and then the availability

4    of the file post-conviction. And the attorneys that

5    handle the cases and are responsible for the cases

6    during trial and pretrial are different than the

7    attorneys from the office that handle the case

8    post-conviction. And so, I haven't seen the transcript

9    that the defense is talking about, about our office

10    saying that these notes were not available, have never

11    been available during trial; but I can tell you this,

12    that the prosecutors who handle PIA discovery, public

13    information discovery post-conviction, are with our

14    general counsel department and they have rules and

15    guidelines that they use generally as to what they think

16    has been disclosed during the pendency of a case, what

17    they think should not be disclosed, or that is

18    privileged, which may be entirely different -- and in

19    this case appears to be entirely different -- than what

20    the State's attorneys actually allowed the defense

21    attorneys to see.

22            MS. ECKHOFF: Just on that point --

23            THE COURT: You may respond.

24            MS. ECKHOFF: The attorney for the State

25    that made those representations in court had nothing to

1    do with the PIA office or whoever would do that.  It was
2    the attorney who was previously handling this case prior
3    to Ms. Hutchins.  It was the person working in the
4    post-conviction unit.  And just also to touch base on --
5                    THE COURT:  What do you say about what
6    Ms. Farnaz has said about Mr. Godinich and Mr. Nunnery
7    say they had access to those notes that you say were not
8    provided?
9                    MS. ECKHOFF:  Well, Your Honor --
10                   THE COURT:  Both of them say they had
11   access to it pretrial.
12                   MS. ECKHOFF:  I appreciate that and you
13   also have to realize, Your Honor, that we didn't know
14   that at the point at which we made these claims.  We
15   only found that out yesterday upon receipt of the
16   affidavits.
17                   THE COURT:  So are you rescinding your
18   claim then?
19                   MS. ECKHOFF:  No.  I believe we should
20   have the opportunity to examine them further regarding
21   their access.
22                   THE COURT:  I'm just trying to tell you
23   that it's greatly weakened by -- what these affidavits
24   that have been provided by the two attorneys.
25                   You were onto which one now?

1        MR. REISS:  Judge, I'm sorry.  Can we go

2   off the record for one moment?

3        *(Mr. Reiss not present.)*

4        THE COURT:  Please continue.

5        MS. ECKHOFF:  Are we back on the record?

6        THE COURT:  Yes, we're back on the

7   record.  You're addressing which point of error?

8        MS. ECKHOFF:  I just want to make one

9   more point just about what Ms. Hutchins said --

10       THE COURT:  Sure.

11       MS. ECKHOFF:  -- regarding what she

12  called the capital murder summary and actually what she

13  just indicated here, that some of this information had

14  been put together in a capital murder summary which was

15  provided to trial counsel, again, that is not a document

16  that we have been able to find in trial counsels' files

17  and post-conviction we haven't had that provided to us

18  either.  So I would at least make a request to be able

19  to see that document.

20       MS. HUTCHINS:  That's probably fair.

21       THE COURT:  If they have it, if they can

22  find it, that will be fine.  I'm sure you should be

23  allowed to see it.

24       MS. ECKHOFF:  Thank you.

25       THE COURT:  Tell us the next point of

1    error.

2                    MS. ECKHOFF:  The -- I'll keep all of

3    the -- if it's all right with Your Honor, go out of

4    order and --

5                    THE COURT:  Go however you want to do it.

6                    MS. ECKHOFF:  And discuss the ineffective

7    assistance of counsel claims together.  Then I'll jump

8    to Claim 5 which was the claim regarding the extraneous

9    influence on the jury.

10                    THE COURT:  From the passenger on the bus

11   from the motel in the seedy part of town?

12                    MS. ECKHOFF:  Correct.  And, Your Honor,

13   that wasn't my description of it; that was the juror's

14   description of it.  And I would just point out that

15   whatever the circumstances of the waving incident or as

16   the jurors interpreted it, the intimidation incident, we

17   provided affidavits explaining that that was not how it

18   actually happened.  Regardless, the primary issue there

19   is not so much that but what effect it had on the

20   jurors.  And affidavits from the jurors make clear that

21   this was a very stressing event for them and that they

22   felt threatened not for only their own safety but for

23   the safety of their family and then after having two

24   days, almost two days full of deliberation and an Allen

25   charge, come back the next day and within hours come to

1    a guilty verdict.  So, again, the important aspect there
2    is the effect that it would have had on the jurors or
3    not even these specific jurors but hypothetical jurors
4    perceiving that the way that they did.

5              The other aspect of that is the fact that
6    as we understand it from our investigation, although the
7    record is not clear on this, is that the Court actually
8    was informed of this incident prior to the verdict
9    coming in.

10             THE COURT:  The waving?

11             MS. ECKHOFF:  The waving, yes.  That she
12   had been made aware that this had happened and -- I
13   mean --

14             THE COURT:  When did the judge have a
15   hearing asking those -- I believe he *[sic]* had a hearing
16   asking all 12 jurors if that would have an influence on
17   them?

18             MS. ECKHOFF:  That is not entirely
19   correct.  So what she did is there was the verdict, they
20   deliberated for a couple more hours, they came up with
21   their verdict, they announced the verdict.  They took a
22   lunch break and upon the return of the lunch break,
23   Judge Guiney has an informal hearing where she sends the
24   bailiff, who was present and described these incidents
25   on the record, back to the jury room to pick out which

. 01544

1    jurors he thought may have been the most affected by it.

2    So, they -- she did speak to 2 of the 14 jurors.  We

3    provided affidavits from five additional jurors

4    recounting their reactions to those events that were

5    never put on the record in this case because they were

6    not questioned as well.  And again, yes, they were

7    asked, hey, did this affect your verdict but this was

8    after the verdict was already reached.  And, you know,

9    what is a juror going to say at that point?  No, Your

10   Honor, I shouldn't have voted this way?

11              THE COURT:  I disagree with you.  I think

12   that's what a juror would say if that's -- was it.  I

13   mean, you can think what you want --

14              MS. ECKHOFF:  Fair enough.

15              THE COURT:  -- but I'm thinking that if

16   you ask a juror did it affect you, I --

17              MS. ECKHOFF:  And the standard -- another

18   point, which I've already mentioned but I'll make at

19   this point again, is just that the standard isn't these

20   specific jurors and if their specific verdict, rather

21   did the event -- would the event have affected the

22   decision-making of a hypothetical juror in those

23   circumstances and with those same perceptions.

24              THE COURT:  I don't have any idea what

25   that means then.  How would that apply to this case?  A

1 hypothetical jury? We're only talking about did it

2 influence any juror to vote a special way. You may

3 continue.

4 MS. ECKHOFF: I think that's the summary

5 of the claim.

6 THE COURT: Okay.

7 MS. HUTCHINS: Judge, during the pendency

8 of, I guess, the time period when the application was

9 filed, when the State filed their answer, the Appellate

10 Court rendered its opinion overruling the direct appeal.

11 And one of the issues that the applicant actually raised

12 on direct appeal was whether the applicant argued his

13 due process rights and his right to an impartial jury

14 was affected and tainted because of this alleged juror

15 misconduct. And the Court of Criminal Appeals decided

16 that these rights were not affected, the jury was not

17 affected.

18 THE COURT: The Court of Criminal

19 Appeals?

20 MS. HUTCHINS: Correct, Judge. Has

21 decided already on his direct appeal that his right to

22 an impartial jury and right to due process were not

23 affected. The juror misconduct as reflected by the

24 examination of the jurors and the bailiff in the

25 courtroom did not have an effect on the jurors and their

1  verdict.  And the Court of Criminal Appeals has stated

2  that the Court did err by overruling the defense's

3  motion for mistrial because they did, in fact, move for

4  a mistrial even after the jurors were questioned and

5  even after the jurors said it did not affect their

6  verdict.  And so, to that end, because the Court of

7  Criminal Appeals has already made a determination on

8  this issue, we would argue that the applicant is now

9  procedurally barred from this issue.  The issue's

10  already been resolved.

11            However, even still, we have the

12  affidavit of Vickie Long, who is one of the managers for

13  the court system, who stated that the reasons why the

14  motel on the first night was picked, because there was

15  limitations with Rodeo Houston.  The Court was even

16  unaware that it happened until the next morning.  It was

17  out of their hands.

18            THE COURT:  You're from Austin, huh?

19            MS. ECKHOFF:  Not even originally.

20            THE COURT:  Forgive me, but when the

21  rodeo's in town, there are no good viable options for

22  places to stay because they are booked and they are

23  booked months in advance, especially anywhere on this

24  side of town.

25            MS. HUTCHINS:  So it's actually on the

01547

1    record that the Court was made aware the next morning

2    and the Court did not know and for the second night

3    found somewhere far away but was trying to accommodate

4    the situation.

5             THE COURT:  Where was it the first time?

6             MS. HUTCHINS:  I'd have to look it up,

7    Judge.

8             MS. ECKHOFF:  It was --

9             THE COURT:  What's the name of the place?

10            MS. ECKHOFF:  I believe it was called the

11   Motel 6 Westfield.

12            MS. HUTCHINS:  Westchase, I believe.

13            MS. ECKHOFF:  Westchase.

14            THE COURT:  Motel 6?

15            MS. HUTCHINS:  Also, Judge, based off

16   of --

17            THE COURT:  This occurred in 2005, the

18   death occurred in 2005?

19            MS. HUTCHINS:  Yes, Judge.  The trial

20   happened in 2014.

21            THE COURT:  See, I was the judge until

22   2012 and now -- so.

23            MS. HUTCHINS:  Also, Judge, pursuant to

24   Texas Rule of Evidence 606(b) and prevailing case law on

25   the issue, juror affidavits are not admissible to

1   address the mental processes and deliberations of jurors

2   unless they are outside influences.  And the case law

3   shows that these types of actions which occurred in this

4   case do not qualify as outside influences.  And so, the

5   juror affidavits that they're relying upon, what our

6   argument would be, would be inadmissible.

7                Also, I'm a little bit confused by

8   opposing counsel's argument that we're talking about a

9   hypothetical jury because we need to address the jury in

10   this case for this applicant in this trial.

11                So, other than that, I don't know if you

12   didn't mention it or if you're abandoning it, there was

13   an issue with a Facebook post.

14                MS. ECKHOFF:  Yes, there was the issue

15   with the Facebook post.

16                MS. HUTCHINS:  I can or you want to?

17                THE COURT:  You go first.

18                MS. ECKHOFF:  Real quick, to respond to

19   what she just said, I think actually what she mentioned

20   with the issues of 606(b) and how the jurors' particular

21   mental impressions and decision-making is outside of the

22   scope based on 606(b), I think that's where this idea of

23   it's more of a hypothetical --

24                THE COURT:  And summarize 606(b) for the

25   record.

. 01549

1           MS. ECKHOFF:  Sure.  Under 606(b) the
2    statements going to or evidence going to the jurors'
3    decision-making process in coming to their verdict are
4    not admissible except for, as Ms. Hutchins noted, if
5    there's an issue of an extraneous influence, which is of
6    course the basis of our --

7           THE COURT:  And I don't think the
8    location of a hotel would be an extraneous that would
9    qualify here -- I just want to tell you what I'm
10   thinking now -- and someone waving at them on a bus.
11   All right.

12          MS. ECKHOFF:  Regarding the Facebook
13   messages, in our investigation we discovered the
14   Facebook posts of one of the jurors sitting on the jury.
15   And despite admonitions from the Court that they are not
16   to discuss the case, including on social media, repeated
17   admonitions from the Court to that effect, he made
18   multiple posts on Facebook regarding his jury service in
19   the midst of his jury service.

20          THE COURT:  Did he say anything about
21   deliberations or guilt or innocence or anything like
22   that?

23          MS. ECKHOFF:  Forgive me for not
24   remembering the exact details --

25          THE COURT:  That's okay.

01550

1            MS. ECKHOFF:  -- of his posts from -- but

2    he did discuss the difficulty that he was feeling and

3    being bored by expert testimony and more importantly,

4    our understanding is that one of the reasons the jurors

5    are admonished not to discuss this is because you want

6    to make sure that people don't feel free to offer their

7    opinions on how things should go while you're sitting on

8    there.  And not only did he post, but his posts

9    encouraged one of his friends to respond by saying

10   something along the lines of "Give him the chair or fry

11   him," you know, basically making clear what his position

12   would be on what the verdict should be.  And all I'm

13   saying, Your Honor, is that's exactly why we -- you --

14   inform jurors that they should not be doing these

15   things.

16            THE COURT:  And that, I agree with you.

17            MS. ECKHOFF:  So it's juror misconduct.

18            THE COURT:  I guess the question would be

19   how serious is this.  So, go ahead.

20            MS. HUTCHINS:  Judge, we'd argue that the

21   applicant fails to show any sort of prejudice or harm

22   from these Facebook posts.  There were 17 posts.  None

23   of them discuss the facts of the case or the content of

24   the deliberations or make any sort of comment about his

25   bias or partiality, which side he was leaning towards.

1   The comment about the experts, I believe, was something
2   along the lines of "just endless testimony from
3   experts." There were experts on both sides of this
4   case. So there's no way that we can tell one way or
5   another what he's even talking about. There's no
6   indication that he was affected by any of the comments
7   that came back to him. He didn't respond to any of the
8   comments that other people posted. There's no evidence
9   that any of the other jurors were influenced by this or
10  knew about these Facebook posts. It is the applicant's
11  burden in this case and even in their writ application
12  they say that it is speculative and it can't be
13  ascertained if this conduct led to votes being changed.
14              THE COURT: Yes, ma'am.
15              MS. ECKHOFF: Your Honor, the entire
16  reason that we're asking for further fact development is
17  because, as Ms. Hutchins noted, we don't know what, if
18  any, effect these things had because we haven't had fact
19  development on what that might have been.
20              MS. HUTCHINS: Which would break the
21  curtain, Judge, the juror curtain under 606.
22              THE COURT: So, go to the next one.
23              MS. ECKHOFF: Your Honor, at this point
24  I'll mention that we've raised five claims of
25  ineffective assistance of counsel at various points of

01552

1   the trial:  Guilt, punishment phase, but also pretrial

2   and jury selection.  These are very -- I'm not even sure

3   I can succinctly go through all of these aspects --

4                   THE COURT:  Try.

5                   MS. ECKHOFF:  But so, our review of trial

6   counsels' file indicated very little guilt phase

7   investigation.  We have a case where the client, as

8   trial counsel make clear in their affidavits, maintained

9   his innocence in this case.  And there seems to be very

10  little evidence of investigation from the trial file,

11  which is what we have, you know, to rely on in assessing

12  their investigation.  In the course of our

13  investigation, we were able to locate and obtain

14  affidavits from witnesses who provide Mr. Balderas with

15  an alibi for the night of this event and those -- some

16  of those witnesses were available to trial counsel

17  because trial counsel spoke to them as potential

18  character witnesses for the punishment phase and others

19  we got to through following the investigation further.

20                  And what is important to remember is, you

21  know, the standard is whether or not the investigation

22  was reasonable or failure to continue or further their

23  investigation was reasonable in light of what they knew

24  at the time.  And it doesn't -- our position is that

25  their failure to further investigate his guilt claims

01553

1    were unreasonable.

2            Another point within that claim is their

3    use of an eyewitness identification expert.  So you may

4    recall that one of the -- from what I -- your review of

5    the case that one of the witnesses against Mr. Balderas

6    was an eyewitness who was present at the time of the

7    shooting and she testified, you know, eight years after

8    the fact about her identification.  And what was

9    interesting and really problematic about her

10   identification of Mr. Balderas was that in the immediate

11   aftermath of the shooting, the same night when she's

12   giving her statement to the police, she says that she

13   had never seen the shooter before and she did not know

14   who he was.  She knew Mr. Balderas, had spent time with

15   him, had been around him in, you know, roughly the year

16   leading up to when the shooting occurred.  She knew who

17   he was and she said that she didn't know who the shooter

18   was.  She didn't make an identification of Mr. Balderas

19   until a week after the crime occurred and even then, the

20   CCA has agreed, in considering this on direct appeal,

21   that the identification procedures used by the police in

22   this case were suggestive.  They disagreed as to whether

23   or not that entitled him to relief at direct appeal but

24   they agree that the procedures were suggestive, the

25   majority of the CCA did.

01554

1           At trial they did, at the last minute,
2 decide to challenge this eyewitness identification.
3 They retained an expert, Dr. Roy Malpass, to come and
4 testify.  They made an effort to get the eyewitness
5 struck and not to present it.  And in so doing, they had
6 a hearing outside the presence of the jury where
7 Mr. Malpass explained his expertise and why there are
8 problems with this identification and the lineup
9 procedures.  The Court declined to, you know, strike the
10 identification and allowed the witness to testify but
11 she also specifically made a ruling that the defense
12 could call Dr. Malpass to testify before the jury to
13 explain to them what the problems could be with this
14 identification and with these procedures, and without
15 opening the door to extraneous conduct.  That happened
16 twice on the record.

17           Trial counsel, in their affidavits, site
18 as their reason for not calling Dr. Malpass to come
19 testify before the jury is that it was a decision in
20 order to avoid extraneous influences coming in -- or I'm
21 sorry -- extraneous conduct coming in.  They believed it
22 would open the door.  It's unclear to us, based on the
23 affidavits alone, why they believed that the Court,
24 after saying that they could put this evidence on
25 without opening the door, would in fact open the door.

1          And then, within that, it's an
2   interesting thing.  One of the counsel actually
3   representing Mr. Balderas at trial who took witnesses
4   and examined witnesses and made argument was Scott
5   Shearer who is actually direct appeal counsel in this
6   case as well.  And Scott Shearer was responsible for the
7   motion for new trial --
8                    THE COURT:  That's in this county?
9                    MS. HUTCHINS:  Yes, Judge.
10                   THE COURT:  I don't know him.  He's the
11  only party I don't know yet.
12                   MS. ECKHOFF:  So included in our guilt
13  phase, IAC claim is a motion -- or I'm sorry -- a claim
14  that --
15                   THE COURT:  Take your time.  I'm not
16  hurrying you.  I'm giving you as much time as you need.
17                   MS. ECKHOFF:  I appreciate that.  That
18  trial counsel or Mr. Shearer was ineffective for failing
19  to conduct any sort of extra record investigation of
20  some of these juror issues that could have been used in
21  the motion for new trial.  We made an IAC claim to that
22  effect, not only in his role as appellate counsel for
23  that claim but the fact that he was involved in this
24  entire trial proceeding.  One of the points that we
25  would raise is that we have affidavits from Mr. Godinich

1    and Mr. Nunnery but the Court and the State have never,

2    as far as I know, asked Mr. Shearer to provide any

3    response to Mr. Balderas' allegation.

4              THE COURT:  And have you?  Have you asked

5    for --

6              MS. ECKHOFF:  Actually, we did.

7              THE COURT:  I mean, you have the same

8    right to ask those things.

9              MS. ECKHOFF:  Your Honor, when we were

10   here on -- in front of Judge Guiney -- I would have to

11   go back and remember what the date of that was.  I

12   apologize.  But we were here on the record arguing much

13   of these same things and us arguing that an evidentiary

14   hearing was necessary, it was when we were arguing the

15   motion for -- or for an ODI, an order designating

16   issues.  At that time when it became clear to us that

17   Judge Guiney was going to enter into an order for trial

18   counsel to submit affidavits and the State had only

19   requested for Mr. Nunnery and Mr. Godinich to submit

20   affidavits, we made an oral motion at that time that

21   Mr. Shearer also be included in that.  She had indicated

22   on the record that she was going to do that and -- but

23   only signed the State's order verbatim that didn't

24   include him.

25              THE COURT:  You didn't do any follow-up

1    to ask her to do that?

2            MS. ECKHOFF:  Your Honor, I don't recall.

3    I would have to --

4            THE COURT:  I'm just saying, you have the

5    same subpoena power that the State does and if you don't

6    do that, who's going to do it?  So, okay.  I'm just

7    trying to tell you where I'm coming from, and what I'm

8    hearing is you have the same ability to call that person

9    and you didn't.  Okay.  Let's proceed.

10           MS. ECKHOFF:  I think that's -- I think

11   that that is the guilt phase IAC claims.  I don't know

12   if you want to address those and then move on to others?

13           THE COURT:  Yes, you want to address --

14   there was quite a bit that she had.

15           MS. HUTCHINS:  Yes, if I may, Judge, and

16   I may take them out of order.

17           THE COURT:  Whatever order you take them

18   in, that will be fine.  If you want to, you can bring

19   chairs up there and sit down.  You've been standing for

20   45 minutes.  You're welcome to sit down if you like.

21           MS. BLACK:  Thank you, Your Honor.

22           THE COURT:  And you --

23           MS. HUTCHINS:  I may take you up on that,

24   Judge.  Thank you, Judge.

25           THE COURT:  Just pull one up and sit

EXHIBIT A Page 34

1    down.

2              MS. HUTCHINS:  Judge, as you are more

3    than aware, there was extensive evidence against the

4    applicant in this case.  Not only was he charged with

5    this capital murder, he was charged with another capital

6    murder, as well as an assault; and in addition to that,

7    there were three other murders that were put on in

8    punishment and an aggravated --

9              THE COURT:  As extraneous?

10             MS. HUTCHINS:  As extraneouses.

11             THE COURT:  I don't know -- I assume

12   that's his family here.  But I don't know if they

13   understand that, that he's charged with one murder

14   and --

15             MS. HUTCHINS:  There are at least four

16   other murders, whether you characterize them as capital

17   murder or murder, that were charged against him and two

18   assaults.

19             THE COURT:  There were four other

20   murders, or four murders total; is that right?

21             MS. HUTCHINS:  Yes, Judge.  No, five.

22             THE COURT:  Five.  So maybe you didn't

23   know that, that they wanted to charge him with that but

24   they proceeded with one case.

25             Is that correct?

01559

1          MS. HUTCHINS: Correct, Judge.

2          THE COURT: I wasn't the judge.

3          MS. HUTCHINS: There was also a larger

4   investigation going on to the La Tercera Crips gang that

5   the applicant was tied to and so there was this big

6   investigation trying to sort of parse out all of these

7   different crimes. All of this, I believe, ended up

8   being in total, I think, 88 different offenses that the

9   State gave the defense notice of. So there was a whole

10  host of information that trial counsel over the years

11  were sifting through.

12         THE COURT: Let me just say that to the

13  audience because I think y'all would like to know what's

14  happening. They're saying there were 88 -- 8-8 -- 88

15  different extraneous offenses that they could have used

16  in trial against --

17         MS. HUTCHINS: And bad acts, Judge, if I

18  may correct.

19         THE COURT: And bad acts against

20  Mr. Balderas. I just want you to know, 88. So, okay.

21         MS. HUTCHINS: And to assist trial

22  counsel, the record will reflect that they hired a host

23  of different investigators, fact investigators,

24  mitigation investigators, experts, specialists. I

25  believe they had experts on mental health, gangs, the

 1    prison system, child abuse, brain development, and

 2    eyewitness identification.  So there was an extensive

 3    defense team going on in this case.  The vouchers that

 4    were turned in to the Court show that there were

 5    multiple meetings with the defendant's family, including

 6    the defendant's mother, his brother, his girlfriend.

 7    Just from 2013 to 2014, there were 26 meetings with the

 8    defendant's girlfriend.

 9                THE COURT:  Is she here?

10                MS. HUTCHINS:  I believe she's the wife,

11    Your Honor.  Yes.

12                THE COURT:  Okay.

13                MS. HUTCHINS:  Also, the applicant has

14    attached a number of different e-mails as exhibits.

15    I've been able to count at least ten e-mails that they

16    have attached to their writ from different members of

17    the defense team which reflect unfavorable and

18    uncooperative witnesses which reflect -- which dispute

19    the alibi defense and which show that the defendant's

20    mom actually attempted to thwart the defense

21    investigation.

22                THE COURT:  Who did?

23                MS. HUTCHINS:  The defendant's mother.

24                THE COURT:  Is she here?

25                MS. ECKHOFF:  Yes, Your Honor.

01561

1        MS. HUTCHINS:  That the defense had

2   trouble with the defendant's mother and these are all

3   documented in the e-mails between the different defense

4   mitigation experts and trial counsel that the applicant

5   has attached as exhibits to his writ.  For example, the

6   defendant's mother did not want the defense to contact

7   the family in Mexico and did not want the family from

8   Mexico coming to visit the defendant.  That the various

9   family members including the girlfriend, Yancy Escobar,

10   came to the office, was told that defense is continuing

11   to pursue leads but urging the family to give them any

12   information, names, phone numbers, contact information

13   that they had and stressing how important it was because

14   the defendant himself did not have those names and

15   information and he kept telling the defense, My brother

16   and my girlfriend have them.

17        And the struggle that the defense had to

18   get this information, the e-mails also showed that it

19   was not until early 2014 that the defendant's family

20   finally gave them information about an alibi and when

21   they pursued this potential alibi, they were told by the

22   defendant's brother, This woman wants nothing to do with

23   this case, she does not want to testify.  They were not

24   given contact information.

25        The other witnesses they've now

1    identified as alibi witnesses, the majority of them were

2    interviewed by the defense at the time and did not have

3    credible information, any information with facts,

4    anything that was usable or not based off of hearsay.

5    And all of that is supported by the affidavits of

6    Mr. Godinich and Mr. Nunnery as well as these e-mails

7    from back then.

8              Just to briefly summarize some of the

9    points that are made in Mr. Godinich and Mr. Nunnery's

10   affidavits --

11             THE COURT:  He likes you to say

12   "God-nich."

13             MS. HUTCHINS:  Godinich.

14             THE COURT:  Not T; "God."

15             MS. HUTCHINS:  Godinich.

16             THE COURT:  Kind of a joke.

17             MS. HUTCHINS:  Which basically the

18   affidavit reinforces the information that the family --

19   the information contained in those contemporaneous

20   e-mails, the family and the defendant did not provide

21   the alibi information; that they interviewed various

22   witnesses the defense now identifies as having not been

23   interviewed or not been given a chance; that the

24   defendant's girlfriend actually did not want to testify

25   at trial because she wanted to watch the trial; that it

1   was strategy for them not to call the defendant's
2   brother because they did not feel he would be credible
3   due to his criminal history, his relationship with the
4   gang, his relationship with the defendant, the various
5   photographs that were found of him during the discovery
6   period --

7                   THE COURT:  Is his brother here?

8                   MS. HUTCHINS:  And ultimately, he was
9   ordered to leave the courtroom during trial because he
10  couldn't control himself.

11                  Some of the information they say that
12  defense counsel would have learned through an
13  investigation, they say in the affidavits they already
14  knew that.  It was nothing that they found to be useful
15  or that they could use in a admissible way, it was
16  through hearsay or innuendo; and that the defendant
17  himself did not want to testify, so some of the
18  information could not come out.

19                  Mr. Nunnery also purports that they spoke
20  to whoever would speak to them, either themselves,
21  through their investigators, their defense team.  At
22  trial, trial counsel put on a witness, Walter Benitez;
23  and he provided evidence of -- as evidence of the
24  defendant's innocence of the guilt -- of the capital
25  that was charged.  Mr. Benitez provided testimony of an

1     alternate shooter; he provided testimony of Israel

2     Diaz's motives against the complainant, talking about

3     the meeting that was called, that Mr. Diaz wanted the

4     complainant's death, and as well as the motives for

5     Mr. Diaz testifying. Mr. -- interestingly, Mr. Godinich

6     states in his affidavit as well that when Mr. Benitez --

7     since I was not there, I could not see it; I don't think

8     counsel was there either. Mr. Benitez, when he

9     testified, flashed a gang sign for the LTC gang during

10    guilt/innocence and that the defendant in trial

11    responded and that they were told this by the jurors

12    when they spoke to the jurors after trial and that that

13    was probably what did it in for Mr. Benitez and his

14    credibility when he testified.

15                  The record shows that much of the

16    proposed testimony, the applicant now says defense would

17    have learned through what they characterize as a

18    reasonable investigation was known, was presented, was

19    just presented through other witnesses, for example,

20    Karen Bardales, Israel Diaz, and Wendy Bardales. They

21    wanted to call a witness, Celeste Munoz, at

22    guilt/innocence to testify to some of this information.

23    They were told if they did, it would open the door to an

24    extraneous.

25                  Speaking of extraneouses, I don't have

1  the record in front of me but I would like to
2  respectfully disagree with defense counsel's
3  characterization of the Court's ruling regarding
4  Mr. Malpass.  I believe the Court ruled that he could
5  testify; he could not give an ultimate opinion about
6  Wendy's accuracy but that he would be allowed to
7  testify.  There was no ruling as to whether or not it
8  would open the door to other extraneouses.  The trial
9  attorneys give an affidavit saying that when they spoke
10 amongst themselves as well as their appellate counsel,
11 they believed that it would open the door to an
12 extraneous offense, which was not in the defendant's
13 best interest.
14           THE COURT:  Trial strategy.
15           MS. HUTCHINS:  Trial strategy, yes,
16 Judge.
17           And as to the issue of Mr. Shearer,
18 defense is saying that -- I guess now saying that
19 Mr. Shearer should have investigated juror misconduct as
20 a ground for a motion for new trial.  However --
21           THE COURT:  When did he come onto the
22 case?
23           MS. HUTCHINS:  I'm not sure when he came
24 on.  He was there during trial sort of as an appellate
25 resource.

01566

1          THE COURT:  I see.

2          MS. HUTCHINS:  However, they have not

3    filed the claim as an ineffective assistance of

4    appellate counsel; they've done it as an ineffective

5    assistance of counsel.  Even still, their argument that

6    he should have investigated juror misconduct as a motion

7    for new trial, now that we have the direct appeal and

8    the CCA's ruling, we know that the CCA found there was

9    no juror misconduct that denied him a right.  So that

10   issue, at the end of the day, they don't establish harm

11   on it.  So, our argument is that issue goes away right

12   there.

13          And I think -- sorry.  I know it's long.

14   There's just a lot to cover.

15          THE COURT:  I'm not limiting you.

16          MS. HUTCHINS:  That's it, Judge.

17          THE COURT:  You want to continue?

18          MS. ECKHOFF:  I will just point to the

19   issue of whether -- what the Court's ruling was on

20   Dr. Malpass.  If you look at Volume 25 of the reporter's

21   record at 179 and again in the Volume 29 of the record,

22   at 14, she discusses both of those -- those -- in both

23   of those cases.  One is her actual ruling on

24   Dr. Malpass, that's the 25th Volume.  The 29th Volume,

25   if I remember correctly, was actually when she was doing

1    the hearing on Celeste Munoz, the witness that
2    Ms. Hutchins mentioned, and where she clarified at that
3    point that Dr. Malpass could -- where Celeste Munoz
4    would open the door, that Dr. Malpass would not.
5                    MS. HUTCHINS:  Judge, I just want to
6    clarify one thing.  The direct appeal -- on direct
7    appeal, the majority opinion from the Court actually
8    found that the pretrial lineup and the in-court
9    identification were not impermissibly suggestive.  It
10   was dissenting opinions.
11                   THE COURT:  Was that from the CCA?
12                   MS. HUTCHINS:  Yes, Judge.  They found
13   that the witness identifications were not impermissibly
14   suggestive.  Defense counsel was talking about the
15   opinion from the dissent that did think it was
16   impermissibly suggestive.  Also --
17                   THE COURT:  Let me -- I remember Joe
18   Kegans saying she didn't care one bit about the Court of
19   Appeals.  She only cared about the Court of Criminal
20   Appeals.  She was a judge down here.  And it's the same
21   thing.  I don't care about the dissenting opinion.  I
22   care only about the majority opinion.  So I think it's
23   disingenuous to cite the minority opinion.  Let's -- you
24   know, I'm just trying to tell you what I'm thinking.
25                   MS. ECKHOFF:  If I may clarify, please?

01566

1    I said a majority said that the lineup was suggestive.

2    I didn't say that the majority said it was impermissibly

3    suggestive.  I apologize if I didn't make that clear.

4                    THE COURT:  I appreciate it.

5                    Any further rebuttal?

6                    MS. HUTCHINS:  I did, but I can't think

7    of it, so it's okay.

8                    MS. ECKHOFF:  Regarding all of the things

9    that Ms. Hutchins just reviewed, I would just like to

10   reiterate the point that these are factual disputes that

11   require fact finding.  That is exactly why we're

12   requesting an evidentiary hearing where we have subpoena

13   powers to further explore these representations that are

14   being made by trial counsel as to what happened, or what

15   they say happened, and that all -- many of the things

16   that she cited and attributed to obviously Mr. Godinich

17   and Mr. Nunnery's responses to these claims are

18   information that we got last night and that's why we're

19   asking for additional time to more thoroughly review

20   them and address and respond to them.

21                   She did mention a couple of things that I

22   wanted to point out is that problems that we do and have

23   spotted with those affidavits that kind of come up

24   nicely here is that one issue is that trial counsel in

25   their affidavits purport to speak on behalf of other

1    members of the trial team. And that wouldn't be proper.

2    For example, on, I believe, it was page 2 of at least

3    the copy that I have reviewed, Mr. Godinich says that

4    neither he nor 12 other members of the trial team that

5    he lists by name had whatever information he was

6    discussing at that point. And so, he's purporting to

7    answer not only on his behalf but on behalf of all those

8    other people.

9              And then, additionally, Ms. Hutchins

10   mentioned, for example, the -- their claim that the

11   jurors said that they saw Mr. Benitez throw a gang sign

12   in the course of his testimony, that's hearsay in this

13   affidavit.

14             THE COURT: You have plenty of hearsay

15   affidavits as well.

16             MS. ECKHOFF: Your Honor --

17             THE COURT: Don't you?

18             MS. ECKHOFF: We have one hearsay

19   affidavit, which we acknowledge is hearsay.

20             THE COURT: Okay.

21             MS. ECKHOFF: But again, we're saying

22   that that just makes the case that further fact finding

23   is necessary. We're not asking Your Honor to make a

24   decision based solely on our affidavit. We want to get

25   that witness in here to talk and speak for himself. In

1    this case, you know, Mr. Godinich is saying that

2    Mr. Shearer told him that something the jurors told

3    Mr. Shearer.  I mean, at that point you're talking

4    hearsay upon hearsay.  It wouldn't presumably be

5    admissible at trial and it shouldn't be admissible as

6    evidence in an affidavit.

7              THE COURT:  I think it's just anecdotal.

8    So, all right.  Do you want to go into the

9    post-conviction errors that you're alleging?

10             MS. ECKHOFF:  The punishment phase?

11             THE COURT:  Yes.

12             MS. ECKHOFF:  Yes.  Sure.

13             THE COURT:  I think we should put them

14   all out here on the record and let Ms. Farnaz respond.

15             MS. ECKHOFF:  I will try to at least

16   discuss the ones that we would like further factual

17   development.

18             THE COURT:  Well, I think you should hit

19   your strongest ones right now.  This might be your only

20   hearing that you will have.  So I think you should hit

21   the very strongest points you have right now.

22             MS. ECKHOFF:  Okay.  Thank you, Your

23   Honor.

24             THE COURT:  And I'll give you as much

25   time as you need.  We can be here until 5:00; it's only

01571

1   2:00 o'clock.  You'll miss rush-hour traffic on 360

2   going back.

3                   MS. ECKHOFF:  I would appreciate that.

4                   Your Honor, the claim in the punishment

5   phase is that, again, the trial counsel did not conduct

6   a reasonable investigation to develop facts, additional

7   facts, that they could have put on the record regarding

8   Mr. Balderas' social history, which is an important

9   piece of miti -- of punishment phase case and the --

10  including additional testimony from witnesses that they

11  did present but also testimony from those that he did

12  not, regarding aspects of, you know, him growing up and

13  the effects that that would have had on him.

14                  One important claim that we made, too --

15  and it's fashioned a little funny because of the nature

16  of an ineffective assistance of counsel claim -- a

17  failure of the trial counsel to object when -- so in the

18  course of the punishment phase proceedings, they

19  presented evidence from experts regarding Mr. Balderas'

20  sexual abuse as a young child to -- and the experts were

21  there to explain the effects that growing up subjected

22  to such sexual abuse could have, the effects that that

23  could have on a young boy.  And in the course of the

24  cross-examination of those experts, the State made some

25  statements -- and, you know, I don't remember exactly

1    how they were worded at this point; they're described in
2    the application -- that insinuated that the jury should
3    doubt the experts' opinions and reports because the jury
4    wasn't hearing about these abuse allegations from
5    Mr. Balderas himself but rather from experts.  And we
6    make a claim that that is a violation of Mr. Balderas'
7    Fifth Amendment right not to testify and kind of
8    highlighting for the jury that they're not hearing this
9    from the defendant himself but rather from experts on
10   his behalf.  And the State then reiterated during their
11   closing argument at punishment, came back to that issue
12   and highlighted it again for the jury.
13               THE COURT:  And if he were to testify,
14   those 88 extraneouses might have come in.
15               MS. ECKHOFF:  Your Honor, this was at the
16   punishment phase where a number of those extraneouses
17   did come in because --
18               THE COURT:  This is trial strategy on the
19   attorneys' part.  So you may continue.
20               MS. ECKHOFF:  In terms of the punishment
21   phase, I believe that that is it.  Yeah.
22               THE COURT:  You would like her to respond
23   now?
24               MS. ECKHOFF:  Yes, Judge.
25               MS. HUTCHINS:  Judge, the record shows

01573

1    that the defense in this case, they put on just as much
2    punishment evidence as the State did.  They put on 18
3    witnesses, put on extensive mitigation evidence, and
4    actually presented much of the exact same evidence that
5    the defendant now claims was lacking.  They just put it
6    on through different witnesses that he now says he would
7    have preferred other witnesses.  They were able to put
8    on testimony of -- and this is according to the record
9    as well as to the trial counsels' affidavits.  They
10   presented all the available mitigation.  Other than what
11   they presented at trial, they were unaware of any other
12   evidence that was going to rebut the extraneouses.
13              To rebut the extraneouses, they
14   cross-examined those witnesses but they used seven
15   mitigation experts, four experts and a reverend.  The
16   mitigation experts traveled to New York and Mexico to do
17   their investigation.  They made strategic decisions to
18   present the evidence and the experts as they did,
19   feeling it was done in the best light possible.  They
20   investigated and presented evidence of the defendant's
21   childhood, his family history of mental illness.  I
22   believe that in the State's answer there are at least
23   10, 15 pages which go through all the evidence that was
24   presented by the defense on these points during
25   punishment phase.

1           They investigated and presented witnesses
2   that testified to his positive character, his role as a
3   protector.  They attempted to investigate his attempted
4   disassociation from the gang; but other than the
5   applicant, there was no evidence of that.  They
6   presented his juvenile caseworker, family, friends, a
7   Harris County Jail guard, they presented evidence of his
8   childhood abuse, his unstable mother.

9           As to the issue of the alleged comment on
10  the defendant's failure to testify, as explained in the
11  State's answer, the State cross-examined these expert
12  witnesses on the points that these expert witnesses
13  testified that they spoke to the applicant, they
14  interviewed him multiple times; yet they didn't have any
15  notes of any of their interviews with the applicants.
16  They didn't make any recordings, any videos, and so
17  these experts came to court basically testifying off the
18  top of their heads about each and every meeting they had
19  and their beliefs and their reactions to the physical
20  reactions that the defendant was having.

21          And so, the State was cross-examining
22  these experts on their ability to come in here and give
23  this testimony without having any sort of documentation
24  to that effect and were asking the experts, well, don't
25  you think it would have been useful or helpful to make

61575

1  these notes or to have these videos or to have these
2  recordings and you certainly know that if you had made
3  them, they would be discoverable to us and the defense
4  experts were agreeing.

5              And so, when looked at the entirety of
6  the context of the cross-examination as well as the
7  argument, the State's argument is not that it's the
8  applicant's failure to testify.  It's the fact that the
9  information that these experts were testifying to was
10  coming from a single source, the applicant, who had all
11  of the motive and bias to say these things, and that the
12  jury should rely on the credibility of these witnesses
13  without the witnesses having anything to justify or back
14  up what they were purporting to the jury.  And so, in
15  the defense attorneys' affidavits, they actually address
16  these issues and say we thought these were valid points
17  for the prosecutor to make, thought they were fair.  We
18  didn't think they were worthy of objection and to that
19  end, these are record claims and they weren't objected
20  to at trial and so, now they're procedurally barred as
21  well.  But there were strategic reasons for not
22  objecting to them.

23              And I don't know if there were issues --
24  there were issues raised in the applicant's writ that
25  were not raised right now.  I don't know if you were

01576

1  just trying to summarize them succinctly? If you want
2  me to address them, there were a couple of other issues
3  they raised in the punishment phase --
4              THE COURT: You may.
5              MS. HUTCHINS: -- that I have responses
6  to and I could just save my responses and you could make
7  the argument after, if you'd like.
8              MS. ECKHOFF: That sounds fine.
9              MS. HUTCHINS: There was some trouble --
10  there was some witnesses that testified via Skype in
11  this case from Mexico, defense witnesses, from the
12  defendant.
13              THE COURT: During trial?
14              MS. HUTCHINS: During trial.
15              THE COURT: The punishment phase?
16              MS. HUTCHINS: In the punishment phase
17  the defendant's family members testified from Mexico.
18  In some e-mails that are attached to Mr. Godinich's
19  affidavit and I believe to the defense exhibits as well,
20  it talks about the fact that the defense wanted to
21  actually bring these people over and the defense was
22  going to foot the bill to bring them over but the
23  witnesses couldn't decide amongst themselves who to
24  come. Meanwhile, the defendant's mother was also
25  telling them not to come. And so, ultimately they

01577

1  managed to work out a way for the witnesses to testify

2  via Skype.  The defense is able to do cross -- direct

3  examination.  The State starts cross-examination and

4  there's technical issues.  They switch witnesses, they

5  take some live witnesses in court, they go back to the

6  witnesses in Mexico.  There's still technical issues.

7  Ultimately they can't use Skype; they use speakerphone.

8  And so, the defense and the State are questioning here

9  in English, there's a translator who is translating in

10  Mexico as well as the defense mitigation expert.

11          THE COURT:  And you have a translator on

12  this end as well.

13          MS. HUTCHINS:  Yes.  And so, there's a

14  defense mitigation expert actually in Mexico sort of

15  relaying everything also back to the trial team.  And

16  from the record, it appears as though the defense and

17  the State were all able to ultimately battle through the

18  technical issues and ask all the questions they wanted,

19  get the answers they wanted.  And these witnesses, two

20  of them are able to testify; one of them was not there

21  when he was called to testify.

22          Mr. Godinich's affidavit as well as an

23  attached exhibit actually says that the defense cut

24  their questioning short of these witnesses in Mexico

25  because they found out that the defendant's girlfriend

01575

1    was calling the witnesses in Mexico, telling them to

2    change their answers.  And so, the testimony that they

3    were getting from the witnesses in Mexico was not what

4    trial counsel expected to be getting, so he immediately

5    tried to get them off the stand before he was presenting

6    perjured testimony, or what he believed was going to be

7    perjured testimony.

8                THE COURT:  Don't react in the audience,

9    ma'am.  She's talking about you.

10               MS. HUTCHINS:  There was also some issues

11   about Mr. Nunnery's behavior and some comments that he

12   made and whether or not they affected the jury in their

13   deliberations.  Some of these alleged comments are -- I

14   guess the comments, these side comments are not on the

15   record.  Mr. Nunnery addresses them in his affidavit to

16   the fact that he has no personal recollection, sometimes

17   words are exchanged.

18               THE COURT:  I read that.

19               MS. HUTCHINS:  I'm not sure if he knows

20   if jurors heard him or not.

21               THE COURT:  When someone alleged that he

22   called one of the prosecutors the "b" word?

23               MS. HUTCHINS:  Correct.  And so, the

24   applicant fails to establish that those comments

25   affected the jury deliberation or that they heard it.  I

EXHIBIT A Page 55

1    know they provided some affidavits from the jurors.

2    Interestingly, I think the juror affidavit --

3                THE COURT:  I don't think you have to go

4    there.

5                MS. HUTCHINS:  Okay.

6                THE COURT:  I'm not considering that.  I

7    just want you to realize that happens in every trial.

8    And unless someone came in here and said, I heard him

9    call her the "b" word and it changed my idea of what I

10   wanted to give him for punishment, short of that, let's

11   move on to something germane.

12               You may continue, or do you have more?

13               MS. HUTCHINS:  Just briefly, Judge.  They

14   criticize his closing argument about that he sort of

15   insulted the jurors and they didn't like the tactic that

16   he took.  He addresses that, that he made points that he

17   thought were valid and he wanted to remind jurors of the

18   oath that they took, to hold to their verdict.  And he

19   felt as though it was important and necessary for him to

20   urge that to the jurors.  And when looked at in the

21   entirety of his argument, the entirety of his argument

22   supports that he did a very thorough closing argument

23   and summation of the evidence.

24               THE COURT:  Yes, ma'am.

25               MS. ECKHOFF:  Your Honor, I would just

EXHIBIT A Page 56

1  point out again that these are factual disputes that we
2  would like to delve into at a hearing.
3           THE COURT:  I'm not going to let you go
4  into that one, I'm telling you there.  That's just
5  malarkey, if you ask me.  Let's go to something germane.
6           MS. ECKHOFF:  Your Honor, I'm not -- I
7  appreciate that you're giving us the opportunity to go
8  into -- the remaining ineffective assistance counsel
9  claims, I will admit at this moment, are not nearly as
10  fresh in my memory as these.
11           THE COURT:  That's okay.  You have as
12  much time here as you need.
13           MS. ECKHOFF:  Okay.
14           THE COURT:  And take your time.  I'm not
15  hurrying you.
16           MS. ECKHOFF:  Thank you.  We raise in
17  claim -- a claim of ineffective assistance of counsel
18  pretrial for failing to assert speedy trial at a time
19  where it would actually be considered.  In this case the
20  defendant himself made a pro se motion for a speedy
21  trial.
22           THE COURT:  Do we have speedy trial in
23  Texas anymore?  I don't think we do.  So do you have a
24  statute that you can cite that shows that we had a
25  speedy trial provision here?

01581

1              MS. ECKHOFF:  If you would allow us to --

2              THE COURT:  Well, I mean, you're bringing

3    up speedy trial as in your appointed error in

4    punishment, do we have it?  I mean, I don't believe --

5    as a sitting district judge, I don't believe we have

6    speedy trial.

7              MS. HUTCHINS:  Judge, after -- I believe

8    what the standard is that after about a year, the

9    defense can raise speedy trial and then there are four

10   factors that the Court uses to weigh whether or not

11   there's been a violation.  And I believe the remedy is

12   if there has been a violation, then you get your trial.

13   But if not, then I believe the case is permitted to

14   proceed as sort of -- as it's going forward.

15             THE COURT:  I just mean -- you may

16   continue.

17             MS. ECKHOFF:  And, Your Honor, there was

18   a claim that was raised on our end as a constitutional

19   claim, it's the Sixth Amendment right to a speedy trial

20   that applies to the states via the Fourteenth Amendment.

21   And in considering the pro se motion for speedy trial

22   that was raised, the Trial Court did consider the

23   factors as laid out in *Barker v. Wingo*; it's a Supreme

24   Court case regarding a speedy trial.  The reason that

25   the speedy trial motion was denied was because voir dire

1  had already begun and that was the basis of the denial.

2            Our allegation is that that's a claim

3  that should have been raised before even getting to jury

4  selection.

5            MS. HUTCHINS:  Briefly, Judge.

6            THE COURT:  Yes.

7            MS. HUTCHINS:  Judge, during the speedy

8  trial motion, the -- Spence Graham testified in the

9  hearing as to the voluminous nature of the case, all the

10 extraneouses, the fact that the defense was putting

11 together mitigation packets to try to persuade the

12 applicant to take a life offer, that the applicant keeps

13 picking up offenses in jail.  It took six years for the

14 State to make a decision whether or not to pursue it as

15 a death case.  So these were all the factors that were

16 going on during the pendency of the case, as well as

17 just the changeover in not only the judges but also the

18 prosecutors handling the case and whatnot.

19            The issue was raised on direct appeal and

20 on direct appeal, the applicant argued the Trial Court

21 erred in overruling the motion for speedy trial.  The

22 Court of Criminal Appeals said, no, there was no error,

23 the Trial Court was within its right and was correct in

24 denying it.

25            When we look at the affidavits of

1   Mr. Godinich and Mr. Nunnery, we get some insight into
2   the defense and that they had strategic reasons for the
3   delay.  The applicant actually never expressed a desire
4   for a speedy trial until the eve of trial when he filed
5   his pro se one.  The affidavits address the abundance of
6   the evidence, the time needed to investigate his new law
7   violation, the applicant -- the defendant never objected
8   to a reset or a continuance.  And I believe it's
9   Mr. Nunnery who says that they filed the speedy trial
10  motion to preserve his appellate rights on the issue but
11  there were no unavailable witnesses or missing witnesses
12  that they would have called or that would have hindered
13  their defense because of this delay.  But they filed the
14  motion anyway, to preserve his rights.
15              THE COURT:  Okay.
16              MS. ECKHOFF:  Just a point on that, Your
17  Honor.  I'm going back to something she said before.  I
18  would just want to point out in raising these claims, we
19  filed this initial application before any decision on
20  direct appeal is made by the CCA.  It's just how it
21  works.  Like, we have to raise all of these claims and
22  we will continue to raise them, even though they're also
23  raised on direct appeal because it's our responsibility
24  to preserve --
25              THE COURT:  And you may drop some of

1   them.

2                   MS. ECKHOFF:  Your Honor, we don't

3   drop -- I respectfully disagree.  We need to preserve

4   the record for further review up the chain, too --

5                   THE COURT:  Okay.

6                   MS. ECKHOFF:  -- and in federal court, if

7   we get there.

8                   THE COURT:  Okay.  I gotcha.

9                   MS. ECKHOFF:  So, no, we are not going to

10  drop any of these claims.  We are preserving them for

11  the future.

12                  THE COURT:  Okay.

13                  MS. ECKHOFF:  And we also, again, assert

14  that further factual development is needed on these

15  factual disputes.

16                  If I could have a moment?

17                  THE COURT:  You may.

18                  MS. ECKHOFF:  Thank you.  Your Honor,

19  would it be all right if we speak with our client?

20                  THE COURT:  Sure.  Let's take a break for

21  a moment.

22                  *(Recess taken.)*

23                  THE COURT:  Are we ready to start?

24                  MS. ECKHOFF:  Yes, Your Honor.  I believe

25  the final IAC claim that we had raised pertained to the

01585

1    jury selection phase of trial where we raised a claim

2    that trial counsel did not adequately account for their

3    mitigation case in their jury selection and therefore,

4    because they did not explore these issues that they knew

5    would be developed and presented in the punishment

6    phase, didn't explore how potential jurors would

7    actually react and consider those claims, specifically

8    in this case, the sexual abuse of small children.

9    And --

10                   THE COURT:  Are you talking about the

11   episode when he's 8 years old and Mr. Hernandez touches

12   him?

13                   MS. ECKHOFF:  I believe it was more than

14   just touching, Your Honor; but, yes, and it was over the

15   course of, I believe, five years that he was pretty

16   repeatedly and regularly sexually assaulted by his

17   stepfather.

18                   THE COURT:  Is that Mr. Hernandez?

19                   MS. ECKHOFF:  I believe.

20                   THE COURT:  Eleazar Hernandez?

21                   MS. ECKHOFF:  Yes, that is correct, Your

22   Honor.  And so, that's the claim that we've made in jury

23   selection.  You know, the ABA guidelines that dictate

24   what is reasonable performance in capital cases make

25   clear that you need to approach the entire trial

1   including jury selection with your punishment phase in

2   mind and in selecting your jury.  And we just made a

3   claim that they didn't do that as they're required to

4   under the ABA guidelines.

5            MS. HUTCHINS:  Judge, under prevailing

6   case law, trial counsel was not ineffective for not

7   attempting during voir dire to improperly bind the

8   prospective jurors as to whether they would specifically

9   consider sexual abuse as mitigating evidence.  Case law

10  says that trying to lock the jurors in on a specific

11  "this set of circumstances is mitigating" is improper

12  jury selection.

13           THE COURT:  Yes, I would agree.

14           MS. HUTCHINS:  So Mr. Nunnery's affidavit

15  addresses that and addresses that because of their

16  understanding of the case law, they voir dired on

17  mitigation globally but not specific types of mitigation

18  and appropriately considered jurors who could give

19  weight to mitigation in general.

20           Mr. Godinich's affidavit also supports

21  that their method of jury selection, the Colorado

22  Method -- I did a little bit of research into it because

23  I wasn't familiar off the top of my head with it --

24  focuses on the issue of whether jurors would give life

25  or death and if they can appropriately consider

1     mitigation.  And so, when you look at their affidavits
2     in conjunction with their approach to voir dire, you see
3     that the defense addressed the issues that the State
4     raises, they addressed issues on the questionnaires,
5     they address both special issues and mitigation, which
6     is absolutely reasonable strategy on their end.

7                    And in addition -- so all of that goes to
8     show there was not a lack of deficient conduct but also
9     that there was no harm because the trial court gave the
10    jury specific instructions throughout trial and also
11    with the punishment charge to consider the totality of
12    the evidence in their deliberations and on the special
13    issues and that they need not agree on what evidence
14    constitutes mitigation.  And so, when you look at it
15    even under the realm of *Strickland*, they don't meet
16    either prong of *Strickland*.

17                    MS. ECKHOFF:  Just as a point of
18    clarification, I agree that it is improper in jury
19    selection to pin a potential juror down on what they
20    would or would not consider mitigation.  However, trial
21    counsel is entitled to explore potential mitigation with
22    them to gauge their reaction and respond to their views
23    of those issues without asking them would you find this
24    mitigating or not.

25                    THE COURT:  I'm giving you the right to

01588

1   first present, then she rebuts, then I'm letting you

2   rebut even again.  So I'm giving you more than I'm

3   giving the State at this time.

4               MS. ECKHOFF:  I appreciate that.  Thank

5   you.  And I'm happy, if she would also like to respond,

6   I'm more than --

7               THE COURT:  No, I'm going to limit them.

8   But I'm trying to give you as much time as you need.

9               MS. ECKHOFF:  Thank you.  A claim that I

10  think I inadvertently skipped over at one point is Claim

11  7 and that was a claim that the State relied on false

12  testimony at the punishment phase when a State's

13  witness, who was a corrections officer here, Harris

14  County, testified that he had essentially been

15  exonerated from some of the charges that had been

16  brought against him, like internal personnel charges.

17  He had been terminated as a corrections officer as a

18  result of an incident that occurred and in his

19  testimony, he indicated that he had been cleared of

20  those charges.  That's not exactly -- a review of his

21  personnel file shows that that's not actually the case.

22  The charges stood.  They modified his punishment.  So

23  there's a claim that that testimony that he was cleared

24  of the charges was false.  And --

25               THE COURT:  Okay.

01585

1          MS. HUTCHINS:  Judge, the standard there

2     is whether the testimony in its entirety left a false

3     impression with the jury.  This particular witness, I

4     believe, testified about a weapon that he found in the

5     applicant's cell, if I'm not mistaken.

6          MS. ECKHOFF:  I don't believe it was a

7     weapon.  I can double-check.  I believe it may have been

8     some other contraband.

9          MS. HUTCHINS:  It was contraband.  I'm

10     sorry.  In my head contraband equals weapon.  There was

11     contraband in his cell and he testified about the

12     contraband.  However, on cross-examination the defense

13     elicited that he was terminated from the sheriff's

14     office for a violation of policies that involved the

15     death of an inmate.  He testified it was about a round

16     sheet, which is a sheet that they use to document things

17     in the sheriff's office; for a failure to render aid and

18     deception.  And on redirect he testified that he was

19     cleared of wrongdoing and he is eligible for rehire

20     after 75 days.

21          When looking at the entirety of his

22     testimony and then you compare it to the applicant's own

23     exhibits, which they've attached as 70, 71, and 72, his

24     termination letter, his separation from the sheriff's

25     office, and then his reinstatement with the sheriff's

01590

1  office, there's no false impression, our argument, that

2  was left with the jury.

3          Also, when -- you have to assess the

4  materiality of this witness' testimony when examining

5  false testimony.  It's not only was the testimony false,

6  which we argue that it wasn't, but was it material.  And

7  when you look at this one witness' testimony about

8  contraband found in his cell, in the greater context of

9  all of the punishment evidence against him, the

10  additional murders, the additional aggravated assaults,

11  in and out of custody, his juvenile history, we argue

12  that it was not material.  And so, based off of all of

13  that and the prevailing law, we believe that their issue

14  is resolvable.

15          THE COURT:  You may continue.

16          MS. ECKHOFF:  Your Honor, I believe that

17  the remaining claims are legal in nature and they're not

18  claims that we would be seeking additional fact finding

19  on.  There are claims that are made to preserve the

20  record going forward and I would just refer to our

21  arguments in the --

22          THE COURT:  Would you just state them and

23  put them in the record?

24          MS. ECKHOFF:  The names of the claims?

25          THE COURT:  Yes.

01591

1          MS. ECKHOFF:  Okay.  It's Claim 10, is

2     the agreement between the State and the defense to

3     exclude African-Americans from Mr. Balderas' jury

4     violated the equal protection clause of the Fourteenth

5     Amendment.

6          Claim 11:  Mr. Balderas' death sentence

7     violates the equal protection due process in cruel and

8     unusual punishment clauses of the United States

9     constitution.

10         Mr. Balderas -- Claim 12:  Mr. Balderas'

11    constitutional rights were violated when the Trial Court

12    was prohibited from instructing the jury that a vote by

13    one juror could result in a life sentence.

14         Claim 13 --

15         THE COURT:  And who made that statement,

16    you're saying?

17         MS. ECKHOFF:  On -- that the Trial Court

18    was prohibited -- are you talking about instructing the

19    jury that a vote --

20         THE COURT:  No -- yes.  Go ahead with

21    that one.

22         MS. ECKHOFF:  With that one --

23         THE COURT:  Who was reported to have said

24    that?

25         MS. HUTCHINS:  It's just a standard jury

1    instruction.

2              THE COURT:  Oh, I thought that you were

3    saying that somebody made that statement in open court.

4              MS. HUTCHINS:  Oh.  They did.  Actually

5    Mr. Nunnery, even though he was prohibited from doing

6    so, actually told the jury in closing argument that one

7    vote equals a life sentence.

8              THE COURT:  That's what I wanted to hear.

9              MS. ECKHOFF:  Okay.

10             THE COURT:  Did you know that?

11             MS. ECKHOFF:  That that occurred?

12             THE COURT:  Yes.

13             MS. ECKHOFF:  Yes, but the jury -- you

14   know, presumably jurors follow the instructions that

15   they're given by the Court.  And it's a pretty standard

16   challenge to the statutory prescribed instruction.

17             Claim 13:  Mr. Balderas' death sentence

18   was arbitrarily and capriciously assigned based on the

19   jury's answer to the unconstitutionally vague first and

20   special issue.

21             Claim 14:  Mr. Balderas' death sentence

22   should be vacated because the punishment phase jury

23   instruction restricted the evidence that the jury could

24   determine was mitigating.  Again, those are all legal

25   claims that are -- a case for those is made in the

1    application and we agree that no further fact finding on
2    those is necessary.
3              THE COURT:   Anything?
4              MS. HUTCHINS:   I mean, our response on
5    No. 10, the affidavits, not only the ones attached to
6    the State's answers, show that no juror was excluded or
7    potential juror was excluded based off of race.
8    Everything was done, on the defense end, pursuant to
9    strategy.  And that, I guess, at some point the
10   applicant actually raises that they object because -- or
11   they're upset --
12             THE COURT:   There was no *Batson* challenge
13   anywhere here, right?
14             MS. HUTCHINS:   No.   There were
15   prospective jurors who were released based off of their
16   answers to the questionnaire.   Now he's upset because he
17   argues the majority of them were minorities, and so
18   there's affidavits from the State saying anybody who was
19   excused was not excused based off of race.   That's
20   consistent with the State's affidavit as well as the
21   defense affidavit.
22             The defense affidavit actually -- I
23   believe it's Mr. Nunnery's -- goes into detail and says
24   that with these types of cases, you have one eye down
25   the line.   You're looking at what juror's coming up and

1  so you have to make a strategic decision as to is this

2  juror better or worse than the one that's coming down

3  the line.  So in those situations, they would agree to

4  dismiss jurors based off of potentially somebody more

5  favorable coming down the line, and that anybody that

6  was dismissed -- agreed to be dismissed by the defense

7  was discussed with Mr. Balderas.  Mr. Balderas had no

8  issue with it.  Trial counsel explained all their

9  reasons.  And for every single juror that was dismissed

10 by agreement, the judge actually asked the defendant

11 whether it was his agreement and the defendant agreed

12 that it was his agreement.  And so, the defense --

13 Mr. Nunnery explains in his affidavit that he didn't

14 believe it was necessary to then further on the record

15 explain the inner workings of his conversation and his

16 advice to the defendant on the record.  It was

17 sufficient for them to say that, yes, the defendant knew

18 and the defendant agreed.  That's Ground No. 10.

19              Grounds No. 11 through 14, all of these

20 were raised by the defense pretrial in a pretrial

21 motion.  They were all overruled by the Trial Court.

22 Because they were previously raised and overruled by the

23 Court, under the prevailing case law, the defendant is

24 now procedurally barred from raising them in a

25 post-conviction writ application.  Despite the bar, in

01595

1   our answer we go through and we give additional reasons

2   as to why those claims don't have any merit.  And so, I

3   can just rely on what we have in the State's answer.

4               THE COURT:  Okay.

5               MS. ECKHOFF:  Your Honor, if you don't

6   mind, at this point I would like to hand it off to

7   Ms. Black to preserve my voice.

8               THE COURT:  Pull up a chair.

9               MS. BLACK:  Your Honor, just to return to

10  our prior primary concern today.  When we came here, the

11  previous -- the Court previously had made a decision

12  that there was a need for further factual development in

13  this case on issues of ineffective assistance of counsel

14  that we've gone into some depth about today.  We came

15  here today to argue that there were actually other

16  issues raised in the petition that require further

17  factual development.

18               And to go back to a point that the

19  district attorney made earlier, this is really -- the

20  Article 11.071 contemplates different ways of assisting

21  this Court in making factual findings.  The pleadings --

22  we're at the pleading stage; we feel we've alleged facts

23  which if we were given the opportunity to come into

24  court and prove, we could prove would entitle

25  Mr. Balderas to relief.  We came here to ask the Court

1    to take a closer look at some of these claims that

2    require further factual development.

3                    THE COURT:  Well, then, please --

4                    MS. BLACK:  The ineffective assistance of

5    counsel claims were the claims that the Court previously

6    had deemed where further factual development was

7    necessary but in fact, had deemed that that could be

8    accomplished by the use of affidavits.  Now, our

9    position then and it's our position now that affidavits

10   are not a reliable substitute for a -- live testimony in

11   court, at which this Court can assess the credibility

12   and the demeanor of witnesses as opposed to on paper.

13                   But an additional point I'd like to make

14   is that there was an order for these affidavits and then

15   there was a long, long delay and the information, a lot

16   of the facts, which the State is relying on to rebut our

17   claims in this hearing today, came to light, basically,

18   within the last 24 hours.  And it would be -- the Court

19   previously, the prior Court had deemed that there was a

20   need to go into further detail on these claims of

21   ineffective assistance of counsel and in fact, to hear

22   from the witnesses and if provided, for affidavits to be

23   an initial way of doing that.  We would ask for an

24   opportunity to respond with more than 24 hours' notice

25   to the factual allegations that were submitted in these

01597

 1    affidavits that hadn't even been served on us --

 2            THE COURT:  Can we enumerate those for

 3    the record, those that you're talking about again, or

 4    are they just the same ones she's already stated?

 5            MS. BLACK:  We did the best we could in

 6    standing here today, basically, doing it in the form of

 7    an ad hoc argument.  But what we'd like the opportunity

 8    to do is take those affidavits --

 9            THE COURT:  I understand.

10            MS. BLACK:  -- back to our office to look

11    at them carefully and to raise -- to file -- a motion

12    has been filed.  If this is, in fact, a hearing on that

13    motion, we would like for the opportunity to oppose the

14    motion in writing because a written motion was filed

15    with numerous allegations made in the form of these

16    lengthy affidavits and we feel we deserve, and due

17    process requires, that we be entitled to take those

18    affidavits, to study them, and to respond in the same

19    form, in writing, in a written opposition to that motion

20    before this Court takes that motion under advisement.

21            And if that -- you know, what we've

22    attempted to do today is, through a quick reading of

23    affidavits, to point out that there are still -- that,

24    in fact, they raise what -- what the Court is charged

25    with doing in designating issues for factual development

1    is deciding whether there's controverted issues of fact.
2    Are there things where we've raised a claim and the
3    State has disputed the claim and it can't -- there's a
4    factual issue that needs to be resolved.  So those facts
5    were -- those disputed issues were found by the prior
6    Court to exist with respect to our ineffective
7    assistance of counsel claim and we would argue that due
8    process requires that --
9             THE COURT:  Do you have her ruling in
10   writing somewhere?
11            MS. HUTCHINS:  Judge, the -- I don't have
12   a copy with me.  There should be a copy in the file.
13            THE COURT:  So what does it say?  If you
14   look at it, what does Judge Guiney say?
15            MS. HUTCHINS:  It's an order designating
16   issue and what it does is, basically, it's the Court
17   saying that the Court finds the applicant filed a writ
18   application with these 14 claims and it lists what the
19   14 claims are and then it said in there that the Court
20   has determined that these claims, that it will resolve
21   these claims and it actually says, "some by application
22   of the applicable law, some" -- back up a second.
23            It says that, "The Court would resolve
24   these issues in the manner the Court deemed appropriate,
25   namely, some by the application of applicable law, some

01595

1   by the review of the pleadings, some by the review of

2   the appellate record, some by the review of the

3   affidavits submitted by trial counsel, some by

4   recollection of the Court, and some by a review of the

5   submitted habeas evidence."

6           And so, what it basically says is that

7   the Court is acknowledging that the applicant filed a

8   writ application, these are the 14 grounds, and the

9   Court is going to decide the manner in which it thinks

10  it's appropriate to resolve them.  And then the Court

11  issued another order that ordered Mr. Godinich and

12  Mr. Nunnery to do affidavits on these six or seven

13  issues.  And that's all that that order said.

14          And what the effect of that order is is

15  it basically stops the clock at the CCA.  Otherwise, if

16  we didn't have that order, we would have to do things on

17  a much speedier timetable.  That's all it does.

18          MS. BLACK:  It does a little more than

19  that.  It's designating that there is an issue that --

20  and it is providing for factual development of that

21  issue.  And these affidavits were contemplated.

22          Now, what we had hoped to convince the

23  Court was that there were -- that in taking a fresh look

24  at this case, there may be other issues that raise

25  controverted issues of fact.  Our position is that there

01500

1    are factual issues in several of the claims and most
2    importantly, in the prosecutorial misconduct relating to
3    false testimony, the ineffective assistance of counsel,
4    and the juror misconduct claims.  And we urge this Court
5    not to decide them based on the pleadings alone because
6    the burden at the pleading stage is to raise facts
7    which, if proven, would entitle Mr. Balderas to relief.

8             But in the event that we are speaking
9    solely about these ineffective assistance of counsel
10   affidavits, the mode of factual development is
11   inadequate here for several reasons but one of which is
12   that the affidavits are not a good substitute for live
13   testimony and an evidentiary hearing for many of the
14   reasons that we've talked about, which is that many of
15   the statements in the affidavits raise allegations or
16   questions that we would dispute but often in a manner
17   that would be inadmissible in the context of an
18   evidentiary hearing.

19            And that's also why we, for example,
20   provided a hearsay affidavit in support of our claim,
21   our false testimony claim regarding Israel Diaz; we're
22   asking for further factual development because we don't
23   want to solely rely on the hearsay affidavit.  We would
24   like to have access to this Court's subpoena power to
25   prove that claim by bringing the witness into the court

01801

1    where the Court can evaluate the witness' credibility,

2    the demeanor, and both sides have the opportunity to

3    examine and cross-examine the witness and we feel the

4    same thing is appropriate in the context of the

5    ineffective assistance of counsel claims where this

6    process of having an affidavit that's filed five days

7    before we're here in argument and submitted through a

8    motion that was filed only hours ago just really doesn't

9    allow for the full exploration of those issues and

10   doesn't give us adequate time to respond to the -- to

11   the -- to the factual questions that are either answered

12   or raised in that affidavit -- in those affidavits.

13              THE COURT:  I think y'all did a fine job

14   presenting and rebutting.

15              MS. BLACK:  But we're stuck with what's

16   in the pleadings and what we're asking this Court for is

17   to allow us to present you with more.

18              THE COURT:  Yes.  I understand.  I

19   understand.  You may not get that but what you can do is

20   supplement your responses here today with affidavits or

21   motions or memorandum.  I don't know what you're going

22   to use and I will read them as well.  And then -- so,

23   you have something today for the first time, these

24   affidavits.

25              MS. BLACK:  Well, the motion, could we

EXHIBIT A Page 78

1    respond to the motion in writing, I guess.  Before the

2    Court rules on the motion, could we file a written

3    opposition?  That's --

4             THE COURT:  And that's fine.  Written

5    opposition, that's fine.  I'll read it.  Let's keep it

6    not so verbose.  Let's keep it at a minimum of what

7    you're going to say and address the most serious issues.

8    I know what you say and you're keeping every one of your

9    options and errors open for federal review as well.  But

10   I've already told you what I think about several of your

11   errors that you've raised.  So, if you want me to

12   respond to it, I would address those of your strongest

13   errors.

14             MS. BLACK:  And we intend to do that

15   and -- and again, this is the difference between where

16   we are now versus where we were at the pleading stage.

17   We did come here --

18             THE COURT:  I understand.  You want a

19   live hearing.

20             MS. BLACK:  But it would be relevant to

21   some of the claims and not all of the claims in the

22   petition.  There are discrete issues that do require a

23   hearing and where due process does require a hearing but

24   not all of the issues in the petition -- we weren't here

25   to argue all of them, that we would present a hearing on

1    every issue that we made.

2              THE COURT:  Well, if that's what you

3    wanted, then you should really pare it down and just use

4    your strongest errors.

5              You didn't talk about the translators and

6    the people on the jury panel that spoke Spanish and

7    contradicted what the translation said it was, or the

8    translator said it was.  We've had that happen in court

9    here all the time.  I'm not -- they are not trained, no

10   one on the jury is trained to be a translator.  The

11   person here is trained and uses that every day.  And

12   every day I will go with what the translator says.  I

13   don't care what the juror said she thought she

14   understood from the people speaking Spanish.  They're

15   not working as a translator down here.  We have a

16   translator here.  I know all four or five of the

17   translators.  I speak Spanish and I've corrected the

18   translator myself.  But she used a word that was proper

19   enough.  So, I'm telling you, I will go with the

20   translator every time.

21             MS. BLACK:  We appreciate the Court's

22   advice about paring things down and putting things into

23   a context.  And again, this hearing has gone back and

24   forth on almost every issue but I guess if I could tag

25   onto our request for an opportunity to respond in

1    writing in opposition to the motion the State filed
2    today, we would also like to, because this Court is
3    hearing these issues for the first time, file a written
4    motion for a evidentiary hearing on certain issues in
5    the petition but not all of them and perhaps accompany
6    them with affidavits and things to further convince the
7    Court that there is -- there are controverted issues of
8    fact related to --
9              THE COURT:  Well, I would pick your
10   strongest ones.  I've given you my opinion already just
11   on what I've heard today.  Please don't spend your
12   wheels -- spin your wheels on the motel, the person
13   waving, the translator.  I know these attorneys, they've
14   practiced before me, I've practiced alongside them for
15   25 years here.  And I've appointed Mr. Godinich before,
16   in the past.  So, I know that he's a good lawyer.
17             There are only -- we have 179 people on
18   the first degree list, 79 people on the second degree
19   list here, and 69 people on the third degree list here.
20   But there are only, what, 40 or 50 people on the capital
21   list.  And that's 40 or 50 people out of the thousands
22   that practice at this courthouse a day.  They have to
23   take a special CLE course and maintain their CLE on
24   capital writs and capital cases.  These attorneys
25   pioneered the way.

01605

1         This county was one of the first and the
2    best counties on requiring proper accreditation for
3    capital crime.  This -- I would say I don't know of a
4    county that does a better job than Harris.  Do you know
5    of one?  And we have the best attorneys that are
6    appointed to capital crime.  I only appoint people that
7    have the highest accreditations.  So, do you know of a
8    county that does it better than this one?  I mean, you
9    practice all over the state, don't you?

10            MS. BLACK:  Yes, and as a defense
11   attorney, we deal with issues of ineffective assistance
12   of counsel all the time and in fact, due to recent --
13   well, not that recent but fairly recent supreme court
14   opinions, doing the work that we're doing at the state
15   court level, we'll have other attorneys reviewing our
16   work and raising allegations of ineffective
17   assistance --

18            THE COURT:  Indeed.  Indeed.

19            MS. BLACK:  -- and really what we're --
20   you know, our position is that even the best attorneys
21   can make mistakes and this is a capital case, so what
22   we're looking at is raising claims of error and having
23   Courts review the claims of error because of the
24   heightened need to get it right and to not make mistakes
25   in a capital case.  So even though it's awkward, raising

01686

1   claims of ineffective assistance of counsel is really a

2   way of saying that even the best counsel can make

3   mistakes and --

4            THE COURT:  Indeed.

5            MS. BLACK:  -- if those mistakes go to

6   the reliability of the guilt verdict and death sentence,

7   we have an obligation to rectify those errors because of

8   the severity of the punishment.

9            THE COURT:  Not every error warrants a

10  reversal.

11           MS. BLACK:  That's certainly true.

12           THE COURT:  That happens every day.  I

13  tell that to appellate attorneys every day that come in

14  here.  So is there anything else you would like to put

15  on the record before we adjourn?

16          MS. HUTCHINS:  Just on our end, Judge,

17  that the clerk's office, based off of, I think, the file

18  stamp on them, I just wanted to clarify for the record

19  that Mr. Godinich and Mr. Nunnery filed their affidavits

20  last week and their certificates of service, I believe,

21  saying that they were mailed out by the clerk's office.

22  So I just didn't want the Court to think --

23         THE COURT:  Nobody thinks that.

24         MS. HUTCHINS:  -- that we were sitting on

25  their affidavits.

01607

1           THE COURT: And they don't think that

2  either. I'm sure it's --

3           MS. BLACK: It's only been a couple of

4  days and we are in Austin, so they are probably in the

5  mail.

6           THE COURT: So, if you want me to grant a

7  hearing on further stuff, then you need to pare it down

8  to just your best arguments and tell me what you want to

9  present, who your witnesses are going to be, and what

10  you think that they might testify to. I mean, so, if

11  you put a little summation on the paragraph and then

12  tell me what you hope to produce by that. And you'll

13  give it to them before they give it to me and I'll have

14  both of your responses.

15           So you get to respond to theirs and

16  they're going to respond to yours right now. So e-mail

17  them and then once you both have it and you can both

18  send me your -- I don't know how you'll present it to

19  the Court. Probably it should be in written form for

20  the clerks, not by e-mail.

21           MS. BLACK: Yeah.

22           THE COURT: Again, I'm not guaranteeing

23  anything but don't -- don't throw everything in the

24  kitchen sink at me and expect me to grant you a hearing

25  on that. Pare it down to the best ones that you have

1    and I will look at it.

2                    MS. HUTCHINS:  Judge, am I correct in my

3    understanding then that you will, once you have their --

4    the defense's objection to our motion and potentially

5    our response from us on their objection, that at that

6    point, once you review it, you will make a decision and

7    you will issue your written order and we will both just

8    get notification of your written order?

9                    THE COURT:  I think that's so, yes.

10                   MS. BLACK:  And just to clarify, it would

11   be more of a -- we're kind of talking about two

12   different things but there's an opposition to your

13   motion but we're actually affirmatively moving for

14   something as well.

15                   MS. HUTCHINS:  No, I understand.

16                   THE COURT:  Explain that to me so that I

17   know what you mean.

18                   MS. BLACK:  We were hoping to -- when you

19   discussed paring down the issues and attaching the

20   relevant affidavits, that would be more of a motion for

21   an evidentiary hearing than our response to their

22   motion.

23                   THE COURT:  Yes.

24                   MS. BLACK:  But it --

25                   THE COURT:  I don't want to receive a

1  35-page document.  Tell me what you want to investigate,

2  tell me who your witnesses are going to be, what you

3  think they're going to proffer, and we'll go from there.

4  Again, I haven't made any promises of what I'm going to

5  do.  I don't know.

6          MS. BLACK:  Should we set a time frame

7  for the response, for the motion and the response?

8          MS. HUTCHINS:  We should.

9          THE COURT:  Because the Court of Criminal

10  Appeals date is what?

11          MS. HUTCHINS:  September the 25th.

12          MS. BLACK:  We can move to push that out.

13          THE COURT:  You will make those motions

14  or do we have to make it?

15          MS. HUTCHINS:  It has to come from the

16  Court.

17          THE COURT:  Does the Court have to make

18  it?

19          MS. HUTCHINS:  It has to come from you.

20          THE COURT:  You provide it to us.  If you

21  send it to our court, we'll sign it and ask for more

22  time.

23          MS. HUTCHINS:  That's fine.

24          THE COURT:  Y'all did a fine job, both of

25  you.  I'm really surprised of how verbal and good

1    you-all are.

2            MS. HUTCHINS:  What type of timetable

3    would you like for the defense to make their motion and

4    objections?

5            THE COURT:  What do you think is a

6    reasonable amount of time?

7            MS. ECKHOFF:  Your Honor, we would

8    request at least 30 days, if possible, only because we

9    actually have evidentiary --

10            THE COURT:  She's going to be in labor.

11            MS. HUTCHINS:  I don't know.  I feel like

12    30 days is appropriate for findings.  10 days maybe for

13    an objection.

14            MS. BLACK:  We both have evidentiary

15    hearings next week in other parts of the state that will

16    require being out of the office, but the two of us won't

17    be back in the office for many days for the next two

18    weeks.  So it might be -- the request is just to put us

19    outside that window so we have some time to put our

20    heads together.

21            THE COURT:  How many cases do y'all have,

22    that you two are handling?

23            MS. BLACK:  Our office has 40 cases.

24            MS. ECKHOFF:  Our office as a whole has

25    about 40 cases.  I believe I currently have -- I'm

01511

1    assigned on nine.

2    THE COURT:  Okay.

3    MS. BLACK:  I'm new to the office, so my

4    caseload hasn't ratcheted up.  The reason for the

5    request is just that there are some cases that are

6    outside of where we live so we go on the road and it

7    just is hard to put a motion together when we're --

8    THE COURT:  Okay.  Y'all did a fine job.

9    Anything else before we're adjourned?

10   MS. HUTCHINS:  Just your timetable,

11   Judge.

12   THE COURT:  Oh.  For you to respond in

13   writing to me, asking for an evidentiary hearing, how

14   about in 25 days or so?

15   Is that okay with you?

16   MS. HUTCHINS:  Yes, Judge.  I'm good with

17   whatever the Court decides.

18   THE COURT:  What day is that?  9/12.  And

19   forgive me.  Tell me the name of the organization with

20   the State?

21   MS. ECKHOFF:  We're with the Office of

22   Capital and Forensic Writs.

23   Is there also a timetable for the State's

24   response to our filing?

25   MS. HUTCHINS:  I'm okay with ten days,

01612

1    Judge.

2                 THE COURT:  Okay.  Ten days beyond that.

3                 MS. HUTCHINS:  From 9/12, which would get

4    us to Friday, 9/22.

5                 THE COURT:  Okay.  9/22, and that's the

6    State's response to -- what's the acronym to your

7    office?

8                 MS. HUTCHINS:  The OCFW.

9                 THE COURT:  OCFW.  Okay.  Thank you very

10   much for your time.

11                MS. BLACK:  Thank you, Your Honor.

12                MS. ECKHOFF:  Thank you.

13                *(Hearing adjourned.)*

14

15

16

17

18

19

20

21

22

23

24

25

1    STATE OF TEXAS
     COUNTY OF HARRIS
2

3          I, Renee Reagan, Official Court Reporter in and

4    for the 179th District Court of Harris County, State

5    of Texas, do hereby certify that the above and

6    foregoing contains a true and correct transcription

7    of all portions of evidence and other proceedings

8    requested in writing by counsel for the parties to be

9    included in this volume of the Reporter's Record in

10   the above-styled and numbered cause, all of which

11   occurred in open court or in chambers and were

12   reported by me.

13         I further certify that this Reporter's Record of

14   the proceedings truly and correctly reflects the

15   exhibits, if any, offered by the respective parties.

16         WITNESS MY OFFICIAL HAND, this the 22nd day

17   of August, 2017.

18
                              /s/Renee Reagan
19                            Renee Reagan, CSR
                              Texas CSR 7573
20                            Official Court Reporter
                              179th District Court
21                            Harris County, Texas
                              1201 Franklin
22                            Houston, Texas 77002
                              Telephone:  832.927.4105
23                            Expiration:  12/31/18

24

25

**MR. REISS: [2]** 3/18 17/25
**MS. BLACK: [27]** 3/12 34/20 72/8
73/3 74/4 74/9 76/17 78/14 78/24
79/13 79/19 80/20 82/9 82/18 83/4
83/10 84/2 84/20 85/9 85/17 85/23
86/5 86/11 87/13 87/22 88/2 89/10
**MS. ECKHOFF: [108]**
**MS. HUTCHINS: [86]** 3/16 9/25
10/11 10/15 11/1 11/17 11/20
13/19 18/19 22/6 22/19 23/24 24/5
24/11 24/14 24/18 24/22 25/15
27/19 28/19 32/8 34/14 34/22 35/1
35/9 35/14 35/20 35/25 36/2 36/16
36/20 37/9 37/12 37/22 37/25
39/12 39/14 39/16 40/7 42/14
42/22 43/1 43/15 44/4 44/11 45/5
49/24 53/4 53/8 53/13 53/15 54/12
55/9 55/18 55/22 56/4 56/12 58/6
59/4 59/6 63/4 63/13 65/25 66/8
68/24 69/3 70/3 70/13 75/10 75/14
83/15 83/23 85/1 85/14 86/7 86/10
86/14 86/18 86/22 87/1 87/10 88/9
88/15 88/24 89/2 89/7
**THE COURT: [196]**

---

**/**

---

**/s/Renee [1]** 90/18

---

**1**

**10 [6]** 7/9 50/23 68/1 70/5 71/18
87/12
**11 [3]** 7/10 68/6 71/19
**11.071 [1]** 72/20
**12 [5]** 20/16 46/4 68/10 88/18
89/3
**12/31/18 [1]** 90/23
**1201 [3]** 1/23 2/6 90/21
**13 [2]** 68/14 69/17
**14 [8]** 7/11 21/2 43/22 69/21
71/19 75/18 75/19 76/8
**1412826-A [1]** 1/2
**15 [1]** 50/23
**16634900 [1]** 2/4
**17 [1]** 27/22
**1700 [1]** 2/16
**179 [2]** 43/21 81/17
**179TH [4]** 1/6 1/22 90/4 90/20
**17th [1]** 1/13
**18 [2]** 50/2 90/23

---

**2**

**2005 [2]** 24/17 24/18
**2012 [1]** 24/22
**2013 [1]** 37/7
**2014 [3]** 24/20 37/7 38/19
**2015 [1]** 12/19
**2017 [2]** 1/13 90/17
**22 [2]** 89/4 89/5
**22nd [1]** 90/16
**23 [1]** 9/11
**24 [2]** 73/18 73/24
**24053738 [2]** 2/3 3/21
**24063791 [1]** 2/2
**24090910 [1]** 2/14
**24099910 [1]** 2/15
**25 [3]** 43/20 81/15 88/14
**25th [2]** 43/24 86/11
**26 [1]** 37/7
**29 [1]** 43/21
**29th [1]** 43/24
**2:00 [1]** 48/1

---

**3**

**30 [2]** 87/8 87/12
**35-page [1]** 86/1
**360 [1]** 48/1

---

**4**

**40 [4]** 81/20 81/21 87/23 87/25
**45 [1]** 34/20
**460 [1]** 2/16

---

**5**

**50 [2]** 81/20 81/21
**512.463.8503 [1]** 2/17
**56 [1]** 15/13
**5:00 [1]** 47/25

---

**6**

**606 [6]** 24/24 25/20 25/22 25/24

---

26/1 28/21
**69 [1]** 81/19

---

**7**

**70 [1]** 66/23
**71 [1]** 66/23
**713.274.5800 [1]** 2/7
**72 [1]** 66/23
**75 [1]** 66/20
**7573 [2]** 1/22 90/19
**77002 [3]** 1/23 2/6 90/22
**78701 [1]** 2/17
**79 [1]** 81/18

---

**8**

**8-8 [1]** 36/14
**832.927.4105 [1]** 90/22
**88 [5]** 36/8 36/14 36/14 36/20
49/14

---

**9**

**9/12 [2]** 88/18 89/3
**9/22 [2]** 89/4 89/5

---

**A**

**ABA [2]** 62/23 63/4
**abandoning [1]** 25/12
**ability [3]** 9/17 34/8 51/22
**able [9]** 15/12 18/16 18/18 29/13
37/15 50/7 54/2 54/17 54/20
**about [46]** 7/25 16/9 16/9 17/5
17/6 18/9 22/1 25/8 26/20 27/24
28/1 28/5 28/10 30/8 30/9 38/20
41/2 42/5 44/14 44/18 44/19 44/21
44/22 49/4 51/18 53/20 55/9 55/11
56/14 58/8 62/10 66/4 66/11 66/15
67/7 68/18 72/14 74/3 77/9 77/14
79/10 80/5 80/22 85/11 87/25
88/14
**above [3]** 1/14 90/5 90/10
**above-styled [1]** 90/10
**above-titled [1]** 1/14
**absolutely [1]** 64/6
**abundance [1]** 60/5
**abuse [7]** 37/1 48/20 48/22 49/4
51/8 62/8 63/9
**acceptable [1]** 8/8
**access [6]** 13/4 14/1 17/7 17/11
17/21 77/24
**accommodate [1]** 24/3
**accompany [1]** 81/5
**accomplished [1]** 73/8
**according [1]** 50/8
**account [4]** 7/20 12/5 14/14 62/2
**accounts [1]** 9/14
**accreditation [1]** 82/2
**accreditations [1]** 82/7
**accuracy [1]** 42/6
**accurate [1]** 7/1
**acknowledge [1]** 46/19
**acknowledging [1]** 76/7
**acronym [1]** 89/6
**actions [1]** 25/3
**acts [2]** 36/17 36/19
**actual [1]** 43/23
**actually [42]** 4/14 7/21 8/2 9/4
9/20 11/8 12/14 12/19 15/14 15/16
16/20 18/12 19/18 20/7 22/11
23/25 25/19 32/2 32/5 33/6 37/20
39/24 43/25 44/7 50/4 52/15 53/21
54/14 54/23 57/19 60/3 62/7 65/21
69/4 69/6 70/10 70/10 72/10 72/15
75/21 85/13 87/9
**ad [1]** 74/7
**add [2]** 5/24 6/20
**addition [2]** 35/6 64/7
**additional [11]** 7/4 7/5 21/3
45/19 48/6 48/10 67/10 67/10
67/18 72/1 73/13
**additionally [1]** 46/9
**address [14]** 4/14 12/1 12/5 25/1
25/9 34/12 34/13 45/20 52/15 53/2
60/5 64/5 79/7 79/12
**addressed [2]** 64/3 64/4
**addresses [4]** 55/15 56/16 63/15
63/15
**addressing [1]** 18/7
**adequate [1]** 78/10
**adequately [1]** 62/2
**adjourn [1]** 83/15
**adjourned [2]** 88/9 89/13
**admissible [5]** 24/25 26/4 40/15
47/5 47/5

---

**admit [2]** 12/1 57/9
**admonished [1]** 27/5
**admonitions [2]** 26/15 26/17
**advance [1]** 23/23
**adverse [2]** 6/5 6/20
**advice [2]** 71/16 80/22
**advisement [1]** 74/20
**affect [3]** 21/7 21/16 23/5
**affected [9]** 21/1 21/21 22/14
22/16 22/17 22/23 28/6 55/12
55/25
**affidavit [31]** 8/13 10/22 11/1
11/7 11/8 11/16 12/2 12/3 14/6
23/12 39/18 41/9 42/9 46/13 46/19
46/24 47/6 53/19 54/22 55/15 56/2
63/14 63/20 70/20 70/21 70/22
71/13 77/20 77/23 78/6 78/12
**affidavits [57]** 5/5 5/23 6/1 7/1
13/23 13/23 14/9 17/16 17/23
19/17 19/20 21/3 24/25 25/5 29/8
29/14 31/17 31/23 32/25 33/18
33/20 39/5 39/10 40/13 45/23
45/25 46/15 50/9 52/15 56/1 59/25
60/5 64/1 70/5 70/18 73/8 73/9
73/14 73/22 74/1 74/8 74/16 74/18
74/23 76/3 76/12 76/21 77/10
77/12 77/15 78/12 78/20 78/24
81/6 83/19 83/25 85/20
**affirmatively [1]** 85/13
**African [1]** 68/3
**African-Americans [1]** 68/3
**after [16]** 4/14 7/16 7/22 9/23
19/23 21/8 23/4 23/5 30/7 30/19
31/24 41/12 53/7 58/7 58/8 66/20
**aftermath [1]** 30/11
**afternoon [2]** 3/21 3/23
**again [19]** 4/15 10/15 18/15 20/1
21/6 21/19 43/21 46/21 48/5 49/12
57/1 61/13 65/2 69/24 74/3 79/15
80/23 84/22 86/4
**against [11]** 9/18 30/5 35/3 35/17
36/16 36/19 41/2 65/16 67/9
**aggravated [3]** 7/19 35/8 67/10
**ago [1]** 78/8
**agree [7]** 27/16 30/24 63/13 64/13
64/18 70/1 71/3
**agreed [4]** 30/20 71/6 71/11 71/18
**agreeing [1]** 52/4
**agreement [4]** 68/2 71/10 71/11
71/12
**ahead [4]** 4/8 8/23 27/19 68/20
**aid [1]** 66/17
**alibi [6]** 29/15 37/19 38/20 38/21
39/1 39/21
**all [47]** 3/24 7/7 10/8 19/2 19/3
19/23 26/11 27/12 29/3 36/6 36/7
38/2 39/5 45/8 45/15 46/7 47/8
47/14 50/10 50/23 52/10 54/17
54/18 50/9 59/15 60/21 61/19 64/7
67/9 67/12 69/24 71/8 71/19 71/21
76/13 76/17 79/21 79/24 79/25
80/9 80/16 81/5 82/9 82/12 87/1
90/7 90/10
**allegation [2]** 33/3 59/2
**allegations [7]** 4/20 4/21 49/4
73/25 74/15 77/15 82/16
**alleged [5]** 22/14 51/9 55/13
55/21 72/22
**alleging [3]** 7/10 8/9 47/9
**Allen [1]** 19/24
**allow [3]** 58/1 78/9 78/17
**allowed [4]** 16/20 18/23 31/10
42/6
**almost [2]** 19/24 80/24
**alone [3]** 5/23 31/23 77/5
**along [3]** 3/18 11/13 27/10 28/2
**alongside [1]** 81/14
**already [11]** 15/2 21/8 21/18
22/21 23/7 23/10 40/13 59/1 74/4
79/10 81/10
**also [40]** 3/13 3/14 4/25 5/4 8/5
8/12 14/6 14/9 14/17 14/21 15/9
15/25 17/4 17/13 24/15 24/23 25/7
29/1 31/11 33/7 36/3 37/13 38/18
40/19 44/16 48/11 53/24 54/15
55/10 59/17 60/22 61/13 63/20
64/8 64/10 65/5 67/3 77/19 81/2
88/23
**alternate [1]** 41/1
**although [1]** 20/6
**Alvin [2]** 5/12 14/10
**always [1]** 13/6
**am [1]** 85/2

01615

# A

Amendment [4] 49/7 58/19 58/20 68/5
Americans [1] 68/3
amongst [2] 42/10 53/23
amount [1] 87/6
anecdotal [1] 47/7
announced [1] 20/21
another [6] 15/23 21/17 28/5 30/2 33/5 76/11
answer [12] 10/20 10/21 12/15 13/22 14/20 22/9 46/7 50/22 51/11 69/19 72/1 72/3
answered [1] 78/11
answers [4] 54/19 55/2 70/6 70/16
any [29] 5/16 12/18 14/14 15/11 21/24 22/2 27/21 27/24 28/6 28/7 28/9 28/18 32/19 33/2 33/25 38/11 39/3 45/5 50/11 51/14 51/15 51/16 51/16 51/23 60/19 61/10 72/2 86/4 90/15
anybody [3] 5/17 70/18 71/5
anymore [1] 57/23
anything [8] 26/20 26/21 39/4 52/13 70/3 83/14 84/23 88/9
anyway [1] 60/14
anywhere [2] 23/23 70/13
apologize [3] 10/6 33/12 45/3
apparently [1] 12/13
appeal [13] 22/10 22/12 22/21 30/20 30/23 32/5 43/7 44/6 44/7 59/19 59/20 60/20 60/23
Appeals [9] 7/9 22/15 22/19 23/1 23/7 44/19 44/20 59/22 86/10
APPEARANCES [1] 2/1
appears [2] 16/19 54/16
appellate [5] 22/9 32/22 42/10 42/24 43/4 60/10 76/2 83/13
applicable [2] 75/22 75/25
applicant [23] 11/6 22/11 22/12 23/8 25/10 27/21 35/4 36/5 37/13 38/4 41/16 51/5 51/13 52/10 55/24 59/12 59/12 59/20 60/3 60/7 70/10 75/17 76/7
applicant's [7] 14/24 15/13 28/10 52/8 52/24 66/5 66/22
applicants [1] 51/15
application [12] 4/1 4/19 22/8 28/11 49/2 60/19 70/1 71/25 75/18 75/21 75/25 76/8
applies [1] 58/20
apply [1] 21/25
appoint [1] 82/6
appointed [2] 58/3 81/15 82/6
appreciate [10] 5/20 6/19 8/24 17/12 32/17 45/4 48/3 57/7 65/4 80/21
approach [2] 62/25 64/2
appropriate [4] 75/24 76/10 78/4 87/12
appropriately [2] 63/18 63/25
arbitrarily [1] 69/18
are [84] 4/15 4/19 4/20 4/21 5/14 5/19 5/23 5/25 6/4 6/25 8/9 11/6 11/14 13/22 14/23 15/12 16/5 16/6 16/13 17/17 18/5 23/21 23/22 23/22 24/25 25/2 26/3 26/15 27/5 29/2 31/7 35/2 35/15 38/2 39/9 45/10 45/13 45/17 50/22 52/19 53/18 54/8 54/20 55/13 55/14 55/17 57/1 57/9 58/9 61/9 61/10 61/23 62/10 67/17 67/19 67/19 68/18 69/24 69/25 73/10 74/4 74/23 75/2 75/19 76/8 77/1 77/8 77/12 78/11 79/16 79/22 80/9 81/7 81/17 81/20 82/5 84/4 84/4 84/9 86/2 87/1 87/22 88/5 88/5
aren't [1] 6/9
argue [8] 4/23 23/8 27/20 67/6 67/11 72/15 75/7 79/25
argued [2] 22/12 59/20
argues [1] 70/17
arguing [3] 33/12 33/13 33/14
argument [18] 15/22 25/6 25/8 32/4 43/5 43/11 49/11 52/7 52/7 53/7 56/11 56/21 56/21 56/22 67/1 69/6 74/7 78/7
arguments [2] 67/21 84/8
arise [1] 6/21
around [1] 30/15
Article [1] 72/20
ascertained [1] 28/13
ask [9] 10/2 21/16 33/8 34/1

# B

54/18 57/5 72/25 73/23 86/21
asked [4] 21/7 33/2 33/4 71/10
asking [10] 20/15 20/16 28/16 45/19 46/23 51/24 64/23 77/22 78/16 88/13
aspect [2] 20/1 20/5
aspects [2] 29/3 48/12
assault [2] 7/19 35/6
assaulted [1] 62/16
assaults [2] 35/18 67/10
assert [2] 57/18 61/13
assess [2] 67/3 73/11
assessing [1] 29/11
assigned [2] 37/19 88/1
assist [1] 36/21
assistance [19] 5/7 6/9 19/7 28/25 43/3 43/5 48/16 57/8 57/17 72/13 73/4 73/21 75/7 77/3 77/9 78/5 82/11 82/17 83/1
Assistant [1] 2/5
assisting [1] 72/20
assume [1] 35/11
attached [10] 10/21 14/23 15/13 37/14 37/16 38/5 53/18 54/23 66/23 70/5
attaching [1] 85/19
attempted [4] 37/20 51/3 51/3 74/22
attempting [1] 63/7
attention [1] 4/13
attorney [6] 8/18 12/22 16/24 17/2 72/19 82/11
Attorney's [3] 2/5 3/20 14/4
attorneys [16] 2/5 2/7 2/18 15/10 16/4 16/7 16/20 16/21 17/24 42/9 81/13 81/24 82/5 82/15 82/20 83/13
attorneys' [2] 49/19 52/15
attribute [2] 11/3 11/5
attributed [1] 45/16
audience [2] 36/13 55/8
August [2] 1/13 90/17
Austin [3] 2/17 23/18 84/4
availability [1] 16/3
available [9] 12/16 12/18 13/6 14/1 14/8 16/10 16/11 29/16 50/10
Ave [1] 2/16
avoid [1] 31/20
aware [5] 14/17 15/8 20/12 24/1 35/3
away [2] 24/3 43/11
awkward [1] 82/25

# B

back [21] 7/25 10/6 10/10 18/5 18/6 19/25 20/25 28/7 33/11 39/7 48/2 49/11 52/13 54/5 54/15 60/17 72/18 74/10 75/22 80/23 87/17
bad [2] 36/17 36/19
bailiff [2] 20/24 22/24
BALDERAS [24] 1/6 3/11 3/15 4/16 4/18 6/22 7/22 7/23 8/3 8/4 9/8 29/14 30/5 30/10 30/14 30/18 32/3 36/20 49/5 68/4 68/13 74/11 72/25 77/7
Balderas' [13] 4/2 5/6 7/17 8/1 33/3 48/8 48/19 49/6 68/3 68/6 68/10 69/17 69/21
bar [2] 3/20 71/25
Bardales [2] 41/20 41/20
Barker [1] 58/23
barred [3] 23/9 52/20 71/24
base [1] 17/4
based [15] 10/14 10/19 24/15 25/22 31/22 39/4 46/24 67/12 69/18 70/7 70/15 70/19 71/4 77/5 83/17
basically [9] 15/2 27/11 39/17 51/17 73/17 74/6 75/16 76/6 76/15 76/15
basis [2] 26/6 59/1
batson [1] 70/12
battle [1] 54/17
be [60] 1/14 7/3 10/18 11/18 13/1 15/22 16/17 16/18 16/19 18/18 18/22 18/22 25/6 26/8 27/12 27/12 27/14 27/18 28/12 29/9 31/13 33/21 34/18 40/2 40/14 42/6 46/1 47/4 47/5 47/19 47/25 52/3 55/4 55/6 57/19 61/19 62/5 67/18 69/22 71/6 73/7 73/18 73/22 74/17 75/4 75/12 76/24 79/13 80/1 84/9 84/19 85/11 85/20 86/2 87/17 87/17 87/18 90/8

# C

became [1] 33/16
because [42] 6/8 12/11 12/17 21/5 22/14 23/3 23/6 23/14 23/22 25/9 27/5 28/17 28/18 29/17 36/13 38/13 39/25 40/2 40/9 48/15 49/3 49/17 54/25 58/25 60/13 60/23 62/4 63/15 63/22 64/9 69/22 70/10 70/16 71/22 74/14 77/5 77/22 81/2 82/23 83/7 86/9 87/8
become [1] 6/5
been [31] 9/20 12/10 12/25 13/2 16/11 16/16 17/24 18/14 18/16 22/11 23/11 23/10 28/19 30/15 32/20 34/19 37/15 39/23 39/23 51/25 58/11 58/12 59/3 63/14 65/15 65/17 65/19 66/7 74/1 74/12 84/3
before [20] 1/15 10/7 12/23 15/19 15/20 30/13 31/12 31/19 55/5 59/3 60/17 60/19 74/20 78/7 79/1 81/14 81/15 83/15 84/13 88/9
begun [1] 59/1
behalf [6] 4/2 7/16 45/25 46/7 46/7 49/10
behavior [1] 55/11
being [6] 13/21 27/3 28/13 36/8 45/14 87/16
beliefs [1] 51/19
believe [35] 6/25 8/20 14/23 17/10 20/15 24/10 24/12 28/1 36/7 36/25 37/10 42/4 46/2 49/21 50/22 53/19 58/4 58/5 58/7 58/11 58/13 60/8 61/24 62/13 62/15 62/19 66/4 66/6 66/7 67/13 67/16 70/23 71/14 83/20 87/25
believed [5] 14/18 31/21 31/23 42/11 55/6
beneficial [1] 14/18
Benitez [6] 40/22 40/25 41/6 41/8 42/13 46/11
Bennett [2] 11/1 14/7
best [12] 7/2 9/17 12/10 42/13 50/19 74/5 82/2 82/20 83/2 84/8 84/25
better [4] 6/4 71/2 82/4 82/8
between [4] 16/3 38/3 68/2 79/15
beyond [1] 89/2
bias [2] 27/25 52/11
big [1] 36/5
bill [1] 53/22
bind [1] 63/7
bit [6] 4/10 5/4 25/7 34/14 44/18 63/22
Black [3] 2/15 3/13 72/7
booked [2] 23/22 23/23
bored [1] 27/3
both [16] 6/12 14/10 17/10 28/3 43/22 43/22 64/5 78/22 84/14 84/17 84/17 85/7 86/24 87/14
boy [1] 48/23
Brady [5] 9/1 9/9 9/19 12/9 13/21
brain [1] 37/1
break [4] 20/22 20/22 28/20 61/20
briefly [3] 39/8 56/13 59/5
bring [3] 34/18 53/21 53/22
bringing [1] 58/2 77/25
brother [5] 37/6 38/15 38/22 40/2 40/7
brought [3] 4/13 9/1 65/16
burden [4] 4/18 4/19 28/11 77/6
bus [2] 19/10 26/10

# C

caliber [1] 8/18
call [5] 31/12 34/8 40/1 41/21 56/9
called [6] 18/12 24/10 41/3 54/21 55/22 60/12
calling [2] 31/18 55/1
came [12] 1/14 20/20 28/7 38/10 42/23 49/11 51/17 56/8 72/10 72/14 72/25 73/17
can [27] 6/10 6/13 10/18 12/5 15/8 16/11 18/11 18/21 21/13 25/16 28/4 29/3 34/18 47/25 57/24 58/9 63/25 66/7 72/3 73/11 74/2 78/1 78/19 82/21 83/2 84/17 86/12
can't [5] 15/7 28/12 45/6 54/7 75/3
capital [22] 2/16 3/10 3/14 5/15 6/16 7/19 14/3 18/12 18/14 35/5 35/5 35/16 40/24 62/24 81/20 81/24 81/24 82/3 82/6 82/21 82/25

**C**

capital... [1]  88/22
capriciously [1]  69/18
card [1]  3/20
care [4]  44/18 44/21 44/22 80/13
cared [1]  44/19
carefully [1]  74/11
case [58]  5/3 10/17 10/19 11/13
  13/24 15/17 15/21 15/22 16/2 16/2
  16/7 16/16 16/19 17/2 21/5 21/25
  24/24 25/2 25/4 25/10 26/16 27/23
  28/4 28/11 29/7 29/9 30/5 30/22
  32/6 35/4 35/24 37/3 38/23 42/22
  46/22 47/1 48/9 50/1 53/11 57/19
  58/13 58/24 59/9 59/15 59/16
  59/18 62/3 62/8 63/6 63/9 63/16
  65/21 69/25 71/23 72/13 76/24
  82/21 82/25
caseload [1]  88/4
cases [13]  5/15 6/13 6/21 16/5
  16/5 43/23 62/24 70/24 81/24
  87/21 87/23 87/25 88/5
caseworker [1]  51/6
cause [4]  1/2 1/15 3/7 90/10
  60/20 76/15
CCA [6]  30/20 30/25 43/8 44/11
CCA's [1]  43/8
Celeste [3]  41/21 44/1 44/3
cell [3]  66/5 66/11 67/8
certain [1]  81/4
certainly [3]  5/24 52/2 83/11
certificates [1]  83/20
certify [2]  90/5 90/13
Chabot [1]  9/3
chain [1]  61/4
chair [2]  27/10 72/8
chairs [1]  34/19
challenge [5]  5/1 6/22 31/2 69/16
  70/12
chambers [1]  90/11
chance [1]  39/23
change [2]  10/24 55/2
changed [2]  28/13 56/9
changeover [1]  59/17
character [2]  29/18 51/2
characterization [1]  42/3
characterize [2]  35/16 41/17
charge [4]  7/19 19/25 35/23 64/11
charged [6]  35/4 35/5 35/13 35/17
  40/25 74/24
charges [5]  65/15 65/16 65/20
  65/22 65/24
Chavez [1]  9/3
check [1]  66/7
child [2]  37/1 48/20
childhood [2]  50/21 51/8
children [1]  62/8
circumstances [4]  12/6 19/15
  21/23 63/11
cite [2]  44/23 57/24
cited [1]  45/16
claim [47]  8/25 9/3 9/9 9/9 9/19
  12/8 12/9 17/18 19/8 19/8 22/5
  30/2 32/13 32/13 32/21 32/23 43/3
  46/10 48/4 48/14 48/16 49/6 57/17
  57/17 58/18 58/19 59/2 62/15 62/1
  62/22 63/3 65/9 65/10 65/11 65/23
  68/1 68/6 68/10 68/14 69/17 69/21
  75/2 75/3 75/7 77/20 77/21 77/25
claiming [1]  6/9
claims [46]  4/3 4/4 4/15 4/23 5/6
  5/7 6/4 6/7 7/11 7/14 17/14 19/7
  28/24 29/25 34/11 45/17 50/5
  52/19 57/9 60/18 60/21 61/10 62/7
  67/17 67/18 67/19 67/24 69/25
  72/2 73/1 73/5 73/5 73/17 73/20
  75/18 75/19 75/20 75/21 77/1 77/4
  78/5 79/21 79/21 82/22 82/23 83/1
clarification [1]  64/18
clarified [1]  44/2
clarify [4]  44/6 44/25 83/18
  85/10
clause [1]  68/4
clauses [1]  68/8
CLE [2]  81/23 81/23
clear [7]  19/20 20/7 27/11 29/8
  33/16 45/3 62/25
cleared [1]  65/19 65/23 66/19
clerk's [2]  83/17 83/21
clerks [1]  84/20
client [3]  3/3 29/7 61/19
clients [1]  6/6
clock [1]  76/15

closer [1]  73/1
closing [4]  49/1 56/14 56/22
  69/6
Colorado [1]  63/21
come [17]  19/25 19/25 31/3 31/18
  40/18 42/21 45/23 49/14 49/17
  51/22 53/24 53/25 72/23 79/17
  83/13 86/15 86/19
coming [11]  16/3 20/9 26/3 31/20
  31/21 34/7 38/8 52/10 70/25 71/2
  71/5
comment [1]  27/24 28/1 51/9
comments [7]  28/6 28/8 55/11
  55/13 55/14 55/14 55/24
common [1]  6/2
compare [1]  66/22
comparing [1]  9/17
complainant [1]  41/2
complainant's [1]  41/4
computerized [1]  1/18
concern [1]  72/10
conduct [6]  28/13 31/15 31/21
  32/19 48/5 64/8
confessed [2]  7/23 8/4
confused [1]  25/7
Congress [1]  2/16
conjunction [1]  64/2
consciousness [1]  15/3
consider [6]  58/22 62/7 63/9
  63/25 64/11 64/20
considered [2]  57/19 63/18
considering [3]  30/20 56/6 58/21
consistent [1]  14/22 70/20
constitute [1]  13/3
constituted [1]  12/24
constitutes [1]  64/14
constitution [1]  68/9
constitutional [2]  58/18 68/11
contact [3]  38/6 38/12 38/24
contained [1]  39/19
contains [1]  90/6
contemplated [1]  76/21
contemplates [1]  72/20
contemporaneous [1]  39/19
content [2]  14/2 27/23
context [5]  52/6 67/8 77/17 78/4
  80/23
continuance [1]  60/8
continue [14]  3/24 5/18 5/21 6/18
  6/18 18/4 22/3 29/22 43/17 49/19
  56/12 58/16 60/22 67/15
continuing [1]  38/10
contraband [6]  66/8 66/9 66/10
  66/11 66/12 67/8
contradicted [1]  80/7
contradictory [1]  12/14
contrary [1]  5/1
control [1]  40/10
controverted [2]  75/1 76/25 81/7
conversation [2]  15/6 71/15
conviction [13]  3/12 7/24 9/10
  11/4 11/7 13/2 16/4 16/8 16/13
  17/4 18/17 47/9 71/25
convince [2]  76/22 81/6
copies [1]  13/17
copy [4]  14/5 46/3 75/12 75/12
corpus [1]  7/2
correct [13]  6/10 13/15 19/12
  20/19 22/20 35/25 36/1 36/18
  55/23 59/23 62/21 85/2 90/6
corrected [1]  80/17
corrections [2]  65/13 65/17
correctly [2]  43/25 90/14
could [29]  9/21 9/24 13/25 31/12
  31/13 31/24 32/20 36/15 40/15
  40/18 41/7 42/4 42/5 44/3 48/7
  48/22 48/23 53/6 53/6 61/16 63/8
  68/13 69/23 72/24 73/7 74/5 78/25
  79/2 80/24
couldn't [2]  40/10 53/23
counsel [59]  5/5 5/7 6/5 6/9 9/18
  12/11 12/17 12/25 13/1 13/6 13/25
  14/5 16/14 18/15 19/17 28/25 29/8
  29/16 29/17 31/17 32/12 32/5 32/18
  32/22 33/18 36/10 36/22 38/14
  40/12 40/22 41/8 42/10 43/4 43/5
  44/14 45/14 45/24 48/5 48/16
  48/17 55/4 57/8 57/17 62/2 63/6
  64/21 71/8 73/24 73/25 73/21 75/7
  76/3 77/3 77/9 78/5 82/12 83/1
  83/2 90/8
counsel's [4]  9/16 12/12 25/8
  42/2

counsels' [3]  18/16 29/6 50/9
count [1]  37/15
counties [1]  82/2
county [15]  1/5 1/16 2/5 3/20
  5/16 6/16 32/8 51/7 65/14 82/1
  82/8 82/11 90/1 90/4 90/21
couple [4]  20/20 45/21 53/2 84/3
course [10]  7/25 12/15 13/7 26/6
  29/12 46/12 48/18 48/23 62/15
  81/23
court [99]
Court's [4]  42/3 43/19 77/24
  80/21
courthouse [1]  81/22
courtroom [2]  22/25 40/9
Courts [1]  82/23
cover [1]  43/14
credibility [4]  41/14 52/12 73/11
  78/1
credible [4]  10/22 13/23 39/3
  40/2
crime [3]  30/19 82/3 82/6
crimes [1]  36/7
criminal [8]  22/15 22/18 23/1
  23/7 40/3 44/19 59/22 86/9
Crips [1]  36/4
criticize [1]  56/14
cross [12]  6/3 9/22 14/19 48/24
  50/14 51/11 51/21 52/6 54/2 54/3
  66/12 78/3
cross-examination [5]  14/19 48/24
  52/6 54/3 66/12
cross-examine [3]  6/3 9/22 78/3
cross-examined [2]  50/14 51/11
cross-examining [1]  51/21
cruel [1]  68/7
CSR [3]  1/22 90/19 90/19
currently [1]  87/25
curtain [1]  6/25
curtain [2]  28/21 28/21
custody [1]  67/11
cut [1]  54/23

**D**

DA's [2]  14/13 14/16
date [2]  33/11 86/10
day [10]  1/13 19/25 43/10 80/11
  80/12 81/22 83/12 83/13 88/18
  90/16
days [12]  19/24 19/24 66/20 78/6
  84/4 87/8 87/12 87/12 87/17 88/14
  88/25 89/2
deal [3]  7/16 7/18 82/11
death [11]  5/2 10/7 24/18 41/4
  59/15 63/25 66/15 68/6 69/17
  69/21 83/6
deception [1]  66/18
decide [2]  31/2 53/23 76/9 77/5
decided [2]  22/15 22/21
decides [1]  88/17
deciding [1]  75/1
decision [10]  21/22 25/21 26/3
  31/19 46/24 59/14 60/19 71/1
  72/11 85/6
decision-making [3]  21/22 25/21
  26/3
decisions [1]  50/17
declined [1]  31/9
deemed [2]  73/6 73/7 73/19 75/24
defendant [21]  2/18 3/1 3/5 38/8
  38/14 39/20 40/4 40/16 41/10 49/9
  50/5 51/20 53/12 57/20 60/7 71/10
  71/11 71/16 71/17 71/18 71/23
defendant's [18]  37/5 37/6 37/8
  37/13 37/23 38/2 38/6 38/19 38/22
  39/24 40/1 40/24 42/12 50/20
  51/10 53/17 53/24 54/25
defending [1]  6/6
defense [58]  12/16 13/25 14/5
  14/19 15/8 15/10 15/14 16/9 16/20
  31/11 36/9 37/3 37/17 37/19 37/20
  38/1 38/3 38/6 38/10 38/15 38/17
  39/2 39/22 40/12 40/21 41/16 42/2
  42/18 44/14 50/1 50/24 52/5 52/15
  53/11 53/19 53/20 53/21 54/2 54/8
  54/10 54/14 54/16 54/23 58/9
  59/10 60/2 60/13 64/3 66/12 68/2
  70/8 70/21 70/22 71/6 71/12 71/20
  82/10 87/3
defense's [2]  23/2 85/4
deficient [2]  64/8
degree [3]  81/18 81/18 81/19
delay [3]  60/3 60/13 73/15

EXHIBIT A Page 93

01817

**D**

deliberated [1]   20/20
deliberation [2]   19/24 55/25
deliberations [5]   25/1 26/21
  27/24 55/13 64/12
delve [1]   57/2
demeanor [2]   73/12 78/2
denial [1]   59/1
denied [3]   4/21 43/9 58/25
denying [1]   59/24
department [1]   16/14
depth [1]   72/14
described [2]   20/24 49/1
description [2]   19/13 19/14
deserve [1]   74/16
designating [4]   33/15 74/25 75/15
  76/19
desire [1]   60/3
despite [2]   26/15 71/25
detail [2]   70/23 73/20
details [1]   26/24
determination [1]   23/7
determine [1]   16/24
determined [1]   75/20
develop [1]   48/6
developed [1]   62/5
development [13]   28/16 28/19 37/1
  47/17 61/14 72/12 72/17 73/2 73/6
  74/25 76/20 77/10 77/22
Diaz [17]   4/6 7/15 7/25 9/7 9/12
  9/22 10/24 10/25 11/6 11/9 11/16
  12/4 12/10 41/3 41/5 41/20 77/21
Diaz's [6]   11/2 11/4 14/2 14/22
  15/11 41/2
dictate [1]   62/23
did [62]   8/2 8/5 8/9 9/6 9/16
  10/23 13/3 15/18 15/23 20/4 20/14
  20/19 21/2 21/7 21/16 21/21 22/1
  22/25 23/2 23/3 23/5 24/2 26/20
  27/2 27/8 30/13 30/25 31/1 33/6
  37/22 38/6 38/7 38/14 39/2 39/20
  39/24 40/2 40/17 41/13 41/23
  42/21 44/15 45/6 45/21 48/5 48/11
  48/11 49/17 50/2 50/18 56/22
  58/22 62/2 62/4 63/22 69/4 69/10
  74/5 78/13 79/17 86/24 88/8
didn't [23]   8/7 17/13 25/12 28/7
  30/17 30/18 33/23 33/25 34/9
  35/22 44/18 45/2 45/3 51/14 51/16
  52/18 56/15 62/6 63/5 71/13 76/16
  80/5 83/22
difference [2]   16/1 79/15
different [15]   10/7 12/23 16/6
  16/18 16/19 36/7 36/8 36/15 36/23
  37/14 37/16 38/3 50/6 72/20 85/12
differing [2]   9/14 13/7
difficult [1]   6/2
difficulty [1]   27/2
dire [3]   58/25 63/7 64/2
direct [14]   21/10 22/12 22/21
  30/20 30/23 32/5 43/7 44/6 44/6
  54/2 59/19 59/20 60/20 60/23
dired [1]   63/16
disagree [3]   21/11 42/2 61/3
disagreed [1]   30/22
disassociation [1]   51/4
disclosed [3]   13/22 16/16 16/17
disclosure [2]   12/20 13/2
discoverable [1]   52/3
discovered [1]   26/13
discovery [3]   16/12 16/13 40/5
discrete [1]   79/22
discuss [6]   19/6 26/16 27/2 27/5
  27/23 47/16
discussed [5]   4/10 5/4 6/24 71/7
  85/19
discusses [1]   43/22
discussing [2]   12/8 46/6
disingenuous [1]   44/23
dismiss [1]   71/4
dismissed [3]   71/6 71/6 71/9
dispositive [1]   11/14
dispute [2]   37/18 77/16
disputed [2]   75/3 75/5
disputes [3]   45/10 57/1 61/15
dissent [1]   44/15
dissenting [2]   44/10 44/21
district [11]   1/4 1/6 1/22 2/5
  2/5 3/20 14/4 58/5 72/19 90/4
  90/20
division [1]   15/3
do [45]   6/25 7/8 9/7 10/3 10/3
  10/4 10/10 13/12 15/12 17/1 17/1

17/5 19/5 25/4 33/22 33/25 34/1
  34/6 34/6 38/22 45/22 47/8 50/16
  54/2 56/12 57/23 57/23 58/4
  63/3 74/8 74/21 75/9 76/12 76/16
  78/19 79/14 79/22 82/4 82/7 86/5
  86/14 87/5 87/21 90/5
document [7]   11/11 11/12 14/4
  18/15 18/19 66/16 86/1
documentation [1]   51/23
documented [1]   38/3
documents [3]   9/10 9/11 11/14
does [12]   15/9 34/5 38/23 75/13
  75/14 75/16 76/17 76/18 79/23
  82/4 82/8 86/17
doesn't [4]   9/4 29/24 78/8 78/10
don't [6]   1/10/5 27/14 31/5
  43/25 69/5 73/23 74/6 74/25 82/14
  82/14
don't [48]   5/8 5/16 7/8 21/24
  25/11 26/7 27/6 28/17 32/10 32/11
  34/2 34/5 34/11 35/11 35/12 41/7
  41/25 43/10 44/21 46/17 48/25
  51/24 52/23 52/25 55/8 56/3 57/23
  58/4 58/5 61/2 64/15 66/6 72/2
  72/5 75/11 77/22 78/21 80/13
  81/11 82/3 82/9 84/1 84/18 84/23
  84/23 85/25 86/5 87/11
done [4]   7/1 43/4 50/19 70/8
door [8]   31/15 31/22 31/25 31/25
  41/23 42/8 42/11 44/4
double [1]   66/7
double-check [1]   66/7
doubt [1]   49/3
down [14]   34/19 34/20 35/1 44/8
  64/19 70/24 71/2 71/5 80/3 80/15
  80/22 84/7 84/25 85/19
dozens [2]   6/13 6/13
Dr [4]   31/3 31/12 44/3 44/4
Dr. [3]   31/18 43/20 43/24
Dr. Malpass [3]   31/18 43/20 43/24
drop [3]   60/25 61/3 61/10
due [9]   5/2 22/13 22/22 40/3 68/7
  71/5 75/7 79/23 82/12
during [19]   14/12 14/14 15/11
  16/2 16/6 16/11 16/16 22/7 40/5
  40/9 41/9 42/24 49/10 50/24 53/13
  53/14 59/7 59/16 63/7
dynamic [1]   6/20

**E**

e-mail [3]   15/14 84/16 84/20
e-mails [7]   37/14 37/15 38/3
  38/18 39/6 39/20 53/18
each [3]   9/24 10/23 51/18
earlier [1]   72/19
early [2]   13/24 38/19
Eckhoff [2]   2/14 3/10
effect [8]   19/19 20/2 22/25 26/17
  28/18 32/22 51/24 76/14
effective [1]   15/12
effects [3]   48/13 48/21 48/22
effort [1]   31/4
eight [1]   30/7
either [6]   18/18 40/20 41/8 64/16
  78/11 84/2
Eleazar [1]   62/20
elicited [1]   66/13
eligible [1]   66/19
else [2]   83/14 88/9
encouraged [1]   27/9
end [9]   10/2 23/6 43/10 52/19
  54/12 58/18 64/6 70/8 83/16
ended [1]   36/7
endless [1]   28/2
English [1]   54/9
enough [2]   21/14 80/19
enter [1]   33/17
entire [3]   28/15 32/24 62/25
entirely [3]   16/18 16/19 20/18
entirety [5]   52/5 56/21 56/21
  66/2 66/21
entitle [3]   4/3 72/24 77/7
entitled [4]   4/16 30/23 64/21
  74/17
entitles [1]   9/8
enumerate [1]   74/2
episode [1]   62/11
equal [2]   68/4 68/7
equals [2]   66/10 69/7
Erin [2]   2/14 3/9
err [1]   23/2
erred [1]   59/21
error [7]   18/7 19/1 58/3 59/22

errors [7]   7/10 47/9 79/9 79/11
  79/13 80/4 83/7
Escobar [1]   38/9
especially [2]   11/15 23/23
essentially [1]   65/14
establish [2]   43/10 55/24
established [1]   4/3
esteem [1]   8/19
evaluate [1]   78/1
eve [2]   7/17 60/4
even [8]   8/3 11/3 11/5 15/19
  15/21 20/3 23/4 23/5 23/11 23/15
  23/19 28/5 28/11 29/2 30/19 43/5
  59/3 60/22 64/15 65/2 69/5 74/1
  82/20 82/25 83/2
event [8]   15/4 15/4 15/4 19/21
  21/21 21/21 29/15 77/8
events [1]   21/4
every [13]   8/13 51/18 56/7 71/9
  79/8 80/1 80/11 80/12 80/20 80/24
  83/9 83/12 83/13
everybody [1]   12/5
everything [1]   54/15 70/8 84/23
evidence [34]   4/10 4/22 4/25 5/1
  9/20 12/20 24/24 26/2 28/8 29/10
  31/24 35/3 40/23 40/23 47/6 48/19
  50/2 50/3 50/4 50/12 50/18 50/20
  50/23 51/5 51/7 56/23 60/6 63/9
  64/12 64/13 67/9 69/23 76/5 90/7
evidentiary [12]   4/24 6/1 11/15
  33/13 45/12 77/13 77/18 81/4
  85/3 86/9 88/13
Ex [1]   9/3
exact [2]   26/24 50/4
exactly [4]   27/13 45/11 48/25
  65/20
examination [8]   14/19 15/12 22/24
  48/24 52/6 54/3 54/3 66/12
examine [6]   6/3 6/22 9/22 17/20
  78/3 78/5
examined [3]   32/4 50/14 51/11
examining [2]   51/21 67/4
example [6]   15/23 38/5 41/19 46/2
  46/10 77/19
except [1]   55/2
exchange [1]   7/18
exchanged [1]   55/17
exclude [1]   68/3
excluded [2]   70/6 70/7
Excuse [1]   4/7
excused [2]   70/19 70/19
exhibit [2]   15/13 54/23
exhibits [7]   10/21 14/23 37/14
  38/5 53/19 66/23 90/15
exist [1]   75/6
exonerated [1]   65/15
expect [1]   84/24
expected [2]   10/25 55/4
expert [7]   27/3 30/3 31/3 51/11
  51/12 54/10 54/14
expertise [1]   31/7
experts [20]   28/1 28/3 28/3 36/24
  36/25 38/4 48/19 48/20 48/24 49/5
  49/9 50/15 50/15 50/16 50/18
  51/17 51/22 51/24 52/4 52/9
experts' [1]   49/3
Expiration [1]   90/23
explain [4]   31/13 48/21 71/15
  85/16
explained [3]   31/7 51/10 71/8
explaining [1]   19/17
explains [1]   71/13
exploration [1]   78/9
explore [3]   41/3 62/4 62/6 64/21
exposed [1]   4/11
expressed [1]   60/3
extensive [3]   35/3 37/2 50/3
extent [3]   6/23 7/5 9/5
extra [1]   32/19
extraneous [11]   4/12 19/8 26/5
  26/8 31/15 31/20 31/21 35/9 36/15
  41/24 42/12
extraneouses [8]   35/10 41/25 42/8
  49/14 49/16 50/12 50/13 59/10
eye [1]   70/24
eyewitness [5]   30/3 30/6 31/2
  31/4 37/2

**F**

F-A-R-N-A-Z [1]   3/18
Facebook [7]   25/13 25/15 26/12
  26/14 26/18 27/22 28/10

EXHIBIT A Page 94

**F**

fact [26]   5/23 9/6 20/5 23/3
28/16 28/18 30/8 31/25 32/23
36/23 45/11 46/22 52/8 53/20
55/16 59/10 67/18 70/1 73/7 73/21
74/12 74/24 75/1 76/25 81/8 82/12
factors [3]   58/10 58/23 59/15
facts [9]   5/24 27/23 39/3 48/6
48/7 72/22 73/16 75/4 77/6
factual [18]   45/10 47/16 57/1
61/14 61/15 72/12 72/17 72/21
73/2 73/6 73/25 74/25 75/4 76/20
77/1 77/10 77/22 78/11
failing [2]   32/18 57/18
fails [2]   27/21 55/24
failure [6]   29/22 29/25 48/17
51/10 52/8 66/17
fair [4]   6/21 18/20 21/14 52/17
fairly [1]   82/13
fall [1]   12/18
false [13]   4/5 9/2 9/5 9/7 10/16
65/11 65/24 66/2 67/1 67/5 67/5
77/3 77/21
familiar [1]   63/23
family [13]   19/23 35/12 37/5 38/7
38/7 38/9 38/11 38/19 39/18 39/20
50/21 51/6 53/17
far [2]   24/3 33/2
Farnaz [4]   2/2 3/17 17/6 47/14
fashioned [1]   48/15
favorable [1]   71/5
federal [2]   61/6 79/9
feel [16]   27/6 40/2 72/22 74/16
78/3 87/11
feeling [2]   27/2 50/19
felt [2]   19/25 56/19
Fifth [1]   49/7
file [17]   9/17 12/12 12/17 13/25
14/8 14/13 14/24 16/1 16/4 29/6
29/10 65/21 74/11 75/12 79/2 81/3
83/17
filed [16]   4/1 22/9 22/9 43/3
60/4 60/9 60/13 60/19 74/12 74/14
75/17 76/7 78/6 78/8 81/1 83/19
files [2]   14/16 18/16
filing [1]   88/24
final [1]   61/25
finally [1]   38/20
find [4]   9/16 18/16 18/22 64/23
finding [5]   5/24 45/11 46/22
67/18 70/1
findings [2]   72/21 87/12
finds [1]   75/17
fine [9]   18/22 34/18 53/8 78/13
79/4 79/5 86/23 86/24 88/8
first [16]   7/7 8/25 10/10 11/19
11/20 11/21 13/20 23/14 24/5
25/17 65/1 69/19 78/23 81/3 81/18
82/1
five [7]   21/3 28/24 35/21 35/22
62/15 78/6 80/16
flashed [1]   41/9
focuses [1]   63/24
follow [2]   33/25 69/14
follow-up [1]   33/25
following [2]   1/13 29/19
foot [1]   53/22
foregoing [1]   90/6
Forensic [4]   2/16 3/10 3/14 88/22
forgive [3]   23/20 26/23 88/19
form [5]   5/23 74/6 74/15 74/19
84/19
former [1]   6/5
forth [1]   80/24
forward [2]   58/14 67/20
found [12]   9/11 17/15 24/3 40/5
40/14 43/8 44/8 44/12 54/25 66/4
67/8 75/5
four [6]   35/15 35/19 35/20 50/15
58/9 80/16
Fourteenth [2]   58/20 68/4
frame [1]   86/6
Franklin [3]   1/23 2/6 90/21
free [1]   27/6
fresh [1]   57/10 76/23
Friday [1]   89/4
friends [2]   27/9 51/6
front [2]   33/10 42/1
fry [1]   27/10
full [1]   19/24 78/9
funny [1]   48/15
further [22]   17/20 28/16 29/19
29/22 29/25 45/5 45/13 46/22

47/16 61/4 61/14 70/1 71/14 72/1
72/12 73/2 73/6 73/20 77/22 81/6
84/7 90/13
future [1]   61/11

**G**

gang [6]   36/4 40/4 41/9 41/9
46/11 51/4
gangs [1]   36/25
gauge [1]   64/22
gave [6]   7/20 9/13 9/13 36/9
38/20 64/9
general [2]   16/14 63/19
generally [1]   16/15
germane [2]   56/11 57/5
get [14]   12/4 31/4 38/18 46/24
54/19 55/5 58/12 60/1 61/7 78/19
82/24 84/15 85/8 89/3
getting [3]   55/3 55/4 59/3
giant [1]   15/7
Giglio [1]   9/1
girlfriend [6]   37/6 37/8 38/9
38/19 39/24 54/25
give [15]   9/24 27/10 38/11 42/5
42/9 47/24 51/22 56/10 63/18
63/24 65/8 72/1 78/10 84/13 84/20
given [8]   6/20 8/12 14/5 38/24
39/23 69/15 72/23 81/10
gives [1]   9/24
giving [7]   10/8 30/12 32/16 57/7
64/23 65/2 65/3
globally [1]   63/17
go [33]   3/6 4/8 7/6 7/9 7/12 7/25
8/23 10/6 18/1 19/3 19/5 25/17
27/7 27/19 28/22 29/3 33/11 47/8
50/23 54/5 56/3 57/3 57/5 57/7
68/20 72/1 72/18 73/20 80/12
80/19 83/5 86/3 88/6
God [2]   39/12 39/14
God-nich [1]   39/12
Godinich [19]   5/11 14/10 14/11
15/14 17/6 32/25 33/19 39/6 39/9
39/13 39/15 41/5 45/16 46/3 47/1
60/1 76/11 81/15 83/19
Godinich's [3]   53/18 54/22 63/20
goes [3]   43/11 64/7 70/23
going [31]   10/2 11/3 11/5 21/9
26/2 26/2 33/17 33/22 34/6 36/4
37/3 48/2 50/12 53/22 55/6 57/3
58/14 59/16 60/17 61/9 65/7 67/20
76/9 78/21 79/7 84/9 84/16 86/2
86/3 86/4 87/10
gold [1]   15/7
gone [3]   11/22 72/14 80/23
good [8]   3/21 3/22 3/22 23/21
77/12 81/16 86/25 88/16
got [2]   29/19 45/18
gotcha [1]   61/8
Graham [2]   13/23 59/8
grant [2]   84/6 84/24
greater [1]   67/8
greatly [1]   17/23
ground [2]   42/20 71/18
grounds [3]   10/14 71/19 76/8
growing [2]   48/12 48/21
guaranteeing [1]   84/22
guard [1]   51/7
guess [8]   11/3 22/8 27/18 42/18
55/14 70/9 79/1 80/24
guidelines [3]   16/15 62/23 63/4
guilt [10]   26/21 29/1 29/6 29/25
32/12 34/11 40/15 41/10 41/22
83/6
guilt/innocence [2]   41/10 41/22
guilty [1]   20/1
Guiney [2]   20/23 33/10 33/17
75/14

**H**

habeas [5]   4/1 4/3 4/16 11/7 76/5
had [57]   5/11 5/17 6/12 6/24 7/22
8/8 9/19 10/6 12/10 12/20 12/25
13/2 13/6 15/16 16/25 17/7 17/10
18/13 18/17 19/19 20/2 20/12
20/12 20/15 28/18 28/18 30/13
30/14 30/15 31/5 33/18 33/21
34/14 36/21 38/1 38/13 38/17 46/5
48/13 51/18 52/2 52/10 57/24 59/1
60/2 61/25 65/14 65/15 65/17
65/19 71/7 72/11 73/6 73/7 73/19
76/22 80/8
hadn't [1]   74/1
hand [2]   72/6 90/16

handle [3]   16/5 16/7 16/12
handled [1]   13/24
handling [3]   17/2 59/18 87/22
hands [1]   23/17
handwritten [2]   9/11 15/5
happen [1]   80/8
happened [8]   9/14 19/18 20/12
23/16 24/20 31/15 45/14 45/15
happening [1]   36/14
happens [2]   56/7 83/12
happy [2]   7/6 65/5
hard [1]   88/7
harm [3]   27/21 43/10 64/9
HARRIS [10]   1/5 1/16 2/5 3/20
51/7 65/13 82/4 90/1 90/4 90/21
has [25]   4/18 4/20 8/4 8/12 12/13
14/25 16/16 17/6 20/23 22/20 23/1
23/7 30/20 37/13 38/5 55/16 58/12
74/12 75/3 75/20 80/23 86/15
86/19 87/23 87/24
hasn't [1]   88/4
have [129]
haven't [4]   16/8 18/17 28/18 86/4
having [7]   19/23 39/22 51/20
51/23 52/13 78/6 82/22
he [94]
he's [9]   12/7 15/19 28/5 32/10
35/13 46/6 62/11 70/16 81/16
head [2]   61/23 66/10
heads [2]   51/18 87/20
health [1]   36/25
hear [3]   12/5 69/8 73/21
heard [5]   8/15 55/20 55/25 56/8
81/11
hearing [35]   1/10 4/24 6/1 11/15
15/15 15/17 20/15 20/15 20/23
31/6 33/14 34/8 44/1 45/12 47/20
49/4 49/8 57/2 59/9 73/17 74/12
77/13 77/18 79/19 79/23 79/23
79/25 80/21 81/3 81/4 84/7 84/24
85/21 88/13 89/13
hearings [2]   12/23 87/15
hearsay [14]   11/10 11/12 11/14
12/2 39/4 40/16 46/12 46/14 46/18
46/19 47/4 47/4 77/20 77/23
heightened [1]   82/24
held [2]   1/14 1/16
help [1]   9/23
helpful [1]   51/25
her [8]   30/8 30/9 30/12 34/1
43/23 49/22 56/9 75/9
here [42]   5/24 8/19 12/5 12/7
14/16 18/13 26/9 33/10 33/12
35/12 37/9 37/24 40/7 44/20 45/24
46/25 47/14 47/25 51/22 54/8 56/8
57/12 57/25 65/13 70/13 72/10
72/15 72/25 74/6 77/11 78/7 78/20
79/17 79/24 80/9 80/11 80/15
80/16 81/15 81/19 81/19 83/14
hereby [1]   90/5
Hernandez [3]   62/11 62/18 62/20
hey [1]   21/7
high [2]   6/17 8/19
highest [2]   8/18 82/7
highlighted [1]   49/8
highlighting [1]   49/8
him [32]   4/3 7/23 8/4 8/6 8/8
8/19 8/20 10/25 12/5 27/10 27/11
28/7 30/15 30/15 30/23 32/10
33/24 35/17 35/23 40/5 43/9 47/2
48/12 48/13 51/14 55/20 56/8
56/10 56/19 62/12 65/16 67/9
himself [9]   11/9 11/16 38/14
40/10 40/17 46/25 49/5 49/9 57/20
hindered [2]   15/10 60/12
hired [1]   36/22
his [72]   3/11 7/18 7/18 7/23 7/25
8/2 8/6 10/24 12/6 14/12 14/15
14/14 14/19 22/12 22/13 22/21
22/21 26/18 26/19 27/11 27/8 27/9
27/11 27/24 29/9 29/25 31/7 32/22
35/12 37/6 37/6 38/5 40/3 40/3
40/4 40/7 41/6 41/13 46/7 46/12
49/10 50/21 51/2 51/2 51/3 51/6
51/7 51/8 55/15 56/14 56/21 56/21
60/5 60/6 60/10 60/14 62/16 65/18
66/24 66/25 67/8 67/11 71/11
71/12 71/13 71/15 71/15
history [4]   40/3 48/8 50/21 67/11
hit [2]   47/18 47/20
hoc [1]   74/7
hold [3]   8/19 15/7 56/18

EXHIBIT A Page 95

**H**

Honor [37]   3/3 3/9 3/21 3/25 10/1
17/9 17/13 19/3 19/12 21/10 27/13
28/15 28/23 33/9 34/2 34/21 37/11
37/25 46/16 46/23 47/23 48/4
49/15 56/25 57/6 58/17 60/17 61/2
61/18 61/24 62/14 62/22 67/16
72/5 72/9 87/7 89/11
Honorable [1]   1/15
hope [1]   84/12
hoped [1]   76/22
hoping [1]   85/18
host [2]   36/10 36/22
hotel [1]   26/8
hour [1]   48/1
hours [5]   14/15 19/25 20/20 73/18
78/8
hours' [1]   73/24
Houston [5]   1/16 1/23 2/6 23/15
90/22
how [15]   10/2 15/23 19/17 21/25
25/20 27/7 27/19 38/13 49/1 60/20
62/6 84/18 86/25 87/21 88/13
however [7]   12/18 19/5 23/11
42/20 43/2 64/20 66/12
huh [1]   23/18
hurrying [2]   32/16 57/15
Hutchins [9]   2/3 3/17 17/3 18/9
26/4 28/17 44/2 45/9 46/9
hypothetical [5]   20/3 21/22 22/1
25/9 25/23

**I**

I'd [2]   24/6 73/13
I'll [8]   5/10 19/2 19/7 21/18
28/24 47/24 79/5 84/13
I'm [53]   3/10 5/17 7/6 8/20 8/22
14/25 17/22 18/1 18/22 21/15 25/7
26/9 27/12 29/2 31/20 32/13 32/15
32/16 34/4 34/6 34/7 34/7 42/23
43/15 44/24 44/24 55/19 56/6 57/3
57/4 57/6 57/14 60/17 64/25 65/1
65/2 65/2 65/5 65/6 65/7 65/8
66/5 66/9 80/9 80/19 84/2 84/22
86/4 86/25 87/25 88/3 88/16 88/25
I've [10]   7/7 10/6 21/18 37/15
79/10 80/17 81/10 81/11 81/14
81/15
IAC [4]   32/13 32/21 34/11 61/25
idea [1]   21/24 25/22 56/9
identification [11]   30/3 30/8
30/10 30/18 30/21 31/2 31/8 31/10
31/14 37/2 44/9
identifications [1]   44/13
identified [1]   39/1
identifies [1]   39/22
identify [1]   7/2
illness [1]   50/21
immediate [1]   30/10
immediately [2]   7/22 55/4
impartial [2]   22/13 22/22
impeachment [3]   4/5 4/10 9/20
impermissibly [4]   44/9 44/13
44/16 45/2
important [10]   4/17 12/4 15/5
15/25 20/1 29/20 38/13 48/8 48/14
56/19
importantly [2]   27/3 77/2
impression [2]   66/3 67/1
impressions [1]   25/21
improper [2]   63/11 64/18
improperly [1]   63/7
in-court [1]   44/8
inadequate [1]   77/11
inadmissible [2]   25/6 77/17
inadvertent [1]   13/3
inadvertently [1]   65/10
incident [3]   17/19 19/16 20/8
65/19
incidents [1]   20/24
include [2]   4/4 33/24
included [1]   14/3 32/12 33/21
90/9
including [5]   26/16 37/5 38/9
48/10 63/1
inconsistencies [2]   14/14 15/24
inconsistent [2]   9/21 12/9
incredibly [1]   8/19
inculpatory [1]   14/21
indeed [3]   82/18 82/18 83/4
indicated [4]   18/13 29/6 33/21
65/19
indication [1]   28/6

ineffective [21]   5/7 6/9 19/6
28/25 32/18 43/3 43/4 48/16 57/8
57/17 63/6 72/13 73/4 73/21 75/6
77/3 77/9 78/5 82/11 82/16 83/1
influence [6]   4/12 4/13 19/9
20/16 22/2 26/5
influenced [1]   28/9
influences [3]   25/2 25/4 31/20
inform [1]   27/14
informal [1]   20/23
information [26]   10/8 12/10 13/21
14/21 15/18 16/13 18/13 36/10
38/12 38/12 38/15 38/18 38/20
38/24 39/3 39/3 39/18 39/19 39/21
40/11 40/18 41/22 45/18 46/5 52/9
73/15
informed [1]   20/8
initial [4]   4/1 7/6 60/19 73/23
inmate [1]   66/15
inner [1]   71/15
innocence [5]   26/21 29/9 40/24
41/10 41/22
innuendo [1]   40/16
insight [1]   60/1
insinuated [1]   49/2
instructing [2]   68/12 68/18
instruction [3]   69/1 69/16 69/23
instructions [2]   64/10 69/14
insulted [1]   56/15
intend [1]   79/14
interest [2]   6/6 42/13
interesting [2]   30/9 32/2
interestingly [2]   41/5 56/2
interlineate [1]   5/11
internal [1]   65/16
interpreted [1]   19/16
interviewed [4]   39/2 39/21 39/23
51/14
interviews [1]   51/15
intimidation [1]   19/16
introduce [1]   3/7
investigate [4]   29/25 51/3 60/6
86/1
investigated [4]   42/19 43/6 50/20
51/1
investigation [18]   7/24 20/6
26/13 29/7 29/10 29/12 29/13
29/19 29/21 29/23 32/19 36/4 36/6
37/21 40/13 41/18 48/6 50/17
investigator [2]   8/11 11/8
investigators [4]   36/23 36/23
36/24 40/21
involved [2]   32/23 66/14
involvement [2]   7/24 8/1
is [152]
Isbell [4]   8/12 8/18 10/22 10/25
isn't [2]   21/19
Israel [7]   7/15 9/12 14/2 15/11
41/1 41/20 77/21
issue [28]   5/24 19/18 23/8 23/9
24/25 25/13 25/14 26/5 42/17
43/10 43/10 43/19 45/24 49/11
51/9 59/19 60/10 63/24 67/13
69/20 71/8 75/4 75/16 76/19 76/21
80/1 80/24 85/7
issue's [1]   23/9
issued [1]   76/11
issues [37]   22/11 25/20 32/20
33/16 52/16 52/23 52/24 53/2 54/4
54/6 54/18 55/10 62/4 64/3 64/4
64/5 64/13 64/23 72/13 72/16
74/25 75/1 75/5 75/24 76/13 76/24
76/25 77/1 78/9 79/7 79/22 79/24
81/3 81/4 81/7 82/11 85/19
it [160]
it's [45]   6/2 6/21 9/2 11/8 11/10
11/12 12/4 15/5 15/5 15/25 17/23
19/3 23/25 25/23 27/17 31/22 32/1
43/13 44/20 44/22 45/7 47/7 47/25
48/15 52/7 52/8 58/14 58/19 58/23
60/8 60/20 60/23 67/5 68/1 68/25
69/15 70/23 73/9 75/15 75/16
76/10 76/19 82/25 84/2 84/3
its [4]   13/24 22/10 59/23 66/2

**J**

jail [2]   51/7 59/13
Jerome [3]   5/11 14/9 14/11
job [4]   78/13 82/4 86/24 88/8
Joe [1]   44/17
joke [1]   39/16
Joshua [2]   2/3 3/19
JUAN [2]   1/6 3/11

judge [50]   1/16 10/12 10/13 11/19
13/20 18/1 20/14 20/23 22/7 22/20
24/7 24/15 24/19 24/21 24/23
27/20 28/21 32/9 33/10 33/17
34/15 34/24 34/24 35/2 35/21 36/1
36/2 36/17 42/16 43/16 44/5 44/12
44/20 49/24 49/25 56/13 58/5 58/7
59/5 59/7 63/5 66/1 71/10 75/11
75/14 83/16 85/2 87/8 88/16 89/1
judges [1]   59/17
JUDICIAL [1]   1/6
jump [1]   19/7
juror [24]   21/9 21/12 21/16 21/22
28/21 32/20 42/19 43/6 43/9 56/2
64/19 68/13 70/6 70/7 71/2 71/9
77/4 80/13
juror's [2]   19/13 70/25
jurors [38]   4/11 19/16 19/20
19/20 20/2 20/3 20/3 20/16 21/1
21/2 21/3 21/20 22/24 22/25 23/4
23/5 25/1 26/14 27/4 27/14 28/9
41/11 41/12 46/11 47/2 55/20 56/1
56/15 56/17 56/20 62/6 63/8 63/10
63/18 63/24 69/14 70/15 71/4
jurors' [2]   25/20 26/2
jury [45]   19/9 20/25 22/1 22/13
22/16 22/22 25/9 25/9 26/14 26/18
26/19 29/2 31/16 31/12 31/19 49/2
49/3 49/8 49/12 52/12 52/14 55/12
55/25 59/3 62/1 62/3 62/22 63/1
63/2 63/12 63/21 64/10 64/18 66/3
67/2 68/3 68/12 68/18 69/25 69/6
69/13 69/22 69/23 80/6 80/10
jury's [1]   69/19
just [73]   5/9 5/10 5/17 6/11 6/20
8/22 8/25 10/3 11/24 13/10 15/8
16/22 17/4 17/22 18/8 18/9 18/13
19/14 21/19 25/19 26/9 28/2 34/4
34/6 34/25 36/12 36/20 37/7 39/8
41/19 43/14 43/18 44/5 44/24 45/9
45/9 46/22 47/7 50/1 50/5 53/1
53/6 56/7 56/13 56/25 57/4 58/15
59/17 60/16 60/18 60/20 62/14
63/2 64/17 67/20 67/22 68/25 72/3
72/9 74/4 78/8 80/3 81/10 83/16
83/18 83/22 84/8 85/7 85/10 87/18
88/5 88/7 88/10
justify [1]   52/13
juvenile [2]   51/6 67/11

**K**

Karen [1]   41/20
Katherine [2]   2/15 3/13
keep [3]   19/2 79/5 79/6
keeping [1]   79/8
keeps [1]   59/12
kegans [1]   44/18
kept [1]   38/15
kind [4]   39/16 45/23 49/7 85/11
kitchen [1]   84/24
knew [7]   28/10 29/23 30/14 30/16
40/14 62/4 71/17
know [62]   4/18 5/11 5/16 5/18
5/18 6/3 6/12 6/12 9/4 9/6 10/7
11/10 11/18 17/13 21/8 24/2 25/11
27/11 28/17 29/11 29/21 30/7
30/13 30/15 30/17 31/9 32/10
32/11 33/2 34/11 35/11 35/12
35/23 36/13 36/20 43/8 43/13
44/24 47/1 48/12 48/25 52/2 52/23
52/25 56/12 62/23 69/10 69/14
74/21 78/21 79/8 80/16 81/13
81/16 82/3 82/4 82/7 82/20 84/18
85/17 86/5 87/11
knowing [1]   9/2
knowingly [1]   10/17
known [1]   41/18
knows [1]   55/19

**L**

La [1]   36/4
labor [1]   87/10
lack [1]   64/8
lacking [1]   50/5
laid [1]   58/23
larger [1]   36/3
last [4]   31/1 45/18 73/18 83/20
law [12]   10/20 11/13 24/24 25/2
60/6 63/6 63/9 63/16 67/13 71/23
75/22 75/25
lawyer [1]   81/16
lawyers [2]   5/14 5/16

**L**

leading [2]   9/13 30/16
leads [1]   38/11
leaning [1]   27/25
learned [5]   15/16 15/17 15/20
  40/12 41/17
least [7]   18/18 35/15 37/15 46/2
  47/15 50/22 87/8
leave [1]   40/9
led [1]   28/13
left [2]   66/2 67/2
legal [2]   67/17 69/24
lengthy [1]   74/16
let [5]   5/9 36/12 44/17 47/14
  57/3
let's [9]   3/6 10/10 34/9 44/23
  56/10 57/5 61/20 79/5 79/6
letter [1]   66/24
letting [1]   65/1
level [3]   6/16 6/17 82/15
life [4]   59/12 63/24 68/13 69/7
light [3]   29/23 50/19 73/17
like [27]   5/3 6/15 10/1 10/9
  13/18 26/21 34/20 36/13 42/1 45/9
  47/16 49/22 53/7 56/15 57/2 60/21
  65/5 65/16 72/6 73/13 74/7 74/13
  77/24 81/2 83/14 87/3 87/11
likes [1]   39/11
limit [1]   65/7
limitations [1]   23/15
limiting [1]   43/15
line [3]   70/25 71/3 71/5
lines [2]   27/10 28/2
lineup [3]   31/8 44/8 45/1
list [4]   81/18 81/19 81/19 81/21
listening [1]   15/6
lists [2]   46/5 75/18
little [7]   25/7 29/6 29/10 48/15
  63/22 76/18 84/11
live [5]   54/5 73/10 77/12 79/19
  88/6
locate [1]   29/13
location [1]   26/8
lock [1]   63/10
log [1]   14/15
long [5]   15/3 23/12 43/13 73/15
  73/15
look [26]   15/1 24/6 43/20 59/25
  64/1 64/14 67/7 73/1 74/10 75/14
  76/23 85/1
looked [2]   52/5 56/20
looking [3]   66/21 70/25 82/22
lot [2]   43/14 73/15
LTC [1]   41/9
lunch [2]   20/22 20/22

**M**

ma'am [3]   28/14 55/9 56/24
machine [1]   1/19
made [34]   12/16 12/20 16/25 17/14
  20/12 23/7 24/1 26/17 31/4 31/11
  32/4 32/21 33/20 39/9 45/14 48/14
  48/24 50/17 52/2 55/12 56/16
  57/20 60/20 62/22 63/2 67/2 69/25
  68/15 69/3 69/25 72/11 72/19
  74/15 80/1 86/4
mail [4]   15/14 84/5 84/16 84/20
mailed [1]   83/21
mails [7]   37/14 37/15 38/3 38/18
  39/6 39/20 53/18
maintain [1]   81/23
maintained [1]   29/8
majority [7]   30/25 39/1 44/7
  44/22 45/1 45/2 70/17
make [29]   5/10 7/6 18/8 18/18
  19/20 21/18 27/6 27/24 29/8 30/18
  45/3 46/23 49/6 51/16 51/25 52/17
  53/6 59/14 62/24 71/1 73/13 82/21
  82/24 83/2 85/6 86/13 86/14 86/17
  87/3
makes [1]   46/22
making [7]   4/20 7/16 21/22 25/21
  26/3 27/11 72/21
malarkey [1]   57/5
Malpass [9]   31/3 31/7 31/12 31/18
  42/4 43/20 43/24 44/3 44/4
managed [1]   54/1
managers [1]   15/24
manner [3]   75/24 76/9 77/16
many [6]   9/12 45/15 77/13 77/14
  87/17 87/21
material [2]   67/6 67/12
materiality [1]   67/4

**may [27]**   3/24 5/18 5/21 6/17 6/25
  8/23 13/25 16/18 16/23 21/1 22/2
  30/3 34/15 34/16 34/23 36/18
  44/25 49/19 53/4 56/12 58/15
  60/25 61/17 66/7 67/15 76/24
  78/19
maybe [2]   35/22 87/12
me [28]   4/7 5/9 10/2 10/3 23/20
  26/23 36/12 42/1 44/17 53/2 57/5
  75/12 79/11 81/14 84/6 84/8 84/22
  84/13 84/18 84/24 84/24 85/16
  86/1 86/2 88/13 88/19 88/19 90/12
mean [11]   20/13 21/13 33/7 47/3
  58/2 58/4 58/15 70/4 82/8 84/10
  85/17
means [1]   21/25
Meanwhile [1]   53/24
media [1]   26/16
meet [1]   64/15
meeting [2]   41/3 51/18
meetings [4]   9/12 10/23 37/5 37/7
  53/17
memorandum [1]   78/21
memorialized [1]   15/20
memory [1]   57/10
mental [4]   25/1 25/21 36/25 50/21
mention [3]   12/5 28/24 45/21
mentioned [4]   21/18 25/19 44/2
  46/10
merit [1]   72/2
messages [1]   26/13
method [2]   63/21 63/22
Mexico [11]   38/7 38/8 50/16 53/11
  53/17 54/6 54/10 54/14 54/24 55/1
  55/3
midst [1]   26/19
might [5]   28/19 47/19 49/14 84/10
  87/18
mind [1]   63/2 72/6
minimum [1]   79/6
minorities [1]   70/17
minority [1]   44/23
minute [1]   31/1
minutes [1]   34/20
misconduct [8]   22/15 22/23 27/17
  42/19 43/6 43/9 77/2 77/4
miss [1]   48/1
missing [1]   60/11
mistaken [1]   66/5
mistakes [4]   82/21 82/24 83/3
  83/5
mistrial [2]   23/3 23/4
miti [1]   48/9
mitigating [4]   63/9 63/11 64/24
  69/24
mitigation [18]   36/24 38/4 50/3
  50/10 50/15 50/16 54/10 54/14
  59/11 62/3 63/17 63/17 63/19 64/1
  64/5 64/14 64/20 64/21
mode [1]   77/10
modified [1]   65/22
mom [1]   37/20
moment [5]   8/14 18/2 57/9 61/16
  61/21
months [1]   23/23
more [21]   5/15 5/17 7/4 15/21
  18/9 20/20 25/23 27/3 35/2 45/19
  56/12 62/13 65/2 65/6 71/4 73/24
  78/17 78/19 87/15 85/20 86/21
morning [3]   3/22 23/16 24/1
most [4]   6/2 21/1 77/1 79/7
motel [5]   19/11 23/14 24/11 24/14
  81/12
mother [6]   37/6 37/23 38/2 38/6
  51/8 53/24
motion [36]   12/19 23/3 32/7 32/13
  32/15 33/20 34/20 42/20 43/6
  57/20 58/21 58/25 59/8 59/21
  60/10 60/14 71/21 74/11 74/13
  74/14 74/14 74/19 74/20 78/8
  78/25 79/1 79/2 81/1 81/4 85/4
  85/13 85/20 85/22 86/7 87/3 88/7
motions [2]   78/21 86/13
motive [1]   44/2
motives [2]   41/2 41/4
move [4]   23/3 34/12 56/11 86/12
moving [1]   85/13
Mr [5]   2/3 4/6 5/11 41/5 68/3
Mr. [106]
Mr. Balderas [22]   3/15 4/16 4/18
  6/22 7/22 7/23 8/3 8/4 9/8 29/14
  30/5 30/10 30/14 30/18 32/3 36/20

  49/5 68/10 71/7 71/7 72/25 77/7
Mr. Balderas' [12]   4/2 5/6 7/17
  8/1 33/3 48/8 48/19 49/6 68/6
  68/10 69/17 69/21
Mr. Benitez [5]   40/25 41/6 41/8
  41/13 46/11
Mr. Diaz [24]   4/6 7/25 9/7 10/24
  10/25 11/6 11/9 11/16 12/4 12/10
  41/3 41/5
Mr. Diaz's [3]   11/2 11/4 14/22
Mr. Godinich [14]   15/14 17/6
  32/25 33/19 39/6 39/9 41/5 45/16
  46/3 47/1 60/1 76/11 81/15 83/19
Mr. Godinich's [3]   53/18 54/22
  63/20
Mr. Hernandez [2]   62/11 62/18
Mr. Isbell [4]   8/12 8/18 10/22
  46/11
Mr. Juan [1]   3/11
Mr. Malpass [2]   31/7 42/4
Mr. Nunnery [13]   14/17 17/6 33/1
  33/19 39/6 40/19 55/15 60/1 60/9
  69/5 71/13 76/12 83/19
Mr. Nunnery's [5]   39/9 45/17
  55/11 63/14 70/23
Mrs. Reiss [1]   18/3
Mr. Shearer [7]   32/18 33/2 33/21
  42/17 42/19 47/2 47/3
Ms [4]   2/2 2/4 2/14 2/15
Ms. [10]   17/3 17/6 18/9 26/4
  28/17 44/2 45/9 46/9 47/14 72/7
Ms. Black [1]   72/7
Ms. Farnaz [2]   17/6 47/14
Ms. Hutchins [7]   17/3 18/9 26/4
  28/17 44/2 45/9 46/9
much [11]   19/19 32/16 33/12 41/15
  47/24 50/1 50/4 57/12 65/8 76/17
  89/10
multiple [3]   26/18 37/5 51/14
Munoz [3]   41/21 44/1 44/3
murder [12]   5/15 6/16 7/19 8/7
  14/3 18/12 18/14 35/5 35/6 35/13
  35/17 35/17
murders [5]   35/7 35/16 35/20
  35/20 67/10
my [15]   3/3 3/9 19/13 38/15 38/16
  53/6 56/9 57/10 63/23 66/10 72/7
  81/10 85/2 88/3 90/16
myself [1]   80/18

**N**

name [4]   3/9 24/9 46/5 88/19
namely [2]   10/22 75/25
names [3]   38/12 38/14 67/24
nature [3]   48/15 59/9 67/17
nearly [1]   57/9
necessary [9]   4/23 4/24 6/23
  33/14 46/23 56/19 70/2 71/14 73/7
need [13]   4/24 25/9 32/16 47/25
  57/12 61/3 62/25 64/13 65/8 72/12
  73/20 82/24 84/7
needed [2]   60/6 61/14
needs [1]   75/4
neither [1]   46/4
never [8]   8/4 8/15 16/10 21/5
  30/13 33/1 60/3 60/7
new [7]   32/7 32/21 42/20 43/7
  50/16 60/6 88/13
next [7]   18/25 19/25 23/16 24/1
  28/22 87/15 87/17
nicely [1]   45/24
nich [1]   39/12
night [9]   7/20 7/21 8/3 9/14
  23/14 24/2 29/15 30/11 45/18
nine [1]   88/1
no [36]   1/2 1/22 2/2 2/3 2/4 2/14
  2/15 15/3 17/19 21/9 23/21 28/4
  28/5 28/8 35/21 42/7 43/9 51/5
  55/16 59/22 59/22 60/11 61/9 64/9
  65/7 67/1 68/20 70/1 70/5 70/6
  70/12 70/14 71/7 71/18 80/9 85/15
No. [4]   3/7 3/21 15/13 71/19
No. I1 [1]   71/19
No. 1412826-A [1]   3/7
No. 24053738 [1]   3/21
No. 56 [1]   15/13
Nobody [1]   83/23
None [1]   27/22
not [146]
note [1]   4/17
noted [3]   10/20 26/4 28/17
notes [25]   5/10 9/11 9/15 12/14
  12/16 12/21 12/24 13/4 14/1 14/2

01621

**N**

notes... **[15]** 14/8 14/11 14/12 14/14 14/18 14/21 14/22 14/24 15/1 15/2 15/6 16/10 17/7 51/15 52/1
nothing **[3]** 16/25 38/22 40/14
notice **[3]** 15/23 36/9 73/24
noticed **[1]** 7/7
notification **[1]** 85/8
now **[29]** 6/8 7/24 11/6 13/5 14/9 15/19 17/23 23/8 24/22 26/10 38/25 39/22 41/16 42/18 43/7 47/19 47/21 49/23 50/5 50/6 52/20 52/25 70/16 71/24 73/8 73/9 76/22 79/16 84/16
number **[4]** 4/2 5/25 37/14 49/16
numbered **[1]** 1/15 90/10
numbers **[1]** 38/12
numerous **[1]** 74/15
Nunnery **[15]** 5/12 14/10 14/17 17/6 33/1 33/19 39/6 41/19 55/15 60/1 60/9 69/5 71/13 76/12 83/19
Nunnery's **[5]** 39/9 45/17 55/11 63/14 70/23

**O**

o'clock **[1]** 48/1
oath **[2]** 12/7 56/18
object **[2]** 48/17 70/10
objected **[2]** 52/19 60/7
objecting **[1]** 52/22
objection **[4]** 52/18 85/4 85/5 87/13
objections **[3]** 7/2 7/5 87/4
obligation **[1]** 83/7
obtain **[1]** 29/13
obviously **[2]** 4/20 45/16
occurred **[8]** 24/17 24/18 25/3 30/16 30/19 65/18 69/11 90/11
OCFW **[2]** 89/8 89/9
ODI **[1]** 33/15
off **[18]** 4/10 5/4 6/24 10/19 13/20 18/2 24/15 39/4 51/17 55/5 63/23 67/12 70/7 70/15 70/19 71/4 72/6 83/17
offense **[1]** 42/12
offenses **[3]** 36/8 36/15 59/13
offer **[2]** 27/6 59/15
offered **[1]** 90/15
office **[26]** 2/5 2/16 3/10 3/14 3/20 14/5 14/13 14/17 16/7 16/9 17/1 38/10 66/14 66/17 66/25 67/1 74/10 83/17 83/21 87/16 87/17 87/23 87/24 88/1 88/21 89/7
officer **[2]** 65/13 65/17
official **[4]** 1/22 90/3 90/16 90/20
often **[2]** 6/5 77/16
oh **[3]** 69/2 69/4 88/12
okay **[32]** 4/6 7/14 8/21 11/17 13/16 22/6 26/25 34/6 34/9 36/20 37/12 45/7 46/20 47/22 56/5 57/11 57/13 60/15 61/5 61/8 61/12 65/25 68/1 69/9 72/4 88/2 88/8 88/15 88/25 89/2 89/5 89/9
old **[1]** 62/11
once **[3]** 84/17 85/3 85/6
one **[49]** 9/24 9/24 10/4 10/4 10/10 11/2 14/7 14/23 17/25 18/2 18/8 22/11 23/12 26/14 27/4 27/9 28/22 30/4 30/5 32/2 32/24 34/25 35/13 35/24 43/23 44/6 44/18 45/24 46/18 48/14 54/20 55/22 57/4 60/5 65/10 67/7 68/13 68/21 68/22 69/6 70/24 71/2 77/11 79/8 80/10 82/1 82/5 82/8
ones **[6]** 47/16 47/19 70/5 74/4 81/10 84/25
only **[25]** 10/8 11/23 17/15 19/22 22/1 27/8 32/11 32/22 33/18 33/23 35/4 44/19 44/22 46/7 47/19 47/25 59/17 67/5 70/5 78/8 81/17 81/20 82/6 84/3 87/8
open **[11]** 3/1 13/25 31/22 31/25 41/23 42/8 42/11 44/4 69/3 79/9 90/11
opening **[2]** 31/15 31/25
openness **[1]** 16/1
opinion **[8]** 22/10 42/5 44/7 44/15 44/21 44/22 44/23 81/10
opinions **[4]** 27/7 44/10 49/3 82/14
opportunity **[11]** 4/22 4/25 6/24

17/20 57/7 72/23 73/24 74/7 74/15 78/2 80/25
oppose **[1]** 74/13
opposed **[1]** 73/12
opposing **[1]** 25/8
opposition **[5]** 74/19 79/3 79/5 81/1 85/12
options **[2]** 23/21 79/9
oral **[1]** 33/20
order **[15]** 19/4 31/20 33/15 33/17 33/23 34/16 34/17 73/14 75/15 76/11 76/13 76/14 76/16 85/7 85/8
ordered **[2]** 40/9 76/11
organization **[1]** 88/19
originally **[1]** 23/19
other **[55]** 5/16 13/4 20/5 25/11 28/8 28/9 35/7 35/16 35/19 38/25 41/19 42/8 45/25 46/4 46/9 50/7 50/10 50/11 51/4 53/2 66/8 72/15 76/24 82/15 87/15 90/7
others **[2]** 29/18 34/12
otherwise **[1]** 76/15
out **[55]** 4/19 4/23 4/25 7/2 7/24 8/11 9/16 9/17 10/12 11/18 12/3 12/10 15/22 16/9 16/13 20/6 25/5 26/6 26/13 27/4 29/5 29/12 29/24 32/12 43/11 46/24 58/18 59/2 60/23 61/19 67/1 67/20 70/4 72/1 72/10 73/8 73/9 73/16 74/10 75/6 76/25 77/20 77/21 80/25 82/15 82/20 83/16 85/4 85/5 85/21 86/21 87/19 87/23 87/24 88/24
outside **[6]** 25/2 25/4 25/21 31/6 87/19 88/6
overruled **[2]** 71/21 71/22
overruling **[3]** 22/10 23/2 59/21
own **[4]** 4/25 7/18 19/22 66/22

**P**

packets **[1]** 59/11
page **[2]** 46/2 86/1
pages **[2]** 9/11 50/23
pair **[1]** 5/16
panel **[1]** 80/6
paper **[1]** 71/2
paragraph **[1]** 84/11
pare **[3]** 80/3 84/7 84/25
paring **[2]** 80/22 85/19
parse **[1]** 36/6
part **[2]** 19/11 49/19
Parte **[1]** 9/3
partiality **[1]** 27/25
particular **[2]** 25/20 66/3
parties **[4]** 5/19 6/12 90/8 90/15
parts **[1]** 87/15
party **[1]** 32/11
passenger **[1]** 19/10
past **[1]** 81/16
penalty **[1]** 5/3
pendency **[4]** 16/2 16/16 22/7 59/16
pending **[1]** 16/2
people **[12]** 27/6 28/8 46/8 53/21 80/6 80/14 81/17 81/18 81/19 81/20 81/21 82/6
perceiving **[1]** 20/4
perceptions **[1]** 21/23
performance **[1]** 62/24
perhaps **[1]** 81/5
period **[2]** 22/8 40/6
perjured **[2]** 55/6 55/7
permitted **[1]** 58/13
person **[5]** 12/7 17/3 34/8 80/11 81/12
personal **[1]** 55/16
personally **[1]** 14/12
personnel **[2]** 65/16 65/21
persuade **[1]** 59/11
pertain **[1]** 7/15
pertained **[1]** 61/25
petition **[2]** 72/16 79/22 79/24 81/5
phase **[20]** 29/1 29/6 29/18 32/13 34/11 47/10 48/5 48/9 48/18 49/16 49/21 50/25 53/3 53/15 53/16 62/1 62/6 63/15 68/12 69/22
phone **[1]** 38/12
photographs **[1]** 40/5

physical **[1]** 51/19
PIA **[2]** 16/12 17/1
pick **[2]** 20/25 81/9
picked **[1]** 23/14
picking **[1]** 59/13
piece **[1]** 48/9
pin **[1]** 64/19
pioneered **[2]** 6/16 81/25
place **[2]** 7/23 24/9
places **[1]** 23/22
pleading **[3]** 72/22 77/6 79/16
pleadings **[4]** 72/21 76/1 77/5 78/16
please **[4]** 18/4 44/25 73/3 81/11
plenty **[2]** 11/13 46/14
point **[36]** 4/17 7/3 8/25 12/13 15/5 15/19 15/25 16/22 17/14 18/7 18/9 18/25 19/14 21/9 21/18 21/19 28/23 30/2 43/18 44/3 45/10 45/22 46/6 47/3 49/1 57/1 60/16 60/18 64/17 65/10 70/9 72/6 72/18 73/13 74/23 85/6
pointed **[1]** 14/20
points **[8]** 28/25 32/24 39/9 47/21 50/24 51/12 52/16 56/16
police **[2]** 30/12 30/21
policies **[1]** 66/14
portions **[1]** 90/7
position **[8]** 12/4 13/5 27/11 29/24 73/9 73/9 76/25 82/20
positions **[1]** 12/14
positive **[1]** 51/2
possession **[1]** 9/19
possible **[4]** 6/23 9/6 50/19 87/8
post **[17]** 3/12 7/24 9/9 11/4 11/7 13/2 13/10 16/4 16/8 16/13 17/4 18/17 25/13 25/15 27/8 47/9 71/25
post-conviction **[12]** 3/12 7/24 11/4 11/7 13/2 16/4 16/8 16/13 17/4 18/17 47/9 71/25
post-trial **[1]** 13/10
posted **[1]** 28/8
posts **[7]** 26/14 26/18 27/1 27/8 27/22 27/22 28/10
potential **[6]** 29/17 38/21 62/6 64/19 64/21 70/7
potentially **[2]** 71/4 85/4
power **[2]** 34/5 77/24
powers **[1]** 45/13
practice **[2]** 81/22 82/9
practiced **[2]** 81/14 81/14
preferred **[1]** 50/7
prejudice **[1]** 27/21
prep **[1]** 14/15
prepared **[1]** 14/4
prescribed **[1]** 69/16
presence **[1]** 31/6
present **[15]** 3/1 3/5 3/15 12/11 18/3 20/24 30/6 31/5 48/11 50/18 65/1 78/17 79/25 84/9 84/18
presented **[14]** 10/17 10/18 41/18 41/19 48/19 50/4 50/10 50/11 50/20 50/24 51/1 51/6 51/7 62/5
presenting **[2]** 55/5 78/14
preserve **[6]** 60/10 60/14 60/24 61/3 67/19 72/7
preserving **[1]** 61/10
Presiding **[1]** 1/16
pressure **[1]** 10/24
presumably **[2]** 13/9 47/4 69/14
pretrial **[13]** 14/12 14/18 15/8 15/15 15/17 15/18 16/6 17/11 29/1 44/8 57/18 71/20 71/20
pretty **[2]** 62/15 69/15
prevailing **[5]** 10/19 24/24 63/5 67/13 71/23
previous **[1]** 72/11
previously **[5]** 17/2 71/22 72/11 73/5 73/19
primary **[2]** 19/18 72/10
prior **[7]** 9/21 12/9 17/2 20/8 72/10 73/19 75/5
prison **[1]** 37/1
privileged **[2]** 12/24 16/18
pro **[3]** 57/20 58/21 60/5
probably **[6]** 5/15 6/13 18/20 41/13 84/4 84/19
problematic **[1]** 30/9
problems **[5]** 5/25 7/2 7/7 31/8 31/13 45/22
procedurally **[3]** 23/9 52/20 71/24
procedures **[4]** 30/21 30/24 31/9 31/14

01622

**P**

proceed [2] 34/9 58/14
proceeded [1] 35/24
proceeding [1] 32/24
proceedings [7] 1/14 1/18 3/12 13/8 48/18 90/7 90/14
process [9] 5/2 22/13 22/22 26/3 68/7 74/17 75/8 78/6 79/23
processes [1] 25/1
produce [1] 84/12
product [3] 12/24 12/25 13/14
proffer [1] 86/3
prohibited [3] 68/12 68/18 69/5
promises [1] 86/4
prong [1] 64/16
proof [2] 4/18 4/19
proper [3] 46/1 80/18 82/2
proposed [1] 41/16
prosecutor [2] 9/2 52/17
prosecutorial [1] 77/2
prosecutors [7] 8/6 8/14 11/2 14/7 16/12 55/22 59/18
prospective [2] 63/8 70/15
protection [2] 68/4 68/7
protector [1] 51/3
prove [4] 4/23 72/24 72/24 77/25
proven [2] 4/15 77/7
provide [4] 29/14 33/2 39/20 86/20
provided [18] 4/5 9/7 12/11 12/25 13/1 13/13 17/8 17/24 18/15 18/17 19/17 21/3 40/23 40/25 41/1 56/1 73/22 77/20
providing [1] 76/20
provision [1] 57/25
public [1] 16/12
pull [2] 34/25 72/8
punishment [26] 29/1 29/18 35/8 47/10 48/4 48/9 48/18 49/11 49/16 49/20 50/2 50/25 53/3 53/15 53/16 56/10 58/4 62/5 63/1 64/11 65/12 65/22 67/9 68/8 69/22 83/8
purport [2] 45/25
purporting [2] 46/6 52/14
purports [2] 40/19
pursuant [2] 24/23 70/8
pursue [2] 38/11 59/14
pursued [1] 38/21
push [1] 86/12
put [20] 4/22 4/25 18/14 21/5 31/24 35/7 40/22 47/13 48/7 50/1 50/2 50/3 50/5 50/7 67/23 83/14 84/11 87/18 87/19 88/7
putting [2] 59/10 80/22

**Q**

qualify [2] 25/4 26/9
question [2] 7/21 27/18
questioned [2] 21/6 23/4
questioning [2] 54/8 54/24
questionnaire [1] 70/16
questionnaires [1] 64/4
questions [3] 54/18 77/16 78/11
quick [2] 25/18 74/22
quickly [2] 7/9 7/13
quite [1] 34/14

**R**

R-E-I-S-S [1] 3/19
race [2] 70/7 70/19
raise [10] 32/25 57/16 58/9 60/21 60/22 74/11 74/24 76/24 77/6 77/15
raised [21] 4/2 6/4 9/19 22/11 28/24 52/24 52/25 53/3 58/18 58/22 59/3 59/19 60/23 61/25 62/1 71/20 71/22 72/16 75/22 78/12 79/11
raises [1] 64/4 70/10
raising [5] 60/18 71/24 82/16 82/22 82/25
Randy [1] 1/15
ratcheted [1] 88/4
rather [3] 21/20 49/5 49/9
reached [2] 4/14 21/8
react [2] 55/8 62/7
reaction [1] 64/22
reactions [3] 21/4 51/19 51/20
read [3] 55/18 78/22 79/5
reading [1] 74/22
ready [1] 61/23
Reagan [4] 1/22 90/3 90/18 90/19

Reagin [1] 2/4
real [3] 7/13 15/3 25/18
realize [4] 6/11 8/17 17/13 56/7
really [8] 6/2 30/9 72/19 78/8 80/3 82/19 83/1 86/25
realm [1] 44/15
reason [5] 11/5 28/16 31/18 58/24 88/4
reasonable [7] 29/22 29/23 41/18 48/6 62/24 64/6 87/6
reasons [8] 23/13 27/4 52/21 60/2 71/9 72/1 77/11 77/14
rebut [4] 50/12 50/13 65/2 73/16
rebuts [1] 65/1
rebuttal [3] 9/24 10/9 45/5
rebutting [1] 78/14
recall [2] 30/4 34/2
recantation [1] 12/6
recanted [1] 73/22
receipt [1] 17/15
receive [1] 85/25
recent [3] 82/12 82/13 82/13
Recess [1] 90/21
recollection [2] 55/16 76/4
record [43] 1/1 3/2 3/6 4/1 4/15 5/5 6/24 15/9 18/2 18/5 18/7 20/7 20/25 21/5 24/1 25/25 31/16 32/19 33/12 33/22 36/22 41/15 42/1 43/21 43/21 47/14 48/7 49/25 50/8 52/19 54/16 55/15 61/4 67/20 67/23 71/14 71/16 74/3 76/2 83/15 83/18 90/9 90/13
recordings [2] 51/16 52/2
recounting [1] 21/4
rectify [1] 83/7
redirect [1] 66/18
reduced [1] 7/19
refer [1] 67/20
reflect [5] 14/15 15/9 36/22 37/17 37/18
reflected [1] 22/23
reflects [1] 90/14
refused [1] 11/2
refutes [1] 11/2
regarding [13] 12/9 17/20 18/11 19/8 26/12 26/18 42/3 45/8 48/7 48/12 48/19 58/24 77/21
Regardless [1] 19/18
regularly [1] 62/16
rehire [1] 66/19
reinforces [1] 39/18
reinstatement [1] 66/25
Reiss [3] 2/3 3/19 18/3
reiterate [1] 45/10
reiterated [1] 49/10
related [1] 81/8
relating [1] 77/2
relationship [2] 40/3 40/4
relaying [1] 54/15
released [1] 70/15
relevant [2] 79/20 85/20
reliability [1] 83/6
reliable [1] 73/10
relied [1] 65/11
relief [6] 4/4 4/16 9/8 30/23 72/25 77/7
rely [4] 29/11 52/12 72/3 77/23
relying [4] 5/25 11/6 25/5 73/16
remaining [1] 57/8 67/17
remedy [1] 58/11
remember [6] 10/11 29/20 33/11 43/25 44/17 48/25
remembering [1] 26/24
remind [1] 56/17
render [1] 66/17
rendered [1] 22/10
Renee [4] 1/22 90/3 90/18 90/19
repeated [1] 26/16
repeatedly [1] 14/6
repeated [4] 1/18 8/10 68/23 90/17
Reporter [1] 1/22 90/3 90/20
reporter's [4] 1/1 43/20 90/9 90/13
reports [1] 49/3
represent [2] 3/8 3/11
representations [3] 13/7 16/25 45/13
represented [1] 12/22
representing [4] 3/15 3/18 12/22 32/3
request [5] 18/18 80/25 87/8 87/18 88/5

requested [2] 33/19 90/8
requesting [1] 4/22 7/3 45/12
require [8] 9/2 9/4 45/11 72/16 73/2 79/22 79/23 87/16
required [1] 63/3
requires [3] 5/2 74/17 75/8
requiring [1] 82/2
rescinding [1] 17/17
research [1] 63/22
reset [1] 60/8
resolvable [1] 67/14
resolve [4] 10/13 75/20 75/23 76/10
resolved [3] 10/19 23/10 75/4
resource [1] 42/25
respect [1] 75/6
respectfully [2] 42/2 61/3
respective [1] 90/15
respond [20] 7/5 13/19 16/23 25/18 27/9 28/7 45/20 47/14 49/22 64/22 65/5 73/24 74/18 78/10 79/1 79/12 80/25 84/15 84/16 88/12
responded [2] 4/21 41/11
responding [1] 5/6
response [9] 10/13 33/3 70/4 85/5 85/21 86/7 86/7 88/24 89/6
responses [6] 11/19 45/17 53/5 53/6 78/20 84/14
responsibility [1] 60/23
responsible [2] 16/5 32/6
restricted [1] 69/23
result [2] 65/18 68/13
retained [1] 31/3
return [2] 20/22 72/9
reverend [1] 50/15
reversal [1] 83/10
review [18] 6/25 7/4 9/16 12/18 14/9 14/13 29/5 30/4 45/19 61/4 65/20 76/1 76/1 76/2 76/4 79/9 82/23 85/6
reviewed [3] 14/11 14/12 14/24 45/9 46/3
reviewing [2] 14/16 82/15
right [24] 3/24 6/8 8/9 19/3 22/13 22/21 22/22 26/11 33/8 35/20 43/9 43/11 47/8 47/19 47/21 49/7 52/5 58/19 59/23 61/9 64/25 70/13 82/24 84/16
rights [5] 22/13 22/16 60/10 60/14 68/11
road [1] 88/6
Rodeo [1] 23/15
rodeo's [1] 23/21
role [2] 32/22 51/2
Roll [1] 1/15
room [1] 20/25
roughly [1] 30/15
round [1] 66/15
Roy [1] 31/3
Rule [2] 16/14 79/2
ruled [1] 42/4
ruling [7] 13/11 42/3 42/7 43/8 43/19 43/23 75/9
rush [1] 48/1
rush-hour [1] 48/1

**S**

safety [2] 19/22 19/23
said [23] 8/2 9/7 13/11 13/24 14/11 17/6 18/9 23/5 25/19 30/17 45/1 45/1 45/2 46/11 56/8 59/22 60/17 68/23 75/19 76/13 80/7 80/8 78/4
same [11] 21/23 30/11 33/7 33/13 34/5 34/8 44/20 50/4 74/4 74/18 78/4
save [1] 53/6
saw [1] 46/11
say [30] 5/9 8/5 8/8 8/22 11/5 11/13 14/10 15/8 17/5 17/7 17/7 17/10 21/9 21/12 26/20 28/12 36/12 39/11 40/11 40/13 45/2 45/15 52/11 52/16 71/17 75/13 75/14 79/7 79/8 82/3
saying [20] 8/13 13/10 16/10 27/9 27/13 31/24 34/4 36/14 42/9 42/18 42/18 44/18 46/21 47/1 68/16 69/3 70/18 75/17 83/2 83/21
says [14] 14/7 14/17 30/12 41/16 46/3 50/6 54/23 60/9 63/10 70/23 75/21 75/23 76/6 80/12
SBOT [5] 2/2 2/3 2/4 2/14 2/15

**S**

scope [1] 25/22
Scott [2] 32/4 32/6
se [3] 57/20 58/21 60/5
second [4] 9/3 24/2 75/22 81/18
see [12] 8/3 8/7 8/9 13/18 15/1
16/21 18/19 18/23 24/21 41/7 43/1
44/2
seedy [1] 19/11
seeking [1] 67/18
seems [1] 29/9
seen [4] 7/22 15/2 16/8 30/13
selecting [1] 63/2
selection [9] 29/2 59/4 62/1 62/3
62/3 63/1 63/12 63/21 64/19
send [2] 84/18 86/21
sends [1] 20/23
sense [1] 6/2
sentence [6] 68/6 68/13 69/7
69/17 69/21 83/6
separation [1] 66/24
September [1] 86/11
serious [2] 27/19 79/7
served [1] 74/1
service [3] 16/18 26/19 83/20
set [2] 63/11 86/6
seven [2] 50/14 76/12
several [3] 77/1 77/11 79/10
severity [1] 83/8
sexual [4] 48/20 48/22 62/8 63/9
sexually [1] 62/16
Shawna [1] 2/4
she [40] 9/23 18/11 18/12 20/11
20/19 20/23 21/2 25/19 25/19 30/7
30/12 30/12 30/13 30/14 30/16
30/18 30/18 31/11 33/21
33/22 34/14 37/9 37/24 38/23
39/25 43/22 43/25 44/2 44/18
44/19 44/20 45/16 45/21 60/17
65/1 65/5 80/13 80/13 80/18
74/4 87/10
she's [6] 10/5 30/11 37/10 55/9
74/4 87/10
Shearer [9] 32/5 32/6 32/18 33/2
33/21 42/17 42/19 47/2 47/3
sheet [2] 66/16 66/16
sheriff's [4] 66/13 66/17 66/24
66/25
shooter [3] 30/13 30/17 41/1
shooting [8] 7/21 7/22 8/3 9/15
9/15 30/7 30/11 30/16
short [2] 54/24 56/10
should [20] 16/17 17/19 18/22
27/7 27/12 27/14 42/19 43/6 47/13
47/18 47/20 49/2 52/12 59/3 69/22
75/12 80/3 84/19 86/6 86/8
shouldn't [2] 21/10 47/5
show [5] 27/21 37/4 37/19 64/8
70/6
showed [1] 38/18
shows [5] 25/3 41/15 49/25 57/24
65/21
sic [1] 20/15
side [4] 10/9 23/24 27/25 55/14
sides [2] 28/3 78/2
sifting [1] 36/11
sign [4] 11/16 41/9 46/11 86/21
signed [1] 33/23
similarly [1] 13/4
simply [1] 5/22
since [1] 41/7
single [2] 52/10 71/9
sink [1] 84/24
sir [1] 4/7
sit [3] 34/19 34/20 34/25
site [1] 31/17
sitting [4] 26/14 27/7 58/5 83/24
situated [1] 13/4
situation [2] 11/15 24/4
situations [1] 71/3
six [2] 59/13 76/12
sixth [1] 58/19
skipped [1] 65/10
Skype [3] 53/10 54/2 54/7
small [1] 62/8
social [2] 26/16 48/8
solely [3] 46/24 77/9 77/23
some [43] 5/6 5/10 6/24 7/6 15/15
15/16 15/18 15/21 15/23 18/13
29/15 32/20 39/8 40/11 40/17
41/22 48/24 53/9 53/10 53/18 54/5
55/10 55/11 55/13 56/1 60/1 60/25
65/15 66/8 70/9 72/14 73/1 75/21
75/22 75/25 75/25 76/1 76/2 76/3

76/4 79/21 87/19 88/5
somebody [2] 69/3 71/4
someone [3] 26/10 55/21 56/8
something [8] 27/10 28/1 47/2
56/11 57/5 60/17 78/23 85/14
sometimes [1] 55/16
somewhere [2] 24/3 75/10
sophistication [1] 6/17
sorry [3] 18/1 31/21 32/13 43/13
66/10
sorry [9] 27/21 27/24 32/19 36/6
42/24 51/23 54/14 56/14 58/14
sounds [1] 53/8
source [1] 52/10
Spanish [3] 80/6 80/14 80/17
speak [6] 21/2 40/20 45/25 46/25
61/19 80/17
speakerphone [1] 54/7
speaking [3] 41/25 77/8 80/14
special [5] 22/2 64/5 64/12 69/20
81/23
specialists [1] 36/24
specific [6] 20/3 21/20 21/20
63/10 63/17 64/10
specifically [5] 5/6 12/21 31/11
62/7 63/8
speculative [1] 28/12
speedier [1] 76/17
speedy [15] 57/18 57/20 57/22
57/23 58/3 58/6 58/9 58/19 58/21
58/24 58/25 59/3 59/21 60/4 60/9
Spence [2] 13/23 59/8
spend [1] 81/11
spent [2] 14/16 30/14
spin [1] 81/12
spoke [6] 29/17 40/19 41/12 42/9
51/13 80/6
spotted [1] 45/23
stage [4] 4/19 72/22 77/6 79/16
stages [1] 13/24
stamp [1] 83/18
stand [1] 55/5
standard [8] 15/7 21/17 21/19
29/21 58/8 66/1 68/25 69/15
standing [2] 34/19 74/6
start [1] 61/23
started [1] 15/19
starting [1] 11/23
starts [1] 54/3
state [50] 1/4 2/7 3/16 3/18 4/9
4/20 7/16 7/17 9/14 9/10 9/12
10/17 10/18 10/23 12/3 12/13 12/15
12/16 12/22 15/16 16/24 22/9 33/1
33/18 34/5 36/9 48/24 49/10 50/2
51/11 51/21 54/3 54/8 54/17 59/14
64/3 65/3 65/11 67/22 68/2 70/18
73/16 75/3 81/1 82/9 82/14 87/15
88/20 90/1 90/4
State's [26] 4/4 5/1 10/20 10/21
11/1 11/2 13/5 13/12 14/3 14/13
14/14 14/15 15/17 15/21 15/21
16/20 33/23 50/22 51/11 52/7
65/12 70/6 70/20 72/3 88/23 89/6
stated [4] 10/22 23/1 23/13 74/4
statement [8] 6/3 8/7 8/13 10/24
11/4 30/12 68/15 69/3
statements [7] 9/21 11/4 12/9
14/2 26/2 48/25 77/15
states [3] 41/6 58/20 68/8
stating [1] 5/22
statute [1] 57/24
statutory [1] 69/16
stay [1] 23/22
ste [1] 2/16
stenotype [1] 1/18
stepfather [1] 62/17
still [1] 9/7 9/8 15/20 23/11
43/5 54/6 74/23
stood [1] 64/2
stops [1] 76/15
strategic [4] 50/17 52/21 60/2
71/1
strategy [6] 40/1 42/14 42/15
49/18 64/6 70/9
stream [1] 15/3
stressing [2] 19/21 38/13
Strickland [2] 64/15 64/16
strike [1] 31/9
strongest [5] 47/19 47/21 79/12
80/4 81/10
struck [1] 31/5
struggle [1] 38/17
stuck [1] 78/15

study [1] 74/18
stuff [1] 84/7
styled [1] 90/10
subjected [1] 48/21
submit [2] 33/18 33/19
submitted [7] 5/5 7/1 12/2 73/25
76/3 76/5 78/7
subpoena [3] 34/5 45/12 77/24
substitute [2] 73/10 77/12
succinctly [1] 10/3 10/5 11/19
29/3 53/1
such [1] 48/22
sufficient [5] 5/23 71/17
suggestive [7] 30/22 30/24 44/9
44/14 44/16 45/1 45/3
summarize [4] 7/13 25/24 39/8
53/1
summarizing [1] 8/23
summary [4] 14/3 18/12 18/14 22/4
summation [2] 56/23 84/11
supplement [1] 78/20
support [1] 77/20
supported [1] 39/5
supports [2] 56/22 63/20
supreme [2] 58/23 82/13
sure [14] 5/20 6/14 7/14 14/25
18/10 18/22 26/1 27/6 29/2 42/23
41/12 55/19 61/20 84/2
surprised [2] 15/10 86/25
surrounding [2] 9/15 12/6
switch [1] 54/4
system [2] 23/13 37/1

**T**

tactic [1] 56/15
tag [1] 80/24
tainted [1] 22/14
take [14] 7/23 11/25 32/15 34/16
34/17 34/23 54/5 57/14 59/12
61/20 73/1 74/8 74/17 81/23
taken [4] 5/15 12/14 15/6 61/22
takes [1] 74/20
taking [1] 76/23
talk [3] 7/25 46/25 80/5
talked [1] 77/14
talking [13] 1/10 16/9 22/1 25/8
28/5 41/2 44/14 47/3 55/9 62/10
68/18 74/3 85/11
talks [1] 53/20
team [7] 15/14 37/3 37/17 40/21
46/1 46/4 54/15
technical [3] 54/4 54/6 54/18
Telephone [3] 2/7 2/17 90/22
tell [14] 3/8 16/11 17/22 18/25
26/9 28/4 34/7 44/24 83/13 84/8
84/12 86/1 86/2 88/19
telling [6] 8/20 38/15 53/25 55/1
57/4 80/19
tells [1] 15/15
ten [3] 37/15 88/25 89/2
Tercera [1] 36/4
terminated [2] 65/17 66/13
termination [1] 66/24
terms [2] 13/21 49/20
testified [15] 7/16 10/25 30/7
41/9 41/14 51/2 51/13 53/10 53/17
59/8 65/14 66/4 66/11 66/15 66/18
testify [18] 31/4 31/10 31/12
31/19 38/23 39/24 40/17 41/22
42/5 42/7 49/7 49/13 51/10 52/8
54/1 54/20 54/21 84/10
testifying [3] 41/5 51/17 52/9
testimony [36] 4/5 7/15 7/18 8/2
9/5 9/8 9/13 10/16 14/22 27/3
27/3 28/2 40/25 41/1 41/16 46/12
48/10 48/11 50/8 51/23 55/2 55/6
55/7 65/12 65/19 65/23 66/2 66/22
67/4 67/5 67/5 67/7 73/10 77/3
77/13 77/21
TEXAS [15] 1/4 1/5 1/17 1/22 1/23
2/6 2/7 2/17 14/24 57/23 90/1
90/5 90/19 90/21 90/22
than [17] 5/15 5/17 16/6 16/19
25/11 35/3 50/10 51/4 62/13 65/2
65/6 71/2 73/24 76/18 82/4 82/8
85/21
Thank [12] 3/25 18/24 34/21 34/24
47/22 57/16 61/18 65/4 65/9 89/9
89/11 89/12
that [600]
that's [46] 3/17 5/2 5/17 10/20
11/20 12/3 13/15 14/21 15/22
18/20 21/12 21/12 22/4 25/22

# T

that's... [32]  26/25 27/13 32/8
34/10 35/12 43/16 43/24 45/18
46/12 57/4 57/11 59/2 62/22 65/20
65/21 69/8 70/19 71/2 71/18 76/13
76/17 77/19 78/6 79/3 79/4 79/5
80/2 81/21 83/11 85/9 86/23 89/5
their [67]  4/13 6/5 9/19 11/7
12/15 13/12 15/5 17/21 19/22 19/23
20/21 21/4 21/20 22/9 22/25 23/5
23/17 26/3 27/6 28/11 29/8 29/12
29/22 29/25 30/2 31/17 31/18
37/16 40/21 40/21 42/10 43/5
45/25 46/10 49/10 50/17 51/15
51/18 51/19 51/19 51/22 54/24
55/2 55/12 56/18 60/13 62/2 62/3
63/15 63/21 64/1 64/2 64/6 64/12
64/22 64/22 67/13 70/15 71/8
81/23 83/19 83/20 83/25 85/3 85/5
85/21 87/3
theirs [1]  84/15
them [63]  6/22 6/22 7/2 7/3 7/4
7/12 10/4 15/7 15/8 17/10 17/20
19/21 19/21 26/10 27/23 29/17
31/13 34/16 34/17 35/16 38/11
38/16 38/20 39/1 40/1 40/20 45/20
45/20 47/13 52/3 52/22 53/1 53/2
53/22 53/25 54/20 54/20 55/1 55/5
55/15 60/22 61/1 61/10 64/22
64/23 65/7 67/22 67/23 70/17
71/17 71/24 74/11 74/18 76/10
77/5 78/22 79/25 81/5 81/6 81/14
83/18 84/13 84/15
themselves [4]  6/6 40/20 42/10
53/23
then [31]  4/16 16/3 17/18 19/7
19/23 21/25 30/19 32/1 34/12 39/7
46/9 49/10 58/9 58/12 58/13 65/1
65/1 66/22 66/25 71/14 73/3 73/9
73/14 75/19 76/10 78/22 80/3 84/7
84/11 84/17 85/3
theory [1]  15/22
there [83]  5/25 7/11 8/13 13/22
19/18 20/1 20/19 23/14 23/21
25/12 25/14 27/8 27/22 28/3 29/9
31/7 34/14 34/19 35/3 35/7 35/15
35/19 36/7 36/5 36/9 36/14 37/2
37/4 37/7 41/7 41/8 42/7 42/24
43/8 43/12 48/21 50/22 51/5 52/21
52/23 52/24 53/2 53/9 53/10 54/20
55/10 56/4 57/4 58/9 58/12 58/17
59/22 60/11 61/7 64/8 64/9 66/1
66/10 67/19 70/12 70/14 72/12
72/15 73/14 73/15 73/19 74/23
75/2 75/12 75/19 76/19 76/23
76/24 76/25 79/22 81/7 81/7 81/17
81/20 83/14 86/3 88/5 88/23
there's [19]  11/13 15/3 16/1 26/5
28/4 28/5 28/8 43/14 54/4 54/6
54/9 54/13 58/11 65/23 67/1 70/18
75/1 75/3 85/12
therefore [2]  13/3 62/3
these [88]  4/4 4/15 5/14 6/4 6/7
6/21 9/25 12/14 12/16 12/21 13/7
14/1 14/8 14/11 14/12 14/17 14/21
15/2 16/10 17/14 17/23 20/3 20/24
21/19 22/16 25/3 27/14 27/22
28/10 28/18 29/2 29/3 31/14 32/20
33/13 36/6 38/2 39/6 45/10 45/13
45/17 49/4 50/24 51/11 51/12
51/17 51/22 52/1 52/1 52/1 52/9
52/11 52/12 52/16 52/16 52/19
53/21 54/19 54/24 55/13 55/14
57/1 57/10 59/15 60/18 60/21
61/10 61/14 62/4 70/24 71/19 73/1
73/14 73/20 73/25 74/15 75/18
75/20 75/21 75/24 76/8 76/12
76/21 77/9 78/23 81/3 81/13 81/24
they [168]
they're [13]  25/5 36/14 49/1 49/8
52/20 60/22 63/3 67/17 69/15
70/11 80/14 84/16 86/3
they've [6]  6/12 15/20 38/25 43/4
66/23 81/13
thing [4]  32/2 44/6 44/21 78/4
things [16]  27/7 27/15 28/18 33/8
33/13 45/8 45/15 45/21 52/11
66/16 75/2 76/16 80/22 80/22 81/6
85/12
think [40]  4/17 14/11 15/4 15/25
16/15 16/17 21/11 21/13 22/4
25/19 25/22 26/7 34/10 34/10 36/8
36/13 41/7 43/13 44/15 44/22 45/6
47/7 47/13 47/18 47/20 51/25
52/18 56/2 56/3 57/23 65/10 78/13
79/10 83/17 83/22 84/1 84/10 85/9
86/3 87/5
thinking [3]  21/15 26/10 44/24
thinks [2]  76/9 83/23
third [2]  11/24 81/19
this [121]
thorough [2]  15/12 56/22
thoroughly [2]  7/4 45/19
those [52]  4/21 6/15 9/11 9/15
9/19 11/5 11/13 11/18 12/23 16/25
17/7 20/15 21/4 21/22 21/23 29/15
29/16 33/8 34/12 38/14 39/19
43/22 43/22 43/23 45/23 46/7
48/11 48/24 49/14 49/16 50/14
55/24 62/7 64/23 65/20 69/24
69/25 70/2 71/3 72/2 72/4 74/3
74/8 74/17 75/4 75/5 78/9 78/12
79/12 83/5 83/7 86/13
though [6]  8/25 54/16 56/19 60/22
69/5 82/25
thought [6]  21/1 52/16 52/17
56/12 69/2 80/13
thousands [1]  81/21
threatened [1]  19/22
three [1]  35/7
through [18]  7/6 7/9 7/12 29/3
29/19 36/11 40/12 40/16 40/21
41/17 41/19 50/6 50/23 54/17
71/19 72/1 74/22 78/7
throughout [1]  64/10
throw [2]  46/11 84/23
thwart [1]  37/20
tied [1]  36/5
time [37]  3/2 7/4 8/1 8/6 11/25
12/18 12/22 14/15 22/8 24/5 29/24
26/9 30/14 32/15 32/16 33/16
33/20 39/2 45/19 47/25 57/12
57/14 57/18 60/6 65/3 65/8 78/10
78/23 80/9 80/20 81/3 82/12 86/6
86/22 87/6 87/19 89/10
times [2]  12/15 51/14
timetable [4]  76/17 87/2 88/10
88/23
titled [1]  1/14
today [10]  72/10 72/14 72/15
73/17 74/6 74/22 78/20 78/23 81/2
81/11
together [6]  8/14 18/14 19/7
59/11 87/20 88/7
told [10]  8/6 8/8 38/10 38/21
41/11 41/23 47/2 47/2 69/6 79/10
too [2]  48/14 61/4
took [6]  14/14 20/21 32/3 56/16
56/18 59/13
top [2]  51/18 63/23
total [2]  35/20 36/8
totality [1]  64/11
touch [1]  17/4
touches [1]  62/11
touching [1]  62/14
towards [1]  27/25
town [3]  19/11 23/21 23/24
Traci [2]  11/1 14/6
traffic [1]  48/1
trained [3]  80/9 80/10 80/11
transcript [3]  13/10 13/10 16/8
transcription [1]  90/6
translating [1]  54/9
translation [1]  80/7
translator [10]  54/9 54/11 80/8
80/10 80/12 80/15 80/16 80/18
80/20 81/13
translators [2]  80/5 80/17
traveled [1]  50/16
trial [110]
tried [1]  55/5
trouble [2]  38/2 53/9
true [3]  4/15 83/11 90/6
truly [1]  90/14
try [3]  29/4 47/15 59/11
trying [9]  8/22 17/22 24/3 34/7
36/6 44/24 53/1 63/10 65/8
turned [4]  9/10 9/20 12/12 37/4
twice [1]  31/16
two [15]  5/14 6/15 11/19 11/20
11/21 12/23 17/24 19/23 19/24
35/17 54/19 85/11 87/16 87/17
87/22
type [1]  12/20 87/2
types [6]  6/4 6/21 12/21 25/3
63/17 70/24

# U

ultimate [1]  42/5
ultimately [4]  40/8 53/25 54/7
54/17
unavailable [1]  60/11
unaware [2]  23/16 50/11
unclear [1]  31/22
unconstitutionally [1]  69/19
uncooperative [1]  37/18
under [10]  9/1 9/3 12/7 26/1
28/21 63/4 63/5 64/15 71/23 74/20
understand [9]  8/16 12/3 20/6
35/13 74/9 78/18 78/19 79/18
85/15
understanding [3]  27/4 63/16 85/3
understood [2]  9/18 80/14
unfavorable [1]  37/17
unit [1]  17/4
United [1]  68/8
unknowingly [1]  10/18
unless [2]  25/2 56/8
unreasonable [1]  30/1
unstable [1]  88/12
until [7]  4/13 23/16 24/21 30/19
38/19 47/25 60/4 80/18
unusual [1]  68/8
up [21]  9/13 10/10 20/20 24/6
30/16 33/25 34/19 34/23 34/25
36/7 45/23 48/12 48/21 52/14 58/3
59/13 61/4 70/25 72/8 75/22 88/6
upon [4]  17/15 20/22 25/5 47/4
upset [2]  70/11 70/16
urge [3]  5/2 56/20 77/4
urging [1]  38/11
us [19]  3/8 12/12 13/2 18/17
18/25 31/22 33/13 33/16 52/3 57/7
58/1 74/1 78/10 78/17 85/5 86/20
87/16 87/18 89/4
usable [1]  39/4
use [9]  16/15 30/3 40/15 54/7
54/7 66/16 73/8 78/22 80/3
used [7]  9/22 14/18 30/21 32/20
36/15 50/14 80/18
useful [2]  40/14 51/25
uses [2]  58/10 80/11

# V

vacated [1]  69/22
vague [1]  69/19
valid [2]  52/16 56/17
various [5]  12/15 28/25 38/8
39/21 40/4
verbal [1]  86/25
verbatim [1]  33/23
verbose [1]  79/6
verdict [15]  4/14 20/1 20/8 20/19
20/21 20/21 21/7 21/8 21/20 23/1
23/6 26/3 27/12 56/18 83/6
versus [1]  79/16
very [11]  6/17 7/9 10/3 12/4
19/21 29/2 29/6 29/9 47/21 56/22
89/9
via [3]  53/10 54/2 58/20
viable [1]  23/21
vickie [1]  23/21
videos [2]  51/16 52/1
views [1]  64/22
violated [2]  68/4 68/11
violates [1]  68/7
violation [5]  49/6 58/11 58/12
60/7 66/14
visit [1]  38/8
voice [1]  72/7
voir [4]  58/25 63/7 63/16 64/2
volume [6]  1/1 43/20 43/21 43/24
43/24 90/9
VOLUMES [1]  1/1
voluminous [1]  59/9
vote [4]  22/2 68/12 68/19 69/7
voted [1]  21/10
votes [1]  28/13
vouchers [1]  37/3

# W

waited [1]  4/13
waiver [1]  13/3
Walter [1]  40/22
want [36]  5/10 5/18 6/11 8/17
10/8 13/19 18/8 19/5 21/13 25/16
26/9 27/5 34/12 34/13 34/18 36/20
36/8 38/7 38/23 39/24 40/17 43/17
44/5 46/24 47/8 53/1 56/7 60/18

**W**

want... **[8]** 77/23 79/11 79/18 83/22 84/6 84/8 85/25 86/1
wanted **[15]** 10/2 10/3 35/23 39/25 41/3 41/21 45/22 53/20 54/18 54/19 56/10 56/17 69/8 80/3 83/18
wants **[2]** 15/1 38/22
warrants **[1]** 83/9
was **[195]**
wasn't **[6]** 8/8 19/13 36/2 49/4 63/23 67/6
watch **[1]** 39/25
waving **[5]** 19/15 20/10 20/11 26/10 81/13
way **[11]** 15/1 20/4 21/10 22/2 28/4 28/4 40/15 54/1 73/23 81/25 83/2
ways **[1]** 72/20
we **[164]**
we'd **[2]** 27/20 74/7
we'll **[4]** 10/6 82/15 86/3 86/21
we're **[25]** 3/7 5/22 11/3 11/5 18/6 22/1 25/8 28/16 45/11 45/18 46/21 46/23 72/22 77/21 78/7 78/15 78/16 82/14 82/19 82/22 85/11 85/13 88/7 88/9 88/21
we've **[10]** 4/1 7/1 28/24 62/22 72/14 72/22 74/21 75/2 77/14 80/8
weakened **[1]** 17/23
weapon **[3]** 66/4 66/7 66/10
week **[3]** 30/19 83/20 87/15
weeks **[1]** 87/18
weigh **[1]** 58/10
weight **[1]** 63/19
welcome **[1]** 14/20
well **[32]** 6/12 10/20 11/1 17/9 21/6 32/6 35/6 39/6 41/4 41/6 42/10 46/15 47/18 50/9 51/24 52/6 52/21 53/19 54/10 54/12 54/22 58/2 59/16 70/20 73/3 78/22 78/25 79/9 80/2 81/9 82/13 85/14
Wendy **[1]** 41/20
Wendy's **[1]** 42/6
were **[105]**
weren't **[2]** 52/19 79/24
Westchase **[2]** 24/12 24/13
Westfield **[1]** 24/11
what **[94]**
what's **[5]** 4/17 24/9 36/13 78/15 89/6
whatever **[4]** 19/15 34/17 46/5 88/17
whatnot **[1]** 59/18
wheels **[2]** 81/12 81/12
when **[41]** 4/12 6/4 12/7 12/19 20/14 22/8 22/9 23/20 30/11 30/16 33/9 33/14 33/16 38/20 41/6 41/8 41/12 41/14 42/9 42/21 42/23 43/25 48/17 52/5 54/21 55/21 56/20 59/25 60/4 62/11 64/1 64/14 65/12 66/21 67/3 67/4 67/7 68/11 72/10 85/18 88/7
where **[24]** 9/9 9/13 11/16 12/5 20/23 24/5 25/22 29/7 31/6 34/7 44/2 44/3 45/12 49/16 57/19 62/1 73/6 75/2 78/1 78/5 79/15 79/16 79/23 88/6
whether **[15]** 10/17 22/12 29/21 30/22 35/16 42/7 43/19 55/12 58/10 59/14 63/8 63/24 66/2 71/11 75/1
which **[38]** 6/2 14/3 14/5 16/18 17/14 17/25 18/7 18/14 19/8 20/25 21/18 25/3 26/5 27/25 28/20 29/11 37/17 37/18 37/18 37/19 39/17 42/12 46/19 48/8 50/23 64/5 66/16 66/23 67/6 72/23 73/11 73/16 76/9 77/7 77/11 77/14 89/3 90/10
while **[3]** 5/10 13/5 27/7
who **[33]** 3/8 3/15 5/18 7/15 10/22 13/23 14/7 14/7 16/12 17/2 20/24 23/12 23/13 29/14 30/6 30/14 30/16 30/17 32/3 32/5 37/22 52/10 53/23 54/9 60/9 63/18 65/13 68/15 68/23 70/15 70/18 84/9 86/2
who's **[1]** 34/6
whoever **[3]** 15/6 17/1 40/20
whole **[2]** 36/9 87/24
whom **[1]** 14/10
why **[10]** 7/8 12/3 23/13 27/13 31/7 31/23 45/11 45/18 72/2 77/19
wife **[1]** 37/10
will **[21]** 7/3 15/1 18/22 34/14

36/22 43/18 47/15 47/20 57/9 60/22 75/20 78/22 80/12 80/19 85/1 85/3 85/6 85/7 85/7 86/13 87/15
window **[1]** 87/19
wingo **[1]** 58/23
withheld **[2]** 4/9 13/21
within **[6]** 9/10 19/25 30/2 32/1 59/23 73/18
without **[5]** 31/14 31/25 51/23 52/13 64/23
witness **[11]** 31/10 40/22 41/21 44/1 44/13 46/25 65/13 66/3 77/25 78/3 90/16
witness' **[3]** 67/4 67/7 78/1
witnesses **[40]** 4/4 12/21 29/14 29/16 29/18 30/5 32/3 32/4 37/18 38/25 39/1 39/22 41/19 48/10 50/3 50/6 50/7 50/14 51/1 51/12 51/12 52/12 52/13 53/10 53/11 53/23 54/1 54/4 54/5 54/6 54/19 54/24 55/1 55/3 60/11 60/11 73/12 73/22 84/9 86/2
woman **[1]** 38/22
won't **[1]** 87/16
word **[3]** 55/22 56/9 80/18
worded **[1]** 49/1
words **[1]** 55/17
work **[6]** 12/24 12/25 13/14 54/1 82/14 82/16
working **[2]** 17/3 80/15
workings **[1]** 71/15
works **[1]** 60/21
worse **[2]** 6/4 71/2
worthy **[2]** 11/14 52/18
would **[97]**
wouldn't **[2]** 46/1 47/4
writ **[9]** 1/10 41/1 28/11 37/16 38/5 52/24 71/25 75/17 76/8
writing **[7]** 74/14 74/19 75/10 79/1 81/1 88/13 90/8
writs **[5]** 2/16 3/11 3/14 81/24 88/22
written **[9]** 6/3 74/14 74/19 79/2 79/4 81/3 84/19 85/7 85/8
wrongdoing **[1]** 66/19

**Y**

y'all **[5]** 36/13 78/13 86/24 87/21 88/8
Yancy **[1]** 38/9
Yeah **[2]** 49/21 84/21
year **[2]** 30/15 58/8
years **[7]** 9/12 30/7 36/10 59/13 62/11 62/15 81/15
yes **[39]** 3/4 3/23 5/13 6/10 10/12 18/6 20/11 21/6 24/19 25/14 28/14 32/9 34/13 34/15 35/21 37/11 37/25 42/15 44/12 47/11 47/12 49/24 54/13 56/24 59/6 61/24 62/14 62/21 63/13 67/25 68/20 69/12 69/13 71/17 78/18 82/10 85/9 85/23 88/16
yesterday **[1]** 17/15
yet **[2]** 32/11 51/14
York **[1]** 50/16
you **[219]**
you'd **[2]** 10/1 53/7
you'll **[3]** 48/1 84/12 84/18
you're **[18]** 5/10 6/8 7/10 18/7 23/18 25/12 27/7 34/20 47/3 47/9 57/7 58/2 68/16 70/25 74/3 78/21 79/7 79/8
you've **[3]** 9/5 34/19 79/11
you-all **[1]** 87/1
young **[2]** 48/20 48/23
your **[70]** 3/3 3/9 3/21 3/25 9/24 10/1 10/9 11/25 17/9 17/13 17/17 19/3 19/12 21/7 21/9 27/13 28/15 28/23 30/4 32/15 33/9 34/2 34/21 37/11 37/25 46/16 46/23 47/19 47/19 47/22 48/4 49/15 56/25 57/6 57/14 58/3 58/12 58/17 60/16 61/2 61/18 61/24 62/14 62/21 63/1 63/2 67/16 72/5 72/9 78/20 79/8 79/10 79/12 80/4 81/9 81/11 81/12 84/8 84/9 84/14 84/18 85/7 85/8 85/12 86/2 87/7 88/10 89/6 89/10 89/11
yours **[1]** 84/16
yourselves **[1]** 3/7

01826