<u>**POST CONVICTION**</u>

FROM:                179TH DISTRICT COURT

RECEIVED IN
COURT OF CRIMINAL APPEALS

SEP 17 2018

Deana Williamson, Clerk

OF

BEST COPY AVAILABLE HARRIS COUNTY, TEXAS

## JUAN BALDERAS
### 1412826-A

<u>APPLICANT</u>

VS.

THE STATE OF TEXAS

<u>RESPONDENT</u>

# VOLUME 7 OF 22

                REV. 01-02-04

Filed 18 March 07 P12:10
Chris Daniel - District Clerk
Harris County
EA001_17877
By: L GARCIA

CAUSE NO. 1412826-A

| EX PARTE | § | IN THE 179th DISTRICT |
| | § | COURT OF |
| JUAN BALDERAS,<br>Applicant | § | HARRIS COUNTY, T E X A S |

## STATE'S PROPOSED SUPPLEMENTAL ORDER DESIGNATING ISSUES TO BE RESOLVED VIA EVIDENTIARY HEARING

Based on this Court's review of the habeas record and the argument of counsel, this Court **FINDS** that the following controverted, unresolved factual issues potentially material to the legality of the applicant's confinement will be addressed by means of a narrowly tailored evidentiary hearing:

- to assist the Court in resolving the issue of whether the State either knowingly or unknowingly presented false testimony at trial through Israel Diaz, this Court will permit the applicant to attempt to present the testimony of Israel Diaz specific to whether Diaz is recanting his trial testimony, whether Diaz was pressured by the State pretrial to "change" his testimony, and whether Diaz testified falsely under oath at the applicant's trial; and

- to assist this Court in resolving the issue of whether trial counsel was ineffective for failing to investigate and present evidence of an alibi defense during the guilt/innocence phase of trial, this Court will permit the applicant to present the testimony of Anali Garcia and Octavio Cortes limited to what these witnesses would have stated if called to testify during the guilt-innocence phase.

Therefore, this Court **ORDERS** an evidentiary hearing to resolve these issues pursuant to **TEX. CRIM. PROC. CODE** art. 11.071 §§ 9, 10.

The Clerk of the Court is **ORDERED** to transmit the Court's instant supplemental order designating issues to the Court of Criminal Appeals.

01857

The Clerk of the Court is **ORDERED NOT** to transmit any additional documents

in the above-styled case to the Court of Criminal Appeals until further ordered.


**By the following signature, the Court adopts the State's Proposed Supplemental Order**
**Designating Issues to be Resolved via Evidentiary Hearing**
**in Cause Number 1412826-A.**


SIGNED this _____ day of March, 2018.


_____
The Honorable Baylor Wortham
Presiding Judge by Assignment
179th District Court
Harris County, Texas

3/9/2018 3:21 PM
Chris Daniel - District Clerk Harris County
Envelope No. 23079412
By: L Garcia
Filed: 3/9/2018 3:21 PM

# IN THE 179TH DISTRICT COURT
# HARRIS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| EX PARTE | ) | **Trial Cause No.** |
| **Juan Balderas,** | ) | **1412826-A** |
| **APPLICANT** | ) |  |
|  | ) |  |
|  | ) |  |

## MOTION FOR EXTENSION OF TIME TO PREPARE FOR EVIDENTIARY HEARING

Juan Balderas, through his attorneys the Office of Capital and Forensic Writs (OCFW), requests this Court grant an extension of time to prepare for evidentiary hearing. For the reasons set out below, good cause exists to justify the granting of an extension to May 11, 2018, in order to allow counsel for Mr. Balderas adequate opportunity to prepare for the evidentiary hearing.

On February 26, 2018, the OCFW and the Harris County District Attorney's Office were contacted by the Court's coordinator regarding scheduling of the evidentiary hearing as early as April 4, 2018. The OCFW respectfully requested an evidentiary hearing date on or after May 10, 2018, due to scheduling conflicts beyond the control of Mr. Balderas's counsel. Specifically, the conflicts include a filing deadline in mid-March for an initial application in a case involving 25

1

terabytes of discovery; an oral argument in late March; and an evidentiary hearing in Hunt County scheduled for late April that is expected to last at least one week.

Under Texas Code of Criminal Procedure article 11.071, this Court is authorized to grant an extension to an applicant seeking an evidentiary hearing. TEX. CODE CRIM. PROC. art. 11.071 § 9(b). The Court may do so if it finds good cause exists. *Id.* In light of the OCFW's obligations in other cases, including the multiple conflicts prior to May 11, 2018 detailed above, good cause exists in this case to allow for a reasonable delay for this evidentiary hearing.

As the state agency charged with representing capital defendants in their state habeas proceedings, the OCFW, which is located in Austin, Texas, accepts appointment to cases that have resulted in a capital sentence after September 1, 2010. Writ proceedings in these cases typically take place in the trial courts in which the cases were originally tried; therefore, counsel represent clients in court proceedings in counties across the State of Texas. The OCFW staff works diligently to provide the highest caliber representation to each of its clients.

While counsel for Mr. Balderas focus on the litigation of this evidentiary hearing, they also must devote attention to other cases with equally pressing deadlines, many of which were set prior to the February 22, 2018 status hearing at which this Court granted an evidentiary hearing, and all of which require travel to other counties to appear in court on behalf of clients. Counsel for Mr. Balderas make

. 01860

this extension request in good faith and because they require the additional time to prepare adequately for the evidentiary hearing.

## PRAYER FOR RELIEF

For the foregoing reasons, Applicant prays this Court would grant the extension of the evidentiary hearing to May 11, 2018.

Respectfully submitted,

DATED: March 9, 2018    /s/ Katherine Froyen Black

ERIN M. ECKHOFF (No. 24090910)
(E-Mail: Erin.Eckhoff@ocfw.texas.gov)
KATHERINE BLACK
(E-Mail: Katherine.Black@ocfw.texas.gov)
Post-Conviction Attorneys
Office of Capital and Forensic Writs
1700 N. Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Mr. Balderas

3

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Motion for Extension of Time to Prepare for Evidentiary Hearing to:

Criminal Post-Trial
Harris County District Clerk
1201 Franklin Street, Suite 3180
Houston, Texas 77002

Judge Baylor Wortham
Jefferson County Courthouse
1085 Pearl Street
Beaumont, TX 77701

Harris County District Attorney
c/o Farnaz Faiaz Hutchins
1301 Prairie, 5th Floor
Houston, TX 77002

This certification is executed on March 9, 2018 at Austin, Texas.

_____
KATHERINE FROYEN BLACK

4

3/9/2018 3:21:25 PM
Chris Daniel - District Clerk
Harris County
Envelope No: 23079412
By: L GARCIA
Filed: 3/9/2018 3:21:25 PM

## IN THE 179TH DISTRICT COURT
## HARRIS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| | ) | Trial Cause No. |
| EX PARTE | ) | 1412826-A |
| Juan Balderas, | ) | |
| APPLICANT | ) | [PROPOSED] ORDER |
| | ) | |
| | ) | |

## ORDER

On this date, the Court considered Applicant's Motion for Extension of Time

to Prepare for Evidentiary Hearing. After due consideration, Applicant's Motion is

GRANTED. The evidentiary hearing will begin on May 11, 2018.

ORDERED AND SIGNED on this _____ day of March, 2018.

_____
The Honorable Baylor Wortham
Judge Sitting by Assignment,
179th Judicial District Court

01863

3/9/2018 4:06 PM
Chris Daniel - District Clerk Harris County
Envelope No. 23082508
By: L Garcia
Filed: 3/9/2018 4:06 PM

# IN THE 179TH DISTRICT COURT
# HARRIS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| ———————————— | ) | **Trial Cause No.** |
| **EX PARTE** | ) | **1412826-A** |
| **Juan Balderas,** | ) |  |
| **APPLICANT** | ) |  |
|  | ) |  |
| ———————————— | ) |  |

## MOTION FOR
## AN ORDER DESIGNATING ADDITIONAL ISSUES FOR FURTHER FACTUAL DEVELOPMENT

Mr. Balderas, through his counsel, hereby moves this Court for an Order Designating Additional Issues for Further Factual Development.

At a status hearing that took place on February 22, 2017, and via a follow-up electronic communication to counsel for both Mr. Balderas and the State, this Court ordered both parties to submit proposed supplemental orders designating several additional issues identified by the Court as requiring further factual development to take place via live testimony at an evidentiary hearing, pursuant to Texas Code of Criminal Procedure Article 11.071, section 9(a). *See* February 22, 2017 Writ Hearing Transcript, attached hereto as Exhibit A, at 60.

Accordingly, Mr. Balderas, through his counsel moves this Court for an order designating the following issues for further factual development via live evidentiary hearing:

1

**A. Mr. Balderas's First and Second Grounds for Relief: That His Due Process Rights Were Violated When the State Obtained a Guilty Verdict Through the Knowing Use of False Evidence Under *Giglio* and *Napue* and/or Through The Use of False Evidence Under *Chabot* and *Chavez***

Mr. Balderas requests this Court issue an order designating further factual development, via live evidentiary hearing, of the whether a key State's witness at trial, Israel Diaz, testified falsely against Mr. Balderas.

**B. Mr. Balderas's Fourth Ground for Relief: That His Trial Counsel Were Ineffective at the Guilt/Innocence Phase of His Trial For Failing to Investigate and Present Alibi Evidence**

Mr. Balderas requests this Court issue an order designating further factual development, via live evidentiary hearing, of whether his trial counsel rendered ineffective assistance of counsel at his trial when they failed to investigate and present evidence of Mr. Balderas's alibi, including the testimony of key alibi witnesses Anali Garcia and Octavio Cortez.

01865

Mr. Balderas respectfully requests this Court issue an order designating the above issues for further factual development via live evidentiary hearing.

Respectfully submitted,

DATED: March 9, 2018

/s/ Katherine Froyen Black
KATHERINE FROYEN BLACK

ERIN M. ECKHOFF (No. 24090910)
(Email: Erin.Eckhoff@ocfw.texas.gov)
KATHERINE FROYEN BLACK (No. 24099910)
(Email: Katherine.Black@ocfw.texas.gov)
Post-Conviction Attorneys

Office of Capital and Forensic Writs
1700 N. Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Mr. Balderas

CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Motion for Extension of Time to Prepare for Evidentiary Hearing to:

Criminal Post-Trial
Harris County District Clerk
1201 Franklin Street, Suite 3180
Houston, Texas 77002

Judge Baylor Wortham
Jefferson County Courthouse
1085 Pearl Street
Beaumont, TX 77701

Harris County District Attorney
c/o Farnaz Faiaz Hutchins
1301 Prairie, 5th Floor
Houston, TX 77002

This certification is executed on March 9, 2018 at Austin, Texas.

/s/ Katherine Froyen Black
KATHERINE FROYEN BLACK

4

```
 1                    REPORTER'S RECORD
                    VOLUME 1 OF 1 VOLUMES
 2              TRIAL COURT CAUSE NO. 1412826-A

 3   EX PARTE, JUAN BALDERAS   ) IN THE DISTRICT COURT
                               )
 4                             )
     vs.                       ) HARRIS COUNTY, TEXAS
 5                             )
                               )
 6   STATE OF TEXAS            ) 179TH JUDICIAL DISTRICT

 7

 8

 9        _____

10                      WRIT HEARING

11        _____

12

13

14        On the 22nd day of February, 2018, the following

15   proceedings came on to be held in the above-titled and

16   numbered cause before the Honorable Baylor Wortham,

17   Judge Presiding, held in Houston, Harris County, Texas.

18        Proceedings reported by computerized stenotype

19   machine.

20

21

22

23

24

25
```

```
 1                        APPEARANCES

 2    Ms. Faraz Hutchins
      SBOT NO. 24063791
 3    Ms. Shawna L. Reagin
      SBOT NO. 16634900
 4    Assistant District Attorney
      1201 Franklin, Suite 600
 5    Houston, TX  77002
      Telephone:  (713) 274-5800
 6    Counsel for the State

 7

 8
      Ms. Erin Eckhoff
 9    SBOT NO. 24090910
      Ms. Katherine Froyen Black
10    SBOT NO. 24099910
      Office of Capital and Forensic Writs
11    1700 N. Congress Avenue, Suite 460
      Austin, TX  78701
12    Telephone:  (512) 463-8503
      Counsel for the Defendant
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          **P-R-O-C-E-E-D-I-N-G-S**

2              THE COURT:  So everybody ready to proceed?

3              MS. ECKHOFF:  Yes, sir.

4              MS. HUTCHINS:  Yes.

5              THE COURT:  The Court will call Cause

6     No. 1412826-A, ex-parte, Juan Balderas.  I'll note for

7     the record that Mr. Balderas is present in the courtroom

8     this afternoon.

9              Counsel, since we are on the record, can I

10    have each of the attorneys identify themselves for the

11    court reporter and your respective clients, please.

12             MS. HUTCHINS:  Farnaz Hutchins, spelled

13    F-a-r-n-a-z; last name Hutchins, H-u-t-c-h-i-n-s.  For

14    the State.

15             MS. REAGIN:  Shawna Reagin, S-h-a-w-n-a

16    R-e-a-g-i-n for the State of Texas.

17             MS. ECKHOFF:  Erin Eckhoff with the Office

18    of Capital and Forensic Writs on behalf of Mr. Balderas.

19             MS. BLACK:  Katherine Froyen Black, from

20    the Office of Capital and Forensic Writs for

21    Mr. Balderas, as well.

22             THE COURT:  Well, Counselor, I know, just

23    procedurally -- I guess we can kind of address this.

24    We're here for, I guess, essentially a status conference

25    is how he would probably label it.  I know because we've

1  had a substitution of judges on this case, it takes some

2  time for -- obviously for myself to get a little bit

3  more familiarized with the case and also to kind of come

4  back and readdress certain issues.

5  So my goal here this afternoon isn't to

6  readdress necessarily all of the issues that were

7  covered in the prior hearing.  I know that was a very

8  lengthy hearing and I was able to review the record.

9  And I think most of the statements that I think you have

10  speak for themselves.

11  So, my goal is to cover some of these

12  issues in more of a cursory manner.  From the onset,

13  I'll note in the filings that each of the parties

14  submitted that it's very apparent from the record that

15  the respective attorneys in this case have worked very,

16  very hard and diligently on this, both the counsel for

17  Mr. Balderas and the counsel for the State.  It's very

18  evident from the filings and the work product of the

19  attorneys that both counsel genuinely care about this

20  case.  It's very important to them.  So I want to

21  commend each of the attorneys for the outstanding

22  representation you've shown your respective clients from

23  the get-go.

24  And I say that, having dealt with a lot of

25  bad lawyers.  It's very refreshing to actually see some

1   good lawyers that do good work on a case.  I do want to

2   commend each of you for the work that you have put forth

3   into the case and are continuing to do so, thus far.

4           Getting somewhat into the crux of the

5   matter, I know, Ms. Eckhoff, you filed a request, asked

6   for a live evidentiary hearing on a litany of issues.

7   So, they're somewhat voluminous, but I'll consolidate

8   those.  From the get-go, we have issues relating to

9   recanted testimony or the alleged false testimony of two

10  witnesses, Mr. Israel Diaz and Mr. Christopher Pool.

11  There's also an issue relating to Brady disclosure of

12  impeachment evidence, although I think technically that

13  would be under the category of Giglio, but I think it's

14  still under the same parameters.  Multiple issues

15  relating to ineffective assistance of counsel, issues

16  pertaining to jury's exposure to outside influences.

17  And then another category, which I would, I guess, label

18  as constitutional law issues relating to jury charge and

19  voir dire and other aspects such as that.

20          So, one of the things that I noted at the

21  get-go was the dispute about whether or not there's a, I

22  guess, mandatory or obligatory right to have an

23  evidentiary hearing to develop some of these matters.

24  Having read the State's response, I think there's merit

25  in their response in that the Supreme Court case law

```
1    recited by counsel for Mr. Balderas was really more
2    limited in scope to issues relating to mental competency
3    or really mental ability relating to somebody being
4    medically diagnosed with an IQ below a certain
5    threshold.  Here we're looking at a little bit more
6    broader issues.
7              So Ms. Eckhoff, having read the filings,
8    I don't believe that's one of the allegations that's
9    been raised in your habeas corpus is that your client is
10   below the requisite IQ in order to be death penalty
11   ineligible.  Is that correct?
12             MS. ECKHOFF:  That's correct.  But, Your
13   Honor, I would point out that US Supreme Court precedent
14   in Evitts V. Lucey makes clear that due process applies
15   in situations where, like here, the State has
16   instituted a process, right, by creating Article 11.071
17   of the court of the Texas Rules of Criminal Procedure.
18   The State has undertaken a post conviction writ process.
19   And to the extent that the State has done that, then due
20   process applies.
21             So, I don't believe that a more limited
22   reading of Panetti and Ford is actually the case.  Those
23   particular cases pertain to those issues, but they are
24   guidance on the issue of due process applying in post
25   conviction, more generally.
```

1          THE COURT:  Okay.  Well, I mean, I'll take

2   that argument certainly under consideration; but I do

3   think that although the Court has discretion, in order

4   to allow the development of evidence in certain

5   categories, if warranted under the circumstances, I

6   don't know that it necessarily equates to an absolute

7   right on any potential issues.  The Court's belief is

8   that each individual issue will turn on its own

9   circumstances.  So...

10          And I'll rule on that, too.  I think that

11   the State was accurate in that the evidentiary hearing

12   is really a matter to be developed.  Evidence after the

13   fact, as necessary, but not necessarily to be used as a

14   fishing expedition or a means to -- where evidence could

15   theoretically exist, to allow it to probe every possible

16   nook and cranny.

17          My take on it has always been that if

18   there is indication of where evidence is likely to exist

19   or issues that are certainly undisputed that need to be

20   developed, that may be the appropriate avenue.  But with

21   each of that being said, let's kind of dive into the

22   weeds.  Specifically, we have the first issue of the

23   recanted testimony and false testimony that was alleged

24   in the briefing.

25          We have Israel Diaz -- and having not

1  presided over the actual trial itself, I'm playing a

2  little bit of catch-up with the facts. But was Mr. Diaz

3  presented as a cooperating witness on behalf of the

4  State's case in chief?

5       MS. HUTCHINS: By "cooperating witness,"

6  Judge, you mean he was himself charged with a different

7  capital murder that was reduced to an aggravated

8  robbery. He had pled guilty to the aggravated robbery

9  and it was open for sentencing after he testified in

10  Mr. Balderas' case and I believe two other cases.

11  Ultimately, he only testified in Mr. Balderas' case. He

12  did not testify in the two other cases because they

13  ended up trying different cases that didn't involve him.

14       All of this information was made known to

15  the jury, it was put out. I believe he testified in his

16  original jumpsuit from the jail and made all of that

17  information aware to the jury and was cross-examined on

18  it, as well.

19       THE COURT: Was there, whether it be an

20  written or oral understanding, I guess, between the

21  counsel for Mr. Diaz and the district attorney's office

22  that if he had provided testimony in the case or

23  presumably had agreed to provide truthful testimony in

24  the proceedings, that that would have been taken into

25  consideration in his own case?

1          MS. HUTCHINS:  Judge, I don't want to

2   misspeak.  There was a formal written notice given to

3   defense counsel who tried the case from State's counsel.

4   I believe it's -- it's been filed, it's in the district

5   clerk's office.  I just don't have a copy of that with

6   me today.  So whatever the terms were or whatever it

7   was, was disclosed to trial counsel at the time.

8          I know that the defense has asked for

9   other writings, communications within the DA's office

10  relating to information about Mr. Diaz' plea deal.  That

11  was all addressed prior to my coming on the case, I

12  believe it was in 2015.  And having read the transcripts

13  and correspondence, whatever existed that wasn't

14  otherwise covered by work product privilege was already

15  turned over to the Office of Capital Writs.  So there

16  shouldn't be anything that remains.  As far as I know,

17  there were no promises, there was nothing.

18          THE COURT:  Okay.  Well, in any event, at

19  some point after the conclusion of Mr. Balderas' trial I

20  understand, Ms. Eckhoff, that that witness has since

21  indicated that a portion or -- all or at least a portion

22  of his testimony was untruthful or has since been

23  recanted?

24          MS. ECKHOFF:  That is correct.

25          THE COURT:  And certainly, to what extent

1    has that witness made that declaration?

2            MS. ECKHOFF: In speaking with our

3    investigator, he explained what testimony of his was

4    false and -- on two different occasions. He did not

5    sign an affidavit to that effect, citing concerns raised

6    by his attorney. However, he confirmed, when presented

7    with the affidavit, that the information in that was

8    correct. So I understand, obviously, that we do not

9    have a sworn document on that; but that is exactly the

10   reason that an evidentiary hearing is necessary here, so

11   that the witness can be subpoenaed and questioned under

12   oath and we have an opportunity to ask him about that.

13           THE COURT: Well -- and this is a question

14   I have and maybe it's just more of a practical

15   consideration. Obviously, counsel who represented

16   Mr. Diaz was instructing him not to give a sworn

17   affidavit because if he had given sworn testimony during

18   the course of the trial that he is now admitting is

19   false, then he would be admitting committing perjury,

20   which in and of itself is a crime and carries punitive

21   consequences.

22           So to the effect that even if this witness

23   was produced and were put on the stand and placed under

24   oath, do you have confidence that questions that you

25   posed about whether or not he gave false testimony would

1  result in him revoking his Fifth Amendment privilege not

2  to testify?

3          MS. ECKHOFF:  I cannot tell you how he

4  would testify.  I don't have any insight into that, but

5  we need the opportunity to try.  We need the opportunity

6  to try and present that evidence to this Court.  We need

7  that in order to satisfy Mr. Balderas' right to due

8  process.

9          THE COURT:  Well, any time I think you

10  have a communication that somebody has changed their

11  testimony or has recanted their testimony -- that is, of

12  all the categories, one that certainly caught my

13  attention the most.  You've talked about either

14  presenting the investigator to testify, although

15  obviously, the issue you run into there is some hearsay

16  issues.

17          The most reliable way to present that

18  evidence would be through that particular witness,

19  though that witness is not willing to testify without

20  invoking the Fifth.  Rather than going through that

21  process of bringing him over here just to have a

22  five-minute hearing to have him invoke the Fifth and not

23  answer any questions, I don't know if you've had any

24  conversations with his attorney to see whether or not he

25  is willing to come and testify at a hearing about those

1   matters or if he's been advised by his attorney to

2   invoke the Fifth; but certainly I think that would be

3   something that would be somewhat helpful to know whether

4   or not it would be a fruitful endeavor to even produce

5   him as a witness.

6            MS. ECKHOFF: Yes, we have not had

7   contact. And I can't say what his attorney has told

8   him. To the extent he's still even represented, I don't

9   know even know that.

10          THE COURT: Well, I think ethically, as a

11   judge presiding over a case, if there's a possibility

12   that somebody is going to testify and possibly

13   incriminate themselves in any capacity, I think,

14   ethically I'm bound to at least admonish that witness as

15   to their constitutional rights and if they're indigent

16   or incarcerated, to appoint an attorney to represent

17   their interests.

18          MS. ECKHOFF: Sure.

19          THE COURT: I think that's another issue

20   that would need to be addressed to certainly protect

21   Mr. Diaz' rights if he's going to be possibly produced

22   at a hearing. Okay.

23          Well, let's discuss Mr. Pool. I looked

24   through the briefing and I've scanned through it several

25   times. I don't know how extensive his involvement is

1  discussed, but if you could share with me specifically
2  the scope you believe that his was false.  Has he also
3  recanted his testimony?

4          MS. ECKHOFF:  No, Your Honor.  We -- at
5  trial, he provided testimony.  He testified in the
6  punishment phase.  He had been a corrections officer at
7  the Harris County Jail and was called by the State to
8  testify, I believe, about a discovery in contraband, I
9  think.  And, in the course of that it came out -- in the
10  course of his testimony, he recognized that he had been
11  essentially let go from the Harris County Sheriff's
12  Office due to an incident with an inmate where the
13  inmate actually died.

14          And through the -- you know, he made
15  appeals through personnel.  And it was notable because
16  the issue was not only that this incident occurred and
17  the inmate ended up dying, but that part of the reason
18  that he was let go was because he was found to have been
19  dishonest about something which is, of course,
20  significant.

21          When this case came out at trial -- at the
22  trial in cross-examination, trial counsel did not have
23  his personnel file.  And he said on the stand that he
24  had been cleared of all of those charges.  And that
25  actually wasn't true because a review of his personnel

1   file, including what he was relying on to say he was

2   cleared of all charges, doesn't actually clear him of

3   dishonesty and doesn't clear him of this incident where

4   the inmate died; but rather, it says that he could be

5   rehired.

6             So, like, part of his punishment was that

7   he could not be rehired by Harris County Sheriff's

8   Office. And what he got, you know, cleared of was

9   actually the punishment was reduced. He wasn't cleared

10   of being dishonest.

11             THE COURT: Okay.

12             MS. ECKHOFF: And it's a misdemeanor. So

13   proof for that is the personnel record that contradicts

14   his testimony.

15             THE COURT: Well --

16             MS. ECKHOFF: So I don't necessarily

17   actually believe testimony from him in a live hearing is

18   necessary. There are records on that.

19             THE COURT: That was going to be my next

20   question, if that can be established through the records

21   developing the testimony through cross-examination

22   probably with some very fruitful --

23             MS. ECKHOFF: Correct.

24             THE COURT: Okay. Next on the issue we

25   have the matter relating to the disclosure of the

1   impeachment information relating to a witness, I think,

2   pertaining to one of the notes.  Through the attorney

3   notes or investigator notes?

4                  MS. HUTCHINS:  They're attorney notes,

5   Judge.

6                  THE COURT:  Well, my understanding is --

7   what the rule requires is whether -- they opposing

8   counsel has provided the notes themselves is typically

9   irrelevant.  What the courts care about is whether or

10  not the information is conveyed, whether that be

11  conveyed via email, or orally, or whatever capacity, as

12  long as it was shared with the opposing counsel prior to

13  trial at a time when it could still be useful and

14  effective.

15                  So I'm reading everyone's briefing

16  correctly.  It seems that the information was conveyed

17  over to opposing counsel, at least, prior to trial, but

18  it was shortly before trial.  I think it was three days.

19  Is that the allegation?

20                  MS. HUTCHINS:  So, Judge, we have looked

21  at it in two different ways sort of based off the

22  argument that defense is making now.  According to the

23  affidavit, trial counsel, Mr. Godinich, he was aware of

24  it pretrial.  There's no timeline from him.  He said in

25  his review of all of the documentation from the DA's

1  office, which was over a series of years that we have

2  based off of his time sheets, he reviewed the entirety

3  of the file.  These notes were amongst the things that

4  he's reviewed, he was aware of them.

5           In terms of trying to pinpoint an exact

6  timeline, I think the defense makes light of this email

7  that existed at least we know three days before

8  testimony started.  At minimum, we know three days

9  before they were made aware of some meetings that

10  occurred and that's sort of, in terms of a timeline, the

11  best we can qualify.  But Mr. Godinich says he was aware

12  of it well before.  Prior prosecutors on the case say

13  that these notes were available in the State's file for

14  defense to review.  The defense did review the State's

15  file and that was back in 2010, 2011.

16           And one thing I did want to mention to the

17  Court that we didn't include in our briefing, I came

18  across it again in preparing for this hearing, is that

19  Mr. Godinich actually in presenting Walter Benitez, I

20  believe, one of his -- his star defense witness,

21  Mr. Benitez actually testifies to some of the contents

22  of these notes and the meetings that were held several

23  days before the murder talking about what was discussed

24  at the murder and the hit being put out.

25           So I just wanted to bring that to the

1   Court's attention that they were able to make use of

2   that evidence, even if it was three days; but we

3   certainly believe it was years before.

4           MS. ECKHOFF: There's a few different

5   points I would like to address here. First of all, I

6   think the State misunderstands the significance of the

7   pretrial hearing, at least the significance to us.

8   Okay.

9           These notes that were withheld were

10  impeachment because on multiple occasions years before

11  the trial, the State's star witness against Mr. Balderas

12  gave contradictory statements. What he says in those

13  happened is not what he testified to. They're prior

14  inconsistent statements. Right? That was not revealed

15  three days before at this pretrial hearing. Right?

16  This is not what that pretrial hearing disclosed.

17          I raised that because in Mr. Godinich's

18  and Mr. Nunnery's affidavits, they make the assertion

19  that they knew about all of these things and

20  incorporated them. And what I'm telling you is that in

21  viewing trial counsel's own emails amongst the defense

22  team, it makes clear that they were unaware of these

23  meetings until three days before.

24          I fully acknowledge that they have notice

25  of that three days before, or whatever, at this pretrial

1    hearing.  However, those meetings were discussed in the

2    notes.  Diaz had provided that information to the State.

3    So, for State -- or for the trial counsel to be like,

4    Hey, I'm surprised to find out that this is the State's

5    theory of what happened, you know, just a few days

6    before trial, calls into question their assertion that

7    they viewed these notes before and incorporated them

8    into their preparations.

9              And further, I will also note that

10   Mr. Godinich doesn't actually say that he saw the notes.

11   His affidavit says the notes were viewed.  It doesn't

12   say who viewed them or when they were viewed.  And they

13   also, both trial counsel -- and Mr. Nunnery's statements

14   is even more vague.  It's, I was aware that the notes

15   existed.

16             Doesn't say how or anything to give you

17   any more information than that.  So I think that that

18   vagueness is a real issue.  And there's a case here of

19   Harris County, ex parte Prevost where the CCA has

20   remanded on one of these writs because trial counsel's

21   affidavits were vague.

22             The other issue is in their affidavits

23   they both say that they incorporated the knowledge that

24   they gained from reviewing these notes into their

25   cross-examination of Mr. Diaz.  Again, these notes

1 pertain to prior inconsistent statements that Mr. Diaz'

2 had made to the State. There are no questions on

3 cross-examination of Mr. Diaz at trial about prior

4 inconsistent statements or even prior meetings with the

5 State. So, that doesn't seem to match up with what

6 trial counsel is asserting in their affidavits.

7 And I think what we need here is the

8 opportunity to cross-examine. You know, the Supreme

9 Court says that reliability in proceedings like this is

10 best determined through the crucible of

11 cross-examination. We need to be able to ask these

12 questions and get past the vague answers and know what

13 we're actually dealing with here. And that's really all

14 we're asking for is an opportunity to confront witnesses

15 against Mr. Balderas and present evidence because we

16 haven't had that opportunity yet.

17 THE COURT: The issue that, as far as the

18 disclosure goes, in the defense counsel's affidavit they

19 stated, at least from the record it was clear, that in

20 the hearing it was laid out or made known, the

21 inconsistent statements.

22 MS. ECKHOFF: No, they said -- my

23 understanding is that the hearing was where the State

24 went in and said, This is what our theory of the case

25 is.

1      They didn't say, This is our theory of the

2  case.  We are going to rely on Mr. Diaz to do it.  And

3  oh, by the way, he said contradictory things to us

4  before.

5          The inconsistent statements were not an

6  issue at the previous trial hearing.

7          MS. HUTCHINS:  Judge, if I may respond?

8          THE COURT:  You may.

9          MS. HUTCHINS:  I think we have, I guess,

10  two different frame works that we're are looking at if

11  I'm understanding correctly.  So at the pretrial hearing

12  that happened, the State proffered what they were going

13  to prove through various witnesses.  And one of the

14  things that they proffered was that they were going to

15  provide testimony, that there was a meeting three days

16  before the murder.  And at that meeting there was a hit

17  put out on the complainant, the defendant was present at

18  that meeting; and it was just made known that that's --

19  that the hit was out.

20          When Mr. Godinich returns to the office,

21  I'm assuming, is when he writes this email.  And he

22  writes the email to the defense team that says, We

23  learned some information.  We learned the State's

24  case -- a part of their theory of their case and it's

25  the first time that we've heard about meetings three

1  days before and three days after the meeting.

2         I've reviewed the transcript from the

3  hearing.  There was never any mention of the meeting

4  three days after.  I believe Mr. Godinich made an error

5  in that regard in writing that front portion of the

6  email.  And so -- and he asked the defense team for any

7  insight into this.

8         Well, when you -- and so that's the extent

9  of sort of, at least on the transcript, what was

10  revealed from the meetings that were held three days

11  before.  There is a portion in the transcript where

12  Mr. Nunnery specifically asked, I believe twice, "Three

13  days before?  Three days before?"  Which in reviewing

14  it -- again, we are reviewing paper documents -- it

15  becomes of note because looking at the Diaz notes, the

16  Diaz notes do mention meetings.  And they mention

17  meetings nine to ten months before.  And they mention

18  meanings that appear to be different with no timeline,

19  but there's never specifically a three-day meeting

20  that's mentioned in the notes.

21         So that's the point that I was trying to

22  make in my written motion was that this element of

23  surprise that appears in Mr. Godinich's email is not

24  mutually exclusive from him, his having prior reviewed

25  the contents of the notes or somebody having told him

1　the notes or whatnot because that three-day number never

2　exists in the notes. In terms of the entirety of notes,

3　the entirety of the notes deal with three different

4　conversations that were had with Mr. Diaz and the

5　State's attorneys back in, I believe it was, 2007 and

6　2008.

7　　　　　　　And these conversations deal with a host

8　of different extraneous offenses. They jump around, the

9　names are sort of confusing as to who's participating in

10　what, what's happening where. And those are the

11　notes -- the rest of the contents of the notes are what

12　Mr. Godinich and Mr. Nunnery say they were aware of the

13　information in that note -- in those notes before trial.

14　　　　　　　I know defense counsel is now making a

15　distinction, Well, if they knew it, they certainly

16　didn't use it at trial. Well, that's trial strategy.

17　That's how they want to conduct their cross-examination.

18　Just because they didn't specifically cross-examine on a

19　point that Mr. Balderas now wishes they had doesn't mean

20　that they were ineffective and doesn't mean that they

21　didn't know about it, and I think that's the key issue

22　here.

23　　　　　　　MS. ECKHOFF: I think there's two points

24　to make to that. One is you're presuming a lot. The

25　State is presuming a lot about what Mr. Godinich's email

1  meant.  This is something we should ask him, he should

2  be providing those answers.  We shouldn't be basing it

3  on what the State is interpreting.

4           Second of all, and to a similar point is

5  that the State -- trial counsel may or may not have a

6  strategy.  Those are things that they can testify to

7  themselves that they should be cross-examined on.  It's

8  very easy in a post-conviction case for trial counsel to

9  come in and say any error was due to strategy.  And

10  that's clearly not always the case because if that was

11  the case, we wouldn't have post-conviction relief.  And

12  they need to be tested on what that strategy was and

13  what the thinking was and we need to be able to prove

14  whether it was or was not strategy.

15           We don't -- we should not just take their

16  assertion, or in this case the State's assertion that it

17  must have been strategy.  That's just not how these

18  proceedings should work.  We need the right to confront

19  these witnesses.

20           MS. HUTCHINS:  Just one more thing, if I

21  may?

22               THE COURT:  Please.

23           MS. HUTCHINS:  Separate from this, I just

24  want to move it along.  One of the cases that Counsel

25  referenced was Prevost saying that that case was out of

| | |
|---|---|
| 1 | Harris County, which it was, and that it was sent back |
| 2 | because the affidavits were so vague. The affidavits in |
| 3 | Prevost were much different than the ones that were |
| 4 | filed here. And in that particular case, they were |
| 5 | sent back for additional affidavits to clarify some of |
| 6 | the points that were made, which is also certainly |
| 7 | something this Court is able to do. |
| 8 | THE COURT: I understand. And that's |
| 9 | something I've noted, as well. Ultimately, as I |
| 10 | understand it, the attorney affidavit referenced that |
| 11 | they had access to the notes and the notes were viewed |
| 12 | by somebody on the defense counsel team -- it doesn't |
| 13 | necessarily state who -- that ultimately at the time the |
| 14 | affidavits were drafted, the defense counsel was aware |
| 15 | of, I guess, the contentions of these inconsistent |
| 16 | statements and had not indicated in their affidavits, at |
| 17 | least that I saw from review of the affidavits, that |
| 18 | there was information that they were not privy to or did |
| 19 | not have access to, just from our review of the |
| 20 | affidavits. That's certainly an aspect that I will take |
| 21 | under consideration. |
| 22 | Next, let's address the matter of |
| 23 | ineffective assistance of counsel. Now, I know there |
| 24 | are at least four different caveats you've raised in |
| 25 | your petition that address ineffective assistance of |

1  counsel on trial counsel and right of capacities.

2       And so first, I'll note that as a basic

3  premise under Strickland the Courts have always

4  addressed this that ineffective assistance of counsel

5  that would amount to representation that was so

6  deficient that essentially the defendant did not have an

7  attorney assisting in the trial.

8       MS. ECKHOFF:  No.  Your Honor, it's

9  whether or not errors were made that would cause

10  prejudice.  And the prejudice is whether or not even one

11  juror would have changed their mind.

12       THE COURT:  Okay.  Well -- so let's kind

13  of probe these individually.  And again, I note -- I say

14  that noting certainly, as you noted, with any trial

15  strategy that, you know, hindsight is always 20/20.

16  Sometimes an attorney can, you know, roll the dice

17  thinking that outcome may have one result and have a

18  different result.  And in my experience, having

19  previously dealt with dozens and dozens of 22.55s and

20  doing the issues of ineffective assistance of counsel

21  this is an area that I have some experience.  So we'll

22  just tackle these individually.

23       We're talking about the first issue, I

24  think, you've raised in the guilt-innocence phase to

25  address, investigate or present information on alibi

1  evidence. Essentially, I guess, you're alleging that

2  counsel didn't do enough information to investigate the

3  case prior to it being tried?

4           MS. ECKHOFF:  Correct, their investigation

5  was inadequate.

6           THE COURT:  Okay.  And specifically, in

7  what regards?

8           MS. ECKHOFF:  First of all, we know that

9  these witnesses exist.  We've provided affidavits from

10 them.  And the only point at which a trial counsel in a

11 capital case should not be investigating is if they have

12 a reasonable basis for not investigating.  Right?  And

13 there's no indication here that there was no -- there

14 was a reasonable basis for failing to investigate the

15 guilt phase aspects of this case.

16          Clearly the guilt phase, the State's case

17 against Mr. Balderas was anything but open-and-shut.  I

18 mean, we have a jury that had to deliberate for more

19 than two days before, you know, finding him guilty and

20 only after, as you've already mentioned, the extraneous

21 influences on them did they come to a guilty verdict,

22 you know.  And there are still serious questions about

23 whether or not Mr. Balderas committed this crime.

24          And the guilt phase could have -- trial

25 counsel could have presented, could have discovered and

1  presented alibis. And there's no indication that they

2  actually sought to investigate, talked to people.

3          I mean, if you read their affidavits they

4  make very clear that they blame any lack of

5  investigation on their part on Mr. Balderas himself, or

6  on his family and friends. And Rompilla v. Beard makes

7  very clear that that is no excuse for not investigating

8  the case.

9          THE COURT: Well, let me pose this

10  question to you: Rather than asking defense counsel to

11  come and question them about the failure to investigate

12  certain factual matters that you think would pertain to

13  guilt/innocence, why not just present evidence on those

14  particulars that you've addressed at a evidentiary

15  hearing? In other words, if you believe that there is

16  additional evidence that exists that was not reflected

17  in the record that would pertain or reflect on actual

18  innocence, why not petition the Court to bring in

19  witnesses to develop that evidence at the habeas corpus

20  level?

21          MS. ECKHOFF: That is a part of what we

22  would present at a live evidentiary hearing because it's

23  important to note that this Court is going to have to

24  make credibility determinations about witnesses. We

25  have provided affidavits from these witnesses in order

1   to support -- to meet our pleading burden in filing the

2   application.

3           And I want to make clear that -- and even

4   the State notes this in their brief -- that we are not

5   required to plead evidence with our application.  We are

6   only required to allege the facts which, if proven true,

7   might result in relief.  And we have met that burden

8   here and we do that by attaching affidavits.  We have

9   those affidavits, we want to call those witnesses, and

10   we want you to hear them testify so you can assess

11   credibility.

12           THE COURT:  And that kind of relates to my

13   original question.  My main goal and my main focus that

14   certainly gets my attention is the issue of wrongful

15   convictions.  And if there's evidence that was not

16   presented or was even unknown at the time that could

17   weigh on a person's conviction that would indicate that

18   the wrong -- an innocent person has been convicted of

19   this crime, or the wrong person has been convicted that

20   it comes up after the fact or is newly discovered, then

21   that a -- at any time post trial, and certainly in the

22   habeas corpus setting, that that would be an appropriate

23   time to do that.

24           So what evidence is it that you believe

25   exists that was not properly developed that needs to be

```
1    developed at this point?  What witnesses, specifically
2    by name, do you need to call in order to develop that
3    testimony?
4                    MS. ECKHOFF:  The specific witnesses that
5    we've attached affidavits from are Anali Garcia --
6                    THE COURT:  Any witnesses that you believe
7    exists that would offer testimony that would bear on the
8    innocence of your clients.
9                    MS. ECKHOFF:  Right.  So we have at least
10   two witnesses, Anali Garcia and -- I apologize, Octavio
11   Cortes.
12                   THE COURT:  And Ms. Garcia, what is her
13   relevance or relation to this case?
14                   MS. ECKHOFF:  She is an alibi witness.
15                   THE COURT:  Okay.  And her testimony was
16   not presented during the original trial?
17                   MS. ECKHOFF:  No.
18                   THE COURT:  Okay.  And then Ms. Cortes,
19   what is her relevance in this case?
20                   MS. ECKHOFF:  It's Octavio, it's a mister.
21                   THE COURT:  Sorry, Mr. Cortes.
22                   MS. ECKHOFF:  Actually, it's Ms. Garcia's
23   brother.  Also an alibi witness.
24                   THE COURT:  Are those witnesses located
25   within the subpoena power of this court or are they
```

1   located in Mexico or any other location that's outside

2   of the subpoena power?

3          MS. ECKHOFF:  I believe at least

4   Ms. Garcia is in Texas.  And Mr. Cortes, the last that

5   we spoke to him, was within the United States.  I'm not

6   sure his current location.

7          MS. HUTCHINS:  May I be heard?

8          THE COURT:  Ms. Hutchins, let me hear from

9   you on that aspect.  Obviously, I guess the contention

10   is that the original trial counsel were aware of these

11   witnesses elected not to present their testimony at

12   trial for whatever, whether it be strategy or whether or

13   not they found that witness to be credible.

14          MS. HUTCHINS:  Correct, Judge.

15   Mr. Godinich specifically identifies Ms. Garcia in his

16   affidavit and has notes from meetings with Ms. Garcia;

17   likewise, met with Iliana Cortes, who is also a sister.

18   Mr. Octavio Cortes, my understanding is, is the brother.

19   This is a family with whom the defendant's brother has a

20   child with one of the sisters.  I can't remember if it's

21   Iliana or Anali.  So in essence, it would be, like, his

22   in-laws.

23          The defense was aware of Ms. Garcia and

24   Ms. Cortes, met with them, specifically spoke with them

25   about the alibi defense which would be that Mr. Balderas

1   was at the house making illegal copies of CDs at the

2   time and wasn't allowed to leave when news broke out of

3   the murder.  But during these meetings these witnesses

4   had very vague recollections, couldn't provide any

5   recollections, no specifics, were told that they had to

6   go meet with the defense attorney by Mr. Balderas'

7   girlfriend so they showed up not really knowing why they

8   were there.

9               And ultimately, defense counsel made the

10  decision that they did not have any either useful or

11  admissible evidence that they can present at trial and

12  chose not to.  And I believe there's documentation

13  attached to Mr. Godinich's affidavit, as well as some of

14  the exhibits the defense has attached to their own writ

15  application that support this.

16              THE COURT:  Okay.

17              MS. ECKHOFF:  That's not entirely correct

18  because while Ms. Cortes, I do believe, was taken to

19  meet with defense counsel, Ms. Garcia did not meet with

20  defense counsel in person.  In fact, she called them up

21  on her own to reach out to them.  They never reached out

22  to her.  And they didn't discuss, like trial counsel --

23  there's no indication that they discussed any aspect of

24  an alibi with her, they were asking her more about

25  mitigation issues of you know, What's your relationship

1     like with Mr. Balderas? And is he a nice guy, type

2     thing. They didn't broach the alibi with her. They

3     never discussed it with her.

4             THE COURT: Well, outside of these

5     particular witnesses, are there any other areas that you

6     felt that the trial attorneys failed to adequately

7     investigate which you believe or note that evidence

8     exists that needs to be established on the record?

9             MS. ECKHOFF: And to be clear, Your Honor,

10    there may be additional witnesses, additional alibi

11    witnesses beyond what we have attached. Right? There

12    were other members of the family, et cetera. However,

13    those are the affiants that we documented to meet our

14    burden.

15            Beyond that, trial counsel also didn't

16    conduct an investigation into the actual gang.

17    Obviously, this was a gang shooting. And to better

18    understand the structure of the gang and how it operated

19    in order to confront the State's depiction of how the

20    gang worked and, you know, the State said that

21    Mr. Balderas had to be the shooter for one reason or

22    another because of, like, essentially gang politics.

23    And there are witnesses who can provide insight, who

24    provided insight to support our application on how the

25    gang actually operated.

1            And had they done that, then they could

2 have actually confronted the State's depiction of how

3 this all went down. And if that were the case, they

4 could have poked holes and challenged what they were

5 telling the jury.

6            THE COURT: And who were those particular

7 witnesses that would have testified on those particular

8 matters?

9            MS. ECKHOFF: In particular, Jose Perez

10 and Walter Benitez. Now, Walter Benitez did testify as

11 a defense witness at trial; but there was more that he

12 could have provided which is detailed in the affidavit

13 attached to the application.

14            THE COURT: Okay. And Mr. Perez'

15 testimony would have been, I'm guessing, in line of what

16 Mr. Benitez would have testified to?

17            MS. ECKHOFF: Correct.

18            THE COURT: Any other areas that you feel

19 were not properly investigated but factually needed to

20 be established on the record or that would establish

21 their actual innocence or wrongful conviction?

22            MS. ECKHOFF: And to an extent, the

23 eyewitness identification, which is a different part but

24 sort of a related piece of the ineffective assistance of

25 counsel guilt claim which is that, you know, aside from

1    Mr. Diaz, the State's other key witness against

2    Mr. Balderas was an eyewitness who is testifying, you

3    know, more than nine years after the fact about her

4    memory of that night.

5           And the line-up procedures that she was

6    put through before making the identification were

7    suggestive and problematic. And her identification in

8    the first place was a problematic because initially she

9    says immediately after the fact, you know, her first

10    recollection in speaking with law enforcement is, I've

11    never seen this guy before. I didn't know who he was.

12           And then it's only more than a week later,

13    after viewing a lineup with Mr. Balderas' picture in it

14    the day before, she says, Oh, yes. That's him.

15           And that's significant because she knew

16    Mr. Balderas for up to a year before this incident

17    occurred. So, that's questionable in the first place.

18    So trial counsel investigated this eyewitness

19    identification and the circumstances surrounding it, and

20    investigated the eyewitness herself. There is evidence

21    out there that the eyewitness, Ms. Bardales, had had a

22    relationship with Mr. Diaz, who the State had also

23    brought to her a lineup with his picture in it before

24    this.

25           And she was, like, Oh, yes, I know him.

1   And she had had a prior relationship with him.  And I

2   think that that is -- if these facts had been presented,

3   I think that that could have been important because I

4   think something else that's really key to this -- it's a

5   complicated case -- is that Mr. Diaz' had a motive to

6   kill this victim.

7               This victim was going to be a witness

8   against him in an aggravated robbery case.  He had the

9   motive to kill, not Mr. Balderas.  And if you combine

10  that with, you know, the eyewitness' prior relationship

11  with Mr. Diaz that can cast further doubt on her already

12  shaky identification.

13              And then, of course, that leads into the

14  issue of the eyewitness identification expert and how

15  that happened.  And I'm happy to go into that now or we

16  can address this first and get there.

17              THE COURT:  I don't think we need to dive

18  into the full fleshed-out matters of that.  Again, I've

19  read the transcripts in the prior hearing; but if I

20  understand it correctly, the issue is that there was

21  identification, an eyewitness expert that was detained

22  or noticed by the defense to be used but ultimately not

23  called?

24              MS. ECKHOFF:  Correct.  He gave testimony

25  outside the presence of the jury because trial counsel

```
 1    attempted to get the identification thrown out.  The
 2    Judge ruled that the identification was coming in,  but
 3    the trial counsel could present this expert to the jury.
 4    This expert who provided information about, you know,
 5    why the lineup procedures were suggestive and how that
 6    may have impacted an identification.  And trial counsel
 7    just never presented this information for the jury.
 8                    MS. HUTCHINS:  Judge, might I be heard?
 9                    THE COURT:  Briefly, yes.
10                    MS. HUTCHINS:  Judge, in terms of that
11    there, in fact, was a hearing on the record with
12    Dr. Malpass, the ID expert.  And after his testimony to
13    the Court and then after another defense witness,
14    Celeste Munoz testified again in another hearing outside
15    of the presence of the jury, the defense brought up with
16    the Court their concern about a particular case that
17    they had found.  And they cite that in the record.  It's
18    in Volume 29, Page 14.
19                    And they specifically tell the Court that
20    in light of what they found and in this case they are
21    worried that it's -- that by presenting Dr. Malpass,
22    they are going to open the door.  And the Court
23    specifically says, you know, I'm not familiar with that
24    case.  I don't think it's going to open the door, but
25    again, I'm not familiar with that case.
```

1          And she's also said she's not familiar

2   with all of the different extraneouses that exist.  And

3   so I think it's clear at that point that the defense had

4   this excerpt, they put on the testimony for the Court,

5   they've heard how the testimony of Ms. Munoz is going to

6   go, as well as Dr. Malpass.  They have this case law and

7   amongst themselves at that point made a reasonable

8   decision that they know the case better than the judge

9   and chose not to present this witness.

10          THE COURT:  Ultimately, the testimony of

11  the witness was, at least, established on the record,

12  although it would be outside the presence of the jury,

13  the evidence was at least recorded on the record for

14  review.  Correct?

15          MS. ECKHOFF:  It's essentially, yeah, a

16  proffer.

17          THE COURT:  Okay.

18          MS. ECKHOFF:  And just to be clear, the

19  Court's ruling on two different occasions in this case,

20  you know, both when Dr. Malpass was present and when

21  she's speaking about when Ms. Munoz was at issue, the

22  Court's ruling was that Dr. Malpass could testify

23  without opening the door about suggestive lineup

24  procedures.

25          THE COURT:  Okay.  I think that kind of

1   covers the issue of evidence that was not presented

2   unless, Ms. Eckhoff, is there anything else that we have

3   not addressed that we need to cover on the issue of

4   trial counsel's failure to present certain evidence that

5   you believe related to guilt or innocence?

6           MS. ECKHOFF:  No, I believe that's it.

7           THE COURT:  Okay.  I note there the next

8   point where you've got trial counsel's failure to

9   present certain testimony of witnesses from Mexico.  And

10  my recollection from the transcripts and from the record

11  was that there had been attempts to obtain those

12  witnesses.  Again, they're outside the subpoena power of

13  the Court, but they voluntarily appeared electronically

14  through Skype or some sort of other teleconference

15  network but because of technical difficulties, some of

16  the testimony was cut short.  And then another witness

17  refused to testify or was unable to because of technical

18  difficulties?

19          MS. ECKHOFF:  That's my understanding in

20  terms of how the actual Skype testimony went was that

21  once -- as it was being presented, there were technical

22  difficulties, I believe, on this side of things that was

23  making it incredibly difficult and it was sort of

24  abandoned.

25          And the claim is actually that trial

1   counsel didn't preserve for the record the trial Court's
2   denial of the funds.  So there are some indications in
3   emails between trial counsel and the judge that he was
4   trying to get funds in order to bring these witnesses in
5   physically from Mexico to testify.  And the Court
6   informs him that she's basically not going to do that
7   and to come up with some other way of doing it.  And, of
8   course, eventually at the trial it doesn't work very
9   well and it all gets abandoned.

10          Because trial counsel never made that
11  request on the record and it was never denied on the
12  record, it was not an issue that could be addressed on
13  appeal.  So the claim is that they were ineffective for
14  failing to preserve the denial of funds on the record.

15          THE COURT:  Okay.  Well -- and again, at
16  least as to the request for denial of funds, as far as
17  questioning defense counsel, it seems like that's
18  something that's not so refuted.  The record will speak
19  for itself whether or not they raised an objection or
20  not.  But as far as the affidavit goes, you're not
21  contending that there's any ambiguity in their responses
22  to that allegation?

23          MS. ECKHOFF:  They're -- if I recall
24  correctly, I don't believe their affidavit addresses
25  their failure to make that request on the record at all.

1        THE COURT:  Next we've got the trial

2   counsel's purported failure to allege the right to a

3   speedy trial.  I do note that there's, I think, eight

4   years between that had passed between the date of the

5   alleged offense and then the date of trial, which is a

6   significant amount of time.  Albeit, in a capital case,

7   it's not out of the ordinary to have a considerable

8   amount of time to pass, especially for defense counsel

9   to be -- have time to prepare for trial.

10        My experience, usually time is usually an

11   ally of the defense.  So it's fairly seldom that I see

12   defense counsel wanting to go to trial rather quickly.

13   But on looking at the issue of prejudice, is there a

14   particular piece of evidence or a particular way that

15   you feel your client was prejudiced by not going to

16   trial sooner versus the date that the trial actually

17   commenced?

18        MS. ECKHOFF:  Well, Your Honor, there was

19   a key mitigation witness who died during that time,

20   Mr. Balderas' brother.  And because this case, you

21   know -- because this case involved such weak evidence

22   against Mr. Balderas in the first instance, it all

23   basically comes down to one eyewitness who has a shaky

24   identification and a codefendant who literally flips a

25   day before Mr. Balderas' trial begins, that

1 recollections -- I mean, we have an entire claim that

2 there was this alibi. Right?

3         If they had investigated and discovered

4 this alibi, like, those memories of the night eight

5 years ago would arguably be much stronger closer in

6 time. I think that all of that -- and I take your point

7 that I'm sure that it is the case that the defense would

8 usually want to wait longer to go trial, but I think

9 that that presumes that there's actually an active

10 adequate investigation happening.

11         There are long, long periods in that eight

12 years where it's wholly unclear whether any significant

13 investigation, particularly into the guilt phase of this

14 case, was ever occurring.

15         THE COURT: Okay. And then finally,

16 alleged ineffective assistance of counsel as to the jury

17 selection process talking about the topic of sexual

18 abuse during voir dire. In what capacity was that

19 particularly an issue in this case?

20         MS. ECKHOFF: Mr. Balderas himself. A key

21 piece of the mitigation that trial counsel presented at

22 trial was his own history of sexual abuse. And it was

23 definitely a key component of the mitigation that they

24 presented in his defense. And despite knowing that well

25 in advance of conducting voir dire, they didn't ask any

1 questions of potential jurors that might kind of sauce

2 out their own experiences with sexual abuse or their

3 understanding of it, those sorts of things that could

4 help them identify whether that would be a juror where

5 evidence of this type might resonate.

6     THE COURT:  Well, so what was -- was the

7 issue to try and identify jurors that had been victims

8 of sexual abuse?

9     MS. ECKHOFF:  It's -- no, not necessarily.

10 It's to their views, and their understanding and how

11 they might receive that evidence.

12     THE COURT:  I mean, I know with voir dire

13 it's kind of not an exact art on what things you may

14 want to raise with a jury or may not want to raise with

15 a jury.  Certainly, logical things that would relate in

16 a capital case would be issues relating to the death

17 penalty, issues relating to prior criminal convictions,

18 criminal history, people's belief on whether someone

19 could be rehabilitated.

20     All those things certainly would be very,

21 very relevant; although, I think that would clearly fall

22 squarely within the issue of trial strategy of someone

23 not wanting to raise the issue of sexual abuse with a

24 jury in that it could also be a double-edged sword.  You

25 have people that have very strong feelings relating to

1   that topic.  That may also result in jurors being -- I

2   guess, having the fans flamed on somebody they'd be more

3   inclined to convict versus one they'd be more inclined

4   to find at issue with mitigation and possibly having to

5   qualify the jurors before they've even decided guilt or

6   innocence is a bit of a challenge.  But that issue, I

7   think, may be a little bit tougher issue.

8           I think generally in voir dire, appellate

9   courts have given lawyers a little bit more leeway in

10  strategy in qualifying jurors.  But other than raising

11  the issue of -- the defendant's issue of people's

12  experience of sexual abuse or their own attitudes

13  towards it, or any other areas within the voir dire

14  process of the trial, you felt that the trial counsel is

15  deficient and would warrant needing to be presented as a

16  witness to be examined further at an evidentiary

17  hearing?

18          MS. ECKHOFF:  I don't believe so.

19          THE COURT:  We've gone about an hour and

20  my customary practice is about every hour to take about

21  at least a 10-minute break to let everybody use the

22  restroom and, more importantly, to let our court

23  reporter get a brief of rest of the hands.  So why don't

24  we do that, take a 10-minute recess and then we resume

25  at 35 minutes past the hour.

1          *(Recess taken.)*

2          THE COURT:  All right.  We're back on the

3    record.  I think we're getting towards the tail end of

4    the issues that we needed to address.

5          Ms. Eckhoff, next on my list was the issue

6    pertaining to the jury's exposure to certain outside

7    influences.  And I know we'll address each of those

8    individually, but I just want to make sure that I'm

9    clear.  Are you asking the Court to bring in individual

10   jurors from that trial and question them pertaining to

11   their deliberations and those influences?

12         MS. ECKHOFF:  No, I don't think it's

13   necessary to question them about their deliberations.

14   And I understand that that's not even permissible under

15   606(b).

16         THE COURT:  Correct.

17         MS. ECKHOFF:  What I do think is important

18   is to hear how they interpreted these events.  It's

19   impossible, I think, to assess whether these were

20   extraneous influences that could affect a juror.  And I

21   think this is why, as we somewhat discussed at the prior

22   hearing, you know, this isn't about these specific

23   jurors and their specific decision and whether they can

24   say that this affected their decision or not.

25         The standard -- the law makes clear that

1   the question is whether or not these events would

2   basically have impacted a hypothetical juror in their

3   position. Right? I think it's important to -- well,

4   because it can't be them, specifically. It's someone

5   sitting in a situation like them. Is it possible or

6   likely that someone experiencing that would be affected

7   and have it affect their verdict?

8             What is important to hear from the jurors

9   is what they saw, how they -- what the reaction was and

10   how that felt and how it impacted them. And then you

11   can take that information to understand, okay, if

12   someone -- a hypothetical juror was feeling that, could

13   it have impacted their verdict.

14             And I think another key piece of this

15   claim is the timing of when the Court addressed this on

16   the record. That's another key piece of this claim.

17   And it's really unclear, even from all of the

18   information that has been presented in the application

19   and in the State's response to it, we still don't have

20   a clear timeline of when the Court became aware that

21   this had happened. And that's really important because

22   we have indication -- we provided an affidavit from a

23   person who was sitting in the courtroom that day, a

24   member of Mr. Balderas' family who says that the Court

25   was informed that this had occurred before the verdict

1   came back at the guilt phase.

2           And if that's the case -- and yet it

3   wasn't actually addressed on the record or acknowledged

4   until after the verdict came in and after everybody took

5   a lunch break -- that violates his rights to due

6   process.  That is something that should have been

7   addressed on the record before the verdict came in.  The

8   impact that that had on the jury should have been

9   assessed prior to their verdict.

10          THE COURT:  And I want to make sure that

11  I'm clear on this.  You're not making any contention

12  that there was any juror misconduct by a member of the

13  jury, that they had engaged in any impermissible

14  investigation or disregarded any of the Court's

15  instructions not to investigate any factual matters on

16  their own outside of the evidence presented in court?

17          MS. ECKHOFF:  Well, we have the extraneous

18  influence portion of this claim and then there are

19  specific claims of juror misconduct.  For example, there

20  was a juror who, in violation of the court's orders, was

21  posting about his experience sitting on the jury on

22  Facebook and had responses from his Facebook friends,

23  you know, saying, you know -- yes, Give him the chair.

24          But with regards to these extraneous

25  influences, no.  There's no allegation that the jurors

1    have gone beyond, these were things that happened to

2    them.

3            THE COURT:  And I've read the affidavits

4    of several of those jurors that were attached as

5    exhibits.  And I do note that those affidavits tend to

6    be very detailed and descriptive.  They generally tend

7    to be consistent with the issues of the location of the

8    hotel, and that several of the jurors were aware that

9    the location of the crime scene was a relatively short

10   distance from the location of the hotel.  But I didn't

11   see anything in the affidavits that indicated that

12   jurors actually went to the location of the crime scene

13   or were transported by the crime scene to and from their

14   transportation from the hotel by the court during

15   sequestration.

16           MS. ECKHOFF:  I think that that's correct

17   as far as I know, as well; but I think what's something

18   to keep in mind and what they noted, right, is they had

19   just sat through days of testimony about this gang and

20   where in southwest Houston it operated.  And they were

21   hearing names of streets and all of this and then

22   they're passing all of these streets on their way.

23           So they know that they're being taken

24   closer and closer and being asked to stay very close to

25   where this happened within the area where the gang at

1  issue in this had operated.  I think that is more than,

2  you know, seeing the crime scene itself.  It's how

3  that -- how that concerned them.

4           THE COURT:  Well, the concerns they had,

5  though, I mean, are those concerns not reflected in the

6  affidavits that have been tendered as exhibits?

7           MS. ECKHOFF:  No, I believe that they are

8  reflected in their affidavits.

9           THE COURT:  Okay.  So as far as presenting

10  testimony at an evidentiary hearing, it would seem to

11  me, though, the concerns that were raised were pretty

12  well documented in their affidavits.  As far as needing

13  to bring a juror into court and place him under oath and

14  ask him questions about that, it seems, though, their

15  concerns relating to the location of that hotel were

16  pretty well documented.

17           The other issue is the concerns about

18  Mr. Balderas' brother purportedly waving at the bus.

19  And I'll note it doesn't seem that he was ever located

20  by the bailiffs or whether it was every actually

21  confirmed if it was, in fact, Mr. Balderas' brother.

22  But there was a person waving that was believed to have

23  been a relative, which also was documented in the

24  affidavit, as well.

25           I'll note that the concern being, as

1   reflected by the jurors, was that some of them felt

2   somewhat frightened or that their safety was not being

3   appropriately addressed.  But wouldn't you agree that if

4   the jurors are generally feeling as though in a capital

5   case involving a gang in the Houston area, that

6   generally speaking the juror issues pertaining to juror

7   intimidation have historically been towards jurors being

8   reluctant to convict because they were intimidated or

9   were afraid of consequences versus convicting because

10  them felt intimidated?

11          I mean, generally speaking, if a juror is

12  saying that they felt threatened or intimidated, usually

13  they were reluctant to convict because they're afraid of

14  repercussions coming from convicting a gang member.

15          MS. ECKHOFF:  I would -- in all honesty,

16  Your Honor, this is actually the only case that I've had

17  where this has been an issue.  And while I see your

18  point, I could just as easily see a juror deciding that

19  they want to punish him more because they're scared and

20  felt like -- that someone associated with them trying to

21  intimidate them.  I can't presume to know how a juror is

22  going to go one way or the other.

23          THE COURT:  I say that -- my background

24  traditionally has been in federal courts dealing with

25  large-scale drug trafficking cases involving the Gulf

1  cartel or the zeta that cartel where obviously there

2  were multiple instances of cartel members or gang

3  members attempting to influence either witnesses, or

4  jurors, or other ways in order to affect the outcome of

5  the case.

6       And so that's something that obviously

7  exists and is recognized in jurisprudence.  It may be

8  more recognized at the federal level; but, I mean, just

9  as a practical matter of speaking one of the things that

10  jumped out at me was that if jurors felt, I guess,

11  intimidated, just logically thinking at it, wouldn't it

12  seem to be more inclined to curry to the defendant's

13  favor versus -- versus not necessarily being more

14  inclined for conviction?

15       I didn't see anybody -- anywhere in the

16  affidavits that one of the jurors indicated that they

17  were more inclined to convict because they were either

18  angry, or upset, or were aggravated because of that

19  occurrence.

20       MS. ECKHOFF:  Well -- and Your Honor, I

21  would point out that that is exactly -- I believe would

22  fall under 606(b).  Right?  That's actually -- that

23  would be evidence of their own deliberations.  And

24  that's why it isn't in their affidavit.  It's not

25  admissible evidence, but I think --

1    THE COURT: Let me rephrase it. It didn't

2    seem as though the jurors indicated that they had taken

3    a hostile approach. It seems that generally the tone of

4    the affidavits were that the jurors were afraid and

5    concerned because of it, because they felt that there

6    were lapses in security and there should have been more

7    higher level of scrutiny or security that should have

8    been given to their safety by the court system and by

9    the bailiffs that were assigned to them.

10    MS. ECKHOFF: I think that's certainly a

11    key, a piece of how they felt; but I mean, they are

12    seeing this person that they understand to be a relative

13    of Mr. Balderas and they're interpreting him as trying

14    to intimidate them and create these feelings of fear.

15    There isn't -- I don't know of any evidence at this

16    point in the record one way or the other, honestly,

17    about either being more or less likely to convict based

18    on that experience. But that is clearly an experience

19    that could impact their verdict.

20    THE COURT: Okay. And then finally I have

21    what I've labeled as the kind of constitutional issues.

22    I think we can move through many of these rather quickly

23    because I don't think they're necessarily going to

24    warrant any calling of any live testimony or develop

25    anything from an evidentiary standpoint.

1      MS. ECKHOFF:  Correct, they're questions

2  of law.

3          THE COURT:  But I did want to cover them

4  very quickly just to make sure that I understand that we

5  are on the same page, that I'm not making any

6  assumptions on whether or not you were asking the

7  Court -- the right to present witnesses.

8          So first is whether or not the death

9  sentence is allegedly unconstitutional because of a jury

10  instruction that was requested, but not given.  I think

11  specifically that a single no vote would result in a

12  life sentence.  And so you've raised that as a

13  constitutional issue.  I'm assuming that there's no --

14  there's no witnesses or any factual matters that you

15  feel you need to develop in order to make that argument?

16          MS. ECKHOFF:  I would note that we have

17  provided affidavits from jurors that indicate that there

18  were holdouts at the punishment phase that may have, if

19  they had understood that being -- that they didn't need

20  to bring nine of their friends along with them to find

21  for LWOP, that they may have done that.  And we've

22  documented that, as best we could, in the affidavits

23  that we attached to the exhibits and -- I'm sorry,

24  exhibits that we attached to the application and that

25  potentially could require some further factual

1    development, but I'm not -- I can't specifically recall

2    at this moment if there's anyone in particular.

3              THE COURT:  Okay.  Next, you allege that

4    the death sentence was allegedly unconstitutional

5    because it was arbitrarily and capriciously assigned

6    based upon response to Special Issue No. 1 did not

7    define key terms that were requested by defense and also

8    poorly failed to narrow the class of death eligibility

9    to defendants.

10             And again, that seems to be a

11   constitutional issue that just turns on the instruction

12   to the jury.  So same thing, I take it there's no other

13   witnesses you're needing, requesting the Court to

14   subpoena or come forward for an evidentiary hearing?

15             MS. ECKHOFF:  That's correct.

16             THE COURT:  And then finally:  The death

17   sentence is ultimately unconstitutional because the

18   punishment charged allegedly limited the evidence the

19   jury could find mitigating.  Again, it's same issue

20   dealing with the jury instruction.

21             MS. ECKHOFF:  Correct.

22             THE COURT:  Is there any other issue

23   that's -- that I have not addressed pertaining to, I

24   guess, in the general constitutional law issue?

25             MS. ECKHOFF:  No.

1          THE COURT:  All right.  Finally, I think

2    you had also made a request to subpoena some of the

3    prosecutors in this case or the attorneys that were

4    actually on the prosecution team.  Was that, again, in

5    furtherance of trying to establish the ineffective

6    assistance of counsel claims or is that relating to

7    another capacity?

8          MS. ECKHOFF:  Do you mean the defense team

9    or prosecutors?

10         THE COURT:  Well, if I saw correctly from

11   your original petition, was there not a request for you

12   to subpoena some of the prosecutors on this case?

13         MS. ECKHOFF:  Yes.  So the prosecutors, I

14   think, would be relevant to two issues.  One is the

15   false testimony claim and the other is the Brady claim.

16   The two instances were, you know, we have alleged

17   misconduct by the State.  The State has provided

18   affidavits from one of the three prosecutors who

19   provided -- who conducted this trial.  We have not heard

20   from the other two, including Caroline Dozier, who was

21   present at the meetings, those earlier meetings with

22   Mr. Diaz.

23         And the same thing with regards to the

24   Brady, all of the information comes from Tracy Bennett

25   and a former prosecutor.  However, clearly the State was

1   represented by more than just one attorney.  And I can

2   envision wanting to cross-examine the other witnesses,

3   as well, about their knowledge of these things.

4           THE COURT:  Okay.  Ms. Eckhoff, is there

5   any other issue that I have not covered that you feel

6   needs to be addressed?  I know we have kind of covered

7   several other areas, some of those we covered very

8   quickly.  But as far as requests to present testimony of

9   actual witnesses developed in furtherance of your

10  clients case, is there any other witness that you're

11  seeking the Court to be present for an evidentiary

12  hearing that we have not discussed?

13          MS. ECKHOFF:  At this time, no.  I believe

14  in terms of the witnesses we have discussed, that is

15  right.  However, I would just make clear that if we were

16  having an evidentiary hearing, it's entirely possible

17  that additional witnesses on these same issues may

18  arise.

19          THE COURT:  Sure.  In the realm of

20  possibilities, I've found that just about anything is

21  possible; but we can only work with the information that

22  we have at hand.  So I think I can work through these

23  kind of in succinct order.

24          MS. ECKHOFF:  Your Honor, before you do

25  that, would it be possible for me to just make one point

1    that I think is relevant here and just the emphasis on

2    we need the right to cross-examine here because the

3    Supreme Court has found that the right to cross-examine

4    is a necessary component in due process in cases where

5    the stakes aren't nearly so high as they are here today

6    in cases where welfare benefits are at issue or a parole

7    revocation.

8              And this is exactly the reason that, you

9    know, they say death is different because the Supreme

10   Court dictates that we strive for a heightened standard

11   of reliability in the outcomes of those cases.   And

12   there's just some, as we've already discussed, some very

13   serious questions about whether Mr. Balderas actually

14   committed this crime.

15             THE COURT:   Okay.   I'll duly note that.

16             Ms. Hutchins, do you have any other final

17   thoughts that you would like to make?

18             MS. HUTCHINS:   Judge, just to sort of

19   follow up on Ms. Eckhoff's final argument, while

20   jurisprudence does say that death is different, the

21   statements that Ms. Eckhoff makes about the due process

22   that is entitled to a defendant, there's no case law on

23   this saying that he's entitled to that in a post

24   conviction.

25             We refer the Court back to the statute and

1  to the interpretation of the statute, 11.07.1 in the

2  post conviction setting and what precisely is due and

3  what is not due unto him.

4  Also, in terms of -- I'm trying to think

5  of the final things just said. One moment, Judge.

6  THE COURT: Take your time.

7  MS. HUTCHINS: Just trying to think of the

8  very last thing she said.

9  Oh, actual innocence. She argued that

10  there still are some very serious concerns as to his

11  actual innocence in this case. And I would just point

12  out for the court that the defendant didn't allege

13  actual innocence as a ground in his writ. He's only

14  alleged ineffective assistance of counsel. And so if

15  that is one of their concerns, then it wasn't raised as

16  a ground.

17  MS. ECKHOFF: Your Honor, he has alleged

18  serious constitutional violations that if proven to have

19  occurred would impact the verdict at the guilt phase.

20  THE COURT: Well, I think, I can probably

21  surmise by looking it all over, the established case

22  law, any time there's going to be purported evidence of

23  actual innocence, that that's always going to be

24  important evidence to be considered.

25  But let me just start by running through

1   these things very quickly.  If we go through the

2   constitutional art issues, it seemly to be everybody is

3   in agreement that those are issues of law, not

4   necessarily of facts; that there's no contested issues

5   of fact that have to be resolved on that; and the issues

6   that we have discussed, we can -- can be resolved

7   basically by reviewing the applicable law and the

8   established record.

9           As to the issue of ineffective assistance

10  of counsel, the Court has reviewed the affidavits of

11  Mr. Godinich and Mr. Nunnery.  The Court finds that both

12  of these affidavits are extremely detailed and have a

13  lot of specificity as to facts and many of the issues

14  that have been raised within the petition.

15          The Court does not find that these

16  affidavits are ambiguous and do properly go to the

17  merits of the issues raised in the petition.  And,

18  therefore, the Court does not find that it would be

19  necessary for those attorneys to present themselves for

20  cross-examination and that the factual matters alleged

21  are adequately addressed in the affidavits.

22          As to the Brady/Giglio disclosure issue,

23  the Court notes specifically on the first page of

24  Mr. Godinich's affidavit that he reviewed specifically

25  23 pages of notes that were from the district attorney's

1   office and that the information contained within those

2   notes was used by them during the course of Mr. Diaz' --

3   in preparation for trial and was used by Mr. Nunnery

4   during the course of his cross-examination.

5         The Court also notes that the request as

6   to the presentment of jurors and their exposure to

7   outside influences, specifically as Ms. Eckhoff

8   correctly stated, any questions that go to their

9   specific deliberations and how they resolve the case are

10  not admissible under the Rules of Evidence.  And to ask

11  a juror under the abstract theory of what an average

12  juror would believe would be something that I don't

13  think that the juror, any juror would be able to

14  adequately weigh upon.

15        I feel that a juror would be able to

16  testify as far as what their feelings and expectations

17  were, but to look at the issue in abstract and how a

18  theoretical juror would look at it is too speculative

19  and would simply be unfair on a juror to have to weigh

20  in upon that.

21        Again, the Court hasn't found that the

22  affidavits submitted by the jurors are very detailed,

23  actually go into areas that would otherwise be

24  inadmissible; but the Court notes that there's nothing

25  in the affidavits that necessarily warrants needing to

1    bring in any jurors for additional questioning or

2    cross-examination on the factors that they were supposed

3    to.

4           However, the issues of the recanted

5    testimony, the Court does find that there are specific

6    issues that do warrant the development of additional

7    testimony.  Specifically, as to Mr. Israel Diaz, there

8    is, in fact, evidence of -- that his testimony was, in

9    fact, recanted; that Mr. Balderas be provided an

10   opportunity to explore that testimony.

11          However, the Court does not find that the

12   testimony of the investigator, Adrian De La Rosa would

13   be probative because -- given the fact it would be a

14   hearsay statement, the State would not be able to

15   properly probe or cross-examine that hearsay statement

16   based upon solely the investigator's accounts of

17   Mr. Diaz' statement.

18          So the Court will provide -- will allow

19   the applicant to subpoena Mr. Diaz.  However, the Court

20   will thus find that given there are potential issues

21   relating to perjury, if Mr. Diaz does not, in fact,

22   already have counsel representing him or advising him on

23   his constitutional issues, the Court will appoint an

24   attorney to represent him for the limited purpose of

25   that hearing to instruct him accordingly.

1           Further, the Court will all allow the

2    testimony of Anali Garcia and Octavio Cortes, who were

3    also alibi witnesses whose testimony was never

4    presented.  The Court does give note and give

5    consideration to the fact that trial counsel had

6    interviewed those witnesses and did not find their

7    testimony, their purported testimony to be credible and

8    did not present that evidence.  As officers of the

9    Court, obviously, any attorney is precluded under the

10   Rules of Ethics from presenting any testimony they

11   believe to be untruthful or perjured.

12           However, given that there's no record of

13   what their testimony would be, it's impossible for the

14   Court to look in abstract to consider the testimony.

15   And, therefore, the Court will provide Mr. Balderas with

16   the opportunity to present that testimony and proffer

17   that here in court, which would also be subject to

18   cross-examination by the State.

19           As to Jose Perez and Walter Benitez, the

20   Court finds that defense counsel did present that

21   testimony, trial counsel presented that testimony at the

22   trial itself; and that those issues were, in fact, put

23   before the jury and the fact finder.  And based upon the

24   juries' verdicts, the jury did not find that testimony

25   to be credible.  Therefore, the Court will not order

1    that those witnesses be produced.

2           So in summation, the Court will conduct an

3    evidentiary hearing involving Mr. Israel Diaz, Ms. Anali

4    Garcia and Mr. Octavio Cortes.

5           Counsel, how much time do you require in

6    order to locate those witnesses and serve them with

7    process for the hearing?

8           MS. ECKHOFF: Your Honor, in light of my

9    caseload and other cases, I would anticipate -- I would

10   request six months to set the hearing.

11          MS. HUTCHINS: Judge, may I be heard?

12          THE COURT: You may.

13          MS. HUTCHINS: Judge, Article 11.07(1)

14   specifically says that if there's to be an evidentiary

15   hearing that it shall be within 30 days, or an

16   additional 30 days for good cause. So 60 days, max.

17          THE COURT: I did actually print off a

18   copy of my statute and I was about to address the time

19   aspects. Counsel, I don't know that six months is

20   necessarily going to be an appropriate timeline. I

21   understand that you do have a hefty caseload and also a

22   hefty traffic schedule, given the courts that you

23   service; but at the same time, I know that this habeas

24   proceeding has carried on very much more lengthy than

25   what normally the rules are prescribed for it for

1  obvious procedural reasons.

2          And so, one of the issues I've raised is

3  that if some of those witnesses have not been located by

4  this time, I guess, the question I would have is are

5  they ever going to be located?  Even if you were given

6  six months to provide them, are there particular

7  witnesses that you do not have any means in which to

8  contact them or to serve them with a subpoena?

9          MS. ECKHOFF:  No, Your Honor.  One of my

10  primary concerns pertaining to the witnesses is Octavio

11  Cortes.  He's in the Marines.  I am not certain at this

12  point where he is stationed, so I cannot -- I don't know

13  how long it might take to bring him in.

14          And I do recognize that this case has gone

15  on for quite a long time, but I'd also want to make

16  clear that, you know, we first requested this

17  evidentiary hearing a year and a half ago and it's the

18  State who wanted to proceed on affidavits from trial

19  counsel that ended up taking a year.  This delay to get

20  to this point is based on what the State has requested.

21          I'm asking for additional time in order to

22  be able to adequately prepare, in light of all of the

23  other cases that I have evidentiary hearings and other

24  cities in Texas and applications that need to be filed.

25          MS. HUTCHINS:  Judge, if I may be heard?

1    THE COURT:  You may.

2        MS. HUTCHINS:  At this point, based on

3    what you have stated, it seems like it's three

4    witnesses:  Israel Diaz, Anali Garcia, Octavio Cortes.

5    Israel Diaz, we know where he is.

6        THE COURT:  Right.

7        MS. HUTCHINS:  We can get him here within

8    two weeks.  Anali Garcia, it seems like counsel knows

9    where she is or at least can get hands on her.  And if

10   Mr. Cortes is in the Marines and is somewhere else, that

11   may be someone that we could get a written affidavit

12   from as to what his testimony would be.

13       I know defense is very busy, they have

14   other accounts all over the state that they go to.  On

15   our end, we also have a caseload that we are handling.

16   And we'd just ask if it's three witnesses, that we try

17   to work something out sooner rather than pushing it off.

18       THE COURT:  Do you have specific knowledge

19   that Mr. Cortes is stationed abroad or is stationed

20   somewhere outside of the intercontinental United States?

21       MS. ECKHOFF:  Not to my knowledge.

22       THE COURT:  Okay.  Well, then this is, I

23   think, how it would be best to proceed to give everybody

24   an opportunity to do their due diligence.  Until we have

25   definitive knowledge that we're not going to be able to

1  comport with timelines subscribed by the rules, then

2  we're going to try to adhere to the rules and conduct

3  the hearing within the timeframe that the rules require.

4  If there is something that you believe

5  would warrant the Court -- I'm not even certain that the

6  rules would allow me to extend those deadlines for good

7  cause; but at least I'll give you an opportunity to

8  contact those witnesses and observe in the process if

9  there's a particular witness that you cannot find or

10  cannot be there, we can explore the issues of whether to

11  submit their information, be it affidavit or

12  telephonically, or in what other capacity you can to try

13  accommodate those witnesses and their availability.

14  But I think, as we sit right now, the

15  timeframe we're looking at is -- let's see.

16  Ms. Hutchins, you said it was 20 days?

17  MS. HUTCHINS:  Thirty days, Your Honor.

18  THE COURT:  Thirty days.  So if we're

19  looking for a timeframe within 30 days, we'll need to

20  obviously check my own calendar, as well as the calendar

21  of the 179th to see if we can find a date within that

22  timeframe in which everyone can be available, make

23  themselves available.

24  And then, in the meantime, if you have any

25  issues locating those witnesses or making those

1   witnesses available to present their testimony, we can

2   cross that bridge when we get there.

3              MS. ECKHOFF:  Okay.

4              MS. HUTCHINS:  Judge, in terms of

5   Mr. Diaz, is the Court going to appoint counsel,

6   assuming that he does not have counsel and is not

7   represented?  Is that going to be appointed now or when

8   he gets back to Harris County or how is that going to

9   work?

10             THE COURT:  I was going to appoint an

11  attorney to represent him today since I've said that he

12  is going to be subject to subpoena.  And that's assuming

13  that he doesn't already have counsel.

14             If I appoint an attorney to represent him

15  and he contacts Mr. Diaz, and says, No, I already have

16  an attorney, the rules don't preclude him from having

17  multiple attorneys, but if there's another counsel that

18  represents him we'll, at least, be able to ascertain

19  that.  But given the short time period, I would like to

20  give the attorney enough opportunity to meet with him,

21  discuss this issue with him, and then be able to make

22  that particular recommendation.

23             Ms. Eckhoff, if the attorney that we

24  appoint to represent Mr. Diaz indicates that he's going

25  to recommend to his counsel to invoke his Fifth

1    Amendment right not to testify, are you still going to

2    persist in wanting to bring that witness here and have

3    him invoke his Fifth Amendment on the stand?  Or are

4    you -- would that affect your decision to call him as a

5    witness?

6               And I'll allow you to make a record of

7    that.  If you don't, you can make a record of your

8    correspondence with his attorney if that's something

9    you'd like to do.

10              MS. ECKHOFF:  At this time, Your Honor, I

11   believe we would want him on record.  And I will reserve

12   the right to change my mind.

13              THE COURT:  Very well.

14              MS. ECKHOFF:  And I would just point out,

15   to my knowledge, he's not longer incarcerated.

16              MS. HUTCHINS:  I haven't checked, I don't

17   know.

18              THE COURT:  Well, if he is no longer

19   incarcerated or if he's on parole, there's typically

20   other mechanisms on how to locate that witness.

21              MS. ECKHOFF:  Right.

22              THE COURT:  But if he is not incarcerated,

23   I'll allow your officers an opportunity to try and find

24   him and have him served.  So -- and likewise, if there's

25   counsel that's been appointed, they also would probably

1  be engaged in trying to track him down. If for some

2  reason he's not incarcerated and he is located, just

3  remember that I have appointed independent counsel to

4  represent him so please refrain from directly

5  communicating with him without, at least, notifying that

6  counsel.

7  MS. ECKHOFF: Okay.

8  THE COURT: Is there anything else we need

9  to take up while we are all here on the record?

10  MS. ECKHOFF: Your Honor, I did want to

11  raise one thing. At the last hearing the State

12  indicated that were going to turn over their capital

13  murder summary. They agreed that we were entitled to it

14  and they haven't turned it over and I would like a copy

15  of that, please.

16  MS. HUTCHINS: Not actually accurate,

17  Judge.

18  So the capital murder summary -- I'm not

19  sure if the Court is aware of what a capital murder

20  summary is in Harris County, Texas. It is --

21  essentially, it is work product. It is quintessential

22  work product. It is what the chief prosecutor in a

23  court prepares on a capital murder cases summarizing the

24  facts of the offense, as well as any aggravating

25  circumstances and mitigating circumstances, and then

1    makes a recommendation up the chain of hierarchy as to

2    what his or her recommendation is in terms of seeking

3    death or seeking life.

4              So a recommendation comes from the court

5    chief, then I believe the division chief, the bureau

6    chief, all the way up to the assistant district

7    attorney.  And so, I mean that is essentially work

8    product in terms of everything, their thought process

9    and what goes into it.

10             In this case, it's become an issue as to

11   whether or not it contained certain information that may

12   be Brady.  That's, I guess, what defense counsel's

13   concern is in terms of wanting to see it.  There were

14   also -- the State is certainly aware of our obligation

15   under Brady to turn over anything that might tend to

16   negate his guilt or be impeachment evidence or whatnot,

17   certainly.

18             The issue in this case is while capital

19   murder summaries are work product, Spence Graham, the

20   former prosecutor in this case provided an affidavit

21   stating that it was in the State's file, not hidden away

22   from defense counsel and that defense counsel had the

23   opportunity to be able to view it.

24             THE COURT:  And when you say "defense

25   counsel" you mean trial counsel?

| | |
|---|---|
| 1 | MS. HUTCHINS: Trial counsel, correct. |
| 2 | Trial counsel, while the case was under Spence, had the |
| 3 | opportunity to be able to view it. Now, whether or not |
| 4 | they actually viewed it, I can't say; but it was made |
| 5 | available technically to defense counsel. Under the |
| 6 | Rules of Discovery, as I understand them, if it's |
| 7 | something that original trial counsel had or reviewed, |
| 8 | then trial counsel there on out would also have that |
| 9 | same ability. |
| 10 | I would like to assert the State's work |
| 11 | product privilege to it. I do believe it's work |
| 12 | product. I am prepared to turn over a copy to the Court |
| 13 | for the Court's in camera review so the court can make a |
| 14 | determination whether or not it needs to be turned over. |
| 15 | If you believe there's an impeachment or Brady evidence |
| 16 | in there, I have that copy for you, Because we would |
| 17 | like to assert our work product privilege and ensure |
| 18 | that we are not otherwise waiving our privilege to |
| 19 | anything else in final. |
| 20 | THE COURT: Well, I agree with you that if |
| 21 | it's internal documents that are comprised based upon |
| 22 | the prosecutor's assessment of the facts and their |
| 23 | individual opinions, it sounds like it's textbook work |
| 24 | product. |
| 25 | Now, if the rules of Brady should always |

1     apply, if there's any information in that report that is

2     either exculpatory or goes to the witnesses'

3     credibility, in other words, the prosecutor says, In my

4     opinion, I don't find this witness to be truthful, or

5     they have the opinion of something going to credibility

6     that potentially could be Giglio evidence, there's

7     always a running obligation to disclose that

8     information.  You don't have to disclose the report, but

9     the exculpatory or impeachment evidence would need to be

10    disclosed.

11          So I'm -- if the parties would prefer, if

12    you would like for me to view that in camera in order to

13    make that assessment, if it would give Ms. Eckhoff peace

14    of mind for me to do that, I'll be happy to do that.

15    But counsel, like I said, as an officer of the court

16    there's always the running duty and obligation to make

17    the Brady disclosures if it's discovered.

18          MS. ECKHOFF:  Right, Your Honor.  And I

19    understand that, but the basis for our request at this

20    point is actually many slightly different than just

21    Brady.  Our original request was Brady and the original

22    response from the State was that was never turned over

23    because it was work product and we accepted that answer.

24    And it's only after Mr. Graham provided an affidavit

25    saying it was made available to trial counsel that we

1   renewed our request for that because we, as successor

2   counsel, should have access to all of the information

3   available to trial counsel. That's what -- we are

4   entitled to their file and to anything that they had

5   access to.

6          And so, whether or not it contains Brady

7   at this point is sort of immaterial because it was made

8   available to trial counsel and we should be able to view

9   it.

10         THE COURT: Well, you know, different

11  files have different requirements on open-file policies.

12  And I note that often district attorneys' offices or

13  other prosecuting authorities will have discovery that

14  exceeds the statutory and legal requirements of

15  discovery. But if -- I don't necessarily know or, I

16  guess it -- I would have to -- I'd probably have to go

17  and brief the issue to see whether or not an open file

18  policy at one time that is later amended would

19  permanently waive work product privilege for items in

20  that file for the duration of the case.

21         I don't necessarily know if that's the

22  case or not, but if the main issue or crux of reviewing

23  the particular documents is looking for exculpatory or

24  impeachment information, which would be the logical

25  purpose -- I mean, is there any other basis you would

1  have for wanting to review that, those notes or that

2  report?

3      MS. ECKHOFF:  We want to have an

4  understanding of what information was available to trial

5  counsel at the time of trial.

6      THE COURT:  Well, I think you could

7  probably ascertain that information from the

8  discoverable items within the file, as a whole, as far

9  as what reports and documents were in the file.  But if

10  this is simply the fact of whether or not to seek the

11  death penalty and then the strengths and weaknesses and

12  mitigating issues, again, this just being a summary, I

13  think probably the easiest way to address that is

14  obviously to do an in camera inspection.

15      I mean, ultimately, as I said before, the

16  goal isn't necessarily to have a fishing expedition.  If

17  there's particular information that you believe is going

18  to be relevant to this habeas proceeding or would weigh

19  mitigating evidence or undisclosed bias or undisclosed

20  impeachment evidence, I think we could ascertain that by

21  in camera review.

22      But is there a particular piece of

23  evidence that you are wanting to see if it's contained

24  within that report?

25      MS. ECKHOFF:  I have no idea what might be

1 in the report because, as the State has indicated, that

2 to my knowledge this is not something that is typically

3 made available to anyone outside of their office.  But

4 for whatever reason, it was made available to trial

5 counsel in this case.

6    And while I take your point that, you

7 know, we should be able to review trial counsel's file

8 to get a sense of what they knew and didn't know about

9 this case, our review of trial counsel's file in this

10 case doesn't have the notes at issue in the Brady claim.

11    So without them having come from the

12 State, we would have never known that trial counsel had

13 viewed them.  It's sort of a similar situation.  I can't

14 tell you what I need to see from there because I don't

15 have any idea what it contains, but I know trial counsel

16 saw it or at least had it available to them.  And in

17 order to make a record of what trial counsel did or did

18 not have going into trial and how that may have affected

19 or contemplated -- affected their tragedy or their

20 claims of strategy, you know, I need to be able to

21 review what they had reviewed.  That's why we go and

22 review the Diaz file in this case.

23    THE COURT:  Well, we're talking about a

24 report that was based upon the prosecutor's assessment

25 of the file.  It's one thing if it was a police report

1    that was produced by an investigator, or a detective, or

2    somebody that was looking at the case. If it's just a

3    prosecutor's own assessment of the file and a

4    recommendation based upon his opinions and viewing of

5    the evidence, it seems to be textbook work product.

6           I mean, do you -- is there any case law or

7    do you have any authority that would go to show that if

8    something that was work product privilege that was made

9    available in an open file policy, would forever waive

10    the right to assert work product privilege?

11           MS. ECKHOFF: Not off the top of my head,

12    but I would like an opportunity to brief it.

13           THE COURT: Well, I will do this. I will

14    conduct an inspection review of the report. And I'm

15    specifically looking for -- we've had a lengthy

16    discussion here and it's very well briefed with the

17    issues that you believe exist. And if there's anything

18    pertaining to relevant impeachment evidence, exculpatory

19    evidence or anything that would significantly weigh on

20    the issues before us that have not already been

21    identified or discussed, then we could certainly take

22    that up once we get to the evidentiary hearing.

23           If you find a case that says that the work

24    product has been waived because it's been voluntarily

25    disclosed and open file policy, then that's a legal

```
 1    issue that would be closed in which case it would be an
 2    open part of discovery.
 3                 MS. ECKHOFF:  Okay.
 4                 THE COURT:  So I will give you the
 5    opportunity to do that and follow up with that.  But
 6    in the mean time, I'll accept a copy, sealed copy of the
 7    exhibit and we will review that.  In which case, if
 8    there is pertinent information I'll notify the parties
 9    accordingly.
10                 MS. ECKHOFF:  Thank you.
11                 THE COURT:  Okay.  Is there anything else
12    we need to take up while we are all here on the record?
13                 MS. HUTCHINS:  Just to touch up on that,
14    if I may?
15                 If the Court does find pertinent
16    information, obviously it will be disclosed.  If the
17    Court does not find pertinent information in the capital
18    murder summary, at that point I would make a motion to
19    place it under seal with the file in this case.
20                 THE COURT:  I will accept it right now as
21    a sealed exhibit, but if -- in that it will be
22    maintained, confidentiality.  Traditionally what I've
23    always done is if it's something that is privileged,
24    I'll return it to the submitting party because of the
25    fact that if it goes into the record as a privileged
```

1  item -- it's not something that typically would go into

2  the record because the privilege has been exerted.

3  But at this time it's been tendered as an

4  exhibit for in camera review, which we maintain sealed

5  in which case until the time the Court has had an

6  opportunity to review it and make a determination on the

7  issues that I've already addressed.

8  Anything else that we need to take up?

9  MS. HUTCHINS: In terms of setting a date,

10  are we going to do that today or via email?

11  THE COURT: I will probably do it via

12  email because I'll need to bring my court coordinator

13  into the loop to make sure that I can find a date where

14  I'm not already set for trial in the 136th over in

15  Beaumont. And so I'll do my best to work with

16  everyone's schedule.

17  I understand -- I take it an afternoon

18  setting is probably preferential, but if you believe

19  that you're going to need more than just half a day to

20  present evidence, then we will set it for a morning

21  hearing so you'll have adequate time to present your

22  witness and also have adequate time for

23  cross-examination.

24  MS. HUTCHINS: And will it be here in

25  Houston, Judge?

```
 1              THE COURT:  That will be, I guess, by
 2    default where I'll have it unless y'all would prefer to
 3    come to Beaumont.  If the agreement of the parties would
 4    be to go there because it's more convenient, I would be
 5    happy to do that; but given that this is a -- the
 6    hearing is in Harris County -- and, obviously, I know
 7    there's people who have been in attendance that are
 8    following this case for the convenience of Mr. Balderas.
 9    I was, by default, going to have it here in Harris
10    County unless the attorneys would prefer otherwise?
11              MS. ECKHOFF:  No, we appreciate that, Your
12    Honor.
13              THE COURT:  If there's nothing further,
14    the Court stands adjourned.
15              (Court adjourned for the day.)
16
17
18
19
20
21
22
23
24
25
```

1  STATE OF TEXAS

2  COUNTY OF HARRIS

3       I, Marcia E. Barnett, Official Court Reporter in and

4  for the 179th District Court of Harris, State of Texas,

5  do hereby certify that the above and foregoing contains

6  a true and correct transcription of all portions of

7  evidence and other proceedings requested in writing by

8  counsel for the parties to be included in this volume of

9  the Reporter's Record in the above-styled and numbered

10  cause, all of which occurred in open court or in

11  chambers and were reported by me.

12       I further certify that this Reporter's Record of the

13  proceedings truly and correctly reflects the exhibits,

14  if any, offered by the respective parties.

15       I further certify that the total cost for the

16  preparation of this Reporter's Record is $ 421.07 and

17  was paid/will be paid by Harris County.

18       WITNESS MY OFFICIAL HAND on this, the 5th day of

19  March, 2018.

20
                              /s/Marcia E. Barnett
21                            Marcia E. Barnett, CSR
                              Texas CSR 5144
22                            Deputy Court Reporter
                              179th District Court
23                            201 Caroline
                              Houston, Texas 77002
24                            Telephone:  (832) 927-3735
                              Expiration:  12/31/2019
25

3/9/2018 4:06:53 PM
Chris Daniel - District Clerk
Harris County
Envelope No: 23082508
By: L GARCIA
Filed: 3/9/2018 4:06:53 PM

# IN THE 179TH DISTRICT COURT
# HARRIS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| _____ | ) | **Trial Cause No.** |
| **EX PARTE** | ) | **1412826-A** |
| **Juan Balderas,** | ) | |
| **APPLICANT** | ) | **[PROPOSED] ORDER** |
| | ) | |
| _____ | ) | |

ORDER DESIGNATING ISSUES FOR EVIDENTIARY HEARING:

The Court designates the following issues in Mr. Balderas's Initial Application for

Writ of Habeas Corpus for further factual development via live evidentiary hearing:

(1) whether a key State's witness at trial, Israel Diaz, testified falsely against Mr. Balderas; and

(2) whether Mr. Balderas's trial counsel rendered ineffective assistance of counsel at his trial when they failed to investigate and present evidence of Mr. Balderas's alibi, including the testimony of key alibi witnesses Anali Garcia and Octavio Cortez.

ORDERED AND SIGNED on this ____ day of March, 2018.

_____
The Honorable Baylor Wortham
Judge Sitting by Assignment
179th Judicial District Court

3/23/2018 10:44 AM
Chris Daniel - District Clerk Harris County
Envelope No. 23379313
By: D Day
Filed: 3/23/2018 10:44 AM

CAUSE NO. 1412826-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 179th DISTRICT |
| | § | COURT OF |
| JUAN BALDERAS,<br>Applicant | § | HARRIS COUNTY, T E X A S |

## STATE'S PROPOSED SUPPLEMENTAL ORDER DESIGNATING ISSUES TO BE RESOLVED VIA EVIDENTIARY HEARING

Based on this Court's review of the habeas record and the argument of counsel, this Court **FINDS** that the following controverted, unresolved factual issues potentially material to the legality of the applicant's confinement will be addressed by means of a narrowly tailored evidentiary hearing:

- to assist the Court in resolving the issue of whether the State either knowingly or unknowingly presented false testimony at trial through Israel Diaz, this Court will permit the applicant to attempt to present the testimony of Israel Diaz specific to whether Diaz is recanting his trial testimony, whether Diaz was pressured by the State pretrial to "change" his testimony, and whether Diaz testified falsely under oath at the applicant's trial; and

- to assist this Court in resolving the issue of whether trial counsel was ineffective for failing to investigate and present evidence of an alibi defense during the guilt/innocence phase of trial, this Court will permit the applicant to present the testimony of Anali Garcia and Octavio Cortes limited to what these witnesses would have stated if called to testify during the guilt-innocence phase.

Therefore, this Court **ORDERS** an evidentiary hearing to resolve these issues pursuant to **TEX. CRIM. PROC. CODE** art. 11.071 §§ 9, 10.

The Clerk of the Court is **ORDERED** to transmit the Court's instant supplemental order designating issues to the Court of Criminal Appeals.

The Clerk of the Court is **ORDERED NOT** to transmit any additional documents

in the above-styled case to the Court of Criminal Appeals until further ordered.

**By the following signature, the Court adopts the State's Proposed Supplemental Order**
**Designating Issues to be Resolved via Evidentiary Hearing**
**in Cause Number 1412826-A.**

SIGNED this **21st** day of March, 2018.

The Honorable Baylor Wortham
Presiding Judge by Assignment
179th District Court
Harris County, Texas

. 01949



# CHRIS DANIEL
## HARRIS COUNTY DISTRICT CLERK

March 26, 2018

KIM OGG
DISTRICT ATTORNEY
HARRIS COUNTY, TEXAS

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1412826-A in the 179th District Court.

☐ State's Original Answer Filed

☐ Affidavit

☐ Court Order Dated

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order

☒ Other

Sincerely,

L. Hernandez, Deputy
Criminal Post Trial

Enclosure(s) – STATE'S PROPOSED SUPPLEMENTAL ORDER DESIGNATING ISSUES TO BE RESOLVED VIA EVIDENTIARY HEARING



# CHRIS DANIEL
## HARRIS COUNTY DISTRICT CLERK

March 26, 2018

KELLEY REYES
COURT OF CRIMINAL APPEALS
P.O. BOX 12308
CAPITOL STATION
AUSTIN, TEXAS 78711

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1412826-A in the 179th District Court.

☐ State's Original Answer Filed

☐ Affidavit

☐ Court Order Dated

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order

☒ Other

Sincerely,

L. Hernandez, Deputy
Criminal Post Trial

Enclosure(s) – STATE'S PROPOSED SUPPLEMENTAL ORDER DESIGNATING ISSUES TO BE RESOLVED VIA EVIDENTIARY HEARING

01551



# CHRIS DANIEL
## HARRIS COUNTY DISTRICT CLERK

March 26, 2018

DEREK VERHAGEN
ATTORNEY AT LAW
1700 N. CONGRESS AVE., STE. 460
AUSTIN, TEXAS 78701

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1412826-A in the 179th District Court.

☐ State's Original Answer Filed

☐ Affidavit

☐ Court Order Dated

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order

☒ Other

Sincerely,

L. Hernandez, Deputy
Criminal Post Trial

Enclosure(s) – STATE'S PROPOSED SUPPLEMENTAL ORDER DESIGNATING ISSUES TO BE RESOLVED VIA EVIDENTIARY HEARING

01952

3/23/2018 10:27 AM
Chris Daniel - District Clerk Harris County
Envelope No. 23379179
By: D Day
Filed: 3/23/2018 10:27 AM

# IN THE 179TH DISTRICT COURT
# HARRIS COUNTY, TEXAS

| | | |
|---|---|---|
| **EX PARTE** | ) | **Trial Cause No.** |
| **Juan Balderas,** | ) | **1412826-A** |
| **APPLICANT** | ) | |
| | ) | **[PROPOSED] ORDER** |
| | ) | |
| | ) | |

## ORDER

On this date, the Court considered Applicant's Motion for Extension of Time to Prepare for Evidentiary Hearing. After due consideration, Applicant's Motion is GRANTED. The evidentiary hearing will begin on May 11, 2018.

ORDERED AND SIGNED on this 21st day of March, 2018.

_Baylor Wortham_
The Honorable Baylor Wortham
Judge Sitting by Assignment,
179th Judicial District Court

01955



# CHRIS DANIEL
### HARRIS COUNTY DISTRICT CLERK

March 26, 2018

KIM OGG
DISTRICT ATTORNEY
HARRIS COUNTY, TEXAS

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1412826-A in the 179th District Court.

☐ State's Original Answer Filed

☐ Affidavit          ,

☐ Court Order Dated          ,

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order          ,

☒ Other

Sincerely,

L. Hernandez, Deputy
Criminal Post Trial

Enclosure(s) –ORDER

61954



# CHRIS DANIEL
## HARRIS COUNTY DISTRICT CLERK

March 26, 2018

DEREK VERHAGEN
ATTORNEY AT LAW
1700 N. CONGRESS AVE., STE. 460
AUSTIN, TEXAS 78701

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1412826-A in the 179th District Court.

☐ State's Original Answer Filed

☐ Affidavit

☐ Court Order Dated

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order

☒ Other

Sincerely,

L. Hernandez, Deputy
Criminal Post Trial

Enclosure(s) –ORDER

4/19/2018 4:46 PM
Chris Daniel - District Clerk Harris County
Envelope No. 24030980
By: D Day
Filed: 4/19/2018 4:46 PM

# IN THE 179th JUDICIAL DISTRICT COURT
# HARRIS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| ———————————— | ) | Cause No. |
| EX PARTE | ) | 1412826-A |
| JUAN BALDERAS, | ) |  |
| APPLICANT | ) | Hearing date: May 11, 2018 |
|  | ) |  |
| ———————————— | ) |  |

## MOTION TO COMPEL DISCLOSURE OF EXCULPATORY AND IMPEACHMENT EVIDENCE

Juan Balderas, by and through his counsel the Office of Capital and Forensic Writs (OCFW), files this motion seeking production of the following materials in the possession, custody, or control of the State,[1] relevant to the claims pending before this Court, and with respect to which this Court has set an evidentiary hearing to commence on May 11, 2018. In support of this motion, Mr. Balderas respectfully states the following:

---

[1] In this motion, Mr. Balderas uses the word "State," which should be interpreted as including, but not limited to, any member of the HCDAO, Houston Police Department, Harris County Sheriff, Harris County Probation Department, and any other governmental entity involved in the investigation of the underlying offense, the prosecution of Mr. Balderas and Mr. Diaz, the incarceration of Mr. Balderas or Mr. Diaz, or the release of Mr. Diaz.

01955

# I.

## RELEVANT BACKGROUND

On December 26, 2017, following a series of proceedings that resulted in the recusal of a prior judge, this case was reassigned to the Honorable Baylor Wortham for disposition of Mr. Balderas's Initial Application for Writ of Habeas Corpus Pursuant to Article 11.071 of the Texas Code of Criminal Procedure (Initial Application), and to dispose of any other business requested by the Court. *See* Exhibit A, Order of Assignment by the Presiding Judge. Judge Wortham contacted the undersigned counsel, Erin Eckhoff and Katherine Black of the OCFW, as well as counsel for the State, Farnaz Hutchins and Shawna Reagin of the Harris County District Attorney's Office (HCDAO), via email, requesting input regarding the scheduling of a "writ hearing" (later clarified to be a status hearing) in the case. Both parties responded, also via email, regarding the scheduling of a hearing and a status hearing was set in the matter for February 22, 2018.

At the February 22 status hearing, the Court heard argument from both parties on numerous substantive issues raised in Mr. Balderas's Initial Application. At the conclusion of the hearing, the Court determined that several of the claims for relief Mr. Balderas had raised in his Initial Application warranted additional factual development via live evidentiary hearing. One of these claims was a claim that a key witness for the State, Israel Diaz, had testified falsely against Mr. Balderas at

1

his capital trial in 2014. The Court determined that Mr. Balderas should be provided "an opportunity to explore" the testimony of Mr. Diaz by subpoena to an evidentiary hearing; however, the Court also found that "given there are potential issues relating to perjury," that it was necessary to appoint Mr. Diaz an attorney "to represent him for the limited purpose of that hearing to instruct him accordingly." *See* Exhibit B, February 22, 2018 Writ Hearing Transcript, at 60. The Court further found that Mr. Balderas should be allowed to present the testimony of Anali Garcia and Octavio Cortes, two alibi witnesses whose testimony was not presented at Mr. Balderas's trial but who signed affidavits that Mr. Balderas filed in support of his Initial Application. *Id.* at 61.

Following the February 22, 2018 writ hearing, the Court and the parties exchanged emails regarding the scheduling of an evidentiary hearing in the case. The Court also appointed counsel for Mr. Diaz, for the limited purpose of advising him regarding constitutional (Fifth Amendment) issues.[2]

---

[2] Danny Lacayo of the Harris County Public Defender's Office. Counsel for Mr. Balderas first became aware of Mr. Lacayo's appointment via electronic communication from the HCDAO, when ADA Hutchins copied Mr. Balderas's counsel on a string of electronic messages to Mr. Lacayo. On March 19, 2018, Mr. Lacayo contacted the Court and both parties via email (attached as Exhibit C). Mr. Lacayo's email contained the following message:

> My name is Danny Lacayo with the Public Defender's Office. I was assigned to represent Israel Diaz in the Writ Hearing regarding Juan Balderas. I have attached all parties involved in this email. I was reviewing the Writ and evidence attached and noticed that there was a witness named Christopher Pool who testified in the trial. The writ

2

For the reasons set forth below, Mr. Balderas, through counsel, respectfully requests that this Court issue an order directing the State to produce the materials listed below to counsel for Mr. Balderas.

## II.

## ARGUMENT AND AUTHORITIES

Mr. Balderas respectfully requests the Court order the State to disclose the following materials, all of which are relevant to specific claims pending before this Court in the Article 11.071 proceeding, including those that are the subject of the evidentiary hearing set to commence May 11, 2018, at which Israel Diaz -- a key witness for the State who testified against Mr. Balderas at trial -- is expected to

---

alleged that he provided false testimony regarding his termination in regards to an inmate death. While at the Harris County District Attorney's Office I worked in Police Integrity for a period of time. I believe that I investigated the incident regarding Detention Officer Pool. This case was eventually presented to a grand jury which returned a no bill. I know that this is an important case to everyone and wanted full disclosure to all parties involved that I investigated one of the witnesses in this case. I am not sure if you wanted to keep me on the case and wanted your guidance. If you believe that there is some conflict I can have the case re-assigned within the Harris County Public Defender's Office.

*See* Exh. C Page 2, email from Mr. Lacayo.

Mr. Lacayo subsequently arranged for the re-assignment of this appointment as counsel for Mr. Diaz within the Harris County Public Defender's Office. Mr. Diaz is currently represented by Genesis Draper.

3

testify.[3] Mr. Balderas is entitled to these materials because he would have been entitled to them prior to trial, and because they may contain information relevant to Diaz's testimony at the upcoming post-conviction evidentiary hearing. Defense counsel are entitled to all materials "favorable" to a defendant of which the State has constructive knowledge, not just self-evidently exculpatory material. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *see also, Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006) (noting that defendants are entitled to 'favorable evidence known only to the police"). This duty to disclose includes any information that could be used to impeach witnesses against Mr. Balderas. *See Giglio v. United States*, 405 U.S. 150 (1972); *Banks v. Dretke*, 540 U.S. 668 (2004); *United States v. Bagley*, 473 U.S. 667 (1985) (prosecution's duty to disclose any information tending to show a witness's bias in favor of the government or against the defendant or that otherwise impeaches a witness's testimony); *Napue v. Illinois*, 360 U.S. 264 (1959) (due process violated where important witness for the State in a murder prosecution falsely testified that witness

---

[3] Prior discovery provided by the State has included some exculpatory material, but counsel has a good faith belief that additional exculpatory material exists and is in the possession of the State. In light of what he has already received, and in anticipation of Mr. Diaz's testimony at the May 11, 2018 evidentiary hearing, Mr. Balderas makes the following requests for disclosure, as such information would constitute exculpatory or impeachment evidence to which Mr. Balderas is entitled under *Brady v. Maryland.*

4

. 01860

had received no promise of consideration in return for his testimony, though in fact Assistant State's Attorney had promised witness consideration, and Assistant State's Attorney did nothing to correct false testimony); *Mooney v. Holohan*, 294 U.S. 103 (1935). Withholding of such evidence violates due process if the evidence is material to either guilt or punishment, irrespective of whether the State knowingly withheld information. *Brady*, 373 U.S. at 87. According to the Supreme Court, "[w]hen police or prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is ordinarily incumbent on the State to set the record straight." *Banks*, 540 U.S. at 675-76.

The Texas discovery statute mirrors these constitutional requirements. *See* TEX. CODE CRIM. PROC. ART. 39.14(h) ("[T]he state shall disclose to the defendant any exculpatory, impeachment, or mitigating document, item or information in the possession, custody, or control of the state that tends to negate the guilt of the defendant or would tend to reduce the punishment for the offense charged."). This statute also explicitly extends this requirement to materials not discovered by the State until after trial. TEX. CODE CRIM. PROC. ART. 39.14(k) ("If at any time before, during or after trial the state discovers any additional document, item, or information required to be disclosed under Subsection (h), the state shall promptly disclose the existence of the document, item, or information to the defendant or the court."). While the underlying offense occurred before this statute was enacted, the Court of

5

. 01861

Criminal Appeals has discussed this provision in the context of a crime that occurred before the statute's enactment, leaving open the prospect that this section applies retroactively to all offenses. *See Francis v. State*, 428 S. W. 3d 850, 856 n.12 (Tex. Crim. App. 2014).

### III. DISCOVERY REQUESTED

In light of the State's disclosure obligations under *Brady* and its progeny, as well as the specific claims pending before this Court in the Article 11.071 proceeding, including the evidentiary hearing set to commence on May 11, 2018, counsel for Mr. Balderas respectfully request an order from this Court compelling the State to produce the following:

1. Copies of any and all Harris County jail records for **Israel Diaz** (DOB 04/09/1986), including, but not limited to all records and logs of visits, jail mail, complaints, grievances, write-ups, disciplinary records, classification worksheets, movement logs, and gang association information.

2. Copies of any and all communications and contact between **Israel Diaz** (DOB 04/09/1986), or his representatives, and the HCDAO, including, but not limited to: emails, text messages, phone messages, in-person conversations (notes and memos) and telephonic communications (and notes and memos) from 2004 to the present.

3. Additionally, Mr. Balderas specifically requests that any oral communications between **Israel Diaz** (DOB 04/09/1986) and the HCDAO that take place in advance of the May 11, 2018 hearing be recorded and a copy of the recording produced to counsel for Mr. Balderas in advance of the hearing.

4. The entire HCDAO case file for **Israel Diaz** (DOB 4/09/86) including but not limited to communications with Diaz, status notes/reports, third party communications, references to the murder of Eduardo "Powder" Hernandez, and any references to cooperation with the State in the following cases: *State v. Juan Balderas* (Cause No. 1050630); *State v. Efrain Lopez* (Cause No. 10500629 or Cause No. 1305940 or Cause No. 1428270); *State v. Jose Hernandez* (Cause No. 1050633).

5. Files kept and maintained by the Harris County District Attorney for any criminal case charging **Israel Diaz** (DOB 04/09/86) from 2003-2008, including all reports, notes, communications, witness lists, charging documents, promises/rewards/inducements, case resolution, and any reference to Eduardo Hernandez as a witness.

6. Communications, including but not limited to, emails, letters, voicemails, and any oral communications reduced to writing between employees and

01963

agents of the HCDAO and employees of the Harris County Department of Probation regarding **Israel Diaz** (DOB 04/09/86).

7. The entire Harris County Department of Probation case file for **Israel Diaz** (DOB 4/09/86) including but not limited to communications with Diaz, status notes/reports, third party communications, references to the murder of Eduardo "Powder" Hernandez, and any references to cooperation with the State in the following cases: *State v. Juan Balderas* (Cause No. 1050630); *State v. Efrain Lopez* (Cause Nos. 1050629, or 1305940, or 1428270); *State v. Jose Hernandez* (Cause No 1050633).

8. All agents' (federal, state, local and administrative agency) rough notes of interrogations or debriefings of **Israel Diaz** (DOB 04/09/86).

9. All prior written, recorded, or oral statements of **Israel Diaz** (DOB 04/09/86) relating to this case that were made to anyone, and all law enforcement agents' rough draft notes of interviews with Diaz.

10. The prior arrest and conviction records of **Israel Diaz** (DOB 04/09/86), including his complete criminal history, and the docket number and jurisdiction of all prior and pending cases.

11. All evidence that **Israel Diaz** (DOB 04/09/86) has ever (a) made any false statement to the authorities, whether or not under oath or under penalty of

8

perjury, and/or (b) does not have a good reputation in the community for honesty. TEXAS RULE OF EVIDENCE 608(a).

12. All evidence that **Israel Diaz** (DOB 04/09/86) has ever made a false, contradictory, or inconsistent statement with regard to this case, or any statement showing bias or a motive to fabricate. *Pennsylvania v. Ritchie*, 480 U.S. 9 (1987).

13. All evidence that the statements of **Israel Diaz** (DOB 04/09/86)are inconsistent with or contradicted by that of any other person or prospective witness. *Kyles*, 514 U. 419.

14. Any express or implicit promise, understanding, offer of immunity, sentencing leniency, or of past, present, or future compensation, or any other kind of agreement or understanding between **Israel Diaz** (DOB 04/09/86) and law enforcement or prosecutorial agent or agency (federal, state, and local). This request includes any explicit or implicit understanding relating to criminal or civil income tax liability, and/or immigration proceedings. *Kyles*, 514 U.S. at 432-34.

15. All evidence of discussion about, or *advice* concerning, any contemplated prosecution of **Israel Diaz** (DOB 04/09/86), or any possible plea bargain, even if no bargain was made, or the advice not followed. *Brown v. Dugger*, 831 F.2d 1547, 1555-56 (11th Cir. 1987) (Clark, J., concurring) (evidence

. 01965

that witness sought plea bargain is to be disclosed, even if no deal struck)
*Haber v. Wainwright*, 756 F.2d 1520, 1524 (11th Cir. 1985).

16. Copies of any and all jail records for **Alejandro Garcia** (DOB 02/02/1989),
    a testifying witness against Mr. Balderas at the punishment phase of Mr.
    Balderas's trial, including, but not limited to, all records and logs of visits,
    jail mail, complaints, grievances, write-ups, disciplinary records,
    classification worksheets, movement logs, gang association information,
    jobs, classes, trainings, and commissary.

17. Copies of any and all communications and contact between **Alejandro
    Garcia** (DOB 02/02/1989) and the Harris County District Attorney's Office,
    including, but not limited to, emails, texts, phone messages, in-person
    conversations and notes and memos, phone conversations and notes/memos,
    etc., between 2005 and present.

18. Copies of any and all jail records for **Edgar Rene Ferrufino** (DOB
    05/10/1988), including but not limited to all records and logs of visits, jail
    mail, complaints, grievances, write-ups, disciplinary records, classification
    worksheets, movement logs, gang association information, jobs, classes,
    trainings, and commissary.

19. The Police Integrity Division file regarding **Christopher Scott Pool**, a
    former detention officer for Harris County Sheriff's Department, who was

01366

employed as a detention officer from May 2009 to August 2012, and who testified for the State in Mr. Balderas's trial.

20. The entire Internal Affairs Department investigation file regarding **Christopher Scott Pool**, a former detention officer for the Harris County Sheriff's Office, employed from May 2009 to August 2012, who testified for the State at Mr. Balderas's trial.

21. Copies of any and all records in the Permanent File of Israel Diaz **Israel Diaz** (DOB 04/09/86); TDCJ No. 1970763), including, but not limited to, medical and mental health screenings; IQ and educational testing; reports and decisions by and to the Classification Committee; visitation logs, disciplinary records, and all parole and probation records and documents.

22. All parole and probation records and documents related to **Israel Diaz** (DOB 04/09/86), including, but not limited to, medical and mental health screenings, initial interviews, reports, and decisions for incarcerations from 2003 to the present.

23. The entire trial file for the case of State v. Juan Balderas, as made available to Mr. Balderas's trial counsel.

. 01967

**IV.**

**PRAYER**

WHEREFORE, for the foregoing reasons, Mr. Balderas respectfully requests

that this Court direct the State to disclose the above-listed information to counsel for

Mr. Balderas (the OCFW) within ten days of signing an order.

Respectfully submitted,
*/s/ Katherine Froyen Black*
KATHERINE FROYEN BLACK

BENJAMIN B. WOLFF, Director (No. 24091608)
(Benjamin.Wolff@ocfw.texas.gov)
ERIN M. ECKHOFF (No. 24090910)
(Erin.Eckhoff@ocfw.texas.gov)
KATHERINE FROYEN BLACK (No 24099910)
(Katherine.Black@ocfw.texas.gov)
NATALIE CORVINGTON (No. 24107401)
(Natalie.Corvington@ocfw.texas.gov)

Office of Capital and Forensic Writs
1700 N. Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Mr. Balderas

12

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing upon:

Office of the Harris County District Attorney
Attn: ADA Farnaz Hutchins

This certification is executed on April 19, 2018, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

*/s/ Katherine Froyen Black*
Katherine Froyen Black



# Eleventh Administrative Judicial Region of Texas

## Olen Underwood
### Acting Presiding Judge
*Rebecca Brite*
*Acting Administrative Assistant*

December 28, 2017

Honorable Baylor Wortham
1085 Pearl Street
Beaumont, TX 77701

Dear Judge Wortham:

Enclosed please find assignment #182 for the 179th Judicial District Court of Harris County to hear Cause No. 1412826-A; Ex Parte Juan Balderas and to dispose of any other business requested by the court.

If you have any questions feel free to call.

Sincerely,

Rebecca Brite
Enclosure(s)

01970

# THE STATE OF TEXAS

## ELEVENTH ADMINISTRATIVE JUDICIAL REGION

## ORDER OF ASSIGNMENT BY THE PRESIDING JUDGE

Pursuant to Section 74.056, Texas Government Code, I hereby assign the Honorable **Baylor Wortham**, Active District Judge, 136th Judicial District Court, to the **179th Judicial District Court** of Harris County, Texas.

This assignment begins the 28th day of December, 2017 and is for the primary purpose of hearing cases and disposing of any accumulated business requested by the court.

This assignment shall continue as may be necessary for the assigned Judge to dispose of any accumulated business and to complete trial of any case or cases begun during this assignment, and to pass on motions for new trial and all other matters growing out of accumulated business or cases heard before the Judge herein assigned, or until terminated by the Presiding Judge.

It is ordered that the Clerk of the Court to which this assignment is made, if it is reasonable and practicable, and if time permits, give notice of this assignment to each attorney representing a party to a case that is to be heard in whole or in part by the assigned Judge.

It is further ordered that the Clerk, upon receipt hereof, shall post a copy of this order in a prominent place in the public area of the Clerk's office. This posting shall constitute "Notice of Assignment" as required by Section 74.053, Texas Government Code.

Ordered this 28th of December, 2017.

Olen Underwood, Acting Presiding Judge
Eleventh Administrative Judicial Region

Attest:

_____
Rebecca Brite
Acting Administrative Assistant

Assignment # 182

Exh. A  Page 002



# Eleventh Administrative Judicial Region of Texas

## Olen Underwood
### Acting Presiding Judge
*Rebecca Brite*
*Acting Administrative Assistant*

December 28, 2017

Erin Eckhoff/Katherine Froyen Black          Shawna Reagin
VIA email                                     VIA email


*NOTICE OF ASSIGNMENT*

The Honorable Baylor Wortham, Active District Judge, 136th Judicial District Court, has been assigned to Cause No. 1412826-A; Ex Parte Juan Balderas; 179th Judicial District Court of Harris County, Texas.


*Enclosure*

Exh. A  Page 003

Dear Judge Wortham,

I spoke with Natalie Corvington with the Office of Capital and Forensic Writs and Farnaz Hutchins of the DA's Office regarding the issue of my knowledge regarding Witness Christopher Pool. I have also attached all parties in this email. Natalie and the Office of Capital and Forensic Writs prefers that someone else from my office (Harris County Public Defender's Office) handle the representation of Witness Israel Diaz. Farnaz has no objection if another attorney from my office also handles the representation of Witness Israel Diaz. I wanted to make sure that it was okay for me to reassign the case to another attorney from the Harris County Public Defender's Office.

Sincerely,

## Danny Lacayo

*Assistant Public Defender – Felony Division*
Harris County Public Defender's Office
Criminal Justice Center

1201 Franklin, 13th Floor
Houston, Texas 77002
Office: (713) 368-0016
Fax: (713) 368-9278
Email: Danny.Lacayo@pdo.hctx.net
http://harriscountypublicdefender.org/

### Notice of Confidentiality

**The information transmitted in this message is confidential, privileged, and/or ATTORNEY-CLIENT WORK PRODUCT intended solely for its named recipient(s). The information contained in this transmission is private. Any unauthorized review, use, disclosure, dissemination, distribution and/or photocopying of the transmission and the information it contains is unauthorized and prohibited absent express consent of the Harris County Public Defender's Office. The information contained in this transmission may be subject to statutory and/or common law privileges and exempt from disclosure. If you are not the intended recipient, please contact the sender immediately so appropriate steps may be taken to ensure the confidentiality of this transmission. The sender of this transmission does not intend to be bound by any agreement that may arise pursuant to the e-signature act or any other similar legislation. Thank you for your cooperation.**

**From:** Hutchins, Farnaz (HCDA)
**Sent:** Monday, March 19, 2018 3:21 PM
**To:** Lacayo, Danny (Public Defender's Office); '1 36clerk@co.jefferson.tx.us'; 'Baylor Wortham'

Exh. C  Page 001

. 61973

(136judge@co.jefferson.tx.us)
**Cc:** Reagin, Shawna (HCDA); 'katherine.black@ocfw.texas.gov'; 'erin.eckhoff@ocfw.texas.gov'
**Subject:** RE:

Good afternoon,

We appreciate Mr. Lacayo bringing this to our attention and his recognition of Rule 1.10 of the Texas
Disciplinary Rules of Professional Conduct.

We do not believe there is any conflict in Mr. Lacayo continuing to represent Israel Diaz in the
upcoming evidentiary hearing, as there is no correlation between Diaz and Christopher Pool. Any
involvement Mr. Lacayo had in investigating Pool during his tenure as an Assistant District Attorney
is unrelated to the allegations involving Diaz. Additionally, Mr. Lacayo was not previously involved in
the prosecution of Juan Balderas.

If the Court believes it is best to implement new counsel, we would respectfully ask that the
reassignment be swift so as to not interfere with conducting the evidentiary hearing on May 11th.
Per Mr. Lacayo's email, it appears reassignment within the Public Defender's Office can be efficiently
undertaken.

Sincerely,
Farnaz Hutchins

---

**From:** Lacayo, Danny (Public Defender's Office) [ mailto:Danny.Lacayo@pdo.hctx.net ]
**Sent:** Monday, March 19, 2018 2:01 PM
**To:** '136clerk@co.jefferson.tx.us'
**Cc:** Hutchins, Farnaz; Reagin, Shawna; 'katherine.black@ocfw.texas.gov'; 'erin.eckhoff@ocfw.texas.gov'
**Subject:**

Dear Judge Wortham,

My name is Danny Lacayo with the Public Defender's Office. I was assigned to represent Israel Diaz
in the Writ Hearing regarding Juan Balderas. I have attached all parties involved in this email. I was
reviewing the Writ and evidence attached and noticed that there was a witness named Christopher
Pool who testified in the trial. The writ alleged that he provided false testimony regarding his
termination in regards to an inmate death. While at the Harris County District Attorney's Office I
worked in Police Integrity for a period of time. I believe that I investigated the incident regarding
Detention Officer Pool. This case was eventually presented to a grand jury which returned a no bill.
   I know that this is an important case to everyone and wanted full disclosure to all parties involved
that I investigated one of the witnesses in this case. I am not sure if you wanted to keep me on the
case and wanted your guidance. If you believe that there is some conflict I can have the case re-
assigned within the Harris County Public Defender's Office.

Sincerely,

**Danny Lacayo**

Exh. C  Page 002

*Assistant Public Defender – Felony Division*

Harris County Public Defender's Office

Criminal Justice Center

1201 Franklin, 13th Floor

Houston, Texas 77002

Office: (713) 368-0016

Fax:    (713) 368-9278

Email: Danny.Lacayo@pdo.hctx.net

http://harriscountypublicdefender.org/

## Notice of Confidentiality

The information transmitted in this message is confidential, privileged, and/or ATTORNEY-CLIENT WORK PRODUCT intended solely for its named recipient(s). The information contained in this transmission is private. Any unauthorized review, use, disclosure, dissemination, distribution and/or photocopying of the transmission and the information it contains is unauthorized and prohibited absent express consent of the Harris County Public Defender's Office. The information contained in this transmission may be subject to statutory and/or common law privileges and exempt from disclosure.

If you are not the intended recipient, please contact the sender immediately so appropriate steps may be taken to ensure the confidentiality of this transmission. The sender of this transmission does not intend to be bound by any agreement that may arise pursuant to the e-signature act or any other similar legislation. Thank you for your cooperation.

Exh. C  Page 003

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
TRIAL COURT CAUSE NO. 1412826-A

EX PARTE, JUAN BALDERAS   ) IN THE DISTRICT COURT
)
)
vs.   ) HARRIS COUNTY, TEXAS
)
)
STATE OF TEXAS   ) 179TH JUDICIAL DISTRICT

---

**WRIT HEARING**

---

On the 22nd day of February, 2018, the following

proceedings came on to be held in the above-titled and

numbered cause before the Honorable Baylor Wortham,

Judge Presiding, held in Houston, Harris County, Texas.

Proceedings reported by computerized stenotype

machine.

Exh. B

| | |
|---|---|
| 1 | **APPEARANCES** |
| 2 | Ms. Faraz Hutchins |
| | SBOT NO. 24063791 |
| 3 | Ms. Shawna L. Reagin |
| | SBOT NO. 16634900 |
| 4 | Assistant District Attorney |
| | 1201 Franklin, Suite 600 |
| 5 | Houston, TX  77002 |
| | Telephone:  (713) 274-5800 |
| 6 | Counsel for the State |
| 7 | |
| 8 | |
| | Ms. Erin Eckhoff |
| 9 | SBOT NO. 24090910 |
| | Ms. Katherine Froyen Black |
| 10 | SBOT NO. 24099910 |
| | Office of Capital and Forensic Writs |
| 11 | 1700 N. Congress Avenue, Suite 460 |
| | Austin, TX  78701 |
| 12 | Telephone:  (512) 463-8503 |
| | Counsel for the Defendant |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Exh. B

```
1            P-R-O-C-E-E-D-I-N-G-S
2            THE COURT:  So everybody ready to proceed?
3            MS. ECKHOFF:  Yes, sir.
4            MS. HUTCHINS:  Yes.
5            THE COURT:  The Court will call Cause
6  No. 1412826-A, ex-parte, Juan Balderas.  I'll note for
7  the record that Mr. Balderas is present in the courtroom
8  this afternoon.
9            Counsel, since we are on the record, can I
10 have each of the attorneys identify themselves for the
11 court reporter and your respective clients, please.
12           MS. HUTCHINS:  Farnaz Hutchins, spelled
13 F-a-r-n-a-z; last name Hutchins, H-u-t-c-h-i-n-s.  For
14 the State.
15           MS. REAGIN:  Shawna Reagin, S-h-a-w-n-a
16 R-e-a-g-i-n for the State of Texas.
17           MS. ECKHOFF:  Erin Eckhoff with the Office
18 of Capital and Forensic Writs on behalf of Mr. Balderas.
19           MS. BLACK:  Katherine Froyen Black, from
20 the Office of Capital and Forensic Writs for
21 Mr. Balderas, as well.
22           THE COURT:  Well, Counselor, I know, just
23 procedurally -- I guess we can kind of address this.
24 We're here for, I guess, essentially a status conference
25 is how he would probably label it.  I know because we've
```

Exh. B

1   had a substitution of judges on this case, it takes some

2   time for -- obviously for myself to get a little bit

3   more familiarized with the case and also to kind of come

4   back and readdress certain issues.

5           So my goal here this afternoon isn't to

6   readdress necessarily all of the issues that were

7   covered in the prior hearing.  I know that was a very

8   lengthy hearing and I was able to review the record.

9   And I think most of the statements that I think you have

10  speak for themselves.

11          So, my goal is to cover some of these

12  issues in more of a cursory manner.  From the onset,

13  I'll note in the filings that each of the parties

14  submitted that it's very apparent from the record that

15  the respective attorneys in this case have worked very,

16  very hard and diligently on this, both the counsel for

17  Mr. Balderas and the counsel for the State.  It's very

18  evident from the filings and the work product of the

19  attorneys that both counsel genuinely care about this

20  case.  It's very important to them.  So I want to

21  commend each of the attorneys for the outstanding

22  representation you've shown your respective clients from

23  the get-go.

24          And I say that, having dealt with a lot of

25  bad lawyers.  It's very refreshing to actually see some

Exh. B

1  good lawyers that do good work on a case.  I do want to

2  commend each of you for the work that you have put forth

3  into the case and are continuing to do so, thus far.

4         Getting somewhat into the crux of the

5  matter, I know, Ms. Eckhoff, you filed a request, asked

6  for a live evidentiary hearing on a litany of issues.

7  So, they're somewhat voluminous, but I'll consolidate

8  those.  From the get-go, we have issues relating to

9  recanted testimony or the alleged false testimony of two

10 witnesses, Mr. Israel Diaz and Mr. Christopher Pool.

11 There's also an issue relating to Brady disclosure of

12 impeachment evidence, although I think technically that

13 would be under the category of Giglio, but I think it's

14 still under the same parameters.  Multiple issues

15 relating to ineffective assistance of counsel, issues

16 pertaining to jury's exposure to outside influences.

17 And then another category, which I would, I guess, label

18 as constitutional law issues relating to jury charge and

19 voir dire and other aspects such as that.

20        So, one of the things that I noted at the

21 get-go was the dispute about whether or not there's a, I

22 guess, mandatory or obligatory right to have an

23 evidentiary hearing to develop some of these matters.

24 Having read the State's response, I think there's merit

25 in their response in that the Supreme Court case law

Exh. B

01980

1   recited by counsel for Mr. Balderas was really more

2   limited in scope to issues relating to mental competency

3   or really mental ability relating to somebody being

4   medically diagnosed with an IQ below a certain

5   threshold.  Here we're looking at a little bit more

6   broader issues.

7            So Ms. Eckhoff, having read the filings,

8   I don't believe that's one of the allegations that's

9   been raised in your habeas corpus is that your client is

10  below the requisite IQ in order to be death penalty

11  ineligible.  Is that correct?

12           MS. ECKHOFF:  That's correct.  But, Your

13  Honor, I would point out that US Supreme Court precedent

14  in Evitts V. Lucey makes clear that due process applies

15  in situations where, like here, the State has

16  instituted a process, right, by creating Article 11.071

17  of the court of the Texas Rules of Criminal Procedure.

18  The State has undertaken a post conviction writ process.

19  And to the extent that the State has done that, then due

20  process applies.

21           So, I don't believe that a more limited

22  reading of Panetti and Ford is actually the case.  Those

23  particular cases pertain to those issues, but they are

24  guidance on the issue of due process applying in post

25  conviction, more generally.

Exh. B

```
 1              THE COURT:  Okay.  Well, I mean, I'll take
 2    that argument certainly under consideration; but I do
 3    think that although the Court has discretion, in order
 4    to allow the development of evidence in certain
 5    categories, if warranted under the circumstances, I
 6    don't know that it necessarily equates to an absolute
 7    right on any potential issues.  The Court's belief is
 8    that each individual issue will turn on its own
 9    circumstances.  So...
10              And I'll rule on that, too.  I think that
11    the State was accurate in that the evidentiary hearing
12    is really a matter to be developed.  Evidence after the
13    fact, as necessary, but not necessarily to be used as a
14    fishing expedition or a means to -- where evidence could
15    theoretically exist, to allow it to probe every possible
16    nook and cranny.
17              My take on it has always been that if
18    there is indication of where evidence is likely to exist
19    or issues that are certainly undisputed that need to be
20    developed, that may be the appropriate avenue.  But with
21    each of that being said, let's kind of dive into the
22    weeds.  Specifically, we have the first issue of the
23    recanted testimony and false testimony that was alleged
24    in the briefing.
25              We have Israel Diaz -- and having not
```

Exh. B

1    presided over the actual trial itself, I'm playing a

2    little bit of catch-up with the facts.  But was Mr. Diaz

3    presented as a cooperating witness on behalf of the

4    State's case in chief?

5              MS. HUTCHINS:  By "cooperating witness,"

6    Judge, you mean he was himself charged with a different

7    capital murder that was reduced to an aggravated

8    robbery.  He had pled guilty to the aggravated robbery

9    and it was open for sentencing after he testified in

10   Mr. Balderas' case and I believe two other cases.

11   Ultimately, he only testified in Mr. Balderas' case.  He

12   did not testify in the two other cases because they

13   ended up trying different cases that didn't involve him.

14             All of this information was made known to

15   the jury, it was put out.  I believe he testified in his

16   original jumpsuit from the jail and made all of that

17   information aware to the jury and was cross-examined on

18   it, as well.

19             THE COURT:  Was there, whether it be an

20   written or oral understanding, I guess, between the

21   counsel for Mr. Diaz and the district attorney's office

22   that if he had provided testimony in the case or

23   presumably had agreed to provide truthful testimony in

24   the proceedings, that that would have been taken into

25   consideration in his own case?

Exh. B

| | |
|---|---|
| 1 | MS. HUTCHINS: Judge, I don't want to |
| 2 | misspeak. There was a formal written notice given to |
| 3 | defense counsel who tried the case from State's counsel. |
| 4 | I believe it's -- it's been filed, it's in the district |
| 5 | clerk's office. I just don't have a copy of that with |
| 6 | me today. So whatever the terms were or whatever it |
| 7 | was, was disclosed to trial counsel at the time. |
| 8 | I know that the defense has asked for |
| 9 | other writings, communications within the DA's office |
| 10 | relating to information about Mr. Diaz' plea deal. That |
| 11 | was all addressed prior to my coming on the case, I |
| 12 | believe it was in 2015. And having read the transcripts |
| 13 | and correspondence, whatever existed that wasn't |
| 14 | otherwise covered by work product privilege was already |
| 15 | turned over to the Office of Capital Writs. So there |
| 16 | shouldn't be anything that remains. As far as I know, |
| 17 | there were no promises, there was nothing. |
| 18 | THE COURT: Okay. Well, in any event, at |
| 19 | some point after the conclusion of Mr. Balderas' trial I |
| 20 | understand, Ms. Eckhoff, that that witness has since |
| 21 | indicated that a portion or -- all or at least a portion |
| 22 | of his testimony was untruthful or has since been |
| 23 | recanted? |
| 24 | MS. ECKHOFF: That is correct. |
| 25 | THE COURT: And certainly, to what extent |

Exh. B

1  has that witness made that declaration?

2          MS. ECKHOFF:  In speaking with our

3  investigator, he explained what testimony of his was

4  false and -- on two different occasions.  He did not

5  sign an affidavit to that effect, citing concerns raised

6  by his attorney.  However, he confirmed, when presented

7  with the affidavit, that the information in that was

8  correct.  So I understand, obviously, that we do not

9  have a sworn document on that; but that is exactly the

10  reason that an evidentiary hearing is necessary here, so

11  that the witness can be subpoenaed and questioned under

12  oath and we have an opportunity to ask him about that.

13          THE COURT:  Well -- and this is a question

14  I have and maybe it's just more of a practical

15  consideration.  Obviously, counsel who represented

16  Mr. Diaz was instructing him not to give a sworn

17  affidavit because if he had given sworn testimony during

18  the course of the trial that he is now admitting is

19  false, then he would be admitting committing perjury,

20  which in and of itself is a crime and carries punitive

21  consequences.

22          So to the effect that even if this witness

23  was produced and were put on the stand and placed under

24  oath, do you have confidence that questions that you

25  posed about whether or not he gave false testimony would

Exh. B

1  result in him revoking his Fifth Amendment privilege not

2  to testify?

3          MS. ECKHOFF:  I cannot tell you how he

4  would testify.  I don't have any insight into that, but

5  we need the opportunity to try.  We need the opportunity

6  to try and present that evidence to this Court.  We need

7  that in order to satisfy Mr. Balderas' right to due

8  process.

9          THE COURT:  Well, any time I think you

10  have a communication that somebody has changed their

11  testimony or has recanted their testimony -- that is, of

12  all the categories, one that certainly caught my

13  attention the most.  You've talked about either

14  presenting the investigator to testify, although

15  obviously, the issue you run into there is some hearsay

16  issues.

17          The most reliable way to present that

18  evidence would be through that particular witness,

19  though that witness is not willing to testify without

20  invoking the Fifth.  Rather than going through that

21  process of bringing him over here just to have a

22  five-minute hearing to have him invoke the Fifth and not

23  answer any questions, I don't know if you've had any

24  conversations with his attorney to see whether or not he

25  is willing to come and testify at a hearing about those

Exh. B

1  matters or if he's been advised by his attorney to

2  invoke the Fifth; but certainly I think that would be

3  something that would be somewhat helpful to know whether

4  or not it would be a fruitful endeavor to even produce

5  him as a witness.

6         MS. ECKHOFF:  Yes, we have not had

7  contact.  And I can't say what his attorney has told

8  him.  To the extent he's still even represented, I don't

9  know even know that.

10        THE COURT:  Well, I think ethically, as a

11  judge presiding over a case, if there's a possibility

12  that somebody is going to testify and possibly

13  incriminate themselves in any capacity, I think,

14  ethically I'm bound to at least admonish that witness as

15  to their constitutional rights and if they're indigent

16  or incarcerated, to appoint an attorney to represent

17  their interests.

18        MS. ECKHOFF:  Sure.

19        THE COURT:  I think that's another issue

20  that would need to be addressed to certainly protect

21  Mr. Diaz' rights if he's going to be possibly produced

22  at a hearing.  Okay.

23        Well, let's discuss Mr. Pool.  I looked

24  through the briefing and I've scanned through it several

25  times.  I don't know how extensive his involvement is

Exh. B

1    discussed, but if you could share with me specifically

2    the scope you believe that his was false. Has he also

3    recanted his testimony?

4            MS. ECKHOFF: No, Your Honor. We -- at

5    trial, he provided testimony. He testified in the

6    punishment phase. He had been a corrections officer at

7    the Harris County Jail and was called by the State to

8    testify, I believe, about a discovery in contraband, I

9    think. And, in the course of that it came out -- in the

10    course of his testimony, he recognized that he had been

11    essentially let go from the Harris County Sheriff's

12    Office due to an incident with an inmate where the

13    inmate actually died.

14            And through the -- you know, he made

15    appeals through personnel. And it was notable because

16    the issue was not only that this incident occurred and

17    the inmate ended up dying, but that part of the reason

18    that he was let go was because he was found to have been

19    dishonest about something which is, of course,

20    significant.

21            When this case came out at trial -- at the

22    trial in cross-examination, trial counsel did not have

23    his personnel file. And he said on the stand that he

24    had been cleared of all of those charges. And that

25    actually wasn't true because a review of his personnel

Exh. B

1    file, including what he was relying on to say he was

2    cleared of all charges, doesn't actually clear him of

3    dishonesty and doesn't clear him of this incident where

4    the inmate died; but rather, it says that he could be

5    rehired.

6             So, like, part of his punishment was that

7    he could not be rehired by Harris County Sheriff's

8    Office. And what he got, you know, cleared of was

9    actually the punishment was reduced. He wasn't cleared

10    of being dishonest.

11             THE COURT: Okay.

12             MS. ECKHOFF: And it's a misdemeanor. So

13    proof for that is the personnel record that contradicts

14    his testimony.

15             THE COURT: Well --

16             MS. ECKHOFF: So I don't necessarily

17    actually believe testimony from him in a live hearing is

18    necessary. There are records on that.

19             THE COURT: That was going to be my next

20    question, if that can be established through the records

21    developing the testimony through cross-examination

22    probably with some very fruitful --

23             MS. ECKHOFF: Correct.

24             THE COURT: Okay. Next on the issue we

25    have the matter relating to the disclosure of the

Exh. B

1   impeachment information relating to a witness, I think,

2   pertaining to one of the notes. Through the attorney

3   notes or investigator notes?

4          MS. HUTCHINS: They're attorney notes,

5   Judge.

6          THE COURT: Well, my understanding is --

7   what the rule requires is whether -- they opposing

8   counsel has provided the notes themselves is typically

9   irrelevant. What the courts care about is whether or

10   not the information is conveyed, whether that be

11   conveyed via email, or orally, or whatever capacity, as

12   long as it was shared with the opposing counsel prior to

13   trial at a time when it could still be useful and

14   effective.

15          So I'm reading everyone's briefing

16   correctly. It seems that the information was conveyed

17   over to opposing counsel, at least, prior to trial, but

18   it was shortly before trial. I think it was three days.

19   Is that the allegation?

20          MS. HUTCHINS: So, Judge, we have looked

21   at it in two different ways sort of based off the

22   argument that defense is making now. According to the

23   affidavit, trial counsel, Mr. Godinich, he was aware of

24   it pretrial. There's no timeline from him. He said in

25   his review of all of the documentation from the DA's

. 01550

1 | office, which was over a series of years that we have
2 | based off of his time sheets, he reviewed the entirety
3 | of the file. These notes were amongst the things that
4 | he's reviewed, he was aware of them.

5 | In terms of trying to pinpoint an exact
6 | timeline, I think the defense makes light of this email
7 | that existed at least we know three days before
8 | testimony started. At minimum, we know three days
9 | before they were made aware of some meetings that
10 | occurred and that's sort of, in terms of a timeline, the
11 | best we can qualify. But Mr. Godinich says he was aware
12 | of it well before. Prior prosecutors on the case say
13 | that these notes were available in the State's file for
14 | defense to review. The defense did review the State's
15 | file and that was back in 2010, 2011.

16 | And one thing I did want to mention to the
17 | Court that we didn't include in our briefing, I came
18 | across it again in preparing for this hearing, is that
19 | Mr. Godinich actually in presenting Walter Benitez, I
20 | believe, one of his -- his star defense witness,
21 | Mr. Benitez actually testifies to some of the contents
22 | of these notes and the meetings that were held several
23 | days before the murder talking about what was discussed
24 | at the murder and the hit being put out.

25 | So I just wanted to bring that to the

Exh. B

1   Court's attention that they were able to make use of

2   that evidence, even if it was three days; but we

3   certainly believe it was years before.

4          MS. ECKHOFF:  There's a few different

5   points I would like to address here.  First of all, I

6   think the State misunderstands the significance of the

7   pretrial hearing, at least the significance to us.

8   Okay.

9          These notes that were withheld were

10  impeachment because on multiple occasions years before

11  the trial, the State's star witness against Mr. Balderas

12  gave contradictory statements.  What he says in those

13  happened is not what he testified to.  They're prior

14  inconsistent statements.  Right?  That was not revealed

15  three days before at this pretrial hearing.  Right?

16  This is not what that pretrial hearing disclosed.

17          I raised that because in Mr. Godinich's

18  and Mr. Nunnery's affidavits, they make the assertion

19  that they knew about all of these things and

20  incorporated them.  And what I'm telling you is that in

21  viewing trial counsel's own emails amongst the defense

22  team, it makes clear that they were unaware of these

23  meetings until three days before.

24          I fully acknowledge that they have notice

25  of that three days before, or whatever, at this pretrial

Exh. B

1    hearing.  However, those meetings were discussed in the

2    notes.  Diaz had provided that information to the State.

3    So, for State -- or for the trial counsel to be like,

4    Hey, I'm surprised to find out that this is the State's

5    theory of what happened, you know, just a few days

6    before trial, calls into question their assertion that

7    they viewed these notes before and incorporated them

8    into their preparations.

9            And further, I will also note that

10   Mr. Godinich doesn't actually say that he saw the notes.

11   His affidavit says the notes were viewed.  It doesn't

12   say who viewed them or when they were viewed.  And they

13   also, both trial counsel -- and Mr. Nunnery's statements

14   is even more vague.  It's, I was aware that the notes

15   existed.

16           Doesn't say how or anything to give you

17   any more information than that.  So I think that that

18   vagueness is a real issue.  And there's a case here of

19   Harris County, ex parte Prevost where the CCA has

20   remanded on one of these writs because trial counsel's

21   affidavits were vague.

22           The other issue is in their affidavits

23   they both say that they incorporated the knowledge that

24   they gained from reviewing these notes into their

25   cross-examination of Mr. Diaz.  Again, these notes

Exh. B

01993

1  pertain to prior inconsistent statements that Mr. Diaz'

2  had made to the State.  There are no questions on

3  cross-examination of Mr. Diaz at trial about prior

4  inconsistent statements or even prior meetings with the

5  State.  So, that doesn't seem to match up with what

6  trial counsel is asserting in their affidavits.

7          And I think what we need here is the

8  opportunity to cross-examine.  You know, the Supreme

9  Court says that reliability in proceedings like this is

10  best determined through the crucible of

11  cross-examination.  We need to be able to ask these

12  questions and get past the vague answers and know what

13  we're actually dealing with here.  And that's really all

14  we're asking for is an opportunity to confront witnesses

15  against Mr. Balderas and present evidence because we

16  haven't had that opportunity yet.

17          THE COURT:  The issue that, as far as the

18  disclosure goes, in the defense counsel's affidavit they

19  stated, at least from the record it was clear, that in

20  the hearing it was laid out or made known, the

21  inconsistent statements.

22          MS. ECKHOFF:  No, they said -- my

23  understanding is that the hearing was where the State

24  went in and said, This is what our theory of the case

25  is.

Exh. B

1           They didn't say, This is our theory of the

2    case.  We are going to rely on Mr. Diaz to do it.  And

3    oh, by the way, he said contradictory things to us

4    before.

5           The inconsistent statements were not an

6    issue at the previous trial hearing.

7           MS. HUTCHINS:  Judge, if I may respond?

8           THE COURT:  You may.

9           MS. HUTCHINS:  I think we have, I guess,

10   two different frame works that we're are looking at if

11   I'm understanding correctly.  So at the pretrial hearing

12   that happened, the State proffered what they were going

13   to prove through various witnesses.  And one of the

14   things that they proffered was that they were going to

15   provide testimony, that there was a meeting three days

16   before the murder.  And at that meeting there was a hit

17   put out on the complainant, the defendant was present at

18   that meeting; and it was just made known that that's --

19   that the hit was out.

20           When Mr. Godinich returns to the office,

21   I'm assuming, is when he writes this email.  And he

22   writes the email to the defense team that says, We

23   learned some information.  We learned the State's

24   case -- a part of their theory of their case and it's

25   the first time that we've heard about meetings three

Exh. B

1    days before and three days after the meeting.

2              I've reviewed the transcript from the

3    hearing.   There was never any mention of the meeting

4    three days after.  I believe Mr. Godinich made an error

5    in that regard in writing that front portion of the

6    email.  And so -- and he asked the defense team for any

7    insight into this.

8              Well, when you -- and so that's the extent

9    of sort of, at least on the transcript, what was

10   revealed from the meetings that were held three days

11   before.  There is a portion in the transcript where

12   Mr. Nunnery specifically asked, I believe twice, "Three

13   days before?  Three days before?"  Which in reviewing

14   it -- again, we are reviewing paper documents -- it

15   becomes of note because looking at the Diaz notes, the

16   Diaz notes do mention meetings.  And they mention

17   meetings nine to ten months before.  And they mention

18   meanings that appear to be different with no timeline,

19   but there's never specifically a three-day meeting

20   that's mentioned in the notes.

21              So that's the point that I was trying to

22   make in my written motion was that this element of

23   surprise that appears in Mr. Godinich's email is not

24   mutually exclusive from him, his having prior reviewed

25   the contents of the notes or somebody having told him

Exh. B

1   the notes or whatnot because that three-day number never

2   exists in the notes.  In terms of the entirety of notes,

3   the entirety of the notes deal with three different

4   conversations that were had with Mr. Diaz and the

5   State's attorneys back in, I believe it was, 2007 and

6   2008.

7            And these conversations deal with a host

8   of different extraneous offenses.  They jump around, the

9   names are sort of confusing as to who's participating in

10  what, what's happening where.  And those are the

11  notes -- the rest of the contents of the notes are what

12  Mr. Godinich and Mr. Nunnery say they were aware of the

13  information in that note -- in those notes before trial.

14           I know defense counsel is now making a

15  distinction, Well, if they knew it, they certainly

16  didn't use it at trial.  Well, that's trial strategy.

17  That's how they want to conduct their cross-examination.

18  Just because they didn't specifically cross-examine on a

19  point that Mr. Balderas now wishes they had doesn't mean

20  that they were ineffective and doesn't mean that they

21  didn't know about it, and I think that's the key issue

22  here.

23           MS. ECKHOFF:  I think there's two points

24  to make to that.  One is you're presuming a lot.  The

25  State is presuming a lot about what Mr. Godinich's email

Exh. B

1    meant.  This is something we should ask him, he should

2    be providing those answers.  We shouldn't be basing it

3    on what the State is interpreting.

4             Second of all, and to a similar point is

5    that the State -- trial counsel may or may not have a

6    strategy.  Those are things that they can testify to

7    themselves that they should be cross-examined on.  It's

8    very easy in a post-conviction case for trial counsel to

9    come in and say any error was due to strategy.  And

10   that's clearly not always the case because if that was

11   the case, we wouldn't have post-conviction relief.  And

12   they need to be tested on what that strategy was and

13   what the thinking was and we need to be able to prove

14   whether it was or was not strategy.

15            We don't -- we should not just take their

16   assertion, or in this case the State's assertion that it

17   must have been strategy.  That's just not how these

18   proceedings should work.  We need the right to confront

19   these witnesses.

20            MS. HUTCHINS:  Just one more thing, if I

21   may?

22            THE COURT:  Please.

23            MS. HUTCHINS:  Separate from this, I just

24   want to move it along.  One of the cases that Counsel

25   referenced was Prevost saying that that case was out of

Exh. B

1 Harris County, which it was, and that it was sent back

2 because the affidavits were so vague. The affidavits in

3 Prevost were much different than the ones that were

4 filed here. And in that particular case, they were

5 sent back for additional affidavits to clarify some of

6 the points that were made, which is also certainly

7 something this Court is able to do.

8 THE COURT: I understand. And that's

9 something I've noted, as well. Ultimately, as I

10 understand it, the attorney affidavit referenced that

11 they had access to the notes and the notes were viewed

12 by somebody on the defense counsel team -- it doesn't

13 necessarily state who -- that ultimately at the time the

14 affidavits were drafted, the defense counsel was aware

15 of, I guess, the contentions of these inconsistent

16 statements and had not indicated in their affidavits, at

17 least that I saw from review of the affidavits, that

18 there was information that they were not privy to or did

19 not have access to, just from our review of the

20 affidavits. That's certainly an aspect that I will take

21 under consideration.

22 Next, let's address the matter of

23 ineffective assistance of counsel. Now, I know there

24 are at least four different caveats you've raised in

25 your petition that address ineffective assistance of

Exh. B

1    counsel on trial counsel and right of capacities.

2           And so first, I'll note that as a basic

3    premise under Strickland the Courts have always

4    addressed this that ineffective assistance of counsel

5    that would amount to representation that was so

6    deficient that essentially the defendant did not have an

7    attorney assisting in the trial.

8           MS. ECKHOFF:  No.  Your Honor, it's

9    whether or not errors were made that would cause

10   prejudice.  And the prejudice is whether or not even one

11   juror would have changed their mind.

12          THE COURT:  Okay.  Well -- so let's kind

13   of probe these individually.  And again, I note -- I say

14   that noting certainly, as you noted, with any trial

15   strategy that, you know, hindsight is always 20/20.

16   Sometimes an attorney can, you know, roll the dice

17   thinking that outcome may have one result and have a

18   different result.  And in my experience, having

19   previously dealt with dozens and dozens of 22.55s and

20   doing the issues of ineffective assistance of counsel

21   this is an area that I have some experience.  So we'll

22   just tackle these individually.

23          We're talking about the first issue, I

24   think, you've raised in the guilt-innocence phase to

25   address, investigate or present information on alibi

Exh. B

1    evidence.  Essentially, I guess, you're alleging that

2    counsel didn't do enough information to investigate the

3    case prior to it being tried?

4              MS. ECKHOFF:  Correct, their investigation

5    was inadequate.

6              THE COURT:  Okay.  And specifically, in

7    what regards?

8              MS. ECKHOFF:  First of all, we know that

9    these witnesses exist.  We've provided affidavits from

10   them.  And the only point at which a trial counsel in a

11   capital case should not be investigating is if they have

12   a reasonable basis for not investigating.  Right?  And

13   there's no indication here that there was no -- there

14   was a reasonable basis for failing to investigate the

15   guilt phase aspects of this case.

16             Clearly the guilt phase, the State's case

17   against Mr. Balderas was anything but open-and-shut.  I

18   mean, we have a jury that had to deliberate for more

19   than two days before, you know, finding him guilty and

20   only after, as you've already mentioned, the extraneous

21   influences on them did they come to a guilty verdict,

22   you know.  And there are still serious questions about

23   whether or not Mr. Balderas committed this crime.

24             And the guilt phase could have -- trial

25   counsel could have presented, could have discovered and

Exh. B

1  presented alibis. And there's no indication that they

2  actually sought to investigate, talked to people.

3          I mean, if you read their affidavits they

4  make very clear that they blame any lack of

5  investigation on their part on Mr. Balderas himself, or

6  on his family and friends. And Rompilla v. Beard makes

7  very clear that that is no excuse for not investigating

8  the case.

9          THE COURT: Well, let me pose this

10 question to you: Rather than asking defense counsel to

11 come and question them about the failure to investigate

12 certain factual matters that you think would pertain to

13 guilt/innocence, why not just present evidence on those

14 particulars that you've addressed at a evidentiary

15 hearing? In other words, if you believe that there is

16 additional evidence that exists that was not reflected

17 in the record that would pertain or reflect on actual

18 innocence, why not petition the Court to bring in

19 witnesses to develop that evidence at the habeas corpus

20 level?

21         MS. ECKHOFF: That is a part of what we

22 would present at a live evidentiary hearing because it's

23 important to note that this Court is going to have to

24 make credibility determinations about witnesses. We

25 have provided affidavits from these witnesses in order

Exh. B

1  to support -- to meet our pleading burden in filing the

2  application.

3  And I want to make clear that -- and even

4  the State notes this in their brief -- that we are not

5  required to plead evidence with our application. We are

6  only required to allege the facts which, if proven true,

7  might result in relief. And we have met that burden

8  here and we do that by attaching affidavits. We have

9  those affidavits, we want to call those witnesses, and

10  we want you to hear them testify so you can assess

11  credibility.

12  THE COURT: And that kind of relates to my

13  original question. My main goal and my main focus that

14  certainly gets my attention is the issue of wrongful

15  convictions. And if there's evidence that was not

16  presented or was even unknown at the time that could

17  weigh on a person's conviction that would indicate that

18  the wrong -- an innocent person has been convicted of

19  this crime, or the wrong person has been convicted that

20  it comes up after the fact or is newly discovered, then

21  that a -- at any time post trial, and certainly in the

22  habeas corpus setting, that that would be an appropriate

23  time to do that.

24  So what evidence is it that you believe

25  exists that was not properly developed that needs to be

Exh. B

1  developed at this point?  What witnesses, specifically

2  by name, do you need to call in order to develop that

3  testimony?

4          MS. ECKHOFF:  The specific witnesses that

5  we've attached affidavits from are Anali Garcia --

6          THE COURT:  Any witnesses that you believe

7  exists that would offer testimony that would bear on the

8  innocence of your clients.

9          MS. ECKHOFF:  Right.  So we have at least

10  two witnesses, Anali Garcia and -- I apologize, Octavio

11  Cortes.

12          THE COURT:  And Ms. Garcia, what is her

13  relevance or relation to this case?

14          MS. ECKHOFF:  She is an alibi witness.

15          THE COURT:  Okay.  And her testimony was

16  not presented during the original trial?

17          MS. ECKHOFF:  No.

18          THE COURT:  Okay.  And then Ms. Cortes,

19  what is her relevance in this case?

20          MS. ECKHOFF:  It's Octavio, it's a mister.

21          THE COURT:  Sorry, Mr. Cortes.

22          MS. ECKHOFF:  Actually, it's Ms. Garcia's

23  brother.  Also an alibi witness.

24          THE COURT:  Are those witnesses located

25  within the subpoena power of this court or are they

Exh. B

020004

1   located in Mexico or any other location that's outside

2   of the subpoena power?

3          MS. ECKHOFF:  I believe at least

4   Ms. Garcia is in Texas.  And Mr. Cortes, the last that

5   we spoke to him, was within the United States.  I'm not

6   sure his current location.

7          MS. HUTCHINS:  May I be heard?

8          THE COURT:  Ms. Hutchins, let me hear from

9   you on that aspect.  Obviously, I guess the contention

10  is that the original trial counsel were aware of these

11  witnesses elected not to present their testimony at

12  trial for whatever, whether it be strategy or whether or

13  not they found that witness to be credible.

14         MS. HUTCHINS:  Correct, Judge.

15  Mr. Godinich specifically identifies Ms. Garcia in his

16  affidavit and has notes from meetings with Ms. Garcia;

17  likewise, met with Iliana Cortes, who is also a sister.

18  Mr. Octavio Cortes, my understanding is, is the brother.

19  This is a family with whom the defendant's brother has a

20  child with one of the sisters.  I can't remember if it's

21  Iliana or Anali.  So in essence, it would be, like, his

22  in-laws.

23         The defense was aware of Ms. Garcia and

24  Ms. Cortes, met with them, specifically spoke with them

25  about the alibi defense which would be that Mr. Balderas

Exh. B

1   was at the house making illegal copies of CDs at the

2   time and wasn't allowed to leave when news broke out of

3   the murder.  But during these meetings these witnesses

4   had very vague recollections, couldn't provide any

5   recollections, no specifics, were told that they had to

6   go meet with the defense attorney by Mr. Balderas'

7   girlfriend so they showed up not really knowing why they

8   were there.

9              And ultimately, defense counsel made the

10  decision that they did not have any either useful or

11  admissible evidence that they can present at trial and

12  chose not to.  And I believe there's documentation

13  attached to Mr. Godinich's affidavit, as well as some of

14  the exhibits the defense has attached to their own writ

15  application that support this.

16             THE COURT:  Okay.

17             MS. ECKHOFF:  That's not entirely correct

18  because while Ms. Cortes, I do believe, was taken to

19  meet with defense counsel, Ms. Garcia did not meet with

20  defense counsel in person.  In fact, she called them up

21  on her own to reach out to them.  They never reached out

22  to her.  And they didn't discuss, like trial counsel --

23  there's no indication that they discussed any aspect of

24  an alibi with her, they were asking her more about

25  mitigation issues of you know, What's your relationship

Exh. B

| | |
|---|---|
| 1 | like with Mr. Balderas?  And is he a nice guy, type |
| 2 | thing.  They didn't broach the alibi with her.  They |
| 3 | never discussed it with her. |
| 4 | THE COURT:  Well, outside of these |
| 5 | particular witnesses, are there any other areas that you |
| 6 | felt that the trial attorneys failed to adequately |
| 7 | investigate which you believe or note that evidence |
| 8 | exists that needs to be established on the record? |
| 9 | MS. ECKHOFF:  And to be clear, Your Honor, |
| 10 | there may be additional witnesses, additional alibi |
| 11 | witnesses beyond what we have attached.  Right?  There |
| 12 | were other members of the family, et cetera.  However, |
| 13 | those are the affiants that we documented to meet our |
| 14 | burden. |
| 15 | Beyond that, trial counsel also didn't |
| 16 | conduct an investigation into the actual gang. |
| 17 | Obviously, this was a gang shooting.  And to better |
| 18 | understand the structure of the gang and how it operated |
| 19 | in order to confront the State's depiction of how the |
| 20 | gang worked and, you know, the State said that |
| 21 | Mr. Balderas had to be the shooter for one reason or |
| 22 | another because of, like, essentially gang politics. |
| 23 | And there are witnesses who can provide insight, who |
| 24 | provided insight to support our application on how the |
| 25 | gang actually operated. |

Exh. B

| | |
|---|---|
| 1 | And had they done that, then they could |
| 2 | have actually confronted the State's depiction of how |
| 3 | this all went down. And if that were the case, they |
| 4 | could have poked holes and challenged what they were |
| 5 | telling the jury. |
| 6 | THE COURT: And who were those particular |
| 7 | witnesses that would have testified on those particular |
| 8 | matters? |
| 9 | MS. ECKHOFF: In particular, Jose Perez |
| 10 | and Walter Benitez. Now, Walter Benitez did testify as |
| 11 | a defense witness at trial; but there was more that he |
| 12 | could have provided which is detailed in the affidavit |
| 13 | attached to the application. |
| 14 | THE COURT: Okay. And Mr. Perez' |
| 15 | testimony would have been, I'm guessing, in line of what |
| 16 | Mr. Benitez would have testified to? |
| 17 | MS. ECKHOFF: Correct. |
| 18 | THE COURT: Any other areas that you feel |
| 19 | were not properly investigated but factually needed to |
| 20 | be established on the record or that would establish |
| 21 | their actual innocence or wrongful conviction? |
| 22 | MS. ECKHOFF: And to an extent, the |
| 23 | eyewitness identification, which is a different part but |
| 24 | sort of a related piece of the ineffective assistance of |
| 25 | counsel guilt claim which is that, you know, aside from |

Exh. B

1  Mr. Diaz, the State's other key witness against

2  Mr. Balderas was an eyewitness who is testifying, you

3  know, more than nine years after the fact about her

4  memory of that night.

5          And the line-up procedures that she was

6  put through before making the identification were

7  suggestive and problematic.  And her identification in

8  the first place was a problematic because initially she

9  says immediately after the fact, you know, her first

10  recollection in speaking with law enforcement is, I've

11  never seen this guy before.  I didn't know who he was.

12          And then it's only more than a week later,

13  after viewing a lineup with Mr. Balderas' picture in it

14  the day before, she says, Oh, yes.  That's him.

15          And that's significant because she knew

16  Mr. Balderas for up to a year before this incident

17  occurred.  So, that's questionable in the first place.

18  So trial counsel investigated this eyewitness

19  identification and the circumstances surrounding it, and

20  investigated the eyewitness herself.  There is evidence

21  out there that the eyewitness, Ms. Bardales, had had a

22  relationship with Mr. Diaz, who the State had also

23  brought to her a lineup with his picture in it before

24  this.

25          And she was, like, Oh, yes, I know him.

Exh. B

02005

1   And she had had a prior relationship with him.  And I

2   think that that is -- if these facts had been presented,

3   I think that that could have been important because I

4   think something else that's really key to this -- it's a

5   complicated case -- is that Mr. Diaz' had a motive to

6   kill this victim.

7            This victim was going to be a witness

8   against him in an aggravated robbery case.  He had the

9   motive to kill, not Mr. Balderas.  And if you combine

10  that with, you know, the eyewitness' prior relationship

11  with Mr. Diaz that can cast further doubt on her already

12  shaky identification.

13           And then, of course, that leads into the

14  issue of the eyewitness identification expert and how

15  that happened.  And I'm happy to go into that now or we

16  can address this first and get there.

17           THE COURT:  I don't think we need to dive

18  into the full fleshed-out matters of that.  Again, I've

19  read the transcripts in the prior hearing; but if I

20  understand it correctly, the issue is that there was

21  identification, an eyewitness expert that was detained

22  or noticed by the defense to be used but ultimately not

23  called?

24           MS. ECKHOFF:  Correct.  He gave testimony

25  outside the presence of the jury because trial counsel

Exh. B

1    attempted to get the identification thrown out.  The

2    Judge ruled that the identification was coming in,  but

3    the trial counsel could present this expert to the jury.

4    This expert who provided information about, you know,

5    why the lineup procedures were suggestive and how that

6    may have impacted an identification.  And trial counsel

7    just never presented this information for the jury.

8                    MS. HUTCHINS:  Judge, might I be heard?

9                    THE COURT:  Briefly, yes.

10                    MS. HUTCHINS:  Judge, in terms of that

11    there, in fact, was a hearing on the record with

12    Dr. Malpass, the ID expert.  And after his testimony to

13    the Court and then after another defense witness,

14    Celeste Munoz testified again in another hearing outside

15    of the presence of the jury, the defense brought up with

16    the Court their concern about a particular case that

17    they had found.  And they cite that in the record.  It's

18    in Volume 29, Page 14.

19                    And they specifically tell the Court that

20    in light of what they found and in this case they are

21    worried that it's -- that by presenting Dr. Malpass,

22    they are going to open the door.  And the Court

23    specifically says, you know, I'm not familiar with that

24    case.  I don't think it's going to open the door, but

25    again, I'm not familiar with that case.

Exh. B

1    And she's also said she's not familiar

2  with all of the different extraneouses that exist.  And

3  so I think it's clear at that point that the defense had

4  this excerpt, they put on the testimony for the Court,

5  they've heard how the testimony of Ms. Munoz is going to

6  go, as well as Dr. Malpass.  They have this case law and

7  amongst themselves at that point made a reasonable

8  decision that they know the case better than the judge

9  and chose not to present this witness.

10    THE COURT:  Ultimately, the testimony of

11  the witness was, at least, established on the record,

12  although it would be outside the presence of the jury,

13  the evidence was at least recorded on the record for

14  review.  Correct?

15    MS. ECKHOFF:  It's essentially, yeah, a

16  proffer.

17    THE COURT:  Okay.

18    MS. ECKHOFF:  And just to be clear, the

19  Court's ruling on two different occasions in this case,

20  you know, both when Dr. Malpass was present and when

21  she's speaking about when Ms. Munoz was at issue, the

22  Court's ruling was that Dr. Malpass could testify

23  without opening the door about suggestive lineup

24  procedures.

25    THE COURT:  Okay.  I think that kind of

Exh. B

1    covers the issue of evidence that was not presented

2    unless, Ms. Eckhoff, is there anything else that we have

3    not addressed that we need to cover on the issue of

4    trial counsel's failure to present certain evidence that

5    you believe related to guilt or innocence?

6            MS. ECKHOFF:  No, I believe that's it.

7            THE COURT:  Okay.  I note there the next

8    point where you've got trial counsel's failure to

9    present certain testimony of witnesses from Mexico.  And

10   my recollection from the transcripts and from the record

11   was that there had been attempts to obtain those

12   witnesses.  Again, they're outside the subpoena power of

13   the Court, but they voluntarily appeared electronically

14   through Skype or some sort of other teleconference

15   network but because of technical difficulties, some of

16   the testimony was cut short.  And then another witness

17   refused to testify or was unable to because of technical

18   difficulties?

19           MS. ECKHOFF:  That's my understanding in

20   terms of how the actual Skype testimony went was that

21   once -- as it was being presented, there were technical

22   difficulties, I believe, on this side of things that was

23   making it incredibly difficult and it was sort of

24   abandoned.

25           And the claim is actually that trial

Exh. B

1  counsel didn't preserve for the record the trial Court's

2  denial of the funds.  So there are some indications in

3  emails between trial counsel and the judge that he was

4  trying to get funds in order to bring these witnesses in

5  physically from Mexico to testify.  And the Court

6  informs him that she's basically not going to do that

7  and to come up with some other way of doing it.  And, of

8  course, eventually at the trial it doesn't work very

9  well and it all gets abandoned.

10             Because trial counsel never made that

11  request on the record and it was never denied on the

12  record, it was not an issue that could be addressed on

13  appeal.  So the claim is that they were ineffective for

14  failing to preserve the denial of funds on the record.

15             THE COURT:  Okay.  Well -- and again, at

16  least as to the request for denial of funds, as far as

17  questioning defense counsel, it seems like that's

18  something that's not so refuted.  The record will speak

19  for itself whether or not they raised an objection or

20  not.  But as far as the affidavit goes, you're not

21  contending that there's any ambiguity in their responses

22  to that allegation?

23             MS. ECKHOFF:  They're -- if I recall

24  correctly, I don't believe their affidavit addresses

25  their failure to make that request on the record at all.

Exh. B

```
 1              THE COURT:  Next we've got the trial
 2   counsel's purported failure to allege the right to a
 3   speedy trial.  I do note that there's, I think, eight
 4   years between that had passed between the date of the
 5   alleged offense and then the date of trial, which is a
 6   significant amount of time.  Albeit, in a capital case,
 7   it's not out of the ordinary to have a considerable
 8   amount of time to pass, especially for defense counsel
 9   to be -- have time to prepare for trial.
10              My experience, usually time is usually an
11   ally of the defense.  So it's fairly seldom that I see
12   defense counsel wanting to go to trial rather quickly.
13   But on looking at the issue of prejudice, is there a
14   particular piece of evidence or a particular way that
15   you feel your client was prejudiced by not going to
16   trial sooner versus the date that the trial actually
17   commenced?
18              MS. ECKHOFF:  Well, Your Honor, there was
19   a key mitigation witness who died during that time,
20   Mr. Balderas' brother.  And because this case, you
21   know -- because this case involved such weak evidence
22   against Mr. Balderas in the first instance, it all
23   basically comes down to one eyewitness who has a shaky
24   identification and a codefendant who literally flips a
25   day before Mr. Balderas' trial begins, that
```

Exh. B

1    recollections -- I mean, we have an entire claim that

2    there was this alibi. Right?

3           If they had investigated and discovered

4    this alibi, like, those memories of the night eight

5    years ago would arguably be much stronger closer in

6    time. I think that all of that -- and I take your point

7    that I'm sure that it is the case that the defense would

8    usually want to wait longer to go trial, but I think

9    that that presumes that there's actually an active

10   adequate investigation happening.

11          There are long, long periods in that eight

12   years where it's wholly unclear whether any significant

13   investigation, particularly into the guilt phase of this

14   case, was ever occurring.

15          THE COURT: Okay. And then finally,

16   alleged ineffective assistance of counsel as to the jury

17   selection process talking about the topic of sexual

18   abuse during voir dire. In what capacity was that

19   particularly an issue in this case?

20          MS. ECKHOFF: Mr. Balderas himself. A key

21   piece of the mitigation that trial counsel presented at

22   trial was his own history of sexual abuse. And it was

23   definitely a key component of the mitigation that they

24   presented in his defense. And despite knowing that well

25   in advance of conducting voir dire, they didn't ask any

Exh. B

02016

1   questions of potential jurors that might kind of sauce

2   out their own experiences with sexual abuse or their

3   understanding of it, those sorts of things that could

4   help them identify whether that would be a juror where

5   evidence of this type might resonate.

6                    THE COURT:  Well, so what was -- was the

7   issue to try and identify jurors that had been victims

8   of sexual abuse?

9                    MS. ECKHOFF:  It's -- no, not necessarily.

10  It's to their views, and their understanding and how

11  they might receive that evidence.

12                   THE COURT:  I mean, I know with voir dire

13  it's kind of not an exact art on what things you may

14  want to raise with a jury or may not want to raise with

15  a jury.  Certainly, logical things that would relate in

16  a capital case would be issues relating to the death

17  penalty, issues relating to prior criminal convictions,

18  criminal history, people's belief on whether someone

19  could be rehabilitated.

20                   All those things certainly would be very,

21  very relevant; although, I think that would clearly fall

22  squarely within the issue of trial strategy of someone

23  not wanting to raise the issue of sexual abuse with a

24  jury in that it could also be a double-edged sword.  You

25  have people that have very strong feelings relating to

Exh. B

| | |
|---|---|
| 1 | that topic. That may also result in jurors being -- I |
| 2 | guess, having the fans flamed on somebody they'd be more |
| 3 | inclined to convict versus one they'd be more inclined |
| 4 | to find at issue with mitigation and possibly having to |
| 5 | qualify the jurors before they've even decided guilt or |
| 6 | innocence is a bit of a challenge. But that issue, I |
| 7 | think, may be a little bit tougher issue. |
| 8 | I think generally in voir dire, appellate |
| 9 | courts have given lawyers a little bit more leeway in |
| 10 | strategy in qualifying jurors. But other than raising |
| 11 | the issue of -- the defendant's issue of people's |
| 12 | experience of sexual abuse or their own attitudes |
| 13 | towards it, or any other areas within the voir dire |
| 14 | process of the trial, you felt that the trial counsel is |
| 15 | deficient and would warrant needing to be presented as a |
| 16 | witness to be examined further at an evidentiary |
| 17 | hearing? |
| 18 | MS. ECKHOFF: I don't believe so. |
| 19 | THE COURT: We've gone about an hour and |
| 20 | my customary practice is about every hour to take about |
| 21 | at least a 10-minute break to let everybody use the |
| 22 | restroom and, more importantly, to let our court |
| 23 | reporter get a brief of rest of the hands. So why don't |
| 24 | we do that, take a 10-minute recess and then we resume |
| 25 | at 35 minutes past the hour. |

Exh. B

1    *(Recess taken.)*

2           THE COURT:  All right.  We're back on the

3    record.  I think we're getting towards the tail end of

4    the issues that we needed to address.

5           Ms. Eckhoff, next on my list was the issue

6    pertaining to the jury's exposure to certain outside

7    influences.  And I know we'll address each of those

8    individually, but I just want to make sure that I'm

9    clear.  Are you asking the Court to bring in individual

10   jurors from that trial and question them pertaining to

11   their deliberations and those influences?

12          MS. ECKHOFF:  No, I don't think it's

13   necessary to question them about their deliberations.

14   And I understand that that's not even permissible under

15   606(b).

16          THE COURT:  Correct.

17          MS. ECKHOFF:  What I do think is important

18   is to hear how they interpreted these events.  It's

19   impossible, I think, to assess whether these were

20   extraneous influences that could affect a juror.  And I

21   think this is why, as we somewhat discussed at the prior

22   hearing, you know, this isn't about these specific

23   jurors and their specific decision and whether they can

24   say that this affected their decision or not.

25          The standard -- the law makes clear that

Exh. B

1  the question is whether or not these events would

2  basically have impacted a hypothetical juror in their

3  position.  Right?  I think it's important to -- well,

4  because it can't be them, specifically.  It's someone

5  sitting in a situation like them.  Is it possible or

6  likely that someone experiencing that would be affected

7  and have it affect their verdict?

8          What is important to hear from the jurors

9  is what they saw, how they -- what the reaction was and

10  how that felt and how it impacted them.  And then you

11  can take that information to understand, okay, if

12  someone -- a hypothetical juror was feeling that, could

13  it have impacted their verdict.

14          And I think another key piece of this

15  claim is the timing of when the Court addressed this on

16  the record.  That's another key piece of this claim.

17  And it's really unclear, even from all of the

18  information that has been presented in the application

19  and in the State's response to it, we still don't have

20  a clear timeline of when the Court became aware that

21  this had happened.  And that's really important because

22  we have indication -- we provided an affidavit from a

23  person who was sitting in the courtroom that day, a

24  member of Mr. Balderas' family who says that the Court

25  was informed that this had occurred before the verdict

Exh. B

1    came back at the guilt phase.

2              And if that's the case -- and yet it

3    wasn't actually addressed on the record or acknowledged

4    until after the verdict came in and after everybody took

5    a lunch break -- that violates his rights to due

6    process.  That is something that should have been

7    addressed on the record before the verdict came in.  The

8    impact that that had on the jury should have been

9    assessed prior to their verdict.

10             THE COURT:  And I want to make sure that

11   I'm clear on this.  You're not making any contention

12   that there was any juror misconduct by a member of the

13   jury, that they had engaged in any impermissible

14   investigation or disregarded any of the Court's

15   instructions not to investigate any factual matters on

16   their own outside of the evidence presented in court?

17             MS. ECKHOFF:  Well, we have the extraneous

18   influence portion of this claim and then there are

19   specific claims of juror misconduct.  For example, there

20   was a juror who, in violation of the court's orders, was

21   posting about his experience sitting on the jury on

22   Facebook and had responses from his Facebook friends,

23   you know, saying, you know -- yes, Give him the chair.

24             But with regards to these extraneous

25   influences, no.  There's no allegation that the jurors

Exh. B

1  have gone beyond, these were things that happened to

2  them.

3          THE COURT:  And I've read the affidavits

4  of several of those jurors that were attached as

5  exhibits.  And I do note that those affidavits tend to

6  be very detailed and descriptive.  They generally tend

7  to be consistent with the issues of the location of the

8  hotel, and that several of the jurors were aware that

9  the location of the crime scene was a relatively short

10  distance from the location of the hotel.  But I didn't

11  see anything in the affidavits that indicated that

12  jurors actually went to the location of the crime scene

13  or were transported by the crime scene to and from their

14  transportation from the hotel by the court during

15  sequestration.

16          MS. ECKHOFF:  I think that that's correct

17  as far as I know, as well; but I think what's something

18  to keep in mind and what they noted, right, is they had

19  just sat through days of testimony about this gang and

20  where in southwest Houston it operated.  And they were

21  hearing names of streets and all of this and then

22  they're passing all of these streets on their way.

23          So they know that they're being taken

24  closer and closer and being asked to stay very close to

25  where this happened within the area where the gang at

Exh. B

1    issue in this had operated.  I think that is more than,

2    you know, seeing the crime scene itself.  It's how

3    that -- how that concerned them.

4            THE COURT:  Well, the concerns they had,

5    though, I mean, are those concerns not reflected in the

6    affidavits that have been tendered as exhibits?

7            MS. ECKHOFF:  No, I believe that they are

8    reflected in their affidavits.

9            THE COURT:  Okay.  So as far as presenting

10   testimony at an evidentiary hearing, it would seem to

11   me, though, the concerns that were raised were pretty

12   well documented in their affidavits.  As far as needing

13   to bring a juror into court and place him under oath and

14   ask him questions about that, it seems, though, their

15   concerns relating to the location of that hotel were

16   pretty well documented.

17           The other issue is the concerns about

18   Mr. Balderas' brother purportedly waving at the bus.

19   And I'll note it doesn't seem that he was ever located

20   by the bailiffs or whether it was every actually

21   confirmed if it was, in fact, Mr. Balderas' brother.

22   But there was a person waving that was believed to have

23   been a relative, which also was documented in the

24   affidavit, as well.

25           I'll note that the concern being, as

Exh. B

1  reflected by the jurors, was that some of them felt

2  somewhat frightened or that their safety was not being

3  appropriately addressed.  But wouldn't you agree that if

4  the jurors are generally feeling as though in a capital

5  case involving a gang in the Houston area, that

6  generally speaking the juror issues pertaining to juror

7  intimidation have historically been towards jurors being

8  reluctant to convict because they were intimidated or

9  were afraid of consequences versus convicting because

10  them felt intimidated?

11         I mean, generally speaking, if a juror is

12  saying that they felt threatened or intimidated, usually

13  they were reluctant to convict because they're afraid of

14  repercussions coming from convicting a gang member.

15         MS. ECKHOFF:  I would -- in all honesty,

16  Your Honor, this is actually the only case that I've had

17  where this has been an issue.  And while I see your

18  point, I could just as easily see a juror deciding that

19  they want to punish him more because they're scared and

20  felt like -- that someone associated with them trying to

21  intimidate them.  I can't presume to know how a juror is

22  going to go one way or the other.

23         THE COURT:  I say that -- my background

24  traditionally has been in federal courts dealing with

25  large-scale drug trafficking cases involving the Gulf

Exh. B

62024

1    cartel or the zeta that cartel where obviously there

2    were multiple instances of cartel members or gang

3    members attempting to influence either witnesses, or

4    jurors, or other ways in order to affect the outcome of

5    the case.

6              And so that's something that obviously

7    exists and is recognized in jurisprudence.  It may be

8    more recognized at the federal level; but, I mean, just

9    as a practical matter of speaking one of the things that

10   jumped out at me was that if jurors felt, I guess,

11   intimidated, just logically thinking at it, wouldn't it

12   seem to be more inclined to curry to the defendant's

13   favor versus -- versus not necessarily being more

14   inclined for conviction?

15             I didn't see anybody -- anywhere in the

16   affidavits that one of the jurors indicated that they

17   were more inclined to convict because they were either

18   angry, or upset, or were aggravated because of that

19   occurrence.

20             MS. ECKHOFF:  Well -- and Your Honor, I

21   would point out that that is exactly -- I believe would

22   fall under 606(b).  Right?  That's actually -- that

23   would be evidence of their own deliberations.  And

24   that's why it isn't in their affidavit.  It's not

25   admissible evidence, but I think --

Exh. B

1　　　　　　THE COURT:  Let me rephrase it.  It didn't
2　seem as though the jurors indicated that they had taken
3　a hostile approach.  It seems that generally the tone of
4　the affidavits were that the jurors were afraid and
5　concerned because of it, because they felt that there
6　were lapses in security and there should have been more
7　higher level of scrutiny or security that should have
8　been given to their safety by the court system and by
9　the bailiffs that were assigned to them.

10　　　　　　MS. ECKHOFF:  I think that's certainly a
11　key, a piece of how they felt; but I mean, they are
12　seeing this person that they understand to be a relative
13　of Mr. Balderas and they're interpreting him as trying
14　to intimidate them and create these feelings of fear.
15　There isn't -- I don't know of any evidence at this
16　point in the record one way or the other, honestly,
17　about either being more or less likely to convict based
18　on that experience.  But that is clearly an experience
19　that could impact their verdict.

20　　　　　　THE COURT:  Okay.  And then finally I have
21　what I've labeled as the kind of constitutional issues.
22　I think we can move through many of these rather quickly
23　because I don't think they're necessarily going to
24　warrant any calling of any live testimony or develop
25　anything from an evidentiary standpoint.

Exh. B

```
1              MS. ECKHOFF:  Correct, they're questions

2    of law.

3              THE COURT:  But I did want to cover them

4    very quickly just to make sure that I understand that we

5    are on the same page, that I'm not making any

6    assumptions on whether or not you were asking the

7    Court -- the right to present witnesses.

8              So first is whether or not the death

9    sentence is allegedly unconstitutional because of a jury

10   instruction that was requested, but not given.  I think

11   specifically that a single no vote would result in a

12   life sentence.  And so you've raised that as a

13   constitutional issue.  I'm assuming that there's no --

14   there's no witnesses or any factual matters that you

15   feel you need to develop in order to make that argument?

16             MS. ECKHOFF:  I would note that we have

17   provided affidavits from jurors that indicate that there

18   were holdouts at the punishment phase that may have, if

19   they had understood that being -- that they didn't need

20   to bring nine of their friends along with them to find

21   for LWOP, that they may have done that.  And we've

22   documented that, as best we could, in the affidavits

23   that we attached to the exhibits and -- I'm sorry,

24   exhibits that we attached to the application and that

25   potentially could require some further factual
```

Exh. B

1  development, but I'm not -- I can't specifically recall
2  at this moment if there's anyone in particular.
3         THE COURT:  Okay.  Next, you allege that
4  the death sentence was allegedly unconstitutional
5  because it was arbitrarily and capriciously assigned
6  based upon response to Special Issue No. 1 did not
7  define key terms that were requested by defense and also
8  poorly failed to narrow the class of death eligibility
9  to defendants.
10        And again, that seems to be a
11 constitutional issue that just turns on the instruction
12 to the jury.  So same thing, I take it there's no other
13 witnesses you're needing, requesting the Court to
14 subpoena or come forward for an evidentiary hearing?
15        MS. ECKHOFF:  That's correct.
16        THE COURT:  And then finally:  The death
17 sentence is ultimately unconstitutional because the
18 punishment charged allegedly limited the evidence the
19 jury could find mitigating.  Again, it's same issue
20 dealing with the jury instruction.
21        MS. ECKHOFF:  Correct.
22        THE COURT:  Is there any other issue
23 that's -- that I have not addressed pertaining to, I
24 guess, in the general constitutional law issue?
25        MS. ECKHOFF:  No.

Exh. B

| | |
|---|---|
| 1 | THE COURT: All right. Finally, I think |
| 2 | you had also made a request to subpoena some of the |
| 3 | prosecutors in this case or the attorneys that were |
| 4 | actually on the prosecution team. Was that, again, in |
| 5 | furtherance of trying to establish the ineffective |
| 6 | assistance of counsel claims or is that relating to |
| 7 | another capacity? |
| 8 | MS. ECKHOFF: Do you mean the defense team |
| 9 | or prosecutors? |
| 10 | THE COURT: Well, if I saw correctly from |
| 11 | your original petition, was there not a request for you |
| 12 | to subpoena some of the prosecutors on this case? |
| 13 | MS. ECKHOFF: Yes. So the prosecutors, I |
| 14 | think, would be relevant to two issues. One is the |
| 15 | false testimony claim and the other is the Brady claim. |
| 16 | The two instances were, you know, we have alleged |
| 17 | misconduct by the State. The State has provided |
| 18 | affidavits from one of the three prosecutors who |
| 19 | provided -- who conducted this trial. We have not heard |
| 20 | from the other two, including Caroline Dozier, who was |
| 21 | present at the meetings, those earlier meetings with |
| 22 | Mr. Diaz. |
| 23 | And the same thing with regards to the |
| 24 | Brady, all of the information comes from Tracy Bennett |
| 25 | and a former prosecutor. However, clearly the State was |

Exh. B

1   represented by more than just one attorney.  And I can

2   envision wanting to cross-examine the other witnesses,

3   as well, about their knowledge of these things.

4         THE COURT:  Okay.  Ms. Eckhoff, is there

5   any other issue that I have not covered that you feel

6   needs to be addressed?  I know we have kind of covered

7   several other areas, some of those we covered very

8   quickly.  But as far as requests to present testimony of

9   actual witnesses developed in furtherance of your

10   clients case, is there any other witness that you're

11   seeking the Court to be present for an evidentiary

12   hearing that we have not discussed?

13         MS. ECKHOFF:  At this time, no.  I believe

14   in terms of the witnesses we have discussed, that is

15   right.  However, I would just make clear that if we were

16   having an evidentiary hearing, it's entirely possible

17   that additional witnesses on these same issues may

18   arise.

19         THE COURT:  Sure.  In the realm of

20   possibilities, I've found that just about anything is

21   possible; but we can only work with the information that

22   we have at hand.  So I think I can work through these

23   kind of in succinct order.

24         MS. ECKHOFF:  Your Honor, before you do

25   that, would it be possible for me to just make one point

Exh. B

1  that I think is relevant here and just the emphasis on

2  we need the right to cross-examine here because the

3  Supreme Court has found that the right to cross-examine

4  is a necessary component in due process in cases where

5  the stakes aren't nearly so high as they are here today

6  in cases where welfare benefits are at issue or a parole

7  revocation.

8          And this is exactly the reason that, you

9  know, they say death is different because the Supreme

10  Court dictates that we strive for a heightened standard

11  of reliability in the outcomes of those cases.  And

12  there's just some, as we've already discussed, some very

13  serious questions about whether Mr. Balderas actually

14  committed this crime.

15          THE COURT:  Okay.  I'll duly note that.

16          Ms. Hutchins, do you have any other final

17  thoughts that you would like to make?

18          MS. HUTCHINS:  Judge, just to sort of

19  follow up on Ms. Eckhoff's final argument, while

20  jurisprudence does say that death is different, the

21  statements that Ms. Eckhoff makes about the due process

22  that is entitled to a defendant, there's no case law on

23  this saying that he's entitled to that in a post

24  conviction.

25          We refer the Court back to the statute and

Exh. B

1  to the interpretation of the statute, 11.07.1 in the

2  post conviction setting and what precisely is due and

3  what is not due unto him.

4  　　　　　Also, in terms of -- I'm trying to think

5  of the final things just said.  One moment, Judge.

6  　　　　　THE COURT:  Take your time.

7  　　　　　MS. HUTCHINS:  Just trying to think of the

8  very last thing she said.

9  　　　　　Oh, actual innocence.  She argued that

10  there still are some very serious concerns as to his

11  actual innocence in this case.  And I would just point

12  out for the court that the defendant didn't allege

13  actual innocence as a ground in his writ.  He's only

14  alleged ineffective assistance of counsel.  And so if

15  that is one of their concerns, then it wasn't raised as

16  a ground.

17  　　　　　MS. ECKHOFF:  Your Honor, he has alleged

18  serious constitutional violations that if proven to have

19  occurred would impact the verdict at the guilt phase.

20  　　　　　THE COURT:  Well, I think, I can probably

21  surmise by looking it all over, the established case

22  law, any time there's going to be purported evidence of

23  actual innocence, that that's always going to be

24  important evidence to be considered.

25  　　　　　But let me just start by running through

Exh. B

02032

1    these things very quickly.  If we go through the

2    constitutional art issues, it seemly to be everybody is

3    in agreement that those are issues of law, not

4    necessarily of facts; that there's no contested issues

5    of fact that have to be resolved on that; and the issues

6    that we have discussed, we can -- can be resolved

7    basically by reviewing the applicable law and the

8    established record.

9             As to the issue of ineffective assistance

10   of counsel, the Court has reviewed the affidavits of

11   Mr. Godinich and Mr. Nunnery.  The Court finds that both

12   of these affidavits are extremely detailed and have a

13   lot of specificity as to facts and many of the issues

14   that have been raised within the petition.

15            The Court does not find that these

16   affidavits are ambiguous and do properly go to the

17   merits of the issues raised in the petition.  And,

18   therefore, the Court does not find that it would be

19   necessary for those attorneys to present themselves for

20   cross-examination and that the factual matters alleged

21   are adequately addressed in the affidavits.

22            As to the Brady/Giglio disclosure issue,

23   the Court notes specifically on the first page of

24   Mr. Godinich's affidavit that he reviewed specifically

25   23 pages of notes that were from the district attorney's

Exh. B

02035

1  office and that the information contained within those

2  notes was used by them during the course of Mr. Diaz' --

3  in preparation for trial and was used by Mr. Nunnery

4  during the course of his cross-examination.

5  The Court also notes that the request as

6  to the presentment of jurors and their exposure to

7  outside influences, specifically as Ms. Eckhoff

8  correctly stated, any questions that go to their

9  specific deliberations and how they resolve the case are

10  not admissible under the Rules of Evidence.  And to ask

11  a juror under the abstract theory of what an average

12  juror would believe would be something that I don't

13  think that the juror, any juror would be able to

14  adequately weigh upon.

15  I feel that a juror would be able to

16  testify as far as what their feelings and expectations

17  were, but to look at the issue in abstract and how a

18  theoretical juror would look at it is too speculative

19  and would simply be unfair on a juror to have to weigh

20  in upon that.

21  Again, the Court hasn't found that the

22  affidavits submitted by the jurors are very detailed,

23  actually go into areas that would otherwise be

24  inadmissible; but the Court notes that there's nothing

25  in the affidavits that necessarily warrants needing to

Exh. B

1  bring in any jurors for additional questioning or
2  cross-examination on the factors that they were supposed
3  to.
4          However, the issues of the recanted
5  testimony, the Court does find that there are specific
6  issues that do warrant the development of additional
7  testimony.  Specifically, as to Mr. Israel Diaz, there
8  is, in fact, evidence of -- that his testimony was, in
9  fact, recanted; that Mr. Balderas be provided an
10 opportunity to explore that testimony.
11          However, the Court does not find that the
12 testimony of the investigator, Adrian De La Rosa would
13 be probative because -- given the fact it would be a
14 hearsay statement, the State would not be able to
15 properly probe or cross-examine that hearsay statement
16 based upon solely the investigator's accounts of
17 Mr. Diaz' statement.
18          So the Court will provide -- will allow
19 the applicant to subpoena Mr. Diaz.  However, the Court
20 will thus find that given there are potential issues
21 relating to perjury, if Mr. Diaz does not, in fact,
22 already have counsel representing him or advising him on
23 his constitutional issues, the Court will appoint an
24 attorney to represent him for the limited purpose of
25 that hearing to instruct him accordingly.

Exh. B

1　　　　　　　Further, the Court will all allow the

2　testimony of Anali Garcia and Octavio Cortes, who were

3　also alibi witnesses whose testimony was never

4　presented.  The Court does give note and give

5　consideration to the fact that trial counsel had

6　interviewed those witnesses and did not find their

7　testimony, their purported testimony to be credible and

8　did not present that evidence.  As officers of the

9　Court, obviously, any attorney is precluded under the

10　Rules of Ethics from presenting any testimony they

11　believe to be untruthful or perjured.

12　　　　　　　However, given that there's no record of

13　what their testimony would be, it's impossible for the

14　Court to look in abstract to consider the testimony.

15　And, therefore, the Court will provide Mr. Balderas with

16　the opportunity to present that testimony and proffer

17　that here in court, which would also be subject to

18　cross-examination by the State.

19　　　　　　　As to Jose Perez and Walter Benitez, the

20　Court finds that defense counsel did present that

21　testimony, trial counsel presented that testimony at the

22　trial itself; and that those issues were, in fact, put

23　before the jury and the fact finder.  And based upon the

24　juries' verdicts, the jury did not find that testimony

25　to be credible.  Therefore, the Court will not order

Exh. B

1　that those witnesses be produced.

2　　　　　So in summation, the Court will conduct an

3　evidentiary hearing involving Mr. Israel Diaz, Ms. Anali

4　Garcia and Mr. Octavio Cortes.

5　　　　　Counsel, how much time do you require in

6　order to locate those witnesses and serve them with

7　process for the hearing?

8　　　　　MS. ECKHOFF: Your Honor, in light of my

9　caseload and other cases, I would anticipate -- I would

10　request six months to set the hearing.

11　　　　　MS. HUTCHINS: Judge, may I be heard?

12　　　　　THE COURT: You may.

13　　　　　MS. HUTCHINS: Judge, Article 11.07(1)

14　specifically says that if there's to be an evidentiary

15　hearing that it shall be within 30 days, or an

16　additional 30 days for good cause. So 60 days, max.

17　　　　　THE COURT: I did actually print off a

18　copy of my statute and I was about to address the time

19　aspects. Counsel, I don't know that six months is

20　necessarily going to be an appropriate timeline. I

21　understand that you do have a hefty caseload and also a

22　hefty traffic schedule, given the courts that you

23　service; but at the same time, I know that this habeas

24　proceeding has carried on very much more lengthy than

25　what normally the rules are prescribed for it for

Exh. B

1    obvious procedural reasons.

2            And so, one of the issues I've raised is

3    that if some of those witnesses have not been located by

4    this time, I guess, the question I would have is are

5    they ever going to be located?  Even if you were given

6    six months to provide them, are there particular

7    witnesses that you do not have any means in which to

8    contact them or to serve them with a subpoena?

9            MS. ECKHOFF:  No, Your Honor.  One of my

10   primary concerns pertaining to the witnesses is Octavio

11   Cortes.  He's in the Marines.  I am not certain at this

12   point where he is stationed, so I cannot -- I don't know

13   how long it might take to bring him in.

14           And I do recognize that this case has gone

15   on for quite a long time, but I'd also want to make

16   clear that, you know, we first requested this

17   evidentiary hearing a year and a half ago and it's the

18   State who wanted to proceed on affidavits from trial

19   counsel that ended up taking a year.  This delay to get

20   to this point is based on what the State has requested.

21           I'm asking for additional time in order to

22   be able to adequately prepare, in light of all of the

23   other cases that I have evidentiary hearings and other

24   cities in Texas and applications that need to be filed.

25           MS. HUTCHINS:  Judge, if I may be heard?

Exh. B

1           THE COURT:  You may.

2           MS. HUTCHINS:  At this point, based on

3 what you have stated, it seems like it's three

4 witnesses:  Israel Diaz, Anali Garcia, Octavio Cortes.

5 Israel Diaz, we know where he is.

6           THE COURT:  Right.

7           MS. HUTCHINS:  We can get him here within

8 two weeks.  Anali Garcia, it seems like counsel knows

9 where she is or at least can get hands on her.  And if

10 Mr. Cortes is in the Marines and is somewhere else, that

11 may be someone that we could get a written affidavit

12 from as to what his testimony would be.

13           I know defense is very busy, they have

14 other accounts all over the state that they go to.  On

15 our end, we also have a caseload that we are handling.

16 And we'd just ask if it's three witnesses, that we try

17 to work something out sooner rather than pushing it off.

18           THE COURT:  Do you have specific knowledge

19 that Mr. Cortes is stationed abroad or is stationed

20 somewhere outside of the intercontinental United States?

21           MS. ECKHOFF:  Not to my knowledge.

22           THE COURT:  Okay.  Well, then this is, I

23 think, how it would be best to proceed to give everybody

24 an opportunity to do their due diligence.  Until we have

25 definitive knowledge that we're not going to be able to

Exh. B

1   comport with timelines subscribed by the rules, then

2   we're going to try to adhere to the rules and conduct

3   the hearing within the timeframe that the rules require.

4           If there is something that you believe

5   would warrant the Court -- I'm not even certain that the

6   rules would allow me to extend those deadlines for good

7   cause; but at least I'll give you an opportunity to

8   contact those witnesses and observe in the process if

9   there's a particular witness that you cannot find or

10  cannot be there, we can explore the issues of whether to

11  submit their information, be it affidavit or

12  telephonically, or in what other capacity you can to try

13  accommodate those witnesses and their availability.

14          But I think, as we sit right now, the

15  timeframe we're looking at is -- let's see.

16          Ms. Hutchins, you said it was 20 days?

17          MS. HUTCHINS:  Thirty days, Your Honor.

18          THE COURT:  Thirty days.  So if we're

19  looking for a timeframe within 30 days, we'll need to

20  obviously check my own calendar, as well as the calendar

21  of the 179th to see if we can find a date within that

22  timeframe in which everyone can be available, make

23  themselves available.

24          And then, in the meantime, if you have any

25  issues locating those witnesses or making those

Exh. B

1    witnesses available to present their testimony, we can

2    cross that bridge when we get there.

3                 MS. ECKHOFF:   Okay.

4                 MS. HUTCHINS:   Judge, in terms of

5    Mr. Diaz, is the Court going to appoint counsel,

6    assuming that he does not have counsel and is not

7    represented?  Is that going to be appointed now or when

8    he gets back to Harris County or how is that going to

9    work?

10                 THE COURT:   I was going to appoint an

11   attorney to represent him today since I've said that he

12   is going to be subject to subpoena.  And that's assuming

13   that he doesn't already have counsel.

14                 If I appoint an attorney to represent him

15   and he contacts Mr. Diaz, and says, No, I already have

16   an attorney, the rules don't preclude him from having

17   multiple attorneys, but if there's another counsel that

18   represents him we'll, at least, be able to ascertain

19   that.  But given the short time period, I would like to

20   give the attorney enough opportunity to meet with him,

21   discuss this issue with him, and then be able to make

22   that particular recommendation.

23                 Ms. Eckhoff, if the attorney that we

24   appoint to represent Mr. Diaz indicates that he's going

25   to recommend to his counsel to invoke his Fifth

Exh. B

1    Amendment right not to testify, are you still going to

2    persist in wanting to bring that witness here and have

3    him invoke his Fifth Amendment on the stand?  Or are

4    you -- would that affect your decision to call him as a

5    witness?

6                 And I'll allow you to make a record of

7    that.  If you don't, you can make a record of your

8    correspondence with his attorney if that's something

9    you'd like to do.

10                MS. ECKHOFF:  At this time, Your Honor, I

11   believe we would want him on record.  And I will reserve

12   the right to change my mind.

13                THE COURT:  Very well.

14                MS. ECKHOFF:  And I would just point out,

15   to my knowledge, he's not longer incarcerated.

16                MS. HUTCHINS:  I haven't checked, I don't

17   know.

18                THE COURT:  Well, if he is no longer

19   incarcerated or if he's on parole, there's typically

20   other mechanisms on how to locate that witness.

21                MS. ECKHOFF:  Right.

22                THE COURT:  But if he is not incarcerated,

23   I'll allow your officers an opportunity to try and find

24   him and have him served.  So -- and likewise, if there's

25   counsel that's been appointed, they also would probably

Exh. B

1  be engaged in trying to track him down.  If for some

2  reason he's not incarcerated and he is located, just

3  remember that I have appointed independent counsel to

4  represent him so please refrain from directly

5  communicating with him without, at least, notifying that

6  counsel.

7           MS. ECKHOFF:  Okay.

8           THE COURT:  Is there anything else we need

9  to take up while we are all here on the record?

10          MS. ECKHOFF:  Your Honor, I did want to

11  raise one thing.  At the last hearing the State

12  indicated that were going to turn over their capital

13  murder summary.  They agreed that we were entitled to it

14  and they haven't turned it over and I would like a copy

15  of that, please.

16          MS. HUTCHINS:  Not actually accurate,

17  Judge.

18          So the capital murder summary -- I'm not

19  sure if the Court is aware of what a capital murder

20  summary is in Harris County, Texas.  It is --

21  essentially, it is work product.  It is quintessential

22  work product.  It is what the chief prosecutor in a

23  court prepares on a capital murder cases summarizing the

24  facts of the offense, as well as any aggravating

25  circumstances and mitigating circumstances, and then

Exh. B

1  makes a recommendation up the chain of hierarchy as to

2  what his or her recommendation is in terms of seeking

3  death or seeking life.

4          So a recommendation comes from the court

5  chief, then I believe the division chief, the bureau

6  chief, all the way up to the assistant district

7  attorney.  And so, I mean that is essentially work

8  product in terms of everything, their thought process

9  and what goes into it.

10         In this case, it's become an issue as to

11 whether or not it contained certain information that may

12 be Brady.  That's, I guess, what defense counsel's

13 concern is in terms of wanting to see it.  There were

14 also -- the State is certainly aware of our obligation

15 under Brady to turn over anything that might tend to

16 negate his guilt or be impeachment evidence or whatnot,

17 certainly.

18         The issue in this case is while capital

19 murder summaries are work product, Spence Graham, the

20 former prosecutor in this case provided an affidavit

21 stating that it was in the State's file, not hidden away

22 from defense counsel and that defense counsel had the

23 opportunity to be able to view it.

24         THE COURT:  And when you say "defense

25 counsel" you mean trial counsel?

Exh. B

1            MS. HUTCHINS:  Trial counsel, correct.

2    Trial counsel, while the case was under Spence, had the

3    opportunity to be able to view it.  Now, whether or not

4    they actually viewed it, I can't say; but it was made

5    available technically to defense counsel.  Under the

6    Rules of Discovery, as I understand them, if it's

7    something that original trial counsel had or reviewed,

8    then trial counsel there on out would also have that

9    same ability.

10           I would like to assert the State's work

11   product privilege to it.  I do believe it's work

12   product.  I am prepared to turn over a copy to the Court

13   for the Court's in camera review so the court can make a

14   determination whether or not it needs to be turned over.

15   If you believe there's an impeachment or Brady evidence

16   in there, I have that copy for you, Because we would

17   like to assert our work product privilege and ensure

18   that we are not otherwise waiving our privilege to

19   anything else in final.

20           THE COURT:  Well, I agree with you that if

21   it's internal documents that are comprised based upon

22   the prosecutor's assessment of the facts and their

23   individual opinions, it sounds like it's textbook work

24   product.

25           Now, if the rules of Brady should always

Exh. B

1   apply, if there's any information in that report that is
2   either exculpatory or goes to the witnesses'
3   credibility, in other words, the prosecutor says, In my
4   opinion, I don't find this witness to be truthful, or
5   they have the opinion of something going to credibility
6   that potentially could be Giglio evidence, there's
7   always a running obligation to disclose that
8   information.  You don't have to disclose the report, but
9   the exculpatory or impeachment evidence would need to be
10  disclosed.

11          So I'm -- if the parties would prefer, if
12  you would like for me to view that in camera in order to
13  make that assessment, if it would give Ms. Eckhoff peace
14  of mind for me to do that, I'll be happy to do that.
15  But counsel, like I said, as an officer of the court
16  there's always the running duty and obligation to make
17  the Brady disclosures if it's discovered.

18          MS. ECKHOFF:  Right, Your Honor.  And I
19  understand that, but the basis for our request at this
20  point is actually many slightly different than just
21  Brady.  Our original request was Brady and the original
22  response from the State was that was never turned over
23  because it was work product and we accepted that answer.
24  And it's only after Mr. Graham provided an affidavit
25  saying it was made available to trial counsel that we

Exh. B

1 renewed our request for that because we, as successor

2 counsel, should have access to all of the information

3 available to trial counsel. That's what -- we are

4 entitled to their file and to anything that they had

5 access to.

6 And so, whether or not it contains Brady

7 at this point is sort of immaterial because it was made

8 available to trial counsel and we should be able to view

9 it.

10 THE COURT: Well, you know, different

11 files have different requirements on open-file policies.

12 And I note that often district attorneys' offices or

13 other prosecuting authorities will have discovery that

14 exceeds the statutory and legal requirements of

15 discovery. But if -- I don't necessarily know or, I

16 guess it -- I would have to -- I'd probably have to go

17 and brief the issue to see whether or not an open file

18 policy at one time that is later amended would

19 permanently waive work product privilege for items in

20 that file for the duration of the case.

21 I don't necessarily know if that's the

22 case or not, but if the main issue or crux of reviewing

23 the particular documents is looking for exculpatory or

24 impeachment information, which would be the logical

25 purpose -- I mean, is there any other basis you would

Exh. B

1  have for wanting to review that, those notes or that

2  report?

3          MS. ECKHOFF:  We want to have an

4  understanding of what information was available to trial

5  counsel at the time of trial.

6          THE COURT:  Well, I think you could

7  probably ascertain that information from the

8  discoverable items within the file, as a whole, as far

9  as what reports and documents were in the file.  But if

10  this is simply the fact of whether or not to seek the

11  death penalty and then the strengths and weaknesses and

12  mitigating issues, again, this just being a summary, I

13  think probably the easiest way to address that is

14  obviously to do an in camera inspection.

15          I mean, ultimately, as I said before, the

16  goal isn't necessarily to have a fishing expedition.  If

17  there's particular information that you believe is going

18  to be relevant to this habeas proceeding or would weigh

19  mitigating evidence or undisclosed bias or undisclosed

20  impeachment evidence, I think we could ascertain that by

21  in camera review.

22          But is there a particular piece of

23  evidence that you are wanting to see if it's contained

24  within that report?

25          MS. ECKHOFF:  I have no idea what might be

Exh. B

1  in the report because, as the State has indicated, that

2  to my knowledge this is not something that is typically

3  made available to anyone outside of their office. But

4  for whatever reason, it was made available to trial

5  counsel in this case.

6              And while I take your point that, you

7  know, we should be able to review trial counsel's file

8  to get a sense of what they knew and didn't know about

9  this case, our review of trial counsel's file in this

10  case doesn't have the notes at issue in the Brady claim.

11              So without them having come from the

12  State, we would have never known that trial counsel had

13  viewed them. It's sort of a similar situation. I can't

14  tell you what I need to see from there because I don't

15  have any idea what it contains, but I know trial counsel

16  saw it or at least had it available to them. And in

17  order to make a record of what trial counsel did or did

18  not have going into trial and how that may have affected

19  or contemplated -- affected their tragedy or their

20  claims of strategy, you know, I need to be able to

21  review what they had reviewed. That's why we go and

22  review the Diaz file in this case.

23              THE COURT: Well, we're talking about a

24  report that was based upon the prosecutor's assessment

25  of the file. It's one thing if it was a police report

Exh. B

1   that was produced by an investigator, or a detective, or

2   somebody that was looking at the case.  If it's just a

3   prosecutor's own assessment of the file and a

4   recommendation based upon his opinions and viewing of

5   the evidence, it seems to be textbook work product.

6       I mean, do you -- is there any case law or

7   do you have any authority that would go to show that if

8   something that was work product privilege that was made

9   available in an open file policy, would forever waive

10  the right to assert work product privilege?

11      MS. ECKHOFF:  Not off the top of my head,

12  but I would like an opportunity to brief it.

13      THE COURT:  Well, I will do this.  I will

14  conduct an inspection review of the report.  And I'm

15  specifically looking for -- we've had a lengthy

16  discussion here and it's very well briefed with the

17  issues that you believe exist.  And if there's anything

18  pertaining to relevant impeachment evidence, exculpatory

19. evidence or anything that would significantly weigh on

20  the issues before us that have not already been

21  identified or discussed, then we could certainly take

22  that up once we get to the evidentiary hearing.

23      If you find a case that says that the work

24  product has been waived because it's been voluntarily

25  disclosed and open file policy, then that's a legal

Exh. B

02050

1    issue that would be closed in which case it would be an

2    open part of discovery.

3                    MS. ECKHOFF:  Okay.

4                    THE COURT:  So I will give you the

5    opportunity to do that and follow up with that.  But

6    in the mean time, I'll accept a copy, sealed copy of the

7    exhibit and we will review that.  In which case, if

8    there is pertinent information I'll notify the parties

9    accordingly.

10                   MS. ECKHOFF:  Thank you.

11                   THE COURT:  Okay.  Is there anything else

12   we need to take up while we are all here on the record?

13                   MS. HUTCHINS:  Just to touch up on that,

14   if I may?

15                   If the Court does find pertinent

16   information, obviously it will be disclosed.  If the

17   Court does not find pertinent information in the capital

18   murder summary, at that point I would make a motion to

19   place it under seal with the file in this case.

20                   THE COURT:  I will accept it right now as

21   a sealed exhibit, but if -- in that it will be

22   maintained, confidentiality.  Traditionally what I've

23   always done is if it's something that is privileged,

24   I'll return it to the submitting party because of the

25   fact that if it goes into the record as a privileged

Exh. B

1   item -- it's not something that typically would go into

2   the record because the privilege has been exerted.

3           But at this time it's been tendered as an

4   exhibit for in camera review, which we maintain sealed

5   in which case until the time the Court has had an

6   opportunity to review it and make a determination on the

7   issues that I've already addressed.

8           Anything else that we need to take up?

9           MS. HUTCHINS: In terms of setting a date,

10   are we going to do that today or via email?

11           THE COURT: I will probably do it via

12   email because I'll need to bring my court coordinator

13   into the loop to make sure that I can find a date where

14   I'm not already set for trial in the 136th over in

15   Beaumont. And so I'll do my best to work with

16   everyone's schedule.

17           I understand -- I take it an afternoon

18   setting is probably preferential, but if you believe

19   that you're going to need more than just half a day to

20   present evidence, then we will set it for a morning

21   hearing so you'll have adequate time to present your

22   witness and also have adequate time for

23   cross-examination.

24           MS. HUTCHINS: And will it be here in

25   Houston, Judge?

Exh. B

```
 1              THE COURT:  That will be, I guess, by
 2   default where I'll have it unless y'all would prefer to
 3   come to Beaumont.  If the agreement of the parties would
 4   be to go there because it's more convenient, I would be
 5   happy to do that; but given that this is a -- the
 6   hearing is in Harris County -- and, obviously, I know
 7   there's people who have been in attendance that are
 8   following this case for the convenience of Mr. Balderas.
 9   I was, by default, going to have it here in Harris
10   County unless the attorneys would prefer otherwise?
11              MS. ECKHOFF:  No, we appreciate that, Your
12   Honor.
13              THE COURT:  If there's nothing further,
14   the Court stands adjourned.
15              (Court adjourned for the day.)
16
17
18
19
20
21
22
23
24
25
```

Exh. B

02053

1   STATE OF TEXAS

2   COUNTY OF HARRIS

3      I, Marcia E. Barnett, Official Court Reporter in and

4   for the 179th District Court of Harris, State of Texas,

5   do hereby certify that the above and foregoing contains

6   a true and correct transcription of all portions of

7   evidence and other proceedings requested in writing by

8   counsel for the parties to be included in this volume of

9   the Reporter's Record in the above-styled and numbered

10   cause, all of which occurred in open court or in

11   chambers and were reported by me.

12      I further certify that this Reporter's Record of the

13   proceedings truly and correctly reflects the exhibits,

14   if any, offered by the respective parties.

15      I further certify that the total cost for the

16   preparation of this Reporter's Record is $ 421.07 and

17   was paid/will be paid by Harris County.

18      WITNESS MY OFFICIAL HAND on this, the 5th day of

19   March, 2018.

20

21                    /s/Marcia E. Barnett
                           Marcia E. Barnett, CSR
                           Texas CSR 5144

22                    Deputy Court Reporter
                           179th District Court

23                    201 Caroline
                           Houston, Texas 77002

24                    Telephone:  (832) 927-3735
                           Expiration:  12/31/2019

25

Exh. B

4/19/2018 4:46:17 PM
Chris Daniel - District Clerk
Harris County
Envelope No: 24030980
By: D DAY
Filed: 4/19/2018 4:46:17 PM

## IN THE 179th JUDICIAL DISTRICT COURT
## HARRIS COUNTY, TEXAS

EX PARTE      )  Cause No.
          )  1412826-A
JUAN BALDERAS,   )
   APPLICANT  )  Hearing date: May 11, 2018
          )
          )

## [PROPOSED] ORDER

On this date, the Court considered Mr. Balderas's Motion to Compel Disclosure of Exculpatory and Impeachment Evidence. After due consideration, Mr. Balderas's Motion is GRANTED. The State shall provide all materials identified in the Motion within the State's constructive possession to counsel for Mr. Balderas within ten days of this Order.

ORDERED AND SIGNED on this _____ day of _____, 2018.

_____
The Honorable Baylor Wortham
Judge Presiding by Appointment
179th District Court

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing upon:

Office of the Harris County District Attorney
Attn: ADA Farnaz Hutchins

This certification is executed on April 19, 2018, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

*/s/ Katherine Froyen Black*
Katherine Froyen Black

02056

CAUSE NO. 1412826-A

| EX PARTE | )( | IN THE DISTRICT COURT |
| | )( | HARRIS COUNTY, TEXAS |
| JUAN BALDERAS, Applicant | )( | 179TH JUDICIAL DISTRICT |

## MOTION TO QUASH SUBPOENAS
## AND REQUEST FOR PROTECTIVE ORDER

COMES NOW THE STATE OF TEXAS, by and through the undersigned assistant

district attorney, and moves the Court to quash six instanter subpoenas duces tecum in

the above-referenced case, filed by the applicant and directed to the custodian of records

for the Legal Department of the Harris County District Attorney's Office. The subpoenas

seek the following:

1. "Files kept and maintained by the Harris District Attorney *[sic]* for any criminal case charging Israel Diaz (DOB 4/9/86) from 2003-2008, including all reports, notes, communications, witness lists, charging documents, promises/rewards/inducements, case resolution, and any reference to Eduardo Hernandez as a witness;"

2. "Trial file for the case of State v. Juan Balderas, as available to defense counsel;"

3. "Copies of any and all communications and contact between Alejandro Garcia (DOB 02/02/1989) and the District Attorney's Office, including, but not limited to emails, texts, phone messages, in-person conversations and notes and memos, phone conversations and notes/memos, etc., between 2005 and present."

4. "Police Integrity Division file regarding Christopher Scott Poole, former detention officer for Harris County Sheriff's Dept., employed as a detention officer from May 2009 – August 2012;"

5. "Copies of any and all communications and contact between Israel Diaz (DOB 04/09/1986) and the District Attorney's Office, including, but not limited to emails, texts, phone messages, in-person conversations and notes and memos, phone conversations and notes/memos, etc., between 2005 and present;" and

6. "Communications, including but not limited to emails, letters, voicemails, and any oral communications reduced to writing between employees and agents of the Harris County District Attorney and employees of the Harris County Department of Probation [sic] regarding Israel Diaz (DOB 4/9/86)."

In support of this motion to quash the subpoena, the State would respectfully show the Court the following:

## I.     DUPLICATIVE & OVERLY BROAD REQUEST

The applicant has made an identical request in a Motion to Compel Disclosure of Exculpatory and Impeachment Evidence, filed April 19, 2018. The availability of said information is scheduled to be addressed at a hearing set for Wednesday, May 2, 2018. Further, to the extent the applicant can be understood in his overly broad request, this same information was provided to the applicant's counsel in 2015.

## II.     GENERAL DISCOVERY OBJECTION

There is no general right to discovery in post-conviction habeas proceedings. Even the scope of pretrial discovery is governed by TEX. CODE CRIM. PROC. art. 39.14. Anything that is not discoverable under art. 39.14 cannot be discovered by the issuance of a court subpoena to the assistant district attorney prosecuting the case. *See, e.g., State ex rel. Wade v. Stephens*, 724 S.W.2d 141, 144 (Tex. App. -- Dallas 1987, orig. proceeding) (holding that "[w]hile Texas courts may have once possessed inherent authority to order criminal discovery, we hold that article 39.14 now defines and limits that authority," and that the legislature "intended article 39.14 to constitute a comprehensive pretrial discovery statute and that criminal discovery orders must fall within the confines of

that article's limited jurisdiction"); *accord Martin v. Darnell*, 960 S.W.2d 838, 841 (Tex. App. -- Amarillo 1997, orig. proceeding).

A subpoena may not be used to circumvent the discovery procedures set forth in art. 39.14, *supra. Wade v. Stephens*, 724 S.W.2d at 144. It follows that a subpoena may not be used to obtain information that is not discoverable in post-conviction proceedings, where the State's only duty of disclosure pertains to "any exculpatory, impeachment or mitigating document, item or information in the possession, custody or control of the state that tends to negate the guilt of the defendant or would tend to reduce the punishment for the offense charged." TEX. CODE CRIM. PROC. art. 39.14(h) and (k). *See also, Dickens v. Court of Appeals for the Second Supreme Judicial District*, 727 S.W.2d 542, 551 (Tex. Cirm. App. 1987). The State must produce this data regardless of whether or not it is requested; therefore, a subpoena is unnecessary.

### III. GENERAL WORK PRODUCT OBJECTION

To the extent the applicant's subpoenas may implicate the privileged work product of the State of Texas, the subpoena should be quashed. See TEX. CODE CRIM. PROC. art. 39.14(a) and (c) (exempting privileged materials from discovery); *State ex rel. Curry v. Walker*, 875 S.W.2d 379, 381(Tex. 1994) (order requiring district attorney to release entire litigation file, except for certain direct communications, "too broad;" prosecutors have work product privilege); *United States v. Nobles*, 422 U.S. 225, 238, 95 S.Ct. 2160 (1975) (recognizing that the role of the work product doctrine "in assuring the proper functioning of the criminal justice system is even more vital" than its more common application in civil litigation). "Work product" includes prosecution files and papers, offense and investigation

reports, worksheets and factual memoranda concerning the arrest of the defendant or investigation of the case by the State. *Franklin v. State*, 702 S.W.2d 241, 245 (Tex. App. -- Houston [1st Dist.] 1985, no pet.). The applicant cannot use a subpoena to circumvent art. 39.14's express exception against discovery of the State's work product.

## IV.    GENERAL RELEVANCE/MATERIALITY OBJECTION

The applicant has failed to show the subpoenaed documents are in any way relevant to his own case, or that the items listed constitute impeachment, exculpatory evidence or mitigation, or that they tend to negate his guilt or would tend to reduce the punishment for the offense charged. Therefore, the State has no duty to comply with the subpoena or with the motion to compel disclosure.

## V.    CONCLUSION

Therefore, the State respectfully requests that the Court quash all six subpoenas issued for the Custodian of Records of the Legal Department of the Harris County District Attorney's Office and direct the applicant not to issue further subpoenas against the Harris County District Attorney's Office without express written permission of the Court.

Respectfully submitted,


/s/ *Shawna L. Reagin*

SHAWNA L. REAGIN
Assistant District Attorney
Harris County District Attorney's Office
1310 Prairie, Suite 500
Houston, Texas 77002
713-274-5990
TBN: 16634900
Reagin_shawna@dao.hctx.net

## CERTIFICATE OF SERVICE

I hereby certify service has been accomplished by e-mailing a true and correct copies of the motion and proposed order to Erin Eckhoff, Katherine Froyen Black and Natalie Corvington of the Office of Capital and Forensic Writs, on this the 30th day of April, 2018, as follows:  Erin.Eckhoff@ocfw.texas.gov,  KatherineBlack@ocfw.texas.gov  and Natalie.Corvington@ocfw.texas.gov, as well as sending a copy to counsel for Israel Diaz, Genesis Draper, at Genesis.Draper@pdo.hctx.net.

/s/ Shawna L. Reagin
SHAWNA L. REAGIN

CAUSE NO. 1412826-A

| | | |
|---|---|---|
| EX PARTE | }{ | IN THE DISTRICT COURT |
| | }{ | HARRIS COUNTY, TEXAS |
| JUAN BALDERAS, Applicant | }{ | 179TH JUDICIAL DISTRICT |

## O R D E R

On this the 2nd day of May, 2018, came to be heard the State's Motion to Quash Subpoenas and Request for Protective Order, and having duly considered same, this Court GRANTS the motion.

It is hereby ORDERED that no further process be exercised against the Harris County District Attorney's Office in this cause without the express written permission of this Court.

SIGNED and ENTERED this __ day of May, 2018.

_____
Hon. Baylor Wortham
Judge Presiding by Assignment
179th District Court
Harris County, Texas

/

62862

Filed 18 April 30 A11:35
Chris Daniel - District Clerk
Harris County
EA001_36755
By: L HERNANDEZ

Cause No. 1412826-A

| EX PARTE | § | IN THE 179th DISTRICT COURT |
| | § | OF |
| JUAN BALDERAS | § | HARRIS COUNTY, TEXAS |

## MOTION TO CLARIFY THE COURT'S ORDER

THE STATE OF TEXAS, by and through its undersigned assistant district attorney, files the instant instrument requesting the Court to clarify its order relating to communications with witness Israel Diaz.

I.

During the February 22, 2018 status hearing, the Court made clear it anticipated witness Israel Diaz may invoke his Fifth Amendment rights during the May 11, 2018, evidentiary hearing. Accordingly, the Court appointed independent counsel from the Harris County Public Defender's Office to represent Diaz.

Additionally, the Court ordered the parties to obtain the express permission of Diaz's counsel before they could talk to him. However, a review of the record indicates that this order occurred off-the-record. The on-the-record order is narrower: "please refrain from directly communicating with him without, *at least, notifying* that counsel" (I R.R. at 68)(emphasis added). In short, "notifying" is a more permissive standard than the Court's off-the-record order.

II.

THEREFORE, the State prays that the Court will clarify its order and require that the parties need the express permission of Diaz's counsel before they can communicate with him.

SIGNED this 30th of April, 2018

Respectfully Submitted,
*/s/ Shawna L. Reagin*
Shawna Reagin
Assistant District Attorney
Harris County District Attorney
1201 Franklin St.
Houston, TX 77002
713-274-5990
Reagin_shawna@dao.hctx.net
SBOT#: 16634900

**CERTIFICATE OF SERVICE**

I hereby certify service on opposing counsel has been effected by emailing a copy of this Motion on this the 30th day of April, 2018, as follows: Erin.Eckhoff@ocfw.texas.gov, Katherine.Black@ocfw.texas.gov and Natalie.Corvington@ocfw.texas.gov, as well as sending a copy to counsel for Israel Diaz, Genesis Draper, at Genesis.Draper@pdo.hctx.net.

/s/ *Shawna L. Reagin*

Shawna L. Reagin

Cause No. 1412826-A

| EX PARTE | § | IN THE 179th DISTRICT COURT |
| | § | OF |
| JUAN BALDERAS | § | HARRIS COUNTY, TEXAS |

**ORDER**

The Court **ORDERS** that counsel for the applicant and the State, including their representatives, may not communicate with witness Israel Diaz without the express permission of his counsel.

SIGNED this _____ of May, 2018

_____

Hon. Baylor Wortham
Presiding Judge

# IN THE 179th JUDICIAL DISTRICT COURT
# HARRIS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| ———————————— | ) | Cause No. |
| EX PARTE | ) | 1412826-A |
| JUAN BALDERAS, | ) |  |
| APPLICANT | ) | Hearing date: May 2, 2018 |
|  | ) |  |
| ———————————— | ) |  |

## RENEWED MOTION TO COMPEL DISCLOSURE OF EXCULPATORY
## AND IMPEACHMENT EVIDENCE

Juan Balderas, by and through his counsel the Office of Capital and Forensic Writs (OCFW), renews his Motion, filed April 20, 2018, seeking production of the following materials in the possession, custody, or control of the State,[1] relevant to the claims pending before this Court and with respect to which this Court has set an evidentiary hearing to commence on May 11, 2018. In support of this motion, Mr. Balderas respectfully states the following:

---

[1] In this motion, Mr. Balderas uses the word "State," which should be interpreted as including, but not limited to, any member of the HCDAO, Houston Police Department, Harris County Sheriff, Harris County Probation Department, and any other governmental entity involved in the investigation of the underlying offense, the prosecution of Mr. Balderas and Mr. Diaz, the incarceration of Mr. Balderas or Mr. Diaz, or the release of Mr. Diaz.

# I.

## RELEVANT BACKGROUND

On December 26, 2017, following a series of proceedings that resulted in the recusal of a prior judge, this case was reassigned to the Honorable Baylor Wortham for disposition of Mr. Balderas's Initial Application for Writ of Habeas Corpus Pursuant to Article 11.071 of the Texas Code of Criminal Procedure (Initial Application), and to dispose of any other business requested by the Court. *See* Exhibit A, Order of Assignment by the Presiding Judge. Judge Wortham contacted the undersigned counsel, Erin Eckhoff and Katherine Black of the OCFW, as well as counsel for the State, Farnaz Hutchins and Shawna Reagin of the Harris County District Attorney's Office (HCDAO), via email, requesting input regarding the scheduling of a "writ hearing" (later clarified to be a status hearing) in the case. Both parties responded, also via email, regarding the scheduling of a hearing, and a status hearing was set in the matter for February 22, 2018.

At the February 22 status hearing, the Court heard argument from both parties on numerous, substantive issues raised in Mr. Balderas's Initial Application. At the conclusion of the hearing, the Court determined that several of the claims for relief Mr. Balderas had raised in his Initial Application warranted additional factual development via live evidentiary hearing. One of these claims was a claim that a key witness for the State, Israel Diaz, had testified falsely against Mr. Balderas at his capital trial in 2014. The Court determined that Mr. Balderas should be provided

1

"an opportunity to explore" the testimony of Mr. Diaz by subpoena to an evidentiary hearing; however, the Court also found that "given there are potential issues relating to perjury," that it was necessary to appoint Mr. Diaz an attorney "to represent him for the limited purpose of that hearing to instruct him accordingly." *See* Exhibit B, February 22, 2018 Writ Hearing Transcript, at 60. The Court further found that Mr. Balderas should be allowed to present the testimony of Anali Garcia and Octavio Cortes, two alibi witnesses whose testimony was not presented at Mr. Balderas's trial but who signed affidavits that Mr. Balderas filed in support of his Initial Application. *Id.* at 61.

Following the February 22, 2018 writ hearing, the Court and the parties exchanged emails regarding the scheduling of an evidentiary hearing in the case. The Court also appointed counsel for Mr. Diaz, for the limited purpose of advising him regarding constitutional (Fifth Amendment) issues.[2]

---

[2] Following the February 22, 2018 status hearing, the Court and the parties exchanged emails regarding the scheduling of an evidentiary hearing in the case. The Court also appointed Danny Lacayo of the Harris County Public Defender's Office as advisory counsel for Mr. Diaz. Counsel for Mr. Balderas first became aware of Mr. Lacayo's appointment via electronic communication from the HCDAO, when ADA Hutchins copied Mr. Balderas's counsel on a string of electronic messages to Mr. Lacayo. On March 19, 2018, Mr. Lacayo contacted the Court and both parties via email (attached as Exhibit C). Mr. Lacayo's email contained the following message:

> My name is Danny Lacayo with the Public Defender's Office. I was assigned to represent Israel Diaz in the Writ Hearing regarding Juan Balderas. I have attached all parties involved in this email. I was reviewing the Writ and evidence attached and noticed that there was a

2

On Friday, April 20, 2018, Mr. Balderas, through his counsel, filed this Motion to Compel Disclosure of Exculpatory and Impeachment Evidence. That afternoon, the Court addressed the Motion in an email communication to both parties, attached hereto as Exhibit E. In the email, the Court requested the parties take a few days to confer with one another as well as with Mr. Diaz's appointed counsel, to see if any of the discovery requests contained within the Motion to Compel could be resolved by agreement.

On Tuesday, April 24, 2018, the parties conferred on the telephone for approximately one hour. At the conclusion of the conversation, the parties had not

---

witness named Christopher Pool who testified in the trial. The writ alleged that he provided false testimony regarding his termination in regards to an inmate death. While at the Harris County District Attorney's Office I worked in Police Integrity for a period of time. I believe that I investigated the incident regarding Detention Officer Pool. This case was eventually presented to a grand jury which returned a no bill. I know that this is an important case to everyone and wanted full disclosure to all parties involved that I investigated one of the witnesses in this case. I am not sure if you wanted to keep me on the case and wanted your guidance. If you believe that there is some conflict I can have the case re-assigned within the Harris County Public Defender's Office.

*See* Exh. C Page 2, email from Mr. Lacayo.

Mr. Lacayo subsequently arranged for the re-assignment of this appointment as counsel for Mr. Diaz within the Harris County Public Defender's Office. Mr. Diaz is currently represented by Genesis Draper.

3

reached agreement as to any of the 23 items in Mr. Balderas's motion, but the representatives of the Harris County District Attorney's Office did indicate to Mr. Balderas's counsel that there were some documents they might submit to the Court for *in camera* review, in response to Mr. Balderas's Motion.[3]

During the telephonic conference between counsel for Mr. Balderas and representatives of the Harris County District Attorney's Office, the HCDAO raised many objections to Mr. Balderas's requests. Some of the objections were that the requests were overbroad, others were that the materials responsive to the requests had already been produced, and still others were that items included in the request were inaccessible to counsel for the State.

For the reasons set forth below, Mr. Balderas, through counsel, respectfully renews his request that this Court issue an order directing the State to produce the materials listed below to counsel for Mr. Balderas.

## II.

## ARGUMENT AND AUTHORITIES

Mr. Balderas respectfully requests the Court order the State to disclose the following materials, all of which are relevant to specific claims pending before this

---

[3] Subsequently, in an email correspondence to the Court and counsel for Mr. Balderas, Assistant District Attorney Farnaz Hutchins represented to the Court that she would like to provide the Court with several documents for an *in-camera* review. *See* Exh. D, attached.

. 02070

Court in the Article 11.071 proceeding, including those that are the subject of the evidentiary hearing set to commence May 11, 2018, at which Israel Diaz—a key witness for the State who testified against Mr. Balderas at trial—is expected to testify.

Prior disclosure provided by the State has included some exculpatory material, but counsel has a good faith belief that additional exculpatory material exists and is in the possession of the State. *See* Exh. E, Affidavit of Erin Eckhoff. In light of what he has already received, and in anticipation of Mr. Diaz's testimony at the May 11, 2018 evidentiary hearing, Mr. Balderas makes the following requests for disclosure, as such information would constitute exculpatory or impeachment evidence to which Mr. Balderas is entitled under the United States Constitution. Mr. Balderas is entitled to these materials because they should have been disclosed to him prior to his trial, and because they may contain information relevant to Mr. Balderas's claims of prosecutorial misconduct and to Israel Diaz's related testimony at the upcoming post-conviction evidentiary hearing. Defense counsel are entitled to all materials "favorable" to a defendant of which the State has constructive knowledge, not just self-evidently exculpatory material. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *see also, Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006) (noting that defendants are entitled to "favorable evidence known only to the police"). This duty to disclose includes any

5

information that could be used to impeach witnesses against Mr. Balderas. *See Giglio v. United States*, 405 U.S. 150 (1972); *Banks v. Dretke*, 540 U.S. 668 (2004); *United States v. Bagley*, 473 U.S. 667 (1985) (prosecution's duty to disclose any information tending to show a witness's bias in favor of the government or against the defendant or that otherwise impeaches a witness's testimony); *Napue v. Illinois*, 360 U.S. 264 (1959) (due process violated where important witness for the State in a murder prosecution falsely testified that witness had received no promise of consideration in return for his testimony, though in fact Assistant State's Attorney had promised witness consideration, and Assistant State's Attorney did nothing to correct false testimony); *Mooney v. Holohan*, 294 U.S. 103 (1935). Withholding of such evidence violates due process if the evidence is material to either guilt or punishment, irrespective of whether the State knowingly withheld information. *Brady*, 373 U.S. at 87. According to the Supreme Court, "[w]hen police or prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is ordinarily incumbent on the State to set the record straight." *Banks*, 540 U.S. at 675-76.

The Texas discovery statute mirrors these constitutional requirements. *See* TEX. CODE CRIM. PROC. ART. 39.14(h) ("[T]he state shall disclose to the defendant any exculpatory, impeachment, or mitigating document, item or information in the possession, custody, or control of the state that tends to negate the guilt of the

6

defendant or would tend to reduce the punishment for the offense charged."). This statute also explicitly extends this requirement to materials not discovered by the State until after trial. TEX. CODE CRIM. PROC. ART. 39.14(k) ("If at any time before, during or after trial the state discovers any additional document, item, or information required to be disclosed under Subsection (h), the state shall promptly disclose the existence of the document, item, or information to the defendant or the court."). While the underlying offense occurred before this statute was enacted, the Court of Criminal Appeals has discussed this provision in the context of a crime that occurred before the statute's enactment, leaving open the prospect that this section applies retroactively to all offenses. *See Francis v. State*, 428 S. W. 3d 850, 856 n.12 (Tex. Crim. App. 2014).

**A. The Discovery Requests, as General Matter, are Not Overbroad.**

Mr. Balderas was convicted of capital murder and sentenced to death on March 14, 2014. The OCFW was appointed to represent Mr. Balderas in his state habeas corpus proceedings on March 24, 2014. As part of the OCFW's statutorily-mandated duty to investigate all potential legal and factual claims for relief, counsel took steps to review potentially exculpatory and impeachment evidence in possession of the State and its various agents who were involved in prosecuting and investigating the case against Mr. Balderas. *See* TEX. CODE CRIM. PROC. Art. 11.071 § 3(a). These steps included having reviewed the case file made available by the

. 02073

Harris County District Attorney's Office and filing Public Information Act requests with the Houston Police Department and other law enforcement agencies.

On or about August 13, 2015, when counsel for the OCFW undertook a review of the files made available by the HCDAO, it was counsel's understanding that representatives of the HCDAO set aside a portion of the contents of each box provided, explaining that certain materials were being withheld pursuant to the Texas Public Information Act. *See* Exh. D, Affidavit of Erin Eckhoff, at ¶6. Therefore, counsel for Mr. Balderas renews the discovery requests included in this Motion in good faith. Despite this fact, the State objects to almost all of Mr. Balderas's discovery requests on the grounds that they are overbroad and vague.

But, there is no way for Mr. Balderas to intuit what specific information the State or its agents possess. Rather, the requests made were as specific as possible. If Mr. Balderas already knew what material the State possessed that might tend to exculpate Mr. Balderas or impeach witnesses against him, including Mr. Diaz, to the point that he could make very specific and extremely detailed descriptions of each document he requests, presumably, he would not need to request them. This is the double-edged sword of the State's position: that Mr. Balderas cannot demand materials that he cannot describe, but he cannot describe them if he does not know what they are. Because the requests are reasonable, and based upon the good faith basis of prior representations by the State that materials were being withheld on the

basis of Public Information Act disclosure requirements (*see* Exh. D, Eckhoff Affidavit), the Motion should be granted in its entirety. The State cannot elide its duty under the United States Constitution to provide Mr. Balderas with relevant impeachment or exculpatory information simply by arguing that Mr. Balderas should be required first to name with specificity the documents or materials that are in the State's possession.

## B. THE SUBMISSION OF DOCUMENTS TO THE COURT FOR IN-CAMERA REVIEW IS INSUFFICIENT

During the April 24, 2018 telephone conference, counsel for the State indicated its intention to submit certain documents that might be encompassed within some of the discovery requests in Mr. Balderas's Motion to the Court for *in camera* review. For the following reasons, *in camera* review by the Court is inadequate here as a means of fulfilling Mr. Balderas's rights (and discharging the State's duties) under *Brady* and its progeny.

While in camera review might, in another case, be an appropriate means of discerning whether particular documents contain *Brady* material, this case is much more complicated than the average case: the litigation spans more than a dozen years and the files are voluminous. To expect the Court—particularly in this case, where the Court has recently been asked to take over subsequent to a recusal motion—to discern whether particular documents might contain impeachment or other exculpatory material is unrealistic and runs an unacceptable risk of depriving

9

Mr. Balderas of important impeachment or exculpatory evidence to use in the presentation of witnesses and the cross-examination of State's witnesses at the upcoming evidentiary hearing. Counsel for Mr. Balderas are much better-suited to this task, particularly because the OCFW has represented Mr. Balderas since 2014, filed his Initial Application, and will be responsible for conducting the examinations of witnesses at the evidentiary hearing. Finally, it is worth noting that Israel Diaz, who was a key witness for the State at Mr. Balderas's capital trial and is being subpoenaed to the evidentiary hearing, has made multiple, conflicting statements over the years, making it virtually certain that any statement he has made to law enforcement or representatives of the State over the years could be used for potential impeachment, and could tend to exculpate Mr. Balderas.

For these reasons, Mr. Balderas respectfully requests that his counsel, the OCFW be allowed to review these files rather than the Court reviewing them *in camera*, as Mr. Balderas's counsel have the extensive background knowledge of his case necessary to determine whether a seemingly innocuous document, or note contained therein, is in fact significant to Mr. Balderas's habeas claims.

## III.

## DISCOVERY REQUESTED

02076

In light of the State's disclosure obligations under *Brady* and its progeny, as well as the specific claims pending before this Court in the Article 11.071 proceeding, including the evidentiary hearing set to commence on May 11, 2018, counsel for Mr. Balderas respectfully request an order from this Court compelling the State to produce the following:

1. Copies of any and all Harris County jail records for **Israel Diaz** (DOB 04/09/1986), including, but not limited to all records and logs of visits, jail mail, complaints, grievances, write-ups, disciplinary records, classification worksheets, movement logs, and gang association information.

For example, the State has in its possession at least some jail records for State's witnesses Israel Diaz and Alejandro Garcia, including audio files of their recorded jail telephone calls. *See* Exh. D, Affidavit of Erin Eckhoff, at ¶9. Indeed, the State's prior disclosure to the OCFW included photocopies of the physical discs containing those audio files. *Id.* The State has not, however, disclosed the contents of those files to the OCFW. *Id.* In fact, the State's prior disclosure appears to contain no audio or video files, even though audio and video files exist in the case file.

2. Copies of any and all communications and contact between **Israel Diaz** (DOB 04/09/1986), or his representatives, and the HCDAO, including, but not limited to: emails, text messages, phone messages, in-person conversations (notes and memos) and telephonic communications (and notes and memos) from 2004 to the present.

3. Additionally, Mr. Balderas specifically requests that any oral communications between **Israel Diaz** (DOB 04/09/1986) and the HCDAO that take place in advance of the May 11, 2018 hearing be

. 02077

recorded and a copy of the recording produced to counsel for Mr. Balderas in advance of the hearing.[4]

---

[4] In the Court's April 20, 2018, email to the parties, the Court indicated that it was inclined to find this request overbroad, because counsel for Mr. Balderas had not made a showing that these recordings actually would contain any exculpatory or impeachment information. But because Diaz has given contradictory statements with regard to Mr. Balderas's involvement in the murder of Eduardo "Powder" Hernandez, any statement that Diaz gives to the State in the presence of his attorney will be exculpatory. Diaz told Mr. Balderas's jury that Mr. Balderas was present at the scene of the murder and confessed to committing the shooting. He told OCFW investigator Adrián de la Rosa that he lied due to pressure from the government: that he did not see Mr. Balderas at the scene in the aftermath of the shooting and that Mr. Balderas never confessed to him. Any statement Diaz makes to prosecutors now necessarily will contradict one of those prior statements, and will, by definition, be exculpatory and, therefore, discoverable. Further, if Diaz offers an explanation to attempt to reconcile his contradictory statements, that explanation is exculpatory and discoverable. Also, if the State engages Diaz in possible explanations for the contradictory statements, those conversations are discoverable.

It is immaterial that the State will inevitably characterize the statements as non-contradictory, because the State's attempted reconciliation of a cooperating

12

witness's contradictory statements is not the standard for determining what is or is not exculpatory under *Brady*. If that were the case, a defendant would never be entitled to receive exculpatory evidence, because the State would always make some attempt to reconcile or explain away the contradictions. The true question is whether it is reasonable to interpret Diaz's statements as contradictory, regardless of the witness's explanation now.

*Brady* evidence encompasses not merely anything the prosecutor believes proves the innocence of the accused: it is in fact much broader. *Brady* material is defined as any information that (1) is relevant to punishment or guilt; and (2) is exculpatory, broadly defined, not solely evidence of innocence. It can also be evidence that may mitigate the sentence (here, death), or anything that reasonably can be used to impeach a State's witness. *Brady*, 373 U.S. at 87; *see also Bagley*, 473 U.S. at 490 ("impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule"). Therefore, if the witness's second, third, or fourth account is in any way different from any of the other accounts, even if it is *more* harmful to the defense, it must be turned over to the defense.

Further, permitting the prosecutor to interpret the statements of the witness is inadequate. The State is an advocate for its position, and will attempt to reconcile any statement made by the witness, even inadvertently (and good or bad faith of the

13

4. The entire HCDAO case file for **Israel Diaz** (DOB 4/09/86) including but not limited to communications with Diaz, status notes/reports, third party communications, references to the murder of Eduardo "Powder" Hernandez, and any references to cooperation with the State in the following cases: *State v. Juan Balderas* (Cause No. 1050630); *State v. Efrain Lopez* (Cause No. 10500629 or Cause No. 1305940 or Cause No. 1428270); *State v. Jose Hernandez* (Cause No. 1050633).

5. Files kept and maintained by the Harris County District Attorney for any criminal case charging **Israel Diaz** (DOB 04/09/86) from 2003-2008, including all reports, notes, communications, witness lists, charging documents, promises/rewards/inducements, case resolution, and any reference to Eduardo Hernandez as a witness.

6. Communications, including but not limited to, emails, letters, voicemails, and any oral communications reduced to writing between employees and agents of the HCDAO and employees of the Harris County Department of Probation regarding **Israel Diaz** (DOB 04/09/86).

7. The entire Harris County Department of Probation case file for **Israel Diaz** (DOB 4/09/86) including but not limited to communications with Diaz, status notes/reports, third party communications, references to the murder of Eduardo "Powder" Hernandez, and any

prosecution is immaterial under *Brady*, see *Brady*, at 87). The only reliable way to insure that any statement made by Diaz will be preserved, verbatim, without interpretation or omission by the prosecutor, intentional or inadvertent, is to require the statement be recorded. This procedure would also protect against any attorney or State agent becoming a witness. A recording of the statement, especially under these circumstances, is therefore the most reliable means of assuring that the statement is accurately preserved.

14

062080

references to cooperation with the State in the following cases: *State v. Juan Balderas* (Cause No. 1050630); *State v. Efrain Lopez* (Cause Nos. 1050629, or 1305940, or 1428270); *State v. Jose Hernandez* (Cause No 1050633).

8. All agents' (federal, state, local and administrative agency) rough notes of interrogations or debriefings of **Israel Diaz** (DOB 04/09/86).

9. All prior written, recorded, or oral statements of **Israel Diaz** (DOB 04/09/86) relating to this case that were made to anyone, and all law enforcement agents' rough draft notes of interviews with Diaz.

10. The prior arrest and conviction records of **Israel Diaz** (DOB 04/09/86), including his complete criminal history, and the docket number and jurisdiction of all prior and pending cases.

11. All evidence that **Israel Diaz** (DOB 04/09/86) has ever (a) made any false statement to the authorities, whether or not under oath or under penalty of perjury, and/or (b) does not have a good reputation in the community for honesty. TEXAS RULE OF EVIDENCE 608(a).

12. All evidence that **Israel Diaz** (DOB 04/09/86) has ever made a false, contradictory, or inconsistent statement with regard to this case, or any statement showing bias or a motive to fabricate. *Pennsylvania v. Ritchie*, 480 U.S. 9 (1987).

13. All evidence that the statements of **Israel Diaz** (DOB 04/09/86) are inconsistent with or contradicted by that of any other person or prospective witness. *Kyles*, 514 U. 419.

14. Any express or implicit promise, understanding, offer of immunity, sentencing leniency, or of past, present, or future compensation, or any other kind of agreement or understanding between **Israel Diaz** (DOB 04/09/86) and law enforcement or prosecutorial agent or agency (federal, state, and local). This request includes any explicit or implicit understanding relating to criminal or civil income tax liability, and/or immigration proceedings. *Kyles*, 514 U.S. at 432-34.

15. All evidence of discussion about, or *advice* concerning, any contemplated prosecution of **Israel Diaz** (DOB 04/09/86), or any possible plea bargain, even if no bargain was made, or the advice not followed. *Brown v. Dugger*, 831 F.2d 1547, 1555-56 (11th Cir. 1987)

02081

(Clark, J., concurring) (evidence that witness sought plea bargain is to be disclosed, even if no deal struck); *Haber v. Wainwright*, 756 F.2d 1520, 1524 (11th Cir. 1985).

16. Copies of any and all jail records for **Alejandro Garcia** (DOB 02/02/1989), a testifying witness against Mr. Balderas at the punishment phase of Mr. Balderas's trial, including, but not limited to, all records and logs of visits, jail mail, complaints, grievances, write-ups, disciplinary records, classification worksheets, movement logs, gang association information, jobs, classes, trainings, and commissary.

17. Copies of any and all communications and contact between **Alejandro Garcia** (DOB 02/02/1989) and the Harris County District Attorney's Office, including, but not limited to, emails, texts, phone messages, in-person conversations and notes and memos, phone conversations and notes/memos, etc., between 2005 and present.

18. Copies of any and all jail records for **Edgar Rene Ferrufino** (DOB 05/10/1988), including but not limited to all records and logs of visits, jail mail, complaints, grievances, write-ups, disciplinary records, classification worksheets, movement logs, gang association information, jobs, classes, trainings, and commissary.

19. The Police Integrity Division file regarding **Christopher Scott Pool**, a former detention officer for Harris County Sheriff's Department, who was employed as a detention officer from May 2009 to August 2012, and who testified for the State in Mr. Balderas's trial.

20. The entire Internal Affairs Department investigation file regarding **Christopher Scott Pool**, a former detention officer for the Harris County Sheriff's Office, employed from May 2009 to August 2012, who testified for the State at Mr. Balderas's trial.

21. Copies of any and all records in the Permanent File of Israel Diaz **Israel Diaz** (DOB 04/09/86; TDCJ No. 1970763), including, but not limited to, medical and mental health screenings; IQ and educational testing; reports and decisions by and to the Classification Committee; visitation logs, disciplinary records, and all parole and probation records and documents.

16

02082

22. All parole and probation records and documents related to **Israel Diaz** (DOB 04/09/86), including, but not limited to, medical and mental health screenings, initial interviews, reports, and decisions for incarcerations from 2003 to the present.

23. The entire trial file for the case of *State v. Juan Balderas*, as made available to Mr. Balderas's trial counsel.

02063

# IV.

## PRAYER

WHEREFORE, for the foregoing reasons, Mr. Balderas respectfully requests that this Court direct the State to disclose the above-listed information to counsel for Mr. Balderas (the OCFW).

Respectfully submitted,
*/s/ Katherine Froyen Black*
KATHERINE FROYEN BLACK

BENJAMIN B. WOLFF, Director (No. 24091608)
(Benjamin.Wolff@ocfw.texas.gov)
ERIN M. ECKHOFF (No. 24090910)
(Erin.Eckhoff@ocfw.texas.gov)
KATHERINE FROYEN BLACK (No 24099910)
(Katherine.Black@ocfw.texas.gov)
NATALIE CORVINGTON (No. 24107401)
(Natalie.Corvington@ocfw.texas.gov)

Office of Capital and Forensic Writs
1700 N. Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Mr. Balderas

02084

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing upon:

Office of the Harris County District Attorney
Attn: ADA Farnaz Hutchins

This certification is executed on May 1, 2018, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

/s/ *Katherine Froyen Black*
Katherine Froyen Black

02085

## IN THE 179th JUDICIAL DISTRICT COURT
## HARRIS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| EX PARTE | ) | Cause No. |
| JUAN BALDERAS, | ) | 1412826-A |
| APPLICANT | ) | |
|  | ) | Hearing date: May 11, 2018 |
|  | ) | |
|  | ) | |

## MOTION TO COMPEL DISCLOSURE OF CAPITAL MURDER
## SUMMARY

Juan Balderas, by and through his counsel, the Office of Capital and Forensic

Writs (OCFW), files this motion seeking production of the capital murder summary

in the aforementioned case. This Court has set an evidentiary hearing to commence

on May 11, 2018, and Mr. Balderas requests this Court order the State to disclose

the capital murder summary to counsel for Mr. Balderas in advance of the May 11

evidentiary hearing. In support of this motion, Mr. Balderas respectfully states the

following:

**I.**

## RELEVANT BACKGROUND

In October 2015, at a hearing on a prior discovery motion, counsel for Mr.

Balderas requested the capital murder summary be disclosed, and the request was

denied. *See* Exhibit A, Transcript of October 27, 2015 Hearing at 17. In response,

the State baldly asserted that the documents were protected under the work product doctrine. *Id.* On that basis, the Court denied Mr. Balderas's request. *Id.*

On July 18, 2016, the State filed its Answer to Mr. Balderas's Initial Application for Writ of Habeas Corpus. In support of its Answer, the State attached a sworn statement from former Harris County Assistant District Attorney Spence Graham. *See* Exhibit B, Spence Graham's Affidavit, filed with the State's Answer on July 18, 2016. Therein, Mr. Graham stated: "Also included in the State's file was the capital murder summary that I prepared which was also *available for trial counsel to review.*" *Id.* at p. 2 (emphasis added).

In light of the State's changed position on the work product status of the capital murder summary, Mr. Balderas, through his counsel, renewed his request for disclosure of the capital murder summary at a status hearing on August 17, 2017. Exhibit C, August 17, 2017 Writ Hearing Transcript, at 18. Indeed, in response to Mr. Balderas's request, the State adhered to the position that the documents had been disclosed to trial counsel, consistent with the affidavit of Spence Graham. Specifically, when counsel for Mr. Balderas requested to be able to see the capital case summary, the State responded: "That's probably fair." *Id.* The Court then decided: "If they have it, if they can find it, that will be fine. I'm sure you should be allowed to see it." *Id.* The State did not, however, disclose the capital murder summary to Mr. Balderas's counsel.

1

02087

At the writ (status) hearing before this Court on February 22, 2018, Mr. Balderas's counsel again requested on the record that a copy of the capital murder summary be disclosed. Despite its earlier representation that it was "probably fair" that the capital murder summary be disclosed to Mr. Balderas's counsel, the State reversed course and again retroactively asserted that the document did not need to be disclosed based upon the work product doctrine. *Id.* at 68-69. Counsel for Mr. Balderas objected to the State's re-assertion of work product protection on the ground that the protection had been waived due to the fact that the former prosecutor in the case, Spence Graham, had disclosed the capital murder summary to Mr. Balderas's trial counsel prior to Mr. Balderas's trial. *See* Exh. B. This Court declined to order the disclosure of the capital case summary on the basis of the State's assertion that it was work product, but agreed to perform an *in camera* review of the document.

## II.

## ARGUMENT

Mr. Balderas requests that this Court order the disclosure of the capital murder summary that was submitted to the Court for its review to Mr. Balderas's counsel, because the State waived the work product protection with respect to this document when it voluntarily disclosed the document to Mr. Balderas's trial counsel. *See* TEX. R. OF EVID. 511(1) ("A person upon whom these rules confer a privilege

2

against disclosure waives the privilege if: the person or a predecessor of the person while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter unless such disclosure itself is privileged"); *Wright v. State*, 374 S.W.3d 564, 580 [Tex.App.—Houston [14th Dist.] 2001, pet. ref'd] (if a person holding a privilege against disclosure voluntarily discloses or consents to disclosure of any significant part of the privileged matter, that person waives any privilege unless the disclosure itself is privileged); *Jones v. State*, 181 S.W.3d 875, 878 [(Tex. App—Dallas 2005 pet. ref'd] (finding a waiver of privileged material when a defendant voluntarily disclosed the existence of a second statement to counsel in response to a prosecutor's cross-examination of the defendant with the defendant's initial statement to police). Waiver of privileged material may be inferred from the totality of the circumstances and reasonable inferences. *See* *Carmona v. State*, 941 S.W.2d 949, 954 (Tex.Crim.App. 1992).

Here, the State has repeatedly represented, before this Court and through a sworn statement of its own witness, that the State voluntarily disclosed the capital murder summary to its adversary in advance of Mr. Balderas's 2014 trial. Specifically, by its own affirmative representation, the State placed the capital murder summary in the trial file made available to Mr. Balderas's trial counsel, who unquestionably constitute a "third party" as contemplated in Texas Rule of Evidence 511(1). Because the State knowingly and intentionally released the information to

3

02088

a third party, the State waived any work product protection that may have applied to the capital murder summary and cannot now reassert that protection.

In consideration of these points and authorities, and in light of the State's voluntary waiver of work product protection here, Mr. Balderas respectfully requests that this Court order the State to disclose the capital murder summary to Mr. Balderas's counsel. If this Court denies Mr. Balderas's request and declines to order the State disclose the capital murder summary directly to Mr. Balderas's counsel, Mr. Balderas respectfully requests this Court make the capital murder summary, under seal, a part of the record in this case so that Mr. Balderas's objections to the Court's rulings with respect to the capital murder summary can be reviewed.

02090

# III.

# PRAYER

WHEREFORE, for the foregoing reasons, Mr. Balderas respectfully requests that this Court direct the State to disclose the capital murder summary to counsel for Mr. Balderas (the OCFW).

Respectfully submitted,
*/s/ Katherine Froyen Black*
KATHERINE FROYEN BLACK
BENJAMIN B. WOLFF, Director (No. 24091608)
(Benjamin.Wolff@ocfw.texas.gov)
ERIN M. ECKHOFF (No. 24090910)
(Erin.Eckhoff@ocfw.texas.gov)
KATHERINE FROYEN BLACK (No 24099910)
(Katherine.Black@ocfw.texas.gov)
NATALIE CORVINGTON (No. 24107401)
(Natalie.Corvington@ocfw.texas.gov)

Office of Capital and Forensic Writs
1700 N. Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Mr. Balderas

# IN THE 179th JUDICIAL DISTRICT COURT
## HARRIS COUNTY, TEXAS

| | | |
|---|---|---|
| EX PARTE | ) | Cause No. |
| JUAN BALDERAS, | ) | 1412826-A |
| APPLICANT | ) | |
| | ) | Hearing date: May 11, 2018 |
| | ) | |
| | ) | |

## [PROPOSED] ORDER

On this date, the Court considered Mr. Balderas's Motion to Compel Disclosure of Capital Murder Summary. After due consideration, Mr. Balderas's Motion is GRANTED. The State shall provide a copy of the capital murder summary to counsel for Mr. Balderas in advance of the May 11, 2018 evidentiary hearing.

ORDERED AND SIGNED on this _____ day of _____, 2018.

_____
The Honorable Baylor Wortham
Judge Presiding by Appointment
179th District Court

6

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing upon:

Office of the Harris County District Attorney
Attn: ADA Farnaz Hutchins

This certification is executed on May 1, 2018, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

/s/ *Katherine Froyen Black*
Katherine Froyen Black

. 02093

1          REPORTER'S RECORD
           VOLUME 1 OF 1 VOLUMES
2         TRIAL COURT CAUSE NO. 1412826

3        APPELLATE COURT NO. AP-77,036

4   EX PARTE                    ) IN THE DISTRICT COURT OF
                                )
5                               ) HARRIS COUNTY, TEXAS
                                )
6   JUAN BALDERAS               ) 179TH JUDICIAL DISTRICT

7

8

9   _____

10            **WRIT OF HABEAS CORPUS**

11  _____

12

13      On the 27th day of October, 2015, the following

14  proceedings came on to be held in the above-titled

15  and numbered cause before the Honorable Kristin M.

16  Guiney, Judge Presiding, held in Houston, Harris

17  County, Texas.

18      Proceedings reported by computerized stenotype

19  machine.

20

21

22

23

24          Renee Reagan, Texas CSR No. 7573
        Official Court Reporter, 179th District Court
25                   1201 Franklin
                 Houston, Texas  77002

EXH A

1                         **APPEARANCES**

2    Ms. Lynn Hardaway
     SBOT No. 08948520
3    Assistant District Attorney
     Harris County District Attorney's Office
4    1201 Franklin
     Houston, Texas  77002
5    Telephone:  713.274.5800
     Attorney for the State of Texas
6

7

8

9                  *  *  *  *  *  *  *  *  *  *

10

11

12   Mr. Derek VerHagen
     SBOT No. 24090535
13   Office of Capital Writs
     1700 N. Congress Ave., Suite 460
14   Austin, Texas 78711
     Telephone:  214.335.2668
15   Attorneys for the Defendant

16

17

18

19

20

21

22

23

24

25

EXH A

1            THE COURT:  In Ex Parte Juan Balderas,

2     the Office of Capital and Forensic Writs has filed a

3     motion for disclosure of exculpatory and impeachment

4     evidence.  We've had a setting here.  The State had

5     argument or wished to give the Court guidance as to what

6     they believe the appropriate resolution of this

7     particular motion was.

8            State, you may proceed.  Oh, sorry.  It's

9     defense's motion.  My apologies.

10           MR. VERHAGEN:  Derek VerHagen on behalf

11    of the Office of Capital and Forensic Writs.  Yes, we're

12    requesting any exculpatory or impeachment evidence that

13    may be in the State's possession under *Brady v. Maryland*

14    and its progeny.  To this point, we've already taken

15    steps to locate that information by filing our own

16    P.I.A. requests at various agencies, reviewing the D.A.

17    files.  I reviewed five of the boxes in mid-August and

18    then received the other six boxes or files on

19    October 21st and have done our best to get through those

20    at this point.  And then obviously, we've conducted our

21    own investigation.  So based on the discovery we've been

22    provided at this point in the investigation that we've

23    conducted, we have a good faith belief that there's

24    additional information that may fall under *Brady v.*

25    *Maryland* and we're asking this Court to order that the

EXH A

02056

1   State provide that to the O.C.F.W. to the extent that it

2   exists.

3               I can go into detail if you'd like, Your

4   Honor, on what exactly we're asking for; but it's listed

5   in the motion itself.  There are two things that aren't

6   listed in the motion that I wanted to talk about very

7   briefly.  The first is, if you'll look at what's listed

8   as No. 3 on page 5 of the motion:  Any information or

9   documentation of communications including e-mails

10  between the State and witnesses or their representatives

11  including but not limited to -- to that list, I'd like

12  to add Edgar Ferrufino, the last name,

13  F-E-R-R-U-F-I-N-O.  Mr. Ferrufino was in the apartment

14  on the night of the shooting; he was an eyewitness'

15  boyfriend.

16               THE COURT:  I'm sorry.  Can you spell his

17  last name again?

18               MR. VERHAGEN:  F-E-R-R-U-F-I-N-O.  And he

19  was in the apartment on the night of the shooting.  He

20  was the eyewitness' boyfriend and he ended up testifying

21  at trial also.

22               In addition to that, the O.C.F.W. is

23  requesting a capital murder summary, to the extent that

24  there was one, explaining the reason for charging

25  capitally in this case.  And again, I can speak in more

EXH A

1   detail about any of the other things that are listed if

2   Your Honor needs --

3              THE COURT:  Capital murder summary would

4   be, then, Request No. 10?

5              MR. VERHAGEN:  Yes.

6              THE COURT:  Okay.  Anything else?

7              MR. VERHAGEN:  Nothing else.

8              THE COURT:  State.

9              MS. HARDAWAY:  Your Honor, Mr. VerHagen,

10  he did touch on the P.I.A. request and I would just like

11  to elaborate on that a little more.  We actually did

12  something a little bit different in this case in that --

13  it's 11 boxes.  We have it all divided up and there's,

14  like -- in each box there's a separate folder with

15  office work product, prosecutor work product.  But

16  anyway, what our office did is we went ahead and scanned

17  in the entire contents of the 11 boxes and we have made

18  available -- at least we did all the documentary items

19  in the boxes and we recently sent disks with the copies

20  of all the documentary items to the Office of Capital

21  and Forensic Writs minus the office work product.  So

22  we've already turned over a lot of information to the

23  Office of Capital Writs.

24              The other thing I'd like to say is it's

25  the State's position that this request is overly broad.

 1    There isn't discovery in habeas proceedings and as a
 2    matter of fact, this proceeding is not covered by the
 3    Michael Morton Act which, because this was an offense in
 4    2005, there's specifically a savings clause in the
 5    Michael Morton Act.  But, Your Honor, I would -- because
 6    there is already a P.I.A. request in place in this case,
 7    I've told Mr. VerHagen that I would be willing to do an
 8    e-mail search for specific items; some of those -- I
 9    mean, I would like to narrow the items in this
10    discovery -- in this motion but I will go ahead and do a
11    search and turn over external e-mails.  I will not agree
12    to turn over internal e-mails amongst the prosecutors
13    and the prosecutors' investigators and I also object to
14    turning over the capital murder summary.
15                THE COURT:  Okay.  And so I'm clear, you
16    said that you've scanned -- the office, your office, has
17    scanned all of the 11 boxes --
18                MS. HARDAWAY:  The documentary --
19                THE COURT:  What is a nondocumentary
20    item?
21                MS. HARDAWAY:  There's various types of
22    media; like, there are interviews and things like that,
23    pictures.  I think there are actually some pictures that
24    have been scanned in.  I'm not sure about all of them,
25    but there are a lot of CDs.

EXH A

1          THE COURT:  All right.  So in terms of
2    the list, if we could just go down the list of the
3    defense -- I mean, the O.C.W.'s.
4               Would the State have any objection to the
5    granting of Request No. 1, any information tending to
6    show a witness' bias in favor of the Government or
7    against Balderas, or which otherwise impeaches a
8    witness' testimony?
9               MS. HARDAWAY:  Well, I mean -- okay.
10   Your Honor, I was actually skipping over to No. 1 on
11   page 4, because generally these are just so general.  I
12   think that all falls under the -- on page 2, the Office
13   of Capital Writs refers to disclosing any potential
14   exculpatory and impeachment information.  Just because
15   something might potentially be exculpatory or
16   impeachment doesn't mean that you have to turn it over.
17              THE COURT:  Say that again.
18              MS. HARDAWAY:  Just because something is
19   potentially exculpatory, I don't believe that that
20   means --
21              THE COURT:  Okay.  Actually I meant to
22   start with the list as it begins on page 4.
23              MS. HARDAWAY:  Okay.
24              THE COURT:  So, any information or
25   documentation in possession of the State regarding the

EXH A

1    State's plea deal with Israel Diaz, including any

2    information about his testimony, failure to testify.

3                I'm sorry.  It's very early in the

4    morning.

5                So I guess the State's general objection

6    to all of these specific requests, the specific requests

7    beginning on page 4 is the P.I.A. request covers it,

8    you've scanned it --

9                MS. HARDAWAY:  We've scanned everything.

10               THE COURT:  Your documentary -- let me

11   read these specifics again.

12               MS. HARDAWAY:  Your Honor, what I can do

13   is -- you know Traci Bennett's in trial right now,

14   correct?

15               THE COURT:  No.

16               MS. HARDAWAY:  Or I don't know if you

17   know; she's in a capital right now.  I'm aware of my

18   duty to turn over *Brady* material and I know that Traci's

19   aware of that, too.  When she gets out of trial, if you

20   want me to, I can have her look through the work product

21   and see what might be responsive to No. 1, if anything.

22               THE COURT:  Okay.  And for scheduling

23   purposes, just so Mr. VerHagen knows, is it a death case

24   or nondeath case?

25               MS. HARDAWAY:  It's a death case.  She

EXH A

1  should be done in about three weeks.

2      THE COURT:  Okay.

3      MS. HARDAWAY:  But actually -- and you

4  probably remember this, Your Honor -- the plea deal with

5  him was pretty well explored at trial.  It's when he

6  testified on direct; and also, Traci did a notice to the

7  defense --

8      MR. VERHAGEN:  It's one of the

9  interesting things about No. 1 and why we continue to

10  ask for it even after the P.I.A. request has been

11  fulfilled by them is that Mr. Diaz -- if you look at the

12  *Brady* notice, it's agreed to that he'll testify in three

13  trials in exchange for his deal and he testifies in

14  Mr. Balderas' trial and then doesn't testify in any

15  other trials.  To the extent that there's any

16  explanation why Mr. Diaz didn't testify in any of the

17  other trials and it has anything to do with the

18  truthfulness of the testimony he gave in Mr. Balderas'

19  trial, we would be requesting any information that would

20  reflect that.

21      THE COURT:  To that specific request,

22  does the State have --

23      MS. HARDAWAY:  You know what, Your Honor?

24  I don't know why he didn't testify in the other trials.

25  I can --

EXH A

1           THE COURT:  Because in the other trials,

2   they didn't try that same case.  That's why.  That would

3   be my guess.  I'm certainly not speaking for the State.

4   That's my recollection of the facts.

5           MR. VERHAGEN:  Possibly, yeah.

6           THE COURT:  Juan Balderas' guilt case was

7   a different guilt case from the other cases that were

8   tried.  Obviously the State has a continuing duty to

9   give you any information regarding Mr. Diaz, so I think

10  the current case law on habeas proceedings covers that.

11          With regard to Request No. 3, which

12  you've added to -- that was where you added Edgar

13  Ferrufino.

14          MR. VERHAGEN:  Yes.

15          THE COURT:  And Ms. Hardaway has

16  indicated that she will begin an e-mail search for those

17  as long as they are not e-mails or correspondence that

18  would normally come under the work product protection.

19          MS. HARDAWAY:  I will do that.  And, Your

20  Honor, okay, the one problem I had with No. 3 is, again,

21  this is pretty wide open.  It says:  Including but not

22  limited to Israel Diaz and Alejondro Garcia.  If we can

23  narrow it just to those individuals, Diaz, Garcia, and

24  Ferrufino, I will do an e-mail search and see if I come

25  up with anything on those individuals.

EXH A

02103

1          THE COURT: Okay. I think that's a fair

2    limitation. Obviously if in the course of your

3    proceedings, Mr. VerHagen, you come up with another

4    specific witness to give her to search; but you can't

5    search for an exhaustive list.

6          MR. VERHAGEN: Right.

7          THE COURT: So if you delineate; but at

8    this point, I will order the State to conduct an e-mail

9    search that would not otherwise be protected by office

10   work product for Israel Diaz, Alejondro Garcia, and

11   Edgar Ferrufino.

12         MR. VERHAGEN: Yes.

13         MS. HARDAWAY: As far as No. 2, I'll

14   agree to do a search for Garcia and his bond reduction,

15   although I think the record pretty well reflects that

16   that was a matter between the Trial Court and his

17   defense counsel, that the State didn't have anything to

18   do with that.

19         THE COURT: That is certainly my

20   recollection, because I lowered the bond.

21         MS. HARDAWAY: Right.

22         THE COURT: And I'm not sure that there

23   would have been any records. I don't think that there

24   are any court reporter records relative to Alejondro

25   Garcia's case.

EXH A

02104

1          MS. HARDAWAY:  But if you want me to, I
2   will just do an e-mail search while I'm doing these
3   others.
4          THE COURT:  That's fine.  An e-mail
5   search relative to No. 2's request.
6          MS. HARDAWAY:  So just for Alejondro
7   Garcia and bond reduction.
8          THE COURT:  Right, and bond reduction.
9          MS. HARDAWAY:  I've explained to
10  Mr. VerHagen, you have to be kind of specific about
11  these e-mails or else you're just going to come up
12  with --
13         THE COURT:  Right, there has to be a
14  search term.
15         MR. VERHAGEN:  Right.
16         THE COURT:  With regard to No. 4, as it's
17  limited to Wendy Bardales --
18         MS. HARDAWAY:  I will agree to do that.
19         THE COURT:  As long as it would not
20  otherwise be protected by work product.
21         MS. HARDAWAY:  Right.  No. 6, I have an
22  objection to.
23         THE COURT:  Let's -- we haven't discussed
24  No. 5.
25         MS. HARDAWAY:  Oh, I'm sorry.

EXH A

1          THE COURT:  Is there anything --

2          MS. HARDAWAY:  I can do a search for

3    anonymous tips.  I think that's in one of the offense

4    reports and that's the only mention I saw of that, but I

5    can do a search for anonymous tips.

6          MR. VERHAGEN:  And that's one of those

7    things that, you know, it's referenced in the police

8    report, these anonymous tips, and then we can't -- no

9    one seems to -- we can't seem to track them down.

10          THE COURT:  Because they're anonymous.

11          MS. HARDAWAY:  Or that might just be all

12    there is.

13          MR. VERHAGEN:  Or any kind of reference

14    other than, Hey, someone from -- another person from the

15    gang unit called me and told me that this other person

16    said this.  Any kind of earlier documentation to the

17    extent any exists, even if it's in HPD's hands, would

18    still fall under *Brady*, right?

19          MS. HARDAWAY:  Well, I can't do a search

20    of HPD's e-mails.

21          THE COURT:  Right.

22          MR. VERHAGEN:  There's an ongoing duty

23    for the State to turn that over, correct?

24          MS. HARDAWAY:  I don't have access to

25    their e-mails.  I will do a search of our office

EXH A

1  e-mails.  If there is an external communication, I will
2  turn that over.
3          THE COURT:  Right.
4          MR. VERHAGEN:  Or even beyond an e-mail,
5  like an actual document that might exist that's not an
6  e-mail that reflects what was said on the tip.
7          THE COURT:  And with all due respect,
8  that's the crux of the current problem with *Brady*.  How
9  is Ms. Hardaway or anyone from the office supposed to
10  turn over something in the custody of HPD of which they
11  have no knowledge?  And if you come up with a policy, I
12  will certainly -- and a way for her to be held
13  responsible for that; but what she can do is what she
14  has suggested, which is an e-mail search for any --
15          MS. HARDAWAY:  Because basically we've
16  already turned over all documentary information except
17  what's protected by work product.
18          THE COURT:  But she certainly can do an
19  e-mail search for that information.
20          No. 6, Ms. Hardaway, you said you had an
21  objection to?
22          MS. HARDAWAY:  Yes, because that is
23  asking for internal communications between the State
24  internally discussing Wendy Bardales testifying in
25  Spanish.  And again, I think that's pretty well

EXH A

1    developed on the record that the State had a meeting

2    with her and it was her idea at that time to ask for an

3    interpreter because -- I mean, that wasn't at the

4    State's suggestion.

5                THE COURT:  I don't know how you get

6    around the work product for those internal e-mails.

7                MR. VERHAGEN:  Right.  Documentation of

8    communications, so that would also include -- at least

9    my interpretation of it is that it also includes notes

10   that were taken during Ms. Bardales' interview.  So to

11   the extent that we've already received notes for -- say

12   the State kept notes on their interviews with Mr. Diaz,

13   with Mr. Lopez, with Garcia.  They kept notes with all

14   kinds of different witnesses they had interviews with

15   and there's no notes regarding Ms. Bardales and maybe

16   there aren't any.  That's just -- we're requesting, to

17   the extent that they do exist, that the State provide

18   those.

19               MS. HARDAWAY:  Those are protected work

20   product.

21               THE COURT:  You already have notes from

22   the other?

23               MR. VERHAGEN:  We have notes from

24   interviews with Diaz.

25               MS. HARDAWAY:  You know, I'm happy to

EXH A

1   look through what we held back as work product and if

2   there's something like that, I can submit it to you in

3   camera.

4           THE COURT:  Okay.  So at that point that

5   would be a ruling then.  The State will look; if there

6   are witness notes for Bardales generated by the office,

7   I will review those in camera and make a determination

8   after that.

9           7, I think the:  But not limited to --

10          MS. HARDAWAY:  That's pretty much along

11   with 6.

12          THE COURT:  I think 7 is subsumed by 6

13   unless you can delineate how --

14          MS. HARDAWAY:  I think it is, too.

15          THE COURT:  So I think the ruling for

16   Request 6, that I will review any evidence, to the

17   extent it exists, regarding internal conversations or

18   strategies as it relates to Ms. Bald- -- Bardales -- it

19   was a problem in the trial and it continues to be a

20   problem -- testifying in Spanish, I will review those in

21   camera to the extent those exist and make a ruling.

22          MR. VERHAGEN:  No. 8, I don't -- there

23   were some witness -- I will say from the Court's

24   perspective that there were some e-mails regarding

25   accommodation or scheduling matters; but when I

EXH A

1   e-mailed, I e-mailed all parties, or at least a

2   representative of all parties, depending on the exigency

3   of needing to get a quick e-mail out.  Because as we all

4   know, there were seven lawyers.

5               MS. HARDAWAY:  It was like herding cats,

6   I'm sure.

7               THE COURT:  You are exactly right.  So

8   can you do an e-mail search for that, Ms. Hardaway?

9               MS. HARDAWAY:  Sure.

10              THE COURT:  I guess -- and Deputy Gerac

11  and Deputy Jenkins were the Court's bailiffs at the

12  time, so I don't know if they sent any e-mails or not

13  but most of the e-mails probably would have come from

14  me.

15              All right.  No. 9.

16              MS. HARDAWAY:  That, I think, goes with

17  our ongoing --

18              THE COURT:  The general, right.

19              Now, the objection to the 10th and today

20  added request for the capital murder summary, if it

21  exists, to explain the decision, I assume the State's

22  position is that would be covered by work product?

23              MS. HARDAWAY:  Yes, Your Honor.

24              THE COURT:  And I would tend to agree

25  unless you have a specific reason that it is not?

EXH A

02116

1    MR. VERHAGEN:  Thank you, Your Honor.

2    THE COURT:  Okay.  Anything else?

3    MS. HARDAWAY:  Can we go ahead and get

4  this transcribed and, Your Honor, if I could give Traci

5  just three weeks to get out of trial and then we can

6  meet back here.

7    THE COURT:  Sure.  Three weeks falls

8  squarely right in the week of Thanksgiving, so maybe we

9  could just have the first Thursday of December, which I

10  think is probably December -- between a death penalty

11  trial and Thanksgiving, she might need a moment.  First

12  Thursday of December, which is Thursday, the 1st.

13    *(Court in recess.)*

14

15

16

17

18

19

20

21

22

23

24

25

EXH A

02111

1  STATE OF TEXAS
   COUNTY OF HARRIS
2

3       I, Renee Reagan, Official Court Reporter in and

4  for the 179th District Court of Harris County, State

5  of Texas, do hereby certify that the above and

6  foregoing contains a true and correct transcription

7  of all portions of evidence and other proceedings

8  requested in writing by counsel for the parties to be

9  included in this volume of the Reporter's Record in

10 the above-styled and numbered cause, all of which

11 occurred in open court or in chambers and were

12 reported by me.

13      I further certify that this Reporter's Record of

14 the proceedings truly and correctly reflects the

15 exhibits, if any, offered by the respective parties.

16      WITNESS MY OFFICIAL HAND, this the 4th day

17 of November, 2015.

18
                        /s/Renee Reagan
19                      Renee Reagan, CSR
                        Texas CSR 7573
20                      Official Court Reporter
                        179th District Court
21                      Harris County, Texas
                        1201 Franklin
22                      Houston, Texas 77002
                        Telephone:  713.755.6340
23                      Expiration:  12/31/16

24

25

EXH A

Cause No. 1412826-A

| EX PARTE | § | IN THE 179TH DISTRICT COURT |
| | § | OF |
| JUAN BALDERAS, | § | HARRIS COUNTY, TEXAS |
| Applicant | | |

## AFFIDAVIT OF SPENCE D. GRAHAM

| STATE OF TEXAS | § | DATE: July 14, 2016 |
| HARRIS COUNTY | § | |

Before me, the undersigned authority, a Notary Public in and for Harris County, Texas, on this day personally appeared Spence D. Graham, who being by me duly sworn, upon his oath deposes and says:

"My name is Spence D. Graham. I am a lawyer licensed in the State of Texas and my bar card no. is 24036665. I was an assistant district attorney for the Harris County District Attorney's Office from 2003 to mid-January, 2013. Since the beginning of 2013, I have been in private practice where the majority of my practice is devoted to criminal defense.

In May, 2009, I was transferred to the 179th District Court of Harris County, Texas, where I assumed responsibility for the prosecution of Juan Balderas and worked on the case for over two years. I remained in the 179th District Court until the end of December, 2011. Prosecutor Paula Hartman then became the chief prosecutor in that court and was responsible for Balderas' case.

Pursuant to the State's request, I recently reviewed handwritten notes of interviews (Applicant's Habeas Ex. 57) that were conducted with Israel Diaz. Pages 1 through 14 of the notes comprise the notes of prosecutor Caroline Dozier. Pages 15 through 23 are notes of a former Harris County District Attorney's Office prosecutor, George Weissfish.

When I was handling the Balderas case, the prosecution file consisted of six to eight well-ordered banker boxes organized by the various criminal offenses. Included in the boxes was a manila folder with Israel Diaz's name on it. The folder contained the interview notes of

EXH B

STATE'S EXHIBIT 3

82113

Dozier and Weissfish as well as transcripts from the interviews that the police conducted with

Diaz. I kept the prosecution files in my office and defense counsel were free to come to my

office and review the contents of the boxes. While the Balderas case was assigned to me, I am

sure that trial counsel (Godinich, Nunnery or both) reviewed the Balderas prosecution file

although I have no memory of when that specifically happened.

Also included in the State's file was the capital murder summary that I prepared which

was also available for trial counsel to review. Regarding Israel Diaz, the summary contained the

following information:

- that Diaz told police and prosecutors previously handling the case that there was a hit out on the complainant and gang leaders had issued an "SOS" (or "shoot on Sight") for anyone in LTC that saw the complainant;

- that Diaz previously gave statements from jail with his lawyer to law enforcement that the applicant admitted to killing the complainant when they spoke that evening at Alejandro Garcia's house;

- that Diaz could assert that the hit out on the complainant was made by the leadership of the La Tercera Crips gang, and that it was because of not only the complainant's potential testimony, but because of his friendship with rival gang members and that the complainant would share LTC secrets with the rival gang; and

- that Diaz knew that the complainant's murder would occur."

I have read the above statement and find it to be true and correct to the best of my

knowledge."

SPENCE D. GRAHAM
Affiant

SWORN AND SUBSCRIBED before me, under oath, on this the **14**TH day of
**July**_____, 2016.

NOTARY PUBLIC in and for the
State of Texas

My commission expires: Febuary 5, 2018

VIVIAN M. LOGAN
Notary Public
STATE OF TEXAS
Commission Exp. FEB. 05, 2018

EXH B

.02114

1          REPORTER'S RECORD
          VOLUME 1 OF 1 VOLUMES
2      TRIAL COURT CAUSE NO. 1412826-A

3

4   THE STATE OF TEXAS        )  IN THE DISTRICT COURT OF
                              )
5   V.                        )  HARRIS COUNTY, TEXAS
                              )
6   JUAN BALDERAS             )  179TH JUDICIAL DISTRICT

7

8

9   _____

10                      **WRIT HEARING**

11  _____

12

13      On the 17th day of August, 2017, the following

14  proceedings came on to be held in the above-titled

15  and numbered cause before the Honorable Randy Roll,

16  Judge Presiding, held in Houston, Harris County,

17  Texas.

18      Proceedings reported by computerized stenotype

19  machine.

20

21

22          Renee Reagan, Texas CSR No. 7573
        Official Court Reporter, 179th District Court
23                    1201 Franklin
                Houston, Texas  77002

24

25

EXH C

1                          **APPEARANCES**

2    Ms. Farnaz Hutchins
     SBOT No. 24063791
3    Mr. Joshua Reiss
     SBOT No. 24053738
4    Ms. Shawna Reagin
     SBOT No. 16634900
5    Assistant District Attorneys
     Harris County District Attorney's Office
6    1201 Franklin
     Houston, Texas  77002
7    Telephone:  713.274.5800
     Attorneys for the State of Texas
8

9

10

11              *  *  *  *  *  *  *  *  *  *

12

13

14   Ms. Erin Eckhoff
     SBOT No. 24090910
15   Ms. Katherine Black
     SBOT No. 24099910
16   Office of Capital and Forensic Writs
     1700 N. Congress Ave. Ste. 460
17   Austin, Texas 78701
     Telephone:  512.463.8503
18   Attorneys for the Defendant

19

20

21

22

23

24

25

EXH C

1              *(Open court, defendant not present.)*

2              THE COURT:  On the record at this time --

3              MS. ECKHOFF:  Your Honor, my client.

4              THE COURT:  Yes.

5              *(Defendant present.)*

6              THE COURT:  Let's go on the record.

7    We're in Cause No. 1412826-A, and introduce yourselves

8    and tell us who you represent.

9              MS. ECKHOFF:  Your Honor, my name is Erin

10   Eckhoff.  I'm with the Office of Capital and Forensic

11   Writs and we represent Mr. Juan Balderas in his

12   post-conviction proceedings.

13             MS. BLACK:  Katherine Black, also from

14   the Office of Capital and Forensic Writs, also

15   representing Mr. Balderas, who is present.

16             THE COURT:  And for the State?

17             MS. HUTCHINS:  Farnaz Hutchins, that's

18   F-A-R-N-A-Z, representing the State along with.

19             MR. REISS:  Joshua Reiss, R-E-I-S-S,

20   Harris County District Attorney's Office.  Bar Card

21   No. 24053738.  Good afternoon, Your Honor.

22             THE COURT:  Good morning -- good

23   afternoon, yes.

24             All right.  You may continue.

25             MS. ECKHOFF:  Thank you, Your Honor.

EXH C

1    We've filed an initial application for writ of habeas

2    corpus on Mr. Balderas' behalf that raised a number of

3    claims that if established, would entitle him to habeas

4    relief.  These claims include that State's witnesses

5    provided false testimony at trial.  The impeachment --

6              THE COURT:  Mr. Diaz, Mr. -- okay.

7              MS. ECKHOFF:  Excuse me, sir?

8              THE COURT:  Go ahead.

9              MS. ECKHOFF:  That the State withheld

10   impeachment evidence and as we have discussed a bit off

11   the record, that the jurors were exposed to a -- an

12   extraneous influence and that the Court, when that

13   influence was brought to their attention, waited until

14   after they reached a verdict to actually address it on

15   the record.  Again, if these claims are proven as true,

16   then Mr. Balderas is entitled to habeas relief and I

17   think what's important to note at this point is that,

18   you know, we have the burden of proof.  Mr. Balderas has

19   the burden of proof at this stage.  Our application are

20   allegations that we are making.  The State obviously has

21   responded and denied those allegations and we are

22   requesting an opportunity to put on the evidence

23   necessary to prove our claims.  For that, we argue, an

24   evidentiary hearing is necessary.  We need the

25   opportunity to put on our own evidence but also

EXH C

02118

1   challenge the State's evidence to the contrary.  And we

2   urge that that's what due process requires in a death

3   penalty case like this.

4               As we also discussed a bit off the

5   record, trial counsel have submitted affidavits

6   responding to some of Mr. Balderas' claims, specifically

7   the ineffective assistance of counsel claims.  We

8   don't --

9               THE COURT:  And let me just say this.

10  I'll make some notes while you're talking.  I just want

11  to interlineate, I know he had Mr. Jerome Godinich and

12  Alvin Nunnery.

13              MS. ECKHOFF:  Yes.

14              THE COURT:  And these are two lawyers

15  that have taken capital murder cases probably more than

16  any other pair of lawyers in the county.  I don't know

17  of anybody that's had more than they.  So I'm just --

18  you may continue but I want you to know I know who the

19  parties are.

20              MS. ECKHOFF:  Sure.  I appreciate that.

21              THE COURT:  You may continue.

22              MS. ECKHOFF:  We're simply stating that

23  the affidavits alone are not a sufficient form of fact

24  finding here.  They certainly add to the facts at issue

25  but there are a number of problems with relying on

EXH C

02119

1    affidavits and not doing an evidentiary hearing, the
2    most common sense of which is that it's really difficult
3    to cross-examine a written statement.  You know, for
4    better for worse, when these types of claims are raised,
5    trial counsel often become adverse to their former
6    clients.  They have an interest in defending themselves
7    from these claims and --
8                THE COURT:  Because right now you're
9    claiming ineffective assistance of counsel, aren't you?
10               MS. ECKHOFF:  Correct, yes.
11               THE COURT:  I just want you to realize
12   that I know both parties well.  I know they've had
13   probably dozens and dozens of cases --
14               MS. ECKHOFF:  Sure.
15               THE COURT:  -- like this.  Those two
16   pioneered capital murder in this county, at this level,
17   at a very high level of sophistication.  You may
18   continue.
19               MS. ECKHOFF:  I appreciate that.  And I
20   would just add that given the adverse dynamic that may
21   arise in these types of cases, it's fair for
22   Mr. Balderas to examine them and challenge them to the
23   extent necessary and if possible.  But -- and as we
24   discussed off the record, we have had some opportunity
25   to do a cursory review of what we believe are the

EXH C

1   accurate affidavits that were submitted and we've done

2   our best to identify problems with them and objections

3   we have to them at this point.  We will be requesting

4   additional time to review them more thoroughly and

5   respond to the extent we have additional objections to

6   make but I'm happy to go through some of the initial

7   problems that I've noticed.  First of all --

8                   THE COURT:  Why don't you do this for the

9   Court of Appeals, very quickly go through -- is it 10 or

10  11 errors that you're alleging?

11                  MS. ECKHOFF:  There were 14 claims.

12                  THE COURT:  Would you go through them

13  real quickly and summarize it?

14                  MS. ECKHOFF:  Sure.  Okay.  So, Claims 1

15  and 2 pertain to the testimony of Israel Diaz who

16  testified on behalf of the State after making a deal

17  with the State on the eve of Mr. Balderas' trial.  And

18  in that deal, in exchange for his testimony, his own

19  capital murder charge was reduced to aggravated assault.

20  At the trial he gave an account of the night in

21  question, the night of the shooting, that he actually

22  had seen Mr. Balderas immediately after the shooting

23  take place and that Mr. Balderas confessed to him his

24  involvement.  Now, in our post-conviction investigation,

25  of course we go back and talk to Mr. Diaz about his

EXH C

1  involvement in Mr. Balderas' trial and at that time he

2  recanted his testimony. He said that he actually did

3  not even see Mr. Balderas the night of the shooting and

4  that Mr. Balderas has never confessed to him.

5            THE COURT: Did he also say that he --

6  that the prosecutors at the time told him that his

7  statement that he didn't see that, the murder, that

8  wasn't acceptable and they told him he had to say that

9  he did see it? Is that right? Are you alleging that?

10           MS. ECKHOFF: That is what he reported to

11  our investigator.

12           THE COURT: Also Mr. Isbell has given a

13  statement, an affidavit, saying he was there every

14  moment that they were together with the prosecutors and

15  he never heard that.

16           MS. ECKHOFF: I understand.

17           THE COURT: I want you to realize

18  Mr. Isbell is the highest caliber attorney that we have

19  here. I hold him in incredibly high esteem and I

20  believe him. I'm telling you that.

21           MS. ECKHOFF: Okay.

22           THE COURT: So I'm just trying to say --

23  go ahead. You may continue summarizing.

24           MS. ECKHOFF: And I appreciate that and I

25  would just point out, though, for the first -- for Claim

EXH C

02122

1    1, that was brought under *Brady* and *Giglio*, that would

2    require the prosecutor knowing that it's false.  The

3    second claim is under *Ex Parte Chabot* and *Chavez* and

4    that doesn't require that the State actually know that

5    it was false testimony.  So to the extent that you've --

6    it is, you know, possible that in fact the State did not

7    do that as Mr. Diaz said but he still provided false

8    testimony, that still entitles Mr. Balderas to relief.

9              Claim 3 is a *Brady* claim where in post

10   conviction, the State turned over documents and within

11   those documents we found 23 pages of handwritten notes

12   of State meetings with Israel Diaz in the many years

13   leading up to this testimony that he gave where he gave

14   differing accounts of what happened the night of the

15   shooting and surrounding the shooting.  Those were notes

16   that we did not find in our review of trial counsel's

17   file and to the best of our ability, comparing it

18   against what we understood trial counsel to have in

19   their possession, raised a Brady claim that those had

20   not actually been turned over as impeachment evidence.

21   They were prior inconsistent statements that they could

22   have used to cross-examine Diaz.

23              THE COURT:  Would it help if after she

24   gives one, you could give your rebuttal to each one of

25   these?

1          MS. HUTCHINS: If you'd like, Your Honor.
2   I was going to ask you at the end how you wanted me to
3   do it, if you wanted me to just do it very succinctly or
4   do them one by one.
5          THE COURT: As she's doing it succinctly,
6   you can. We'll go back. I apologize. I've not had a
7   death case before and I know this is different, but I
8   want to have all the information. Only you were giving
9   your side of it. I would like to have a rebuttal. So,
10  let's back up to the first one. And so, do you
11  remember?
12         MS. HUTCHINS: Yes, Judge. So, our
13  response to that, Judge, is that the Court can resolve
14  Grounds 1 and 2 based on --
15         THE COURT: And what were they again?
16         MS. HUTCHINS: The false testimony,
17  whether it was knowingly presented by the State or
18  unknowingly presented by the State, that that can be
19  resolved by this Court based off of the prevailing case
20  law that's noted in the State's answer as well as the
21  exhibits that were attached to the State's answer,
22  namely, the credible affidavit of Mr. Isbell who stated
23  that he was at each of the meetings, that the State did
24  not pressure Mr. Diaz to change his statement and that
25  Mr. Diaz testified as Mr. Isbell expected him to, as

EXH C

1    well as the affidavit of Traci Bennett, the State's --
2    one of the State's prosecutors, that refutes Mr. Diaz's,
3    I guess -- if we're even going to attribute the
4    statement to Mr. Diaz's statements post-conviction.  The
5    reason I say if we're even going to attribute those to
6    Mr. Diaz are that the applicant now is relying on a
7    post-conviction affidavit from their habeas
8    investigator.  It's not actually an affidavit from
9    Mr. Diaz himself.
10               THE COURT:  I know.  It's a hearsay
11   document.
12               MS. HUTCHINS:  It's a hearsay document.
13   So there's plenty of case law along with those that say
14   hearsay documents are not dispositive and not worthy of
15   an evidentiary hearing especially in this situation
16   where Mr. Diaz himself refused to sign an affidavit.
17               THE COURT:  Okay.
18               MS. HUTCHINS:  Those would be our
19   responses succinctly, Judge, to the first two.
20               THE COURT:  That's the first two.
21               MS. HUTCHINS:  First two.
22               THE COURT:  Have you gone into the --
23               MS. ECKHOFF:  I was only starting on the
24   third but just to --
25               THE COURT:  Take your time.

EXH C

62125

1          MS. ECKHOFF:  -- address that, we admit

2    that the affidavit that we submitted is a hearsay

3    affidavit and I understand that and that's why our

4    position is that it's very important to get Mr. Diaz in

5    here where everybody can hear him account for -- address

6    his recantation and the circumstances surrounding that

7    when he's here in person and under oath.

8          With Claim 3 we were discussing was the

9    *Brady* claim regarding the prior inconsistent statements

10   of Mr. Diaz that to our best information had not been

11   provided to trial counsel because they were not present

12   in trial counsel's file as they turned it over to us.

13   And at this point, it apparently -- the State has

14   actually taken contradictory positions on these notes at

15   various times.  Of course the State in their answer

16   state that these notes were made available to defense

17   counsel because they were in the trial file and

18   available to review at any time.  However, in the fall

19   of 2015 when we were actually in court on a motion that

20   we had made for disclosure of this type of evidence and

21   specifically these types of notes of witnesses, the

22   attorney representing the State at that time represented

23   at two different hearings before the Court that those

24   notes constituted work product and were privileged as

25   work product and had not been provided to trial counsel

1   and would not be provided to trial counsel and that

2   their disclosure to us in post-conviction had been

3   inadvertent and therefore did not constitute a waiver of

4   access to other similarly situated notes.

5                    So while the State's position now is that

6   they were always available to trial counsel, we have had

7   differing representations in the course of these

8   proceedings.

9                    THE COURT:  And presumably you have a

10  trial transcript or post-trial transcript saying just

11  what you said?

12                   MS. ECKHOFF:  I do.

13                   THE COURT:  They were not provided and

14  that they were work product?

15                   MS. ECKHOFF:  That's correct.

16                   THE COURT:  Okay.

17                   MS. ECKHOFF:  I have copies of that if

18  you would like to see it.

19                   THE COURT:  You want to respond?

20                   MS. HUTCHINS:  First off, Judge, the --

21  in terms of it being *Brady* information that was withheld

22  and not disclosed, in the State's answer there are

23  affidavits, credible affidavits, from Spence Graham who

24  handled the case early on in its stages and said that

25  the trial file was open.  Defense counsel could have

EXH C

1   access to it and these notes were available and that the
2   content of the notes in Israel Diaz's statements were
3   included in the State's capital murder summary, which is
4   a document that is prepared by the District Attorney's
5   Office, a copy of which was given to defense counsel.

6   Also, we have the affidavit of Traci
7   Bennett, who was one of the trial prosecutors, who says
8   that these notes were in the file and available for
9   review. We also have the affidavits now of Jerome
10  Godinich and Alvin Nunnery, both of whom say that they
11  reviewed these notes in -- I think Jerome Godinich said
12  he personally reviewed these notes pretrial during his
13  review of the State's file at the DA's Office and he
14  took notes from any inconsistencies into account during
15  his trial prep. His log hours reflect the time that he
16  spent reviewing the State's files here at the DA's
17  Office. Mr. Nunnery says he was also aware of these
18  notes pretrial and used what he believed was beneficial
19  to the defense in his cross-examination.

20  As pointed out in the State's answer,
21  these notes also have inculpatory information that's
22  consistent with Mr. Diaz's trial testimony. The notes
23  are attached, I believe, as one of the exhibits to the
24  applicant's file. I have reviewed the notes. The
25  Court -- I'm not sure if the Court has or not but if the

EXH C

1    Court wants to look at the notes, the Court will see or
2    may have already seen that these notes are basically a
3    long stream of consciousness. There's no real division
4    of this event, this event, this event. And so, I think
5    it's important to point out that it's their handwritten
6    notes taken by whoever was listening to the conversation
7    and we can't hold them as this giant gold standard. We
8    can just say the defense was aware of them pretrial.

9            The trial record also does not reflect
10   that the defense attorneys were hindered or surprised in
11   any way during Israel Diaz's testimony, that they were
12   able do an effective and thorough examination.
13   Applicant's Exhibit No. 56 that they have attached is
14   actually an e-mail from Mr. Godinich to the defense team
15   that tells of some -- of a pretrial hearing that they
16   had with the State and that they actually learned some
17   of the State's case in that pretrial hearing and learned
18   some information that they did not know pretrial. And
19   at that point, even before they started trial, he's now
20   memorialized that still before trial they've learned
21   even more of the State's case, some of the State's
22   theory of the case. And so our argument would be that's
23   another example of how they did notice some of the
24   inconsistencies.

25           I think it's also important to point out

EXH C

02129

1    that there's a difference between the openness of a file

2    during the pendency of a case, as the case is pending in

3    the court, as trial is coming, and then the availability

4    of the file post-conviction. And the attorneys that

5    handle the cases and are responsible for the cases

6    during trial and pretrial are different than the

7    attorneys from the office that handle the case

8    post-conviction. And so, I haven't seen the transcript

9    that the defense is talking about, about our office

10   saying that these notes were not available, have never

11   been available during trial; but I can tell you this,

12   that the prosecutors who handle PIA discovery, public

13   information discovery post-conviction, are with our

14   general counsel department and they have rules and

15   guidelines that they use generally as to what they think

16   has been disclosed during the pendency of a case, what

17   they think should not be disclosed, or that is

18   privileged, which may be entirely different -- and in

19   this case appears to be entirely different -- than what

20   the State's attorneys actually allowed the defense

21   attorneys to see.

22              MS. ECKHOFF:  Just on that point --

23              THE COURT:  You may respond.

24              MS. ECKHOFF:  The attorney for the State

25   that made those representations in court had nothing to

EXH C

1    do with the PIA office or whoever would do that.  It was
2    the attorney who was previously handling this case prior
3    to Ms. Hutchins.  It was the person working in the
4    post-conviction unit.  And just also to touch base on --
5                    THE COURT:  What do you say about what
6    Ms. Farnaz has said about Mr. Godinich and Mr. Nunnery
7    say they had access to those notes that you say were not
8    provided?
9                    MS. ECKHOFF:  Well, Your Honor --
10                   THE COURT:  Both of them say they had
11   access to it pretrial.
12                   MS. ECKHOFF:  I appreciate that and you
13   also have to realize, Your Honor, that we didn't know
14   that at the point at which we made these claims.  We
15   only found that out yesterday upon receipt of the
16   affidavits.
17                   THE COURT:  So are you rescinding your
18   claim then?
19                   MS. ECKHOFF:  No.  I believe we should
20   have the opportunity to examine them further regarding
21   their access.
22                   THE COURT:  I'm just trying to tell you
23   that it's greatly weakened by -- what these affidavits
24   that have been provided by the two attorneys.
25                   You were onto which one now?

EXH C

.02131

1           MR. REISS:  Judge, I'm sorry.  Can we go

2   off the record for one moment?

3                *(Mr. Reiss not present.)*

4           THE COURT:  Please continue.

5           MS. ECKHOFF:  Are we back on the record?

6           THE COURT:  Yes, we're back on the

7   record.  You're addressing which point of error?

8           MS. ECKHOFF:  I just want to make one

9   more point just about what Ms. Hutchins said --

10          THE COURT:  Sure.

11          MS. ECKHOFF:  -- regarding what she

12  called the capital murder summary and actually what she

13  just indicated here, that some of this information had

14  been put together in a capital murder summary which was

15  provided to trial counsel, again, that is not a document

16. that we have been able to find in trial counsels' files

17  and post-conviction we haven't had that provided to us

18  either.  So I would at least make a request to be able

19  to see that document.

20          MS. HUTCHINS:  That's probably fair.

21          THE COURT:  If they have it, if they can

22  find it, that will be fine.  I'm sure you should be

23  allowed to see it.

24          MS. ECKHOFF:  Thank you.

25          THE COURT:  Tell us the next point of

EXH C

1    error.

2              MS. ECKHOFF:  The -- I'll keep all of

3    the -- if it's all right with Your Honor, go out of

4    order and --

5              THE COURT:  Go however you want to do it.

6              MS. ECKHOFF:  And discuss the ineffective

7    assistance of counsel claims together.  Then I'll jump

8    to Claim 5 which was the claim regarding the extraneous

9    influence on the jury.

10             THE COURT:  From the passenger on the bus

11   from the motel in the seedy part of town?

12             MS. ECKHOFF:  Correct.  And, Your Honor,

13   that wasn't my description of it; that was the juror's

14   description of it.  And I would just point out that

15   whatever the circumstances of the waving incident or as

16   the jurors interpreted it, the intimidation incident, we

17   provided affidavits explaining that that was not how it

18   actually happened.  Regardless, the primary issue there

19   is not so much that but what effect it had on the

20   jurors.  And affidavits from the jurors make clear that

21   this was a very stressing event for them and that they

22   felt threatened not for only their own safety but for

23   the safety of their family and then after having two

24   days, almost two days full of deliberation and an Allen

25   charge, come back the next day and within hours come to

EXH C

. 02133

1  a guilty verdict. So, again, the important aspect there
2  is the effect that it would have had on the jurors or
3  not even these specific jurors but hypothetical jurors
4  perceiving that the way that they did.
5           The other aspect of that is the fact that
6  as we understand it from our investigation, although the
7  record is not clear on this, is that the Court actually
8  was informed of this incident prior to the verdict
9  coming in.
10          THE COURT: The waving?
11          MS. ECKHOFF: The waving, yes. That she
12  had been made aware that this had happened and -- I
13  mean --
14          THE COURT: When did the judge have a
15  hearing asking those -- I believe he *[sic]* had a hearing
16  asking all 12 jurors if that would have an influence on
17  them?
18          MS. ECKHOFF: That is not entirely
19  correct. So what she did is there was the verdict, they
20  deliberated for a couple more hours, they came up with
21  their verdict, they announced the verdict. They took a
22  lunch break and upon the return of the lunch break,
23  Judge Guiney has an informal hearing where she sends the
24  bailiff, who was present and described these incidents
25  on the record, back to the jury room to pick out which

EXH C

1   jurors he thought may have been the most affected by it.
2   So, they -- she did speak to 2 of the 14 jurors.  We
3   provided affidavits from five additional jurors
4   recounting their reactions to those events that were
5   never put on the record in this case because they were
6   not questioned as well.  And again, yes, they were
7   asked, hey, did this affect your verdict but this was
8   after the verdict was already reached.  And, you know,
9   what is a juror going to say at that point?  No, Your
10  Honor, I shouldn't have voted this way?
11              THE COURT:  I disagree with you.  I think
12  that's what a juror would say if that's -- was it.  I
13  mean, you can think what you want --
14              MS. ECKHOFF:  Fair enough.
15              THE COURT:  -- but I'm thinking that if
16  you ask a juror did it affect you, I --
17              MS. ECKHOFF:  And the standard -- another
18  point, which I've already mentioned but I'll make at
19  this point again, is just that the standard isn't these
20  specific jurors and if their specific verdict, rather
21  did the event -- would the event have affected the
22  decision-making of a hypothetical juror in those
23  circumstances and with those same perceptions.
24              THE COURT:  I don't have any idea what
25  that means then.  How would that apply to this case?  A

1    hypothetical jury? We're only talking about did it
2    influence any juror to vote a special way. You may
3    continue.
4                    MS. ECKHOFF: I think that's the summary
5    of the claim.
6                    THE COURT: Okay.
7                    MS. HUTCHINS: Judge, during the pendency
8    of, I guess, the time period when the application was
9    filed, when the State filed their answer, the Appellate
10   Court rendered its opinion overruling the direct appeal.
11   And one of the issues that the applicant actually raised
12   on direct appeal was whether the applicant argued his
13   due process rights and his right to an impartial jury
14   was affected and tainted because of this alleged juror
15   misconduct. And the Court of Criminal Appeals decided
16   that these rights were not affected, the jury was not
17   affected.
18                   THE COURT: The Court of Criminal
19   Appeals?
20                   MS. HUTCHINS: Correct, Judge. Has
21   decided already on his direct appeal that his right to
22   an impartial jury and right to due process were not
23   affected. The juror misconduct as reflected by the
24   examination of the jurors and the bailiff in the
25   courtroom did not have an effect on the jurors and their

EXH C

02155

1    verdict.  And the Court of Criminal Appeals has stated

2    that the Court did not err by overruling the defense's

3    motion for mistrial because they did, in fact, move for

4    a mistrial even after the jurors were questioned and

5    even after the jurors said it did not affect their

6    verdict.  And so, to that end, because the Court of

7    Criminal Appeals has already made a determination on

8    this issue, we would argue that the applicant is now

9    procedurally barred from this issue.  The issue's

10   already been resolved.

11            However, even still, we have the

12   affidavit of Vickie Long, who is one of the managers for

13   the court system, who stated that the reasons why the

14   motel on the first night was picked, because there was

15   limitations with Rodeo Houston.  The Court was even

16   unaware that it happened until the next morning.  It was

17   out of their hands.

18            THE COURT:  You're from Austin, huh?

19            MS. ECKHOFF:  Not even originally.

20            THE COURT:  Forgive me, but when the

21   rodeo's in town, there are no good viable options for

22   places to stay because they are booked and they are

23   booked months in advance, especially anywhere on this

24   side of town.

25            MS. HUTCHINS:  So it's actually on the

EXH C

1   record that the Court was made aware the next morning
2   and the Court did not know and for the second night
3   found somewhere far away but was trying to accommodate
4   the situation.
5               THE COURT:   Where was it the first time?
6               MS. HUTCHINS:   I'd have to look it up,
7   Judge.
8               MS. ECKHOFF:   It was --
9               THE COURT:   What's the name of the place?
10              MS. ECKHOFF:   I believe it was called the
11  Motel 6 Westfield.
12              MS. HUTCHINS:   Westchase, I believe.
13              MS. ECKHOFF:   Westchase.
14              THE COURT:   Motel 6?
15              THE REPORTER:   They went all the way past
16  Clear Lake.   They looked everywhere.
17              MS. HUTCHINS:   They looked everywhere.   I
18  think they ended up having the hotel the second night --
19  and I may be mistaken -- but I think the second night it
20  was in Willowbrook.
21              THE COURT:   And you were the court
22  reporter at that time?
23              THE REPORTER:   Yes, sir.
24              MS. HUTCHINS:   Also, Judge, based off
25  of --

1              THE COURT:  This occurred in 2005, the
2    death occurred in 2005?
3              MS. HUTCHINS:  Yes, Judge.  The trial
4    happened in 2014.
5              THE COURT:  See, I was the judge until
6    2012 and now -- so.
7              MS. HUTCHINS:  Also, Judge, pursuant to
8    Texas Rule of Evidence 606(b) and prevailing case law on
9    the issue, juror affidavits are not admissible to
10   address the mental processes and deliberations of jurors
11   unless they are outside influences.  And the case law
12   shows that these types of actions which occurred in this
13   case do not qualify as outside influences.  And so, the
14   juror affidavits that they're relying upon, what our
15   argument would be, would be inadmissible.
16             Also, I'm a little bit confused by
17   opposing counsel's argument that we're talking about a
18   hypothetical jury because we need to address the jury in
19   this case for this applicant in this trial.
20             So, other than that, I don't know if you
21   didn't mention it or if you're abandoning it, there was
22   an issue with a Facebook post.
23             MS. ECKHOFF:  Yes, there was the issue
24   with the Facebook post.
25             MS. HUTCHINS:  I can or you want to?

EXH C

1             THE COURT:  You go first.

2             MS. ECKHOFF:  Real quick, to respond to

3    what she just said, I think actually what she mentioned

4    with the issues of 606(b) and how the jurors' particular

5    mental impressions and decision-making is outside of the

6    scope based on 606(b), I think that's where this idea of

7    it's more of a hypothetical --

8             THE COURT:  And summarize 606(b) for the

9    record.

10            MS. ECKHOFF:  Sure.  Under 606(b) the

11   statements going to or evidence going to the jurors'

12   decision-making process in coming to their verdict are

13   not admissible except for, as Ms. Hutchins noted, if

14   there's an issue of an extraneous influence, which is of

15   course the basis of our --

16            THE COURT:  And I don't think the

17   location of a hotel would be an extraneous that would

18   qualify here -- I just want to tell you what I'm

19   thinking now -- and someone waving at them on a bus.

20   All right.

21            MS. ECKHOFF:  Regarding the Facebook

22   messages, in our investigation we discovered the

23   Facebook posts of one of the jurors sitting on the jury.

24   And despite admonitions from the Court that they are not

25   to discuss the case, including on social media, repeated

EXH C

1    admonitions from the Court to that effect, he made
2    multiple posts on Facebook regarding his jury service in
3    the midst of his jury service.
4                THE COURT: Did he say anything about
5    deliberations or guilt or innocence or anything like
6    that?
7                MS. ECKHOFF: Forgive me for not
8    remembering the exact details --
9                THE COURT: That's okay.
10               MS. ECKHOFF: -- of his posts from -- but
11   he did discuss the difficulty that he was feeling and
12   being bored by expert testimony and more importantly,
13   our understanding is that one of the reasons the jurors
14   are admonished not to discuss this is because you want
15   to make sure that people don't feel free to offer their
16   opinions on how things should go while you're sitting on
17   there. And not only did he post, but his posts
18   encouraged one of his friends to respond by saying
19   something along the lines of "Give him the chair or fry
20   him," you know, basically making clear what his position
21   would be on what the verdict should be. And all I'm
22   saying, Your Honor, is that's exactly why we -- you --
23   inform jurors that they should not be doing these
24   things.
25               THE COURT: And that, I agree with you.

EXH C

1          MS. ECKHOFF:  So it's juror misconduct.

2          THE COURT:  I guess the question would be

3   how serious is this.  So, go ahead.

4          MS. HUTCHINS:  Judge, we'd argue that the

5   applicant fails to show any sort of prejudice or harm

6   from these Facebook posts.  There were 17 posts.  None

7   of them discuss the facts of the case or the content of

8   the deliberations or make any sort of comment about his

9   bias or partiality, which side he was leaning towards.

10  The comment about the experts, I believe, was something

11  along the lines of "just endless testimony from

12  experts."  There were experts on both sides of this

13  case.  So there's no way that we can tell one way or

14  another what he's even talking about.  There's no

15  indication that he was affected by any of the comments

16  that came back to him.  He didn't respond to any of the

17  comments that other people posted.  There's no evidence

18  that any of the other jurors were influenced by this or

19  knew about these Facebook posts.  It is the applicant's

20  burden in this case and even in their writ application

21  they say that it is speculative and it can't be

22  ascertained if this conduct led to votes being changed.

23          THE COURT:  Yes, ma'am.

24          MS. ECKHOFF:  Your Honor, the entire

25  reason that we're asking for further fact development is

EXH C

1    because, as Ms. Hutchins noted, we don't know what, if
2    any, effect these things had because we haven't had fact
3    development on what that might have been.
4              MS. HUTCHINS:  Which would break the
5    curtain, Judge, the juror curtain under 606.
6              THE COURT:  So, go to the next one.
7              MS. ECKHOFF:  Your Honor, at this point
8    I'll mention that we've raised five claims of
9    ineffective assistance of counsel at various points of
10   the trial:  Guilt, punishment phase, but also pretrial
11   and jury selection.  These are very -- I'm not even sure
12   I can succinctly go through all of these aspects --
13             THE COURT:  Try.
14             MS. ECKHOFF:  But so, our review of trial
15   counsels' file indicated very little guilt phase
16   investigation.  We have a case where the client, as
17   trial counsel make clear in their affidavits, maintained
18   his innocence in this case.  And there seems to be very
19   little evidence of investigation from the trial file,
20   which is what we have, you know, to rely on in assessing
21   their investigation.  In the course of our
22   investigation, we were able to locate and obtain
23   affidavits from witnesses who provide Mr. Balderas with
24   an alibi for the night of this event and those -- some
25   of those witnesses were available to trial counsel

EXH C

1    because trial counsel spoke to them as potential

2    character witnesses for the punishment phase and others

3    we got to through following the investigation further.

4              And what is important to remember is, you

5    know, the standard is whether or not the investigation

6    was reasonable or failure to continue or further their

7    investigation was reasonable in light of what they knew

8    at the time.  And it doesn't -- our position is that

9    their failure to further investigate his guilt claims

10   were unreasonable.

11             Another point within that claim is their

12   use of an eyewitness identification expert.  So you may

13   recall that one of the -- from what I -- your review of

14   the case that one of the witnesses against Mr. Balderas

15   was an eyewitness who was present at the time of the

16   shooting and she testified, you know, eight years after

17   the fact about her identification.  And what was

18   interesting and really problematic about her

19   identification of Mr. Balderas was that in the immediate

20   aftermath of the shooting, the same night when she's

21   giving her statement to the police, she says that she

22   had never seen the shooter before and she did not know

23   who he was.  She knew Mr. Balderas, had spent time with

24   him, had been around him in, you know, roughly the year

25   leading up to when the shooting occurred.  She knew who

EXH C

1  he was and she said that she didn't know who the shooter

2  was. She didn't make an identification of Mr. Balderas

3  until a week after the crime occurred and even then, the

4  CCA has agreed, in considering this on direct appeal,

5  that the identification procedures used by the police in

6  this case were suggestive. They disagreed as to whether

7  or not that entitled him to relief at direct appeal but

8  they agree that the procedures were suggestive, the

9  majority of the CCA did.

10               At trial they did, at the last minute,

11  decide to challenge this eyewitness identification.

12  They retained an expert, Dr. Roy Malpass, to come and

13  testify. They made an effort to get the eyewitness

14  struck and not to present it. And in so doing, they had

15  a hearing outside the presence of the jury where

16  Mr. Malpass explained his expertise and why there are

17  problems with this identification and the lineup

18  procedures. The Court declined to, you know, strike the

19  identification and allowed the witness to testify but

20  she also specifically made a ruling that the defense

21  could call Dr. Malpass to testify before the jury to

22  explain to them what the problems could be with this

23  identification and with these procedures, and without

24  opening the door to extraneous conduct. That happened

25  twice on the record.

1          Trial counsel, in their affidavits, site

2     as their reason for not calling Dr. Malpass to come

3     testify before the jury is that it was a decision in

4     order to avoid extraneous influences coming in -- or I'm

5     sorry -- extraneous conduct coming in.  They believed it

6     would open the door.  It's unclear to us, based on the

7     affidavits alone, why they believed that the Court,

8     after saying that they could put this evidence on

9     without opening the door, would in fact open the door.

10          And then, within that, it's an

11     interesting thing.  One of the counsel actually

12     representing Mr. Balderas at trial who took witnesses

13     and examined witnesses and made argument was Scott

14     Shearer who is actually direct appeal counsel in this

15     case as well.  And Scott Shearer was responsible for the

16     motion for new trial --

17          THE COURT:  That's in this county?

18          MS. HUTCHINS:  Yes, Judge.

19          THE COURT:  I don't know him.  He's the

20     only party I don't know yet.

21          MS. ECKHOFF:  So included in our guilt

22     phase, IAC claim is a motion -- or I'm sorry -- a claim

23     that --

24          THE COURT:  Take your time.  I'm not

25     hurrying you.  I'm giving you as much time as you need.

EXH C

1           MS. ECKHOFF:  I appreciate that.  That
2   trial counsel or Mr. Shearer was ineffective for failing
3   to conduct any sort of extra record investigation of
4   some of these juror issues that could have been used in
5   the motion for new trial.  We made an IAC claim to that
6   effect, not only in his role as appellate counsel for
7   that claim but the fact that he was involved in this
8   entire trial proceeding.  One of the points that we
9   would raise is that we have affidavits from Mr. Godinich
10  and Mr. Nunnery but the Court and the State have never,
11  as far as I know, asked Mr. Shearer to provide any
12  response to Mr. Balderas' allegation.
13           THE COURT:  And have you?  Have you asked
14  for --
15           MS. ECKHOFF:  Actually, we did.
16           THE COURT:  I mean, you have the same
17  right to ask those things.
18           MS. ECKHOFF:  Your Honor, when we were
19  here on -- in front of Judge Guiney -- I would have to
20  go back and remember what the date of that was.  I
21  apologize.  But we were here on the record arguing much
22  of these same things and us arguing that an evidentiary
23  hearing was necessary, it was when we were arguing the
24  motion for -- or for an ODI, an order designating
25  issues.  At that time when it became clear to us that

EXH C

1    Judge Guiney was going to enter into an order for trial
2    counsel to submit affidavits and the State had only
3    requested for Mr. Nunnery and Mr. Godinich to submit
4    affidavits, we made an oral motion at that time that
5    Mr. Shearer also be included in that.  She had indicated
6    on the record that she was going to do that and -- but
7    only signed the State's order verbatim that didn't
8    include him.
9             THE COURT:  You didn't do any follow-up
10   to ask her to do that?
11            MS. ECKHOFF:  Your Honor, I don't recall.
12   I would have to --
13            THE COURT:  I'm just saying, you have the
14   same subpoena power that the State does and if you don't
15   do that, who's going to do it?  So, okay.  I'm just
16   trying to tell you where I'm coming from, and what I'm
17   hearing is you have the same ability to call that person
18   and you didn't.  Okay.  Let's proceed.
19            MS. ECKHOFF:  I think that's -- I think
20   that that is the guilt phase IAC claims.  I don't know
21   if you want to address those and then move on to others?
22            THE COURT:  Yes, you want to address --
23   there was quite a bit that she had.
24            MS. HUTCHINS:  Yes, if I may, Judge, and
25   I may take them out of order.

EXH C

1          THE COURT:  Whatever order you take them

2   in, that will be fine.  If you want to, you can bring

3   chairs up there and sit down.  You've been standing for

4   45 minutes.  You're welcome to sit down if you like.

5          MS. BLACK:  Thank you, Your Honor.

6          THE COURT:  And you --

7          MS. HUTCHINS:  I may take you up on that,

8   Judge.  Thank you, Judge.

9          THE COURT:  Just pull one up and sit

10  down.

11         MS. HUTCHINS:  Judge, as you are more

12  than aware, there was extensive evidence against the

13  applicant in this case.  Not only was he charged with

14  this capital murder, he was charged with another capital

15  murder, as well as an assault; and in addition to that,

16  there were three other murders that were put on in

17  punishment and an aggravated --

18         THE COURT:  As extraneous?

19         MS. HUTCHINS:  As extraneouses.

20         THE COURT:  I don't know -- I assume

21  that's his family here.  But I don't know if they

22  understand that, that he's charged with one murder

23  and --

24         MS. HUTCHINS:  There are at least four

25  other murders, whether you characterize them as capital

EXH C

1      murder or murder, that were charged against him and two
2      assaults.
3                  THE COURT:   There were four other
4      murders, or four murders total; is that right?
5                  MS. HUTCHINS:  Yes, Judge.  No, five.
6                  THE COURT:   Five.  So maybe you didn't
7      know that, that they wanted to charge him with that but
8      they proceeded with one case.
9                  Is that correct?
10                 MS. HUTCHINS:  Correct, Judge.
11                 THE COURT:   I wasn't the judge.
12                 MS. HUTCHINS:  There was also a larger
13     investigation going on to the La Tercera Crips gang that
14     the applicant was tied to and so there was this big
15     investigation trying to sort of parse out all of these
16     different crimes.  All of this, I believe, ended up
17     being in total, I think, 88 different offenses that the
18     State gave the defense notice of.  So there was a whole
19     host of information that trial counsel over the years
20     were sifting through.
21                 THE COURT:   Let me just say that to the
22     audience because I think y'all would like to know what's
23     happening.  They're saying there were 88 -- 8-8 -- 88
24     different extraneous offenses that they could have used
25     in trial against --

EXH C

1          MS. HUTCHINS:  And bad acts, Judge, if I
2     may correct.

3          THE COURT:  And bad acts against
4     Mr. Balderas.  I just want you to know, 88.  So, okay.

5          MS. HUTCHINS:  And to assist trial
6     counsel, the record will reflect that they hired a host
7     of different investigators, fact investigators,
8     mitigation investigators, experts, specialists.  I
9     believe they had experts on mental health, gangs, the
10    prison system, child abuse, brain development, and
11    eyewitness identification.  So there was an extensive
12    defense team going on in this case.  The vouchers that
13    were turned in to the Court show that there were
14    multiple meetings with the defendant's family, including
15    the defendant's mother, his brother, his girlfriend.
16    Just from 2013 to 2014, there were 26 meetings with the
17    defendant's girlfriend.

18          THE COURT:  Is she here?

19          MS. HUTCHINS:  I believe she's the wife,
20    Your Honor.  Yes.

21          THE COURT:  Okay.

22          MS. HUTCHINS:  Also, the applicant has
23    attached a number of different e-mails as exhibits.
24    I've been able to count at least ten e-mails that they
25    have attached to their writ from different members of

EXH C

1    the defense team which reflect unfavorable and

2    uncooperative witnesses which reflect -- which dispute

3    the alibi defense and which show that the defendant's

4    mom actually attempted to thwart the defense

5    investigation.

6                    THE COURT:  Who did?

7                    MS. HUTCHINS:  The defendant's mother.

8                    THE COURT:  Is she here?

9                    MS. ECKHOFF:  Yes, Your Honor.

10                   MS. HUTCHINS:  That the defense had

11   trouble with the defendant's mother and these are all

12   documented in the e-mails between the different defense

13   mitigation experts and trial counsel that the applicant

14   has attached as exhibits to his writ.  For example, the

15   defendant's mother did not want the defense to contact

16   the family in Mexico and did not want the family from

17   Mexico coming to visit the defendant.  That the various

18   family members including the girlfriend, Yancy Escobar,

19   came to the office, was told that defense is continuing

20   to pursue leads but urging the family to give them any

21   information, names, phone numbers, contact information

22   that they had and stressing how important it was because

23   the defendant himself did not have those names and

24   information and he kept telling the defense, My brother

25   and my girlfriend have them.

EXH C

02152

1        And the struggle that the defense had to
2  get this information, the e-mails also showed that it
3  was not until early 2014 that the defendant's family
4  finally gave them information about an alibi and when
5  they pursued this potential alibi, they were told by the
6  defendant's brother, This woman wants nothing to do with
7  this case, she does not want to testify.  They were not
8  given contact information.
9        The other witnesses they've now
10  identified as alibi witnesses, the majority of them were
11  interviewed by the defense at the time and did not have
12  credible information, any information with facts,
13  anything that was usable or not based off of hearsay.
14  And all of that is supported by the affidavits of
15  Mr. Godinich and Mr. Nunnery as well as these e-mails
16  from back then.
17        Just to briefly summarize some of the
18  points that are made in Mr. Godinich and Mr. Nunnery's
19  affidavits --
20        THE COURT:  He likes you to say
21  "God-nich."
22        MS. HUTCHINS:  Godinich.
23        THE COURT:  Not T; "God."
24        MS. HUTCHINS:  Godinich.
25        THE COURT:  Kind of a joke.

EXH C

1          MS. HUTCHINS:  Which basically the
2    affidavit reinforces the information that the family --
3    the information contained in those contemporaneous
4    e-mails, the family and the defendant did not provide
5    the alibi information; that they interviewed various
6    witnesses the defense now identifies as having not been
7    interviewed or not been given a chance; that the
8    defendant's girlfriend actually did not want to testify
9    at trial because she wanted to watch the trial; that it
10   was strategy for them not to call the defendant's
11   brother because they did not feel he would be credible
12   due to his criminal history, his relationship with the
13   gang, his relationship with the defendant, the various
14   photographs that were found of him during the discovery
15   period --
16          THE COURT:  Is his brother here?
17          MS. HUTCHINS:  And ultimately, he was
18   ordered to leave the courtroom during trial because he
19   couldn't control himself.
20          Some of the information they say that
21   defense counsel would have learned through an
22   investigation, they say in the affidavits they already
23   knew that.  It was nothing that they found to be useful
24   or that they could use in a admissible way, it was
25   through hearsay or innuendo; and that the defendant

02154

1  himself did not want to testify, so some of the
2  information could not come out.

3         Mr. Nunnery also purports that they spoke
4  to whoever would speak to them, either themselves,
5  through their investigators, their defense team.  At
6  trial, trial counsel put on a witness, Walter Benitez;
7  and he provided evidence of -- as evidence of the
8  defendant's innocence of the guilt -- of the capital
9  that was charged.  Mr. Benitez provided testimony of an
10 alternate shooter; he provided testimony of Israel
11 Diaz's motives against the complainant, talking about
12 the meeting that was called, that Mr. Diaz wanted the
13 complainant's death, and as well as the motives for
14 Mr. Diaz testifying.  Mr. -- interestingly, Mr. Godinich
15 states in his affidavit as well that when Mr. Benitez --
16 since I was not there, I could not see it; I don't think
17 counsel was there either.  Mr. Benitez, when he
18 testified, flashed a gang sign for the LTC gang during
19 guilt/innocence and that the defendant in trial
20 responded and that they were told this by the jurors
21 when they spoke to the jurors after trial and that that
22 was probably what did it in for Mr. Benitez and his
23 credibility when he testified.

24         The record shows that much of the
25 proposed testimony, the applicant now says defense would

EXH C

1   have learned through what they characterize as a

2   reasonable investigation was known, was presented, was

3   just presented through other witnesses, for example,

4   Karen Bardales, Israel Diaz, and Wendy Bardales.  They

5   wanted to call a witness, Celeste Munoz, at

6   guilt/innocence to testify to some of this information.

7   They were told if they did, it would open the door to an

8   extraneous.

9           Speaking of extraneouses, I don't have

10  the record in front of me but I would like to

11  respectfully disagree with defense counsel's

12  characterization of the Court's ruling regarding

13  Mr. Malpass.  I believe the Court ruled that he could

14  testify; he could not give an ultimate opinion about

15  Wendy's accuracy but that he would be allowed to

16  testify.  There was no ruling as to whether or not it

17  would open the door to other extraneouses.  The trial

18  attorneys give an affidavit saying that when they spoke

19  amongst themselves as well as their appellate counsel,

20  they believed that it would open the door to an

21  extraneous offense, which was not in the defendant's

22  best interest.

23           THE COURT:  Trial strategy.

24           MS. HUTCHINS:  Trial strategy, yes,

25  Judge.

EXH C

02156

1              And as to the issue of Mr. Shearer,

2     defense is saying that -- I guess now saying that

3     Mr. Shearer should have investigated juror misconduct as

4     a ground for a motion for new trial.  However --

5              THE COURT:  When did he come onto the

6     case?

7              MS. HUTCHINS:  I'm not sure when he came

8     on.  He was there during trial sort of as an appellate

9     resource.

10             THE COURT:  I see.

11             MS. HUTCHINS:  However, they have not

12    filed the claim as an ineffective assistance of

13    appellate counsel; they've done it as an ineffective

14    assistance of counsel.  Even still, their argument that

15    he should have investigated juror misconduct as a motion

16    for new trial, now that we have the direct appeal and

17    the CCA's ruling, we know that the CCA found there was

18    no juror misconduct that denied him a right.  So that

19    issue, at the end of the day, they don't establish harm

20    on it.  So, our argument is that issue goes away right

21    there.

22             And I think -- sorry.  I know it's long.

23    There's just a lot to cover.

24             THE COURT:  I'm not limiting you.

25             MS. HUTCHINS:  That's it, Judge.

EXH C

1      THE COURT: You want to continue?

2      MS. ECKHOFF: I will just point to the

3  issue of whether -- what the Court's ruling was on

4  Dr. Malpass. If you look at Volume 25 of the reporter's

5  record at 179 and again in the Volume 29 of the record,

6  at 14, she discusses both of those -- those -- in both

7  of those cases. One is her actual ruling on

8  Dr. Malpass, that's the 25th Volume. The 29th Volume,

9  if I remember correctly, was actually when she was doing

10  the hearing on Celeste Munoz, the witness that

11  Ms. Hutchins mentioned, and where she clarified at that

12  point that Dr. Malpass could -- where Celeste Munoz

13  would open the door, that Dr. Malpass would not.

14      MS. HUTCHINS: Judge, I just want to

15  clarify one thing. The direct appeal -- on direct

16  appeal, the majority opinion from the Court actually

17  found that the pretrial lineup and the in-court

18  identification were not impermissibly suggestive. It

19  was dissenting opinions.

20      THE COURT: Was that from the CCA?

21      MS. HUTCHINS: Yes, Judge. They found

22  that the witness identifications were not impermissibly

23  suggestive. Defense counsel was talking about the

24  opinion from the dissent that did think it was

25  impermissibly suggestive. Also --

EXH C

02156

1          THE COURT:  Let me -- I remember Joe

2    Kegans saying she didn't care one bit about the Court of

3    Appeals.  She only cared about the Court of Criminal

4    Appeals.  She was a judge down here.  And it's the same

5    thing.  I don't care about the dissenting opinion.  I

6    care only about the majority opinion.  So I think it's

7    disingenuous to cite the minority opinion.  Let's -- you

8    know, I'm just trying to tell you what I'm thinking.

9          MS. ECKHOFF:  If I may clarify, please?

10   I said a majority said that the lineup was suggestive.

11   I didn't say that the majority said it was impermissibly

12   suggestive.  I apologize if I didn't make that clear.

13          THE COURT:  I appreciate it.

14          Any further rebuttal?

15          MS. HUTCHINS:  I did, but I can't think

16   of it, so it's okay.

17          MS. ECKHOFF:  Regarding all of the things

18   that Ms. Hutchins just reviewed, I would just like to

19   reiterate the point that these are factual disputes that

20   require fact finding.  That is exactly why we're

21   requesting an evidentiary hearing where we have subpoena

22   powers to further explore these representations that are

23   being made by trial counsel as to what happened, or what

24   they say happened, and that all -- many of the things

25   that she cited and attributed to obviously Mr. Godinich

1 and Mr. Nunnery's responses to these claims are

2 information that we got last night and that's why we're

3 asking for additional time to more thoroughly review

4 them and address and respond to them.

5 She did mention a couple of things that I

6 wanted to point out is that problems that we do and have

7 spotted with those affidavits that kind of come up

8 nicely here is that one issue is that trial counsel in

9 their affidavits purport to speak on behalf of other

10 members of the trial team. And that wouldn't be proper.

11 For example, on, I believe, it was page 2 of at least

12 the copy that I have reviewed, Mr. Godinich says that

13 neither he nor 12 other members of the trial team that

14 he lists by name had whatever information he was

15 discussing at that point. And so, he's purporting to

16 answer not only on his behalf but on behalf of all those

17 other people.

18 And then, additionally, Ms. Hutchins

19 mentioned, for example, the -- their claim that the

20 jurors said that they saw Mr. Benitez throw a gang sign

21 in the course of his testimony, that's hearsay in this

22 affidavit.

23 THE COURT: You have plenty of hearsay

24 affidavits as well.

25 MS. ECKHOFF: Your Honor --

EXH C

02160

1       THE COURT:  Don't you?

2       MS. ECKHOFF:  We have one hearsay

3  affidavit, which we acknowledge is hearsay.

4       THE COURT:  Okay.

5       MS. ECKHOFF:  But again, we're saying

6  that that just makes the case that further fact finding

7  is necessary.  We're not asking Your Honor to make a

8  decision based solely on our affidavit.  We want to get

9  that witness in here to talk and speak for himself.  In

10  this case, you know, Mr. Godinich is saying that

11  Mr. Shearer told him that something the jurors told

12  Mr. Shearer.  I mean, at that point you're talking

13  hearsay upon hearsay.  It wouldn't presumably be

14  admissible at trial and it shouldn't be admissible as

15  evidence in an affidavit.

16       THE COURT:  I think it's just anecdotal.

17  So, all right.  Do you want to go into the

18  post-conviction errors that you're alleging?

19       MS. ECKHOFF:  The punishment phase?

20       THE COURT:  Yes.

21       MS. ECKHOFF:  Yes.  Sure.

22       THE COURT:  I think we should put them

23  all out here on the record and let Ms. Farnaz respond.

24       MS. ECKHOFF:  I will try to at least

25  discuss the ones that we would like further factual

EXH C

1    development.

2                THE COURT:  Well, I think you should hit

3    your strongest ones right now.  This might be your only

4    hearing that you will have.  So I think you should hit

5    the very strongest points you have right now.

6                MS. ECKHOFF:  Okay.  Thank you, Your

7    Honor.

8                THE COURT:  And I'll give you as much

9    time as you need.  We can be here until 5:00; it's only

10   2:00 o'clock.  You'll miss rush-hour traffic on 360

11   going back.

12               MS. ECKHOFF:  I would appreciate that.

13               Your Honor, the claim in the punishment

14   phase is that, again, the trial counsel did not conduct

15   a reasonable investigation to develop facts, additional

16   facts, that they could have put on the record regarding

17   Mr. Balderas' social history, which is an important

18   piece of miti -- of punishment phase case and the --

19   including additional testimony from witnesses that they

20   did present but also testimony from those that he did

21   not, regarding aspects of, you know, him growing up and

22   the effects that that would have had on him.

23               One important claim that we made, too --

24   and it's fashioned a little funny because of the nature

25   of an ineffective assistance of counsel claim -- a

EXH C

1   failure of the trial counsel to object when -- so in the
2   course of the punishment phase proceedings, they
3   presented evidence from experts regarding Mr. Balderas'
4   sexual abuse as a young child to -- and the experts were
5   there to explain the effects that growing up subjected
6   to such sexual abuse could have, the effects that that
7   could have on a young boy. And in the course of the
8   cross-examination of those experts, the State made some
9   statements -- and, you know, I don't remember exactly
10  how they were worded at this point; they're described in
11  the application -- that insinuated that the jury should
12  doubt the experts' opinions and reports because the jury
13  wasn't hearing about these abuse allegations from
14  Mr. Balderas himself but rather from experts. And we
15  make a claim that that is a violation of Mr. Balderas'
16  Fifth Amendment right not to testify and kind of
17  highlighting for the jury that they're not hearing this
18  from the defendant himself but rather from experts on
19  his behalf. And the State then reiterated during their
20  closing argument at punishment, came back to that issue
21  and highlighted it again for the jury.
22             THE COURT: And if he were to testify,
23  those 88 extraneouses might have come in.
24             MS. ECKHOFF: Your Honor, this was at the
25  punishment phase where a number of those extraneouses

EXH C

.02163

1   did come in because --

2                THE COURT:  This is trial strategy on the

3   attorneys' part.  So you may continue.

4                MS. ECKHOFF:  In terms of the punishment

5   phase, I believe that that is it.  Yeah.

6                THE COURT:  You would like her to respond

7   now?

8                MS. ECKHOFF:  Yes, Judge.

9                MS. HUTCHINS:  Judge, the record shows

10  that the defense in this case, they put on just as much

11  punishment evidence as the State did.  They put on 18

12  witnesses, put on extensive mitigation evidence, and

13  actually presented much of the exact same evidence that

14  the defendant now claims was lacking.  They just put it

15  on through different witnesses that he now says he would

16  have preferred other witnesses.  They were able to put

17  on testimony of -- and this is according to the record

18  as well as to the trial counsels' affidavits.  They

19  presented all the available mitigation.  Other than what

20  they presented at trial, they were unaware of any other

21  evidence that was going to rebut the extraneouses.

22               To rebut the extraneouses, they

23  cross-examined those witnesses but they used seven

24  mitigation experts, four experts and a reverend.  The

25  mitigation experts traveled to New York and Mexico to do

EXH C

1    their investigation. They made strategic decisions to
2    present the evidence and the experts as they did,
3    feeling it was done in the best light possible. They
4    investigated and presented evidence of the defendant's
5    childhood, his family history of mental illness. I
6    believe that in the State's answer there are at least
7    10, 15 pages which go through all the evidence that was
8    presented by the defense on these points during
9    punishment phase.

10                  They investigated and presented witnesses
11   that testified to his positive character, his role as a
12   protector. They attempted to investigate his attempted
13   disassociation from the gang; but other than the
14   applicant, there was no evidence of that. They
15   presented his juvenile caseworker, family, friends, a
16   Harris County Jail guard, they presented evidence of his
17   childhood abuse, his unstable mother.

18                  As to the issue of the alleged comment on
19   the defendant's failure to testify, as explained in the
20   State's answer, the State cross-examined these expert
21   witnesses on the points that these expert witnesses
22   testified that they spoke to the applicant, they
23   interviewed him multiple times; yet they didn't have any
24   notes of any of their interviews with the applicants.
25   They didn't make any recordings, any videos, and so

EXH C

02165

1 | these experts came to court basically testifying off the
2 | top of their heads about each and every meeting they had
3 | and their beliefs and their reactions to the physical
4 | reactions that the defendant was having.

5 | And so, the State was cross-examining
6 | these experts on their ability to come in here and give
7 | this testimony without having any sort of documentation
8 | to that effect and were asking the experts, well, don't
9 | you think it would have been useful or helpful to make
10 | these notes or to have these videos or to have these
11 | recordings and you certainly know that if you had made
12 | them, they would be discoverable to us and the defense
13 | experts were agreeing.

14 | And so, when looked at the entirety of
15 | the context of the cross-examination as well as the
16 | argument, the State's argument is not that it's the
17 | applicant's failure to testify. It's the fact that the
18 | information that these experts were testifying to was
19 | coming from a single source, the applicant, who had all
20 | of the motive and bias to say these things, and that the
21 | jury should rely on the credibility of these witnesses
22 | without the witnesses having anything to justify or back
23 | up what they were purporting to the jury. And so, in
24 | the defense attorneys' affidavits, they actually address
25 | these issues and say we thought these were valid points

1    for the prosecutor to make, thought they were fair.  We

2    didn't think they were worthy of objection and to that

3    end, these are record claims and they weren't objected

4    to at trial and so, now they're procedurally barred as

5    well.  But there were strategic reasons for not

6    objecting to them.

7             And I don't know if there were issues --

8    there were issues raised in the applicant's writ that

9    were not raised right now.  I don't know if you were

10    just trying to summarize them succinctly?  If you want

11    me to address them, there were a couple of other issues

12    they raised in the punishment phase --

13             THE COURT:  You may.

14             MS. HUTCHINS:  -- that I have responses

15    to and I could just save my responses and you could make

16    the argument after, if you'd like.

17             MS. ECKHOFF:  That sounds fine.

18             MS. HUTCHINS:  There was some trouble --

19    there was some witnesses that testified via Skype in

20    this case from Mexico, defense witnesses, from the

21    defendant.

22             THE COURT:  During trial?

23             MS. HUTCHINS:  During trial.

24             THE COURT:  The punishment phase?

25             MS. HUTCHINS:  In the punishment phase

EXH C

1   the defendant's family members testified from Mexico.

2   In some e-mails that are attached to Mr. Godinich's

3   affidavit and I believe to the defense exhibits as well,

4   it talks about the fact that the defense wanted to

5   actually bring these people over and the defense was

6   going to foot the bill to bring them over but the

7   witnesses couldn't decide amongst themselves who to

8   come. Meanwhile, the defendant's mother was also

9   telling them not to come. And so, ultimately they

10  managed to work out a way for the witnesses to testify

11  via Skype. The defense is able to do cross -- direct

12  examination. The State starts cross-examination and

13  there's technical issues. They switch witnesses, they

14  take some live witnesses in court, they go back to the

15  witnesses in Mexico. There's still technical issues.

16  Ultimately they can't use Skype; they use speakerphone.

17  And so, the defense and the State are questioning here

18  in English, there's a translator who is translating in

19  Mexico as well as the defense mitigation expert.

20              THE COURT: And you have a translator on

21  this end as well.

22              MS. HUTCHINS: Yes. And so, there's a

23  defense mitigation expert actually in Mexico sort of

24  relaying everything also back to the trial team. And

25  from the record, it appears as though the defense and

EXH C

02168

1      the State were all able to ultimately battle through the

2      technical issues and ask all the questions they wanted,

3      get the answers they wanted.  And these witnesses, two

4      of them are able to testify; one of them was not there

5      when he was called to testify.

6                      Mr. Godinich's affidavit as well as an

7      attached exhibit actually says that the defense cut

8      their questioning short of these witnesses in Mexico

9      because they found out that the defendant's girlfriend

10     was calling the witnesses in Mexico, telling them to

11     change their answers.  And so, the testimony that they

12     were getting from the witnesses in Mexico was not what

13     trial counsel expected to be getting, so he immediately

14     tried to get them off the stand before he was presenting

15     perjured testimony, or what he believed was going to be

16     perjured testimony.

17                      THE COURT:  Don't react in the audience,

18     ma'am.  She's talking about you.

19                      MS. HUTCHINS:  There was also some issues

20     about Mr. Nunnery's behavior and some comments that he

21     made and whether or not they affected the jury in their

22     deliberations.  Some of these alleged comments are -- I

23     guess the comments, these side comments are not on the

24     record.  Mr. Nunnery addresses them in his affidavit to

25     the fact that he has no personal recollection, sometimes

EXH C

1   words are exchanged.

2           THE COURT:  I read that.

3           MS. HUTCHINS:  I'm not sure if he knows

4   if jurors heard him or not.

5           THE COURT:  When someone alleged that he

6   called one of the prosecutors the "b" word?

7           MS. HUTCHINS:  Correct.  And so, the

8   applicant fails to establish that those comments

9   affected the jury deliberation or that they heard it.  I

10  know they provided some affidavits from the jurors.

11  Interestingly, I think the juror affidavit --

12          THE COURT:  I don't think you have to go

13  there.

14          MS. HUTCHINS:  Okay.

15          THE COURT:  I'm not considering that.  I

16  just want you to realize that happens in every trial.

17  And unless someone came in here and said, I heard him

18  call her the "b" word and it changed my idea of what I

19  wanted to give him for punishment, short of that, let's

20  move on to something germane.

21          You may continue, or do you have more?

22          MS. HUTCHINS:  Just briefly, Judge.  They

23  criticize his closing argument about that he sort of

24  insulted the jurors and they didn't like the tactic that

25  he took.  He addresses that, that he made points that he

EXH C

1    thought were valid and he wanted to remind jurors of the
2    oath that they took, to hold to their verdict.  And he
3    felt as though it was important and necessary for him to
4    urge that to the jurors.  And when looked at in the
5    entirety of his argument, the entirety of his argument
6    supports that he did a very thorough closing argument
7    and summation of the evidence.

8                        THE COURT:  Yes, ma'am.

9                        MS. ECKHOFF:  Your Honor, I would just
10   point out again that these are factual disputes that we
11   would like to delve into at a hearing.

12                       THE COURT:  I'm not going to let you go
13   into that one, I'm telling you there.  That's just
14   malarkey, if you ask me.  Let's go to something germane.

15                       MS. ECKHOFF:  Your Honor, I'm not -- I
16   appreciate that you're giving us the opportunity to go
17   into -- the remaining ineffective assistance counsel
18   claims, I will admit at this moment, are not nearly as
19   fresh in my memory as these.

20                       THE COURT:  That's okay.  You have as
21   much time here as you need.

22                       MS. ECKHOFF:  Okay.

23                       THE COURT:  And take your time.  I'm not
24   hurrying you.

25                       MS. ECKHOFF:  Thank you.  We raise in

EXH C

1 claim -- a claim of ineffective assistance of counsel
2 pretrial for failing to assert speedy trial at a time
3 where it would actually be considered. In this case the
4 defendant himself made a pro se motion for a speedy
5 trial.

6 THE COURT: Do we have speedy trial in
7 Texas anymore? I don't think we do. So do you have a
8 statute that you can cite that shows that we had a
9 speedy trial provision here?

10 MS. ECKHOFF: If you would allow us to --

11 THE COURT: Well, I mean, you're bringing
12 up speedy trial as in your appointed error in
13 punishment, do we have it? I mean, I don't believe --
14 as a sitting district judge, I don't believe we have
15 speedy trial.

16 MS. HUTCHINS: Judge, after -- I believe
17 what the standard is that after about a year, the
18 defense can raise speedy trial and then there are four
19 factors that the Court uses to weigh whether or not
20 there's been a violation. And I believe the remedy is
21 if there has been a violation, then you get your trial.
22 But if not, then I believe the case is permitted to
23 proceed as sort of -- as it's going forward.

24 THE COURT: I just mean -- you may
25 continue.

EXH C

1          MS. ECKHOFF:  And, Your Honor, there was
2     a claim that was raised on our end as a constitutional
3     claim, it's the Sixth Amendment right to a speedy trial
4     that applies to the states via the Fourteenth Amendment.
5     And in considering the pro se motion for speedy trial
6     that was raised, the Trial Court did consider the
7     factors as laid out in *Barker v. Wingo*; it's a Supreme
8     Court case regarding a speedy trial.  The reason that
9     the speedy trial motion was denied was because voir dire
10    had already begun and that was the basis of the denial.
11         Our allegation is that that's a claim
12    that should have been raised before even getting to jury
13    selection.
14         MS. HUTCHINS:  Briefly, Judge.
15         THE COURT:  Yes.
16         MS. HUTCHINS:  Judge, during the speedy
17    trial motion, the -- Spence Graham testified in the
18    hearing as to the voluminous nature of the case, all the
19    extraneouses, the fact that the defense was putting
20    together mitigation packets to try to persuade the
21    applicant to take a life offer, that the applicant keeps
22    picking up offenses in jail.  It took six years for the
23    State to make a decision whether or not to pursue it as
24    a death case.  So these were all the factors that were
25    going on during the pendency of the case, as well as

EXH C

1   just the changeover in not only the judges but also the

2   prosecutors handling the case and whatnot.

3            The issue was raised on direct appeal and

4   on direct appeal, the applicant argued the Trial Court

5   erred in overruling the motion for speedy trial.  The

6   Court of Criminal Appeals said, no, there was no error,

7   the Trial Court was within its right and was correct in

8   denying it.

9            When we look at the affidavits of

10  Mr. Godinich and Mr. Nunnery, we get some insight into

11  the defense and that they had strategic reasons for the

12  delay.  The applicant actually never expressed a desire

13  for a speedy trial until the eve of trial when he filed

14  his pro se one.  The affidavits address the abundance of

15  the evidence, the time needed to investigate his new law

16  violation, the applicant -- the defendant never objected

17  to a reset or a continuance.  And I believe it's

18  Mr. Nunnery who says that they filed the speedy trial

19  motion to preserve his appellate rights on the issue but

20  there were no unavailable witnesses or missing witnesses

21  that they would have called or that would have hindered

22  their defense because of this delay.  But they filed the

23  motion anyway, to preserve his rights.

24            THE COURT:  Okay.

25            MS. ECKHOFF:  Just a point on that, Your

EXH C

1    Honor.  I'm going back to something she said before.  I
2    would just want to point out in raising these claims, we
3    filed this initial application before any decision on
4    direct appeal is made by the CCA.  It's just how it
5    works.  Like, we have to raise all of these claims and
6    we will continue to raise them, even though they're also
7    raised on direct appeal because it's our responsibility
8    to preserve --
9                    THE COURT:  And you may drop some of
10   them.
11                   MS. ECKHOFF:  Your Honor, we don't
12   drop -- I respectfully disagree.  We need to preserve
13   the record for further review up the chain, too --
14                   THE COURT:  Okay.
15                   MS. ECKHOFF:  -- and in federal court, if
16   we get there.
17                   THE COURT:  Okay.  I gotcha.
18                   MS. ECKHOFF:  So, no, we are not going to
19   drop any of these claims.  We are preserving them for
20   the future.
21                   THE COURT:  Okay.
22                   MS. ECKHOFF:  And we also, again, assert
23   that further factual development is needed on these
24   factual disputes.
25                   If I could have a moment?

EXH C

1            THE COURT:  You may.

2            MS. ECKHOFF:  Thank you.  Your Honor,

3   would it be all right if we speak with our client?

4            THE COURT:  Sure.  Let's take a break for

5   a moment.

6            *(Recess taken.)*

7            THE COURT:  Are we ready to start?

8            MS. ECKHOFF:  Yes, Your Honor.  I believe

9   the final IAC claim that we had raised pertained to the

10  jury selection phase of trial where we raised a claim

11  that trial counsel did not adequately account for their

12  mitigation case in their jury selection and therefore,

13  because they did not explore these issues that they knew

14  would be developed and presented in the punishment

15  phase, didn't explore how potential jurors would

16  actually react and consider those claims, specifically

17  in this case, the sexual abuse of small children.

18  And --

19            THE COURT:  Are you talking about the

20  episode when he's 8 years old and Mr. Hernandez touches

21  him?

22            MS. ECKHOFF:  I believe it was more than

23  just touching, Your Honor; but, yes, and it was over the

24  course of, I believe, five years that he was pretty

25  repeatedly and regularly sexually assaulted by his

EXH C

02176

1    stepfather.

2              THE COURT:  Is that Mr. Hernandez?

3              MS. ECKHOFF:  I believe.

4              THE COURT:  Eleazar Hernandez?

5              MS. ECKHOFF:  Yes, that is correct, Your

6    Honor.  And so, that's the claim that we've made in jury

7    selection.  You know, the ABA guidelines that dictate

8    what is reasonable performance in capital cases make

9    clear that you need to approach the entire trial

10   including jury selection with your punishment phase in

11   mind and in selecting your jury.  And we just made a

12   claim that they didn't do that as they're required to

13   under the ABA guidelines.

14             MS. HUTCHINS:  Judge, under prevailing

15   case law, trial counsel was not ineffective for not

16   attempting during voir dire to improperly bind the

17   prospective jurors as to whether they would specifically

18   consider sexual abuse as mitigating evidence.  Case law

19   says that trying to lock the jurors in on a specific

20   "this set of circumstances is mitigating" is improper

21   jury selection.

22             THE COURT:  Yes, I would agree.

23             MS. HUTCHINS:  So Mr. Nunnery's affidavit

24   addresses that and addresses that because of their

25   understanding of the case law, they voir dired on

EXH C

1    mitigation globally but not specific types of mitigation
2    and appropriately considered jurors who could give
3    weight to mitigation in general.

4                    Mr. Godinich's affidavit also supports
5    that their method of jury selection, the Colorado
6    Method -- I did a little bit of research into it because
7    I wasn't familiar off the top of my head with it --
8    focuses on the issue of whether jurors would give life
9    or death and if they can appropriately consider
10   mitigation.  And so, when you look at their affidavits
11   in conjunction with their approach to voir dire, you see
12   that the defense addressed the issues that the State
13   raises, they addressed issues on the questionnaires,
14   they address both special issues and mitigation, which
15   is absolutely reasonable strategy on their end.

16                   And in addition -- so all of that goes to
17   show there was not a lack of deficient conduct but also
18   that there was no harm because the trial court gave the
19   jury specific instructions throughout trial and also
20   with the punishment charge to consider the totality of
21   the evidence in their deliberations and on the special
22   issues and that they need not agree on what evidence
23   constitutes mitigation.  And so, when you look at it
24   even under the realm of *Strickland*, they don't meet
25   either prong of *Strickland*.

1          MS. ECKHOFF:  Just as a point of
2   clarification, I agree that it is improper in jury
3   selection to pin a potential juror down on what they
4   would or would not consider mitigation.  However, trial
5   counsel is entitled to explore potential mitigation with
6   them to gauge their reaction and respond to their views
7   of those issues without asking them would you find this
8   mitigating or not.

9          THE COURT:  I'm giving you the right to
10  first present, then she rebuts, then I'm letting you
11  rebut even again.  So I'm giving you more than I'm
12  giving the State at this time.

13         MS. ECKHOFF:  I appreciate that.  Thank
14  you.  And I'm happy, if she would also like to respond,
15  I'm more than --

16         THE COURT:  No, I'm going to limit them.
17  But I'm trying to give you as much time as you need.

18         MS. ECKHOFF:  Thank you.  A claim that I
19  think I inadvertently skipped over at one point is Claim
20  7 and that was a claim that the State relied on false
21  testimony at the punishment phase when a State's
22  witness, who was a corrections officer here, Harris
23  County, testified that he had essentially been
24  exonerated from some of the charges that had been
25  brought against him, like internal personnel charges.

EXH C

1    He had been terminated as a corrections officer as a
2    result of an incident that occurred and in his
3    testimony, he indicated that he had been cleared of
4    those charges.  That's not exactly -- a review of his
5    personnel file shows that that's not actually the case.
6    The charges stood.  They modified his punishment.  So
7    there's a claim that that testimony that he was cleared
8    of the charges was false.  And --
9                    THE COURT:  Okay.
10                   MS. HUTCHINS:  Judge, the standard there
11   is whether the testimony in its entirety left a false
12   impression with the jury.  This particular witness, I
13   believe, testified about a weapon that he found in the
14   applicant's cell, if I'm not mistaken.
15                   MS. ECKHOFF:  I don't believe it was a
16   weapon.  I can double-check.  I believe it may have been
17   some other contraband.
18                   MS. HUTCHINS:  It was contraband.  I'm
19   sorry.  In my head contraband equals weapon.  There was
20   contraband in his cell and he testified about the
21   contraband.  However, on cross-examination the defense
22   elicited that he was terminated from the sheriff's
23   office for a violation of policies that involved the
24   death of an inmate.  He testified it was about a round
25   sheet, which is a sheet that they use to document things

EXH C

1  in the sheriff's office; for a failure to render aid and
2  deception.  And on redirect he testified that he was
3  cleared of wrongdoing and he is eligible for rehire
4  after 75 days.

5  When looking at the entirety of his
6  testimony and then you compare it to the applicant's own
7  exhibits, which they've attached as 70, 71, and 72, his
8  termination letter, his separation from the sheriff's
9  office, and then his reinstatement with the sheriff's
10 office, there's no false impression, our argument, that
11 was left with the jury.

12 Also, when -- you have to assess the
13 materiality of this witness' testimony when examining
14 false testimony.  It's not only was the testimony false,
15 which we argue that it wasn't, but was it material.  And
16 when you look at this one witness' testimony about
17 contraband found in his cell, in the greater context of
18 all of the punishment evidence against him, the
19 additional murders, the additional aggravated assaults,
20 in and out of custody, his juvenile history, we argue
21 that it was not material.  And so, based off of all of
22 that and the prevailing law, we believe that their issue
23 is resolvable.

24 THE COURT:  You may continue.

25 MS. ECKHOFF:  Your Honor, I believe that

EXH C

. Ø2181

1    the remaining claims are legal in nature and they're not

2    claims that we would be seeking additional fact finding

3    on.  There are claims that are made to preserve the

4    record going forward and I would just refer to our

5    arguments in the --

6            THE COURT:  Would you just state them and

7    put them in the record?

8            MS. ECKHOFF:  The names of the claims?

9            THE COURT:  Yes.

10           MS. ECKHOFF:  Okay.  It's Claim 10, is

11    the agreement between the State and the defense to

12    exclude African-Americans from Mr. Balderas' jury

13    violated the equal protection clause of the Fourteenth

14    Amendment.

15           Claim 11:  Mr. Balderas' death sentence

16    violates the equal protection due process in cruel and

17    unusual punishment clauses of the United States

18    constitution.

19           Mr. Balderas -- Claim 12:  Mr. Balderas'

20    constitutional rights were violated when the Trial Court

21    was prohibited from instructing the jury that a vote by

22    one juror could result in a life sentence.

23           Claim 13 --

24           THE COURT:  And who made that statement,

25    you're saying?

EXH C

02182

1          MS. ECKHOFF:  On -- that the Trial Court
2     was prohibited -- are you talking about instructing the
3     jury that a vote --
4          THE COURT:  No -- yes.  Go ahead with
5     that one.
6          MS. ECKHOFF:  With that one --
7          THE COURT:  Who was reported to have said
8     that?
9          MS. HUTCHINS:  It's just a standard jury
10    instruction.
11         THE COURT:  Oh, I thought that you were
12    saying that somebody made that statement in open court.
13         MS. HUTCHINS:  Oh.  They did.  Actually
14    Mr. Nunnery, even though he was prohibited from doing
15    so, actually told the jury in closing argument that one
16    vote equals a life sentence.
17         THE COURT:  That's what I wanted to hear.
18         MS. ECKHOFF:  Okay.
19         THE COURT:  Did you know that?
20         MS. ECKHOFF:  That that occurred?
21         THE COURT:  Yes.
22         MS. ECKHOFF:  Yes, but the jury -- you
23    know, presumably jurors follow the instructions that
24    they're given by the Court.  And it's a pretty standard
25    challenge to the statutory prescribed instruction.

EXH C

1          Claim 13:  Mr. Balderas' death sentence
2    was arbitrarily and capriciously assigned based on the
3    jury's answer to the unconstitutionally vague first and
4    special issue.
5          Claim 14:  Mr. Balderas' death sentence
6    should be vacated because the punishment phase jury
7    instruction restricted the evidence that the jury could
8    determine was mitigating.  Again, those are all legal
9    claims that are -- a case for those is made in the
10   application and we agree that no further fact finding on
11   those is necessary.
12          THE COURT:  Anything?
13          MS. HUTCHINS:  I mean, our response on
14   No. 10, the affidavits, not only the ones attached to
15   the State's answers, show that no juror was excluded or
16   potential juror was excluded based off of race.
17   Everything was done, on the defense end, pursuant to
18   strategy.  And that, I guess, at some point the
19   applicant actually raises that they object because -- or
20   they're upset --
21          THE COURT:  There was no *Batson* challenge
22   anywhere here, right?
23          MS. HUTCHINS:  No.  There were
24   prospective jurors who were released based off of their
25   answers to the questionnaire.  Now he's upset because he

EXH C

.02184

1   argues the majority of them were minorities, and so

2   there's affidavits from the State saying anybody who was

3   excused was not excused based off of race. That's

4   consistent with the State's affidavit as well as the

5   defense affidavit.

6                 The defense affidavit actually -- I

7   believe it's Mr. Nunnery's -- goes into detail and says

8   that with these types of cases, you have one eye down

9   the line. You're looking at what juror's coming up and

10   so you have to make a strategic decision as to is this

11   juror better or worse than the one that's coming down

12   the line. So in those situations, they would agree to

13   dismiss jurors based off of potentially somebody more

14   favorable coming down the line, and that anybody that

15   was dismissed -- agreed to be dismissed by the defense

16   was discussed with Mr. Balderas. Mr. Balderas had no

17   issue with it. Trial counsel explained all their

18   reasons. And for every single juror that was dismissed

19   by agreement, the judge actually asked the defendant

20   whether it was his agreement and the defendant agreed

21   that it was his agreement. And so, the defense --

22   Mr. Nunnery explains in his affidavit that he didn't

23   believe it was necessary to then further on the record

24   explain the inner workings of his conversation and his

25   advice to the defendant on the record. It was

EXH C

1    sufficient for them to say that, yes, the defendant knew

2    and the defendant agreed.  That's Ground No. 10.

3            Grounds No. 11 through 14, all of these

4    were raised by the defense pretrial in a pretrial

5    motion.  They were all overruled by the Trial Court.

6    Because they were previously raised and overruled by the

7    Court, under the prevailing case law, the defendant is

8    now procedurally barred from raising them in a

9    post-conviction writ application.  Despite the bar, in

10   our answer we go through and we give additional reasons

11   as to why those claims don't have any merit.  And so, I

12   can just rely on what we have in the State's answer.

13           THE COURT:  Okay.

14           MS. ECKHOFF:  Your Honor, if you don't

15   mind, at this point I would like to hand it off to

16   Ms. Black to preserve my voice.

17           THE COURT:  Pull up a chair.

18           MS. BLACK:  Your Honor, just to return to

19   our prior primary concern today.  When we came here, the

20   previous -- the Court previously had made a decision

21   that there was a need for further factual development in

22   this case on issues of ineffective assistance of counsel

23   that we've gone into some depth about today.  We came

24   here today to argue that there were actually other

25   issues raised in the petition that require further

EXH C

1   factual development.

2              And to go back to a point that the

3   district attorney made earlier, this is really -- the

4   Article 11.071 contemplates different ways of assisting

5   this Court in making factual findings.  The pleadings --

6   we're at the pleading stage; we feel we've alleged facts

7   which if we were given the opportunity to come into

8   court and prove, we could prove would entitle

9   Mr. Balderas to relief.  We came here to ask the Court

10  to take a closer look at some of these claims that

11  require further factual development.

12             THE COURT:  Well, then, please --

13             MS. BLACK:  The ineffective assistance of

14  counsel claims were the claims that the Court previously

15  had deemed where further factual development was

16  necessary but in fact, had deemed that that could be

17  accomplished by the use of affidavits.  Now, our

18  position then and it's our position now that affidavits

19  are not a reliable substitute for a -- live testimony in

20  court, at which this Court can assess the credibility

21  and the demeanor of witnesses as opposed to on paper.

22             But an additional point I'd like to make

23  is that there was an order for these affidavits and then

24  there was a long, long delay and the information, a lot

25  of the facts, which the State is relying on to rebut our

EXH C

02187

1    claims in this hearing today, came to light, basically,

2    within the last 24 hours.  And it would be -- the Court

3    previously, the prior Court had deemed that there was a

4    need to go into further detail on these claims of

5    ineffective assistance of counsel and in fact, to hear

6    from the witnesses and if provided, for affidavits to be

7    an initial way of doing that.  We would ask for an

8    opportunity to respond with more than 24 hours' notice

9    to the factual allegations that were submitted in these

10   affidavits that hadn't even been served on us --

11                   THE COURT:  Can we enumerate those for

12   the record, those that you're talking about again, or

13   are they just the same ones she's already stated?

14                   MS. BLACK:  We did the best we could in

15   standing here today, basically, doing it in the form of

16   an ad hoc argument.  But what we'd like the opportunity

17   to do is take those affidavits --

18                   THE COURT:  I understand.

19                   MS. BLACK:  -- back to our office to look

20   at them carefully and to raise -- to file -- a motion

21   has been filed.  If this is, in fact, a hearing on that

22   motion, we would like for the opportunity to oppose the

23   motion in writing because a written motion was filed

24   with numerous allegations made in the form of these

25   lengthy affidavits and we feel we deserve, and due

EXH C

1    process requires, that we be entitled to take those

2    affidavits, to study them, and to respond in the same

3    form, in writing, in a written opposition to that motion

4    before this Court takes that motion under advisement.

5              And if that -- you know, what we've

6    attempted to do today is, through a quick reading of

7    affidavits, to point out that there are still -- that,

8    in fact, they raise what -- what the Court is charged

9    with doing in designating issues for factual development

10   is deciding whether there's controverted issues of fact.

11   Are there things where we've raised a claim and the

12   State has disputed the claim and it can't -- there's a

13   factual issue that needs to be resolved.  So those facts

14   were -- those disputed issues were found by the prior

15   Court to exist with respect to our ineffective

16   assistance of counsel claim and we would argue that due

17   process requires that --

18              THE COURT:  Do you have her ruling in

19   writing somewhere?

20              MS. HUTCHINS:  Judge, the -- I don't have

21   a copy with me.  There should be a copy in the file.

22              THE COURT:  So what does it say?  If you

23   look at it, what does Judge Guiney say?

24              MS. HUTCHINS:  It's an order designating

25   issue and what it does is, basically, it's the Court

EXH C

1   saying that the Court finds the applicant filed a writ
2   application with these 14 claims and it lists what the
3   14 claims are and then it said in there that the Court
4   has determined that these claims, that it will resolve
5   these claims and it actually says, "some by application
6   of the applicable law, some" -- back up a second.

7               It says that, "The Court would resolve
8   these issues in the manner the Court deemed appropriate,
9   namely, some by the application of applicable law, some
10  by the review of the pleadings, some by the review of
11  the appellate record, some by the review of the
12  affidavits submitted by trial counsel, some by
13  recollection of the Court, and some by a review of the
14  submitted habeas evidence."

15              And so, what it basically says is that
16  the Court is acknowledging that the applicant filed a
17  writ application, these are the 14 grounds, and the
18  Court is going to decide the manner in which it thinks
19  it's appropriate to resolve them.  And then the Court
20  issued another order that ordered Mr. Godinich and
21  Mr. Nunnery to do affidavits on these six or seven
22  issues.  And that's all that that order said.

23              And what the effect of that order is is
24  it basically stops the clock at the CCA.  Otherwise, if
25  we didn't have that order, we would have to do things on

EXH C

1    a much speedier timetable. That's all it does.

2                   MS. BLACK: It does a little more than

3    that. It's designating that there is an issue that --

4    and it is providing for factual development of that

5    issue. And these affidavits were contemplated.

6                   Now, what we had hoped to convince the

7    Court was that there were -- that in taking a fresh look

8    at this case, there may be other issues that raise

9    controverted issues of fact. Our position is that there

10   are factual issues in several of the claims and most

11   importantly, in the prosecutorial misconduct relating to

12   false testimony, the ineffective assistance of counsel,

13   and the juror misconduct claims. And we urge this Court

14   not to decide them based on the pleadings alone because

15   the burden at the pleading stage is to raise facts

16   which, if proven, would entitle Mr. Balderas to relief.

17                   But in the event that we are speaking

18   solely about these ineffective assistance of counsel

19   affidavits, the mode of factual development is

20   inadequate here for several reasons but one of which is

21   that the affidavits are not a good substitute for live

22   testimony and an evidentiary hearing for many of the

23   reasons that we've talked about, which is that many of

24   the statements in the affidavits raise allegations or

25   questions that we would dispute but often in a manner

EXH C

1  that would be inadmissible in the context of an
2  evidentiary hearing.
3              And that's also why we, for example,
4  provided a hearsay affidavit in support of our claim,
5  our false testimony claim regarding Israel Diaz; we're
6  asking for further factual development because we don't
7  want to solely rely on the hearsay affidavit.  We would
8  like to have access to this Court's subpoena power to
9  prove that claim by bringing the witness into the court
10 where the Court can evaluate the witness' credibility,
11 the demeanor, and both sides have the opportunity to
12 examine and cross-examine the witness and we feel the
13 same thing is appropriate in the context of the
14 ineffective assistance of counsel claims where this
15 process of having an affidavit that's filed five days
16 before we're here in argument and submitted through a
17 motion that was filed only hours ago just really doesn't
18 allow for the full exploration of those issues and
19 doesn't give us adequate time to respond to the -- to
20 the -- to the factual questions that are either answered
21 or raised in that affidavit -- in those affidavits.
22             THE COURT:  I think y'all did a fine job
23 presenting and rebutting.
24             MS. BLACK:  But we're stuck with what's
25 in the pleadings and what we're asking this Court for is

EXH C

1    to allow us to present you with more.

2                  THE COURT:  Yes.  I understand.  I

3    understand.  You may not get that but what you can do is

4    supplement your responses here today with affidavits or

5    motions or memorandum.  I don't know what you're going

6    to use and I will read them as well.  And then -- so,

7    you have something today for the first time, these

8    affidavits.

9                  MS. BLACK:  Well, the motion, could we

10   respond to the motion in writing, I guess.  Before the

11   Court rules on the motion, could we file a written

12   opposition?  That's --

13                 THE COURT:  And that's fine.  Written

14   opposition, that's fine.  I'll read it.  Let's keep it

15   not so verbose.  Let's keep it at a minimum of what

16   you're going to say and address the most serious issues.

17   I know what you say and you're keeping every one of your

18   options and errors open for federal review as well.  But

19   I've already told you what I think about several of your

20   errors that you've raised.  So, if you want me to

21   respond to it, I would address those of your strongest

22   errors.

23                 MS. BLACK:  And we intend to do that

24   and -- and again, this is the difference between where

25   we are now versus where we were at the pleading stage.

EXH C

02155

1  We did come here --

2              THE COURT:  I understand.  You want a

3  live hearing.

4              MS. BLACK:  But it would be relevant to

5  some of the claims and not all of the claims in the

6  petition.  There are discrete issues that do require a

7  hearing and where due process does require a hearing but

8  not all of the issues in the petition -- we weren't here

9  to argue all of them, that we would present a hearing on

10 every issue that we made.

11             THE COURT:  Well, if that's what you

12 wanted, then you should really pare it down and just use

13 your strongest errors.

14             You didn't talk about the translators and

15 the people on the jury panel that spoke Spanish and

16 contradicted what the translation said it was, or the

17 translator said it was.  We've had that happen in court

18 here all the time.  I'm not -- they are not trained, no

19 one on the jury is trained to be a translator.  The

20 person here is trained and uses that every day.  And

21 every day I will go with what the translator says.  I

22 don't care what the juror said she thought she

23 understood from the people speaking Spanish.  They're

24 not working as a translator down here.  We have a

25 translator here.  I know all four or five of the

EXH C

1    translators. I speak Spanish and I've corrected the
2    translator myself. But she used a word that was proper
3    enough. So, I'm telling you, I will go with the
4    translator every time.

5            MS. BLACK: We appreciate the Court's
6    advice about paring things down and putting things into
7    a context. And again, this hearing has gone back and
8    forth on almost every issue but I guess if I could tag
9    onto our request for an opportunity to respond in
10   writing in opposition to the motion the State filed
11   today, we would also like to, because this Court is
12   hearing these issues for the first time, file a written
13   motion for a evidentiary hearing on certain issues in
14   the petition but not all of them and perhaps accompany
15   them with affidavits and things to further convince the
16   Court that there is -- there are controverted issues of
17   fact related to --

18           THE COURT: Well, I would pick your
19   strongest ones. I've given you my opinion already just
20   on what I've heard today. Please don't spend your
21   wheels -- spin your wheels on the motel, the person
22   waving, the translator. I know these attorneys, they've
23   practiced before me, I've practiced alongside them for
24   25 years here. And I've appointed Mr. Godinich before,
25   in the past. So, I know that he's a good lawyer.

1          There are only -- we have 179 people on
2    the first degree list, 79 people on the second degree
3    list here, and 69 people on the third degree list here.
4    But there are only, what, 40 or 50 people on the capital
5    list.  And that's 40 or 50 people out of the thousands
6    that practice at this courthouse a day.  They have to
7    take a special CLE course and maintain their CLE on
8    capital writs and capital cases.  These attorneys
9    pioneered the way.

10         This county was one of the first and the
11   best counties on requiring proper accreditation for
12   capital crime.  This -- I would say I don't know of a
13   county that does a better job than Harris.  Do you know
14   of one?  And we have the best attorneys that are
15   appointed to capital crime.  I only appoint people that
16   have the highest accreditations.  So, do you know of a
17   county that does it better than this one?  I mean, you
18   practice all over the state, don't you?

19         MS. BLACK:  Yes, and as a defense
20   attorney, we deal with issues of ineffective assistance
21   of counsel all the time and in fact, due to recent --
22   well, not that recent but fairly recent supreme court
23   opinions, doing the work that we're doing at the state
24   court level, we'll have other attorneys reviewing our
25   work and raising allegations of ineffective

EXH C

1    assistance --

2              THE COURT:  Indeed.  Indeed.

3              MS. BLACK:  -- and really what we're --

4    you know, our position is that even the best attorneys

5    can make mistakes and this is a capital case, so what

6    we're looking at is raising claims of error and having

7    Courts review the claims of error because of the

8    heightened need to get it right and to not make mistakes

9    in a capital case.  So even though it's awkward, raising

10   claims of ineffective assistance of counsel is really a

11   way of saying that even the best counsel can make

12   mistakes and --

13             THE COURT:  Indeed.

14             MS. BLACK:  -- if those mistakes go to

15   the reliability of the guilt verdict and death sentence,

16   we have an obligation to rectify those errors because of

17   the severity of the punishment.

18             THE COURT:  Not every error warrants a

19   reversal.

20             MS. BLACK:  That's certainly true.

21             THE COURT:  That happens every day.  I

22   tell that to appellate attorneys every day that come in

23   here.  So is there anything else you would like to put

24   on the record before we adjourn?

25             MS. HUTCHINS:  Just on our end, Judge,

EXH C

02197

1    that the clerk's office, based off of, I think, the file

2    stamp on them, I just wanted to clarify for the record

3    that Mr. Godinich and Mr. Nunnery filed their affidavits

4    last week and their certificates of service, I believe,

5    saying that they were mailed out by the clerk's office.

6    So I just didn't want the Court to think --

7                    THE COURT:   Nobody thinks that.

8                    MS. HUTCHINS:   -- that we were sitting on

9    their affidavits.

10                   THE COURT:   And they don't think that

11   either.   I'm sure it's --

12                   MS. BLACK:   It's only been a couple of

13   days and we are in Austin, so they are probably in the

14   mail.

15                   THE COURT:   So, if you want me to grant a

16   hearing on further stuff, then you need to pare it down

17   to just your best arguments and tell me what you want to

18   present, who your witnesses are going to be, and what

19   you think that they might testify to.   I mean, so, if

20   you put a little summation on the paragraph and then

21   tell me what you hope to produce by that.   And you'll

22   give it to them before they give it to me and I'll have

23   both of your responses.

24                   So you get to respond to theirs and

25   they're going to respond to yours right now.   So e-mail

EXH C

02188

1    them and then once you both have it and you can both
2    send me your -- I don't know how you'll present it to
3    the Court.  Probably it should be in written form for
4    the clerks, not by e-mail.
5                   MS. BLACK:  Yeah.
6                   THE COURT:  Again, I'm not guaranteeing
7    anything but don't -- don't throw everything in the
8    kitchen sink at me and expect me to grant you a hearing
9    on that.  Pare it down to the best ones that you have
10   and I will look at it.
11                  MS. HUTCHINS:  Judge, am I correct in my
12   understanding then that you will, once you have their --
13   the defense's objection to our motion and potentially
14   our response from us on their objection, that at that
15   point, once you review it, you will make a decision and
16   you will issue your written order and we will both just
17   get notification of your written order?
18                  THE COURT:  I think that's so, yes.
19                  MS. BLACK:  And just to clarify, it would
20   be more of a -- we're kind of talking about two
21   different things but there's an opposition to your
22   motion but we're actually affirmatively moving for
23   something as well.
24                  MS. HUTCHINS:  No, I understand.
25                  THE COURT:  Explain that to me so that I

EXH C

02199

1  know what you mean.

2           MS. BLACK:  We were hoping to -- when you

3  discussed paring down the issues and attaching the

4  relevant affidavits, that would be more of a motion for

5  an evidentiary hearing than our response to their

6  motion.

7           THE COURT:  Yes.

8           MS. BLACK:  But it --

9           THE COURT:  I don't want to receive a

10 35-page document.  Tell me what you want to investigate,

11 tell me who your witnesses are going to be, what you

12 think they're going to proffer, and we'll go from there.

13 Again, I haven't made any promises of what I'm going to

14 do.  I don't know.

15          MS. BLACK:  Should we set a time frame

16 for the response, for the motion and the response?

17          MS. HUTCHINS:  We should.

18          THE COURT:  Because the Court of Criminal

19 Appeals date is what?

20          MS. HUTCHINS:  September the 25th.

21          MS. BLACK:  We can move to push that out.

22          THE COURT:  You will make those motions

23 or do we have to make it?

24          MS. HUTCHINS:  It has to come from the

25 Court.

EXH C

1           THE COURT:  Does the Court have to make
2  it?
3                MS. HUTCHINS:  It has to come from you.
4                THE COURT:  You provide it to us.  If you
5  send it to our court, we'll sign it and ask for more
6  time.
7                MS. HUTCHINS:  That's fine.
8                THE COURT:  Y'all did a fine job, both of
9  you.  I'm really surprised of how verbal and good
10  you-all are.
11                MS. HUTCHINS:  What type of timetable
12  would you like for the defense to make their motion and
13  objections?
14                THE COURT:  What do you think is a
15  reasonable amount of time?
16                MS. ECKHOFF:  Your Honor, we would
17  request at least 30 days, if possible, only because we
18  actually have evidentiary --
19                THE COURT:  She's going to be in labor.
20                MS. HUTCHINS:  I don't know.  I feel like
21  30 days is appropriate for findings.  10 days maybe for
22  an objection.
23                MS. BLACK:  We both have evidentiary
24  hearings next week in other parts of the state that will
25  require being out of the office, but the two of us won't

EXH C

1   be back in the office for many days for the next two

2   weeks.  So it might be -- the request is just to put us

3   outside that window so we have some time to put our

4   heads together.

5                    THE COURT:  How many cases do y'all have,

6   that you two are handling?

7                    MS. BLACK:  Our office has 40 cases.

8                    MS. ECKHOFF:  Our office as a whole has

9   about 40 cases.  I believe I currently have -- I'm

10  assigned on nine.

11                   THE COURT:  Okay.

12                   MS. BLACK:  I'm new to the office, so my

13  caseload hasn't ratcheted up.  The reason for the

14  request is just that there are some cases that are

15  outside of where we live so we go on the road and it

16  just is hard to put a motion together when we're --

17                   THE COURT:  Okay.  Y'all did a fine job.

18  Anything else before we're adjourned?

19                   MS. HUTCHINS:  Just your timetable,

20  Judge.

21                   THE COURT:  Oh.  For you to respond in

22  writing to me, asking for an evidentiary hearing, how

23  about in 25 days or so?

24                   Is that okay with you?

25                   MS. HUTCHINS:  Yes, Judge.  I'm good with

02202

1    whatever the Court decides.

2                    THE COURT:  What day is that?  9/12.  And

3    forgive me.  Tell me the name of the organization with

4    the State?

5                    MS. ECKHOFF:  We're with the Office of

6    Capital and Forensic Writs.

7                    Is there also a timetable for the State's

8    response to our filing?

9                    MS. HUTCHINS:  I'm okay with ten days,

10   Judge.

11                   THE COURT:  Okay.  Ten days beyond that.

12                   MS. HUTCHINS:  From 9/12, which would get

13   us to Friday, 9/22.

14                   THE COURT:  Okay.  9/22, and that's the

15   State's response to -- what's the acronym to your

16   office?

17                   MS. HUTCHINS:  The OCFW.

18                   THE COURT:  OCFW.  Okay.  Thank you very

19   much for your time.

20                   MS. BLACK:  Thank you, Your Honor.

21                   MS. ECKHOFF:  Thank you.

22                   *(Hearing adjourned.)*

23

24

25

EXH C

1  STATE OF TEXAS
   COUNTY OF HARRIS
2

3      I, Renee Reagan, Official Court Reporter in and

4  for the 179th District Court of Harris County, State

5  of Texas, do hereby certify that the above and

6  foregoing contains a true and correct transcription

7  of all portions of evidence and other proceedings

8  requested in writing by counsel for the parties to be

9  included in this volume of the Reporter's Record in

10 the above-styled and numbered cause, all of which

11 occurred in open court or in chambers and were

12 reported by me.

13     I further certify that this Reporter's Record of

14 the proceedings truly and correctly reflects the

15 exhibits, if any, offered by the respective parties.

16     WITNESS MY OFFICIAL HAND, this the 22nd day

17 of August, 2017.

18
                          /s/Renee Reagan
19                        Renee Reagan, CSR
                          Texas CSR 7573
20                        Official Court Reporter
                          179th District Court
21                        Harris County, Texas
                          1201 Franklin
22                        Houston, Texas 77002
                          Telephone:  832.927.4105
23                        Expiration:  12/31/18

24

25

EXH C

. 02204

MR. REISS: [2]  3/18 17/25
MS. BLACK: [27]  3/12 35/4 72/17
73/12 74/13 74/18 77/1 78/23 79/8
79/22 80/3 81/4 82/18 83/2 83/13
83/19 84/11 85/4 85/18 86/1 86/7
86/14 86/20 87/22 88/6 88/11
89/19
MS. ECKHOFF: [108]
MS. HUTCHINS: [87]  3/16 9/25
10/11 10/15 11/11 11/17 11/20
13/19 18/19 22/6 22/19 23/24 24/5
24/11 24/16 24/23 25/2 25/6 25/24
28/3 29/3 32/17 34/23 35/6 35/10
35/18 35/23 36/4 36/9 36/11 36/25
37/4 37/18 37/21 38/6 38/9 39/21
39/23 39/25 40/16 42/23 43/6
43/10 43/24 44/13 44/20 45/14
50/8 53/13 53/17 55/22 53/24
54/21 55/18 56/2 56/6 56/13 56/21
58/15 59/13 59/15 63/13 63/22
66/9 66/17 69/8 69/12 70/12 70/22
75/19 75/23 83/24 84/7 85/10
85/23 86/16 86/19 86/23 87/2 87/6
87/10 87/19 88/18 88/24 89/8
89/11 89/16
THE COURT: [197]
THE REPORTER: [2]  24/14 24/22

**/**
/s/Renee [1]  90/18

**1**
10 [6]  7/9 51/7 68/10 70/14 72/2
87/21
11 [3]  7/10 68/15 72/3
11.071 [1]  73/4
12 [5]  20/16 46/13 68/19 89/2
89/12
12/31/18 [1]  90/23
1201 [1]  1/23 2/6 90/21
13 [2]  68/23 70/1
14 [8]  7/11 21/2 44/6 70/5 72/3
76/2 76/3 76/17
1412826-A [1]  1/2
15 [1]  51/7
16634900 [1]  2/4
17 [1]  28/6
1700 [1]  2/16
179 [2]  44/5 82/1
179TH [4]  1/6 1/22 90/4 90/20
17th [1]  1/13
18 [2]  50/11 90/23

**2**
2005 [2]  25/1 25/2
2012 [1]  25/6
2013 [1]  37/16
2014 [3]  25/4 37/16 39/3
2015 [1]  12/19
2017 [2]  1/13 90/17
22 [2]  89/13 89/14
22nd [1]  90/16
23 [1]  9/11
24 [2]  74/2 74/8
24053738 [2]  2/3 3/21
24063791 [1]  2/2
24090910 [1]  2/14
24099910 [1]  2/15
25 [3]  44/4 81/24 88/23
25th [2]  44/8 86/20
26 [1]  37/16
29 [1]  44/5
29th [1]  44/8
2:00 [1]  48/10

**3**
30 [2]  87/17 87/21
35-page [1]  86/10
360 [1]  48/10

**4**
40 [4]  82/4 82/5 88/7 88/9
45 [1]  35/4
460 [1]  2/16

**5**
50 [2]  82/4 82/5
512.463.8503 [1]  2/17
56 [1]  15/13
5:00 [1]  48/9

**6**
606 [6]  25/8 26/4 26/6 26/8 26/10
29/5
69 [1]  82/3

**7**
70 [1]  67/7
71 [1]  67/7
713.274.5800 [1]  2/7
72 [1]  67/7
75 [1]  67/4
7573 [2]  1/22 90/19
77002 [3]  1/23 2/6 90/22
78701 [1]  2/17
79 [1]  82/2

**8**
8-8 [1]  36/23
832.927.4105 [1]  90/22
88 [5]  36/17 36/23 36/23 37/4
49/23

**9**
9/12 [2]  89/2 89/12
9/22 [2]  89/13 89/14

**A**
ABA [2]  63/7 63/13
abandoning [1]  25/21
ability [3]  9/17 34/17 52/6
able [9]  15/12 18/16 18/18 29/22
37/24 50/16 54/11 55/1 55/4
about [46]  7/25 16/9 16/9 17/5
17/6 18/9 22/1 25/17 27/4 28/8
28/10 28/14 28/19 30/17 30/18
39/4 41/11 42/14 44/23 45/2 45/3
45/5 45/6 49/13 52/2 54/4 55/18
55/20 56/23 58/17 62/19 66/13
66/20 66/24 72/10 72/25 74/23
74/12 77/18 77/23 79/19 80/14
81/6 85/20 88/9 88/23
above [3]  1/14 90/5 90/10
above-styled [1]  90/10
above-titled [1]  1/14
absolutely [1]  64/15
abundance [1]  60/14
abuse [7]  37/10 49/4 49/6 49/13
51/17 62/17 63/18
acceptable [1]  8/8
access [6]  13/4 14/1 17/7 17/11
17/21 78/8
accommodate [1]  24/3
accompany [1]  81/14
accomplished [1]  73/17
according [1]  50/17
account [4]  7/20 12/5 14/14 62/11
accounts [1]  9/14
accreditation [1]  82/11
accreditations [1]  82/16
accuracy [1]  42/15
accurate [1]  7/1
acknowledge [1]  47/3
acknowledging [1]  76/16
acronym [1]  89/15
actions [1]  25/12
acts [2]  37/1 37/3
actual [1]  44/7
actually [42]  4/14 7/21 8/2 9/4
9/20 11/8 12/14 12/19 15/14 15/16
16/20 18/12 19/18 20/7 22/11
23/25 26/3 32/11 32/14 33/15 38/4
40/8 44/9 44/16 50/13 52/24 54/5
54/23 55/7 58/3 60/12 62/16 66/5
69/13 69/15 70/19 71/6 71/19
72/24 76/5 85/22 87/18
ad [1]  74/16
add [2]  5/24 6/20
addition [2]  35/15 64/16
additional [11]  7/4 7/5 21/3 46/3
48/15 48/19 67/19 67/19 68/22
72/10 73/22
additionally [1]  46/18
address [14]  4/14 12/1 12/5 25/10
25/18 34/21 34/22 46/4 52/24
53/11 60/14 64/14 76/16 79/21
addressed [2]  64/12 64/13
addresses [4]  55/24 56/25 63/24
63/24
addressing [1]  18/7
adequate [1]  78/19
adequately [1]  62/11
adjourn [1]  83/24

adjourned [2]  88/18 89/22
admissible [5]  29/5 26/13 40/24
47/14 47/14
admit [2]  12/1 57/18
admonished [1]  27/14
admonitions [2]  26/24 27/1
advance [1]  23/23
adverse [2]  6/5 6/20
advice [2]  71/25 81/6
advisement [1]  75/4
affect [3]  21/7 21/16 23/5
affected [9]  21/1 21/21 22/14
22/16 22/17 22/23 28/15 55/21
56/9
affidavit [31]  8/13 10/22 11/1
11/7 11/18 11/16 12/2 12/3 14/6
23/12 40/2 41/15 42/18 46/22 47/3
47/8 47/15 54/3 55/6 55/24 56/11
63/23 64/4 71/4 71/5 71/6 71/22
78/4 78/7 78/15 78/21
affidavits [57]  5/5 5/23 6/1 7/1
13/23 13/23 19/4 17/16 17/23
19/17 19/20 21/3 25/9 25/14 29/17
29/23 32/1 32/7 33/9 34/2 34/4
39/14 39/19 40/22 46/7 46/9 46/24
50/18 52/24 56/10 60/9 60/14
64/10 70/14 71/2 73/17 73/18
73/23 74/6 74/10 74/17 74/25 75/2
75/7 76/12 76/17 77/5 77/19 77/21
77/24 78/21 79/4 79/8 81/15 84/3
84/9 86/4
affirmatively [1]  85/22
African [1]  68/12
African-Americans [1]  68/12
after [16]  4/14 7/16 7/22 9/23
19/23 21/8 23/4 23/5 30/16 31/3
32/8 41/21 53/16 58/16 58/17 67/4
aftermath [1]  30/20
afternoon [2]  3/21 3/23
again [19]  4/15 10/15 18/15 20/1
21/6 21/19 44/5 47/5 48/14 49/21
57/10 61/22 65/11 70/8 74/12
79/24 81/7 85/6 86/13
against [9]  9/18 30/14 35/12 36/1
36/25 37/3 41/11 65/25 67/18
aggravated [3]  7/19 35/17 67/19
ago [1]  78/17
agree [7]  27/25 31/8 63/22 64/22
65/2 70/10 71/12
agreed [4]  31/4 71/15 71/20 72/2
agreeing [1]  52/13
agreement [4]  68/11 71/19 71/20
71/21
ahead [4]  4/8 8/23 28/3 69/4
aid [1]  67/1
alibi [6]  29/24 38/3 39/4 39/5
39/10 40/5
all [48]  3/24 7/7 10/8 19/2 19/3
20/16 24/15 26/20 27/21 29/12
36/15 36/16 38/11 39/14 45/17
45/24 46/16 47/17 47/23 50/19
51/7 52/19 55/1 55/2 59/18 59/24
61/5 62/3 64/16 67/18 67/21 70/8
71/17 72/3 72/5 76/22 77/1 80/5
80/8 80/9 80/18 80/25 81/14 82/18
82/21 87/10 90/7 90/10
allegation [2]  33/12 59/11
allegations [7]  4/20 4/21 49/13
74/9 74/24 77/24 82/25
alleged [5]  22/14 51/18 55/22
56/5 73/6
alleging [3]  7/10 8/9 47/18
allen [1]  19/24
allow [3]  58/10 78/18 79/1
allowed [2]  16/20 18/23 31/19
42/15
almost [2]  19/24 81/8
alone [3]  5/23 32/7 77/14
along [3]  3/18 11/13 27/19 28/11
alongside [1]  81/23
already [11]  15/2 21/8 21/18
22/21 23/7 23/10 40/22 59/10
74/13 79/19 81/19
also [40]  3/13 3/14 4/25 5/4 8/5
9/12 14/6 14/9 14/17 14/21 15/9
15/25 17/4 17/13 24/24 25/7 25/16
29/10 31/20 34/5 36/12 37/22 39/2
41/3 44/25 48/20 54/8 54/24 55/19
61/6 61/6 61/22 64/4 64/17 64/19
65/14 67/12 78/3 81/11 89/7
alternate [1]  41/10
although [1]  20/6
Alvin [2]  5/12 14/10

**A**

always [1] 13/6
am [1] 85/11
Amendment [4] 49/16 59/3 59/4
68/14
Americans [1] 68/12
amongst [2] 42/19 54/7
amount [1] 87/15
anecdotal [1] 47/16
announced [1] 20/21
another [12] 15/23 21/17 28/14
30/11 35/14 76/20
answer [12] 10/20 10/21 12/15
13/22 14/20 22/9 46/16 51/6 51/20
70/3 72/10 72/12
answered [1] 78/20
answers [4] 55/3 55/11 70/15
70/25
any [29] 5/16 12/18 14/14 15/11
21/24 22/2 28/5 28/8 28/15 28/16
28/18 29/2 33/3 33/11 34/9 38/20
39/12 45/14 50/20 51/23 51/24
51/25 51/25 52/7 61/3 61/19 72/11
86/13 90/15
anybody [3] 5/17 71/2 71/14
anymore [1] 58/7
anything [8] 27/4 27/5 39/13
52/22 70/12 83/23 85/7 88/18
anyway [1] 60/23
anywhere [2] 23/23 70/22
apologize [3] 10/6 33/21 45/12
apparently [1] 12/13
appeal [3] 22/10 22/12 22/21
31/4 31/7 32/14 43/16 44/15 44/16
60/3 60/4 61/4 61/7
Appeals [9] 7/9 22/15 22/19 23/1
23/7 45/3 45/4 60/6 86/19
APPEARANCES [1] 2/1
appears [2] 16/19 54/25
appellate [8] 22/9 33/6 42/19
43/8 43/13 60/19 76/11 83/22
applicable [2] 76/6 76/9
applicant [23] 11/6 22/11 22/12
23/8 25/19 28/5 35/13 36/14 37/22
38/13 41/25 51/14 51/22 52/19
56/8 59/21 59/21 60/4 60/12 60/16
70/19 76/1 76/16
applicant's [7] 14/24 15/13 28/19
52/17 53/8 66/14 67/6
applicants [1] 51/24
application [12] 4/1 4/19 22/8
28/20 49/11 61/3 70/10 72/9 76/2
76/5 76/9 76/17
applies [1] 59/4
apply [1] 21/25
appoint [1] 82/15
appointed [3] 58/12 81/24 82/15
appreciate [10] 5/20 6/19 8/24
17/12 33/1 45/13 48/12 57/16
65/13 81/5
approach [2] 63/9 64/11
appropriate [4] 76/8 76/19 78/13
87/21
appropriately [2] 64/2 64/9
arbitrarily [1] 70/2
are [84] 4/15 4/19 4/20 4/21 5/14
5/19 5/23 5/25 6/4 6/25 8/9 11/6
11/14 13/22 14/23 15/2 16/5 16/6
16/17 17/17 18/5 23/21 23/22
23/22 25/9 25/11 26/12 26/24
27/14 29/11 31/16 35/11 35/24
38/11 39/18 45/19 45/22 46/1 51/6
53/3 54/2 54/17 55/4 55/22 55/23
56/1 57/10 57/18 58/18 61/18
61/19 62/7 62/19 68/1 68/3 68/3
69/2 70/8 70/9 73/19 74/13 75/7
75/11 76/3 76/17 77/10 77/17
77/21 78/20 79/25 80/6 80/18
81/16 82/1 82/4 82/14 84/13 84/13
84/18 86/11 87/10 88/6 88/14
88/14
aren't [1] 6/9
argue [8] 4/23 23/8 28/4 67/15
67/20 72/24 75/16 80/9
argued [2] 22/12 60/4
argues [1] 71/1
arguing [3] 33/21 33/22 33/23
argument [18] 15/22 25/15 25/17
32/13 43/14 43/20 49/20 52/16
52/16 53/16 56/23 57/5 57/5 57/6
67/10 69/15 74/16 78/16
arguments [2] 68/5 84/17
arise [1] 6/21

**B**

back [21] 7/25 10/6 10/10 18/5
18/6 19/25 20/25 28/16 33/20
39/16 48/11 49/20 52/22 54/14
54/24 61/1 73/2 74/19 76/6 81/7
88/1
bad [2] 37/1 37/3
bailiff [1] 20/24 22/24
BALDERAS [24] 1/6 3/11 3/15 4/16
4/18 6/22 7/22 7/23 8/3 8/4 9/8
29/23 30/14 30/19 30/23 31/2
32/12 37/4 49/14 68/19 71/16
71/16 73/9 77/16
Balderas' [13] 4/2 5/6 7/17 8/1
33/12 48/17 49/3 49/15 68/12
68/15 68/19 70/1 70/5
bar [2] 3/20 72/9
Bardales [2] 42/4 42/4
Barker [1] 59/7
barred [3] 23/9 53/4 72/8
base [1] 17/4
based [15] 10/14 10/19 24/24 26/6
32/9 36/13 47/8 67/21 70/24 70/25
70/24 71/3 71/13 77/14 84/1
basically [9] 15/2 27/20 40/1
52/1 74/1 74/15 75/25 76/15 76/24
basis [2] 26/15 59/10
Batson [1] 70/21
battle [1] 55/1
be [61] 1/14 7/3 10/18 11/18 13/1
15/22 16/17 16/18 16/19 18/18
18/22 18/22 24/19 25/15 25/15
26/17 27/21 27/21 27/23 28/2
28/21 29/18 31/22 34/5 35/2 40/11
40/23 42/15 46/10 47/13 47/14
48/3 48/9 52/12 55/13 55/15 58/3
62/3 62/14 68/2 70/6 71/15 73/16

**C**

caliber [1] 3/10 3/14 5/15
call [5] 31/21 34/17 40/10 42/5
called [6] 18/12 24/10 41/12 55/5
56/6 60/21
calling [2] 32/5 55/10
came [12] 1/14 20/20 28/16 38/19
43/7 49/20 52/1 56/17 72/19 72/23
73/9 74/1
can [27] 10/6 10/13 10/18 12/5
15/8 16/11 18/1 18/21 21/13 25/25
28/13 29/12 35/2 48/9 58/8 58/18
64/9 66/16 72/12 73/20 74/11
78/10 79/3 83/5 83/11 85/1 86/21
can't [5] 15/7 28/21 45/15 54/16
75/12
capital [22] 2/16 3/10 3/14 5/15

4/2 74/6 75/1 75/13 75/21 77/8
78/1 80/4 80/19 84/18 85/3 85/20
86/4 86/11 87/19 88/1 88/2 90/8
became [1] 33/25
because [42] 6/8 12/11 12/17 21/5
22/14 23/3 23/6 23/14 23/22 25/18
27/14 29/1 29/2 30/1 36/22 38/22
40/9 40/11 40/18 48/24 49/12 50/1
55/9 59/9 60/22 61/7 62/13 63/24
64/6 64/18 70/6 70/19 70/25 72/6
74/23 77/14 78/6 81/11 83/7 83/16
86/18 87/17
become [1] 6/5
been [31] 9/20 12/10 12/25 13/2
16/11 16/16 17/24 18/14 18/16
20/12 21/1 23/10 29/3 30/24 33/4
35/3 37/24 40/6 40/7 52/9 58/20
58/21 59/12 65/23 65/24 66/1 66/3
66/16 74/10 74/21 84/12
before [20] 1/15 10/7 12/23 15/19
15/20 30/22 31/21 32/3 55/14
59/12 61/1 61/3 75/4 78/16 79/10
81/23 81/24 83/24 84/22 88/18
begun [1] 59/10
behalf [6] 4/2 7/16 46/9 46/16
46/16 49/19
behavior [1] 55/20
being [6] 13/21 27/12 28/22 36/17
45/23 87/25
beliefs [1] 52/3
believe [35] 6/25 8/20 14/23
17/19 20/15 24/10 24/12 28/10
36/16 37/9 37/19 42/13 46/11 50/5
51/6 54/3 58/13 58/14 58/16 58/20
58/22 60/17 62/8 62/22 62/24 63/3
66/13 66/15 66/16 67/22 67/25
71/7 71/23 84/4 88/9
believed [5] 14/18 32/5 32/7
42/20 55/15
beneficial [1] 14/18
Benitez [6] 41/6 41/9 41/15 41/17
41/22 46/20
Bennett [2] 11/1 14/7
best [12] 7/2 9/17 12/10 42/22
51/3 74/14 82/11 82/14 83/4 83/11
84/17 85/9
better [4] 6/4 71/11 82/13 82/17
between [4] 16/1 38/12 68/11
79/24
beyond [1] 89/11
bias [2] 28/9 52/20
big [1] 36/14
bill [1] 54/9
bind [1] 63/16
bit [6] 4/10 5/4 25/16 34/23 45/2
64/6
Black [3] 2/15 3/13 72/16
booked [2] 23/22 23/23
bored [1] 27/12
both [14] 6/12 14/10 17/10 28/12
44/6 44/6 64/14 78/11 84/23 85/1
85/1 85/16 87/8 87/23
boy [1] 49/7
Brady [5] 9/1 9/9 9/19 12/9 13/21
brain [1] 37/10
break [4] 20/22 20/22 29/4 62/4
briefly [3] 39/17 56/22 59/14
bring [3] 35/2 54/5 54/6
bringing [2] 58/11 78/9
brother [3] 37/15 38/24 39/6
40/11 40/16
brought [3] 4/13 9/1 63/21
burden [4] 4/18 4/19 28/20 77/15
bus [2] 19/10 26/19

**C**

capital... [18]  6/16 7/19 14/3 18/12 18/14 35/14 35/14 35/25 41/8 63/8 82/4 82/8 82/8 82/12 82/15 83/5 83/9 89/6
capriciously [1]  70/2
card [1]  3/20
care [4]  45/2 45/5 45/6 80/22
cared [1]  45/3
carefully [1]  74/20
case [58]  5/3 10/7 10/19 11/13 13/24 15/17 15/21 15/22 16/2 16/2 16/16 16/19 17/2 21/5 21/25 25/8 25/11 25/13 25/19 26/25 28/7 28/13 28/20 29/16 29/18 30/14 31/6 32/15 33/13 36/8 37/12 39/7 43/6 47/6 47/10 48/18 50/10 53/20 58/3 58/22 59/8 59/18 59/24 59/25 60/2 62/12 62/17 63/15 63/18 63/25 66/5 70/9 72/7 72/22 77/8 83/5 83/9
caseload [1]  88/13
cases [11]  5/15 6/13 6/21 16/5 16/5 44/7 63/8 71/8 82/8 88/5 88/7 88/9 88/14
caseworker [1]  51/15
cause [4]  1/2 1/15 3/7 90/10
CCA [6]  31/4 31/9 43/17 44/20 61/4 76/24
CCA's [1]  43/17
Celeste [3]  42/5 44/10 44/12
cell [3]  66/14 66/20 67/17
certain [1]  81/13
certainly [3]  5/24 52/11 83/20
certificates [1]  84/4
certify [2]  90/5 90/13
Chabot [1]  9/3
chain [1]  61/13
chair [2]  27/19 72/17
chairs [1]  35/3
challenge [5]  5/1 6/22 31/11 69/25 70/21
chambers [1]  90/11
chance [1]  40/7
change [2]  10/24 55/11
changed [2]  28/22 56/18
changeover [1]  60/1
character [2]  30/2 51/11
characterization [1]  42/12
characterize [2]  35/25 42/1
charge [4]  7/19 19/25 36/7 64/20
charged [6]  35/13 35/14 35/22 36/1 41/9 75/8
charges [5]  65/24 65/25 66/4 66/6 66/8
Chavez [1]  9/3
check [1]  66/16
child [2]  37/10 49/4
childhood [2]  51/5 51/17
children [1]  62/17
circumstances [4]  12/6 19/15 21/23 63/20
cite [2]  45/7 58/8
cited [1]  45/25
claim [47]  8/25 9/3 9/9 9/9 9/9 12/8 12/9 17/18 19/8 19/8 22/5 30/11 32/22 32/22 33/5 33/7 43/12 46/19 48/13 48/23 48/25 49/15 58/1 58/11 59/2 59/3 59/11 62/9 62/10 63/6 63/12 63/18 65/19 63/20 66/7 68/10 68/15 68/19 68/23 70/1 70/5 75/11 75/12 75/16 78/4 78/5 78/9
claiming [1]  6/9
claims [46]  4/3 4/4 4/15 4/23 5/6 5/7 6/4 6/7 7/11 7/14 17/14 19/7 29/8 30/9 34/20 46/1 50/14 53/3 57/18 61/2 61/5 61/19 62/16 68/1 68/2 68/3 68/8 70/9 72/11 73/10 73/14 73/14 74/1 74/4 76/2 76/3 76/4 76/5 77/10 77/13 78/14 80/5 80/5 83/6 83/7 83/10
clarification [1]  65/2
clarified [1]  44/11
clarify [4]  44/15 45/9 84/2 85/19
clause [1]  68/13
clauses [1]  68/17
CLE [2]  82/7 82/7
clear [8]  19/20 20/7 24/16 27/20 29/17 33/25 45/12 63/9
cleared [3]  66/3 66/7 67/3
clerk's [2]  84/1 84/5
clerks [1]  85/4

client [3]  3/3 29/16 62/3
clients [1]  6/6
clock [1]  76/24
closer [1]  73/10
closing [4]  49/20 56/23 57/6 69/15
Colorado [1]  64/5
come [17]  19/25 19/25 31/12 32/2 41/2 43/5 46/7 49/23 50/1 52/6 54/8 54/9 73/7 80/1 83/22 86/24 87/3
coming [11]  16/3 20/9 26/12 32/4 32/5 34/16 38/17 52/19 71/9 71/11 71/14
comment [2]  28/8 28/10 51/18
comments [7]  28/15 28/17 55/20 55/22 55/23 55/23 56/8
common [1]  6/2
compare [1]  67/6
comparing [1]  9/17
complainant [1]  41/11
complainant's [1]  41/13
computerized [1]  1/18
concern [1]  72/19
conduct [6]  28/22 31/24 32/5 33/3 48/14 64/17
confessed [2]  7/23 8/4
confused [1]  25/16
Congress [1]  2/16
conjunction [1]  64/11
consciousness [1]  15/3
consider [6]  59/6 62/16 63/18 64/9 64/20 65/24
considered [2]  58/3 64/2
considering [3]  31/4 56/15 59/5
consistent [2]  14/22 71/4
constitute [1]  13/3
constituted [1]  12/24
constitutes [1]  64/23
constitution [1]  68/18
constitutional [2]  59/2 68/20
contact [3]  38/15 38/21 39/8
contained [1]  40/3
contains [1]  90/6
contemplated [1]  77/5
contemplates [1]  73/4
contemporaneous [1]  40/3
content [2]  14/2 28/7
context [5]  52/15 67/17 78/1 78/13 81/7
continuance [1]  60/17
continue [14]  3/24 5/18 5/21 6/18 8/23 18/4 22/3 30/6 44/1 50/3 56/21 58/25 61/6 67/24
continuing [1]  38/19
contraband [6]  66/17 66/18 66/19 66/20 66/21 67/17
contradicted [1]  80/16
contradictory [1]  12/14
contrary [1]  5/1
control [1]  40/19
controverted [3]  75/10 77/9 81/16
conversation [2]  15/6 71/24
conviction [13]  3/12 7/24 9/10 11/4 11/17 13/2 16/4 16/8 16/13 17/4 18/17 47/18 72/9
convince [2]  77/6 81/15
copies [1]  13/17
copy [4]  14/5 46/12 75/21 75/21
corpus [1]  4/2
correct [13]  6/10 13/15 19/12 22/20 36/9 36/10 37/2 56/7 60/7 63/25 85/11 90/6
corrected [1]  81/1
corrections [2]  65/22 66/1
correctly [2]  44/9 90/14
could [29]  9/21 9/24 13/25 31/21 31/22 32/8 33/4 36/24 40/24 41/2 41/16 42/13 42/14 44/12 48/16 49/6 49/7 53/15 53/15 61/25 64/2 68/22 70/7 73/8 73/16 74/14 79/9 79/11 81/8
couldn't [2]  40/19 54/7
counsel [59]  5/5 5/7 6/5 6/9 9/18 12/11 12/17 12/25 13/1 13/6 13/25 14/5 16/14 18/15 19/7 29/9 29/17 29/25 30/1 32/1 32/11 32/14 33/8 33/9 33/16 34/2 36/19 36/24 40/21 46/5 49/1 51/4 51/19 54/1 54/8 55/9

3/10 83/11 90/8
counsel's [4]  9/16 12/12 25/17 42/11
counsels' [3]  18/16 29/15 50/18
count [1]  37/24
counties [1]  82/11
county [15]  1/5 1/16 2/5 3/20 5/16 6/16 32/17 51/16 65/23 82/10 82/13 82/17 90/1 90/4 90/21
couple [4]  20/20 46/5 53/11 84/12
course [10]  7/25 12/15 13/7 26/15 29/21 46/21 49/2 49/7 62/24 82/7
court [100]
court's [4]  42/12 44/3 78/8 81/5
courthouse [1]  82/6
courtroom [2]  22/25 40/18
courts [1]  83/7
cover [1]  43/23
credibility [4]  41/23 52/21 73/20 78/10
credible [4]  10/22 13/23 39/12 40/11
crime [1]  31/3 82/12 82/15
crimes [1]  36/16
criminal [8]  22/15 22/18 23/1 23/7 40/12 45/3 60/6 86/18
Crips [1]  36/13
criticize [1]  56/23
cross [12]  6/3 9/22 14/19 49/8 50/23 51/20 52/5 52/15 54/11 54/12 66/21 78/12
cross-examination [5]  14/19 49/8 52/15 54/12 66/21
cross-examine [3]  6/3 9/22 78/12
cross-examined [2]  50/23 51/20
cross-examining [1]  52/5
cruel [1]  68/16
CSR [3]  1/22 90/19 90/19
currently [1]  88/9
cursory [1]  6/25
curtain [2]  29/5 29/5
custody [1]  67/20
cut [1]  55/7

**D**

DA's [2]  14/13 14/16
date [2]  33/20 86/19
day [10]  1/13 19/25 43/19 80/20 80/21 82/6 83/21 83/22 89/2 90/16
days [12]  19/24 19/24 67/4 78/15 84/13 87/17 87/21 87/21 88/1 88/23 89/9 89/11
deal [2]  7/16 7/18 82/20
death [11]  5/2 10/7 25/2 41/13 59/24 64/9 66/24 68/15 70/1 70/5 83/15
deception [1]  67/2
decide [4]  31/11 54/7 76/18 77/14
decided [2]  22/15 22/21
decides [1]  89/1
deciding [1]  75/10
decision [10]  21/22 26/5 26/12 32/3 47/8 59/23 61/3 71/10 72/20 85/15
decision-making [3]  21/22 26/5 26/12
decisions [1]  51/1
declined [1]  31/18
deemed [4]  73/15 73/16 74/3 76/8
defendant [21]  2/18 3/1 3/5 38/17 38/23 40/4 40/13 40/25 41/19 49/18 50/14 52/4 53/21 58/4 60/16 71/19 71/20 71/25 72/1 72/2 72/7
defendant's [18]  37/14 37/15 37/17 38/3 38/7 38/13 38/15 39/3 39/6 40/8 40/10 41/8 42/21 51/4 51/19 54/1 54/8 55/9
defending [1]  6/6
defense [58]  12/16 13/25 14/5 14/19 15/8 15/10 15/14 16/9 16/20 31/20 36/18 37/12 38/1 38/3 38/4 38/10 38/12 38/15 39/18 38/24 39/1 39/11 40/6 40/21 41/5 41/25 42/11 43/2 44/23 50/10 51/8 52/12 52/24 53/20 54/3 54/4 54/11 54/17 54/19 54/23 54/25 55/7 58/18 59/19 60/11 60/22 64/12 66/21 68/11 70/17 71/5 71/6 71/15 71/21 72/4 82/19 87/12
defense's [2]  23/2 85/13
deficient [1]  64/17
degree [3]  82/2 82/2 82/3
delay [3]  60/12 60/22 73/24

**D**

deliberated [1]   20/20
deliberation [2]   19/24 56/9
deliberations [5]   25/10 27/5 28/8
  55/22 64/21
delve [1]   57/11
demeanor [2]   73/21 78/11
denial [1]   59/10
denied [3]   4/21 43/18 59/9
denying [1]   60/8
department [1]   16/14
depth [1]   72/23
described [2]   20/24 49/10
description [2]   19/13 19/14
deserve [1]   74/25
designating [4]   33/24 75/9 75/24
  77/3
desire [1]   60/12
despite [2]   26/24 72/9
detail [2]   71/7 74/4
details [1]   27/8
determination [1]   23/7
determine [1]   70/8
determined [1]   76/4
develop [1]   48/15
developed [1]   62/14
development [13]   28/25 29/3 37/10
  48/1 61/23 72/21 73/1 73/11 73/15
  75/9 77/4 77/19 78/6
Diaz [17]   4/6 7/15 7/25 9/7 9/12
  9/22 10/24 10/25 11/6 11/9 11/16
  12/4 12/10 41/12 41/14 42/4 78/5
Diaz's [6]   11/2 11/4 14/2 14/22
  15/11 41/11
dictate [1]   63/7
did [62]   8/2 8/5 8/9 9/6 9/16
  10/23 13/3 15/18 15/23 20/4 20/14
  20/19 21/2 21/7 21/16 21/21 22/1
  22/25 23/2 23/3 23/5 24/2 27/4
  27/11 27/17 30/22 31/9 31/10
  33/15 38/6 38/15 38/16 38/23
  39/11 40/4 40/8 40/11 41/1 41/22
  42/7 43/5 44/24 45/15 46/5 48/14
  48/20 48/20 50/1 50/11 51/2 57/6
  59/6 62/11 62/13 64/6 69/13 69/19
  74/14 78/22 80/1 87/8 88/17
didn't [23]   8/7 17/13 25/21 28/16
  31/1 31/2 34/7 34/9 34/18 36/6
  45/2 45/11 45/12 51/23 51/25 53/2
  56/24 62/15 63/12 71/22 76/25
  80/14 84/6
difference [2]   16/1 79/24
different [15]   10/7 12/23 16/6
  16/18 16/19 36/16 36/17 36/24
  37/7 37/23 37/25 38/12 52/15 73/4
  85/21
differing [2]   9/14 13/7
difficult [1]   6/2
difficulty [1]   27/11
dire [3]   59/9 63/16 64/11
direct [14]   22/10 22/12 22/21
  31/4 31/7 32/14 43/16 44/15 44/15
  54/11 60/3 60/4 61/4 61/7
dired [1]   63/25
disagree [3]   21/11 42/11 61/12
disagreed [1]   31/6
disassociation [1]   51/13
disclosed [3]   13/22 16/16 16/17
disclosure [2]   12/20 13/2
discoverable [1]   52/12
discovered [1]   26/22
discovery [3]   16/12 16/13 40/14
discrete [1]   80/6
discuss [6]   19/6 26/25 27/11
  27/14 28/7 47/25
discussed [5]   4/10 5/14 6/24 71/16
  86/3
discusses [1]   44/6
discussing [2]   12/8 46/15
disingenuous [1]   45/7
dismiss [1]   71/13
dismissed [3]   71/15 71/15 71/18
dispositive [1]   11/14
dispute [2]   38/2 77/25
disputed [2]   75/12 75/14
disputes [3]   45/19 57/10 61/24
dissent [1]   44/24
dissenting [2]   44/19 45/5
district [11]   1/4 1/6 1/22 2/5
  2/5 3/20 14/4 58/14 73/3 90/4
  90/20
division [1]   15/3
do [45]   6/25 7/8 9/7 10/3 10/3

10/4 10/10 13/12 15/12 17/1 17/1
  17/5 19/5 25/13 34/6 34/9 34/10
  34/15 34/15 39/6 46/6 47/17 50/25
  54/11 56/21 58/6 58/7 58/7 58/13
  63/12 74/17 75/6 75/18 76/21
  76/25 79/3 79/23 80/6 82/13 82/16
  86/14 86/23 87/14 88/5 90/5
document [7]   11/11 11/12 14/4
  18/15 18/19 66/25 86/10
documentation [1]   38/12
documents [3]   9/10 9/11 11/14
does [12]   15/9 34/14 39/7 75/22
  75/23 75/25 77/1 77/2 80/7 82/13
  82/17 87/1
doesn't [4]   9/4 30/8 78/17 78/19
doing [11]   6/1 10/5 27/23 31/14
  44/9 69/14 74/7 74/15 75/9 82/23
  82/23
don't [48]   5/8 5/16 7/8 21/24
  25/20 26/16 27/15 29/1 32/19
  32/20 34/11 34/14 34/20 35/20
  35/21 41/16 42/9 43/19 45/5 47/1
  49/9 52/8 53/7 53/9 55/17 56/12
  58/7 58/13 58/14 61/11 64/24
  66/15 72/11 72/14 75/20 78/6 79/5
  80/22 81/20 82/12 82/18 84/10
  85/2 85/7 85/7 86/9 86/14 87/10
done [4]   7/1 43/13 51/3 70/17
door [8]   31/24 32/6 32/9 32/9
  42/7 42/17 42/20 44/13
double [1]   66/16
double-check [1]   66/16
doubt [1]   49/12
down [14]   35/3 35/4 35/10 45/4
  65/3 71/8 71/11 71/14 80/12 80/24
  81/6 84/16 85/9 86/3
dozens [1]   6/13
Dr [4]   31/12 31/21 44/12 44/13
Dr. [1]   32/2 44/4 44/8
Dr. Malpass [3]   32/2 44/4 44/8
drop [3]   61/9 61/12 61/19
due [9]   5/2 22/13 22/22 40/12
  68/16 74/25 75/16 80/7 82/21
during [19]   14/12 14/14 15/11
  16/72 16/6 16/11 16/16 22/7 40/14
  40/18 41/18 43/8 49/19 51/8 53/23
  59/20 59/25 63/16
dynamic [1]   6/20

**E**

e-mail [3]   15/14 84/25 85/4
e-mails [3]   37/23 37/24 38/12
  39/2 39/15 40/4 54/2
each [3]   9/24 10/23 52/2
earlier [1]   73/3
early [2]   13/24 39/3
Eckhoff [2]   2/14 3/10
effect [8]   19/19 20/2 22/25 27/1
  29/2 33/6 52/8 76/23
effective [1]   15/12
effects [3]   48/22 49/5 49/6
effort [1]   31/13
eight [1]   30/16
either [6]   18/18 41/4 41/17 64/25
  78/20 84/11
Eleazar [1]   63/4
elicited [1]   66/22
eligible [1]   67/3
else [2]   83/23 88/18
encouraged [1]   27/18
end [9]   10/2 23/6 43/19 53/3
  54/21 59/2 64/15 70/17 83/25
ended [2]   24/18 36/16
endless [1]   28/11
English [1]   54/18
enough [2]   21/14 81/3
enter [1]   34/1
entire [3]   28/24 33/8 63/9
entirely [3]   16/18 16/19 20/18
entirety [5]   52/14 57/5 57/5
  66/11 67/5
entitle [1]   4/3 73/8 77/16
entitled [4]   4/16 31/7 65/5 75/1
entitles [1]   9/8
enumerate [1]   74/11
episode [1]   62/20
equal [2]   68/13 68/16
equals [2]   66/19 69/16
Erin [2]   2/14 81/3
err [1]   23/2
erred [1]   60/5
error [7]   18/7 19/1 58/12 60/6

3/6 83/7 83/18
errors [7]   7/10 47/18 79/18 79/20
  79/22 80/13 83/16
Escobar [1]   38/18
especially [2]   11/15 23/23
essentially [1]   65/23
establish [2]   43/19 56/8
established [1]   4/3
esteem [1]   8/19
evaluate [1]   78/10
eve [2]   7/17 60/13
even [25]   8/3 11/3 11/5 15/19
  15/21 20/3 23/4 23/5 23/11 23/15
  23/19 28/14 28/20 29/11 31/3
  43/14 59/12 61/6 64/24 65/11
  69/14 74/10 83/4 83/9 83/11
event [8]   15/4 15/4 15/4 19/21
  21/21 21/21 29/24 77/17
events [1]   21/4
every [13]   8/13 52/2 56/16 71/18
  79/17 80/10 80/20 80/21 81/4 81/8
  83/18 83/21 83/22
everybody [1]   12/5
everything [5]   54/24 70/17 85/7
everywhere [2]   24/16 24/17
evidence [34]   4/10 4/22 4/25 5/1
  9/20 12/20 25/8 26/11 28/17 29/19
  32/8 35/12 41/7 41/7 47/15 49/3
  50/11 50/12 50/13 50/21 51/2 51/4
  51/7 51/14 51/16 57/7 60/15 63/18
  64/21 64/22 67/18 70/7 76/14 90/7
evidentiary [12]   4/24 6/1 11/15
  71/23 72/21 77/22 78/2 81/13 86/5
  87/18 87/23 88/22
Ex [1]   9/3
exact [2]   27/8 50/13
exactly [4]   27/22 45/20 49/9 66/4
examination [3]   14/19 15/12 22/24
  49/8 52/15 54/12 54/12 66/21
examine [6]   6/3 6/22 9/22 17/20
  78/12 78/12
examined [3]   32/13 50/23 51/20
examining [2]   52/5 67/13
example [6]   15/23 38/14 42/3
  46/11 46/19 78/3
except [1]   26/13
exchange [1]   7/18
exchanged [1]   56/1
exclude [1]   68/12
excluded [2]   70/15 70/16
Excuse [1]   4/7
excused [2]   71/3 71/3
exhibit [2]   15/13 55/7
exhibits [7]   10/21 14/23 37/23
  38/14 54/3 67/7 90/15
exist [1]   75/15
exonerated [1]   65/24
expect [1]   85/8
expected [1]   10/25 55/13
expert [7]   27/12 30/12 31/12
  51/20 51/21 54/19 54/23
expertise [1]   31/16
experts [20]   28/10 28/12 28/12
  37/8 37/9 38/13 49/3 49/4 49/8
  49/14 49/18 50/24 50/24 50/25
  51/2 52/1 52/6 52/8 52/13 52/18
experts' [1]   49/12
Expiration [1]   90/23
explain [4]   31/22 49/5 71/24
  85/25
explained [3]   31/16 51/19 71/17
explaining [1]   19/17
explains [1]   71/22
exploration [1]   78/18
explore [4]   45/22 62/13 62/15
  65/5
exposed [1]   4/11
expressed [1]   10/12
extensive [3]   35/12 37/11 50/12
extent [3]   6/23 7/5 9/5
extra [1]   33/3
extraneous [11]   4/12 19/8 26/14
  26/17 31/24 32/4 32/5 35/18 36/24
  42/8 42/21
extraneouses [8]   35/19 42/9 42/17
  49/23 49/25 50/21 50/22 59/19
eye [1]   71/8
eyewitness [5]   30/12 30/15 31/11
  31/13 37/11

**F**

F-A-R-N-A-Z [1]   3/18
Facebook [7]   25/22 25/24 26/21

**F**

Facebook... **[4]** 26/23 27/2 28/6 28/19
fact **[26]** 5/23 9/6 20/5 23/3 28/25 29/2 30/17 32/9 33/7 37/7 45/20 47/16 52/14 54/4 55/25 59/19 68/2 70/16 73/16 74/4 74/21 75/8 75/10 77/9 81/17 82/21
factors **[3]** 58/19 59/7 59/24
facts **[9]** 5/24 28/7 39/12 48/15 48/16 73/6 73/25 75/13 77/15
factual **[18]** 45/19 47/25 57/10 61/23 61/24 72/21 73/1 73/5 73/11 73/15 74/9 75/9 75/13 77/4 77/10 77/19 78/6 78/20
failing **[2]** 33/2 58/2
fails **[2]** 28/5 56/8
failure **[6]** 30/6 30/9 49/1 51/19 52/17 67/1
fair **[4]** 6/21 18/20 21/14 53/1
fairly **[1]** 82/22
fall **[1]** 12/18
false **[13]** 4/5 9/2 9/5 9/7 10/16 65/20 66/8 66/11 67/10 67/14 67/14 77/12 78/5
familiar **[1]** 64/7
family **[13]** 19/23 35/21 37/14 38/16 38/16 38/18 38/20 39/3 40/2 40/4 51/5 51/15 54/1
far **[2]** 24/3 33/11
Farnaz **[4]** 2/2 3/17 17/6 47/23
fashioned **[1]** 48/24
favorable **[1]** 71/14
federal **[2]** 61/15 79/18
feel **[6]** 27/15 40/11 73/6 74/25 78/12 82/20
feeling **[2]** 27/11 51/3
felt **[2]** 19/22 57/3
Fifth **[1]** 49/16
file **[17]** 9/17 12/12 12/17 13/25 14/8 14/13 14/24 16/1 16/4 29/15 29/19 66/5 74/20 75/21 79/11 81/12 84/1
filed **[16]** 4/1 22/9 22/9 43/12 60/13 60/18 60/22 61/3 74/21 74/23 76/1 76/16 78/15 78/17 81/10 84/3
files **[2]** 14/16 18/16
filing **[1]** 89/8
final **[1]** 62/9
finally **[1]** 39/4
find **[4]** 9/16 18/16 18/22 65/7
finding **[5]** 5/24 45/20 47/6 68/2 70/10
findings **[2]** 73/5 87/21
finds **[1]** 76/1
fine **[9]** 18/22 35/2 53/17 78/22 79/13 79/14 87/7 87/8 88/17
first **[16]** 7/7 8/25 10/10 11/19 11/20 11/21 13/20 23/14 24/5 26/1 65/10 70/3 79/7 81/12 82/2 82/10
five **[7]** 21/3 29/8 36/5 36/6 62/24 78/15 80/25
flashed **[1]** 41/18
focuses **[1]** 64/8
follow **[2]** 34/9 69/23
follow-up **[1]** 34/9
following **[1]** 1/13 30/3
foot **[1]** 54/6
foregoing **[1]** 90/6
forensic **[4]** 2/16 3/10 3/14 89/6
forgive **[3]** 23/20 27/7 89/3
form **[5]** 5/23 74/15 74/24 75/3 85/3
former **[1]** 6/5
forth **[1]** 81/8
forward **[2]** 58/23 68/4
found **[12]** 9/11 17/15 24/3 40/14 40/23 43/17 44/17 44/21 55/9 66/13 67/17 75/14
four **[6]** 35/24 36/3 36/4 50/24 58/18 80/25
Fourteenth **[2]** 59/4 68/13
frame **[1]** 86/15
Franklin **[3]** 1/23 2/6 90/21
free **[1]** 27/15
fresh **[2]** 57/19 77/7
Friday **[1]** 89/13
friends **[2]** 27/18 51/15
front **[2]** 33/19 42/10
fry **[1]** 27/19
full **[2]** 19/24 78/18
funny **[1]** 48/24

**G**

gang **[6]** 36/13 40/13 41/18 41/18 46/20 51/13
gangs **[1]** 37/9
gauge **[1]** 65/6
gave **[6]** 7/20 9/13 9/13 36/18 39/4 64/18
general **[2]** 16/14 64/3
generally **[1]** 16/15
germane **[2]** 56/20 57/14
get **[14]** 12/4 31/13 39/2 47/8 53/5 55/14 58/21 60/10 61/16 79/3 83/8 84/24 85/17 89/12
getting **[3]** 55/12 55/13 59/12
giant **[1]** 15/7
Giglio **[1]** 9/1
girlfriend **[6]** 37/15 37/17 38/18 38/25 40/8 55/9
give **[15]** 9/24 27/19 38/20 42/14 42/18 48/8 52/6 56/19 64/2 64/8 65/17 72/10 78/19 84/22 84/22
given **[8]** 6/20 8/12 14/5 39/8 40/7 69/24 73/7 81/19
gives **[1]** 9/24
giving **[7]** 10/8 30/21 32/25 57/16 65/9 65/15 65/12
globally **[1]** 64/1
go **[33]** 3/6 4/8 7/6 7/9 7/12 7/25 8/23 10/6 18/1 19/3 19/5 26/1 27/16 28/3 29/6 29/12 33/20 47/17 51/7 54/16 54/18 57/16 69/4 72/10 73/2 74/4 80/21 81/3 83/14 86/12 88/15
God **[2]** 39/21 39/23
God-nich **[1]** 39/21
Godinich **[19]** 5/11 14/10 14/11 15/14 17/6 33/9 34/3 39/15 39/18 39/22 39/24 41/14 45/25 46/17 47/10 60/10 76/20 81/24 84/3
Godinich's **[3]** 54/2 55/6 64/4
goes **[3]** 43/20 64/16 71/7
going **[31]** 10/2 11/3 11/5 21/9 26/11 26/11 34/1 34/6 34/15 36/13 37/12 48/11 50/21 54/6 55/15 57/12 58/23 59/25 61/1 61/18 65/16 68/4 76/18 79/5 79/16 84/18 84/25 86/11 86/12 86/13 87/19
gold **[1]** 15/7
gone **[3]** 11/22 72/23 81/7
good **[8]** 3/21 3/22 3/22 23/21 77/21 81/25 87/9 88/25
got **[2]** 30/3 46/2
gotcha **[1]** 61/17
Graham **[2]** 13/23 59/17
grant **[2]** 84/15 85/8
greater **[1]** 67/17
greatly **[1]** 17/23
ground **[2]** 43/4 72/2
grounds **[3]** 14/10 72/3 76/17
growing **[2]** 48/21 49/5
guaranteeing **[1]** 85/6
guard **[1]** 51/16
guess **[8]** 11/3 22/8 28/2 43/2 55/23 70/18 79/10 81/8
guidelines **[3]** 16/15 63/7 63/13
guilt **[10]** 27/5 29/10 29/15 30/9 32/21 34/20 41/8 41/19 42/6 83/15
guilty/innocence **[2]** 41/19 42/6
guilty **[2]** 20/1
Guiney **[4]** 20/23 33/19 34/1 75/23

**H**

habeas **[5]** 4/1 4/3 4/16 11/7 76/14
had **[57]** 5/11 5/17 6/12 6/24 7/22 8/8 9/19 10/6 12/10 12/20 12/25 13/2 13/6 15/16 16/25 17/7 17/10 18/13 18/17 19/19 20/2 20/12 20/12 20/15 29/2 29/2 30/20 30/24 31/14 34/2 34/5 34/23 37/9 38/10 38/22 39/1 46/14 48/22 52/2 52/11 52/19 58/8 59/10 60/11 62/9 65/23 65/24 66/1 66/3 71/16 72/20 73/15 73/16 74/3 77/6 80/17
hadn't **[1]** 74/10
hand **[2]** 72/15 90/16

---

ndle **[3]** 16/5 16/7 16/12
ndled **[1]** 13/24
handling **[3]** 17/2 60/2 88/6
hands **[2]** 23/17
handwritten **[2]** 9/11 15/5
happen **[1]** 80/17
happened **[9]** 9/14 19/18 20/12 23/16 25/4 31/24 45/23 45/24
happening **[1]** 36/23
happens **[2]** 56/16 83/21
happy **[2]** 7/6 65/14
hard **[1]** 88/16
harm **[3]** 28/5 43/19 64/18
HARRIS **[10]** 1/5 1/16 2/5 3/20 51/16 65/22 82/13 90/1 90/4 90/21
has **[22]** 14/18 4/20 8/4 8/12 12/13 14/25 16/16 17/6 20/23 22/20 23/1 23/7 31/4 37/22 38/14 55/25 58/21 74/21 75/12 76/4 81/7 86/24 87/3 88/7 88/8
hasn't **[1]** 88/13
have **[129]**
haven't **[4]** 16/8 18/17 29/2 86/13
having **[8]** 19/23 24/18 40/6 52/4 52/7 52/22 78/15 83/6
he **[94]**
he's **[9]** 12/7 15/19 28/14 32/19 35/22 46/15 62/20 70/25 81/25
head **[2]** 64/7 66/19
heads **[2]** 52/2 88/4
health **[1]** 37/9
hear **[3]** 12/5 69/17 74/5
heard **[5]** 8/15 56/4 56/9 56/17 81/20
hearing **[35]** 1/10 4/24 6/1 11/15 15/15 15/17 20/15 20/16 20/23 31/15 33/23 34/17 44/10 45/21 48/4 49/13 49/17 57/11 59/18 74/1 74/21 77/22 78/2 80/3 80/7 80/7 80/9 81/7 81/12 81/13 84/16 85/8 86/5 88/22 89/22
hearings **[2]** 12/23 87/24
hearsay **[14]** 11/10 11/12 11/14 12/2 39/13 40/25 46/21 46/23 47/2 47/3 47/13 47/13 78/4 78/7
heightened **[1]** 83/8
held **[2]** 1/14 1/16
help **[1]** 9/23
helpful **[1]** 52/9
her **[8]** 30/17 30/18 30/21 34/10 44/7 50/6 56/18 75/18
here **[42]** 5/24 8/19 12/5 12/7 14/16 18/13 26/18 33/19 33/21 35/21 37/18 38/8 40/16 45/4 46/8 47/9 47/23 48/9 52/6 54/17 56/17 57/21 58/9 65/22 70/22 72/19 72/24 73/9 74/15 77/20 78/16 79/4 80/1 80/8 80/18 80/20 80/24 80/25 81/24 82/3 82/3 83/23
hereby **[1]** 90/5
Hernandez **[2]** 62/20 63/2 63/4
hey **[1]** 21/7
high **[2]** 6/17 8/19
highest **[2]** 8/18 82/16
highlighted **[1]** 49/21
highlighting **[1]** 49/17
him **[32]** 4/3 7/23 8/4 8/6 8/8 8/19 8/20 10/25 12/5 27/19 27/20 28/16 30/24 30/24 31/7 32/19 34/8 36/1 36/7 40/14 43/18 47/11 48/21 48/22 51/23 56/4 56/17 56/19 57/3 62/21 65/25 67/18
himself **[9]** 11/9 11/16 38/23 40/19 41/1 47/9 49/14 49/18 58/4
hindered **[2]** 15/10 60/21
hired **[1]** 37/6
his **[72]** 3/11 7/18 7/18 7/23 7/25 8/2 8/6 10/24 12/6 14/12 14/15 14/15 14/19 22/12 22/13 22/21 22/21 27/16 27/17 27/18 27/20 28/8 29/18 30/9 31/16 33/6 35/21 37/15 37/15 38/14 40/12 40/12 40/13 40/16 41/15 41/22 46/16 46/21 49/19 51/5 51/12 51/13 51/21 51/21 51/16 51/17 55/24 56/23 57/5 57/5 60/14 60/15 60/19 60/23 62/24 66/2 66/4 66/6 66/20 67/5 67/7 67/8 67/9 67/17 67/20 71/20 71/21 71/22 71/24 71/24
history **[4]** 40/12 48/17 51/5 67/20
hit **[2]** 48/2 48/4

02205

## H

hoc [1] 74/16
hold [3] 8/19 15/7 57/2
Honor [37] 3/3 3/9 3/21 3/25 10/1 17/9 17/13 19/3 19/12 21/10 27/22 28/24 29/7 33/18 34/11 35/5 37/20 38/9 46/25 47/7 48/7 48/13 49/24 57/9 57/15 59/1 61/1 61/11 62/2 62/8 62/23 63/6 67/25 72/14 72/18 87/16 89/20
Honorable [1] 1/15
hope [1] 84/21
hoped [1] 77/6
hoping [1] 86/2
host [2] 36/19 37/6
hotel [2] 24/18 26/17
hour [1] 48/10
hours [5] 14/15 19/25 20/20 74/2 78/17
hours' [1] 74/8
Houston [5] 1/16 1/23 2/6 23/15 90/22
how [15] 10/2 15/23 19/17 21/25 26/4 27/16 28/3 38/22 49/10 61/4 62/15 85/2 87/9 88/5 88/22
however [7] 12/18 19/5 23/11 43/4 43/11 65/4 66/21
huh [1] 23/18
hurrying [2] 32/25 57/24
Hutchins [9] 2/2 3/17 17/3 18/9 26/13 29/1 44/11 45/18 46/18
hypothetical [5] 20/3 21/22 22/1 25/18 26/7

## I

I'd [2] 24/6 73/22
I'll [8] 5/10 19/2 19/7 21/18 29/8 48/8 79/14 84/22
I'm [53] 3/10 5/17 7/6 8/20 8/22 14/25 17/22 18/1 18/22 21/15 25/16 26/18 27/21 29/11 32/4 32/22 32/24 32/25 34/13 34/15 34/16 43/7 43/24 45/8 45/8 56/3 56/15 57/12 57/13 57/15 57/23 61/1 65/9 65/10 65/11 65/11 65/14 65/16 65/16 65/17 66/14 66/18 80/18 81/3 84/11 85/6 86/13 87/9 88/9 88/12 88/25 89/9
I've [10] 7/7 10/6 21/18 37/24 79/19 81/1 81/19 81/20 81/23 81/24
IAC [4] 32/22 33/5 34/20 62/9
idea [3] 21/24 26/6 56/18
identification [11] 30/12 30/17 30/19 31/2 31/5 31/11 31/17 31/19 31/23 37/11 44/18
identifications [1] 44/22
identified [1] 39/10
identifies [1] 40/6
identify [1] 7/2
illness [1] 51/5
immediate [1] 30/19
immediately [2] 7/22 55/13
impartial [2] 22/13 22/22
impeachment [3] 4/5 4/10 9/20
impermissibly [4] 44/18 44/22 44/25 45/11
important [10] 4/17 12/4 15/5 15/25 20/1 30/4 38/22 48/17 48/23 57/3
importantly [2] 27/12 77/11
impression [2] 66/12 67/10
impressions [1] 26/5
improper [2] 63/20 65/2
improperly [1] 63/16
in-court [1] 44/17
inadequate [1] 77/20
inadmissible [2] 25/15 78/1
inadvertent [1] 13/3
inadvertently [1] 65/19
incident [4] 19/15 19/16 20/8 66/2
incidents [1] 20/24
include [2] 4/4 34/8
included [4] 14/3 32/21 34/5 90/9
including [5] 26/25 37/14 38/18 48/19 63/10
inconsistencies [2] 14/14 15/24
inconsistent [2] 9/21 12/9
incredibly [1] 8/19
inculpatory [1] 14/21
Indeed [3] 83/2 83/2 83/13
indicated [1] 18/13 29/15 34/5 66/3
indication [1] 28/15
ineffective [21] 5/7 6/9 19/6 29/9 33/2 43/12 43/13 48/25 57/17 58/1 63/15 72/22 73/13 74/5 75/15 77/12 77/18 78/14 82/20 82/25 83/10
influence [6] 4/12 4/13 19/9 20/16 22/2 26/14
influenced [1] 28/18
influences [3] 25/11 25/13 32/4
inform [1] 27/23
informal [1] 20/23
information [26] 10/8 12/10 13/21 14/21 15/18 16/13 18/13 36/19 38/21 38/21 38/24 39/2 39/4 39/8 39/12 39/12 40/2 40/3 40/5 40/20 41/2 42/6 46/2 46/14 52/18 73/24
informed [1] 20/8
initial [4] 4/1 7/6 61/3 74/7
inmate [1] 66/24
inner [1] 71/24
innocence [5] 27/5 29/18 41/8 41/19 42/6
innuendo [1] 40/25
insight [1] 60/10
insinuated [1] 49/11
instructing [2] 68/21 69/2
instruction [3] 69/10 69/25 70/7
instructions [2] 64/19 69/23
insulted [1] 56/24
intend [1] 79/23
interest [2] 6/6 42/22
interesting [2] 30/18 32/11
interestingly [2] 41/14 56/11
interlineate [1] 5/11
internal [1] 65/25
interpreted [1] 19/16
interviewed [4] 39/11 40/5 40/7 51/23
interviews [1] 51/24
intimidation [1] 19/16
introduce [1] 3/7
investigate [4] 30/9 51/12 60/15 86/10
investigated [4] 43/3 43/15 51/4 51/10
investigation [18] 7/24 20/6 26/22 29/16 29/19 29/21 29/22 30/3 30/5 30/7 33/3 36/13 36/15 38/5 40/22 42/2 48/15 51/1
investigator [2] 8/11 11/8
investigators [4] 37/7 37/7 37/8 41/5
involved [1] 33/7 66/23
involvement [2] 7/24 8/1
is [152]
Isbell [4] 8/12 8/18 10/22 10/25
isn't [1] 21/19
Israel [7] 7/15 9/12 14/2 15/11 41/10 42/4 78/5
issue [28] 5/24 19/18 23/8 23/9 25/9 25/22 25/23 26/14 43/1 43/19 43/20 44/3 46/8 49/20 51/18 60/3 60/19 64/8 67/22 70/4 71/17 75/13 75/25 77/3 77/5 80/10 81/8 85/16
issue's [1] 23/9
issued [1] 76/20
issues [37] 22/11 26/4 33/4 33/25 52/25 53/7 53/8 53/11 54/13 54/15 55/2 55/19 62/13 64/12 64/13 64/14 64/22 65/7 72/22 72/25 75/9 75/10 75/14 76/8 76/22 77/8 77/9 77/10 78/18 79/16 80/6 80/8 81/12 81/13 81/16 82/20 86/3
it [161]
it's [45] 6/2 6/21 9/2 11/8 11/10 11/12 12/4 15/5 15/5 15/25 17/23 19/3 23/25 26/7 28/1 32/6 32/10 43/22 45/4 45/6 45/16 47/16 48/9 48/24 52/16 52/17 58/23 59/3 59/7 60/17 61/4 61/7 67/14 68/10 69/9 69/24 71/7 73/18 75/24 75/25 76/19 77/3 83/9 84/11 84/12
its [4] 13/24 22/10 60/7 66/11

## J

jail [2] 51/16 59/22
Jerome [3] 5/11 14/9 14/11
job [4] 78/22 82/13 87/8 88/17
Joe [1] 45/1
joke [1] 39/25
Joshua [2] 2/3 3/19

AN [2] 1/6 3/11
judge [50] 1/16 10/12 10/13 11/19 13/20 18/1 20/14 20/23 22/7 22/20 24/7 24/24 25/3 25/5 25/7 28/4 29/5 32/18 33/19 34/1 34/24 35/8 35/8 35/11 36/5 36/10 36/11 37/1 42/25 43/25 44/14 44/21 45/4 50/8 50/9 56/22 58/14 58/16 59/14 59/16 63/14 66/10 71/19 75/20 75/23 83/25 85/11 88/20 88/25
judges [1] 60/1
JUDICIAL [1] 1/6
jump [1] 19/7
juror [24] 21/9 21/12 21/16 21/22 22/2 22/14 22/23 25/9 25/14 28/1 29/5 33/4 43/3 43/15 43/18 56/11 63/3 68/22 70/15 70/16 71/11 71/18 77/13 80/22
juror's [2] 19/13 71/9
jurors [38] 4/11 19/16 19/20 19/20 20/2 20/3 20/3 20/16 21/1 21/2 21/3 21/20 22/24 22/25 23/4 23/5 25/10 26/23 27/13 27/23 28/18 41/20 41/21 46/20 47/11 56/4 56/10 56/24 57/1 57/4 62/15 63/17 63/19 64/2 64/8 69/23 70/24 71/13
jurors' [2] 26/4 26/11
jury [45] 19/9 20/25 22/1 22/13 22/16 22/22 25/18 25/18 26/23 27/2 27/3 29/11 31/15 31/21 32/3 49/11 49/12 49/17 49/21 52/21 52/23 55/21 56/9 59/12 62/10 62/12 63/6 63/10 63/11 63/21 64/5 64/19 65/2 66/12 67/18 68/21 63/9 69/9 69/15 69/22 70/6 70/7 80/15 80/9
jury's [1] 70/3
just [73] 5/9 5/10 5/17 6/11 6/20 8/22 8/25 10/3 11/24 13/10 15/8 16/22 17/4 17/22 18/8 18/9 18/13 19/14 21/19 26/3 26/18 28/11 34/13 34/15 35/9 36/21 37/14 37/16 39/17 42/3 43/23 44/2 44/14 45/8 45/18 45/18 47/6 47/16 50/10 50/14 53/10 53/15 56/16 56/22 57/9 57/13 58/24 60/1 60/25 61/2 61/4 62/23 63/11 65/1 68/4 68/6 69/9 72/12 72/18 74/13 78/17 80/12 81/19 83/25 84/2 84/6 84/17 85/16 85/19 88/2 88/14 88/16 88/19
justify [1] 52/22
juvenile [2] 51/15 67/20

## K

Karen [1] 42/4
Katherine [2] 2/15 3/13
keep [3] 19/2 79/14 79/15
keeping [1] 79/17
keeps [1] 59/21
Kegans [1] 45/2
kept [1] 38/24
kind [4] 39/25 46/7 49/16 85/20
kitchen [1] 85/8
knew [7] 28/19 30/7 30/23 30/25 40/23 62/13 72/1
know [62] 4/18 5/11 5/16 5/18 5/18 6/3 6/12 6/12 9/4 9/6 10/7 11/10 15/18 17/13 21/8 24/2 25/20 27/20 29/1 29/20 30/5 30/16 30/22 30/24 31/1 31/18 32/19 32/20 33/11 34/20 35/20 35/21 36/7 36/22 37/4 43/17 43/22 45/8 47/10 48/21 49/9 52/11 53/7 53/9 56/10 63/7 69/19 69/23 75/5 79/5 79/17 80/25 81/22 81/25 82/12 82/13 82/16 83/4 85/2 86/14 87/20
knowing [1] 9/2
knowingly [1] 10/17
known [1] 42/2
knows [1] 56/3

## L

La [1] 36/13
labor [1] 87/19
lack [1] 64/17
lacking [1] 50/14
laid [1] 59/7
Lake [1] 24/16
larger [1] 36/12
last [4] 31/10 46/2 74/2 84/4

**L**

law [12]  10/20 11/13 25/8 25/11
60/15 63/15 63/18 63/25 67/22
72/7 76/6 76/9
lawyer [1]  81/25
lawyers [2]  5/14 5/16
leading [2]  9/13 30/25
leads [1]  38/20
leaning [1]  28/9
learned [5]  15/16 15/17 15/20
40/21 42/1
least [7]  18/18 35/24 37/24 46/11
47/24 51/6 87/17
leave [1]  40/18
led [1]  28/22
left [2]  66/11 67/11
legal [2]  68/1 70/8
lengthy [1]  74/25
let [5]  5/9 36/21 45/1 47/23
57/12
let's [9]  3/6 10/10 34/18 45/7
56/19 57/14 62/4 79/14 79/15
letter [1]  67/8
letting [1]  65/10
level [3]  6/16 6/17 82/24
life [4]  59/21 64/8 68/22 69/16
light [3]  30/7 51/3 74/1
like [27]  5/3 6/15 10/1 10/9
13/18 27/5 35/4 36/22 42/10 45/18
47/25 50/6 53/16 56/24 57/11 61/5
65/14 65/25 72/15 73/22 74/16
74/22 78/8 81/11 83/23 87/12
87/20
likes [1]  39/20
limit [1]  65/16
limitations [1]  23/15
limiting [1]  43/24
line [3]  71/9 71/12 71/14
lines [2]  27/19 28/11
lineup [3]  31/17 44/17 45/10
list [4]  82/2 82/3 82/3 82/5
listening [1]  15/6
lists [2]  46/14 76/2
little [7]  25/16 29/15 29/19
48/24 64/6 77/2 84/20
live [5]  54/14 73/19 77/21 80/3
88/15
locate [1]  29/22
location [1]  26/17
lock [1]  63/19
log [1]  14/15
long [5]  15/3 23/12 43/22 73/24
73/24
look [12]  15/1 24/6 44/4 60/9
64/10 64/23 67/16 73/10 74/19
75/23 77/7 85/10
looked [4]  24/16 24/17 52/14 57/4
looking [3]  67/5 71/9 83/6
lot [2]  43/23 73/24
LTC [1]  41/18
lunch [2]  20/22 20/22

**M**

ma'am [3]  28/23 55/18 57/8
machine [1]  1/19
made [34]  12/16 12/20 16/25 17/14
20/12 23/7 24/1 27/1 31/13 31/20
32/13 33/5 34/4 39/18 45/23 48/23
49/8 51/1 52/11 55/21 56/25 58/4
61/3 63/6 63/11 68/3 68/24 69/12
70/9 72/20 73/3 74/24 80/10 86/13
mail [4]  15/14 84/14 84/25 85/4
mailed [1]  84/5
mails [5]  37/23 37/24 38/12 39/2
39/15 40/4 54/2
maintain [1]  82/7
maintained [1]  29/17
majority [7]  31/9 39/10 44/16
45/6 45/10 45/11 71/1
make [29]  5/10 7/6 18/8 18/18
19/20 21/18 27/15 28/8 29/17 31/2
45/12 47/7 49/15 51/25 52/9 53/1
53/15 59/23 63/8 71/10 73/22 83/5
83/8 83/11 85/15 86/22 86/23 87/1
87/12
makes [1]  47/6
making [7]  4/20 7/16 21/22 26/5
26/12 27/20 73/5
malarkey [1]  57/14
Malpass [9]  31/12 31/16 31/21
32/2 42/13 44/4 44/8 44/12 44/13
managed [1]  54/10
managers [1]  23/12

manner [3]  76/8 76/18 77/25
88/1 88/5
many [6]  9/12 45/24 77/22 77/23
88/1 88/5
material [2]  67/15 67/21
materiality [1]  67/13
may [28]  3/24 5/18 5/21 6/17 6/20
8/23 15/2 16/18 16/23 21/1 22/2
24/19 30/12 34/24 34/25 35/7 37/2
45/9 50/3 53/13 56/21 58/24 61/9
62/1 66/16 67/24 77/8 79/3
maybe [2]  36/6 87/21
me [28]  4/7 5/9 10/2 10/3 23/20
27/7 36/21 42/10 45/1 53/11 57/14
75/21 79/20 81/23 84/15 84/17
84/21 84/22 85/2 85/8 85/8 85/25
86/10 86/11 88/22 89/3 89/3 90/12
mean [11]  20/13 21/13 33/16 47/12
58/11 58/13 58/24 70/13 82/17
84/19 86/1
means [1]  21/25
Meanwhile [1]  54/8
media [1]  26/25
meet [1]  64/24
meeting [2]  41/12 52/2
meetings [4]  9/12 10/23 37/14
37/16
members [5]  37/25 38/18 46/10
46/13 54/1
memorandum [1]  79/5
memorialized [1]  15/20
memory [1]  57/19
mental [4]  25/10 26/5 37/9 51/5
mention [3]  25/21 29/8 46/5
mentioned [4]  21/18 26/3 44/11
46/19
merit [1]  72/11
messages [1]  26/22
method [2]  64/5 64/6
Mexico [11]  38/16 38/17 50/25
53/20 54/1 54/15 54/19 54/23 55/8
55/10 55/12
midst [1]  27/3
might [5]  29/3 48/3 49/23 84/19
88/2
mind [2]  63/11 72/15
minimum [1]  79/15
minorities [1]  71/1
minority [1]  45/7
minute [1]  31/10
minutes [1]  35/4
misconduct [8]  22/15 22/23 28/1
43/3 43/15 43/18 77/11 77/13
miss [1]  48/10
missing [1]  60/20
mistaken [2]  24/19 66/14
mistakes [4]  83/5 83/8 83/12
83/14
mistrial [2]  23/3 23/4
miti [1]  48/18
mitigating [4]  63/18 63/20 65/8
70/8
mitigation [18]  37/8 38/13 50/12
50/19 50/24 50/25 54/19 54/23
59/20 62/12 64/1 64/1 64/3 64/10
64/14 64/23 65/4 65/5
model [1]  77/19
modified [1]  66/6
mom [1]  38/4
moment [5]  8/14 18/2 57/18 61/25
62/5
months [1]  23/23
more [21]  5/15 5/17 7/4 15/21
18/9 20/20 26/7 27/12 35/11 46/3
56/21 62/22 65/11 65/15 71/13
74/8 77/2 79/1 85/20 86/4 87/5
morning [3]  3/22 23/16 24/1
most [4]  6/2 21/1 77/10 79/16
motel [5]  19/11 23/14 24/11 24/14
81/21
mother [6]  37/15 38/7 38/11 38/15
51/17 54/8
motion [36]  12/19 23/3 32/16
32/22 33/5 33/24 34/4 43/4 43/15
58/4 59/5 59/9 59/17 60/5 60/19
60/23 72/5 74/20 74/24 74/23
74/23 75/3 75/4 78/17 79/9 79/10
79/11 80/12 81/13 85/13 85/22
86/4 86/6 86/16 87/12 88/16
motions [2]  79/5 86/22
motive [1]  52/20
motives [2]  41/11 41/13
move [4]  23/3 34/21 56/20 86/21
moving [1]  85/22

[5]  2/3 4/6 5/11 41/14 68/12
Mr. [106]
Mr. Balderas [22]  3/15 4/16 4/18
6/22 7/22 7/23 8/3 8/4 9/8 29/23
30/14 30/19 30/23 31/2 32/12 37/4
49/14 68/19 71/16 71/16 73/9
77/16
Mr. Balderas' [12]  4/2 5/6 7/17
8/1 33/12 48/17 49/3 49/15 68/15
68/19 70/1 70/5
Mr. Benitez [5]  41/9 41/15 41/17
41/22 46/20
Mr. Diaz [12]  4/6 7/25 9/7 10/24
10/25 11/6 11/9 11/16 12/10
41/12 41/14
Mr. Diaz's [3]  11/2 11/4 14/22
Mr. Godinich [14]  15/14 17/6 33/9
34/3 39/15 39/18 41/14 45/25
46/12 47/10 60/10 76/20 81/24
84/3
Mr. Godinich's [3]  54/2 55/6 64/4
Mr. Hernandez [2]  62/20 63/2
Mr. Isbell [4]  8/12 8/18 10/22
10/25
Mr. Juan [1]  3/11
Mr. Malpass [2]  31/16 42/13
Mr. Nunnery [13]  14/17 17/6 33/10
34/3 39/15 41/3 55/24 60/10 60/18
69/14 71/22 76/21 84/3
Mr. Nunnery's [5]  39/18 46/1
55/20 63/23 71/7
Mr. Reiss [1]  18/3
Mr. Shearer [7]  33/2 33/11 34/5
43/1 43/3 47/11 47/12
Ms [4]  2/2 2/4 2/14 2/15
Ms. [10]  17/3 17/6 18/9 26/13
29/1 44/11 45/18 46/18 47/23
72/16
Ms. Black [1]  72/16
Ms. Farnaz [2]  17/6 47/23
Ms. Hutchins [3]  17/3 18/9 26/13
29/1 44/11 45/18 46/18
much [11]  19/19 32/25 33/21 41/24
48/8 50/10 50/13 57/21 65/17 77/1
89/19
multiple [3]  27/2 37/14 51/23
Munoz [3]  42/5 44/10 44/12
murder [12]  5/15 6/16 7/19 8/7
14/3 18/12 18/14 35/14 35/15
35/22 36/1 36/5
murders [5]  35/16 35/25 36/4 36/4
67/19
my [15]  3/3 3/9 19/13 38/24 38/25
53/15 56/18 57/19 64/7 66/19
72/16 81/19 85/11 88/12 90/16
myself [1]  81/2

**N**

name [4]  3/9 24/9 46/14 89/3
namely [2]  10/22 76/9
names [3]  38/21 38/23 68/8
nature [3]  48/24 59/18 68/8
nearly [1]  57/18
necessary [9]  4/23 4/24 6/23
33/23 47/7 57/3 70/11 71/23 73/16
need [13]  4/24 25/18 32/25 48/9
57/21 61/12 63/9 64/22 65/17
72/21 74/4 83/8 84/16
needed [2]  60/15 61/23
needs [1]  75/13
neither [1]  46/13
never [8]  8/4 8/15 16/10 21/5
30/2 33/10 60/12 60/16
new [7]  32/16 33/5 43/4 43/16
50/25 60/15 88/12
next [7]  18/25 19/25 23/16 24/1
29/6 87/24 88/1
nicely [1]  46/8
nich [1]  39/21
night [11]  7/20 7/21 8/3 9/14
23/14 24/2 24/18 24/19 29/24
30/20 46/2
nine [1]  88/10
no [36]  1/2 1/22 2/2 2/3 2/4 2/14
2/15 15/3 17/19 21/9 23/21 28/13
28/14 28/17 36/5 42/16 43/18
51/14 55/25 60/6 60/6 60/20 61/18
64/18 65/16 67/10 69/4 70/10
72/2 80/18 85/24
No. [4]  3/7 3/21 15/13 72/3
No. 11 [1]  72/3
No. 1412826-A [1]  3/7

**N**

No. 24053738 [1]   3/21
No. 56 [1]   15/13
Nobody [1]   84/7
None [1]   28/6
not [146]
note [1]   4/17
noted [3]   10/20 26/13 29/1
notes [25]   5/10 9/11 9/15 12/14
12/16 12/21 12/24 13/4 14/1 14/2
14/8 14/11 14/12 14/14 14/18
14/21 14/22 14/24 15/1 15/2 15/6
16/10 17/7 51/24 52/10
nothing [3]   16/25 39/6 40/23
notice [3]   15/23 36/18 74/8
noticed [1]   7/7
notification [1]   85/17
now [29]   6/8 7/24 11/6 13/5 14/9
15/19 17/25 23/8 25/6 26/19 39/9
40/6 41/25 43/2 43/16 48/3 48/5
50/7 50/14 50/15 53/4 53/9 70/25
72/8 73/17 73/18 77/6 79/25 84/25
number [4]   4/2 5/25 37/23 49/25
numbered [2]   1/15 90/10
numbers [1]   38/21
numerous [1]   74/24
Nunnery [15]   5/12 14/10 14/17
17/6 33/10 34/3 39/15 41/3 55/24
60/10 60/18 69/14 71/22 76/21
84/3
Nunnery's [5]   39/18 46/1 55/20
63/23 71/7

**O**

o'clock [1]   48/10
oath [2]   12/7 57/2
object [2]   49/1 70/19
objected [2]   53/3 60/16
objecting [1]   53/6
objection [4]   53/2 85/13 85/14
87/22
objections [3]   7/2 7/5 87/13
obligation [1]   83/16
obtain [1]   29/22
obviously [2]   4/20 45/25
occurred [8]   25/1 25/2 25/12
30/25 31/3 66/2 69/20 90/11
OCFW [2]   89/17 89/18
ODX [1]   33/24
off [18]   4/10 5/4 6/24 10/19
13/20 18/2 24/24 39/13 52/1 55/14
64/7 67/21 70/16 70/24 71/3 71/13
72/15 84/1
offense [1]   42/21
offenses [3]   36/17 36/24 59/22
offer [2]   27/15 59/21
offered [1]   90/15
office [26]   2/5 2/16 3/10 3/14
3/20 14/5 14/13 14/17 16/7 16/9
17/1 38/19 66/23 67/1 67/9 67/10
74/19 84/1 84/5 87/25 88/1 88/7
88/8 88/12 89/5 89/16
officer [2]   65/22 66/1
official [4]   1/22 90/3 90/16
90/20
often [2]   6/5 77/25
oh [3]   69/11 69/13 88/21
okay [32]   4/6 7/14 8/21 11/17
13/16 22/6 27/9 34/15 34/18 37/4
37/21 45/16 47/4 48/6 56/14 57/20
57/22 60/24 61/14 61/17 61/21
66/9 68/10 69/18 72/13 88/11
88/17 88/24 89/9 89/11 89/14
89/18
old [1]   62/20
once [3]   81/1 85/12 85/15
one [49]   9/24 9/24 10/4 10/4
10/10 11/2 14/7 14/23 17/25 18/2
18/8 22/11 23/12 26/23 27/13
27/18 28/13 29/6 30/13 30/14
32/11 33/8 35/9 35/22 36/8 44/7
44/15 45/2 46/8 47/2 48/23 55/4
56/6 57/13 60/14 65/19 67/16
68/22 69/5 69/6 69/15 71/8 71/11
77/20 79/17 80/19 82/10 82/14
82/17
ones [6]   47/25 48/3 70/14 74/13
81/19 85/9
only [25]   10/8 11/23 17/15 19/22
22/1 27/17 32/20 33/6 34/2 34/7
35/13 45/3 45/6 46/16 48/3 48/9
60/1 67/14 70/14 78/17 82/1 82/4
82/15 84/12 87/17

**O (cont.)**

open [11]   3/1 13/25 32/6 32/9
42/7 42/17 42/20 44/13 69/12
79/18 90/11
opening [2]   31/24 32/9
openness [1]   16/1
opinion [8]   22/10 42/14 44/16
44/24 45/5 45/6 45/7 81/19
opinions [4]   27/16 44/19 49/12
82/23
opportunity [11]   4/22 4/25 6/24
17/20 57/16 73/7 74/8 74/16 74/22
78/11 81/9
oppose [1]   74/22
opposed [1]   73/21
opposing [1]   25/17
opposition [5]   75/3 79/12 79/14
81/10 85/21
options [2]   23/21 79/18
oral [1]   34/4
order [15]   19/4 32/4 33/24 34/1
34/7 34/25 35/1 73/23 75/24 76/20
76/22 76/23 76/25 85/16 85/17
ordered [2]   40/18 76/20
organization [1]   89/3
originally [1]   23/19
other [26]   5/16 13/4 20/5 25/20
28/17 28/18 35/16 35/25 36/3 39/9
42/3 42/17 46/9 46/13 46/17 50/16
50/19 50/20 51/13 53/11 66/17
72/24 77/8 82/24 87/24 90/7
others [2]   30/2 34/21
otherwise [1]   76/24
our [55]   4/19 4/23 4/25 7/2 7/24
8/11 9/16 9/17 10/12 11/18 12/3
12/10 15/22 16/9 16/13 20/6 25/14
26/15 26/22 27/13 29/14 29/21
30/8 32/21 43/20 47/8 59/2 59/11
61/7 62/3 67/10 68/4 70/13 72/10
72/19 73/17 73/18 73/25 74/19
75/15 77/9 78/4 78/5 81/9 82/24
83/4 83/25 85/13 85/14 86/5 87/5
88/3 88/7 88/8 89/8
outside [6]   25/11 25/13 26/5
31/15 88/3 88/15
overruled [2]   72/5 72/6
overruling [3]   22/10 23/2 60/5
own [4]   4/25 7/18 19/22 67/6

**P**

packets [1]   59/20
page [2]   46/11 86/10
pages [2]   9/11 51/7
pair [1]   5/16
panel [1]   80/15
paper [1]   73/21
paragraph [1]   84/20
pare [3]   80/12 84/16 85/9
paring [2]   81/6 86/3
parse [1]   36/15
part [2]   19/11 50/3
Parte [1]   9/3
partiality [1]   28/9
particular [2]   26/4 66/12
parties [4]   5/19 6/12 90/8 90/15
parts [1]   87/24
party [1]   32/20
passenger [1]   17/10
past [2]   24/15 81/25
penalty [1]   5/3
pendency [4]   16/2 16/16 22/7
59/25
pending [1]   16/2
people [12]   27/15 28/17 46/17
54/5 80/15 80/23 82/1 82/2 82/3
82/4 82/5 82/15
perceiving [1]   20/4
perceptions [1]   21/23
performance [1]   63/8
perhaps [1]   81/14
period [2]   22/8 40/15
perjured [2]   55/15 55/16
permitted [1]   58/22
person [5]   12/7 17/3 34/17 80/20
82/21
personal [1]   55/25
personally [1]   14/12
personnel [2]   65/25 66/5
persuade [1]   59/20

**P (cont.)**

rtain [1]   7/15
pertained [1]   62/9
petition [4]   72/25 80/6 80/8
81/14
phase [20]   29/10 29/15 30/2 32/22
34/20 47/19 48/14 48/18 49/2
49/25 50/5 51/9 53/12 53/24 53/25
62/10 62/15 63/10 65/21 70/6
phone [1]   38/21
photographs [1]   40/14
physical [1]   52/3
PIA [2]   16/12 17/1
pick [2]   20/25 81/18
picked [1]   23/14
picking [1]   59/22
piece [1]   48/18
pin [1]   65/21
pioneered [2]   6/16 82/9
place [2]   7/23 24/9
places [1]   23/22
pleading [3]   73/6 77/15 79/25
pleadings [4]   73/5 76/10 77/14
78/25
please [6]   18/4 45/9 73/12 81/20
plenty [2]   11/13 46/23
point [36]   4/17 7/3 8/25 12/13
15/5 15/19 15/25 16/22 17/14 18/7
18/9 18/25 19/14 21/9 21/18 21/19
29/7 30/11 44/2 44/12 45/19 46/6
46/15 47/12 49/10 57/10 60/25
61/2 65/1 65/19 70/18 72/15 73/2
73/22 75/7 85/15
pointed [1]   14/20
points [8]   29/9 33/8 39/18 48/5
51/8 51/21 52/25 56/25
police [2]   30/21 31/5
policies [1]   66/23
portions [1]   90/7
position [8]   12/4 13/5 27/20 30/8
73/18 73/18 77/9 83/4
positions [1]   12/14
positive [1]   51/11
possession [1]   9/19
possible [4]   6/23 9/6 51/3 87/17
post [17]   3/12 7/24 9/9 11/4 11/7
13/2 13/10 16/4 16/8 16/13 17/4
18/17 25/22 25/24 27/17 47/18
72/9
post-conviction [12]   3/12 7/24
11/4 11/7 13/2 16/4 16/8 16/13
17/4 18/17 47/18 72/9
post-trial [1]   13/10
posted [1]   28/17
posts [7]   26/23 27/2 27/10 27/17
28/6 28/6 28/19
potential [6]   30/1 39/5 62/15
65/3 65/5 70/16
potentially [2]   71/13 85/13
power [2]   34/14 78/8
powers [1]   45/22
practice [2]   82/6 82/18
practiced [2]   81/23 81/23
preferred [1]   50/16
prejudice [1]   28/5
prep [1]   14/15
prepared [1]   14/4
prescribed [1]   69/25
presence [1]   31/15
present [15]   3/1 3/5 3/15 12/11
18/3 20/24 30/15 31/14 48/20 51/2
65/10 79/1 80/9 84/18 85/2
presented [14]   10/17 10/18 42/2
42/3 49/3 50/13 50/19 50/20 51/4
51/8 51/10 51/15 51/16 62/14
presenting [2]   55/14 78/23
preserve [6]   60/19 60/23 61/8
61/12 68/3 72/16
preserving [1]   61/19
presiding [1]   1/16
pressure [1]   10/24
presumably [3]   13/9 47/13 69/23
pretrial [13]   14/12 14/18 15/8
15/15 15/17 15/18 16/6 17/11
72/10 84/17 58/2 72/4 72/4
pretty [2]   62/24 69/24
prevailing [5]   10/19 25/8 63/14
67/22 72/7
previous [1]   72/20
previously [5]   17/2 72/6 72/20
73/14 74/3
primary [2]   19/18 72/19
prior [7]   9/21 12/9 17/2 20/8
72/19 74/3 75/14

**P**

prison [1]  37/10
privileged [2]  12/24 16/18
pro [3]  58/4 59/5 60/14
probably [6]  5/15 6/13 18/20
  41/22 84/13 85/3
problematic [1]  30/18
problems [5]  5/25 7/2 7/7 31/17
  31/22 46/6
procedurally [3]  23/9 53/4 72/8
procedures [4]  31/5 31/8 31/18
  31/23
proceed [2]  34/18 58/23
proceeding [1]  36/8
proceedings [1]  33/8
proceedings [7]  1/14 1/18 3/12
  13/8 49/2 90/7 90/14
process [9]  5/2 22/13 22/22 26/12
  68/16 75/1 75/17 78/15 80/7
processes [1]  25/10
produce [1]  84/21
product [3]  12/24 12/25 13/14
proffer [1]  86/12
prohibited [3]  68/21 69/2 69/14
promises [1]  86/13
prong [1]  64/25
proof [2]  4/18 4/19
proper [3]  46/10 81/2 82/11
proposed [1]  41/25
prosecutor [2]  9/2 53/1
prosecutorial [1]  77/11
prosecutors [7]  8/6 8/14 11/2
  14/7 16/12 56/6 60/2
prospective [2]  63/17 70/24
protection [2]  68/13 68/16
protector [1]  51/12
prove [4]  4/23 73/8 73/8 78/9
proven [2]  4/15 77/16
provide [4]  29/23 33/11 40/4 87/4
provided [18]  4/5 9/7 12/11 12/25
  13/1 13/13 17/8 17/24 18/15 18/17
  19/17 21/3 41/7 41/9 41/10 56/10
  74/6 78/4
providing [1]  77/4
provision [1]  58/9
public [1]  16/12
pull [2]  35/9 72/17
punishment [26]  29/10 30/2 35/17
  47/19 48/13 48/18 49/2 49/20
  49/25 50/4 50/11 51/9 53/12 53/24
  53/25 56/19 58/13 62/14 63/10
  64/20 65/21 66/6 67/18 68/17 70/6
  83/17
purport [1]  46/9
purporting [2]  46/15 52/23
purports [1]  41/3
pursuant [2]  25/7 70/17
pursue [2]  38/20 59/23
pursued [1]  39/5
push [1]  86/21
put [20]  4/22 4/25 18/14 21/5
  32/8 35/16 41/6 47/22 48/16 50/10
  50/11 50/12 50/14 50/16 68/7
  83/23 84/20 88/2 88/3 88/16
putting [2]  59/19 81/6

**Q**

qualify [2]  25/13 26/18
question [2]  7/21 28/2
questioned [2]  21/6 23/4
questioning [2]  54/17 55/8
questionnaire [1]  70/25
questionnaires [1]  64/13
questions [3]  55/2 77/25 78/20
quick [2]  26/2 75/6
quickly [2]  7/9 7/13
quite [1]  34/23

**R**

R-E-I-S-S [1]  3/19
race [2]  70/16 71/3
raise [10]  33/9 57/25 58/18 61/5
  61/6 74/20 75/8 77/8 77/15 77/24
raised [21]  4/2 6/4 9/19 22/11
  29/8 53/8 53/9 53/12 59/2 59/6
  59/12 60/3 61/7 62/9 62/10 72/4
  72/6 72/25 75/11 78/21 79/20
raises [2]  64/13 70/19
raising [5]  61/2 72/8 82/25 83/6
  83/9
Randy [1]  1/15
ratcheted [1]  88/13

rather [3]  21/20 49/14 49/18
reached [2]  4/14 21/8
react [2]  55/17 62/16
reaction [1]  65/6
reactions [1]  21/4 52/3 52/4
read [3]  56/2 79/6 79/14
reading [1]  75/6
ready [1]  62/7
Reagan [4]  1/22 90/3 90/18 90/19
Reagin [1]  2/4
real [3]  7/13 15/3 26/2
realize [4]  6/11 8/17 17/13 56/16
really [8]  6/2 30/18 73/3 78/17
  80/12 83/3 83/10 87/9
realm [1]  64/24
reason [5]  11/5 28/25 32/2 59/8
  88/13
reasonable [7]  30/6 30/7 42/2
  47/16 43/18 64/15 87/15
reasons [8]  23/13 27/13 53/5
  60/11 71/18 72/10 77/20 77/23
rebut [4]  50/21 50/22 65/11 73/25
rebuts [1]  65/10
rebuttal [3]  9/24 10/9 45/14
rebutting [1]  78/23
recall [2]  30/13 34/11
recantation [1]  12/6
recanted [1]  8/2
receipt [1]  17/15
receive [1]  86/9
recent [3]  82/21 82/22 82/22
Recess [1]  62/6
recollection [1]  55/25 76/13
record [43]  1/1 3/2 3/6 4/11 4/15
  5/5 6/24 15/9 18/2 18/5 18/7 20/7
  20/25 21/5 24/1 26/9 31/25 33/3
  33/21 34/6 37/6 41/24 42/10 44/5
  44/5 47/23 48/16 50/9 50/17 53/3
  54/25 55/24 61/13 68/4 68/7 71/23
  71/25 74/12 76/11 83/24 84/2 90/9
  90/13
recordings [2]  51/25 52/11
recounting [1]  21/4
rectify [1]  83/16
redirect [1]  67/2
reduced [1]  7/19
refer [1]  68/4
reflect [5]  14/15 15/9 37/6 38/1
  38/2
reflected [1]  22/23
reflects [1]  90/14
refused [1]  11/16
refutes [1]  11/2
regarding [13]  12/9 17/20 18/11
  19/7 26/21 27/2 42/12 45/17 48/16
  48/21 49/3 59/8 78/5
Regardless [1]  19/18
regularly [1]  62/25
rehire [1]  67/3
reinforces [1]  40/2
reinstatement [1]  67/9
Reiss [3]  2/3 3/19 18/3
reiterate [1]  45/19
reiterated [1]  49/19
related [1]  81/17
relating [1]  77/11
relationship [2]  40/12 40/13
relaying [1]  54/24
released [1]  70/24
relevant [2]  80/4 86/4
reliability [1]  83/15
reliable [1]  73/19
relied [1]  65/20
relief [6]  4/4 4/16 9/8 31/7 73/9
  77/16
rely [4]  29/20 52/21 72/12 78/7
relying [4]  5/25 11/6 25/14 73/25
remaining [2]  57/17 68/1
remedy [1]  58/20
remember [6]  10/11 30/4 33/20
  44/9 45/1 49/9
remembering [1]  27/8
remind [1]  57/1
render [1]  67/1
rendered [1]  22/10
Renee [4]  1/22 90/3 90/18 90/19
repeated [1]  26/25
repeatedly [1]  62/25
reported [4]  1/18 8/10 69/7 90/12
reporter [4]  1/22 24/22 90/3
  90/20
reporter's [4]  1/1 44/4 90/9
  90/13

reports [1]  49/12
represent [2]  3/8 3/11
representations [3]  13/7 16/25
  45/22
representing [1]  12/22
representing [4]  3/15 3/18 12/22
  32/12
request [5]  18/18 81/9 87/17 88/2
  88/14
requested [2]  34/3 90/8
requesting [4]  4/22 7/3 45/21
require [8]  9/2 9/4 45/20 72/25
  73/11 80/6 80/7 87/25
required [1]  63/12
requires [3]  5/2 75/1 75/17
requiring [1]  82/11
rescinding [1]  17/17
research [1]  64/6
reset [1]  60/17
resolvable [1]  67/23
resolve [4]  10/13 76/4 76/7 76/19
resolved [3]  10/19 23/10 75/13
resource [1]  43/9
respect [1]  75/15
respectfully [1]  42/11 61/12
respective [1]  90/15
respond [20]  7/5 13/19 16/23 26/2
  27/18 28/16 46/4 47/23 50/6 65/6
  65/14 74/8 75/2 78/19 79/10 79/21
  81/9 84/24 84/25 88/21
responded [2]  4/21 41/20
responding [1]  5/6
response [9]  10/13 33/12 70/13
  85/14 86/5 86/16 86/16 89/8 89/15
responses [6]  11/19 46/1 53/14
  53/15 79/4 84/23
responsibility [1]  61/7
responsible [2]  16/5 32/15
restricted [1]  70/7
result [2]  66/2 68/22
retained [1]  31/12
return [2]  20/22 72/18
reverend [1]  50/24
reversal [1]  83/19
review [18]  6/25 7/4 9/16 12/18
  14/9 14/13 29/14 30/13 46/3 61/13
  66/4 76/10 76/10 76/11 76/13
  79/18 83/7 85/15
reviewed [5]  14/11 14/12 14/24
  45/18 46/12
reviewing [2]  14/16 82/24
right [24]  3/24 6/8 8/9 19/3
  22/13 22/21 22/22 26/20 33/17
  36/4 43/18 43/20 47/17 48/3 48/5
  49/16 53/9 59/3 60/7 62/3 65/9
  70/22 83/8 84/25
rights [5]  22/13 22/16 60/19
  60/23 68/20
road [1]  88/15
Rodeo [1]  23/15
rodeo's [1]  23/21
role [2]  33/6 51/11
Roll [1]  1/15
room [1]  20/25
roughly [1]  30/24
round [1]  66/24
Roy [1]  31/12
Rule [1]  25/8
ruled [1]  42/13
rules [2]  16/14 79/11
ruling [7]  31/20 42/12 42/16
  43/17 44/3 44/7 75/11
rush [1]  48/10
rush-hour [1]  48/10

**S**

safety [2]  19/22 19/23
said [23]  8/2 9/7 13/11 13/24
  14/11 17/6 18/9 23/5 26/3 31/1
  45/10 45/10 45/11 46/20 56/17
  60/6 61/1 69/7 76/3 76/22 80/16
  80/17 80/22
same [11]  21/23 30/20 33/16 33/22
  34/14 34/17 45/4 50/13 74/13 75/2
  78/13
save [1]  53/15
saw [1]  46/20
say [30]  5/9 8/5 8/8 8/22 11/5
  11/13 14/10 15/8 17/5 17/7 17/7
  17/8 17/12 17/12 27/4 28/21 36/21
  39/20 40/20 40/22 45/11 45/24
  52/20 52/25 72/1 75/22 75/23
  79/16 79/17 82/12

EXH C

**S**

saying [20]   8/13 13/10 16/10
27/18 27/22 32/8 34/13 36/23
42/18 43/2 43/2 45/2 47/5 47/10
68/25 69/12 71/2 76/1 83/11 84/5
76/5 76/7 76/15 80/21
says [14]   14/7 14/17 30/21 41/25
46/12 50/15 55/7 60/18 63/19 71/7
76/5 76/7 76/15 80/21
SBOT [5]   2/2 2/3 2/4 2/14 2/15
scope [1]   26/6
Scott [2]   32/13 32/15
se [3]   58/4 59/5 60/14
second [6]   9/3 24/2 24/18 24/19
70/6 82/2
see [12]   8/3 8/7 8/9 13/18 15/1
16/21 18/19 18/23 25/5 41/16
43/10 64/11
seedy [1]   19/11
seeking [1]   68/2
seems [1]   29/18
seen [4]   7/22 15/2 16/8 30/22
selecting [1]   63/11
selection [9]   29/11 59/13 62/10
62/12 63/7 63/10 63/21 64/5 65/3
send [2]   85/2 87/5
sends [1]   20/23
sense [1]   6/2
sentence [4]   68/15 68/22 69/16
70/1 70/5 83/15
separation [1]   67/8
September [1]   86/20
serious [2]   28/3 79/16
served [1]   74/10
service [3]   27/2 27/3 84/4
set [2]   63/20 86/15
seven [2]   50/23 76/21
several [3]   77/10 77/20 79/19
severity [1]   83/17
sexual [4]   49/4 49/6 62/17 63/18
sexually [1]   62/25
Shawna [1]   2/4
she [40]   9/23 18/11 18/12 20/11
20/19 20/23 21/2 26/3 26/3 30/16
30/21 30/21 30/22 30/23 30/25
31/1 31/1 31/2 31/20 34/5 34/6
34/23 37/18 38/8 39/7 40/9 44/6
44/9 44/11 45/2 45/3 45/4 45/25
46/5 61/1 65/10 65/14 80/22 80/22
81/2
she's [6]   10/5 30/20 37/19 55/18
74/13 87/19
Shearer [9]   32/14 32/15 33/2
33/11 34/5 43/1 43/3 47/11 47/12
sheet [2]   66/25 66/25
sheriff's [4]   66/22 67/1 67/8
67/9
shooter [1]   30/22 31/1 41/10
shooting [8]   7/21 7/22 8/3 9/15
9/15 30/16 30/20 30/25
short [2]   55/8 56/19
should [20]   16/17 17/19 18/22
27/16 27/21 27/23 43/3 43/15
42/22 48/2 48/4 49/11 52/21 59/12
70/6 75/21 80/12 85/3 86/15 86/17
shouldn't [2]   21/10 47/14
show [5]   28/5 37/13 38/3 64/17
70/15
showed [1]   39/2
shows [5]   25/12 41/24 50/9 58/8
66/5
sic [1]   20/15
side [4]   10/9 23/24 28/9 55/23
sides [2]   28/12 78/11
sifting [1]   36/20
sign [4]   11/16 41/18 46/20 87/5
signed [1]   34/7
similarly [1]   13/4
simply [1]   5/22
since [1]   41/16
single [2]   52/19 71/18
sink [1]   85/8
sir [2]   4/7 24/23
sit [3]   35/3 35/4 35/9
site [1]   32/1
sitting [4]   26/23 27/16 58/14
84/8
situated [1]   13/4
situation [2]   11/15 24/4
situations [1]   71/12
six [2]   59/22 76/21
Sixth [1]   59/3
skipped [1]   65/19
Skype [3]   53/19 54/11 54/16

small [1]   62/17
social [2]   26/25 48/17
solely [3]   47/8 77/18 78/7
some [43]   5/6 5/10 6/24 7/6 15/15
15/16 15/18 15/21 15/23 18/13
29/24 33/4 39/17 40/20 41/1 42/6
49/8 53/18 53/19 54/2 54/14 55/19
55/20 55/22 56/10 60/10 61/9
65/24 66/17 70/18 72/23 73/10
76/5 76/6 76/9 76/9 76/10 76/11
76/12 76/13 80/5 88/3 88/14
somebody [2]   69/12 71/13
someone [3]   26/19 56/5 56/17
something [8]   27/19 28/10 47/11
56/20 57/14 61/1 79/7 85/23
sometimes [1]   55/25
somewhere [2]   24/3 75/19
sophistication [1]   6/17
sorry [5]   18/1 32/5 32/22 43/22
66/19
sort [9]   28/5 28/8 33/3 36/15
43/8 52/7 54/23 56/23 58/23
sounds [1]   53/17
source [1]   52/19
Spanish [3]   80/15 80/23 81/1
speak [6]   21/2 41/4 46/9 47/9
62/3 81/1
speakerphone [1]   54/16
speaking [3]   42/9 77/17 80/23
special [5]   22/2 64/14 64/21 70/4
82/7
specialists [1]   37/8
specific [6]   20/3 21/20 21/20
63/19 64/1 64/19
specifically [5]   5/6 12/21 31/20
62/16 63/17
speculative [1]   28/21
speedier [1]   77/1
speedy [15]   58/2 58/4 58/6 58/9
58/12 58/15 58/18 59/3 59/5 59/8
59/9 59/16 60/5 60/13 60/18
Spence [2]   13/23 59/17
spend [1]   81/20
spent [2]   14/16 30/23
spin [1]   81/21
spoke [6]   30/1 41/3 41/21 42/18
51/22 80/15
spotted [1]   46/7
stage [4]   4/19 73/6 77/15 79/25
stamp [1]   84/2
stand [1]   55/14
standard [8]   15/7 21/17 21/19
30/5 58/17 66/10 69/9 69/24
standing [2]   35/3 74/15
start [1]   82/7
started [1]   15/19
starting [1]   11/23
starts [1]   54/12
state [50]   1/4 2/7 3/16 3/18 4/9
4/20 7/16 7/17 9/4 9/6 9/10 9/12
10/17 10/18 10/23 12/13 12/15
12/16 12/22 15/16 16/24 24/2 29/9
33/10 34/2 34/14 36/18 49/8 49/19
70/6 75/21 80/12 85/3 86/15 86/17
53/23 64/12 65/22 65/20 68/6
68/11 71/2 73/25 75/12 81/10
82/18 82/23 87/24 89/4 90/1 90/4
State's [26]   4/4 5/1 10/20 10/21
11/11 11/12 13/5 13/22 14/3 14/13
14/16 14/20 15/17 15/21 15/21
16/20 34/7 51/6 51/20 52/16 65/21
70/15 71/4 72/12 89/7 89/15
stated [4]   10/22 23/1 23/13 74/13
statement [8]   6/3 8/7 8/13 10/24
11/4 30/21 68/24 69/12
statements [7]   9/21 11/4 12/9
14/2 26/11 49/9 77/24
states [3]   41/15 59/4 68/17
stating [1]   52/3
statute [1]   58/8
statutory [1]   69/25
stay [1]   23/22
Ste [1]   2/16
stenotype [1]   1/18
stepfather [1]   63/1
still [7]   9/7 9/8 15/20 23/11
43/14 54/15 75/7
stood [1]   66/6
stops [1]   76/24
strategic [4]   51/1 53/5 60/11
71/10
strategy [6]   40/10 42/23 42/24

0/2 64/15 70/18
stream [1]   15/3
stressing [2]   19/21 38/22
Strickland [2]   64/24 64/25
strike [1]   31/18
strongest [5]   48/3 48/5 79/21
80/13 81/19
struck [1]   31/14
struggle [1]   39/1
stuck [1]   78/24
study [1]   75/2
stuff [1]   84/16
styled [1]   90/10
subjected [1]   49/5
submit [2]   34/2 34/3
submitted [7]   5/5 7/1 12/2 74/9
76/12 76/14 78/16
subpoena [3]   34/14 45/21 78/8
substitute [2]   73/19 77/21
succinctly [1]   10/3 10/5 11/19
29/12 53/10
such [1]   49/6
sufficient [2]   5/23 72/1
suggestive [2]   31/6 31/8 44/18
44/23 44/25 45/10 45/12
summarize [4]   7/13 26/8 39/17
53/10
summarizing [1]   8/23
summary [4]   14/3 18/12 18/14 22/4
summation [2]   57/7 84/20
supplement [1]   79/4
support [1]   78/4
supported [1]   39/14
supports [2]   57/6 64/4
supreme [2]   59/7 82/22
sure [14]   5/20 6/14 7/14 14/25
18/10 18/22 26/10 27/15 29/11
43/7 47/21 56/3 62/4 84/11
surprised [2]   15/10 87/9
surrounding [2]   9/15 12/6
switch [1]   54/13
system [2]   23/13 37/10

**T**

tactic [1]   56/24
tag [1]   81/8
tainted [1]   22/14
take [14]   7/23 11/25 32/24 34/25
35/1 35/7 54/14 57/23 59/21 62/4
73/10 74/17 75/1 82/7
taken [4]   5/15 12/14 15/6 62/6
takes [1]   75/4
taking [1]   77/7
talk [3]   7/25 47/9 80/14
talked [1]   77/23
talking [3]   5/10 16/9 22/1 25/17
28/14 41/11 44/23 47/12 55/18
62/19 69/2 74/12 85/20
talks [1]   54/4
team [3]   15/14 37/12 38/1 41/5
46/10 46/13 54/24
technical [3]   54/13 54/15 55/2
Telephone [3]   2/7 2/17 90/22
tell [14]   3/8 16/11 17/22 18/25
26/18 28/13 34/16 45/8 83/22
84/17 84/21 86/10 86/11 89/3
telling [6]   8/20 38/24 54/9 55/10
57/13 81/3
tells [1]   15/15
ten [3]   37/24 89/9 89/11
Tercera [1]   36/13
terminated [2]   66/1 66/22
termination [1]   67/8
terms [2]   13/21 50/4
testified [15]   7/16 10/25 30/16
41/18 41/23 51/11 51/22 53/19
54/1 59/17 65/23 66/13 66/20
66/24 67/2
testify [18]   31/13 31/19 31/21
32/3 39/7 40/8 41/1 42/6 42/14
42/16 49/16 49/22 51/19 52/17
54/10 55/4 55/5 84/19
testifying [3]   41/14 52/1 52/18
testimony [36]   4/5 7/15 7/18 8/2
9/5 9/8 9/11 10/16 14/22 15/11
27/12 28/11 41/9 41/10 41/25
46/21 48/19 48/20 50/17 52/7
55/11 55/15 55/16 65/21 66/3 66/7
66/11 67/6 67/13 67/14 67/14
67/16 73/19 77/12 77/22 78/5
TEXAS [15]   1/4 1/5 1/17 1/22 1/23
2/6 2/7 2/17 25/8 58/7 90/1 90/5
90/19 90/21 90/22

**T**

than [17]  5/15 5/17 16/6 16/19 25/20 35/12 50/19 51/13 62/22 65/11 65/15 71/11 74/8 77/2 82/13 82/17 86/5
Thank [1]  3/25 18/24 35/5 35/8 48/6 57/25 62/2 65/13 65/18 89/18 89/20 89/21
that [601]
that's [46]  3/17 5/2 5/17 10/20 11/20 12/3 13/15 14/21 15/22 18/20 21/12 21/12 22/4 26/6 27/9 27/22 32/17 34/19 35/21 43/25 44/8 46/2 46/21 57/13 57/20 59/11 63/6 66/4 66/5 69/17 71/3 71/11 72/2 76/22 77/1 78/3 78/15 79/12 79/13 79/14 80/11 82/5 83/20 85/18 87/7 89/14
their [67]  4/13 6/5 9/19 11/7 12/15 13/2 15/5 17/21 19/22 19/23 20/21 21/4 21/20 22/9 22/25 23/5 23/17 26/12 27/15 28/20 29/17 29/21 30/6 30/9 30/11 32/1 32/2 37/25 41/5 41/5 42/19 43/14 46/9 46/19 49/19 51/1 51/24 52/2 52/3 52/3 52/6 55/8 55/11 55/21 57/2 60/22 62/11 62/12 63/24 64/5 64/10 64/11 64/15 64/21 65/6 65/6 67/22 70/24 71/17 82/7 84/3 84/4 84/9 85/12 85/14 86/5 87/12
theirs [1]  84/24
them [63]  6/22 6/22 7/2 7/3 7/4 7/12 10/14 15/7 15/8 17/10 17/20 19/21 20/7 26/19 28/7 30/1 31/22 34/25 35/1 35/25 38/20 38/25 39/4 39/10 40/10 41/4 46/4 46/4 47/22 52/12 53/6 53/10 53/11 54/6 54/9 55/4 55/4 55/10 55/14 55/24 61/6 61/10 61/19 65/6 65/7 65/16 68/6 68/7 71/1 72/1 72/8 74/20 75/2 76/19 77/14 79/6 80/9 81/14 81/15 81/23 84/2 84/22 85/1
themselves [4]  6/6 41/4 42/19 54/7
then [31]  4/16 16/3 17/18 19/7 19/23 21/25 31/3 32/10 34/21 39/16 46/18 49/19 58/18 58/21 58/22 65/10 65/10 67/6 67/9 71/23 73/12 73/18 73/23 76/3 76/19 79/6 80/12 84/16 84/20 85/1 85/12
theory [1]  15/22
there [83]  5/25 7/11 8/13 13/22 19/18 20/1 20/19 23/14 23/21 25/21 25/23 27/17 28/6 28/12 29/18 31/16 34/23 35/3 35/12 35/16 35/24 36/3 36/12 36/14 36/18 36/23 37/11 37/13 37/16 41/16 41/17 42/16 43/8 43/17 43/21 49/5 51/6 51/14 53/5 53/7 53/8 53/11 53/18 53/19 55/4 55/19 56/13 57/13 58/18 58/21 59/1 60/6 60/20 61/16 64/17 64/18 66/10 66/19 68/3 70/21 70/23 72/21 72/24 73/23 73/24 74/3 75/7 75/11 75/21 76/3 77/3 77/7 77/8 77/9 80/6 81/16 81/16 82/1 82/4 83/23 86/12 88/14 89/7
there's [19]  11/13 15/3 16/1 26/14 28/13 28/14 28/17 43/23 54/13 54/15 54/18 54/22 58/20 66/7 67/10 71/2 75/10 75/12 85/21
therefore [1]  13/3 62/12
these [88]  4/4 4/15 5/14 6/4 6/7 6/21 9/25 12/14 12/16 12/21 13/7 14/1 14/8 14/11 14/12 14/17 15/2 16/10 17/14 17/23 20/3 20/24 21/19 22/16 25/12 27/23 28/16 28/19 29/2 29/11 29/12 31/23 33/4 33/22 36/15 38/11 39/15 45/19 45/22 46/1 49/13 51/8 51/20 51/21 52/1 52/6 52/10 52/10 52/12 52/18 52/20 52/21 52/25 52/25 53/3 54/5 55/3 55/8 55/22 55/23 57/10 57/19 59/24 61/2 61/5 61/19 61/23 62/13 71/8 72/3 73/10 73/23 74/4 74/9 74/24 76/2 76/4 76/5 76/8 76/17 76/21 77/5 77/18 79/7 81/12 81/22 82/8
they [172]
they're [13]  25/14 36/23 49/10 49/17 53/4 61/6 63/12 68/1 69/24 70/20 80/23 84/25 86/12
they've [6]  6/12 15/20 39/9 43/13 67/7 81/22
thing [4]  32/11 44/15 45/5 78/13
things [16]  27/16 27/24 29/2 33/17 33/22 45/17 45/24 46/5 52/20 66/25 75/11 76/25 81/6 81/6 81/15 85/22
think [42]  4/17 14/11 15/4 15/25 16/15 16/17 21/11 21/13 22/4 24/18 24/19 26/3 26/6 26/16 34/19 34/19 36/17 36/22 41/16 43/22 44/24 45/6 45/15 47/16 47/22 48/2 48/4 52/9 53/2 56/11 56/12 58/7 65/19 78/22 79/19 84/1 84/6 84/10 84/19 85/18 86/12 87/14
thinking [3]  21/15 26/19 45/8
thinks [2]  76/18 84/7
third [2]  11/24 82/3
this [121]
thorough [2]  15/12 57/6
thoroughly [2]  7/4 46/3
those [52]  4/21 6/15 9/11 9/15 9/19 11/5 11/13 11/18 12/23 16/25 17/7 20/15 21/4 21/22 21/23 29/24 29/25 33/17 34/21 38/23 40/3 44/6 44/6 44/7 46/7 46/16 48/20 49/8 49/23 49/25 50/23 56/8 62/16 65/7 66/4 70/8 70/9 70/11 71/12 72/11 74/11 74/12 74/17 75/1 75/13 75/14 78/18 78/21 79/21 83/14 83/16 86/22
though [6]  8/25 54/25 57/3 61/6 69/14 83/9
thought [6]  21/1 52/25 53/1 57/1 69/11 80/22
thousands [1]  82/5
threatened [1]  19/22
three [1]  35/16
through [18]  7/6 7/9 7/12 29/12 30/3 36/20 40/21 40/25 41/5 42/1 42/3 50/15 51/7 55/1 72/3 72/10 75/6 78/16
throughout [1]  64/19
throw [2]  46/20 85/7
thwart [1]  38/4
tied [1]  36/14
time [38]  3/2 7/4 8/1 8/6 11/25 12/18 12/22 14/15 22/8 24/5 24/22 30/8 30/15 30/23 32/24 32/25 33/25 34/4 39/11 46/3 48/9 57/21 57/23 58/2 60/15 65/12 65/17 78/19 79/7 80/18 81/4 81/12 82/21 86/15 87/6 87/15 88/3 89/19
times [2]  12/15 51/23
timetable [4]  77/1 87/11 88/19 89/7
titled [1]  1/14
today [10]  72/19 72/23 72/24 74/1 74/15 75/6 79/4 79/7 81/11 81/20
together [6]  8/14 18/14 19/7 59/20 88/4 88/16
told [10]  8/6 8/8 38/19 39/5 41/20 42/7 47/11 47/11 69/15 79/19
too [2]  48/23 61/13
took [6]  14/14 20/21 32/12 56/25 57/2 59/22
top [2]  52/2 64/7
total [2]  36/4 36/17
totality [1]  64/20
touch [1]  17/4
touches [1]  62/20
touching [1]  62/23
towards [1]  28/9
town [3]  19/11 23/21 23/24
Traci [2]  1/1 14/6
traffic [1]  48/10
trained [3]  8/19 18/9 80/20
transcript [3]  13/10 13/10 16/8
transcription [1]  90/6
translating [1]  54/18
translation [1]  80/16
translator [10]  54/18 54/20 80/17 80/19 80/21 80/24 80/25 81/2 81/4 81/22
translators [2]  80/14 81/1
traveled [1]  50/25
trial [110]
tried [1]  55/14
trouble [2]  38/11 53/18
true [3]  4/15 83/20 90/6
truly [1]  90/14
try [3]  29/13 47/24 59/20
trying [9]  8/22 17/22 24/3 34/16
turned [4]  9/10 9/20 12/12 37/13
twice [1]  31/25
two [15]  5/14 6/15 11/19 11/20 11/21 12/23 17/24 19/23 19/24 36/1 55/3 85/20 87/25 88/1 88/6
type [2]  12/20 87/11
types [6]  6/4 6/21 12/21 25/12 64/1 71/8

**U**

ultimate [1]  42/14
ultimately [4]  40/17 54/9 54/16 55/1
unavailable [1]  60/20
unaware [2]  23/16 50/20
unclear [1]  32/6
unconstitutionally [1]  70/3
uncooperative [1]  38/2
under [10]  9/1 9/3 12/7 26/10 29/5 63/13 63/14 64/24 72/7 75/4
understand [9]  8/16 12/3 20/6 35/22 74/18 79/2 79/3 80/2 85/24
understanding [3]  27/13 63/25 85/12
understood [2]  9/18 80/23
unfavorable [1]  38/1
unit [1]  17/4
United [1]  68/17
unknowingly [1]  10/18
unless [2]  25/11 56/17
unreasonable [1]  30/10
unstable [1]  51/17
until [7]  4/13 23/16 25/5 31/3 39/3 48/9 60/13
unusual [1]  68/17
up [22]  9/13 10/10 20/20 24/6 24/18 30/25 34/9 35/3 35/7 35/9 36/16 46/7 48/21 49/5 52/23 58/12 59/22 61/13 71/9 72/17 76/6 88/13
upon [4]  12/15 20/22 25/14 47/13
upset [2]  70/20 70/25
urge [3]  5/2 57/4 77/13
urging [1]  38/20
us [19]  3/8 12/12 13/2 18/17 18/25 32/6 33/22 33/25 52/12 57/16 58/10 74/10 78/19 79/1 85/14 87/4 87/25 88/2 89/13
usable [1]  39/13
use [9]  16/15 30/12 40/24 54/16 54/16 66/25 73/17 79/6 80/12
used [7]  9/22 14/18 31/5 33/4 36/24 50/23 81/2
useful [2]  40/23 52/9
uses [2]  58/19 80/20

**V**

vacated [1]  70/6
vague [1]  70/3
valid [2]  52/25 57/1
various [5]  12/15 29/9 38/17 40/5 40/13
verbal [1]  87/9
verbatim [1]  34/7
verbose [1]  79/15
verdict [15]  4/14 20/1 20/8 20/19 20/21 20/21 21/7 21/8 21/20 23/1 23/6 26/12 27/21 57/2 83/15
versus [1]  79/25
very [11]  6/17 7/9 10/3 12/4 19/21 29/11 29/15 29/18 48/5 57/6 89/18
via [3]  53/19 54/11 59/4
viable [1]  23/21
Vickie [1]  23/12
videos [2]  51/25 52/10
views [1]  65/6
violated [2]  68/13 68/20
violates [1]  68/16
violation [5]  49/15 58/20 58/21 60/16 66/23
visit [1]  38/17
voice [1]  72/16
voir [4]  59/9 63/16 63/25 64/11
volume [1]  1/1 44/4 44/5 44/8 44/8 90/9
VOLUMES [1]  1/1
voluminous [1]  59/18
vote [4]  22/2 68/21 69/3 69/16
voted [1]  21/10
votes [1]  28/22
vouchers [1]  37/12

EXH C

**W**

waiver [1]   13/3
Walter [1]   41/6
want [36]   5/10 5/18 6/11 8/17
10/8 13/19 18/8 19/5 21/13 25/25
26/18 27/14 34/21 34/22 35/2 37/4
38/15 38/16 39/7 40/8 41/1 44/1
44/14 47/8 47/17 53/10 56/16 61/2
78/7 79/20 80/2 84/6 84/15 84/17
86/9 86/10
wanted [15]   10/2 10/3 36/7 40/9
41/12 42/5 46/6 54/4 55/2 55/3
56/19 57/1 69/17 80/12 84/2
wants [2]   15/1 39/6
warrants [1]   83/18
was [196]
wasn't [6]   8/8 19/13 36/11 49/13
64/7 67/15
watch [1]   40/9
waving [5]   19/15 20/10 20/11
26/19 81/22
way [12]   15/11 20/4 21/10 22/2
24/15 28/13 28/13 40/24 54/10
74/7 82/9 83/11
ways [1]   73/4
we [164]
we'd [2]   28/4 74/16
we'll [4]   10/6 82/24 86/12 87/5
we're [25]   3/7 5/22 11/3 11/5
18/6 22/1 25/17 28/25 45/20 46/2
47/5 47/7 73/6 78/5 78/16 78/24
78/25 82/23 83/3 83/6 85/20 85/22
88/16 88/18 89/5
we've [10]   4/1 7/1 29/8 63/6
72/23 73/6 75/5 75/11 77/23 80/17
weakened [1]   17/23
weapon [3]   66/13 66/16 66/19
week [3]   31/3 84/4 87/24
weeks [1]   88/2
weigh [1]   58/19
weight [1]   64/3
welcome [1]   35/4
well [32]   6/12 10/20 11/1 17/9
21/6 32/15 35/15 39/15 41/13
41/15 42/19 46/24 48/2 50/18 52/8
52/15 53/5 54/3 54/19 54/21 55/6
58/11 59/25 71/4 73/12 79/6 79/9
79/18 80/11 81/18 82/22 85/23
Wendy [1]   42/4
Wendy's [1]   42/15
went [1]   24/15
were [106]
weren't [2]   53/3 80/8
Westchase [2]   24/12 24/13
Westfield [1]   24/11
what [94]
what's [5]   4/17 24/9 36/22 78/24
89/15
whatever [4]   19/15 35/1 46/14
89/1
whatnot [1]   60/2
wheels [2]   81/21 81/21
when [41]   4/12 6/4 12/7 12/19
20/14 22/8 22/9 23/20 30/20 30/25
33/18 33/23 33/25 39/4 41/15
41/17 41/21 41/23 42/18 43/5 43/7
44/9 49/1 52/14 55/5 56/5 57/4
60/9 60/13 62/20 64/10 64/23
65/21 67/5 67/12 67/13 67/16
68/20 72/19 86/2 88/16
where [24]   9/9 9/13 11/16 12/5
20/23 24/5 26/6 29/16 31/15 34/16
44/11 44/12 45/21 49/25 58/3
62/10 73/15 75/11 78/10 78/14
79/24 79/25 80/7 88/15
whether [15]   10/17 22/12 30/5
31/6 35/25 42/16 44/3 55/21 58/19
59/23 63/17 64/8 66/11 71/20
75/10
which [38]   6/2 14/3 14/5 16/18
17/14 17/25 18/7 18/14 19/25
21/18 25/12 26/14 28/9 29/4 29/20
38/1 38/2 38/2 38/3 40/1 42/21
47/3 48/17 51/7 64/14 66/25 67/7
67/15 73/7 73/20 73/25 76/18
77/16 77/20 77/23 89/12 90/10
while [3]   5/10 13/5 27/16
who [33]   3/8 3/15 5/18 7/15 10/22
13/23 14/7 14/7 16/12 17/2 20/24
23/12 23/13 29/23 30/15 30/23
30/25 31/1 32/12 32/14 38/6 52/19
54/7 54/18 60/18 64/2 65/22 68/24
69/7 70/24 71/2 84/18 86/11

**who's [1]**   34/15
whoever [3]   15/6 17/1 41/4
whole [2]   36/18 88/8
whom [1]   14/10
why [10]   7/8 12/3 23/13 27/22
31/16 32/7 45/20 46/2 72/11 78/3
wife [1]   37/19
will [21]   7/3 15/1 18/22 35/2
37/6 44/2 47/24 48/4 57/18 61/6
76/4 79/6 80/21 81/3 85/10 85/12
85/15 85/16 85/16 86/22 87/24
willowbrook [1]   24/20
window [1]   88/3
Wingo [1]   59/7
withheld [2]   4/9 13/21
within [6]   9/10 19/25 30/11 32/10
60/7 74/2
without [5]   31/23 32/9 52/7 52/22
65/7
witness [11]   31/19 41/6 42/5
44/10 44/22 47/9 65/22 66/12 78/9
78/12 90/16
witness' [3]   67/13 67/16 78/10
witnesses [40]   4/4 12/21 29/23
29/25 30/2 30/14 32/12 32/13 38/2
39/9 39/10 40/6 42/3 48/19 50/12
50/15 50/16 50/23 51/10 51/21
51/21 52/12 52/21 53/19 53/20
54/7 54/10 54/13 54/14 54/15 55/3
55/8 55/10 55/12 60/20 60/20
73/21 74/6 84/18 86/11
woman [1]   39/6
won't [1]   87/25
word [3]   56/6 56/18 81/2
worded [1]   49/10
words [1]   56/1
work [6]   12/24 12/25 13/14 54/10
82/23 82/25
working [2]   17/3 80/24
workings [1]   71/24
works [1]   61/5
worse [2]   6/4 71/11
worthy [2]   11/14 53/2
would [97]
wouldn't [2]   46/10 47/13
writ [9]   1/10 4/1 28/20 37/25
38/14 53/8 72/9 76/1 76/17
writing [7]   74/23 75/3 75/19
79/10 81/10 88/22 90/8
writs [5]   2/16 3/11 3/14 82/8
89/6
written [9]   6/3 74/23 75/3 79/11
79/13 81/12 85/3 85/16 85/17
wrongdoing [1]   67/3

**Y**

y'all [5]   36/22 78/22 87/8 88/5
88/17
Yancy [1]   38/18
Yeah [2]   50/5 85/5
year [2]   30/24 58/17
years [7]   9/12 30/16 36/19 59/22
62/20 62/24 81/24
yes [40]   3/4 3/23 5/13 6/10 10/12
18/6 20/11 21/6 24/23 25/3 25/23
28/23 32/18 34/22 34/24 36/5
37/20 38/9 42/24 44/21 47/20
47/21 50/8 54/22 57/8 59/15 62/8
62/23 63/5 63/22 68/9 69/4 69/21
69/22 72/1 79/2 82/19 85/18 86/7
88/25
yesterday [1]   17/15
yet [2]   32/20 51/23
York [1]   50/25
you [220]
you'd [2]   10/1 53/16
you'll [3]   48/10 84/21 85/2
you're [18]   5/10 6/8 7/10 18/7
23/18 25/21 27/16 35/4 47/12
47/18 57/16 58/11 68/25 71/9
74/12 79/5 79/16 79/17
you've [3]   9/5 35/3 79/20
you-all [1]   87/10
young [2]   49/4 49/7
your [70]   3/3 3/9 3/21 3/25 9/24
10/1 10/9 11/25 17/9 17/13 17/17
19/3 19/12 21/7 21/9 27/22 28/24
29/7 30/13 32/24 33/18 34/11 35/5
37/20 38/9 46/25 47/7 48/3 48/3
48/6 48/13 49/24 57/9 57/15 57/23
58/12 58/21 59/1 60/25 61/11 62/2
62/8 62/23 63/5 63/10 63/11 67/25
72/14 72/18 79/4 79/17 79/19

9/21 80/13 81/18 81/20 81/21
84/17 84/18 84/23 85/2 85/16
85/17 85/21 86/11 87/16 88/19
89/15 89/19 89/20
yours [1]   84/25
yourselves [1]   3/7

EXH C