## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

JUAN BALDERAS,

                    *Petitioner*,

        v.

BOBBY LUMPKIN,

        Director, Texas Department of Criminal Justice,
        Institutional Division,

                    *Respondent*.

Case No. 4:20-CV-04262

**<u>DEATH PENALTY CASE</u>**

## PETITION FOR WRIT OF HABEAS CORPUS (SECOND AMENDED)<br><u>UNDER 28 U.S.C. § 2254 OF A PERSON IN STATE CUSTODY</u>

### DLA PIPER LLP (US)
*Pro Bono Attorneys for Petitioner*

Jeffrey E. Tsai**
555 Mission Street, 24th Floor
San Francisco, California 94105
(415) 836-2500
jeff.tsai@us.dlapiper.com

Marc A. Silverman**
Jessica Park Wright**
1251 Avenue of the Americas, 27th Floor
New York, New York 10020
(212) 335-4800
marc.silverman@us.dlapiper.com
jessica.wright@us.dlapiper.com

Ashley Allen Carr (Tex. Bar No. 24082619)*
Brett Solberg (Tex. Bar No. 24070651)
401 Congress Avenue, Suite 2500
Austin, Texas 78701
(512) 457-7251
ashley.carr@us.dlapiper.com

* Attorney-in-charge as required by Local Rule 11.3
** Admitted Pro Hac Vice

Table of Contents

Page

**PRELIMINARY STATEMENT** ...................................................................1

**JURISDICTION AND VENUE** ..................................................................3

**PARTIES** ........................................................................................3

**TIMELINESS OF PETITION** ..................................................................4

**PROCEDURAL HISTORY** .....................................................................4

**REQUIREMENTS FOR GRANTING HABEAS RELIEF** ..............................18

**STATEMENT OF FACTS** .....................................................................21

    **A.** The La Tercera Crips ("LTC") Street Gang ..................................21

    **B.** Victor "Gumby" Arevalo and Israel "Cookie" Diaz Conspire to Kill Powder ............23

    **C.** The Murder of Eduardo "Powder" Hernandez .................................277

    **D.** Mr. Balderas's Whereabouts at the Time of Powder's Murder ...............288

    **E.** The State Investigation .........................................................30

    **F.** The Arrest of Mr. Balderas, Cookie, and Other LTC Members .................344

    **G.** While in Jail, Cookie Attempts to Convince Others to Blame Mr. Balderas.............35

    **H.** Mr. Balderas Languishes in Jail for Eight Years Before Going to Trial......................36

    **I.** Trial Counsel Fails to Conduct an Investigation For Eight Years ................37

        **1.** Trial counsel pushes a plea deal instead of conducting an investigation...........37

        **2.** Trial counsel realizes that it must proceed to trial. ..............................40

    **J.** The Trial of Mr. Balderas ........................................................47

        **1.** Jury selection. ..................................................................477

        **2.** The State's case. ...............................................................48

        **3.** The Defense case. ..............................................................57

        **4.** Closing statements. .............................................................60

        **5.** The jury's deliberations, request for readback of Cookie's testimony, deadlock, Allen charge and verdict................................................65

    **K.** The Punishment Phase ...........................................................67

        **1.** The State's case. ...............................................................67

        **2.** The Defense case. ..............................................................699

        **3.** The jury deliberation and verdict................................................700

    **L.** State Appellate Proceedings.....................................................70

    **M.** State Habeas Proceedings.......................................................72

        **1.** OCFW is appointed to represent Mr. Balderas in post-conviction habeas proceedings. ...................................................................72

        **2.** First post-trial disclosures. ....................................................73

        **3.** The State issues Brady disclosures four days before the hearing. ...................755

        **4.** The Texas State habeas hearing. ...............................................76

        **5.** The Texas State court conclusions...............................................77

        **6.** Post-Texas State hearing Brady disclosures. ....................................83

    **N.** Undersigned Counsel's Investigation of Mr. Balderas's Mental Health......................89

**GROUNDS FOR PETITION** ...................................................................97

i

**I.    THE STATE VIOLATED MR. BALDERAS'S DUE PROCESS RIGHTS UNDER *BRADY V. MARYLAND* AND ITS PROGENY ........................................97**

**A.** The State Has a Duty to Disclose Exculpatory and Impeachment Evidence to Defense Counsel.........................................................................................97

**B.** History of *Brady* Requests and Disclosures ..................................................98

**C.** The State Withheld Impeachment Evidence as to its Star Witness, Israel "Cookie" Diaz .............................................................................................................102

    **1.** The undisclosed evidence that Cookie gave multiple versions of the alleged confession providing multiple contradictions that trial counsel was unable to confront Cookie with. .............................................................................102

    **2.** The undisclosed evidence that Cookie's testimony that he never spoke with prosecutors in 2007 or 2008 as to this case was a lie. .....................................103

    **3.** The undisclosed evidence that Cookie told prosecutors that the LTC meeting on Powder occurred nine to ten months before the murder (not three to four Days before). ................................................................................103

    **4.** The undisclosed evidence that Cookie told prosecutors that Powder's alleged transgression against the gang for hanging out with other gangs was punishable by a beating (not death). ...................................................104

    **5.** The undisclosed evidence that Cookie wanted Powder dead. ..........................104

    **6.** The undisclosed evidence as to Cookie's explanation of his discussion with Powder on the "snitching." .............................................................105

    **7.** The undisclosed evidence that Cookie had a violent history with Powder. ......105

    **8.** The undisclosed evidence that Cookie was desperate for a plea deal and had approached prosecutors repeatedly to help himself. ........................................105

**D.** The State Withheld Evidence Supporting the Defense Theory that Mr. Balderas Was Merely Holding the LTC Guns the Day He Was Arrested ..................108

**E.** The State Withheld Impeachment Evidence That Police Were Playing "Where's Waldo" With Photo Lineups, Pressuring Witnesses to Identify Suspects on Photo Lineups, and Putting their Fingers on Photos of Suspects ...........................110

**F.** The State Withheld Exculpatory Evidence As to MS-13's Potential Involvement in the Murder ..................................................................................................111

**G.** The State Withheld Exculpatory Evidence that the Tagging on the Wall of the Crime Scene Had Nothing to Do with Powder .........................................113

**H.** The State Withheld Impeachment Evidence that the Officer Who Testified About Mr. Balderas's Alleged Infraction of Having Extra Medication Was Terminated for Conduct Resulting in the Death of an Inmate........................................114

**I.** The Withheld Evidence Prejudiced Mr. Balderas and There is a Reasonable Probability That the Result of the Trial Would Have Been Different Had the Evidence Been Disclosed .............................................................................1166

**II.   INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL THROUGH THE GUILT/INNOCENCE PHASE.........................................................................122**

**A.** Ineffective Assistance of Counsel in a Capital Case is that Which Falls Below the Prevailing Standard of Professional Competence ...........................................122

**B.** Trial Counsel Were Ineffective During Jury Selection ................................1266

    **1.** Trial counsel failed to address Mr. Balderas's primary mitigation theme......1266

**C.** Trial Counsel Were Ineffective For Failing to Timely Assert Balderas's Right to a Speedy Trial ......................................................................................................131

    **1.** A criminal defendant is entitled to a speedy trial. ...........................................131

    **2.** Mr. Balderas did not receive a speedy trial........................................................132

    **3.** The delay in bringing Mr. Balderas's case to trial cannot be attributed to Mr. Balderas.................................................................................................................132

    **4.** Trial counsel was deficient in asserting Mr. Balderas's right to a speedy trial. ...........................................................................................................................134

    **5.** Mr. Balderas suffered great prejudice as a result of the delay in bringing his case to trial. ...........................................................................................................136

**D.** Trial Counsels' Failure to Investigate and Present Evidence of Mr. Balderas's Innocence Deprived Him of His Sixth Amendment Right to Effective Assistance of Counsel ............................................................................................................................139

    **1.** Mr. Balderas's Sixth Amendment rights were violated by trial counsel's failure to perform an appropriate investigation into Mr. Balderas's innocence. ...............................................................................................................142

    **2.** Trial counsel's investigation fell below the objective standards of reasonableness required by Strickland......................................................................143

    **3.** Trial counsel's failure to investigate alternative suspects and material facts prejudiced Mr. Balderas.........................................................................................150

    **4.** Mr. Balderas's Sixth Amendment rights were violated by trial counsel's failure to investigate an alibi defense. ..............................................................153

    **3.** Mr. Balderas's Sixth Amendment rights were violated by trial counsel's failure to present testimony of an eyewitness identification expert...............1599

    **4.** Mr. Balderas's Sixth Amendment rights were violated by trial counsel's failure to investigate juror misconduct as grounds for a motion for a new trial. ........................................................................................................................1655

    **5.** Trial counsel's unmanageable caseload and inappropriate fee structure should be considered concurrently with specific deficiencies.........................1699

**III.** **INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL AT THE PUNISHMENT PHASE** ................................................................................................................................172

**A.** Ineffective Assistance of Counsel in a Capital Case is that Which Falls Below the Prevailing Standard of Professional Competence .......................................................172

**B.** Trial Counsel Were Ineffective at the Punishment Phase of Mr. Balderas's Trial ....1733

    **1.** Trial counsel failed to investigate the "other acts" evidence of four shootings linked to Mr. Balderas. ......................................................................173

    **2.** Trial counsel failed to investigate and present evidence that other LTC members used Mr. Balderas's car on a regular basis......................................1777

    **3.** Trial counsel failed to investigate Mr. Balderas's dissociation from LTC.....1799

    **4.** Trial counsel failed to investigate LTC's retaliation against its own members..................................................................................................................1833

    **5.** Trial counsel failed to investigate and present mitigation evidence. ...............186

**C.** Trial Counsel's Investigation .................................................................................................187

    **1.** Mr. Balderas's violent and abusive childhood and unstable family. ...............190

    **2.** Mr. Balderas's history of mental illness. .........................................................196

    **3.** Mr. Balderas's positive character and role as a protector................................206

**D.**  Trial Counsel's Failure to Investigate Mitigating Evidence Constituted Ineffective Assistance of Counsel .................................................................................208

**E.**  Trial counsel failed to preserve the record for appeal .................................209

    **1.**  Trial counsel failed to object and preserve error when the State emphasized Mr. Balderas's failure to testify, in violation of his Fifth Amendment rights. .211

**F.**  Trial Counsel's Behavior During the Punishment Phase .............................220

    **1.**  Mr. Nunnery's performance at the punishment phase was deficient...............221

**IV.  INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL FOR FAILURE TO RAISE THE ISSUE OF MR. BALDERAS'S MENTAL COMPETENCY ................226**

**A.**  Trial Counsel's failure to object to Mr. Balderas's competency deprived Mr. Balderas of his due process right to a competency hearing and harmed Mr. Balderas because it is reasonably probable that Mr. Balderas was incompetent at the time of trial. ...................................................................................................226

**B.**  Considering the ample indicia of Mr. Balderas's mental illness and brain impairment, objectively reasonable counsel would have formed a doubt about Mr. Balderas's competence. ..........................................................................227

**C.**  Mr. Balderas was harmed because there is a reasonable probability that he was incompetent at trial. ..................................................................................231

**V.  MR. BALDERAS'S DUE PROCESS RIGHTS WERE VIOLATED BECAUSE HE WAS TRIED WHILE INCOMPETENT .................................................................234**

**A.**  The Criminal Trial of an Incompetent Defendant Violates Due Process....................234

**B.**  Mr. Balderas was Incompetent to Stand Trial During Both the Guilt and Innocence Phases ...................................................................................................235

    **1.**  Mr. Balderas's psychotic and brain impairment symptoms were manifest at the time of his trial. .....................................................................................235

    **2.**  Mr. Balderas lacked sufficient ability to consult with trial counsel with a reasonable degree of rational understanding. .................................................236

    **3.**  Mr. Balderas lacked a rational as well as factual understanding of the proceeding against him. ...................................................................................237

**VI.  INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL ....................................238**

**A.**  Ineffective Assistance of Counsel at the Direct Appeals Phase is that Which Falls Below an Objective Standard of Reasonableness per Strickland When Appellate Counsel Declines to Raise a Claim on Appeal that is Plainly Stronger Than Those Actually Presented to the Appeals Court .......................................................238

**B.**  The Direct Appeal and Appellate Ruling......................................................241

**C.**  Appellate Counsel Failed to Present Evidence to Support Ineffective Assistance of Trial Counsel Claims.........................................................................................244

**D.**  Appellate Counsel Failed to Present Evidence Concerning the False Testimony Presented by Cookie at Trial .........................................................................244

**E.**  Appellate Counsel Failed to Present an Available Alibi Defense..............................245

**F.**  Appellate Counsel Failed to Raise Trial Counsel's Failure to Introduce Mitigation Evidence .........................................................................................................245

**G.**  Appellate Counsel Failed to Raise the Issue of Trial Counsel's Failure to Request a Competency Hearing ...................................................................................2466

**H.** Appellate Counsel Failed to Raise the Issue of a Suggestive Photo Spread and Suggestive Identification Procedure ..................................................247

**I.** Appellate Counsel Failed to Raise Violations of Mr. Balderas's Constitutional Rights on Direct Appeal ..................................................248

    **1.** Jury instructions. ..................................................248

    **2.** Speedy trial. ..................................................248

    **3.** The 10-12 Rule and jury instruction restricting evidence that the jury could determine what was mitigating. ..................................................249

    **4.** Competency to Stand Trial ..................................................250

**J.** Appellate Counsel Failed to Raise *Brady* Issues on Direct Appeal ..................................................250

**K.** Appellate Counsel Failed to Raise Prosecutorial Misconduct Issues Concerning The State's Closing Statement ..................................................251

**VII. TRIAL COUNSEL VIOLATED MR. BALDERAS'S SIXTH AMENDMENT AUTONOMY RIGHT TO PRESENT AN ALIBI DEFENSE** ..................................................**254**

**A.** The Sixth Amendment Right to Autonomy in the Objectives of the Defense ..................................................254

**B.** Trial Counsel Violated Mr. Balderas's Right to Autonomy By Refusing to Present an Alibi Defense ..................................................255

**VIII. MR. BALDERAS'S EQUAL PROTECTION RIGHTS WERE VIOLATED BY THE AGREEMENT BETWEEN THE STATE AND THE DEFENSE TO EXCLUDE AFRICAN AMERICANS FROM MR. BALDERAS'S JURY** ..................................................**257**

**A.** United States Constitution Prohibits Racial Discrimination in Jury Selection and *Batson* Established a Three-Part Test ..................................................257

**B.** The Totality of the Relevant Facts Give Rise to the Inference that African American Persons Were Improperly Excluded from the Jury Because of Their Race ..................................................258

    **2.** Excluded venirepersons were similar to those allowed to proceed to individualized voir dire and to serve on the jury. ..................................................261

    **3.** The Harris County District Attorney's Office has a history of discrimination in jury selection ..................................................262

**IX. THE JURY WAS EXPOSED TO MULTIPLE EXTERNAL INFLUENCES AND ENGAGED IN MISCONDUCT THAT PREJUDICED THEIR DELIBERATIONS AND IMPROPERLY INFLUENCED THEIR VERDICT** ..................................................**263**

**A.** Mr. Balderas was Entitled to Trial by an Impartial Jury ..................................................263

**B.** The Jury Was Exposed To A Series Of Prejudicial External Influences That Affected Its Deliberation And Verdict ..................................................2655

    **1.** Social media commentary. ..................................................265

    **2.** The jury was improperly sequestered near the crime scene. ..................................................266

    **3.** Jurors were subjected to perceived threats and intimidation from a member of Mr. Balderas's family. ..................................................268

    **4.** The trial court failed to properly investigate the external influences. ..................................................271

    **5.** Mr. Balderas was prejudiced when his jury prematurely discussed evidence and relied on the "expertise" of other jurors. ..................................................275

    **6.** Jurors considered potential punishment when deciding guilt. ..................................................284

    **7.** Jurors failed to consider all evidence before making guilt and punishment decisions. ..................................................2866

C.  These Extraneous Influences and Juror Misconduct Violated Mr. Balderas's Due Process Rights By Prejudicing the Jury and Influencing Its Deliberations.................289

X.    MR. BALDERAS'S DEATH SENTENCE WAS ARBITRARILY AND CAPRICIOUSLY IMPOSED BASED ON THE JURY'S ANSWER TO THE UNCONSTITUTIONALLY VAGUE SPECIAL ISSUE ONE, THE TEXAS "10-12 RULE," AND THE PUNISHMENT PHASE JURY INSTRUCTIONS.................**290**
      A.  The Sentence Was Arbitrary and Capricious Because of the Unconstitutional Jury Instructions in Special Issue One ...............................................................................291
          1.   Juror discretion must be suitably directed and limited in capital cases ...........291
          2.   Special Issue One acts as a de facto determinant of death eligibility. ..............292
          3.   Mr. Balderas's death sentence was arbitrarily and capriciously assigned in violation of the Eighth and Fourteenth Amendments because the jury answered Special Issue One without definitions for key terms. ......................292
      B.  The 10-12 Rule .........................................................................................................296
          1.   A capital sentencing scheme cannot unduly burden sentencer before opportunity to consider all mitigating evidence. ..............................................2966
          2.   Mr. Balderas's constitutional rights were violated when the trial court was prohibited from instructing the jury about the 10-12 Rule. ..............................299

XI.   THE HIGHLY SUGGESTIVE PHOTO SPREAD VIOLATED MR. BALDERAS'S DUE PROCESS RIGHTS.........................................................................**304**
      A.  The Due Process Clause Bars Out of Court Photo Identifications That Are Impermissibly Suggestive .........................................................................................304
      B.  The Pretrial Identification Procedure Was Impermissibly Suggestive .......................305
      C.  The In-Court Identification Was Unreliable Under the Totality of the Circumstances ...........................................................................................................307

XII.  THE COURT VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS BY INSTRUCTING THE JURY TO CONSIDER ONLY MITIGATING EVIDENCE THAT RELATES TO "MORAL BLAMEWORTHINESS" ................................................................................................**309**
      A.  The Jury Must Be Allowed to Consider All Mitigating Evidence with Respect to the Death Penalty .....................................................................................................309
      B.  The Trial Court Gave Jury Instructions That Prevented the Jury From Considering All Mitigating Evidence ...........................................................................................311
      C.  Mr. Balderas Presented Mitigating Evidence at the Trial That the Jury Was Prohibited from Considering ....................................................................................313

XIII. ACTUAL INNOCENCE ...............................................................................................**314**

XIV.  MR. BALDERAS WAS INDICTED, TRIED AND SENTENCED TO DEATH UNDER THE UNCONSTITUTIONAL STATUTORY SCHEME SET FORTH IN TEXAS CODE CRIMINAL PROCEDURE, ARTICLE 37. ...................................**3155**

XV.   THE STATE HABEAS PROCEEDING VIOLATED DUE PROCESS ....................**319**
      A.  A State Court Must Observe Due Process When Adjudicating Constitutional Claims Raised in a Post-Conviction Proceeding.........................................................319

vi

**B.** The State Habeas Court Violated Due Process By Failing to Comply with Texas State Procedures and Refusing to Allow Him to Confront and Cross-Examine Trial Counsel on Statements in Their Affidavits. ....................................................320

**C.** The State Habeas Court Violated Due Process By Denying Mr. Balderas the Opportunity to be Heard on a *Brady* Claim Based on Evidence Disclosed After the Court Denied the Writ ....................................................324

**D.** The State Court Denied Mr. Balderas a Fair Hearing. ....................................................325

**XVI. TRIAL COUNSEL VIOLATED MR. BALDERAS'S SIXTH AMENDMENT RIGHT TO SUBSTITUTE COUNSEL** ....................................................**3277**

**A.** The Sixth Amendment Right to Substitute Counsel ....................................................327

**B.** The Trial Court Violated Mr. Balderas's Sixth Amendment Right By Failing to Conduct a Hearing or Even Rule on His *Pro Se* Motion For New Trial on the Basis of a Breakdown of Communication ....................................................328

**XVII. THE TEXAS DEATH PENALTY VIOLATES THE FOURTH, SIXTH, EIGHTH, NINTH AND FOURTEENTH AMENDMENTS AS IT IMPINGES ON MR. BALDERAS'S FUNDAMENTAL RIGHT TO LIFE** ....................................................**329**

**A.** No Compelling State Interest Justifies the Death Penalty for Mr. Balderas ...............329

**XVIII. POST-CONVICTION COUNSEL WAS INEFFECTIVE** ....................................................**3300**

**XIX. LETHAL INJECTION CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS** ....................................................**331**

**XX. MR. BALDERAS IS INCOMPETENT TO BE EXECUTED** ....................................................**332**

**XXI. THE STATE VIOLATED MR. BALDERAS'S DUE PROCESS RIGHTS BY FAILING TO CORRECT FALSE TESTIMONY UNDER *NAPUE* AND *GIGLIO*** ....................................................**333**

**A.** The Knowing Use of False Testimony to Obtain a Conviction Violates Due Process ....................................................3333

**XXII. CUMULATIVE ERROR** ....................................................**3355**

**PRAYER FOR RELIEF** ....................................................**3355**

**VERIFICATION** ....................................................**3366**

**APPENDIX A – LIST OF KEY FIGURES** ....................................................**338**

Petitioner Juan Balderas, by and through undersigned counsel, pursuant to all rights available under Article I § 9 and Article III of the United States Constitution; the Fourth, Fifth, Sixth, Eighth, Tenth, and Fourteenth Amendments to the United States Constitution; 28 U.S.C. § 2201, and 28 U.S.C. § 2241 *et seq.*, including 28 U.S.C. § 2254 (currently and as it existed prior to its amendment in 1996), respectfully petitions this Court for a Writ of Habeas Corpus "declaring him in custody in violation of the Constitution of the United States and ordering his release because his conviction for murder as well as the resulting death sentence were unconstitutionally obtained." 28 U.S.C. § 2241(c)(3) & 2254(a)

## PRELIMINARY STATEMENT

1.      This is an original federal petition in a death penalty case.

2.      Petitioner Juan Balderas (Texas Department of Criminal Justice Inmate No. 00999590) is currently confined on death row at the Institutional Division's Polunsky Unit located in Livingston, Texas. Through undersigned counsel, and pursuant to the Constitution of the United States and 28 U.S.C. § 2254 *et. seq.*, Mr. Balderas petitions this Court to issue a Writ of Habeas Corpus and to order his release from confinement on grounds that his custody violates the Constitution and laws of the United States.

3.      Mr. Balderas was convicted and sentenced to death in 2014 for the murder of Eduardo "Powder" Hernandez—a murder he did not commit. He was framed by two leaders of his Houston-area street gang (Israel "Cookie" Diaz and Victor "Gumby" Arevalo), who ordered and carried out the hit on Powder as both an act of revenge against Powder for informing law enforcement about a crime that Cookie committed and to otherwise silence Powder from testifying against Cookie. Despite the fact that Mr. Balderas was elsewhere with extended family at the time of Powder's murder, Cookie and Gumby's plan worked—and the Harris County District

1

Attorney's Office, in its shared zeal to pin the crime on Mr. Balderas, ultimately became the unwitting facilitator of the pair's conspiracy.

4.      Mr. Balderas remains on Texas' death row today due to a series of errors and deprivations at trial, on direct appeal, and on state collateral review, in violation of his federal constitutional rights. Although Mr. Balderas has been unlawfully confined on death row since his 2014 sentencing, his unlawful incarceration actually began starting at his original arrest in December 2005. And for almost nine years of this imprisonment, Mr. Balderas languished without a speedy trial. Over many years, these injustices have become a perfect storm of constitutional violations—misconduct by prosecutors, ineffective counsel during trial and on direct appeal, and ineffective state habeas counsel as to a sentencing mitigation claim related to Mr. Balderas's mental health. All of which is to say that this Court represents the best and only forum for Mr. Balderas to vindicate his federal constitutional rights and to seek vacatur of his unlawful conviction and death sentence.

5.      During the *eight years* Mr. Balderas was incarcerated and awaiting trial to prove his innocence, trial counsel squandered numerous opportunities to investigate alibi witnesses, confessions from an alternative suspect, details of a plan by fellow gang members to frame Mr. Balderas for the crime, and expert evidence showing that eyewitness Wendy Bardales's identification of Mr. Balderas as the shooter was suggestive, biased, and unreliable. In addition, the Harris County District Attorney's Office (the "State") coerced Israel "Cookie" Diaz—a leader of Powder and Mr. Balderas's street gang, the State's critical trial witness, and law enforcement's original suspect in the murder—into falsely testifying that Mr. Balderas had confessed on the night of the crime. Cookie was an incredible and unreliable witness—indeed, Cookie recanted his trial testimony after trial, only to then later *recant* his recantation. Yet, prior to trial, the State withheld

2

prior inconsistent statements by Cookie from disclosure to trial counsel that would have undermined this individual's crucial testimony. It was *four years* after trial, and on the eve of Mr. Balderas's state habeas evidentiary proceeding, that the State bothered to begin the process of complying with its *Brady* obligations related to its star witness.

6.     At trial, after the close of evidence and arguments, additional errors and prejudice occurred to Mr. Balderas's unconstitutional detriment. The jury deliberated on guilt/innocence for two days, but it abruptly convicted Mr. Balderas due to the improper influence of an outside event that the jurors themselves attributed to Mr. Balderas. And during the punishment phase of the trial, trial counsel failed to investigate and present reasonably discoverable evidence to rebut the State's allegations of extraneous offenses. Trial counsel also failed to present compelling mitigating evidence.

## JURISDICTION AND VENUE

7.     This Court has personal jurisdiction over this matter pursuant to 28 U.S.C. § 2241 as Mr. Balderas was convicted and sentenced in *State of Texas v. Juan Balderas*, Trial Cause No. 1412826, in the 179th Judicial District Criminal Court in Harris County, Texas, located in the Houston Division of the Southern District of Texas. Mr. Balderas's judgment and sentence of death was rendered on March 14, 2014.

8.     Subject matter jurisdiction is conferred by 28 U.S.C. § 2254 *et seq.* and amendments four, five, six, eight, and fourteen of the United States Constitution, and section nine, clause two of the United States Constitution.

## PARTIES

9.     Petitioner Juan Balderas is a husband, son, and brother currently confined on death row at the State of Texas Department of Criminal Justice's Institutional Division at the Polunsky Unit located in Livingston, Texas. His inmate number is 00999590.

3

10.    Defendant Bobby Lumpkin is the Director of the Texas Department of Criminal Justice's Institutional Division.

## TIMELINESS OF PETITION

11.    Under 28 U.S.C. § 2244(d)(1), a state prisoner has one year from the date that direct review concludes to petition for a writ of habeas corpus in federal court. The one-year deadline is tolled during the pendency of state post-conviction or other collateral review. *See* 28 U.S.C. § 2254(d)(2).

12.    Mr. Balderas filed his state habeas application on January 15, 2016.

13.    Mr. Balderas's state post-conviction review before the Texas Court of Criminal Appeals was denied by that court on December 18, 2019. Accordingly, this Petition is timely filed.

## PROCEDURAL HISTORY

**<u>Trial Proceeding</u>**

14.    On December 16, 2005, Mr. Balderas was arrested and incarcerated at a Harris County Sheriff's Office detention facility in Houston. The court found that probable cause for detention existed and ordered Mr. Balderas committed to the custody of the Sheriff with no bail.

15.    On April 12, 2006, a criminal grand jury in Harris County, Texas, returned a capital murder indictment against Mr. Balderas for causing the death of Eduardo "Powder" Hernandez in the course of committing or attempting to commit a burglary of a habitation. Mr. Balderas made an initial appearance on the indictment on July 13, 2006, with attorney Alvin Nunnery. (Docket, CCA Record, Vol. I, 00048-00054, at 00048.) At some point shortly thereafter, attorneys Jerome Godinich, Jr., and Robert R. Scott were appointed as counsel. Attorney R. Scott Shearer was also appointed several years later in January 2014 as a member of Mr. Balderas's legal defense team.

16.    On January 13, 2014, almost eight years after his initial arrest and continuous incarceration, Mr. Balderas received a trial with the commencement of jury selection. Following

4

jury selection's conclusion on February 7, 2014, Mr. Balderas was arraigned and pleaded not guilty on February 17, 2014.

17.    Trial began before then-Judge Kristin Guiney in the 179th District Criminal Court on February 17, 2014. The State of Texas—represented by the Harris County District Attorney's Office—presented its case and rested three days later on February 20, 2014. The defense presented a case, and both sides rested and presented closing arguments on February 24, 2014. The jury began its deliberations and announced approximately 14 hours later on February 26, 2014, that it was still unable to reach a unanimous verdict. The court denied a defense motion for mistrial and instead issued an *Allen* charge instructing the jury to continue deliberations. The jury deliberated for several more hours and returned a verdict of guilty the next day on February 27, 2014.

18.    The punishment phase of trial began on February 27, 2014, and the State rested its case on March 5, 2014. The defense for Mr. Balderas then presented a case, which concluded on March 12, 2014. Following the presentation of rebuttal witnesses, the case was submitted to the jury for punishment-phase deliberations on March 13, 2014.

19.    For its punishment-phase deliberations, the jury was tasked with answering two special verdict questions. The first question (Special Issue One) asked the jury to answer:

> "Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Juan Balderas also known as Apache, would commit criminal acts of violence that would constitute a continuing threat to society?"

(Jury Charge and Verdict, Mar. 14, 2014, Texas Court of Criminal Appeals ("CCA Record"), Vol. XII, 03334-45, at 03342.)[1]

---

[1] References to "CCA Record" are the Clerk's Record, Direct Appeal to the Court of Criminal Appeals of Texas, Trial Cause No. 1412826, Volumes I to XII. References to "RR" are the Reporter's Record, Volumes 1 to 49, Trial Court Cause No. 1412826. References to "Habeas Writ Record" are the Writ Record in the Court of Criminal Appeals of Texas for Post-Conviction Applications for Writ of Habeas Corpus, Trial Court Writ No. 1412826-A, Volumes I to XXII.

20.     In the event of a "Yes" to the first question, the jury was directed to answer the following question (Special Issue Two):

> "Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Juan Balderas also known as Apache, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed?"

(*Id.* at 03343.)

21.     On March 14, 2014, the jury returned a verdict as to both questions—it answered "Yes" as to Special Issue One and "No" as to Special Issue Two. (*Id.* at 03342-43.)

22.     The same day, on March 14, 2014, Judge Guiney sentenced Mr. Balderas to death. The trial court appointed Mr. Shearer to remain as counsel for Mr. Balderas for purposes of direct appeal and appointed the then-named Office of Capital Writs—now known as the Office of Capital and Forensic Writs ("OCFW")—as state habeas corpus counsel for Mr. Balderas.

**Direct Appeal**

23.     Mr. Shearer timely filed a notice of direct appeal on Mr. Balderas's behalf with the Texas Court of Criminal Appeals ("TCCA") on March 14, 2014. (Notice of Appeal, Mar. 14, 2014, CCA Record, Vol. XII, 03360.) The opening brief for Mr. Balderas was due to be filed with the TCCA on January 20, 2015.

24.     On January 23, 2015, the Clerk of the TCCA issued an official notice indicating that the opening brief had not been filed and directed the immediate filing of the brief (along with a motion for extension of time) in order to avoid the issuance of a show-cause order. Counsel for Mr. Balderas filed the opening brief three months later on April 27, 2015. The brief asserted nine grounds for relief: (1) insufficient evidence to prove guilt; (2) denial of speedy trial; (3) denial of Sixth Amendment right to confront accuser in the English language when the witness speaks,

understands, and is fluent in English; (4) denial of Sixth Amendment right to cross-examine and impeach accuser concerning her ability to speak English; (5) abuse of trial court's discretion by allowing eyewitness Wendy Bardales to testify in Spanish; (6) violation of the *Gaskin* Rule by improperly denying Mr. Balderas the opportunity to impeach Wendy Bardales with her prior audio recorded statement to police; (7) deprivation of due process and an impartial jury by outside influence; (8) deprivation of due process of law when trial court failed to suppress Wendy Bardales' in-court and out-of-court identifications; and (9) abuse of discretion when the trial court failed to have testimony read back in response to two jury notes.[2]

25.    On June 24, 2015, the State filed its opposition brief. Counsel for Mr. Balderas did not file a reply brief.

26.    On November 2, 2016, the TCCA issued its opinion, delivered by Judge Michael Keasler, affirming the trial court's judgment. *See Balderas v. State*, 517 S.W.3d 756 (Tex. Crim. App. 2016). Former Judge Elsa Alcala filed a dissenting opinion. *See id.* at 803-14. In her dissent, Judge Alcala disagreed with the majority opinion that the pretrial identification procedure was not impermissibly suggestive, and she also disagreed that the in-court identification that was made over eight years later was reliable. Judge Alcala stated that she would "sustain appellant's eighth issue, find the error harmful, reverse appellant's conviction and death sentence, and remand for a new trial." *Id.* at 804.

27.    The United States Supreme Court denied a writ of certiorari from Mr. Balderas's direct appeal on February 27, 2017, thereby concluding direct review. *See Balderas v. Texas*, 137 S. Ct. 1207 (2017).

---

[2] Undersigned counsel is prepared to provide these voluminous documents to the Court upon request and in conjunction with counsel for the Texas Attorney General's Office.

**State Habeas Corpus Proceeding**

28. As required by Texas law, Mr. Balderas's state habeas corpus application commenced during the pendency of his direct appeal. Once an application challenging a judgment imposing death is filed, the Texas Code of Criminal Procedure directs the habeas court to determine, based on the application and the State's answer, "whether controverted, previously unresolved factual issues material to the legality of the applicant's confinement exist" and then "issue a written order of the determination." Tex. Code Crim. Proc. art. 11.071 § 8(a).

29. Section 9 of Article 11.071, entitled "Hearing," governs the proceeding when the habeas court "determines that controverted, previously unresolved factual issues material to the legality of [ ] confinement exist." Tex. Code Crim. Proc. art. 11.071 § 9(a). In that circumstance, the habeas court must designate by written order the issues of fact that are to be resolved and the manner by which the court will consider evidence to resolve those issues. *Id*. § 9(a). To resolve the issues, the court can hold a hearing appropriate to the case; the statute authorizes the court to receive evidence via affidavits, depositions, interrogatories, live witnesses, and personal recollection. *Id.*

30. On July 6, 2015, OCFW moved the TCCA for a statutorily authorized 90-day extension to file his state habeas application. OCFW moved again for another extension on October 22, 2015. On November 5, 2015, the TCCA extended the filing deadline to file the state habeas corpus application with the trial court until January 15, 2016. OCFW subsequently filed its Initial Application for Writ of Habeas Corpus on Mr. Balderas's behalf on January 15, 2016.

31. Several weeks later, on February 8, 2016, OCFW filed a motion seeking the recusal of Judge Guiney from the case on the basis that Judge Guiney was a material fact witness to one of Mr. Balderas's habeas claims related to her "actions extraneous to courtroom proceedings." Judge Olen Underwood was referred the motion for hearing, which he denied. Judge Underwood

also denied a motion for reconsideration on May 5, 2016. On May 13, 2016, OCFW filed a petition for writ of mandamus with the TCCA regarding the recusal issue and filed a related motion for a stay of Mr. Balderas's state habeas proceedings until resolution of the mandamus. On July 27, 2016, the TCAA denied Mr. Balderas's petition for writ of mandamus without written order.

32.    On August 5, 2016, Mr. Balderas filed a Motion to Designate Issues of Fact to be Resolved and Request for Evidentiary Hearing Under Article 11.071, § 9(A). (Motion for Order Designating Issues and Live Evidentiary Hearing; Proposed Order Designating Issues, Aug. 5, 2016, Habeas Writ Record, Vol. V, 01426-46.) In particular, Mr. Balderas presented evidence from his post-conviction investigation on controverted, previously unresolved factual issues, including:

- That the State's star witnesses, Israel "Cookie" Diaz, had recanted his trial testimony;

- Alibi evidence that the jury never heard;

- That the only witness to identify Mr. Balderas (Wendy Bardales) had been in an ongoing, intimate relationship with the State's star witness in the year leading up to the shooting;

- An affidavit from an eyewitness identification detailing numerous defects in Ms. Bardales's identification;

- That Mr. Balderas had been in the process of distancing himself from the gang for months prior to his arrest and that his attempt to do so angered other members of the gang, and the gang had a history of responding to perceived traitors by setting them up for crimes they did not commit;

- Affidavits from other gang members who identified a plan of the State's star witness to blame Mr. Balderas for the murder;

- Affidavits from several witnesses who believed the gang had set up Mr. Balderas in response to Mr. Balderas attempting to leave the gang; and

- Evidence in addition to the trial testimony concerning Mr. Balderas's sexually abusive stepfather and absent father, Mr. Balderas's mother was also highly unstable and absent in Mr. Balderas's life.

33.    The State filed its Motion to Designate Issues on September 7, 2016, (State's Motion to Designate Issues, Sept. 7, 2006, Habeas Writ Record, Vol. V, 01447-49), and Order for Filing Affidavits on September 7, 2016 (Order for Filing Affidavits, Sept. 7, 2006, Habeas Writ Record, Vol. V, 01460). In its filings, the State requested the habeas court to order the submission of trial counsel affidavits.

34.    Judge Guiney issued an Order Designating Issues on September 16, 2016. (Court's Order Designating Issues, Sept. 16, 2016, Habeas Writ Record, Vol. V, 01450-51.) According to the Order, Judge Guiney planned to resolve "some of the designated issues by application of the applicable law, some by review of the appellate record and application of applicable law, some by review of the pleadings, some by review of affidavits submitted by trial counsel, some by recollection of the trial court, and some by review of submitted habeas exhibits." On that same date, Judge Guiney also entered an order directing Mr. Balderas's trial counsel to submit affidavits responding to the allegations in the claims submitted by OCFW on Mr. Balderas's behalf. (Order for Affidavits, Sept. 16, 2016, Habeas Writ Record, Vol. V, 01457-62.) Pursuant to that order, affidavits were due November 15, 2016, but trial counsel—Jerome Godinich and Alvin Nunnery—did not submit their affidavits until August 9, 2017, and August 11, 2017. (Notice regarding filing Affidavit of Jerome Godinich, Aug. 9, 2017, Habeas Writ Record, Vol. V, 01485; Notice regarding filing Affidavit of Alvin Nunnery, Aug. 11, 2017, Habeas Writ Record, Vol. V, 01493.)

35.    On November 8, 2016, Judge Guiney stood for re-election to the 179th District Court and was defeated by current Judge Randy Roll, who then took over as the presiding habeas bench officer for the matter. Less than five months later, on March 29, 2017, the TCCA issued a *per curiam* order directing "the trial court to resolve any remaining issues in the case within 180 days[.]"

36.    Following a recusal of Judge Roll on December 15, 2017, for bias related to statements he made concerning his high opinion of Mr. Balderas's trial counsel (Verified Motion to Recuse Judge Randy Roll From Proceedings Connected to Juan Balderas's Initial Application for Writ of Habeas Corpus, Sept. 22, 2017, Habeas Writ Record, Vol. V, 01505-01524, at 01522.), Mr. Balderas's state habeas case was re-assigned to Judge Baylor Wortham on December 28, 2017. (Order of Assignment by the Presiding Judge, Dec. 28, 2017, Habeas Writ Record, Vol. VII, 01971.) Several days later, on January 2, 2018, OCFW filed a renewed motion for evidentiary hearing, which it had originally sought approximately 17 months earlier. (Opposition to State's Motion for Trial Court To Order the Submission of Proposed Findings of Fact and Renewed Motion for a Live Evidentiary Hearing, Jan. 2, 2018, Habeas Writ Record, Vol. VI, 01788-1822.) Judge Wortham held a status hearing on February 22, 2018, regarding the disputed issues for evidentiary resolution. The judge directed both parties to submitted proposed orders.

37.    On March 21, 2018, almost 20 months after OCFW first identified issues for resolution and a request for evidentiary hearing, Judge Wortham issued an order which essentially adopted verbatim the proposed order submitted by the State narrowing the issues. Indeed, Judge Wortham's order was even entitled "*State's Proposed* Supplemental Order Designating Issues To Be Resolved Via Evidentiary Hearing." (State's Proposed Supplemental Order Designating Issues To Be Resolved Via Evidentiary Hearing, March 21, 2018, Habeas Writ Record), Vol. VII, 01857-

11

58) (emphasis added). The order limited the scope of a "narrowly tailored evidentiary hearing" to only two of the issues that Mr. Balderas originally raised for hearing (namely, the State's alleged presentation of false testimony by key witness Israel "Cookie" Diaz and trial counsel's failure to present alibi testimony at trial). The evidentiary hearing was scheduled to begin on May 11, 2018.

38.    On April 19, 2018, OCFW filed a Motion to Compel Disclosure of Exculpatory and Impeachment Evidence. (Motion to Compel Disclosure of Exculpatory and Impeachment Evidence, April 19, 2018, Habeas Writ Record, Vol. VII, 01956-69.) This included requests as to exculpatory and impeachment evidence as to Cookie and Alejandro Garcia. (*Id.* at 01962-67.)

39.    Several days before the evidentiary hearing, the State abruptly made a disclosure of information on May 7, 2018, that had *never* previously been disclosed—not prior to Mr. Balderas's trial, not during the direct appeal process, and not at any point prior during the state habeas proceeding. All of the information (such as jailhouse call audio and prosecution interview notes) related to Cookie—the State's key witness against Mr. Balderas.

40.    The State's May 7, 2018, disclosure followed years of ignored motions that Mr. Balderas filed, *pro se*, seeking exculpatory and impeachment information. His first came on October 8, 2015, and again on August 18, 2017, and then on April 19, 2018, and then finally once more on May 1, 2018. It was only after Mr. Balderas's *fourth* motion for exculpatory and impeachment information that the State made this new disclosure of information days later—over four years *after* his trial concluded.

41.    On May 8, 2018, OCFW moved for a continuance of the evidentiary hearing in light of the late disclosure. Judge Wortham denied the motion. On May 11, 2018, Judge Wortham held the evidentiary hearing as originally planned.

12

42.     On July 11, 2018, OCFW filed a motion to supplement the evidentiary record on the basis that OCFW had been limited in the evidence it sought to introduce during the May 11, 2018, hearing, as well as the late-disclosed information from the State just days before the hearing commenced. Judge Wortham denied the motion the same day.

43.     On July 19, 2018, OCFW and the State each submitted proposed findings of fact and conclusions of law. Just one day later, on July 20, 2018, Judge Wortham issued his Findings of Fact and Conclusions of Law, and Order denying Mr. Balderas's state habeas application. (State Habeas Findings of Fact and Conclusions of Law ("FFCL"), July 20, 2018, Habeas Writ Record, Volume X, 02844-2937.) The court also ordered that all papers be transmitted to the TCCA. Judge Wortham's order was a nearly verbatim version of the proposed order submitted by the State.

44.     On August 20, 2018, the State made yet another disclosure of information that had never previously been provided to trial, appellate, or state habeas counsel. Among the information were statements from a witness (Alejandro Garcia) indicating that Mr. Balderas was not Powder's killer. On November 30, 2018, OCFW filed a motion with the TCCA seeking to stay the proceedings and to remand the matter for a renewed evidentiary hearing in light of the State's late-disclosed information. The TCCA never ruled on OCFW's motion.

45.     On December 18, 2019, the TCCA issued a *per curiam* order adopting Judge Wortham's findings of fact and conclusions of law and denying relief to Mr. Balderas. With the TCCA's order closing this tortuous last chapter of Mr. Balderas's state proceedings, he had been incarcerated at that point for 14 years—approximately eight of which was spent simply waiting in county jail just to have his constitutional right to a trial.

**Federal Habeas Proceedings Initiated**

46.     Following the TCCA's denial, undersigned federal habeas *pro bono* counsel began its preparation of Mr. Balderas's federal habeas petition in January 2020.

47.     On March 11, 2020, the World Health Organization officially classified a novel strain of coronavirus, COVID-19, as a pandemic.[3] On March 13, 2020, the White House declared a national emergency under Section 319 of the Public Health Service Act, 42 U.S.C. § 247(d), and issued guidance a few days later recommending that, for the next eight weeks, gatherings of ten persons or more be cancelled or postponed. As of December 9, 2020, the *New York Times* reported that the State of Texas alone recorded over 14,500 new cases of the virus and 288 deaths that day. In total, its death total on December 9, 2020, was 23,727 lost souls.

48.     On March 11, 2020, Harris County issued a Declaration of Local Disaster. On March 13, 2020, the Institutional Division's Polunsky Unit suspended visitation until further notice. On March 19, 2020, the governor issued a Public Health Disaster Declaration that prohibited gatherings of more than 10 people. On March 24, 2020, Harris County issued a stay-at-home order, and on March 31, 2020, the governor extended his order that persons in Texas must minimize social gatherings and in-person contact.

49.     Notwithstanding Mr. Balderas's and undersigned federal habeas counsel's reasonable diligence in preparing his federal habeas petition since January 2020, including receiving previously undisclosed documents from the State, national, state, and local emergency responses have impeded undersigned counsel's ability to communicate and utilize office resources and personnel, utilize retained experts, investigate the record, and travel and interview witnesses. Mr. Balderas's counsel have also had difficulty communicating with and visiting him at Polunsky Unit.

50.     As an example of the efforts that have been impeded by the COVID-19 pandemic, undersigned counsel retained Dr. Bhushan S. Agharkar, a forensic psychiatrist based in Atlanta,

---

[3] Tedros Adhanom Ghebreyesus, Director General, World Health Org., "WHO Director-General's Opening Remarks at the Media Briefing on COVID-19" (Mar. 11, 2020).

Georgia, to provide a psychiatric evaluation of Mr. Balderas. Dr. Agharkar has published extensively on moral competence as mitigation in capital cases, traumatic brain injury in criminal litigation, roadblocks to competency to stand trial, and treatment outcomes in schizophrenia, among other topics. Given the extraordinary and unforeseeable circumstances arising from the COVID-19 pandemic, it was not until May 27, 2021 that Dr. Agharkar was able to perform a psychiatric evaluation of Mr. Balderas. (Exhibit A, Report of Dr. Bhushan Agharkar, MD, DFAPA, "Agharkar Report," at 1.) Dr. Agharkar's evaluation is central to several of Mr. Balderas's claims in this Petition.

51.     Additionally, undersigned counsel hired Randi Chavez—a mitigation expert with extensive experience in death penalty cases—to meet with Mr. Balderas and report on her impressions, as well as interview mitigation witnesses, work with a mental health expert, and review the record in order to suggest additional records to collect and specific focus areas. Due to the extraordinary and unforeseeable circumstances arising from the COVID-19 pandemic, Ms. Chavez also faced incredible difficulty collecting documents and gathering information, and was unable to meet with Mr. Balderas in person and report on her impressions.

52.     Notwithstanding the challenges posed by the COVID-19 pandemic, Mr. Balderas submitted his First Amended Petition for Writ of Habeas Corpus ("First Amended Petition") on April 18, 2022. (Dkt. No. 38.)

53.     The First Amended Petition sets forth five claims not previously raised in state post-conviction proceedings:

- Claim I – The State Violated Mr. Balderas's Due Process Rights Under *Brady v. Maryland* and its Progeny;
- Claim IV – Ineffective Assistance of Trial Counsel for Failure to Raise the Issue of Mr. Balderas's Mental Competency;

- Claim V – Mr. Balderas's Due Process Rights Were Violated Because He Was Tried While Incompetent;

- Claim VII – Trial Counsel Violated Mr. Balderas's Sixth Amendment Autonomy Right to Present an Alibi Defense; and

- Claim XXI – The State Violated Mr. Balderas's Due Process Rights by Failing to Correct False Testimony Under *Napue* and *Giglio*.

54. On April 18, 2022, Mr. Balderas submitted a Motion to Stay Proceedings Pending Exhaustion of State Court Remedies, pursuant to *Rhines v. Weber*, 544 U.S. 269 (2005), requesting the Court stay these proceedings so that he may litigate the five aforementioned claims in state court. ("Motion to Stay", Dkt. No. 39, Apr. 18, 2022.)

55. The Court granted Mr. Balderas's Motion to Stay on December 13, 2022, directing Mr. Balderas to file his successive state habeas application "in an expeditious manner." (Order, Dkt. No. 57, Dec. 13, 2022.) The Court also directed Mr. Balderas to move to reopen these proceedings within thirty days after the resolution of his state proceedings. (Id.)

**Subsequent State Habeas Corpus Proceedings**

56. Following the Court's grant of Mr. Balderas's Motion to Stay, on February 24, 2023, Mr. Balderas filed in the 179th Judicial District Court of Harris County, Court of Criminal Appeals, his Subsequent Application for Writ of Habeas Corpus Filed Pursuant to Tex. Code Crim. Proc. Art. 11.071 § 5 (Texas's "abuse of the writ" statute). ("Subsequent Application," *State of Texas v. Juan Balderas*, Cause No. 1412826, TCCA Cause No. WR-84-,066-01, Tex. Crim. App. Feb. 24, 2023.) Mr. Balderas sought consideration of the merits of the five aforementioned claims, arguing that the threshold showing under Texas's abuse of the writ statute was met.

57. On March 29, 2023, Mr. Balderas's Subsequent Application was transferred from the 179th District Court of Harris County to the 228th District Court. (Order of Transfer, *State of Texas v. Juan Balderas*, Cause No. 1412826-B, Tex. Crim. App. Mar. 29, 2023.) The reason for

the Order of Transfer was "Recusal by Judge of the 179 District Court," Judge Ana Martinez. The Order of Transfer notes that "Judge Martinez handled the case as a prosecutor." (Id.)[4]

58.     On April 12, 2023, the TCCA for the 228th District ordered Mr. Balderas to file a shorter Subsequent Application to comply with the amended Texas Rule of Appellate Procedure 9.5(i) (relating to length and word count of documents).  (Order, *Ex Parte Juan Balderas*, No. WR-84-066-03, Tex. Crim. App. Apr. 12, 2023.) Mr. Balderas responded on May 15, 2023, requesting that the TCCA permit him to file his Subsequent Application in excess of Rule 9.4(i)'s word limit. (Mr. Balderas's Response to April 12, 2023 Order, *State of Texas v. Juan Balderas*, Casue No. 1412826-B, CCA Cause No. WR-84-,066-01, Tex. Crim. App. May 15, 2023.)

59.     The TCCA denied Mr. Baldera's May 15, 2023 request to exceed the word limit and directed him to file an amended subsequent application that complies with Rule 9.4(i). (Order, *Ex Parte Juan Balderas*, No. WR-84-066-03, Tex. Crim. App. Jun. 21, 2023.)

60.     On July 3, 2023, Mr. Balderas submitted his Amended Subsequent Application for Writ of Habeas Corpus Filed Pursuant to Tex. Code Crim. Proc. Art. 11.071 § 5, in compliance with Rule 9.4(i). ("Amended Subsequent Application," *State of Texas v. Juan Balderas*, Cause No. 14128260101B-3, CCA No. WR-84-,066-01, Tex. Crim. App. Jul. 3, 2023.)

61.     On October 25, 2023, the TCCA dismissed Mr. Balderas's Amended Subsequent Application. *See* Order, *Ex Parte Juan Balderas*, No. WR-84,066-03, Tex. Crim. App. Oct. 25, 2023.

62.     Following the TCCA's dismissal, Mr. Balderas submitted in this Court a Motion to Stay Proceedings Pending Writ of Certiorari on November 20, 2023. (Dkt. No. 62, Nov. 20, 2023.) Mr. Balderas requested this Court stay the federal habeas corpus proceedings while he sought to

---

[4] Mr. Balderas learned for the first time of Judge Martinez's handling of his criminal case as a prosecutor on March 29, 2023, upon receipt of the Order of Transfer.

file a Suggestion of Reconsideration in the TCCA, pursuant to Texas Rule of Appellate Procedure 79.2(d), and a petition to the Supreme Court of the United States for a writ of certiorari to request review of the CCA's decision.

63.     On or about November 14, 2023, Mr. Balderas mailed to the TCCA a *pro se* Motion for Reconsideration of the TCCA's October 25, 2023 dismissal of his Amended Subsequent Application, which the TCCA received on November 20, 2023. The TCCA denied Mr. Balderas's *pro se* motion on December 20, 2023. (Notice, *Ex Parte Juan Balderas*, No. WR-84,066-03, Tex. Crim. App. Dec. 20, 2023.)

**Reopened Federal Habeas Corpus Proceedings**

64.     Respondent moved to reopen these proceedings following the TCCA's dismissal of Mr. Baldera's Amended Subsequent Application. (Opposed Motion to Reopen Proceedings and Opposition to Petitioner's Motion to Stay Proceedings, Dkt. No. 64, Nov. 28, 2023.) On December 22, 2023, the Court denied Mr. Balderas's motion to stay pending certiorari review and granted Respondent's motion to reopen this case. (Order, Dkt. No. 67, Dec. 22, 2023.)

65.     Per the Court's January 24, 2024 Scheduling Order, Mr. Balderas submits this Petition for Writ of Habeas Corpus (Second Amended) ("Second Amended Petition"). (Order, Dkt. No. 69, Jan. 24, 2024.)

**REQUIREMENTS FOR GRANTING HABEAS RELIEF**

**The Federal Scheme Related to the Collateral Attack of State Convictions**

66.     Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), a federal district court may grant habeas relief on a claim "adjudicated on the merits in State court proceedings" when that adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based

18

on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." In this circumstance, the federal court may conduct its review *de novo*.

a.    The Supreme Court clarified in *Williams v. Taylor*, 529 U.S. 362, 405-07 (2000), that the "contrary to" and "unreasonable application" clauses in § 2254(d) should be viewed independently.

i.    A state court decision will be "contrary to" Supreme Court precedent if it is "substantially different from the relevant precedent." *Id.*

ii.    A state court decision will be an "unreasonable application" if (A) "the state court identifies the correct governing legal rule from [the] Court's cases but unreasonably applies it to the facts of the particular prisoner's case"; or (B) "the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id*. at 407. An unreasonable application of federal law must be "objectively unreasonable." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003), *accord Williams*, 529 U.S. at 410-12.

b.    For a state court's factual determination to be unreasonable, it must be more than merely incorrect or erroneous. *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). Rather, "it must be sufficiently against the weight of the evidence that it is objectively unreasonable." *Winston v. Kelly,* 592 F.3d 535, 554 (4th Cir. 2010). "[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding[.]" *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). A federal habeas court must presume the underlying factual determinations of the state court to be correct unless the prisoner "rebut[s] the presumption of

correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Miller-El*, 537 U.S. at 341.

67.     Under 28 U.S.C. § 2254(b), a petitioner must exhaust the remedies in the courts of the state. The exhaustion requirement is satisfied when "the substance of the federal habeas claim has been fairly presented to the highest state court." *Mercadel v. Cain*, 179 F.3d 271, 275 (5th Cir. 1999). This presentment can take place through direct appeal or in a state habeas proceeding. *Orman v. Cain*, 228 F.3d 616, 620 (5th Cir. 2000). This rule applies to the development of the facts material to a petitioner's claims, as well as to the legal principles underlying those claims. *See Picard v. Connor*, 404 U.S. 270, 275 (1971) ("It follows, of course, that once the federal claim has been fairly presented to the state courts, the exhaustion requirement is satisfied.") (emphasis added).

68.     Generally, the federal court's assessment must be made in light of the evidence the state court had before it. *Holland v. Jackson*, 542 U.S. 649, 652 (2004); *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). However, it is a valid exercise of a federal court's power to review evidence not presented to state courts—leaving the claim exhausted—where the evidence is "supplemental," as long as it does not "fundamentally alter the legal claim already considered by the state courts." *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986); *Anderson v. Johnson*, 338 F.3d 382, 386 (5th Cir. 2003). The question of when new evidence "fundamentally alters" an otherwise exhausted claim "is necessarily case and fact specific." *Morris v. Dretke*, 413 F.3d 484, 491 (5th Cir. 2005). In *Vasquez*, a district court was permitted to consider new evidence to the extent that the evidence supported factual allegations for which there was already at least some support in the state record. *Vasquez*, 474 U.S. at 260.

## STATEMENT OF FACTS

### A.    The La Tercera Crips ("LTC") Street Gang

69.    La Tercera Crips ("LTC") is a street gang based in southwest Houston with a neighborhood subgroup in the Alief neighborhood ("LTC Alief"). Relevant LTC members or associates included, among others:

    a.    Victor "Gumby" Arevalo (co-conspirator who framed Mr. Balderas);

    b.    Israel "Cookie" Diaz (co-conspirator who framed Mr. Balderas);

    c.    Willie Arevalo;

    d.    Eduardo "Powder" Hernandez (the victim);

    e.    Jose "Pepe" Perez;

    f.    Jose "Debo" Luviano;

    g.    Alejandro "Twin" Garcia;

    h.    Pedro "Twin" Garcia;

    i.    Walter "Kool-Aid" Benitez;

    j.    Efrain "Hairless" Lopez;

    k.    Pedro "Trey" Acuna; and

    l.    Juan "Apache" Balderas (the petitioner in this matter).[5]

70.    Gumby was the leader of LTC Alief in 2004 and 2005. (28 RR 142:25-143:16; Affidavit of Jose Perez ("Jose Perez Aff."), Nov. 11, 2015, Habeas Writ Record, Vol. II, 0064756, ¶ 9; Affidavit of Yancy Escobar ("Yancy Escobar Aff."), Oct. 24, 2015, Habeas Writ Record, Vol. II, 00558-63, ¶ 5; Affidavit of Daniella Chavez ("Daniella Chavez Aff."), Nov. 2, 2015, Habeas Writ Record, Vol. II, 00522-24, ¶ 3.) He "called the shots." (28 RR 155:18-20.) In fact, members

---

[5] A more exhaustive list of key figures in this matter is included in Appendix A ("List of Key Figures").

of LTC Alief paid him weekly stipends from their legitimate jobs or from criminal activity. LTC Alief had regular meetings at various members homes, including those belonging to Gumby and Twin. (28 RR 147:21-149:9, 153:24-154:25.) It was well known that there were two sides of LTC—one was concerned with the "business branch" of the group, while another was concerned with the image, respect, or "dirtier" and violent side of the group. (Jose Perez Aff., Habeas Writ Record, Vol. II, 00647-56, ¶ 10.)

71.    Cookie was close friends with Gumby and served as his "right hand man." (26 RR 149:2-9; Jose Perez Aff., Habeas Writ Record, Vol. II, 00647-56, ¶ 5; Affidavit of Walter Benitez ("Walter Benitez Aff."), Oct. 26, 2015, Habeas Writ Record, Vol. II, 00513-20, ¶ 11; Daniella Chavez Aff., Habeas Writ Record, Vol. II, 00522-24, ¶ 3.) He was described as a "crazy, angry" individual—someone who you "don't know what he would do next." (26 RR 158:10-12.) He was described as "very, very aggressive" by others. (Jose Perez Aff., Habeas Writ Record, Vol. II, 00647-56, ¶ 11; Yancy Escobar Aff., Habeas Writ Record, Vol. II, 00558-63, ¶ 6.) Cookie was close with Gumby because both were on the more violent side of the gang. (Jose Perez Aff., Habeas Writ Record, Vol. II, 00647-56, ¶ 10.)

72.    Mr. Balderas's role was to "hold onto and transport [LTC's] guns," which were shared among the group. (*Id*. ¶ 9.) That included "hold[ing] on to guns other guys had used to shoot at someone." (*Id.)* Mr. Balderas was more on the "business" side of the group. (*Id.* ¶ 10.) Generally, he did not agree with "bringing on heat to" LTC. (*Id.)*

73.    Powder was a younger member of LTC, brought to the group by Mr. Balderas, and the two were close friends. (*Id*. ¶ 16.)

74.    Loyalty to LTC Alief was an important pillar of LTC Alief's code. LTC Alief gang members would tattoo "LRL," which meant "love, respect, loyalty." (26 RR 129:25-130:15.) Any

activity seen as disloyal to the gang was strictly prohibited. And "snitching" on another member was seen as a serious offense that was punishable by death in the gang. (26 RR 160:9-13; 26 RR 182:8-13; 28 RR 161:5-9.)

**B.    Victor "Gumby" Arevalo and Israel "Cookie" Diaz Conspire to Kill Powder**

75.    On December 3, 2004, Powder was arrested by the Houston Police Department ("HPD") in a stolen vehicle while in possession of a 9-millimeter handgun. In the vehicle, officers also later found a 9-millimeter shell casing that matched to ballistics evidence in the murder of a victim named Ines Maldonado. (HPD Offense Report, Incident No. 179083204 I, Habeas Writ Record, Vol III, 00942-64, at 00950.)

76.    In an interview with investigators on January 9, 2005, Powder said that he had obtained the vehicle from Israel "Cookie" Diaz. (*Id* at 00950.) Powder further told investigators that Cookie had admitted to killing "this Cholo on Corporate [Drive in Houston] recently," and that Cookie was "bragging to the OG's that he had killed the Cholo on Corporate [Drive]." (*Id.* at 00951.) When asked what type of gun Cookie had, Powder told investigators that he had seen Cookie with a ".45 caliber" "chrome" gun that has an "animal on the grip." (*Id.* at 00952.) Powder further told investigators that "'Cookie' keeps the guns in a green box under his bed in his house." (*Id.* at 00951.) Investigators asked Powder if he knew where Cookie's guns might be given that police did not find any firearms when Cookie was arrested. Powder claimed that Cookie "might have given the guns to some guy named Jonathan because Jonathan is the one who supplies him with the guns." (*Id.* at 2.066.) Powder added that Cookie "probably heard when he ([Powder]), got arrested, and he might have thought he would snitch him out about the stolen truck." (*Id.*)

77.    At the time of the interview, Powder had already been released, but Cookie was still being held in the Harris County Jail until he later made bond in April 2005. Shortly after on February 1, 2005, investigators interviewed Cookie. (*Id.* at 2.074.) Investigators informed Cookie

that "the vehicle in the case where he is charged with aggravated robbery, had a spent shell casing that matched up to [the] murder investigation" of Ms. Maldonado. (*Id.* at 2.075.) Importantly, investigators also "advised [Cookie] that they had been told that he had been bragging about killing the 'Cholo' on Corporate" and asked him "how come his own gang member friends are telling them that he (Cookie), has been bragging about committing this murder[.]" (*Id.* at 2.076.) Cookie claimed he did not know and that "maybe they are just trying to pin this on him cause he is locked up." (*Id.*) Cookie also told investigators that he used to have a shotgun, but he sold it about six months prior to the interview. He also told investigators that he didn't have any handguns except for "the one that [Powder] was arrested with[.]" (*Id.*) The police report of the interview notes that "investigators could tell that [Cookie] was not being totally truthful" and "showed signs of deception wile being interviewed[.]" (*Id.* at 2.077.)

78.     Following the stolen vehicle incident, Powder was considered a "snitch" by Cookie and many other members of the LTC. (26 RR 160:9-13.) Gumby restricted anyone from talking to Powder. (Jose Perez Aff., Habeas Writ Record, Vol. II, 00647-56, ¶ 17.) Mr. Balderas, however, continued to remain friends with Powder. (*Id.*) Gumby and Cookie were "really pissed" at Mr. Balderas for not following orders. (*Id.*)

79.     Powder was expected to testify against Cookie in the case related to the stolen vehicle, and he had received a subpoena compelling him to do so. (HPD Offense Report, Incident No. 184361705, Habeas, Writ Record, Vol. III, 00806-57, at 00823.) Powder told his sister Miriam Hernandez "that he was afraid of [Cookie] and that [Cookie] had told him that he had committed some murders on Corporate [Drive] earlier this year." (*Id.* at 00813.) Powder further told his sister that Cookie told him, "I know you are the one that told them what happened," and that if "you

testify against me in court I will kill you and your family." (*Id.* at 00845.) Powder told her that Cookie "had a gun and pointed it at him when he told him that." (*Id.*)

80.    On or about December 3, 2005, Cookie called an LTC meeting to discuss Powder's snitching. (28 RR 161:12-17.) The meeting included approximately 12 to 15 LTC Alief members including, among others, Gumby, Cookie, Alejandro "Twin" Garcia, Walter "Kool Aid" Benitez, Efrain "Hairless" Lopez, Tomas "Taz" Correón, Jr., Jose "Little Taz" Diaz, and Mr. Balderas. (28 RR 161:18-162:20; Jose Perez Aff., Habeas Writ Record, Vol. II, 00647-56, ¶ 18; Walter Benitez Aff., Habeas Writ Record, Vol. II, 00513-20, ¶ 17.) Cookie argued that Powder should be killed for snitching on him. (28 RR 169:3-13; Jose Perez Aff., Habeas Writ Record, Vol. II, 00647-56, ¶ 18.) He suggested that Powder should also be killed because he had slept with Cookie's girlfriend and other people's girlfriends in the gang. (Walter Benitez Aff., Habeas Writ Record, Vol. II, 00513-20, ¶ 17.) Cookie also said the gang should distrust Powder based on a picture allegedly depicting "Powder throwing signs of rival gangs." (*Id.*, ¶¶ 13, 17.) Many in the group were not persuaded by Cookie because of LTC's rule that, "if someone snitches on you, it is your responsibility to deal with it." (Jose Perez Aff., Habeas Writ Record, Vol. II, 00647-56, ¶ 22.) Cookie, however, did not want to deal with Powder's snitching himself because he was out on bond for the very same arrest Powder snitched on him for, and "did not want to get in more trouble." (Jose Perez Aff., Habeas Writ Record, Vol. II, 00647-56, ¶ 23.)

81.    Mr. Balderas opposed Cookie's position and argued that there was no need to kill Powder because Powder ran away from home and would not testify against Cookie. (28 RR 171:18-172:23.) Mr. Balderas "did not want Powder touched." (Jose Perez Aff., Habeas Writ Record, Vol. II, 00647-56, ¶ 18.)

82.     At the meeting, the only two who "appeared to be pissed off were Cookie and Gumby." (Walter Benitez Aff., Habeas Writ Record, Vol. II, 00513-20, ¶ 17.) Cookie was also upset with Mr. Balderas for "putting his name on the line for Powder and sticking up for Powder over him." (*Id.*) After the meeting, Gumby sent many younger members of the gang away, leaving around eight people remaining—including Cookie, Walter "Kool Aid" Benitez, and Mr. Balderas. Gumby gave the "green light to take Powder out, while Mr. Balderas continued to say it should not be done. In the alternative, Mr. Balderas said that LTC could "give Powder an ass whooping instead." (Walter Benitez Aff., Habeas Writ Record, Vol. II, 00513-20, ¶ 19.) This angered Cookie more, and he asked: "Why choose Powder over my opinion?" (*Id.*)

83.     At some point after the meeting, Cookie and Gumby worked together on a plan to murder Powder. Gumby had recently "jumped bail," and many falsely believed he was in Mexico avoiding the police. Because Gumby was believed to be out of the country, the plan called for Gumby to kill Powder on Cookie's behalf. (Jose Perez Aff., Habeas Writ Record, Vol. II, 0064756, ¶ 24.)

84.     As a result of the perceived slights and disloyalty, Cookie and Gumby decided that Mr. Balderas should be framed for Powder's murder. (Jose Perez Aff., Habeas Writ Record, Vol. II, 00647-56, ¶ 25; Walter Benitez Aff, Habeas Writ Record, Vol. II, 00513-20, ¶ 22.) Cookie was furious with Mr. Balderas for taking Powder's side and opposing Cookie at the meeting. He was also angry with Mr. Balderas because he had allegedly "messed around with Judy, Gumby's girlfriend and the mother of his child." (Jose Perez Aff., Habeas Writ Record, Vol. II, 00647-56, ¶ 25.) And it all reached the boiling point when Cookie and Gumby learned that Mr. Balderas was attempting to leave LTC because he "wanted a better life." (Walter Benitez Aff., Habeas Writ Record, Vol. II, 00513-20, ¶ 16.)

26

85.     This was not the first time LTC would frame one of its members. LTC had a history of responding to perceived traitors by setting them up for crimes they did not commit. Indeed, it was "common for people in the gang to point fingers just to keep their hands clean." (*Id*. ¶ 23.) For example, not long before Mr. Balderas's arrest, the LTC responded to a falling out with a former member—Jose "Debo" Luviano —by blaming him for a murder under investigation at the Loma Vista apartment complex in Houston on September 12, 2005 ("the Loma Vista Shooting"). (Jose Perez Aff., Habeas Writ Record, Vol. II, 00647-56, ¶ 14). Officers later discovered that Debo was incarcerated at the time of the Loma Vista Shooting.

### C.     The Murder of Eduardo "Powder" Hernandez

86.     On December 6, 2005, Powder had run away from home and was with his girlfriend, Karen Bardales, at an apartment located on Corporate Drive. The apartment—a known MS-13 hangout location—belonged to Karen's friends Durjan "Rata" Decorado and Juan Estrada. Powder spent the day with Karen, her sister Wendy Bardales (another associate of MS-13 and the Southwest Cholos street gang), Edgar Ferrufino (an MS-13 member and Wendy's boyfriend), Rata, and "Javier" (Edgar Ferrufino's cousin).

87.     At the time, it was known that Wendy Bardales also had a year-long intimate relationship with Cookie. She had also known Mr. Balderas for at least six months at that point and, in fact, had recently gotten into an altercation with Mr. Balderas when she attempted to get a tattoo from Mr. Balderas at his home. After Mr. Balderas kicked her out for being associated with MS-13, she screamed that she would have him killed. (Affidavit of Celeste Munoz ("Celeste Munoz Aff."), Oct. 23, 2015, Habeas Writ Record, Vol. II, 00643-45, ¶ 8; 29 RR 7:25-10:23)

88.     In the afternoon of December 6, 2005, LTC member Jose "Chango" Vazquez visited the apartment to speak with Powder. Chango told Powder to leave the MS-13 apartment because LTC would be angry if it found out he was associating with the rival street gang. Powder

27

chose to stay. As Chango left, Karen uttered "Fuck LTC"—Chango responded by pulling up his shirt to reveal a gun. After Chango left, the group at the apartment departed to get dinner at various places. (24 RR 234:12-14, 237:20-240:11, 241:10-18)

89.     Karen, Wendy, Powder, Rata, and Ferrufino came back to the apartment at around 9:30 or 10:00 p.m. on December 6, 2005. (25 RR 23:6-8, 23:23-24:17.) As they returned, they saw fresh gang graffiti on the wall outside of the apartment that said "LTC CK" (translated to "LTC Crip Killer") or "LTC BK" (translated to "LTC Blood Killer"). (24 RR 50:18-52:22.) The group entered the apartment and stayed in the living room right inside the door. Wendy and Ferrufino were sitting on a couch near a television and Karen and Powder were lying near the door.

90.     At some point after they returned to the apartment, the group heard gunshots coming from outside the door. (24 RR 54:11-55:2, 241:22-242:4.) A shooter wearing khakis and a dark hooded sweatshirt covering his face then entered the apartment firing a silver or chrome gun inside the apartment. (*Id.* at 253:13-25, 264:21-265:5; HPD Offense Report, Habeas Writ Record, Volume III, 00806-57, at 00821.) During the ensuing commotion, the shooter's hood momentarily fell. The shooter looked around and pointed his gun at Ferrufino, who was by the television on the opposite side of the room. The shooter turned back toward the door where Powder was laying on the ground with Karen. The shooter walked over to Powder and shot him two times in the back of the head and ran out. (24 RR 246:7-9, 252:20-253:7, 256:3-9.) Powder died on the scene.

### D.     Mr. Balderas's Whereabouts at the Time of Powder's Murder

91.     On the evening of December 6, 2005, Mr. Balderas was at the home of Oralia McCrary—located at the Bayou Apartments on Corporate Drive, within walking distance of Mr. Balderas's apartment and Rata's MS-13 apartment—with three of her children, Anali Garcia, Octavio Cortes, and Ileana Cortes. (Affidavit of Anali Garcia ("Anali Garcia Aff."), Oct. 27, 2015,

28

Habeas Writ Record, Vol. II, 565-568, ¶¶ 2-5; Affidavit of Octavio Cortes ("Octavio Cortes Aff."), Oct. 26, 2015, Habeas Writ Record, Vol. II, 526-529, ¶¶ 3-5; Ex. B, Declaration of Ileana Cortes ("Ileana Cortes Decl."), Mar. 23, 2021, ¶¶ 9-10)

92.    In or around 2002, Mr. Balderas's brother, Jesus, began dating Ileana. In the spring of 2005, Ileana gave birth to the couple's daughter, and Mr. Balderas's niece. Mr. Balderas was a proud uncle and began to visit McCrary's home on a regular basis. Mr. Balderas also worked with McCrary cleaning homes and with Ileana grooming dogs. Mr. Balderas became close with the family and encouraged young Octavio to join the military when he grew up, as Octavio was interested in doing when he got older (which he later did). (Ex. B, Ileana Cortes Decl., ¶¶ 4-5.)

93.    Anali, Ileana, and Octavio all independently recall that Mr. Balderas spent all afternoon and evening of December 6, 2005, with them at their family's apartment, *including at the time when Powder as shot and killed*. They each remember the afternoon and evening of December 6, 2005, specifically because their mother received news of a nearby shooting and she would not let anyone leave the apartment, including Mr. Balderas. As a result, Mr. Balderas spent the night at their apartment. (Ex. B, Ileana Cortes Decl., ¶ 9.)

94.    One or two days after the shooting, Anali, Ileana, and Octavio were devastated to find out that the shooting victim that night was Powder. (Octavio Cortes Aff., Habeas Writ Record, Vol. II, 526-529 ¶¶ 8-9; Garcia Aff. ¶¶ 10-11; Ex. B, Ileana Cortes Decl. ¶ 9.) Powder was a close friend of theirs. (Anali Garcia Aff., Habeas Writ Record, Vol. II, 565-568, ¶¶ 7, 10; Octavio Cortes Aff., Habeas Writ Record, Vol. II, 526-529 ¶ 8; Affidavit of Jesus Balderas ("Jesus Balderas Aff."), Habeas Writ Record, Vol. II, 00476-483, ¶ 17.) They were each shocked again when they found out thereafter that Mr. Balderas had been accused of Powder's murder, as they knew that Mr. Balderas had been with them in their apartment the entire night of the shooting. (Octavio

Cortes Aff., Habeas Writ Record, Vol. II, 526-529, ¶¶ 8-9; Anali Garcia Aff., Habeas Writ Record, Vol. II, 565-568, ¶¶ 10-11; Ex. B, Ileana Cortes Decl., ¶ 9.)

### E.    The State Investigation

95.    On the night of the murder, HPD took statements from witnesses Karen Bardales, Wendy Bardales, Edgar Ferrufino, Durjan "Rata" Decorado, Francisco Hernandez, and Juan Estrada:

a.    Rata told officers that "he was in the living room when [he] heard some shooting at the front door." He then "ran into the bedroom and then there was more shooting." When he came out, Powder was lying on the floor dead. Rata "did not see the shooter at all." (HPD Offense Report, Incident No. 184361705, Habeas Writ Record, Vol. III, 00806-57, at 00816.)

b.    Estrada was in a different apartment and said that he was "upstairs watching television with a friend" when he heard "gunshots outside." He "ran out onto the balcony and saw a male with a gun in his hands." He "could not see his face." He said the person was 5'6 to 5'7 in height, weighed about 130 to 140 pounds, and was wearing a "black and gray hooded jacket." (*Id.* at 00817.)

c.    Karen Bardales said that she had had spent the day with Powder, her sister Wendy, Ferrufino, and Ferrufino's cousin "Javier." She told the police that, with the exception of Javier, they had all "run with gangs." She said she was "Southwest Cholos," and that Feruffino and Wendy were with MS-13. She said that they spent the day in Rata's apartment, and that Powder's "homeboy" came to the apartment to talk with Powder in the afternoon. Three MS-13 gang members named "Reynaldo, George, and Lechero" also came to the apartment. Powder and his "homeboy" came out of the back room about an hour later, and then the "homeboy" left. Karen told police that Powder wanted to stay with her. He told her that the "homeboy" told Powder that LTC was upset with Powder for hanging out with Karen because she was with the Southwest

30

Cholos and hung out with MS-13, and that Powder had not been hanging out with LTC as much. (*Id.* at 00817-19.) Karen also told Houston Police that, after the group left the apartment that evening, they came back at around 10:00 p.m. to see fresh LTC "tagging" on the outside of Rata's apartment. The tagging said "LTC CK" (translated to "La Tercera Crip Killer"). Powder explained to Karen that another gang—La Prima—had put the tagging on the wall. After they entered the apartment, Karen "heard about six gunshots from outside the door" a few minutes later. Someone then pushed her to the floor, and she heard "shooting everywhere." When the shooting stopped for a moment, she saw Powder laying near her and observed "someone who was wearing dark blue pants with dark colored 'FUBU' or 'Timberland' shoes, walk over to [Powder] and sho[o]t him two times in the back of the head." (*Id.* at 00819.)

    d.  Wendy Bardales told officers that she went to Rata's apartment at 7:00 p.m. She said that she was sitting on the floor with Ferrufino near the sofa, and that Karen was lying on the floor near the door with Powder. She said "there was a gunshot outside the apartment and the shot came through the front door of the apartment." She said the "door then opened and a skinny Hispanic guy dressed in a black hooded sweatshirt type jacket had a gun" and that "the hood cover[ed] his face and head." He was carrying a "large black automatic kind" of gun. She said he was "looking around the apartment as if he was looking for someone" and then "shot one time at [Ferrufino] and [Ferrufino] hid behind the T.V." She said that after the gunman shot at Ferrufino, the "hood to his jacket came off and exposed his face." The shooter then "shot [Powder] 2 or 3 times in the head." She then said the shooter shot at her until his gun was empty and "missed her every time." The shooter then ran away. She told the police she "got a good look at his face," but she had "never seen him before." She said he was "Hispanic and about 16-17 years old," and 5'5" to 5'7" in height. She recalled he had a "dark birth mark on his face," but she could not "remember

exactly where." She said he was "very skinny and clean shaven" with a short "fade type haircut" with black hair. She said he was wearing a "black sweat shirt hooded jacket and khaki pants." (*Id.* at 00819-20.)

   e. Ferrufino confessed to Houston Police that he associated with MS-13. Ferrufino recounted that Powder's friend had come to speak with him during that day. Ferrufino told police that before the friend left, Karen had yelled "fuck L.T.C." and that the friend pulled a gun and said, "who said that shit." After Karen said she did, the "guy laughed and put the gun down." Ferrufino said his MS-13 friends present in the apartment "were pissed." (HPD Offense Report, Incident No. 184361705, Habeas Writ Record, Vol. III, 00806-57, at 00820-21.) Ferrufino stated that everyone left and came back to the apartment at about 9:30 p.m. At 10:00 pm, Powder and Karen came back to the apartment. Ferrufino then said that a "few seconds later a gunshot came through the door," and the shooter came in the apartment and "kept shooting." Ferrufino said the shooter walked up to Powder and "shot him in the back of the head" and "ran out." Ferrufino said he "never saw the guy who did the shooting before." He said it was "not the same guy that had been at the apartment earlier." (*Id.* at 00820-21.) He also said the shooter was about 18 or 19 years' old, 5'8" in height, and weighed about 140 to 155 pounds. He said the shooter "wore a black hoodie with the hood up and khaki pants." Ferrufino said the "hood fell down during the shooting," and that Wendy told him that "his eyes looked Chinese and he was also dark skinned." But Ferrufino said "I did not see him that clearly myself." Ferrufino said the gunman carried a "chrome" pistol. (*Id.*)

   96. On December 7, 2005, HPD Sergeant Norman Thomas Ruland drove to Wendy Bardales' residence and presented her with a photograph array for the purpose of identifying the gunman. The array did not include Mr. Balderas's photograph. (*Id.* at 00823-24.) Wendy did not

identify anyone as the shooter, but she said that she recognized one of the people shown—Israel "Cookie" Diaz—as a friend of Powder. She did not believe he was the shooter. At this time, Wendy changed her earlier description of the shooter from not knowing where the dark mark was located to claiming it was on the shooter's cheek. (*Id.* at 00824.)

97.     Moreover, at no point did Wendy tell Sgt. Ruland that she had a year-long sexual history with Cookie between fall 2004 and early summary 2005. (Yancy Escobar Aff., Habeas Writ Record, Volume II, 00558-63, ¶ 7.)

98.     On December 12, 2005, officers received an anonymous tip delivered to the Mayor's Anti-Gang Office that identified Mr. Balderas as the shooter. (HPD Offense Report, Incident No. 184361705, Habeas Writ Record, Vol. III, 00806-57, at 00824.) As a result, Sgt. Ruland arranged for a second photograph array that this time include Mr. Balderas's picture. (*Id.*) Sgt. Ruland visited Wendy at her residence again and presented the second array to her. This time, Wendy pointed to Mr. Balderas's photograph—the only one of which in the array depicted an individual wearing a black hoodie and with a dark birthmark on his cheek—and said "she knew him" as "Apache." She said "he looked like the shooter." Sgt. Ruland asked what she meant, and she said that "his face looked exactly like the shooter." Sgt. Ruland asked if "Apache" was the shooter and Wendy "responded by saying that his face looked exactly like the shooter's face." Wendy said she had not seen "Apache" for approximately six months. Sgt. Ruland asked Wendy to clarify what she meant. She said that "Apache" and the "shooter had the same exact face" and was "positive" that the face was the same and that "Apache" could be the shooter. (*Id.* at 0082425.)

99.     At no point during the interview on December 12, 2005, however, did Wendy tell the officers that she and Mr. Balderas had gotten into an altercation prior to Mr. Balderas's arrest

in which she threatened to have Mr. Balderas killed. (Celeste Munoz Aff., Oct. 23, 2015, Habeas Writ Record, Vol. II, 00643-45, ¶ 8.)

100.    On December 13, 2005, Sgts. Ruland and Brian Harris went back to Wendy a third time to clarify her earlier statements. She said again that "the shooter and Balderas had the same face." She said the "shooter was wearing a hood and that is why she focused on the face." She "insisted that is why she kept talking about the face." She then said she had known "Apache" for six months. One of the officers then "asked her to view each of the photos again with the hair covered" by using her hands to cover the top portion of each photograph. Upon doing so, Wendy Bardales then said she was sure that Mr. Balderas was the shooter. (HPD Offense Report, Incident No. 184361705, Habeas Writ Record, Vol. III, 00806-57, at 00826.)

101.    Investigators also found the LTC member who had visited Powder the day of the murder, Jose Vazquez. (*Id.* at 00827.) Vazquez said that when he went to the apartment, "there was some MS 13 guys there and they kept 'mugging' [him]." He told Powder to "get away from those people because if the O.G. hears about it he will be mad." (*Id.*) Powder told him he wanted to stay. After he left, "Alejandro" called him and he told him where the apartment was. (*Id.*)

### F.    The Arrest of Mr. Balderas, Cookie, and Other LTC Members

102.    On December 16, 2005, HPD Officers Eric Termulen and Rick Moreno met with a SWAT team of approximately 24 other officers to serve arrest warrants on various LTC Alief members for ten murders and other crimes—the arrests included Victor "Gumby" Arevalo, Israel "Cookie" Diaz, Jose R. "Debo" Luviano, Jose Vasquez, Jose C. Hernandez, Silder Armando Regalado, Pedro Acuna, Willie Arevalo, Alejandro Garcia, and Mr. Balderas. (26 RR 83:1384:13; HPD Offense Report, Incident No. 184361705, Habeas Writ Record, Vol. III, 00806-57; Harris County District Clerk Record, Luviano, Habeas Writ Record, Vol. III, 00873-80; Jose Perez Aff., Habeas Writ Record, Vol. II, 00647-56, ¶ 26; Houston Police Dep't News Release, Dec. 21, 2005,

34

Habeas Writ Record, Vol. III, 00859-60.) As for Cookie, he was arrested that day for capital murder. (26 RR 164:18-20.)

103.    The officers observed Mr. Balderas walking in a parking lot of an apartment complex carrying a green container and black bag with Silder. (26 RR 86:1-14, 93:13-15.) It was the same green plastic container that Gumby had brought to Mr. Balderas earlier that morning. (28 RR 183:25-184:2.) When Mr. Balderas saw the officers, he dropped the green container and black bag, ran, and was arrested. (26 RR 94:2-5, 96:23-25, 98:5-17, 113:16-24.) When Mr. Balderas dropped the green plastic container, a number of guns and ammunition fell from it—including what was later discovered to be the firearm used to kill Powder. (26 RR 113:2-7.)

104.    While in custody, Mr. Balderas gave a statement to officers that, "prior to Powder's murder[,] he had received a letter from 'Trey' telling him to kill 'Powder.'" He told the officers that he "did not act on the letter" and that he was "afraid that they were after him for not carrying out the order." (HPD Offense Report, Incident No. 184361705, Habeas Writ Record, Vol. III, 00806-57, at 00830.) Mr. Balderas told the officers that the day before, December 15, 2005, he was "carjacked by some LTC members that took his Honda." (*Id.*) He said that "LTC members had framed him." (*Id.*)

**G.     While in Jail, Cookie Attempts to Convince Others to Blame Mr. Balderas**

105.    While Cookie and Mr. Balderas were in jail, Cookie maintained friendly relationships with other LTC members, as well as with Yancy Escobar (Mr. Balderas's wife). He would see them and communicate with them from jail. During one of these communications, he told Escobar that "[Mr. Balderas] should take the blame for all of the murders because [Mr. Balderas] did not have a family, unlike Cookie and some of the others." (Yancy Escobar Aff., Habeas Writ Record, Vol. II, 00558-63, ¶ 8; Jose Perez Aff., Habeas Writ Record, Vol. II, 00647-56, ¶ 27.)

106.    Cookie also contacted Alejandro Garcia and "convinced him to go along with his putting everything on Juan." (Jose Perez Aff., Habeas Writ Record, Vol. II, 00647-56, ¶ 28.) Indeed, Garcia indicated that "the plan he was told to follow was to pin every lick on [Mr. Balderas] —they were going to set [Mr. Balderas] up." (*Id.* ¶ 29.)

**H.    Mr. Balderas Languishes in Jail for Eight Years Before Going to Trial**

107.    Following his arrest on December 16, 2005, Mr. Balderas was incarcerated in the Harris County Jail. Mr. Balderas remained in jail until the State formally charged him with the capital murder of Powder on April 12, 2006. (Complaint, April 12, 2006, CCA Record, Vol. I, 00003). The same day, the court found "probable cause for further detention exists" and denied Mr. Balderas bail. (Probable Cause for Further Detention & Statutory Warnings by Magistrate, Apr. 12, 2016, CCA Record Vol. I, 00004 (capitalization omitted).) Mr. Balderas has remained incarcerated ever since.

108.    Over the course of the next eight years, Mr. Balderas's case was reset for trial more than *fifty* times. (Resets, CCA Record, Vol. I, at 00005-6, 00011-00016, 00023,000 27-28, 00048-54, 00060, 00074, 00076, 00078, 00080; 22 RR 5:22-6:15.) Indeed, the State has conceded that Mr. Balderas's trial was not brought in a speedy fashion. (22 RR 5:25-18 ("Judge, the State's in agreement that the eight-year delay in Mr. Balderas's going to trial is sufficient to trigger the inquiry made by the Court under Barker.")

109.    For instance, the prosecutors assigned to Mr. Balderas's case changed multiple times between 2005 and 2014, resulting in significant delays. (22 RR 22:21-23:3, 26-27.) Similarly, many times between 2005 and 2009, trial was reset because the State had not yet decided its course of prosecution. (Agreed Setting, Apr. 10, 2008, CCA Record, Vol. I, at 00011; *see also* Agreed Setting, Oct. 3, 2007, 46 RR 18; Agreed Setting, 46 RR 47.) Indeed, the State did not even

decide to seek the death penalty until April 28, 2011—five and a half years into Mr. Balderas's incarceration. (22 RR 17:15-18:10.)

110.    According to Spence Graham, one of the assistant district attorneys assigned to Mr. Balderas's case, the decision to seek the death penalty was influenced by a jailhouse incident that occurred in mid-2010 during which Mr. Balderas was alleged to have assaulted a public servant. (*Id*. 35:18-36:12.)

## I.    Trial Counsel Fails to Conduct an Investigation For Eight Years

### *1.    Trial counsel pushes a plea deal instead of conducting an investigation.*

111.    From April 2006 to April 2011, trial counsel's investigation was limited to reviewing discovery, as trial counsel's files do not reflect a single guilt/innocence witness interview in that entire time period. Three fact investigators and five mitigation specialists were hired at different times to work on Mr. Balderas investigation in the eight years leading up to trial. John Castillo served as the fact investigator on the case until his death in June 2011. Mr. Castillo's investigation in the first five years consisted primarily of subpoenaing and reviewing records. Carmen Laffey, Amy Martin, Cyndy Short, Mary Poirier, and Adriana Helenek served as mitigation specialists at various times over the first five years, but their files indicate that their investigative efforts did not include any investigation of the guilt/innocence side of the case. The closest thing was Ms. Short's and Ms. Poirier's review and summarization of State-created offense reports.

112.    In the initial several years of Mr. Balderas's pre-trial incarceration, trial counsel's efforts were centrally focused on persuading Mr. Balderas to plead guilty. (Email from Jerome Godinich, June 14, 2010, Habeas Writ Record, Vol. III, 00700; Email from Mary Poirier, Sept. 1, 2010, Habeas Writ Record, Vol III, 00702-03; Emails from Spence Graham, June 14, 2010 and Oct. 21, 2020, Habeas Writ Record, Vol III, 00710-13; Email from J. Godinich, Nov. 7, 2010,

Habeas Writ Record, Vol III, 00715; Email from Carroll Pickett, June 18, 2012, Habeas Writ Record, Vol III, 00724-26; Email from Adriana Helenek, Sept. 23, 2012, Habeas Writ Record, Vol III, 00730; Email from Jerome Godinich, Nov. 21, 2013, Habeas Writ Record, Vol III, 00747; Email from Jerome Godinich, Dec. 3, 2013, Habeas Writ Record, Vol III, 00749; Email from Terry Pelz, Dec. 30, 2013, Habeas Writ Record, Vol III, 00751.) For example, in a September 2010 email to trial counsel, Ms. Poirier acknowledged that Mr. Balderas was still unwilling to accept a deal, and she suggested that the team at least conduct something resembling an investigation to earn Mr. Balderas's trust in the plea negotiation process:

> John [Castillo] could be useful in the area of looking like we are just going ahead with trial by finding witnesses and talking to Juan about them. If Juan sees more work as in direction of what he expects to prepare for trial he will gain trust and we can possibly make him see outside the box for a plea.

(Email from Mary Poirier, Sept. 1, 2010, Habeas Writ Record, Vol III, 00702-03.) Ms. Poirier even went on to point out that, regardless of the trust issue, trial counsel should consider conducting a guilt/innocence investigation for the purpose of preparing for trial for its own sake:

> Should we be thinking about the investigation if we go to trial too? I know the pressure is about the possible offer that could come any day but I think we should also be thinking about the possibility of trial, roles and time lines [sic]. (WE can be doing this simultaneously with the work towards a plea.)

*(Id.)*

113.   Despite Ms. Poirier's urging, counsel continued to ignore the guilt/innocence phase investigation while attempting to convince Mr. Balderas to take a deal. (Email from Jerome Godinich, Nov. 7, 2010, Habeas Writ Record, Vol. III, 00715.) In November 2010, trial counsel Godinich acknowledged that Mr. Balderas was "angry" over the topic of plea negotiations and that Mr. Balderas maintained that "[h]e did not kill anyone and the female witnesses [against Mr. Balderas] are ex-girlfriends of the gang ring leader who set the whole thing up." *(Id.)* Later in the

38

same email, Mr. Godinich suggested that "[Mr. Balderas] is manipulating his mother into believing he is not guilty." (*Id.*)

114.    On April 14, 2011, a full five years after Mr. Balderas had been initially charged with the shooting, he filed a *pro se* "motion to appoint new counsel [due] to fact present counsel is ineffective." (*Pro Se* Motion to Appoint New Counsel, Apr. 14, 2011, CCA Record, Vol. I, 00057-58.) In that motion, Mr. Balderas stated that he had only seen Mr. Godinich two times in the calendar year, that he had "not seen Alvin E. Nunnery in years," and he had only met and spoken to the fact investigator one time in the previous five years. (*Id.*) Additionally, Mr. Balderas stated that the defense team had so far failed to interview any of the witnesses that were present at the scene on the day of the shooting. (*Id.*)

115.    On April 28, 2011, the State announced its intention to seek the death penalty against Mr. Balderas. (Notice of the State's Intention to Seek the Death Penalty, Apr. 28, 2011, CCA Record, Vol. II, 00504; 22 RR 32:1-6.) That same month counsel took their first step towards a guilt/innocence investigation by retaining ballistics expert Richard Ernest. (Email from Jermone Godinich, Apr. 19, 2011, Habeas Writ Record, Vol. III, 00717.) In June 2012, Mr. Ernest provided a report and invoice to trial counsel, effectively ending his involvement with the defense team. (Email from Richard Ernest, June 11, 2012, Habeas Writ Record, Vol. III, 00722.)

116.    In the summer of 2012, trial counsel was still focused on trying to convince Mr. Balderas to take a plea deal, even enlisting the help of a former death row chaplain to speak with him. By this time, Mr. Balderas had become outwardly "hostile" to the idea. (Email from Carroll Pickett, June 18, 2012, Habeas Writ Record, Vol. III, 00724-26.) Counsel also reached out to Escobar for help in convincing Mr. Balderas to accept a plea deal. In an attempt to secure her help, counsel promised to "continue to investigate any potential leads that might help [Mr. Balderas] in

39

the guilt innocence [sic] phase of the trial." (Email from Adriana Helenek, Sept. 23, 2012, Habeas Writ Record, Vol. III, 00730.) Counsel added that Escobar or someone else in Mr. Balderas's family should provide any leads they had to the defense team. In an email to the defense team memorializing the conversation with Escobar, counsel noted that she had no leads or other helpful information at that time. (*Id.*)

117.     In November 2012, Mr. Godinich sent an update to defense team members indicating that he had again requested that Mr. Balderas's family provide information on potential leads, but that they had not done so. (Email from Carroll Pickett, Nov. 5, 2012, Habeas Writ Record, Vol. III, 00734.) Once again, in a January 2013 email, counsel expressed frustration with Mr. Balderas and his family's failure to conduct their own guilt/innocence investigation: "[Mr. Balderas] did not have the names, addresses or phone numbers" for certain witnesses. (Email from Jerome Godinich, Jan. 30, 2013, Habeas Writ Record, Vol. III, 00736.) A few days later, counsel and his legal secretary, Gloria Poa, reached out to Escobar looking for witness contact information but she was unable to provide it: "We again reminded [Escobar] that we follow through with any potential witnesses but she needs to contact me or the office and provide contact information." Counsel went on to state: "This is the third time I can recall having to tell [Escobar] that if she has witness information she needs to let me know. She has yet to come through with a single witness." (*Id.*) Counsel echoed this sentiment about Mr. Balderas in February 2013, relating to the defense team that he was "puzzled" as to why Mr. Balderas was unable to provide legal names, addresses, or phone numbers of former members of the LTC. (Email from Jerome Godinich, Feb. 11, 2013, Habeas Writ Record, Vol. III, 00738.)

### 2.    *Trial counsel realizes that it must proceed to trial.*

118.     In July 2013, after dozens of re-set dates, Mr. Balderas was finally provided a trial date in February 2014. (Case Reset Form, July 29, 2013, CCA Record, Vol. I, 00080.) Rather than

devote their remaining time and energy to the guilt/innocence investigation that they had repeatedly put off to that point, counsel instead doubled down on their efforts to convince Mr. Balderas to plead guilty. By November 2013, counsel had retained the help of classification and prison experts Beth and Terry Pelz to speak with Mr. Balderas about life in prison. (Email from Jerome Godinich, Nov. 21, 2013, Habeas Writ Record, Vol. III, 00747; Email from Jerome Godinich, Dec. 3, 2013, Habeas Writ Record, Vol. III, 00749; Email from Terry Pelz, Dec. 30, 2013, Habeas Writ Record, Vol III, 00751.)

119.    Escobar and Mr. Balderas's mother requested to meet with counsel in December 2013, as trial was nearing, to discuss the state of the case. At the meeting, counsel stated they still did not have a guilt-phase theory of the case and did not intend to put on affirmative evidence of Mr. Balderas's innocence. Counsel explained that they only planned to cross examine State witnesses and object to State evidence. (Yancy Escobar Aff., Habeas Writ Record, Vol. II, 00558-63, ¶ 9; Affidavit of Maria Victoria Reyes Mirafuentes ("Vicky Mirafuentes Aff."), Oct. 25, 2015, Habeas Writ Record, Vol. II, 00589-613, ¶ 41.) By the end of the month, the defense team finally came to terms with the fact that "[Mr. Balderas] ha[d] pretty well dug in his heels to go to trial." (Email from Terry Pelz, Dec. 30, 2013, Habeas Writ Record, Vol III, 00751.)

120.    On January 3, 2014, defense counsel filed a motion to hold statutory definition of mitigating evidence unconstitutional as applied to impose a "nexus" limitation, and to grant defendant's requested clarifying voir dire, instruction, argument and motion in limine. (Motion, Jan. 3, 2014, CCA Record, Vol. IV, 00910-18.) The motion was denied on February 12, 2014, by Judge Guiney. (Order, Feb. 12, 2014, CCA Record, Vol. IV, 00919.)

121.    On January 8, 2014, Mr. Balderas executed a *pro se* motion in limine requesting that the court bar prosecutors from "making any comment during the Voir Dire examination of the

jury on the right of the Defendant not to testify in a criminal case[.]" The motion was filed on January 17, 2014. (Motion in Limine, January 8, 2014, CCA Record, Vol. II, 00488-89.) It does not appear that the motion was ever ruled on.

122.    Jury selection began on January 13, 2014. (4 RR.) The next day, counsel brought attorney R. Scott Shearer onto the defense team as an appellate expert. (Motion for Appointment of Appellate Counsel, Jan. 14, 2014, CCA Record, Vol. VIII, 02073.) On his very first day with the team, Mr. Shearer noted that there were problems with Wendy Bardales' identification of Mr. Balderas, and he suggested counsel retain the services of an eyewitness identification expert. Counsel then retained Dr. Roy Malpass and provided him with materials regarding the Wendy Bardales identification on January 17, 2014. (Affidavit of Roy S. Malpass, Ph.D. ("Dr. Roy Malpass Aff."), Nov. 2, 2015, Habeas Writ Record, Vol. II, 00403-474, ¶ 8.)

123.    On January 17, 2014, counsel also requested for the *first time* that the State provide background information about certain anonymous tips implicating Mr. Balderas in the shooting, which were originally made to the Mayor's Anti-Gang Task Force over eight years earlier in December 2005. (Email from Traci Bennett, Jan. 17, 2014, Habeas Writ Record, Vol. III, 00757-58.) The State responded that the tips were anonymous, and there is no record of further follow-up by counsel. (*Id.*)

124.    At the end of January 2014, a defense team email indicated that Escobar provided Ms. Poa (Mr. Godonich's assistant) with first names of five people who she believed may have been able to offer helpful testimony at the guilt/innocence phase of trial:

- "Billy" – A member of the LTC who could name the true leader of the gang and explain Mr. Balderas's role/rank within the LTC;

- "Oralia [McCrary]" – A potential alibi witness for Mr. Balderas on the night of the shooting;

- "Anale [Garcia]" – Oralia's daughter;

- "Walter [Benitez]" – Another member of the LTC; and

- "Daniela [Chaves]" – A woman who associated with the LTC and could name the true leaders of the gang.

(Email from Jerome Godinich, Jan. 31, 2014, Habeas Writ Record, Vol. III, 00770-71.) Escobar also provided the full name and contact information for Celeste Munoz, a mutual friend of Mr. Balderas, Wendy Bardales, and Powder. Ms. Poa stated in a January 31, 2014, email that this was the first time the defense team had heard of this information and that she would schedule a meeting with Munoz but was waiting on contact information for the other five witnesses. (*Id.*) At that point, trial was scheduled to start in 17 days.

125.    On January 30, 2014, the State filed a motion in limine requesting the court instruct "the Defendant, lawyers and witnesses for the defense . . . not to allude to, refer to or in any way bring before the jury . . . without first approaching the judge . . . [a]ny reference regarding prior criminal history, bad acts or character of the complainant or the witnesses in th[e] case." (Motion in Limine, Jan. 30, 2014, Habeas Writ Record, Vol. XII, 06301-02, at 06301.) The motion was granted on February 14, 2014. (*Id*. at 06302.)

126.    On February 4, 2014, Ileana Cortes—one of the alibi witnesses for Mr. Balderas— contacted trial counsel to inform them that Mr. Balderas had been with her and her family at their apartment all afternoon and evening on the day Powder was killed. (Email from Jerome Godinich, February 4, 2014, Habeas Writ Record, Vol. III, 00773-74; Ex. B, Ileana Cortes Decl., ¶ 12.) In a memorandum about the meeting, counsel indicated that Ileana did not know any specific facts

about the Powder shooting and that she had difficulty remembering whether it was the exact night

of the Powder shooting that Mr. Balderas was at her apartment. (*Id.*) However, rather than attempt

to corroborate or further explore whether Mr. Balderas was indeed with Ileana on the night of the

shooting, counsel bluntly told Ileana her testimony was useless and sent her away. (Jesus Balderas

Aff., Habeas Writ Record, Vol. II, 00476-83, ¶¶ 21, 22.); Ex. B, Ileana Cortes Decl., ¶ 12)

127.    The same day, counsel documented receiving a trove of information from Escobar

relevant to the guilt/innocence phase of Mr. Balderas's case. Among other things, counsel noted

that Escobar informed them that: she was friends with the leaders of LTC Alief and knew their

roles and ranks within the gang; "Victor A." was the leader of LTC Alief; Cookie held a higher

rank than Mr. Balderas; multiple members of LTC Alief began plotting against Mr. Balderas after

[Gumby's] girlfriend cheated on him with Mr. Balderas; Cookie and Wendy Bardales were in an

ongoing, intimate relationship; [Gumby] left Mr. Balderas with many of the guns Mr. Balderas

was arrested with, suggesting that someone other than Mr. Balderas may have used the gun tied to

the Powder shooting; Cookie was coordinating with co-defendants in jail to set up Mr. Balderas;

and Cookie told Escobar that Mr. Balderas needed to take the blame "for everything" because he

did not have a family like the other co-defendants. Escobar told counsel she was previously afraid

to testify to this information because Mr. Balderas had been threatened by other members of LTC

Alief, but now felt like she needed to come forward. She also suggested that counsel speak with

[Gumby's] brother William or [Gumby's] girlfriend Judy to corroborate this information. (Email

from Jerome Godinich, Feb. 4, 2014, Habeas Writ Record, Vol. III, 00773-74; Yancy Escobar

Aff., Habeas Writ Record, Vol. II, 00558-63, ¶ 8.)

128.    That same week, Ms. Poa scheduled an appointment with Munoz at counsel's law

office for "eight o'clock" on Saturday, February 8, 2014, eight days after receiving Munoz's

contact information and nine days before the scheduled start of trial. However, Munoz did not show at 8:00 a.m. and instead called Ms. Poa at 8:00 p.m. that night to inform her that she was waiting outside counsel's office. Rather than adapting to the miscommunication and securing a potentially vital interview with a fact witness on the eve of trial, Ms. Poa informed Munoz that she had missed the scheduled meeting and would need to reschedule for later in the week. (Email from Jerome Godinich to Team, Feb. 13, 2014, Habeas Writ Record, Vol. III, 00776.) On February 12, Ms. Poa finally interviewed Munoz at counsel's office. No other members of the defense team were present. During the interview, Munoz explained that she had witnessed Mr. Balderas get into an altercation with Wendy Bardales sometime in 2005 and that Wendy told Mr. Balderas she would have him killed as a result.[6] Munoz also told Ms. Poa that Wendy Bardales was known to be sleeping with Mr. Balderas, Cookie, and Powder at one point or another. Ms. Poa did not elicit any other relevant information during the interview. (Follow-up email from Jerome Godinich to Team, Feb. 13, 2014, Habeas Writ Record, Vol. III, 00778.)

129.    Not surprisingly, Ms. Poa—a legal secretary with no experience investigating homicide cases—also had difficulty scheduling "Billy" for a meeting at counsel's office. She left him a voicemail, but he never responded. Because Jesus Balderas and Escobar were unable to produce phone numbers for Oralia McCrary, Benitez, and Daniella Chaves, Ms. Poa could not call them to set up times for them to come to counsel's office for an interview either. (Email from Jerome Godinich to Team, Feb. 13, 2014, Habeas Writ Record, Vol. III, 00776.)

130.    At no point in this time period was there mention of a qualified investigator attempting to locate any of these witnesses, nor was there any mention of attempting to conduct

---

[6] At trial, the Court informed the defense that this evidence could not be presented without opening the door to extraneous offenses. As a result, counsel did not present any testimony from Munoz at the guilt/innocence phase of trial. (29 RR 14:7-17.)

the interviews at the witnesses' homes or somewhere convenient for them. Counsel's approach to this investigation was deaf to the cultural, socio-economic, and legal circumstances in this case and made it unlikely for witnesses to reliably communicate and schedule interviews in a business-like and reliable manner.

131.    As of February 13, 2014, four days before trial, counsel had only spoken with two people from Escobar's list: Munoz and Anali Garcia (sister of Ileana Cortes). Even then, the conversation with Anali was brief and over the phone, and counsel quickly determined that they did not need her as a "character witness"—either oblivious or indifferent to her critical importance as a potential alibi witness. (*Id.*) As Anali recalls, she was informed that counsel had set what can only be described as an arbitrary deadline for potential witnesses to come forward. (Anali Garcia Aff., Habeas Writ Record, Vol. II, ¶ 12.) Anali called counsel before that deadline to inform them that Mr. Balderas had spent the afternoon and evening at her house on the day of Powder's murder and that he therefore could not have been the shooter. Counsel again advised Anali that they already had enough "character" witnesses and did not need her testimony. (*Id.*) Anali attempted to clarify that she was not calling as a character witness, but counsel did not let her explain. Ultimately, Anali took counsel's word that they did not need her testimony, stating: "I thought that he would know better than me." (*Id.*) Anali was shocked when she attended Mr. Balderas's trial and found that counsel did not offer an alibi defense. (*Id.* ¶ 13.)

132.    On February 15, 2014, two days before trial, counsel first became aware of the LTC meeting held in early December 2005 to discuss whether to kill Powder—a foundational fact for the State's guilt case. (Email from Dr. Matthew Brams to Godinich, Feb. 15, 2014, Habeas Writ Record, Vol. III, 00780.) Given that Benitez, the defense's most important witness at the guilt/innocence phase, testified about the LTC meeting at trial, it is clear that counsel had not yet

interviewed him as of February 15, 2014. This is further supported by the fact that counsel pronounced in opening arguments on February 17, 2014, that Cookie was the "likely shooter" while later presenting evidence from Benitez that Gumby had confessed to being the killer. (24 RR 27:12-24; 28 RR 224:4-18; 30 RR 59:23-60:8.) As such, counsel gave opening statements in Mr. Balderas's capital murder trial having interviewed only three witnesses with information potentially relevant to Mr. Balderas's eight-year-old claim of innocence.

### J.    The Trial of Mr. Balderas

#### 1.    Jury selection.

133.    Voir dire in Mr. Balderas's trial began on February 7, 2014, before Judge Guiney. During jury selection, the court repeatedly expressed the sentiment to the State and the defense that it wanted a speedy voir dire.

134.    Over the course of voir dire, the parties agreed to excuse 206 of the 273 prospective jurors without ever speaking to them. The discussion between the State and trial counsel occurred off the record and there was no indication of either party's basis for the broad excusals. Some excluded veniremembers met the apparent standard of acceptable jurors by the State and trial counsel, apart from the sole factor of their race, and were not allowed to even proceed to individualized voir dire.

135.    At the conclusion of jury selection, Mr. Balderas's jury was disproportionately white. A white venireperson was almost 4.5 times more likely to be selected as a juror than an African American venireperson. Taking into account the African American venirepersons who were excused by agreement after being questioned or peremptorily struck, almost 95% of the African American prospective jurors were struck for reason other than cause.

### 2.    *The State's case.*

136.    The trial guilt/innocence phase of the trial began on February 18, 2014, in front of Judge Guiney. The State's case was presented by Assistant District Attorneys Traci Bennett and Caroline Dozier. During the guilt/innocence phase of Mr. Balderas's trial, the State's theory was that Mr. Balderas killed Powder in retaliation for Powder snitching on Cookie. Cookie was facing capital murder charges in a different case at the time and was incarcerated alongside Mr. Balderas from December 2005. (26 RR 121:16-122:10.)

137.    On the eve of Mr. Balderas's trial, Cookie secured a plea deal with the State, wherein the State agreed to reduce his capital murder charge to aggravated robbery in exchange for his testimony against Mr. Balderas at trial. (*Id.* at 122:17-124:12.) As a result, Cookie became one of the State's primary witnesses against Mr. Balderas.

138.    Cookie testified that he was a member of LTC, which contained about 20 members. (26 RR 127:4-7, 137:15-17.) He testified that the gang's tattoo included a "3" on the wrist with three dots above it that signified "LRL, which is love, respect, and loyalty." (*Id.* at 129:9-130-1.) He testified that "[y]ou have to be loyal, and you have to love just the gang." (*Id.* at 130:4-5.) Cookie testified that Mr. Balderas was also a member of LTC and went by "Apache." (*Id.* at 132:22-133:17.) Cookie testified that Mr. Balderas brought Powder into LTC because Powder was friends with Mr. Balderas's younger brother. (*Id.* at 136:6-18.)

139.    Cookie told the jury that he had "robbed a man at gunpoint for his vehicle" and that Powder was caught with the vehicle. (*Id.* at 139:18-140:24.) He said that Powder told the police about him and the stolen vehicle. (*Id.* at 140:25-141:4.) As a result, Cookie was arrested and remained in jail for five months. He testified that he was "upset" with Powder about this. (*Id.* at 141:5-9.) He testified, however, that he asked Powder why he did it (and Powder denied it), but he never threatened him in any way. (*Id.* at 142:4-143:20.) Instead, Cookie allegedly just wanted to

48

"understand his motive for ratting." (*Id.* at 142:21-23.) Cookie then tried to convince Powder not

to testify against him because it was "pointless" and Powder agreed. (*Id.* at 143:25-145:5.) As a

result, Cookie testified that his situation was "under control." (*Id.* at 145:6-8.) Cookie testified that

no one else in the gang knew about Powder "ratt[ing]" him out. (*Id.* at 146:1-6.) Others in the gang

just knew not to "hang out with him." (*Id.* at 146:7-10.)

140.    Cookie further testified that Powder got into trouble with other LTC members

because he was "hanging out with other gangs, rival gangs." (*Id.* at 146:11-22. He said that this

(not snitching on him) was the "ultimate betrayal." (*Id.* at 146:23-147:2.) He also told the jury that

there was "some serious stuff going on between our gang and [MS-13]" at that time and that MS-

13 "were looking to retaliate for other unrelated reasons to this . . . [there] were some serious

rivalry - - rivalries." (*Id.* at 148:12-20.) Cookie also testified that pictures circulated of Powder

hanging out with other gangs and throwing other gang signs. (*Id.*at 149:7-150:11.)

141.    After LTC members saw the photographs, Cookie said that LTC held a meeting in

members Pedro and Alejandro Garcia's backyard "about three to four days before [Powder] was

killed." (*Id.* at 150:15-152:17.) At the meeting, LTC discussed Powder and they agreed that

"somebody needed to take him out," which meant "somebody needed to shoot him." (*Id.* at 152:18-

153:1.) Cookie testified that he "truly didn't care" what happened to Powder, but thought it would

"expose him" because he would be suspected of the murder. (*Id.* at 152:2-153:17.)

142.    Three days after the meeting, Cookie testified he got a call from Efrain Lopez, who

said they found Powder. (*Id.* at 155:5-24.) Cookie then drove to Pedro and Alejandro Garcia's

house where he, Loc, Efrain, and others gathered. (*Id.* at 155:25-156:9.) At the house, Cookie

learned that Powder had been killed. (*Id.* at 157:15-17.) He said that everyone drove over to the

apartment complex where Powder had been killed and stood across the street. (*Id.* at 158:9-23.) It

was there that Cookie said Mr. Balderas came over to him, wearing a blue or dark blue or black sweater with khaki pants. He testified that Mr. Balderas "approached all of us, everybody, like he just hugged everyone like sort of when you haven't seen nobody in a long time, like joyful, and he gave each individual a hug and when he got towards me, he gave me a hug and a kiss on the cheek." (*Id.* at 159:11-18.) Cookie then testified that Mr. Balderas "basically, just took credit for the whole thing" and said "he got him, he finally got him," while he had a chrome "handgun and he was just exchanging the magazine, the clip." (*Id.* at 159:23-160:18.) Cookie said Mr. Balderas was "joyful." (*Id.* at 161:2-4.)

143.    Mr. Balderas's defense counsel cross-examined Cookie on his cooperation with police, what he would receive in exchange, the "snitching" incident with Powder, the "throwing" of gang signs, and the pre-murder meeting, but counsel never asked Cookie about Mr. Balderas's alleged confession. (*Id.* at 166:15-179:23, 182:8-184:7, 185:1-189:1, 190:20-191:12.)

144.    The State also called Karen Bardales—Powder's girlfriend—as a witness. Karen testified that she was associated with both MS-13 and Southwest Cholos. (24 RR 41:1-17.) She and Powder started dating in July or August of 2005. (*Id.* at 66:11-23.) They hung out at Rata's apartment all the time. (*Id.* at 38:18-21.) On December 6, 2005, Karen was with Powder, her sister Wendy Bardales, Ferrufino, and other MS-13 gang members at Rata's apartment. (*Id.* at 44:17-46:3.) An LTC associate wearing an HEB shirt came to meet with Powder and they went in the back bedroom to talk for about an hour, but Karen testified that she was not sure this happened on December 6, 2005. (*Id.* at 46:4-47:24; *Id.* at 90:25-91:16.) When they came out, the LTC associate wanted to take Powder with him and leave, but Powder stayed with Karen. (*Id.* at 48:4-49:12.) Powder did not tell Karen what the LTC associate talked to him about, but Powder seemed worried. (*Id.* at 50:9-11.) Powder and Karen left Rata's apartment, returned after about an hour around 10:00

50

p.m., and noticed a new tagging outside Rata's apartment. (*Id*. at 49:1551:7; *Id*. at 63:4-8.) The tagging says "LTC" and "a 'b' with a slash through it and a 'k'" meaning LTC "Blood killer." (*Id*. at 52:3-12.) Right after Powder and Karen went into the apartments, Karen heard gunshots. (*Id*. at 54:11-17.) Powder put her down to the ground, and she heard "gunshots everywhere," and someone coming into the apartment. (*Id*. at 54:21-55:5.) Karen never saw the face of the shooter, only his hand when he shot Powder in the head three times. (*Id*. at 56:11-57:13, 60:20-22, 105:12-14.) She saw the shooter had "a black sweater." (*Id*. at 56:22.) She gave a statement to the police that night. (*Id*. at 59:20-25.)

145.    The State called Edgar Ferrufino as a witness. Ferrufino testified that he and Wendy Bardales associated with MS-13, while Karen Bardales associated with Southwest Cholos. (24 RR 235:4–237:3.) He and Wendy Bardales had been dating for about a year prior to December 2005. (*Id.* at 225:23-226:1.) Ferrufino hung out at Rata's apartment "pretty often." (*Id*. at 229:411.) Members of a variety of gangs hung out at the apartment. (*Id*. at 234:18-235:3.) On December 6, 2005, Wendy, Karen, Powder, Ferrufino, and "Loco" hung out at the apartment. (*Id*. at 234:6-12.). Around 2:00 p.m. or 3:00 p.m., Powder's friend, wearing a red HEB shirt, came over. (*Id*. at 234:12-14, 237:20-25, 239:2-9.) Karen said to Powder's friend "Fuck LTC," and Powder's friend—after "trying to play it off" because Karen was a girl—"pulled a gun out on Karen." (*Id*. at 238:1-240:23.) He wanted Powder to leave with him—but Powder stayed and his friend left angry. (*Id*. at 238:15-18, 240:24-241:9.). Later that night, they left the apartment and Wendy and Ferrufino returned around 9:30 p.m. (*Id.* at 241:17-24; 25 RR 23:6-8.) About half an hour later, Karen and Powder returned to the apartment. (25 RR 23:23-24:17.) As soon as Powder closed the door, Ferrufino heard one or two gunshots from the outside. (24 RR 241:25-242:2, 244:13-245:15; 25 RR 24:18-20.) "[A] second later," the shooter was inside the apartment, "shooting crazy." (24

RR 242:2-2.) The shooter pointed the gun at Ferrufino at one point, and Ferrufino told him to "chill" and do not shoot him, and the shooter turned around. (*Id.* at 245:18246:6.) Ferrufino saw the man "st[and] over [Powder] and shot him." (*Id.* at 246:7-9, 249:4250:1, 252:5-8.) Powder was shot two times in the back of his head, and the shooter "ran out." (*Id.* at 251:10-17, 252:20-253:7, 256:3-9.) Ferrufino saw the shooter was wearing "khakis and a [zip-up] hoodie" that is some "dark color, black, towards black." (*Id.* at 253:13-23). The shooter's hood fell during the shooting. (25 RR 25:19-26:21.) He had short hair. (24 RR 254:17-255:6.) Ferrufino did not see the shooter's face. (*Id.* at 255:7-9, 26:7-15.) Ferrufino testified that the shooter was not Powder's friend from earlier that day, but he had never seen the shooter before. (24 RR 255:13-256:2.) Ferrufino gave a statement to the police that night. (*Id.* at 259:19-23.) His statement said that the shooter was about 18 or 19 years old, about 5'8, and weighed about 140 to 150 pounds. (25 RR 31:19-32:3.) He said the shooter's gun "wasn't a revolver" and is a "silver," "polished-type gun." (24 RR 264:21-265:19.)

146.    The State called Wendy Bardales. Wendy testified that she had been dating Ferrufino for several months prior to December 2005. (25 RR 36:7-14.) She had been hanging out with MS-13 gang members. (26 RR 52:1-9.) She hung out at Durjan's apartment all the time. (25 RR 41:22-42:8.) On December 6, 2005, she was sitting on the carpet against the sofa with Ferrufino. (*Id.* at 42:23-43:17.) Powder and Karen came into the apartment and closed the door, and Wendy heard gunshots from outside of the apartment. (*Id.* at 45:14-20, 181:16-182:11.) The shooter came into the apartment, "running around, looking for something, shooting." (*Id.* at 45:22-44:12, 182:12,-183:17.) He was wearing a hoodie, and the hood fell off when he was running. (*Id.* at 47:13-17.) Wendy froze the entire time the shooter was in the apartment. (*Id.* at 184:6-14, 185:3-7.) She saw the shooter's face but did not recognize him at the time. (*Id.* at 48:4-9, 50:1315, 186:12-

15.) He was tall and thin, had short hair, and did not have a beard. (*Id*. at 50:6-9.) He shot Powder

in the head and left. (*Id*. at 185:25-187:12.) Wendy gave a statement to the police that night. (*Id*.

at 48:13-19.) Wendy confirmed that when she was first interviewed by the police, she told the

police she had gotten a good look at the shooter, but did not know who he was. (*Id*. at 64:7-10,

189:23.) At the time of the interview she was "in shock." (*Id*. at 64:11-18.) She told the police that

the shooter was Hispanic. (26 RR 56:17-57:5.) She also tried to tell the police that the shooter had

a mole on his face, but the officer typed birthmark in her statement. (*Id*. at 60:818.) She told the

police that the shooter had a black hoodie, and his gun was black. *Id*. at 67:2168:7; *Id*. at 78:7-24.)

147.    Wendy testified that several days after Powder's death, a police offer came to her

house and showed her a photo spread. (25 RR 50:19-51:8). The officer told her if she did not

recognize the shooter, she did not have to point anyone out. (*Id*. at 192:6-16.) She did not identify

anyone as the shooter, but told the officer that she recognized Cookie from the spread. (*Id*. at 52:18-

53:9.) On December 12, 2005, Wendy recognized Mr. Balderas in another photo spread and told

the officer that he was the shooter. (*Id*. at 53:17-54:10, 196:4-197:10.) She signed and dated on

that photo, and also wrote in Spanish "I am positive that he is the one that killed [Powder]." (*Id*. at

55:18-56:9, 195:23-197:23.) This was the first time Wendy told anyone that Mr. Balderas could

have been the shooter. (26 RR 36:15-38:1.) She did not notice at the time that Mr. Balderas was

wearing a black hoodie in that photo. (*Id*. at 76:7-15.) The next day, the officer came and talked to

Wendy again about her identification, and Wendy told him that she knew it was the right person.

(25 RR 56:22-58:16.)

148.    Wendy testified that she had known Mr. Balderas for about a year prior to the

shooting and had gone to his house "maybe once or twice." (*Id*. at 37:8-12; *Id.* at 198:19-199:3;

26 RR 69:22-70:2.) She had seen him around a few weeks before the shooting. (25 RR 59:1117.)

She could not remember ever getting in an argument with Mr. Balderas, being asked by Mr. Balderas to leave his apartment, being assaulted by Mr. Balderas, noticing a birthmark on Mr. Balderas's face, or kissing Mr. Balderas. (*Id*. at 60:3-62:4.)

149.     The State called Officer S.L. Grant. Officer Grant testified that on December 6, 2005, at 10:04 pm, he was dispatched to the shooting scene, and he arrived at 10:14pm. (24 RR 124:3-125:21.) An ambulance was already there when he arrived. (*Id*. at 130:1-3.) He secured the scene and contacted the homicide division. (*Id*. at 135:16-20, 137:20-138:2.) He located Ferrufino, Wendy, Karen, Francisco Hernandez, Juan Estrada, and Rata as witnesses. (*Id*. at 139:322.) Officer Grant was released from the scene around 11:00 pm. (*Id*. at 140:11-22.)

150.     The State called Sgt. Jeff Cruser. Sgt Cruser worked in the crime scene unit of the homicide division of the Houston Police Department at the time of the shooting. (24 RR 149:17-150:11.) Sgt. Cruser testified that he was dispatched to the scene, arrived at 11:10 pm, and spoke with Officer Grant. (*Id*. at 153:12-21, 209:7-23.) He went through the standard procedure to obtain evidence, including conducting walk-through, taking photos, videotaping, creating diagrams, etc. (*Id.* at 152:13-153:11, 210:20-213:8.) He recovered two fired casings outside and eight inside, as well as bullets. (*Id*. at 172:14-173:22, 185:14-186:5.) He did not take fingerprints or DNA samples. (*Id*. at 218:10-219:23.) He testified about his observations from the scene and explained the evidence he recovered.

151.     The State called Officers Rick Moreno and Eric Termulen. Officer Moreno worked in the homicide division of the Houston Police Department in December 2005. (25 RR 203:1416.) Officer Termulen was working on the SWAT team in 2005. (26 RR 82:21-23.) On December 16, 2005, they and other officers were searching for Mr. Balderas in order to arrest him. (25 RR 204:24-205:3; 26 RR 82:21-83:5.) Officer Moreno went to an apartment complex and was waiting

for SWAT assistance. (25 RR 205:4-23, 207:11-12.) While he was waiting, Mr. Balderas and Rigalado Silder came out of the apartment Officer Moreno was monitoring. (*Id*. at 212:2-12, 2435-8.) Mr. Balderas was carrying a black bag and a "green Tupperware-type or tote box" and Silder was carrying a long cardboard box. (*Id*. at 212:15-19; 26 RR 93:11-15.) When Mr. Balderas saw the officers, he dropped what he was carrying and ran. (26 RR 94:2-5.) Officer Termulen arrested Mr. Balderas and turned him over to Officer Moreno. (*Id*. at 82:24-83:9, 108:2-109:4.) SWAT Officer Gutierrez gave Officer Moreno a shell casing to a handgun, which was found on Mr. Balderas. (25 RR 229:14-230:7, 232:1-13.) Officer Moreno testified about the various weapons and ammunition recovered from the containers Mr. Balderas and Silder dropped. (*Id*. at 232:14-239:7.)

152.    The State called Sgt**.** Norman Thomas Ruland. Sgt. Ruland was working in the homicide division at the Houston Police Department in December 2005 and was the lead investigator on Powder's death. (26 RR 199:4-200:12.) On December 6, 2005, Sgt. Ruland arrived at the scene around 10:00 PM. (*Id.* at 200:16-18.) He testified that the description of the suspect was a Hispanic male, thin build, 16 to 19 years old, 140-155 pounds, and a black hoodie. (*Id.* at 213:8-13.) He testified that on December 7, 2005, he identified the name of a potential suspect—Israel "Cookie" Diaz and made up a photo array containing his photograph. (*Id.* at 214:22-215:10.) On December 7, 2005 at 10:30 p.m., he showed the photo array to Wendy Bardales because she told Sgt. Ruland she had seen the shooter. (*Id*. at 215:11-216:23.) Wendy identified Cookie as being a friend of Powder's and "she was positive that he's not the shooter." (*Id.* at 220:17-221:12.) On December 12, 2005, Sgt. Ruland and Officer Palos had another meeting with Wendy in her apartment where he showed her another photo spread. (*Id.* at 227:18-228:25; 27 RR 37:17-25.) Sgt. Ruland testified that Wendy "immediately pointed to . . . Mr. Balderas, and said she knew

him as Apache and that he was friends with the complainant and Israel," and that "he looked like the shooter." (26 RR 229:19-25.) Sgt. Ruland asked her to clarify what she meant, and she said that "[h]is face looked exactly like the shooter's face." (*Id.* at 230:1-5.) The next day, December 13, 2005, Sgt. Ruland returned to Wendy's apartment with Sgt. Harris to ask for clarification about her statements she made about Apache. (*Id.* at 235:1-236:5; 27 RR 28:3-5.) Sgt. Ruland showed her the exact same photo spread as she had seen the prior day—it was not reversed or put in any different order, and it contained Wendy's handwriting on the photo from the day before. (27 RR 39:1-40:7, 51:7.) Wendy said that "the shooter and Balderas had the same face" and "the shooter was wearing a hoodie and that is why she focused on the face." (26 RR 236:10-14.) She said, "she had known Apache for six months." (*Id.* at 236:14-15.) Sgt. Ruland then asked Wendy to look as the photo spread again with the hair covered and "she then said that Apache did the killing" and she was "absolutely positive." (*Id.* at 237:9-16.) Sgt. Ruland did not ask Wendy whether she felt that she needed an interpreter. (*Id.* at 238:4-239:20.) Sgt. Ruland testified that after the photo array was shown to Wendy a recording was made. (27 RR 31:1-2). Sgt. Ruland also testified that the department has since changed the way they present photo arrays, and that as the lead detective on the case, someone else would now be required to present the array to the witness. (*Id.* at 47:19-49:12.)

153.    The State called Sgt. Clint Ponder. Sgt. Ponder testified as an expert in gangs generally. (27 RR at 71:22-23, 75:24-76:1.) He did not testify about the homicide at issue; instead, he testified generally about the different gangs in Houston—their colors, types of clothing, types of tattoos, etc. (*Id.* at 87:24-93:13.) He testified that the LTC gang is more secretive than other gangs, and they do not have a rank system. (*Id.* at 93:20-95:25.) He testified that loyalty is very important to the gang. (*Id.* at 96:20-98:23.)

56

154.    The State called Kim Downs, a police firearms examiner. (28 RR at 6:8-10.) Ms. Downs testified generally about firearms and firearms evidence. (*Id.* at 10:25-24:16.) Ms. Downs examined the firearm in this case and several pieces of fired evidence. (*Id.* at 24:20-25:3.) She testified that certain bullets were fired out of the weapon at issue in the case and some were inconclusive. (*Id.* at 38:23-40:6, 52:14-55:7.) She testified that the 9-millimeter casing recovered from Mr. Balderas's pocket when he was arrested was *not* fired from the firearm at issue in the case. (*Id.* at 40:7-41:7.)

### 3.     The Defense case.

155.    The Defense called Walter Benitez. Benitez was a member of the LTC gang in 2005 and was "cliqued in" on the same day with Powder. (28 RR 140:23-141:4 & 152:2-9.) Benitez testified that Gumby was considered the leader of the LTC Alief in 2004 and 2005, which had about 20 members. (*Id.* at 143:15-17, 146:15-147:6, 155:18-20-156:9.)

156.    He also told the jury that Gumby and Cookie were friends. (*Id.* at 149:7-9.) Benitez testified that there were problems between Cookie and Powder because Powder had snitched on Cookie. He also said that it was Cookie who called the meeting on December 3, 2005, to discuss what was to be done. (*Id.* at 159:24-162:3, 170:1-7.)

157.    Benitez said that Cookie argued at the meeting that Powder should be killed, while Mr. Balderas lobbied for Powder to be spared. (*Id.* at 169:4-16, 171:15-172:23.) Gumby was present at the meeting and gave the green light to kill Powder, but he did not assign anyone to carry out the killing. (*Id.* at 172:24-173:1, 209:23-210:5.)

158.    A few days later, Benitez heard that Powder had been killed, though he did not know who committed it. (*Id.* at 173:16-19.) He had no knowledge that Cookie and other LTC members went to the scene and ran into Mr. Balderas the night of the shooting. (*Id.* at 174:1-7.)

159.     After the murder, in the early morning of December 16, 2005, Benitez testified that Gumby went to Benitez's house and asked Benitez to choose a gun from a green container for protection. (*Id.* at 176:10-177:22.) Benitez did not choose one and Gumby and three others were going to drop all the guns at Mr. Balderas's house. (*Id.* at 179:8-180:5, 182:13-183:6.) Benitez identified the green container he saw in exhibits. (*Id.* at 177:19-178:22.) Benitez also testified that when Gumby came by that day, Gumby confessed to killing Powder himself and showed Benitez the gun he used to "[take] care of Powder." (*Id.* at 224:4-226:3.)

160.     The defense also attempted to present the testimony of an expert witness related to Wendy Bardales' identification of Mr. Balderas from a photograph array. The court conducted a hearing outside the jury's presence and heard from the expert—Dr. Roy Malpass, a professor emeritus and a former director of the criminal justice program at the University of Texas at El Paso and an expert on eyewitness identification. (25 RR 122:20-123:13; *Id.* at 127:8-14.) Dr. Malpass reviewed materials related to Wendy's identification and testified about its reliability problems. (*Id.* at 134:8-22; *Id.* at 137:16-21.) Dr. Malpass said the causes for concerns include various ways five filler photos in the spread differed from Mr. Balderas's photo: Mr. Balderas was the only one wearing a black hoodie, which was named specifically in Wendy's description of the shooter; Mr. Balderas had a distinct mark on his left cheek; and Mr. Balderas had a different haircut. (*Id.* at 137:22-139:5.) Dr. Malpass said that people who had guns pointed at them tended to focus on the weapon, which would reduce their ability to form a memory about the face. (*Id.* at 143:2-144:3.)

161.     Dr. Malpass testified that the progression of identification by Wendy (from "'[i]t wasn't him,'" to "'[i]t could be him," to "'[i]t's definitely him,'") raised a red flag that her identifications subsequent to the first one suffered from "memory contamination." (*Id.* at 144:4-146:15.) He explained that having the December 13th meeting one day after Wendy's

58

identification suggested to her that the police are "not going to take no[] for an answer," and her very positive identification was in fact a "confirmation of one of officer's statements of how positive it should be." (*Id.* at 145-146:9.) Dr. Malpass said that, if Wendy was in shock, that was a factor leading to "degradation of the initial memory that she could form. (*Id.* at 147:15-148:2.) He stated that Wendy's emotional reactions during the December 13, 2005, interview does not necessarily indicate the identification was valid, because she was not emotionally aroused by Mr. Balderas's face in earlier times. (*Id.* at 148:17-149:22.) Dr. Malpass said that the most reliable identification was the first "identification" where Wendy did not identify a shooter, and that the photo spread shown on December 12, 2005, and December 13, 2005, were impermissibly suggestive. (*Id.* at 149:23-150:23). Dr. Malpass testified that there was a substantial likelihood that a misidentification had been made. (*Id.* at 150:24-151:2.)

162.    The defense called retired Houston Police Department officer Thomas Cunningham. Officer Cunningham was an investigator in the homicide division in December 2005. (29 RR 15:17-18.) Officer Cunningham's only involvement in this case was taking Wendy's statement on the night of the shooting. (*Id.* at 39:3-25, 52:10-15.) Wendy never asked Officer Cunningham for a translator. (*Id.* at 28:15-23.) Officer Cunningham said that the information included in the statement reflected what Wendy told him, including that she got a good look at the shooter, she had never seen the shooter before, the shooter's age, his height, and his "dark birthmark." (*Id.* at 29:12-20, 33:2-36:13.) He was simply memorializing what she said. (*Id.* at 58:8-11.) Wendy never indicated that Officer Cunningham got anything wrong. (*Id.* at 29:2131:9.) Based on his experience, Officer Cunningham believed that Wendy was capable of giving a statement on December 7, 2005. (*Id.* at 31:24-32:2.)

163.    The State called Dr. Michael Robert Condron, II. Dr. Condron worked as an assistant medical examiner for Harris County in the Institute of Forensic Sciences in 2014. (27 RR 123:15-124:6.) Dr. Condron testified that the autopsy report determined "[m]ultiple gunshot wounds was the cause of death, and the manner of death was homicide." (*Id.* at 170:18-21.)

164.    The State called Dr. Morna Gonsoulin. Dr. Gonsoulin worked as an assistant medical examiner at the Harris County Institute of Forensic Sciences in 2005. (37 RR 9:12-18.) On December 16, 2005, Dr. Gonsoulin performed an autopsy of the body of Jose Garcia—the victim of the December 2005 Bunker Hill Shooting—and recorded her findings in an autopsy report. (*Id.* at 10:9-12.) Dr. Gonsoulin testified as to her findings in the autopsy report. (*Id.* at 9:13-19.) Dr. Gonsoulin testified that she determined the cause of Jose Garcia's death was "gunshot wounds of the head, chest, and legs." (*Id.* at 32:2-5.)

165.    The State called Powder's sister, Miriam Hernandez. (28 RR 104:19-23.) Hernandez testified that she became aware that Powder was a member of LTC in 2004. (*Id.* at 105:12-106:5.) Hernandez said that she and her mother went to the police station in December 2004 to see Powder in connection with his car-theft arrest, where she observed that Powder was upset and unwilling to cooperate during his police interview. (*Id.* at 106:10-17, 109:17-22.) Hernandez testified that Powder told her that he was scared of "[Cookie] and the gang." (*Id.* at 109:13-16.) By late August and early September 2005, Hernandez said Powder appeared to be spending less time with LTC. (*Id.* at 108:13-109:1.) Hernandez testified that she last saw Powder on the day he was killed when she dropped him off at the apartments on Corporate Drive after taking him for a shopping trip. (*Id.* at 110:23-111:23.)

### 4.    Closing statements.

166.    In closing, the defense argued the State had not proven its case beyond a reasonable doubt by calling into question several key pieces of evidence. Counsel discussed the credibility of

testimony given by Wendy Bardales, asking why the State chose for her to testify through an interpreter when "[Wendy] speaks perfect English." (30 RR 7:1-4.) Counsel also argued that the purpose of the interpreter was to "put a barrier between [the jury] and the witness so [the jury] can't see [Wendy's] face and the appropriateness of her response, so [the jury] can't tell from the tone of [Wendy's] voice and her inflection that [Wendy's] lying to [the jury]." (*Id.* at 7:11-15.)

167.    Counsel further questioned the credibility of Wendy by citing a portion of her testimony script wherein she said during her police interview in December 2005 she requested to have someone assist her in Spanish, but they continued talking in English. (*Id.* at 13:19-23.) The defense argued to believe Wendy is to believe "Officer Cunningham is a liar" (*id.* at 14:11-20) because Officer Cunningham, "having been with the police department at that time in December of 2005 over 30 years, having taken hundreds and hundreds of statements, would have the knowledge, the ability, and the skill to recognize if he is engaged in an interview with a witness, that he would reach out and find somebody proficient in that language[.]" (*Id.* at 15:12-19.)

168.    Counsel further argued that, "[b]ack in December 2005, Wendy Bardales, her sister Karen, Edgar, [Powder], were all, basically, gangbanger or gangbanger assistants – associates[,]" despite Wendy's attempt to minimize this fact. (*Id.* at 16:20-24.) Furthermore, the defense argued Wendy was in all probability pregnant in December 2005 because she gave birth in August 2006. (*Id.* at 17:10-13.)

169.    The defense called into question Wendy's ability to form a memory. Counsel argued Wendy testified she first heard shots coming from outside, and "the person came in, he was running all over the place, to the right, to the left, everywhere, shooting." (*Id.* at 18:3-7.) The defense argued that, "if someone is moving about . . . your opportunity to observe them is already compromised." (*Id.* at 18:10-11.) Further, counsel questioned how Wendy was able to focus on

the shooter, instead of looking away or trying to take cover. (*Id.* at 18:12-14.) Additionally, the defense noted Wendy "said it was a black gun[,]" when "[t]he gun introduced in this case is anything but black." (*Id.* at 18:19-22.)

170.    The defense then argued Wendy's identification of Mr. Balderas was unreliable because she testified she did not immediately recognize the shooter as Mr. Balderas at the time the shooter's hood allegedly fell off. (*Id.* at 19:10-19.) Counsel argued Wendy testified she did not immediately recognize Mr. Balderas at that time, even though she also testified "she has known [Mr. Balderas] for anywhere from a year to six months, depending upon her answers. She said she had been to his apartment on several occasions. She says she saw him frequently at the bus stop, all of these opportunities to see this person." (*Id.* at 19:23-20:3.) Despite Wendy's attested familiarity with Mr. Balderas, the defense cited her statement to Officer Cunningham on December 7th 2005, about four hours after the incident, where she said "'I have never seen that face before.'" (*Id.* at 20:16-19.)

171.    Counsel emphasized to the jury that, "from December 6th, the day of the offense, to December 13th, 2005, Wendy never recognized or recalled [Mr. Balderas] being the shooter." (*Id.* at 24:25-25:3.) "[Wendy] . . . never implicated him, never indicted him in no way, shape, fashion, or form until this suggestive, leading, improper photo spread was flashed in front of her." (*Id. at* 25:7-10.)

172.    As to Israel "Cookie" Diaz's crucial testimony against Mr. Balderas, counsel argued Cookie lied and had a motive to lie. (*Id.* at 25:23-25.) Counsel urged that Cookie's testimony about Mr. Balderas's alleged confession must be disregarded because, in addition to his motive to lie, LTC member Benitez had testified that Gumby confessed to Powder's murder. (*Id.* at 27:25-28:1.)

62

173.    The State argued that Mr. Balderas had come into the apartment and "took care of business." (30 RR 31:25.) She described in detail how Karen was "on the ground covered in the blood and brains of her boyfriend [Powder]." (*Id.* at 32:3-6.) The State argued that Mr. Balderas committed a "premeditated, cold-blooded execution." (*Id.* at 32:19-20.)

174.    To support the State's theory that Mr. Balderas was the killer, the prosecution first relied on Wendy's testimony that she had seen the shooter's "right side exposed to her" when the "hood fell off" as he "cross[ed] right by her path." (*Id.* at 34:17-24.) As to Wendy's statement that she had never seen the shooter and then her later claim that she knew the shooter, the State argued that Wendy "was in such shock at that moment, she didn't recognize the defendant," and "didn't recognize him until the police showed a photograph of him." (*Id.* at 35:12-15.)

175.    In bolstering Wendy's testimony, the prosecutor also drew upon her own past. The prosecutor recalled how she had seen a magazine several years ago with a "cute little kid on the front" and put the magazine away without thinking about it. (*Id.* at 40:22-41:2.) Two months later, the prosecutor told the jury that her brother-in-law came to town and had a conversation with her father about photographs he had taken and sold to the magazine. The prosecutor told the jury that she realized that the "cute little kid on the cover [was her] niece" and did not recognize her "until I heard that conversation." (*Id.* at 41:2-8.) The prosecutor stated, "I would submit to you that's something that's happened to all of us," (*id.* at 41:14-15,) and that "I would submit to you that Wendy's lack of recognition that night is understandable[.]" (*Id.* at 41:25-42:2.)

176.    Despite two other people in the room at the time, the State argued that Wendy was "the only one who can come in here and testify as to the identity of the shooter because [Powder's] dead. He can't tell you." (*Id.* at 36:3-6.) The State tried to rehabilitate Wendy's inconsistent testimony with the evidence as to the gun as having "some black on it" (when it was a silver or

chrome gun) that she was in "shock." (*Id.* at 38:17.) And even though the police said she wasn't in shock, the prosecutor argued that she believed Wendy was in shock because "she has just seen her friend get his brains blown out." (*Id.* at 38:18-25.)

177.    The State then discussed the police investigation and that "Mr. Nunnery [defense counsel] talked about the police and one minutes he's holding them up, they're the best thing he'd ever seen and the next moment, he's tearing them down. It just depends on what his purposes are." (*Id.* at 42:4-9.)

178.    The State responded to defense arguments that the jury should disregard Wendy's identification given that Mr. Balderas was the only one wearing a black hoodie. According to the prosecutor: "You put my mom in this photo spread, no matter how much she sticks out, I'm going to pick her out because I know her. You could put my mom with five black males, with five white males, with five elephants. You can move her picture around, I'm going to be able to pick her out every single time because I know who she is. And once Wendy was provided this photograph, she immediately recognized the defendant." (*Id.* at 43:9-22.) Defense counsel's objection that this was a mischaracterization of the testimony and improper jury argument was overruled. (*Id.* at 43:23-44:2.) The State went on to discuss how Wendy "recognized him," "[k]ind of like when my brother-in-law was talking to my dad about the photographs he'd taken." (*Id.* at 45:1-4.) The State argued that the officers went back a third time because they were "confused about her words not about her identification." (*Id.* at 45:1:13.) Defense counsel's objection that this was a misstatement of the record and improper jury argument was overruled. (*Id.* at 45:14-17.)

179.    The State then argued "how else do you know that Juan Balderas is the killer? Israel ["Cookie"] Diaz. He told you. Juan Balderas told [Cookie] that he got him, that he killed Powder." (*Id.* at 48:11-14.) Defense counsel's objection that this was "outside the record" because Cookie

64

testified Balderas said, "we got him," was overruled. (*Id.* at 48:15-19.) The State further relied on Cookie's testimony about "gang life, specifically LTC gang life, about the things that could get you into trouble with the gang." (*Id.* at 50:14-18.) And the State recounted that Powder had gotten into "trouble with the gang" when he "cooperated with the police and he told on [Cookie] for that aggravated robbery." (*Id.* at 50:18-20.) But the State argued that Cookie was not the killer because he would be "Suspect No. 1." (*Id.* at 51:7-15.) The State argued that the real reason, however, that Powder was killed was because he was "[h]anging out with other gang members, he was actually pictured throwing the signs of another gang." (*Id.* at 51:17-21.) That "trivial reason," the State argued, was "enough to get [him] killed." (*Id.* at 52:1-3.)

180.    The State further pointed to Cookie's testimony "about the meeting at the twins' house in December of 2005 to discuss Powder's violations." (*Id.* at 52:6-8.) The State argued that Cookie "didn't really care too much about what happened." (*Id.* at 52:9.) The State argued that "Powder's fate was decided at the meeting and that anyone in the gang could do it but that it was understood that since Apache brought Powder into the gang, it was his responsibility and he was the one who was responsible." (*Id.* at 55:8-12.)

### 5.    *The jury's deliberations, request for readback of Cookie's testimony, deadlock, Allen charge and verdict.*

181.    The jurors were sequestered for two nights during the guilt/innocence phase deliberations.

182.    On the first night, after hearing extensive testimony regarding the gang violence and danger of certain southwest Houston neighborhoods, the jury was sent to stay at a motel located in the same neighborhood as the murder. Many jurors realized they were being forced to spend the night near the crime scene. (Affidavit of John Armstrong ("Juror Armstrong Aff."), Sept. 25, 2015, Habeas Writ Record, Vol. III, 00668-73, ¶¶ 5-6; Affidavit of Alison Birney ("Juror

Birney Aff."), Sept. 26, 2015, Habeas Writ Record, Vol. III, 00675-78, ¶ 4; Affidavit of Ronald

Browning-McCauley ("Juror Browning-McCauley Aff."), Sept. 26, 2015, Habeas Writ Record,

Vol. III, 00680-81, ¶ 5; Affidavit of Christopher Norwood ("Juror Norwood Aff."), Sept. 25, 2015,

Habeas Writ Record, Vol. III, 00683-86, ¶ 4; Affidavit of Michael Orosz ("Juror Orosz Aff."),

Sept. 25, 2015, Habeas Writ Record, Vol. III, 00688-93, ¶ 5; Affidavit of Chad Sullivan ("Juror

Sullivan Aff."), Sept. 26, 2015, Habeas Writ Record, Vol. III, 00695-98, ¶¶ 3, 5.)

183.    During deliberations, the jury sent five notes requesting exhibits or read-back of

testimony relevant to Cookie's account of the night in question:

- "Can we have the aerial photo of 7700 Corporate—showing complex across the street?" (Jury Note, Feb. 25, 2014, CCA Record, Vol. XII, 03289.)

- "Would like to hear [Cookie's] testimony about receiving phone call to go to crime scene and who was across the street from the crime scene right after Powder was killed." (Jury Note, Feb. 25, 2014, CCA Record, Vol. XII, 03291.)

- "After incident, [Cookie's] testimony about what [Mr. Balderas] was wearing." (Jury Note, Feb. 26, 2014, CCA Record, Vol. XII, 03298.)

- "[Cookie's] testimony where he said [Mr. Balderas] was changing or switching magazines during the gathering across the street right after the incident." (Jury Note, Feb. 26, 2014, CCA Record, Vol. XII, 03302.)

- "In [Cookie's] testimony, did he describe the weapon [Mr. Balderas] had at the meeting across the street right after the incident of Powder's death?" (Jury Note, Feb. 26, 2014, CCA Record, Vol. XII, 03307.)

184.    The jury deliberated for more than two days and even informed the trial court that it reached an impasse at one point. On the afternoon of the second day of guilt/innocence deliberations, after about 14 hours of deliberation, the jury sent out a note: "We are deadlocked. We agreed that we are not to 'strong arm' each other to change votes and have exhausted our questions over testimony and evidence. Now what?" (Jury Note, Feb. 26, 2014, CCA Record, Vol. XII, 03312.) In response, the trial court issued an *Allen* charge, instructing the jury to continue deliberations. (31 RR 24:7-13.) The next day, the jury reached a verdict of guilty. Despite this, at least one juror has expressed that she is still not completely convinced of Mr. Balderas's guilt. (Juror Birney Aff., Habeas Writ Record, Vol. III, 00675-78, ¶ 8.)

### K.    The Punishment Phase

#### 1.    The State's case.

185.    The punishment phase of the trial began the same day the guilty verdict was rendered. (33 RR 6-10.) During punishment phase, the State presented 39 witnesses. (33 RR 11 - 37 RR 169; 42 RR 124-283.) One of the most critical witnesses was Christopher Pool, a former Harris County detention officer. Pool testified about a search he conducted of Mr. Balderas's cell at the Harris County detention facility on May 29, 2010, during which he allegedly found two razor blades, 34 Seroquel and Klonopin pills, and a pen. (42 RR 249:3-252:12.) Pool testified that he wrote up a disciplinary citation for a "misuse of medication," instead of the lesser charge of contraband, "due to the fact that there was 34 pills." (42 RR 253:11-22.)

186.    On cross-examination, trial counsel asked Pool why he had left the Harris County Sheriff's Office, and Pool admitted that he had been terminated for "violation of policies," specifically, "failure to render aid and deception" related to an incident resulting in an inmate's death. (42 RR 254:6-21.) On redirect, the State elicited false testimony from Pool about his

termination from the Harris County Sheriff's Office in that Pool told the jury that, just the day prior, he had been "cleared of all wrongdoing." (42 RR 255:3-5.)

187.    Post-conviction investigation has actually revealed that Pool was never cleared in connection with his employment termination. (Pool Civil Service Commission Letter, Mar. 12, 2014, Habeas Writ Record, Vol. III, 00932.) The Harris County Civil Service Commission had modified Pool's punishment from termination to suspension, but it did not comment at all on the Harris County Sheriff's Office's finding that Pool had violated department policies requiring employees to be truthful, not make false statements, not include false information in reports, and not be dishonest. *Id.*; (Pool Termination Letter, Aug. 21, 2012, Habeas Writ Record, Vol. III, 00918-928.)

188.    The State also presented evidence during the punishment phase that attempted to tie Mr. Balderas to four extraneous offenses committed by the LTC between September and December 2005: (1) a September 12, 2005, burglary of a home on Loma Vista Street in Houston during which Daniel Zamora was shot and killed (the "Loma Vista Shooting"); (2) the December 3, 2005, drive-by shooting death of victim Eric Romero on Beltway 8 (the "Beltway Shooting"); (3) the December 15, 2005, shooting death of victim Jose Garcia on Bunker Hill Road (the "Bunker Hill Shooting"); and (4) the November 14, 2005, non-fatal shooting of victim Luis Garcia on Woodfair Drive (the "Woodfair Drive Shooting"). (33 RR 6:13-8:5.) Multiple members of the LTC were present during each of these offenses.

189.    To support the allegations for the extraneous offenses, the State relied on the jury's guilt/innocence phase determination that Mr. Balderas had used a specific .40-caliber handgun to shoot Powder, as well as Cookie's testimony that Mr. Balderas was known to use a particular .357-caliber handgun. (*Id.*)

68

190.    Through ballistics evidence, the State attempted to show that the .40-caliber handgun used to kill Powder was also used in the Loma Vista Shooting, and that the .357-caliber handgun mentioned by Cookie was used in the Beltway, Bunker Hill, and Woodfair Drive Shootings. (*Id*.; 37 RR 113:24-160:17.)

191.    The State also presented testimony from LTC member Alejandro Garcia that Mr. Balderas was involved in the Loma Vista and Beltway Shootings. (34 RR 154-60, 204-46; 35 RR 10-32.) Garcia testified in exchange for a charge reduction in a case of capital murder to aggravated robbery charge, which carried a five-year probated sentence instead of life imprisonment. (34 RR 154-60.) The State also presented evidence that Mr. Balderas was involved in two separate altercations with a correctional officer and was cited for contraband while awaiting trial in the Harris County Jail. (42 RR 247-275.)

### 2.    The Defense case.

192.    Mr. Balderas's defense touched briefly on the childhood sexual abuse Mr. Balderas suffered from his stepfather, and the early abandonment he experienced from his mother. (38 RR 125-183; 39 RR 37-108.) Mr. Balderas's mother testified that she sent her son to live with her family in Mexico for approximately one year when he was eight or nine years old. (38 RR 41, 5659.) His biological father testified about the discord with Mr. Balderas's mother during Mr. Balderas's early childhood. (38 RR 89-91.) And two relatives from Mexico attempted to testify via Skype to offer mitigation evidence relating to Mr. Balderas's life history, but their testimony was cut short due to repeated technical difficulties. (39 RR 7-24, 35, 109-12; 40 RR 172-75, 193-95.)

193.    Socioeconomic and cultural factors were also briefly raised. Amy Nguyen, an expert in geographic information systems, discussed the socio-economics of Southwest Houston. (40 RR 125-170.) And Dr. John Rodriguez, a sociologist and gang expert, testified to the various

69

factors in Mr. Balderas's life that made him more likely to join a street gang in his youth. (40 RR 195-258. Dr. Matthew Mendel addressed sexual abuse (38 RR 125-183; 39 RR 36-108), and Dr. Jolie Brams testified to the overall trauma that Mr. Balderas suffered in his youth and how it likely impaired his development. (41 RR 251-71; 42 RR 6-95.)

194.    Dr. Brams testified that Mr. Balderas's brain had not fully developed at the time of his arrest when he was nineteen years old, but that it had matured in his years of pre-trial incarceration. (42 RR 87-90.) Accordingly, Mr. Balderas was likely to be a compliant inmate within the Texas Department of Criminal Justice. (39 RR 139-59; 40 RR 9-63.) Terry Pelz, an expert in prison environment and prison gangs, echoed the opinion that Mr. Balderas would likely acclimate well to life in TDCJ. (41 RR 210-250.)

### 3.    The jury deliberation and verdict.

195.    The jury deliberated for a day and a half before returning with a verdict of death. (44 RR 11:6-11.) The jurors answered "Yes" to Special Issue One concerning future dangerousness, and "No" to Special Issue Two concerning the existence of mitigating factors that would have made a life sentence an appropriate punishment. (44 RR 9:5-9.)

### L.    State Appellate Proceedings

196.    The court appointed R. Scott Shearer to continue representing Mr. Balderas on direct appeal. (Order on Notice of Appeal, March 14, 2014, CCA Record, Vol. XII, 03360-61.) Mr. Shearer moved for a mistrial and a new trial on April 14, 2014, arguing that the verdict was reached as a result of outside influence and Mr. Balderas's right to an impartial jury, due process, and a fair trial had been violated. (Motion for New Trial, April 14, 2014, CCA Record, Vol. XII, 03365-3387.) The motion for a mistrial /new trial was denied without hearing on April 21, 2014. (Order – Determination, April 21, 2014, CCA Record, Vol. XII, 03409.)

197.    On April 27, 2015, Mr. Shearer filed an opening brief on appeal in the CCA. On direct appeal, Mr. Balderas argued that: (1) the evidence was insufficient to support the verdict; (2) he was deprived of his Sixth Amendment right to a speedy trial; (3) he was deprived of his Sixth Amendment right to confront Wendy Bardales in English; (4) even if he did not have a Sixth Amendment right to confront Wendy Bardales in English, he was deprived of the right to cross-examine and impeach her concerning her ability to speak English; (5) the trial court abused its discretion by allowing Wendy Bardales to testify in Spanish; (6) the trial court violated the *Gaskin v. State* rule by preventing Mr. Balderas from impeaching Wendy Bardales with the prior audiotaped statement she gave to police; (7) he was deprived of due process and an impartial jury by an outside influence acting upon the jury during their deliberations; (8) he was deprived of due process when the trial court failed to suppress both the in-court and out-of-court identifications; and (9) the trial court abused its discretion by failing to have testimony read back in response to two jury notes. (Brief for Appellant, Texas Court of Criminal Appeals, *Juan Balderas v. The State of Texas*, No. AP-77,036, Apr. 27, 2015.) The State filed a brief in response on June 24, 2015.

198.    On October 7, 2015, both parties presented oral arguments before the CCA. On November 2, 2016, the CCA denied Mr. Balderas's direct appeal and affirmed the judgment and sentence of death. The CCA held that: (1) the evidence was sufficient to prove that Mr. Balderas was guilty of capital murder; (2) Mr. Balderas was not deprived of a speedy trial; (3) the assistance of an interpreter did not deprive Mr. Balderas of his Sixth Amendment right to confront Wendy Bardales; (4) the trial court did not violate the Sixth Amendment by excluding the audio recording; (5)     the trial court did not abuse its discretion by allowing Wendy Bardales to testify in Spanish; (6)     there was no violation of the *Gaskin* Rule; (7) the trial court did not abuse its discretion by overruling Mr. Balderas's motion for a mistrial due to outside influence allegedly acting upon the

71

jury during their deliberations; (8) the trial court did not err by admitting Wendy Bardales's in-court and out-of-court identifications; (9) the trial court did not abuse its discretion by failing to have testimony read back in response to two jury notes. (*Id.*)

### M. State Habeas Proceedings

#### 1. *OCFW is appointed to represent Mr. Balderas in post-conviction habeas proceedings.*

199.    While his direct state appeal was pending, the trial court appointed OCFW to represent Mr. Balderas in post-conviction habeas proceedings. Mr. Derek VerHagen ("VerHagen") and Ms. Erin M. Eckhoff ("Eckhoff") were the two staff attorneys at OCFW assigned to Mr. Balderas's case. (Exhibit D, Declaration of Erin M. Eckhoff In Support of Juan Balderas's Petition for Writ of Habeas Corpus (First Amended) Under 28 U.S.C. § 2254 of a Person in State Custody ("Eckhoff Decl."), April 17, 2022; Exhibit E, Declaration of Derek VerHagen In Support of Juan Balderas's Petition for Writ of Habeas Corpus (First Amended) Under 28 U.S.C. § 2254 of a Person in State Custody ("VerHagen Decl."), April 17, 2022)

200.    During the time OCFW handled Mr. Balderas's case, OCFW lacked adequate resources and funding, causing excessive caseloads for each of the OCFW attorneys and high turnover. (Ex. D, Eckhoff Decl., ¶ 5) According to Eckhoff and VerHagen, it was extremely difficult for attorneys and investigators to dedicate sufficient time and resources to each of their cases. (Ex. D, Eckhoff Decl., ¶ 6; Ex. E, VerHagen Decl., ¶ 7) Due to their caseloads, it was not until the summer of 2015 that Eckhoff and VerHagen were able to review and investigate Mr. Balderas's case in depth. (Ex. D, Eckhoff Decl., ¶ 8; Ex. E, VerHagen Decl., ¶ 3) By that time, the complexity and size of Mr. Balderas's case was overwhelming. (Ex. E, VerHagen Decl., ¶ 9)

201.    In order to best optimize OCFW's limited time and resources, OCFW took a triage approach to managing Mr. Balderas's case. (Ex. D, Eckhoff Decl., ¶ 14) Accordingly, OCFW

focused on investigating and developing claims related to trial counsel's failure to investigate and present alibi testimony at trial. (Ex. D, Eckhoff Decl., ¶¶ 14, 18) Due to a lack of resources, OCFW did not investigate claims related to Mr. Balderas's competency, even though Eckhoff and VerHagen were aware of Mr. Balderas's long history of mental illnesses, history of behavior consistent with those diagnoses, and periods of refusing to take his prescribed medications. (Ex. D, Eckhoff Decl., ¶¶ 15-17; Ex. E, VerHagen Decl., ¶¶ 10-12) Nor did OCFW investigate or consider an additional claim that trial counsel violated Mr. Balderas's Sixth Amendment right to present an alibi defense. (Ex. D, Eckhoff Decl., ¶ 19; Ex. E, VerHagen Decl., ¶ 14)

202.    Thus limited by time and resources, OCFW began its narrowly targeted investigation into Mr. Balderas's case in the summer of 2015.

### 2.    First post-trial disclosures.

203.    On August 13, 2015, OCFW visited the DA's office to review the State's file. Counsel was given only five of eleven boxes of the State's files. The State withheld six boxes, stating that they are in the process of being scanned.

204.    On October 8, 2015, after OCFW had yet to receive the full file, OCFW filed a Motion for Disclosure of Exculpatory and Impeachment Evidence. (Motion for Disclosure of Exculpatory and Impeachment Evidence, Oct. 8, 2015.) On October 21, 2015, the State finally provided to OCFW what was purported to be the full file.

205.    In reviewing the newly disclosed file, OCFW found evidence reflecting differing accounts related to Powder's murder. Two of the accounts came from handwritten investigative notes from 2007 and 2008 between the State and Cookie that contradicted Cookie's trial testimony—none of which were disclosed prior to trial.

206.    In the 2007 notes, there was a "meeting 9-10 mos before Powder was killed." (2007 and 2008 Israel "Cookie" Diaz Interview Notes, Habeas Writ Record, Vol. III, 00782-804, at

00788.) At trial Cookie said the meeting was three or four days before Powder's murder. (26 RR

160:2-3; 26 RR 184:5-7.) The notes also state that "[Mr. Balderas] called [Cookie] the day *after*

Powder [was] killed & said 'we took care of that.'" (*See* 2007 and 2008 Israel "Cookie" Diaz

Interview Notes, Habeas Writ Record, Vol. III, 00782-804, at 00788 (emphasis added).)

207.    In the 2008 notes, in which the prosecutor was again present, the notes provided a

different rendition of the alleged confession. According to the notes, Cookie told the State that

LTC members and associates later gathered in Alejandro Garcia's backyard and "talked about

Powder's murder" on the night of the shooting. He told the State, as reflected in the notes, that it

was at the backyard gathering that "Apache [Mr. Balderas] said he took care of it." (*Id.* at 00795.)

208.    None of the alternative confession versions were disclosed to Mr. Balderas's legal

team prior to the trial. As a result, defense counsel was unable to confront Cookie with these

conflicting accounts and demonstrate the inconsistencies to the jury.

209.    During OCFW's investigation, its investigator spoke with Cookie, who recanted

his trial testimony. (Affidavit of Adrian De La Rosa, Jan. 13, 2016, Habeas Writ Record, Vol. II,

00531-00535.) Cookie explained that the State approached him multiple times over the course of

his eight-year incarceration awaiting trial on a separate capital murder charge asking him to

provide information inculpating Mr. Balderas in Powder's shooting. Cookie said that he told

prosecutors that "Juan did not tell me he killed [Powder], but that it was the word on the street. . .

. Juan never told me he did it." (*Id.* at 00533 ¶ 8.) Cookie further told the OCFW investigator that,

on the eve of Mr. Balderas's trial, the State again approached Cookie, who indicated that he again

told them that Mr. Balderas had never confessed. This time, Cookie said that prosecutors told him

to change that story. (*Id.*, ¶¶ 8, 10.) Cookie told investigators that he felt pressured to cooperate

with the State because he had already been incarcerated for nearly a decade with no word on how

or when his case would be resolved. (*Id.*, ¶ 8.) As a result, Cookie accepted a plea deal on the first day of Mr. Balderas's trial and testified falsely that he had seen Mr. Balderas near the scene on the night of the shooting and that Mr. Balderas had confessed.

### 3.    The State issues *Brady* disclosures four days before the hearing.

210.    On May 7, 2018, four days before the evidentiary hearing was to begin in May 2018, the State disclosed for the first time voluminous information about Cookie relevant to Mr. Balderas's claims and which Mr. Balderas had requested since 2015. The disclosure included:

a.    The capital murder summary;

b.    561 audio copies of jail calls made by Cookie while incarcerated in Harris County jail (approximately 16 CD-ROMs); and

c.    Documents and audio recordings pertaining to communications and contact between Cookie and the Harris County District Attorney's Office (including Cookie's State File, Traci Bennett's Pretrial Interview Notes with Cookie, and Cookie's 2006-2010 Harris County Jail Disciplinary Record).

(Letters from Harris County District Attorney's Office, May 4, 2018; Post-Conviction Writ Evidentiary Hearing Tr. ("EH"), Vol. 2, at 9:14-11:3, 56:17-62:12, 76:16-78:11.)

211.    OCFW requested a continuance to review the disclosed material given that the evidentiary hearing was scheduled for just four days later. The request was denied.

212.    The *Brady* information that the State disclosed contained crucial information calling Cookie's credibility into serious question. The material contained new evidence that Cookie told prosecutors prior to the murder in connection with an alleged car theft that he and Powder had gotten into physical altercations because Powder was attempting to pull away from the gang. (Audio recording of Israel Diaz interview by Officers H. Chavez and A. Carrillo at the

Harris County Jail relating to Case No. 179083204I, Feb. 1, 2005, produced by Harris County District Attorney's office on Oct. 22, 2020 as Disc 5.)

### 4.    *The Texas State habeas hearing.*

213.    On May 11, 2018, the court held the evidentiary hearing on OCFW's habeas motion. During the hearing, the court restricted the ability of Mr. Balderas to present evidence to support the already truncated claims at issue. As to the first issue (originally designated by Judge Guiney), the state habeas court only permitted Mr. Balderas to put on the testimony of Cookie. And for the second issue, the court limited the evidentiary presentation to two specific witnesses— Anali Garcia and Octavio Cortes—related to the abili evidence that trial counsel failed to present to the jury. (Signed Order Designating Issues for Hearing, Mar. 21, 2018, Habeas Writ Record Volume VII, 01948-49.)

214.    When defense counsel put Cookie on the stand, he recanted the recantation he previously made to OCFW. He testified that Mr. Balderas had actually made a confession as he had originally testified. Cookie further claimed that Efrain Lopez and Jose Hernandez and all the other LTC gang members were present for that confession.

215.    Contrary to Cookie's evidentiary hearing testimony, however, both Lopez and Hernandez provided affidavits to OCFW during its investigation that they were not, in fact, present at the scene shortly after the shooting. The court refused to allow these affidavits into evidence at the hearing because they allegedly went beyond one of the "limited purpose[s] of the [evidentiary] hearing," which was to determine if Cookie had recanted his trial testimony. (4 EH 294:3-295:21.) The habeas court acknowledged that the affidavits impeached Cookie trial testimony, but still refused them even for that purpose. (*Id.* at 291:10-92:22, 294:3-95:21.)

216.    The habeas court also denied the affidavit of University of Virginia Law Professor Brandon L. Garrett on the inherent risks of informant testimony. The court ruled that it was

impermissible comment on the credibility of a witness. In fact, Professor Garrett's testimony was not directed at Cookie specifically, but was intended to assist the fact-finder in understanding the unique risks of informant testimony in a case where it is so critical to the conviction. (5 EH 4-26.)

217.    The habeas court also denied admission of the proffered affidavits of six jurors, including one alternate, supporting Mr. Balderas's claims of juror misconduct and extraneous influences. The court found that the affidavit of alternate juror Browning-McCauley was irrelevant because she did not participate in deliberations. (FFCL, Habeas Writ Record, Volume X, 02844–02937, at 02885 ¶¶ 178.) The court found that the affidavits of jurors Armstrong, Birney, Norwood, Orosz and Sullivan were all "not dispositive on the merits" of Mr. Balderas's habeas claims. (*Id*., at 02886 ¶ 179, 02888 ¶ 193, 02911 ¶ 273, 02917 ¶ 303.) The court also found that these affidavits were not admissible—the court had no explanation as to some and ruled as to others that they would constitute impermissible commentary on the deliberation process. (*Id*. at 02924 ¶ 21, 02928-29 ¶ 36, 02931 ¶ 47, 02933 ¶ 58.)

218.    On July 11, 2018, OCFW filed a motion to supplement the record and to expand the evidentiary hearing. (Motion to Supplement the Record and to Expand the Evidentiary Hearing, July 11, 2018, Habeas Writ Record, Vol. VII, 02268-86.) Counsel for Mr. Balderas also asked for the opportunity to move affidavits and additional documents into evidence. (*Id*.) The habeas court denied these requests. The Court denied the motion via email the same day. (Email from Judge Baylor Worthman, July 11, 2018, Habeas Writ Record, Vol. X, 02948).

### 5.    *The Texas State court conclusions.*

219.    Shortly thereafter, on July 20, 2018, Judge Wortham issued his Findings of Fact and Conclusions of Law denying relief. (*Id*. at 02844-2938).

220.    The court's order denying relief closely tracked the State's proposed findings and conclusions. With respect to the first and second grounds alleging the State presented false

evidence through Cookie, the court held that: (1) Mr. Balderas failed to demonstrate that the State presented false testimony or that Cookie's testimony left a false impression with the jury; (2) in the alternative, Mr. Balderas failed to demonstrate that Cookie's trial testimony was material to the jury's verdict, in light of the totality of the State's evidence of guilt against Mr. Balderas; and (3) Mr. Balderas failed to demonstrate that his constitutional rights were violated because the prosecution obtained his guilty verdict through the knowing or unknowing use of false evidence via Cookie. (FFCL, Habeas Writ Record, Volume X, 02844–02937, at 02919 ¶¶ 1-4.)

221.    With respect to the third ground alleging the State failed to disclose impeachment information regarding Cookie, the court held that Mr. Balderas failed to demonstrate that the State violated *Brady* as he failed to demonstrate that the State suppressed 23 pages of Cookie's pretrial interview notes, that the notes were favorable to the defense, or that the notes were material. (*Id.* at 02920 ¶ 5.)

222.    With respect to the fourth ground alleging ineffective assistance of counsel in the guilt/innocence phase, the court held that Mr. Balderas failed to demonstrate that trial counsel rendered ineffective assistance during either phase of trial when, *inter alia*:

- Trial counsel's pretrial investigation included more than 70 hours reviewing the State's prosecution files, conducting interviews, and retaining and keeping in continued communication with a variety of experts. (*Id.* at 02920 ¶ 6.)

- Trial counsel conducted individual voir dire examinations on prospective jurors, cross-examined witnesses, raised objections, and requested specific jury instructions. (*Id.* at 02920 ¶ 7.)

- Trial counsel interviewed but decided not to present trial testimony of Anali Garcia, Jesus Balderas, or Ileana Cortes. (*Id.* at 02921 ¶ 8.)

- Trial counsel did not investigate and present an alibi defense. (*Id.* at 02921 ¶ 9.)

- Trial counsel did not present the testimony of Jose Perez. (*Id.* at 02922 ¶ 10.)

- Trial counsel did not present the testimony of Yancy Escobar. (*Id.* at 02922 ¶ 11.)

- Trial counsel did not investigate and present evidence of Mr. Balderas's innocence. (*Id.* at 02922 ¶ 12.)

- Trial counsel did not call Celeste Munoz as a witness. (*Id.* at 02922 ¶ 13.)

- Trial counsel did not call Dr. Roy Malpass to testify as an eyewitness identification expert in front of the jury. (*Id.* at 02923 ¶ 14.)

- Trial counsel challenged the State's eyewitness identification evidence. (*Id.* at 02923 ¶ 15.)

- Trial counsel did not investigate juror misconduct as a grounds for a new trial. (*Id.* at 02923 ¶ 16.)

223.    With respect to the fifth ground alleging a violation of Mr. Balderas's right to a fair trial due to juror misconduct and exposure to outside influences, the court held that Mr. Balderas failed to demonstrate that "he was prejudiced or that the results of his trial were affected in any way by the hotel accommodations secured for the jurors" or by "Juror Armstrong's Facebook entries before, during, or after the trial." (*Id.* at 02924 ¶¶ 18, 20.) Mr. Balderas failed to demonstrate "that he was denied the right to a fair and impartial jury because the jury received or considered evidence other than what was presented at trial" or "fail[ed] to follow [ ] the trial court's instructions. (*Id.* at 02925 ¶¶ 22-23.) It also held that Mr. Balderas's proffered juror affidavits are irrelevant, speculative, inadmissible, and have no bearing on the applicant's instant habeas claims.

(*Id.* at 02924-25 ¶ 21.) Mr. Balderas's "claim regarding the alleged improper outside influence stemming from the bus-waiving incident was ... procedurally barred." (*Id.* at 02924 ¶ 19.)

224.    With respect to the sixth ground alleging ineffective assistance of counsel in the punishment phase, the court held that Mr. Balderas failed to demonstrate that trial counsel rendered ineffective assistance when counsel, *inter alia*:

- Retained multiple expert and mitigation witnesses, made relevant objections, and preserved error. (*Id.* at 02925 ¶ 24.)

- Interviewed but decided not to present trial testimony of Jesus Balderas, Anali Garcia, Octavio Cortes, German Enriquez, Yancy Escobar, Ivan Hernandez, Jose Perez, Maria Guadalupe, or Francisco Reyes. (*Id.* at 02925-26 ¶ 25.)

- Failed to question Vicky Reyes, Juan Balderas, Sr., Walter Benitez, Daniella Chavez, Marina Reyes Mirafuentes, Paloma Reyes Mirafuentes, or Celeste Munoz more extensively regarding Mr. Balderas's violent and abusive childhood surroundings, mental health issues, positive behavior while in custody, and other mitigation evidence. (*Id.* at 02926-27 ¶¶ 26, 28-29.)

- Presented expert testimony to "explain the impact and ramifications of the applicant's childhood and upbringing on the applicant, his mental health, and his behaviors, and to correlate this evidence to the mitigation special issue." (*Id.* at 02926 ¶ 27.)

- Failed to investigate and present evidence "rebutting the extraneous offense evidence presented by the State." (*Id.* at 02927 ¶ 30.)

- Failed to "object and to preserve error on portions of the State's cross-examinations of Mr. Matthew Mendel and Dr. Matthew Brams and closing argument." (*Id.* at 02927 ¶ 33.)

- Failed to "object to and preserve error on the trial court's denial of funding to transport defense witnesses from Mexico to the United States." (*Id.* at 02928 ¶¶ 34-35.)

- The court also held that Mr. Balderas failed to demonstrate that "trial counsel Alvin Nunnery rendered ineffective assistance by allegedly engaging in bad behavior that alienated the jury, was not in accord with professional norms, or affected the outcome of the proceeding." (*Id.* at 02928-29 at ¶ 36.)

225. With respect to the seventh ground alleging the State presented false evidence through former Harris County detention officer Christopher Pool, the court held that Mr. Balderas failed to demonstrate that "Christopher Pool's testimony as a whole left a false impression with the jury" or that "it was material to the jury's verdict." (*Id.* at 02929 ¶¶ 38-39.)

226. With respect to the eighth ground alleging ineffective assistance of counsel for failure to timely and competently assert Mr. Balderas's right to a speedy trial, the court held that Mr. Balderas failed to demonstrate that trial counsel "rendered ineffective assistance by failing to employ reasonable strategy in the timing of their assertion of [Mr. Balderas's] right to a speedy trial and the motion to dismiss on the same basis. (*Id.* at 02929-30 ¶¶ 40-42.)

227. With respect to the ninth ground alleging ineffective assistance of counsel during jury selection, the court held Mr. Balderas failed to demonstrate that trial counsel rendered ineffective assistance by "failing to question jurors on whether they would consider evidence of sexual abuse as mitigation or failing to commit prospective jurors to whether they would consider

[such] evidence." (*Id.* at 02930 ¶¶ 43-44.) The court also found Mr. Balderas's proffered juror affidavits to be inadmissible evidence of any improper outside influence and have no bearing on Mr. Balderas's instant claim. (*Id.* at 02931 ¶ 47.)

228.    With respect to the tenth ground alleging violation of Mr. Balderas's Equal Protection rights due to counsels' agreements to exclude African-American jurors, the court found it to be procedurally barred and, in any event, to lack merit "as the decisions of trial counsel during jury selection were clearly a matter of strategy, and irrespective of the race of the potential jurors." (*Id.* at 02931 ¶¶ 48-49.)

229.    With respect to the eleventh ground alleging that Mr. Balderas's death sentence violates Equal Protection, Due Process, and the Eighth Amendment, the court found it to be procedurally barred and, in any event, that Mr. Balderas failed to demonstrate that his death sentence was unconstitutional based on racial basis or an alleged arbitrary system of administering death penalties in various Texas counties, specifically in Harris County rather than other counties. (*Id.* at 02931-33 ¶¶ 50-52.) The court also held that Mr. Balderas failed to demonstrate that "the Texas death penalty scheme is unconstitutional as applied to him" and that it was "enacted or maintained because of any anticipated discriminatory effect in violation of Equal Protection." (*Id.* at 02932-33 ¶¶ 53-54.)

230.    With respect to the twelfth ground alleging violation of Mr. Balderas's constitutional rights as a result of what is referred to as the "10-12 Rule," the court found it to be procedurally barred and, in any event, that Mr. Balderas failed to demonstrate the unconstitutionality of the rule based on the allegation it misled the jury as to the effect of a single "no" vote, or based on the U.S. Constitution and Texas Constitution and Supreme Court precedent. (*Id.* at 02933 ¶¶ 55-57.) The court also found Mr. Balderas's proffered juror affidavits to be not

admissible evidence of any improper outside influence and having no bearing on [this] claim. (*Id.* at 02933 ¶ 58.)

231.    With respect to the thirteenth ground alleging that Mr. Balderas's death sentence was arbitrarily and capriciously assigned based on the jury's answer to Special Issue One and the lack of definitions for key terms, the court found it to be procedurally barred and, in any event, that Mr. Balderas failed to show the unconstitutionality of Special Issue One due to the lack of definitions for "probability" and "criminal acts of violence." (*Id.* at 02933-34 ¶¶ 60-61.)

232.    With respect to the fourteenth ground alleging that Mr. Balderas's death sentence is unconstitutional because the evidence the jury could consider mitigating was limited, the court found it to be procedurally barred and, in any event, that the trial court properly denied Mr. Balderas's pretrial motion objecting to the Texas death penalty scheme on the ground that the instruction concerning "moral blameworthiness" allegedly prevented the jury from considering and giving effect to all mitigating evidence. (*Id.* at 02934 ¶¶ 62-63.) The court also found that Mr. Balderas failed to demonstrate that the Texas death penalty scheme is unconstitutional as applied to him. (*Id.* at 02934 ¶ 64.)

### *6.    Post-Texas State hearing Brady disclosures.*

233.    On August 20, 2018, two months after the habeas court denied relief, the State made yet another first-time disclosure. The State filed another Disclosure Pursuant to Texas Code of Criminal Procedure Article 29.14(h), (k) (the "August 2018 *Brady* Disclosure"). In it, the State disclosed stunning exculpatory information:

> • "On December 10, 2013, prosecutors Traci Bennet, Caroline Dozier, and Mary McFaden met with witness Alejandro Garcia and Garcia's counsel Bob Loper. At this meeting, Garcia stated that at school, Eduardo 'Powder' Hernandez's brother told Garcia that MS had killed [Powder]."

- "On December 19, 2013, prosecutors Traci Bennett, Caroline Dozier, and Mary McFaden met with witness Alejandro Garcia and Garcia's counsel Bob Loper. At this meeting, Garcia stated: he did not suspect that the applicant killed Eduardo "Powder" Hernandez; the applicant did not talk to Garcia about killing [Powder]; and Garcia thought MS killed [Powder]."

(State's Disclosure Pursuant to Tex. Code Crim. Proc. Art. 39.14(h), (k), Aug. 20, 2018, Habeas Writ Record, Vol. X, 02960-61.)

234.    On November 30, 2018, Mr. Balderas—through OCFW—filed a motion for remand, arguing, among others that the State's repeated Brady violations deprived Mr. Balderas of his due process rights. The Motion for Remand was never decided. And on December 18, 2019, the TCCA denied Mr. Balderas's State Habeas Petition.

235.    On April 27, 2020, Mr. Balderas filed a motion with the TCCA seeking reconsideration of its denial of his State Habeas Petition. On June 18, 2020, the TCCA denied Balderas's motion without written order.

236.    On June 29, 2020, undersigned counsel sent a letter to the Harris County District Attorney's Office notifying the office that DLA Piper LLP (US) serves as federal habeas counsel for Mr. Balderas ("Federal Habeas Counsel"). Federal Habeas Counsel requested that the State produce any further *Brady* information within thirty days—including six specific requests for documents and communications concerning meetings with Alejandro Garcia, investigations arising from information provided by Alejandro Garcia, documents sufficient to identify the identity of Powder's brother as described by Alejandro Garcia, interviews with Powder's brother, investigations into Alejandro Garcia's statement that MS-13 killed Powder, and documents regarding the investigation of Powder's murder that had not been previously disclosed.

84

237.    On July 1, 2020, Federal Habeas Counsel issued a Texas Public Information Act request ("Public Records Request") for all public records concerning Mr. Balderas, including those requested in the June 29, 2020 letter. On July 10, 2020, Brian L. Rose—General Litigation Division Chief, Harris County District Attorney's Office—responded to the letter requesting a call to discuss the June 29, 2020, letter. Federal Habeas Counsel spoke with Mr. Rose on July 14, 2020, and agreed to withdraw the Public Records Request without prejudice and that the Harris County District Attorney's Office would work informally with Federal Habeas Counsel to provide the information requested.

238.    To move forward on informal discovery, Federal Habeas Counsel and the Harris County District Attorney's Office agreed to move forward in two steps: (1) the Harris County District Attorney's Office would provide a list of documents it believed were previously provided to Mr. Balderas's counsel; and (2) it would then provide further responsive documents that were not previously produced.

239.    On July 22, 2020, Federal Habeas Counsel sent a letter to State of Texas Assistant Attorney General Tomee Heining seeking the office's agreement to waive any statute of limitations defenses or agree that equitable tolling for a reasonable period would apply to Mr. Balderas's claims. Federal Habeas Counsel's request was due to the extraordinary difficulties of conducting an appropriate federal habeas review in light of COVID-19 (including counsel's inability to meet with Mr. Balderas, to gather records, and to otherwise complete investigation of new and previously unknown facts). On July 28, 2020, Assistant Attorney General Heining responded that "unfortunately we cannot agree to waive any procedural defense or make an open-ended agreement for equitable tolling." However, she agreed that, because of the unusual circumstances, her office "would not oppose the filing of a skeletal petition within the one-year time limit, identifying all

the claims you intend to raise in federal court, and allowing for amendment of that petition with full briefing within a reasonable period of time" and that the Attorney General "will not assert a limitations defense against any later-filed amendment that relates back to those timely-filed claims."

240.    On July 31, 2020, Federal Habeas Counsel received a list from the Harris County District Attorney's Office of documents it represented had been previously produced to Mr. Balderas's previous counsel. After reviewing files it had received, Federal Habeas Counsel advised the Harris County District Attorney's Office that it was missing a number of files, mostly related to audio interviews or jail calls. On September 10, 2020, the State provided the requested files.

241.    On August 20, 2020, Federal Habeas Counsel had a telephone conference with Mr. Rose concerning the documents it had requested that were not included in previous disclosures, including potential files that have not been previously produced in this matter at all, such as prosecutor or law enforcement notes with witnesses or documents concerning investigations into other potential suspects. Mr. Rose stated that he understood the remaining files may be work product, but that the State would review those files for further *Brady* material and also likely produce any notes between prosecutors or law enforcement and any witness, regardless of the substance. In particular, Federal Habeas Counsel requested that the State produce the actual notes underlying the State's August 20, 2018, disclosure describing two meetings between prosecutors and Alejandro Garcia (and his counsel Bob Loper) in December 2013. Federal Habeas Counsel also requested, and the State agreed to search for, any documents concerning investigations into leads on other suspects. In particular, Federal Habeas Counsel asked the State to search for any documents concerning investigation into the statements by Garcia at the December 2013 meeting that Powder's brother had told Garcia that "MS had killed [Powder]" and that Garcia believed the

86

same. Mr. Rose agreed that the State wanted to "aggressively push out anything that could be *Brady*" and that he would produce the "statement" portion of any witness interviews with a work-product redaction for any notes that would constitute the prosecutor's thoughts.

242.    On October 28, 2020, the State provided notes from prosecutors Mary McFaden and Traci Bennett taken during a series of interviews with Alejandro Garcia from December 2020. The State advised that the Bennett notes had been previously produced to State Habeas Counsel during the State Habeas Petition. The State advised that ADA Dozier had been unavailable to review her notes and as such would produce those notes later.

243.    On October 29, 2020, Federal Habeas Counsel noted that it had also asked for any notes between prosecutors or law enforcement and any witness, regardless of substance, and also any documents concerning investigations into leads on other suspects, including but not limited to, MS-13. Federal Habeas Counsel requested whether the State intended to produce interviews with any other witnesses that have not been produced and whether the State investigated other potential suspects.

244.    On November 2, 2020, as to the investigation of other suspects, the State responded that "any and all documentation of the investigations into the charged homicide has been previously produced . . . no documentation of an investigation has been withheld." The State further advised that "as to Brady material and specifically prosecutor notes of witness interviews, that review process continues and will heat up now."

245.    On November 11, 2020, the State disclosed prosecutor Caroline Dozier's notes from her meeting with Alejandro Garcia in December 2013.

246.    On October 23, 2020, Federal Habeas Counsel issued a Texas Public Information Act request for personnel files on the HPD officers involved in Powder's murder investigation,

87

including Investigator Art J. Palos, Sgt. Thomas Ruland, Sgt. Brian Harris, Sgt. Will Gonzales, and Investigator Thomas R. Cunningham. On November 6, 2020, the City of Houston's Human Resources Department advised that it had 818 pages of responsive documents and would require a payment of $189.80 to provide the files. On November 11, 2020, Federal Habeas Counsel overnighted the check for the full amount. As of the filing of this petition, Federal Habeas Counsel has not received the files.

247.    On November 25, 2020, the State disclosed notes with: (1) handwritten notes with Angelina Quinones from July 15, 2010; (2) handwritten notes with Angelina Quinones from January 24, 2006; (3) handwritten and typewritten summary of notes with Guadalupe Sepulveda from August 8, 2014; (4) handwritten notes with Yeni Rivas from August 4, 2014; (5) typewritten summary of notes with Courtney Altimore from December 31, 2013; (6) handwritten notes with Kilyn (unclear spelling) Velasquez from January 3, 2014; (7) typewritten summary with Myriam Flores from September 26, 2014; (8) typewritten summary with Brenda Velasquez from October 1, 2014; (9) handwritten notes with "Cueva" from December 19, 2005; (10) handwritten notes with Roxanne Resendez from October 26, 2014; (11) typewritten summary of notes from Karen and Wendy Bardales from January 20, 2014; (12) typewritten summary of notes from Edgar Ferrufino dated February 10, 2014; and (13) handwritten notes with Wendy and Karen Bardales from January 2014.

248.    On December 1, 2020, the State also disclosed prosecutor notes with: (1) handwritten notes with Cookie from January 27, 2014; (2) Karen and Wendy Balderas from February 11, 2014; (3) handwritten notes with Tommy Ruland from February 14, 2014; (4) handwritten notes with Steve Guerra from January 23, 2014; (5) handwritten notes with Rick Moreno from January 23, 2014; (6) handwritten notes with Karen Balderas from January 20, 2014;

88

(7) handwritten notes with Officer Grant from January 23, 2014; (8) handwritten notes with Victor Gonzalez from January 10, 2014; (9) handwritten notes with Myriam Flores from December 3, 2005; (10) handwritten notes with Karen and Wendy Bardales undated; (11) an email from Traci Bennett to herself summarizing an interview with Miriam Hernandez from September 21, 2013; (12) handwritten notes with Edgar Ferrufino from February 10, 2014; (13) handwritten notes with Luis Garcia undated; and (14) typewritten summary of notes with Jose Espinoza from August 21, 2014.

### N.    Undersigned Counsel's Investigation of Mr. Balderas's Mental Health

249.    A review of Mr. Balderas's medical records reveals that Mr. Balderas has suffered from mental disease since well before the time of trial:

- Mr. Balderas entered the juvenile justice system in February 2001 (13 years before he was convicted) and was diagnosed with Adjustment Disorder. (Harris County Sheriff's Office Records ("HCSO Records"), Feb. 15, 2001, TDS-000001-001140, at TDS-000759-761.)

- In May 2001, Mr. Balderas was examined by the Mental Health and Mental Retardation Authority of Harris County ("MHMRA"). Mr. Balderas was diagnosed with oppositional defiant disorder and the MHMRA noted that he exaggerated certain facts and was in partial remission from an inhalant-related disorder.

- In May 2002, Mr. Balderas was charged with assault, placed in CJPO Boot Camp, and referred for a psychological evaluation. He was evaluated by Matthew Shelton, Staff Psychologist, and Dr. Quintana, Supervising Clinical Psychologist. Mr. Shelton gave Mr. Balderas a GAF score of 42, which

signified serious symptoms including suicidal ideation, severe obsessions, and serious impairment in social, occupational, and/or school functioning. Mr. Balderas's score of 42 is considered one level away from a diagnosis of impaired reality or psychosis. (MHMRA Records, May 13, 2002, TDS-001197-001281, at TDS-001210-1216.)

- Mr. Balderas was diagnosed with adolescent onset Conduct Disorder, Oppositional Defiant Disorder, and Development/Personality Disorders by Mr. Shelton in May 2002. The records indicate that conduct disorder manifests when a child is antisocial and prone to disregarding basic social standards and rules. Oppositional Defiant Disorder is a childhood mental health disorder that includes frequent and persistent anger, irritability, arguing, et cetera as a result of genetic and environmental factors. (MHMRA Records, May 13, 2002, TDS-001197-001281, at TDS-001201-1202 and TDS-001210-1216).

- The records indicate that Mr. Balderas was medicated for Major Depressive Disorder. Specifically, Mr. Balderas was taking Lexapro and Seroquel in 2010. (HCSO Records, TDS-000001-001140, at TDS-000833 and TDS-000867.)

- In December 2013, a Personality Assessment Inventory Analysis Report states that Mr. Balderas is experiencing a moderate to severe level of psychiatric distress and impairment in one or more areas. The distress appears to be manifested in mood disturbance, anxiety, somatization, character pathology, paranoia, and psychotic symptoms. The report states that Mr. Balderas also had some degree of personality dysfunction characterized by moodiness and

90

interpersonal sensitivity, and some degree of personality dysfunction. Finally, the report states that Mr. Balderas has a moderate to severe amount of suicidal ideation and a considerable level of suspiciousness and hostility along with significant levels of anxiety.

250.    Undersigned counsel retained Dr. Bhushan Agharkar, MD, DFAPA ("Dr. Agharkar"), to conduct a psychiatric evaluation of Mr. Balderas. In addition to Dr. Agharkar's private practice treating a wide range of conditions, Dr. Agharkar has extensive experience performing independent medical examinations and medical record reviews for criminal and civil cases nationwide. Dr. Agharkar performed a psychiatric evaluation of Mr. Balderas on May 27 and July 29, 2021 to assess the existence and extent of Mr. Balderas's psychiatric difficulties. (Ex. A, Agharkar Report, Jan. 12, 2022.) Based on Dr. Agharkar's evaluation of Mr. Balderas, with reference to his review of Mr. Balderas's juvenile records, school records, Harris County mental health record, Texas Department of Corrections mental health records, family history documents, trial transcripts, and the psychological reports of Jolie S. Brams, PhD., and Matthew Mendel, PhD, and the neuropsychological report by Dr. Robert H. Ouaou, PhD (Exhibit C, Report of Robert H. Ouaou, PhD ("Ouaou Report"), Jan. 15, 2022), Dr. Agharkar formed the following opinions and observations:

- Mr. Balderas exhibits compelling mood, trauma, and brain impairment symptoms that likely pre-date his trial but were not adequately investigated and presented to the fact-finder in his capital case.

- Mr. Balderas currently suffers from Schizoaffective Disorder, Bipolar Type, and Post-Traumatic Stress Disorder (PTSD). There is also evidence he suffers from Organic brain impairment.

91

- Mr. Balderas's Schizoaffective Disorder, Bipolar Type, is indicated by Mr. Balderas's history of depressive episodes, endorsement of hallucinations, paranoid and grandiose delusions, and disorganized and tangential thought processes. During Dr. Agharkar's interviews, Mr. Balderas was pressured in his speech and preoccupied with discussing UFO's, the existence of aliens, and visual hallucinations he has experienced. Mr. Balderas believes the "prosecutors and gang members" set him up to be incarcerated so the government can experiment on him and learn more about his connections to aliens and their spaceships. Mr. Balderas reported to the Harris County Juvenile Probation Department that opposing gang members from Killough were after him as early as August 2001. (Harris County Records, p. 762).

- Mr. Balderas likely has frontal and parietal lobe brain damage/dysfunction, based on his poor performance on neurological screenings performed during Dr. Agharkar's examinations. Mr. Balderas's thought processes were tangential, he had difficulty switching from one topic or task to another, his insight and judgment were poor, and he had difficulty recalling a short story after fifteen minutes.

- Mr. Balderas's mood difficulties are compounded by his exposure to significant environmental trauma in childhood as well as physical and sexual abuse.

- Mr. Balderas exhibited a host of cognitive defects that are found in patients with significant central nervous system damage. Mr. Balderas demonstrated learning and memory deficits, as well as significant impairments on many measures of executive functioning strongly associated with damage and/or diminished development of the frontal lobe region of the brain and general neurological disease.

- According to Dr. Agharkar's interview of Mrs. Yancy Balderas conducted via Zoom on October 22 and 29, 2021, it is believed Mr. Balderas's mother drank while pregnant with Mr. Balderas. Mr. Balderas's mother reportedly dropped him on his head when he was a newborn infant. Mr. Balderas's stepfather would hold his face down under water to drown him when he was about 8 years old in Mexico.

- Mr. Balderas has told Mrs. Yancy Balderas he hears voices and believes he is descended form an Egyptian prince. Since his incarceration in his late teens, he has often talked about witchcraft, ancient civilizations, an aliens. Mr. Balderas believed the State was spying on Mrs. Yancy Balderas though a mirror in her house and asked her to remove it. Mr. Balderas admitted to Mrs. Yancy Balderas that he heard voices, several years before his trial.

- The records available indicate a complex interplay of trauma, potential brain damage, a mood disorder, and a psychotic condition, all which require extensive work-up to determine the extent of Mr. Balderas's brain impairment.

- Mr. Balderas's manic and psychotic symptoms as recounted in his pre-trial jail medical records would have raised doubts as to Mr. Balderas's competency to stand trial and required additional follow-up.

- The psychological experts retained by trial counsel, Dr. Jolie Brams and Dr. Matthew Mendel, were both the wrong types of experts to integrate the abundance of mental health data in this case, misattributed symptoms of major mental illness as trauma rather than a confluence of psychiatric, neurologic and traumatic factors. As such, their reports are unreliable and incomplete.

- Dr. Jolie S. Brams conducted a psychological consultation in September 2012 at the direction of Mr. Godinich, for mitigation purposes. (Brams & Associates Psychological

93

Consultation Report, TDS-002452-72). Dr. Brams's report focuses mostly on sexual abuse rather than mental health and incorporates a report from Dr. Matthew Mendel, an expert in treatment of male sexual abuse victims. Id. Dr. Brams's report indicated that the sexual abuse Mr. Balderas suffered occurred at a critical and formative stage of his life, and that Mr. Balderas did not receive the type of mental health intervention he needed throughout his youth. Id.

- Dr. Brams also discussed the significance of Mr. Balderas's experiences with childhood neglect, parental abandonment, and physical abuse as additional sources of trauma, and hypothesized that Mr. Balderas's abuse of inhalants may have caused brain impairment. However, she did not recommend neurological or neuropsychological screening or testing, nor did she evaluate Mr. Balderas for other mood disorders or psychotic symptoms after she diagnosed him with Post-traumatic Stress Disorder. Further, Dr. Brams does not appear to have relied on any of the critical information concerning Mr. Balderas's diagnoses while at the Harris County jail. As such, the accuracy and reliability of Dr. Brams's report is in question and is incomplete.

- Dr. Mendel was not provided with critical information about Mr. Balderas's psychiatric history and treatment, including treatment with antipsychotic and antidepressant medication. His examination of Mr. Balderas is therefore incomplete and unreliable.

- Based on the full neuropsychological battery performed by Dr. Ouaou on October 15, 2021 (discussed infra), Mr. Balderas demonstrates learning and memory deficits in addition to significant impairments on many measures of executive functioning strongly associated with damages to the frontal lobes of the brain. Damage to these areas would negatively impact Mr. Balderas's ability to rationally weigh and deliberate, inhibit his impulses,

94

regulate his mood and emotions, memory functioning, and freedom from perseveration. Frontal lobe dysfunction is also implicated in symptoms of paranoia and psychotic disorders.

- Based on the nature of brain damage/dysfunction revealed by neuropsychological testing, and that there have been no head injuries since the time of trial, it is likely Mr. Balderas's brain impairments were present at the time of his trial.

- At the time of trial, Mr. Balderas's psychotic and brain impairment symptoms would have negatively impacted his ability to rationally assist trial counsel and his understanding of the charges and proceedings.

251.    At the suggestion of Dr. Agharkar, undersigned counsel also retained Dr. Robert H. Ouaou, PhD ("Dr. Ouaou"), to assess Mr. Balderas's neurocognitive functioning secondary to a history of neurodevelopmental, neurological, and psychiatric disease and/or damage. Dr. Ouaou performed a full battery of neuropsychological tests on Mr. Balderas on October 15, 2021. (Ex. C, Ouaou Report, Jan. 15, 2022.) Based on Dr. Ouaou's evaluation of Mr. Balderas, with reference to his review of Mr. Balderas's Medical Records, Mental Health Records, Academic Records, Jail and Prison Records, Juvenile and Extraneous Offense Records, Psychological Report by Jolie S. Brams, PhD, Declaration of Bhushan S. Agharkar, MD, DFAPA, and Declarations of Lay Witnesses, Dr. Ouaou formed the following opinions and observations:

- Mr. Balderas has a history of severe childhood physical and sexual abuse, head injuries, inhalant abuse, and possible in utero alcohol exposure.

- Mr. Balderas suffered innumerable blows to the head from physical abuse, accidents, and youth boxing, many of which occurred during the developmental period and resulted in a

loss of consciousness. Evidently, Mr. Balderas was dropped as an infant by his uncle and sustained a permanent skull depression.

- Mr. Balderas abused inhalants daily for one year beginning at age 14. Such inhalants included carbonator cleaners, known to cause changes to the central nervous.

- Mr. Balderas has been diagnosed with PTSD, major depression, and psychosis.

- Mr. Balderas's IQ was below average (FSIQ = 87; 19th percentile). An estimate of premorbid IQ showed his IQ should be in the average range (105; 63rd percentile). This represents a significant decline form the expected baseline.

- Mr. Balderas exhibited intellectual declines and a host of cognitive deficits that are found in patients with significant central nervous system damage.

- Mr. Balderas demonstrated learning and memory deficits and significant impairments on many measures of executive functioning strongly associated with damage to and/or diminished development of the frontal lobe region of the brain as well as general neurological disease.

- Mr. Balderas likely suffered from severe etiologies of central nervous system damage that were present at the time of the alleged offense and trial. Behavioral and cognitive consequences of Mr. Balderas's history of abuse and trauma, head injuries, and other risk factors on a developing brain contributed to his behavior at the time of his offense and trial. The mental diseases suffered by Mr. Balderas were present well before and at the time of trial.

- Mr. Balderas exhibits evidence of residual cognitive deficits that are consistent with damage to the frontal-limbic areas of the brain, affecting judgment, reasoning, impulse control, problem solving, and rational decision making.

96

- Despite the prior psychological examiner's reports that Mr. Balderas suffered profound developmental damage at critical points in this life and had significant risk factors that cause brain damage, there was a failure to refer him to experts to further evaluate the impact of brain damage on Mr. Balderas's ability to competently participate in the trial proceedings.

## GROUNDS FOR PETITION

I. **THE STATE VIOLATED MR. BALDERAS'S DUE PROCESS RIGHTS UNDER** *BRADY V. MARYLAND* **AND ITS PROGENY**

    A. **The State Has a Duty to Disclose Exculpatory and Impeachment Evidence to Defense Counsel**

252.     Under *Brady v. Maryland,* 373 U.S. 83 (1963), and its progeny, the State has a duty to disclose exculpatory and impeachment evidence to defense counsel.

253.     To protect a criminal defendant's right to a fair trial, the Due Process Clause of the Fourteenth Amendment to the United States Constitution requires the prosecution to disclose exculpatory and impeachment evidence to the defense that is material to either guilt or punishment. *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *Brady*, 373 U.S. at 83.

254.     Under *Brady,* "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87.

255.     Favorable evidence includes both exculpatory and impeachment evidence. *See, e.g.*, *United States v. Bagley,* 473 U.S. 667, 676 (1985); *see also Giglio v. United States,* 405 U.S. 150, 154 (1972) ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [the *Brady* rule].").

256.     To prevail on a *Brady* claim, an applicant must show (1) that the evidence at issue is favorable to the defense in that it is either exculpatory or impeaching; (2) the State or persons

acting on behalf of the State failed to disclose this evidence to the defense; and (3) prejudice. *See, e.g., Strickler,* 527 U.S. at 281-82.

### B.    History of *Brady* Requests and Disclosures

257.    Prior to trial, on August 15, 2007, Judge J. Michael Wilkinson ordered the state to produce "all exculpatory evidence pursuant to *Brady v. Maryland* and related cases." (Discovery Order, CCA Record, Vol. I, 00008-10, at 00008.)

258.    On January 17, 2014, still apparently not having received *Brady* evidence, trial counsel made a motion for the production of exculpatory and mitigating evidence, including "any evidence, documentary or otherwise, which might undermine or tend to undermine the credibility of any state witness," "all exculpatory evidence which the prosecuting attorneys and their agents may have in their files," and "any evidence of any kind which is in any way mitigating. (Motion for the Production of Exculpatory and Mitigating Evidence, CCA Record, Vol. II, 00492-93.)

259.    On or about August 13, 2015, State Habeas Counsel visited the State's office in-person to review the State's file. Counsel was given five out of eleven boxes of files, but were told that six were unavailable because they were in the process of being scanned. (Initial Application for Writ of Habeas Corpus, Jan. 15, 2016, Habeas Writ Record, Vol. I, 00002-3960.)

260.    On October 8, 2015, State Habeas Counsel filed a Motion for Disclosure of Exculpatory and Impeachment Evidence. (Motion for Disclosure of Exculpatory and Impeachment Evidence, Oct. 8, 2015.)

261.    On or about October 21, 2015, the State disclosed several boxes of information to State Habeas Counsel, that included the 23 pages of 2007 and 2008 Israel "Cookie" Diaz Notes (the "October 2015 Disclosure"). (Initial Application for Writ of Habeas Corpus, Habeas Writ Record, Vol. I, 00002-3960, at 00069.)

262.    On April 19, 2018, State Habeas Counsel filed a second Motion to Compel Disclosure of Exculpatory and Impeachment Evidence. (Motion to Compel Disclosure of Exculpatory and Impeachment Evidence, Apr. 19, 2018, Habeas Writ Record, Vol. VII, 0195669.)

263.    On May 1, 2018, State Habeas Counsel filed a third Motion to Compel Disclosure of Exculpatory and Impeachment Evidence. (Renewed Motion to Compel Disclosure of Exculpatory and Impeachment Evidence, May 1, 2018, Habeas Writ Record, Vol. VII, 02066-85.)

264.    On May 1, 2018, the State Habeas Court ordered the State to disclose: (1) the capital murder summary; (2) audio copies of Jail calls made by Cookie while incarcerated in the Harris County Jail, comprising approximately 16 CDs; (3) documents pertaining to communications and contact between Cookie and the Harris County District Attorney's Office, including Cookie's State File, Cause No. 1009713, Traci Bennett's Pretrial Interview Notes with Cookie, Cookie's 2006-2010 Harris County Jail Disciplinary Record; and (4) NCIC/TCIC for Cookie, as of May 3, 2018; (5) disclosure document dated May 7, 2018 pertaining to the procedural profile of Cookie's charge in cause no. 1050628. (Motion to Continue Evidentiary Hearing, May 8, 2018, Habeas Writ Record, Vol. VIII, 02251-58, at 02252.)

265.    On May 7, 2018, state habeas counsel received the documents ordered by the State Habeas Court. (*Id.*).

266.    On May 8, 2018, State Habeas Counsel requested a continuance to review the May 2018 Disclosures, citing the late disclosure and inability to open the Cookie jail audio files. The State opposed. The Court denied the continuance request. (*Id.*; Motion in Opposition to Delay of Evidentiary Hearing, May 8, 2018, Habeas Writ Record, Vol. VIII, 02259-64.)

267.    On August 20, 2018, the State filed a self-styled *Brady* disclosure from a December 19, 2013 interview with Alejandro "Twin" Garcia (the "August 2018 Disclosures"). (State's

Disclosure Pursuant to Tex. Code Crim. Proc. Art. 39.14(h), (k), Aug. 20, 2018, Habeas Writ

Record, 02960-61.) Twin told the State that, contrary to its star witnesses' testimony that Mr.

Balderas had "confessed" to him, that Mr. Balderas never made any such confession:

> On December 19, 2013, prosecutors Traci Bennett, Caroline Dozier, and Mary McFaden met with witness Alejandro Garcia and Garcia's counsel Bob Loper. At this meeting, Garcia stated: he did not suspect that the applicant killed Eduardo "Powder" Hernandez; *the applicant did not talk to Garcia about killing Hernandez*; and Garcia thought MS killed Hernandez.

(*Id.*)

268.    On October 28, 2020, the State disclosed Prosecutor Mary McFaden's and Traci

Bennett's underlying handwritten notes from the December 19, 2013 interview with Twin ("2013

McFaden Garcia Notes") ("2013 Bennett Garcia Notes").[7]

269.    On November 11, 2020, the State disclosed Prosecutor Caroline Dozier's

underlying handwritten notes from the December 19, 2013 interview with Twin that state: "[Mr.

Balderas] did not talk about killing Powder" or that "[Mr. Balderas] never talked about Powder

getting killed" (the "2013 Dozier Garcia Notes"). (2013 Dozier Garcia Notes, at 8.)

270.    On November 25, 2020, the State disclosed notes with: (1) handwritten notes with

Angelina Quinones from July 15, 2010 (the "2010 Quinones Notes"); (2) handwritten notes with

Angelina Quinones from January 24, 2006; (3) handwritten and typewritten summary of notes

with Guadalupe Sepulveda from August 8, 2014; (4) handwritten notes with Yeni Rivas from

August 4, 2014; (5) typewritten summary of notes with Courtney Altimore from December 31,

2013; (6) handwritten notes with Kilyn (unclear spelling) Velasquez from January 3, 2014; (7)

typewritten summary with Myriam Flores from September 26, 2014; (8) typewritten summary

with Brenda Velasquez from October 1, 2014; (9) handwritten notes with "Cueva" from December

---

[7] The State has represented that it disclosed the 2013 Bennett Garcia Notes to State Habeas counsel sometime during the State Writ Proceedings but it is unclear when this occurred.

19, 2005; (10) handwritten notes with Roxanne Resendez from October 26, 2014; (11) typewritten summary of notes from Karen and Wendy Bardales from January 20, 2014; (12) typewritten summary of notes from Edgar Ferrufino dated February 10, 2014; and, (13) handwritten notes with Wendy and Karen Bardales from January 2014.

271.    The 2010 Quinones Notes stated: "When I asked her about picking the Δ's out in photospreads, she said that the cops already knew who they were after & were pushing her to choose their suspects. When I asked her if they put their finger on the person she needed to choose she didn't answer my question & just said that, 'Well, when you have one white guy, a black guy & a Hispanic guy, you know who they are after.' I'm not sure what she meant, b/c the photospreads contain photos of nothing but Hispanic males." (2010 Quinones Notes, at 1.)

272.    On December 1, 2020, the State disclosed prosecutor notes with: (1) handwritten notes with Cookie from January 27, 2014 (the "2014 Cookie Notes"); (2) Karen and Wendy Balderas from February 11, 2014; (3) handwritten notes with Tommy Ruland from February 14, 2014; (4) handwritten notes with Steve Guerra from January 23, 2014; (5) handwritten notes with Rick Moreno from January 23, 2014; (6) handwritten notes with Karen Balderas from January 20, 2014; (7) handwritten notes with Officer Grant from January 23, 2014; (8) handwritten notes with Victor Gonzalez from January 10, 2014; (9) handwritten notes with Myriam Flores from December 3, 2005; (10) handwritten notes with Karen and Wendy Bardales undated; (11) an email from Traci Bennett to herself summarizing an interview with Miriam Hernandez from September 21, 2013; (12) handwritten notes with Edgar Ferrufino from February 10, 2014; (13) handwritten notes with Luis Garcia undated; and, (14) typewritten summary of notes with Jose Espinoza from August 21, 2014.

C. **The State Withheld Impeachment Evidence as to its Star Witness, Israel "Cookie" Diaz**

1. *The undisclosed evidence that Cookie gave multiple versions of the alleged confession providing multiple contradictions that trial counsel was unable to confront Cookie with.*

273.    At trial, Cookie testified that he went to the crime scene the night of the murder and stood across the street with fellow LTC gang members, including Twin. Cookie testified that Mr. Balderas came up to him wearing a dark blue or black sweatshirt and khakis, hugged and kissed him, and joyfully told he "got him" while exchanging the magazine in a chrome gun. (26 RR 157.)

274.    *The Version Where There is No Confession.* Also, within the October 2015 Disclosure, in the 2007 Notes, Cookie said that he met with LTC members on the night of the murder but does not mention Mr. Balderas being there or that he confessed. Instead, Cookie said: "[w]ent to the twins house while everyone else went to the funeral. Went to twins house to smoke weed – night of killing – everyone talked about it. Including the OGs. Muerto was there & talked a lot. Muerto said [] that's it – don't talk about it. Not a big deal to [Cookie]. Don't brag about these things b/c if you are a talker then you will be a snitch." (2007 and 2008 Cookie Notes, Habeas Writ Record, Vol. III, 00782-804, at 00789-90.) Moreover, there is no mention that Balderas was wearing a blue or black sweatshirt or khakis, no mention of hugs or kisses or joy, or that Balderas was holding a chrome gun and exchanging the magazine.

275.    *The Version Where the Confession Was the Day After on the Phone.* Within the October 2015 Disclosure, in the 2007 Notes, Cookie stated "[Mr. Balderas] *called [him]* the *day after* Powder killed & said 'we took care of that.'" (2007 and 2008 Cookie Notes, Habeas Writ Record, Vol. III, 00782-804, 00788 (emphasis added).) Moreover, there is no mention that Balderas was wearing a blue or black sweatshirt or khakis, no mention of hugs or kisses or joy, or that Balderas was holding a chrome gun and exchanging the magazine.

276.     The Version Where the Confession Was the Night of the Murder at the Twins House—Not at the Murder Scene Exchanging Magazines and Without Hugs and Kisses. In the October 2015 Disclosure, in the 2008 Notes, Cookie states he "[m]et at Twins house later – talked about Powder's murder. [Mr. Balderas] said he took care of it." (2007 and 2008 Cookie Notes, Habeas Writ Record, Vol. III, 00782-804, at 00794-95.) There is no mention that Mr. Balderas was wearing a blue or black sweatshirt or khakis, and no mention of hugs, kisses, joy, or that Balderas was holding a chrome gun and exchanging the magazine.

> **2.     The undisclosed evidence that Cookie's testimony that he never spoke with prosecutors in 2007 or 2008 as to this case was a lie.**

277.     At trial, defense counsel asked Cookie about his interactions with the State prosecutors in 2007 and 2008. (26 RR 165-67.)

278.     When asked what the subject matter of the conversation was, Cookie said "different things that were even not related to this." (*Id.* at 167:10-13.)

279.     The 2007 and 2008 Notes would have shown this was a lie. Indeed, the notes show that Cookie spoke with prosecutors extensively on all "things" "related to" to the murder of Powder. (2007 and 2008 Cookie Notes, Habeas Writ Record, Vol. III, 00782-804.)

> **3.     The undisclosed evidence that Cookie told prosecutors that the LTC meeting on Powder occurred nine to ten months before the murder (not three to four Days before).**

280.     At trial, Cookie testified that the LTC meeting before Powder's murder was three or four days prior to the killing.

281.     But within the October 2015 Disclosure, in the 2007 Notes, Cookie said the meeting about murdering Powder was "9-10 mos before Powder was killed." (2007 and 2008 Cookie Notes, Habeas Writ Record, Vol. III, 00782-804, at 0788.)

282.     The difference is critical. Powder was killed in December 2005. Nine months before that is April 2005 (counting April). And April 2005 is when Cookie was bonded out of jail on the crime that Powder "snitched" on him about. Accordingly, it would make sense that Cookie would call a meeting on Powder's betrayal of him as soon as he could.

> **4.     *The undisclosed evidence that Cookie told prosecutors that Powder's alleged transgression against the gang for hanging out with other gangs was punishable by a beating (not death).***

283.     At trial, Cookie testified on direct that "hang[ing] out with other gang members from our gang . . . a rival gang, that's just unacceptable. That's the ultimate betrayal." (26 RR 146:23-147:2.) He testified that it was Powder's hanging out with other gang members that caused his death. (*Id.* at 149:7-153:1.)

284.     On cross-examination, Cookie doubled-down on his testimony that Powder's hanging out with other gangs—and not his "snitching" on Cookie—was the reason for his murder. (26 RR 182:8-16.)

285.     In withheld notes between prosecutors and Cookie on January 27, 2014, disclosed in December 2020, Cookie told prosecutors that "[i]f caught w/ other gang member get checked (beat up)." And if someone kept doing it, that would be "more serious." (2014 Cookie Notes, at 9.). He does not say that it was the "ultimate betrayal." (*See id.*)

> **5.     *The undisclosed evidence that Cookie wanted Powder dead.***

286.     During trial, Cookie testified that he "truly didn't care" what happened to Powder, even though he "snitched" on him. (26 RR 152-53.)

287.     But within the October 2015 Disclosure in the 2007 and 2008 Notes, Cookie says "[t]he day he (Powder) lost his flag, he lost his life. . . Every body wanted Powder dead." (2007 and 2008 Cookie Notes, Habeas Writ Record, Vol. III, 00782-804, at 00790.)

### 6. The undisclosed evidence as to Cookie's explanation of his discussion with Powder on the "snitching."

288.    Also, at trial, Cookie testified that he was not concerned with Cookie testifying against him because he "lectured [Powder] and spoke to [Powder] and guided [Powder]" and convinced Powder "it was pointless for" Powder to testify against him. (26 RR 180:17-25.)

289.    But that is not what he told prosecutors just a month earlier.

290.    In the January 27, 2014 notes, disclosed in December 2020, Cookie told prosecutors that he "met [Powder] when on bond (met in secret) told [Powder] if you tell on me, I'll tell on you," regarding the "Ice Cream Man . . . [Powder] took part in the Ice Cream Man murder." (2014 Cookie Notes, at 2.)

### 7. The undisclosed evidence that Cookie had a violent history with Powder.

291.    Further, within the September 2020 Disclosure, the State disclosed an interview of Cookie with Harris County Officers on February 1, 2005, where Cookie stated that he had gotten into a fight with Powder prior to Powder "snitching" on him. Cookie told interviewers that it was never "okay" with him and Powder after that.

### 8. The undisclosed evidence that Cookie was desperate for a plea deal and had approached prosecutors repeatedly to help himself.

292.    During the trial, defense counsel explored with Cookie the circumstances of his deal with prosecutors to testify against Mr. Balderas. (26 RR 166-76.)

293.    Cookie testified that he "never asked [the prosecutors] for anything." (26 RR 168:15).

294.    Defense counsel asked Cookie: "How did this deal come about then? Did the prosecution come to you through your attorney and say this what we got to offer, or did you go to them and say this is what I will take if you need me to participate?" Cookie responded: "Actually

they came to me and interviewed me one more time and they didn't tell me what it was." (26 RR 174:12-20.)

295.    Cookie testified that he had just made a deal with prosecutors "[j]ust last week" before trial. (26 RR 174:9-11.)

296.    But withheld evidence of Cookie's prison phone calls show this testimony was false, and the State failed to correct it. *See* U.S. Const. amend. XIV; *Giglio v. United States*, 405 U.S. 150 (1972); *Napue v. Illinois*, 360 U.S. 264 (1959); *Blankenship v. Estelle*, 545 F.2d 510, 514-15 (5th Cir. 1977); *Kirkpatrick v. Whitley*, 992 F.2d 491, 497-98 (5th Cir. 1993).

297.    Instead, it was Cookie who had been desperately seeking a deal from prosecutors to save himself and had believed a deal had been made years prior to Mr. Balderas's trial.

298.    In a call sometime eight years after his arrest, Cookie spoke with his father about how frustrated he was that it had been eight years that he was in prison awaiting trial. He asked his father whether his attorneys could get his trial date pushed forward. Cookie's father said that he spoke with Cookie's attorney who told him that he could attempt to push forward trial but the State would "give him court for the same charge." Cookie's father explained, that "they are like that because the agreement is the same. Your son will testify against him. For that reason, they won't make the same trial for your son. If your son was sent to trial, they would do it for the same charge, and they would charge him for life. They would leave him there for life." Cookie's father told him to wait and "hop[e] that things get resolved" have "faith in God." Cookie said he lost his faith and his father told him it was "because you became desperate." Cookie lamented that he was in prison for 8 years and that he "wrote to the judge," he "wrote to the prosecutor," and that he was going to write to the "State Bar of Texas" so that they could "go to the prosecutors" and "pressure them" to get his trial scheduled. Cookie told his father that the prosecutors were "not so informed

106

regarding the four visits that I had from the other prosecutors" where he "spoke with them for periods of two to three hours." Cookie told his father he had been trying to be patient, but "this is torturing my mind."

299.    In another call with his mother and father, Cookie's father tells him to write a letter reminding prosecutors that "a deal had been made previously, and that you hope that they will continue to honor it, and you will continue in your position of collaborating and helping out." His father said, "if they had promised to continue with the deal, the agreement – to continue with the agreement, they even went there to visit you, and they went to speak together with your solicitor."

300.    In another call with his brother-in-law, Cookie describes how prosecutors told him after they "get done with [Mr. Balderas], they are going ahead to make a deal or something." Cookie states the prosecutors are not going to take him to trial. Similarly, in another call with his uncle, Cookie affirms he has received a promise from prosecutors of an offer of a deal.

301.    In two separate calls with his father and uncle, respectively, Cookie states he will not testify at Mr. Balderas's trial until he is offered a deal.

302.    There are over 560 prison calls containing over a hundred hours of calls that were withheld until days before the May 2018 State Habeas Hearing.[8] State habeas counsel requested a continuance to review this material, citing trouble accessing these files, but the State Habeas Court refused.

303.    Had this information not been withheld, it would have been used to impeach Cookie at trial and at the State Habeas Hearing.

---

[8] The State should have turned these materials over without request, but to the extent these calls were available to trial counsel, their failure to request them prior to trial constitutes ineffective assistance.

**D.     The State Withheld Evidence Supporting the Defense Theory that Mr. Balderas Was Merely Holding the LTC Guns the Day He Was Arrested**

304.     When Mr. Balderas was approached on the day he was arrested, he was found carrying six firearms in a green plastic container, one of which the State claimed was the murder weapon. (28 RR 40.)

305.     Testimony at trial indicated, however, that the LTC held guns collectively and it was Mr. Balderas's job to hold the guns. (30 RR 8:1-7, 29:12-13.)

306.     Further testimony showed that Gumby had the green box that contained the murder weapon on the day Mr. Balderas was arrested and brought it to Mr. Balderas that very morning. (28 RR 177:3-179:3, 214:3-16.)

307.     Mr. Balderas's theory at trial, therefore, was that Mr. Balderas was in possession of the gun because he was given the green container with the murder weapon that day by the real killer—Gumby.

308.     Importantly, there was no testimony that Mr. Balderas's fingerprints were found on the murder weapon.[9] (30 RR 29:15-18.)

309.     The State withheld evidence, however, that would have supported this exculpatory theory.

---

[9] With regard to evidence of fingerprint *exclusions*, Houston Police Department has a history of not issuing reports on eliminations. *See The State of Texas v. Ronald Hamilton, Jr.*, Cause No. 0901049-B, ¶ 168 (180th Dist. Ct., Harris County, Tex., Oct. 30, 2002) (recounting in the Court's Findings of Fact in consideration of applicant's initial writ for Habeas Corpus that it was the practice of the Houston Police Department's crime lab to create supplemental offense reports when identifications were made, but not to make supplemental reports if exclusions were made). The trial court in *Hamilton* recommended relief, which the Court of Criminal Appeal rejected without disturbing or rejecting the trial court's findings of fact. *Ex Parte Ronald James Hamilton, Jr.*, No. WR-78,114-02 (Tex. Crim. App. Nov. 11, 2020) (Order) (not designated for publication). According to the trial court, Houston Police Department's policy of not documenting fingerprint exclusions led to the suppression of potential evidence that a defendant was excluded from leaving a print at a scene or on an item of evidentiary value. *See The State of Texas v. Ronald Hamilton, Jr.*, Cause No. 0901049-B, ¶ 97 (180th Dist. Ct., Harris County, Tex., Oct. 30, 2002).

310.    In the October 2015 Disclosure, the 2007 Notes include Cookie stating that, when Mr. Balderas and Silder were arrested, "[Silder] was helping Apache get rid of guns." (2007 and 2008 Cookie Notes, Habeas Writ Record, Vol. III, 00782-804, at 00787.)

311.    In the May 2018 Disclosure, the State disclosed notes from Prosecutor Bennett's interview with Twin in December 2013 in which he told prosecutors that "everyone gave [Balderas] guns to hold." (2013 Bennett Garcia Notes, at 6.)

312.    Further, withheld notes with Cookie, disclosed in December 2020, would have supported the theory of collective gun use and impeached Cookie's trial testimony.

313.    At trial, when asked whether "passing guns back and forth," was a "common practice" in LTC, Cookie responded, "at first, when we were younger until they eventually find out about the - - the gun shows that they have in different parts. And then everybody purchased their own." (26 RR 190: 14-19.)

314.    But the undisclosed notes with Cookie show him saying "group would fight over guns." (2014 Cookie Notes, at 4.)

315.    After Cookie answered that LTC no longer had a practice of sharing guns, trial counsel moved on. But had it possessed the January 27, 2014 notes, it would have been able to confront Cookie with this apparent contradiction.

316.    This evidence would have supported the important defense theory that Mr. Balderas was merely in possession of the green box that day, despite the murderer being someone else, including Gumby or Cookie.

### E. The State Withheld Impeachment Evidence That Police Were Playing "Where's Waldo" With Photo Lineups, Pressuring Witnesses to Identify Suspects on Photo Lineups, and Putting their Fingers on Photos of Suspects

317. At trial, the State presented evidence concerning Wendy Bardales's identification of Mr. Balderas. The testimony showed that the officers asked Wendy Bardales to place her finger over the top portion of each picture because the shooter was wearing a hood.

318. However, previously withheld evidence has shown that the officers investigating LTC at the time may have been putting their own finger on the person that the witness needed to choose. (2010 Quinones Notes, at 1.)

319. In November 2020, the State disclosed notes from an interview with Angelina Quinones dated July 15, 2010, stating: "When I asked her about picking the Δ's out in photospreads, she said that the cops already knew who they were after & were pushing her to choose their suspects. When I asked her if they put their finger on the person she needed to choose she didn't answer my question & just said that, 'Well, when you have one white guy, a black guy & a Hispanic guy, you know who they are after.' I'm not sure what she meant, b/c the photospreads contain photos of nothing but Hispanic males." (2010 Quinones Notes, at 1.)

320. Also in November 2020, the State disclosed notes from an interview with Ms. Quinones dated January 24, 2006, stating that an officer showed her a photospread and then "guided her hand to the photo (kind of like playing Where's Waldo." She said the officer was "not really asking if they could ID – telling them. Very clear – said only one on each spreadsheet." (Quinones Notes, at 3-4.)[10]

---

[10] While the State previously issued a *Brady* disclosure on September 18, 2013 as to Ms. Quinones 2006 statements, it did not include the underlying notes containing the "Where's Waldo" allegation or the specific allegations that the officer was "telling" her which photograph to pick. Nor did the September 2013 Brady Disclosure identify the 2010 interview or the underlying notes.

321.    These notes would have provided strong impeachment evidence as to the identification of Mr. Balderas by Wendy Bardales. Counsel could have used these notes to call into question the identification by showing that perhaps the officers had *themselves* put their finger on Mr. Balderas. Indeed, these notes are contemporaneous to the same investigation of Mr. Balderas in the Powder murder and have an officer pointing to Mr. Balderas and pressuring Ms. Quinones to identify him. The defense could have argued the same happened here, and could have explored this with the officers at trial, but did not.

322.    Worse it deprived Trial Counsel of an opportunity to investigate this allegation as to Mr. Balderas's case. These notes identify a potential practice of the investigating officers playing "Where's Waldo" with witnesses and putting their finger on pictures and pressuring witnesses to make identifications.

323.    Wendy Bardales' identification testimony was at the forefront of the State's evidence. The State spent a significant amount of time in their closing argument arguing that Mr. Balderas was the killer because of Wendy Bardales's identification. This evidence would have significantly undermined that argument.

F.    **The State Withheld Exculpatory Evidence As to MS-13's Potential Involvement in the Murder**

324.    During the State Habeas Writ the State disclosed audio interviews with Efrain "Hairless" Lopez where he stated, in two separate interviews on December 16, 2005, that "everybody was saying it was MS[-13]."

325.    Also during the State Habeas Writ, the State also provided an audio interview with Cookie who stated during his original interview on December 16, 2005, that he had heard "a lot of people is saying cause he went out with a girl that was MS."

326.    Within the August 2018 Disclosure, the State disclosed that Alejandro "Twin" Garcia had stated in December 2013 that he believed "MS killed [Powder]." (August 2018 Disclosure, Habeas Writ Record, Vol. 10, 02960-61.)

327.    In November 2020, the State disclosed notes with Twin that stated: "Powder's brother came crying the next day & said they killed his brother. . . . Said MS killed him." (2013 Dozier Garcia Notes, at 1.)

328.    The State never investigated the potential that MS-13 committed the crime or had any involvement.[11] It never even told defense counsel that it had information pointing to MS-13.

329.    While most of the evidence pointed to either Gumby or Cookie being involved in the murderer, the failure to disclose this alternative suspect, and the failure of the State to investigate, deprived trial counsel of a bedrock defense tactic of discrediting the police investigation to raise reasonable doubt. *See Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir.1985) ("the evidence withheld by the prosecutor in today's case carried within it the potential both for the destruction of Alexander's identification of Lindsey and the discrediting, in some degree, of the police methods employed in assembling the case against him"); *Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir. 1986) ("A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possible Brady violation."); *Orena v. United State*s, 956 F. Supp. 1071, 1100 (E.D.N.Y.1997) (as "the O.J. Simpson case and many others demonstrate, destroying the bona

---

[11] On August 21, 2020, the undersigned federal habeas counsel requested that the Harris County DA's office produce "documents concerning investigations into leads on other suspects," and in particular related to the leads provided regarding MS-13. (Email Chain Between DLA and Brian Rose, Oct. 29 to Nov. 2, 2020.). The Harris County DA stated it produced all investigation files. (*Id.*) As none of the underlying files show any such investigation into MS-13, it appears that no such investigation was undertaken.

fides of the police is a tactic that has never lost its place in the criminal defense reasonable doubt armamentarium.").

### G. The State Withheld Exculpatory Evidence that the Tagging on the Wall of the Crime Scene Had Nothing to Do with Powder

330.    At trial, the State presented testimony that Powder had met an LTC member earlier in the day at the apartment, who then left and allegedly called members of LTC to tell them where Powder was, and then other members of LTC had put graffiti the wall of the apartment to let the killer know where Powder. (*See* 24 RR 50:18-51:3; 25 RR 28:10-19; 26 RR 253:10-254:12; 46 RR 98, State's Exhibit 41.)

331.    In particular, the State elicited testimony from Karen Bardales that this graffiti had appeared only after she and Powder had left the apartment and then came back later that day. (24 RR 50:18-51:3.) She testified that when she and Powder returned and they noticed this, Powder "put his head down and we just walked back to the apartment." (*Id.* at 51:1-3.) Karen testified that, after Powder saw it, "he knew something was going to happen." (*Id.* at 53:4-9.)

332.    The State also elicited testimony from Edgar Ferrufino on whether this tagging had "special significance" to him and he responded, "well, I mean, taking into consideration what happened, you know what I mean?" (25 RR 28:10-19.)

333.    The State's implication, accordingly, was that LTC had tagged the apartment to let the killer know where to find Powder. Indeed, it drove that home in its closing statement where it argued that there was "one problem" for the gang after "decid[ing] his fate," which was that "the gang didn't know where [Powder] was" because he "had run away from home." The State argued, "how did they find him . . . the guy in the red HEB shirt [Jose Vazquez]." (30 RR 53:9-24.)

334.    The State withheld evidence, however, that expressly rebutted this theory from its star witness, Cookie. In notes with Cookie on January 27, 2014, disclosed in December 2020,

Cookie told prosecutors that "tagging had ⊘ to do w/ Powder – saying LTC territory <u>coincidence</u>." (2014 Cookie Notes, at 6.) The notes further show Cookie telling prosecutors, "insane amount of guns. Always fighting over who was going to hold them." (*Id.* at 11.)

335. Trial counsel had no access to this information and therefore no opportunity to bring this fact in front of the jury, which would have been especially powerful coming from the State's star witness Cookie.

### H. The State Withheld Impeachment Evidence that the Officer Who Testified About Mr. Balderas's Alleged Infraction of Having Extra Medication Was Terminated for Conduct Resulting in the Death of an Inmate

336. At the punishment phase of trial, the State presented testimony from former Harris County detention officer Christopher Pool. (*See* 42 RR 247-55.)

337. Mr. Pool's testimony centered on a disciplinary citation that he issued to Mr. Balderas on May 29, 2010, while Mr. Pool was still employed as a detention officer. (*Id.* at 253.) Mr. Pool testified that during a routine monthly cell search, he located medication—specifically, Seroquel and Klonopin, which Mr. Balderas had been prescribed to treat his diagnosed mental health conditions—in Mr. Balderas's cell, along with a pen and two razors. (*Id.* at 249-53). Mr. Pool testified that he determined that the extra medication should be written up as a "major offense" ("misuse of medicine") rather than as a minor offense for possession of contraband because he felt the "higher offense" designation was "more appropriate" under the circumstances. (*Id.* at 253.)

338. Notably absent from the State's examination of Mr. Pool was any inquiry into the circumstances under which he left his Harris County employment. (42 RR 247-53.). On cross-examination, Mr. Pool revealed that he had been terminated from the Harris County Sheriff's Office for "deception" and "failure to render aid" to an injured inmate, who subsequently died as

a result of his injuries. (*Id*. at 254-55). Mr. Pool did not offer any further testimony regarding the circumstances of his termination.

339.    As part of its post-conviction investigation, the Office of Forensic and Capital Writs obtained copies of Mr. Pool's Termination Letter and associated Separation of Licensee Form. (Pool Termination Letter, Aug. 21, 2012, Habeas Writ Record, Vol. III, 00918-928; Pool Separation of Licensee Form, Aug. 24. 2012, Habeas Writ Record, Vol. III, 00930.) These documents reveal that Mr. Pool was terminated as a consequence of an investigation into the death of a mentally ill, 72-year-old inmate. The investigation revealed that Mr. Pool "used force" against this inmate (punching him in the face), left him "unmoving and unresponsive" and "face down" on the floor of his cell, and made no effort to secure any medical assistance to attend to his injuries. The inmate died six days later as a result of these injuries.

340.    The investigation report found that Mr. Pool was "untruthful" and made false statements, including flatly contradictory claims in sworn statements over the course of the investigation. The report concluded that Mr. Pool failed to "tell the truth throughout the course of [the] investigation." In addition to his failure to render aid, it was this "untruthfulness" that formed the basis for his "dishonorable discharge." (Pool Termination Letter, Aug. 21, 2012, Habeas Writ Record, Vol. III, 00918-928; Pool Separation of Licensee Form, Aug. 24. 2012, Habeas Writ Record, Vol. III, 00930.) Sheriff Adrian Garcia described Mr. Pool's actions as "a gross neglect of duty" that "discredits you, the Sheriff's Office, and its employees." (Pool Termination Letter, Aug. 21, 2012, Habeas Writ Record, Vol. III, 00918-928.)

341.    Mr. Pool's termination for "untruthfulness" and making false statements plainly qualifies as impeachment evidence, yet there is no indication in the record that the State disclosed this information to the defense. On cross-examination, defense counsel elicited testimony that Mr.

Pool had been terminated from his employment, but without this material context, was unable to establish the details of Mr. Pool's termination.

## I.    The Withheld Evidence Prejudiced Mr. Balderas and There is a Reasonable Probability That the Result of the Trial Would Have Been Different Had the Evidence Been Disclosed

342.    As demonstrated above, the State repeatedly withheld evidence that infected the entire trial and all of its major witnesses. The cumulative effect of all such evidence withheld raises a reasonable probability that its disclosure would have produced a different result. *See Kyles v. Whitley*, 514 U.S. 419, 422 (1995).

343.    The withheld evidence casts doubt on all three pieces of evidence that the State relied upon to convict Mr. Balderas: (1) Wendy Bardales's photospread identification; (2) Cookie's testimony that Balderas "confessed" to him; and, (3) that the gun was in the green container found with Balderas when he was arrested.

344.    <u>First</u>, the withheld evidence would have called into doubt the first pillar of the State's evidence: Wendy Bardales's identification. (30 RR 33-50.)

345.    The State argued "Wendy Bardales. She saw the defendant do it. She's the only one who can come in here and testify as to the identity of the shooter." (30 RR 36:3-8.) Indeed, the State went on, "Wendy was the only one who did actually tell the police what she saw." (*Id.* at 36:24-25.) And, of course, the State took considerable pains to try and explain away the many contradictions and the issues with her photo identification, including the multiple attempts of officers to have her identify with certainty anyone. (*Id.* at 39:12-43:3.) The State concluded "she was positive when she made her identification eight years ago." (*Id.* at 47:16-17.)

346.    The jury sent multiple notes regarding Wendy Bardales's testimony and the photospread identification:

a.    The jury specifically requested Wendy's statements and testimony and asked to see "both photo arrays that were shown to Wendy and admitted into evidence." (Jury Notes, CCA Record, Vol. XII, at 03286, 03292.)

b.    The jury also requested to "hear when the defense asked Officer Rulen if he would question Wendy's credibility if she knew [Mr. Balderas] prior to the incident." (*Id.* at 3295.)

c.    "Point or statement in dispute: [Officer Ruland's] belief that he had a positive identification on December 12 and his communication or lack of communication with the district attorney's office." (Jury Note, CCA Record, Vol. XII at 003305.)

d.    "Point or statement in dispute: How did Officer Cunningham ask about and record the statement 'I have never seen him before' according to his testimony." (*Id.* at 03314.)

347.    If her testimony was tainted by an officer putting his own finger on the photograph, however, then, as the State acknowledged, there was not another witness who identified Mr. Balderas as the shooter.

348.    Second, the withheld evidence would have called into doubt the second pillar of the State's evidence: the Cookie testimony that Mr. Balderas confessed outside the scene of the crime wearing clothing similar to those identified by the witnesses.

349.    In its closing argument, the State argued: "[H]ow else do you know that Juan Balderas is the killer? Israel ["Cookie"] Diaz. He told you. Juan Balderas told [Cookie] that he got him, that he killed Powder." (30 RR 48:11-14.)

350.    Indeed, during deliberations, the jury sent five notes requesting exhibits or read-back of testimony relevant to Cookie's account of the night in question:

- "Point or statement in dispute: Would like to hear [Cookie's] testimony about receiving phone call to go to crime scene and who was across the street from the crime scene right after Powder was killed. (Jury Note, CCA Record, Vol. XII, at 3291.)

- "Point or statement in dispute: After incident, Cookie's testimony about what [Mr. Balderas] was wearing." (*Id.* at 3298.)

- "Point or statement in dispute: Cookie's testimony where he said [Mr. Balderas] was changing or switching magazines during the gathering across the street right after the incident." (*Id.* at 3302.)

- "Point or statement in dispute: In Cookie's testimony, did he describe the weapon apache had at the meeting across the street right after the incident of Powder's death?" (*Id.* at 03307.)

351.    The details of the confession, including its location and time, were thus of critical importance to the jury. That the 2007 and 2008 Notes state that the confession happened somewhere and sometime else undermines Cookie's testimony on this critical piece of evidence, which included Cookie stating that Mr. Balderas hugged and kissed him and was joyful about the murder while switching magazines in a chrome gun (a gun resembling the murder weapon). There is none of that in the 2007 and 2008 Notes and its absence could have been used to call into question Cookie's testimony.

352.    Moreover, that the alleged confession happened elsewhere at a different time or even through a phone call undermines Cookie's testimony that Balderas was wearing a dark sweatshirt and khakis after the murder. That is critical because Cookie's testimony about Mr. Balderas wearing those articles of clothing corroborated testimony from the shooting witnesses (Edgar Ferrufino and Karen and Wendy Bardales) who testified the shooter was wearing khakis

and a dark sweatshirt. Indeed, the jury had asked "Point or statement in dispute: According to her testimony, what did Karen [Bardales] describe about the physical description of the shooter or any description of his clothing." (Jury Note, CCA Record, Vol. VII, at 03315.)

353.    Cookie's testimony of a confession is also undermined by Twin's statement. Cookie testified that Garcia was with him during the alleged confession outside the murder. (26 RR 155-159.) But Garcia told Prosecutors that Balderas never "talk[ed] to [to him] about killing [Powder]; and [he] thought MS killed [Powder]." (August 2018 Disclosure.)

354.    Further, the August 2018 Disclosure provided a potential lead into an alternative theory—that MS-13 may have been involved in the murder. Because trial counsel was never presented with this evidence, they had no opportunity to look into any potential leads or formulate a theory. *See Carrillo v. Cnty. of Los Angeles*, 798 F.3d 1210, 1226 (9th Cir. 2015) (it is the "prerogative of the defendant and his counsel—and not of the prosecution—to exercise judgment in determining whether the defendant should make use of it"); *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 306 (3d Cir. 2016) ("There is no requirement that leads be fruitful to trigger disclosure under *Brady*, and it cannot be that if the Commonwealth fails to pursue a lead, or deems it fruitless, that it is absolved of its responsibility to turn over to defense counsel *Brady* material.").

355.    Further, the August 2018 Disclosures deprived trial counsel of pointing to the State's failure to pursue an alternative lead that MS-13 might have committed the murder. *See Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir.1985); *Bowen*, 799 F.2d at 613 ("A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possible *Brady* violation."); *Orena v. United State*s, 956 F. Supp. 1071, 1100 (E.D.N.Y.1997) (as "the O.J. Simpson case and many

others demonstrate, destroying the bona fides of the police is a tactic that has never lost its place in the criminal defense reasonable doubt armamentarium.").

356.   <u>Third</u>, the withheld evidence would have called into doubt the third pillar of the State's evidence: that Mr. Balderas was in possession of the murder weapon when it fell out of a green box he was carrying.

357.   The State argued, "how else do you know that Juan Balderas killed [Powder]? He was caught with the gun that killed [Powder]." (30 RR 56:14-16.) The State returned to the point again to drive it home: "The defendant was caught with the murder weapon. And that's how you know that Juan Balderas is the killer." (*Id.* at 58:1-3.) In reality, Mr. Balderas was caught carrying a green container that had the murder weapon inside it, and none of his fingerprints were found on the gun.

358.   Indeed, the theory at trial, supported by testimonial evidence, was that LTC held guns collectively and it was Mr. Balderas's job to hold the guns. (26 RR 190; 30 RR 8:1-7, 29:12-13.) And, further, that Gumby held this green box on the day Balderas was arrested and brought it to Balderas that very morning. (28 RR 177:3-179:3, 214:3-16.)

359.   Mr. Balderas's theory at trial, therefore, was that Mr. Balderas was in possession of the gun because he was given the green container with the murder weapon that day by the real killer—Gumby.

360.   The jury signaled the importance of this point:

a.   "Point or statement in dispute: Can we have the pictures of the green tote with the guns." (Jury Note, CCA Record, Vol. XII, at 03301.)

b.   "Point or statement in dispute: When Cookie talked about how LTC shared guns or passed them around." (*Id.* at 03319.)

120

361.    The State withheld evidence, however, that would have supported Mr. Balderas's theory. In the 2007 Cookie Notes, he told police that: "[Silder] was helping Apache get rid of guns." (2007 and 2008 Cookie Notes, Habeas Writ Record, Vol. III, 00782-804, at 00787.)

362.    The State also withheld evidence from Prosecutor Bennett's interview with Twin in December 2013 in which he told prosecutors that "everyone gave [Balderas] guns to hold." (2013 Bennett Garcia Notes, at 6.)

363.    Accordingly, the State withheld significant evidence calling into doubt all three pillars of its evidence, and there is a reasonable possibility that had it been disclosed, the outcome may have been different. Indeed, the jury was originally deadlocked until it received an *Allen* charge. (Jury Note, CCA Record, Vol. XII, at 03312 ("We are deadlocked. We agreed that we are not to 'strong arm' each other to change cotes and have exhausted our questions over testimony and evidence.").)

364.    The State also withheld evidence calling into doubt the truthfulness of Christopher Pool's testimony, which was presented during the punishment phase. It is highly likely that the jury considered Mr. Pool's false testimony that he had been "cleared" of deception and untruthfulness in evaluating his credibility as a witness, and thus in assessing the weight to give his testimony regarding Mr. Balderas's misconduct. Had the State corrected Mr. Pool's testimony, the jury would have seen a pattern of deception and dishonesty likely to significantly impact its perceptions of Mr. Pool's credibility.

365.    The State presented Mr. Pool's testimony and the related disciplinary citation as evidence in support of its argument on the first special issue, which asks whether there is probability that a defendant will commit future criminal acts of violence that would pose a continuing threat to society. *See* Tex. Code Crim. Proc. Art. 37.701 § 2(b)(1), (e)(1). Unless the

jury finds that this probability exists beyond a reasonable doubt, it is not permitted to impose the death penalty.

366.    As a State employee charged with maintaining safety and order in the prison, Mr. Pool's testimony on this issue likely carried considerable weight with jurors unaware of his pattern of dishonesty and deception.

367.    Mr. Pool's impact on the proceedings was significant. State witness Sergeant David Davis repeatedly referred to Mr. Pool's "misuse of medicine" citation in discussing Mr. Balderas's disciplinary history. Because the State failed to correct Mr. Pool's false testimony, the jury lacked the necessary context to evaluate the veracity of Mr. Pool's testimony regarding that incident or the degree to which Mr. Pool's conclusions regarding that incident should be trusted.

368.    Accordingly, Mr. Balderas's conviction and death sentence must be reversed.

## II.    INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL THROUGH THE GUILT/INNOCENCE PHASE

### A.    Ineffective Assistance of Counsel in a Capital Case is that Which Falls Below the Prevailing Standard of Professional Competence

369.    The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970); *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963) ("any person hauled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him"). This right "is meant to assure fairness in the adversary criminal process" (*United States v. Morrison*, 449 U.S. 361, 364 (1981), and is "the 'very premise' that underlies and gives meaning to the Sixth Amendment. *United States v. Cronic*, 466 U.S. 648, 655-56 (1984). *See also Herring v. New York*, 422 U.S. 853, 862 (1975).

370.    To state a claim for ineffective assistance of counsel, Mr. Balderas must show that trial counsel's performance was deficient, falling below an objective standard of reasonableness,

and that the deficiency prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Porter v. McCollum*, 558 U.S. 30, 38-39 (2009); *Wiggins*, 539 U.S. at 521; *Virgil v. Dretke*, 446 F.3d 598, 608 (5th Cir. 2006).

371.    To establish deficient performance, the prisoner must show that trial counsel's representation fell below an "objective standard of reasonableness." *Strickland*, 466 U.S. at 688.[12]

372.    The Supreme Court applies a "case-by-case approach" in determining whether an attorney's performance was unconstitutionally deficient (*Rompilla v. Beard*, 545 U.S. 374, 393-94 (2005) (citing *Strickland*, 466 U.S. 668)), using law and standards from the time of the trial or sentencing itself. *Strickland*, 466 U.S. at 688-89.

373.    Thus, the court must look to "[p]revailing norms of practice as reflected in [the] American Bar Association standards" then in effect.[13] *Id.* at 688; *see also Padilla v. Kentucky*, 559 U.S. 356, 387 (2010). This case-by-case approach should consider the cumulative effect of counsel's errors when establishing the ineffectiveness prong. *White v. Thaler*, 610 F.3d 890, 912 (5th Cir. 2010); *Richards v. Quarterman*, 566 F.3d 533, 564 (5th Cir. 2009).

374.    Because adequacy is based upon "counsel's perspective at the time," *Strickland*, 466 U.S. at 689, courts must look to the guidelines then in effect. *See Bobby v. Van Hook*, 558 U.S. 4 (2009). According to the ABA guidelines, "jury selection is important and complex in any criminal case. In capital cases, it is all the more critical." *ABA Guidelines*, Guideline 10.10.2 cmt.

---

[12] *See also* ABA CRIMINAL JUSTICE STANDARDS FOR THE DEFENSE FUNCTION §§ 4-1.1 to 4-8.3 (4th ed. 2017) (the "<u>ABA Criminal Justice Standards</u>"). This is a vague test. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland*, 466 U.S. at 688-89. Justice O'Connor observed, "More specific guidelines are not appropriate." *Id.* at 688.

[13] The Supreme Court instructs the reviewing court to look at the following: (1) the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (2003) (the "ABA Guidelines"); (2) the ABA Criminal Justice Standards (4th 2017); and (3) the National Legal Aid & Defender Association's Standards for the Appointment and Performance of Counsel in Death Penalty Cases (1988) (the "<u>NLADA Standards</u>"). *See Wiggins v. Smith*, 539 U.S. 510, 524 (2003). Courts may also look to the State Bar of Texas's Guidelines and Standards for Texas Capital Counsel, 69 Tex. B.J. 966 (2006) (the "<u>Texas Counsel Guidelines</u>").

(citing John H. Blume, et al., *Probing "Life Qualification" Through Expanded Voir Dire*, 29 HOFSTRA L. REV. 1209, 1209 & n.1 (2001) ("The conventional wisdom is that most trials are won or lost in jury selection."); NAT'L LEGAL AID & DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION, Guideline 11.7.2 cmt. (1995) ("Voir Dire and Jury Selection")).

375.    The accused in a criminal proceeding is entitled to an impartial jury composed of people who are unprejudiced, disinterested, equitable, and just, and who have not prejudged the merits of the case. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) ("In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process.") (citations omitted); *Shaver v. State*, 280 S.W.2d 740, 742 (Tex. Crim. App. 1955); TEX. CONST. Art. I, § 10. Indeed, voir dire is designed to ensure, to the fullest extent possible, that an impartial jury is selected. *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) ("*Voir dire* plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored") (emphasis and alteration in original); *Salazar v. State*, 562 S.W.2d 480, 482 (Tex. Crim. App. 1978).

376.    To establish whether trial counsel's deficient performance prejudiced the defense, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is *not* a "more likely than not" standard, but rather "a probability sufficient to undermine confidence in [the] outcome." *Porter*, 558 U.S. at 44 (quoting *Strickland*, 466 U.S. at 693-94). In *Smith v. Robbins*, 528 U.S. 259, 285 (2000), the Supreme Court noted that in addition to demonstrating that counsel's performance was "objectively unreasonable,"

petitioner must also show a "reasonable probability" that, but for his counsel's objectively unreasonable performance, he would have "prevailed on his appeal.

377.    The reviewing court must take into consideration the totality of available evidence and evaluate whether counsel's performance prejudiced the defense using law that exists at the time of the ineffectiveness challenge. *Kyles v. Whitley*, 514 U.S. 419, 436 (1995) (suppressed evidence standard is the same, consider collectively not item by item [fix this parenthetical]; *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (add parenthetical). And like the evaluation of ineffectiveness, the evaluation of prejudice should consider the cumulative effect of counsel's deficiencies in performance. *Moore v. Johnson*, 194 F.3d 586, 619 (5th Cir. 1999), *superseded on other grounds by statute,* AEDPA, Pub. L. No. 104-132, 110 Stat. 1214 [do I need a new case here?]. The likelihood of a different result due to the ineffectiveness of counsel must be "substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

378.    Finally, as a general matter, it is well established that counsel in capital cases have an explicit duty to investigate mitigating evidence that will convince a jury to spare the client's life. *See Wiggins*, 539 U.S. at 523-24 (recognizing the importance of social history presentations in capital cases); ABA Guidelines, Guideline 10.11(F)(2); Texas Guidelines, Guideline 11.7(F)(2). Capital counsel is responsible for conducting a broad and thorough investigation in order to identify and present the full range of mitigating evidence that "may help the decisionmaker to have a more complete view" of the defendant. ABA Guidelines, Guideline 10.11 cmt.

379.    In selecting a jury, counsel must have a *case-specific* strategy that will aid in "choosing a jury most favorable to the theories of mitigation that will be presented." *ABA Guidelines*, Guideline 10.10.2 cmt. In Texas, capital counsel are required to be familiar with techniques "for uncovering those prospective jurors who are unable to give meaningful

consideration to mitigating evidence." State Bar of Tex., *Guidelines and Standards for Texas Capital Counsel*, 69 TEX. B.J. 966 (2006) ("*Texas Guidelines: Voir Dire and Jury Selection*"), Guideline 11.6.B.

380.    Trial counsel failed in every phase of the trial.

**B.    Trial Counsel Were Ineffective During Jury Selection**

***1.    Trial counsel failed to address Mr. Balderas's primary mitigation theme.***

381.    The primary focus of Mr. Balderas's punishment phase defense was the sexual abuse Mr. Balderas suffered as a child and the impact those experiences had on him for the rest of his life.

382.    Years before trial, counsel learned that Mr. Balderas had been the victim of severe and repeated sexual abuse by a neighbor, an extended family member, and, worst of all, his own stepfather.

383.    Recognizing the importance of sexual abuse as a mitigation theme, counsel retained Dr. Matthew Mendel, a psychologist with expertise in working with male victims of sexual abuse.

384.    Dr. Mendel met with Mr. Balderas for approximately twenty hours, conducted psychological testing, and testified regarding the devastating trauma Mr. Balderas suffered. (*See* 38 RR at 125-78; 39 RR at 37-108.)

385.    Though planning for years to present mitigation evidence at trial, counsel failed utterly to include this theme as part of jury selection.

386.    First, trial counsel failed to include any reference to the topic of sexual abuse in the jury questionnaire. As a result, prospective jurors were never asked whether they had any personal experience with sexual abuse or knew anyone who had. Instead, the juror questionnaire focused on general background information and views on the death penalty, asking only one question regarding the juror's feelings about gang violence. (Pretrial Motions, 23 RR 8:15-15, 10:5-6.)

126

387.    Second, trial counsel failed completely to address sexual abuse during individual voir dire, their one opportunity to directly probe sensitive personal matters with prospective jurors.

388.    Trial counsel had no conceivable reasonable strategy for failing to address the topic of sexual abuse at jury selection. Counsel had already submitted their mitigation packet in late 2009 and early 2010, so the State was fully aware of counsel's strategy. (*See* 22 RR at 31-32.)

389.    Moreover, counsel clearly must have expected to reach the punishment phase in this trial, as evidenced by their near-complete failure to conduct a guilt/innocence investigation and their repeated statements to Mr. Balderas and his family that he would likely be found guilty in this case. (*See* Section II.D, trial counsel failed to conduct a reasonable investigation for the guilt/innocence phase of trial.)

390.    The prejudicial effect of counsel's failure during jury selection soon became manifest. Dr. Mendel testified at length during the punishment phase of the trial about the psychological damage Mr. Balderas likely experienced as the result of his stepfather's brutal sexual assaults. Dr. Mendel explained that sexual abuse that occurs at a young age and that is perpetrated by a family member often has the most long-lasting and damaging results. (38 RR at 156-57.) However, because of counsel's ineffective performance during jury selection, jurors were not receptive to this testimony, for reasons that came out after sentencing.

391.    As was the case during guilt-phase deliberations, the jury was once again split at the punishment phase, sending out fourteen notes requesting clarification of testimony and requiring overnight sequestration before finally deciding to sentence Mr. Balderas to death. (CR 3320-33; 43 RR at 86-88.) Approximately five or six jurors originally voted for life without parole and four of them held out overnight before eventually being swayed to change their vote to death. (*See* Affidavit of John Armstrong ("Juror Armstrong Aff."), Sept. 25, 2015, Habeas Writ Record,

127

Vol. III, 00668-73, ¶ 13; ¶ Affidavit of Allison Birney ("Juror Birney Aff."), Sept. 26, 2015, Habeas Writ Record, Vol. III, 00675-678, ¶¶ 9-10; Affidavit of Christopher Norwood ("Juror Norwood Aff."), Sept. 25, 2015, Habeas Writ Record, Vol. III, 00683-86, ¶ 7; Affidavit of Chad Sullivan ("Juror Sullivan Aff."), Sept. 26, 2015, Habeas Writ Record, Vol. III, 00695-98, ¶¶ 7-8.

392.    Counsel's failure to effectively identify suitable jurors became clear during deliberations over the second special issue – whether there was sufficient mitigating evidence to warrant sparing Mr. Balderas's life.

393.    Several of the jurors shared their own experiences with childhood sexual abuse. (Juror Armstrong Aff., Habeas Writ Record, Vol. III, 00668-73, ¶ 13; Juror Norwood Aff., Habeas Writ Record, Vol. III, 00683-86, ¶ 7; Juror Orosz Aff., Habeas Writ Record, Vol. III, 00688-93, ¶ 13.) Those jurors, who might have been identified during *voir dire*, did believe sexual abuse was a mitigating factor because they themselves had not gone on to commit crimes after their own victimization. As victims themselves, their resistance to this important mitigation inevitably influenced their fellow jurors. For example, Juror Norwood recalled:

> We talked about the sexual abuse testimony the defense presented. Several people on the jury told the rest of us that they had gone through childhood sexual abuse and [were] victimized sexually as kids. Those jurors with those experiences similar to Mr. Balderas's did not go and commit crimes.

(Juror Norwood Aff., Habeas Writ Record, Vol. III, 00683-86, ¶ 7.) Similarly, Juror Orosz remembered:

> [T]wo jurors mentioned that they suffered abuse as children. Because it was during the discussion about Juan's supposed sexual abuse, I took it as they were sexually abused. They told us that though they had been victimized, they were able to get past it. They did not go out and murder anyone.

(Juror Orosz Aff., Habeas Writ Record, Vol. III, 00688-93, ¶ 13.)

394.    Jurors who have been the victims of violent crime or who have endured the same traumatic experiences as those offered as mitigation evidence are likely to be impaired in their

consideration of that evidence. Neglecting to probe such potential bias is apt to result in the seating of jurors who are not "unprejudiced," and "disinterested" as required by the ABA Guidelines. Had trial counsel performed effectively during jury selection, prospective jurors with skepticism about the "abuse excuse" based on their own experiences would not have been seated. There is a reasonable probability that a properly selected jury would have found the vicious childhood rapes perpetrated on Mr. Balderas by his brutal mentally ill stepfather to be sufficiently mitigating to warrant sparing his life.

395.    Trial counsel's deficient performance also resulted in the seating of at least one juror who was not open to the idea that those who are sexually abused often do not reveal the abuse until much later. Though the prevalence of "delayed outcry" and reasons for a victim not to reveal his abuse were discussed by Dr. Mendel and others at trial, Juror Orosz referred to the childhood rape Mr. Balderas suffered as "Juan's *supposed* sexual abuse." (Juror Orosz Aff., Habeas Writ Record, Vol. III, 00688-93, ¶ 13 (emphasis added).) In his affidavit, Juror Orosz goes on to say:

> I did not believe that Mr. Balderas was sexually abused. None of that information about sexual abuse came out until two years before the trial, but there were eight years between his arrest and his trial. So for six years, nothing was ever said about any of it. So I do not believe it was true.

(*Id.*)[14]

396.    Juror Orosz's position reflected an unwillingness to consider the reality of delayed outcry. This is precisely the type of information that counsel is expected to elicit during jury selection, but here they failed to "uncover[] those prospective jurors who [were] unable to give meaningful consideration to [Mr. Balderas's] mitigating evidence." See Texas Guidelines, Guideline 11.6.B.

---

[14] It is worth noting that Juror Orosz's understanding of the facts is incorrect. There was testimony that Mr. Balderas confided in a family member about the sexual abuse long before he was ever arrested for this crime. (39 RR 120-24.)

397.     Trial counsel allowed jurors to be seated on Mr. Balderas's case who in fact had personal experiences with sexual abuse that they discussed with other jurors. It is now clear that not only were these individual jurors swayed by their own experience, but they also caused other jurors to be skeptical about the mitigating evidence in deciding whether he should be put to death. Trial counsel's failure to address their primary mitigation theme during jury selection constituted deficient performance and prejudiced Mr. Balderas's rights under the state and federal Constitutions, state statutory law, and United States Supreme Court and state case law. Accordingly, Mr. Balderas's conviction and sentence must be reversed.

398.     Trial counsel were ineffective for failing to preserve the record during jury selection and voir dire.

399.     Effective trial counsel in a capital case must "ensure that a full record is made of all legal proceedings...." ABA Guidelines, Guideline 10.8(B)(2). Indeed, the ABA Guidelines state that:

> One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review. Failure to preserve an issue may result in the client being executed even though reversible error occurred at trial. For this reason, trial counsel in a death penalty case must be especially aware not only of strategies for winning at trial, but also of the heightened need to fully preserve all potential issues for later review.

*Id.*, cmt.

400.     Here, trial counsel failed to preserve the record of one of the most impactful decisions made in preparing for trial: the selection of a jury. As discussed in detail in Section IV, trial counsel and the State agreed to excuse over 200 prospective jurors without examination, a disproportionate number of whom were minorities.

401.     While the trial court acknowledged the agreement on the record, trial counsel proffered the reason for excusing so many minority jurors without ever hearing from them. As a

result of trial counsel's failure, appellate counsel could not argue on direct appeal that Mr. Balderas's right to Equal Protection was violated.

402.    This dereliction of one of the "most fundamental duties of an attorney defending a capital case" prejudiced Mr. Balderas's rights under state and federal Constitutions, state statutory law, and United States Supreme Court and state case law. *See id.*

403.    Had counsel properly preserved the issue for appeal, there is a reasonable likelihood that Mr. Balderas would have been granted relief.

404.    Accordingly, Mr. Balderas's conviction and sentence must be reversed.

**C.    Trial Counsel Were Ineffective For Failing to Timely Assert Balderas's Right to a Speedy Trial**

*1.    A criminal defendant is entitled to a speedy trial.*

405.    The right to a speedy trial is guaranteed by the Sixth Amendment and applies to state criminal proceedings through the Fourteenth Amendment. *See Klopfer v. North Carolina*, 386 U.S. 213, 223-26 (1967).

406.    A court must consider several factors when evaluating a speedy trial claim:

(1)    the length of delay;

(2)    the reason for the delay;

(3)    the defendant's assertion of his right to speedy trial; and

(4) prejudice to the defendant.

*Barker v. Wingo*, 407 U.S. 514, 530 (1972); *United States v. Litton Sys., Inc.*, 722 F.2d 264, 266 (5th Cir. 1984).

407.    The remedy for a violation of the speedy trial right is dismissal of the indictment. S*ee Strunk v. United States*, 412 U.S. 434, 439-40 (1973).

131

### 2.    Mr. Balderas did not receive a speedy trial.

408.    Mr. Balderas languished in jail for eight years before going to trial.

409.    Mr. Balderas was arrested on December 16, 2005. (Indictment, Dec. 26, 2013, CCA Record, Vol. I, at 00002.)

410.    In April 2006, the State formally charged Mr. Balderas with the capital murder of Powder. (Complaint, April 12, 2006, CCA Record, Vol. I, at 00003.)

411.    Over the course of the next eight years, Mr. Balderas's case was reset for trial more than fifty times. (Agreed Settings, CCA Record, Vol. I, at 00005-00006, 00011-00016, 00023, 00027-00028, 00048-00054, 00060, 00074, 00076, 00078, 00080.)

412.    Mr. Balderas's trial finally began on February 17, 2014. (24 RR 11.)

413.    The State has conceded that Mr. Balderas's trial was not brought in a speedy fashion. (22 RR 5:15-19 ("Judge, the State's in agreement that the eight-year delay in Mr. Balderas going to trial is sufficient to trigger the inquiry to be made by the Court under Baker.").)

### 3.    The delay in bringing Mr. Balderas's case to trial cannot be attributed to Mr. Balderas.

414.    The eight-year delay in bringing Mr. Balderas's case to trial was unreasonable, and Mr. Balderas was not responsible for that delay.

415.    Most of this delay was attributable to the State.

416.    For instance, the prosecutor assigned to Mr. Balderas's case changed multiple times between 2005 and 2014, resulting in significant delays.

417.    There were at least two different prosecutors assigned to Mr. Balderas's case between 2005 and 2009, George Weissfisch and Stephen St. Martin. (22 RR 26:23-27:3.)

418.    Neither Mr. Weissfisch nor Mr. St. Martin brought Mr. Balderas's case to trial. (*Id.*)

419.    Then, in 2009, four years into Mr. Balderas's incarceration, Spence Graham was assigned to Mr. Balderas. (22 RR 9:1-13.)

420.    Mr. Graham did not bring Mr. Balderas's case to trial for two years, through 2012. (22 RR 36.)

421.    In 2012, Mr. Graham was replaced by another prosecutor, Paula Hartman. (22 RR 43:7-20.)

422.    Ms. Hartman acknowledged that it took her several months to get up to speed on Mr. Balderas's case. (22 RR 44:11-13.)

423.    And once again, in January 2013, Ms. Hartman was replaced by Traci Bennett. (22 RR 50:23-51:1.)

424.    Ms. Bennett did not take the case to trial for another year thereafter, until February 2014. (24 RR 11.)

425.    Similarly, many times between 2005 and 2009, trial was reset because the State had not yet decided its course of prosecution. (*See* Agreed Settings, CCA Record, Vol. I, at 00011; 46 RR 18, 19, 47.)

426.    This is further evidenced by the fact that the State did not decide to seek the death penalty until April 28, 2011, five and a half years into Mr. Balderas's incarceration. (22 RR 18:7-19:1.)

427.    This outcome was unsurprising given the State's massive backlog (1,000+ cases) at the time. (*See* 22 RR 27:14-28:4; 33:10-34:3.)

428.    It is also consistent with the State's excessively slow resolution of other cases initiated around the same time.

429.   Six other men were arrested on the same day as Mr. Balderas. (Houston Police Department News Release, Dec. 21, 2005, Habeas Writ Record, Vol. III, 00858-00860, 00858-00860, at 00859.)

430.   Of those, four were not sentenced until 2014.

431.   In addition to prosecutorial feet-dragging, the case was reset in 2013 because the incumbent judge lost re-election and was replaced—a delay plainly attributable to the State.

432.   The remainder of the delay was attributable to Mr. Balderas's trial counsel, not to Mr. Balderas himself.

433.   In May 2012, six years into Mr. Balderas's incarceration, Mr. Balderas's trial counsel requested a continuance due to lack of preparedness and a failure of investigation. (22 RR 47:14-49:4.)

434.   And in September 2013, seven years into Mr. Balderas's incarceration, Mr. Balderas's trial counsel requested a further continuance to 2014, due to illness of counsel. (22 RR at 59:23-60:9.)

435.   None of the foregoing causes of delay can be attributed to Mr. Balderas.

### 4.   Trial counsel was deficient in asserting Mr. Balderas's right to a speedy trial.

436.   Mr. Balderas was eager to go to trial from the outset. (Email from Mary K. Poirier to Jerome Godinich and others, Sept. 1, 2010, Habeas Writ Record, Vol. III, 00701-00703, at 00702-000703); (Email from Jerome Godinich to Mary K. Poirier and others, Nov. 7, 2010, Habeas Writ Record, Vol. III, 00714-00715, at 00715); (Email from Jerome Godinich, Sept. 21, 2012, Habeas Writ Record, Vol. III, 00729-00730, at 00730.)

437.   However, his trial counsel was obsessed with getting him to take a plea deal. (Email from Jerome Godinich, Habeas Writ Record, Vol. III, 00729-00730, at 00730.)

438.     Trial counsel also neglected its duty to communicate with Mr. Balderas, resulting in great stretches of time during which Mr. Balderas received no news about his case. (*pro se* Motion to Appoint New Counsel, April 12, 2011, CCA Record, Vol. I, 00057-00058, at 00057-00058.)

439.     Trial counsel's failure to communicate was so great that Mr. Balderas eventually moved *pro se* for a substitution of counsel in 2011:

> I am not an attorney and am filing this Motion the best I can myself. Stricklen v. Washington (sic) says I have a right to competent counsel. My trial is about to start in a week and my lawyer...hasn't come to see me so that we can go over my defense. So far this year I have received two visits from my lawyer Gerome. (sic) I haven't seen Alvin E. Nunnery in years. ... Last time I went to court was on the 28 of March 2011 and I did not see neither one of my two lawyers. My lawyer and P.I. have not spoken to any of the witnesses that were at the scene of the crime. I've only met and spoken to my P.I. once during the 5 years that I have been here. I do not have any copies of the Motions that he has filed.

(Id.)

440.     It does not appear from the record that the trial court ever decided this motion.

441.     Then, on January 17, 2014, having heard nothing from the trial court or his own counsel, Mr. Balderas moved *pro se* for a speedy trial. (Defendant's Motion for a Speedy Trial, Jan. 17, 2014, CCA Record, Vol. II, 00496-00497, at 00496.)

442.     It was only then, on January 29, 2014, that trial counsel finally asserted Mr. Balderas's right to a speedy trial, eight years into Mr. Balderas's incarceration and after voir dire had already begun. (Motion to Dismiss the Indictment for Lack of a Speedy Trial, Jan. 29, 2014, CCA Record, Vol. XI, 03121-03132, at 03121.)

443.     Trial counsel's lack of preparedness, untimely investigation, and ignorance of basic legal ethical standards culminated in their failure to assert Mr. Balderas's right to a speedy trial.

444.     As a result of this failure, Mr. Balderas was denied effective assistance of counsel.

**5.    Mr. Balderas suffered great prejudice as a result of the delay in bringing his case to trial.**

445.    The eight-year delay in bringing Mr. Balderas's case to trial had deleterious effects on his health, affecting him "very, very much, mentally, physically, emotionally and spiritually." (22 RR 62:23-63:5.).)

446.    The delay also crippled his defense and prejudiced him in many ways.

447.    Mr. Balderas lost his half-brother, Alejandro Hernandez, to suicide in 2011. (22 RR 75:3-6.)

448.    Mr. Balderas spent the day of the shooting with Alejandro at the apartment of Anali Garcia, Ileana Cortes and Octavio Cortes, and Alejandro would have served as a crucial alibi witness for Mr. Balderas had he been alive at the time of trial. (Anali Garcia Aff., Oct. 27, 2015, Habeas Writ Record, Vol. II, 00564-00568, at 00566.)

449.    Alejandro would have been alive and able to testify at trial had Mr. Balderas's case been brought to trial within even five years of his incarceration.

450.    Mr. Balderas was also unable to meaningfully cross-examine central State witnesses like Wendy Bardales, who made an eyewitness identification of Mr. Balderas.

451.    At trial, Ms. Bardales was unable to remember much of anything regarding what happened on the night of the shooting, eight years prior, including:

- Her whereabouts for much of the day. (25 RR 180:4-10; 26 RR 19:4-5, 25:15-18, 28:4-15);

- Who was present in the apt. at the time of the shooting (25 RR 43:4-11); and

- How many shots she had heard (26 RR 39:18-22.).

452.    Nor could Wendy Bardales remember details regarding interactions with law enforcement:

- Whether she spoke with law enforcement at the scene, and if so, what she told them. (25 RR 188:3-19; 26 RR 22:7-14);

- Once at the police station, whether she requested to speak with a Spanish-speaking officer, and if so, how such a request was made (26 RR 23-25);

- The details of her initial description of the shooter on the night of the crime (25 RR 189:14-190:4; 26 RR 56-57);

- Whether she told law enforcement that she had never seen the shooter before (26 RR 54:23-25);

- The details of her description of the firearm used in the shooting (26 RR 77:19-23); and

- Whether she reviewed her first written statement before signing it (25 RR 190:5-24.).

453. She also could not recall much about her multiple interactions with law enforcement in the days following the shooting, including:

- How many times she was approached by law enforcement for an identification (26 RR 63-65);

- Who were the officers who showed her photographic lineups (25 RR 191:19-24);

- When she finally told law enforcement that she recognized Mr. Balderas to be the shooter (26 RR 32:14-33:21); and

- How many statements she gave to law enforcement and whether any were given in Spanish (26 RR 36:2-14.).

454. Finally, Wendy Bardales was unable to recall details about her own life at the time of the shooting, including:

137

- How long she had known or been in a relationship with Edgar Ferrufino at the time of the shooting (26 RR 29:5-20);

- Whether she was pregnant at the time of the shooting (26 RR 31:4-7);

- How long she had known Mr. Balderas and how often she had seen him in the time leading up to the shooting (26 RR 14-16, 21:15-19, 70:3-21); and

- Whether she was involved in an altercation with Mr. Balderas in the months before her identification of him as the shooter (26 RR 61:18-62:6.).

455.    Because Wendy Bardales's memories had faded during the eight-year delay between the shooting and Mr. Balderas's trial, Mr. Balderas was denied a meaningful opportunity to explore her biases and loyalties, and the reliability of her identification.

456.    It is likely that Wendy Bardales would have been able to recall crucial details surrounding her testimony had the case been brought to trial even a few years earlier.

457.    In addition, the great delay bolstered the State's case, as it was able to obtain central testimony from Israel "Cookie" Diaz, who testified that Mr. Balderas confessed the crime to him, and Alejandro Garcia, who testified that Mr. Balderas was linked to certain extraneous offenses.

458.    The State had not made deals with either of these witnesses until the eve of Mr. Balderas's trial, by which point both Cookie and Alejandro Garcia had also been waiting for resolution of cases pending against them for years.

459.    It is likely that the contributions of these witnesses would have been different, perhaps even exculpatory, had Mr. Balderas's case been brought to trial sooner.

460.    Finally, the great delay directly resulted in the State's choice to seek the death penalty against him.

461.     It was not until alleged incident between Mr. Balderas and a correctional officer in May 2009 that the State began considering the death penalty against Mr. Balderas. (22 RR 35:18-36:23.)

462.     The incident, according to the officer, occurred when Mr. Balderas took a knife from him and threatened him with it briefly, before quickly throwing it over a railing. (Inmate Offense Report, May 10, 2009, Habeas Writ Record, Vol. III, 00934-00940, at 00934.)

463.     Notwithstanding the sheer absurdity of the officer's account—for example, how did Mr. Balderas know the officer was carrying a knife, and for what ostensible purpose would he threaten the officer—the State nevertheless considered this event a turning point in deciding to pursue the death penalty against Mr. Balderas. (22 RR 36:10-23.)

464.     Had Mr. Balderas's case been brought to trial even in early 2009, before the incident but still three full years after his arrest, the State likely would not have sought the death penalty and Mr. Balderas would not now be facing execution.

465.     As noted above, Mr. Balderas suffered great prejudice to his defense as a result of the great delay in taking his case to trial (which delay is not attributable to him), and therefore he is entitled to reversal of his conviction and sentence.

**D.      Trial Counsels' Failure to Investigate and Present Evidence of Mr. Balderas's Innocence Deprived Him of His Sixth Amendment Right to Effective Assistance of Counsel**

466.     On September 1, 2010, Mary Poirier, one of the mitigation specialists hired by Trial Counsel, wrote to Jerome Godinich and others pondering:

> Should we be thinking about the investigation if we go to trial too? I know the pressure is about the possible [plea] offer that could come any day but I think we should also be thinking about the possibility of trial, roles and time lines. (WE can be doing this simultaneously with the work towards a plea).

(Email from Mary K. Poirier to Jerome Godinich and others, Sept. 1, 2010, Habeas Writ Record, Vol. III, 00702-03.) Mr. Balderas had been in prison for nearly five years by then. Five years into their representation, and Mr. Balderas's defense team was just starting to even consider investigating the alleged crime they were ostensibly defending him on. Five years of lost memories, lost leads, and lost evidence of Mr. Balderas's innocence.

467.    Throughout this period, Mr. Balderas maintained his innocence. He repeatedly asked trial counsel to conduct an investigation to establish his innocence and present a substantiated case to the jury, but his requests fell on deaf ears. Instead of investigating, trial counsel focused their efforts on convincing Mr. Balderas to take a plea deal for a crime he did not commit. In an apparent cry for help from the courts, on April 12, 2011, Mr. Balderas filed a hand written, *pro se* motion to appoint new counsel "do [sic] to fact present counsel is ineffective." (*Pro Se* Motion to Appoint New Counsel, Apr. 14, 2011, CCA Record, Vol. I, 00057-59.) In his motion, Mr. Balderas alerted the court to his counsels' ongoing failures:

> So far this year I have received two visits from my lawyer Gerome. (sic) I haven't seen Alvin E. Nunnery in years. ... Last time I went to court was on the 28 of March 2011 and I did not see neither one of my two lawyers. My lawyer and P.I. have not spoken to any of the witnesses that were at the scene of the crime. I've only met and spoken to my P.I. once during the 5 years that I have been here. I do not have any copies of the Motions that he has filed.

(*Id.*) The court did not act.

468.    Finally, after years of wasted opportunities, trial counsel relented enough to agree to interview guilt/innocence witnesses—but only if Mr. Balderas or his family were able to locate the witnesses, bring them to counsel's office, and explain their relevance to the case. Counsel entered the final month before Mr. Balderas's February 2014 trial without a single defense witness to present to the jury at the guilt/innocence phase. In that final month before Mr. Balderas's trial, trial counsel attempted an eleventh-hour investigation, conducted primarily by a legal secretary.

140

By the first day of trial—more than eight years after Mr. Balderas's arrest—counsel had conducted only three witness interviews that were potentially relevant to Mr. Balderas's guilt/innocence case.

469.     Post-conviction investigation uncovered a wealth evidence pointing to Mr. Balderas's innocence that was readily available to trial counsel had they conducted a reasonable investigation. This includes evidence that: (1) multiple witnesses could testify that Mr. Balderas was with them all afternoon and evening of December 6, 2005, the day of Powder's death; (2) the eyewitness, Wendy Bardales, was engaged in an intimate relationship with Cookie, who was the primary suspect in the shooting before Wendy made her identification of Mr. Balderas; (3) Mr. Balderas had recently disgruntled high-ranking members of the LTC by his perceived betrayal and insubordination; (4) Cookie had called for Powder's murder just days before the shooting; (5) high-ranking LTC members had developed a plan to have Powder killed by LTC Alief leader Gumby; (6) Gumby described the plan in detail and confessed the murder to Pepe in the days after the shooting; (7) while incarcerated, Cookie attempted to intimidate Mr. Balderas into taking the fall for the Powder murder; and (8) there was significant, scientifically-validated evidence that Wendy's eyewitness identification was highly unreliable, as there likely were defects in her memory-forming process and because the identification protocol used by law enforcement was decidedly and unacceptably suggestive.

470.     Had Mr. Balderas's counsel properly investigated and presented his case, they would have been able to effectively impeach the State's witnesses, and present vital alibi witnesses to support Mr. Balderas's innocence. Were that the case, there is a reasonable likelihood that at least one juror would have harbored reasonable doubt of Mr. Balderas's guilt. Indeed, even without hearing this evidence, the jury was deadlocked for more than two days before finding him guilty. Trial counsel's failure to conduct a reasonable pre-trial investigation constituted deficient

performance and prejudiced Mr. Balderas's defense at the guilt/innocence phase of trial. Accordingly, Mr. Balderas's conviction and sentence were imposed in violation of his rights under the United States Constitution and United States Supreme Court precedent, and must be overturned.

### 1. Mr. Balderas's Sixth Amendment rights were violated by trial counsel's failure to perform an appropriate investigation into Mr. Balderas's innocence.

471.    Trial counsel abdicated its duty to conduct a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary. *Wiggins*, 539 U.S. 510, 521 (2003); *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984). Consequently, trial counsel failed in every respect to properly present evidence—and rebut State's evidence—throughout the guilt/innocence phase of Mr. Balderas's trial.

472.    The ABA Guidelines demand that Counsel's investigation "must begin upon counsel's entry into the case, even before the prosecution has affirmatively indicated that it will seek the death penalty." *ABA Guidelines*, Guideline 1.1 cmt. They further emphasize that the guilt/innocence phase investigation "should be conducted regardless of any admission or statement by the client concerning the facts of the alleged crime, or overwhelming evidence of guilt."[15] *ABA Guidelines*, Guideline 10.7(A)(1); *see also Texas Guidelines*, Guideline 11.1(A)(1).

473.    While counsel is not required to investigate "frivolous, implausible, or meritless defenses," *United States v. Carr*, 740 F.2d 339, 349 (5th Cir. 1984), counsel must engage in a reasonable amount of pretrial investigation and make an *independent* investigation of the facts and circumstances involved in the case to make the determination of what defenses are or are not

---

[15] "[T]he American Bar Association Standards for Criminal Justice [is] a proper guide for determining what is reasonable under the circumstances." *Nealy v. Cabana*, 764 F.2d 1173, 1177–78 (5th Cir. 1985).

plausible. *Harrison v. Quarterman*, 496 F.3d 419, 425 (5th Cir. 2007) (citing *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994)).

474.    For the purposes of this section, the facts presented in Factual Background § I are incorporated herein.

> ### 2.    Trial counsel's investigation fell below the objective standards of reasonableness required by Strickland.

475.    Instead of undertaking an investigation of the facts relevant to Mr. Balderas's case, trial counsel presumed that Mr. Balderas was guilty, and proceeded under that assumption. (*See* Email from Jerome Godinich to Amy Martin, Nov. 7, 2010, Habeas Writ Record, Vol. III, 00715 (Jerome Godinich writes to Amy Martin that it is possible that "[Mr. Balderas] is manipulating his mother into believing he is not guilty.").) Instead of building a defense, trial counsel spent the vast majority of their time working towards a plea agreement and attempting to force the agreement on Mr. Balderas, which he routinely rejected. (*See* Email from Jerome Godinich, June 14, 2010, Habeas Writ Record, Vol. III, 00700; Email from Mary Poirier, Sept. 1, 2010, Habeas Writ Record, Vol III, 00702-03; Email from Spence Graham, June 14, 2010 and October 21, 2020, Habeas Writ Record, Vol III, 00710-13; Email from J. Godinich, Nov. 7, 2010, Habeas Writ Record, Vol III, 00715; Email from Carroll Pickett, June 18, 2012, Habeas Writ Record, Vol III, 00724-26; Email from Adriana Helenek, Sept. 23, 2012, Habeas Writ Record, Vol III, 00730; Email from Jerome Godinich, Nov. 21, 2013, Habeas Writ Record, Vol III, 00747; Email from Jerome Godinich, Dec. 3, 2013, Habeas Writ Record, Vol III, 00749; Email from Terry Pelz, Dec. 30, 2013, Habeas Writ Record, Vol III, 00751.)

476.    In this instance, pushing a plea deal on Mr. Balderas itself fell below the prevailing norms because counsel is expected to have "thoroughly examined the quality of the prosecution's case and investigated possible [guilt]-phase defenses" *before even entering into plea negotiations*.

*Id.* at Guideline 10.9.1 cmt. Such an investigation was *never* undertaken; not prior to attempting to work out a plea deal, nor after.

477.    A reasonable investigation would have uncovered evidence that Cookie and LTC Alief leader Gumby planned out the murder of Powder, that Powder was actually killed by Gumby—which he subsequently confessed to fellow LTC member Pepe—and that Gumby conspired with Cookie to set up Mr. Balderas to take the fall. (*See* Jose Perez Aff., Habeas Writ Record, Vol. II, 00647-56, ¶¶ 25-29; Yancy Escobar Aff., Habeas Writ Record, Vol. II, 00558-63, ¶ 8.) Indeed, Mr. Balderas's State Habeas Counsel appropriately hired an investigator and uncovered a trove of information that trial counsel failed to investigate. Unfortunately for Mr. Balderas, his court appointed counsel utterly failed him when they failed to do the bare minimum to investigate potential other suspects. This failure clearly undermines confidence in the result of Mr. Balderas's trial. There is a reasonable probability that at least one juror would have harbored reasonable doubt about Mr. Balderas's guilt if counsel had investigated and presented evidence in a competent manner.

478.    A full five years after appointment, counsel had yet to conduct any guilt investigation outside of reviewing and summarizing discovery provided by the State. (Email from Mary K. Poirier to Jerome Godinich and others, Sep. 1, 2010, Habeas Writ Record Vol. III, 70203.) And even counsel's review of the offense reports proved to be merely nominal—failing to identify and follow up on important issues such as Wendy Bardales's questionable identification, Cookie being pegged as the initial suspect in the case, and the fact that Powder had told police not only about Cookie's aggravated robbery, but also murder. This is a far cry from the independent investigation that is constitutionally required. *See Harrison v. Quarterman*, 496 F.3d 419, 425 (5th Cir. 2007) (citing *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994)); *Anderson v. Johnson*, 338

144

F.3d 382, 392 (5th Cir. 2003); *Ex parte Raborn*, 658 S.W.2d 602, 605 (Tex. Crim. App. 1983); *ABA Guidelines*, Guideline 10.7(A)(1); *Texas Guidelines*, Guideline 11.1(A)(1).

479.    There is no evidence that counsel conducted its own investigation to become more familiar with the circumstances surrounding the shooting, including understanding the LTC organization and the relationships between key witnesses. Such information is essential to understanding this case. As experienced trial attorneys, counsel should have been aware of this importance and acted on it. *See ABA Guidelines*, Guideline 1.1 cmt. ("Investigation and planning for both phases must begin immediately upon counsel's entry into the case, even before the prosecution has affirmatively indicated that it will seek the death penalty."). Instead, counsel focused only on securing a plea deal. While the ABA Guidelines encourage counsel to initiate plea negotiations in capital cases, it *can never* be a substitute for investigation. *ABA Guidelines*, Guideline 10.9.1.

480.    None of this is to suggest that counsel's investigation improved after the five-year mark. Their shift in approach in the last three years to relying entirely on Mr. Balderas and his family to conduct their own investigation was hardly better than their initial approach of ignoring the guilt phase altogether. "[A]n attorney must engage in a reasonable amount of pretrial investigation and 'at a minimum, ... interview potential witnesses and ... make an independent investigation of the facts and circumstances in the case.'" *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994) (quoting *Nealy v. Cabana*, 764 F.2d 1173, 1177 (5th Cir. 1985). While it is true that a client often may provide information to aid in an investigation, it does not follow that counsel may abdicate the responsibility to the client altogether. *See Bryant v. Scott*, 28 F.3d 1411, 1413 (5th Cir. 1994).

145

481.     Not only did counsel fail to seek out their own witnesses in this case, they failed to interview witnesses who were provided to them. Despite the challenge of conducting their own guilt phase investigation, Mr. Balderas and his family provided the names of six potential witnesses approximately two weeks before the start of trial: (i) "Billy," (ii) Oralia McCrary, (iii) Anali Garcia, (iv) Walter Benitez, (v) Daniela Chaves, and (vi) Celeste Munoz. (*See* Email from Gloria Poa using Godinich's email address, Jan. 31, 2014, Habeas Writ Record Vol. III, 77071.)

482.     Counsel's legal secretary blamed her failure to interview these witnesses on the fact that Mr. Balderas and his family did not provide contact information for the witnesses. (*Id.*) However, the reasonableness of an investigation is not dependent on the defendant's ability to provide any information, including witnesses he wants interviewed. In fact, the Fifth Circuit has specifically found that a defendant does not have the duty to provide even the names of such witnesses. *See Rummel v. Estelle*, 590 F.2d 103, 105 (5th Cir. 1979) ("Nor is it necessarily fatal to an ineffective assistance of counsel claim that the defendant was only able to provide counsel with information regarding where potential witnesses worked, for example, rather than their full names.") By providing the defense team with the names of these witnesses, Counsel had the duty to at least attempt to find and interview them. Weeks before trial began, Escobar provided an outline of compelling issues to investigate and present at the guilt/innocence phase of trial. (*See* Email from Gloria Poa using Godinich's email address, Jan. 31, 2014, Habeas Writ Record Vol. III, 770-71.) Counsel unreasonably failed to follow up on this information.

483.     Counsel's failed attempt to interview "Billy" and limited information gained from Munoz in the weeks leading up to trial were also a result of counsel's shallow and incomplete investigation. The *ABA Guidelines* clearly state the importance of hiring and utilizing a qualified fact investigator in a capital murder case. The investigation should not be conducted only by

counsel because "counsel lacks the special expertise required" to conduct an adequate homicide investigation. *ABA Guidelines*, Guideline 4.1 cmt. "The assistance of an investigator who has received specialized training is indispensable to discovering and developing the facts that must be unearthed at trial." *Id.* However, counsel is responsible for the performance of all team members, and they should be guiding and supervising the investigators in their work. While Mr. Balderas's counsel hired three different fact investigators to work on the case over the course of the eight years leading up to trial, there is no indication that these investigators actually conducted an independent fact investigation. Instead, their efforts were limited to subpoenaing and reviewing records.

484.    In the final month before trial, counsel relied on their legal secretary, Ms. Poa, to coordinate what might be called an investigation, but her skill set in that arena was obviously limited. (*See supra*, Statement of Facts § I.) As a result, Ms. Poa made basic, harmful mistakes that a qualified investigator would not have made. For example, Ms. Poa expected fact witnesses to independently schedule and attend meetings at counsel's office. (Email from Gloria Poa, Feb. 13, 2014, Habeas Writ Record Vol. III, 776.) Counsel's reliance on an inexperienced legal secretary to perform a capital murder investigation in no way obviated counsel's duty to investigate. This key responsibility "may not be sloughed off" on someone else. *Butler*, 716 S.W.2d 48, 55 (Tex. Crim. App. 1986); *see also See Bell v. Georgia*, 554 F.2d 1360, 1361 (5th Cir.1977) (concluding that attorney's performance was unreasonable where he knew of alibi witnesses and did not contact them because accused agreed to contact witnesses himself).

485.    While Benitez and Munoz were eventually presented by the defense at the guilt/innocence and punishment phases of trial, respectively, their testimony does not cure counsel's failure to investigate. *See Anderson v. Johnson*, 338 F.3d 382, 393 (5th Cir. 2003) ("The

fact that trial counsel was marginally successful in some respects does not excuse his complete failure to investigate and prepare *before* trial.") (emphasis in original). Both Benitez and Munoz's trial testimonies were severely underdeveloped.

486.    Counsel's failure to meet with Benitez for any reasonable amount of time before his testimony resulted in valuable information regarding Mr. Balderas's innocence being left out of the trial. (Furthermore, counsel failed to prepare Benitez to testify which had an impact on the jury finding his testimony not credible. (Godinich Aff., Aug. 8, 2017, Habeas Writ Record Vol. V, at 1472-73)

487.    Although the trial court ruled that Munoz was not allowed to testify at the guilt/innocence phase without opening the door to extraneous offenses, (29 RR at 13-14), the testimony counsel intended to elicit from her was only a fraction of the relevant information she had to offer—much of which would have been admissible without opening the door to extraneous offenses. This issue with Munoz was a direct result of counsel's failure to utilize a qualified investigator.

488.    Additionally, and as discussed below in greater detail, counsel failed to properly investigate the extraneous offenses prosecutors planned to use against Mr. Balderas and other related activity. (*See infra*, Claim III(B)(1).) Had counsel properly reviewed and familiarized themselves with relevant police records, counsel would have discovered several important facts that could have been used to impeach Cookie—the State's star witness.

489.    Specifically, counsel would have discovered that Powder had not only snitched on Cookie with respect to the aggravated robbery that Cookie was charged with, but also murder. In a January 2005 interview with police, Powder told investigators that Cookie was "bragging to the OG's that he had killed the Cholo on corporate[,]" referring to Inez Maldonado. (HPD Offense

Report, Incident No. 179083204 I, Habeas Writ Record, Vol III, 00942-64, at 00948-99.) When investigators asked Powder if Cookie was also bragging about killing another man, Angel Gonzalez, the week before the Maldonado murder, Powder told investigators that Cookie did not admit that murder to him, but "he heard other L.T.C. gang members saying that 'Cookie' was also bragging about that one." (*Id*. at 00952.)

490.     A review of the record would also have shown that Cookie had good reason to know that Powder implicated him in murder. On February 1, 2005, investigators following-up on the Ines Maldonado murder interviewed Cookie while he was still in prison for the stolen vehicle charges, investigators "advised Israel that they had been told that he had been bragging about killing the 'Cholo' on Corporate" and asked Cookie "how come his own gang member friends are telling them that he (Israel), has been bragging about committing this murder[.]" (*Id*. at 00963.) Counsel spent a good portion of their cross-examination of Cookie attempting to show that Cookie had motive to want Powder killed because he was going to testify against him in his aggravated robbery charge. Counsel entirely failed to recognize that Cookie wanted Powder dead to avoid murder charges.

491.     During his interview, Powder also told investigators that "he has personally seen 'Cookie' with a .45 caliber, a 9mm, and a .38 caliber revolver." Powder described the guns, noting that the 9mm was black and the ".45 caliber" was "chrome" with an "animal on the grip." (*Id*. at 00952.) He also claimed that Cookie "keeps the guns in a green box under his bed in his house." (*Id.*) When asked if he knew where the guns Cookie used might be, Powder told investigators that Cookie "might have given the guns to some guy named Jonathan because Jonathan is the one who supplies him with the guns." (*Id*. at 00952.) Powder's description of the guns and the green box come remarkably close to the guns and box that Mr. Balderas was arrested with. These statements

149

lend credibility to Mr. Balderas's claims that the guns he was arrested with were gang property. Further credibility is leant to these claims by Cookie himself, who told police that he had given Powder the 9-millimeter gun he was arrested with. (*Id*. at 00963.)

492.   At trial, when asked whether "passing guns back and forth," was a "common practice" in LTC, Cookie responded, "at first, when we were younger until they eventually find out about the—the gun shows that they have in different parts. And then everybody purchased their own." (26 RR 190: 14-19.) These notes provided the perfect opportunity to impeach Cookie with the victim's own words, but counsel failed to do so as a result of their inefficient preparation.

493.   Ultimately, counsel's unreasonable investigation prevented them from presenting a wealth of evidence, the preponderance of which would have pointed to Mr. Balderas's innocence. Counsel's failure to conduct a reasonable investigation for the guilt/innocence phase of this case constituted deficient performance. *See Strickland*, 466 U.S. at 690-91; *Wiggins*, 539 U.S. at 521.

### 3.   *Trial counsel's failure to investigate alternative suspects and material facts prejudiced Mr. Balderas.*

494.   Had Mr. Balderas's trial counsel taken advantage of the eight-year pre-trial period and conducted a reasonable investigation, they would have uncovered the above evidence of Cookie and Gumby's plan to put both Powder and Mr. Balderas away. Instead, Mr. Balderas's jury deadlocked for over two days without knowing:

- Gumby was the hand-selected leader of LTC Alief. He was feared and respected by his members and he made all final decisions for Alief (Jose Perez Aff., Habeas Writ Record, Vol. II, 00647-56, ¶¶ 9-10; Yancy Escobar Aff., Habeas Writ Record, Vol. II, 00558-63, ¶ 5);16

---

[16] Clarifying the LTC hierarchy was an important piece of this case that was neglected by trial counsel. On the second day of guilt/innocence deliberations, the jury sent out three separate notes requesting a read-back of testimony about the LTC hierarchy from Benitez, Cookie, and Officer Clint Ponder. (CR at 3308-10.) On the morning of the final day

- Cookie was an aggressive and vindictive right-hand-man to Gumby. He led the more violent faction of LTC Alief and was known to cause problems, only to fall back on Gumby for help (Jose Perez Aff., Habeas Writ Record, Vol. II, 00647-56, ¶¶ 9-11; Yancy Escobar Aff., Habeas Writ Record, Vol. II, 0055863, ¶ 6);

- Mr. Balderas valued the business-side of gang life—e.g., buying and selling guns, bootlegging movies, etc.—over the more violent aspects. This often put him at odds with Gumby and Diaz (Jose Perez Aff., Habeas Writ Record, Vol. II, 00647-56, ¶¶ 9-10);

- Initially, Mr. Balderas and Powder were close friends. Over time, Powder gravitated towards Gumby and Cookie because he hoped to move up the LTC Alief ladder quickly (Jose Perez Aff., Habeas Writ Record, Vol. II, 00647-56, ¶ 16);

- In late 2004 and early 2005, Powder snitched on Cookie for two murders in addition to the aggravated robbery (HPD Offense Report, Incident No. 179083204 I, Habeas Writ Record, Vol III, 00942-64, at 00950-52);

- After Powder snitched, Cookie campaigned against Hernandez, and Gumby ordered LTC Alief not to associate with Hernandez. Mr. Balderas continued to openly associate with Powder, betraying Cookie and defying Gumby's authority (Jose Perez Aff., Habeas Writ Record, Vol. II, 0647-56, ¶ 17);

- Additional evidence showed that Gumby remained in Houston until at least early 2006 after cutting off his ankle monitor. He continued to run LTC Alief at that time and instructed members to spread the word that he had fled to Mexico in order to put law

---

of guilt/innocence deliberations, the jury sent out a note asking, "What did Cookie say about he and Apache [Mr. Balderas] starting the Alief branch of LTC?" (*Id.* at 3317.) Because counsel had not presented evidence that LTC Alief was started by Gumby, the Court's only option was read back testimony stating that Mr. Balderas had started LTC Alief. (32 RR at 8-9.) Just over an hour later, after two days of deliberations, the jury returned with a guilty verdict. (*Id.* at 10-11.)

enforcement off his trail and to create the appearance that he was not in Houston when the murder was committed (Id., ¶ 24);

- At the meeting on December 3, 2005, Cookie warned Gumby that Powder might also turn Gumby in to the police for the murder charge he was dodging at the time. Cookie called for Powder's death while Mr. Balderas stood up for Powder. Gumby and Cookie were visibly angry about Mr. Balderas standing up for Powder (Id., ¶ 20);

- After the meeting, Gumby agreed to kill Powder on Cookie's behalf. They considered this to be a good plan because Cookie would have been the obvious suspect and Gumby was believed to be hiding in Mexico (Id., ¶ 24.);

- The eyewitness to the shooting, Wendy Bardales, was in an ongoing, intimate relationship with Cookie . (Yancy Escobar Aff., Habeas Writ Record, Vol. II, 00558-63, ¶ 7; Celeste Munoz Aff., Oct. 23, 2015, Habeas Writ Record, Vol. II, 00643-45, ¶ 5.) This relationship raised questions about the timing and source of the anonymous tips that shifted the focus away from the initial suspect, Cookie , and onto Mr. Balderas;

- On one occasion while Wendy was at Mr. Balderas's home, he asked Wendy to leave because she was an associate of MS-13 and he did not want her around his family. After she refused to leave and "gave him attitude," he "pushed her out the door." (Celeste Munoz Aff., Oct. 23, 2015, Habeas Writ Record, Vol. II, 00643-45, ¶ 8.) Wendy was "really mad" and was "yelling as she got kicked out of Juan's house" that she would "have him killed" (Id.);

- Shortly after the shooting, Gumby told Pepe that he had shot Powder in the head at the apartments on Corporate Drive. This confession by Gumby was in addition to the one he

152

gave to Benitez before dropping off the box of guns at Mr. Balderas's apartment on the morning of the arrests (Jose Perez Aff., Habeas Writ Record, Vol. II, 00647-56, ¶ 25); and

- While in Harris County Jail, Cookie attempted to use Escobar, Judy de la Fuente, and others to set up Mr. Balderas for the Powder shooting (Yancy Escobar Aff., Habeas Writ Record, Vol. II, 00558-63, ¶ 8).

495. Furthermore, counsel's failure to conduct a reasonable review of the record resulted in counsel's failure to impeach Cookie with Powder's prior statements, and build a stronger explanation for Cookie wanting Powder dead.

496. Had Mr. Balderas's jury been presented with the above evidence, there is a reasonable probability that at least one juror would have harbored reasonable doubt about his guilt.[17] Ultimately, counsel's unreasonable investigation prevented them from presenting a wealth of evidence of Mr. Balderas's innocence. Counsel's failure to conduct a reasonable investigation for the guilt/innocence phase of this case constituted deficient performance. *See Strickland*, 466 U.S. at 690-91; *Wiggins*, 539 U.S. at 521.

497. For the reasons stated above, Mr. Balderas's conviction and death sentence must be reversed.

    ***4.    Mr. Balderas's Sixth Amendment rights were violated by trial counsel's failure to investigate an alibi defense.***

498. A glaring hole in the defense case at the guilt/innocence phase of trial was the fact that counsel argued that Mr. Balderas was not the shooter, yet presented no evidence regarding Mr. Balderas's whereabouts at the time of the crime. Had counsel conducted a constitutionally-

---

[17] To this day, jurors have significant doubts about Mr. Balderas's guilt. (*See* Affidavit of Juror Birney Aff., Writ Record Vol. III, 675-678 ¶ 8 ("Carlos was the last juror to flip to 'guilty' on the final day of guilt/innocence deliberations. He was very reluctant to change his vote. I do not think he ever fully believed Juan committed the crime. I was never 100% sure either. I am still only about 80% sure.").)

adequate investigation prior to trial, they would have discovered that Mr. Balderas spent the entire afternoon and evening of December 6, 2005, with Anali Garcia, Ileana Cortes and Octavio Cortes at their family's apartment in Southwest Houston.

499.    For the purposes of this section, the facts presented in Factual Background § J are incorporated herein.

> ### i.    *Trial counsel's investigation into an alibi defense fell below the objective standards of reasonableness required by Strickland.*

500.    Mr. Balderas and his family provided counsel with the names of alibi witnesses and put two of them in contact with counsel. (*See* Email from Gloria Poa using Godinich's Email Address, Jan. 31, 2014, Habeas Writ Record Vol. III, 770-771; Email from Gloria Poa using Godinich's Email Address, Feb. 14, 2014, Habeas Writ Record Vol. III, 773-74; Email from Gloria Poa using Godinich's Email Address, Feb. 13, 2014, Habeas Writ Record Vol. III, 775-76;) Nevertheless, counsel showed little interest in pursuing this defense. For example: (i) counsel made no independent attempt to contact Oralia McCrary—mother of Anali and Octavio—despite being told she could provide an alibi for Mr. Balderas (*Id.*); (ii) Counsel made no attempt to clarify Ileana Cortes's partial memory of the night in question (Email from Gloria Poa using Godinich's Email Address, Feb. 14, 2014, Habeas Writ Record Vol. III, 773-74; Ex. B, Ileana Cortes Decl., ¶ 12.); (iii) Counsel did not allow Anali to share her alibi with the defense team, cutting her off and telling her they did not need any additional character witnesses (*see* Anali Garcia Aff., Habeas Writ Record, Vol. II, 565-568, ¶ 12.); and finally, (iv) counsel made no attempt to independently investigate the alibi defense by contacting other people who may have been at the Garcia/McCrary/Cortes apartment ("Garcia's apartment") with Mr. Balderas on the night of the shooting. These failures are inexcusable considering that counsel's stated defense theory was "misidentification." (Dr. Roy Malpass Aff., Habeas Writ Record, Vol. II, 00403-474 ¶ 7.)

501.    Counsel's failure to investigate the alibi defense, despite being well-aware of evidence that supported it, constituted deficient performance. *See Bryant* at 1415. "[W]hen alibi witnesses are involved, it is unreasonable for counsel not to try to contact the witnesses and 'ascertain whether their testimony would aid the defense.'" *Id*. (quoting *Grooms v. Solem*, 923 F.2d 88, 90 (8th Cir.1991), *cert. denied*, 461 U.S. 910, 103 S. Ct. 1886, 76 L.Ed.2d 815).

502.    In *Bryant*, the Fifth Circuit had the occasion to consider whether counsel provided constitutionally deficient assistance of counsel by not searching for and interviewing potential alibi witnesses. There, the attorney accused of providing ineffective assistance of counsel did not try to contact potential alibi witnesses that were out of state. The Court found that "[Counsel] abdicated his responsibility of investigating potential alibi witnesses and failed to 'attempt to investigate and to argue on the record for the admission for the alibi witnesses' testimony.'" *Bryant*, at 1417 (quoting *Grooms v. Solem*, 923 F.2d 88, 91 (8th Cir. 1991). The Court reasoned that "[Counsel's failure to investigate potential alibi witnesses was not a 'strategic choice' that precludes claims of ineffective assistance. *Id*. (citing *Nealy*, 764 F.2d at 1178 (according deference to counsel's strategic decisions)). Furthermore, the Court noted that because of the severity of the crime and punishment of his client, Counsel there had a greater duty to attempt to investigate an alibi defense. *Id*. at 1417-18.

503.    Here, both Ileana Cortes and Anali Garcia *made efforts* to speak with Mr. Balderas's trial attorneys about the night in question, and both were met with hostility. (See Anali Garcia Aff., Habeas Writ Record, Vol. II, 565-568, ¶ 12; Jesus Balderas Aff., Habeas Writ Record, Vol. II, 00476-483, ¶¶ 21-22; Ex. B, Ileana Cortes Decl., ¶ 12) After speaking to them on separate occasions, counsel informed both Ileana and Anali that their testimony was not helpful and that Mr. Balderas did need any more character witnesses, indicating a clear misunderstanding of the

evidence both women were attempting to supply. (*Id*.) Counsel never attempted to speak with Octavio, despite their knowledge of evidence that Mr. Balderas had spent the entire evening at Anali's apartment. (Octavio Cortes Aff. Oct. 26, 2015, Habeas Writ Record, Vol. II, 526-529, ¶ 11.) To the extent that counsel did not know about Octavio, that is based solely on their failure to investigate.

504.    Even if counsel were to find the alibi defense to be incredible after speaking with Ileana, as they claim, it was unacceptable to refuse to speak with her. Not only did she have critical testimony regarding Mr. Balderas's whereabouts on the night in question, she also could have provided the names of additional alibi witnesses, such as her brother Octavio Cortes. (Ex. B, Ileana Cortes Decl., ¶¶ 9-10.)

505.    Counsel's failure to even attempt to contact Oralia McCrary and Octavio, and their failure to treat Anali Garcia as a legitimate alibi witness, constituted deficient performance. *See Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994) ("[W]hen alibi witnesses are involved, it is unreasonable for counsel not try to contact witnesses and ascertain whether their testimony would aid the defense.")

506.    Counsel's failures are not excused by the fact that Mr. Balderas and his family provided the names only a couple weeks before trial. In *Bryant v. Scott*, 28 F.3d 1411 (5th Cir. 1994), the defendant did not provide counsel with the names of certain alibi witnesses until three days before trial. Nevertheless, the Fifth Circuit found that "it was incumbent upon [counsel] to at least try to contact [the alibis]." *Bryant*, 28 F.3d at 1417. The court went on to state that counsel has a duty to interview potential alibis "[e]ven if [counsel] had first learned of the alibi witnesses on the first day of trial." *Id.* In reaching its decision, the court also noted the "seriousness of the offense and gravity of the punishment"—Bryant was facing life imprisonment for his role in a

robbery. *Id.* Mr. Balderas's counsel must be held to the same standard where the State was seeking death. Counsel's failure to investigate Mr. Balderas's alibi defense, or even attempt to speak with certain alibi witnesses, constituted deficient performance. In this case, "counsel's failure to investigate alibi witnesses and interview eyewitnesses is unprofessional conduct falling below the standard of a reasonably competent attorney practicing under prevailing professional norms." *See id.* at 1419.

> ### ii.    *Mr. Balderas was prejudiced by trial counsel's failure to investigate and present an alibi defense.*

507.    Had counsel conducted a reasonable investigation, Anali Garcia and Octavio Cortes could and would have provided testimony of Mr. Balderas's whereabouts at the time Powder was killed.

508.    As state habeas counsel's investigation was able to show, on the afternoon of Powder's murder, Mr. Balderas went to Garcia's apartment to burn DVDs as he normally did around that time.[18] (Anali Garcia Aff., Habeas Writ Record, Vol. II, 565-568, at ¶¶ 5-6; Octavio Cortes Aff., Habeas Writ Record, Vol. II, 526-529, at ¶ 6; Jose Perez Aff., Habeas Writ Record, Vol. II, 00647-56, at ¶ 9; Ex. B, Ileana Cortes Decl., at ¶ 7) As usual, he spent the entire afternoon and into the evening at the apartment. Later in the evening, as Mr. Balderas and Octavio were in

---

[18] Around 2002, Mr. Balderas's younger brother Jesus began dating Ileana Cortes. As the years went by, Mr. Balderas got to know Ileana and her family through Jesus and began spending more time at their apartment. Ileana lived with her mother Oralia, two sisters, Anali and Diana, and two brothers, Octavio and Horacio, at the Bayou Apartments on Corporate Drive, within walking distance of Mr. Balderas's apartment. In the spring of 2005, Jesus and Ileana welcomed a daughter. By all accounts, Mr. Balderas was a proud uncle and began visiting on a regular basis to see his niece. He got along well with the family and they appreciated having him around. (Anali Garcia Aff., Habeas Writ Record, Vol. II, 565-568, at ¶¶ 2-5; Octavio Cortes Aff., Habeas Writ Record, Vol. II, 526-529, at ¶¶ 3-5; Ex. B, Ileana Cortes Decl., ¶¶ 3-5)

At some point in 2005, Mr. Balderas began burning and selling bootleg DVDs at a flea market for extra money. He did not have the appropriate computer equipment to burn the DVDs at his own apartment, so he often used the computer and printer at Garcia's apartment. Octavio fondly recalls helping Mr. Balderas burn the DVDs and search the internet for pictures to use as movie covers. Mr. Balderas usually came over to the apartment after school to work on the DVDs and would stay into the evening.

the bedroom finishing up the DVDs, one of Octavio's sisters came into the room and told them that someone had been shot at a nearby apartment. (*Id*.) Mr. Balderas and Octavio came out into the living room to find Oralia closing and locking the front door. Oralia was known to be very protective of her children, and she insisted that no one go outside. (*Id*.) Even though Mr. Balderas had been at the apartment all afternoon and evening, Oralia refused to let him walk home. (*Id*.) Instead, she insisted that Mr. Balderas and the others stay inside the apartment and watch one of the movies that Mr. Balderas had burned that evening. (*Id*.) The family laid out some blankets for Mr. Balderas on the floor and he stayed there with them until the next morning. (*Id*.)

509.    One or two days after the shooting, Anali and Ileana were devastated to find out that the shooting victim that night had been their close friend, Powder.[19] They were shocked when they found out shortly thereafter that Mr. Balderas had been accused of Powder's murder. They knew that Mr. Balderas had been with them in their apartment the entire night of the shooting. (Anali Garcia Aff., Habeas Writ Record, Vol. II, 565-568, at ¶¶ 10-11; Octavio Cortes Aff., Habeas Writ Record, Vol. II, 526-529 at ¶¶ 8-9; (Ex. B, Ileana Cortes Decl., ¶¶ 9-10)

510.    Mr. Balderas was convicted primarily on the testimony of a single eyewitness; there was no physical evidence such as DNA or fingerprints linking Mr. Balderas to the scene of the shooting; trial counsel failed to present testimony of multiple witnesses that someone other than Mr. Balderas was actually the shooter; and trial counsel failed to present the testimony of two witnesses that Mr. Balderas was with them at another location at the exact time of the shooting. There is a reasonable probability that had counsel investigated and presented the available alibi

---

[19] Growing up in the same neighborhood, Mr. Balderas, Jesus, Ileana, and Anali shared mutual friends, including Powder. Jesus, Ileana, and Anali went to middle school with Powder and got to know him well as a result. Also, Powder was often around the apartments nearby at 7700 Corporate Drive. Mr. Balderas and his brother Jesus were particularly close with Powder, and Powder even stayed at their apartment off and on in 2005. (Anali Garcia Aff., Habeas Writ Record, Vol. II, 565-568, at ¶¶ 7, 10; Octavio Cortes Aff., Habeas Writ Record, Vol. II, 526-529, at ¶ 8; Jesus Balderas Aff., Habeas Writ Record, Vol. II, 00476-483, at ¶ 17.)

defense, at least one juror would have harbored reasonable doubt about Mr. Balderas's guilt. Indeed, even without the alibi defense, the jury deadlocked for over two days at the first phase of trial.

511.    Trial counsel's failure to investigate and present alibi evidence at the guilt/innocence phase of trial constitutes ineffective assistance, prejudicing Mr. Balderas's rights under the state and federal Constitutions, state statutory law, and United States Supreme Court and state case law. Accordingly, Mr. Balderas's conviction and resulting death sentence must be reversed.

### 3.    Mr. Balderas's Sixth Amendment rights were violated by trial counsel's failure to present testimony of an eyewitness identification expert.

512.    Roughly one month before the start of trial, counsel retained the services of Dr. Roy Malpass, an expert in eyewitness identification. Counsel presented Dr. Malpass at a mid-trial hearing on its motion to suppress Wendy Bardales's identification of Mr. Balderas. The trial court denied the motion, but found that Dr. Malpass was qualified to testify as an expert before the jury and that his testimony would not open the door to any extraneous offenses. Despite this ruling, counsel did not present Dr. Malpass's testimony to the jury—instead they focused their cross-examination of Wendy Bardales to her ability to speak English at the time of the identification (See *e.g.*, 26 RR 10-33.) Trial counsel's failure to present the readily-available exculpatory expert testimony on eyewitness identification in a case where counsel's defense theory was misidentification constituted deficient performance and prejudiced Mr. Balderas.

513.    For the purposes of this section, the facts presented in Factual Background § J are incorporated herein.

### i. *Trial counsel performed deficiently by failing to present an eyewitness identification expert.*

514. Prevailing professional norms required that trial counsel consult with necessary experts in scientific fields. *See ABA Guidelines*, Guideline 5.1 (B)(2)(e); *see also Texas Guidelines*, Guideline 4.1 (B)(2)(e) (same). Those norms have established that "[c]riminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011). Trial counsel were aware from the time of appointment that the State's case against Mr. Balderas would rely heavily on the testimony of the only eyewitness to make an identification, Wendy Bardales. Counsel were also aware early on that there were a number of red flags concerning the reliability of Wendy Bardales's identification, including that: (i) she initially stated she did not recognize the shooter, yet later identified Mr. Balderas, whom she had known for approximately one year prior; (ii) on the day before her positive identification, she claimed that the shooter had the "same face" as Mr. Balderas but did not make a definitive identification; (iii) she was shown the exact same lineup on back to back days; and (iv) she did not make the definitive identification until one week after the shooting. These issues, and the potential presence of other problems with the identification procedure itself, concerned counsel enough to retain an eyewitness identification expert to assess the identification evidence and testify at a hearing on Mr. Balderas's motion to suppress the identification.

515. On January 14, 2014, more than eight years after the identification and just one month before the start of trial, counsel retained Dr. Malpass as an eyewitness identification expert. Counsel explained to Dr. Malpass that they intended to use him to further their theory "that, in light of the eyewitness's own description of the events surrounding the shooting, [the eyewitness] did not get a good look at the shooter's face, despite being present at the time." (Dr. Roy Malpass

Aff., Habeas Writ Record, Vol. II, 00403-474, ¶ 7.) After reviewing materials relevant to Wendy Bardales's identification, Dr. Malpass noted "significant concerns" regarding the identification procedure, including their failure to ask necessary and appropriate questions when recording witness descriptions immediately after the shooting, the suggestive nature of the photo array presented to Wendy Bardales, and the potentially deceptive nature of the lineup administration. (*Id.* at ¶9.) Dr. Malpass relayed these concerns to counsel, but it did not appear to Dr. Malpass that counsel understood the significance of expert eyewitness identification testimony for this case. Counsel had only one phone call with Dr. Malpass, on January 29, 2014, prior to his testimony, and never met with him before he took the witness stand at the suppression hearing. (*Id.* at ¶10.)

516.    On February 18, 2014, Dr. Malpass testified at a hearing on counsel's motion to suppress Wendy Bardales's identification. At the conclusion of the hearing, the trial court denied the motion, but ruled that Dr. Malpass could testify as an expert before the jury because "his testimony *would be helpful to the jury* on the issue of eyewitness identification." (25 RR 177:24-178:2 (emphasis added).) The court also held that Dr. Malpass' testimony would not open the door to extraneous offenses. (29 RR at 14.) Based on this ruling and communications with counsel, Dr. Malpass expected to return to testify at trial within the next week. However, inexplicably, counsel never called Dr. Malpass to testify, which Dr. Malpass himself found surprising. (Dr. Roy Malpass Aff., Habeas Writ Record, Vol. II, 00403-474, at ¶13.)

517.    The failure to put Dr. Malpass on the stand in order to attack the credibility of Wendy Bardales's identification after the presiding judge opined that the testimony "would be helpful to the jury" is inexcusable in light of the fact that the judge assured trial counsel that the testimony would not open the door to unfavorable evidence.

518.    It was particularly inexcusable because Dr. Malpass's testimony would have explained for the jury many of Wendy Bardales's answers on the stand:

     a.    Wendy agreed that "until [the police] put in front of [her] some photographs that contained a picture of Juan, [she] never told anybody from December 6, 2005, to December 12th, 2005, that Juan Balderas could have been the shooter" (26 RR 36:20-25);

     b.    Wendy agreed that "before [the photograph of Mr. Balderas] was presented to [her], [she] never told anybody with law enforcement [or anybody else] that he was the shooter" including her sister, mother, or boyfriend (*Id.* at 37:15-38:1);

     c.    Wendy testified that the apartment was lit by a television and the kitchen light (*Id.* 38:23-39:1);

     d.    Wendy agreed that "[she] did not recognize [the gunman] that night" (*Id.* at 41:16-19); and

     e.    Despite testifying that she had known Mr. Balderas for "at least a year" at the time of Powder's killing (*Id.* at 15:13-17), Wendy testified that "in that moment, I did not recognize him" (*Id.* at 42:9-13).

As explained below, Dr. Malpass was prepared to testify that based on these, and other, answers provided by Wendy Bardales, her identification of Mr. Balderas was not reliable. (*See generally*, Dr. Roy Malpass Aff., Habeas Writ Record, Vol. II, 00403-474.)

519.    Despite the fact that counsel were, or should have been, aware of the importance of properly explaining the underlying issues that can make eyewitness identification unreliable, and the fact that counsel's retained expert expected to testify before the jury and was waiting to be

called by counsel, Mr. Balderas's trial counsel failed to call him. Considering the importance of expert testimony generally, and the necessity of attacking the State's primary witness at trial, counsel performed deficiently by failing to present testimony to the jury from their retained eyewitness identification expert.

> ### ii.    *Mr. Balderas was prejudiced by Counsel's failure to present an eyewitness identification expert.*

520.    Had counsel presented Dr. Malpass to the jury, he could have explained that there were significant concerns with Wendy Bardales's identification that made it unreliable, including likely deficiencies in Wendy's memory-forming and memory-recall processes as well as problems with the identification procedure employed by investigators.

521.    Dr. Malpass is a Professor Emeritus of Psychology at the University of Texas at El Paso ("UTEP"). He has been researching facial recognition and eyewitness identification for more than forty years. He established the Eyewitness Identification Research Lab at UTEP in 1992. The Lab focuses on research in eyewitness memory, eyewitness identification, and many aspects of facial recognition, and provides expert testimony to both prosecution and defense teams on those topics. (Dr. Roy Malpass Aff., Habeas Writ Record, Vol. II, 00403-474, ¶ 4.) He has published numerous peer-reviewed articles and book chapters concerning eyewitness identification. In 1999 and 2003, he co-authored the guide and training manual for the Department of Justice's National Institute for Justice, materials that address the proper handling of eyewitness evidence by law enforcement. (*Id.* ¶ 5.) In other words, his testimony would have had the weight of his experience.

522.    Based on the information provided to Dr. Malpass regarding Wendy Bardales's identification of Mr. Balderas, he was prepared to testify at trial concerning a number of issues as to both eyewitness identification generally and Wendy's unreliable identification in particular. These issues included: the effects of stress during a shooting event on the witness's ability to form

a memory of the shooter; the effects of the sequence and pacing of the event on the witness's (divided) attention; the effects of potential post-event information on subsequent identifications by the witness; concerns about the lineup administration, including the suggestive and biased characteristics of the photospread used and the questionable nature of the admonishments given to the witness; and the reliability of the witness's statements of confidence. (*Id*. ¶ 15.) Dr. Malpass would have testified that several factors would likely have negatively impacted Wendy Bardales's ability to extract individualizing information from the face she observed and to create a clear memory image including the shooter's fast movements, the dim lighting of the apartment, the shooter's obstructive clothing and her described shock at the time of the attack (*Id*. ¶ 35.). Dr. Malpass would also have presented a thorough explanation of the science involved in encoding and forming memories, and would have applied that science to the testimony of Wendy Bardales. (*See generally*, *id*.)[20]

523.    One reason Courts have repeatedly acknowledged the importance of expert testimony on eyewitness identification is that jurors are known to have a poor understanding of scientific principles that affect eyewitness identifications. This is especially troublesome insofar as eyewitness identification is one of the most persuasive types of evidence. A study conducted in 2005 revealed how large a gap in understanding there is between eyewitness experts and jurors on the complications presented by eyewitness testimony. *See* Tanja Rapus Benton, et al., *Eyewitness Memory Is Still Not Common Sense: Comparing Jurors, Judges and Law Enforcement to Eyewitness Experts*, 20 APPLIED COGNITIVE PSYCHOL. 115 (2006). Researchers presented 111 jurors and sixty experts in the field of eyewitness identification with a list of thirty statements

---

[20] Dr. Malpass provides a lengthy affidavit on all of the numerous points he was prepared to testify to and the science that supports those points. For the sake of brevity, we incorporate the contents of said affidavit herein, and refer the Court thereto if it seeks a deeper understanding of the issues Dr. Malpass was prepared to speak to.

about issues affecting eyewitness identification. Participants were asked to either agree or disagree with statements about how different scientific principles affect eyewitness identifications. The disparity in understanding between experts and laypersons was alarming. For example, 94% of experts agreed that post-event information can influence the reliability of an eyewitness identification, whereas only 60% of jurors polled felt the same way. *Id*. at 120. The study asked about many other issues affecting the accuracy of eyewitness identification, and overall jurors disagreed with experts 87% of the time. *Id*. at 119. This study shows that, despite the fact that there has been increased awareness of the problems with eyewitness testimony in public discourse, jurors still need to be educated about the underlying issues that can make such testimony unreliable.

524.    As the Honorable Judge Guiney observed, Dr. Malpass' expert testimony would have been "**very helpful** to the jury" in evaluating the testimony of Wendy Bardales. (25 RR 177:24-178:2 (emphasis added).) Had trial counsel presented the expert testimony of Dr. Malpass, it is likely that at least one of the jurors would have questioned the credibility of Wendy Bardalas's memory and identification, and would have changed their vote. This is particularly true because Dr. Malpass' testimony goes straight to the credibility of the State's star witness.

525.    For the reasons stated above, Mr. Balderas's conviction and death sentence must be reversed.

### 4.    *Mr. Balderas's Sixth Amendment rights were violated by trial counsel's failure to investigate juror misconduct as grounds for a motion for a new trial.*

526.    The guilt/innocence deliberations in Mr. Balderas's trial were replete with improper outside influences and juror misconduct. (*See infra*, Claim VII for a more detailed discussion of these issues.) At the conclusion of the guilt/innocence trial, the jury was sequestered for two nights during deliberations and on both mornings that followed, the court took to the record to address

outside influences that the jury was subject to the previous nights. The first night, jurors were housed in a motel in a seedy neighborhood very close to the crime scene. The court went on record and apologized for the conditions of the housing, and assured jurors they would find better accommodations for the second night. On their way to the hotel for the second night of sequestration, some of the jurors claimed to have seen Mr. Balderas's brother waiving at them from across the street. They took that as a threat. The court was forced to address this issue the following day. Despite being on notice that the jury had been subject to outside influences, counsel failed to investigate and raise the issues in Mr. Balderas's Motion for New Trial. (*See generally*, Motion for New Trial, April 14, 2014, CCA Record, Vol. XII, 003389-3407.) Counsel's failure to do so constituted deficient performance and prejudiced Mr. Balderas.

### i.    Applicable state law provided grounds for a new trial.

527.    According to Texas state law, trial or appellate counsel have 30 days from the time of sentencing to file a motion for a new trial in the trial court, after which time it may not be considered. TEX. R. APP. PROC. 21.4(a). A motion for new trial may be granted on the basis of reversal of trial court rulings or on the basis of outside-the-record evidence. When a motion for new trial raises matters extrinsic to the record, the trial court is required to hold a hearing on the motion. *See e.g.*, *McMillan v. State*, 769 S.W.2d 675 (Tex. App.—Dallas 1989, pet. ref'd); *see also Mata v. State*, 867 S.W.2d 798 (Tex. App.—El Paso 1993, no pet.).

528.    The Texas Rules of Appellate Procedure ("TRAP") and CCA case law have identified particular issues that require the trial court to order a new trial. TRAP 21.3(f) states that a motion for new trial <u>must</u> be granted "when, after retiring to deliberate, the jury has received other evidence." In *Rogers v. State*, 551 S.W.2d 369 (Tex. Crim. App. 1977), the CCA for the first time interpreted this as a *per se* rule mandating a new trial if it is established that (1) "other evidence" was received, and (2) such evidence was adverse to the defendant. *See, e.g., Eckert v.*

166

*State*, 623 S.W.2d 359, 364 (Tex. Crim. App. 1981); *Garza v. State*, 630 S.W.2d 272, 274 (Tex. Crim. App. 1982). Texas courts have held that "other evidence" may include an unauthorized view of the crime scene. *Shivers v. State*, 756 S.W.2d 442 (Tex. App.—Houston [1st Dist.] 1988); *Aguirre v. State*, 683 S.W.2d 502 (Tex. App.—San Antonio 1984). "Other evidence" may also include unauthorized communications between jurors and outside persons after the jury has retired to deliberate. *Gomez v. State*, 991 S.W.2d 870, 872 (Tex. App.— Houston [1st Dist.] 1999). *See also*, TEX. CODE CRIM. PROC. art. 36.22. When jurors communicate with unauthorized persons during deliberations, there is a presumption that the defendant was injured. *See id. (*citing *Quinn v. State*, 958 S.W.2d 395, 401 (Tex. Crim. App. 1997).

529.     TRAP also states that a new trial *must* be granted when it has been established that the verdict was decided "in any manner other than a fair expression of the jurors' opinion," or when it is established that the jury "engaged in such misconduct that the defendant did not receive a fair and impartial trial." TRAP 21.3(c), (g).

### ii.     *Trial counsel failure to investigate grounds for a new trial amounted to deficient representation.*

530.     Because a motion for new trial can, and sometimes must, be granted on the basis of outside-the-record evidence, professional norms require counsel to conduct a reasonable investigation into potential grounds for the motion. *See ABA Guidelines*, Guideline 10.7(B); *Texas Guidelines*, Guideline 10.2; NLADA Standard 11.9.2. However, in Mr. Balderas's case, counsel failed to conduct such an investigation.

531.     During the guilt/innocence phase deliberations of Mr. Balderas's trial, the Court twice went on the record to address outside influences encountered by the jury during its sequestration. After the first day of deliberations, the jury was put up at a Motel 6 in Southwest Houston. The next morning, the court apologized— apparently in response to juror complaints—

and promised that accommodations would be better if there were to be a second night of sequestration. (31 RR at 7.) Following the second night of sequestration, the jury returned a guilty verdict after only a couple hours of deliberation. Following the verdict, the court took to the record yet again to discuss an unusual incident involving the jury from the afternoon before. (32 RR at 11-29.) As the record reflects, the jury was leaving the courthouse on a bus when they passed Mr. Balderas's brother on the street. (*Id.*) Mr. Balderas's brother allegedly waved and smirked at the jurors as they went by. (*Id.*) Several of the jurors were alarmed and perceived the wave as a threat. The bailiffs stopped the bus and attempted to chase Mr. Balderas's brother. (*Id.*) The bailiffs returned to the bus, having not caught the brother, and continued their route to the hotel for the night. (*Id.*) Many of the jurors were noticeably shaken by the event and some were even allowed to call home to their family to tell them to "lock their doors." (*Id.*) There were even concerns that the incident was somehow connected to Mr. Balderas or was gang-related. (*Id.*) At the brief hearing, the court asked the bailiff to select two jurors who seemed to be the most alarmed by the event. The two jurors were questioned on the record and explained that they were shaken by the situation but believed that the event did not affect their deliberations. (*Id.*)

532.    These two incidents should have alerted counsel to the likelihood that there were improper outside influences on the jury's deliberations, jury misconduct, or both. For example, the jury spending the night in a seedy motel in Southwest Houston should have been alarming to counsel considering that the motel was in the neighborhood where the crime took place. Moreover, the fact that some jurors felt so threatened by the wave from Mr. Balderas's brother that they insisted on calling their families should have alerted counsel to the high likelihood that the jurors discussed the perceived-threat amongst themselves and possibly considered it in their

deliberations. This is especially true when one considers that the jury had been deadlocked for two days prior to the incident and then returned a guilty verdict within a couple hours following it.

533.    Despite the court flagging these issues, counsel's motion for new trial following Mr. Balderas's verdict did not include a single outside-the-record claim. (Motion for New Trial, Apr. 14, 2014, CCA Record, Vol. XII, 03365-3387.) Unsurprisingly, the record-based arguments were denied by the court without a hearing. (*Id*. at 3409.) Counsel's failure to investigate these issues and present them in the motion for new trial constitutes deficient performance.

### iii.    Mr. Balderas was prejudiced by Counsels' failure to investigate juror misconduct.

534.    "The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." *Oliver v. Quarterman*, 541 F.3d 329, 334 (5th Cir. 2008) (quoting, *inter alia*, *Turner v. Louisiana*, 379 U.S. 466, 472 (1965); *Mattox v. United States*, 146 U.S. 140, 149 (1892) ("in capital cases [ ] the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment")).

535.    As explained in greater detail below, the extraneous influences Mr. Balderas's jury was exposed to prejudiced Mr. Balderas. (*See infra*, Claim VII, discussing prejudice caused by jury exposure to extraneous influences and juror misconduct.) Trial counsel's failure to investigate and act on this prejudice further prejudiced Mr. Balderas.

536.    Had counsel properly investigated and presented evidence of extraneous influences on the jury in a motion for a new trial, it is likely that such a motion would have been granted.

### 5.    Trial counsel's unmanageable caseload and inappropriate fee structure should be considered concurrently with specific deficiencies.

537.    Counsel's near total failure to conduct a guilt/innocence phase investigation may be explained in part by the unacceptably high caseload counsel routinely carried, including at the

time of Mr. Balderas's trial. "Excessive caseloads erode the right to competent and effective counsel by inhibiting attorneys' ability to devote the time and attention required for 'meaningful adversarial testing' of the charges." Carmichael et al., *Guidelines for Indigent Defense Caseloads*, Jan. 2015, at xiii (available at http://www.tidc.texas.gov/media/31818/150122_ weightdcl _final.pdf) (quoting *United States v. Cronic*, 466 U.S. 648, 668 (1984)). Long before Mr. Balderas's trial, well-established and widely-accepted professional norms deemed 150 felony cases the maximum caseload for one full-time defense attorney. (*Id.* at v.) A recent study evaluating the Texas Regional Public Defender Office for Capital Cases ("RPDO") lends further perspective on capital cases in particular. *See* Carmichael & Caspers, *Judgment and Justice: An Evaluation of the Texas Regional Public Defender for Capital Cases*, June 2013 (available at: http://ppri.tamu.edu/judgment-and-justice/). RPDO's office policy "limits the maximum number of concurrent death-penalty clients to five, but the actual average caseload is just four cases per attorney." *Id.* at 24.

538.    In 2014 alone, attorney Godinich carried a total of 330 adult felony cases, more than the twice the acceptable load, *and* five capital murder cases, more than the average load by RPDO attorneys who work exclusively on capital trials. Attorney Alvin Nunnery worked 140 adult felony cases in addition to six capital murder cases that same year. (*See* Attorney Caseload Table, on file with OCFW.) Of course, standing alone, proof of excessive caseloads does not establish a Sixth Amendment violation. But the information is nonetheless relevant because it explains in part counsel's prejudicial failure to prepare for trial: they simply did not have time to do it.

539.    This problem was compounded by the fact that counsel were paid a flat fee for their representation. As a result, trial counsel had no financial incentive to spend time on Mr. Balderas's pre-trial investigation. The *ABA Guidelines* express "strong disapproval" of such payment

structures in the capital context. *ABA Guidelines*, Guideline 9.1 cmt.; *Id.* at Guideline 9.1(B)(1)

("Flat fees, caps on compensation, and lump-sum contracts are improper in death penalty cases.").

Such payment structures are improper because "the possible effect of such rates is to discourage

lawyers from doing more than what is minimally necessary to qualify for the flat payment." *Id.*

Courts have begun to recognize that flat fee structures can greatly contribute to ineffective

assistance in capital cases, especially when counsel have a demanding caseload in addition to the

capital case in question. In *State v. Cheatham*, 292 P.3d 318, 341 (Kan. S.Ct. 2013), the Kansas

Supreme Court found that a flat fee structure in a capital case "created a conflict of interest for

[counsel] that adversely affected the representation . . . in multiple respects."[21] The court noted the

ABA's disapproval of flat fee structures and observed:

> [A] solo practitioner with a 'high Vol.' law practice requiring near daily
> court appearances, would have little financial incentive to invest the
> significant time commitment a capital case requires. On the contrary, his
> incentive would have been to pay attention to those cases whose billable
> hours were more likely to produce an actual outcome.

*Id.* at 340-41. As further evidence of the conflict of interest, the court pointed to the attorney's

failure to conduct a pre-trial investigation . *Id.* at 341. Likewise, in Mr. Balderas's case, counsel's

near total failure to conduct a guilt/innocence investigation in their eight years of representation

was very likely influenced by the lack of incentive to conduct more investigation than was

minimally necessary.

540.    Had counsel represented Mr. Balderas while carrying an acceptable caseload and

not been saddled with a flat fee covering eight years of work, they presumably would have begun

their guilt/innocence phase investigation earlier than one month before trial and would have

---

[21] The Kansas Supreme Court later disbarred the attorney in Cheatham based almost entirely on his ineffective assistance in that case and, in the process, heavily discouraged the use of the flat fee structure as it greatly contributed to his ineffective assistance in the case. *In re Hawver*, No. 111,425, 2014 WL 6606481 (Kan. S. Ct., Nov. 14, 2014).

interviewed more than three witnesses with relevant guilt/innocence information by the time they gave their opening statements. They certainly would have been in a better position to do so.

## III.    INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL AT THE PUNISHMENT PHASE

### A.    Ineffective Assistance of Counsel in a Capital Case is that Which Falls Below the Prevailing Standard of Professional Competence

541.    The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970); *Gideon v. Wainwright*, 372 U.S. 335, 355 (1963).

542.    To state a claim for ineffective assistance of counsel, Mr. Balderas must show that trial counsel's performance was deficient, falling below an objective standard of reasonableness, and that the deficiency prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Porter v. McCollum*, 558 U.S. 30, 38-39 (2009).

543.    To establish deficient performance, the prisoner must show that trial counsel's representation fell below an "objective standard of reasonableness." *Strickland*, 466 U.S. at 688. The court must look to "[p]revailing norms of practice as reflected in [the] American Bar Association standards" then in effect.[22] *Id*. at 688; *see also Padilla v. Kentucky*, 559 U.S. 356, 387 (2010). This case-by-case approach should consider the cumulative effect of counsel's errors when establishing the ineffectiveness prong. *White v. Thaler*, 610 F.3d 890, 912 (5th Cir. 2010); *Richards v. Quarterman*, 566 F.3d 533, 564 (5th Cir. 2009).

---

[22] The Supreme Court instructs the reviewing court to look at the following: (1) the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (2003) (the "ABA Guidelines"); (2) the ABA Standards for Criminal Justice (2d 1980); and (3) the National Legal Aid & Defender Association's Standards for the Appointment and Performance of Counsel in Death Penalty Cases (1988) (the "NLADA Standards"). *See Wiggins v. Smith*, 539 U.S. 510, 524 (2003). Courts may also look to the State Bar of Texas's Guidelines and Standards for Texas Capital Counsel, 69 Tex. B.J. 966 (2006) (the "Texas Counsel Guidelines").

**B.    Trial Counsel Were Ineffective at the Punishment Phase of Mr. Balderas's Trial**

544.    Balderas's trial counsel team presented a woefully deficient mitigation case in his capital sentencing trial, consisting of only three witnesses who provided superficial, conclusory, and disjointed facts about him. The trial team also failed to investigate and rebut "other acts" evidence of four shootings linked to Mr. Balderas, and they failed to thoroughly investigate and present mitigation evidence concerning his history of mental illness, his abusive childhood, and his positive character and role as a protector. Likewise, Mr. Balderas's state habeas counsel failed to properly assert the glaring deficiencies of trial counsel in his State Petition. Because the representation provided by Mr. Balderas's trial counsel and habeas counsel fell far below an "objective standard of reasonableness," he was deprived of a fair sentencing trial with a reliable result.

***1.    Trial counsel failed to investigate the "other acts" evidence of four shootings linked to Mr. Balderas.***

545.    Trial counsel failed to sufficiently investigate the extraneous offenses the State alleged were attributable to Mr. Balderas, leaving the State's attribution of four additional shootings—including three murders—to Mr. Balderas largely unrebutted. Had counsel conducted a proper investigation, the jury would have heard evidence that cast serious doubt on Mr. Balderas's involvement in those extraneous offenses, and as a result, they would have had a much different evidentiary picture to consider when determining the answer to the first special issue.

546.    There is no reasonable explanation for trial counsel's failure to investigate and present evidence rebutting the damaging extraneous offense evidence. Trial counsel knew the State's strategy and that it would allege that Mr. Balderas was involved in several shootings that law enforcement attributed to the LTC between September and December 2005. The State alleged that Mr. Balderas was involved in (1) a September 12, 2005 burglary of a home on Loma Vista

street during which Daniel Zamora was shot and killed (the "Loma Vista Shooting"); (2) a December 3, 2005 drive-by shooting of Eric Romero on Beltway (the "Beltway Shooting"); (3) a December 15, 2005 shooting death of Jose Garcia on Bunker Hill Road (the "Bunker Hill Shooting"); and (4) a November 14, 2005 non-fatal shooting of Luis Garcia on Woodfair Drive (the "Woodfair Drive Shooting"). (33 RR at 6:8-8:5.) Multiple members of the LTC were present during each of these offenses.

547.     To support the allegations concerning Mr. Balderas's involvement, the State relied on the jury's guilt/innocence phase determination that Mr. Balderas had used a specific .40 caliber handgun to shoot Powder, as well as Cookie's guilt/innocence phase testimony that Mr. Balderas was known to use a particular .357 caliber handgun. (*Id.*) Through ballistics evidence, the State attempted to show that the .40 caliber handgun used in the Powder shooting was also used in the Loma Vista Shooting, and that the .357 caliber handgun was used in the Beltway, Bunker Hill, and Woodfair Drive Shootings. (*Id.*; 37 RR at 113:24-160:20.)

548.     The State also presented testimony from Alejandro Garcia that Mr. Balderas was involved in the Loma Vista and Beltway Shootings. Mr. Garcia testified in exchange for a deal reducing his capital murder charge to an aggravated robbery charge carrying a five-year probated sentence. (*See* 34 RR at 154:6-160:18, 204:21-246:14; 35 RR at 10:12-30:23.)

549.     The State also relied on testimony from an eyewitness, Courtney Altimore, to link Mr. Balderas to the Bunker Hill shooting. According to Ms. Altimore, she was on her way home from church on December 15, 2005, when she approached the intersection of Westview and Bunker Hill. (36 RR at 96:8-97:20.) At the intersection, she saw a small silver car ahead of her, facing in the same direction, that was stopped in the middle of the intersection. (*Id.* at 98:1899:21.) She also saw two more cars pulled over to the side, also facing the same direction, in front of the

silver car. (*Id*.) Ms. Altimore recalled that the front vehicle was a large sedan and the middle vehicle was a car, not a truck. (*Id*.) When she first pulled up, it appeared that the first two cars had been in an accident, and that the small silver car had hit them from behind. (*Id*.) Ms. Altimore said a person exited the passenger side of the silver car and tried to run away before being shot by someone who exited the driver's side of the same vehicle. (*Id*. at 99:22-100:6.) The shooter shot the victim three to five times before getting back into the car. (*Id*. at 103:16-20.) Ms. Altimore took note of the silver car's license plate number and later reported it to law enforcement, who determined the car was registered to Mr. Balderas. (*Id*. at 104:16-105:23.).)

550. Thus, even though Ms. Altimore did not see the shooter well enough to make an identification, the State used her identification of the car's license plate to implicate Mr. Balderas as the Bunker Hill shooter. (36 RR at 110:17-19.) There were also significant deficiencies in Ms. Altimore's testimony. Trial counsel attempted to highlight some of them in their cross examination, including the fact that she originally reported hearing two rounds of shooting and that she originally failed to report seeing the victim trying to run from the scene. (*Id*. at 118:10-119:19.) The state court referenced trial counsel's cross-examination of the relevant witnesses in its FFCL. (*See* FFCL, Habeas Writ Record, Vol. X, 02844-2938, at 02901 ¶ 225.)

551. The basis for challenging Ms. Altimore's statement about Bunker Hill was, however, even more significant than that. Her recollection of the events, which she admitted caused her to be "frozen in fear, ducking for [her] own safety" (36 RR 107:24-108:7), was completely contradicted by the account provided by Clemente Tovar Flores, the surviving victim of Bunker Hill who was closer to the events as they were taking place. Mr. Flores reported to law enforcement that he was driving in his pickup truck toward the intersection of Bunker Hill and Westview on the evening of December 15, 2005. (Houston Police Department Report, Incident

No. 1886929005, Habeas Writ Record, Vol. III, 00888-890, at 00888.) When he got to the intersection, a cream-colored sedan, perhaps a Cadillac, pulled in front of his truck and cut them off. (*Id.*) According to Mr. Flores, three men got out of the sedan and pointed guns at him and his passenger, Jose Garcia. (*Id.*) At that point, Mr. Garcia exited Mr. Flores's truck and began to run. (*Id.*) Two of the men who had gotten out of the sedan in front of his truck shot at Mr. Garcia about four times. At least one of the men then commandeered Mr. Flores's truck and drove away, eventually taking Mr. Flores to a location where he was held for a period of time before eventually being released. (*Id.* at 00888-90.) Important aspects of Mr. Flores's account of the shooting were corroborated by an eyewitness, Eduardo Tamayo, who gave his initial statement to the HPD on December 20, 2005.

552.    Mr. Flores's statement would have painted Ms. Altimore as an unreliable witness and would have undermined the State's claim that Mr. Balderas's car was tied to the shooting. It is hard to conceive why trial counsel would not use Mr. Flores to impeach Ms. Altimore, however, for precisely that reason. Had trial counsel investigated the Bunker Hill shooting, they would have undoubtedly discovered evidence that called the eyewitness's inculpatory account into question. Mr. Flores's account clearly indicates that the shooters exited the first car, not the third car, as Ms. Altimore testified. Had trial counsel presented this evidence to the jury, it is unlikely that the State could have proven that Mr. Balderas was the Bunker Hill shooter.

553.    In addition, on November 25, 2020, the State disclosed handwritten notes from a July 15, 2020 discussion with Angela Quinones, which were never sent to trial or appellate counsel. Ms. Quinones was a witness to the Bunker Hill shooting, and she told prosecutors that she saw a Honda Accord, a Cadillac, and a truck that were involved in the incident. (*See* handwritten notes

with Angelina Quinones from July 15, 2010 (the "2010 Quinones Notes")). This testimony corroborates Mr. Flores's description of a Cadillac near the intersection.

554.    At least as early as May 2, 2012, the State began providing written notice to trial counsel of its intention to use evidence of prior and extraneous offenses that were introduced at trial. (Notice of Intention to Use Evidence of Prior and Extraneous Offenses, May 2, 2012, Habeas Writ Record, Vol. II, at 00517-28; Notice of the State's Intent to Extraneous Offenses and Prior Convictions for Impeachment And/Or Punishment, January 6, 2014, CCA Record, Vol. V, at 01130-35.) And yet trial counsel failed to conduct a professionally competent investigation into these extraneous offenses, resulting in an incomplete, misleading, and prejudicial picture of Mr. Balderas. Because trial counsel failed to investigate the Bunker Hill Shooting and the other extraneous crimes, they were used to Mr. Balderas's extreme detriment and contributed substantially to the jury's decision to sentence him to death.

### 2. Trial counsel failed to investigate and present evidence that other LTC members used Mr. Balderas's car on a regular basis.

555.    Had trial counsel investigated the extraneous offenses just discussed, and Mr. Balderas's activities around the time those offenses occurred, they would have discovered that the Honda with license plate number 756 GNB, registered in Mr. Balderas's name, was often used by other members of LTC Alief. That license plate number was the primary piece of evidence the State presented to tie Mr. Balderas to the Bunker Hill and Woodfair Drive Shootings. Because trial counsel failed to investigate, they failed to present testimony that would have established reasonable doubt that Mr. Balderas was present at or involved in those shootings.

556.    Mr. Balderas often allowed other LTC Alief members to borrow his car when they needed it. For example, when Gumby was trying to lay low in Houston after cutting off his ankle monitor, he asked Mr. Balderas if he could use his car to move around. He had asked another LTC

member, Benitez, first, but Benitez had said no. Benitez stated that he sometimes saw Gumby driving past him in Mr. Balderas's car. (Affidavit of Walter Benitez ("Walter Benitez Aff."), Oct. 26, 2015, Habeas Writ Record, Vol. II, 00513-20, at 00515 ¶ 10.)

557.     Evidence about the Bunker Hill Shooting was critical at the punishment phase. Trial counsel attempted to introduce evidence that someone else had been using Mr. Balderas's car through a cross examination of Mitch Weston, the lieutenant with the Harris County Fire Marshal's Office. Lt. Weston testified that he arrived on the scene at 12:06 am on December 17, 2005, approximately 28 hours after the Bunker Hill Shooting. (36 RR 148:21-149:12.) Based on his analysis of Mr. Balderas's burned out car and his own expertise, Lt. Weston opined that the fire was started in the car less than two hours before he arrived at the scene. (36 RR 149:13-22.) Trial counsel made the point that Mr. Balderas had been arrested and in HPD custody since around noon on December 16, 2005, and Lt. Weston then changed his story to say that the fire could not have been ignited more than 13 hours before he arrived at the scene. (*Id*. at 149:23-150:7.) Trial counsel's theory that someone other than Mr. Balderas was using his car was not supported by crucial evidence because they had failed to conduct an independent investigation into collateral offenses. *Rompilla v. Beard*, 545 U.S. 374, 393 (2005). Had counsel presented testimony from Mr. Benitez, the jury would have known that Mr. Balderas's car was regularly used by other members of LTC Alief.

558.     Thus, had trial counsel conducted the requisite investigation of the alleged extraneous offenses as they were obligated to do, they would have discovered evidence to defeat the aggravating evidence presented by the State. Counsel's performance in this regard was deficient and severely prejudiced Mr. Balderas. Given the import of the undiscovered and unutilized testimony and evidence, Mr. Balderas is entitled to a live evidentiary hearing to fully

178

develop and present material that would have affected the outcome of the sentencing phase. *Strickland*, 466 U.S. at 690-91.

### 3.    Trial counsel failed to investigate Mr. Balderas's dissociation from LTC.

559.    Many of the issues that pertain to trial counsel's failures at the guilt/innocence phase of trial, detailed above in in Claim II, also affected and pertain to trial counsel's investigation in preparation for the punishment phase. A sufficient investigation during the guilt/innocence phase would have uncovered, for example, evidence that Mr. Balderas belonged to a subgroup of LTC Alief that was not directly involved in violent activities. Further, trial counsel would have discovered that Mr. Balderas had been making an effort to distance himself from the gang. The presentation of these key facts would have cast doubt on the State's claims that Mr. Balderas committed the extraneous offenses.

560.    In its Findings of Fact and Conclusions of Law, the State court stated that "trial counsel presented testimony regarding the hierarchy and operations of LTC as rebuttal to the State's presentation of extraneous offenses," listing Celeste Munoz, Daniella Chavez, and Judy Gallegos. (FFCL, Habeas Writ Record, Vol. X, 02844-2938, at 02902 ¶ 226.) But this testimony barely touched the surface of the inner workings of the LTC, and the court did not address the paucity of the investigation.

561.    The State court also stated that, based on the affidavit of Jerome Godinich, trial counsel "investigated whether the applicant was disassociating from LTC." (*Id.* at 02889 ¶ 200(e).) However, the affidavit merely states that Mr. Balderas's "attempts at dissociation could not be verified," which hardly suggests a thorough investigation. (Affidavit of Jerome Godinich ("Jerome Godinich Aff."), Aug. 8, 2017, Habeas Writ Record, Vol. V, 01471-75, at 01473.)

562.    In the year or so leading up to his arrest in December 2005, many of Mr. Balderas's friends and family noticed a change in him. He had reconnected with his father and was building

179

a relationship with him. (Affidavit of Juan Balderas, Sr. ("Juan Balderas Sr. Aff."), Jan. 8, 2016, Habeas Writ Record, Vol. II, 00485-00511, at 00507 ¶¶ 30-31.) He was also focusing on his education. (Affidavit of Maria Victoria Reyes Mirafuentes ("Vicky Mirafuentes Aff."), December 25, 2015, Habeas Writ Record, Vol. II, 00589-00613, at 00611 ¶ 39; Affidavit of Jesus Balderas ("Jesus Balderas Aff.), Oct. 25, 2015, Habeas Writ Record, Vol. II, 00475-00483, at 00481 ¶¶ 1819; Affidavit of Daniella Chaves ("Daniella Chaves Aff."), Nov. 2, 2015, Habeas Writ Record, Volume II, 00522-24, at 00523 ¶ 9; Walter Benitez Aff, Habeas Writ Record, Vol. II, 0051300520, at 00517 ¶ 16.) His friend, Daniella Chaves, recalls working with him "constantly on his academic work to help get him through high school." (Daniella Chaves Aff., Habeas Writ Record, Vol. II, 00522-00524, at 00523 ¶ 9.) Mr. Balderas was also making plans for the future; he wanted to go to college and had applied to the Art Institute. (Vicky Mirafuentes Aff., Habeas Writ Record, Vol. II, 00589-00613. at 00611 ¶ 39; Jesus Balderas Aff., Habeas Writ Record, Vol. II, 0047500483, at 00481 ¶ 19; Juan Balderas, Sr. Aff., Habeas Writ Record, Vol. II, 00485-00511, at 00508 ¶ 32; Daniella Chaves Aff., Habeas Writ Record, Volume II, 00522-00524, at 00523 ¶ 9; Walter Benitez Aff., Habeas Writ Record, Vol. II, 00513-00520, at 00517 ¶ 16.)

563.    In the fall and winter of 2005, Mr. Balderas was associating less with the LTC. According to Walter, Mr. Balderas "just did not come around as much anymore." (*Id*.) Instead, he was spending more time with people who were not involved in LTC Alief, such as Ileana Cortes, the then girlfriend of his brother, Jesus Balderas, and her family. (Vicky Mirafuentes Aff., Habeas Writ Record, Vol. II, 00589-00613, at 00611 ¶ 40; Affidavit of Anali Garcia ("Anali Garcia Aff."), Oct. 27, 2015, Habeas Writ Record, Vol. II, 00565-00568, at 00565 ¶ 3; Affidavit of Octavio Cortes ("Octavio Cortes Aff."), Oct. 26, 2015, Habeas Writ Record, Vol. II, 00526-00529, at 00527 ¶ 5; Exhibit B, Declaration of Ileana Cortes ("Ileana Cortes Decl."), Mar. 23, 2021, ¶¶ 45)

To those close to Mr. Balderas, it was clear that he was "trying hard to turn his life around," and that he "wanted to get out of the gang." (Jesus Balderas Aff., Habeas Writ Record, Vol. II, 00476-483, at 00481 ¶ 19; *see also* Vicky Mirafuentes Aff., Habeas Writ Record, Vol. II, 00589613, at 00611 ¶ 37; Daniella Chaves Aff., Habeas Writ Record, Vol. II, 00513-20, at 00515 ¶ 9; Anali Garcia Aff., Habeas Writ Record, Vol. II, 00565-00568, at 00567 ¶ 14; Walter Benitez Aff., Habeas Writ Record, Vol. II, 00513-20, at 00517 ¶ 16.) He had started the process of getting his visible gang tattoos removed, and he started dressing differently, in a more preppy style than before. (Jesus Balderas Aff., Habeas Writ Record, Vol. II, 00476-483, at 00481 ¶ 19; *see also* Juan Balderas, Sr. Aff., Habeas Writ Record, Vol. II, 00485-00511, at 00508 ¶ 32; Vicky Mirafuentes Aff., Habeas Writ Record, Vol. II, 00589-613, at 00611 ¶ 37; Affidavit of German Enriquez ("German Enriquez Aff."), Dec. 18, 2015, Habeas Writ Record, Vol. II, 00537-00556, at 00555 ¶ 23.)

564.    It was not only Mr. Balderas's friends and family who noticed a change in him. Other members of LTC Alief also recognized that he was moving "in a complete opposite direction." Because they "did not have a future to look forward to," they were starting to get frustrated with Mr. Balderas for trying to pull away from LTC. (Jesus Balderas Aff., Habeas Writ Record, Vol. II, 00476-483, at 00481 ¶ 19.) This frustration likely came to a head when Mr. Balderas broke ranks even further with the LTC Alief's "conservative" faction and advocated against their intention to murder Powder in retaliation for snitching on Cookie. (*See* Walter Benitez Aff, Habeas Writ Record, Vol. II, 00537-00556, at 00553-00554 ¶¶ 17-19; Affidavit of Jose Perez ("Jose Perez Aff."), Nov. 11, 2015, Habeas Writ Record, Vol. II, 00647-56, at 0065200653 ¶¶ 18-24.)

565.     Mr. Balderas's jury never heard about the full extent of his efforts to distance himself from LTC Alief in the months leading up to his arrest. In particular, trial counsel never contacted Octavio Cortes, nor did they ask his brother to testify. (Jesus Balderas Aff., Habeas Writ Record, Vol. II, 00476-483, at 00482 ¶ 24.) Garcia reached out to trial counsel on her own accord in an effort to provide testimony on Mr. Balderas's behalf but was turned away after a brief conversation. She was told that "they had enough character witnesses and they did not need [her]." (Anali Garcia Aff., Habeas Writ Record, Vol. II, 00565-00568, at 00566 ¶ 12.) Mr. Balderas's mother, Mr. Benitez, and Ms. Chaves testified at trial on other matters, but because trial counsel failed to investigate, they did not know to examine them on how Mr. Balderas was beginning to pull away from LTC Alief. (Vicky Mirafuentes Aff., Habeas Writ Record, Vol. II, 00589-613, at 00612 ¶ 43; Walter Benitez Aff., Habeas Writ Record, Vol. II, 00513-00520, at 00513-00514 ¶¶ 3-5; Daniella Chaves Aff., Habeas Writ Record, Volume II, 00522-00524, at 00523 ¶ 11.) Each of them would have all testified to these facts, had they been asked. (Octavio Cortes Aff., Habeas Writ Record, Vol. II, 00526-00529, at 00528¶ 11; Jesus Balderas Aff., Habeas Writ Record, Vol. II, 00476-483, at 00482 ¶ 24; Anali Garcia Aff., Habeas Writ Record, Vol. II, 00565-00568, at 00566 ¶ 12; Vicky Mirafuentes Aff., Habeas Writ Record, Vol. II, 00589-613, at 00612 ¶ 43; Walter Benitez Aff., Habeas Writ Record, Vol. II, 00513-20, at 00520 ¶ 24; Daniella Chaves Aff., Habeas Writ Record, Volume II, 00522-24, at 00523 ¶ 11). Because trial counsel failed to sufficiently investigate Mr. Balderas's life leading up to his arrest, including his deteriorating relationship with the gang, they also failed to present evidence establishing those crucial exculpatory facts to the jury.

### 4. Trial counsel failed to investigate LTC's retaliation against its own members.

566.    Trial counsel also failed to introduce evidence that LTC Alief was not above retaliating against its own members. Indeed, such retaliation was the crux of the State's theory at Mr. Balderas's trial. Again, the State court only mentioned that Judy Gallegos testified that Gumby was the leader of LTC Alief and that he made the ultimate decisions. (FFCL, Habeas Writ Record, Vol. X, 02844-02937, at 02902 ¶ 226(c).) According to the State, Powder was murdered because he had upset LTC Alief members by snitching on Cookie, by hanging out with people associated with other gangs, and by throwing signs of other gangs. (*See* 24 RR at 16-18.) There were also rumors circulating that Powder had slept with Cookie's girlfriend. (Walter Benitez Aff., Habeas Writ Record, Vol. II, 00513-20, at 00517 ¶ 13), which the State court noted in its decision (FFCL, Habeas Writ Record, Vol. X, 02844-2938, at 02902 ¶ 226(a)), but this was certainly not the only example of the LTC Alief retaliating against members it perceived to have stepped out of line. The State's theory that the murder was an act of retaliation was thus correct, but as detailed in Claim I, they pinned Powder's murder on an innocent man.

567.    Available evidence showed that LTC Alief had a propensity for framing its own members in retaliation. Jose "Debo" Luviano, a former LTC member, was a prime example, and evidence of the retaliation against him could have been found in the State's discovery. Debo shot another LTC Alief member, Pedro Acuna, on March 4, 2004. (Houston Police Department Report, Incident No. 173100804K ("HPD Report 173"), Habeas Writ Record, Vol. III, 00864.) Debo was arrested that same day on aggravated assault charges for the shooting. (Houston Police Department Report, Incident No. 139901405L ("HPD Report 139"), Habeas Writ Record, Vol. III, 00866-00871.) Mr. Acuna had owed Debo money. (Jose Perez Aff., Habeas Writ Record, Vol. II, 00647-00656, at 00650 ¶ 13.)

568.    That Debo would shoot a fellow LTC Alief member was against the code. Members of LTC Alief took issue with Debo's actions because it made the organization "look weak" and caused it to "lose respect in the community." Shooting a fellow member "was supposed to be a group decision," and such decisions were usually made by majority rule, though sometimes Gumby, the de facto leader, "would decide to do whatever he wanted to do." (*Id*. at 00650-00651 ¶ 14.)

569.    The Luviano family's neighbors reported to law enforcement that shortly after Debo had been released from county jail on bond, the family had moved away from their home and relocated to the Katy, Texas area. According to their neighbor, rumors were that Debo "had done some bad things in the neighborhood and the family could not remain at that house." (Houston Police Department Report, Incident No. 189107305U ("HPD Report 189"), Habeas Writ Record, Vol. III, 00882.) On May 12, 2005, Debo was sentenced to two years for shooting Pedro. (Harris County District Clerk Record, Luviano, Oct. 29, 2015, Habeas Writ Record, Vol. III, 00873-00880.) Debo was in TDJC custody from June 14, 2005 to April 25, 2007. (Brady Notice, Luviano ("Luviano Brady Notice"), Jan. 2, 2014, Habeas Writ Record, Vol. III, 00884-00886.)

570.    Unaware of what was happening with Debo or his case, Cookie coordinated with other LTC members, including Alejandro Garcia, to frame Debo for the Loma Vista Shooting. (Jose Perez Aff., Habeas Writ Record, Vol. II, 00647-56, at 00650-00651 ¶ 14.) Monica Esquivel, the mother of Cookie's girlfriend, reported to law enforcement that Cookie told her Debo had been involved. (HPD Report 139, Habeas Writ Record, Vol. III, 00866-00871, at 00867.) Mr. Garcia also identified Debo in a photo array as the fifth participant in the Loma Vista Shooting, along with Pedro Garcia, Cookie, Efrain "Hairless" Lopez, and Mr. Balderas. (*Id*. at 00868.) Based on the information Mr. Garcia provided, the HPD filed aggravated robbery charges against Debo for

his "role" in the Loma Vista Shooting on December 20, 2005. (*Id.* at 00871.) Those charges persisted for nearly a year, until the Harris County District Attorney's office moved to dismiss them because "defendant was in prison at time of offense." (*See* Luviano Brady Notice.)

571.    Trial counsel failed to utilize any of this readily available evidence to establish LTC Alief's penchant for retaliation, including their willingness to frame members for crimes they did not commit. Because counsel failed to sufficiently investigate the extraneous offenses, they were either unaware of LTC Alief's propensity to frame its own or were ill-prepared to present evidence of it. Trial counsel never contacted Perez, who was willing to testify to this information, had he been asked. (Jose Perez Aff., Habeas Writ Record, Vol. II, 00647-56, at 00656 ¶ 31.)

572.    Further, trial counsel not only failed to investigate, they also failed to utilize records and information already within their possession to rebut the State's use of the alleged extraneous offenses to obtain a death sentence. Counsel made no effort to cross-examine Alejandro Garcia, the State's key witness during the punishment phase, about his identification of Debo as a Loma Vista Shooting participant, even after he testified at trial that Debo was there. (*See* 34 RR at 204:21-217:23, 228:1-231:9.) Further, the State had filed a *Brady* notice that Debo could not have been involved in the Loma Vista Shooting. (Luviano Brady Notice.) Trial counsel's failure to cross-examine Mr. Garcia is incomprehensible, especially considering their focus on his credibility. Instead of exploiting a readily-available example of Mr. Garcia lying in his trial testimony, trial counsel focused on his incredible plea deal that reduced his charges from capital murder to aggravated assault and resulted in a probated sentence. (*See* 35 RR at 10:11-115:25.)

573.    Evidence of LTC's history of retaliation would have buttressed trial counsel's weak effort to defend Mr. Balderas against the State's extraneous offense allegations. Had counsel presented evidence of the LTC's prior retaliations, the jury would have understood that some of

the State's main evidence against Mr. Balderas at the guilt/innocence and punishment phases—namely, that the weapons used to commit the various crimes were found in his custody—did not mean that he participated in the offenses in question.

574.    Trial counsel's failure to sufficiently investigate the foregoing claims and issues, and their equally serious failure to present evidence rebutting the alleged extraneous offenses, constitutes deficient performance.

**5.    *Trial counsel failed to investigate and present mitigation evidence.***

575.    In *Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007) and *Brewer v. Quarterman*, 550 U.S. 286 (2007), the Supreme Court reaffirmed that "sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future." *Abdul-Kabir*, 550 U.S. at 246; *Brewer*, 550 U.S. at 295-95. Further, "when the defendant's evidence may have meaningful relevance to the defendant's moral culpability 'beyond the scope of the special issues,' a mitigation instruction is required." *Abdul-Kabir*, 550 U.S. at 354 n.14; *McGowen v. Thaler*, 675 F.3d 482 (5th Cir. 2012). "[W]hen deciding whether to sentence a defendant to death, jurors must be able to give a reasoned moral response to evidence that has meaningful mitigating relevance beyond its ability to negate the special issues, particularly evidence which speaks to a defendant's moral culpability." *Coble v. Quarterman*, 496 F.3d 430, 447 n.15 (5th Cir. 2007).

576.    Trial counsel must conduct a reasonable investigation, and any strategic choices made to conduct a less than complete investigation are reasonable only to the extent that reasonable professional judgment supports those limitations. *Wiggins v. Smith*, 539 U.S. 510 (2003); *Sears v. Upton*, 130 S. Ct. 3259, 3265 (2010) (per curiam) (holding that trial counsel cannot insulate their decision from collateral attack by claiming that it was a strategic choice to pursue or not pursue or

186

present mitigating evidence if they failed to first complete a reasonable investigation.). Further, trial counsel is bound to make reasonable efforts to obtain and review material it knows the prosecution will likely rely on as aggravation at the trial's sentencing phase. *Rompilla v. Beard*, 545 U.S. 374 (2005). Capital counsel are required to conduct a far-reaching, exhaustive investigation into their client's life history for potential mitigation evidence that will motivate a jury to vote for life over death. ABA Guidelines, Guideline 10.7 cmt. Mitigating evidence can be any evidence that "might serve 'as a basis for a sentence less than death.'" *Tennard v. Dretke*, 542 U.S. 274, 286-87 (2004) (quoting *Skipper v. South Carolina*, 476 U.S. 1,5 (1986)).

577.    In fact, trial counsel did not conduct a thorough pretrial mitigation investigation and it did not retain expert witnesses that delved into Mr. Balderas's mental health history in detail. Trial counsel's investigation did not meet the standard required under the ABA Guidelines, the Texas Supplementary Guidelines, or the United States Constitution. As such, this Court should consider the merits of this claim *de novo*.

### C.    Trial Counsel's Investigation

578.    Trial counsel's investigation, and consequently their punishment phase presentation, focused primarily on three issues: the sexual abuse Mr. Balderas suffered as a child, the circumstances of his introduction to a gang, and his mental development. The majority of trial counsel's punishment phase presentation relied on the testimony of various experts on limited issues. Trial counsel did little to investigate and provide the jury with an accurate and complete picture of their client and his remarkable life, including the transformation he was undergoing in the timeframe leading up to his arrest. In failing to develop lay testimony with first-hand knowledge of Mr. Balderas's traumatic childhood, counsel was unable to present witnesses that could put a human face on the experts' opinions and make the mitigating evidence more accessible and compelling. Perhaps most importantly, trial counsel failed to investigate and understand Mr.

Balderas's own mental health issues, an understanding of which is crucial at the punishment phase and would have helped to paint a more nuanced picture of Mr. Balderas's life.

579.    Trial counsel had more than eight years to prepare for trial, but their investigation did not benefit from that exceedingly long pre-trial period. Rather, the mitigation investigation was plagued by steady turnover. The original mitigation specialist, Carmen Laffey, was retained on Mr. Balderas's case from around 2006 to 2008, though it appears from trial files that Ms. Laffey was primarily active on the case between February and October 2007.[23] From February 2009 to March 2011, Cyndy Short and Mary Poirier served as Mr. Balderas's mitigation specialists. Then, in mid-2009, upon recommendation by Ms. Short and Ms. Poirier that the trial team add a Spanish-speaking mitigation specialist, Adriana Helenek also joined Mr. Balderas's case as a mitigation specialist. Ms. Short and Ms. Poirier appear to have directed the mitigation investigation until 2011 when they left, and Ms. Helenek remained on the case after Ms. Short and Ms. Poirier withdrew, staying involved until the trial was completed in March 2014. An attorney named Amy Martin was also involved in Mr. Balderas's case intermittently between 2009 and 2012 in a mitigation consulting role. It appears she reviewed records, consulted with outside experts, and met with Mr. Balderas.

580.    This lack of continuity contributed to a disjointed and scattered mitigation investigation. For example, Mr. Balderas's brother, Jesus, received a call from Mr. Balderas's trial team at some point after 2011 asking him about Mr. Balderas's family tree, which was information he had already provided years before. When Jesus asked why they were making a second request, the trial team told him they had "lost all of [the] boxes with this information and that they needed

---

[23] Note that the Clerk's Record does not appear to contain a full record of trial counsel's funding and expert requests that were likely filed over the course of the eight years Mr. Balderas's case was pending. Thus, some of these dates are estimated based on trial counsel communication and work product.

me to give them the information again." (Jesus Balderas Aff., Habeas Writ Record, Vol. II, 00476-483, at 00482 ¶ 23.)

581.    Further, trial counsel did not retain any Spanish-speaking mitigation team members until they retained Ms. Helenek almost four years after Mr. Balderas's arrest, even though key mitigation witnesses such as Mr. Balderas's parents and extended family in Mexico only spoke Spanish. None of Mr. Balderas's attorneys spoke Spanish either, which became a significant impediment to communicating with the client's family. Moreover, aside from Ms. Laffey and Ms. Martin, the trial team's mitigation specialists were all based outside of Texas. Ms. Short and Ms. Poirier were based out of Kansas City, Missouri, and Ms. Helenek was based out of Atlanta, Georgia. Thus, for the majority of the mitigation investigation, Mr. Balderas's mitigation specialists were based more than 600 miles away from Mr. Balderas and his life in Houston. They did not have consistent physical access to Mr. Balderas, his family members and friends, or the places important to his life.

582.    Ms. Laffey, the only Houston-based mitigation specialist, apparently conducted only one mitigation interview of Mr. Balderas's mother, Maria Victoria Reyes Mirafuentes, during her entire two-year tenure on the case. When the out-of-town mitigation specialists joined the case, virtually no investigation had been done. Mirafuentes recalls meeting with Ms. Helenek, and instead of asking questions to build a mitigation case, Ms. Helenek was focused on recruiting Mirafuentes to pressure Mr. Balderas to plead for a life without parole sentence. When Mirafuentes voiced her frustration to Ms. Helenek about being pushed to convince her son to take the plea, Ms. Helenek identified Mr. Godinich as the source of the pressure. (Vicky Mirafuentes Aff., Habeas Writ Record, Vol. II, 00589-613, at 00612 ¶ 42.) Mr. Balderas's brother, Jesus, also recalled that

as the trial neared, "Godinich would only talk to me to pressure Juan to accept life in prison." (Jesus Balderas Aff., Habeas Writ Record, Vol. II, 00476-00483, at 00482 ¶ 23.)

583.    Mirafuentes had less than six meetings over eight years with her son's attorneys, and even when she did meet with them, no one could speak to her in Spanish, the only language in which she was able to communicate. Trial counsel had a Spanish-speaking woman at meetings to translate, but Mirafuentes had difficulty communicating through her. (Vicky Mirafuentes Aff., Habeas Writ Record, Vol. II, 00589-613, at 00611-00612 ¶¶ 41-42.) For all of these reasons, trial counsel's performance in investigating Mr. Balderas's case was deficient, and Mr. Balderas's punishment phase trial was prejudiced. Had the available evidence been presented, there is a reasonable probability that at least one juror would have voted to spare Mr. Balderas's life.

### 1.    *Mr. Balderas's violent and abusive childhood and unstable family.*

584.    Evidence concerning Mr. Balderas's violent and abusive childhood was readily available to trial counsel and should have been presented during the punishment phase. In denying Mr. Balderas's State Petition, the court relied on the Godinich Affidavit, which states that trial counsel presented substantial evidence of Mr. Balderas's "violent, abusive, and unstable childhood environment and upbringing." (FFCL, Habeas Writ Record, Vol. X, 02844-2938, at 02889-91 ¶¶ 200(d), 202, 205, and 206.) However, trial counsel failed to delve into the details of Mr. Balderas's life.

585.    Mirafuentes did not discover that she was pregnant with Mr. Balderas until at least two months into her pregnancy, which meant that she continued to drink as she normally would, easily consuming a six pack of beer on the weekends. Even after finding out she was pregnant, Vicki continued to drink alcohol, potentially causing damage to Mr. Balderas in utero. (Vicky Mirafuentes Aff., Habeas Writ Record, Vol. II, 00589-613, at 00609 ¶ 31). Mr. Balderas's father, Juan Balderas, Sr., grew up in extreme poverty – the family did not even have money enough for

shoes or pants. He was unable to attend school through most of his childhood and instead started working in the fields, planting corn and beans and harvesting sugarcane alongside his father. When he was finally able to attend school around 13 or 14 years of age, he quit within a year or two because he was humiliated to be placed in class with 6-year-olds instead of children his own age. He also had trouble concentrating due to hunger. (Juan Balderas, Sr. Aff., Habeas Writ Record, Vol. II, 00485-00511, at 00499 ¶¶ 2, 4-5.)

586.    When Balderas Sr. was 20 years old, he decided to leave Mexico and come to the United States to find work that would allow him to "make more money in order to survive." Balderas Sr. arrived in the Houston area alone, without any family or savings. He needed to work in order to eat, so he took a job as a construction worker, which entailed hard physical work. (Juan Balderas, Sr. Aff., Habeas Writ Record, Vol. II, 00485-00511, at 00502-503 ¶¶ 13, 15.)

587.    Balderas Sr. met Mirafuentes when he was 24 years old. He knew that Mirafuentes "liked to be with men" and that she was "loose" or "wild." He hoped she would settle down and change after they got together. That did not happen. (Juan Balderas, Sr. Aff., Habeas Writ Record, Vol. II, 00485-00511, at 00503-00504 ¶¶ 18-19.)

588.    Mirafuentes moved in with Balderas Sr. after speaking with him only a few times. Shortly after she moved in, she got pregnant with Mr. Balderas. Balderas Sr. believed that she had planned to get pregnant because she knew he had a good job and a baby meant more security for her. He believed that she had used him, and even though they were together for around a year and a half, Balderas Sr. never felt that he and Mirafuentes were close. (Juan Balderas, Sr. Aff., Habeas Writ Record, Vol. II, 00485-00511, at 00504 ¶¶ 20-21.)

589.    Mirafuentes eventually left Balderas Sr. after he found out that she was having an affair with another man. Balderas Sr. discovered the affair and severely beat Mirafuentes in front

of Mr. Balderas. Mr. Balderas saw it all and was sobbing and screaming while it happened. Nevertheless, Mirafuentes did not leave Balderas Sr. until he severely beat her a second time. (Vicky Mirafuentes Aff., Habeas Writ Record, Vol. II, 00589-613, at 00607-00608 ¶¶ 24-26.) Mr. Balderas was only about a year old when his father and mother's relationship ended. According to Balderas Sr., Mirafuentes made sure he could not see his sons; she would try to get him in trouble with the police if he came around. As a result, Balderas Sr. did not meet Jesus until he was 12 or 13 years old. (Juan Balderas, Sr. Aff., Habeas Writ Record, Vol. II, 00485-00511, at 00506 ¶ 27.)

590.    After Mirafuentes left Balderas Sr. she met and became involved with a horribly brutal man named Eliazar Hernandez. She moved in with him soon after meeting him and they had two boys together, Alex and Ivan. Eliazar was very abusive to Mirafuentes's children, hitting them often with wire clothes hangers as hard as he could. (Jesus Balderas Aff., Habeas Writ Record, Vol. II, 00476-483, at 00476 ¶ 4); Vicky Mirafuentes Aff., Habeas Writ Record, Vol. II, 00589-00613, at 00610 ¶ 34.) Mr. Balderas and Jesus told their mother that Eliazar was hurting them, but she did not listen or seem to care. Eliazar also had unpredictable, violent outbursts and would get angry over nothing. He would hit walls and punch glass windows. (Jesus Balderas Aff., Habeas Writ Record, Vol. II, 00476-483, at 00476-00477 ¶¶ 3-4, 6.)

591.    Eliazar's abuse of the children was not limited to violent outbursts. He also raped Mr. Balderas, Jesus, and Alex. There were times when Mr. Balderas and Jesus could hear Eliazar sexually abusing Alex in the next room. After Eliazar was done abusing Alex, he would take him outside the house and hose him down with the water hose. (Jesus Balderas Aff., Habeas Writ Record, Vol. II, 00476-483, at 00603 ¶ 5.) Years later, as a teen, Mr. Balderas confided in his now-wife, Escobar, that he had once confronted his mother about the fact that Eliazar was raping him, and Mirafuentes responded by calling him a liar. This response seems to have deeply affected Mr.

192

Balderas. (Affidavit of Yancy Escobar ("Yancy Escobar Aff."), Oct. 24, 2015 Habeas Writ Record, Vol. II, 00558-00563, at 00558 ¶ 3.)

592.    Mirafuentes claims she was not aware that Eliazar was sexually abusing Mr. Balderas and the boys until many years later. She said she was "lost in [her] own world." (Vicky Mirafuentes Aff., Habeas Writ Record, Vol. II, 00589-00613, at 00610 ¶ 35.) She recognizes in hindsight that Mr. Balderas did not want to be around Eliazar – Mr. Balderas would leave the room whenever Eliazar would arrive, and he went so far as to run away from home when he realized he would have to move back in with Eliazar after his year with family in Mexico. Mirafuentes said she noticed that Mr. Balderas and Jesus's personalities would change whenever Eliazar was around, changes she associated with the physical abuse he inflicted on them. But despite Eliazar's constant violence and abuse, Mirafuentes would often leave her sons alone with him. When the family was living in Veracruz in the year before she left him, Mirafuentes travelled back to Houston at least twice for about eight days each time, leaving the boys with Eliazar. She understands that he sexually abused Mr. Balderas, Jesus, and Alex during those times. Mr. Balderas told his mother that "Eliazar used to open his anus up so he could look inside him," a disturbing revelation that she never shared with anyone. (Vicky Mirafuentes Aff., Habeas Writ Record, Vol. II, 00589-00613, at 00610 ¶¶ 34-35.)

593.    Abuse by Eliazar was not the only sexual abuse Mr. Balderas suffered. When he was about 8 years old, he was preyed on by his Aunt Theresa and her friend. They molested him and touched him inappropriately. Mr. Balderas later told Jesus about these molestations, and according to Jesus, Mr. Balderas wanted him to believe that the incident didn't bother him. Jesus knows that it did. (Jesus Balderas Aff., Habeas Writ Record, Vol. II, 00476-483, at 00478 ¶ 10.)

594.    When Mr. Balderas was around 11 years old, he and his brothers escaped the repeated sexual abuse by Eliazar when their mother left him after he tried to strangle and kill her. (Vicky Mirafuentes Aff., Habeas Writ Record, Vol. II, 00589-613, at 00610 ¶ 36.) And yet, Mr. Balderas and his brothers continued to experience physical abuse from their mother even after Eliazar was gone. According to Ivan, his mother would treat him and his brothers "just as Eliazar had treated her," beating them "for nothing." Ivan and Alex were beat with a belt often, hard enough to leave "big bruises" and belt marks on their legs. They would compare the bruises she left on their bodies. Mirafuentes beat the boys for minor infractions like not listening or playing outside when they were not supposed to. She would also beat Ivan when he did not understand what was going on at school, or when he forgot something. Ivan recalls that his mother "was really impatient with me and my brothers." (Affidavit of Ivan Hernandez ("Ivan Hernandez Aff."), Oct. 18, 2015, Habeas Writ Record, Vol. II, 00570-00587, at 00572 ¶¶ 9-10.) She would get extremely angry and lose her temper on the kids. Ivan recalls seeing his mother grab Jesus and slam his head into a wall, though he does not recall what Jesus may have done to "deserve" it. (*Id.* at 00573 ¶ 10.)

595.    Mirafuentes's mental and emotional instability had a negative influence on Mr. Balderas and had an enormous impact on his development and mental health. She testified at trial that she felt Mr. Balderas was a nuisance in her life when he was a small child and that she "did not want to be responsible for him." (38 RR at 46:11-47:14.) She admitted that she was careless with her children and did not care what happened to them when they were young. (*Id.* at 50:6-23.) The jury did not hear, however, about her destructive history of making rash, risky, and dangerous decisions without regard for the consequences, even when they affected Mr. Balderas and her other children.

596.    Shortly after leaving Eliazar, Mirafuentes moved herself and her four boys to the Alief neighborhood of Houston, which was violent and dangerous at the time. While the violence Mr. Balderas witnessed at home had abated after Eliazar left, he now saw more violence and crime surrounding him in his community. (Jesus Balderas Aff., Habeas Writ Record, Vol. II, 00476483, at 00479-00480 ¶¶ 14, 16; German Enriquez Aff., Habeas Writ Record, Vol. II, 00537-00556, at 00551 ¶ 11.) Mirafuentes was so afraid of being attacked in that neighborhood that Mr. Balderas and Jesus—as young children—would walk her out to her car every morning in an effort to protect her. (Jesus Balderas Aff., Habeas Writ Record, Vol. II, 00476-483, at 00479 ¶ 14.) There was frequent violence between African Americans and Latinos in the community, and Mr. Balderas's family heard gunshots nearly every night and would often see people getting into fights and being stabbed. (*Id.*)

597.    Mr. Balderas was exposed to extreme violence, crime, and sexual abuse his entire life. Trial counsel failed to conduct a proper investigation into these issues, and thus their focus was necessarily limited. In particular, once Mr. Balderas revealed that he had been sexually abused as a child, trial counsel's punishment phase focus was limited to the effects of abuse and his decision to join a gang in middle school. The focus should have been much broader and far reaching to encompass other important mitigation avenues.

598.    In addition, trial counsel failed to provide evidence of Mr. Balderas's well-known and documented good character, as detailed below, particularly in the important period leading up to Powder's murder. This failure left the jury with an incredibly distorted picture of who Mr. Balderas is and the nature and extent of his gang involvement. Thus, the State's highly misleading portrayal of Mr. Balderas as a gang leader who readily participated in violent activities and took advantage of young girls went largely un-rebutted.

195

### 2.    Mr. Balderas's history of mental illness.

599.    Trial counsel utterly failed to present evidence concerning the crucial topic of Mr. Balderas's history of mental illness. Such information was readily available to counsel and should have been presented during both the guilt /innocence phase and the punishment phase of trial. Evidence of mental illness is pertinent to culpability, and here, it would have been powerful evidence that would have affected the jury's evaluation of Mr. Balderas's culpability and decision to sentence him to death.

600.    Trial counsel retained Dr. Matthew Mendel, a psychologist with expertise in working with male victims of sexual abuse. Dr. Mendel met with Mr. Balderas for approximately twenty hours, conducted psychological testing, and testified regarding the devastating trauma Mr. Balderas suffered. (*See* 38 RR at 125:5-178:15; 39 RR at 36:20-108:19.) Though planning for years to present mitigation evidence at trial, counsel failed to include this theme as part of jury selection.

601.    As discussed in detail above, Mr. Balderas was raised by mentally ill caregivers, and many members of his family suffer from mental illness. Eliazar was a severely mentally ill perpetrator of sexual abuse who was eventually institutionalized in Mexico. Jesus thought it was highly possible that Eliazar was schizophrenic (Jesus Balderas Aff., Habeas Writ Record, Vol. II, 00476-483, at 00477 ¶ 6), and at one-point Eliazar told Mirafuentes that he too had been sexually abused. (Vicky Mirafuentes Aff., Habeas Writ Record, Vol. II, 00589-613, at 00608 ¶ 27.) Eliazar attempted suicide at least once while living in Houston. His cousin, Mr. Enriquez, said Eliazar attributed his mental health issues to "what happened to him when he was younger, when he was kidnapped and held hostage and sexually abused." (German Enriquez Aff., Habeas Writ Record, Vol. II, 00537-00556, at 00548-00549 ¶¶ 2, 4-6.)

602.    In February 2001, Mr. Balderas was diagnosed with adjustment disorder with disturbance of conduct, which caused educational problems and disruptions to his primary support group. (Harris County Sheriff's Office Records ("HCSO Records"), Feb. 15, 2001, TDS-000001-001140, at TDS-000759-761.) In May 2002 he was diagnosed with Axis I: Oppositional defiant d/co and was placed at Riverside Hospital for inpatient substance abused treatment. (*See* Mental Health and Mental Retardation Authority of Harris County Records ("MHMRA Records"), May 13, 2002, TDS-001197-001281, at TDS-001201 and TDS-001210-1216.) He attended a Juvenile Boot Camp in June 2002, and camp records indicate that he was constantly talking without permission and disrupting the unit. He received incident reports for the disruptions, and for refusing to sleep. (*See* Juvenile Boot Camp Records, Delta Boot Camp Incident Report ("Boot Camp Incident Report"), June 5, 2002, 001853-856.)

603.    In February 2008, Mr. Balderas's initial mental health assessment was completed. At the time, he reported trouble sleeping and said he slept only two to three hours a day. He had nightmares about his stepfather abusing him and reported seeing shadows "without faces" that would say things to him. (HCSO Records, TDS-000001-001140, at TDS-000746-749.) Mr. Balderas was diagnosed with mood D/O NOS R/O (Rule out) schizoaffective d/o NDS with depressed mood. He was Axis II: antisocial traits and GAF-38. (*Id*.)

604.    In May 2009, Mr. Balderas was diagnosed with bipolar D/O NOS (not otherwise specified) with psychosis, generalized anxiety disorder, and polysubstance dependence. (HCSO Records, TDS-000001-001141, at TDS-000824-825.) He reported continued symptoms of paranoia, hallucinations, mood swings, irritability, depression, and anxiety. In October 2009, Mr. Balderas reported having A/V hallucinations and that he could "feel an evil presence." (HCSO

197

Records, TDS-000001-001140, at TDS-000829.) He also said he was "having nightmares and Satan is taunting him." (*Id*.)

605.    Mr. Balderas took several different types of medications for his depression, including Lexapro, Seroquel, Zoloft, Paxil, Klonopin, and Celexa, with varying success and with some side effects. (HCSO Records, TDS-000001-001140, at TDS-000833 and TDS-000867.) At certain points he refused to take his medications routinely. (*Id*. at TDS-000868.)

606.    In April 2012, Mr. Balderas was diagnosed with MDD with psychotic features and continued on a variety of antidepressants throughout 2013. (HCSO Records, April 18, 2012, TDS-000237.) In July 2013, Mr. Balderas reported suicidal ideation/thoughts, and admitted that he kept his meds in order to complete a suicide attempt. (HCSO Records, at TDS-000174.) At the time he was reporting moderate symptoms of visual hallucinations and mentioned that he has a history of seeing the shadows and hallucinations since he was a child. (*Id*. at TDS-000185.)

607.    In March 2014, Mr. Balderas received a physical Exam at the Polunsky Unit. He complained of depression and was prescribed medicines, including Luvox, Abilify, and Seroquel. (Texas Department of Criminal Justice, Institutional Division, Health Services Records ("TDCJ Records"), April 11, 2014, Vol. XI, TDS-002315-002451, at TDS-002353-002354 and TDS-002392-002395.) He was also prescribed thiothixene (brand: Navane), which is used to treat schizophrenia and psychotic symptoms. (TDCJ Records, TDS-002315-002451, at TDS-002402.)

608.    In September 2014, Mr. Balderas underwent an initial psychiatric evaluation in TDCJ custody. The report noted that he had no history of psychiatric hospitalization or outpatient treatment in the "free world," but that he had been treated with Seroquel and Prozac during the 8 years he spent in county jail. (*See* TDCJ Records, TDS-002315-002451, at TDS-002435-002441.), September 8, 2014, TDS-002435-002441.) Mr. Balderas stated that he has a history of hearing

demonic voices saying, "you are supposed to die," and that his "mind plays tricks." He said he wakes up with nightmares and sees shadows that look like him. He often has insomnia. (*Id.*) Mr. Balderas was diagnosed with Axis I: R/O Psychosis NOS, R/O MDD with Psychosis, and R/O PTSD. (*Id.*)

609.   Mr. Balderas's younger brothers, Alex and Ivan Hernandez also had serious mental health issues. Alex started seeing and hearing imaginary things when he was about 16 years old, suggesting he may have been schizophrenic. After Alex committed suicide in 2011, Ivan became depressed and was unable to keep up with his schoolwork. (Affidavit of Ivan Hernandez, ("Hernandez Aff."), Dec. 18, 2015, Habeas Writ Record, Vol. II, 00570-00587, at 00576-00577, 00579-00580 ¶¶ 21-23, 29-30.) He also has mental illnesses of his own. He laughs at inappropriate times and displays many childlike behaviors. According to Mirafuentes, Ivan seems to live in a different world. She says he's sick and hears voices. (Vicky Mirafuentes Aff., Habeas Writ Record, Vol. II, 00589-613, at 00608 ¶ 28.) Ivan has been in and out of mental hospitals and has been on a number of medications that contribute to his abnormal behavior. Ivan has told Jesus he sees demons, and when they are talking Ivan seems to be responding to things that Ivan cannot hear. (Jesus Balderas Aff., Habeas Writ Record, Vol. II, 00476-483, at 00477 ¶ 8.) Ivan tried to commit suicide in 2012 after Alex died, and then again in 2013, after which he spent some time in a mental hospital. (Vicky Mirafuentes Aff., Habeas Writ Record, Vol. II, 00589-613, at 00608 ¶ 28.)

610.   As is evident, Mr. Balderas grew up in a home with severely mentally ill individuals prone to irrational outbursts, hallucinations, abuse, and all sorts of bizarre behavior that became a part of his daily life. Mr. Balderas's own mental state was affected by these influences. The state court found that trial counsel presented evidence of Mr. Balderas's familial history of mental illness (FFCL, Habeas Writ Record, Vol. X, 02844-2938, at 02891 ¶ 205), but they did not use

that information to effectively support Mr. Balderas's defense or mitigation case. Most importantly, they spent very little time on Mr. Balderas's own troubled mental health picture.

611.    In the six years since Mr. Balderas was sentenced to death, Mr. Balderas's condition has deteriorated. In November 2014 Mr. Balderas was enrolled in the Treatment and Relapse Prevention Program and prescribed various medications. (TDJC Records, Vol. XI, TDS-002315-002451, at TDS-002432-002434.) In March 2015 Mr. Balderas began refusing medical visits, medications, and x-rays, and continues to do so. (*See* University of Texas Medical Branch Records ("UTMB Records"), March 12, 2015, Vol. XVI, TDS-002737-002890, at TDS-002784-2787.)

612.    Undersigned counsel hired Dr. Bhushan Agharkar, a psychiatrist with extensive experience treating a wide range of conditions, to evaluate Mr. Balderas. Dr. Agharkar performed two psychiatric evaluations of Mr. Balderas, on May 27, 2021 and July, 29 2021. (See Exhibit A, Report of Bhushan Agharkar, MD ("Agharkar Report"), Jan. 12, 2022.) Based on his evaluation, Dr. Agharkar recommended a full neuropsychological battery be performed to elucidate the existence and extent of organic brain damage. Undersigned counsel hired Dr. Robert H. Ouaou, PhD, who conducted such testing of Mr. Balderas on October 15, 2021. (See Exhibit C, Report of Robert H. Ouaou, PhD ("Ouaou Report"), Jan. 15, 2022.)

613.    Based on Dr. Agharkar's evaluation of Mr. Balderas, with reference to his review of Mr. Balderas's juvenile records, school records, Harris County mental health record, Texas Department of Corrections mental health records, family history documents, trial transcripts, and the psychological reports of Jolie S. Brams, PhD., and Matthew Mendel, PhD, and the neuropsychological report by Dr. Robert H. Ouaou, PhD,Dr. Agharkar formed the following opinions and observations:

- Mr. Balderas has a long history of significant and pervasive mental health difficulties. He was diagnosed with Bipolar Disorder and Major Depression with Psychotic Features while incarcerated in the Harris County jail.

- Mr. Balderas currently suffers from Schizoaffective Disorder, Bipolar Type, and Post-Traumatic Stress Disorder (PTSD). There is also evidence he suffers from Organic brain impairment.

- Mr. Balderas's Schizoaffectice Disorder, Bipolar Type, is indicated by Mr. Balderas's history of depressive episodes, endorsement of hallucinations, paranoid and grandiose delusions, and disorganized and tangential thought processes. During Dr. Agharkar's interviews, Mr. Balderas was pressured in his speech and preoccupied with discussing UFO's, the existence of aliens, and visual hallucinations he has experienced. Mr. Balderas believes the "prosecutors and gang members" set him up to be incarcerated so the government can experiment on him and learn more about his connections to aliens and their spaceships.

- Mr. Balderas likely has frontal and parietal lobe brain damage/dysfunction, based on his poor performance on neurological screenings performed during Dr. Agharkar's examinations. Mr. Balderas's thought processes were tangential, he had difficulty switching from one topic or task to another, his insight and judgment were poor, and he had difficulty recalling a short story after fifteen minutes.

- Mr. Balderas's mood difficulties are compounded by his exposure to significant environmental trauma in childhood as well as physical and sexual abuse.

- Mr. Balderas exhibited a host of cognitive defects that are found in patients with significant central nervous system damage. Mr. Balderas has demonstrated learning and memory

deficits. Mr. Balderas demonstrated significant impairments on many measures of executive functioning strongly associated with damage and/or diminished development of the frontal lobe region of the brain as well as general neurological disease.

- According to Dr. Agharkar's interview of Mrs. Yancy Balderas conducted via Zoom on October 22 and 29, 2021, it is believed Mr. Balderas's mother drank while pregnant with Mr. Balderas. Mr. Balderas's mother reportedly dropped him on his head when he was a newborn infant. Mr. Balderas's stepfather would hold his face down under water to drown him when he was about 8 years old in Mexico.

- During Dr. Agharkar's interview with Mrs. Yancy Balderas, Mr. Balderas has told he hears voices and believes he is descended form an Egyptian prince. Since his incarceration in his late teens, he often talks about witchcraft, ancient civilizations, an aliens. Mr. Balderas believed the State was spying on Mrs. Yancy Balderas though a mirror in her house and asked her to remove it. Mr. Balderas admitted to Mrs. Yancy Balderas that he heard voiced, several years before his trial.

- Mr. Balderas was diagnosed with Psychotic Disorder, Not Otherwise Specified, and treated with antidepressants and antipsychotic medication while on death row in the Texas DOC. The records available indicate a complex interplay of trauma, potential brain damage, a mood disorder, and a psychotic condition, all which require extensive work-up to determine the extent of Mr. Balderas's brain impairment.

- Dr. Brams's report focused on Mr. Balderas's horrific experience of prolonged sexual abuse and the resulting trauma. Dr. Brams also discussed the significance of Mr. Balderas's experiences with childhood neglect, parental abandonment, and physical abuse as additional sources of trauma, and hypothesized that Mr. Balderas's abuse of inhalants may

have caused brain impairment. However, she did not recommend neurological or neuropsychological screening or testing, nor did she evaluate Mr. Balderas for other mood disorders or psychotic symptoms after she diagnosed him with Post-traumatic Stress Disorder. Further, Dr. Brams does not appear to have relied on any of the critical information concerning Mr. Balderas's diagnoses while at the Harris County jail. As such, the accuracy and reliability of Dr. Brams's report is in question and is incomplete.

- Dr. Mendel also diagnosed Mr. Balderas with Post-traumatic Stress Disorder and failed to evaluate Mr. Balderas for other mood disorders or for psychosis. Due to failures of Trial Counsel, Dr. Mendel was not provided with critical information about Mr. Balderas's psychiatric history and treatment, including treatment with antipsychotic and antidepressant medication. His examination of Mr. Balderas is therefore incomplete and unreliable.

- Based on the full neuropsychological battery performed by Dr. Ouaou on October 15, 2021, Mr. Balderas demonstrates learning and memory deficits in addition to significant impairments on many measures of executive functioning strongly associated with damages to the frontal lobes of the brain. Damage to these areas would negatively impact Mr. Balderas's ability to rationally weigh and deliberate, inhibit his impulses, regulate his mood and emotions, memory functioning, and freedom from preservation. Frontal lobe dysfunction is also implicated in symptoms of paranoia and psychotic disorders.

- Based on the nature of brain damage/dysfunction revealed by neuropsychological testing, and that there have been no head injuries since the time of trial, it is likely Mr. Balderas's brain impairments were present at the time of his trial.

614.    Dr. Agharkar stated in his report that there were compelling mood, trauma, and brain impairment symptoms that were not adequately investigated and presented in his capital case. Mr. Balderas's manic and psychotic symptoms as recounted in his pre-trail jail medical records should have been followed-up on. Furthermore, Mr. Balderas's childhood trauma was not fully addressed in this case even though early childhood trauma has a tremendous impact on brain development and functioning. Furthermore, Mr. Balderas's clear mental disease and defect, detailed in Dr. Ouaou's neuropsychological report, was unknown at the time of trial because inadequate experts were hired and no brain testing was performed. (Ex. A, Agharkar Report. at 78.)

615.    The results of Dr. Ouaou's subsequent neuropsychological evaluation of Mr. Balderas, conducted on October 15, 2021, are consistent with Dr. Agharker's psychiatric evaluation. (See Ex. C, Ouaou Report, Jan. 15, 2022.) Based on Dr. Ouaou's evaluation of Mr. Balderas, with reference to his review of Mr. Balderas's Medical Records, Mental Health Records, Academic Records, Jail and Prison Records, Juvenile and Extraneous Offense Records, Psychological Report by Jolie S. Brams, PhD, Declaration of Bhushan S. Agharkar, MD, DFAPA, and Declarations of Lay Witnesses, Dr. Ouaou formed the following opinions and observations:

- Mr. Balderas has a history of severe childhood physical and sexual abuse, head injuries, inhalant abuse, and possible in utero alcohol exposure.

- Mr. Balderas suffered innumerable blows to the head from physical abuse, accidents, and youth boxing, many of which occurred during the developmental period and resulted in a loss of consciousness. Evidently, Mr. Balderas was dropped as an infant by his uncle and sustained a permanent skull depression.

- Mr. Balderas abused inhalants daily for one year beginning at age 14. Such inhalants included carbonator cleaners, known to cause changes to the central nervous.

- Mr. Balderas has been diagnosed with PTSD, major depression, and psychosis.

- Mr. Balderas's IQ was below average (FSIQ = 87; 19th percentile). An estimate of premorbid IQ showed his IQ should be in the average range (105; 63rd percentile). This represents a significant decline form the expected baseline.

- Mr. Balderas exhibited intellectual declines and a host of cognitive deficits that are found in patients with significant central nervous system damage.

- Mr. Balderas demonstrated learning and memory deficits and significant impairments on many measures of executive functioning strongly associated with damage to and/or diminished development of the frontal lobe region of the brain as well as general neurological disease.

- The mental diseases suffered by Mr. Balderas were present well before and at the time of trial.

- Despite the prior psychological examiners' reports that Mr. Balderas suffered profound developmental damage at critical points in his life and had significant risk factors that caused brain damage, there was a failure to refer him to experts to further evaluate the impact of brain damage on Mr. Balderas's ability to competently participate in the trial proceedings.

616.    Dr. Ouaou opines that Mr. Balderas's cognitive deficits were not only likely present at the time of the alleged offense and trial, but were likely greater in severity at that time. Mr. Balderas likely suffered from severe etiologies of central nervous system damage that were present at the time of trial. Behavioral and cognitive consequences of Mr. Balderas's history of abuse and

trauma, head injuries, and other risk factors on a developing brain contributed to his behavior at the time of trial. According to Dr. Ouaou, the ramifications of Mr. Balderas's cognitive deficits likely hampered his competency at the time of trial and an understanding of his neuropsychological functioning would have been vital to determine whether he was able to have a rational understanding of the proceedings, adequately process information presented to him during trial, and accurately relate information to counsel. (Ex. C, Ouaou Report, Jan. 15, 2022, at 10.)

### 3.    *Mr. Balderas's positive character and role as a protector.*

617.    In its Findings of Fact and Conclusions of law, the State court cited evidence of Mr. Balderas's positive character and role as a protector that had been presented by trial counsel. (*See* FFCL, Habeas Writ Record, Vol. X, 02844-2938, at 02891 ¶ 204.) However, neither trial counsel nor habeas counsel delved into the specifics, details that were important for the jury to hear.

618.    Despite his traumatic upbringing, Mr. Balderas was a typical child in many ways. He was mellow and liked playing video games and hanging out with his brothers. (Jesus Balderas Aff., Habeas Writ Record, Vol. II, 00475-00483, at 00479 ¶ 15; Daniella Chaves Aff., Habeas Writ Record, Vol. II, 00522-00524, at 00523 ¶ 6.) He played soccer with his friends and attended church. (Octavio Cortes Aff., Habeas Writ Record, Vol. II, 00526-00529, at 00526 ¶ 2.) He cared so much about school that Jesus considered him "basically a nerd." (Jesus Balderas Aff., Habeas Writ Record, Vol. II, 00475-00483, at 00479 ¶ 15.) In fact, Mr. Balderas made a point of encouraging his younger brothers and friends to focus on their education. He "strongly encouraged Jesus to go to school" and explained to his brothers how important education was if they wanted to have a good and successful life. (Affidavit of Celeste Munoz ("Celeste Munoz Aff."), October 23, 2015, Habeas Writ Record, Vol. II, 00643-00645, at 00643 ¶ 2; Yancy Escobar Aff., Habeas Writ Record, Vol. II, 00558-00563, at 00558 ¶ 4.) He also encouraged his younger friend, Octavio

Cortes, to do well in school. (Octavio Cortes Aff., Habeas Writ Record, Vol. II, 00526-00529, at 00528 ¶ 10.)

619.    As a quiet, private person, Mr. Balderas had a selective group of friends and did not share his private life widely. (Vicky Mirafuentes Aff., Habeas Writ Record, Vol. II, 00589613, at 00609 ¶ 32; Daniella Chaves Aff., Habeas Writ Record, Vol. II, 00522-00524, at 00523 ¶ 7.) He was known for his introspection and reserve.

620.    Mr. Balderas struggled with the fact that he did not have a father figure in his life, but he also felt pressure to step up and take care of his family, especially since Mirafuentes neglected the children on a regular basis. According to Jesus, the boys "rarely had a parent around to watch over us." (Jesus Balderas Aff., Habeas Writ Record, Vol. II, 00476-483, at 00476, 00479 ¶¶ 2, 13; *see also* Celeste Munoz Aff., Habeas Writ Record, Vol. II, 00643-00645, at 00643 ¶ 2; Yancy Escobar Aff., Habeas Writ Record, Vol. II, 00558-00563, at 00558 ¶ 4.) Mr. Balderas stepped into that role and tried to be a father figure for his younger brothers. (Jesus Balderas Aff., Habeas Writ Record, Vol. II, 00476-483, at 00480 ¶ 16; Celeste Munoz Aff., Habeas Writ Record, Vol. II, 00643-00645, at 00558 ¶ 2.) He was very supportive of them and served as a major source of love in their lives. (*Id.*) From the age of nine or ten, Mr. Balderas would clean the house and walk his younger brothers to and from school to make sure no one was bothering them. He took care of their daily needs, including washing their clothes and cooking them meals. (Ivan Hernandez Aff., Habeas Writ Record, Vol. II, 00570-00587, at 00573 ¶¶ 12-14; Jesus Balderas Aff., Habeas Writ Record, Vol. II, 00476-483, at 00477, 00480 ¶¶ 7, 16.)

621.    Mr. Balderas was also very supportive of his friends. For example, he grew very close to the family of Jesus's former girlfriend Ileana's family, especially after Jesus and Ileana had a daughter in March 2005. (Anali Garcia Aff., Habeas Writ Record, Vol. II, 00565-00568, at

00565 ¶¶ 2-3; Octavio Cortes Aff., Habeas Writ Record, Vol. II, 00526-00529, at 00527 ¶ 2; (Ex. B, Ileana Cortes Decl., ¶¶ 4-5)

622.    Finally, Mr. Balderas was very protective of his family. Even thought he was involved in LTC, he tried to keep his brothers away from the gangs in the area. (Jesus Balderas Aff., Habeas Writ Record, Vol. II, 00476-00483, at 00481 ¶ 16.) There are many more examples of Mr. Balderas acting as a protector, a role model, and as a good friend, brother, and son. The jury should have heard this evidence as it would have positively affected their overall impression of Mr. Balderas.

### D.    Trial Counsel's Failure to Investigate Mitigating Evidence Constituted Ineffective Assistance of Counsel

623.    Capital counsel have an explicit duty to investigate and present mitigating evidence that will convince a jury to spare their client's life. *See Wiggins*, 539 U.S. at 523-24 (recognizing the importance of social history presentations in capital cases); ABA Guidelines, Guideline 10.11(F)(2); Texas Guidelines, Guideline 11.7(F)(2); Texas Supplementary Guidelines, Guideline 5.1(B), 10.11. And yet, in Mr. Balderas's case, trial counsel limited their mitigation investigation and presentation to a couple issues: Mr. Balderas's sexual victimization as a child and the effects of those traumatic experiences on his mental and emotional development. But presentation of a capital defendant's social history is necessary to provide the jury with a comprehensive and sympathetic appreciation for the individual whose life is in their hands. *See* ABA Guidelines, Guideline 4.1 cmt. ("[T]he defendant's psychological and social history and his emotional and mental health are often of vital importance to a jury's decision at the punishment phase.").

624.    In Mr. Balderas's case, trial counsel's inquiry and presentation ended with Mr. Balderas's sexual victimization and gang involvement. In presenting the case for Mr. Balderas's life, trial counsel failed to locate and utilize numerous readily available lay witnesses, including

some who were already testifying on other matters, to explain the many other aspects of Mr. Balderas's personhood. Because counsel failed to present this evidence, the jury was virtually ignorant of Mr. Balderas's character, and the ways in which he was valuable and important to those closest to him. Capital counsel is responsible for conducting a broad and thorough investigation in order to identify and present the full range of mitigating evidence that "may help the decisionmaker to have a more complete view" of the defendant. *See* ABA Guidelines, Guideline 10.11, cmt.

625.    A partial investigation and presentation to the jury of very little relevant evidence is inadequate at the punishment phase and does not permit the presumption of effective representation. Rather, it is counsel's responsibility to conduct a thorough and searching inquiry into a client's background, and into the alleged extraneous offenses that heavily influence a jury's perception of a defendant. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009); *Williams v. Taylor*, 529 U.S. 362, 396 (2000); ABA Guidelines, Guideline 10.7(A); Texas Guidelines, Guideline 11.1(A)(3)(b). Further, trial counsel completely failed to conduct an inquiry into Mr. Balderas's own mental health issues. *See Walbey v. Quarterman*, 309 Fed. App'x 795, 802 (5th Cir. 2009) (not published) ("This standard clearly contemplates that even when some mitigating evidence is presented at trial, prejudice is still possible if that evidence is substantially incomplete." (emphasis in original)). Had the evidence been presented, there is a reasonable probability that at least one juror would have voted for a life sentence. *See Strickland*, 466 U.S. at 694; *Ex parte Ellis*, 233 S.W.3d 324, 329-30 (Tex. Crim. App. 2007); *Ex parte Chandler*, 182 S.W.3d 350, 353 (Tex. Crim. App. 2005).

### E.    Trial counsel failed to preserve the record for appeal

626.    Effective trial counsel in a capital case must "ensure that a full record is made of all legal proceedings..." ABA Guidelines, Guideline 10.8(B)(2). The ABA Guidelines further provide the following:

> "One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review. Failure to preserve an issue may result in the client being executed even though reversible error occurred at trial. For this reason, trial counsel in a death penalty case must be especially aware not only of strategies for winning at trial, but also of the heightened need to fully preserve all potential issues for later review."

*Id.*, cmt.

627.    Further, trial counsel has a duty to object to inadmissible evidence or improper argument, and to establish a record reflecting adverse rulings by the court. See ABA Guidelines, Guideline 10.8, cmt. ("One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review"); ABA Criminal Justice Standard for the Defense Function, 4-1.5 ("defense counsel should take steps necessary to make a clear and complete record for potential review"); *Id.* at 4-7.2(f) ("If defense counsel considers an order to be significantly erroneous or prejudicial, counsel should ensure that the record adequately reflects the events"); Texas Guidelines, Guideline 11.2(A) ("Counsel at every stage of the case... should...evaluate each potential claim in light of the importance of protecting the client's rights against later contentions by the government that the claim has been waived, defaulted, not exhausted, or otherwise forfeited....") and Guideline 11.2(B) ("Counsel... should ensure that a full record is made of all legal proceedings in connection with the claim.").

628.    Trial counsel repeatedly failed to fulfill these fundamental duties in Mr. Balderas's case. Counsel failed to object during the punishment phase when the State referenced Mr. Balderas's failure to testify in the jury's presence multiple times, violating Mr. Balderas's Fifth Amendment rights. Trial counsel also failed to make a record of the trial court's denial of the funds necessary to produce key mitigation witnesses located in Mexico to testify in person. As a result, these very important witnesses were required to testify via Skype, and due to insurmountable

technical problems with the Skype transmission, their testimony wasn't heard at all. Trial counsel's failure to preserve this major error prejudiced Mr. Balderas's right to appeal a fundamental violation of his right to a fair trial under both the state and federal constitutions, and Texas law.

> **1.    Trial counsel failed to object and preserve error when the State emphasized Mr. Balderas's failure to testify, in violation of his Fifth Amendment rights.**

629.    In order to establish that his counsel was ineffective for failing to properly object, Mr. Balderas must show, under *Strickland*, that his attorney "acted objectively unreasonably in failing to object and that he was prejudiced by the failure to object." *Vuong v. Scott*, 62 F.3d 673, 684 (5th Cir.), *cert. denied*. 516 U.S. 1005 (1995) (citing *Strickland*, 446 U.S. at 687). Specifically, Mr. Balderas must demonstrate that his counsel's performance was deficient under prevailing professional norms (*id.* at 684), and that counsel committed "errors so serious that counsel was not functioning as counsel guaranteed by the Sixth Amendment." *Strickland*, 446 U.S. at 689.

630.    At the punishment phase of Mr. Balderas's trial, the State, through its questioning, implied that the jury should not believe the information about Mr. Balderas relayed by the experts—including details about the sexual abuse he endured as a child—because Mr. Balderas himself did not testify to it. Dr. Matthew Mendel, a psychologist who testified about trauma and sexual abuse, and Dr. Matthew Brams, a psychiatrist who testified about juvenile brain development, stated that Mr. Balderas suffered sexual abuse at the hands of his stepfather when he was very young. In Dr. Mendel's expert opinion, Mr. Balderas re-experienced the abuse in the course of discussing it with him. (38 RR at 142:8-144:1.) On cross examination, the State posed the following questions to Dr. Mendel:

> So the jury doesn't have the opportunity to watch this reliving that you're describing. *They don't get to see that for themselves. They don't get to hear his words*. They have you to rely on? (39 RR at 54:19-22.) (emphasis added)

> So in this particular instance when a jury's being asked to judge the credibility of what the defendant said to you, you would agree that it would
>
> be much more helpful for them to do that if it was recorded? (*Id*. at 57:29.)
>
> And again, you're the only one that has that opportunity [to hear and see Balderas describe his sexual abuse], *because jurors aren't going to get to see that,* are they? (*Id*. at 58.) (emphasis added)

The State pursued a similar line of questioning while cross examining Dr. Brams. Specifically, the State asked Dr. Brams the following:

> Certainly it would be helpful to the jurors if they could see or hear the interviews that you conducted with the defendant so they could judge for themselves how he sounded, maybe how he looked, if you could video it. Don't you think that would be helpful to the jurors? (40 RR at 15-16.) (emphasis added)

The State asserted through its questioning that because Mr. Balderas did not testify, the jury was unable to "judge for themselves how he sounded, maybe how he looked" while recounting the information. (*Id.*) Likewise, they did not have the "opportunity to watch [him] reliving" the abuse as Dr. Mendel described. (39 RR at 54:19-22.) These questions by the State, an explicit appeal to the jury, were meant to penalize Mr. Balderas for exercising his Fifth Amendment right not to testify. With no possible justification, trial counsel did not object.

631.    In its Findings of Fact and Conclusions of Law, the state court again relied on the affidavits of trial counsel, stating that "counsel did not object to portions of the State's cross-examination of Dr. Matthew Mendel and Dr. Matthew Brams regarding the failure to record conversations with the applicant, or the associated portions of the State's closing argument because counsel did not construe these as comments on the applicant's failure to testify, and believed these were fair points for cross-examination and attacks on the credibility of the experts." (FFCL, Habeas Writ Record, Vol. X, 02844-2938, at 02904-05 ¶ 244.) The transcript of the cross examination, excerpted in part above, suggests otherwise.

212

632.     The State court also noted that it did not find "the State's argument and cross-examination of experts Matthew Mendel and Matthew Brams constituted a comment on the applicant's failure to testify, but rather appropriately raised questions concerning the credibility of the defense's sexual abuse evidence." (*Id*. at 02905 ¶ 245.) Again, as the transcript shows, the State's questions were mean to penalize Mr. Balderas for choosing not to testify.

633.     Further, in its closing argument at the punishment phase, the State unleashed a broadside attack on Mr. Balderas's right not to testify:

> And remember how Mendel described how animated the defendant was when he's reporting his abuse? Wouldn't you have liked to have seen that for yourself so you could judge for yourself how truthful you found the defendant's words to be instead of relying on his 60,000 dollars' worth of mouthpieces? But you didn't get to see that...

(43 RR at 67:6-12.) (emphasis added) At least one juror bought the State's argument. Juror Orosz did not believe that Mr. Balderas was sexually abused. (*See* Juror Orosz Aff., Habeas Writ Record, Vol. IV, 01087-01092, at 01091 ¶ 13.)

634.     Despite these egregious Fifth Amendment violations, trial counsel failed to raise any objection to the State's serious misconduct. And further harm was done to Mr. Balderas's penalty phase defense by the State's suggestion that the jury should disbelieve that Mr. Balderas was sexually abused as a child, or at least disregard the sexual abuse as mitigation, because he failed to take the stand during the punishment phase to testify about himself.

635.     Had the objection been raised and denied by the Court, it is likely that Mr. Balderas would have prevailed in raising the issue on direct appeal. And notably, because the State's error implicated Mr. Balderas's rights under the United States Constitution, the appellate court would have applied a harmless error test. That is, it would have had to determine "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *See Bird v. State*, 527 S.W.2d 891, 895 (Tex. Crim. App. 1975) (finding prosecutor's comment on failure to testify

not harmless error where defendant "received the most extreme punishment authorized by law – death"). Because the reviewing court likely would have determined the error was not harmless and vacated Mr. Balderas's sentence on direct appeal, Mr. Balderas suffered prejudice as a result of defense counsel's failure to object to and properly preserve this issue.

636.    Trial counsel failed to preserve error by making a record of the court's denial of funds to produce witnesses from Mexico.

637.    As discussed above, the clarity and integrity of the trial record is vital to preserving the possibility of meaningful appellate review. *See, e.g.,* Michael Catalano, Making and Preserving the Record – Objections, 6 Am. Jur. Trials 605 (1967). It is the duty of defense counsel to "keep the trial record clear, correct, and complete, so that at the end of the trial there will be an accurate history of the proceedings." *Id.* This duty is of paramount importance in a capital murder trial, as the imposition of the death penalty is subject to automatic appeal. Tex. Crim. Pro. art. 37.071 § 2(h).

638.    The ABA Guidelines make clear that a failure to preserve the record in a capital trial should be considered deficient performance. *See* ABA Guidelines, Guideline 10.8(B)(2), cmt. Although the CCA has never directly addressed the issue of ineffective assistance of counsel for failing to ensure the preservation of a complete and clear record, indications are that failure to do so satisfies the deficient performance prong of *Strickland*. First, in considering these claims, lower appellate courts in Texas have moved directly to the *Strickland* prejudice prong, implicitly finding that failure to ensure a complete record may constitute deficient performance. *See, e.g., Howard v. State*, 239 S.W.3d 359, 367 (Tex. App.-San Antonio 2007) (noting that "competent trial counsel should ensure all rulings appear in the record"). The Fifth Circuit has done the same in similar cases. *See, e.g., Green v. Johnson*, 160 F.3d 1029, 1042-43 (5th Cir. 1998).

214

639.    The state court relied on Mr. Godinich's affidavit, stating that "the trial court would have paid for the transportation and housing of defense witnesses from Mexico . . . but the witnesses were unable to coordinate among themselves who would come to Houston." (FFCL, Habeas Writ Record, Vol. X, 02844-2938, at 02902 ¶ 229.) Further, that it was Mr. Balderas's friends and family who "created obstacles and tried to undermine the defense's efforts during the punishment phase. (*Id.* at 2903 ¶ 234.) There are facts that directly contradict these statements, but Mr. Balderas was never given an opportunity to present them or to object to Mr. Godinich's affidavit.

640.    Texas state and federal courts do not often reject the claim that defense counsel's failure to ensure a complete record may constitute deficient performance. That is because the reasonableness of counsel's performance under *Strickland* is measured against prevailing professional norms. *Wiggins*, 539 U.S. at 511.

641.    Trial counsel failed to make a record of the trial court's denial of funds to produce punishment phase witnesses.

642.    Trial counsel were aware that Mr. Balderas spent a significant amount of time living with his extended family in Mexico when he was around eight and nine years old. Ms. Helenek, their Spanish-speaking mitigation specialist, traveled to Mexico approximately six times in her several years on the case to interview members of Mr. Balderas's extended family about his time living with them. (Vicky Mirafuentes Aff., Habeas Writ Record, Vol. II, 00589-613, at 00602 ¶ 3; Affidavit of Paloma Reyes Mirafuentes ("Paloma Mirafuentes Aff."), November 5, 2015, Habeas Writ Record, Vol. II, 00631-00641, at 00638 ¶ 2.) After those interviews, the trial team determined that some of Mr. Balderas's extended family should travel to Houston to testify at the punishment phase. As far back as at least 2010, the trial team discussed the logistics necessary to bring the

215

witnesses from Mexico to testify, including securing necessary travel documents and arrangements. (*See, e.g*., email from Ms. Helenek to Mr. Godinich, Sept. 21, 2010, Habeas Writ Record, Vol. III, 00705-00706; email from Ms. Martin to Ms. Helenek, Oct. 10, 2020, Habeas Writ Record, Vol. III, 00708; Email from Ms. Behrana to Team, Aug. 8, 2012, Habeas Writ Record, Vol. III, 00728.)

643.    On July 31, 2013, about five months before trial was scheduled to begin, the State sent an email to the trial team providing an update on the expected trial dates, and Ms. Helenek responded in the affirmative and immediately inquired about logistical issues for the Mexico-based witnesses. She wrote, "I need to know the dates for the people from Mexico so we can planning [sic] the humanitarian visa situation , [sic] I will need to travel with them to the border 2 or 3 days befor [sic] them [sic] participation in court." (Email from Ms. Helenek to Team, Aug. 1, 2013, Habeas Writ Record, Vol. III, 00740.) Although trial team communications clearly indicate that trial counsel intended to have Mr. Balderas's family from Mexico testify live and in person, there is no indication in either the record or trial counsel's files that counsel ever made a motion for the funding necessary to do so.

644.    Then, on August 8, 2013, the trial court conveyed to trial counsel off the record that it "[did] not want to pay to bring witnesses from Mexico but would rather use something similar to Skype." (Email from Mr. Godinich to Ms. Helenek, Aug. 8, 2013, Habeas Writ Record, Vol. III, 00742.) When Ms. Helenek inquired about whether Mr. Balderas's extended family should continue their efforts to secure passports, trial counsel replied, in part, as follows:

> Let me emphasize that I prefer the witnesses testifying live. It is the court that does not want to approve the expenditure. The message from the witnesses will be diluted when presented through a computer and then a translator. So, do not cancel the passport requests just yet. I will keep you posted.

(Email from Mr. Godinich to Ms. Helenek, Aug. 9, 2013, Habeas Writ Record, Vol. III, 00744-00745.)

645.    Despite acknowledging the importance of securing live testimony from Mr. Balderas's extended family and indicating that he would make an effort to do so, there is no record that trial counsel sought funding from the trial court. He neither made a motion on the record to obtain the funding nor did he make an objection on the record to the trial court's off-the-record stated intent to deny such funds. As a result, the record is completely silent on the issue, and no errors resulting therefrom are preserved.

646.    The entire Skype process by which Mr. Balderas's family had to testify was very frustrating for them. They had spent a great deal of time and effort—taking days away from work and traveling significant distances—in order to testify on Mr. Balderas's behalf, only to have their efforts stymied by technological problems outside their control. Marina Reyes Mirafuentes, Paloma Reyes Mirafuentes, and other members of Mr. Balderas's extended family were available and prepared to travel to Houston to testify in person at Mr. Balderas's trial. Indeed, Marina would have preferred it, as doing so would have allowed the jury to see "how we are as a family—the way we act, the way we dress." Even Marina understood that testifying in person was important because it gives the jury a chance to "get to know us a little bit." (Affidavit of Marina Reyes Mirafuentes ("Marina Mirafuentes Aff."), Nov. 5, 2015, Habeas Writ Record, Vol. II, 00615-00629, at 00625, 00626 ¶¶ 2, 5; Paloma Mirafuentes Aff., Habeas Writ Record, Vol. II, 00631-00641, at 00639 ¶ 6; Affidavit of Maria Guadalupe Francisco Reyes ("Maria Reyes Aff."), Nov. 5, 2015, Habeas Writ Record, Vol. II, 00658-00666, at 00666 ¶ 8.)

647.    The court was also frustrated with the technical difficulties. Jurors could see that the judge was annoyed that the Skype connection kept getting lost and that the technology was not

217

working. Although the attorneys worked to fix the connection problems, they eventually informed the jury that they were foregoing any additional testimony from witnesses in Mexico.

648.    Even when the Skype technology failed—just as Mr. Harris had warned it would months before—trial counsel failed to move for the witnesses in Mexico to be transported to Houston so they could testify in person. Instead, trial counsel responded by truncating their critical presentation of mitigating evidence from important family witnesses in Mexico.

649.    The trial court erred in denying Mr. Balderas funds to produce witnesses necessary for his defense, and failing to make a record, constituted ineffective assistance of counsel.

650.    As an indigent defendant, Mr. Balderas was unable to retain the legal and expert assistance necessary to investigate and present his defense, including costs associated with producing out-of-country witnesses for testimony. He was therefore entitled to funding from the court so he could acquire the necessary resources for his defense. (*See, e.g.*, Motion for Investigative and Expert Assistance Fee in Indigent Case, CCA Record, Vol. I, 00034-00035.) In most cases, the trial court granted Mr. Balderas's requests for such funding. (*See, e.g.*, Order on Motion for Investigative and Expert Assistance Fee in Indigent Case, CCA Record, Vol. I, 00036.) However, the trial court apparently declined to provide Mr. Balderas with the funding necessary to pay for the travel, lodging, and other associated expenses necessary for him to produce important mitigation witnesses from Mexico. Trial counsel made an informal suggestion, but never formally moved for these witnesses to be brought to testify in person. Moreover, trial counsel should have presented the court with feasible alternatives to Skype that would have allowed Mr. Balderas to present the necessary testimony without the court incurring the cost of transporting the witnesses.[24]

---

[24] For example, counsel failed to investigate a program administered by the State Comptroller that pays for travel expenses of witnesses in criminal proceedings. *See* TEX. CRIM. PROC. CODE, art. 35.27; *see also* Texas Comptroller of Public Accounts, Expenses Related to Legal Proceedings: Witness Fees and Expenses,

651.    The state court found that "any obstacle the defense faced was the result of witness tampering with its witnesses in Mexico, was a result of the applicant's friends and family, and not the trial court's failure to fund travel expenses from Mexico." (FFCL, Habeas Writ Record, Vol. X, 02844-2938, at 02903 ¶ 235.) Mr. Balderas was never given the opportunity to refute this finding.

652.    Had trial counsel made a motion requesting such funding on the record and had the trial court denied it, the court's denial would have been appealable error. Specifically, the denial would have infringed on Mr. Balderas's rights to compulsory process and due process under the Sixth and Fourteenth Amendments to the United States Constitution. *See Washington v. Texas*, 388 U.S. 14, 16 (1967) (holding state statute barring accomplice testimony on defendant's behalf denied defendant compulsory process); *Webb v. Texas*, 409 U.S. 95, 98 (1972) (holding judicial action to "effectively [drive a defense witness] off the stand" denied defendant due process). That is, Mr. Balderas had a right to present witnesses to establish his defense. *Id.*

653.    Moreover, Mr. Balderas had a "compelling interest in fair adjudication at the sentencing phase" of his capital trial. *See Ake v. Oklahoma*, 470 U.S. 68, 83 (1985) (holding indigent capital defendant entitled to funding for expert assistance in his defense). Fundamental fairness dictated that, as an indigent defendant, Mr. Balderas was entitled to "the basic tools of an adequate defense" necessary to have "an adequate opportunity to present [his] claims fairly within the adversary system," and to have those tools provided at no cost to him. *Ake*, 470 U.S. at 77 (internal citations omitted).

654.    Finally, trial counsel should have supported their argument by establishing that, under the Sixth Amendment, they had the responsibility to conduct an adequate and independent mitigation investigation and effective penalty presentation in order to properly represent a client

219

facing the death penalty. Counsel's abject failure to seek and secure the necessary funding for crucial mitigation witnesses was patently deficient, and the absence of these witnesses from Mr. Balderas's trial prejudiced him in the extreme.

655.    Trial counsel's failure to make a clear record of requests for funding to produce necessary mitigation witnesses from Mexico, and their failure to object to the court's denial of that funding, constituted ineffective assistance of counsel. As a result of trial counsel's decision to abandon presentation of indispensable mitigation testimony, the jurors were left to assume that no other mitigating evidence existed and that the full case had been made by the witnesses presented. At least one juror assumed that if the witnesses were indispensable the defense would have flown them in for trial." That is, at least one juror believed the absence of the Mexico witnesses in the courtroom meant that their testimony was not important. He stated, "I think that, had the defense made the case for an essential witness, the court would have paid to fly them in. The court had the money to do so, considering the number of paid experts that were presented at trial." (Affidavit of John Armstrong ("Juror Armstrong Aff."), Sept. 25, 2015, Habeas Writ Record, Vol. IV, 01067-01072, at 01069, 01070 ¶¶ 10-11.) Indeed, the State's closing argument at punishment reinforced this notion when it pointed out that a different witness "wasn't brought to you even though you know we have the ability to bring you witnesses from Mexico." (43 RR at 65:22-66:7 (emphasis added).)

656.    For the reasons set forth above, trial counsel's performance was deficient, and Mr. Balderas was prejudiced by trial counsel's unreasonable errors and omissions. Accordingly, he is entitled to a new sentencing proceeding.

### F.    Trial Counsel's Behavior During the Punishment Phase

657.    It is axiomatic that trial counsel in a capital case should endeavor to develop a rapport with the jury, as doing so undoubtedly increases the likelihood that the jury will be attentive

to counsel's presentation and argument at trial. Trial counsel should also avoid acting in such a way as to alienate the jury. *See Wilson v. Butler*, 813 F.2d 664, 671-72 (5th Cir. 1987). Mr. Balderas's trial counsel, Alvin Nunnery, used antics and arguments that alienated the jury during the punishment phase that stood in stark contrast to the "prevailing professional norms" laid out in the ABA Standards. *See Harrington v. Richter*, 131 S. Ct. 770, 788 (2011); *Strickland*, 466 U.S. at 688; *see also* ABA Standards, Standard 4-1.1 (providing a "guide to professional conduct and performance").

### 1.    *Mr. Nunnery's performance at the punishment phase was deficient.*

658.    Mr. Nunnery made several comments directed at the State or the State's witnesses that were wholly inappropriate. Although these comments did not appear in the record, several jurors reported hearing them. For example, at least three jurors heard Mr. Nunnery insult one of the prosecutors by calling her a "bitch" under his breath. (Juror Armstrong Aff., Habeas Writ Record, Vol. IV, 010607-01072, at 01071 ¶ 15; Affidavit of Allison Birney ("Juror Birney Aff."), September 26, 2015, Habeas Writ Record, Vol. IV, 01074-01077, at 01077 ¶ 11; Affidavit of Ronald Browning-McCauley ("Juror McCauley Aff."), September 26, 2015, Habeas Writ Record, Vol. IV, 01079-01080, at 01079 ¶ 4.)

659.    Based on the prosecutor's reaction, it was clear to the jurors that she had heard the insult too. (Juror Birney Aff., Habeas Writ Record, Vol. IV, 01074-01077, at 01077 ¶ 11; Juror McCauley Aff., Habeas Writ Record, Vol. IV, 01079-01080, at 01079 ¶ 4; Juror Sullivan Aff., Habeas Writ Record, Vol. IV, 01094-01097, at 01096 ¶ 10.) Juror Birney "could see on her face it hurt her feelings." (Juror Birney Aff., Habeas Writ Record, Vol. IV, 01074-01077, at 01077 ¶ 11.) Even jurors who did not hear Mr. Nunnery's comment themselves noticed the prosecutor's visible reaction to it. (Juror Sullivan Aff., Habeas Writ Record, Vol. IV., 01094-01097, at 01096 ¶ 10.) Mr. Nunnery's antics caused at least one juror to "feel bad" for the prosecutor. (Juror Birney Aff.,

Habeas Writ Record, Vol. IV, 01074-01077, at 01077 ¶ 11.) In another instance, a juror heard Mr. Nunnery make a comment "along the lines of 'so and so doesn't like me because I'm black.'" (Juror Armstrong Aff., Habeas Writ Record, Vol. IV, 01067-01072, at 01091 ¶ 15.)

660.    Counsel on both sides share a duty to adhere to the codes of professionalism, and must manifest a "professional attitude toward the judge, witnesses, jurors, and others in the courtroom." ABA Standards, Standard 4-7.1(a) (Courtroom Professionalism); *see also United States v. Young*, 470 U.S. 1, 10, 105 S. Ct. 1038, 1043, 84 L. Ed. 2d 1 (1985). Moreover, common sense and the ABA Standards dictate that trial counsel should avoid making "personal attacks on the prosecutor." ABA Standards, Standard 4-7.7 cmt. Mr. Nunnery's name calling—particularly in the presence of the jury—was patently unprofessional and served no strategic purpose.

661.    Furthermore, Mr. Nunnery doubled down on his inappropriate behavior in the courtroom during his closing argument at the punishment phase. (Michael Orosz Aff., Habeas Writ Record, Vol. IV, 01087-01092, at 01091 ¶ 14.) During his closing, Mr. Nunnery repeatedly referred to the jury's decision at the guilty phase in a derisive manner. He led off his argument by calling the guilty verdict into question: "I want to make it abundantly clear, with all due respect, I could not more vehemently disagree with the decision you reached... [T]here was simply not proof beyond a reasonable doubt that Juan Balderas committed the capital murder as the State alleged." (43 RR at 6:2-10.) Later, he returned to the topic and expressed disappointment in the jury's process:

> And I asked each one of you individually [during voir dire], would you promise me that if you found yourself in a position where you disagreed with your fellow jurors, would you have that inner strength, that intestinal fortitude to stick by your opinion. And each one of you looked me in the eye and you said, yes, I would. More importantly, because this case is not about me, you told my client, [Mr.] Balderas, the same thing. I have no idea what your split was back there [during guilt deliberations]. I do know what

> the word 'deadlocked' means... Nonetheless, you indicated that you would
> stand by your position; and I counted on that.

(43 RR at 7:5-21.) (omitting sustained objection for improper closing argument)

662.    Further, Mr. Nunnery questioned whether the jury was "being attentive or not and commented that some of them "seemed from time to time looked [sic] like you were just bristling with hostility." (43 RR at 26:8-19.) Finally, Mr. Nunnery topped off his argument to the jury with the following:

> I never met any of you prior to this proceeding; and in just a moment, I'm
> going to pick up my stuff—Jerome doesn't know this, my co-counsels don't
> know this. But I'm going to pick up my stuff in just a moment and I'm going
> to walk out of this courtroom and I'm not coming back. I'll never see the
> 12 or 14 of you again. I will not be here when you return your verdict.

(43 RR at 36:1-12.)

663.    Astoundingly, Mr. Nunnery did in fact leave to join his wife on a trip to Florida, and the jury did not see him again. (Juror Birney Aff., Habeas Writ Record, Vol. IV, 01074-01077, at 01074 ¶ 1; Juror McCauley Aff., Habeas Writ Record, Vol. IV, 01079-01080, at 01079 ¶ 4; Chad Sullivan Aff., Habeas Writ Record, Vol. IV, 01094-01097, at 01096 ¶ 11; *see also* 43 RR at 8.) Heightening the prejudice of Mr. Nunnery's offensive behavior to the jury, Mr. Nunnery made this statement after noting that at least one of the jurors had "lost their trip to Rome" due to her jury service. (43 RR 8:8-21; *see also* Juror Norwood Aff., Habeas Writ Record, Vol. IV, 01082-01085, at 01082 ¶ 2.) In effect, Mr. Nunnery signaled to the jury that his vacation to Florida was not only more important than the juror's trip to Rome, but that it was also more important than Mr. Balderas's life.

664.    The State's closing argument provides additional insight into the effects of Mr. Nunnery's unprofessional conduct. In a not so subtle comparison to Mr. Nunnery's admonitions, the prosecutor began by thanking the jury: "I don't want to yell at you, I don't want to criticize

223

you, I want to thank you." (43 RR 38:9-12.) Later, the State again referred to Mr. Nunnery's delivery style, harkening back to the time when "Mr. Nunnery was yelling at you" about the State's case. (43 RR 46:3-7.) The State even went so far as to apologize to the jury for defense counsel's rudeness, stating: "And I apologize for Mr. Nunnery's statements to you about questioning your verdict. I apologize for that. We asked you to do a job, and you did it." (43 RR 56:3-6.)

665.    The ABA Standards dedicate an entire Standard to advising trial counsel how best to develop a relationship with the jury. *See* ABA Standards, Standard 4-7.3 (Relations with Jury). Specifically, the ABA Standards dictate that trial counsel should "treat jurors with deference and respect." *Id*. at Standard 4-7.3(b). They also advise that trial counsel "should not intentionally make comments to or ask questions of a juror for the purpose of harassing or embarrassing the juror in any way which will tend to influence judgment in future jury service." *Id*. at Standard 47.3(c). The commentary on Standard 4-7.3 states, in part: "Since it is vital to the proper functioning of the jury system that jurors not be influenced in their deliberations by fears that they subsequently will be harassed by lawyers or others who wish to learn what transpired in the jury room, neither defense counsel nor the prosecutor should discuss a case with jurors after trial in a way that is critical of the verdict." ABA Standards, Standard 4-7.1 cmt (emphasis added). Although this guideline generally applies after a jury has been discharged from a case, it arguably has implications in capital trials that are bifurcated into a guilt/innocence phase and a punishment phase.

666.    Mr. Nunnery's repeated criticism of the jury's guilty verdict and their process for determining the verdict could serve no strategic purpose. On the whole, Mr. Nunnery's behavior during the punishment phase fell far below the standards of professional conduct and plainly constituted deficient performance.

667.    Mr. Nunnery's punishment phase performance was prejudicial.

668.    Mr. Nunnery's deficient performance during the punishment phase, including his poor demeanor and critical closing argument, had a significant negative impact on the jurors who were being asked to determine whether Mr. Balderas would receive life without parole or be put to death. Unsurprisingly, many of the jurors reacted negatively to Mr. Nunnery's punishment phase performance. According to Juror Norwood, the jury foreman:

> [S]ome of the jurors did not like one of the defense attorney, Mr. Nunnery. The jurors discussed their thoughts of him with each other. Some did not like him since the voir dire stage because he gave them a real tough time. *Mr. Nunnery finished his closing argument at the punishment phase by insulting the jury.* He made a statement about how we sent out notes and how we were deadlocked at the guilt/innocence phase, and, *at the end, he questioned our method about what happened in the jury room to change our final vote and decision. The way he was questioning our verdict was very off putting, especially because we felt like we had worked hard as a group. It was like he was minimizing what we went through.* Some of the jurors did not like him because of these final statements. Mr. Nunnery did not have a poker face and there were times that he would roll his eyes or visibly react to something. At the end, that affected other jurors.

(Juror Norwood Aff., Habeas Writ Record, Volume III, 00683-86, at 00685 ¶8 (emphasis added).)

669.    Juror Birney was also bothered by Mr. Nunnery's punishment phase closing argument:

> I was deeply bothered by Mr. Nunnery's actions during the punishment phase of trial. He presented his closing argument and then took off to go on vacation to Florida. When Juan received his death sentence, Mr. Nunnery was not even there. He told us that would be the case, but it seemed wrong when it happened.

(Juror Birney Aff., Habeas Writ Record, Vol. III, 00675-78, at 00678 ¶ 11 (emphasis added).)

670.    Similarly, Alternate Juror Browning McCauley was upset by Mr. Nunnery's antics:

> Most of the attorneys seemed fine except for the defense attorney, Mr. Nunnery... [D]uring his closing argument at the punishment phase, Mr. Nunnery scolded the jury for our verdict at the guilt/innocence phase. It made me angry that he talked to us like that. Then, at the end of his

225

argument, he just walked out and went on vacation. That was frustrating for me.

(Juror Browning-McCauley Aff., Habeas Writ Record, Vol. III, 00680-81, at 00680 ¶ 4 (emphasis added)).)

671.    Another juror, Juror Sullivan, was also disturbed by Mr. Nunnery's closing argument at the punishment phase:

> The thing that bothered me the most was when we were hearing the closing argument for the punishment phase. We had been there for so long at that point. The defense had deferred, so they went last. Mr. Nunnery got up there and questioned our ability as a jury to effectively sentence because we found him guilty. On top of that, he said he would not be there to hear our verdict because he would be on vacation. I understand that people have private lives, family, and so on, but to make that claim—that regardless of what decision was being rendered, that he was not going to be there for it— I would have expected him to be there. And then he questioned my ability as a juror to do my duty after we had labored so much over the case. Finding guilt was a huge challenge. That is probably the thing that stuck with me the most. It really had a lot of meaning for me.

(Juror Sullivan Aff., Habeas Writ Record, Vol. III, 00695-98, at 00697-98 ¶ 11 (emphasis added).)

672.    As is evident, Mr. Nunnery's performance during the punishment phase had a significant negative impact on the jury. There was not and could not have been a strategic reason for alienating the jury in this way. As a result, the punishment phase of Mr. Balderas's trial was prejudiced, and he is entitled to a new sentencing proceeding.

## IV.    INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL FOR FAILURE TO RAISE THE ISSUE OF MR. BALDERAS'S MENTAL COMPETENCY

### A.    Trial Counsel's failure to object to Mr. Balderas's competency deprived Mr. Balderas of his due process right to a competency hearing and harmed Mr. Balderas because it is reasonably probable that Mr. Balderas was incompetent at the time of trial.

673.    Due process prohibits prosecution of a defendant who is not competent to stand trial. *Bouchillon v. Collins*, 907 F.2d 589, 592 (5th Cir. 1990).

226

674.    Competency to stand trial is measured by the two-part *Dusky* standard. A defendant is only competent to stand trial if: (1) "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," and (2) "he has a rational as well as factual understanding of the proceedings against him." *Dusky v. U.S.*, 362 U.S. 402, 402 (1960).

675.    "Where substantial evidence is presented raising an issue as to the defendant's competency, a defendant is constitutionally entitled to a hearing on their competence to stand trial." *Green v. Davis*, 479 F. Supp. 3d 442, 507 (S.D. Tex. 2020) (*appeal filed*, *Green v. Lumpkin*, (5th Cir.2020) (citing *Pate v. Robinson*, 383 U.S. 375, 385 (1966)).

676.    "[W]here counsel notes evidence raising a bona fide doubt as to a defendant's competence, counsel has a duty to request a competency hearing." *Green,* 479 F. Supp. 3d at 507 (citing *Drope v. Missouri*, 420 U.S. 162, 180 (1975)). "Trial counsel provides deficient performance if he fails to investigate a defendant's medical history when he has reason to believe that the defendant suffers from mental health problems." *Roberts v. Dretke*, 381 F.3d 491, 498 (5th Cir. 2004) (citing *Bouchillon*, 907 F.2d at 597).

677.    To show prejudice, a defendant "need only demonstrate a 'reasonable probability' that he was incompetent, 'sufficient to undermine confidence in the outcome.'" *Bouchillon*, 907 F.2d at 595 (quoting *Strickland*, 466 U.S. at 694). "This is a lower burden of proof than the preponderance standard." *Bouchillon*, 907 F.2d at 595.

### B.    Considering the ample indicia of Mr. Balderas's mental illness and brain impairment, objectively reasonable counsel would have formed a doubt about Mr. Balderas's competence.

678.    Evidence which raises a bona fide doubt as to a defendant's competence is not fixed in any rigid set of factors. *Drope v. Missouri*, 420 U.S. 162, 180 (1975). "[E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but .

. . even one of these factors standing alone may, in some circumstances, be sufficient." *Drope*, 410 U.S. at 180. The *Drope* court further noted that there are "no fixed or immutable signs which invariably indicate the need for further inquiry;" instead, "the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." *Id.*

679.    Substantial evidence, readily available to trial counsel, would have raised the issue as to Mr. Balderas's competency. Specifically:

- Mr. Balderas has a family history of mental illness. (See Jesus Balderas Aff., Habeas Writ Record, Vol. II, 00476-483, at 00477 ¶ 6; Vicky Mirafuentes Aff., Habeas Writ Record, Vol. II, 00589-613, at 00608 ¶ 27; German Enriquez Aff., Habeas Writ Record, Vol. II, 00537-00556, at 00548-00549 ¶¶ 2, 4-6.)

- Mr. Balderas has a permanent skull depression, the result of reported childhood trauma. (See Ex. A, Agharkar Report, Jan. 17, 2022, at 4; Ex. C, Ouaou Report, Jan. 15, 2022, at 2.)

- Mr. Balderas was diagnosed with adjustment disorder with disturbance in conduct, in February 2001. (Harris County Sheriff's Office Records ("HCSO Records"), Feb. 15, 2001, TDS-000001-001140, at TDS-000759-761.)

- In May 2002 he was diagnosed with Axis I: Oppositional defiant d/co and was placed at Riverside Hospital for inpatient substance abused treatment. (See Mental Health and Mental Retardation Authority of Harris County Records ("MHMRA Records"), May 13, 2002, TDS-001197-001281, at TDS-001201 and TDS-001210-1216.)

- In February 2008 Mr. Balderas was diagnosed with mood D/O NOS R/O (Rule out) schizoaffective d/o NDS with depressed mood. He was Axis II: antisocial traits and GAF-38. (HCSO Records, TDS-000001-001140, at TDS-000746-749.)

- In May 2009, Mr. Balderas was diagnosed with bipolar D/O NOS (not otherwise specified) with psychosis, generalized anxiety disorder, and polysubstance dependence. (HCSO Records, TDS-000001-001140, at TDS-000824-825.)

- In October 2009, Mr. Balderas reported having A/V hallucinations and that he could "feel an evil presence." (HCSO Records, TDS-000001-001140, at TDS-000829.) He also said he was "having nightmares," and "Satan is taunting him." (Id.)

- Mr. Balderas took several different types of medications for his depression, including Lexapro, Seroquel, Zoloft, Paxil, Klonopin, and Celexa, with varying success and with some side effects. (HCSO Records, TDS-000001-001140, at TDS-000833 and TDS-000867.) At certain points he refused to take his medications routinely. (Id. at TDS-000868.)

- In April 2012, Mr. Balderas was diagnosed with MDD with psychotic features and continued on a variety of antidepressants throughout 2013. (HCSO Records, April 18, 2012, TDS-000237.)    In July 2013, Mr. Balderas reported suicidal ideation/thoughts, and admitted that he kept his meds in order to complete a suicide attempt. (HCSO Records, at TDS-000174.) At the time he was reporting moderate symptoms of visual hallucinations and mentioned that he has a history of seeing the shadows and hallucinations since he was a child. (Id. at TDS-000185.)

229

680.    In sum, before Mr. Balderas's judgment and sentence of death was rendered on March 14, 2014, trial counsel had access to Mr. Balderas's long history of mental illness diagnoses, history of behavior consistent with those diagnoses, and periods of refusing to take his prescribed medication. Further, the recent psychiatric and neuropsychological reports rendered by Dr. Agharkar and Dr. Ouaou, respectively, concur that Mr. Balderas's cognitive deficits affecting judgment, reasoning, impulse control, problem solving, and rational decision making, were likely manifest at the time of trial. (See Ex. C, Ouaou Report, Jan. 15, 2022, at 10; Ex. A, Agharkar Report, Jan. 17, 2022, at 9.) Trial counsel evidently formed some doubt as to Mr. Balderas's mental health, since Dr. Brams was retained to investigate Mr. Balderas's childhood physical and sexual abuse, and Dr. Mendel was retained to conduct psychological testing regarding the devastating trauma Mr. Balderas suffered. *See Green v. Davis*, 479 F. Supp. 3d 442, 509 (S.D. Tex. 2020) appeal filed by *Green v. Lumpkin*, 5th Cir., September 16, 2020 (holding that where trial counsel in fact formed a bona fide doubt about defendant's incompetence, trial counsel's subsequent failure to request a hearing on defendant's competence to stand trial, and a continuance to further investigate defendant's mental illness, undermined defendant's due process rights to a competency hearing at a critical juncture and was constitutionally deficient performance falling below an objective standard of reasonableness).

681.    Regardless of whether trial counsel in fact formed a bona fide doubt as to Mr. Balderas's incompetency, the standard is whether objectively reasonable counsel, in light of the evidence available to it, would have. *See Green v. Davis*, 479 F. Supp. 3d 442, 509 (S.D. Tex. 2020). Here, Dr. Agharkar and Dr. Ouaou agree that Mr. Balderas's manic and psychotic symptoms as recounted in this pre-trial jail medical records should have been followed-up on and that brain testing should have been performed due to Mr. Balderas's clear mental disease and

defect. (See Ex. A, Agharkar Report, Jan. 17, 2022, at 8; Ex. C, Ouaou Report, Jan. 15, 2022, at 1.) Trial counsel's failure to request a hearing on Mr. Balderas's competence to stand trial, or a continuance to further investigate his mental illness, undermined his due process rights and was constitutionally deficient performance falling below an objective standard of reasonableness.

### C. Mr. Balderas was harmed because there is a reasonable probability that he was incompetent at trial.

682.     Mr. Balderas's complete mental health history is recounted in Claim II, *supra*. Mr. Balderas presents ample evidence that he was incompetent at trial in 2014, sufficient to meet the *Dusky* standard for incompetence by a preponderance of the evidence, which is more than the 'reasonable probability' standard he is required to show here. *Bouchillon,* 907 F.2d at 595 (5th Cir. 1990) ("[The 'reasonable probabilty' standard] is a lower burden of proof than the preponderance standard.").

683.     As a foundational matter, Mr. Balderas suffers from mental illness and brain damage/dysfunction. To determine whether Mr. Balderas had a mental illness at the time of trial in 2014 the Court may rely on retrospective mental health expert evaluations and other contemporaneous evidence of symptoms consistent with the retrospective diagnoses. *See Green v. Davis*, 479 F. Supp. 3d 442, 481-85 (S.D. Tex. 2020) (holding that petitioner suffered from Schizophrenia at the time of trial in 2000, relying on a retrospective mental health evaluation and diagnosis conducted in 2014, transcripts from the state pre-trial and trial proceedings, and records of petitioner's grossly disorganized behavior in pre-trial detention and in court). According to the recent psychiatric evaluation by Dr. Agharkar, Mr. Balderas suffers from Schizoaffective Disorder, Bipolar Type, and PTSD. (Ex. A, Agharkar Report, Jan. 17, 2022, at 7.) Further, Mr. Balderas likely has frontal and parietal lobe brain damage/dysfunction. (Ex. A, Agharkar Report, Jan. 17, 2022, at 9; Ex. C, Ouaou Report, Jan. 15, 2022, at 9.) Dr. Agharkar and Dr. Ouaou concur that the

brain damage/dysfunction revealed by neuropsychological testing, and the fact that there have been no head injuries since the time of trial, indicate that Mr. Balderas's brain impairments were present at the time of his trial. (Ex. A, Agharkar Report, Jan. 17, 2022, at 9; Ex. C, Ouaou Report, Jan. 15, 2022, at 10.) Further, Mr. Balderas's manic and psychotic symptoms are recounted in his pre-trial jail record. (Ex. A, Agharkar Report, Jan. 17, 2022 at 7.)

684.    Per the first *Dusky* prong, Mr. Balderas's mental illness and brain impairment symptoms affected his ability to consult trial counsel with a reasonable degree of rational understanding. Mr. Balderas is given to hallucinations, paranoid and grandiose delusions, and disorganized and tangential thought processes. (Ex. A, Agharkar Report, Jan. 17, 2022, at 8.) Mrs. Yancy Balderas recalls that, as a teenager, Mr. Balderas confided that he could talk to angels. (Ex. A, Agharkar Report, Jan. 17, 2022, at 5.) During his evaluation by Dr. Agharkar, Mr. Baldears was preoccupied with discussing UFO's, the existence of aliens, and visual hallucinations he has experienced. (Ex. A, Agharkar Report, Jan. 17, 2022, at 3.) Mr. Balderas endorsed ideas of reference and believed that when the light in the room flickered, something significant was discussed that required further "research." (Ex. A, Agharkar Report, Jan. 17, 2022, at 3.) Mr. Balderas recounted to Dr. Agharkar that, while in juvenile, he saw symbols of aliens and that they talked to him about levitating. (Ex. A, Agharkar Report, Jan. 17, 2022, at 3.) Further, Mr. Balderas has expressed both to Dr. Agharkar and Mrs. Yancy Balderas that he believes the "prosecutors and gang members" set him up to be incarcerated so the government can experiment on him and learn more about his connections to aliens and their spaceships. (Ex. A, Agharkar Report, Jan. 17, 2022, at 3.) Mr. Balderas suspected the State was spying on Mrs. Yancy Balderas though a mirror in their house. (Ex. A, Agharkar Report, Jan. 17, 2022, at 5.) "Courts have found defendants incompetent when they suffer from conspiratorial delusions, particularly where the delusion integrates police,

counsel, and the court." *Green v. Davis*, 479 F. Supp. 3d 442, 489 (S.D. Tex. 2020) (citing, e.g., *United States v. Ghane*, 490 F.3d 1036, 1040 (8th Cir. 2007); *United States v. Boigegrain*, 155 F.3d 1181, 1189 (10th Cir. 1998); *United States v. Hiebert*, 30 F.3d 1005, 1007 (8th Cir. 1994)). Mr. Balderas's ability to communicate effectively is also impaired by his brain impairment. Dr. Agharkar opines that damage to the frontal lobes of the brain, indicated in Mr. Balderas's neuropsychological examination, would negatively impact his ability to rationally weigh and deliberate, inhibit his impulses, regulate his mood and emotions, memory functioning, and freedom from perseveration. (Ex. A, Agharkar Report, Jan. 17, 2022, at 10.) These impairments, according to Dr. Agharkar and Dr. Ouaou, pre-date Mr. Balderas's trial and would have impacted Mr. Balderas at the time of trial. (Ex. A, Agharkar Report, Jan. 17, 2022, at 9-10; Ex. C, Ouaou Report, Jan. 15, 2022, at 9-10.)

685. Second, Mr. Balderas's brain impairment diminished his capacity for a rational as well as factual understanding of the proceedings against him. According to Dr. Ouaou, Mr. Balderas IQ is well below average (FSIQ = 87; 19th percentile) and Mr. Balderas exhibits a host of cognitive defects associated with patients with significant central nervous system damage. (Ex. C, Ouaou Report, Jan. 15, 2022, at 8.) Mr. Balderas exhibits learning and memory deficits in addition to significant impairments on many measures of executive functioning. (Ouaou Report, Jan. 15, 2022, at 8.) As reiterated by Dr. Agharkar, Mr. Balderas's memory and his ability to rationally weigh and deliberate are affected by these impairments. (Ex. A, Agharkar Report, Jan. 17, 2022, at 10.) Furthermore, even if Mr. Balderas has the capacity to factually understand the charges against him, his understanding is not rational because Mr. Balderas suffers from the conspiratorial delusion that the prosecution set him up to be incarcerated in order to study him and probe his knowledge of aliens and their spaceships. *See Green,* 479 F. Supp. 3d at 489 (citing, e.g.,

*Ghane,* 490 F.3d at 1040 (8th Cir. 2007) (holding that despite defendant's factual understanding of the charges against him, his understanding was not rational because he believed the charges were part of a wide ranging government conspiracy)).

686.    In sum, the host of symptoms stemming from Mr. Balderas's mental illness and brain impairment, present at the time of trial, significantly impaired his ability to consult trial counsel with a reasonable degree of rational understanding and stood as an obstacle to his rational and factual understanding of the proceedings against him. Mr. Balderas thus demonstrates that there is a reasonable probability that he was incompetent under the *Dusky* standard and was therefore prejudiced by trial counsel's ineffective assistance in failing to either further investigate Mr. Balderas's mental illness or request a competency hearing. *See Bouchillon*, 907 F.2d at 595.

## V.    MR. BALDERAS'S DUE PROCESS RIGHTS WERE VIOLATED BECAUSE HE WAS TRIED WHILE INCOMPETENT

### A.    The Criminal Trial of an Incompetent Defendant Violates Due Process

687.    The Supreme Court has "repeatedly and consistently recognized that the criminal trial of an incompetent defendant violates due process." *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) (internal quotation marks and citation omitted); *Wheat v. Thigpen*, 793 F.2d 621, 629 (5th Cir. 1986). The Supreme Court explained, "[c]ompetenc[y] to stand trial is rudimentary, for upon it depends that main part of those rights deemed essential to a fair trial," such as "the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so." *Cooper*, 517 U.S. at 354 (citation omitted).

688.    Competency to stand trial is measured by the two-part *Dusky* standard, wherein an inmate is only competent to stand trial if: (1) "he has sufficient present ability to consult with his

lawyer with a reasonable degree of rational understanding" and (2) "he has a rational as well as factual understanding of the proceedings against him." *Dusky,* 362 U.S. at 402.

689.    "The proper inquiry for an incompetency claim is the petitioner's mental state *at or near the time of trial*." *Goynes v. Dretke*, 139 F. App'x 616, 619 (5th Cir. 2005) (emphasis in original). Mr. Balderas bears the burden of proving his incompetency to stand trial by a preponderance of the evidence. *Green v. Davis*, 479 F. Supp. 442, 481 (S.D. Tex. 2020), *appeal filed*, *Green v. Lumpkin*, (5th Cir. 2020) (internal citation omitted). "[I]f the evidence of incompetency is more convincing than the evidence otherwise, the court must find in [Mr. Balderas's] favor." *Aldridge v. Thaler*, No. H-05-608, 2010 WL 1050335, at *27 (S.D. Tex. Mar. 17, 2010); *see Bruce v. Estelle*, 536 F.2d 1051, 1059 (5th Cir. 1976) ("[P]roof by a preponderance . . . is all that is required . . . To place a greater burden on the petitioner might bring up due process considerations.").

**B.      Mr. Balderas was Incompetent to Stand Trial During Both the Guilt and Innocence Phases**

> ***1.      Mr. Balderas's psychotic and brain impairment symptoms were manifest at the time of his trial.***

690.    The Fifth Circuit has recognized that to meaningfully apply the *Dusky* standard, courts "must often [first] ascertain the nature of petitioner's allegedly incapacitating illness" before determining "whether such condition rendered the accused incompetent under the [*Dusky*] formulation." *Bruce,* 536 F.2d at 1059 (5th Cir. 1976). As discussed in Claim IV, *supra*, Mr. Balderas suffers from Schizoaffective Disorder, Bipolar Type, and PTSD. (Ex. A, Agharkar Report, Jan. 17, 2022, at 7.) Further, Mr. Balderas likely has frontal and parietal lobe brain damage/dysfunction. (Ex. A, Agharkar Report, Jan. 17, 2022, at 9; Ex. C, Ouaou Report, Jan. 15, 2022, at 9-10.) Dr. Agharkar and Dr. Ouaou concur that the brain damage/dysfunction and manic

and psychotic symptoms were manifest at the time of trial in 2014.(Ex. A, Agharkar Report, Jan.

17, 2022, at 2; Ex. C, Ouaou Report, Jan. 15, 2022, at 1.)

### 2. *Mr. Balderas lacked sufficient ability to consult with trial counsel with a reasonable degree of rational understanding.*

691.    Mr. Balderas may be found incompetent where he suffered from paranoid delusions

which impeded his ability to effectively consult with counsel. *See, e.g., Green,* 479 F. Supp. 442

at 489 ("Green suffered from a paranoid delusion that the evidence in his case had been tampered

with and that police were violently abusing him in jail. These delusions . . . impeded his ability to

communicate with counsel and understand the proceedings in his case[.]"). Mr. Balderas is given

to hallucinations, paranoid and grandiose delusions, and disorganized and tangential thought

processes. (Ex. A, Agharkar Report, Jan. 17, 2022, at 7.) Mr. Balderas's specifically suffers from

conspiratorial delusions that the State is spying on his wife, Mrs. Yancy Balderas, and that he was

set up by the prosecution to be incarcerated so that his knowledge of aliens and spaceships could

be probed. (Ex. A, Agharkar Report, Jan. 17, 2022, at 5.) Such conspiratorial delusions support a

finding of incompetence, especially where the delusion integrates police, counsel, and the court.

*See Green*, 479 F. Supp. 3d 422, 489 (citing, e.g,.*Ghane,* 490 F.3d at 1040 (8th Cir. 2007) (holding

that despite defendant's factual understanding of the charges against him, his understanding was

not rational because he believed the charges were part of a wide ranging government conspiracy);

*Boigegrain*, 155 F.3d at 1189 (10th Cir. 1998) (holding that defendant was incompetent where

defendant was delusional and suffered from paranoid ideation causing him to believe his lawyer,

the prosecutor and judge were participating in a conspiracy to incarcerate him for reasons unrelated

to the charge against him); *Hiebert,* 30 F.3d at 1007 (8th Cir. 1994) (holding that defendant was

incompetent because he believed the judge and the attorneys were part of a conspiracy against

him)). Mr. Balderas's of delusions, hallucinations, paranoia, and tangential thought processes

undermined his ability to consult with trial counsel with a reasonable degree of rational understanding.

### 3. *Mr. Balderas lacked a rational as well as factual understanding of the proceeding against him.*

692.    Turning to the second Dusky prong, Mr. Balderas lacked a rational understanding of the proceedings, as evidenced by his conspiratorial delusions implicating the prosecution and the State. *See Green,* 479 F. Supp. 3d at 489 (citing, *e.g., U.S. v. Ghane*, 490 F.3d 1036, 1040 (8th Cir. 2007)). Even if Mr. Balderas evidenced a factual grasp of the charges set against him, this alone would be insufficient to conclude Mr. Balderas had a rational understanding of the proceedings, according. *Id.* Moreover, the brain impairments observed by Dr. Ouaou and the psychotic behavior observed by Dr. Agharker, posed significant obstacles to Mr. Balderas's factual understanding of the proceedings. According to Dr. Ouaou, Mr. Balderas IQ is well below average (FSIQ = 87; 19th percentile) and Mr, Balderas exhibits a host of cognitive defects associated with patients with significant central nervous system damage. (Ex. C, Ouaou Report, Jan. 15, 2022, at 9-10.) Mr. Balderas exhibits significant impairments on many measures of executive functioning, which are those neuropsychological processes that allow an individual to plan, initiate, program, sequence, and maintain goal-directed behavior. (Ex. C, Ouaou Report, Jan. 15, 2022, at 8.) Dr. Ouaou also observed that Mr. Balderas suffers significant memory impairments, scoring in the 3rd percentile for the Logical Memory subtest of the WMS-IV, related to the acquisition of new information. (Ex. C, Ouaou Report, Jan. 15, 2022, at 7.) Dr. Agharkar observed that Mr. Balderas could not accurately recall a short story after fifteen minutes. (Ex. A, Agharkar Report, Jan. 17, 2022, at 7.) As reiterated by Dr. Agharkar, Mr. Balderas's memory and his ability to rationally weigh and deliberate are affected by these impairments. (Ex. A, Agharkar Report, Jan. 17, 2022, at 9.) Dr. Agharkar and Dr. Ouaou concur that these neuropsychological impairments, associated

with damage to the frontal lobes of the brain, were likely present at the time of his trial. (Ex. A, Agharkar Report, Jan. 17, 2022, at 2; Ex. C, Ouaou Report, Jan. 15, 2022, at 1.)

693.    Mr. Balderas need only demonstrate his incompetence by a preponderance of the evidence. "[I]f the evidence of incompetency is more convincing than the evidence otherwise, the court must find in [Mr. Balderas's] favor." *Aldridge*, 2010 WL 1050335, at *27. Mr. Balderas's incompetency, manifest through hallucinations, paranoia, delusions, ideas of reference, memory impairment, and tangential thought processes, is well-documented by pre-trial mental health records, the evaluations of Dr. Mendel and Dr. Brams, declarations by lay witnesses, jail records, and the recent evaluations by Dr. Agharkar and Dr. Ouaou. Mr. Balderas's symptoms significantly undermined his ability to consult trial counsel with a reasonable degree of rational understanding, and impaired his factual and rational grasp of the proceedings against him. Mr. Balderas's was therefore tried while actually incompetent in violation of his due process rights.

## VI.    INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

### A.    Ineffective Assistance of Counsel at the Direct Appeals Phase is that Which Falls Below an Objective Standard of Reasonableness per Strickland When Appellate Counsel Declines to Raise a Claim on Appeal that is Plainly Stronger Than Those Actually Presented to the Appeals Court

694.    In *Coleman v. Thompson*, 501 U.S. 722 (1991), the Supreme Court held that because a prisoner does not have a constitutional right to counsel in state postconviction proceedings, ineffective assistance in those proceedings does not qualify as cause to excuse a procedural default.

695.    Under the cause and prejudice standard, "[a] state prisoner may overcome the prohibition on reviewing procedurally defaulted claims if he can show 'cause' to excuse his failure to comply with the state procedural rule and 'actual prejudice resulting from the alleged constitutional violation.'" *Davila v. Davis*, 137 S. Ct. 2058, 2064-65 (2017) (quoting *Wainwright Sykes*, 433 U.S. 72, 84 (1977)). Cause is established when the prisoner shows that "some objective

factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Isbel v. Davis*, No. CV H-162836, 2018 WL 8951192, at *16 (S.D. Tex. Sept. 19, 2018). A factor is external to the defense if it "cannot fairly be attributed to" the prisoner (*Coleman*, 501 U.S. at 753), and attorney error has long been considered an objective external factor providing cause for excusing a procedural default. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). However, "[a]ttorney error that does not violate the Constitution, however, is attributed to the prisoner 'under well-settled principles of agency law.'" *Davila*, 137. S. Ct. at 2065 (quoting *Coleman*, 501 U.S. at 754. Thus, where the Constitution does not guarantee the assistance of counsel, as in postconviction counsel, attorney error cannot provide cause to excuse default.

696.    The Supreme Court announced a narrow exception to *Coleman's* general rule in *Martinez v. Ryan*, 566 U.S. 1 (2012) and *Trevino v. Thaler*, 569 U.S. 413 (2013). That exception treats ineffective assistance of state postconviction counsel as cause to overcome the default of "a single claim—ineffective assistance of trial counsel—in a single context—where the State effectively requires a defendant to bring that claim in state postconviction proceedings rather on direct appeal." *Davila*, 137 S. Ct. at 2062-63. In *Trevino*, the Court clarified that the exception applies where state law explicitly prohibits prisoners from bringing claims of ineffective assistance of trial counsel on direct appeal, and also where the State's "procedural framework, by reason of its design and operation, makes it unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal. *Trevino*, 659 U.S. at 414.

697.    In *Davila*, the Supreme Court declined to extend the *Martinez* and *Trevino* exception to ineffective assistance of appellate counsel claims. *Davila*, 137 S. Ct. at 2063. In that

case the Court reasoned that "[i]neffective assistance of appellate counsel is not a trial error," which was *Martinez's* primary concern, nor is such a claim "necessary to ensure that a meritorious trial error (of any kind) receives review." *Id.* at 2066.

698.    However, if appellate counsel declines to raise a claim on appeal that was "plainly stronger than those actually presented to the appellate court," (*id.* at 2067) the prisoner may make out a substantial claim of ineffective assistance of appellate counsel based on *Strickland*. *Smith v. Robbins*, 528 U.S. 259, 288 (2000). Further, the Supreme Court has firmly held that where, as in Texas, criminal defendants are entitled to an appeal as a matter of law (as opposed to judicial discretion), the right to competent appellate counsel is indistinguishable in importance, for the purpose of due process, from the right to a competent trial attorney. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *accord Ries v. Quarterman*, 522 F.3d 517, 531-32 (5th Cir. 2008). In *Evitts v. Lucey* the Supreme Court stated:

> A first appeal as of right therefore is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney. This result is hardly novel. The petitioners in both *Anders v. California*, 386 U.S. 738, 87 S.C. 1396, 18 L.Ed.2d 493 (1967), and *Entsminger v. Iowa*, 386 U.S. 748, 87 S. Ct.1402, 18 L.Ed.2d 501 (1967), claimed that, although represented in name by counsel, they had not received the type of assistance constitutionally required to render the appellate proceedings fair. In both cases, we agreed with the petitioners, holding that counsel's failure in *Anders* to submit a brief on appeal and counsel's waiver in *Entsminger* of the petitioner's right to a full transcript rendered the subsequent judgments against the petitioners unconstitutional. In short, the promise of *Douglas* that a criminal defendant has a right to counsel on appeal – like the promise of *Gideon* that a criminal defendant has a right to counsel at trial – would be futile gestures unless it comprehended the right to the effective assistance of counsel.

*Evitts*, 469 U.S. at 396-97. Ineffective assistance of appellate counsel is a claim analyzed under *Strickland* and therefore requires a harm analysis that includes an inquiry into the question of whether the appeal would have been set aside if appellate counsel would have raised different claims. As such, this claim cannot be brought until the direct appeal is completed and a decision

240

has been rendered. An ineffective assistance of appellate counsel claim, therefore, can only be brought for the first time in a state habeas petition. District courts in other jurisdictions have thus interpreted *Martinez* to encompass appellate ineffective assistance of counsel claims alleging that the direct appeal should have raised trial ineffective assistance claims. *See, e.g., Williams v. Alabama*, 1:07-CV-1276, 2012 WL 1339905, at *62 (N.D. Ala. Apr. 12, 2012).

699.    The *Martinez* and *Trevino* exception to procedural default is an equitable remedy that recognizes and is motivated by the vital importance of competent representation in criminal proceedings. Those equitable concerns are amplified in the situation of a prisoner who has been confined on death row in the equivalent of solitary confinement for over six years, as Mr. Balderas has, and who has been deprived of his Sixth Amendment right to competent trial, appellate, and habeas counsel. In such situations, the equitable principles of *Martinez* militate in favor of excusing default rather than enforcing it.

## B.    The Direct Appeal and Appellate Ruling

700.    Mr. Shearer filed a motion for new trial on Mr. Balderas's behalf on April 14, 2014. (CR at 3365-87.) The trial court denied the motion on April 21, 2014. (*Id.* at 3409.) On April 27, 2015, Mr. Shearer filed an opening brief on appeal in the TCCA, *Juan Balderas v. The State of Texas*, cause no. AP-77,036. The brief alleged nine points of error: (1) insufficiency of evidence to prove guilt; (2) denial of motion to dismiss the indictment for lack of speedy trial; (3) improper assistance of a Spanish-language interpreter during Wendy Balderas's cross examination; (4) denial of right to cross examine and impeach an accuser concerning her ability to speak English; (5) abuse of discretion in allowing Wendy to testify in Spanish; (6) violation of the Gaskin rule by improperly denying defendant the opportunity to impeach Wendy with her prior audio-recorded statement to the police; (7) deprivation of due process of law and an impartial jury due to an outside influence; (8) failure to suppress Wendy's in-court and out-of-court identifications based in part

241

on an improperly suggestive photo lineup; and (9) the trial court's abuse of discretion by failing to have testimony read back in response to two jury notes. The State filed a brief in response on June 24, 2015, and both parties presented oral argument before the TCCA on October 7, 2015.

701.    On November 2, 2016, the TCCA affirmed the trial court's judgment (Texas Court of Criminal Appeals Opinion, *Juan Balderas v. The State of Texas*, No. AP-77,036 ("TCCA Opinion"), November 2, 2016, Habeas Writ Record, Vol. X, 002963-3041.) On the first point of error, the TCCA reasoned that "a rational jury could have determined from all of [the] evidence that Balderas, in the course of committing the offense of burglary, intentionally caused [Powder]'s death." (TCCA Opinion, Nov. 2, 2016, Habeas Writ Record, Vol. X, 002963-3041 at 02973.) On the second point of error, the TCCA addressed the right to speedy trial issue based on the *Barker* factors. *Barker v. Wingo*, 407 U.S. 514, 530 (1972). The court concluded that because defense counsel repeatedly urged the prosecutors and the trial court to delay the trial, and the State acquiesced, and because the defendant did not timely demand a speedy trial, the first three factors weighed in favor of the State. The fourth Barker factor, prejudice to the defendant because of the length of delay, weighed in favor of Mr. Balderas because the delay adversely affected his ability to defend himself. However, weighing the factors, the TCCA determined that since defense counsel caused most of the delay, there was no violation.

702.    Regarding point of error three, the TCCA deferred to the wide discretion of the trial judge who had direct contact with the witness, the parties, and the interpreter. Further, the court held that the Confrontation Clause guarantees only an opportunity for "effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, a defendant might wish." (TCCA Opinion, Nov. 2, 2016, Habeas Writ Record, Vol. X, 0029633041 at 02998.) Relatedly, the TCCA determined that the trial court did not abuse its discretion under

point of error four in denying Mr. Balderas's motion to compel cross-examination in English and with an audio recording because Mr. Balderas did not show that he was effectively prevented from cross-examining Wendy Bardales based on the exclusion of the audio recording. The TCCA applied the same reasoning to point of error five.

703.    The *Gaskin* rule entitles a defendant to inspect a State's witness's prior statements if they relate to the subject matter of the witness's testimony, for use in cross-examination and impeachment. *Gaskin v. State*, 353 S.W.2d 467, 469 (Tex. Crim. App. 1961). The TCCA overruled point of error six on the basis that Mr. Balderas misunderstood the rule, as he had a copy of the recorded statement.

704.    As to point of error seven, the TCCA determined that Mr. Balderas's brother's conduct of waving at the jurors as their bus passed did not constitute "contact ... about a matter pending before the jury." (TCCA Opinion, Nov. 2, 2016, Habeas Writ Record, Vol. X, 002963-3041 at 3020.) Further, that the contact at issue was not particularly threatening or intrusive, and that the evidence before the trial court rebutted any presumption of harm. (*Id.* at 3021.)

705.    Regarding the trial court's failure to suppress Wendy Bardales's in-court and out-of-court identifications of Mr. Balderas, and the improperly suggestive nature of the photo lineup, the TCCA considered, *de novo*, five non-exclusive factors against the corrupting effect of any suggestive identification procedure. *Luna v. State*, 268 S.W.3d 594, 605 (Tex. Crim. App. 2008). The TCCA held that Mr. Balderas did not establish that the procedure that led to Wendy Bardales's initial identification of him as the gunman was unnecessarily or impermissibly suggestive and that there was no substantial likelihood of misidentification. Finally, as to point of error nine, the TCCA held that the trial court's response to the jury was not a clear abuse of discretion and did not cause harm.

**C.      Appellate Counsel Failed to Present Evidence to Support Ineffective Assistance of Trial Counsel Claims**

706.    As the TCCA has long recognized, in a case like Mr. Balderas's, where the defendant has been positively identified but maintains his innocence, "it is incumbent upon the defense to cast doubt" on that identification. *Butler v. State of Texas*, 716 S.W.2d 48, 55 (Tex. Crim. App. 1986). Trial Counsel have a clear duty to independently seek out witnesses that say the defendant was not the person seen at the crime scene. *See Harris v. Dugger*, 874 F.2d 756, 763 (11th Cir. 1989).

707.    After trial counsel failed to conduct a reasonable investigation into the guilt/innocence phase issues in this case, and also failed to present crucial evidence during the punishment phase, appellate counsel then failed to present evidence about this failure of trial counsel on appeal. (*See* Claims II and III.)

**D.      Appellate Counsel Failed to Present Evidence Concerning the False Testimony Presented by Cookie at Trial**

708.    Cookie's testimony about Mr. Balderas's alleged confession was false based on information discovered post-trial. The testimony affected the verdict because the jury did not hear cross examination of Cookie's differing rendition of events, and his subsequent recantation underscores doubts about the veracity of his testimony.

709.    As explained in detail in Claim I, *supra*, Israel "Cookie" Diaz provided crucial testimony for the State: namely, that Mr. Balderas confessed to killing Powder. Cookies testified, among other things, that Mr. Balderas gave him a "huge and a kiss on the cheek," and then "took credit for the whole thing" by saying that he "got him." (26 RR at 159:11-160:18; 160:4-14.) This testimony was false.

710.    Prosecution notes, obtained only after trial, provide insight regarding the interviews that prosecutors held with Cookie in 2007 and 2008. (Exhibits 1-74 to Initial Application for Writ

of Habeas Corpus, Jan. 15, 2016, Habeas Writ Record, Vols. I - III, 00002-965, State Habeas, Dkt. No. 12.) (2007 and 2008 Cookie Notes, Habeas Writ Record, Vol. III, 00782-804.) These notes show that during these early interviews, Cookie discussed details surrounding the shooting but did not mention seeing Mr. Balderas at the crime scene and did not indicate that Mr. Balderas confessed to him.

### E.    Appellate Counsel Failed to Present an Available Alibi Defense

711.    Throughout his eight years of pre-trial incarceration, Mr. Balderas maintained his innocence. Mr. Balderas and his family also provided names of alibi witnesses and put two of them—Anali Garcia and Octavio Cortes—in contact with counsel. Nevertheless, neither trial counsel nor Mr. Shearer made an independent attempt to contact either. Had Mr. Shearer examined the evidence available to trial counsel, and the evidence presented at trial, he could have—and should have—raised the issue of trial counsel's failure to call additional witnesses and probe an available alibi defense at trial. Anali and Octavio could have and would have provided information about Mr. Balderas's whereabouts on the night of Powder's murder.

712.    Further, as explained in Claim I, the exculpatory and impeachment evidence that the State failed to disclose were not sought by Mr. Shearer nor raised on appeal. Cookie's three different accounts of Mr. Balderas's alleged confession on the day of the murder were not raised, nor was the fact that he was considered the keeper of the LTC's guns.

### F.    Appellate Counsel Failed to Raise Trial Counsel's Failure to Introduce Mitigation Evidence

713.    As stated above in Section I, OCFW uncovered a significant amount of exculpatory punishment phase evidence that was never presented to the jury, including compelling mitigation evidence regarding Mr. Balderas's life and family history. In addition to the trial testimony concerning Mr. Balderas's absent father and abusive stepfather, Mr. Balderas's mother was a

highly unstable parent who provided no guidance to Mr. Balderas in his youth. Mr. Balderas's maternal aunt and cousins in Mexico also provided affidavits detailing what it was like for Mr. Balderas to be abandoned by his mother in a rural Mexican town when he was eight years old. They were ready and willing to testify at Mr. Balderas's trial, but were unable to do so because of repeated technical difficulties.

714.    The mitigation investigation that was carried out by trial counsel was disjointed and scattered. Trial counsel did not retain any Spanish-speaking mitigation team members until they retained Ms. Helenek almost four years after Mr. Balderas's arrest, even though key mitigation witnesses such as Mr. Balderas's parents and extended family in Mexico only spoke Spanish.

### G.    Appellate Counsel Failed to Raise the Issue of Trial Counsel's Failure to Request a Competency Hearing

715.    Mr. Balderas's childhood physical and sexual abuse was probed by Dr. Brams and Dr. Mendel, retained by trial counsel, but neither expert ordered further brain testing nor inquired further into Mr. Balderas's clear signs of psychotic disorders and brain impairment. As discussed in Claims IV and V, *supra*, Mr. Balderas's history of psychotic disorders and brain impairment is well-documented by medical records, mental health records, academic records, jail and prison records, juvenile and extraneous offense records, and declarations of lay witnesses. For instance, Mr. Balderas was diagnosed with adjustment disorder with disturbance of conduct as early as 2001, thirteen years before Mr. Balderas's trial. (HSCO Records, Feb. 15, 2001, TDS-000001-001140, at TDS-000759-761.)

716.    In spite of the abundance of evidence indicating Mr. Balderas suffers from psychotic disorders and brain impairment, trial counsel failed to even raise the issue of competency.

**H.     Appellate Counsel Failed to Raise the Issue of a Suggestive Photo Spread and Suggestive Identification Procedure**

717.     The photo array in Mr. Balderas's case was impermissibly suggestive. As detailed in Claim VIII, Section B, *infra*, police officers obtained a description of the shooter from Wendy Bardales before she was shown any photo spread. Wendy told the police that the shooter wore a black jacket with a hood pulled over his head, and that he had a mark on his face. Wendy told the police she had never seen the gunman before.

718.     On the night of the shooting, a police officer showed Wendy a photo-spread array that did not include Mr. Balderas's photo, nor did it show any individual with a dark birth mark. Wendy did not identify anyone as the shooter, but she did recognized Cookie as a friend of Powder's.

719.     Six days after the shooting, the police showed Wendy a different photo array, including one photo of an individual with a dark mark on his cheek and wearing a black hooded sweatshirt. Wendy identified that individual as Mr. Balderas and tentatively said he was the shooter.

720.     Appellate counsel failed to raise this issue even though "conviction based on an eyewitness identification at trial following a pretrial photographic identification may be set aside 'if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Sturgeon v. Quarterman*, 615 F. Supp. 2d 546, 573 (S.D. Tex. 2009) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)).

721.     The TCCA ignored all factors demonstrating that the photo lineup was impermissibly suggestive. *Balderas v. State*, 517 S.W.3d 756, 795 (Tex. Crim. App. 2016). Appellate counsel's failure to raise this issue on direct appeal constituted ineffective assistance of counsel.

## I.    Appellate Counsel Failed to Raise Violations of Mr. Balderas's Constitutional Rights on Direct Appeal

### 1.    Jury instructions.

722.    Under Texas criminal law, objections to jury instructions cannot be forfeited. "[C]harge error is never forfeitable by a defendant's failure to object at trial." *Cosio v. State*, 353 S.W.3d 766, 776 (Tex. Crim. App. 2011). When a defendant raises a charge issue on appeal, an "appellate court's first duty... is to determine whether error exists." *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003). The standard for harm depends on whether the defendant objected at trial. Where the defendant objected to the instruction, reversal is required if there was "some harm." *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009). But even when there is no objection at trial, a court of appeals will reverse the conviction when the erroneous instruction has caused "egregious harm," when the error either "go[es] to the very basis of the case [or] vitally affect[s] [the] defensive theory." *Almanza v. State*, 686 S.W.2d 157, 172 (Tex. Crim. App. 1984) (en banc). To avoid the arbitrary and capricious imposition of the death penalty struck down in *Furman*, states must narrow the class of death-eligible defendants "by providing specific and detailed guidance to the sentencer." *McCleskey v. Kemp*, 481 U.S. 279, 303 (1987) (internal citations and quotation omitted).

### 2.    Speedy trial.

723.    The TCCA stated that the interval of more than eight years between Mr. Balderas's arrest in December 2005 and his trial in March 2014 was a length of delay "sufficient to trigger the *Barker* inquiry. Further, because this delay stretched far beyond the minimum needed to trigger the inquiry, the first *Barker* factor weighs heavily in favor of finding a violation of Balderas's speedy-trial right." (TCCA Opinion, Nov. 2, 2016, Habeas Writ Record, Vol. X, 002963-3041 at 02975.) But the TCCA held that it was defense counsel that was mostly responsible for the delay.

248

Defense counsel never indicated that they were ready to set the case for trial, and "the State acquiesced in a delay in January 2013." (*Id*. at 02981.) Further, "[d]efense counsel represented as late as May 2012 that the defense's investigation was incomplete and that the defense would be 'substantially prejudiced in its ability to present the defense' if the court did not grant a continuance." (*Id*.)

724.    Appellate counsel gave the court the impression that defendant did not want a speedy trial. The court opined that "defense counsel expressly requested a substantial portion of the delay. (*Id.* at 02982.) From 2009 to 2013, defense counsel consistently sought additional time for investigation and negotiation. It was not until January 29, 2014—after the jury had been selected—that defense counsel asserted the right to a speedy trial by filing a motion. See, *e.g. Amos v. Thornton*, 646 F.3d 199, 207 (5th Cir. 2011). It is also significant that defense counsel sought to dismiss the indictment rather than hasten the trial. *See, e.g., Barker*, 407 U.S. at 534-35 (observing that when defense counsel responded to a State's motion for a continuance by moving to dismiss the indictment without moving in the alternative for an immediate trial, such actions suggest that appellant hoped to take advantage of the delay and thereby obtain dismissal of the charges and definitely did not want to be tried).

### 3.    The 10-12 Rule and jury instruction restricting evidence that the jury could determine what was mitigating.

725.    The U.S. Supreme Court has held that juror discretion must be suitably directed and limited in capital cases. *Gregg v. Georgia*, 428 U.S. 153, 189 (1976). Article 37.071, section 2(b)(1), of the Texas Code of Criminal Procedure is unconstitutionally vague because it fails to define any of the key terms in Special Issue One and, thus, does not properly channel the sentencer's discretion in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution.

726.    In addition, the Eighth and Fourteenth Amendments to the U.S. Constitution require that the sentencer "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion) (emphasis in original).

727.    Mr. Balderas raised the unconstitutionality of the 10-12 Rule and the restriction on mitigation evidence in a pretrial motion that was subsequently overruled by the trial court, but appellate counsel failed to raise the issue on direct appeal.

### 4.    Competency to Stand Trial

728.    The Supreme Court has "repeatedly and consistently recognized that the criminal trial of an incompetent defendant violates due process." *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) (internal quotation marks and citation omitted); *Wheat v. Thigpen*, 793 F. 2d 621, 629 (5th Cir. 1986).

729.    Trial counsel failed to raise the issue of competency, or conduct an adequate investigation of Mr. Balderas's mental health, despite abundant evidence that Mr. Balderas suffered from psychotic disorders and brain impairment which would have impeded Mr. Balderas's ability to consult trial counsel with a rational degree of understanding and have a rational as well as factual understanding of the proceedings against him. *Dusky v. U.S.*, 362 U.S. 402 (1960).

730.    Appellate counsel failed to rasie the issue on direct appeal.

## J.    Appellate Counsel Failed to Raise *Brady* Issues on Direct Appeal

731.    Post-conviction investigation uncovered handwritten notes from State interviews with Israel "Cookie" Diaz (the "Interview Notes") showing that Cookie gave pre-trial statements indicating that: (1) Mr. Balderas did not confess to him; (2) Cookie did not see what Mr. Balderas

was wearing on the night of the shooting; and (3) Cookie did not see Mr. Balderas with the murder weapon on the night of the shooting. (2007 and 2008 Cookie Notes, Habeas Writ Record, Vol. III, 00782-804.) *See* Claim I.

### K.    Appellate Counsel Failed to Raise Prosecutorial Misconduct Issues Concerning The State's Closing Statement

732.    Personal assertions by a prosecutor as to the credibility of government witnesses during closing statements is a basis for prosecutorial misconduct.

733.    "A prosecutor is confined in closing argument to discussing properly admitted evidence and any reasonable inferences or conclusions that can be drawn from that evidence." *United States v. Vargas*, 580 F.3d 274, 278 (5th Cir. 2009). "A prosecutor may argue fair inferences from the evidence that a witness has no motive to lie, but cannot express a personal opinion on the credibility of witnesses." *Garcia,* 522 F.3d 597, 601 (5th Cir. 2008).

734.    As stated by the United States Supreme Court in *United States v. Young*, the danger of a prosecutor vouching for the credibility of witnesses is that "such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury . . . the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." 470 U.S. 1, 18-19 (1985).

735.    Furthermore, disparagements or denigrations of defense counsel made by prosecutors during closing argument are also prohibited under Fifth Circuit law. *See United States v. Murrah*, 888 F.2d 24, 27 (5th Cir. 1989) ("No counsel is to throw verbal rocks at opposing counsel."); *United States v. Jones,* 839 F.2d 1041, 1049 (5th Cir. 1988) ("During his closing argument, [the prosecutor commented:] 'Out of an absolute act of desperation, as a final grasp of

hope in trying to get you to buy their various distorted defenses, [the defense attorneys] sponsor perjury. They bring you a lie.' ... [U]nder our cases the comment was reprehensible."); *United States v. Rodriguez-Lopez*, 756 F.3d 422, 434 (5th Cir. 2014) ("Disparaging defense counsel's motives for representing a criminal defendant is a foul blow.").

736.    In two instances during her closing statement, Ms. Dozier made impermissible personal assertions about the credibility of State witnesses. First, Ms. Dozier tried to rehabilitate Wendy's inconsistent testimony that she had never seen the shooter and then later that she knew him with an anecdote from her past. Ms. Dozier recalled how she had seen a magazine several years ago with a "cute little kid on the front," and put the magazine away without thinking about it. *Id.* at 40:22-41:2. Two months later, Ms. Dozier recalled, her brother-in-law came to town and had a conversation with her father about photographs he had taken and sold to the magazine. Ms. Dozier then said, "that cute little kid on the cover, my niece," and "I didn't recognize her until I heard that conversation." *Id.* at 41:2-8. Ms. Dozier stated, "I would submit to you that's something that's happened to all of us," and that "I would submit to you that Wendy's lack of recognition that night is understandable." *Id.* at 41-42.

737.    Second, while recounting Cookie's testimony about the meeting at the twins' house in December 2005, Ms. Dozier remarked, "[a]nd [Cookie] was honest when he told you he didn't really care too much about what happened." *Id.* at 52:6-9.

738.    Additionally, Ms. Dozier remarked on the credibility of defense counsel, stating "[y]ou know, Mr. Nunnery talked about the police and one minute he's holding them up, they're the best thing he'd ever seen and the next moment, he's tearing them down. It just depends on what his purposes are. . . I'm just asking you to consider all the evidence and consider what you saw and what you heard, not the spin that's put on it." *Id.* at 42:4-13.

739.    These statements bolstering Wendy Bardales and Cookie constitute error, defined as "deviation from a legal rule," because they are impermissible personal assertions by a prosecutor of a government witness' credibility. *Garcia*, 522 F.3d at 600-01 (quoting *United States v. Gallardo-Trapero*, 185 F.3d 307, 322 (5th Cir. 1999)).

740.    Ms. Dozier's personal anecdote far exceeds the bounds of closing argument and supplants the jury's determination of credibility with her own by submitting the jury that, based on her own personal experience, "Wendy's lack of recognition that night in understandable." Ms. Dozier went even further when she declared directly that Cookie's testimony was honest, taking that determination from the province of the jury. *Id.* at 41-42. *See Garcia*, 522 F.3d at 600-01 (holding that it was an error when prosecutor expressed his opinion to the jury that the agents were "very, very credible witnesses.").

741.    The statement calling into question defense counsel's integrity disparages the credibility of defense counsel, Mr. Nunnery, implying that his arguments should be disregarded because they are spun to fit the Defense's purposes.

742.    These statements at issue affected Mr. Balderas's substantial rights. "In cases where there is little or no evidence against the defendant apart from the improperly bolstered testimony and where a credibility determination is of crucial importance, [the Fifth Circuit] has reversed and remanded for a new trial." *United States v. Aguilar*, 645 F.3d 319, 326 (5th Cir. 2011) (citing *Garcia*, 522 F.3d at 604-06; *United States v. Garza*, 608 F.2d 659, 665-66 (5th Cir. 1979)).

743.    The most significant evidence the State produced to prove Mr. Balderas was the shooter on December 6, 2005, was the identification and testimony given by Wendy. The State emphasized that, although Wendy testified she did not recognize Mr. Balderas that night, she nevertheless identified Mr. Balderas out of the photographic lineup presented on December 12,

2005. (30 RR at 39:14-15; 43:9-20.) Because resolving this glaring inconsistency was critical to Wendy's credibility, Ms. Dozier's improper bolstering of her credibility renders the prejudice high on the magnitude scale. *See Aguilar*, 645 F.3d at 325 (holding that, where the credibility of the testimony was a critical issue, and where there was no improper argument by the defense to counterbalance the prosecutor's misconduct, the prosecutor's improper bolstering rendered the prejudice high on the magnitude scale).

744.     Further, the State relied on Wendy's testimony that she had seen the shooter's "right side exposed to her" when the "hood fell off" as he "cross[ed] right by her path." (30 RR at 34:17-24.) Despite two other people in the room at the time, the State professed that Wendy was "the only one who can come here and testify as to the identity of the shooter because [Powder's] dead. He can't tell you." (*Id.* at 36:3-6.) The trustworthiness of Wendy's identification of Mr. Balderas from the photographic lineup was a key issue raised by the Defense and defended by the State.

745.     Cookie's testimony was also crucial and the improper bolstering magnified his credibility. The State then argued "how else - - how else do you know that Juan Balderas is the killer? Israel [Cookie] Diaz. He told you. Juan Balderas told [Cookie] that he got him, that he killed Powder." (*Id.* at 48:11-14.) However, Mr. Balderas's confession was neither recorded nor transcribed and Mr. Balderas vehemently denies having made it. Furthermore, as discussed in Claim I, the undisclosed evidence shows that Cookie gave multiple versions of the alleged confession providing multiple contradictions.

## VII.     TRIAL COUNSEL VIOLATED MR. BALDERAS'S SIXTH AMENDMENT AUTONOMY RIGHT TO PRESENT AN ALIBI DEFENSE

### A.     The Sixth Amendment Right to Autonomy in the Objectives of the Defense

746.     The Sixth Amendment guarantees a defendant the right to defendant the right "to have the *Assistance* of Counsel for *his* defence." *McCoy v. Louisiana*, 138 S. Ct. 1500, 1505, 200

L. Ed. 2d 821 (2018) (emphasis in original). Thus, "[w]ith individual liberty—and, in capital cases, life—at stake, it is the defendant's prerogative, not counsel's, to decide on the objective of his defense." *Id*. The "right to defend is personal," and a defendant's choice in exercising that right "must be honored out of 'that respect for the individual which is the lifeblood of the law.'" *Id.* at 1507.

747.     Accordingly, the Sixth Amendment includes a right to "autonomy" to "decide that the objective of the defense is to assert innocence." *Id.* at 1508.

748.     When a "client's autonomy, not counsel's competence, is in issue," a court does not apply "ineffective-assistance-of-counsel jurisprudence." *Id.* at 1510–11.

749.     The violation of a "protected autonomy right" is "complete when the court allow[s] counsel to usurp control of an issue within [the defendant's] prerogative." *Id. at 1511*

750.     Violation of a "defendant's Sixth Amendment-secured autonomy ranks as error of the kind our decisions have called 'structural'; when present, such an error is not subject to harmless-error review." *Id.*

751.     Where a "structural" error exists, the appropriate remedy is a new trial. *Id.*

**B.     Trial Counsel Violated Mr. Balderas's Right to Autonomy By Refusing to Present an Alibi Defense**

752.     The decision to present an alibi defense is within the sole prerogative of a defendant and a defense counsel that refuses to present an alibi defense violates a defendant's Sixth Amendment autonomy right. *See McCoy*, 138 S. Ct. at 1510 (counsel admitted guilt and also refused to present alibi defense). It is a structural error affecting "the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty." *Id.* at 1511.

753.    At the end of January 2014, Mr. Balderas's wife provided counsel with first names of five people who she believed may have been able to offer helpful testimony at the guilt/innocence phase of trial, including two potential alibi witnesses, Anali Garcia and Oralia McCrary, who were with Mr. Balderas on the night of the murder.

754.    On February 4, 2014, Ileana Cortes, the mother of Mr. Balderas's niece (his brother's daughter), contacted counsel to inform them that Mr. Balderas had been with her and her family at their apartment all afternoon and evening on the day Powder was killed. In a memorandum memorializing the meeting, counsel indicated that Ileana did not know any specific facts about the Powder shooting and that she had difficulty remembering whether it was the exact night of the Powder shooting that Mr. Balderas was at her apartment. (E-mail from Jerome Godinich, February 4, 2014, Habeas Writ Record, Vol. III, 00773-74.)

755.    Rather than attempt to corroborate or further explore whether Mr. Balderas was indeed with Ileana on the night of the shooting, counsel bluntly told Ileana her testimony was useless and sent her away. (Affidavit of Jesus Balderas ("Balderas Aff."), October 25, 2015, Habeas Writ Record, Vol. II, 00476-832, ¶ 21; Ex. B, Ileana Cortes Decl., ¶ 12)

756.    On February 13, 2014, four days before trial, counsel spoke with Anali Garcia. However, the conversation with Anali was brief and over the phone, and counsel quickly determined that they did not need her as a "character witness," either oblivious or indifferent to her critical importance as a potential alibi witness. (*Id.*) As Anali recalls, however, she was informed that counsel had set what can only be described as an arbitrary deadline for potential witnesses to come forward. Anali called counsel before that deadline to inform them that Mr. Balderas had spent the afternoon and evening at her house on the day of the Powder shooting and that he therefore could not have been the shooter. Counsel again advised Anali that they already

had enough "character" witnesses and did not need her testimony. Anali attempted to clarify that she was not calling as a character witness, but counsel did not let her explain. Ultimately, Anali took counsel's word that they did not need her testimony, stating, "I thought that he would know better than me." Anali was shocked when she attended Mr. Balderas's trial and found that counsel did not offer an alibi defense. (Garcia Aff. ¶¶12-13.)

## VIII. MR. BALDERAS'S EQUAL PROTECTION RIGHTS WERE VIOLATED BY THE AGREEMENT BETWEEN THE STATE AND THE DEFENSE TO EXCLUDE AFRICAN AMERICANS FROM MR. BALDERAS'S JURY

### A. United States Constitution Prohibits Racial Discrimination in Jury Selection and *Batson* Established a Three-Part Test

757.    The Equal Protection Clause of the United States Constitution forbids racial discrimination in the jury selection. *See Miller-El v. Dretke,* 545 U.S. 231, 238 (2005). The Constitution prohibits excluding even one juror for a discriminatory reason. *See Flowers v. Mississippi*, 139 S. Ct. 2228, 2241 (2019). A litigant need not be of the same race or ethnicity as the excluded jurors to have standing to champion their rights. *See Id*. at 2243.

758.    Neither the prosecution nor the defense is permitted to exclude potential jurors on account of their race or ethnicity. *See*, *e.g., Georgia v. McCollum,* 505 U.S. 42 (1992). When the defense joins with the state or the court to engage in discriminatory jury selection, the Equal Protection Clause is not waived or rendered irrelevant. *See*, *e.g.*, *Mata v. Johnson,* 99 F.3d 1261, 1268-71 (5th Cir. 1996), *vacated on other grounds,* 105 F.3d 209 (5th Cir. 1997); *United States v. Huey*, 76 F.3d 638 (5th Cir. 1996).

759.    *Batson v. Kentucky* established a three-part test for determining if a juror was improperly excluded because of their race. 476 U.S. 79 (1986).

760.    First, a defendant must "make out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory

purpose." *Id.* at 93–94. A defendant satisfies this requirement by producing evidence "sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson v. California,* 545 U.S. 162, 170 (2005).

761.    At the second step—if the defendant has succeeded in making a *prima facie* case— the burden shifts to the State. The State must "explain adequately the racial exclusion" by demonstrating "permissible racially neutral selection criteria and procedures have produced the monochromatic result." *Batson*, 476 U.S. at 94 (quotation marks omitted).

762.    At the third step, if the state has successfully shown a race-neutral reason, the defendant must "establish[] purposeful discrimination." *Id.* at 98.

**B.     The Totality of the Relevant Facts Give Rise to the Inference that African American Persons Were Improperly Excluded from the Jury Because of Their Race**

763.    The State, trial counsel, and the trial court's actions in the jury selection process systematically excluded African Americans.

764.    During jury selection of Mr. Balderas's capital trial, the Court repeatedly expressed the sentiment to the State and trial counsel that it wanted a speedy voir dire. On the first day of jury selection, the Court stated that it expected parties to move to strike a juror as soon as the juror gave an unequivocal disqualifying answer to a question. (4 RR at 5:2-14.) The Court would question the juror on the matter to be sure that the juror understood and gave the same unequivocal answer. (*Id*. at 5:5-9.) If so, the Court would grant the strike for cause. (*Id*. at 5:11-14.) The Court warned:

> We're not going to get into ping-pong matches, let me try to rehabilitate and all this back and forth. So, when you get the person who has given you a definitive answer that you want to use to strike him for cause, then make your motion and we'll get it over with.

*Id*. at 5:9-14.)

765.    After only two venirepersons were questioned, the Court instructed the parties to "scrutinize these a little better on your exchanges. [That last prospective juror] had so many strikes against him, that was really a wasted hour." (*Id.* at 87:15-18.)

766.    On the third day of voir dire, the Court repeated the sentiment about another prospective juror: "Now that's kind of an example of what I'm trying to get across. That juror had no chance of ever being on the jury and why we spent an hour talking to him is beyond me." (6 RR at 53:5-8.)

767.    Over the course of voir dire, the parties agreed to excuse 206 of the 273 prospective jurors (75.5 percent of the venire) without examination.[25] The discussion between the State and defense occurred off the record and there was no indication in the record of either party's basis for the broad excusals.

768.    A disproportionate number of these excusals were people of color. 84.8 percent of the African American women in the venire were excused before they were ever questioned, and 75.0 percent of the African American men in the venire were excused without examination. By contrast, 72.1 percent of the white women, and 67.7 percent of the white men in the venire were excused without questioning. As a result, Mr. Balderas was tried by a disproportionately white jury.

769.    The following table provides a breakdown of the venire and the jury by race and gender.

| Composition of the venire (%) | Composition of the petit jury, including alternates (%) | Chance of venirepersons of a particular group being selected as jurors, including alternates (%) |
| --- | --- | --- |

---

[25] Race and gender information is unknown for 32 of the 273 prospective jurors, either because they did not report that information or because their juror information cards were misplaced by the District Clerk's office. Those 32 veniremembers have been removed from the percentage calculations to avoid confusion. A total venire of 241 were used for the calculations.

| | | | |
|---|---|---|---|
| All races and ethnicities | | | 5.8% (14/241) |
| White, overall | 52.3% (126/241) | 71.4% (10/14) | 7.9% (10/126) |
| White men | 27.0% (65/241) | 42.9% (6/14) | 9.2% (6/65) |
| White women | 25.3% (61/241) | 28.6% (4/14) | 6.6% (4/61) |
| African American, overall | 23.6% (57/241) | 7.1% (1/14) | 1.8% (1/57) |
| African American men | 10.0% (24/241) | 0.0% (0/14) | 0.0% (0/24) |
| African American women | 13.7% (33/241) | 7.1% (1/14) | 3.0% (1/33) |
| Latino/a, overall | 17.4% (42/241) | 21.4% (3/14) | 7.1% (3/42) |
| Latino | 9.1% (22/241) | 7.1% (1/14) | 4.5% (1/22) |
| Latina | 8.3% (20/241) | 14.3% (2/14) | 10.0% (2/20) |

770.    The venire was comprised of 241 potential jurors whose race and gender are discernable from available information. Each venireperson should have had a 5.8 percent chance (14/241) of being selected to the jury. However, an African American venireperson only had a 1.8 percent chance (1/57) of being selected. By contrast, a white venireperson had a 7.9 percent chance (10/126) of being selected. A white venireperson was almost 4.5 times more likely to be selected as a juror than an African American venireperson. Stated differently, African Americans comprised 23.6 percent of the venire, but only 7.1 percent of the jury. By contrast, whites comprised of 52.3 percent of the venire, but made up an overwhelming 71.4 percent of the jury. Taking into account the seven African American venirepersons who were excused by agreement after being questioned and one who was peremptorily struck by the defense, a total of 54 out of 57 African American prospective jurors, or 94.7 percent, were struck for reason other than cause.

**2.    Excluded venirepersons were similar to those allowed to proceed to individualized voir dire and to serve on the jury.**

771.    The excluded prospective jurors in Mr. Balderas's case were similar to veniremembers who were allowed individual examination and veniremembers who were eventually included in the jury—apart from the sole factor of their race. A review of the jury questionnaires of those jurors who were accepted for individual examination demonstrates that jurors who gave certain answers were considered "acceptable jurors" by the State and the defense.

772.    For example, because this was a capital case, the juror questionnaire asked about veniremembers' views about death penalty on a scale of 1 to 5, where "1" indicates "I am opposed to the death penalty under any circumstances," and "5" indicates "I am strongly in favor of the death penalty as an appropriate remedy." The State and the defense deemed an answer of "3" or "4" most acceptable because it eliminated prospective jurors who held such strong opinions on the death penalty that they could not be objective.

773.    Jurors who were allowed individual examination also agreed with the presumption that "[a] defendant is innocent until proven guilty beyond a reasonable doubt," and indicated that he or she "would consider all of the penalties provided by law, and the facts and circumstances of the particular case," rather than being more or less likely to choose the death penalty.

774.    Despite this being the apparent standard for "acceptable jurors" in this case, some African American prospective jurors with those exact characteristics were excused without ever being questioned on individual voir dire. The only possible reason for their excusal without examination is an unacceptable one: race.

775.    Numerous African American veniremembers were not permitted to proceed to individual voir dire, even though they shared the same relevant characteristics as those who were. Both the State and trial counsel failed to ask meaningful questions to the struck veniremembers.

The State and trial counsel showed little interest in discerning whether there were legitimate grounds to question the minority veniremembers' objectivity. Rather, they made up their mind to exclude them even before any individual examination.

### 3. The Harris County District Attorney's Office has a history of discrimination in jury selection.

776. History of racial discrimination in district attorney's office supports an inference of discrimination. *See Madison v. Comm'r, Ala. Dep't of Corr.*, 677 F.3d 1333, 1339 (11th Cir. 2012)

777. The Harris County District Attorney's Office has a recent history of discrimination in jury selection. *See*, *e.g.*, *Rosales v. Quarterman*, No. H-03-1016, Mem. Order at 47 (S.D. Tex. Dec. 12, 2008) (ECF No. 109); *Jones v. State*, 431 S.W.3d 149, 154-62 (Tex. App. 2013); *Moore v. State*, 265 S.W.3d 73, 86-90 (Tex. App. 2008); *State v. Thomas*, 209 S.W.3d 268, 275 (Tex. App. 2006).

778. The Harris County District Attorney's Office's history inferentially suggests that this practice occurred during the jury selection in Mr. Balderas's trial.

779. Contemporaneous objection is not required.

780. Because Mr. Balderas's trial counsel's actions, in conjunction with the State's conduct, served to exclude African American veniremembers, they did not raise any *Batson* objections at trial. Mr. Balderas's counsel did not raise a *Batson* claim at the direct appeal, either. During the state habeas proceeding, OCFW on Mr. Balderas's behalf raised the *Batson* issue.

781. Mr. Balderas's *Baston* claim does not fail automatically due to the lack of contemporaneous objection. In *Huey*, Huey's own counsel exercised peremptory challenges in a racially discriminatory manner and obviously did not make contemporaneous objections. 76 F.3d at 641. The Fifth Circuit nevertheless found a *Batson* violation and granted Huey a new trial. *Id. at 642. See also Mata*, 99 F.3d at 1269-71.

## IX.  THE JURY WAS EXPOSED TO MULTIPLE EXTERNAL INFLUENCES AND ENGAGED IN MISCONDUCT THAT PREJUDICED THEIR DELIBERATIONS AND IMPROPERLY INFLUENCED THEIR VERDICT

### A.  Mr. Balderas was Entitled to Trial by an Impartial Jury

782.  The right to judgment by an impartial jury is at the very heart of the protections afforded to criminal defendants by the U.S. Constitution. The Sixth Amendment requires that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . [and] to be confronted with the witnesses against him. . . ." U.S. CONST. amend. VI. The Due Process Clause of the Fourteenth Amendment independently requires that any jury provided to a defendant must "stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Morgan v. Illinois*, 504 U.S. 719, 726 (1992).

783.  To safeguard this fundamental right, the Supreme Court has "established a constitutional rule forbidding a jury from being exposed to an external influence." *Oliver v. Quarterman*, 541 F.3d 329, 336 (5th Cir. 2008). ("The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." *Id.* at 334 (quoting, *inter alia*, *Turner v. Louisiana*, 379 U.S. 466, 472 (1965); *Mattox v. United States*, 146 U.S. 140, 149 (1892) ("in capital cases [ ] the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment").

784.  Under well-established Supreme Court precedent, in criminal cases, any "private communication, contact, or tampering" with the jury is presumptively prejudicial. *Remmer v. United States*, 347 U.S. 227, 229 (1954); *see also Richardson v. United States*, 360 F.2d 366, 369 (5th Cir. 1966).

263

785.    Attempts to intimidate jurors are also presumptively prejudicial. *See, e.g., United States v. Cheek*, 94 F.3d 136, 144 (4th Cir. 1996) (finding that third party's approaching juror for purposes of bribing the juror was presumptively prejudicial and granting habeas relief).

786.    The scope of impermissible external influence extends far beyond direct threats or intimidation—and can occur inside or outside the courtroom. In *Stockton v. Virginia*, the Fourth Circuit found a restaurant owner's comment to jurors during a capital sentencing phase that "they ought to fry the son of a bitch" harmful and requiring retrial. 852 F.2d 740, 743 (4th Cir.1988) ("The fact that there was here no threat or inducement, no invasion of the sanctity of jury room deliberations, does not still the sense that something went awry.").

787.    When external influences are attributable to court personnel, the presumption of prejudice is heightened even further. Indeed, "a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process." *Estes v. Texas,* 381 U.S. 532, 542-543 (1965); *see also United States v. Greer*, 620 F.2d 1383, 1389-90 (10th Cir. 1980) (bailiff's comments to jurors during a lunch break regarding the Federal Youth Corrections Act were presumptively prejudicial because the comments might have led jurors to conclude that the defendant, who had a youthful appearance, would be subject to sentencing under the Act)*; Parker v. Gladden*, 385 U.S. 363, 363-66 (1966) (reversing conviction because bailiff commented to juror on defendant's guilt and ability to correct verdict on appeal because influence violated the Sixth Amendment guarantee that the criminally accused be tried by an impartial jury).[26]

---

[26] *See also Turner v. Louisiana*, 379 U.S. 466, 473-74 (1964) (reversing conviction and death sentence because sheriffs who were witnesses had also fraternized with the jury); *Mattox*, 146 U.S. at 150-51 (reversing murder conviction because of bailiff's remarks to the jury and because newspaper article about case was read to jury); *Ward v. Hall*, 592 F.3d 1144, 1152, 1173-81 (11th Cir. 2010) (reversing denial of habeas relief from death sentence based on allegation that bailiff improperly responded to a juror's question about parole during penalty phase of trial); *Moore v. Knight*, 368 F.3d 936, 937-38 (7th Cir. 2004) (finding habeas relief warranted where trial judge had ex parte communications with the jury because the state court had unreasonably deemed the conduct harmless error).

788.   The "ultimate inquiry" is whether the "intrusion affect[ed] the jury's deliberations and thereby its verdict." *United States v. Olano*, 507 U.S. 725, 739 (1993). Where a juror in a criminal case is exposed to an external influence, "the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant," that the influence was "harmless to the defendant." *Remmer*, 347 U.S. at 229; see also *United States v. Khoury*, 539 F.2d 441,443 (5th Cir. 1976) (the law requires affirmative proof of harmlessness of communications involving jurors held outside the jury room.)

### B.   The Jury Was Exposed To A Series Of Prejudicial External Influences That Affected Its Deliberation And Verdict

789.   Here, the "ultimate inquiry" demonstrates that Mr. Balderas's jury was subjected to numerous external influences that affected its "deliberation and thereby its verdict," in violation of Mr. Balderas's due process right to a fair and impartial jury. *Olano*, 507 U.S. at 739.

#### 1.   *Social media commentary.*

790.   First, in contravention of the trial court's clear instructions (24 RR 13), at least one juror posted about the trial on Facebook, discussing the proceedings on at least a dozen different dates. Just as the trial court had warned, Juror Armstrong received "unsolicited words of advice" on Facebook in response to his posts. (*See id.*) In response to one of his numerous posts, one of Juror Armstrong's Facebook friends commented: "Give them the chair." (John Armstrong Facebook Excerpts, Habeas Writ Record, Vol. III, 00894-913, 0900). Another asked: "Were any white Ford Broncos part of the testimony?"—an obvious reference to the O.J. Simpson trial, a case in which the overwhelming majority of the public felt that a guilty man beat the system. (*Id.* at 00909.*)* These comments alone meet the standard for harmful influence and require reversal of Mr. Balderas's conviction. *See Stockton*, 852 F.2d at 740 (restaurant owner's comment to jurors during

a capital sentencing phase that "they ought to fry the son-of-a-bitch" was harmful and required retrial).

### 2. The jury was improperly sequestered near the crime scene.

791.     In addition, the entire jury was subjected to a series of frightening and intimidating external influences over the court of their deliberations.

792.     The jury was deadlocked at the end of the first day of deliberations (*See* Juror Armstrong Aff., ¶ 4; Juror Birney Aff., ¶ 3; Juror Orosz Aff., ¶ 4; Juror Sullivan Aff., ¶ 2) and was bused to a motel to remain sequestered for the night. The motel was located close to the crime scene and the area where Mr. Balderas grew up, in a neighborhood known for gang and other criminal activity. These facts were not lost on the jury. In sworn affidavits submitted to the state habeas court, the jurors testified:

- "I knew the motel was close to the crime scene that had been discussed in testimony." (Juror Norwood Aff., ¶ 4.)

- "We ended up staying at a motel that was close to the crime scene... I am from Houston, so I knew where we were." (Juror Sullivan Aff., ¶ 34.)

- "[The motel] was very close to the neighborhood where the crimes discussed at trial took place." (Juror Browning-McCauley Aff., ¶ 5.)

- "I was aware that the motel was in the general area that we had been hearing about at trial." (Juror Birney Aff., ¶ 4.)

- The motel was in an area that "had a reputation for gang activity." (Juror Armstrong Aff., ¶ 6.)

793.     Jurors described the motel as "terrible, seedy" (Juror Birney Aff., ¶ 4.) The motel lobby had a sign informing its patrons that the motel was subject to random police searches—a

"clear marker saying this [was] not a great place to be." (Juror Sullivan Aff., ¶ 3; Juror Norwood Aff., ¶ 5; Juror Browning-McCauley Aff., ¶ 5.) The jurors expressed concern, "talking about how they thought the place was scary or dangerous," to the point where "[n]o one seemed comfortable there." (Juror Birney Aff., ¶ 4; Juror Armstrong Aff., ¶ 5.) After the jurors checked in, the bailiffs visited the jurors in their rooms, telling them "to keep our doors closed and locked" and "not to come out." (Juror Birney Aff., ¶ 4.) One juror stated he perceived that the bailiffs "were concerned about our safety." (*Id.*)[27]

794.    After many days of testimony regarding Mr. Balderas's alleged involvement in gang violence, the jurors were, understandably, "very fearful" of their surroundings and deeply concerned that that they were staying in a place that was "dangerous." (Juror Armstrong Aff., ¶ 5; Juror Birney Aff., ¶ 4). One juror felt it was "freaky that we were down in that area" near the crime scene discussed in trial. (Juror Norwood Aff., ¶ 4.) Another found the proximity to the crime scene "unnerving." (Juror Sullivan Aff., ¶ 3.) Unsurprisingly, at least one juror stated that staying near the crime scene that night "*made me think of the crime.*" (Juror Armstrong Aff., ¶ 5.)[28]

795.    The proximity to the crime scene was "a big enough deal" that the jurors raised it with the bailiffs the next day. (Juror Armstrong Aff., ¶ 5.) The trial court evidently agreed, as it apologized on the record for the accommodations. (31 RR 7:7-16) When the trial court "apologized and said they would make better arrangements for the jury going forward," two or three of the

---

[27] Those jurors who were not immediately aware of the implications of their surroundings were made aware the next morning when the jurors discussed the issue at breakfast. (Juror Armstrong Aff., ¶ 5; Juror Orosz Aff., ¶ 5; Juror Sullivan Aff., ¶ 5.) Juror Sullivan recalled that he may have been one of the jurors who commented on the motel's proximity to the crime scene as the jurors were getting ready to leave for court that day, saying: "We are not even that far from where the crime happened." (Juror Sullivan Aff., ¶ 5.) Other jurors heard these statements: Juror Orosz

[28] The impact of their sequestration near the crime scene was not limited to guilt-phase deliberations. Juror Armstrong specifically recalled raising the motel's location during the punishment phase of trial. "Later on, during the punishment phase, I told people we had stayed close to where some of the extraneous crimes took place." Juror Armstrong even recalled pointing out the motel's location on an aerial map they were reviewing. (*See* Juror Armstrong Aff., ¶ 6.) Juror Armstrong entreated his fellow jurors to "remember" that they "were so close" to the crime scene. (*Id.*)

other jurors "gave a big sigh of relief when we were told they would move us to a different hotel because they all struggled with it." (Juror Orosz Aff., ¶ 5.)

### 3. Jurors were subjected to perceived threats and intimidation from a member of Mr. Balderas's family.

796.    The jurors' concern for their safety was compounded by an incident that occurred the following day. noted that, "[t]he next day, someone else on the jury mentioned how close the motel was to the crime scene." (Juror Orosz Aff., ¶ 4.)

797.    The jury remained deadlocked throughout the second day and sent a note reporting the deadlock to the trial court. (Juror Norwood Aff., ¶ 3; "We are deadlocked. We agreed that we are not to 'strong arm' each other to change votes and have exhausted our questions over testimony and evidence. Now what?" (CR at 3312.) Trial counsel moved for a mistrial, noting that the jury had been deliberating for fourteen hours at that point, but the trial court denied that motion. (31 RR at 20-23.) Instead, the trial court read the jury an *Allen* charge and instructed them to continue their deliberations. (*Id*. at 22-24.) Nonetheless, the jury remained deadlocked when the court ended for the day about an hour later. (*Id.* at 27.) One juror recalled that the "guilty to not-guilty split at the end of the second day was either five to seven or four to eight"—in other words, the majority of jurors were voting against convicting Mr. Balderas. (Juror Armstrong Aff. at ¶ 7.)

798.    As they were leaving the courthouse and being loaded onto a bus, several jurors noticed Mr. Balderas's younger brother, Ivan, standing on the street corner and gesturing or waving at their bus. (Birney Aff. at ¶ 5; Juror Norwood Aff. at ¶ 5; Juror Armstrong Aff. at ¶ 7; 32 RR at 12-13 [Deputy Henning testimony].) Ivan's gestures caused "hysteria" among jurors, some of whom even considered the gesture to be life threatening. (*See* Juror Armstrong Aff. at ¶ 7.)

799.    Even those jurors who did not see Ivan gesture were instantly made aware of the incident by the reactions of those who did. According to the jury foreman, who did not see the

268

gesture himself, "[t]here definitely was a change in the conversation [on the bus] that brought my attention to the issue." "[S]ome of the jurors flipped out and were vocalizing their concern" and "some of the jurors were really creeped out." (Juror Norwood Aff. at ¶ 5.) Juror Orosz testified that fellow jurors "seemed alert and afraid." (Juror Orosz Aff. at ¶ 6.) One juror was so "worked up" that she was "shaking and emotional on the bus for at least ten or fifteen minutes" afterwards. (Juror Armstrong Aff. at ¶ 8; see also Juror Sullivan Aff. at ¶ 6.)

800.    These concerns were heightened by the reaction of the bailiffs. Deputy Henning, one of the bailiffs on the bus at the time, testified that he told the bus driver to stop the bus, and then got off the bus in an attempt to locate Ivan. (32 RR at 12-13.) Several jurors reported that the bailiffs yelled to stop the bus, then got off the bus and chased Ivan. (32 RR 24) Other jurors reported that the bailiffs attempted to "look for" and "confront" Ivan but "could not find him." (Juror Norwood Aff. at ¶ 5; Juror Orosz Aff. at ¶ 6.)

801.    Juror Birney testified that the bailiffs' decision to go after Ivan made her "realize[] that they perceived it as a threat." (Juror Birney Aff. at ¶ 5; see also Juror Sullivan Aff. at ¶ 6.) After that, Juror Birney "felt like [the gesture] potentially was a tactic to intimidate or threaten perhaps." (32 RR at 18.) Juror Orosz agreed that the incident "smacked of intimidation." As he explained:

> I believe it was an attempt to intimidate the jurors, and all the jurors agreed that it was an attempt to intimidate us. [Juror Trujillo] saw him waving and was the first person to call it an act of intimidation. **We talked about the incident and I believe some people were very afraid and everyone was concerned. Up until that point, the proceedings were seen by the jury as an everyday thing. In that moment, when the waving incident occurred, it became so real to us that our lives could be in jeopardy that the gang activity and frame of mind could actually be interjected into our personal lives and we could become victims** in one way or another.

> We started watching our backs and began to be more concerned about where we were staying and who was watching us.

269

> We would watch the women on the jury go [to] the parking lots before the incident, but after we would make sure they got into their cars safely. Each morning, we would check in with each other, asking how people slept or if anything strange happened overnight. It was uncomfortable. ***We were concerned with our personal safety.***
>
> Although the brother was never in court again after that, those feelings never went away. I thought that if the brother had the same temperament as the people in the gang being discussed in testimony, something could happen. I thought we could be killed— the fear of it feeling like a mob strike, or the potential of a drive-by shooting. At that point, things became so real. ***We came to the realization that these people were capable of anything, including murder of jurors,*** innocent people, lawyers, others. ***We thought members of the gang or someone related to Juan Balderas could have upped the ante and taken out a slew of us.***

(Juror Orosz Aff. at ¶¶ 7-9. (emphasis added))

802.    The jurors continued to be alarmed even after they reached the hotel for the night.

(32 RR at 14-15.) Juror Birney reportedly was "in somewhat of a panic" about it at the hotel and

"wanted to call her family because she was worried that somebody knew where she lived in her

mind." (*Id.* at 15.) The bailiffs accommodated her request, despite the court's sequestration order.

According to Juror Birney:

> I was concerned enough about the incident that I told the bailiffs I needed to call my husband, who was at home with our children. I was not totally trusting that the county would keep us anonymous and I worried that someone could look up our names and find our information. ***It would be easy, since Juan sat through all the juror questions.*** I went up to the bailiff and told him I wanted my cellphone and I wanted to call my husband. They let me call but told me not to panic him. They told me not to give him details, but just tell him to keep the doors locked.[29]

(Juror Birney Aff. ¶ 6 (emphasis added).)

---

[29] The fact that Juror Birney called her husband that night with the bailiffs' blessing was not directly addressed in the "hearing" on the issue the next day. (*See* 32 RR 12-29.) Deputy Henning did not testify that he allowed her to make the call, only that she asked to, and Juror Birney was only asked about her request to make the call, not whether she had made one. (*Id.*)

803.    The perceived intimidation incident was so significant that the jurors "were still talking about it" the next day in the jury room. Even though the bailiffs said, "it should not be part of our deliberations," jurors remained "scared" and "still discussed it." (Juror Birney Aff. at ¶ 7; see also Juror Armstrong Aff. at ¶ 83; Juror Norwood Aff. at ¶ 5; Juror Orosz Aff. at ¶ 6.) As Juror Orosz explained: "The next day, the jury talked about the waving incident in the jury room. We discussed how the incident sounded like what we were hearing about in the courtroom during trial." (Juror Orosz Aff. at ¶ 6.).

804.    In fact, Juror Trujillo—whom fellow jurors identified as being particularly affected by the incident—raised the issue with the bailiffs again the next morning because she was "concerned." (32 RR at 26.) Juror Trujillo stated: "I don't know what kind of information he has of us. Due to the nature of the case, I just told [the bailiffs] that I was going to hold my gun closer at night." (*Id.* at 26 (emphasis added).)

805.    The morning after the incident, after two days of deadlock, the jury voted to convict Mr. Balderas of murder in the first degree. (32 RR 4-11.)

806.    These external influences, particularly when taken together, reasonably drew into question the integrity of the verdict, and required investigation, and affirmative proof of harmlessness, to safeguard Mr. Balderas's constitutional rights. *Remmer v. United States*, 347 U.S. 227, 229 (1954); *see also Barnes v. Joyner*, 751 F.3d 229, 244 (4th Cir. 2014).

### *4.    The trial court failed to properly investigate the external influences.*

807.    "When a trial court is apprised of the fact that an extrinsic influence may have tainted the trial, the proper remedy is a hearing to determine the circumstances of the improper contact and the extent of the prejudice, if any, to the defendant." *United States v. Hornung*, 848 F.2d 1040, 1045 (10th Cir. 1988) (citing *Smith v. Phillips*, 455 U.S. 209, 217 (1982); *see also Remmer*, 347 U.S. at 230 (1954) ("In a criminal case, any private communication, contact, or

271

tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial . . . the burden rests heavily upon the Government to establish, *after notice to and hearing of the defendant*, that such contact with the juror was harmless to the defendant."); *see also United States v. Forrest*, 620 F.2d 446, 458-69 (5th Cir. 1980) (remanding for hearing to determine whether defendant had been convicted by improperly influenced jury); *United States v. Rutherford*, 371 F.3d 634, 643-45 (9th Cir. 2004) (remanding for hearing on defendants' claim that jurors were intimidated by the presence of numerous government agents in courtroom during trial); *New Jersey v. Bisaccia*, 724 A.2d 836, 843-46 (N.J. Super. Ct. Law Div. 1999) (finding trial court erred for failing to inquire into possible extraneous influence on jury and remanding for interviews with jurors to determine whether jury was tainted).

808.    A trial court has an obligation to explore the possibility of prejudice as a result of external influence regardless of whether there was any intentional effort to influence the jurors. *See, e.g., Rutherford*, 371 F.3d at 634 (vacating sentence and remanding for evidentiary hearing on defendants' claim that jurors were intimidated by the presence of numerous government agents in the courtroom during the trial). The appropriate inquiry is whether unauthorized conduct "raises a risk of influencing the verdict" or "had an adverse effect on the deliberations." *Id.* at 644.

809.    Where a colorable claim of extraneous influence surfaces during jury deliberations, the trial court "has a duty to investigate the allegation promptly." *United v. Bradshaw*, 281 F.3d 278, 289 (1st Cir. 2002), *cert. denied*, 537 U.S. 1049 (2002). Delaying the investigation until after issuance of a verdict denies a defendant of the "meaningful opportunity to prove actual bias" and requires a retrial. *United States v. Herndon*, 156 F.3d 629, 637 (6th Cir. 1998); *see also Atl. Research Mktg. Sys. v. Troy*, 659 F.3d 1345, 1360 (Fed. Cir. 2011) (failure to investigate the

prejudicial effect of an external influence prior to issuance of the verdict meant that "[b]y default, the court did not investigate the issue in a "satisfactory manner." This alone warrants a reversal and a grant of a mistrial.").

> ### i.    The trial court failed to conduct any inquiry into the improper sequestration incident.

810.    After issuing an apology to the jury, the court took *no* other steps to investigate or otherwise evaluate the impact the first night's accommodations had on the jury. (*See* 31 RR 7.) The trial court's failure to conduct any inquiry into the impact of this external influence constitutes an abuse of its discretion. *United States v. Phillips*, 664 F.2d 971, 999 (5th Cir. 1981) (trial court's failure to hold a hearing after it has received report of improper external influence is an abuse of discretion because a "presumption of prejudice arises when the trial court learns of such influences"), *superseded on other grounds by United States v. Lechuga*, 820 F. App'x 261 (5th Cir. 2020).

> ### ii.    The trial court's investigation of the intimidation incident was dilatory, insufficient, and improper.

811.    The morning following the intimidation incident, the trial court acknowledged that the bailiff had informed her about the incident "this morning in chambers."[30] (32 RR at 12.) At least one courtroom witness established that the court was aware of the issue *hours before* the jury reached a verdict. (Yancy Escobar Aff., ¶¶ 11-13). Nonetheless, the court waited until nearly *two hours after the jury's verdict was read*, to address the issue with the jury (*See* CR 3432 (noting the jury verdict was read at 11:23 am and the trial court "handled matters outside of the presence

---

[30] Significantly, the trial court had informed jurors at the close of trial that day that it would be in contact with the bailiffs as needed while the jurors were sequestered. "If there is an emergency this evening, I will be contacted." (31 RR 27.) It seems unlikely that highly unusual circumstances like "hysteria" amongst jurors— which compelled the bailiffs to dramatically stop the bus in order to give chase, which in turn prompted a juror to demand to call home in contravention of court admonishments—would not constitute an emergency.

of the jury" at 1:23 pm).) This delay denied Mr. Balderas of the "meaningful opportunity to prove bias" and requires a retrial. *Herndon*, 156 F.3d at 637.

812.    When the trial court *did* finally consider the intimidation incident, its investigation was insufficient. Where extraneous prejudicial material has likely reached the jury, the trial should interview all members of the panel and should not limited its inquiry to interviewing only certain jurors. *See, e.g.*, *Forrest*, 620 F.2d at 458 (where extraneous prejudicial material has likely reached the jury, 'The district court . . . should . . . (examine) each juror separately, in the presence of counsel, to determine (1) how much contact the jury members had had with the [extraneous influence] and (2) how much prejudice to the defendant had resulted from that contact, assuming that any had occurred.'") (quoting *United States v. Herring*, 568 F.2d 1099 (5th Cir. 1978)); *United States v. Angulo*, 4 F.3d 843, 847 (9th Cir.1993) ("where a bribe or threat to a juror was communicated to the other jurors, the trial judge must fully examine the effect of the threat on the remaining jurors").

813.    The trial court's investigation of the incident's impact fell far short of this standard. The court limited its inquiries to just two of the jurors—Juror Birney and Juror Trujillo. The Court did not evaluate which jurors were most appropriate to interview; rather, the court asked the bailiff to select the jurors he thought the court should hear from (32 RR at 16-17.)

814.    The trial court's investigation was also improper. In its limited inquiry, the Court focused its questions on the impact the jurors *perceived* the events to have had on their deliberations, asking, for example, "Did any of that feeling of cautiousness weigh in your deliberations this morning when you came back to return to deliberations?" (*Id*. at 18) Trial counsel made similar inquiries. Asking Juror Birney, "How if at all—a, did that affect or going forward, will it affect your ability to continue to serve as a juror in this case?" (*Id*. at 21).

815.    This inquiry into the subjective effect that the incident had on the jurors is contrary to the established legal standard, and indeed was legally improper. "[A]n objective test should be applied in making an assessment of whether the defendant was prejudiced by the extraneous information." *Hornung*, 848 F.2d at 1045 (citing *United States v. Bruscino,* 687 F.2d 938, 940–41 (7th Cir.1982) (*en banc*), *cert. denied,* 459 U.S. 1228 (1983); *Miller v. United States,* 403 F.2d 77, 83 n.11 (2d Cir.1968); 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 606[05] (1987). Indeed, the Federal Rules of Evidence explicitly forbid inquires like those conducted by the trial court here. Fed. R. Ev. 606(b); *see also Hornung*, 848 F.3d at 1045 ("The court's questioning of a juror who is the recipient of extraneous information is limited to the circumstances and nature of the improper contact, as Fed. R. Evid. 606(b) precludes the court from delving into the subjective effect of the contact on the juror's decision-making.") Instead, "[t]he court 'should assess the "possibility of prejudice" by reviewing the entire record, analyzing the substance of the extrinsic evidence, and comparing it to that information of which the jurors were properly aware.'" *Id. (*quoting *United States v. Weiss,* 752 F.2d 777, 783 (2d Cir. 1985), *cert. denied,* 474 U.S. 944 (1985). The court plainly did not do that here.[31]

816.    The trial court's failure to investigation these allegations adequately and promptly denied Mr. Balderas of his right to due process by depriving him of a meaningful opportunity to prove bias. *Remmer*, 347 U.S. at 230; *Herndon*, 156 F.3d at 637.

### 5.    *Mr. Balderas was prejudiced when his jury prematurely discussed evidence and relied on the "expertise" of other jurors.*

817.    In addition to the external influence described above, jury deliberations were prejudiced by numerous incidents of juror misconduct, including deliberating prior to the close of

---

[31] After the cursory hearing trial counsel moved for a mistrial, arguing that "the verdict was reached as a result of an outside influence" and "violate[d] the defendant's right to a [sic] impartial jury" and the defendant's "right to due process and to a fair trial." (32 RR at 28).[29] The court summarily denied the motion, without explanation. (*Id.*)

evidence and relying on the Jury deliberations prior to the close of evidence threaten a defendant's constitutional right to be tried by an impartial jury. *United States v. York*, 600 F.3d 347, 356 (5th Cir. 2010) (citing *United States v. Dominguez*, 226 F.3d 1235, 1243 (11th Cir. 2000)).

818.    In order to preserve this right, it is a firmly established practice that trial judges admonish juries at the outset of trial not to discuss the case before its conclusion. *United States v. Resko*, 3 F.3d 684, 689 (3d Cir. 1993); *see, e.g.*, *United States v. Wiesner*, 789 F.2d 1264, 1269 n.3 (7th Cir. 1986) (stating that "[a]dmonishing the jury [regarding premature deliberations] is a critical and important duty and cannot be over-emphasized"); *United States v. Lemus*, 542 F.2d 222, 224 (4th Cir. 1976), *cert. denied*, 430 U.S. 947 (1977); Lillian B. Hardwick & B. Lee Ware, Juror Misconduct § 7.04, at 7–27 (1988).

819.    When jurors violate the court's admonitions and engage in premature deliberations that prejudice a defendant by introducing evidence outside the record and adverse to defendant, a new trial is warranted. *Knorpp v. State*, 645 S.W.2d 892, 905 (Tex. Crim. App. 1983) (reversing and remanding for new trial because jurors prematurely discussed the case at lunch and during other breaks).[32] See also *United States v. Mix*, 25 F.Supp.3d 914, 931 (E.D. La. 2014) (finding that defendant was "not tried by an impartial jury" where a juror injected extraneous information that "likely affected the jury's deliberations and verdict").

820.    Of course, trial judges have discretion to determine whether a new trial is warranted as a result of premature deliberations. But this discretion is supposed to be guided by the policy reasons behind the rule that prohibits such deliberations. The Fifth Circuit in York, holding that

---

[32] The *Knorpp* court found that the conduct of the jury in receiving and considering evidence outside the record was in contravention of Article 40.03(7) of the Code of Criminal Procedure (now codified as Texas Rule of Appellate Procedure 21.3(f)). "A new trial is mandated if the other evidence is adverse to the accused. It is the character of the evidence which controls, and it is not necessary to speculate on the probable effect upon the jury or to demonstrate that one or more jurors were persuaded to vote for guilt because of the improper information." *Knorpp*, 645 S.W.2d at 905; *see also Rogers v. State*, 551 S.W.2d 369, 370 (Tex. Crim. App. 1977).

the trial court did not abuse its discretion in denying a motion for a new trial when the record was not even clear as to whether the jurors had engaged in any premature deliberations, and following the Third Circuit's lead, has acknowledged the following six major policy rationales:

- "First, it is unfair to the defense if jurors prematurely deliberate since the prosecution presents its evidence first, and the jury may reach conclusions before the defense is able to present its case."

- "Second, once a juror expresses his or her view, he or she is more likely to adhere to that opinion," resulting in a confirmation bias towards evidence that aligns with that opinion.

- "Third, "the jury system is meant to involve decision making as a collective, deliberative process and premature discussions among individual jurors may thwart that goal."

- Fourth, because legal instructions are only provided to the jury after all evidence has been presented, jurors who engage in premature deliberations do so without the court's instructions on the reasonable doubt standard.

- Fifth, prohibiting premature deliberations ensures that the burden of proof remains on the Government to prove its case beyond a reasonable doubt. When premature deliberations occur before the defendant has had an opportunity to present all of his evidence (as occurred here) and jurors form conclusions about the case, the burden of the proof is shifted from the government to the defendant, who now has "the burden of changing by evidence the opinion thus formed."

- Finally, premature jury deliberations threaten a defendant's Sixth Amendment right to a fair trial. *Id.*; *see also In re Winship*, 397 U.S. at 364.

277

(600 F.3d at 356-58 (citing and quoting *Resko*, 3 F.3d at 689-91).)

821.    Each of these policy considerations are implicated in this case.

822.    Despite the trial court's instruction that jurors should "not discuss the case with any of your fellow jurors" (24 RR at 267), post-conviction investigation indicates that Mr. Balderas's jury engaged in routine, substantive discussions about trial evidence outside of deliberations at both phases of the trial, including improper discussion of their own personal experiences and expertise in relation to the evidence.)

823.    Several jurors acknowledged in their affidavits that they discussed trial evidence at many points before the close of evidence. Specifically, two jurors shared their own "expertise" regarding guns and ballistics, and others provided Spanish to English translation of testimony from multiple witnesses.[33] The jury's premature discussion of evidence – particularly the juror-provided opinion proffered as expertise – was wholly improper and casts doubt on the fairness of the jury's verdict.

### i.    Jurors provided improper "expert evidence" on ballistics outside of deliberations.

824.    Here, at least two jurors discussed case-related ballistics issues with the jury before the any of them had even heard expert testimony on the subject. (*See* Juror Orosz Aff., ¶ 3; see also 28 RR 6-82, 37 RR 113-60.)

825.    For example, they "talked about what they knew about different styles of guns." (Juror Orosz Aff., ¶ 3.) Juror Sullivan recalled answering questions from other jurors regarding guns and ballistics:

---

[33] The jury was charged at both the guilt and punishment phases – after these premature discussions had already occurred – that they "must not consider, discuss, nor relate any matters not in evidence" during deliberations. (Jury Instructions (Guilt Phase), Feb. 25, 2014, CCA, Vol. XII, 03275-83, at 03282; Jury Instructions (Punishment Phase), Mar. 13, 2014, CCA,Vol. XII 0333441, at 3341.) The charges expressly stated: "You should not consider nor mention any personal knowledge or information you may have about any fact or person connected with this case which is not shown by the evidence." (*Id.* (emphasis added).)

> We sometimes clarified for the other jurors things like calibers, for example. Jurors would ask something like, "How many different calibers are there?" We would clarify between the guns; that it was a .40 caliber that was used in the crimes, or which guns were used in other crimes. For example, there was another gun that had a special status, a Sig Saur .38. There was also *confusion about casing type and sizing*. It was all stuff the ballistics expert had gone over in court but *people were confused* about after. We talked about the magazine size, and what it meant to have one in the chamber. There were a whole bunch of magazines, and we helped clarify which ones went to which guns. We talked about how many rounds each gun would hold, and how you could tell by the number on the bottom of the magazine.

(Juror Sullivan Aff., ¶ 9 (emphasis added).)

826.    Likewise, Juror Armstrong admitted sharing his purported gun expertise with his fellow jurors:

> Other people on the jury had specialized backgrounds in certain topics that they would share with the rest of the jury. For example, Chad was really into guns and I was licensed through the NRA to teach gun classes. *When it came to the ballistics testimony, Chad and I helped the rest of the jury understand stuff about what the experts were saying*. In the jury room, we helped explain the ballistics to the rest of the jurors and answer questions they had.

 (Juror Armstrong Aff., ¶ 13 (emphasis added).)

827.    The information offered by these two jurors was not inconsequential and had direct influence on the panel. According to Juror Norwood, "[t]hose of us who did not know much about guns would have questions, and [fellow jurors] gave us answers and would volunteer information." (Juror Norwood Aff., ¶ 2.) For his part, Juror Orosz found the experience of his gun-familiar fellow jurors "helpful because they would explain things to us in layman's terms." (Juror Orosz Aff., ¶3.)

828.    Indeed, beyond being "helpful," these two jurors became de facto experts to their fellow jurors. According to Juror Orosz, "Ron [Browning-McCauley] and Chad [Sullivan] would tell us something about the guns, and then the ballistics expert would come in and repeat what Ron and Chad had told us. ... Then, when the jury deliberated and we were looking at ballistics, jury

279

members would ask Ron and Chad for clarification on our questions and get the information from them. We did not have to go back and get it from the expert's testimony." (*Id.*)

829.    Significantly, Alternate Juror Browning-McCauley did not even participate in the actual deliberations. (Juror Browning-McCauley Aff., ¶ 2.) Thus, Alternate Juror Browning-McCauley's discussions with the jury constituted an "extraneous influence."

830.    Both before and after deliberations, it is clear that these two jurors had inordinate influence on the jury, taking on the role of expert witnesses, contaminating the deliberation process and prejudicing Mr. Balderas:

- First, the jurors clearly discussed and evaluated the ballistics evidence even before the defense was able to able to present its case. *York*, 600 F.3d at 357–58

- Second, once the two "expert" juror expressed their opinions, it is impossible to know whether the jury was improperly influenced to accept actual expert testimony through the lens of confirmation bias. *Resko*, 3 F.3d at 689.

- Third, premature discussion of ballistics evidence with two juror "experts" subverted a "the jury system...meant to involve decision making as a collective, deliberative process." *Resko*, 3 F.3d at 689.

- Fourth, the jurors did not have the benefit of the court's instructions on the reasonable doubt standard before being improperly provided with and influenced by juror "expert" evidence. *Id.*

- Fifth, extraneous juror influence may well have caused jurors to have formed conclusions about the evidence before Mr. Balders had an opportunity to present his own evidence, unfairly shifting the burden of proof to the defense. *Id.* at 689-90(quoting *Winebrenner v. United States*, 147 F.2d 322, 328 (8th Cir. 1945)).

- Finally, these premature jury deliberations threatened Mr. Balderas's Sixth Amendment right to a fair trial. *Id.*; *see also In re Winship*, 397 U.S. at 364.

       **ii.**       ***Jurors provided improper Spanish to English language translations.***

831.     At various points in both the guilt and punishment phases of trial, witnesses testified in Spanish with the aid of translators. (See, *e.g.*, 25 RR at 33; 34 RR at 5; 37 RR at 161; 38 RR at 41, 86; 39 RR at 6, 112; 40 RR at 193.)

832.     During a pre-trial conference, the trial court questioned whether the parties were going to include a question about speaking Spanish in the juror questionnaire. (3 RR 8:18-23.) The State responded that the questionnaire did not include a question about Spanish speakers "being able to disregard the Spanish" answers from witnesses in favor of the official translated answer. (*Id.* at 8:24-25) The State and trial counsel appeared to agree that it was best to give that instruction to potential jurors during voir dire. (*Id.* at 8:25-9:10.) The trial court agreed with that plan. (*Id.* at 9:11-12)

833.     However, there is no record that potential jurors actually received that instruction, either during voir dire or before testimony in Spanish was presented at trial. At least two jurors seated on Mr. Balderas's jury spoke Spanish fluently (See 39 RR at 26:5-7, 28:14-16.), and neither received such an instruction during their individual voir dire. (*Id*.) Additionally, there is no indication in the record that either the State or trial counsel attempted to have potential jurors so instructed. Likewise, there is no indication in the record that the court instructed the seated jurors, including Juror Trujillo and Alternate Juror Palacios, that their understanding of the Spanish answers should be disregarded in favor of the official translations.

834.     Midway through the punishment phase, Juror Trujillo and Alternate Juror Palacios raised a concern with the court that the translators were not translating correctly. (39 RR at 2632.) For example, Juror Trujillo stated that, on a least one occasion, the translator had stated the

opposite of the witness's statement. (*Id.* at 26:23-27:15.) Juror Trujillo also noted that Mr. Balderas's "mother had said something on the stand and it was never translated, so it's not in the record." (*Id.* at 27:24-28:1.) Alternate Juror Palacios confirmed that the court interpreters failed to actually translate some witness testimony and recounted that Mr. Balderas's mother had stated that her son had been killed, "but it wasn't translated at any point that that's what she had stated." (*Id.* at 29:2-7.)

835.     Significantly, the Spanish-speaking jurors reported the discrepancies and issues with the translations to their fellow jurors during trial. According to Juror Trujillo, she and other jurors "were talking about" the translation issues amongst themselves while punishment phase evidence was still being presented. (39 RR at 27:24-25.) Other jurors confirmed that they understood there were issues with the official court translation of Spanish testimony from talking with Juror Trujillo and Alternate Juror Palacios:

> At some point later in the proceedings, after about two or three witnesses testified through Spanish translators, Darlene and Lianna, who both speak Spanish, told the jury that the Spanish translators were not translating precisely. *Back in the jury room, during the break, we asked them to explain the issues to us. They said that the translations were not exact, and that some of the words substituted were not correct.* I asked Darlene and Lianna if that meant different words were being used or if they were saying it with more inflection.

(Juror Orosz Aff., ¶ 11 (emphasis added).)

836.     Another juror confirmed:

> At some point while the court and attorneys were trying to figure out the technical difficulties with the testimony from the witnesses in Mexico, some of the Spanish-speaking jurors brought up to the rest of the jury that they had concerns about the translation of the testimony. *The Spanish-speaking jurors told the rest of us that the translator was providing an incorrect translation.* We had a *big conversation* about it and then one of them informed the judge.

(*See* Juror Armstrong Aff., ¶ 12 (emphasis added).)

837.    Another added:

> During trial, the Spanish-speaking jurors, Darlene and Lianna, listened to the translations. They voiced concerns about the translators to the rest of the jurors back in the jury room during trial. Darlene expressed that the words were not being translated correctly. Lianna verified that the translations were off. They were concerned about it, and we brought the issue to the court's attention.

(*See* Juror Norwood Aff., ¶ 6 (emphasis added).)

838.    Despite the court's admonition to the jury – given on the record for the first time after the discrepancies were brought to the court's attention – that "the translation is the official testimony you can refer to" (39 RR at 34:14-15), some jurors acknowledged that they gave greater credence to the opinions of Juror Trujillo and Alternate Juror Palacios about the Spanish translations than to the official translation: "It was nice to know that things were not being translated correctly. I knew it was a problem because I trusted Darlene and Lianna's judgment." (*See* Juror Orosz Aff., ¶ 11.)

839.    Indeed, the court's admonition did not sit well with at least one of the jurors who raised the translation issue, and her fellow jurors knew it: "The judge called Lianna and Darlene into a private meeting. When they came back, they told us that they were told the translators had a lot of experience translating in court. Darlene was bothered by the court's reaction, telling us that she thought it was a cop-out." (*Id.*)

840.    Moreover, the admonition may have come too late to avoid prejudicing the jurors: "The judge called us in and told us to base our deliberations on the official translation, which was the translation that the Spanish-speaking jurors had called into question." (See Juror Armstrong Aff., ¶ 12.) However, by this time, the jurors had already heard and joined in their fellow jurors'

concern. It is unreasonable to believe that they could simply disregard the fact that other jurors had forcefully asserted that the official translations were wrong.[34]

841.    Not only were the discrepancies between witness testimony and the "official" translation on the record concerning in and of themselves, the jurors' efforts to raise the issue with the trial court disclosed significant juror misconduct. In flagrant violation of the court's admonitions, the jurors discussed the translation problems – and, necessarily, the translated testimony – extensively in the midst of trial and outside of deliberations.

### 6.    Jurors considered potential punishment when deciding guilt.

#### i.    The bifurcation of capital trials into guilt/innocence and punishment phases is to prevent jurors from conflating these issues to the prejudice of the defendant.

842.    Capital trials are bifurcated into guilt/innocence and punishment phases because "[m]uch of the information that is relevant to the sentencing decision may have no relevance to the question of guilt, or may even be extremely prejudicial to a fair determination of that question." *Gregg v. Georgia*, 428 U.S. 153, 190 (1976).

843.    Thus, the purpose of bifurcating capital proceedings is wholly undermined when jurors consider the issue of punishment while they are still supposed to be adjudicating guilt, and that conduct, standing alone, is jury misconduct warranting a new trial. *See, e.g.*, *Bennett v. State*, 738 S.W.2d 33, 33-34 (Tex. App. – Texarkana 1987, no writ).

---

[34] 32 The trial court failed to investigate the extent of the jury's understanding or concerns about the translation issues, even after Juror Trujillo admitted that the jurors "were talking" about the translation issues the day before. (39 RR at 27:24-25.) The court's failure to investigate possible jury misconduct by, at a minimum, questioning all the jurors about it, constitutes error. (*See* Section VI(B)(4), *ante*.) Further, by this time, the State was clearly concerned about the possibility of juror misconduct, as it requested that the court admonish the jury not to discuss the case. (39 RR at 30:14-20.) However, Mr. Balderas's trial counsel inexplicably failed to seek an investigation of the jury's premature discussions of evidence, much less a mistrial on the basis of such misconduct. Instead, trial counsel merely joined the State's request to admonish the jury because "that may constitute jury misconduct because they're not supposed to be discussing the case at all at this point." (*Id.*) Trial counsel's failure to preserve the record of this juror misconduct and move for a mistrial constitute deficient performance that prejudiced Mr. Balderas.

**ii.      The trial court charged the jury during the guilt phase to deliberate only on the issue of guilt or innocence.**

844.     The jury charges read to the jurors before their deliberations at the guilt phase refer several times to the jurors' duty to focus only on the issue of guilt or innocence. (*See* Jury Instructions, Mar. 13, 2014, CCA, Vol. XII 03275-83, at 3282-83.)

845.     The jury was clearly instructed that its "sole duty at this time is to determine the guilt or innocence of the defendant under the indictment in this cause and *restrict your deliberations solely to the issue of guilt or innocence of the defendant*." (*Id.* at 3283 (emphasis added).)

846.     In addition, the jurors were instructed that they "must not consider, discuss, nor relate any matters not in evidence" before them. (*Id.* at 3282.)

847.     Thus, the trial court made clear that the jurors should not consider issues of punishment during their guilt-phase deliberations. (*Id.* at 3283.)

**iii.      The jury breached its duty to deliberate only on guilt or innocence and improperly considered punishment during its guilt-phase deliberations.**

848.     Some of Mr. Balderas's jurors considered Mr. Balderas's potential punishment – specifically, the death penalty – during deliberations at the guilt phase. Indeed, some jurors had already decided on punishment prior to completing deliberations on guilt or innocence.

849.     Juror Armstrong recalled that jurors actually discussed potential punishment during the guilt-phase deliberations: "At some point during our guilt/innocence phase deliberations, the possibility of a death sentence came up with other jurors. Some had a hard time separating the issues." (Juror Armstrong Aff. at ¶ 9; see also Juror Orosz Aff., ¶ 4.)

285

850.    Thus, the jurors clearly did not "restrict [their] deliberations solely to the issue of guilt or innocence" as instructed. (*See* Jury Instructions, Mar. 13, 2014, CCA,Vol. XII 03275-83, at 3283.) Mr. Balderas is, therefore, entitled to a new trial.

### 7.    *Jurors failed to consider all evidence before making guilt and punishment decisions.*

#### i.    *Habeas relief is available when jurors fail to consider all evidence before drawing conclusions on guilt or punishment.*

851.    For a trial to be fair, it is imperative that a juror be able to "lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723 (1961). In *Irvin*, a death case, the Supreme Court found the mere prospect that the jury had included a juror whose preconceptions of guilt may have permeated his deliberations showed that the trial did not meet constitutional standards. *Id.*

852.    Where jurors acknowledge forming opinions on guilt or punishment before all the evidence has been presented has been the basis for granting federal habeas relief. See, *e.g.*, *White v. Mitchell*, 431 F.3d 517, 537-43 (6th Cir. 2005) (granting habeas relief to a death-sentenced defendant where a juror admitted that, before the penalty phase began, she had a strong inclination against the defendant and that she was looking forward to participating in imposing a sentence); *Oswald v. Bertrand*, 374 F.3d 475, 480-81 (7th Cir. 2004) (affirming grant of habeas relief where jury misconduct included "the flagrant disobedience of the judge's instructions that the prospective jurors not discuss the case in advance of the trial").

#### ii.    *The trial court properly questioned and instructed prospective jurors on the duty to consider all presented evidence.*

853.    When questioned by the State during voir dire, Juror Armstrong seemed to understand that determining his verdict prematurely would be improper:

> **The State:** Basically, we need people who are going to be
> fair and open-minded, *listen to all the evidence and make a*

286

> *determination based on where that evidence leads them*, whether it leads to a conviction on capital murder or a lesser offense or whether it leads to the death penalty or life in prison without parole. Does that seem fair?
>
> **Juror Armstrong:** Yes, ma'am.

(4 RR at 95:16-23 (emphasis added).)

> **The State:** Does it seem fair that a juror should be willing to listen to all of the evidence before making those types of decisions?
>
> **Juror Armstrong:** Yes.

(*Id.* at 95:24-96:2.)

854.    Like Juror Armstrong, Juror Orosz was extensively questioned by the State, defense counsel, and even the court about his ability to consider evidence at the punishment phase:

> **The State:** *You're supposed to look at all the evidence that's presented in this question whether it's presented from the State or from the defense.* You can find mitigation from anywhere in the evidence that's presented.
>
> [...]
>
> *Would you be willing to consider everything?* It doesn't mean that you have to find something mitigating. It just means that you have to think about it and then kind of—I say, you think about the evidence and you categorize it. It's mitigating, it's not mitigating—I might find it aggravating, even though somebody else says I think it's mitigating—or it doesn't affect—it's not going to affect my judgment one way or the other. It's just categorized. Does that make sense?
>
> **Juror Orosz:** Yes.

(19 RR at 57:16-20, 59:11-21 (emphasis added).)

855.    Indeed, when some confusion arose in trial counsel's questioning of Juror Orosz on this topic, the court stepped in to ensure Juror Orosz knew what was expected of jurors in this regard:

> **The Court:** Remember when I talked to the whole group, I explained it's a bifurcated or a two-stage system. The first stage of

trial, whether or not the person's guilty or not, is simply about the facts of the crime, if there was a crime. If that person is found guilty, then we have a second trial, so to speak. This time, the evidence is about the person.

**Juror Orosz:** Uh-huh.

**The Court:** And it could be good things about them or bad things about them. *Then when you have all that evidence, you've already found the person guilty, now you hear this additional evidence, then you get to these questions.* Does that help you a little bit? *What they're really trying to ask, would you automatically answer that question one way or the other or would you just let the evidence dictate to you to answer it yes or no depending on what you heard?*

**Juror Orosz:** Understanding it, no, as that there could be more evidence brought in after the conviction of guilty, yeah, I have to—I have to say, you know, *I have to listen to more evidence in order to be able to make a rational judgment on whether or not the person should get life without parole or the death penalty.*

(*Id.* at 75:8-76:7.)

### iii.    At least two jurors admitted to breaching their duties and forming conclusions on guilt and punishment before considering all of the evidence presented.

856.    At least two jurors determined their verdicts, one at guilt and the other at punishment, before they heard all of the evidence presented.

857.    For example, Juror Armstrong stated: "I knew I was going to vote 'guilty' when I saw the forensics evidence where the State matched the caliber and style to the known gun." (Juror Armstrong Aff., ¶ 9.)

858.    Significantly, the State presented testimony from its ballistics expert during its guilt-phase case in-chief. (28 RR 6-82.) Thus, Juror Armstrong improperly concluded Mr. Balderas was guilty without considering all the evidence in the case, reaching his conclusion before the State even closed its case and thus before the defense presented its evidence.

859.    At the punishment phase, a different juror similarly failed to adhere to the trial court's instruction to consider all the evidence and all relevant mitigating circumstances.

860.    Juror Orosz stated: "I decided that Mr. Balderas should get the death penalty right away after we found him guilty." (Juror Orosz Aff., ¶ 12.) Thus, Juror Orosz improperly concluded Mr. Balderas deserved the death penalty without considering any of the evidence presented in the punishment phase and, therefore, without considering any of the relevant mitigating circumstances Mr. Balderas presented.

861.    In light of these admissions, Mr. Balderas did not receive a fair trial and is entitled to a new one.

### C.    These Extraneous Influences and Juror Misconduct Violated Mr. Balderas'sDue Process Rights By Prejudicing the Jury and Influencing Its Deliberations

862.    The trial court's failure to investigate and evaluate the impact of known external influences on the jury, compounded by the manifest prejudice of the unknown extraneous influences and juror misconduct, served to deprive Mr. Balderas of his due process right to a fair and impartial jury.

863.    After placing the jurors in a motel adjacent to the crime scene, the trial court offered them an apology, but took no steps to evaluate the actual impact on them. Due process requires more than an apology.

864.    Then, although the trial court's bailiffs were not only aware of the jurors' collective concern about the incident on the bus, but were actually personally involved in the event, the trial court make no effort to evaluate what effect the event had on those jurors in the midst of their deliberations. Doing nothing is the epitome of a procedural failure that, in this case, deprived Mr. Balderas of any opportunity assess the prejudice that the harrowing incident had on his right to an impartial jury.

865.    What process existed after the verdict was rendered was wholly deficient. The trial court relied on bailiffs to select the jurors that it would interview about the incident instead of questioning every juror. Then, its questioning focused on the jurors' subjective perception of the impact of the event in direct contravention of the Federal Rules of Evidence.

866.    The court had a duty to afford Mr. Banderas due process, which includes investigating the extraneous influences on the jury and seriously evaluating their impact on the ongoing deliberations, and it failed in that duty. The courts' failure, and the patent absence of due process, was further illuminated as evidence of the other improper influences and misconduct of the jury came to light.

867.    The cumulative effect of the known extraneous influences, particularly in light of the considerable juror misconduct and as yet unknown external influences described above, created a "high probability of jury bias" that required a diligent inquiry. *Oswald v. Bertrand*, 374 F.3d 475, 480-81 (7th Cir. 2004); *see also Richardson v. United States*, 360 F.2d 366 (5th Cir. 1966) (failure to conduct "thorough inquiry" into allegation regarding external influence before overruling motion for new trial constitute abuse of discretion). Yet no such inquiry was ever conducted, either at the trial stage or, as discussed below, in connection with the State Habeas proceeding. The failure to conduct this inquiry violated Mr. Balderas's due process right to a fair and impartial jury. *See Oliver*, 541 F.3d at 341. Mr. Balderas is entitled to habeas relief for these due process violations. *Id.*

## X.    MR. BALDERAS'S DEATH SENTENCE WAS ARBITRARILY AND CAPRICIOUSLY IMPOSED BASED ON THE JURY'S ANSWER TO THE

## UNCONSTITUTIONALLY VAGUE SPECIAL ISSUE ONE, THE TEXAS "10-12 RULE," AND THE PUNISHMENT PHASE JURY INSTRUCTIONS

### A.   The Sentence Was Arbitrary and Capricious Because of the Unconstitutional Jury Instructions in Special Issue One

#### 1.   *Juror discretion must be suitably directed and limited in capital cases*

868.    The U.S. Supreme Court has held that juror discretion must be suitably directed and limited in capital cases. *Gregg v. Georgia*, 428 U.S. 153, 189 (1976) ("[W]here discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.") (citing *Furman v. Georgia*, 408 U.S. 238 (1972) (per curiam).

869.    To avoid the arbitrary and capricious imposition of the death penalty struck down in *Furman*, states must narrow the class of death-eligible defendants "by providing specific and detailed guidance to the sentencer." *McCleskey v. Kemp*, 481 U.S. 279, 303 (1987) (citing *Proffitt v. Florida*, 428 U.S. 242, 253 (1976)); *see also Maynard v. Cartwright*, 486 U.S. 356, 362 (1988) ("Since *Furman*, our cases have insisted that the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action.").

870.    In *Zant v. Stephens*, Justice Marshall and Justice Brennan, in dissent, argued that "[i]f this Court's decisions concerning the death penalty establish anything, it is that a capital sentencing scheme based on 'standardless jury discretion' violates the Eighth and Fourteenth Amendments." *Zant v.* Stephens, 462 U.S. 862, 905 (1983) (citing *Gregg*, 428 U.S. at 195, n.47 (1976)).

### 2. *Special Issue One acts as a de facto determinant of death eligibility.*

871.    Texas employs a unique sentencing scheme under which up to three special issues are submitted to the jury during the sentencing phase of a capital trial: (1) whether there is a probability that the defendant constitutes a continuing threat to society (the "First Special Issue"); (2) whether the defendant actually caused, intended, or anticipated the death of the deceased (the "Second Special Issue"); and (3) whether, considering all of the evidence, there are sufficient mitigating circumstances to warrant a sentence of life imprisonment without parole (the "Third Special Issue"). Tex. Code Crim. Proc. art. 37.071, § 2(b)(1)-(2), (e)(1). This sentencing scheme requires juries to first answer Special Issue One. Special Issue One asks the jury "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. art. 37.071 § 2(b)(1).

872.    If jurors answer Special Issue One with a "Yes," they are asked to answer Special Issue Two. If the jurors answer "No" to Special Issue One, the defendant is automatically sentenced to a term of life without parole.

873.    Although Special Issue One is not presented to the jury until the punishment phase of trial, it must be found beyond a reasonable doubt before mitigating evidence may be considered. Tex. Code Crim. Proc. art. 37.071 § 2(b)–(e).

874.    In essence, Special Issue One acts as a de facto determinant of a death sentence. The jury should instead receive specific and detailed guidance in answering Special Issue One in order to narrow the class of death-eligible defendants.

### 3. *Mr. Balderas's death sentence was arbitrarily and capriciously assigned in violation of the Eighth and Fourteenth Amendments because the jury answered Special Issue One without definitions for key terms.*

875.    On March 13, 2014, at the punishment phase of trial, the jury was charged with Special Issue One: "Do you find from the evidence beyond a reasonable doubt that there is a

probability that the defendant, Juan Balderas also known as Apache, would commit criminal acts of violence that would constitute a continuing threat to society?" (Jury Charge and Verdict, March 14, 2014, Habeas Writ Record, Vol. XII, 03334-45, at 03342.)

876.    The Texas Code of Criminal Procedure does not define "probability" and "criminal acts of violence."

877.    By failing to provide any further instruction or definition with respect to the terms "probability" and "criminal acts of violence," the court did not provide specific and detailed guidance to the jury. *See McCleskey*, 481 U.S. at 303. The jury's discretion was not suitably directed and limited to further the narrowing of the class of death-eligible defendants. *Gregg*, 428 U.S. at 189.

878.    Mr. Balderas's jury was essentially asked to determine whether there is *any* likelihood that he might commit *any* act of violence in the future that would constitute a continuing threat to society. That bar is far too low. Psychiatrists are unable to completely rule out the possibility of *any* person committing future acts of violence, much less a person who was just convicted of a violent crime. *See* Michael L. Radelet & James W. Marquart, *Assessing Nondangerousness During Penalty Phases of Capital Trials*, 54 ALB. L. REV. 845, 849 (1989-1990) ("Predictions of violent behavior are difficult because the probabilities considered in the prediction are conditional. That is, each of us, given certain circumstances, might engage in violent behavior in the future; thus, each of us has a non-zero probability of killing another."). Such acts could reasonably range from capital murder to simple assault. *See* Christopher Slobogin, *Capital Punishment and Dangerousness*, in MENTAL DISORDER AND CRIMINAL LAW:

RESPONSIBILITY AND COMPETENCE 119, 121, 125 (Robert F. Schopp et al. eds., 2009) (questioning what qualifies as "dangerousness" and "criminal acts of violence").[35]

879.    Further, the fact that the Special Issue One determination had to be made beyond a reasonable doubt *before* the jury was presented with Special Issue Three (mitigation) meant that the jury's ability to give full consideration to the evidence was limited.

880.    Since there are no clarifying definitions or other non-subjective guidance with respect to "probability" and "criminal acts of violence," Mr. Balderas's death sentence was arbitrarily and capriciously imposed by a jury without directed or limited discretion in violation of the Eighth and Fourteenth Amendments. *See McCleskey*, 481 U.S. at 303.

881.    The trial court found that "the Court of Criminal Appeals has consistently and repeatedly held the terms 'deliberately,' 'probability,' and 'criminal acts of violence' and 'continuing threat to society' require no special definitions, and Tex. Code Crim. Proc. art. 37.071 is not unconstitutional for lack of such definitions[]" and that "the Texas death penalty scheme properly narrows the class of death-eligible defendants at guilt, rather than through the special issues at punishment." (FFCL, Habeas Writ Record, Vol. X, 02844-2938, at 02918, ¶ 309) (internal citations omitted).

---

[35] The American Bar Association has long recognized the problems with Special Issue One. *See Barefoot v. Estelle*, 463 U.S. 880, 930 (1983) (Blackmun, J., dissenting) (citing the ABA amicus brief for the claim that jurors are not well-suited to predict the probability of a defendant committing criminal acts of violence in the future). In 2013, the ABA released *The Texas Capital Punishment Assessment Report* which called on Texas to "abandon altogether the use of the 'future dangerousness' special issue" as it and other aspects of the Texas sentencing scheme "place limits on a juror's ability to give full consideration to any evidence that might serve as a basis for a sentence less than death." ABA Death Penalty Due Process Review Project, *Evaluating Fairness and Accuracy in State Death Penalty Systems: The Texas Capital Punishment Assessment Report*, at viii, xxxix (September 2013) ("ABA Texas Assessment Report"). Among the ABA's concerns with the Texas scheme is that the key terms of Special Issue One are undefined. *See* ABA Texas Assessment Report at 308. Additionally, the ABA notes that juries must unanimously find a probability that a defendant will commit future acts of violence before reaching the question of mitigation, thus placing Special Issue One "at the center of the jury's punishment decision." ABA Texas Assessment Report at 307.

882.    Although courts have found that the key terms in Special Issue One require no special definition, such findings fly in the face of clearly established federal law, particularly since Special Issue One acts as a *de facto* determinant of a death sentence. *See Gregg*, 428 U.S. at 189.

883.    The U.S. Supreme Court has held that the use of vague, aggravating factors to be unconstitutional. *See Stringer v. Black*, 503 U.S. 222, 235 (1992) ("A vague aggravating factor employed for the purpose of determining whether a defendant is eligible for the death penalty fail to channel the sentencer's discretion. A vague aggravating factor used in the weighing process is in a sense worse, for it creates the risk that the jury will treat the defendant as more deserving of the death penalty than he might otherwise be by relying upon the existence of an illusory circumstance.").

884.    The jury's discretion in answering Special Issue One—a de facto "determination of whether human life should be taken or spared"—without definitions was not "suitably directed or limited so as to minimize the risk of wholly arbitrary and capricious action." *Id.*

885.    In *Arave v. Creech*, 507 U.S. 463, 471 (1993), the Supreme Court also considered the constitutionality of an aggravating circumstance which asked if the defendant "exhibited utter disregard for human life." The Court found that the phrase was constitutional because the Idaho Supreme Court had adopted a construction that limited the phrase to an action of a "cold-blooded, pitiless slayer," a non-subjective limitation which describes the defendant's state of mind as determined by the facts surrounding the case. *Id.* at 471-475.

886.    Here, however, there is no construction that could have prevented jurors from interposing their own definition of "probability" or "criminal acts of violence" when answering Special Issue One. Thus, the lack of definitions with respect to the key terms in Special Issue One do not adequately limit the jury's discretion in violation of clearly established federal law.

887.     Accordingly, the sentence in this case must be vacated and remanded for a new trial, or, alternatively, this Court should commute Mr. Balderas's death sentence to life in prison. As an additional alternative, the Court should remand for a new punishment hearing, in which the jury could be properly instructed with defined terms.

**B.     The 10-12 Rule**

### 1.     *A capital sentencing scheme cannot unduly burden sentencer before opportunity to consider all mitigating evidence.*

888.     A capital sentencing scheme cannot unduly burden a sentencer before he or she has the opportunity to consider all mitigating evidence. *Mills v. Maryland*, 486 U.S. 367 (1988); *McKoy v. North Carolina*, 494 U.S. 433 (1990). In *Mills*, the Court considered a capital sentencing scheme that required jurors to unanimously agree on mitigating factors. The Maryland scheme asked in Section I whether it found unanimously one or more aggravating factors, in Section II whether it found unanimously one or more mitigating factors, and in Section III, to balance the aggravating factors it found against the mitigating factors. *Mills*, 486 U.S. 386-389. Because a reasonable juror could have interpreted the instruction and accompanying verdict form as requiring unanimous agreement respecting each mitigating circumstance, the scheme was deemed unconstitutional. *Id*. at 384. The sentencing scheme in *Mills* bore the additional risk that even if all twelve jurors believed *some* mitigating circumstances existed, the jury would be prevented from giving effect to any such circumstance unless they unanimously agreed on *which* mitigating circumstances existed.

889.     In *McKoy*, the North Carolina sentencing scheme required the jury to find unanimously the presence of a mitigating factor. *McKoy*, 494 U.S. at 435. This unanimity requirement prevented the jury "from considering, in deciding whether to impose the death penalty, any mitigating factor that the jury does not unanimously find," thus violating the Eight

and Fourteenth Amendments "by preventing the sentence from considering all mitigating evidence." *Id.*; *see also Frey v. Fulcomer*, 132 F.3d 916 (3d Cir. 1997) ("a death sentence should be vacated if the jury, upon receiving the judge's instructions, may have thought that it could only consider those mitigating factors which it unanimously found to exist") (citing *Mills* and *McKoy*).

890.    In a Third Circuit case, *Kubat v. Thieret*, 867 F.2d 351 (3d Cir. 1989), the court held that *Mills* was dispositive of *Kubat's* Eighth Amendment claim. In that case, the jurors were never expressly informed that if one juror believed that the death penalty should not be imposed, the prisoner would not be sentenced to death. *Id.* Quite to the contrary, the jury instructions emphasized unanimity. The Court held that one or more of the jurors might have been precluded from granting a life sentence because of the mistaken belief, based on the instructions, that the sufficiency of the mitigating factors had to be found unanimously. *Id.*

891.    In this case, the TCCA stated without explanation that Mr. Balderas "faile[d] to demonstrate by a preponderance of the evidence that the 10-12 jury instruction violates the United States and Texas Constitutions and the 'Supreme Court precedent' of *Mills* and *McKoy*." (FFCL, Habeas Writ Record, Vol. X, 02844-2938, at 02933 ¶ 57.) The evidence presented to the TCCA establishes otherwise.

892.    The TCCA also stated that "[t]he applicant's proffered juror affidavits are not admissible evidence of any improper outside influence and have no bearing on the applicant's instant claim." (*Id.* ¶ 58.) However, while Texas Rule of Evidence 606(b) prohibits the admission of juror statements regarding the mental or emotional process by which a verdict is reached, the TCCA has held that countervailing interests in maintaining "confidence in judgments" and protecting "the administration of public justice" can outweigh the prohibition of juror statements. *McQuarrie v. State*, 380 S.W.3d 145, 153 (Tex. Crim. App. 2012) (internal citations omitted).

893.    Additionally, the rules of evidence must yield to concerns of constitutional violations. *See Crawford v. Washington*, 541 U.S. 36, 50-51 (2004) ("Leaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices."); *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006) ("[T]he Constitution thus prohibits the exclusion of defense evidence under rules . . . that are disproportionate to the ends that they are asserted to promote."); *Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1973) (finding constitutional concerns trumped application of otherwise valid state evidentiary rules). While courts "should not invade the jury room for little purpose, ...due process demands that there be a way to address blatant misconduct." *Ex parte Green*, 159 S.W.3d 925, 926 (Tex. Crim. App. 2004) (Johnson, J., dissenting to dismissal of writ application, joined by Price, J.). And because "[a] trial cannot be fair if jury deliberations are tainted[,] ...[t]he inability to challenge jury misconduct is a violation of applicant's right to due process and a fair trial." *Id.*

894.    Such concerns of constitutional violations are especially heightened in capital sentencing, a realm in which the Supreme Court has made clear that "the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." *Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985) (quoting *California v. Ramos*, 463 U.S. 992, 998-99 (1983)) (internal quotation marks omitted); accord *Ex parte McKay*, 819 S.W.2d 478, 484 (Tex. Crim. App. 1990) (noting "the heightened need for assurances that the requirements of due process are followed in a capital case"). Given such considerations, Rule 606(b) must be read to allow the admission of juror affidavits in Mr. Balderas's case.

### 2. *Mr. Balderas's constitutional rights were violated when the trial court was prohibited from instructing the jury about the 10-12 Rule.*

895. Under Texas law, as detailed above, up to three special issues are submitted to the jury during the sentencing phase of a capital trial. Tex. Code Crim. Proc. art. 37.071, § 2(b)(1)(2), (e)(1). The court must sentence a defendant to death if the jury unanimously answers "Yes" to the First and Second Special Issues and no to the Third Special Issue. By contrast, if the jury answers "No" to either the First or Second Special Issue, or "Yes" to the Third Special Issue, the court must sentence the defendant to life imprisonment without parole. Tex. Code Crim. Proc. art. 37.071, § 2(g).

896. The "10-12 Rule" states that if the jury finds against the First or Second Special Issue or *in favor of mitigating circumstances* in the Third Special issue, the answers need not be unanimous. Rather, so long as ten or more jurors agree, the defendant will not receive a death sentence. Tex. Code Crim. Proc. art. 37.071, § 2(d)(2), (f)(2). Furthermore, the court must also sentence the defendant to life imprisonment without parole if the jury is unable to answer any of the special issues consistent with these guidelines. Tex. Code Crim. Proc. art. 37.071, § 2(g). In other words, the absence of unanimity does not result in a hung jury—it results in life imprisonment. Under Texas law, however, the jury cannot be informed of the consequences should it fail to answer a special issue. *Id.* at § 2(a)(1). Thus, jurors remain free to improperly speculate about what will happen if they fail to answer a special issue, or to be persuaded by their peers who are equally ignorant of the law's requirements.

897. As in *Mills*, *McKoy*, and *Kubat*, the Texas capital sentencing scheme leads to misinformation and confusion and allows a jury to bring impermissible consideration to bear on the verdict. As in *Mills*, the "critical question" is "whether a reasonable jury could have understood the instructions according to petitioner's interpretation." *Mills*, 108 S. Ct. at 1866. "The risk that

the death penalty will be imposed in spite of factors which may call for a less severe penalty ... is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." *Id.* The Texas capital sentencing scheme deprived Mr. Balderas of his constitutional rights under the Eighth and Fourteenth Amendments to the U.S. Constitution and controlling state and federal law.

898.   In Mr. Balderas's case, post-conviction investigation revealed that multiple jurors ultimately felt compelled to vote against their consciences because of the 10-12 rule, which they had been minimally and confusingly instructed on following the close of evidence by both parties at the punishment phase. (43 RR at 5:1-4; CR at 3334-41.) Following the first day of deliberations, at least five jurors felt that Mr. Balderas deserved a sentence of life in prison without parole. At least two jurors continued to hold out for a life sentence throughout the second day, believing that Mr. Balderas did not constitute a future danger *and* that there was sufficient mitigating evidence to support a life sentence. Nevertheless, as a result of the State-endorsed confusion regarding the statutory punishment scheme, the jurors felt compelled to flip their vote to a penalty of death for fear that holding out would cause a mistrial.

899.   In Mr. Balderas's case, jurors who did not believe Mr. Balderas represented a future danger and thought there were sufficient mitigating circumstances to warrant a life sentence were misled into yielding to other jurors because of their misunderstanding of the 10-12 Rule. Several jurors stated that the jury was "fairly evenly split" on Special Issue One and Two at the beginning of punishment phase deliberations. (Affidavit of John Armstrong ("Juror Armstrong Aff."), September 25, 2015, Habeas Writ Record, Vol. IV, 01067-01072, at 01070 ¶ 14.) ¶14; Affidavit of Allison Birney ("Juror Birney Aff."), September 26, 2015, Habeas Writ Record, Vol. IV, 01074-01077, at 01076 ¶ 9; Affidavit of Christopher Norwood ("Juror Norwood Aff."), September 25,

2015, Habeas Writ Record, Vol. IV, 01082-01085, at 01083 ¶ 7; Affidavit of Chad Sullivan ("Juror

Sullivan Aff."), September 24, 2015, Habeas Writ Record, Vol. IV, 01094-01097, at 01095 ¶7.)

Juror Birney recalls:

> We really wrestled with whether Juan would be a continuing threat to society. I started at 'no, he would not be a continuing threat.' [Juror Chambers] and [Juror Norwood] felt similarly. Sometimes, you see defendants in a trial like Kenneth McDuff or Jeffery Dahmer and you think, 'Sleazeball. I would never be alone in a room with you.' I never had that feeling about Juan. I would sit in a room alone with him and not be afraid. Then, I heard all the evidence about Juan being molested as a child and his mother not wanting him. I realized he never had a chance. I felt great empathy for Juan. I do not think he is a bad person. I do not think he is evil. I just think he has done some bad things.

(Juror Birney Aff., Habeas Writ Record, Vol. IV, 01074-01077, at 01076 ¶ 9.)

900.    The deadlock continued through the first afternoon of deliberations, overnight, and
into the second morning. By that time, the fear of a mistrial started to set in. On the second day,
Juror Norwood addressed the jurors saying: "Somebody's got to move... We are not going to go
and hang this part because we have all suffered and we are not going to put someone else through
what we just sat through because we cannot come to a decision." (Sullivan Aff., Habeas Writ
Record, Vol. IV, 01094-01097, at 01095 ¶7.) At the time, the jurors genuinely believed that if they
did not reach a unanimous vote for the death sentence or get ten jurors to vote for life imprisonment
without parole, then a mistrial would be declared. (*Id*. at 01095 ¶8; Juror Birney Aff., Habeas Writ
Record, Vol. IV, 01074-01077, at 01076 ¶10.) Under that pressure, and with this mistaken
extraneous influence on their minds, some jurors began to change their votes. Juror Birney, one of
the holdout jurors who changed her vote toward the end of deliberations, explained that the
decision was "in part due to fatigue." (*Id*.)

901.    There is no doubt that the jurors would have voted differently if they had been
allowed to know the truth about their options and the effect of their votes. During the post-

conviction investigation, several jurors discussed their confusion about the Texas sentencing statute and stated that they or someone else on the jury would have followed their conscience and stuck with their original vote had they known they were allowed to do so without causing a mistrial. (*Id.*; Juror Armstrong Aff., Habeas Writ Record, Vol. IV, 01067-01072, at 01071 ¶14; *see also* Juror Norwood Aff., Habeas Writ Record, Vol. IV, 01082-01085, at 01084 ¶7 ("When I switched my vote in the punishment part, it was very brutal for me and I had a rough go at it.").)

902.    The TCCA and the Supreme Court agree that jurors are not to be misled about their heightened roles in the capital sentencing process. *See Caldwell v. Mississippi*, 472 U.S. 320 (1985); *Draughon v. State*, 831 S.W.2d 331, 337 (Tex. Crim. App. 1992). Evidence, argument, or instructions that minimize a juror's sense of responsibility in assessing the appropriateness of a death sentence have been routinely criticized by both courts. As explained by the TCCA, the "reliability of the decision to impose death is reduced impermissibly when, among other reasons, jurors are misled into believing that their decision may be less momentous than it really is." *Draughon*, 831 S.W.2d at 337.

903.    Another danger that must be guarded against is the possibility that a juror's free exercise of her own judgment on the merits of the case is inhibited by statute or instruction. *Draughon*, 831 S.W.2d at 338 (*citing Mills*, 486 U.S. 367). In *Draughon*, for example, the TCCA recognized that one of the dangers of the 10-12 Rule and the statutory prohibition against informing the jurors of the effect of a hung jury is that they "might mistakenly think a sentence other than death to be impossible unless ten of them agree," and that this is constitutionally suspect. *Id.* at 338. In that case the TCCA minimized the danger, stating that "no juror would be misled" into thinking a vote for death should be given unless ten or more jurors agreed to a life sentence."

*Id.* That danger was not minimized in Mr. Balderas's case. Indeed, many of the jurors were misled into thinking that a sentence other than death was impossible without unanimity.

904.    Based on the holdout jurors' interpretation of the court's instructions, they felt they needed to convince nine fellow jurors to answer one of the special issues in favor of a life sentence in order to end the deliberative process. After two days of holding out in a jury room filled with others who were willing to sentence Mr. Balderas to death, they accepted the futility of convincing nine others to vote for life. By misleading jurors as to the result of a failure to reach a unanimous or ten vote agreement, the Texas statute essentially coerced the jury into a death sentence on the basis of reasoning that was divorced from the merits of the case. Further, where, as here, there are only a few holdout jurors in a capital case, the concern over being responsible for a mistrial increases exponentially.

905.    The holdout jurors' ultimate capitulation to the death sentence in Mr. Balderas's case was not the result of careful deliberation about the special issues. Rather, the 10-12 Rule effectively convinced the jurors that if they could not secure ten of twelve votes for life imprisonment, they would have to vote for the death sentence to avoid a mistrial. Though the TCCA has repeatedly upheld constitutional challenges to the 10-12 Rule, these rulings were predicated on the notion that capital jurors would not be misled by the inaccurate instructions required by the statute. *See Draughon*, 831 S.W.2d at 338. However, evidence obtained in the wake of Mr. Balderas's trial underscores the unreliability of the CCA's premise and the unconstitutionality of the 10-12 Rule.

## XI.    THE HIGHLY SUGGESTIVE PHOTO SPREAD VIOLATED MR. BALDERAS'S DUE PROCESS RIGHTS

### A.    The Due Process Clause Bars Out of Court Photo Identifications That Are Impermissibly Suggestive

906.    The Due Process Clause bars the admission of identification evidence when the introduction of that evidence is "so extremely unfair that its admission violates fundamental conceptions of justice." *Perry v. New Hampshire*, 132 S. Ct. 716, 723 (2012) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

907.    A "conviction based on an eyewitness identification at trial following a pretrial photographic identification may be set aside 'if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Sturgeon v. Quarterman*, 615 F. Supp. 2d 546, 573 (S.D. Tex. 2009) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)).

908.    A two-step process governs the admissibility of identification evidence: "First, a court must determine whether the pretrial identification was impermissibly suggestive; if it was, then second, a court must determine whether, "under the totality of the circumstances, the suggestiveness leads to a substantial likelihood of irreparable misidentification." *Coleman v. Quarterman*, 456 F.3d 537, 544 (5th Cir. 2006) (quoting *Herrera v. Collins*, 904 F.2d 944, 946 (5th Cir.1990)).

909.    The Supreme Court has identified several factors to help determine the likelihood of misidentification: "(1) the opportunity of the witness to view the criminal at the crime scene; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation." *Id.* (quoting *Neil v. Biggers*, 409 U.S. 188, 199-200, 93 S. Ct. 375, 34 L.Ed.2d 401 (1972)).

304

**B.      The Pretrial Identification Procedure Was Impermissibly Suggestive**

910.      On the night of the shooting, police officers obtained a description of the shooter from Wendy Bardales before she was shown any photo spread. Wendy said that she saw the gunman enter the apartment, that her eyes followed him until he left, and that he wore a black jacket with a hood pulled over his head, but that, at one point, when his hood fell down, she got a good look at his face. Wendy said that she had never seen the gunman before, and that he had a mark on his face, but she did not recall where it was.

911.      On the night of the shooting, a police officer showed Wendy a photo-spread array that did not include Mr. Balderas's photo or any individual with a dark birth mark. Wendy did not identify anyone as the shooter, but she said that she recognized one of the people shown, Israel "Cookie" Diaz (top middle), was a friend of Powder's.



(46 RR 115, State's Exhibit 57.)

912.      Six days after the shooting, a police officer showed Wendy a different photo array with six photos—one of which then included an individual with a dark mark on his cheek and wearing a black hooded sweatshirt.

305



(46 RR 113, State's Exhibit 56.)

913.    When Wendy saw the photo spread, she pointed at Mr. Balderas's photo (bottom middle) and identified him as "Apache." She described him as a friend of Powder and Cookie. But Wendy did not positively identify appellant as the shooter at that time. Rather, she made more tentative statements that appellant "could be the shooter," that he "looked like the shooter," and that his "face looked exactly like the shooter's face." (Incident No. 184361705, Current Information Report, Habeas Writ Record, Vol. III, 00806-57, at 00825.) Wendy's indefinite remarks about appellant's photo left the officer unable to characterize her identification as "positive" when he left from his meeting with her.

914.    Unsatisfied with his not having obtained a positive identification from Wendy, the officer visited her again the next day to further discuss the second photo spread. (*Id*. at 00826.) Wendy again told the officer that "the shooter and Balderas had the same face." (*Id*.) The officer then told her to "view each of the photos again with the hair covered," (*id.* at 00827), which would emphasize the lower portion of the faces in the photograph, and in turn, the dark birth mark on Mr. Balderas's photograph. After Wendy did so, she said she was now positive in her identification. (*Id*.)

306

915.    This identification procedure was impermissibly suggestive. It was Wendy herself who gave a description of the shooter with several identifying features, including a dark birth mark on his face. She was then shown a photograph array that did not include a single individual with a dark birth mark on his face. She did not identify the shooter. She was then shown a photo array with a single person who had a dark birth mark on his face and thought that person might be the shooter. The next day, the officers came back and had her cover the upper half of each face, leaving only the bottom half with the dark birth mark, and she identified Mr. Balderas as the shooter. That process of covering the top half of the face accentuated the most distinguishing feature of her pre-photo array identification—the dark birth mark. Moreover, that process had the effect of accentuating a black sweatshirt with the hood at the neck—another feature only present in Balderas's photo. Wendy had told police that she got a good look at the shooter only after his hood fell. Covering the top half of the photo brought her attention to not only the dark birth mark but now a hood worn at the neck. No other photograph contained these features when covering the top half of the photograph (or at all).

## C.    The In-Court Identification Was Unreliable Under the Totality of the Circumstances

916.    The totality of the circumstances show that Wendy's identification was unreliable.

917.    The entire incident was a "matter of seconds." (24 RR 104:18-23.) Wendy's opportunity to view the shooter at the crime scene was impeded by the hoodie worn during the entire event (seconds), except for a potential second or two during which the hood fell. During those few seconds, the shooter "was running and running" around the room. While the shooter was running around the room, his hood came off for what could be no more than a second or two. It was within those few seconds (where Wendy admitted she was "in shock") that she had an

307

opportunity to view the shooter and direct her attention to him. (25 RR at 48:23-49:1, 58:21-23, 64:18.)

918.    Further, Wendy knew Mr. Balderas by the name of "Apache" prior to the night of the shooting, but she did not mention that to police officers when she gave a physical description of the shooter before she was shown a photo spread; instead she represented to police officers that she had never seen the shooter before. (Incident No. 184361705, Current Information Report, Habeas Writ Record, Vol. III, 00806-57, at 00820.)

919.    Other circumstances that suggest that Wendy's degree of attention was minimal are that she misdescribed the murder weapon and misstated that she had been shot at "until [the] gun was empty." (*Id.* (describing the gun as a "large black automatic kind" and that the shooter "shot at me . . . I don't know how many times until his gun was empty.")

920.    Dr. Malpass explained why an identification by an eyewitness can be impeded or degraded by the shock of the criminal events—indeed, Wendy admitted she was in shock. (25 RR at 48:23-49:1, 58:21-23, 64:18.)

921.    Further, there are many inaccuracies and uncertainties in Wendy's testimony.

922.    At first, Wendy said that she had never seen the gunman before. Later, when she saw Mr. Balderas's photo in the photo spread, she said she knew Mr. Balderas. (*Compare* Incident No. 184361705, Current Information Report, Habeas Writ Record, Vol. III, 00806-57, at 00820 ("I got a good look at his face. I have never seen him before.") *with id.*, 008245-25 ("Wendy Bardales looked at the photos and immediately pointed to the male in position #5, Juan Balderas, and said that she knew him as 'Apache.'").)

923.    At first, Wendy said the shooter had a mark on his face, but she did not know where on his face. Later, Wendy specified that the mark was on the shooter's cheek. (*Compare id.* at

308

00820 (statement from night of the shooting: "I remember him having a dark birth mark on his face but I can't remember exactly where") with *id.* at 00824 (the day after the shooting after looking at Cookie's photo array: "Wendy went on to describe the mark on the shooter's face as being on his cheek, that it was dark in color and that it was different from the scars on [Cookie's] face.").)

924.    At first, Wendy could not positively identify Mr. Balderas as the shooter when she was shown the second photo spread. (*Id.* at 00824 ("She said that he looked like the shooter. Ruland then asked her what she meant by 'looked like the shooter.' Wendy responded by saying that his face looked exactly like the shooter. Ruland asked her if 'Apache' was the shooter and she responded by saying that his face looked exactly like the shooter's face.").) The next day, when the same officer returned to her with the same photo spread asking her to be more definitive in her identification, she positively identified Mr. Balderas as the shooter. (*Id.* at 00826 (stating that she was positive after covering the top half of the photographs).)

## XII.    THE COURT VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS BY INSTRUCTING THE JURY TO CONSIDER ONLY MITIGATING EVIDENCE THAT RELATES TO "MORAL BLAMEWORTHINESS"

### A.    The Jury Must Be Allowed to Consider All Mitigating Evidence with Respect to the Death Penalty

925.    "[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion) (emphasis in original), aff'd, *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982). The *Lockett* Court's decision was animated by "the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty," and it accordingly found

unconstitutional a state statute that "prevent[ed] the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation." *Id.* at 605.

926.   The Supreme Court requires that a jury "be permitted to 'consider fully' [] mitigating evidence" that provides a basis for a sentence of life rather than death." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 260 (2007). "[S]uch consideration," the Court has explained, "would be meaningless unless the jury not only [has] such evidence available to it, but also [is] permitted to give that evidence meaningful, mitigating effect in imposing the ultimate sentence." *Id.* (internal quotations omitted). Each juror is entitled to broad discretion in assessing the import of the mitigating evidence the defense proffers; at the same time, the State may not limit this evidence to those categories which the State deems as mitigating.

927.   As the Court stated in *Tennard v. Dretke*, 542 U.S. 274, 285 (2004) (internal quotations omitted), "[A] State cannot bar the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death." *See also McCleskey v. Kemp*, 481 U.S. 279, 304 (1987) ("[T]he Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to decline to impose the death sentence.").

928.   Consistent with this jurisprudence, the avenues of mitigation open to a capital jury cannot be limited to evidence that relates solely to the defendant's culpability, the nature of his crime, or what the crime says about that individual defendant. *See Abdul-Kabir*, 550 U.S. at 246 (establishing a low threshold for what constitutes "mitigating evidence," namely, that which "might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future").

929.    For example, evidence that a defendant has adjusted well in prison prior to his trial qualifies as mitigating evidence because "there is no question but that [inferences drawn from the evidence] would be 'mitigating' in the sense that they might serve 'as a basis for a sentence less than death.'" *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986) (quoting *Lockett*, 438 U.S. at 604). Importantly, the *Skipper* Court observed that the proffered evidence—the testimony of two guards and a prison visitor—"would not relate specifically to petitioner's culpability for the crime he committed." *Id.* at 4. Nevertheless, it could "hardly be disputed" that the exclusion of the evidence "deprived petitioner of his right to place before the sentencer relevant evidence in mitigation of punishment." *Id.* at 4; *see also Abdul-Kabir*, 550 U.S. at 259 ("Like Penry's evidence, Cole's evidence of childhood deprivation and lack of self-control did not rebut either deliberateness or future dangerousness but was intended to provide the jury with an entirely different reason for not imposing a death sentence."). In other words, mitigating evidence cannot be limited to evidence that relates to "moral blameworthiness."

930.    The Texas statute governing capital trials gives rise to this risk by expressly limiting the evidence that a jury may consider mitigating for purposes of punishment in violation of the Eighth and Fourteenth Amendments. Mr. Balderas's sentence therefore violates his rights under the United States Constitution and United State Supreme Court case law.

## B.    The Trial Court Gave Jury Instructions That Prevented the Jury From Considering All Mitigating Evidence

931.    Article 37.071 of the Texas Code of Criminal Procedure governs the instructions given to Texas capital juries. The statute requires a trial court to submit at least two special issues to the jury at the punishment stage: (1) whether there is a probability that the defendant constitutes a continuing threat to society; and (2) whether, considering all the evidence, there are sufficient mitigating circumstances to warrant a sentence of life imprisonment without parole instead of

death. Tex. Code Crim. Proc. art. 37.071, § 2(b)(1), (e)(1). With respect to the mitigating circumstances issue, the court must instruct the jury that it must answer this special issue "Yes" or "No," that it may not answer "No" unless by unanimous agreement, that it may not answer "Yes" unless ten or more jurors agree, and that the jurors need not agree on which evidence in particular is mitigating. *Id.* at § 2(f)(1)-(3).

932.    The Texas Code of Criminal Procedure requires a capital trial court to submit the following special issue to the jury at the punishment stage: whether, considering all the evidence, there are sufficient mitigating circumstances to warrant a sentence of life imprisonment without parole instead of death. Tex. Code Crim. Proc. art. 37.071, § 2(e)(1).

933.    Further, Texas law requires the court to instruct the jury that mitigating evidence is "evidence that a juror might regard as reducing the defendant's moral blameworthiness." Tex. Code Crim. Proc. art. 37.071 § 2(f)(4) (emphasis added). ). However, the statute fails to define "moral blameworthiness" and requires no additional instructions on the matter.

934.    The trial court in this case gave the statutorily mandated instructions during the punishment phase of trial and before the jury retired to deliberate. (*See* 43 RR at 4:24-5:4; CR at 3334-45.) Specifically, the court charged the jury as follows:

> Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Juan Balderas also known as Apache, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed?

(*Id.* at 3343.) The charge also included the following direction: "In answering Special Issue No. 2 you shall consider mitigating evidence to be evidence that a juror might regard as reducing Juan Balderas also known as Apache's moral blameworthiness." (*Id.* at 3338 (emphasis added).)

### C.     Mr. Balderas Presented Mitigating Evidence at the Trial That the Jury Was Prohibited from Considering

935.     At the punishment phase, Mr. Balderas presented mitigating evidence that bore no relationship to his moral blameworthiness for the capital crime. For instance, Mr. Balderas's parents testified that Mr. Balderas is a "good boy" and is searching for God, and that they support him. (38 RR at 84:19, 94:3-95:1.) Other relatives testified that they "love him very much" and that they would be there for him emotionally if he were granted a life sentence. (39 RR at 128:1112; 40 RR at 194:25-195:4.)

936.     Mr. Balderas's biological father also testified that Mr. Balderas was just a "normal" kid, and that he would support Mr. Balderas even if Mr. Balderas spent the remainder of his life in prison. (38 RR at 94-95.)

937.     Similarly, Mr. Balderas's cousin, who had lived with Mr. Balderas in Mexico when they were younger, noted that "he's my brother and I know many good qualities about him and we were happy." (39 RR at 119.) She also noted that "He was always very respectful, well-mannered child, he was always happy, he smiled. Even if things happened, he tried to be happy." (*Id.*) Finally, she noted that she loves Mr. Balderas "very much." (39 RR at 128.)

938.     Another cousin had a similar experience with Mr. Balderas, noting "He's my cousin, but I love him as a brother." (40 RR at 194-195.)

939.     This evidence, though unrelated to Mr. Balderas's moral blameworthiness for the crime, bolstered the argument that Mr. Balderas nevertheless was a worthwhile person undeserving of a death sentence. Such evidence is equally meaningful for jurors as background and character evidence when deciding whether to impose a sentence of death. *See Penry v. Lynaugh*, 492 U.S. 302, 327 (1989) (*Penry* I) ("[S]o long as the class of murderers subject to capital punishment is

narrowed, there is no constitutional infirmity in a procedure that allows a jury to recommend mercy based on the mitigating evidence introduced by a defendant.").

940.    The Texas statutorily-mandated instruction to consider only mitigating evidence that bears on "moral blameworthiness" fatally undermines the jury's capacity to give effect to the broader types of mitigating evidence described above. Tex. Code Crim. Proc. art. 37.071, § 2(f)(4) (emphasis added). (*See also* CR at 968.) Put differently, this instruction precluded jurors from considering mitigating evidence unrelated to Mr. Balderas's "moral blameworthiness," a limitation wholly at odds with three decades of U.S. Supreme Court precedent. Had Mr. Balderas's jurors (or any one of them) credited such evidence—that is, evidence that did not reduce Mr. Balderas's moral blameworthiness for the crime but still warranted a life sentence—they would be in violation of the court's instructions. *Penry v. Johnson*, 532 U.S. 782, 800 (2001) (*Penry* II). Because "[w]e generally presume that jurors follow their instructions," there exists a reasonable probability that the result of Mr. Balderas's trial would have been different had a constitutionally adequate instruction been given. *Id.* at 799.

## XIII.  ACTUAL INNOCENCE

941.    In violation of the Eighth and Fourteenth Amendments, Juan Balderas is actually innocent of the offense for which he has been convicted.

942.    He was erroneously convicted on the basis of various violations, including the withholding of evidence, false testimony, ineffectiveness of trial counsel, prosecutorial misconduct, and other constitutional errors and failures that occurred at the trial and which led to an erroneous conviction as discussed in this petition.

943.    Even apart from any violation of rights which occurred at trial, the evidence would establish that, as a matter of fact, Mr. Balderas did *not* commit the offense for which he has been convicted—and, most critically, that someone else killed Powder.

314

944.    As a result, his conviction and death sentence are unconstitutional and he is entitled to habeas corpus relief.

## XIV.  MR. BALDERAS WAS INDICTED, TRIED AND SENTENCED TO DEATH UNDER THE UNCONSTITUTIONAL STATUTORY SCHEME SET FORTH IN TEXAS CODE CRIMINAL PROCEDURE, ARTICLE 37.

945.    In violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments, the Texas death penalty statute set forth in Texas Code of Criminal Procedure, Article 37.071 is unconstitutional for the following non-exclusive reasons:

946.    The statute is vague and overbroad for failure to define (i) "probability"; (ii) "criminal acts of violence"; (iii) "continuing threat to society"; (iv) "personal moral culpability"; and (v) "moral blameworthiness." This failure on the part of the legislature to define these terms, and to require the trial court to do so, denies the jury the guidance necessary to exercise its discretion. *Gregg v. Georgia*, 428 U.S. 153 (1976).

947.    Requiring twelve jurors to predict the probability (whatever that means) that a person will commit criminal acts of violence (whatever that means) that constitute a continuing threat to society (whatever that means) when mental health professionals are not able to reliably make such predictions, particularly over a long term, is arbitrary and capricious and violates the evolving standards of decency of our society.

948.    The statute is unconstitutional because the state legislature has failed to provide the local district attorneys with a uniform method for determining which cases will be prosecuted as death penalty cases and which will be prosecuted as non-death penalty capital cases. The Texas death penalty scheme does not give district attorneys guidance in exercising their discretion in determining who will face the death penalty. Who will face death is often a matter of how much money the county is willing or has to spend to prosecute and defend a death penalty case, who the prosecutor is, the social standing of the victim, the race of the Defendant, the race of the victim

315

and not a constitutionally mandated narrowing system where only the worst of the worst face death.

949.    The statute is unconstitutional in that the standard of "probability" imposed on the jury by Art. 37.071(b)(1) is less stringent than proof beyond a reasonable doubt. The language of the statute impermissibly causes a juror to focus, if at all, on the probability language rather than on the real burden of proof which should be beyond a reasonable doubt. The fact that jurors must decide if a "probability has been established beyond a reasonable doubt" makes the application of Art. 37.071 arbitrary and capricious.

950.    The statute is unconstitutional because it fails to require that mitigation be considered.

951.    The statute denies the accused due process and equal protection of the law by permitting introduction at the punishment phase of "any matter that the court deems relevant to sentence."

952.    The statute does not properly narrow the class of persons eligible for the death penalty upon conviction for a capital offense.

953.    The statute is not based on a uniform national standard, resulting in arbitrary, capricious, freakish and wanton imposition of the death penalty.

954.    The statute does not provide for a proportionality review to determine if the penalty imposed is proportionate to other similar offenses.

955.    Art. 37.071(d)(2) is unconstitutional because it requires ten votes to answer the issue with a "no" response that would be in favor of a defendant and a life sentence.

956.    When jurors are instructed that they may not give a verdict of life unless ten or more agree upon a life answer in response to at least one of the two issues, this provides an

incorrect picture of the state of the law. In fact, if only one juror is able to conclude that sufficient mitigation exists to warrant the imposition of a life sentence, despite that juror's inability to convince nine other jurors of his or her position, a life sentence will be imposed.

957.    Instructing the jury that ten or more of them must agree upon a "life" answer in order to sentence the Defendant to life, regardless of whether the court informs the jury of the effects of a non-answer, is an incorrect statement of the law.

958.    So long as the Texas statute equates the sentencing consequences of a life verdict with the consequences of a non-verdict, the jury must not be misled to believe that anything more than one vote for life is required to secure that sentence.

959.    The false distinction between a "life" answer of ten or more jurors and a non-answer of less than ten jurors is impermissibly vague and arbitrary and violates due process and *Simmons v. South Carolina*, 512 U.S. 154, 171 (1994).

960.    Moreover, the ten-twelve rule violates the right to a fair and impartial jury. By manufacturing confusion in the minds of the jury and preventing the court or attorneys from correcting it, the ten-twelve rule creates fertile ground for jurors to draw upon their own biases and preconceived notions in coming to a verdict.

961.    Execution by lethal injection is cruel and unusual punishment and otherwise unconstitutional.

962.    The statute is unconstitutional because it prohibits the judge and the parties from informing the jury that a hung jury (failure to achieve unanimity on Special Issue No. 1 or less than ten "no" votes on Special Issue No. 2) will result in a life sentence. This is in effect a denial of the juror's right to a fair trial as they are intentionally misinformed about who is ultimately responsible for the verdict. The statute requires that they be told that the verdict rests with ten or

317

twelve when, in effect, a verdict for life rests with only one juror. This scheme artificially frustrates those jurors who would vote for life if properly instructed. It makes those "hold out" jurors (particularly those who are fearful of causing a "mistrial") more susceptible to the pressures from the death voting majority. There is no such thing as a "mistrial" during the penalty phase of a capital trial and the jurors should be so informed.

963.    The statute permits the introduction of unadjudicated extraneous offenses at the punishment phase. There is required in capital cases a heightened need for reliability in the sentencing decision. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). Allowing evidence of unadjudicated offenses, particularly in situations where those offenses would be inadmissible in a non-capital trial, denies the jury's verdict and the Court's sentence the reliability required by the Eighth Amendment to the United States Constitution.

964.    The statute permits the introduction of juvenile offenses at the punishment phase.

965.    The statute is unconstitutional because there are no appellate standards for determining the sufficiency of the evidence to support the jury's answers to the special issues, and the Texas Court of Criminal Appeals has repeatedly and consistently refused to conduct any meaningful appellate review of mitigation sufficiency.

966.    The statute does not require the indictment to allege special issues, *i.e.* the "facts" relied upon to enhance the capital sentence from life to death, contrary to *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

967.    As a result, where Juan Balderas was indicted, convicted and sentenced to death based on an unconstitutional statute, he is entitled to habeas relief.

318

## XV.    THE STATE HABEAS PROCEEDING VIOLATED DUE PROCESS

### A.    A State Court Must Observe Due Process When Adjudicating Constitutional Claims Raised in a Post-Conviction Proceeding.

968.    When a state provides a mechanism for a habeas applicant to collaterally attack a criminal conviction, the procedures employed must comport with due process. *See Evitts v. Lucey*, 469 U.S. 387, 401 (1985) ("[W]hen a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution— and, in particular, in accord with the Due Process Clause.").

969.    Due process requires, at a minimum, notice and the opportunity to be heard in a manner appropriate to the nature of a case. *See, e.g.*, *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971).

970.    In "capital proceedings generally, this Court has demanded that factfinding procedures aspire to a heightened standard of reliability." *Ford v. Wainwright*, 477 U.S. 399, 411 (1986).

971.    A fair hearing requires the opportunity to present evidence in support of constitutional claims and controvert adverse evidence. *See, e.g.*, *Ford*, 477 U.S. at 413.

972.    Importantly, in "almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970); *Ellis v. Capps*, 500 F.2d 225, 227 (5th Cir. 1974) ("Cordoning off a highly relevant area of inquiry such as the bias and prejudice of a complainant is repugnant to the principle of a fair trial."); *Carter v. Morehouse Par. Sch. Bd.*, 441 F.2d 380, 382 (5th Cir. 1971) ("A ruling based on evidence which a party has not been allowed to confront or rebut is one which denies due process.").

**B.    The State Habeas Court Violated Due Process By Failing to Comply with Texas State Procedures and Refusing to Allow Him to Confront and Cross-Examine Trial Counsel on Statements in Their Affidavits.**

973.    An applicant filing a writ of habeas corpus has the initial burden at the pleading stage was to allege specific facts, which, if true, might entitle him to relief. *See, e.g.*, *Ex parte Medina*, 361 S.W.3d 633, 637 (Tex. Crim. App. 2011) ("Texas law has long required all post-conviction applicants for writs of habeas corpus to plead specific facts which, if proven to be true, might call for relief."); *Ex parte Armstrong*, No. WR-78,106-01, 2015 WL 7354084, at *2 (Tex. Crim. App. Nov. 18, 2015) (noting that the applicant had "alleged facts that, if true, might entitle him to relief").

974.    The State may then answer or rely on a general denial. *See* Tex. Code Crim. Proc. Art. 11.071 § 7.

975.    When an applicant pleads facts that, if true, might call for relief, and the State denies those allegations, these factual issues are "controverted." *See, e.g.*, *Ex parte Carnes*, 579 S.W.2d 249, 250 (Tex. Crim. App. 1979) ("Because the State admitted none of the matters which were alleged, they are deemed denied. V.A.C.C.P., Article 11.07, Section 2(b). Thus they are controverted."

976.    When a court determines that controverted, previously unresolved factual issues exist, the court must then issue an order designating the issues of fact that are to be resolved and announce the manner by which those issues will be resolved. Tex. Code Crim. Proc. Art. 110.071 § 9(a); *Ex parte Ryan*, No. 05-01-01217-CR, 2001 WL 1079092, at *1 (Tex. App. Sept. 17, 2001) ("In post-conviction writs of habeas corpus, governed by article 11.07 of the code of criminal procedure, an applicant is entitled to a hearing on her application if there are controverted, previously unresolved issues of fact that are material to the legality of the applicant's confinement.").

320

977.    Mr. Balderas alleged facts that, if true, would entitle him to relief. He alleged fourteen grounds that would entitle him to relief, including that the State presented false testimony of Israel "Cookie" Diaz, that the State violated *Brady* by failing to disclose impeachment evidence as to Cookie, and that trial counsel were ineffective for failing to present alibi evidence and failing to investigate and present mitigating evidence. (Initial Application, January 15, 2016, Habeas Writ Record, Vol. I, 00002-396.)

978.    The State answered denying Mr. Balderas's allegations, thereby controverting Mr. Balderas's factual allegations. (Respondent's Original Answer, July 18, 2016, Cause No. 1412826-A, Docket No. 24.)

979.    On August 20, 2016, Mr. Balderas filed a Motion for Order Designating Issues and Live Evidentiary Hearing and a Proposed Order Designating the fourteen issues pleaded in in his Initial Application. (Motion for Order Designating Issues, Aug. 5, 2016, Habeas Writ Record, Vol. V, 01426-46.)

980.    On September 7, 2015, the State filed its Motion to Designate Issues identifying all fourteen issues as designated issues. (State's Motion to Designate Issues, Sept. 7, 2016, Habeas Writ Record, Vol. V, 01447-49.)

981.    At first the habeas court, under Judge Guiney, acknowledge that all of the claims were controverted and that Mr. Balderas had met his pleading burden in his Initial Application, and accordingly designated all fourteen issues. (Court's Order Designating Issues, September 16, 2016, Habeas Writ Record, Vol. V, 01450-51.)

982.    Indeed, recognizing that there were controverted, designated issues of fact related to *Brady* and ineffective assistance of counsel, the State moved and the habeas court ordered trial counsel, Jerome Godinich and Alvin Nunnery, to file affidavits summarizing the actions taken to

represent Mr. Balderas. (State's Motion for Affidavits, Sept. 7, 2016, Order for Affidavits, Sept. 16, 2016, Habeas Writ Record, Vol. V, 01455-59; Godinich Aff., Aug. 9, 2017, Habeas Writ Record, Vol. V, 01471-75; Nunnery Aff., Aug. 11, 2017, Vol. V, 01486-91.)

983.    However, following the change in judge to Judge Baylor Wortham, the habeas court severely narrowed the issues for factual development. On March 23, 2018, the court found that only two controverted, unresolved factual issues existed that would be "addressed by means of a narrowly tailored evidentiary hearing," related to whether the State presented false testimony through Cookie and whether trial counsel was ineffective for failing to investigate and present alibi evidence. (Supplemental Order, March 23, 2018, Habeas Writ Record, Vol. VII, 01948-49.)

984.    Despite requesting the opportunity to confront and cross-examine Godinich and Nunnery on the assertions in their affidavits, the habeas court denied Mr. Balderas the opportunity to confront and cross-examine his trial counsel. (Opposition to State's Motion to Order the Submission of Proposed Findings of Fact and Renewed Motion for a Live Evidentiary Hearing, Jan. 2, 2018, Habeas Writ Record, Vol. 6, 01788-822, at 01807-08; Writ Hearing, Feb. 22, 2018, Vol. VII, 01887-945, at 01890 ("These are things [Godinich and Nunnery] can testify on themselves and that they should be cross-examined on. . . . We need the right to confront [Godinich and Nunnery].");  Supplemental Order, March 23, 2018, Habeas Writ Record, Vol. VII, 01948-49 (allowing only live testimony of Cookie and alibi witnesses Anali Garcia and Octavio Cortes). This denial closed off Mr. Balderas's ability to question counsel about factual issues such as what facts trial counsel were aware of and when, identify any bias, and poke holes in their purported strategy regarding the use of alibi witnesses during the guilt phase.

985.    The habeas court designated only two witnesses that Mr. Balderas could present in order to prove his IAC claim, those related to the alibi defense. *Id. (*"[T]his Court will permit the

applicant to present the testimony of Anali Garcia and Octavio Cortes limited to what these witnesses would have stated if called to testify during the guilt-innocence phase.").

986.    The habeas court's failure to designate clearly controverted factual issues which needed factual development and resolution—contrary to the procedure clearly outlined in Article 11.071—deprived Mr. Balderas the ability to be heard.

987.    Following the habeas court's narrowing, all other controverted issues fell away, including trial counsel's ineffective assistance for failing to investigate mitigating evidence, extraneous influence on the jury, and multiple *Brady* violations.

988.    The habeas court denied Mr. Balderas the opportunity to introduce evidence in multiple ways. Regarding Mr. Balderas's ineffective assistance of counsel claim, only one party, the State, was permitted to procure evidence specifically related to trial counsel's ineffectiveness, and only through the affidavits supplied by trial counsel.

989.    While Mr. Balderas was able to present two alibi witnesses supposedly in support of this claim, these witnesses did not and could not adequately address how Mr. Balderas's counsels' representation fell below an objective standard of reasonableness as required by *Strickland*.

990.    The habeas court then adopted the State's proposed findings of fact. (*Compare* State's Proposed Findings of Fact, Conclusions of Law and Order, July 12, 2018, Vol. X, 02755-2842, *with* Court's Findings of Fact and Conclusions of Law and Order, July 20, 2018, Vol. X, 02844-2937.)

991.    Then the TCCA summarily adopted the habeas court's findings, making a premature determination on of the merits on several of Mr. Balderas's claims even though the

habeas court did not allow him to expand the record beyond the allegations and evidentiary proffers of his pleadings.

992.    Consequently, Mr. Balderas was deprived a fair hearing on these claims and denied the due process protections this Court has previously recognized.

### C.    The State Habeas Court Violated Due Process By Denying Mr. Balderas the Opportunity to be Heard on a *Brady* Claim Based on Evidence Disclosed After the Court Denied the Writ

993.    Mr. Balderas's Initial Application included a claim addressing the State's violations of due process when it withheld exculpatory and impeachment evidence. (Initial Application, January 15, 2016, Habeas Writ Record, Vol. I, 00002-396, at 00059-72.)

994.    Throughout post-conviction proceedings, Mr. Balderas made repeated demands for exculpatory and impeachment evidence from the State, including demands for notes the State took when it met with its two informants, Cookie and Alejandro "Twin" Garcia. (Motion to Compel Disclosure of Exculpatory and Impeachment Evidence, April 19, 2018, Habeas Writ Record, Vol. VII, 01956-69; Motion to Compel Disclosure of Exculpatory and Impeachment Evidence, May 1, 2018, Habeas Writ Record, Vol. VII, 02066-85.)

995.    The interview notes taken with both of these witnesses demonstrated the inconsistency between their pretrial statements to the prosecution and their trial testimony. Cookie testified during the guilt phase to an alleged confession Mr. Balderas made to Cookie in the presence of Twin and other LTC members. Twin testified during the punishment phase to Mr. Balderas's involvement in the extraneous offenses the State alleged Mr. Balderas committed. Both Cookie and Twin were charged with capital murder and received reduced charges of aggravated assault right before Mr. Balderas's trial started in exchange for their testimony.

996.    It was not until after the May 11, 2018 evidentiary hearing, and two months after the trial court submitted its findings of fact and conclusions of law, however, that the State finally

324

disclosed exculpatory and impeachment evidence it had in its possession since 2013. (State's Disclosure Pursuant to Tex. Code Crim. Proc. Art. 29.14(h), (k), Aug. 20, 2018, Vol. X, 0296061.)

997.    According to the State's disclosure, Twin told prosecutors in 2013 that Mr. Balderas was not the killer; that the victim's brother had informed him that the gang MS-13 had actually committed the killing; and—contrary to evidence presented at trial—Mr. Balderas never made any statements confessing to the killing in his presence, a statement that completely undermined the trial testimony of Cookie. (*Id.*)

998.    No trier of fact has ever heard this evidence.

999.    As soon as the State disclosed the information that Twin provided, Mr. Balderas filed a motion for stay of proceedings and remand to reopen evidentiary hearings pursuant to Tex. R. App. P. 73.7(b). (Motion for Remand, November 30, 2018.)

1000.    The Motion for Remand, however, was never ruled upon and the TCCA adopted the Trial Court's findings and denied the writ. (Order Denying Writ, December 18, 2019.)

### D.    The State Court Denied Mr. Balderas a Fair Hearing.

1001.    Mr. Balderas pleaded specific facts that, if true, entitled him to relief. Thereafter, Texas law mandated a particular procedure for adjudicating Mr. Balderas's legal claims. Yet the habeas court and the TCCA refused to follow Texas law and failed to provide him with the required due process, in violation of his rights under the Fourteenth Amendment. This case never progressed beyond the pleading stage, and Mr. Balderas had indisputably satisfied his pleading burden. Consequently, the state courts made a premature determination of the merits of his constitutional post-conviction claims without providing him the full evidentiary proceedings required by state law.

1002.    In Mr. Balderas's case, no trier of fact ever heard live testimony from trial counsel Godinich or Nunnery or multiple witnesses who undermined the State's evidence against Mr.

Balderas, including Alejandro Garcia or other alibi witnesses like Jose Vasquez and Efrain Lopez, as well as experts proffered to establish the weakness of the evidence presented by the State.

1003.    Due process requires a fair playing field, where each party is granted the opportunity to be heard and the rules are evenly applied. Here, however, the habeas court applied entirely different rules for the State than it did for Mr. Balderas. In so doing, the habeas court deprived Mr. Balderas of due process.

1004.    In sum, in support of his habeas application and to meet his pleading burden, Mr. Balderas attached various sworn evidentiary proffers from potential witnesses. The State answered, controverting Mr. Balderas's factual averments. The statute was clear about what should have happened at this point: a written designation of controverted issues of fact material to the legality of Mr. Balderas's confinement and the opportunity to present evidence to prove his allegations in a hearing, thus providing Mr. Balderas the opportunity to be heard, a touchstone of procedural due process. This did not happen. Instead:

- The habeas court initially issued an order designating fourteen issues pertaining to Mr. Balderas's habeas claims, however following a changeover in judges, but without a meaningful change in circumstances the habeas court instead allowed for only two extremely narrow and mischaracterized areas of factual development;

- The habeas court refused to provide Mr. Balderas any meaningful opportunity to present evidence in support of his allegations, relying instead on the self-interested predecessor counsel affidavits and a biased state witness;

- The habeas court denied Mr. Balderas the opportunity to challenge the self-serving affidavits;

- The habeas court handpicked the specific witnesses that Mr. Balderas was allowed to present, denying Mr. Balderas agency over what evidence might be offered in support of his claim;

- The habeas court and the TCCA denied Mr. Balderas the opportunity to be heard on exculpatory evidence withheld by the State until after the evidentiary hearing had concluded;

- The habeas court and the TCCA denied relief to Mr. Balderas based on findings and conclusions that were drafted almost entirely by the State; and

1005.   The state habeas court and the TCCA denied relief to Mr. Balderas on the merits of multiple claims, notwithstanding the fact that Mr. Balderas had been denied the opportunity to introduce evidence in support of these claims.

1006.   When considered in the aggregate, the deviations from the statutorily mandated post-conviction procedure resulted in a fact-finding process that was arbitrary and demonstrably unfair.

1007.   The habeas court's unreliable findings flow directly from its deviations from mandatory statutory procedures for adjudicating habeas corpus applications in Texas. Had the court afforded Mr. Balderas the opportunity to prove his case, Mr. Balderas could have presented evidence and met his burden of proof.

## XVI. TRIAL COUNSEL VIOLATED MR. BALDERAS'S SIXTH AMENDMENT RIGHT TO SUBSTITUTE COUNSEL

### A.    The Sixth Amendment Right to Substitute Counsel

1008.   The Sixth Amendment provides a defendant the right to counsel, and while indigent defendants do not have a right to appointed counsel of their choice, the "court is constitutionally required to provide substitute counsel" when there is a "substantial conflict or problem affecting

the ability to represent the defendant." *United States v. Mitchell*, 709 F.3d 436, 441–42 (5th Cir. 2013).

1009.   Where the conflict "compromise[es] the defendant's representation" or shows that the attorney is unable "to provide zealous representation," the defendant is entitled to substitute counsel. *United States v. Fields*, 483 F.3d 313, 350 (5th Cir. 2007).

1010.   Further, a substantial conflict that requires a court to substitute counsel include "a complete breakdown in communication." *United States v. Mitchell*, 709 F.3d 436, 441–42 (5th Cir. 2013).

1011.   Where a defendant seeks to substitute new counsel based on a breakdown of communication, the court must hold a hearing to determine whether good cause exists to substitute counsel. "As all Circuits agree, courts cannot properly resolve substitution motions without probing why a defendant wants a new lawyer." *Martel v. Clair*, 565 U.S. 648, 664, 132 S. Ct. 1276, 1288, 182 L. Ed. 2d 135 (2012). Failure to hold a hearing "constitutes reversable error." *See United States v. Young*, 482 F.2d 993, 995 (5th Cir. 1973).

1012.   Factors considered in determining whether substitution of counsel is appropriate include: "the timeliness of the motion; the adequacy of the district court's inquiry into the defendant's complaint; and the asserted cause for that complaint, including the extent of the conflict or breakdown in communication between lawyer and client." *Martel v. Clair*, 565 U.S. 648, 663, 132 S. Ct. 1276, 1287, 182 L. Ed. 2d 135 (2012).

### B.      The Trial Court Violated Mr. Balderas's Sixth Amendment Right By Failing to Conduct a Hearing or Even Rule on His *Pro Se* Motion For New Trial on the Basis of a Breakdown of Communication

1013.   On April 12, 2011, Mr. Balderas moved to appoint new counsel due "to fact that counsel is ineffective." (Motion to Appoint New Counsel, Apr. 12, 2011, CCA Record, Vol. I, 00071-72.)

1014.   In his motion, Mr. Balderas wrote that "my lawyer . . . hasn't came to see me so that we can go over my defense. So far this year I have only received two visits from my lawyer Gerome. I haven't seen Alvin E. Nunnery in years." (*Id.*) Mr. Balderas wrote that he did "not have any cop[ies] of the Motions that he has filed." (*Id.*)

1015.   Mr. Balderas further wrote that on "March 15, 2011, Gerome lied to me telling me that my capital murder trial was the only one that was gonna be focusing on for this month of April." (*Id.*) Further, he says that the "truth is that he starts on another capital murder case; on the same week of when I start picking my jury." (*Id.*) Mr. Balderas explained that he had "read about both of my lawyers in Houston Chronicle saying in an article that both my lawyers . . . [were] over loaded with cases." (*Id.*) He asked, "how could my attorneys possibly be able to represent me in any true fairness under the circumstances with here in mentioned." (*Id.*) Mr. Balderas therefore stated, "it is my prayer that Honorable Judge in 179th Court, appoint new counsel to represent me!" (*Id.*)

1016.   These allegations demonstrate a complete and utter breakdown of communication between Mr. Balderas and his counsel. Indeed, it shows there was *zero* communication between Mr. Balderas and his counsel.

1017.   The trial court, however, held no hearing on Mr. Balderas's motion, and as a result, violated his Sixth Amendment rights. *See Martel v. Clair*, 565 U.S. 648, 663, 132 S. Ct. 1276, 1287, 182 L. Ed. 2d 135 (2012); *United States v. Young*, 482 F.2d 993, 995 (5th Cir. 1973).

## XVII. THE TEXAS DEATH PENALTY VIOLATES THE FOURTH, SIXTH, EIGHTH, NINTH AND FOURTEENTH AMENDMENTS AS IT IMPINGES ON MR. BALDERAS'S FUNDAMENTAL RIGHT TO LIFE

### A.    No Compelling State Interest Justifies the Death Penalty for Mr. Balderas

1018.   The right to life is a fundamental constitutional right. Any law that impinges upon a fundamental right is presumptively unconstitutional.

1019.   Under fundamental rights strict scrutiny analysis under substantive due process and equal protection, the District Attorney's Office must prove that the infringement of the fundamental right to life is "necessary to promote a compelling state interest."

1020.   The Harris County District Attorney's Office has shown no "compelling State interest" justifying the death penalty for Mr. Balderas.

1021.   The Harris County District Attorney's Office has failed to demonstrated that the use of life imprisonment (including without parole) does not promote any alleged interest in deterrence as well as the death penalty (even assuming the death penalty deters, which it does not).

1022.   The Harris County District Attorney's Office has not demonstrated that there are no less restrictive means of punishing him. In fact, there is a "reasonable less restrictive alternative to the death penalty" in this case: life imprisonment.

## XVIII. POST-CONVICTION COUNSEL WAS INEFFECTIVE

1023.   In violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), Mr. Balderas's post-conviction counsel, OCFW, rendered ineffective assistance when they failed to adequately plead, prepare, investigate, and present compelling and substantial claims that Mr. Balderas was entitled to post-conviction relief, including but not limited to all of the claims presented in this petition.

1024.   OCFW's investigation was impeded internally by a lack of adequate resources to handle a case as large and complex as Mr. Balderas's. At the time, OCFW only staffed its cases with a team of two attorneys and one investigator. (Ex. D., Eckhoff Decl., ¶ 4) Meanwhile, each of OCFW's attorneys were assigned to several cases at a time. In addition to internal factors, OCFW's investigation was impeded externally by the State's delinquent and incomplete

exculpatory evidence disclosures leading up to Mr. Balderas's evidentiary hearing in May 2018. (Ex. D., Eckhoff Decl., ¶ 21; Ex. E, VerHagen Decl., ¶ 16)

1025.   As a result of these internal and external factors, OCFW did not investigate or plead claims related to Mr. Balderas's competency, despite awareness of Mr. Balderas's long history of mental illness and behavior consistent with those diagnoses. Further, OCFW did not investigate or consider raising additional claims related to Mr. Balderas's alibi defense, even though there was ample evidence available that would have supported such a claim. Accordingly, Mr. Balderas was prejudiced by OCFW's failure to adequately plead, prepare, investigate, and present compelling and substantial claims, such as these and others set forth in this petition.

## XIX.   LETHAL INJECTION CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS

1026.   The State of Texas intends to execute Mr. Balderas by lethal injection in violation of his Eighth and Fourteenth Amendment rights.

1027.   Executions by lethal injection have been marked by human error in which drugs are administered to the condemned in the wrong order, drugs are administered to the wrong part of the body of the condemned, persons are unable to locate a suitable vein and must therefore cut the condemned in his neck and/or groin, and needles once inserted in the condemned become loose and come out of the condemned during the execution procedure.

1028.   In executions that occur without human error, the condemned suffers pain and suffering over and above that necessary to produce death, *i.e.* the condemned is tortured. Specifically, the condemned is first paralyzed and is then given a drug which suffocates him while conscious. Such pain and suffering violates the Eighth Amendment.

1029.   The state's intended use of compounded pentobarbital (a controlled substance) to perform any execution of Mr. Balderas violates the Controlled Substance Act, 21 U.S.C. § 841 *et*

*seq.*, as it involves the transport, possession, use, and administration of a controlled substance not in the normal course of professional medical practice, without any legitimate medical purpose and/or involves the issuance of a prescription for such non-legitimate purposes, all of which violate the federal Controlled Substance Act. The acquiring of such controlled substance is also done in violation of law and such drug is unlawfully obtained under federal law, given the absence of a legitimate medical purpose for which the substances are being prescribed and/or used. The transport, possession, use, and administration of pentobarbital under such circumstances is also pre-empted by the CSA. As such, for all these reasons, the possession, use and administration of pentobarbital violates not only the CSA, but Article VI Section 2 of the United States Constitution (the Supremacy Clause), the Eighth Amendment to the Constitution (*see Brewer v. Landrigan*, 562 U.S. 996 (2010)), and the Fourteenth Amendment, as it shocks the conscience and is fundamentally unfair, especially given the use of such substances in violation of law. U.S. Const. amend. VIII, XIV.

1030.  Moreover, the use of compounded pentobarbital in the execution protocol here creates a substantial risk of serious bodily harm and torture and therefore cannot be used consistent with the Eighth Amendment. U.S. Const. amend. VIII.

## XX.    MR. BALDERAS IS INCOMPETENT TO BE EXECUTED

1031.  In violation of the Eighth and Fourteenth Amendments to the United States Constitution, Mr. Balderas is incompetent to be executed.

1032.  At the time of any execution of Mr. Balderas, he will not comprehend the punishment he is about to receive or the reason for it, and his sentence is thus in violation of the Eighth Amendment. U.S. Const. amend. VIII.

## XXI.   THE STATE VIOLATED MR. BALDERAS'S DUE PROCESS RIGHTS BY FAILING TO CORRECT FALSE TESTIMONY UNDER *NAPUE* AND *GIGLIO*

### A.     The Knowing Use of False Testimony to Obtain a Conviction Violates Due Process

1033.   A conviction obtained through the use of false evidence, known to be false by the State, violates due process under the Fourteenth Amendment. *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (internal citations omitted); *see also Giglio v. United States,* 405 U.S. 150, 153 (1972) ("[D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" (citing *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)).

1034.   To obtain relief under *Napue* and *Giglio*, a petitioner must show that (1) the testimony was actually false; (2) the State knew that it was false; and (3) the testimony was material. *Canales v. Stephens*, 765 F.3d 551, 573 (5th Cir. 2014). "[D]ue process is not implicated by the prosecution's introduction or allowance of false or perjured testimony unless the prosecution actually knows or believes the testimony to be false or perjured; it is not enough that the testimony is challenged by another witness or is inconsistent with prior statements." *Kutzner v. Cockrell*, 303 F.3d 333, 337 (5th Cir. 2002). The testimony is material "if there is any reasonable likelihood that the false testimony could have affected the judgement of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976).

1035.   Here, the State failed to correct Cookie's false testimony under *Napue* and *Giglio*. At trial, Cookie testified that he "never asked [the prosecutors] for anything." (26 RR 168:15). But this is proven false based on Cookie prison phone calls from several years before Mr. Balderas's trial that were disclosed days before the May 2018 State Habeas proceeding, in which Cookie discussed with his mother, father, uncle, and brother-in-law his communications with prosecutors about obtaining a plea deal. This evidence also establishes that the State knew Cookie's testimony

was false and failed to correct it. Had the prosecutors' notes not been withheld, it could have been used to impeach Cookie at trial and at the State Habeas Hearing. At minimum, the State should have corrected Cookie's false testimony when elicited. Thus, there is a reasonable likelihood that Cookie's uncorrected false testimony affected the judgement of the jury.

1036.   The recently disclosed prosecutors' notes also reveal numerous inconsistencies in Cookie's testimony that further underscore the likelihood that false testimony was not corrected in violation of Mr. Balderas's Due Process rights. For example, Cookie testified that Mr. Balderas confessed to killing Powder; specifically, that Mr. Balderas gave him a "hug and a kiss on the cheek," and then "took credit for the whole thing" by saying that he "got him." (26 RR 159:13-160:18.) However, the prosecutors' notes, which were obtained only after trial, reveal that Cookie discussed details surrounding the shooting but did not mention seeing Mr. Balderas at the crime scene and did not indicate that Mr. Balderas confessed to him. Additionally, Cookie testified that the LTC meeting before Powder's murder was three or four days prior to the killing, but the disclosures revealed that Cookie said the meeting about murdering Powder was "9-10 mos before Powder was killed." (2007 and 2008 Israel "Cookie" Interview Notes, Habeas Writ Record, Vol. III, 00782-804, at 00788.) Powder also testified that "hang[ing] out with other gang members from. . . a rival gang, that's just unacceptable. That's the ultimate betrayal[]" and that it was Powder's hanging out with other gang members that caused his death. (26 RR 146:23-147:2; 149:7-153:1.) The December 2020 disclosures, however, indicate that Cookie told prosecutors that "[i]f caught w/ other gang member get checked (beat up)" and if someone kept doing it, that would be "more serious." (2014 Cookie Notes, at 9.) He does not say that it was the "ultimate betrayal." Cookie further testified that he "truly didn't care" what happened to Powder, even though he "snitched" on him, but the disclosures revealed that Cookie said "the day he (Powder) lost his flag, he lost his

life. . . Every body wanted Powder dead." (2007 and 2008 Cookie Notes, Habeas Writ Record, Vol. III, 00782-804, at 00790.) In sum, in addition to the demonstrably false testimony by Cookie that he "never asked [the prosecutors] for anything[,]" several other recently revealed prosecutors' notes underscore Cookie's unreliability on a number of other points. Nevertheless, the State failed to correct or address these known falsehoods and inconsistencies in violation of Mr. Balderas's due process rights.

## XXII.  CUMULATIVE ERROR

1037.   The cumulative effect of the errors at Mr. Balderas's trial, sentencing hearing, direct appeal, and post-conviction proceedings recited herein, render his conviction and death sentence unconstitutional in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

PRAYER FOR RELIEF

**WHEREFORE**, in consideration of the claims enumerated herein, Petitioner Juan Balderas prays that this Court:

A.    Grant Mr. Balderas any other documents or materials ascertainable after a reasonable opportunity for discovery and an evidentiary hearing so that he can investigate and offer evidence in support of his claims;

B.    Order an evidentiary hearing for the purpose of examining the merits of his claims;

C.    Order a briefing scheduling;

D.    Grant Mr. Balderas a writ of habeas corpus and order him released from the custody of the State;

E.    Vacate his death sentence and conviction; and

F.    Grant any other relief that law or justice may require.

Dated: February 23, 2024

Respectfully submitted,

DLA PIPER LLP (US)

By:    /s/ Ashley Allen Carr
       Ashley Allen Carr (Tex. Bar No.
       24082619)*
       Jeffrey E. Tsai**
       Marc A. Silverman**
       Jessica Park Wright**

*Pro Bono Attorneys for Petitioner Juan Balderas*

*\* Attorney-in-charge as required by Local Rule 11.3*
*\*\* Admitted Pro Hac Vice*

## VERIFICATION

I, the undersigned, am an attorney with DLA Piper LLP (US), pro bono attorneys for Petitioner Juan Balderas. Members of my Firm and I have spoken with Mr. Balderas, consulted with staff at OCFW concerning the history of this case, obtained records from trial counsel, OCFW, and the Harris County District Attorney's Office (as available), and directed experts and investigators regarding the circumstances of Mr. Balderas's conviction and sentence of death. It is in that capacity that I verify this Petition.

I declare under penalty of perjury that the foregoing allegations in this Petition are true and correct to the best of my knowledge and that this Petition for Writ of Habeas Corpus is being filed using this Court's CM/ECF system.

Subscribed by me on February 23, 2024, in Austin, Texas.

/s/ Ashley Allen Carr
Ashley Allen Carr (Tex. Bar No. 24082619)

336

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served courtesy copies of the foregoing

Petition for Writ of Habeas Corpus (Second Amended) Under 28 U.S.C. § 2254 to the following

recipients:

1.      Juan Balderas
         TDCJ # 999590
         TDCJ Polunsky Unit
         3872 FM 350 South
         Livingston, TX 77351

2.      Ali Mustapha Nasser
         Office of the Attorney General
         300 W. 15th Street
         Austin, Texas 78701
         ali.nasser@oag.texas.gov

3.      Brian Rose
         Harris County District Attorney's Office
         1201 Franklin Street, 6th Floor
         Houston, Texas 77002
         rose_brian@dao.hctx.net

This certification is executed on February 23, 2024, in Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.

_/s/ Donna L. Look_____
Donna L. Look

337

## APPENDIX A – LIST OF KEY FIGURES

| Person | Role |
|---|---|
| Balderas, Juan | The Petitioner. Nicknamed "Apache." Currently confined on death row for the 2014 murder of Eduado "Powder" Hernandez. |
| *La Tercera Crips ("LTC") and Other Street Gangs* | |
| Acuna, Pedro | LTC member, nicknamed "Trey," who was shot by Jose "Debo" Luviano on March 4, 2004. |
| Arevalo, Victor | LTC in 2004 and 2005. Nicknamed "Gumby." Brother of Willie Arevalo. |
| Arevalo, Willie | LTC Member. Brother of Victor "Gumby" Arevalo. |
| Benitez, Walter | Former LTC member. Nicknamed "Kool-Aid." |
| Diaz, Israel | LTC member, nicknamed "Cookie," who was "snitched" on by the victim, Eduardo "Powder" Hernandez, for stealing a vehicle at gunpoint and subsequently arrested in December 2004 for aggravated robbery. Cookie also faced a capital murder charge, which was later dropped to an aggravated robbery charge in exchange for his testimony against Juan Balderas at trial. |
| Ferrufino, Edgar | MS-13 member and boyfriend of Wendy Bardales who was in the apartment on Corporate Drive at the time of the shooting on December 6, 2005. |
| Garcia, Alejandro | LTC member, nicknamed "Twin," whose backyard was used for LTC meetings. Twin brother of Pedro "Twin" Garcia. Garcia testified against Juan Balderas in exchange for a deal reducing a capital murder charge to an aggravated robbery charge. |
| Garcia, Pedro | LTC member, nicknamed "Twin," whose backyard was used for LTC meetings. Twin brother of Alejandro "Twin" Garcia. |
| Hernandez, Eduardo | LTC member, nicknamed "Powder," who was killed on December 6, 2005 and is the victim in this case. |
| Lopez, Efrain | LTC member, nicknamed "Hairless." |

| | |
|---|---|
| Luviano, Jose | Former LTC member, nicknamed "Debo," who LTC falsely blamed for a murder at the Loma Vista Shooting. |
| Perez, Jose | LTC member, nicknamed "Pepe," with knowledge of LTC's operations and conspiracies who was never asked to testify at Mr. Balderas's trial. |
| Silder, Rigalado | LTC member who, on December 16, 2005, was arrested with Mr. Balderas. |
| Vazquez, Jose | LTC member, nicknamed "Chango," who visited the Corporate Drive apartment on December 6, 2005 before the shooting. |
| *Key Individuals* | |
| Bardales, Karen | Witness present at the crime scene at Corporate Drive on December 6, 2005. Girlfriend of the victim, Eduardo "Powder" Hernandez, and sister of Wendy Bardales. |
| Bardales, Wendy | Witness present at the crime scene at Corporate Drive on December 6, 2005. Identified Juan Balderas as the shooter after being asked on three different occasions with two different photo arrays. Sister of Karen Bardales. |
| Chavez, Daniela | Friend of Juan Balderas and girlfriend of Willie Arevalo. |
| Cortes, Ileana | Was with Juan Balderas at her family's apartment on Corporate Drive the night of December 6, 2005, during Powder's shooting. Sister of Anali Garcia and Octavio Cortes. |
| Cortes, Octavio | Was with Juan Balderas at her family's apartment on Corporate Drive the night of December 6, 2005, during Powder's shooting. Brother of Anali Garcia and Ileana Cortes. |
| Decorado, Durjan | Nicknamed "Rata." Lived in the apartment on Corporate Drive and was a witness present at the crime scene on December 6, 2005. |
| Garcia, Anali | Was with Juan Balderas at her family's apartment on Corporate Drive the night of December 6, 2005, during Powder's shooting. Sister of Octavio Cortes and Ileana Cortes. |
| Hernandez, Miriam | Sister of Eduardo "Powder" Hernandez. |

339

| Quinones, Angelina | Identified Juan Balderas, Efrain Lopez, and Israel Diaz as individuals allegedly involved in an extraneous offense. |
|---|---|
| ***Juan Balderas's Family*** | |
| Balderas, Sr., Juan | Juan Balderas's father. |
| Escobar (Balderas), Yancy | Juan Balderas's wife. |
| Reyes, Marina | Juan Balderas's aunt. |
| Reyes, Paloma | Juan Balderas's cousin. |
| Reyes, Maria Victoria | Juan Balderas's mother. |
| ***Attorneys, Judges, and Law Enforcement*** | |
| Bennett, Traci | Assistant District Attorney in the Harris County District Attorney's Office who presented the State's case at the guilt/innocence phase of Juan Balderas's trial beginning on February 18, 2014. |
| Cruser, Jeff | Sergeant in the homicide division of the Houston Police Department who responded to crime scene at Corporate Drive on December 6, 2005. |
| Cunningham, Thomas | Investigator in the homicide division of the Houston Police Department in December 2005. Took Wendy Bardales's statement on the night of the shooting. |
| Davis, David | Sergeant in the Harris County Sheriff's Office. |
| Dozier, Caroline | Assistant District Attorney in the Harris County District Attorney's Office who presented the State's case at the guilt/innocence phase of Juan Balderas's trial beginning on February 18, 2014. |
| Graham, Spence | Former Assistant District Attorney in the Harris County District Attorney's Office who was assigned Juan Balderas's case in 2009. In 2012, Spence Graham was replaced by another prosecutor, Paula Hartman. |
| Grant, S.L. | Officer in the Houston Police Department who was dispatched to the scene of the shooting at Corporate Drive on December 6, 2005. |

| | |
|---|---|
| Godinich, Jr., Jerome | Defense counsel who represented Juan Balderas at trial. |
| Guiney, The Hon. Kristin | Former Judge in the 179th District Criminal Court who initially presided over Juan Balderas's trial when it commenced on February 17, 2014. After losing reelection, Judge Randy Roll was assigned to Juan Balderas's trial. |
| Hartman, Paula | Assistant District Attorney in the Harris County District Attorney's Office who was assigned Juan Balderas's case in 2012 after Spence Graham. In 2013, Paula Hartman was replaced by another prosecutor, Traci Bennett. |
| Nunnery, Alvin | Defense counsel who represented Juan Balderas at trial. |
| McFaden, Mary | Assistant District Attorney in the Harris County District Attorney's Office who met with witness Alejandro Garcia on December 19, 2013. |
| Moreno, Rick | Officer in the homicide division of the Houston Police Department who was involved in Juan Balderas's arrest on December 16, 2005. |
| Poa, Gloria | Legal secretary who worked for Jerome Godinich, Juan Balderas's trial counsel. |
| Ponder, Clint | Sergeant in the gang unit of the Houston Police Department who testified at Juan Balderas's trial regarding the LTC hierarchy. |
| Pool, Christopher | Correctional officer in Harris County who testified during the punishment phase of Juan Balderas's trial. |
| Roll, The Hon. Randy | Judge in the 179th District Criminal Court who presided over Juan Balderas's case after Judge Guiney lost reelection. He was recused from the case for bias, and the mater was assigned to Judge Baylor Wortham. |
| Ruland, Norman Thomas | Sergeant in the homicide division of the Houston Police Department who interviewed Wendy Bardales and presented her with two different photo arrays on two different occasions. |
| Scott, Robert R. | Appointed as one of Juan Balderas's defense counsel after a grand jury returned the indictment against Juan Balderas. |
| Shearer, R. Scott | Appointed as one of Juan Balderas's defense counsel after a grand jury returned the indictment against Juan Balderas. Also appointed as Juan Balderas's counsel for direct appeal. |

| St. Martin, Stephen | One of at least two prosecutors assigned to Juan Balderas's case between 2005 and 2009. |
| --- | --- |
| Termulen, Eric | Officer in the Houston Police Department who worked on the SWAT team in 2005 and arrested Juan Balderas on December 16, 2005. |
| Wortham, The Hon. Baylor | Judge assigned to Juan Balderas's case on December 28, 2017, after Judge Roll's recusal. |
| Weston, Mitch | Lieutenant in the Harris County Fire Marshal's Office who responded to the Bunker Hill Shooting scene on December 17, 2005. |
| ***Other Relevant Individuals*** | |
| Altimore, Courtney | Eyewitness to the Bunker Hill Shooting on December 15, 2005. On November 25, 2020. |
| Brams, Dr. Jolie | Psychologist who testified about the trauma Juan Balderas suffered in his youth during the punishment phase of Juan Balderas's trial. |
| Brams, Dr. Matthew | Psychiatrist who testified about juvenile brain development during the punishment phase of Juan Balderas's trial. |
| Estrada, Juan | Lived in the apartment on Corporate Drive. |
| Esquivel, Monica | Mother of Israel "Cookie" Diaz's girlfriend who reported to law enforcement that Diaz told her Jose "Debo" Luviano had been involved in the Loma Vita Shooting on December 20, 2005. |
| Flores, Myriam | Girlfriend of Eric Romero and who was present in the vehicle when Romero was shot and killed in the Beltway Shooting on December 3, 2005. |
| Gallegos, Judy | Mother of Victor "Gumby" Arevalo's child who dated Arevalo for approximately 5 years. |
| Garcia, Jose | Victim of the Bunker Hill Shooting on December 15, 2005. |
| Garcia, Luis | Victim of the non-fatal Woodfair Drive Shooting on November 14, 2005. |
| Malpass, Roy | Professor emeritus and former director of the criminal justice program at the University of Texas at El Paso. He is an expert on |

| | |
|---|---|
| | eyewitness identification who was retained in this case on January 17, 2014, to review materials related to Wendy Bardales' eyewitness identification of Juan Balderas. |
| Mendel, Dr. Matthew | Psychologist with expertise in working with male victims of sexual abuse who conducted psychological testing on Juan Balderas and testified regarding the trauma that Juan Balderas suffered in his youth. |
| Munoz, Celeste | Mutual friend of Juan Balderas, Wendy Bardales, and Eduardo "Powder" Hernandez. |
| Nguyen, Amy | Expert on geographic information systems who testified during the punishment phase of Juan Balderas's trial. |
| Pelz, Terry | Expert on prison environments and prison gangs who testified during the punishment phase of Juan Balderas's trial. |
| Pickett, Rev. Carroll | A former death row chaplain who spoke with Juan Balderas in the summer of 2012. |
| Rescendez, Roxanne | On November 25, 2020, the State disclosed previously undisclosed prosecutor notes with Roxanne Rescendez dated October 26, 2014. |
| Rodriguez, John | Sociologist and gang expert with a Ph.D. in juvenile justice who testified during the punishment phase of Juan Balderas's trial. |
| Romero, Eric | Victim in the drive-by Beltway Shooting on December 3, 2005. |
| Sepulveda, Guadalupe | Victim (non-fatal) in the Loma Vista Shooting on September 12, 2005. |
| Waters, Millard F. "Fil" | Detective in the Houston Police Department who showed Angelina Quinones a photo array in attempt to procure identifications of the individuals involved in the murder of Jose Garcia on December 15, 2005. |
| Weissfisch, George | One of the prosecutors assigned to Juan Balderas's case between 2005 and 2009. |
| Zamora, Daniel | Victim in the Loma Vista Shooting on September 12, 2005. |