IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JUAN BALDERAS, §
    *Petitioner*, §
     §
v. §
     § CIVIL ACTION NO. 4:20-CV-4262
     § (Death Penalty Case)
BOBBY LUMPKIN, §
Director, Texas Department of §
Criminal Justice, Correctional §
Institutions Division, §
    *Respondent*. §

## ANSWER TO AMENDED PETITION

KEN PAXTON       ALI MUSTAPHA NASSER
Attorney General      Assistant Attorney General
of Texas        *Counsel of Record*

BRENT WEBSTER     P.O. Box 12548, Capitol Station
First Assistant Attorney General  Austin, Texas 78711
           (512) 936-1400
JOSH RENO       ali.nasser@oag.texas.gov
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

*Counsel for Respondent*

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................I

TABLE OF AUTHORITIES ...........................................................X

ANSWER TO AMENDED PETITION ............................................. 1

JURISDICTION............................................................................. 1

PETITIONER'S ALLEGATIONS .................................................... 1

STATEMENT OF THE CASE........................................................ 3

STATEMENT OF FACTS .............................................................. 4

I.    Facts Relating to Guilt ...................................................... 4

II.   Facts Relating to Punishment............................................ 8

    A.    State's punishment case ........................................... 8

        1.    Balderas's juvenile record .............................. 8

        2.    The Loma Vista murder ................................. 10

        3.    The Bissonnet murder .................................... 15

        4.    The Club Creek hooting.................................. 16

        5.    The Bunker Hill murder.................................. 17

        6.    Rounding up LTC........................................... 18

    B.    Defense punishment case ....................................... 20

        1.    Residual doubt evidence ................................ 20

        2.    Balderas's childhood ..................................... 21

        3.    Testimony of Dr. Matthew Mendel ................... 25

        4.    Testimony of Dr. Matthew Brams .................... 27

        5.    Testimony of Dr. Jolie Brams........................... 28

        6.    Evidence of Balderas's risk factors ................... 29

        7.    Evidence that Balderas would not be a future danger
            in prison............................................................ 30

8.    Evidence of Balderas's good character.................................. 32

C.    State's punishment rebuttal......................................... 33

FEDERAL HABEAS STANDARDS ...................................................... 34

I.    Exhaustion of State Court Remedies.................................... 34

II.   State Court Adjudication.............................................. 35

III.  Procedural Default................................................... 37

IV.   Antiretroactivity Limitations ....................................... 39

V.    Evidentiary Development Restrictions................................. 41

VI.   Other Relief Restrictions ........................................... 42

ANSWER ........................................................................ 42

I.    Ground One: Balderas's *Brady* and *Giglio* Claims. ................. 42

A.    The *Brady* and *Giglio* standards................................... 44

B.    The adjudicated claim: alleged suppression of the 2007-
      2008 Diaz interview notes ........................................... 45

      1.    State court presentation of the claim regarding the
            2007-2008 Diaz notes........................................... 45

      2.    Balderas fails to meet his burden under AEDPA. ................ 47

C.    The rest of Balderas's guilt-phase *Brady* claims are
      procedurally defaulted. ............................................. 52

D.    Balderas's procedurally defaulted guilt-phase *Brady* claims
      are alternatively meritless. ........................................ 54

      1.    Balderas fails to establish suppression for all his
            claims because he has offered no evidence that trial
            counsel did not have this information. ........................ 54

      2.    Balderas fails to establish favorability and
            materiality.................................................... 56

            a.    Diaz's statement that hanging out with rival
                  gang members was the "ultimate betrayal" ............... 56

            b.    Diaz's statement that he was not concerned
                  about Hernandez testifying against him. ................ 57

            c.    Diaz's statement that the graffiti near the
                  murder scene was just a coincidence .................... 59

|   | d. | Diaz's allegedly "violent" history with Hernandez. | 60 |
|   | e. | Diaz's jail calls and his hope for a plea deal | 62 |
|   | f. | Speculation about MS-13's involvement in Hernandez's murder | 64 |
|   | g. | Information that everyone gave Balderas guns to hold. | 68 |
|   | h. | Alleged *Brady* evidence from Angelina Quinones | 70 |

3. Even cumulating these claims, Balderas cannot show materiality. .................................................. 72

E. Balderas's punishment-phase *Brady* claim is meritless. ........... 74

II. Ground Two: Balderas Claims that Trial Counsel Were Ineffective at the Guilt Phase of Trial. ....................................................................... 77

A. The *Strickland* standard ............................................... 78

B. Balderas's IATC voir-dire claim ................................... 80

1. IATC-voir-dire strategy ........................................ 81

2. IATC-preservation-of-record .............................. 84

C. Balderas's IATC-speedy-trial claim ............................. 85

1. Background on Balderas's motion for speedy trial ........... 85

2. Balderas fails to meet his burden under AEDPA ............. 87

D. Balderas's failure-to-investigate claims ....................... 94

1. Balderas's failure-to-investigate-LTC claim ............. 94

a. The LTC hierarchy and the "violent" faction versus the "business" faction ....................... 94

b. Evidence that Arevalo murdered Hernandez at Diaz's request. ................................... 98

c. Wendy Bardales's motive to frame Balderas for Hernandez's murder. ........................... 101

d. Diaz's alleged attempt to frame Balderas while in jail. ........................................ 103

2. Balderas's IATC-alibi claim ........................... 105

|   |   | a. | Trial counsel's investigation of an alibi defense .... | 106 |

b. Balderas's IATC-alibi allegations and evidence..... 108

c. State court findings on the IATC-alibi claim ........ 109

d. Balderas fails to meet his burden under AEDPA................................................................. 113

E. Balderas's IATC-identification-expert claim ............................ 117

    1. Trial counsel's strategic decision to retain Dr. Malpass but not present his testimony to the jury. ......... 118

    2. The CCA's denial of this claim was reasonable. .............. 120

F. Balderas's IATC-juror misconduct claim.................................. 123

    1. Alleged failure to investigate bus-waiving incident. ....... 123

    2. Alleged failure to investigate hotel accommodations ...... 125

G. Balderas's novel "flat fee" and "excessive caseload" presumption ............................................................................ 127

III. Ground Three: Balderas Claims That Trial Counsel Were Ineffective at the Punishment Phase of Trial ............................................................. 129

A. Failure-to-investigate-extraneous-offenses claim. .................... 130

    1. Failure to impeach Courtney Altimore............................. 131

    2. Failure to present evidence that other LTC members borrowed Balderas's car. ................................................ 132

    3. Failure to present evidence that Balderas was dissociating from LTC........................................................ 134

    4. Failure to present evidence that LTC would retaliate against its own members by framing them. ..................... 138

    5. Balderas cannot show prejudice given the staggering evidence that he was involved in all the extraneous shootings and murders. ..................................... 141

B. Failure to present mitigating evidence...................................... 143

    1. *Wiggins* jurisprudence ...................................................... 143

    2. Failure to present evidence of violent and abusive childhood................................................................. 145

        a. Trial counsel's mitigation investigation ................ 146

iv

|   | b. | Trial counsel's mitigation presentation | 147 |

c. The CCA's denial of this claim was not unreasonable. ......... 151

3. Balderas's new evidence is barred under § 2254(d) and § 2254(e)(2) and, in the alternative, would not establish trial counsel's ineffectiveness. .......... 153

a. Balderas's new evidence is barred under § 2254(d) and § 2254(e)(2). ................... 153

b. This evidence fails to show trial counsel's ineffectiveness. ......... 155

C. Trial counsel's alleged failure to preserve the record ............... 160

1. Failure to object on Fifth Amendment grounds .............. 160

2. Failure to preserve denial of funding ............... 165

D. Trial counsel's alleged behavior at punishment ....................... 170

IV. Grounds Four and Five: Balderas's IATC-Competency and Standalone Competency Claims ................ 173

A. Claims four and five are time-barred. ....................... 173

B. Claims four and five are procedurally defaulted. ................. 176

C. Balderas's new evidence is barred by § 2254(e)(2). .................. 179

D. Claim five is meritless. ................ 180

1. Competency standard ..................... 180

2. Balderas's evidence of incompetency ................ 181

3. Balderas's expert reports are unreliable given his experts' failures to consider his exaggeration of symptoms. ................ 182

4. Even if he is mentally ill, Balderas has failed to submit any evidence that he was incompetent at the time of trial. ................ 186

E. Claim four is plainly meritless. ................ 191

V. Claim Six: Ineffective Assistance of Appellate Counsel ...................... 193

A. All of Balderas's IAAC claims are unexhausted and procedurally defaulted. ................ 193

B.   Balderas's failure-to-investigate claims on direct appeal are meritless. ................................................................ 194

C.   Balderas's claims that appellate counsel should have raised claims that appellate counsel, in fact, *did* raise. ....................... 197

D.   The remaining IAAC claims are meritless. ............................... 197

VI.   Claim Seven: Balderas Argues That Trial Counsel Violated His Autonomy Right to Put on an Alibi Defense. ....................................... 201

A.   Claim seven is procedurally defaulted. .................................... 202

B.   Claim seven is meritless and *Teague*-barred. ........................... 203

VII.   Ground Eight: Equal Protection ......................................... 206

A.   State court adjudication ............................................... 206

B.   Procedural default ................................................... 207

C.   In the alternative, the claim fails. ..................................... 209

VIII.   Ground Nine: Biased Jury Claim ........................................ 212

A.   Balderas's external influence claims ...................................... 212

1.   The bus-waving incident ................................................ 214

a.   Evidentiary hearing on the waving incident .......... 214

b.   The CCA's denial of this claim was not an unreasonable application of Supreme Court law ................................................................. 217

2.   Hotel accommodations .................................................... 221

3.   Social media posts ..................................................... 223

a.   Evidence of the social media posts ......................... 223

b.   Balderas fails to show the state court decision was unreasonable ..................................................... 225

B.   Juror misconduct claims ................................................. 229

1.   Improper expertise testimony ............................................ 229

2.   Issues with the translator .............................................. 231

3.   Consideration of death penalty at punishment .............. 234

4.   Allegations of premature decisions ................................. 236

C.     Balderas fails to show harm under *Brecht*. ................................ 238

IX.   Ground Ten: Balderas's Challenges to the Texas Special Issues........ 238

A.     This claim is procedurally defaulted........................................... 239

B.     Balderas's challenge to the future danger special issue is foreclosed by precedent................................................... 241

C.     Balderas's challenge to the 10-12 Rule is foreclosed by precedent. ...................................................................... 242

D.     Balderas is precluded from relying on juror affidavits here. .... 243

X.    Ground Eleven: Suggestive Identification............................................. 244

A.     Factual background of the identification ................................... 245

B.     The law on out-of-court identifications....................................... 247

C.     The CCA's decision was not unreasonable. ............................... 249

1.     The impermissibly suggestiveness determination........... 249

2.     Substantial-likelihood-of-misidentification determination. .............................................................. 256

D.     Balderas cannot show *Brecht* harm. ........................................... 260

XI.   Ground Twelve: Mitigation Special Issue ............................................. 261

A.     Procedural default ....................................................................... 262

B.     Alternatively, Balderas fails to meet his burden under § 2254(d). ............................................................................ 263

XII.  Ground Thirteen: Balderas Claims He Is Actually Innocent. ............. 264

XIII. Ground Fourteen: Balderas's Challenge to Texas's Death Penalty Scheme................................................................................ 267

A.     Some of the claims are duplicates of claims raised elsewhere in Balderas's petition. ................................................. 269

B.     All these claims are unexhausted and procedurally defaulted.................................................................. 269

C.     All these claims are legally frivolous. ......................................... 270

1.     Ground 14(b): failure to provide district attorneys with a uniform method for determining which cases should be prosecuted as death penalty cases. .................. 270

2. Ground 14(c): The use of the word "probability" in the future dangerousness special issue ................................. 273

3. Ground 14(e): Permitting judge to determine relevancy at sentencing. ................................... 274

4. Ground 14(f): Failure to properly narrow the class of persons eligible for the death penalty. ............................ 275

5. Ground 14(g): Texas's death penalty is not based on a uniform national standard. ............................... 276

6. Ground 14(h): Failure to provide for proportionality review of death sentences ................................. 276

7. Ground 14(k): Permitting introduction of unadjudicated offenses at punishment ............................ 277

8. Ground 14(l): Permitting introduction of juvenile offenses at punishment ...................................... 278

9. Claim 14(m): Texas's alleged failure to create appellate standards regarding the special issues ........... 279

10. Claim 14(n): Failure to include the special issues in the indictment ................................. 280

D. Conclusion ................................................ 281

XIV. Ground Fifteen: Balderas Alleges His State Habeas Proceedings Violated Due Process. ...................................... 281

XV. Ground Sixteen: Balderas Alleges That His Right to Substitute Counsel was Violated. ...................................... 284

XVI. Ground Seventeen: Balderas Alleges That the Death Penalty Is Unconstitutional. ...................................... 288

XVII. Ground Eighteen: Habeas Counsel Ineffectiveness ............................ 291

XVIII. Ground Nineteen: Lethal Injection ...................................... 292

XIX. Ground Twenty: Incompetence to Be Executed. ................................. 297

XX. Ground Twenty-One: False Testimony ................................. 298

A. The *Napue* standard ................................................ 298

B. Except for claim 21(b), all of claim 21 is procedurally defaulted. ...................................... 299

C.    All the false-testimony claims are meritless. ............................ 300

1.    False-testimony claims premised on the 2007-2008 Diaz Notes. ........................................................................ 300

a.    Diaz's testimony that Balderas confessed to murdering Hernandez. ........................................... 300

b.    Diaz's statement that the meeting to decide whether to kill Hernandez took place nine months before the murder, not mere days. ........... 304

c.    Diaz's statement that he didn't care what happened to Hernandez. .......................................... 305

2.    That flashing rival gang signs is the "ultimate betrayal." ........................................................................ 306

3.    That Diaz never asked the prosecutors for anything. ..... 307

XXI.  Ground Twenty-Two: Cumulative Error ............................................ 309

CONCLUSION .............................................................................................. 311

CERTIFICATE OF SERVICE ...................................................................... 313

# TABLE OF AUTHORITIES

## CASES

*Adams v. Thaler,*
  421 F. App'x 322 (5th Cir. 2011) .................................................... 279

*Aguilar v. Dretke,*
  428 F.3d 526 (5th Cir. 2005) ........................................................ 240

*Akins v. Easterling,*
  648 F.3d 380 (6th Cir. 2011) ........................................................ 285

*Alexander v. Johnson,*
  211 F.3d 895 (5th Cir. 2000) ........................................................ 312

*Allen v. Stephens,*
  805 F.3d 617 (5th Cir. 2015) ................................................. 270, 271

*Amos v. Scott,*
  61 F.3d 333 (5th Cir. 1995) .......................................................... 207

*Anderson v. Harless,*
  459 U.S. 4 (1982) ........................................................................ 35

*Anderson v. Quarterman,*
  204 F. App'x 402 (5th Cir. 2006) ................................................... 280

*Apprendi v. New Jersey,*
  530 U.S. 466 (2000) .................................................................... 280

*Ayestas v. Davis,*
  584 U.S. 28 (2018) ...................................................................... 271

*Ayestas v. Davis,*
  933 F.3d 384 (5th Cir. 2019) ........................................................ 159

*Bailey v. Nagle,*
  172 F.3d 1299 (11th Cir. 1999) ....................................................... 38

*Balderas v. State*,

    517 S.W.3d 756 (Tex. Crim. App. 2016) .................................................. passim

*Banks v. Dretke*,

    540 U.S. 668 (2004) ....................................................................................... 52

*Barker v. Wingo*,

    407 U.S. 514 (1972) ....................................................................................... 86

*Barr v. Lee*,

    591 U.S. 979 (2020) ..................................................................................... 294

*Batiste v. Davis*,

    Civ. No. H-15-1258, 2017 WL 4155461 (S.D. Tex. Sep. 19, 2017) ..... 128, 129

*Battaglia v. Stephens*,

    621 F. App'x 781 (5th Cir. 2015).................................................................. 83

*Baxter v. Palmigiano*,

    425 U.S. 308 (1976) ..................................................................................... 162

*Baze v. Rees*,

    553 U.S. 35 (2008) ....................................................................................... 297

*Beazley v. Johnson*,

    242 F.3d 248 (5th Cir. 2001) ............................................................... 263, 282

*Bell v. Cone*,

    535 U.S. 685 (2002) ..................................................................................... 171

*Bible v. Davis*,

    739 F. App'x 766 (5th Cir. 2018).................................................................. 294

*Bigby v. Stephens*,

    595 F. App'x 350 (5th Cir. 2014).................................................................. 280

*Blue v. Thaler*,

    665 F.3d 647 (5th Cir. 2011) ................................................. 42, 242, 243, 274

*Blystone v. Pennsylvania,*

    494 U.S. 299 (1990) ................................................................. 274

*Bobby v. Van Hook,*

    558 U.S. 4 (2009) ..................................................................... 129

*Bordenkircher v. Hayes,*

    434 U.S. 357 (1978) ................................................................. 272

*Bousley v. United States,*

    523 U.S. 614 (1998) ................................................................. 265

*Bower v. Quarterman,*

    497 F.3d 459 (5th Cir. 2007) ................................................... 134

*Boyer v. Vannoy,*

    863 F.3d 428 (5th Cir. 2017) ................................................... 282

*Brady v. Maryland,*

    373 U.S. 83 (1963) ..................................................................... 42

*Brecht v. Abrahamson,*

    507 U.S. 619 (1993) ................................................................... 42

*Brewer v. Landrigan,*

    562 U.S. 996 (2010) ................................................................. 295

*Briscoe v. County of St. Louis, Missouri,*

    690 F.3d 1004 (8th Cir. 2012) ................................................. 250

*Brooks v. Dretke,*

    418 F.3d 430 (5th Cir. 2005) ................................................... 213

*Brown v. Davenport,*

    596 U.S. 118 (2022) ..................................................... 36, 37, 42

*Brown v. Dretke,*

    419 F.3d 365 (5th Cir. 2005) ........................................... 277, 281

*Bruce v. Estelle,*

    483 F.2d 1031 (5th 1973) ................................................................. 180

*Bruce v. Estelle,*

    536 F.2d 1051 (5th Cir. 1976) ........................................................... 180

*Brumfield v. Cain,*

    576 U.S. 305 (2015) ............................................................................ 36

*Bryant v. Scott,*

    28 F.3d 1411 (5th Cir. 1994) ............................................................. 116

*Bryson v. Ward,*

    187 F.3d 1193 (10th Cir. 1999) .......................................................... 188

*Buchanan v. Kentucky,*

    483 U.S. 402 (1987) ........................................................................... 163

*Bucklew v. Precythe,*

    587 U.S. 119 (2019) .................................................................. 289, 296

*Buntion v. Lumpkin,*

    31 F.4th 952 (5th Cir. 2022) .............................................................. 298

*Burket v. Angelone,*

    208 F.3d 172 (4th Cir. 2000) .............................................................. 181

*Burt v. Titlow,*

    571 U.S. 12 (2013) ............................................................................... 80

*Busby v. Davis,*

    925 F.3d 699 (5th Cir. 2019) ............................................................. 152

*Canales v. Stephens*

    765 F.3d 551 (5th Cir. 2014) .............................................................. 64

*Carter v. Stephens,*

    805 F.3d 552 (5th Cir. 2015) ............................................................. 242

*Carty v. Thaler,*

    583 F.3d 244 (5th Cir. 2009) ........................................................ 144

*Castille v. Peoples,*

    489 U.S. 346 (1989) .................................................................... 35

*Castillo v. Stephens,*

    640 F. App'x 283 (5th Cir. 2016).................................................. 141

*Chaidez v. United States,*

    568 U.S. 342 (2013) .................................................................... 40

*Clark v. Collins,*

    19 F.3d 959 (5th Cir. 1994) ........................................................ 164

*Clark v. Thaler,*

    673 F.3d 410 (5th Cir. 2012) ...................................................... 159

*Claudio v. United States,*

    No. 4:09-CR-57-FL, No. 4:12-CV-229-FL, 2014 WL 582953 (E.D.N.C. Feb.

    13, 2014).................................................................................... 89

*Coble v. Quarterman,*

    496 F.3d 430 (5th Cir. 2007) ............................................... 152, 159

*Coleman v. Quarterman,*

    456 F.3d 537 (5th Cir. 2006) .............................................. 248, 272

*Coleman v. Thompson,*

    501 U.S. 722 (1991) ..............................................................passim

*Conley v. United States,*

    415 F.3d 183 (1st Cir. 2005)............................................. 58, 62, 76

*Cooper v. Harris,*

    581 U.S. 285 (2017) .................................................................. 290

*Cox v. McNeil,*

    638 F.3d 1356 (11th Cir. 2011) .................................................... 83

*Cullen v. Pinholster*,

    563 U.S. 170 (2011) ...............................................................passim

*Davila v. Davis*,

    582 U.S. 521 (2017) ............................................... 37, 177, 194, 202

*Davila v. Davis*,

    650 F. App'x 860 (5th Cir. 2016)...................................... 242, 243

*Davis v. Ayala*,

    576 U.S. 257 (2015) ....................................................................... 36

*Day v. Quarterman*,

    566 F.3d 527 (5th Cir. 2009) ............................................. 104, 113

*De La Paz v. State*,

    279 S.W.3d 336 (Tex. Crim. App. 2009) .................................... 134

*Dennes v. Davis*,

    797 F. App'x 835 (5th Cir. 2020)....................................... 64, 67, 75

*Derden v. McNeel*,

    978 F.2d 1453 (5th Cir. 1992) ..................................................... 311

*Druery v. Thaler*,

    647 F.3d 535 (5th Cir. 2011) ...................................................... 242

*Duncan v. Henry*,

    513 U.S. 364 (1995) ...................................................................... 35

*Dunn v. Reeves*,

    594 U.S. 731 (2021) ...................................................................... 80

*Dusky v. United States*,

    362 U.S. 402 (1960) .................................................................... 180

*Eddings v. Oklahoma*,

    455 U.S. 104 (1982) .................................................................... 274

*Edwards v. Vannoy,*

    593 U.S. 255 (2021) .................................................................. 40, 203

*Eldridge v. Davis,*

    661 F. App'x 253 (5th Cir. 2016)........................................... 184, 186

*Enriquez v. Procunier,*

    752 F.2d 111 (5th Cir. 1984) ...................................................... 180

*Evans v. Davis,*

    875 F.3d 210 (5th Cir. 2017) ...................................................... 168

*Evitts v.* Lucey,

    469 U.S. 387 (1985) ................................................................... 282

*Ex parte Balderas,*

   No. WR-84,066-01, 2019 WL 6885361, (Tex. Crim. App. Dec. 18, 2019)

    ..........................................................................................passim

*Ex parte Balderas,*

   No. WR-84,066-03, 2023 WL 7023648 (Tex. Crim. App. Oct. 25, 2023)

    ..........................................................................................passim

*Ex parte Elizondo,*

    947 S.W.2d 202 (Tex. Crim. App. 1996) ..................................... 265

*Ex parte Torres,*

    943 S.W.2d 469 (1997).............................................................. 195

*Felkner v. Jackson,*

    562 U.S. 594 (2011) ..................................................................... 35

*Fitzpatrick v. United States,*

    178 U.S. 304 (1900) ................................................................... 163

*Foster v. Quarterman,*

    466 F.3d 359 (5th Cir. 2006) ............................................... 264, 265

xvi

*Fulks v. United States,*

    875 F. Supp. 2d 535 (D.S.C. 2010) ................................................................ 82

*Fuller v. Johnson,*

    114 F.3d 491 (5th Cir. 1997) ....................................................................... 213

*Furman v. Georgia,*

    408 U.S. 238 (1972) .................................................................................... 276

*Galloway v. County of Nassau,*

    No. 19-CV-5026 (AMD) (JMW), 2024 WL 1345634 (E.D.N.Y. Mar. 29, 2024)

    .................................................................................................................... 251

*Garza v. Stephens,*

    738 F.3d 669 (5th Cir. 2013) ......................................................................... 83

*Georgia v. McCollum,*

    505 U.S. 42 (1992) ..................................................................................... 209

*Giglio v. United States,*

    405 U.S. 150 (1972) ................................................................................ 43, 44

*Gissendaner v. Commissioner, Georgia Dept. of Corrections,*

    779 F.3d 1275 (11th Cir. 2015) .................................................................. 297

*Glossip v. Gross,*

    576 U.S. 863 (2015) .............................................................. 293, 294, 297

*Godinez v. Moran,*

    509 U.S. 389 (1993) ................................................................................... 181

*Gomes v. Brady,*

    564 F.3d 532 (1st Cir. 2009) ....................................................................... 163

*Graham v. Collins,*

    506 U.S. 461 (1993) ............................................................................ 40, 264

*Graves v. Cockrell,*

    351 F.3d 143 (5th Cir. 2003) ............................................................ 265, 266

*Gray v. Douglas*,

    No. 2:21-cv-11356, 2023 WL 6519259 (E.D. Mich. Oct. 5, 2023) .............. 285

*Gray v. Lucas*,

    677 F.2d 1086 (5th Cir. 1982) ...................................................................... 290

*Green v. Davis*,

    479 F. Supp. 3d 442 (S. D. Tex. 2020) ........................................................ 190

*Green v. Johnson*,

    160 F.3d 1029 (5th Cir. 1998) ...................................................................... 169

*Green v. Lumpkin*,

    No. 20-70021, 2023 WL 2941470 (5th Cir. Apr. 23, 2023) ........................ 190

*Greer v. Thaler*,

    380 F. App'x 373 (5th Cir. 2010) .................................................................. 237

*Gregg v. Georgia*,

    428 U.S. 153 (1976). ................................................................ 270, 271, 289

*Gregory v. Thaler*,

    601 F.3d 347 (5th Cir. 2010) ...................................................................... 144

*Griffin v. California*,

    380 U.S. 609 (1965) ...................................................................................... 162

*Griffith v. Kentucky*,

    479 U.S. 314 (1987) ...................................................................................... 203

*Grossman v. McDonough*,

    466 F.3d 1325 (11th Cir. 2006) .................................................................. 144

*Grotemeyer v. Hickman*,

    393 F.3d 871 (9th Cir. 2004) .............................................................. 230, 231

*Hall v. Thaler*,

    EP-10-CV-135-FM, 2011 WL 13185739 (W.D. Tex. Dec. 20, 2011)............. 84

*Hardy v. Cross,*
    565 U.S. 65 (2011) .................................................................. 35

*Harper v. Lumpkin,*
    64 F.4th 684 (5th Cir. 2023) ........................................... 164, 240

*Harrington v. Richter,*
    562 U.S. 86 (2011) ...........................................................passim

*Hatten v. Quarterman,*
    570 F.3d 595 (5th Cir. 2009) .................................................. 240

*Hawthorne v. Phelps,*
    Civ. No. 11-682-GMS, 2014 WL 4954300 (D. Del. Sep 23, 2014) ...... 285, 286

*Hays v. Alabama,*
    85 F.3d 1492 (11th Cir. 1996) .................................................. 49

*Henderson v. Norris,*
    118 F.3d 1283 (8th Cir. 1997) ................................................ 141

*Herrera v. Collins,*
    904 F.2d 944 (5th Cir. 1990) ................................................. 260

*Herrerra v. Collins,*
    506 U.S. 390 (1993) ............................................................ 265

*Herring v. New York,*
    422 U.S. 853 (1975) ............................................................ 171

*Hill v. Davis,*
    781 F. App'x 277 (5th Cir. 2019) ............................................. 311

*Hill v. McDonough,*
    547 U.S. 573 (2006) ............................................................ 293

*Hinton v. Alabama,*
    571 U.S. 263 (2014) ............................................................ 158

*Howard v. Bouchard,*

    405 F.3d 459 (6th Cir. 2005) ...................................................................... 260

*Hughes v. Dretke,*

    412 F.3d 582 (5th Cir. 2005) ...................................................................... 277

*Hughes v. Johnson,*

    191 F.3d 607 (5th Cir. 1999) .............................................................. 207, 243

*Hummel v. Davis,*

    908 F.3d 987 (5th Cir. 2018) ...................................................................... 263

*In re West,*

    119 F.3d 295 (5th Cir. 1997) ...................................................................... 290

*Indiana v. Edwards,*

    554 U.S. 164 (2008) ................................................................ 175, 180, 192

*J.E.B. v. Alabama ex rel. T.B.,*

    511 U.S. 127 (1994) .................................................................................... 230

*Jackson v. Johnson,*

    194 F.3d 641 (1999) .................................................................................... 310

*Jackson v. Virginia,*

    443 U.S. 307 (1979) .................................................................................... 279

*Jacobs v. Scott,*

    31 F.3d 1319 (5th Cir. 1994) ...................................................................... 243

*James v. Kentucky,*

    466 U.S. 341 (1984) ...................................................................................... 38

*Johnson v. Cockrell,*

    306 F.3d 249 (5th Cir. 2002) ...................................................................... 279

*Johnson v. Estelle,*

    704 F.2d 232 (5th Cir. 1983) ...................................................................... 187

*Johnson v. State,*

    691 S.W.2d 619 (Tex. Crim. App. 1984) ..................................................... 276

*Jones v. Barnes,*

    463 U.S. 745 (1983) ........................................................................ 196, 199

*Jones v. United States,*

    527 U.S. 373 (1999) ................................................................................. 242

*Juluke v. Cain,*

    134 F. App'x 684 (5th Cir. 2005) ............................................................. 260

*Jurek v. Texas,*

    428 U.S. 262 (1976) ...................................................... 274, 276, 290

*Kansas v. Cheever,*

    571 U.S. 87 (2013) .................................................................................. 163

*Kerr v. Thaler,*

    384 F. App'x 400 (5th Cir. 2010) ........................................................ 242, 273

*King v. Davis,*

    883 F.3d 577 (5th Cir. 2018) .................................................................. 144

*Kitchens v. Johnson,*

    190 F.3d 698 (5th Cir. 1999) .................................................................. 152

*Knowles v. Mirzayance,*

    556 U.S. 111 (2009) ........................................................................... 79, 145

*Knox v. Cain,*

    Civ. No. 5:13-cv-241-KHJ, 2023 WL 4053413

    (S.D. Miss. June 16, 2023) ............................................................... 128, 129

*Koch v. Puckett,*

    907 F.2d 524 (5th Cir. 1990) ............................................................. passim

*Kubat v. Thieret,*

    867 F.2d 351 (7th Cir. 1989) .................................................................. 242

*Kutzner v. Cockrell*,

    303 F.3d 333 (5th Cir. 2002) ........................................................ 50

*Kyles v. Whitley*,

    514 U.S. 419 (1995). ...................................................................... 72

*Ladd v. Cockrell*,

    311 F.3d 349 (5th Cir. 2002) ...................................................... 117

*Ladd v. Livingston*,

    777 F.3d 286 (5th Cir. 2015) ...................................................... 295

*Lambrix v. Singletary*,

    520 U.S. 518 (1997) ...................................................................... 40

*Lang v. Bobby*,

    No. 5:12 CV 2923, 2015 WL 1423490 (N.D. Ohio Mar. 27, 2015) .............. 172

*Leal v. Dretke*,

    428 F.3d 543 (5th Cir. 2005) ...................................................... 241

*Lee v. Davis*,

    No. 04CV74632-DT, 2006 WL 276732 (E.D. Mich. 2006) .......................... 253

*Lee v. Kemna*,

    534 U.S. 362 (2002) ...................................................................... 38

*Legenzoff v. Steckel*,

    564 F. App'x 136 (6th Cir. 2014) .............................................. 252

*Lewis v. Horton*,

    No. 5:18-cv-12542, 2021 WL 4443346 (E.D. Mich. Sep. 28, 2021) ............. 254

*Lockyer v. Andrade*,

    538 U.S. 63 (2003) ........................................................................ 37

*Lookingbill v. Cockrell*,

    293 F.3d 256 (5th Cir. 2002) ...................................................... 289

*Lowenfield v. Phelps*,

    484 U.S. 231 (1988) ...................................................................... 275

*Macias v. Shinn*,

    No. C-21-02094-PHX-JJT(MTM), 2022 WL 20636347 (D. Ariz. Oct. 11,

    2022)............................................................................................. 237

*Manson v. Brathwaite*,

    432 U.S. 98 (1977) ........................................................................ 247

*Marquez v. City of Albuquerque*,

    399 F.3d 1216 (10th Cir. 2005) .................................................. 231

*Martel v. Clair*,

    565 U.S. 648 (2012) ...................................................................... 286

*Martinez v. Dretke*,

    404 F.3d 878 (5th Cir. 2005) ...................................................... 159

*Martinez v. Johnson*,

    255 F.3d 229 (5th Cir. 2001) ...................................................... 277

*Martinez v. Quarterman*,

    481 F.3d 249 (5th Cir. 2007) ...................................................... 172

*Mata v. Johnson*,

    99 F.3d 1261 (5th Cir. 1996) ............................................... 208, 209

*Mayle v. Felix*,

    545 U.S. 644 (2005) ...................................................................... 174

*Mays v. Stephens*,

    757 F.3d 211 (5th Cir. 2014) ...................................................... 186

*McCleskey v. Kemp*,

    481 U.S. 279 (1987) ............................................................... 272, 290

*McCoy v. Louisiana*,

    584 U.S. 414 (2018) ................................... 202, 203, 204, 205

xxiii

*McCoy v. North Carolina,*
494 U.S. 433 (1990) ...................................................................... 243

*McDonald v. Johnson,*
139 F.3d 1056 (5th Cir. 1998). .................................................... 42

*McQuiggin v. Perkins,*
569 U.S. 383 (2013) ...................................................................... 265

*McWee v. Weldon,*
283 F.3d 179 (4th Cir. 2002) ...................................................... 138

*Medina v. California,*
505 U.S. 437 (1992) ...................................................................... 192

*Miles v. Dorsey,*
61 F.3d 1459 (10th Cir. 1995) ..................................................... 184

*Mills v. Maryland,*
486 U.S. 367 (1988) ...................................................................... 243

*Milton v. State,*
572 S.W.3d 234 (Tex. Crim. App. 2019) ................................... 201

*Missouri v. Frye,*
566 U.S. 134 (2012) ........................................................................ 88

*Moody v. Lumpkin,*
70 F.4th 884 (5th Cir. 2023) ...................................................... 291

*Moore v. Anderson,*
154 F.3d 417, 1998 WL 526790 (5th Cir. 1998) ....................... 128

*Moore v. Johnson,*
194 F.3d 586 (5th Cir. 1999) ...................................................... 172

*Moore v. Quarterman,*
526 F.Supp.2d 654 (W.D. Tex. 2007) ....................................... 277

*Moore v. Quarterman,*

    533 F.3d 338 (5th Cir. 2008) .......................................................... 35

*Morris v. Slappy,*

    461 U.S. 1 (1983) ........................................................................ 285

*Mullen v. Blackburn,*

    808 F.2d 1143 (5th Cir. 1987) ...................................................... 310

*Mullis v. Lumpkin,*

    47 F.4th 380 (5th Cir. 2022) ............................................... 177, 202

*Murphy v. Davis,*

    901 F.3d 578 (5th Cir. 2018) ................................................... 50, 73

*Murray v. Carrier,*

    477 U.S. 478 (1986) ............................................................. 38, 240

*Napue v. Illinois,*

    360 U.S. 264 (1959) ..................................................................... 298

*Neil v. Biggers,*

    409 U.S. 188 (1972) .............................................................. 247, 248

*Nelson v. Lumpkin,*

    72 F.4th 649 (5th Cir. 2023) ................................................ 44, 153

*Newbury v. Stephens,*

    756 F.3d 850 (5th Cir. 2014) ...................................................... 178

*Nobles v. Johnson,*

    127 F.3d 409 (5th Cir. 1997) ........................................................ 38

*O'Dell v. Netherland,*

    521 U.S. 151 (1997) ....................................................................... 40

*O'Sullivan v. Boerckel,*

    526 U.S. 838 (1999) ....................................................................... 34

*Oliver v. Quarterman,*

    541 F.3d 329 (5th Cir. 2008) ...................................................... 238

*Overton v. United States,*

    450 F.2d 919 (5th Cir. 1971) ...................................................... 305

*Padilla v. Kentucky,*

    559 U.S. 356 (2010) ...................................................... 145

*Page v. State,*

    137 S.W.3d 75 (Tex. Crim. App. 2004) ...................................................... 121

*Panetti v. Quarterman,*

    551 U.S. 930 (2007) ...................................................... 297

*Paredes v. Quarterman,*

    574 F.3d 281 (5th Cir. 2009) ...................................................... 241

*Parker v. State,*

    No. 13-13-00128-CR, 2014 WL 6085584 (Tex. App.—Corpus Christi Nov. 13, 2014, pet ref'd) ...................................................... 200

*Parr v. Quarterman,*

    472 F.3d 245 (5th Cir. 2006) ...................................................... 35

*Pawlyk v. Wood,*

    248 F.3d 815 (9th Cir. 2001) ...................................................... 163

*Perry v. New Hampshire,*

    565 U.S. 228 (2012) ...................................................... 247

*Pippin v. Dretke,*

    434 F.3d 782 (5th Cir. 2005) ...................................................... 117

Powell v. Quarterman,

    536 F.3d 325 (5th Cir. 2008) ...................................................... 50

*Premo v. Moore,*

    562 U.S. 115 (2011) ...................................................... 88

*Pulley v. Harris,*

    465 U.S. 37 (1984) ................................................................. 277

*Raby v. Livingston,*

    600 F.3d 552 (5th Cir. 2010) .......................................... 294, 296

*Ramey v. Davis,*

    314 F. Supp. 3d 785 (S.D. Tex. Jul. 11, 2018).............................. 84

*Ramey v. Davis,*

    942 F.3d 241 (5th Cir. 2019) ...................................................... 160

*Ramirez v. Collier,*

    595 U.S. 411 (2022) ................................................................. 293

*Ramirez v. Stephens,*

    Civ. No. 2:12-CV-410, 2015 WL 3629639 (S.D. Tex. Jun. 10, 2015)............ 82

*Remmer v. United States,*

    347 U.S. 227 (1954) ...............................................................passim

*Renteria v. Curry,*

    No. 1:08-cv-01209-AWI-DLB (HC), 2009 WL 2985674 (E.D. Cal. Sep. 16, 2009)............................................................................... 253, 254

*Rich v. State,*

    160 S.W.3d 575 (Tex. Crim. App. 2005) .................................... 201

*Richardson v. Marsh,*

    481 U.S. 200 (1987) ......................................................... 233, 235

*Roberts v. Louisiana,*

    428 U.S. 325 (1976) ................................................................. 289

*Robinson v. State,*

    16 S.W.3d 808 (Tex. Crim. App. 2000) ...................................... 195

*Rocha v. Thaler,*

    619 F.3d 387 (5th Cir. 2010) .................................... 51, 58, 62, 70

*Rocha v. Thaler*,
  626 F.3d 815 (5th Cir. 2010) ........................................................ 37

*Rockwell v. Davis*,
  853 F.3d 758 (5th Cir. 2017) ...................................................... 263

*Rockwell v. Davis*,
  Civ. No. 4:14-CV-1055-O, 2016 WL 4398378 (N.D. Tex. Aug. 18, 2016)... 283

*Romo v. State*,
  631 S.W.2d 504 (Tex. Crim. App. 1982) ...................................... 217

*Rompilla v. Beard*,
  545 U.S. 374 (2005) .................................................................... 157

*Roper v. Simmons*,
  543 U.S. 551 (2005) .................................................................... 278

*Ross v. Yost*,
  No. 20-3477, 2020 WL 6440470 (6th Cir. 2020) ........................... 227

*Roybal v. Davis*,
  148 F. Supp.3d 958 (S.D. Cal. 2015) .......................................... 128

*Ruiz v. Lawlyer*,
  No. 11-1993, 2012 WL 606722 (E.D. Penn. Feb. 2, 2012) .......................... 251

*Sandoval Mendoza v. Lumpkin*,
  81 F.4th 461 (5th Cir. 2023) ...................................................... 282

*Sawyer v. Whitley*,
  505 U.S. 333 (1992) ...................................................................... 39

*Schaetzle v. Cockrell*,
  343 F.3d 440 (5th Cir. 2003) ........................................................ 79

*Scheanette v. Quarterman*,
  482 F.3d 815 (5th Cir. 2007) .............................................. 273, 288

*Schlup v. Delo*,
    513 U.S. 298 (1995) ........................................................ 39, 265, 266

*Schriro v. Landrigan*,
    550 U.S. 465 (2007) ................................................................ 42

*Scott v. United States*,
    Case No. 2:14-cv-0092-SWS, 2015 WL 10877548 (D. Wyo. Apr. 29, 2015)
    ........................................................................................ 128, 129

*Segundo v. Davis*,
    831 F.3d 345 (5th Cir. 2016) .................................................. 157

*Sells v. Livingston*,
    561 F. App'x 342 (5th Cir. 2014) ............................................ 296

*Sexton v. Beaudreaux*,
    585 U.S. 961 (2018) .............................................................. 164

*Sharpe v. Bell*,
    593 F.3d 372 (4th Cir. 2010) .................................................. 266

*Shinn v. Martinez Ramirez*,
    596 U.S. 366 (2022) ..........................................................passim

*ShisInday v. Quarterman*,
    511 F.3d 514 (5th Cir. 2007) .................................................. 298

*Shoop v. Twyford*,
    596 U.S. 811 (2022) ................................................................ 41

*Shore v. Davis*,
    845 F.3d 627 (5th Cir. 2017) .................................................. 204

*Smith v. Cain*,
    565 U.S. 73 (2012) ........................................................ 50, 74, 77

*Smith v. Dretke*,
    522 F.3d 269 (5th Cir. 2005) .................................................. 35

*Smith v. Johnson,*
    216 F.3d 521 (5th Cir. 2000) ........................................................ 208

*Smith v. Maggio,*
    696 F.2d 365 (5th Cir. 1983) ........................................................ 191

*Smith v. Philips,*
    455 U.S. 209 (1982) ........................................................ 213

*Smith v. Robbins,*
    528 U.S. 259 (2000) ........................................................ 195, 196

*Smith v. Spisak,*
    558 U.S. 139 (2010) ........................................................ 173

*Sok v. Romanowski,*
    619 F. Supp. 2d 334 (W.D. Mich. 2008) ........................................ 255

*Sonnier v. Quarterman,*
    476 F.3d 349 (5th Cir. 2007) ....................................... 77, 242, 275

*Sprouse v. Stephens,*
    748 F.3d 609 (5th Cir. 2014) ........................................................ 241

*Stewart v. Smith,*
    536 U.S. 856 (2002) ........................................................ 38

*Stockton v. Virginia,*
    852 F.2d 740 (4th Cir. 1988) ........................................................ 228

*Strickland v. Washington,*
    466 U.S. 667 (1984) ........................................................ 78

*Strickler v. Greene,*
    527 U.S. 263 (1999) ........................................................ 44, 54

*Taylor v. Thaler,*
    397 F. App'x 104 (5th Cir. 2010)................................................ 242, 278

*Teague v. Lane,*
    489 U.S. 288 (1989) ...............................................................passim
*Thomas v. Lumpkin,*
    995 F.3d 432 (5th Cir. 2021) ..................................................... 186
*Thompson v. Cain,*
    161 F.3d 802 (5th Cir. 1998) ............................................ 59, 65, 68
*Thompson v. Davis,*
    No. H-13-1900, 2017 WL 1092309 (S.D. Tex. Mar. 23, 2017) ........... 279, 281
*Tolliver v. Dallman,*
    57 F.3d 1070, 1995 WL 364176 (6th Cir. 1995) ......................... 287
*Tong v. Lumpkin,*
    90 F.4th 857 (5th Cir. 2024) ..............................................passim
*Trevino v. Johnson,*
    168 F.3d 173 (5th Cir. 1999) .................................... 265, 267, 292
*Trevino v. Thaler,*
    569 U.S. 413 (2013) ............................................................ 194
*Tucker v. Johnson,*
    242 F.3d 617 (5th Cir. 2001) ................................................. 298
*Turner v. United States,*
    582 U.S. 313 (2017) ............................................................. 50
*United States v, Crotteau,*
    218 F.3d 826 (7th Cir. 2000) ................................................. 124
*United States v. Amiel,*
    95 F.3d 135 (2d Cir. 1996)................................................. 58, 62
*United States v. Armstrong,*
    517 U.S. 456 (1996) ............................................................ 272

xxxi

*United States v. Bagley,*

    473 U.S. 667 (1985) ...................................................... 44

*United States v. Barraza,*

    982 F.3d 1106 (8th Cir. 2020) ...................................... 181

*United States v. Bernard,*

    762 F.3d 467 (5th Cir. 2014) ....................................... 141

*United States v. Boigegrain,*

    155 F.3d 1181 (10th Cir. 1998) ................................... 190

*United States v. Bourgeois,*

    423 F.3d 501 (5th Cir. 2005) ....................................... 280

*United States v. Brown,*

    650 F.3d 582 (5th Cir. 2011) ....................................... 283

*United States v. Brown,*

    Civ. No. 3:15-cr-00001-TCB-2, 2015 WL 5156193 (N.D. Ga. Sep. 2, 2015)

    ...................................................................................... 253

*United States v. Casey,*

    825 F.3d 1 (1st Cir. 2016)............................................ 250

*United States v. Cruz-Valdez,*

    773 F.2d 1541 (11th Cir. 1985) ................................... 231

*United States v. Daniels,*

    97 F.4th 800 (11th Cir. 2024) ............................. 122, 253

*United States v. Diaz,*

    922 F.3d 998 (2d Cir. 1990)........................................ 55

*United States v. Dixon,*

    132 F.3d 192 (5th Cir. 1997) ................................. 55, 56

*United States v. Edwards,*

    488 F.2d 1154 (5th Cir. 1974) ..................................... 191

*United States v. Fails*,
    51 F. App'x 211 (9th Cir. 2002)......................................................................... 199

*United States v. Fields*,
    761 F.3d 443 (5th Cir. 2014) ......................................................................... 308

*United States v. Fleming*,
    216 F.3d 1084, 2000 WL 486265 (9th Cir. 2000) ........................................ 255

*United States v. Flores-Martinez*,
    677 F.3d 699 (5th Cir. 2012) ......................................................................... 189

*United States v. Frady*,
    456 U.S. 152 (1982) ......................................................................................... 39

*United States v. Fumo*,
    655 F.3d 288 (3d Cir. 2011)........................................................................... 226

*United States v. Gershman*,
    31 F.4th 80 (2d Cir. 2022) ............................................................................. 252

*United States v. Ghane*,
    490 F.3d 1036 (8th Cir. 2007) ....................................................................... 190

*United States v. Gianakos*,
    415 F.3d 912 (8th Cir. 2005) ......................................................................... 237

*United States v. Gibbs*,
    421 F.3d 352 (5th Cir. 2005) ................................................................. 116, 117

*United States v. Green*,
    882 F.2d 999 (5th Cir. 1989) ......................................................................... 144

*United States v. Gregory*,
    54 F.4th 1183 (10th Cir. 2022) ..................................................................... 199

*United States v. Griley*,
    814 F.2d 967 (4th Cir. 1987) ......................................................................... 305

*United States v. Hall,*

    165 F.3d 1095 (7th Cir. 1999) ................................................... 122

*United States v. Harris,*

    281 F.3d 667 (7th Cir. 2002) ..................................................... 250

*United States v. Hiebert,*

    30 F.3d 1005 (8th Cir. 1994) ..................................................... 190

*United States v. Huey,*

    76 F.3d 638 (1996) ................................................................... 207

*United States v. Isaac,*

    134 F.3d 199 (3d. Cir. 1998) ..................................................... 162

*United States v. Jones,*

    172 F.3d 381 (5th Cir. 1999) ..................................................... 265

*United States v. Kechego,*

    91 F.4th 845 (6th Cir. 2024) ..................................................... 227

*United States v. Kelsey,*

    917 F.3d 740 (D.C. Cir. 2019) ................................................... 255

*United States v. Kimler,*

    167 F.3d 889 (5th Cir. 1999) ..................................................... 168

*United States v. Lewis,*

    547 F.2d 1030 (8th Cir. 1976) ................................................... 250

*United States v. Moye,*

    951 F.2d 59 (5th Cir. 1992) ....................................................... 310

*United States v. O'Keefe,*

    128 F.3d 885 (5th Cir. 1997) .............................................. 299, 306

*United States v. O'Keefe,*

    722 F.2d 1175 (5th Cir. 1983) ............................................ 236, 237

*United States v. Olano,*
  507 U.S. 725 (1993) ............................................................ 213, 218

*United States v. Perkins,*
  787 F.3d 1329 (11th Cir. 2015) ................................................ 255

*United States v. Perkins,*
  99 F.4th 804 (5th Cir. 2024) ..................................................... 196

*United States v. Peterson,*
  411 F. App'x 857 (6th Cir. 2011)............................................... 252

*United States v. Ramirez,*
  954 F.2d 1035 (5th Cir. 1992) ................................................... 231

*United States v. Ramos,*
  71 F.3d 1150 (5th Cir. 1995) ..................................................... 220

*United States v. Robinson,*
  485 U.S. 25 (1988) ............................................................ 162, 163

*United States v. Robinson,*
  87 F.4th 658 (5th Cir. 2023) ............................................... 236, 238

*United States v. Saenz,*
  286 F. App'x 166 (5th Cir. 2008)............................................... 252

*United States v. Simpson,*
  645 F.3d 300 (5th Cir. 2011) ..................................................... 189

*United States v. Spano,*
  421 F.3d 599 (7th Cir. 2005) ..................................................... 231

*United States v. Stanford,*
  823 F.3d 814 (5th Cir. 2016) ..................................................... 305

*United States v. Wade,*
  388 U.S. 218 (1967) ................................................................. 252

*United States v. Washington,*

    714 F.3d 962 (6th Cir. 2013) ....................................................... 252

*United States v. Whittington,*

    586 F.3d 613 (8th Cir. 2020) ....................................................... 181

*United States v. Wilks,*

    464 F.3d 1240 (11th Cir. 2006) ................................................... 278

*United States v. Williams,*

    35 F.3d 558, 1994 WL 477912 (4th Cir. 1994) .......................... 257

*United States v. Wintermute,*

    443 F.3d 993 (8th Cir. 2006) ....................................................... 227

*United States v. Wright,*

    57 F.4th 524 (5th Cir. 2023) ....................................................... 116

*United States v. Young,*

    482 F.2d 993 (5th Cir. 1973) ....................................................... 287

*United States v. Ziegler,*

    1 F.4th 219 (4th Cir. 2021) ......................................................... 181

*Valdez v. Cockrell,*

    274 F.3d 941 (5th Cir. 2001) ................................................. 37, 282

*Warger v. Shauers,*

    574 U.S. 40 (2014) ...................................................................... 230

*Watts v. Singletary,*

    87 F.3d 1282 (11th Cir. 1996) ..................................................... 188

*Westley v. Johnson,*

    83 F.3d 714 (5th Cir. 1996) ......................................................... 310

*Whitaker v. Collier,*

    862 F.3d 490 (5th Cir. 2017) ................................................ 295, 297

*Whitaker v. Livingston,*

732 F.3d 465 (5th Cir. 2013) ....................................................................... 295

*White v. Pollard,*

No. 2:18-cv-05057-JFW (AFM), 2020 WL 1173508 (C.D. Cal. Jan. 29, 2020)

................................................................................................................... 90

*White v. Thaler,*

522 F. App'x 226 (5th Cir. 2013) ................................................................. 241

*Whittenburg v. Wener Enters. Inc.,*

561 F.3d 1122 (10th Cir. 2009) ................................................................... 199

*Wiggins v. Smith,*

539 U.S. 510 (2003) ........................................................................... 143, 144

*Wilkerson v. Whitley,*

16 F.3d 64 (5th Cir. 1994) ........................................................................... 143

*Williams v. Lynaugh,*

814 F.2d 205 (5th Cir. 1987) ....................................................................... 290

*Williams v. Taylor,*

529 U.S. 362 (2000) ...................................................................................... 36,

*Williams v. Taylor,*

529 U.S. 420 (2000) ...................................................................................... 41,

*Wilson v. Bradt,*

Civ. No. 6973(KBF), 2014 WL 4116960 (S.D.N.Y. Aug. 20, 2014) ........... 228

*Winn v. Washburn,*

Case No. 2:18-cv-02426-TLP-tmp, 2021 WL 4496952 (W.D. Tenn. Sep. 30,

2021).............................................................................................................. 256

*Wong v. Belmontes,*

558 U.S. 15 (2009) ......................................................................................... 95

*Wood v. Bartholomew,*

    516 U.S. 1 (1995) ................................................................ 65, 72, 74

*Wood v. Collier,*

    836 F.3d 534 (5th Cir. 2016) .................................... 289, 293, 297

*Woodford v. Visciotti,*

    537 U.S. 19 (2002) .......................................................... 36, 152

*Woods v. Cockrell,*

    307 F.3d 353 (5th Cir. 2002) ................................................ 279

*Woods v. Johnson,*

    75 F.3d 1017 (5th Cir. 1996) ............................................... 275

*Woods v. Sinclair,*

    764 F.3d 1109 (9th Cir. 2014) ............................................. 128

*Woodson v. North Carolina,*

    428 U.S. 280 (1976) ............................................................. 276

*Yarborough v. Gentry,*

    540 U.S. 1 (2003) ........................................................ 171, 172

*Yearwood v. Keane,*

    101 F.3d 685, 1996 WL 282134 (2d Cir. 1996) ......................... 258

*Young v. Davis,*

    835 F.3d 520 (5th Cir. 2016) ........................................... passim

*Young v. Davis,*

    860 F.3d 318 (5th Cir. 2017) ............................................... 243

## STATUTES

18 U.S.C. § 3599 ................................................................. 286

28 U.S.C. § 2243 ................................................................... 42

28 U.S.C. § 2244(d) ............................................................. 174

28 U.S.C. § 2254 ................................................................... 1, 3

28 U.S.C. § 2254(d)(1) ............................................................ 219

28 U.S.C. § 2254(d)(2) ....................................................... 209, 210

28 U.S.C. § 2254(e)(1) ................................................ 210, 233, 235

28 U.S.C. § 2254(e)(2) ............................................................. 54

42 U.S.C. § 1983 .................................................................. 293

Tex. Code Crim. Proc. art. 11.071 § 5(a)(1) .............................. 75, 283

Tex. Code Crim. Proc. art. 37.071 § 2(a)(1) ................................. 274

Tex. Code Crim. Proc. art. 37.071 § 2(b)(1) ................................. 273

Tex. Code Crim. Proc. art. 37.071 § 2(f)(4) .................................. 261

## RULES

Fed. R. Civ. P. 15(c)(1)(B) ....................................................... 174

Fed. R. Evid. 606(b) ..................................................... 82, 230, 236

Fed. R. Evid. 606(b)(1) ........................................................... 235

Tex. R. App. P. 21.4(a) ........................................................... 126

Tex. R. App. P. 33.1 .............................................................. 198

Tex. R. App. P. 44.2(b) ........................................................... 201

Tex. R. Evid. 405(a)(1) ............................................................ 96

Tex. R. Evid. 801 ................................................................. 65

## ANSWER TO AMENDED PETITION

In 2014, Petitioner Juan Balderas was properly convicted of capital murder and sentenced to death for the 2005 murder of Eduardo Hernandez. *Balderas v. State*, 517 S.W.3d 756, 762 (Tex. Crim. App. 2016). The State's evidence showed that Balderas entered an apartment where Hernandez was staying and executed him at point-blank range with a .40 caliber semiautomatic handgun. Balderas now petitions this Court under 28 U.S.C. § 2254, or AEDPA,[1] to vacate this presumptively valid judgment condemning him to death.

## JURISDICTION

This Court has jurisdiction to consider the merits of Balderas's petition under § 2254.

## PETITIONER'S ALLEGATIONS

Balderas presents the following grounds for relief:

1.    The State violated Balderas's due process rights by failing to disclose exculpatory and impeaching evidence;

2.    Trial counsel were ineffective at the guilt phase of trial;

3.    Trial counsel were ineffective at the punishment phase of trial;

---

[1]    The Anti-Terrorism and Effective Death Penalty Act.

1

4.   Trial counsel were ineffective for failing to raise the issue of Balderas's competency;

5.   Balderas's due process rights were violated because he was tried while incompetent;

6.   Appellate counsel was ineffective;

7.   Trial counsel violated Balderas's right to put on an alibi defense;

8.   Trial counsel and the State violated Balderas's equal protection rights by agreeing to exclude African Americans from the jury;

9.   Balderas was not tried by an impartial jury;

10.  Balderas's death sentence was arbitrarily and capriciously imposed due to inadequacies in Texas's special issues;

11.  Balderas's due process rights were violated by an unduly suggestive photo identification;

12.  Texas unconstitutionally narrows the evidence a jury may consider as mitigating;

13.  Balderas is actually innocent;

14.  Texas's death-penalty scheme is unconstitutional;

15.  Balderas's state-habeas proceedings violated due process;

16.  Balderas's right to substitute counsel was violated;

17.  The death penalty is unconstitutional;

18.  Balderas's state-habeas counsel were ineffective;

19.  Lethal injection violates Balderas's right against cruel and unusual punishment;

20.  Balderas is incompetent to be executed;

2

21.     Balderas's due process rights were violated by the State's knowing presentation of false testimony; and

22.     Balderas's allegations of error should be cumulated for harm.

## STATEMENT OF THE CASE

On March 14, 2014, Balderas was sentenced to death for the capital murder of Eduardo Hernandez. 12.CR 3355.[2] Balderas appealed his conviction, and the Texas Court of Criminal Appeals (CCA) affirmed the trial court's judgment. *Balderas*, 517 S.W.3d at 799. He also filed a state-habeas application, which the CCA denied in 2019. *Ex parte Balderas*, No. WR-84,066-01, 2019 WL 6885361, at *1–3 (Tex. Crim. App. Dec. 18, 2019). His case then moved to federal court, where he filed a federal habeas petition under 28 U.S.C. § 2254. ECF No. 2. In December 2022, this Court stayed federal proceedings so that Balderas could exhaust his unexhausted claims in state court. ECF No. 57.

Back in state court, Balderas filed a subsequent state-habeas application. *See* SHCR-03.[3] The CCA dismissed the application in its entirety

---

[2]     "CR" indicates the clerk's record at trial, followed by the page number. "RR" indicates the reporter's record at trial, preceded by volume number and followed by the page number.

[3]     "SHCR-03" refers to the single volume of the state-habeas clerk's record of Balderas's third state-habeas proceeding, followed by page number. "SHCR-01" refers

as an abuse of the writ. *Ex parte Balderas*, No. WR-84,066-03, 2023 WL 7023648, at *1 (Tex. Crim. App. Oct. 25, 2023).

This Court reopened proceedings on December 22, 2024, ECF No. 67, and, on January 24, 2024, this Court issued a scheduling order, ordering Balderas to amend his petition within thirty days. ECF No. 69. In accordance with the order, Balderas filed his amended petition on February 23, 2024. ECF No. 70 (referred to as "Pet."). The Director's answer follows.

STATEMENT OF FACTS

## I.    Facts Relating to Guilt

On direct appeal, the CCA provided the following summary of the facts of Balderas's capital murder of Hernandez:

> In 2004, the victim, Eduardo Hernandez, became a member of the Barrio Tres Alief ("BTA"), a regional subset of the La Tercera Crips ("LTC") street gang in Houston. Balderas, a long-time member of the LTC gang and one of the founding members of the BTA subset, had introduced Hernandez to the gang. Initially, the other LTC members liked Hernandez, and Hernandez was proud to be part of the gang. LTC member Israel Diaz befriended Hernandez, and for a while Hernandez lived with Diaz. However, in late 2004, this friendship soured after Diaz let Hernandez borrow a vehicle that Diaz had stolen the week before. Police officers stopped and arrested Hernandez while he was driving the stolen vehicle. After Hernandez informed them that he had borrowed the vehicle from Diaz, they arrested Diaz for aggravated robbery.

to the state-habeas clerk's record of Balderas's initial state-habeas proceeding, preceded by volume number and followed by page number. "EHRR-01" refers to the reporter's record in Balderas's initial state-habeas proceedings.

Diaz bonded out of jail in April 2005. He was angry with Hernandez for "snitching" on him. He "lectured" Hernandez about giving his name to the police, and Hernandez promised that he would not testify against Diaz in the aggravated robbery case. Balderas's defense counsel argued at trial that Hernandez's snitching gave Diaz a motive for murder, but Diaz denied that he wanted to kill Hernandez. Diaz testified that he knew that two other witnesses could identify him as the thief and that police had found his fingerprints on the stolen vehicle; therefore, preventing Hernandez from testifying would not have helped him avoid the robbery conviction. Also, because of the pending robbery case, Diaz knew that he would be the first suspect if anything happened to Hernandez. Diaz testified that even though he personally did not want to kill Hernandez, other LTC members viewed Hernandez's conduct as being disrespectful of the gang and thought that Hernandez needed to be punished. Diaz testified that he asked those members to wait until his trial was over before they took action against Hernandez.

After the snitching incident, Hernandez stopped associating with other LTC gang members. He also moved out of his family home so that LTC members could not easily locate him. In August or September 2005, he began dating Karen Bardales ("Karen"). Hernandez and Karen spent much of their time "hanging out" in an apartment belonging to one of Karen's friends, Durjan Decorado, who was not in a gang. Karen's older sister, Wendy Bardales ("Wendy"), and Wendy's boyfriend, Edgar Ferrufino, also spent much of their time in that apartment. Karen and Wendy's friends, including members of several rival gangs, would visit them there. Hernandez socialized with those friends.

Over the next few months, LTC gang members heard rumors that Hernandez was associating with members of rival gangs and flashing rival gangs' hand signs, which constituted acts of disloyalty and disrespect against the LTC gang. After seeing images of Hernandez on social media confirming these rumors, some indignant LTC members urged the gang to take action against him. Three or four days before Hernandez's killing, senior members of the gang called a meeting. Those in attendance agreed

to shoot and kill Hernandez. Although they did not expressly select an individual to kill him, everyone understood that Hernandez was Balderas's responsibility because he had introduced Hernandez to the gang.

On the afternoon of December 6, 2005, Wendy, Ferrufino, Karen, and Hernandez were hanging out in Decorado's apartment. Jose Vazquez, a senior LTC gang member, stopped by to talk to Hernandez. Karen began saying disrespectful things about the LTC gang, which upset Vazquez. Vasquez wanted Hernandez to leave the apartment with him, but Hernandez refused. Hernandez was visibly upset after Vazquez left. He told Karen that he was worried that something was going to happen. Later, Hernandez left with his sister to go shopping and have dinner. He and Karen reunited at the apartment complex that night.

Around 9:45 p.m., Wendy, Ferrufino, Decorado, and Decorado's cousin were in Decorado's apartment. Ferrufino and Wendy were playing a video game in the living room. As Karen and Hernandez approached the apartment, Karen noticed fresh LTC gang graffiti on the exterior wall. Immediately after entering the apartment, they heard gunshots, and then the front door opened and a gunman ran into the apartment. Hernandez dropped to the floor and pulled Karen down with him, positioning himself between Karen and the gunman. Decorado and his cousin fled to the bedrooms, and Ferrufino crouched next to the television stand. Wendy, who was sitting on the floor between the couch and the television, froze. She could see the gunman as he entered the apartment, and her eyes followed him until he left.

The gunman fired his gun as he ran around the living room. Wendy saw that he was wearing khaki pants and a black hoodie, with the hood pulled up over his head. She got a good look at his face when his hood fell down as he passed her. The gunman paused in front of Ferrufino, who asked him not to shoot. He did not shoot Ferrufino and began to move back toward the entryway, but then he stopped and stood over Hernandez. He shot Hernandez in the back and head multiple times. Karen, who was lying face-down next to Hernandez, did not see the gunman's face, but when the gunman extended his arm toward Hernandez, Karen could see

6

that he was wearing a black sweater. After shooting Hernandez at least nine times, the gunman left. Ferrufino called 9-1-1.

Around that time, Diaz heard from another LTC gang member that "they" had "found [Hernandez,]" which Diaz understood to mean that Hernandez was about to be (or had just been) killed. He and other LTC members gathered across the street from the apartment complex. They could see an ambulance and police cars in the parking lot. Diaz saw Balderas waiting near the apartment complex. Balderas was wearing a dark blue or black sweater-like top and khakis. When Balderas noticed Diaz and the others, he crossed the street to join them. Balderas hugged everyone and seemed "joyful" as he reported that he "finally got him." Diaz saw Balderas change the magazine of a silver handgun. Diaz recognized the handgun as one of two silver guns that Balderas regularly carried.

That night, law enforcement officials took Wendy, Karen, and Ferrufino to the police station to give witness statements. In the early morning hours of December 7, Wendy gave a statement that was committed to writing by Officer Thomas Cunningham. Wendy stated that she had never seen the gunman before, and she described him as a "skinny Hispanic guy dressed in a black hooded sweatshirt type jacket." She also stated that he had a "dark birth mark" on his face but she could not remember where.

Around 10:30 p.m., Sergeant Norman Ruland drove to Wendy's apartment to show her a photo array of six suspects that included Diaz but not Balderas. Wendy did not identify the gunman, but she recognized Diaz. She stated that he was a friend of Hernandez who went by the street name "Cookie," and that she was sure he was not the gunman. She told Ruland that the gunman had a dark mark on his cheek that did not resemble the scars that were visible on Diaz's face.

On December 12, Ruland returned to Wendy's apartment with a second photo array that included Balderas's photograph. Wendy immediately pointed to Balderas, saying that she recognized him as a friend of Hernandez and Diaz who went by the street name "Apache." She also stated that he "looked like the

7

shooter." When Ruland asked Wendy if Balderas was the shooter, she reiterated that Balderas's "face looked exactly like the shooter's face." She signed and dated Balderas's photograph to confirm her identification. Although Ruland felt that Wendy was confident in her identification of Balderas as the gunman, he was confused by her verbal phrasing in making the identification. Therefore, the following day, he returned to Wendy's apartment to seek clarification. On this occasion, Wendy expressly identified Balderas as the gunman, stating that she was positive in her identification. She wrote a sentence in Spanish on the back of the lineup to confirm her positive identification. Based on this identification, police obtained a warrant for Balderas's arrest.

On December 16, Officer Rick Moreno drove to an apartment complex where he watched for Balderas and another LTC gang member, Rigalado Silder, and waited for the assistance of a SWAT team. After Moreno had been watching the complex for about 25 minutes, he observed Balderas and Silder leave an upstairs apartment and start down the stairs. Each man was carrying a large box, and Balderas had a black bag slung over his shoulder. When they saw the SWAT team arriving, Balderas and Silder set everything down and started running. Moreno caught Silder in the apartment complex, while the SWAT team pursued Balderas into the neighborhood and caught him as he tried to hide under a car. Moreno saw that the boxes and bag contained firearms and other weapons, bullet-proof vests, identification holders, magazines, and ammunition. One of the weapons recovered from the box that Balderas had been carrying was a handgun that was later identified, through ballistics testing, as the murder weapon in Hernandez's killing. A shell casing from a semiautomatic handgun was recovered from Balderas's right rear pants pocket.

*Balderas*, 517 S.W.3d at 763–65.

## II.    Facts Relating to Punishment

### A.    State's punishment case

#### 1.    Balderas's juvenile record

8

At the beginning of the punishment phase of trial, the State presented evidence of Balderas's juvenile record. First, the State called Jo Droddy Chenier, Balderas's juvenile probation officer. 33.RR 11. Balderas went to juvenile court in May 2001 and was placed on probation for theft, evading arrest, and unauthorized use of a motor vehicle. 33.RR 16.

Chenier listed Balderas's issues as a juvenile, including curfew violations, gang affiliation, truancy, drug use, and verbal disrespect towards his mother. 33.RR 20–21. She went into great detail listing the different programs available to Balderas as a juvenile, including a Drug Free Youth Program, the Association for the Advancement of Mexican Americans (AAMA), a six-week course for gang members, D-tag (a tattoo removal program), and Casa Phoenix Program (CPP) (a drug rehabilitation program). 33.RR 25–32. Despite being involved with some of these programs, Balderas's behavioral issues continued. He was kicked out of CPP for fighting new intakes, and he continued testing positive for drugs. 33.RR 32–35. Eventually his probation was revoked. 33.RR 36.

Balderas was then sent to the juvenile department's Delta 3 Boot Camp. 33.RR 36–37. But again, Balderas was brought back to court for assaulting another boot camp resident in a gang related incident. 33.RR 37–38. He was then sent back to boot camp. 33.RR 40. In October 2002, Balderas was released

back to his mother. 33.RR 40. He entered the D-Tag program to remove his tattoos and started doing better in school. 33.RR 40–41. But despite this improvement, Balderas had trouble fully dissociating from LTC due to his loyalty to the gang. 33.RR 41–44. He was therefore sent to the juvenile department's Project Spotlight Program, which "targeted gang-related . . . serious offender youth" in the Alief area of Houston. 33.RR 42–43. He ultimately completed his probation in April 2003. 33.RR 43.

The State also presented mental health testimony from Balderas's time in the juvenile justice system. Balderas was psychologically evaluated in May 2002, and testing revealed an IQ of 108 and academic testing consistent with his age (fifteen years old). 33.RR 50–52. He was cooperative during his clinical interview. 33.RR 50. He never reported being violent to his parents, but he did report that he once got into a fight with his stepfather. 33.RR 53–54. He denied ever being the victim of sexual abuse." 33.RR 54. As a juvenile, Balderas was diagnosed with adolescent-onset conduct disorder, cannabis abuse, inhalant abuse, cocaine abuse, and alcohol abuse. 33.RR 60.

### 2.   The Loma Vista murder

On September 12, 2005, Guadalupe Sepulveda, a wheelchair-bound drug dealer, was at home with his brother Daniel Zamora in a house Sepulveda rented at 6401 Loma Vista Dr. 33.RR 106; 34.RR 8. At around nine in the

evening on that date, Zamora heard a knock at the door and went to answer thinking it was his son returning to the house. 34.RR 12. When Zamora opened the door, four English-speaking men entered, clad in gloves, black shirts, and face coverings such as bandanas or ski masks. 34.RR 12–17. They threw Zamora to the ground and pointed a gun at Sepulveda's head. 34.RR 19.

Of the four men, one holding a shotgun appeared to be the leader, as he was giving orders and demanded that the victims hand over all the money, drugs, and jewelry in the house or else he would "kill" them. 34.RR 19–21. Two men with handguns and the leader with the shotgun forced Sepulveda to roll his wheelchair into the bedroom. 34.RR 19–20. The remaining gunman stayed behind to keep an eye on Zamora. 34.RR 20. In his bedroom, Sepulveda had marijuana and cocaine packaged for sale, about $2,400, and two handguns. 34.RR 22–24, 27. Once in the room, the leader kept saying "where's the money" and then hit Sepulveda in the back of his head with the shotgun, knocking him out of his wheelchair to the floor. 34.RR 29. The leader kept hitting Sepulveda in the back and on his head with the shotgun. 34.RR 31. The leader then started searching the drawers in the room while the other two men held handguns to Sepulveda's head. 34.RR 31. The leader was shouting at the two other gunmen "kill him, kill him." 34.RR 31. The leader also pointed at a picture of Sepulveda's son and said "if you call the police, we're going to come

and we're going to kill all your family." 34.RR 42. At some point, one of the gunmen shot him with an expanding .40 caliber bullet that "tore up" his "intestines." 34.RR 35.

Eventually, the leader left the room and came back with a sheet and the men started searching under the bed and rummaging through the drawers. 34.RR 31–32; SX 220.[4] The men started to put everything they found in the room in the sheet. 34.RR 33. The leader then left the room to find Zamora, while Sepulveda was left with the other two gunmen, pretending to be unconscious. 34.RR 34. Sepulveda then heard a shotgun gunshot come from the living room where Zamora was held. 34.RR 34. He continued to play dead. 34.RR 34. And as the men left the house with the sheet of valuables and Sepulveda's cell phone, he heard another two shots in the room where he last saw Zamora. 34.RR 36–37. Sepulveda's neighbors then came over, followed shortly thereafter by the police and an ambulance. 34.RR 38. Zamora died of a shotgun wound to the abdomen and a gunshot wound to the left thigh. 34.RR 89–90. Sepulveda was taken to the hospital. 34.RR 38.

Alejandro Garcia testified to Balderas's involvement in the Loma Vista murder. He testified that he was hanging out at a corner store when Balderas,

---

[4]    "SX" refers to the state's exhibits at trial, followed by the exhibit number.

Israel Diaz, Efrain Lopez, and another man who Garcia believed to be named "Debo"[5] picked him up in a white Dodge Stratus. 34.RR 206. Once in the car, Garcia saw a shotgun and two other guns. 34.RR 208. They drove down Loma Vista and saw two men in a house through the kitchen window. 34.RR 209; SX 170 (picture of house). Diaz continued driving the car up and down the street while they observed the house. 34.RR. 210. They began talking about the men in the kitchen and Garcia heard Diaz mention a man in a wheelchair. 34.RR 211. Then they drove to a field behind the house and walked through the field towards the house. 34.RR 212. Lopez carried a shotgun, Balderas carried a chrome silver .40 caliber handgun, Garcia carried a .38 caliber handgun given to him by Balderas or Lopez, and "Debo" carried a gun that might have been a 9-millimeter handgun. 34.RR 213–14. While they did not tell Garcia what was about to happen, he took the gun because he did not want to lose their respect and be denied entry into LTC. 34.RR 214–15. Diaz stayed in the car. 34.RR 217.

Balderas and Lopez approached the front door and rushed in when someone answered the door. 34.RR 218. One man laid down in the living room.

---

[5]     Garcia identified the fourth person as "Debo," but this appears to have been an incorrect identification, as "Debo" is Jose Luviano, who was in custody at the time of the Loma Vista shooting. The State had issued a notice to trial counsel that Garcia incorrectly identified the fifth Loma Vista perpetrator as Luviano. 3.SHCR-01 884.

13

34.RR 218. Balderas wheeled Sepulveda into the bedroom and began demanding money, drugs, and guns. 34.RR 220. Lopez hit the man in the living room in the head with a shotgun and then hit him in the ribs. 34.RR 221. Garcia then went into the bedroom and saw Balderas continuing to threaten Sepulveda and his family. 34.RR 224. Garcia then began carrying boxes from the house back to the car and left Sepulveda alone with Balderas in the bedroom; he then heard a gunshot come from the bedroom. 34.RR 225. As he walked through the living room to exit the house he saw Lopez pointing a shotgun at Zamora, as Zamora pleaded that he not to "kill" him because he "had a little girl." 34.RR 227. Despite these pleas, Lopez shot Zamora. 34.RR 227. Garcia then walked back towards the car and was followed by Balderas and Lopez running out of the house; Balderas holding a sheet full of valuables. 34.RR 228, 233. Once they were all in the car, a white truck coming down the street began slowing down and driving up next to their car; Balderas and Lopez pointed their guns at the truck, and then it they drove away. 34.RR 228–29. On the drive back, Diaz asked Balderas if he shot anyone and Balderas gave a "smirk, like a short laugh." 34.RR 232–33.

Homicide detective Mike Walker found a fired .40 caliber shell casing on a couch in the living room and recovered another casing from Sepulveda. 34.RR 112–14; SX 184, 185. The two casings found at the scene were shown to be .40

14

Caliber S&W shell casings that were fired from the same .40 Taurus semiautomatic pistol Balderas used to murder Eduardo Hernandez. 37.RR 118. SX's 75, 110.

### 3.    The Bissonnet murder

On December 3, 2005, Alejandro Garcia and Jose Hernandez, an LTC member, were smoking marijuana in a parking lot when Diaz and Balderas pulled up in a Honda Accord. 35.RR 13. Then another LTC member named "Taz" pulled into the parking lot as well. 35.RR 14–15. Around this time, Eric Romero got off his shift waiting tables and drove to pick up his girlfriend, Myriam Flores, from her job. 35.RR. 205. As he drove her back to his house, they passed the parking lot where the LTC crew was hanging out. 35.RR 16–17. At around 2 a.m., Romero drove Flores back to her house, and they passed the parking lot with the LTC members again. 35.RR 16–18.

After Romero passed them the second time, one of the LTC members mentioned that Romero was affiliated with the Southwest Cholos. 35.RR 18. The LTC members then piled into Balderas's car with their weapons and began pursuing Romero and Flores, Diaz at the wheel. 35.RR 18–22. They eventually caught up to Romero and Flores on the feeder road of Beltway 8 and pulled up beside Romero's car with the front and back passenger windows down. 35.RR 22, 211–13. Balderas and Jose Hernandez then began shooting at Romero's

15

car, Balderas firing a .357 caliber gun. 35.RR 22–24. Romero screamed for Flores to get down before crashing his car into a pole. 35.RR 214. Diaz then made a U-turn and drove away from the scene. 35.RR 25. Flores called 911, and Romero was taken to the hospital where he died of six gunshot wounds. 35.RR 183–97; SX 334–51 (autopsy report).

Among the ballistics evidence recovered from the crime scene were nine .357 cartridge casings. 35.RR 168; SX 254–62. Those nine casings were found to have been fired from the .357 Taurus that Balderas dropped when he was arrested on December 16, 2005. 37.RR 127–31; SX 113.[6]

### 4.    The Club Creek hooting

On November 14, 2005, Luis Garcia was walking towards Club Creek around 4:00 p.m. 36.RR 162. The area was notorious for gang-related activity, most notably LTC, La Primera, and Southwest Cholos. 36.RR 164. As he was walking, a four-door Honda Accord with two people inside stopped next to him, and the driver rolled down his window, pulled out a gun, and fired five to seven gunshots in Garcia's direction. 36.RR 21, 169. Garcia fled the scene by jumping over a gate and then realized he had been shot in the hand. 36.RR 172.

---

[6]    Specifically, the .357 Taurus (SX113) was dropped by Balderas as he ran from SWAT officers on December 16, 2005. 36.RR 231.

Officer S.L. Grant responded to the shooting. 36.RR 31. He met with
Garcia who gave him a description of the shooter. 36.RR 34. He also spoke with
bystander McKinely Polk who saw the shooting. 36.RR 35. Polk gave Officer
Grant the shooter's license plate number: 756 GNB. 36.RR 22–23, 35–36.
Officer Grant ran the plates, which showed that the vehicle was a 1996 Honda
registered to Balderas and that the title to the car was in Balderas's name.
36.RR 37–40; SX 211. An ambulance then arrived at the scene and transported
Garcia to the hospital, where it was determined that Garcia sustained a
gunshot wound to his left hand from a 9-millimeter gun. 36.RR 42; SX 213
(medical records).

Officer Grant further searched the scene for any ballistics evidence.
36.RR 44. He found five spent shell casings. 36.RR 44, 47; SX's 208, 209. Those
five casings were fired from the .357 Taurus that Balderas dropped when
fleeing police on December 16, 2005. 37.RR 122–23, 125–26; SX 113.

### 5.    The Bunker Hill murder

On December 15, 2005, Courtney Altimore was driving home from her
church at around 9:00 p.m. 36.RR 95–97. As she approached the intersection
of Westview and Bunker Hill, she saw three cars: a small silver car was in the
middle of the intersection. 36.RR 99. Another car and a large sedan were pulled
over to the side just past the intersection. 36.RR 98–99. A man got out of the

17

passenger side of the silver car in the intersection and tried to run away. 36.RR 100. Then, another man exited the driver's side of the silver car and shot the fleeing man three to five times in the head. 36.RR 100. The shooter then got back in the silver car, and all three cars drove away from the scene. 36.RR 103. Altimore did not see the shooter because he was wearing a cap and a jacket, but she described him as average height, medium build, and of Hispanic or Asian descent. 36.RR 101–02. Altimore called 911 and gave the license plate of the car the shooter emerged from: 756 GNB, 36.RR 105, which matched the Honda registered to Balderas. 36.RR 22–23; 35–36.

Among the crime scene evidence were projectiles, bullet fragments, and casings. 36.RR 86–89; 37.RR 29; SX 303–06, 331–32. These casings, projectiles, and fragments were determined to have been fired from the .357 Taurus Balderas dropped when fleeing police on December 16, 2005. 37.RR 144–48; SX 113.

### 6.    Rounding up LTC

On December 16, 2005, HPD homicide officers met at a movie theater parking lot between 3:00 and 4:00 a.m. to go over the coordinated arrest of five or six LTC members. 36.RR 226–27. The plan was to catch them all at the same time to take away their ability to notify each other, which would lead to others fleeing or destroying evidence. 36.RR 227.

18

HPD Officer Rick Moreno was tasked with surveying Balderas's apartment until a SWAT team arrive to help with the arrest. 36.RR 228. When Balderas saw law enforcement, he fled, dropping multiple firearms, ammunition for several types of guns, and gun magazines. 36.RR 231–44; SX's 64–75. Balderas was also carrying a bullet-repellant bounty-hunter jacket, a bulletproof vest, and a shoulder holster. 36.RR 241–44; SX's 67–73.

After Balderas was arrested, Officer Patrick Leblanc searched Balderas's apartment pursuant to a search warrant. 37.RR 37; SX 369 (search warrant). In Balderas's apartment, Officer Leblanc found large amounts of cash, cell phones, a machete, marijuana rolling papers, a substance appearing to be marijuana, a substance appearing to be crack cocaine, bags for drug distribution, scales, a plastic bag with thirty-one live 9mm bullets, a pocketknife, a Desert Eagle 9mm semiautomatic pistol, rosary beads, LTC dog tags, a rifle, blue bandanas, a black ski mask, and photos of Balderas posing with guns and friends. 37.RR 36–82; SX 370–432.

The State also presented the testimony of gang expert Sergeant Clint Ponder. 36.RR 267. Ponder testified that the La Tercera Crips were a criminal street gang. 36.RR 268. Ponder noted that, in a pictures of LTC members, Balderas was making a "three point crown" with his hands, a common symbol used by LTC. 36.RR 269; SX 221, 333. Ponder also noted that Balderas had

19

several tattoos that were either common with LTC or Hispanic gangs in general. 36.RR 274–81; SX's 167, 359–67.

### B. Defense punishment case

#### 1. Residual doubt evidence

Despite the jury's finding of guilt, Balderas presented evidence that related to his guilt of the underlying capital offense. Judy Gallegos testified to this effect. Gallegos dated Victor Arevalo, a leader of LTC, and they had a child together. 37.RR 178–79. She said the gang would typically meet at Arevalo's house to make decisions, not Garcia's house, and that Arevalo had the final say on gang decisions. 37.RR 183–85. Gallegos remembered Diaz being angry with Hernandez because for the snitching incident. 37.RR 187. According to Gallegos, a meeting was held at Arevalo's house with about thirteen people present to discuss Hernandez. 37.RR 189. Gallegos claimed that, at this meeting, Diaz and others wanted Hernandez killed, but Balderas did not. 37.RR 189. She did not know if Arevalo ever gave the go ahead to kill Hernandez. 37.RR 190. She recalled that, on the night of the Hernandez murder, Diaz went over to the apartment complex where Hernandez was killed to find out what happened. 37.RR 191–93.

Balderas also presented evidence attacking the credibility of Wendy Bardales. According to Celeste Munoz, Celeste and Wendy would go to

20

Balderas's apartment while he gave people tattoos. 38.RR 11. On one occasion, Wendy was hanging out at Balderas's house when she asked for a tattoo. 38.RR 15–16. When Balderas refused, Wendy and Balderas got into a shouting match. 38.RR 16–17. Balderas then grabbed her and physically forced her out of the house while she shouted that she would have him killed. 38.RR 17.

### 2. Balderas's childhood

Balderas presented evidence of his allegedly chaotic, abusive, and tumultuous childhood. His mother, Vicky Reyes, met his father Juan Balderas Sr. in 1985, and they had Balderas together in 1986. 38.RR 44–45. Neither wanted to be a parent, and Balderas Sr. ultimately left Vicky.[7] 38.RR 45. Vicky claimed that she never loved Balderas and that he was a "nuisance" to her. 38.RR 46. So she would leave Balderas and his younger brother Jesus at home with various male partners to go out and party. 38.RR 47.

In the brief time they were together, Vicky and Balderas Sr. did not get along. Balderas Sr. was seeing another woman, and Vicky was seeing another man as well. 38.RR 48, 88. According to Balderas Sr. they would fight about Vicky romantically seeing other men. 38.RR 90. Vicky claimed that Balderas Sr. was jealous, and their fights would sometimes turn physical, leading to

---

[7]     To avoid confusion, the Director refers to some individuals by their first name where they share a last name with other individuals.

Balderas Sr. hitting Vicky in front of Balderas. 38.RR 48. Sometimes Balderas would hide under his bed or in his closet during these fights. 38.RR 47–48. Eventually Balderas Sr. moved out and did not attempt to visit or communicate with Balderas or Jesus. 38.RR 48–49.

Vicky never thought about how Balderas Sr.'s absence affected her children. 38.RR 50. Instead, she would leave them with neighbors and go out to drink or smoke. 38.RR 50. She eventually met a man named Eleazar Hernandez when Balderas was four or five years old. 38.RR 51. But ultimately that relationship also devolved into physical fights between Vicky and Eleazar, which Balderas witnessed. 38.RR 51–53. Eleazar was also abusive towards Balderas, sometimes beating Balderas with hangers. 38.RR 53. Vicky did not care that Eleazar abused her children because she was obsessed with him and did not want him to leave her. 38.RR 53. She eventually had two sons with Eleazar, Alejandro and Ivan Hernandez. 38.RR 53–54.

In 1992, Vicky brought Balderas and Jesus to Puebla, Mexico to live with her family because she did not want them anymore. 38.RR 57–58. Her sister Marina remembered being surprised when she just showed up. 39.RR 9–10. In the past, Vicky had brought them to visit, but this time she left the boys in Mexico and went back to Houston by herself. 39.RR 9–11. Balderas struggled to adjust to living in Mexico at first, as he missed his mother. 39.RR 12–13. He

would sit on the roof and wait for his mother to return. 39.RR 118. But he eventually adjusted and started going to school. 39.RR 14, 118. Balderas and Jesus became part of the family, and Marina treated Balderas like one of her own children. 39.RR 14, 119. Once he acclimated to his new life, Balderas was respectful, well-mannered, and happy. 39.RR 119.

Vicky then came back for her children in 1996 when Eleazar attempted suicide so that Eleazar could visit a psychiatrist in Mexico. 38.RR 57, 61. They spent two months in Puebla with Vicky's family. 38.RR 61. While they were there, members of Vicky's family noticed Eleazar behaving inappropriately with Balderas. Marina saw Eleazar "caress" Balderas while sitting on the couch; he had Balderas sit on his lap while he touched Balderas's "little parts." 39.RR 18. Balderas's cousin Vianet saw Eleazar put on "adult movies" for the children and saw him watch the boys sleep. 39.RR 124–25.

When Marina confronted Vicky about this behavior, Vicky insisted it was just because Eleazar loved Balderas. 39.RR 18. Vianet also told Vicky about Eleazar's inappropriate behavior, apparently prompting Vicky to leave Puebla, 39.RR 123, and to take her family to Veracruz, Mexico. 38.RR 63–64. Marina pleaded with her sister to let Balderas and Jesus stay, but Vicky insisted that they were her children. 39.RR 16. Balderas did not want to leave Puebla and he ran away for three to four days, before his family found him on the street

23

selling popsicles. 38.RR 62; 39.RR 123. Vicky then took Balderas and Jesus back and moved them to Veracruz, Mexico. 38.RR 62–64. After a year in Veracruz, when Balderas was about eleven years old, Vicky left Eleazar and moved her family back to Houston. 38.RR 66. Eleazar had started abusing Vicky, often wanting to strangle her. 38.RR 66.

Once back in Houston, Vicky would go to work eight to nine hours a day, and Balderas would look after his younger brothers. 40.RR 87–88. At some point, Vicky began noticing Balderas's association with street gangs, but she never gave it much thought. 40.RR 91–92.

### 3.    Testimony of Dr. Matthew Mendel

Balderas presented expert testimony from Dr. Matthew Mendel on the traumatic effect of being sexually abused as a child. Based on his interviews with Balderas and Balderas's mother, brothers, and cousin, Dr. Mendel gave his opinion that Balderas had been sexually abused by Eleazar while growing up. 38.RR 131–35. Dr. Mendel described Balderas's anger and emotion when describing the abuse as "very credible, very believable[.]" 38.RR 131–32, 134. Dr. Mendel also administered the Detailed Assessment of Post-traumatic Symptoms (DAPS), which indicated that Balderas was not embellishing or exaggerating his experiences. 38.RR 134. He testified that Balderas showed several risk factors for post-traumatic stress, including sexual abuse, physical abuse, transitory childhood, looking out for his younger siblings and living in a gang-ridden environment. 38.RR 136–41.

Dr. Mendel also discussed other incidents of sexual abuse that Balderas reported. First, Balderas recounted a man inviting him over when he was seven years old, and the man touching his penis. 38.RR 145–46. He also recounted two experiences with women in Mexico where, as a child, he was sexually abused by older women. 38.RR 147. In one event, he was attending a wedding at eight years old and sipping drinks that he was supposed to carry around. 38.RR 147. Later that night, his sixteen-year-old-cousin led him to bed

25

and started kissing and touching him until his aunt showed up and told her to stop. 38.RR 147. In the other event, his aunt left him alone with her girlfriend, who then sexually abused him. 38.RR 147–48. When Balderas was thirteen or fourteen years old he had sex with a woman in her twenties. 38.RR 148. While Balderas felt these abusive encounters with women were "healing," Dr. Mendel disagreed with that perception, finding the reassurance gained from sexual encounters with females to be a symptom of Balderas doubting his sexuality, which is a "common" impact of sexual abuse. 38.RR 145.

Dr. Mendel also went into how Balderas's childhood abuse touched on the four traumagenic factors: powerlessness, betrayal, stigmatization, and traumatic sexualization. 38.RR 150. Balderas felt powerless and betrayed because his stepfather sexually abused him, and his mother did not protect him. 38.RR 151–52. He also was stigmatized to believe there was something wrong with him. 38.RR 152–53. And finally, he suffered from sexual dysfunction. 38.RR 153–54. According to Dr. Mendel, the fact that the abuse was frequent, severe, perpetrated by a parental figure, and committed against such a young child only exacerbated Balderas's trauma. 38.RR 155–60.

Dr. Mendel also traced Balderas's issues as a teenager back to his childhood abuse. He believed that memories of the abuse fueled Balderas's anger and that his gang provided him with both an outlet for the anger as well

26

as a family he never had. 38.RR 162–63. He opined that Balderas used marijuana to numb his feelings and that he abused inhalants to make himself feel powerful and invincible. 38.RR 164. He also found that Balderas would cut himself and force himself to make difficult emotional decisions, such as hurting people close to him, to make himself stronger. 38.RR 166–68.

### 4.    Testimony of Dr. Matthew Brams

Dr. Matthew Brams,[8] a child and adult psychiatrist, gave testimony that Balderas would not be a future danger to society. 39.RR 147–48. Dr. Matthew Brams reviewed a Personality Assessment Inventory (PAI) of Balderas and Balderas's juvenile and jail records, as well as the psychosocial history of Balderas's childhood. 39.RR 48–54.

Dr. Matthew Brams claimed that the PAI showed Balderas is less aggressive than other inmates. 39.RR 151. He opined that Balderas would be more submissive in a prison population, would avoid conflict, and would view the prison staff as a form of protection. 39.RR 151. While the PAI showed that Balderas scored higher than the normal population on his antisocial scales, his antisocial scale was nevertheless lower than the prison population. 39.RR 151–52. Moreover, Dr. Matthew Brams explained that the antisocial scales were

---

[8]    As Balderas also presented another expert, Dr. Jolie Brams, the Director refers to both by their full names to avoid confusion.

divided into three parts: antisocial behavior (rule-breaking), novelty (thrill-seeking), and egocentricity (vindictiveness, vengefulness, hostility, resentfulness). 39.RR 151–52. While Balderas scored high on antisocial behavior, he had low scores for novelty and egocentricity. 39.RR 152–53. Dr. Matthew Brams also found that through structure and continued brain development due to Balderas's young age, Balderas would be able to mature and cope better in a structured environment. 39.RR 155–59.

### 5.    Testimony of Dr. Jolie Brams

Balderas also presented testimony from Dr. Jolie Brams, a psychologist. 41.RR 251. Dr. Jolie Brams interviewed Balderas several times, interviewed collateral witnesses, and reviewed Balderas's records. 41.RR 259–65. She concluded that Balderas experienced continuing, repeated, and pervasive trauma throughout his life that impacted his functioning during childhood and adolescence. 41.RR 268. She also opined that, according to medical literature, such trauma could affect a person's neurodevelopment, behavior, and mental health functioning over the course of time. 41.RR 268. She concluded that the trauma was directly related to his involvement in gang activity at a young age. 41.RR 269.

Dr. Jolie Brams repeated what other witnesses said: That Balderas's mother was not prepared to be a mother and that she did not understand how

28

to love a child. 42.RR 12–14. Balderas also wasn't provided any role models to show him how to handle his emotions and problem solve. 42.RR 17–19. His childhood exposed him to fighting, arguing, and the need for survival. 42.RR 19. He was constantly abandoned, was sexually abused, and his mother chose his abuser over him. 42.RR 20–21. His stepfather and abuser, Eleazar, was verbally and physically abusive to Balderas and his brother Jesus. 42.RR 24–25. Dr. Jolie Brams found Balderas suffered from complex developmental trauma and that he scored nine out of ten on the adverse-childhood-experiences checklist. 42.RR 42–43.

As a result of this abandonment, Balderas joined a gang to feel safe and release his anger. 42.RR 29–30. Dr. Jolie Brams explained that, as his brain became dysregulated due to trauma and abandonment, Balderas perceived the world as unsafe and unpredictable and thus became vulnerable, angry, and impulsive. 42.RR 34–37. He therefore detached to survive and couldn't understand intimacy or caring. 42.RR 40.

### 6. Evidence of Balderas's risk factors

Balderas presented evidence from Dr. Amy Nguyen, an analyst for a consulting firm. 40.RR 101. Dr. Nguyen testified that she was able to take data from the Department of Justice and analyze risk factors for community disorganization, poverty, and lack of education attainment in the neighborhood

Balderas grew up in. 40.RR 128–47. She described Balderas's neighborhood as "an area that's really struggling" with two decades over which education rates did not improve and poverty rates increased. 40.RR 147.

Balderas also presented testimony from John Rodriguez, a professor who focused on the struggle of Hispanic males and how they fall into gang life. 40.RR 195. He looked at Balderas's life to determine the propensity of him joining a gang. 40.RR 200. He pointed out that Balderas's social environment was disorganized. 40.RR 205. He had no academic aspirations. 40.RR 205. He also noted that Balderas lived in a predominantly black neighborhood where he didn't fit in. 40.RR 206. He had stressors and a lack of self. 40.RR 208, 213. Ultimately, this led to Balderas looking to LTC as his adopted family. 40.RR 208, 214.

### 7.    Evidence that Balderas would not be a future danger in prison.

Balderas also presented evidence that he could be controlled in an institutional setting. He first called Frank Aubuchon, a former TDCJ corrections officer, to explain TDCJ's security measures and classifications. 41.RR 78. He explained that a capital defendant sentenced to life without parole would be sent to intake for a diagnostic process. 41.RR 80–85. After intake, some inmates that are a security threat are sent to segregation. 41.RR 85–89. Those assigned to general population are grouped into "five primary

custodies" that are "based on the risk level of the offender." 41.RR 89. G1 is trustee status, the lowest level of security, and G5 is the highest level of security, reserved for inmates that "have demonstrated that they cannot and will not obey the rules and . . . have acted out in a way that is assaultive or aggressive in nature." 41.RR 90.

Aubuchon testified that a capital murderer sentenced to life without parole would start out as a G3 inmate, so long as there aren't any "indicators requiring a more restrictive custody." 42.RR 92. G3 inmates are always housed at Level 5 prisons, which are considered "maximum security prison[s]." 41.RR 93. They would be assigned to cell block housing and would have to share a cell with someone. 41.RR 93. They would be assigned to the same twenty-four-hour routine everyday. 41.RR 95. A G3 inmate would have to work jobs that wouldn't permit freedom of movement, such as in the laundry room or chow hall. 41.RR 96. He would have some recreational time after work. 41.RR 97. Being lowered to G4 would cause an inmate to lose privileges, such as recreational time, commissary access, or visitation rights. 41.RR 98. A G3 would also have access to the library or the telephone. 41.RR 101–03.

As for security, a cell block has at least one officer assigned at all times. 41.RR 107. The higher the security area, the more guards that are staffed in the area. 41.RR 108. TDCJ prisons are also equipped with "crash gates" that

31

can be used to "shut down and isolate certain portions of the penitentiary at any time you need to in case there's a disturbance." 41.RR 108–09. Cameras are also kept in every unit. 41.RR 109.

Balderas also called Terry Pelz, a prison consultant who met with Balderas and looked over his juvenile history. 41.RR 210. Pelz testified that street gangs are not considered problematic in prison, as they are different from prison gangs. 41.RR 220. He also said that Balderas would have no reason to join a gang in prison, as it would result in being on 23-hour lockdown. 41.RR 221. In Pelz's opinion, TDCJ could handle Balderas. 41.RR 223.

### 8.    Evidence of Balderas's good character

In addition to presenting witnesses to explain his more troubling behavior, Balderas also offered witnesses to tell the jury about his more positive side. Balderas's mother Vicky Reyes testified that Balderas had changed and that he was searching for God. 38.RR 84. Balderas's cousin, Paloma Reyes, testified that Balderas was an important person and that she loved him. 40.RR 195. Judy Gallegos testified that Balderas was always overprotective and respective of the women associated with LTC. 41.RR 41. Daniella Chavez testified that she helped Balderas study and get his diploma. 41.RR 59. She also said that, when Balderas was arrested, they were "helping him get enrolled into the art institute and everything else." 41.RR 59.

32

Balderas also put on evidence of his religious side. He called TDCJ chaplain, Carroll Pickett, who met with Balderas three times, during which Balderas talked about his spirituality. 42.RR 96. Pickett described Balderas as well-versed in the Bible and claimed that Balderas was repentant and sought forgiveness. 42.RR 101–04. Deputy Oscar Gonzalez testified that, on one occasion, he witnessed Balderas talk down an unruly inmate by discussing religion with him. 42.RR 111–13.

## C.    State's punishment rebuttal

In response to Balderas's evidence that he could be controlled in prison, the State presented a bevy of jailhouse infractions in rebuttal. HPD Officer Woodrow Tompkins testified to a November 2005 incident in which Balderas was placed in a holding cell and kicked an inmate lying on the ground. 42.RR 138–39. Tompkins told Balderas he didn't want to see him do that again, and Balderas said "see what motherfucker." 42.RR 139. Tompkins told him to calm down, and Balderas responded, "you calm down bitch." 42.RR 139. Balderas then kicked the inmate again. 42.RR 140–41. Tompkins went into the cell to take Balderas to solitary, and Balderas punched him in the mouth and continued to resist him until other officers arrived. 42.RR 141. In 2009, Balderas also grabbed Officer Chris Aguero's pocketknife during recreational

time and brandished it before ultimately dropping it without further incident. 42.RR 260–65.

The State also presented several incidents in which Balderas was found hoarding contraband in jail. Officer Martin Spears recounted searching Balderas's jail cell in July 2013 at about 3:00 am and finding two brass drill bits hidden in a roll of toilet paper. 42.RR 207–09. In 2010 Balderas was caught with razor blades and thirty-four psychiatric pills in his cell. 42.RR 249–51. In 2012, he was caught hoarding 123 different pills in his cell. 42.RR 216–18, 229–40. The State presented other evidence of Balderas's commission of petty offenses while in jail, such as destruction of property, possession of tattoo paraphernalia, and tampering. 42.RR 170–88.

## FEDERAL HABEAS STANDARDS

## I.    Exhaustion of State Court Remedies

"Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court. In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Exhaustion occurs "when the substance of

the federal habeas claim has been fairly presented to the highest[9] state court."

*Parr v. Quarterman*, 472 F.3d 245, 252 (5th Cir. 2006) (quoting *Smith v. Dretke*, 522 F.3d 269, 275 (5th Cir. 2005)). It doesn't occur when the claim has been raised (1) in a procedural posture that doesn't ensure merits adjudication, *see Castille v. Peoples*, 489 U.S. 346, 351 (1989); (2) using only state, and not federal, law, *see Duncan v. Henry*, 513 U.S. 364, 366 (1995) (per curiam); or (3) alleging only the factual, and not the legal, basis for a claim, *see Anderson v. Harless*, 459 U.S. 4, 6–8 (1982) (per curiam). The determination of "whether a petitioner exhausted his claim in state court is a case- and fact-specific inquiry." *Moore v. Quarterman*, 533 F.3d 338, 341 (5th Cir. 2008) (en banc).

## II.   State Court Adjudication

If a claim is adjudicated on the merits in state court, it must be reviewed under 28 U.S.C. § 2254(d). *Harrington v. Richter*, 562 U.S. 86, 98–99 (2011). This section "imposes a highly deferential standard of review for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Hardy v. Cross*, 565 U.S. 65, 66 (2011) (per curiam) (quoting *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam)). In plainer terms, it is "difficult to meet." *Richter*, 562 U.S. at 102.

---

[9]     The CCA is the highest court in Texas for criminal matters. *Richardson v. Procunier*, 762 F.2d 429, 431 (5th Cir. 1985).

Under § 2254(d), relief may not be granted unless the state-court adjudication (1) "'was contrary to' federal law then clearly established in the holdings of" the Supreme Court, (2) "'involved an unreasonable application of' such law," or (3) "'was based on an unreasonable determination of the facts' in light of the record before the state court." *Id*. at 100 (quoting § 2254(d)(1)–(2)). And "it is the habeas applicant's burden to show that the state court applied [clearly established Supreme Court precedent] to the facts in his case in an objectively unreasonable manner." *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002).

A state-court decision is contrary to clearly established federal law if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or confronts facts that are "materially indistinguishable" from relevant Supreme Court precedent yet reaches an opposite result. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000) (*Terry Williams*). It is an unreasonable application of law if "no 'fairminded juris[t]' could reach the state court's conclusion under th[e Supreme] Court's precedents." *Brown v. Davenport*, 596 U.S. 118, 135 (2022) (alteration in original) (quoting *Davis v. Ayala*, 576 U.S. 257, 269 (2015)). And a factual determination is not unreasonable simply because "'reasonable minds reviewing the record might disagree about the finding in question.'" *Id*. (quoting *Brumfield v. Cain*, 576 U.S. 305, 314 (2015)).

36

Review under § 2254(d) comes with many limitations. For one, a federal court "is limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). For another, "[s]tate-court decisions are measured against [Supreme] Court[] precedents as of 'the time state court renders its decision.'" *Id*. at 183. (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003)). And relief cannot be predicated on Supreme Court dicta, "high level of generality" holdings, or "offend[ing] lower federal court precedents." *Davenport*, 596 U.S. at 136. In addition, state-court findings of fact are "presumed to be correct" and the petitioner carries "the burden of rebutting the presumption of correctness by clear and convincing evidence." § 2254(e)(1). This "not only applies to explicit findings of fact," but also "those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

## III.  Procedural Default

"[A] federal court may not review federal claims that were procedurally defaulted in state court." *Davila v. Davis*, 582 U.S. 521, 527 (2017). "A habeas claim can be procedurally defaulted in either of two ways." *Rocha v. Thaler*, 626 F.3d 815, 820 (5th Cir. 2010).

The first way happens when "a state court clearly and expressly bases its dismissal of a prisoner's claim on a state procedural rule, and that

procedural rule provides an independent and adequate ground for the dismissal." *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997). State rules are adequate if they are "'firmly established and regularly followed.'" *Lee v. Kemna*, 534 U.S. 362, 376 (2002) (quoting *James v. Kentucky*, 466 U.S. 341, 348 (1984)). They are independent when they do "not depend upon a federal constitutional ruling on the merits." *Stewart v. Smith*, 536 U.S. 856, 860 (2002).

 The second way occurs "when a prisoner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Nobles*, 127 F.3d at 420. (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)). If "it is clear from state law that any future attempts at exhaustion would be futile," *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999), then the claim is defaulted.

Default may be overcome if a petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 749–50. Cause exists, for the most part, when "something *external* to the petitioner, something that cannot fairly be attributed to him . . . 'impeded [his] efforts to comply with the State's procedural rule.'" *Id.* at 753 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). If cause is shown, "[t]he habeas petitioner must show

38

'not merely that the errors . . . at trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Carrier*, 477 U.S. at 494 (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). "Such a showing of pervasive actual prejudice can hardly be thought to constitute anything other than a showing that the prisoner was denied 'fundamental fairness' at trial." *Id.*

Miscarriage of justice requires proving factual, as opposed to legal, innocence of the crime or death penalty. *Sawyer v. Whitley*, 505 U.S. 333, 339–40 (1992). For the former, a petitioner must prove "that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). The latter requires clear and convincing evidence of death penalty ineligibility, not merely the jury's discretion in imposing such punishment. *Sawyer*, 505 U.S. at 346–47.

## IV.    Antiretroactivity Limitations

Federal habeas is generally not an appropriate forum to recognize or implement new constitutional rules of criminal procedure. *Teague v. Lane*, 489 U.S. 288, 310 (1989) (plurality opinion). For the most part, such rules do not apply to convictions that became final before the rule was announced. *Id.*

"The *Teague* inquiry is conducted in three steps. First, the date on which the [petitioner's] conviction became final is determined." *O'Dell v. Netherland*, 521 U.S. 151, 156 (1997). Second, a reviewing court determines whether the rule, or the proposed rule, is new. *Id.* "'[A] case announces a new rule,' *Teague* explained, 'when it breaks new ground or imposes a new obligation' on the government." *Chaidez v. United States*, 568 U.S. 342, 347 (2013) (quoting *Teague*, 489 U.S. at 301). "To put it differently, . . . if the result was not dictated by precedent existing at the time the [petitioner's] conviction became final," the rule is new. *Teague*, 489 U.S. at 301. "And a holding is not so dictated . . . unless it would have been 'apparent to all reasonable jurists.'" *Chaidez*, 568 U.S. at 347 (quoting *Lambrix v. Singletary*, 520 U.S. 518, 527–28 (1997)). Third, a court "determine[s] whether the rule nonetheless falls within" the sole exception "to the *Teague* doctrine." *O'Dell*, 521 U.S at 157; *see Edwards v. Vannoy*, 593 U.S. 255, 275 (2021) (eliminating the "watershed exception"). That lone exception applies to rules placing primary conduct beyond the government's power to proscribe or a class of persons beyond the government's power to punish in certain ways. *See Graham v. Collins*, 506 U.S. 461, 477 (1993). In sum, "new [constitutional] procedural rules do not apply retroactively on federal collateral review." *Edwards*, 593 U.S. at 276.

## V.    Evidentiary Development Restrictions

If a petitioner has "'failed to develop the factual basis of a claim in State court proceedings,' a federal court may admit new evidence, but only in two quite limited situations." *Shoop v. Twyford*, 596 U.S. 811, 819 (2022) (quoting § 2254(e)(2)). "Either the claim must rely on a 'new' and 'previously unavailable' 'rule of constitutional law' made retroactively applicable by th[e Supreme] Court, or it must rely on 'a factual predicate that could not have been previously discovered through the exercise of due diligence." *Id.* (quoting § 2254(e)(2)(A)). Even then, the petitioner "must also show that the desired evidence would demonstrate, 'by clear and convincing evidence,' that 'no reasonable factfinder' would have convicted him of the charged crime." *Id.*

Section 2254(e)(2) is triggered if the petitioner is "'at fault' for the undeveloped record in state court," meaning they "'bear[] responsibility for the failure' to develop the record." *Shinn v. Martinez Ramirez*, 596 U.S. 366, 382 (2022) (quoting *Williams v. Taylor*, 529 U.S. 420, 432 (2000) (*Michael Williams*)). This includes a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Michael Williams*, 529 U.S. at 432.

If diligence was exercised, a district court still has discretion to deny an evidentiary hearing. *Schriro v. Landrigan*, 550 U.S. 465, 468 (2007). To invoke

41

that discretion, a petitioner must show, at a minimum, that they were denied a full and fair hearing in state court and that the allegations, if true, would warrant relief. *See Blue v. Thaler*, 665 F.3d 647, 661 (5th Cir. 2011). If a claim has been adjudicated on the merits in state court, however, there is "no reason for . . . an evidentiary hearing," *id.*, nor is there a need if the record is sufficiently developed to make an informed decision, *McDonald v. Johnson*, 139 F.3d 1056, 1060 (5th Cir. 1998).

## VI. Other Relief Restrictions

Demonstrating that a state court decision is unreasonable does "not guarantee relief," *Davenport*, 596 U.S. at 134, but simply satisfies § 2254(d), a "*condition* for obtaining habeas corpus from a federal court," *Richter*, 562 U.S. at 103 (emphasis added). If § 2254(d) is satisfied, a petitioner must still "persuade a federal habeas court that 'law and justice require' relief," *Davenport*, 596 U.S. at 134 (quoting 28 U.S.C. § 2243), including showing that "the error had a 'substantial and injurious effect or influence' on the verdict," *id*. at 133 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

## ANSWER

### I. Ground One: Balderas's *Brady* and *Giglio* Claims.

Balderas alleges that the State violated his due-process rights by suppressing exculpatory and impeachment evidence under *Brady v. Maryland*,

42

373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). Specifically, he alleges that the State withheld exculpatory and impeachment material that would have been helpful at the guilt phase of trial. These materials are grouped as follows:

- The 2007-2008 Diaz notes (taken by prosecutors Caroline Dozier and George Weissfish), 3.SHCR-01 782–804; SHCR-01 Supp. 117;

- The 2014 Diaz notes (taken by prosecutors), SHCR-03 248–57;[10]

- The Diaz December 16, 2005 interview transcript (interview conducted by Sergeant Edward Gonzalez), 8.SHCR-01 2308–67;

- The audio recording of the February 1, 2005 police interview with Diaz (no supporting materials in the record);[11]

- The December 2013 notes from interviews with Alejandro Garcia (taken by prosecutors Mary McFaden, Caroline Dozier, and Traci Bennett), SHCR-03 317–61;

- An audio recording of a 2005 interview with Efrain Lopez (no supporting materials in the record);

- Notes from 2006 and 2010 interviews with Angelina Quinones, SHCR-03 198–204;[12] and

---

[10]    The Director believes the handwritten notes were taken by prosecutors Mary McFaden and Caroline Dozier. Prosecutor Traci Bennett was present at this meeting, and her typewritten notes from this meeting can be found at 8.SHCR-01 2305–07. Her notes indicate that Dozier and McFaden were present. *Id.* at 2305.

[11]    According to a supplemental report, it appears this interview was conducted by Investigator Chavez and Sergeant Carrillo. 3.SHCR-01 961.

[12]    The Director believes the 2006 Quinones notes were taken by prosecutor Caroline Dozier. 2.CR 530–32 (indicating Dozier interviewed Quinones in 2006). The Director is unsure, however, about who took the 2010 Quinones notes.

43

- Jail calls made by Diaz (no supporting materials in the record).

Pet. at 102–12. In addition to these guilt-phase *Brady* claims, Balderas also raises a punishment-phase *Brady* claim that the State failed to disclose the reason a State's witness (Christopher Pool) was terminated from his job. *Id*. at 114–16.

The claims predicated on the 2007-2008 Diaz notes were exhausted in state court and adjudicated on the merits. The rest of the claims are procedurally defaulted and alternatively meritless.

## A.    The *Brady* and *Giglio* standards

Under *Brady*, a petitioner must show that the prosecution withheld evidence favorable to the defense and that the evidence was material—"there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)). "Impeachment evidence . . . as well as exculpatory evidence falls within the *Brady* rule." *Bagley*, 473 U.S. at 676 (citing *Giglio*, 405 U.S. at 154).

Evaluations of *Brady* claims are conducted on an item-by-item basis. *Nelson v. Lumpkin*, 72 F.4th 649, 660 (5th Cir. 2023). Thus, each piece of evidence warrants its own analysis. Balderas's claim predicated on the 2007-

2008 notes was adjudicated on the merits in state court, and thus is reviewed under § 2254(d). The remaining claims were presented in Balderas's subsequent application and procedurally barred by the CCA.

### B.    The adjudicated claim: alleged suppression of the 2007-2008 Diaz interview notes

Balderas alleges that the State failed to disclose the 2007-08 Diaz notes in violation of *Brady*. Pet. at 102–03. Balderas exhausted his claim that the 2007-2008 Diaz notes were withheld in violation of *Brady*, and the CCA adjudicated that claim on the merits. 1.SHCR 59–71; 10.SHCR 2857–62. Thus, this claim turns on whether the state court adjudication was unreasonable. *See* 28 U.S.C. § 2254(d).

### 1.    State court presentation of the claim regarding the 2007-2008 Diaz notes

In state court, Balderas alleged that the State violated *Brady* by failing to turn over the 2007-2008 Diaz notes. 1.SHCR-01 59. According to Balderas, those notes reflect that "Diaz gave pre-trial statements indicating that: (1) Mr. Balderas did not confess to him; (2) Diaz did not see what clothes Mr. Balderas was wearing on the night of the shooting; and (3) Diaz did not see Mr. Balderas with the murder weapon on the night of the shooting." *Id*.

More specifically, the notes reflect that, in his 2007 statement to law enforcement, Diaz apparently said Balderas called him the day after the

shooting and said "we took care of that" in reference to Hernandez's murder. 1.SHCR-01 64. In a 2008 statement, Diaz said he got a call from Efrain Lopez the night of the murder, and Lopez said, "they found him." *Id*. at 67. Hernandez was killed an hour later, and LTC members "gathered in Alejandro Garcia's backyard and 'talked about Powder's murder.'" *Id*. at 67. At this gathering, Balderas allegedly took credit for Hernandez's murder. *Id*. These statements conflicted with Diaz's eventual trial testimony that he saw Balderas right after the murder across the street from the murder scene, and that Balderas confessed to him there. *Id*. at 61–63.

Trial counsel and the prosecution submitted affidavits establishing that these notes were available to, and reviewed by, trial counsel. SHCR-01 Supp. 113–18 (prosecutor affidavits), 120–31 (trial counsel billing records); 5.SHCR-01 1471, 1486. The trial court found these affidavits credible. 10.SHCR-01 2858–60. It also noted that the 2007-2008 notes still supported several aspects of the State's case against Balderas, including that (1) LTC was concerned about Hernandez fraternizing with rival gang members, (2) a meeting was held among LTC members during which they decided to kill Hernandez on sight, (3) Jose Vazquez (Chango) found Hernandez's whereabouts shortly before his murder, (4) LTC graffiti was found outside the apartment where Hernandez was staying just before his murder, (5) the night of the murder, Balderas

46

admitted to killing Hernandez at a meeting at Alejandro Garcia's house, and (6) Balderas typically carried a handgun that matched the murder weapon. *Id.* at 2860–61. Based on this, the state court concluded that Balderas failed to show suppression, favorability, or materiality under *Brady*. *Id.* at 2862, 2920.

### 2.     Balderas fails to meet his burden under AEDPA.

As this claim was adjudicated on the merits in state court, Balderas cannot obtain relief unless he can show that the state court's decision was an unreasonable application of federal constitutional law. § 2254(d). Moreover, the State's disclosure of the 2007-2008 notes is presumed correct under § 2254(e)(1).

Balderas offers nothing to overcome the presumptively correct finding that these notes were turned over. Instead, he misleads the Court by routinely describing the 2007-2008 notes as disclosed in 2015. Pet. at 98, 102–04. But Balderas's conclusory—and refuted—statement does rebut the state-court finding that no suppression occurred. Thus, his *Brady* claim surrounding the 2007-2008 notes instantly fails on the suppression prong.

Balderas also fails to show that the CCA's determination that the notes were not favorable or material was an unreasonable application of *Brady*. Balderas raises the same arguments he made in state court, namely that Diaz's prior versions of Balderas's confession were different from the version given at

trial. Pet. at 102–03. But given that the 2007-2008 notes still heavily implicate Balderas and given the evidence independent of Diaz that implicated Balderas—Wendy Bardales' identification of Balderas as the shooter and that Balderas was arrested holding the murder weapon—Balderas fails to show that the CCA's materiality determination was an unreasonable application of *Brady*. § 2254(d).

In addition to the arguments raised in state court, Balderas also lodges brand new arguments premised on the 2007-2008 notes that he never raised in state court. First, he alleges that the notes contradicted Diaz's trial testimony that, when asked about conversations with prosecutors in 2007 and 2008, Diaz said he talked about "different things that were even not related to this." Pet. at 103. Second, he points out that Diaz said in 2007 that the meeting to determine how to handle Hernandez occurred nine to ten months before Hernandez was killed. *Id*. And third, Diaz said in 2007-2008 that "everybody wanted [Hernandez] dead." *Id*. at 104. According to Balderas, this contradicted Diaz's trial testimony "that he 'truly didn't care' what happened to [Hernandez] even though he 'snitched' on him." *Id*.

These new arguments were never pressed in state court, and thus should have no bearing on whether the state court's denial of the *Brady* claim was unreasonable under § 2254(d). But, in any event, what Balderas points to are

meaningless inconsistencies, if they can even be called that. First, Balderas raises a *Giglio* claim, alleging that the 2007-2008 notes show that Diaz testified falsely when he said he did not care whether LTC killed Hernandez, because the 2007-2008 Diaz Notes show that Diaz said "everybody wanted Powder [Hernandez] dead." Pet. at 102–103. But the notes show that Diaz was trying to convey LTC's general hostility towards Hernandez due to his recent association with rival gangs. 3.SHCR-01 790. Consistent with this testimony, the 2007-2008 Diaz Notes indicate that Diaz said about Hernandez's murder, "not a big deal to W." 3.SHCR-01 790. Even accepting Balderas's hyper-technical reading of Diaz's prior statements, such impeachment value would have been almost nil. *See Hays v. Alabama*, 85 F.3d 1492, 1499 (11th Cir. 1996) (holding there was "no obvious reason . . . that the jury would have regarded the inconsistency as particularly significant").

Balderas also points to the 2007-2008 Diaz Notes to argue that the State withheld evidence that could have been used to impeach Diaz when he said that, during his first meeting with prosecutors, he discussed "[d]ifferent things that were even not related to this." Pet. at 103; 26.RR 167. While it does appear that there was some brief discussion of Hernandez's murder in those 2007-2008 meetings, those notes are mostly about other murders committed by LTC. *See generally* 3.SHCR 782–804. In any event, it didn't matter because the State

49

put on its own evidence for the jury that Diaz discussed the Hernandez murder

with law enforcement in 2007-2008:

> Q:    Did you ever have an opportunity to talk to him about this case
> involving he killing of Eduardo Hernandez?
>
> A:    I did.
>
> Q:    Okay. At what point was it that you were given that opportunity?
>
> A:    Well, to the best of my memory, I spoke to Mr. Diaz at least on two
> occasions, if not more, over the last several years, I believe
> beginning maybe in '07', '08 . . . [.]

27.RR 17–18 (testimony of Tommy Ruland).

The State's presentation of this evidence belies Balderas's claim of a due

process violation. Evidence is not suppressed when the State presents it at

trial. *See, e.g.*, *Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002); *see also*

*Powell v. Quarterman*, 536 F.3d 325, 335 (5th Cir. 2008) ("The Supreme Court

has never expressly held that evidence that is turned over to the defense during

trial has been 'suppressed' within the meaning of *Brady*."). Moreover, it also

renders this evidence cumulative and therefore immaterial. *See Turner v.*

*United States*, 582 U.S. 313, 328 (2017) (holding that "the cumulative effect of

[ ] withheld evidence" may be "insufficient to undermine confidence in the

jury's verdict." (citing *Smith v. Cain*, 565 U.S. 73, 75–76 (2012))); *Murphy v.*

*Davis*, 901 F.3d 578, 598 (5th Cir. 2018) (immaterial evidence "was of marginal

value to the defense and was cumulative with already presented [ ] evidence.");
*Rocha v. Thaler*, 619 F.3d 387, 396 (5th Cir. 2010) ("Undisclosed evidence that is merely cumulative of other evidence is not material[.]")

Balderas also raises a *Giglio* argument by pointing to Diaz's 2007-2008 statement that the meeting where LTC decided to kill Hernandez was nine to ten months before the murder. Pet. at 103–04. Balderas seems to suggest this would make Diaz look like the murderer, because it would mean the meeting took place around the time he bonded out of jail "on the crime" Hernandez "'snitched' on him about." Pet. at 103. But if that were the theory, it does not make any sense that LTC made the final decision to kill Hernandez in April 2005 because Diaz had just bonded out of jail, but then waited until December 2005 to kill him. If anything, the lag in time between Diaz's release and the murder supports the theory that Hernandez was murdered for his dissociation with LTC and association with rival gangs and not because he snitched on Diaz. Also, it was undisputed at trial that the fateful meeting to decide to kill Hernandez took place in December 2005. *See* 28.RR 170 (Balderas's witness saying that the meeting took place on December 3, 2005).

### C.    The rest of Balderas's guilt-phase *Brady* claims are procedurally defaulted.

Balderas raised the remaining *Brady* claims in his subsequent application. SHCR-03 112–18. In support, he attached the following prosecutor notes: (1) January 27, 2014 notes from the State's interview with Diaz, SHCR-03 248–57; (2) three separate exhibits of State interviews with Alejandro Garcia from December 2013, SHCR-03 316–61; and (3) notes from 2006 and 2010 interviews with Angelina Quinones. SHCR-03 198–203. He also relied on an audio recording of a February 1, 2005 police interview with Diaz, a December 2005 audio recording with Diaz, and a December 2005 audio recording with Efrain Lopez.[13] SHCR-03 113, 121. And last, he describes jail calls made by Diaz in which he allegedly claimed he wanted to obtain a plea deal. SHCR-03 113–16. The CCA procedurally barred these claims. *Balderas*, 2023 WL 7023648, at *1. Balderas can show cause for failure to overcome the default if he can prove that the default was caused by the State's suppression of the evidence. *Banks v. Dretke*, 540 U.S. 668, 691 (2004).

But to do so, Balderas must overcome the presumption that suppression did not cause the default. If the CCA bars a claim under Texas's abuse of the

---

[13]    These audio interviews were not submitted in state court. But it appears a transcript of Diaz's December 2005 transcript is part of the initial state habeas record. 8.SHCR-01 2308–67.

writ statute, as it did here, it implicitly determines that the petitioner "knew or could have reasonable known" the factual predicate of the claim "before filing his first petitions." *Ford v. Davis*, 910 F.3d 232, 235 (5th Cir. 2018). And that "implicit factual finding is subject to the presumption of correctness" of § 2254(e)(1). *Id.* (citing *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006)). Thus, the CCA's dismissal of the *Brady* claims predicated on the 2014 Diaz notes, the 2005 Diaz and Lopez interviews, the Quinones notes, and the Diaz jail calls, creates a presumption that the claims were available at the time Balderas filed his first state application. § 2254(e)(1).

Balderas has not pointed to any evidence to overcome this presumption. The jail calls and audio recordings have never been filed in any court. Trial counsel has not given any statement on whether they were ever made aware of the contents of these allegedly suppressed materials. Moreover, the February 2005 interview of Diaz and the Quinones allegations were available to Balderas when he filed his first state application. 3.SHCR-01 963; 2.CR 529–32. As Balderas fails to overcome the § 2254(e)(1) presumption, he cannot show cause to overcome the default of these claims. Moreover, because the claims are immaterial, *see infra* Part I.D., he cannot show actual prejudice. *Banks*, 540 U.S. at 691 (holding materiality is coextensive with actual prejudice).

### D.    Balderas's procedurally defaulted guilt-phase *Brady* claims are alternatively meritless.

#### 1.    Balderas fails to establish suppression for all his claims because he has offered no evidence that trial counsel did not have this information.

Balderas carries the burden here of establishing that there exists favorable evidence that was withheld by the state. *Strickler*, 527 U.S. at 280. Balderas's allegation of undisclosed audio material, specifically the 2005 audio interview of Efrain Lopez, the 2005 audio interview of Israel Diaz, and the Diaz jail calls, is wholly conclusory because Balderas has never presented those materials as evidence. He did not file them as exhibits to his subsequent application. *See generally* SHCR-03. Nor has he filed them in this Court. *See generally* ECF. Thus, his *Brady* claim predicated on digital material fails as conclusory. *See Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990). Because Balderas failed to file these documents in state court, they are also barred under 28 U.S.C. § 2254(e)(2). *See Williams*, 529 U.S. at 433 (a "lack of diligence" in developing the factual basis of a claim triggers "the opening clause of § 2254(e)(2)).

All of Balderas's claims are also meritless because he fails to prove any evidence that these materials were suppressed. "*Brady* does not obligate the government 'to produce for [a defendant] evidence or information already known to him, or that he could have obtain from other sources by exercising

54

reasonable diligence." *United States v. Dixon*, 132 F.3d 192, 199 (5th Cir. 1997); *United States v. Diaz*, 922 F.3d 998, 1007 (2d Cir. 1990) ("[T]here is not improper suppression within the meaning of *Brady* where facts are already known by the defendant."). Balderas offers no statement from trial counsel that they were unaware of the information in the allegedly suppressed documents at the time of trial.

The Director notes that, in Balderas's reply in support of his motion to stay, Balderas's current counsel issued an affidavit, detailing State's disclosures made over the court of federal litigation. ECF No. 55-1 (affidavit of Ashley Carr). The Director does not challenge the veracity of that statement. In fact, during an in camera proceeding in state-habeas court, the State appeared to concede that the 2014 Diaz notes were not turned over to trial counsel. 3.EHRR-01 12–19 (sealed). But this information does not answer the critical question here—what was disclosed or known to *trial counsel* at the time of trial. As the state-habeas court pointed out, it was possible that the prosecutor discussed the interviews with trial counsel off the record. *See id.* at 18–19 (trial court asking if the prosecutor might have "shown those summaries

to the defense counsel . . . to kind of disclose an overview of the case").[14] A post-trial disclosure of work-product notes is not a constitutional violation if the information in that note was known to trial counsel.[15] *See Dixon*, 132 F.3d at 199. Thus, Balderas's failure to proffer any statement from trial counsel is fatal to his *Brady* claims. Moreover, Balderas's failure to demonstrate that these claims were previously unavailable triggers the opening clause of § 2254(e)(2) and bars Balderas's evidence under that provision.

### 2. Balderas fails to establish favorability and materiality.

#### a. Diaz's statement that hanging out with rival gang members was the "ultimate betrayal"

In one of his more specious arguments, Balderas raises a *Giglio* claim that Diaz's 2014 statement to prosecutors that if you were "caught w/ other gang members [you would] get checked (beat up)" and if you kept doing it, that

---

[14]    Further supporting this theory is a February 14, 2014, email in which trial counsel says the "defense team got a taste of the State's trial theory" and noted that trial counsel first learned about meetings with Israel Diaz and Alejandro Garcia. 3.SHCR-01 780. Notably, the hearing from that morning doesn't mention Garcia at all. *See generally* 23.RR. Thus, trial counsel's knowledge of a deal with Garcia appears to come from an off-the-record discussion with the prosecution.

[15]    For example, Balderas complains that the State did not turn over the 2010 Quinones notes, which indicated that HPD officers were using suggestive tactics in LTC investigations. The State filed a *Brady* notice telling trial counsel the contents of the Quinones interviews. 2.CR 529–32 Balderas's claim that the State was obligated to turn over the work-product notes themselves, instead of filing a *Brady* notice of the exculpatory information has no support in the law.

would be "more serious[,]" was inconsistent with his trial testimony that hanging out with rival gangs was the "ultimate betrayal." Pet. at 104. These statements are in no way contradictory. Something "more serious" than assault—perhaps murder—would seem the logical gangland punishment for the "ultimate betrayal." Thus, not only is this 2014 statement not material, but it is also not even impeachment evidence.

> **b.    Diaz's statement that he was not concerned about Hernandez testifying against him.**

Balderas also points to the 2014 Diaz notes to argue that the State withheld impeachment evidence that Diaz provided inconsistent statements regarding whether he was worried that Hernandez would "snitch" on him about an armed robbery. According to the 2014 Diaz notes, Diaz said he met Hernandez in secret while out on bond for armed robbery and told Hernandez that if Hernandez told on Diaz, Diaz would tell on Hernandez about a murder Hernandez was involved in. Pet. at 105 ¶¶ 288–90; SHCR-03 249 (Ex. Q). Balderas argues that this was inconsistent with Diaz's trial testimony that "he was not concerned" with Hernandez testifying against him. Pet. at 105 ¶ 288.

But Diaz's statement to prosecutors was not inconsistent with his trial testimony. Diaz testified that he was not concerned with Hernandez testifying against him only because he had already lectured, spoken to, and guided Hernandez to convince him it was pointless for Hernandez to testify against

him. *Balderas*, 517 S.W.3d at 763. So Diaz *did admit* to the jury that he was concerned enough about Hernandez testifying that he met with Hernandez and convinced him not to testify. In fact, Diaz told the jury the very language he used: "Man, this is bullshit. Don't come up here and tell these they people. They don't know what the fuck's going on. Don't come up here." 26.RR 181.

The fact that Diaz might have threatened reciprocal snitching is consistent with what he told the jury: that he was trying to persuade Hernandez not to testify against him. Thus, this evidence is not impeaching. And even if it was, it is cumulative because Diaz admitted that Hernandez snitched on him and that he tried to talk Hernandez out of testifying against him. 26.RR 145; *see Conley*, 415 F.3d at 189 ("Suppressed impeachment evidence, if cumulative of *similar* impeachment evidence used at trial . . . is superfluous and therefore has little, if any, probative value."); *United States v. Amiel*, 95 F.3d 135, 145 (2d Cir. 1996) ("Suppressed evidence is not material when it merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable."); *Rocha*, 619 F.3d at 396 ("Undisclosed evidence that is merely cumulative of other evidence is not material[.]").

### c. Diaz's statement that the graffiti near the murder scene was just a coincidence

Balderas also relies on the 2014 Diaz notes to claim that Diaz had said the graffiti marking the apartment where Hernandez was murdered was not a signal of where to find Hernandez but was rather a "coincidence." Pet. at 113–14 ¶ 334. This information was exculpatory, Balderas claims, because it would rebut the State's theory that the graffiti was a signal to LTC members of where to find Hernandez.[16] *Id.* at 111–12 ¶¶ 314–15. First, if the graffiti was not a signal to LTC members, Balderas, a high ranking LTC member, would have known that. *See* 28.RR 162–72 (Balderas's witness Walter Benitez testifying that Balderas was at the meeting where LTC decided to kill Hernandez). So the evidence was not suppressed. *See Thompson v. Cain*, 161 F.3d 802, 807 (5th Cir. 1998) ("[T[he prosecution is under no duty to furnish defendant with information that is readily accessible to the defense.").

Moreover, this argument would be pointless. Both sides at trial presented evidence that a meeting was held in early December to decide how to handle Hernandez. 26.RR 151–55; 28.RR 170. It was undisputed at trial that, a few days after the meeting, LTC member Jose Vasquez came to the apartment where Hernandez was staying and confronted him about his divided

---

[16]     Diaz never testified about the graffiti. Thus, this claim is not a *Giglio* impeachment claim, but rather is a straightforward exculpatory evidence claim.

loyalties. 24.RR 46–52. And only a few hours later, Hernandez and Karen Bardales noticed the LTC graffiti outside the apartment, and Hernandez knew something "bad" would happen when he saw it. 24.RR 52–53. Seconds later, Hernandez was gunned down in that same apartment. Trying to handwave away LTC's involvement by downplaying the graffiti would have been a fool's errand. Thus, Diaz's statement that the graffiti was a "coincidence" was immaterial.

### d.    Diaz's allegedly "violent" history with Hernandez.

Balderas cites to a February 1, 2005 interview between Diaz and the Houston Police Department to argue that Diaz "had a violent history" with Hernandez that was not disclosed. Pet. at 105 ¶ 291. As best the Director can find, there is a February 1, 2005 offense report that summarizes an interview with Diaz in the state-habeas record. 3.SHCR-01 963. Balderas's reply in support of his motion to stay indicates that he is referring to an audio recording of the 2005 interview. ECF No. 55 at 4. Again, the audio file was never made part of the state-court record. Thus it is barred under § 2254(e)(2).

But the offense summary in the state-court record is sufficient to disprove suppression. Unlike the work product notes that Balderas claims were not turned over until postconviction, there is no allegation that these offense reports—presumably part of the State's open file—were unavailable to

60

trial counsel. SHCR-01 Supp. 118 (prosecutor affidavit attesting "I am sure that trial counsel (Godinich, Nunnery or both) reviewed the Balderas prosecution file although I have no memory of when that specifically happened"); 10.SHCR-01 2920 ¶ 6 (finding that trial counsel reviewed the State's file).[17]

Moreover, the interview summary in the state-court record reveals no evidence of violence: "Israel [Diaz] said he had a fight with [Hernandez] over him wanting to get out of the gang, but after the fight, things were cool between them." 3.SHCR-01 963. So this "fight" appears to have merely been an argument. And the argument was completely unrelated to Hernandez "snitching" on Diaz. Thus. this incident is completely unrelated to Diaz's credibility at trial.

Moreover, even if this evidence could be impeaching, it would be cumulative. The jury understood that Hernandez snitched on Diaz and that Diaz was angry with him for that. 26.RR 141 (Diaz testifying he was upset with Hernandez for ratting him out), 143–44 (Diaz testifying that he was "verbally upset" with Hernandez and didn't want him in the gang anymore), 172 (Diaz

---

[17]    The offense reports also include a statement from Hernandez's sister, which describes threats Diaz made to Hernandez while pointing a gun at him. 3.SHCR-01 844–45. Again, there is ample evidence that trial counsel was made aware of Hernandez's history with Diaz.

testifying that he was angry and "pissed" off because Hernandez snitched on him). Thus, evidence that Hernandez and Diaz had a "fight" about another topic at some point is cumulative of any bias. *See Conley*, 415 F.3d at 189; *Amiel*, 95 F.3d at 145; *Rocha*, 619 F.3d at 396.

### e.    Diaz's jail calls and his hope for a plea deal

Balderas claims that the State withheld impeachment evidence showing Diaz testified falsely when he said he "never asked [the prosecutors] for anything," and when he said his plea agreement with prosecutors occurred "just last week" when the prosecutors "came to [him] one more time." Pet. at 105–06. Balderas claims that jail calls reveal Diaz talking to family members about his desperation for a plea deal and makes some reference to negotiations with prosecutors for a plea deal. *Id*. As these jail calls were not presented in state court, *see* SHCR-03, they cannot be considered here. § 2254(e)(2).

These jail calls are not favorable or material because they are not at all inconsistent with Diaz's trial testimony. Balderas accuses the State of presenting false testimony while putting his own misleading spin on Diaz's testimony. The transcript shows that, when Diaz said he "never asked them for anything," Diaz was very specifically referring to his 2007 and 2008 interviews with prosecutors:

> Q:    Back in 2007, 2008, what did you think would be a fair deal for you?

A:    I never asked them for anything.

26.RR 168. Consistent with this testimony, the disclosed notes from those interviews make no mention of potential plea agreements. *See* 3.SHCR-01 782–804. And then when Diaz said the prosecution approached him, it was clearly not a reference to him never wanting or asking for a plea deal, it was in reference to the *exact* meeting where his plea deal was struck:

Q:    Okay. So even after a jury was picked in this case, no deal had been sealed with you yet, right?

A:    No, Sir. Just last week and Monday.

Q:    How did this deal come about then? Did the prosecution come to you through your attorney and say this is what we got to offer, or did you go to them and say this is what I will take if you need me to participate?

A:    Actually they came to me and interviewed me one more time and they didn't tell me what it was. My attorney told me that they would drop my case to a lesser charge.

26.RR 174. This narrow testimony could in no way be construed to mean Diaz had never reached out about a plea deal or that he was never "desperate" for a plea deal.

Moreover, Balderas cannot show materiality through such jail calls because they would have been cumulative. Trial counsel impeached Diaz with the fact that he had long hoped for a plea deal and discussed potential deals with his own attorney. 26.RR 168–69. And, of course, it was no secret that Diaz

63

*did* get a plea deal and was only testifying to avoid a capital murder charge and a potential death sentence. 26.RR 122–23, 169–70. Trial counsel even elicited that Diaz was holding out hope that he would get "probation" in exchange for cooperation. 26.RR 171. As the jury already knew this information, more details about Diaz's hope for a plea deal wouldn't have changed the outcome at trial. *See Canales v. Stephens* 765 F.3d 551, 575–76 (5th Cir. 2014) (finding suppressed evidence that witnesses received assistance with housing and parole issues cumulative because "the jury heard at least some of this information at trial" and trial counsel impeached the witnesses "about being encouraged to help the State in exchange for benefits."); *Dennes v. Davis*, 797 F. App'x 835, 845 (5th Cir. 2020) (rejecting materiality of evidence that witness had a longstanding informant relationship with the State in other cases because he was already impeached at trial with his hope of obtaining favorable treatment in exchange for testimony).

### f.    Speculation about MS-13's involvement in Hernandez's murder

Balderas claims the State withheld evidence showing MS-13 was involved in Hernandez's murder. In support, Balderas points to an audio interview with Efrain Lopez from 2005, in which Lopez said in reference to Hernandez's murder, "everybody was saying it was MS[-13]." Pet. at 111 ¶ 324. He also points to the State's disclosure of notes from a December 2013

interview with Alejandro Garcia, in which Garcia said he "believed" that MS-13 killed Hernandez, and that he saw Hernandez's brother the day after the murder and his brother said that MS-13 killed him. SHCR-03 318 (Ex. N).

This information was not suppressed because it was always available and known to Balderas. If there were rumors around LTC that MS-13 might have murdered Hernandez, Balderas would have known about it. *See Thompson*, 161 F.3d at 807. In his reply in support of his *Rhines* motion, Balderas responded that "[i]t is at least plausible that information could have spread in the community regarding the murder while Mr. Balderas was already in custody." ECF No. 55 at 10. Except it's not plausible. Balderas's own pleading says the interview with Lopez was conducted on December 16, 2005, Pet. at 111, the date Balderas was arrested. Garcia similarly reported that he heard the MS-13 rumor from Hernandez's brother at school "the next day." SHCR-03 354. So these rumors were spreading before Balderas was in custody.

Moreover, this information is not material, as none of these allegedly withheld notes indicate witnesses who had any direct knowledge or actionable information regarding MS-13's involvement in Hernandez's murder. This hearsay and rumor testimony would not have been admissible. *See* Tex. R. Evid. 801; *see also Wood v. Bartholomew*, 516 U.S. 1, 6–7 (1995) (inadmissible *Brady* material is only material if it would have led to admissible evidence).

The evidence is also immaterial because LTC's responsibility for Hernandez's murder has never been disputed by the State or Balderas. *See* 28.RR at 162–72 (defense witness Walter Benitez testifying that LTC decided to murder Hernandez). Balderas suggests that trial counsel could have used the MS-13 rumors to show that the State did not thoroughly investigate other potential leads. ECF No. 55 at 10. Suggesting a less-than-thorough investigation can certainly be defensive strategy in *some cases*. But here, where the evidence that LTC was behind the murder was undisputed, asking the State why they didn't investigate a theory that *everyone agreed was frivolous* would likely have wasted time and credibility with the jury. Indeed, Balderas has offered no affidavit from trial counsel indicating that they would have done so if they knew about the—ultimately false—MS-13 rumors.

Balderas also claims that Garcia's statement that Balderas never talked to him about killing Hernandez would have undercut Diaz's testimony that Garcia was present when Balderas confessed after the murder. Pet. at 119; 26.RR 155–59; SHCR-01 Supp. Ex. A (August 2018 disclosure). For the reasons listed above, Balderas fails to show trial counsel was not aware of this discrepancy. *See supra* Part I.D.1. In fact, at punishment trial counsel elicited from Garcia that he never went to the apartment where Hernandez's murder

took place.[18] 35.RR 106–07. There is no indication in the record that trial counsel were surprised that Garcia's testimony contradicted Diaz's testimony.

In any event, this information is not material. Trial counsel likely wouldn't have called Garcia, as he cut a deal for the State to testify at punishment. 35.RR 64. Perhaps more importantly, Garcia would have corroborated aspects of the State's case and undercut aspects of Balderas's defensive theory. His testimony that he had never met Arevalo and that Arevalo never went to Garcia's house, 35.RR 33, would have undercut Benitez's testimony that Arevalo was at the meeting concerning Hernandez and that the meeting was held at Garcia's house. 28.RR 162. He also could have corroborated Diaz's testimony that Balderas always carried .357 and .40 handguns. SHCR-03 329 (note from Garcia interview that Balderas "always had 357 & 40").

Finally, Balderas further cites to a December 2005 interview in which Diaz said "he had heard 'a lot of people is saying" the murder was "cause he went out with a girl that was MS.'" Pet. at 110 ¶ 325; 8.SHCR 2363. But this information was not exculpatory. The State's theory was that Balderas killed

---

[18]    The fact that two State's witnesses contradicted each other on the record also rendered this claim available when Balderas filed his first state-habeas application. This would undercut a showing of cause to overcome the procedural default. *See Dennes*, 797 F. App'x at 843–44.

Hernandez because he betrayed LTC by hanging out with rival gang members, including MS-13. *See supra* Statement of Facts Part I. So Diaz's statement that people were saying Hernandez was killed "cause" he was dating a girl that was associated with MS-13 feeds into the State's theory. It does not rebut it. Thus, the statement is neither favorable nor material.

> **g.** **Information that everyone gave Balderas guns to hold.**

Balderas also claims that the State withheld evidence that Garcia told them in 2013 that "everyone gave [Balderas] guns to hold." Pet. at 109 ¶ 311. 293. This information was not suppressed because, if Balderas was tasked with holding guns for everyone, he was surely aware of that fact. *See Thompson*, 161 F.3d at 807; *see also* 3.SHCR 715 (email from trial counsel stating that Balderas said he only provided weapons to the gang). In fact, Balderas *did* put on evidence that he was holding the murder weapon by happenstance. 28.RR 177–83.

Balderas also says the State withheld impeachment evidence that, according to the 2014 Diaz notes, Diaz said that LTC "would fight over guns"; according to Balderas, this was inconsistent with Diaz's trial testimony that "passing guns back and forth" was a "common practice" until they discovered gun shows and then "everybody purchased their own" guns. Pet. at 109 ¶¶ 313–14. Diaz's statement that LTC members would fight over guns barely rebuts

(if it does at all) Diaz's testimony that LTC members bought their own guns at gun shows.

In any event, Balderas wouldn't have been able to rebut Diaz's testimony that "everyone purchased their own guns" because his testimony was corroborated by the weapons Balderas was arrested with. Diaz testified that Balderas regularly carried two guns that he bought at a gun show. 26.RR 192–93. He described them as "two silver ones[,]" one of which might have been a .40 caliber handgun. 26.RR 193. Sure enough, Balderas was arrested carrying two silver handguns, one of which was the .40 caliber murder weapon. SX's 68, 72, 75. The jury took note, asking for a readback: "Did [Diaz] testify to the fact that the gun, the one identified as the murder weapon, was the gun known to be carried by [Balderas]?" 12.CR 3316.

Moreover, whether exculpatory or impeaching, none of this evidence would have been material because it would be cumulative of the trial testimony from Walter Benitez, that the container of weapons Balderas was arrested with contained guns belonging to multiple LTC members. Benitez testified that, on the morning of December 16, 2005, LTC leader Victor Arevalo came to his house and told him to pick a gun out of a green container for protection. 28.RR 177. Benitez said the container and the weapons inside it matched the container and weapons Balderas was arrested with. 28.RR 178–82; SX 64, 65,

68. He also said Arevalo was going to drop the box off with Balderas. 28.RR 183. Because the information would have been cumulative, Balderas fails to show it would have been material. *See Rocha*, 619 F.3d at 396.

### h.    Alleged *Brady* evidence from Angelina Quinones

Balderas also claims that the State withheld impeachment evidence regarding improper identification tactics used by law enforcement in a separate investigation involving LTC. Pet. at 110–11. According to notes from a 2010 interview with Angelina Quinones involving her identifying LTC suspects, Quinones said, "the cops already knew who they were after & were pushing her to choose their suspects." SHCR-03 199 (Ex. D). Balderas also points to notes from a 2006 interview with Quinones, in which she said the officer showed her a photospread and "guided her hand to the photo (kind of like playing Where's Waldo)." SHCR-03 202 (Ex. E).

As Balderas concedes, Pet. at 110 n.10, Quinones's allegations were disclosed through a *Brady* notice in 2013. 2.CR at 529–32. In his reply in support of his *Rhines* motion, Balderas claims that the *Brady* notice was insufficient because it "did not include the underlying notes in the November 2020 disclosure containing the 'Where's Waldo' allegation or the specific allegations that the officer was 'telling' her which photograph to pick." ECF No. 55 at 4–5. He also contends that the disclosure included only a summary

70

of the 2006 notes, but not the 2010 notes that recounted the exact same information.

Such an inane argument should be rejected. The State only had an obligation to turn over the relevant exculpatory information: That officers investigating the Bunker Hill murder had been accused of suggestive identification procedures. As the *Brady* notice shows, this was disclosed: "Waters began to encourage her saying come on you can do this, help me out. He then guided her finger to one of the photos and said here he is, you know that's the guy, come on you can do it." 2.CR 531. Balderas's argument that this summary did not include an allegation that "the officer was 'telling' her which photograph to pick" is pure delusion.

Moreover, this evidence is not material. Balderas references it as "impeachment" information, but it is unclear who he would be impeaching. These notes appear to be from an investigation into the Bunker Hill murder, which the State did not prove up through photo identification. *See supra* Statement of Facts Part II.A.5. So, apparently Balderas believes that he would be able to impeach either eyewitness Wendy Bardales or Officer Tommy Ruland, the officer who conducted the photo identification procedure, by citing another officer's improper tactics in a different investigation. 25.RR 191–97; 26.RR 228–40. It is unclear under what theory of the rules of evidence Balderas

71

thinks such an examination would be allowed. Because no such rule exists, this evidence is immaterial. *See Bartholomew*, 516 U.S. at 6–7.

### 3. Even cumulating these claims, Balderas cannot show materiality.

When favorable evidence is suppressed by the State, the proper course is to review the prejudicial effect of the suppressed and favorable evidence cumulatively. *See Kyles v. Whitley*, 514 U.S. 419, 421 (1995). The Director contends that these items were neither suppressed nor favorable, *see supra* Part I.D.1–2, thus rending a cumulative error analysis unnecessary. Nevertheless, even assuming such an analysis, Balderas would still come up short. As explained above, all the evidence Balderas points to was either trivial, cumulative, or totally irrelevant to Balderas's defensive theory.

Finally, any alleged errors are immaterial because the evidence that Balderas murdered Hernandez is strongly corroborated by other evidence. *See Rocha*, 619 F.3d at 396–97 ("[T]he impeached testimony of a witness whose account is strongly corroborated by additional evidence supporting a guilty verdict . . . generally is not found to be material[.]"). Here, Wendy Bardales identified Balderas as the shooter. 25.RR 197–99; 26.RR 228–38; SX 56. Diaz's description of the clothes Balderas wore right after the murder also matched the clothes of the shooter. 24.RR 253 (eyewitness Edgar Ferrufino testimony that shooter wore khaki pants and a dark colored hoodie); 25.RR 183

(eyewitness Wendy Bardales testimony that shooter wore a black hoodie); 26.RR 159 (Diaz said that when Balderas confessed after the murder he was wearing "khaki pants" and a "sweater-like" shirt that was either "blue or dark blue, kind of looks black."). The jury specifically requested a read back of Diaz's "testimony about what [Balderas] was wearing" and Ferrufino's testimony about what the shooter was wearing. 12.CR 3298, 3304.

Moreover, the gun that Diaz saw Balderas holding right after the murder matched the murder weapon. 26.RR 160 (Diaz testifying that Balderas was holding a silver gun); 28.RR 60 (firearms examiner Kim Downs describing the murder weapon as "shiny silver" or "nickel-like"); SX 75 (picture of murder weapon). Diaz also said Balderas was exchanging the gun magazine when he confessed, 26.RR 160, which was consistent with the forensic evidence that the shooter emptied the magazine. Firearms examiner Kim Downs testified that the most cartridges the magazine of the murder weapon could hold would be ten, with one extra in the chamber. 28.RR 67–68. Ten casings were found in the apartment. 24.RR 185–86; SX 16. That's also consistent with Wendy's statement that the shooter shot until the gun was empty. SX 160. Again, the jury picked up on this, requesting a read back of Diaz's testimony that Balderas "was changing or switching magazines during the gathering across the street right after the incident." 12.CR 3302.

Also, Hernandez was confronted hours before the murder by LTC member Jose Vasquez. And Balderas just happened to call the house phone of Vasquez's father (a number he had never called before) roughly two hours before the Hernandez murder and then right around the time of the murder. 26.RR 253; 27.RR 10–11. The jury specifically requested the phone records supporting this connection. 12.CR 3290.

And finally, Balderas was arrested while possessing the murder weapon, a silver gun that matched one of the two guns that, according to Diaz, Balderas had bought at a gun show. 25.RR 219–29, 236–39; 28.RR 37–40; SX's 64–75. Even taken cumulatively, Balderas's *Brady* claims are not material. *See Bartholomew*, 516 U.S at 8 (evidence not material in part due to the overwhelming evidence); *Smith*, 565 U.S. at 76 (holding that evidence "may not be material if the State's other evidence is strong enough to sustain confidence in the verdict").

### E.    Balderas's punishment-phase *Brady* claim is meritless.

Harris County detention office Christopher Pool testified at punishment that he found Balderas hoarding medication in his jail cell. 42.RR 247–55. On cross-examination, Balderas impeached Officer Pool with the fact that he had been discharged from the Harris County Sheriff's Office for "failure to render aid and deception", over an incident that involved "the death of an inmate[.]"

74

42.RR 254. Balderas now points to Pool's termination letter, which states that Pool gave contradictory statements in the investigation concerning his failure to render aid. 3.SHCR-01 918–28. He claims this information was suppressed and could have been used to impeach Pool. Pet. at 114–16.

This claim is unexhausted and procedurally defaulted. While Balderas presented the termination letter in support of a false-testimony claim in state court, 1.SHCR-01 289–95, he currently relies on the letter in support of a *Brady/Giglio* claim. And because Balderas had access to the factual predicate for his current claim (the termination letter) before his first state application was filed, his failure to raise it as a *Brady/Giglio* claim would render it procedurally barred under Texas statute. *See* Tex. Code Crim. Proc. art. 11.071 § 5(a)(1) (requiring factual predicate be previously unavailable to file subsequent application). Moreover, because the factual predicate was available when he filed his first application, he cannot show cause for failing to properly exhaust his claim here. *See Dennes*, 797 F. App'x at 843–44. (holding that, even assuming evidence was suppressed at trial, petitioner could not show cause where state-habeas counsel was aware of the information).

In any event, the claim fails on the merits. Balderas gives no evidence that trial counsel were unaware of the termination letter. In fact, the exchange

75

between trial counsel and Pool reveals that trial counsel likely had access to the circumstances surrounding his termination:

Q:    Let's stop there. Tell the jury why you were terminated.

A:    I was terminated for violation of policies.

Q:    Specifically what policy?

A:    It was a round sheet, there was failure to render aid and deception.

Q:    Okay. In fact, the incident itself, actually, did it not, involve the death of an inmate?

A:    Yes it did.

42.RR 254. The fact that trial counsel *knew* the nature of the termination supports the fact that they had access to these materials. Balderas's claim fails on suppression.[19]

In any event, even assuming suppression, this evidence was not material. First, Pool did testify that he was terminated for "deception." 42.RR 254. So any further evidence of his contradictory statements over the course of the termination investigation would have been cumulative. *See*, *Murphy*, 901 F.3d at 598; *Rocha*, 619 F.3d at 396; *Conley*, 415 F.3d at 189. Moreover, Pool's testimony concerned a relatively minor infraction (hoarding of medication)

---

[19]    This also underscores the importance of exhausting the claim on the correct theory. If Balderas had raised this as a suppression claim in state court, we would likely have a response from trial counsel and findings regarding whether this information was made available.

76

compared to the totality of the aggravating evidence—multiple murders, gangland shootings, and violence towards correctional officers. Thus, even assuming any impeachment value, Balderas cannot show materiality. *Cf. Smith*, 565 U.S. at 76 (holding that evidence "may not be material if the State's other evidence is strong enough to sustain confidence in the verdict"); *Sonnier v. Quarterman*, 476 F.3d 349, 363 (5th Cir. 2007) (finding no *Strickland* prejudice where there was "overwhelming aggravating" punishment evidence).

## II.    Ground Two: Balderas Claims that Trial Counsel Were Ineffective at the Guilt Phase of Trial.

In his second ground for relief, Balderas lodges several allegations that trial counsel performed ineffectively during the guilt phase of trial: (1) that trial counsel were ineffective during jury selection, Pet. at 126–31; (2) that trial counsel were ineffective for failing to timely assert his right to a speedy trial, *id*. at 131–39; (3) that trial counsel failed to investigate and present evidence of his innocence, *id*. at 139–53; (4) that trial counsel failed to reasonably investigate an alibi defense, *id*. at 153–59; (5) that trial counsel failed to present testimony of an eyewitness identification expert, *id*. at 159–65; (6) that trial counsel failed to investigate juror misconduct as a grounds for motion for a new trial, *id*. at 165–69; and (7) that trial counsel adopted an unmanageable caseload and inappropriate fee structure. *Id*. at 169–72.

These claims were exhausted and adjudicated on the merits in state court. Thus, Balderas must show that the state court's decision to deny relief was unreasonable under § 2254(d).

### A.    The *Strickland* standard

A defendant's claim that he was denied constitutionally effective assistance of counsel requires him to prove both that: (1) counsel rendered deficient performance, and (2) counsel's actions resulted in actual prejudice. *Strickland v. Washington*, 466 U.S. 667, 687–88, 690 (1984).

To demonstrate deficient performance, Balderas must show that in light of the circumstances as they appeared at the time of the conduct, "counsel's representation fell below an objective standard of reasonableness," i.e., "prevailing professional norms." *Id*. at 689–90. The Supreme Court has admonished that judicial scrutiny of counsel's performance "must be highly deferential," with every effort made to avoid "the distorting effect of hindsight." *Id*. Accordingly, there is a "strong presumption" that the alleged deficiency "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. If there is *any* "reasonable argument that counsel satisfied *Strickland*'s deferential standard," the state court's denial will be upheld. *Richter*, 562 U.S. at 105.  And even if deficient performance can be established, Balderas must still affirmatively prove prejudice that is "so serious as to

78

deprive him of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. This requires him to show a reasonable probability that, but for counsel's deficiencies, the result of the proceeding would have been different. *Id.* at 694.

Moreover, to the extent that a petitioner seeks a federal writ of habeas corpus based on an ineffective-assistance-of-trial-counsel (IATC) claim raised in the state court, the standard is more arduous. In that situation, "the test is whether the state court's decision—that [petitioner] did not make the *Strickland* showing—was contrary to, or an unreasonable application of, the standards, provided by the clearly established federal law (*Strickland*), for succeeding on his [IATC] claim." *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003); *see also Richter*, 562 U.S. at 101. Thus, a federal court's review of a state court's resolution of an IATC claim under AEDPA is "doubly deferential," *Pinholster*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111 (2009)), because the question is "whether the state courts application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 101. Importantly, "[t]his is different from asking whether defense counsel's performance fell below *Strickland*'s standard," because the "state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.* Consequently, "even a strong case for

relief does not mean the state court's contrary conclusion was unreasonable."
*Id*. at 102. Rather, to obtain habeas relief, "a state prisoner must show that the
state court's ruling on the claim being presented in federal court was so lacking
in justification that there was an error well understood and comprehended in
existing law beyond any possibility for fairminded disagreement." *Id*. at 102–
03.

As the Supreme Court recently reiterated, in conducting a federal habeas
review, this Court "owe[s] deference to both [trial] counsel *and* the state court."
*Dunn v. Reeves*, 594 U.S. 731, 739 (2021). The Court may only grant relief if
counsel "took an approach that no competent lawyer would have chosen." *Id*.
(citing *Burt v. Titlow*, 571 U.S. 12, 22–23 (2013)). "Or, in more concrete terms,
a federal court may grant relief only if *every* fairminded jurist would agree that
*every* reasonable lawyer would have made a different decision. *Id*. at 739
(internal quotation marks omitted.

## B.    Balderas's IATC voir-dire claim

Balderas argues that trial counsel were ineffective during voir dire
because, despite learning that Balderas had been sexually abused as a child,
they failed to "include this theme as part of jury selection." Pet. at 126 ¶ 385.
He argues that trial counsel should have included questions about feelings
towards sexual abuse in the juror questionnaire and should have probed these

matters with potential jurors during voir dire. *Id.* at 126–27. He also claims that trial counsel failed to preserve the appellate record at voir dire. Pet. at 130–31.

### 1.    IATC-voir-dire strategy

Balderas raised this claim in his initial state-habeas application. 1.SHCR-01 318–24. In support, he offered affidavits from the jurors at trial, noting that some of the jurors said they had been sexually abused and did not go on to commit crimes. 1.SHCR-01 322. One juror allegedly also said that he did not believe Balderas was sexually abused because he didn't speak up about it until two years before trial. *Id.* at 323.

Trial counsel responded to these allegations by way of affidavit. Alvin Nunnery explained,

> We did not specifically qualify jurors on the issue of sexual abuse because we saw it as inappropriate and not in accordance with the law. The law as we understood it was clear, there was no specific circumstance or fact that qualified as mitigation; it was for each juror to decide individually what they found to be mitigation. And so, we talked about mitigation globally and qualified jurors on whether or not they could keep any open mind to mitigation evidence, but did not discuss specific types of mitigation evidence.

5.SHCR-01 1490. Godinich similarly stated, "[i]t was trial strategy to voir dire utilizing the Colorado method of jury selection[.]"[20] *Id.* at 1474.

The state court rejected this claim. It first noted that the proffered juror affidavits concerned "mental processes" and not whether "any extraneous influences or impropriety" affected juror deliberations, and thus refused to consider them under Texas Rule of Evidence 606(b). 10.SHCR-01 2911 ¶272; In the alternative, the state court found that, even considering the juror affidavits, Balderas's claim was meritless. *Id.* at 2911 ¶ 273. It found trial counsel's affidavits on their strategy credible and noted that trial counsel performed adequately during jury selection. *Id.* at 2911 ¶¶ 274–75. It further found "trial counsel's avoidance of committing prospective jurors as to whether or not they would consider sexual abuse as mitigating evidence was reasonable trial strategy." *Id.* at 2912 ¶ 276. Accordingly, the state court concluded that Balderas failed to meet either prong of *Strickland. Id.* at 2930–31.

Balderas cannot show the CCA's decision was unreasonable. The juror affidavits he proffers cannot be considered here. Fed. R. Evid. 606(b); *Young v.*

---

[20]     "The Colorado method 'was developed for use [in] capital cases to rate potential jurors on a scale of 1 through 7 based on their views on the death penalty, with 1 being a juror who would never under any circumstances give death, and 7 being a juror who would always give death.'" *Ramirez v. Stephens*, Civ. No. 2:12-CV-410, 2015 WL 3629639, at *14 n.19 (S.D. Tex. Jun. 10, 2015) (unpublished) (quoting *Fulks v. United States*, 875 F. Supp. 2d 535, 600 (D.S.C. 2010)).

*Davis*, 835 F.3d 520, 529 (5th Cir. 2016) ("[W]e have repeatedly held that [Federal Rule of Evidence] 606(b) forbids consideration of juror affidavits in federal habeas cases."). Thus, the Director objects to the consideration of the juror affidavits regarding any claim raised by Balderas to the extent that they do not fit within the exceptions outlined in Federal Rule of Evidence 606(b)(2). Going forward, the Director addresses the juror affidavits as they pertain to individual claims, but even where the Director doesn't specifically raise an objection under Rule 606, the Director reserves the right to argue that the juror affidavits cannot be considered under that rule.

Applying Rule 606 here, Balderas cannot show prejudice. *See Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013) ("Garza argues that, because Callahan did not ask what the jurors would do in a case exactly like this one, the jurors *may* not have been fair and impartial. Garza therefore fails to establish that he suffered prejudice as a result of trial counsel's alleged error."); *Cox v. McNeil*, 638 F.3d 1356, 1362–63 (11th Cir. 2011) (finding no prejudice on claim that trial counsel failed to question jurors on "mitigation and mental health issues"). Nor can he show that the CCA's decision on deficiency was unreasonable. *See Garza*, 738 F.3d at 676 ("Moreover, Garza cites no authority, and we have found none, that would require a defense attorney to ask specific questions at voir dire."); *Battaglia v. Stephens*, 621 F. App'x 781, 785 (5th Cir.

2015) (noting that "none of the cases" cited by counsel establish that "counsel *must* ask such questions" about whether a juror could consider mental health evidence as mitigating).

### 2.    IATC-preservation-of-record

Balderas also complains that trial counsel excused "over 200 prospective jurors" without voir dire examination. Pet. at 130–31. While he labels this as a failure-to-preserve-the-record claim, it cannot be that because trial counsel did preserve the record as to jury excusals. 10.SHCR-01 2912 ¶ 277 (citing where excusals were announced on the record). Rather, this appears to be a generic broadside attack on the process of excusals by agreement altogether. Such an attack has no basis in law. *See Ramey v. Davis*, 314 F. Supp. 3d 785, 812 (S.D. Tex. Jul. 11, 2018) ("No authority requires all potential jurors to be questioned."); *Hall v. Thaler*, EP-10-CV-135-FM, 2011 WL 13185739, at *71– 72 (W.D. Tex. Dec. 20, 2011) (finding "speculative and conclusory" arguments about juror excusals failed under both prongs of *Strickland*).

Balderas also complains that this failure to question venirepersons deprived him of his ability to argue his Equal Protection claim on direct appeal. That argument makes no sense, though, as trial counsel made the excusals part of the record, 10.SHCR-01 2912 ¶ 277, and appellate counsel could have easily supplemented the record with any juror cards or questionnaires to

support the same statistical argument Balderas makes in his Equal Protection claim. *See* Pet. at 257–62. Also, we already know the claim would have failed on direct appeal because the CCA held the claim failed on collateral review. 10.SHCR-01 2931 (adopted conclusion of law that excusals were not racially motivated and that the claim was meritless).

For these reasons, the CCA's rejection of this claim was not an unreasonable application of *Strickland*. *Balderas*, 2019 WL 6885361, at *1; 10.SHCR-01 2930–31.

### C.    Balderas's IATC-speedy-trial claim

Balderas also alleges that trial counsel were ineffective for failing to timely assert his right to a speedy trial. Pet. at 131. He notes that his case was reset for trial fifty times over an eight-year period, during which he sat in jail. *Id*. He further asserts that he was prejudiced by the delay due to the deterioration of witness recollection and the 2011 suicide of his brother—which rendered his brother unavailable to testify to an alibi defense. *Id*. at 135–39.

### 1.    Background on Balderas's motion for speedy trial

Balderas moved to dismiss the indictment for lack of a speedy trial in January 2014. 11.CR 3121–32. A hearing was held, and the trial court overruled the motion. 22.RR 80–81. Balderas then appealed the denial, and the CCA adjudicated the claim on the merits. *Balderas*, 517 S.W.3d at 767. The

CCA accordingly took up the four-factor test under *Barker v. Wingo*, 407 U.S. 514 (1972), considering "(1) the length of delay, (2) the State's reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) prejudice to the defendant because of the length of delay." *Balderas*, 517 S.W.3d at 767 (citing *Barker*, 407 U.S. at 530). The CCA agreed that the eight-year delay in going to trial triggered a presumption of prejudice under the first *Barker* factor. *Id.* at 768. But the reasons for the delay and Balderas's timing in asserting it ultimately weighed "in favor of the State." *Id.* at 771. Thus, the claim was denied.

Then, in state-habeas court, Balderas attacked trial counsel for raising the speedy trial claim so late. 1.SHCR-01 295–318. Trial counsel Godinich responded,

> Until the eve of trial, [Balderas] never raised an objection to any continuance or reset filed by his attorneys. [Balderas] was informed of each and every reset and continuance and the reason for each reset. The sheer volume of the guilt innocence and punishment discovery required extensive time[-]consuming investigation. Moreover, there were ongoing negotiations with the prosecution pertaining to whether the [S]tate would consider a life sentence.

5.SHCR-01 1474. Trial counsel Nunnery responded similarly:

> Our timing in filing the speedy trial motion was a matter of trial strategy based the totality of the circumstances at play in Mr. Balderas' case. Mr. Balderas was charged with two capital murders and an assault, and had extensive extraneous criminal conduct including three additional murders and continued bad

> behavior in the jail. This required a considerable amount of investigation on our part, relating not only to his guilt or innocence, but also to presenting a mitigation case. We also had ongoing negotiations with the State and with Mr. Balderas concerning a life plea for a number of years prior to the State making its decision to pursue death against Mr. Balderas. During the entirety of his case, Mr. Balderas never indicated his desire to have a speedy trial. At the time we filed the speedy trial motion, we did not feel that there were any beneficial defense witnesses who were unavailable as a result of the delay or that our defense was hampered in any way due to the passage of time. Nevertheless, we filed the speedy trial motion to preserve his appellate rights.

5.SHCR-01 1490.

The CCA found trial counsel's explanation to be credible and their strategy reasonable. 10.SHCR-01 2910 ¶ 270. It therefore rejected the claim finding that Balderas could not show deficiency or prejudice. *Id*. at 2929–30.

### 2.    Balderas fails to meet his burden under AEDPA

Balderas fails to show the CCA's decision was unreasonable. He claims that he was "eager to go to trial from the outset." Pet. at 134. But Balderas offers nothing other than emails indicating that he preferred to go to trial over taking a plea deal. None of those emails indicate that Balderas had been pushing his trial counsel to set a date for trial. 3.SHCR-01 702–03, 715, 730. It was not until January 2014 that Balderas filed a pro se motion for speedy trial only two weeks before trial counsel filed a motion for speedy trial on his behalf. 2.CR 496–97. Balderas presents no evidence that he was dissatisfied with any

delay until January 2014. In fact, both trial counsel made clear that Balderas "never raised an objection to any continuance or reset filed by his attorneys" or "indicated his desire to have a speedy trial." 5.SHCR-01 1474, 1489–90. The CCA found the affidavits credible. Thus, Balderas's suggestion he urged trial counsel to set a date is unfounded. *See* § 2254(e)(1).

Balderas also fails to show that trial counsel's decision to seek the continuances was unreasonable. As Godinich and Nunnery credibly explained, they were holding out for a potential plea deal that would spare Balderas a death sentence. 5.SHCR-01 1474, 1490. It is obviously commonplace for an attorney to try to procure a favorable plea deal for his client. *See Premo v. Moore*, 562 U.S. 115, 127 (2011) (holding it was not unreasonable for state court to find trial counsel reasonable in in opting for a "quick plea bargain"); *see also Missouri v. Frye*, 566 U.S. 134, 144–45 (2012) (declining to "define the duties of defense counsel" in plea negotiations given that "[b]argaining is, by its nature, defined to a substantial degree by personal style"). It was certainly not unreasonable for trial counsel to wait and see how the State wanted to proceed so that they could potentially spare Balderas of the death penalty—or at least give him the option to enter such a plea. As the record shows, the State did not decide to seek the death penalty until April 2011. 2.CR 504. And according to prosecutor Spence Graham, Balderas's assault of a jailer in 2009 factored

heavily in the State's decision to ultimately seek the death penalty. 22.RR 36–37. It's possible that, had Balderas not assaulted the jailer, trial counsel's decision to wait for the State to make a decision on whether to seek the death penalty might have worked.[21] Any prejudice from this instance was the result of Balderas's own personal misbehavior, not professional negligence by counsel.

Also reasonable was trial counsel's decision to use this time to further investigate Balderas's case. According to prosecutor Graham, Balderas was implicated in "11 total homicides . . . that were linked in some way to Balderas and the evidence that we had against Balderas." 22.RR 10. Trial counsel's billing records evidence their thorough investigation, going back to 2006, and continuing all the way up to trial. SHCR-01 Supp. 120–62; 10.SHCR-01 2862–63 (findings summarizing trial counsel's investigation). Trial counsel's request for additional time to fully investigate his case and build a mitigation defense was certainly not unreasonable. *See Claudio v. United States*, No. 4:09-CR-57-FL, No. 4:12-CV-229-FL, 2014 WL 582953, at *7 (E.D.N.C. Feb. 13, 2014) (holding trial counsel not ineffective for requesting continuance that undercut speedy trial claim because trial counsel showed need to further investigate the

---

[21]     If the State decided not to seek death, Balderas would not have needed to enter a plea at all.

case); *White v. Pollard*, No. 2:18-cv-05057-JFW (AFM), 2020 WL 1173508, at *7 (C.D. Cal. Jan. 29, 2020) (finding trial counsel not ineffective in requesting continuance where counsel "acted reasonable by seeking additional time to investigate and prepare an adequate defense.").

Balderas also fails to show that the CCA's prejudice finding was unreasonable. His claim that delay had "deleterious effects on his health" has no bearing on the outcome-determinative test of *Strickland* prejudice. 466 U.S. at 695. His claim that his brother Alejandro's 2011 suicide deprived him of an alibi defense is also unpersuasive. He relies on Anali Garcia's affidavit to support the claim that Alejandro and Balderas were at Anali's mother's (Oralia McCrary's) apartment when Hernandez was murdered. But the CCA already determined that Anali's affidavit was not credible.[22] 10.SHCR-01 2871 ¶ 121. Also, this version of the alibi would require that Balderas and his brother Alejandro knew they spent the night at Oralia McCrary's apartment the night of Hernandez's murder, but *neither of them* went to trial counsel with that information.[23] On its face that theory is absurd.

---

[22]    The state-court adjudication of Anali Garcia's credibility is discussed later. *See infra.* Part II.D.2.

[23]    Balderas has provided no corroborating evidence that he tried to get trial counsel to talk to Alejandro about a potential alibi. And the state-court record presumptively establishes that no alibi witnesses ever came forward. *See infra* Part

Balderas also makes the specious argument that, had trial counsel pushed for an earlier trial date, he would not have assaulted a jailer in 2009, and the State accordingly would not have decided to seek the death penalty against him. Pet. at 138–39. First, it is unclear that the *Strickland* "outcome of the proceeding" test can be applied in this way. 466 U.S. at 694. Moreover, Balderas cannot prove that the State would not have sought death had he never assaulted a jailer. And third, Balderas cannot tie this event to his trial counsel's alleged deficiency; he is the one who assaulted a jailer, not his counsel.

Balderas also claims that the delay caused eyewitness Wendy Balderas's memory of the day of the murder "to fade" which denied Balderas an opportunity to "explore her biases and loyalties, and the reliability of her identification." Pet. at 138. First, Balderas fails to explain how better recollection from Wendy would have affected his case. Thus, the argument is conclusory. *See Koch*, 907 F.2d at 530. Moreover, it is unclear how several of the topics that Wendy couldn't remember could ever be relevant to her identification of Balderas including, her whereabouts the day of the murder, who was present in the apartment, how long she had known then-boyfriend

---

II.D.2. Thus, any argument that Alejandro would have been available to testify to such an alibi is baseless and not credible.

Edgar Ferrufino, and whether she was pregnant at the time of the shooting. Pet. at 136–38.

Second, Balderas's argument makes little sense when considering that all the relevant details Wendy couldn't remember in 2014, were in fact preserved and documented through police reports and her official statement. Her statement just after the murder was in fact admitted as a trial exhibit. SX 160.[24] And that statement contains nearly all of the of the information Balderas claims he couldn't inquire about, including "her initial description of the shooter on the night of the crime[,]" that she initially said she had never seen the shooter before, that she described the firearm as a "large black automatic" firearm, and that she had reviewed her written statement before she signed it. SX 160.

Not only were these statements admitted through an exhibit, but trial counsel used it to impeach Wendy in front of the jury *several times. See* 26.RR 55–56 (Wendy admitting that, in her 2005 statement, she said she had never seen the shooter before), 56–59 (impeaching Wendy with 2005 description of the shooter), 77–78 (using 2005 statement to fresh recollection on description of the firearm). If anything, Balderas got the best of both worlds. He got to

---

[24]    While admitted out of the presence of the jury, there is no indication the statement was only admitted for limited record purposes. 26.RR 69.

paint Wendy as unreliable due to her lack of memory, while still drawing out the parts of her 2005 statement that undercut her reliability.

And finally, the details of Wendy's interactions with law enforcement the days after the murder to go over the photo identification procedure are also well catalogued in police reports that were available to counsel. 3.SHCR-01 824–26. Sergeant Ruland—the officer who conducted the photo identification procedure—reviewed that report to refresh his memory in preparation for testifying. 25.RR 79. And he provided all the details that Balderas supposedly couldn't explore due to Wendy's lack of memory.[25] *See Balderas*, 517 S.W.3d at 793–95 (summarizing Ruland's testimony regarding photo identification).

Nunnery attested in his affidavit that trial counsel "did not feel that . . . our defense was hampered in any way due to the passage of time." 5.SHCR-01 1490. This is supported by the record. Every relevant inquiry that Balderas says he wasn't able to probe due to the passage of time was thoroughly probed by trial counsel. Thus, the CCA's determination that Balderas failed to show prejudice, 10.SHCR-01 2930 ¶ 41, was not unreasonable under § 2254(d).

---

[25]    The Director addresses Ruland's testimony in detail in addressing Claim Eleven. *See infra* Part X.

### D.    Balderas's failure-to-investigate claims

In his third IATC sub-claim, Balderas argues that trial counsel failed to adequately investigate his innocence including (1) evidence that indicated another member of LTC committed the murder and (2) an alibi defense. This claim was raised and adjudicated in state court. Thus, Balderas must meet his burdens under § 2254(d) and § 2254(e)(1) to prevail.

#### 1.    Balderas's failure-to-investigate-LTC claim

##### a.    The LTC hierarchy and the "violent" faction versus the "business" faction

In his first failure-to-investigate claim, Balderas argues that trial counsel failed to investigate and present evidence of the LTC hierarchy. Pet. at 151. Balderas supported this claim in state court with affidavits from Jose Perez and Yancy Escobar. 2.SHCR-01 559 ¶ 6, 649–50. Both attested that Balderas was part of the less violent, more business-oriented faction of LTC, and that Diaz part of the more violent and conservative faction of LTC along with LTC-leader Arevalo. *Id.*

Trial counsel Godinich attested that he had never heard of Jose Perez in his investigation. 5.SHCR-01 1472. The CCA found this credible. 10.SHCR-01 2867 ¶ 110. As not a single person—not Balderas or one of his friends or

family—indicated an individual named Jose Perez might have information, trial counsel were not deficient for failing to interview him. *See Strickland*, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."). Moreover, trial counsel did investigate the inner workings of LTC, including interviewing Yancy Escobar. 3.SHCR-01 773 (Godinich email summarizing Escobar's description of the LTC hierarchy). Escobar, however, decided not to testify so she could watch the trial. The CCA found credible that Yancy Escobar told trial counsel should would testify at trial, only to later decide not to testify so she could "be present for the entirety of trial." 10.SHCR-01 2864 ¶ 100.

But regardless, trial counsel did elicit testimony on the LTC hierarchy at trial through their witness, Walter Benitez. Benitez testified that "Gumby" (Victor Arevalo) was the leader of LTC. 28.RR 142–44. He described the initiation process. 28.RR 144–45. He described the different LTC subgroups. 28.RR 146–48. He testified that Diaz was "really close" with Arevalo. 28.RR 149. And Benitez further testified that Balderas had no leadership role in LTC, followed orders from Arevalo, and never made decisions. 28.RR 226. Thus, to the extent Balderas argues that trial counsel should have presented evidence that he wasn't as close with Arevalo and had minimal authority in LTC, trial counsel did exactly that. *See Wong v. Belmontes*, 558 U.S. 15, 22 (2009) (holding

95

that adding cumulative evidence to "what was already there would have made little difference").

As for the evidence that Balderas was less violent than his fellow LTC members, trial counsel were certainly not deficient for choosing not to present this evidence. It is already well-documented that they were fearful of opening the door to extraneous offenses at the guilt phase of trial. 29.RR 5–14 (ex parte hearing); 5.SHCR-01 1473, 1487–88. In fact, the trial court granted the State's motion in limine requesting counsel to approach before going into the bad acts of the witnesses. 11.CR 3149–50. At one point, Benitez began to describe Diaz as "angry" and "crazy." 28.RR 158. Godinich then asked if Diaz was "unstable" which prompted an objection from the State and a reminder of the motion in limine. 28.RR 158–59. Testimony that Diaz was violent would have elicited the same objection.

And a suggestion that Balderas was less violent than other LTC members would have been catastrophic. It is black letter law that character evidence can be met with "inquiry into relevant specific instances of the person's conduct." Tex. R. Evid. 405(a)(1). Thus, the State would have been able to grill these character witnesses with the very extraneous conduct that trial counsel were hoping to avoid. A suggestion that Balderas was nonviolent would have elicited questions from the witness as to whether they were aware

96

that he had committed other shootings, that his car was at the scene of multiple shootings, and whether they were aware of the numerous pictures of him posing with firearms. *See supra* Statement of Facts Part II.A. The damage done would have been immeasurable.

### b.    Evidence that Arevalo murdered Hernandez at Diaz's request.

In his next argument, Balderas argues that trial counsel did not investigate and present evidence of the fact that Hernandez had snitched on Diaz, and that Diaz accordingly wanted Hernandez killed. Pet. at 151–52. In state court Balderas offered the affidavit of Jose Perez who said that (1) Hernandez snitched on Diaz; (2) Diaz accordingly told LTC members not to associate with Hernandez; (3) Balderas defied Diaz and continued to hang out with Hernandez; (4) Arevalo stayed in Houston despite cutting off his ankle monitor while on probation; (5) on December 3, 2005, LTC held a meeting at which Diaz asked to have Hernandez killed and Balderas objected; (6) it was agreed that Arevalo should be the one to kill Hernandez since Diaz would be a suspect and Arevalo was believed to be in Mexico; and (7) that Arevalo told Perez he was the one who shot Hernandez. Pet. at 151–52 (citing 2.SHCR-01 651–54 (Perez affidavit)). As explained above trial counsel were not deficient for failing to call Perez, as they pleaded for investigative leads, and no one ever mentioned Perez. *See supra* Part II.D.1.a.

In any event, this particular claim is confounding, as it resembles the *exact* evidence trial counsel presented at the guilt phase of trial. Diaz conceded on direct examination that he lent Hernandez a car he had stolen at gunpoint, that Hernandez had told the police he got the car from Diaz, and that this led

98

to Diaz's arrest for aggravated robbery. 26.RR 140–41. Diaz further admitted that he was upset with Hernandez for violating LTC's code of loyalty. 26.RR 141. He also admitted that he confronted Hernandez, and that Hernandez denied ever snitching on him. 26.RR 142. Diaz believed he had convinced Hernandez not to testify against him, but he claimed that other LTC members were still mad at Hernandez for snitching on a fellow member and for hanging out with rival gang members. 26.RR 146.

Unsurprisingly, trial counsel seized on Diaz's anger towards Hernandez. On cross-examination, trial counsel pointed out that Diaz told Hernandez he was "pissed" at him "not on one occasion but on a few occasions[.]" 26.RR 172. Trial counsel also asked Diaz if he ever pulled a gun on Hernandez, suggesting that this information had come from Hernandez's mother, but Diaz denied the incident. 26.RR 176. They also grilled Diaz about the fact that Hernandez couldn't testify against Diaz if he were dead. 26.RR 177–78. While Diaz steadfastly denied ever wanting to take action against Hernandez, trial counsel vigorously cross-examined him on his motive to take Hernandez out of the picture. 26.RR 179–86.

But trial counsel did not rest alone on their cross-examination of Diaz— they presented evidence of the very same Arevalo-did-it theory that Balderas presents now. Fellow LTC member Walter Benitez was called for the defense.

99

28.RR 140. He testified that Diaz called the December 2005 meeting because he was angry that Hernandez snitched on him. 28.RR 160–62. Like Balderas claims now, Benitez claimed Arevalo was at the meeting despite the suspicion that he was at large in Mexico, as he had cut off his ankle monitor but stayed in Houston. 28.RR 170, 210–11. Benitez claimed that Diaz was pushing Arevalo to give the green light to kill Hernandez, and that Balderas took up for Hernandez and said Hernandez wouldn't testify against Diaz. 28.RR 171–73.

Benitez claimed that no decision was made that night, but he heard that Hernandez was killed a couple of days later. 28.RR 173. He then claimed that Arevalo came to his house on December 16, 2005, at around five or six in the morning to give Benitez a gun for protection. 28.RR 175–77. Arevalo was accompanied by three other LTC members, who were carrying various firearms. 28.RR 179–81. Arevalo allegedly presented a green box full of weapons for Benitez to choose from. 28.RR 178. Benitez testified that he saw Balderas with the green box when he was being arrested on television. 28.RR 183. He also said that the weapons found in the green box Balderas was arrested with were the same weapons he saw in the green box Arevalo had that morning. 28.RR 183. Benitez then testified that Arevalo showed him a gun that morning and said that it was the gun he used to "take care of" Hernandez.

28.RR 225. Benitez understood Arevalo to mean that he (Arevalo) had committed the shooting himself. 28.RR 226. According to Benitez, Arevalo then left to drop the box off with Balderas. 28.RR 183.

Based on this record, the CCA found that trial counsel presented evidence of the alternate-shooter theory, and that Benitez testified "consistent with the information recited in Jose Perez's affidavit[.]" 10.SHCR-01 2874—75. It accordingly found that trial counsel were not ineffective for failing to call Perez to give "substantially similar testimony" to what Benitez had already presented. *Id.* at 2922. Balderas cannot show that this was an unreasonable application of *Strickland*. *See Belmontes*, 558 U.S. at 22 (holding that adding cumulative evidence to "what was already there would have made little difference").

### c.  Wendy Bardales's motive to frame Balderas for Hernandez's murder.

In his next guilt-phase-IATC allegation, Balderas claims trial counsel failed to present to the jury evidence that eyewitness Wendy Bardales was biased against Balderas. Pet. at 152–53. In state-court affidavits, Yancy Escobar and Celeste Munoz attested that Wendy had previously dated Diaz. 2.SHCR-01 559 ¶ 7, 644 ¶ 5. Balderas also points to Munoz's affidavit, in which she recounts an incident when Balderas kicked Wendy out of his house when she refused to leave, leading to her yelling that she would "have him killed."

101

2.SHCR-01 645 ¶ 8. Munoz believed that Wendy never "got over that incident" and "held a grudge against [Balderas]." *Id*.

Again, Balderas perplexingly complains that trial counsel failed to investigate what they already knew. Godinich attested that Escobar and Munoz "informed counsel that Wendy Bardales had an intimate relationship with Diaz." 5.SHCR-01 1472. Godinich's statement was corroborated by trial counsel's contemporaneous emails. According to a February 2014 email summary of trial counsel's interview with Munoz, Wendy "was messing around with Juan [Balderas]. Israel [Diaz], and Eduardo [Hernandez]." 3.SHCR-01 778. According to Munoz, "Wendy and Israel became close." *Id*. She also recounted the same incident in which Wendy threatened Balderas when he kicked her out of his house. *Id*.

In fact, we *know* that trial counsel considered presenting this incident to the jury because they presented Munoz's testimony about the incident to the trial court at an ex parte hearing. 29.RR 5–14. The purpose of the hearing was to see if Munoz's testimony would open the door to Balderas's extraneous offenses. *Id*. The trial court told trial counsel it would open the door, as the implication would be that Wendy had motive to frame Balderas, and thus was fabricating her identification of Balderas as the shooter. Trial counsel therefore decided not to elicit this testimony from Munoz.

The CCA found that trial counsel was not ineffective in its strategic decision to not call Munoz out of fear of opening the door to extraneous offenses. 10.SHCR-01 2922 ¶ 13. Balderas cannot show this was unreasonable. The state-court record establishes that trial counsel investigated this allegation and knew about it. And a fully informed strategic decision such as this one is "virtually unchallengeable." *Strickland*, 466 U.S. at 691. Moreover, it was not unreasonable to find Balderas was not prejudiced by this decision considering the catastrophically damaging extraneous offenses that would have followed. *See Belmontes*, 558 U.S. at 20 (considering evidence that "almost certainly would have come in" when evaluating prejudice).

### d.    Diaz's alleged attempt to frame Balderas while in jail.

Lastly, Balderas claims that trial counsel failed to uncover and present evidence that, while in jail, Diaz tried to get people to "set Mr. Balderas up for the [Hernandez] shooting." Pet. at 153. In support of this argument, Balderas only relies on an affidavit from his wife, Yancy Escobar. Escobar claims that she visited Diaz in jail and Diaz told her:

> that Juan [Balderas] should take the blame for all of the murders because Juan did not have a family, unlike [Diaz] and some of the others. He also said that Juan was going to go down anyway because he was the one caught with all he guns, so I should just tell him to take the fall . . . After this happened, I told Juan's attorneys about what [Diaz] said and they responded that no one would believe me.

103

2.SHCR-01 560 ¶ 8. Escobar apparently reported this to trial counsel. 3.SHCR-01 773 (2014 Godinich email that Escobar said, a few years prior, Diaz told Escobar Balderas "needed to take the blame for everything since he did not have a family like everyone else").

Balderas's claim immediately fails because Escobar told trial counsel she did not want to testify so that she could watch the entire trial. Trial counsel explained that this was the reason they never called her to testify, 5.SHCR-01 1472, and this explanation was found credible by the CCA. 10.SHCR-01 2864 ¶ 100. While Escobar did attest that she was willing to testify, 2.SHCR-01 562 ¶ 17, the CCA's credibility determination in favor of Godinich is presumed correct here. § 2254(e)(1). Thus, Balderas fails to meet his burden of demonstrating "that the witness was available to testify and would have done so[.]" *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).

Moreover, even if Escobar were willing to testify, the claim would still fail. Assuming Escobar is truthful when she says that trial counsel told her that no one would believe her, an informed and strategic decision to not present evidence trial counsel deems not credible is reasonable. 466 U.S. at 691. And the alleged statement cryptically referred to Balderas taking the fall "for everything" doesn't suggest Balderas was necessarily innocent of Hernandez's murder. 2.SHCR-01 560 ¶ 8. Indeed, all the LTC members were facing various

charges after the coordinated December 16, 2005 arrest of several of its members. *See Supra* Statement of Facts. And finally, this statement, coming from Balderas's (at the time) girlfriend, would not have accomplished more than trial counsel already accomplished through their vigorous cross-examination of Diaz and presentation of Benitez's testimony.

Perhaps realizing the futility of these arguments, Balderas cites to juror affidavits to impeach the jury's verdict. Pet. at 153 n.17. But that evidence is precluded under Federal Rule of Evidence 606(b)(1). *See Young*, 835 F.3d at 529. Reviewing Balderas's arguments under the proper standard of *Strickland,* Balderas fails to show trial counsel were ineffective in their investigation and presentation of an alternative suspect theory.

### 2.    Balderas's IATC-alibi claim

In his IATC-alibi claim, Balderas claims that trial counsel were ineffective for failing to present the testimony of three siblings, Anali Garcia, Octavio Cortes, and Ileana Cortes Pet. at 153–54. According to Balderas, these witnesses were prepared to testify that, on the evening of December 6, 2005, Balderas spent the night at their mother's apartment. *Id*. This claim was adjudicated on the merits in state court. Thus, it is reviewed under § 2254(d).

### a.     Trial counsel's investigation of an alibi defense

In 2012, nearly two years before trial, Godinich told Balderas's girlfriend (Yancy Escobar) that if she, Jesus, or Balderas's mother had any leads to bring them directly to him. 3.SHCR-01 730. As trial grew near, Balderas remained as unhelpful as ever. In January 2013, Godinich visited Balderas who had indicated (for the first time, it seems) that there were witnesses to interview. 3.SHCR-01 736. But Balderas "did not have the names, addresses, or phone numbers for these two witnesses." *Id*. Instead, Balderas said that Jesus and Yancy Escobar would have that information. *Id*. But when trial counsel reached out to Escobar, "she could not tell us who these witnesses are, what they know or how to get a hold of them." *Id*. A month later, Godinich visited Balderas, who was still unable to provide the names of these witnesses. *Id*. a 738. It also appears that Balderas was not suggesting he had "alibi witnesses" but was rather telling Godinich that these supposed witnesses were fellow gang members. *Id*. Godinich was understandably perplexed that Balderas had been unable to provide him "with even a name." *Id*.

When trial counsel finally *did* get a name, Celeste Munoz, trial was only a month away. 3.SHCR-01 768. And they immediately asked for Munoz's contact information to interview her. *Id*. And it was not until January 31, 2014, that Balderas's mother and girlfriend *finally* suggested that Oralia McCrary

106

(the mother of Anali, Octavio, and Ileana) might be a potential alibi witness. *Id.* at 770 ("This witness is the ex-mother-in-law of Jesus Balderas. We are told that she was with Juan at the time of the Hernandez murder."). According to Escobar and Reyes, Balderas was having an affair with McCrary, but McCrary was only now willing to come forward because she was divorced. *Id.* Escobar also finally gave the names of several witnesses, including Oralia and Anali Garcia. *Id.* at 771.

On February 4, 2014, Oralia's daughter, Ileana Cortes, "dropped into the office unannounced" to speak to Godinich. 3.SHCR-01 774. Jesus (who has a child with Ileana) had told trial counsel that Ileana "was one of Juan's alibi witnesses." *Id.* Godinich spoke to her and took notes. But Ileana "could not remember anything from 2005. She says that she and Juan were close but he had never discussed the corporate murder with her. She admitted Jesus sent her over but she could not remember if Juan was with her on December 6, 2005. She claims its [sic] been 8 years and she can not [sic] remember that far back." *Id.*

About a week later, Jesus told trial counsel that Oralia "does not want to have anything to do with the case" and did not provide "any contact information" for her. 3.SHCR-01 776. Moreover, Godinich spoke with Anali

Garcia on the phone and she had "no factual information about the case." *Id*. Every alibi lead was exhausted and turned up empty.

### b.    Balderas's IATC-alibi allegations and evidence

In his first IATC argument in state court, Balderas claimed he had an alibi: He spent the night of Hernandez's murder at the apartment of Oralia McCrary, burning DVDs with her son Octavio Cortes. 1.SHCR-01 92–96. Allegedly, McCrary's daughters, Ileana Cortes and Anali Garcia, were there as well.

In support, Balderas presented the affidavits of Octavio and his sister Anali. 2.SHCR-01 527–28, 565–67. Octavio claimed Balderas spent the night of Hernandez's murder with Balderas at his mother's apartment. *Id*. He claimed that Balderas's trial counsel "never contacted" him and that, being unfamiliar "with investigations and trial" he "did not know what exactly [he] could have done to help." *Id*. at 528–29. He "just expected [Balderas's] attorneys to contact [him] at some point." *Id*. at 529. He claimed to be willing to testify. Anali also claimed that Balderas was at their apartment the night of the murder, and that he did not leave their apartment that night. *Id*. at 566. She said that she tried to tell Balderas's attorneys, but they told her they "had enough character witnesses" and they did not let her talk. *Id*.

The trial court probed the credibility of Anali and Octavio at a live evidentiary hearing. *See* 4.EHRR-01. Both Anali and Octavio testified, consistent with their affidavits, that on the night of Hernandez's murder Balderas was at their mother's apartment. Both testified that Balderas arrived in the afternoon to burn DVDs with Octavio and that, at some point in the night, their mother heard about a nearby shooting (which was the shooting of Hernandez), locked the door, and forbade anyone from leaving; thus Balderas spent the night sleeping in their living room. 4.EHRR 21–29, 82–85.

### c.     State court findings on the IATC-alibi claim

Regarding the alibi claim, the trial court found that "notwithstanding the untimeliness of potential alibi information provided to the defense, the Court finds defense counsel adequately and appropriately investigated the information provided to them. 10.SHCR-01 2867 ¶ 108. The Court took note of the fact that Oralia McCrary wanted nothing to do with Balderas's trial and that not a single person—Balderas included—mentioned Octavio Cortes as a potential alibi witness. *Id.* at 2867 ¶ 110. It also took note of the fact that trial counsel spoke with Anali and Ileana, and "found these witnesses had no useful information about the case." *Id.* at 2867 ¶ 109.

The court made further findings based on the evidentiary hearing at which Anali and Octavio testified. As explained above, Anali testified that

109

Balderas was at her mother's apartment the night of the murder, and that he spent the night. 10.SHCR-01 2868–69 ¶ 115. The trial court, however, took note of discrepancies her in testimony. First, Anali claimed that she at first thought Balderas was on trial for aggravated assault but gave wildly conflicting timelines on when she finally learned he was charged for the Hernandez murder that occurred on the night he allegedly slept over at her apartment. *Id.* at 2869 ¶ 116. She also gave outlandish and unbelievable explanations on why she sat on this information for over a decade:

- She said she attended trial "once or twice" and thought "maybe she would be called as a 'surprise witness' like in the movies, but that did not happen."

- Anali admitted visiting Balderas in jail an unknown "number of times[,]" but they "never discussed her having knowledge that could possible lead to a dismissal of the charges against him."

- Despite being in disbelief over Balderas being arrested for a murder he allegedly did not commit, Anali "took no steps to help [Balderas] because she 'was scared'" and in fear of "the 'real' killer, who she believed would tack her down and kill her and her entire family if she "tried to clear [Balderas's] name";

- Despite this fear, she called Godinich two to three days before trial "to say 'I'm a character witness and he was with us.'"

- Anali admitted to posting a petition on Facebook about Balderas's case, but "failed to mention anything about his innocence or her alibi"; again Anali justified this by claiming "that's something you wouldn't post on there, especially if I'm scared of [sic] my life.";

- Despite knowing Balderas's mother, "she cannot remember if she ever told his mother she had exculpatory evidence";

- Anali admitted that she thought her alibi evidence "would make a difference" at trial, but she "thought [Balderas's] lawyers had other evidence and she did not . . . wish to be involved."

- Anali "never said 'I don't remember' during direct examination, but gave this response more than 45 times during cross-examination";

*Id*. at 2868–72. Based on this testimony, the trial court found Garcia's affidavit and live testimony "to be not credible in its entirety and completely unpersuasive." *Id*. at 2871 ¶ 121.

The trial court next reviewed the testimony of Octavio Cortes. 10.SHCR-01 2872 ¶ 123. Like Anali, Octavio testified that Balderas was at their mother's apartment the night of Hernandez's murder. *Id*. at 2872–73 ¶ 124. Also like, Anali, Octavio failed to give an consistent account of "whether or not he was aware [Balderas] was charged with [Hernandez's] murder, and the timeframe of when he learned this information." *Id*. at 2873 ¶ 125. In addition, he provided the following testimony that undercut his credibility:

- He testified that he views Balderas as a father figure and that he and Balderas are uncles to the daughter of Ileana and Jesus;

- He had never disclosed the allegation that Balderas was at his apartment the night of Hernandez's murder until Balderas's postconviction investigator helped him compose his affidavit;

111

- He and his mother both visited Balderas in jail leading up to trial but Balderas "never told [Octavio] to contact his lawyers with the alleged alibi information nor provided [Octavio] with his attorneys' information";

- He claimed that he was "too busy, in the Marines" to learn "the details of why [Balderas] was in custody and made no effort to contact [Balderas's] attorneys";

- He commented on Facebook in 2014 about Balderas's case but "did not mention [Balderas's] alleged innocence or any alibi information."

*Id.* at 2872–73. Based on his testimony, the court found Octavio's "habeas affidavit and post-conviction evidentiary hearing testimony to be not credible and unpersuasive." *Id.* at 2874 ¶ 126. Despite Jesus's claims that Oralia and Ileana might have alibi information, the court also noted that Balderas failed to present any affidavit or live testimony from Oralia McCrary or Ileana Cortes. *Id.* at 2874 ¶ 127.

The CCA accordingly denied the claim. It found that, trial counsel were not deficient, nor was Balderas prejudiced, by trial counsel failing to call Anali, Jesus, or Ileana. 10.SHCR-01 2921 ¶ 8. Specifically, the court noted that trial counsel interviewed all these witnesses, "determined the testimony of these witnesses would not be beneficial or useful for the defense" and "believed the State could thrive on the weaknesses and biases of these witnesses." *Id.* The CCA also found that trial counsel was not deficient for, nor was Balderas prejudiced by, trial counsel failing to present an alibi witness because, (1) Balderas failed to provide alibi information to pursue; (2) the alibi information

112

presented by Balderas's family "on the eve of trial revealed either uncooperative witnesses or those who counsel believed lack credible or personal knowledge"; (3) Anali and Octavio "did not provide persuasive alibi testimony in the post-conviction evidentiary hearing; and (4) trial counsels made a strategic decision to only present testimony from witnesses counsel 'deemed credible or beneficial' and not those 'who could not account for the date and time of the offense in any credible way, or who only possessed information by means of hearsay or innuendo.'" *Id*. at 2921 ¶ 9.

### d.    Balderas fails to meet his burden under AEDPA.

Balderas foregoes any discussion of his burden under § 2254 in the argument section of this claim. His initial complaint that trial counsel did not investigate Oralia's potential alibi information fails instantly, as Balderas has never offered any statement from Oralia in state or federal court. *See Day*, 566 F.3d at 538.

Balderas also sneaks in an argument that "[c]ounsel made no independent attempt to clarify Ileana Cortes's partial memory of the night in question." Pet. at 154. In support, he relies on a statement from Ileana from March 2021, in which she claims, like Anali and Octavio did, that Balderas was at their mother's apartment on the night of the murder. *See* Pet. Ex. B. But this statement was not made part of the state court record, and it is

therefore barred under § 2254(d). *See Pinholster*, 501 U.S. at 181. Second, because Balderas did not present it in state court, it is also barred under § 2254(e)(2). *Martinez Ramirez*, 596 U.S. at 371.

And even if Cortes's statement could be considered, it would change nothing. Godinich attested in state court that he spoke with Ileana before trial and she "had no useful factual information and no alibi defense information." 5.SHCR-01 1472. The CCA found this credible, determining that Ileana's conversation with trial counsel revealed "no useful factual, alibi, or mitigation evidence for [Balderas's] defense." 10.SHCR-01 2864 ¶ 105. Trial counsel's contemporaneous 2014 email corroborates trial counsel's affidavit, which indicates that Ileana could not remember what happened on the night of December 6, 2005. 3.SHCR-01 774. This memorialization is certainly more credible than Cortes's sixteen-years-late statement that she remembers the exact movie her family watched with Balderas that night. Pet. Ex. B. at 2–3. Ileana's declaration doesn't rebut the § 2254(e)(1) presumption that this she failed to report any alibi information to trial counsel.

Ileana's federal-court declaration is also inconsistent with a declaration she gave in state court. Ileana gave a handwritten statement to Balderas's state-habeas counsel, in which she said she went to Godinich only to provide mitigation information, *not* alibi information. Pet. Ex. B. at 4. Not only is this

inconsistent with her 2021 statement, but it also tracks with Godinich's statement that "what little information [Ileana] possessed was also not helpful for mitigation purposes." 5.SHCR-01 1472. Thus, Ileana's 2021 statement is contrary to all the corroborating evidence that she spoke with trial counsel, gave weak mitigation information, and *never* brought up a potential alibi for Balderas. Balderas's Hail Mary attempt to provide another alibi witness nearly two decades later is stymied by §§ 2254(d), (e)(1), & (2).

The same is true for the arguments that trial counsel should have called Anali and Octavio to testify. Balderas fails to acknowledge that the CCA determined trial counsel were credible when they said that Anali had no factual information about the case. 5.SHCR-01 1472; 10.SHCR-01 2864 ¶ 105. The CCA also noted that this was corroborated by trial counsel's email summarizing the meeting with Anali. 3.SHCR-01 776; 10.SHCR-01 2866 ¶ 106.j. Balderas tries to argue on a blank slate, claiming that Anali and Ileana made efforts to speak with trial counsel but were turned away before they could adequately explain that they had alibi information. Pet. at 155–56. And he says that, had trial counsel allowed Anali to explain, that would have led them to Octavio who could have also verified the alibi. *Id*. But that ignores that the CCA already found Godinich and Nunnery credible when they made clear that

115

they did speak with Anali and Ileana, and the two sisters had no factual information about the case.

On that factual determination, § 2254(e)(1), *it must be presumed* that trial counsel did interview these witnesses, and they told trial counsel that they had no information about the supposed alibi. Moreover, given this factual presumption, Balderas's citation to *Bryant v. Scott*, 28 F.3d 1411, 1417 (5th Cir. 1994), a case in which trial counsel did not interview listed alibi witnesses at all, is inapplicable here. Balderas provides no argument to overcome his burden under § 2254(d) and § 2254(e)(1).

Balderas's prejudice argument is similarly lacking any discussion of § 2254 review. His citation to Octavio and Anali's affidavits omits the fact that the two were called to testify at a live hearing in state court. It also omits that the trial court found their testimony to be not credible given their farfetched, implausible, and dilatory accounts of the night of Hernandez's murder. Balderas cannot show this credibility determination—based on live testimony—was incorrect by clear and convincing evidence. *See* § 2254(e)(1); *see also United States v. Wright*, 57 F.4th 524, 530 (5th Cir. 2023) ("One of the most important principles in our judicial system is the deference given to the finder of fact who hears the live testimony of witnesses because of his opportunity to judge the credibility of the witnesses." (quoting *United States v.*

*Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005)); *Ladd v. Cockrell*, 311 F.3d 349, 356 (5th Cir. 2002) (finding that a challenge "'turns heavily on demeanor and other issues not discernible from a cold record, such that deference to the trial court is highly warranted' (even if AEDPA did not apply)"; *Pippin v. Dretke,* 434 F.3d 782, 792 (5th Cir. 2005) ("credibility determinations made on the basis of conflicting evidence are entitled to a strong presumption of correctness and are 'virtually unreviewable' by the federal courts."). And while Ileana's testimony wasn't tested in state court (due to Balderas's failure to obtain an affidavit from her alleging an alibi), her dilatory account of the night in question is non-credible on its face. *See Reed v. Stephens*, 739 F.3d 753, 786–87 (5th Cir. 2014) (deferring to a state-court determination that a witness's credibility was suspect "because she did not come forward with the information until several years after" the crime).

For these reasons, Balderas cannot show that the CCA's factual determinations were incorrect, nor can he show that the CCA's disposition of his IATC-alibi claim was an unreasonable application of *Strickland*.

### E.    Balderas's IATC-identification-expert claim

In his fourth part of Ground Two, Balderas alleges that trial counsel were ineffective for failing to call an expert on the unreliability of eyewitness identification. Pet. at 159. Balderas raised this claim in state court. 1.SHCR-

117

01 116–53. In support, he offered the declaration of Dr. Roy Malpass, an identification expert who was retained by trial counsel, but ultimately not asked to testify. 2.SHCR-01 403–49. In his declaration, Dr. Malpass opined that Wendy Bardales's identification of Balderas in the photo lineup was not reliable. *Id*. According to Balderas, trial counsel's decision not to call Dr. Malpass was ineffective.

### 1. Trial counsel's strategic decision to retain Dr. Malpass but not present his testimony to the jury.

Dr. Malpass's declaration indicates that he was contacted by trial counsel Godinich in January 2014 concerning "presenting expert testimony regarding eyewitness identification." 2.SHCR-01 404 ¶7. He was provided information regarding Wendy's identification of Balderas as the shooter and felt there were issues with the identification. *Id*. at 404–05 ¶¶8–9. Trial counsel presented Dr. Malpass's testimony in support of Balderas's motion to suppress Wendy's identification. 25.RR 122–78. The motion was denied. 25.RR 178.

Later during the trial, trial counsel held an ex parte conference with the trial court in chambers to determine how much they could attack the State's case without opening the door to the presentation of extraneous offenses. 29.RR 5. First, trial counsel presented the proposed testimony of Celeste Munoz, who would testify to an altercation in which Balderas physically

118

pushed and grabbed Wendy to get her to leave his house. 29.RR 9–10. According to Munoz, Wendy screamed "fuck LTC" and said "you're going to get payback." 29.RR 10. The trial court warned trial counsel that "that testimony from Ms. Munoz fairly clearly opens the door for the other, what I believe, the other charged capital and anything else." 29.RR 12. When asked about Dr. Malpass, the trial court said "Malpass' testimony . . . is different from an attack on fabrication. It's just an conclusory attack that it wasn't done properly. I don't think that opens the door to extraneousness." 29.RR 14.

Despite the trial judge's inclination to not "open the door" to extraneous offenses upon Dr. Malpass's testimony, trial counsel strategically decided to play it safe and not present his testimony. According to Godinich, the trial team decided that "if we were to call an eyewitness identification expert to testify, the court could and probably would allow evidence of Balderas's extraneous conduct into the guilt innocence portion of the trial. This was basic trial strategy." 5.SHCR-01 1473. Nunnery said the same: "After discussion, co-counsel and I made a strategic decision not to present Dr. Malpass as a witness because we believed it would open the door to evidence of prejudicial extraneous." *Id.* at 1487–88. Nunnery also pointed out that they were able to incorporate Dr. Malpass's findings into cross-examination "to highlight what he indicated was suggestive, improper or deficient with the photo array." *Id.*

119

### 2.    The CCA's denial of this claim was reasonable.

The CCA's findings made note of trial counsel's desire to avoid opening the door to presentation of Balderas's extraneous offenses at the guilt phase of trial. 10.SHCR-01 2879–80. It further found that trial counsel made the reasonable and strategic decision not to present Dr. Malpass's testimony out of fear of opening the door. *Id.* at 2880. Finally, it found that trial counsel was nevertheless able to "incorporate key aspects" of Dr. Malpass's testimony through "cross-examination of other witnesses[.]" *Id.* at 2881. It accordingly held that Balderas failed to show both deficiency and prejudice. *Id.* at 2923; *Balderas*, 2019 WL 6885361, at *2.

Balderas's claim is precisely what *Strickland* cautions against— challenging the fully informed decisions of trial counsel. *See Strickland*, 466 U.S. at 691 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"). Balderas makes much of the importance of Dr. Malpass's testimony, Pet. at 161–62, but obviously trial counsel agreed, as they retained Dr. Malpass. Thus, Balderas cannot claim lack of a "thorough investigation" of the "facts." And the ex parte conference with the trial court demonstrated that the trial team had been researching the possibility of opening the door through their challenge to the identification. 29.RR 12–14.

120

Citing to nothing, Balderas claims that trial counsel's decision not to call Dr. Malpass 'is inexcusable in light of the fact that the judge assured trial counsel that the testimony would not open the door to unfavorable evidence." Pet. at 161. But the trial court's ex parte "assurance" was merely a preliminary indication how of the court was leaning; of course, a ruling would need to be made in the presence of the State, who could voice their own arguments. And CCA precedent, if brought to the trial court's attention, may well have swayed the trial court. The CCA has held that a suggestion of mistaken identification, based on a challenge to a witness's "capacity to observe[,]" can open the door to rebuttal evidence of extraneous offenses. *Page v. State*, 137 S.W.3d 75, 78–79 (Tex. Crim. App. 2004). The CCA's determination that trial counsel reasonably decided not to tread on this treacherous ground was itself reasonable. *See* 28 U.S.C. § 2254(d).

Even more so considering the CCA's determination that trial counsel was able to accomplish much of the same through cross-examination. Ironically, all the points that Balderas wishes Dr. Malpass could have made are obtained from trial counsel's cross-examination of Wendy. Pet. at 162 (citing 26.RR 36, 37, 38, ,41, 42). These points include (1) Wendy's initial statement that she didn't know the shooter even though she was an acquaintance of Balderas's and (2) that the apartment was only lit by a television and kitchen light. *Id*.

121

The decision to play it safe by eliciting the same facts on cross-examination rather than calling Dr. Malpass was certainly reasonable. *See United States v, Crotteau*, 218 F.3d 826, 832 (7th Cir. 2000) ("As we stated before, 'any weaknesses in eyewitness identification testimony ordinarily can be exposed through careful cross-examination of the eyewitnesses.'" (quoting *United States v. Hall*, 165 F.3d 1095, 1101 (7th Cir. 1999))); *see also United States v. Daniels*, 97 F.4th 800, 807 (11th Cir. 2024) ("Our precedent has long held—since at least 1982—that expert testimony on eyewitness identification is generally disfavored and the district court need not admit it."). But trial counsel didn't stop at cross-examination. During closing argument, when the door to extraneous offenses could no longer be opened, trial counsel then launched a full-throated attack on Wendy's credibility. *See* 30.RR 6–7 (closing argument referring to "Wendy Bardales's casserole of confusion" and suggesting that Wendy "is lying to you"), 12–14 (pointing out Spanish speaking officer didn't help with photo identification procedure), 18–19 (attacking Wendy's ability to observe the shooter).

Trial counsel's fully informed, calculated, and strategic decision to attack Wendy's identification through cross-examination and closing argument rather than through expert testimony was reasonable. And Balderas was not prejudiced by the decision given the cumulative nature of Dr. Malpass's

testimony and the overwhelming evidence corroborating Wendy's identification. *See supra* Statement of Facts. Thus, Balderas fails to show the CCA's decision was unreasonable under § 2254(d).

### F.    Balderas's IATC-juror misconduct claim

In his IATC-juror-misconduct claim, Balderas claims that trial counsel were ineffective for failing to investigate grounds for a new trial based on juror misconduct. Pet. at 165–67. Specifically, Balderas claims that the jury was improperly influenced by being sequestered in a "seedy" motel near that was near the crime scene and by Balderas's brother waving to the jury bus as it departed from the courthouse. *Id*. He further argues that, had counsel investigated and presented the effect these incidents had on the jurors, they could have obtained a new trial. *Id*.

### 1.    Alleged failure to investigate bus-waving incident.

Balderas raised this claim in his state-habeas application. 1.SHCR-01 153–58. The CCA denied it, finding that trial counsel adequately investigated the bus-waving incident by questioning a "deputy and two jurors on the record" and moving for a mistrial. 10.SHCR-01 2923. It further noted that, on direct appeal, the CCA found the bus-waving incident "was not an improper outside influence." *Id*.

123

This claim is meritless. First, the underlying juror-bias claim claim was already preserved for direct appeal by trial counsel's development of testimony from a deputy and two jurors, as well as their timely motion for a mistrial. 32.RR 29. The CCA also held that the denial wasn't error. *Balderas*, 517 S.W.3d at 789. Admittedly, the juror affidavits offered by Balderas in state-habeas proceedings were not made part of the record on direct appeal. But Balderas fails to explain how those affidavits—if presented in a motion for new trial—would have provided any new information that might have altered the CCA's analysis. Looking to those affidavits, they reveal a simple rehash of what was already undisputed on direct appeal: Balderas's brother waved to the jury bus, some jurors saw it, those who didn't see it were made aware of it, and some of them perceived it as a threat. *Compare* 3.SHCR-01 669–70, 676–77, 684, 690, 696 *with Balderas*, 517 S.W. 3d at 783–89 (summarizing testimony regarding the incident).

The CCA nevertheless doubted,

> . . . that Balderas's brother's conduct of waving and smirking at the jurors as their bus passed him on a public street constituted "contact ... about the matter pending before the jury." The fact that some jurors recognized Balderas's brother because he had been a spectator in the courtroom did not necessarily transform his conduct of waving and smirking into a communication about the case. Thus, the testimony presented at the hearing did not establish that the contact at issue was "about the matter pending before the jury."

*Id.* at 789–90. Obviously, five affiant jurors saying the same thing the two testifying jurors said would not have changed this analysis. Thus, Balderas fails to show both deficiency and prejudice. *Cf. Pinholster*, 563 U.S. at 200 (finding no prejudice where "[t]he 'new' evidence largely duplicated the mitigation evidence at trial"); *Belmontes*, 558 U.S. at 22 (holding that adding cumulative evidence to "what was already there would have made little difference").

### 2.    Alleged failure to investigate hotel accommodations

Balderas's claim that trial counsel were ineffective for failing to investigate the hotel accommodation incident similarly fails because the underlying claim is futile. The CCA determined that Balderas failed to show deficiency and prejudice through this claim. *Balderas*, 2019 WL 6885361, at *2. This Balderas must show this was an unreasonable application of *Strickland*. 28 U.S.C. § 2254(d).[26]

Balderas cannot make this showing. First, it is curious for Balderas to allege ineffectiveness for a claim he was able to investigate and present in state-habeas proceedings. 1.SHCR-01 160–66. He fails to allege why trial

---

[26]    While the adopted findings are silent on the IAAC-hotel-accommodations claim, the CCA's written opinion made clear that it was rejecting all the "failure to investigate juror misconduct" claims under both prongs of *Strickland*. *Balderas*, 2019 WL 6885361, at *2.

counsel's failure to bring the claim on a more truncated motion-for-new-trial deadline prejudiced him. Tex. R. App. P. 21.4(a) (giving only thirty days to file a motion for new trial). Indeed, Balderas cites no authority for the proposition that he can be prejudiced for trial counsel's failure to raise a claim when he obtained a merits adjudication of the very same claim on postconviction review.

And, of course, the juror-bias claim was deemed meritless upon that review anyways: "Concerning the hotel accommodations, [Balderas] fails to do more than state mere conclusions of law or allegations of error; the evidence before us fails to show by a preponderance of the evidence that [Balderas] was prejudiced or that the results of his trial were affected." *Balderas*, 2019 WL 6885361, at *2; *see also* 10.SHCR-01 2924 ¶ 18 (same). For the reasons listed below, the CCA's denial of this biased juror claim was a reasonable application of Supreme Court law. *See infra* Part VIII.

The CCA's reasonable denial of the underlying hotel-accommodation claim is fatal to Balderas's IAAC permutation of the claim. Very recently, the Fifth Circuit rejected an IAAC claim, finding that the petitioner "fail[ed] to show that, even if his . . . claim had been properly briefed the [CCA] would likely have ruled in his favor on direct appeal." *Tong v. Lumpkin*, 90 F.4th 857, 869 (5th Cir. 2024) (citing *Strickland*, 466 U.S. at 694). As Balderas's claim suffers from the very same flaw here, it should be denied.

126

### G.    Balderas's novel "flat fee" and "excessive caseload" presumption

In his final argument, Balderas raises what is not so much a claim, but rather a suggestion that this Court should cast a suspicious eye towards trial counsel based on their excessive caseloads and flat fee structure. Pet. at 169 ("Trial counsel's unmanageable caseload and inappropriate fee structure should be considered concurrently with specific deficiencies"). Balderas raised this argument in his state-habeas application, 1.SHCR-01 87–89, and unsurprisingly, the CCA completely ignored it. *See generally* 10.SHCR-01 2862–81, 2920–24; *Balderas*, 2019 WL 6885361, at *2. Instead, it correctly focused its inquiry on whether "counsel's representation fell below an objective standard of reasonableness." *Id.* at *2.

Balderas must show that the CCA's repudiation of his novel theory was an unreasonable application of *Strickland*. Of course, he cannot; his argument is antithetical to the entirety of ineffectiveness jurisprudence. *Strickland* merely asks whether "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688. More than that, it instructs courts to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Balderas's suggestion that, due to caseload and fee structure, a court may instead do the opposite—

127

reviewing allegations of deficiency while casting suspicion towards counsel—is wholly foreign to the "highly deferential" review *Strickland* requires. *Id.*

This Court need not look far to find authority rejecting this type of argument. Federal courts of appeals have rejected his excessive caseload argument. *See Woods v. Sinclair*, 764 F.3d 1109, 1132 (9th Cir. 2014) (rejecting "unmanageable caseload" argument); *Moore v. Anderson*, 154 F.3d 417, 1998 WL 526790, at *1 (5th Cir. 1998) (rejecting "heavy caseload" argument where the record reflected "that counsel was well-versed in the facts of Moore's case and that he provided effective assistance at all stages of the prosecution").

Several courts, including a sister court in this district, have also rejected Balderas's flat-fee argument. *Batiste v. Davis*, Civ. No. H-15-1258, 2017 WL 4155461, at *29 (S.D. Tex. Sep. 19, 2017); *accord Roybal v. Davis*, 148 F. Supp.3d 958, 1104 (S.D. Cal. 2015); *Scott v. United States*, Case No. 2:14-cv-0092-SWS, 2015 WL 10877548, at *14 (D. Wyo. Apr. 29, 2015); *Knox v. Cain*, Civ. No. 5:13-cv-241-KHJ, 2023 WL 4053413, at *4 (S.D. Miss. June 16, 2023).

These courts have also rejected various aspects of Balderas's argument. Balderas cites extensively to the ABA Guidelines. But, as the Southern District of California pointed out, "the guidelines are useful of 'as evidence of what reasonable diligent attorneys *would do*,' as opposed to outlining requirements for the performance of counsel." *Roybal*, 147 F. Supp. at 1104 (emphasis added)

128

(quoting *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009)). Moreover, two district courts rejected the suggestion Balderas makes here that such a fee arrangement amounts to a conflict of interest. *Knox*, 2023 WL 4053413, at *4; *Scott*, 2015 WL 10877548, at *14.

As multiple district courts have rejected this very argument, Balderas cannot show the CCA was unreasonable for doing the same. Moreover, his argument is barred by the nonretroactivity principles in *Teague*, 489 U.S. at 310. The suggestion of a per se rule—that a specific fee structure or caseload somehow rebuts or reverses the presumption of reasonableness—would clearly be a new rule of procedure. *See Batiste*, 2017 WL 4155461, at *29 (concluding that flat-fee arrangement violating a constitutional right "would require the creation of new federal law in violation of the non-retroactivity doctrine announced in [*Teague*]."). Thus, the argument fails under both § 2254(d) and *Teague*.

### III. Ground Three: Balderas Claims That Trial Counsel Were Ineffective at the Punishment Phase of Trial

In his third ground for relief Balderas claims that trial counsel were ineffective at the punishment phase of trial. First, he claims that trial counsel failed to adequately investigate the four shootings linked to Balderas. Pet. at 173–77. Second, Balderas claims that trial counsel failed to adequately investigate and present mitigation evidence at the punishment phase of his

trial. *Id*. at 187–90. Third, Balderas claims that trial counsel were ineffective at punishment for failing to adequately preserve the record. Pet. at 209–11. And fourth, Balderas claims that trial counsel's behavior at the punishment phase rendered them ineffective. Pet. at 220–21.

All these claims were adjudicated on the merits in state court. Thus, Balderas must meet his burdens under §§ 2254(d) & (e)(1) to prevail.

## A.    Failure-to-investigate-extraneous-offenses claim.

Balderas claims that trial counsel failed to rebut the allegations that he committed four extraneous shootings or murders by failing to (1) impeach statements made by eyewitness Courtney Altimore regarding the Bunker Hill shooting, Pet. at 174–77; (2) investigate and present fact that LTC members would borrow Balderas's car, *id*. at 177–78; (3) investigate and present the fact that Balderas's tried to distance himself from LTC leading up to his arrest, *id* at 179–82; and (4) failed to investigate and present LTC's method of retaliating against its own members by framing them, *id*. at 183–86.

These claims were adjudicated in state court. The CCA made general findings noting that trial counsel, in rebuttal to aggravating evidence, cross-examined State's witnesses, presented testimony regarding the "hierarchy and operations of LTC", and "presented all the evidence available to them to rebut

130

the State's extraneous offense allegations against [Balderas]." 10.SHCR-01 2901–02.

### 1.     Failure to impeach Courtney Altimore

At trial, Altimore testified that on December 15, 2005, she pulled up to a four-way stop and saw a "small silver car" stopped in the intersection, with a large sedan and another car pulled over to the side of the road ahead of the silver car. 36.RR 99. She saw someone run out of the passenger side of the silver car, and that a man came from around the driver's side of the silver car and shot the fleeing passenger. 36.RR 100.

In state court, Balderas attached the police report to that shooting, which revealed that there was a survivor to the shooting who, according to Balderas, contradicted Altimore's testimony. Clemente Tovar Flores told police that he was in the car that was stopped, that the stopped car he was driving was a pickup truck, and that he was hit over the head and kidnapped by the assailants after his passenger was shot. 3.SHCR-01 888–90. According to Balderas, this contradicted Altimore's testimony regarding the description of the stopped car and the recollection that the driver of the car shot the victim— contradictions that Balderas argues trial counsel should have pointed out. Pet. at 175–76. The CCA denied this claim, concluding that trial counsel conducted

131

a thorough punishment investigation and "extensively cross-examined State's witnesses." 10.SHCR-01 2927 ¶ 30.

Balderas fails to show this was an unreasonable application of *Strickland*. He argues that the contradictions between Flores and Altimore "would have painted Ms. Altimore as an unreliable witness and would have undermined the State's claim that Mr. Balderas's car was tried to the shooting." Pet. at 176. Balderas's argument makes no sense in context. Even if Altimore's version of the shooting was inaccurate, she reported a license plate number that matched Balderas's vehicle to law enforcement. 36.RR 35–40, 105. Thus, it would have been impossible for trial counsel to refute the fact that Balderas's car was at the scene of the murder.

### 2. Failure to present evidence that other LTC members borrowed Balderas's car.

In his second allegation in this section, Balderas complains that trial counsel failed to investigate the fact that other LTC members used his car regularly, providing an exculpatory reason for his car's conspicuous presence at the scene of two extraneous crimes. 1.SHCR-01 229. In his affidavit, Benitez attested that fellow LTC members "Gumby and Willie would often borrow Juan's car . . . As I recall, it was a Honda." 2.SHCR-01 515. Altimore told police that a car with a license plate number of 756 GNB was involved in the Bunker Hill murder. 36.RR 105, 111. A separate shooting was also carried out by

people inside a vehicle with the same license plate. 36.RR 35–36. Sure enough, that vehicle was a Honda registered to Juan Balderas. 36.RR 37–40. Balderas claims that Benitez's testimony that Balderas shared his car would have convinced a jury that someone else was using Balderas's car to carry out these crimes. 1.SHCR-01 230.

First, it is unclear if Balderas himself ever told his lawyers that he lent his Honda out to other LTC members. *See Strickland*, 466 U.S. at 691 ("Counsel's actions are usually based, quite properly, on . . . information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information."). And, although Benitez testified for Balderas at the guilt phase of trial, he does not say in his affidavit whether he mentioned this fact to Balderas's lawyers. 2.SHCR-01 513–20.

In any event, as Balderas concedes, Pet. at 178, trial counsel *did* point out that LTC members had access to Balderas's vehicle. Specifically, they cross-examined Lieutenant Mitch Weston about the fact that someone set fire to Balderas's Honda thirteen hours *after* Balderas's arrest. 36.RR 149 Balderas argues, though, that this was "not supported by crucial evidence," namely the testimony of Benitez. Pet. at 178. But the jury had already signaled that they didn't believe Benitez's guilt-phase testimony when they convicted Balderas. Moreover, it is clearly a strategic decision to elicit information through cross-

examination of a state's witness rather than through a defense witness. *See Bower v. Quarterman*, 497 F.3d 459, 467 (5th Cir. 2007) ("[A] decision to attack the state's expert witnesses on cross examination rather than calling additional experts can be part of a reasonable trial strategy."). And it certainly seems to be a sound decision to rely on forensic evidence—the time the fire must have been set and the time of Balderas's arrest—rather than the testimony of a known gang member.

And even if Benitez had anything to add, it would not have established prejudice. Given that the jury saw Balderas and Benitez exchange gang signs during the guilt phase of trial, 5.SHCR-01 1473, 1481, it is unlikely that the jury would have found Benitez credible at punishment. Moreover, Balderas had already been implicated in three murders and two shootings. *See supra* Statement of Facts. Under the "doctrine of chances[,]" testimony that Balderas lent his car out would be insufficient to prove he didn't partake in these violent crimes. *Cf. De La Paz v. State*, 279 S.W.3d 336, 347 (Tex. Crim. App. 2009) ("The 'doctrine of chances' tells us that highly unusual events are unlikely to repeat themselves inadvertently or by happenstance.").

### 3. Failure to present evidence that Balderas was dissociating from LTC.

In his third allegation, Balderas argues that trial counsel failed to present evidence that Balderas was in the process of dissociating from LTC at

the time of the extraneous offenses. Pet. at 179–82. He points to the affidavits of family and friends to support this argument. He claims that he was reconnecting with his biological father, 2.SHCR-01 507, and that he was going to church, removing his gang tattoos, focusing on his education, and considering going to an art institute for college or joining the Marines. 2.SHCR-01 481 ¶ 19, 508 ¶ 32, 523 ¶ 9, 517–18 ¶16, 611 ¶ 39. Allegedly, Balderas wanted out of LTC, and he accordingly started hanging out with LTC less and dressing differently. 2.SHCR-01 481 ¶ 19, 508 ¶ 32, 517–18 ¶ 16, 523 ¶ 9, 555 ¶ 23, 567 ¶ 14, 611 ¶ 37.

Balderas presented this argument and these affidavits in state court. Trial counsel Godinich attested that "[c]ounsel specifically investigated whether [Balderas] was attempting to dissociate with LTC. Except for [Balderas], his attempts at dissociation could not be verified." 5.SHCR-01 1473. The CCA found this credible in rejecting the ineffectiveness claim. 10.SHCR-01 2927 ¶ 29. That determination is presumed correct here. *See* § 2254(e)(1).

Balderas complains that Godinich's affidavit "hardly suggests a thorough investigation." Pet. at 179. But, just because people weren't willing to come forward, it doesn't mean that trial counsel didn't investigate. For example, one of the witnesses who talked about Balderas changing his life, was his brother Jesus, who trial counsel strategically determined they would not

135

call due to his gang affiliation. 5.SHCR-01 1472. Moreover, trial counsel *did* elicit testimony from Walter Benitez, Daniella Chaves, and Vicky Mirafuentes Reyes, but there is no indication that they told trial counsel Balderas was pulling away from LTC during interviews. Chaves did, however, testify that she helped Balderas enroll in an art institute. 41.RR 59.

In any event, this argument can be easily dismissed because Balderas's claims are belied by the record. The jury had *just* convicted Balderas for murdering Hernandez in December 2005, 32.RR 11, which seems to conflict with an argument that he was pulling away from the gang in the fall and winter of that year.[27] And then there's the fact that Balderas's car just happened to be at two of the extraneous shootings, presented at punishment. 36.RR 35–40, 111. And then *there's also* the fact that Balderas was arrested while carrying several firearms, including the murder weapon of Hernandez, and the weapons used at the other four extraneous murders or shootings. *See supra* Statement of Facts Part II.A. Even straining credulity and accepting Balderas's argument that he was just holding weapons for the gang and lending his car out, that still cuts against his argument that he was in the process of dissociating from LTC.

---

[27]    Even under Balderas's defensive theory, he was at the meeting discussing whether to kill Hernandez.

If there were any doubt, though, that Balderas was still heavily involved in LTC, the pictures of Balderas's life in 2005 put an end to that. Here is Balderas in June 2005, only months before the extraneous offenses:



SX 431 (Balderas is on the far right). And the pictures of his home at the time of his arrest are just as bad, revealing an apartment strewn with burner cell phones, bags of powder, pills, drug scales, drug paraphernalia, firearms, knives, cash, a ski mask, and blue bandanas (the LTC "flag"). 37.RR 40–79; SX 370–428; Balderas's claim that trial counsel could have convinced a jury that he was dissociating from LTC—against this evidence—is fantastical.

Given this backdrop, it's hardly surprising that trial counsel found Balderas's change in lifestyle to be unverified. Even now, Balderas fails to offer any proof corroborating the affidavits of his family and friends—not a single

137

Marines or college brochure, not a journal entry, not a picture of Balderas in "preppy" clothing. Just affidavits that are easily refuted by the documented evidence that Balderas was still heavily involved in LTC. If anything, fighting against this reality likely would have lost trial counsel credibility with the jury. *See McWee v. Weldon*, 283 F.3d 179, 187 n.2 (4th Cir. 2002) (noting that trial counsel "could have lost credibility with the jury" by presenting frivolous insanity defense). Thus, Balderas fails to show the CCA unreasonably rejected this claim on both deficiency and prejudice grounds.

### 4. Failure to present evidence that LTC would retaliate against its own members by framing them.

Lastly, Balderas claims that trial counsel should have presented evidence that LTC tended to retaliate against its own members. Pet. at 183–86. Balderas's main argument is that LTC had previously framed its member Jose "Debo" Luviano. *Id.* at 183–85. Apparently, Luviano shot fellow LTC member Pedro Acuna over a debt. 2.SHCR-01 650; 3.SHCR-01 864. According to LTC member Jose "Pepe" Perez, as Luviano's punishment for shooting Acuna, Israel Diaz and Alejandro Garcia tried to frame Luviano by falsely saying he took part in the Loma Vista murder. 2.SHCR-01 651. According to the State's *Brady* notice, Garcia and Diaz had alleged Luviano was involved in the Loma Vista robbery, but records showed he could not have been; he was in TDCJ custody at the time. 3.SHCR-01 884. Balderas complains that trial

138

counsel failed to call Perez to testify and failed to impeach Garcia with his false allegation that Luviano was part of the Loma Vista robbery. 1.SHCR-01 226.

It's true that a police report reflects that Garcia incorrectly implicated Luviano in the Loma Vista shooting when he talked to the police. 3.SHCR-01 864. But the only evidence of Luviano being framed comes from Jose Perez, the self-appointed "knowledge keeper" of LTC. 2.SHCR-01 651 ¶ 15. First, Perez's credibility is dubious given his apparent absence from almost all LTC activities found in the record. Second, Perez gives no information about how he knows that Diaz "tried to get Alejandro [Garcia] to frame Luviano for an armed robbery on Loma Vista[.]" *Id.* at 651 ¶ 14. Is it hearsay? How many levels of hearsay? Is Perez speculating? He doesn't clarify, so there is no way to know if Perez's testimony on the matter would even be admissible if trial counsel called him.

And third, the police reports do not support the argument that Diaz framed Luviano. Diaz told Monica Esquivel that Luviano was involved in the Loma Vista shooting, not the police. 3.SHCR-01 866–67. And there is nothing in the record indicating that Diaz ever told Esquivel to implicate Luviano. Moreover, there is no evidence that Garcia's implication of Luviano was directed by Diaz. In fact, Garcia admitted that he did not know the fifth person that went along on the Loma Vista murder. *Id.* at 866–68. It was only when he

139

was shown a photospread with Luviano that he (apparently mistakenly) identified him as the fifth perpetrator. Garcia's failure to even correctly name Luviano cuts against any argument that Diaz told Garcia to frame Luviano, and it also casts suspicion on Perez's affidavit.

To the extent that Balderas is simply complaining that trial counsel did not impeach Garcia with his incorrect identification of Luviano, his claim still fails. Trial counsel did much better than pointing out Garcia mistakenly implicated Luviano. They impeached Garcia with his October 2005 statement, in which he denied being involved in the Loma Vista murder at all. 35.RR 65. In the October 2005 statement, Garcia told the police that Efrain Lopez told him about the Loma Vista shooting. 35.RR 72–73. Numerous times, trial counsel extracted from Garcia that his October 2005 statement was a lie. 35.RR 72–95. Trial counsel also confronted Garcia with the fact that he put the blame on Efrain Lopez "because [it] was convenient." 35.RR 80–81. Garcia admitted that he lied about "97 percent of the information" he provided to the police about Efrain Lopez's implication in the Loma Vista murder. 35.RR 94.

It is hard to imagine a better impeachment of Garcia on the basis that he had previously lied to implicate fellow LTC members. Trial counsel's decision to focus on impeaching Garcia through his false October 2005 statement instead of through his mistaken identification of Luviano was not

only strategic, it was remarkably effective. And since decisions regarding the cross-examination of witnesses are strategic, they usually "will not support an ineffective assistance claim." *United States v. Bernard*, 762 F.3d 467, 472 (5th Cir. 2014) (citation omitted); *see also Henderson v. Norris*, 118 F.3d 1283, 1287 (8th Cir. 1997) (an ineffectiveness claim based on an allegedly deficient cross examination "is not the type of error, if indeed it [is] error at all, that the Sixth Amendment functions to correct."). Indeed, "[s]peculating about the effect of tinkering with the cross-examination questions is exactly the sort of hindsight that *Strickland* warns against." *Castillo v. Stephens*, 640 F. App'x 283, 292 (5th Cir. 2016); *Nelson v. Davis*, 952 F.3d 651, 668 (5th Cir. 2020) ("the fact that [petitioner] has identified in hindsight another unprobed weakness in [the witness]'s testimony does not render his trial counsel's cross-examination unreasonable").

>           **5.    Balderas cannot show prejudice given the staggering evidence that he was involved in all the extraneous shootings and murders.**

Balderas's undisputed involvement in all these shootings and murders is so overwhelming, it warrants its own analysis. Of course, the jury had already concluded that Balderas murdered Hernandez with a .40 Taurus semiautomatic, one of the guns he was arrested with. SX 110. But that *same gun* was used during the Loma Vista home invasion murder. 34.RR 114

(testimony identifying SX 184 and SX 185 as casings found at the Loma Vista crime scene); 37.RR 118–19 (finding SX's 184, 185 were fired from SX 110). And the other gun Balderas was arrested with, a .357 sig, Taurus semiautomatic, was used at the scene of the three other murders. 36.RR 231 (testimony identifying SX 113 as one of the handguns Balderas dropped when fleeing police). It was used at the Club Creek shooting. 34.RR 47 (identifying SX 208 and SX 209 as casings found at Club Creek crime scene); 37.RR 122–23, 125–26 (testimony that SX's 208 and 209 were fired from SX 113). It was used at the Bissonet murder of Eric Romero. 35.RR 168 (testimony identifying SX's 254–62 as casings found at Bissonet crime scene); 37.RR 127–31 (testimony that SX's 254–62 were fired from SX 113). And finally, it was used at the Bunker Hill murder of Jose Garcia. 36.RR 84–86 (testimony that SX's 303–06 were found at Bunker Hill crime scene); 37.RR 144–47 (testimony that SX's 303–06 were fired from SX 113).

This independent forensic evidence only corroborates the evidence that Balderas was involved in these extraneous crimes. Alejandro Garcia testified that Balderas was one of the perpetrators in the Loma Vista murder. 34.RR 206–37. As mentioned above, Balderas's Honda was used in carrying out the Club Creek Shooting and the Bunker Hill murders. 36.RR 35–40, 105. At a certain point, there was nothing trial counsel could have done to convince the

jury that Balderas played no part in these extraneous crimes. *Cf. Wilkerson v. Whitley*, 16 F.3d 64, 68 (5th Cir. 1994) ("If facts adduced at trial point so overwhelmingly to defendant's guilt that even the most competent attorney would be unlikely to have obtained an acquittal, the defendant's ineffective assistance of counsel claim must fail.").

## B.    Failure to present mitigating evidence

In Balderas's *Wiggins*[28] claim, he complains that (1) trial counsel failed to adequately present evidence of his "violent and abusive childhood and unstable family," and his good character, Pet. at 190–95; and (2) trial counsel failed to adequately present evidence of his mental illness, *id*. at 196–206. The former allegation was adjudicated in state court. The latter allegation was not, and is therefore barred under §§ 2254(d) and (e)(2).

### 1.    *Wiggins* jurisprudence

Allegations of ineffective investigations, including those concerning mitigating evidence, are governed by the *Strickland* standard. *See, e.g.*, *Wiggins*, 539 U.S. at 521. The well-worn two-pronged test, described in greater detail earlier, applies—a petitioner must prove deficient performance and prejudice to garner relief. *See Strickland*, 466 U.S. at 687. Concerning

---

[28]    *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).

investigatory efforts, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id*. at 691. And reviewing courts "must be particularly wary of arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing." *Carty v. Thaler*, 583 F.3d 244, 258 (5th Cir. 2009) (quoting *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000)). This is because "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689.

To prove prejudice, a petitioner must show how the undiscovered evidence "would have altered the outcome of trial." *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010) (quoting *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989)). However, "[t]he mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." *King v. Davis*, 883 F.3d 577, 590 (5th Cir. 2018) (quoting *Grossman v. McDonough*, 466 F.3d 1325, 1347 (11th Cir. 2006)). To assess prejudice, reviewing courts "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. And the showing of prejudice "must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

144

Demonstrating ineffective assistance isn't an "easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). Review under *Strickland* is "most deferential," and under § 2254(d) it "is 'doubly' so." *Richter*, 562 U.S. at 105 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

### 2. Failure to present evidence of violent and abusive childhood

Balderas claims that trial counsel failed to present evidence of Balderas's "violent and abusive childhood and unstable family." Pet. at 190. He relies on affidavits from his mother, father, cousins and siblings. 3.SHCR-01 476–511, 664–66, 570–642. In these affidavits, he claimed that his father, Juan Balderas, Sr., beat his mother (Vicky Reyes) in front of him when he was one year old. Pet. at 191. He claim that his parents split up, and his mother moved in with Eleazar Hernandez, who abused Balderas and his brother Jesus. *Id.* at 192 ¶ 590. His mother didn't care that Eleazar was abusing them. *Id.* He presented further evidence that Eleazar sexually assaulted him and his brothers Jesus and Alejandro. Pet. at 192 ¶ 591. Balderas's mother attested that she ignored the signs of abuse, often leaving her children alone with Eleazar. *Id.* at 193 ¶ 592. Balderas was also molested by his aunt in Mexico. *Id.* at 193 ¶ 593. Balderas also claims that, even after Eleazar left, his mother continued beating him and his siblings. *Id.* at 194 ¶ 594. She always felt Balderas was a nuisance in her life and she did not care about her children

145

when they were young. *Id*. at 194 ¶ 595. Eventually Vicky moved her children to "violent and dangerous" Alief neighborhood in Houston. *Id*. at 195 ¶ 596. Finally, Balderas claims that trial counsel did not "provide evidence of Mr. Balderas's well-known and documented good character[.]" *Id*. at 195 ¶ 598.

### a.    Trial counsel's mitigation investigation

Balderas argues that trial counsel's mitigation investigation was "plagued by steady turnover" and "disjointed and scattered." Pet. at 188. He further complains that trial counsel took four years after his arrest to hire a Spanish speaking mitigation specialist. *Id*. at 189. But despite Balderas's generic arguments, the state-habeas court found that, based on the credible affidavits of trial counsel, the defense team "conducted a thorough pretrial mitigation investigation" which included retaining "multiple expert witnesses including fact investigators, seven mitigation experts, and four expert witnesses[,]" and sending experts to Mexico and New York to develop mitigation, investigating Balderas's "childhood, background, and familiar history of mental illness." 10.SHCR-01 2889 ¶ 200. They also "investigated whether [Balderas] was disassociating from LTC." *Id*. at 2889 ¶ 200.e. And finally, they "made reasoned, strategic choices in the manner and witnesses through mitigation evidence was to be presented." *Id*. at 2889 ¶ 200.g. Balderas even concedes that trial counsel's mitigation specialist "traveled to Mexico

146

approximately *six times* in her several years on the case to interview members of Mr. Balderas's extended family about his time living with them." Pet. at 215.

The trial court also noted the numerous challenges Balderas's family posed to trial counsel's investigations, as borne out by counsel's affidavits and corroborating emails. 10.SHCR-01 2889 ¶ 201. According to Godinich, Balderas's mother didn't want testimony about Balderas being sexually abused as a child to come out at trial, and she also "told her relatives in Mexico not to come to Houston, or testify for [Balderas]." *Id*. at 2890 ¶ 201.b. Apparently, she was so disruptive to the mitigation efforts that "the defense forced [her] to go to Mexico and apologize" to Balderas's relatives to convince them to testify. *Id*. ¶ 202.c. And the relatives could not coordinate amongst themselves "which of them would come to Houston." *Id*. ¶ 202.d. Despite this disruption, trial counsel still managed to present "the testimony of [eighteen] defense witnesses, including seven experts, [Balderas's] juvenile caseworker, a guard at the Harris County Jail, and friends and family of [Balderas]." *Id*. ¶ 203.

### b.    Trial counsel's mitigation presentation

Balderas also fails to trace his claims of a "disjointed and scattered" mitigation investigation to any showing of deficiency or prejudice. Despite the alleged high turnover, trial counsel seemed to do just fine. They presented testimony from nearly all the witnesses Balderas presented in state-habeas

court, including his mother Vicky Reyes, his aunt Marina Reyes, his father, Juan Balderas, Sr., and his cousin Paloma Reyes.[29] They recounted exactly the same evidence that Balderas presented in state-habeas court. Balderas presented evidence from Vicky Reyes that she didn't want to be a mother. 38.RR 45. She said she didn't love Balderas and saw him as a nuisance. 38.RR 46. She would therefore go out with friends to drink or smoke and leave her children with her neighbors or whatever male partner she was seeing. 38.RR 47. She described fighting with Balderas's father in front of Balderas when he was only three years old. 38.RR 47–48. She described how Eleazar physically abused Balderas. 38.RR 53.

Trial counsel also put on evidence of how Vicky abandoned Balderas and Jesus with her family in Puebla, Mexico, when Balderas was about eight years old. 38.RR 58. Balderas's aunt, Marina Reyes, told the jury about their time in Mexico. 39.RR 10. It was hard for them to live in Mexico at first, as they had to adjust and Balderas missed his mother. 39.RR 12. They stayed with Marina who had seven children in the house. 39.RR 13. Vianet Reyes, Balderas's cousin, recalled Balderas waiting on the roof of their house for his mother to come back. 39.RR 118. Eventually, Balderas adjusted and began getting along

---

[29]    Trial counsel made the strategic decision not to call Jesus Balderas due to his gang affiliation and criminal history. 5.SHCR-01 1472.

with his extended family. 39.RR 119. Vianet remembered that he was well-mannered and happy. 39.RR 120.

But, just as Balderas was starting to enjoy Mexico, Vicky came back to pick up her children. 39.RR 16. And she brought Eleazar with her. 38.RR 62–63; 39.RR 17. Eleazar and Vicky stayed in Mexico for some time, and Marina saw Eleazar molesting Balderas. 39.RR 17–18. Vianet suspected Eleazar was sexually assaulting Balderas as well. 39.RR 123. When Marina confronted Vicky about what she saw, Vicky dismissed the allegation. 38.RR 63–64; 39.RR 18. Vianet also confronted Vicky with the fact that Eleazar was touching Balderas. 39.RR 123.

Vicky then tried to take her children to Veracruz, but Balderas didn't want to come back with her. 38.RR 62–63. At one point, he ran away so he didn't have to go back. 39.RR 17. Eventually, however, they found him, and Vicky and Eleazar took him and Jesus to Veracruz. 39.RR 122. Vicky only left Eleazar when he almost killed her by strangling her one day. 38.RR 66. Once they moved back to Houston, she ignored the fact that Balderas was getting involved in gang activity. 38.RR 69–72.

Trial counsel also presented further detail of Eleazar's abuse of Balderas through Dr. Mendel. Dr. Mendel told the jury of Balderas's self-report that Eleazar beat him to the point that he lost consciousness. 38.RR 136. He further

described Balderas's graphic recounting of Eleazar anally raping him to the point that he "there was a lot of blood." 38.RR 138–41. Balderas also told Dr. Mendel about his childhood relationships with adult women, which Dr. Mendel perceived as abusive (although Balderas did not). 38.RR 145–49. Dr. Mendel diagnosed Balderas with PTSD arising from these traumatic events. 38.RR 170. Dr. Mendel and Dr. Jolie Brams both opined on mental health ramifications of Balderas's traumatic and neglectful upbringing. 38.RR 160–68; 42.RR 12–64.

In addition to presenting witnesses to explain his more troubling behavior, Balderas also offered witnesses to tell the jury about his more positive side. Balderas's mother Vicky Reyes testified that Balderas had changed and that he was searching for God. 38.RR 84. Balderas's cousin, Paloma Reyes, testified that Balderas was an important person and that she loved him. 40.RR 195. Judy Gallegos testified that Balderas was always overprotective and respective of the women associated with LTC. 41.RR 41. Daniella Chavez testified that she helped Balderas study and get his diploma. 41.RR 59. She also said that, when Balderas was arrested, they were "helping him get enrolled into the art institute." 41.RR 59.

Balderas also put on evidence of his religious side. He called a TDCJ chaplain, Carroll Pickett, who met with Balderas three times, during which

meetings Balderas talked about his spirituality. 42.RR 96. Pickett described Balderas as well-versed in the Bible and claimed that Balderas was repentant and sought forgiveness. 42.RR 101–04. Deputy Oscar Gonzalez testified that, on one occasion, he witnessed Balderas talk down an unruly inmate by discussing religion with him. 42.RR 111–13.

### c.     The CCA's denial of this claim was not unreasonable.

The CCA denied this claim on both prongs of *Strickland*. It found that trial counsel were not deficient and Balderas was not prejudiced by trial counsel's investigation and presentation of their mitigation case. 10.SHCR-01 2925 ¶ 24. It found the failure to present any uncalled witnesses was not unreasonable or prejudicial given that these witnesses (1) would have provided cumulative evidence, (2) would not have overcome the State's powerful punishment case, and (3) were interviewed by trial counsel who strategically decided not to call them. *Id*. at 2925 ¶ 25. The CCA went on to find that trial counsel's questioning of the witnesses they did call at punishment was neither deficient nor prejudicial, and that "more extensive questioning" would have merely been cumulative of what the witnesses already testified to. *Id*. at 2926 ¶ 27. The CCA accordingly found that trial counsel's presentation of evidence and correlation of that evidence to both the mitigation special issue and future danger special issue was not ineffective. *Id*. at 2926–27 ¶¶ 27–28.

This cumulativeness analysis was spot on. More witnesses that could have given the same testimony does not establish ineffectiveness. *See Coble*, 496 F.3d at 436 (counsel not ineffective for failing to present witnesses that "would have presented testimony already provided by other witnesses"). And such cumulativeness militates against a finding of prejudice. *See Pinholster*, 563 U.S. at 200 (finding no prejudice where "[t]he 'new' evidence largely duplicated the mitigation evidence at trial"); *Belmontes*, 558 U.S. at 22 (holding that adding cumulative evidence to "what was already there would have made little difference"). And pointing to further details that could have been provided is precisely the kind of quibbling that is foreclosed on *Strickland* review. *Dowthitt*, 230 F.3d at 743 ("We must be particularly wary of argument[s] [that] essentially come[ ] down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing.") (citing *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999)). Moreover, the CCA's finding of no prejudice based on the overwhelming aggravating evidence against Balderas was also reasonable. *See Visciotti*, 537 U.S. at 26–27; *Busby v. Davis*, 925 F.3d 699, 726 (5th Cir. 2019). Thus, not only do these claims easily fail under *Strickland*, but they fail under § 2254(d)'s "doubly deferential" analysis of IATC claims.

### 3. Balderas's new evidence is barred under § 2254(d) and § 2254(e)(2) and, in the alternative, would not establish trial counsel's ineffectiveness.

In a new facet of his claim, Balderas presents new mental health evidence that he claims trial counsel should have uncovered and presented at the punishment phase of his trial. Pet. at 196–205. As this evidence merely supplements an adjudicated claim with evidence that Balderas failed to develop in state court, it is barred from consideration. In the alternative, assuming it could be construed as a new claim, it is procedurally defaulted and fails on de novo review.

### a. Balderas's new evidence is barred under § 2254(d) and § 2254(e)(2).

Balderas presents new expert reports in support of his *Wiggins* claim. Pet. at 200–05. But this evidence merely supplements Balderas's failure-to-present-mitigation claim that was already adjudicated in state court. It *does not* operate as its own claim. Thus, the evidence cannot be considered when evaluating the state court's determination under § 2254(d). *See Pinholster*, 563 U.S. at 181.

To the extent that Balderas may argue this is a new claim that evades § 2254(d) review, the Fifth Circuit rejected that very argument in *Nelson v. Lumpkin*, 72 F.4th 649 (5th Cir. 2023). Nelson raised in state court a challenge to his trial counsel's performance at sentencing, alleging that trial counsel

"fail[ed] to adequately investigate and present mitigation evidence." *Id.* at 659.

In federal court, Nelson again challenged trial counsel's performance at

sentencing, this time alleging that trial counsel should have presented

evidence that would have diminished Nelson's culpability of the capital

murders as well as alleging that trial counsel failed to present evidence of

Nelson's "background and mental health." *Id.* The Fifth Circuit held that,

> [t]he only difference between the claim adjudicated in the state
> court and the claim presented in federal court is that Nelson
> pointed out more instances of trial counsel's alleged deficient
> performance at sentencing in the federal court claim. That is not
> enough to fundamentally alter the ineffective assistance claim
> adjudicated in the state court to place the claim in a significantly
> different legal posture. A state prisoner cannot aggregate alleged
> instances of ineffective assistance of counsel to satisfy the
> *Strickland* deficient performance and prejudice requirements and
> then disaggregate those theories to create new, unadjudicated
> claims and thereby circumvent § 2254(d)'s limitations.

*Id.* at 659–60.

*Nelson* applies with full force here. Balderas alleged that trial counsel

were deficient in their failure to investigate mitigation to present at the

punishment phase of trial. 1.SHCR-01 34–36. And "[t]he only difference

between the claim adjudicated in the state court and the claim presented in

federal court is that [Balderas] pointed out more instances of trial counsel's

alleged deficient performance at punishment in the federal court claim."

*Nelson*, 72 F.4th at 659. Under circuit precedent, "[t]hat is not enough to fundamentally alter the ineffective assistance claim adjudicated in the state court[.]" *Id*. Thus, Balderas's attack on trial counsel's performance at the punishment phase of trial is the same claim that was adjudicated on the merits in Balderas's first application, and his newly presented evidence cannot be considered under § 2254(d). *See Pinholster*, 563 U.S. at 181.

Moreover, this evidence cannot be considered because Balderas failed to develop it in state court. *See* § 2254(e)(2). Even if Balderas plans on arguing that state-habeas counsel were ineffective for failing to develop the evidence in state court, *see* Pet. at 330–31, that would trigger § 2254(e)(2), thus barring review. *See Martinez Ramirez*, 596 U.S. at 371.

> **b.    This evidence fails to show trial counsel's ineffectiveness.**

Balderas presents two expert reports that were not presented in state court:[30] one is a neuropsychological evaluation from Dr. Robert Ouaou, SHCR-03 302–12, and the other is a psychiatric evaluation from Dr. Bushan Agharkar. SHCR-03 291–301. In addition, Balderas presents a supplemental

---

[30]    Balderas attached these reports to his subsequent application that was dismissed as procedurally barred. SHCR-03 291–314. But, as these reports were attached to a barred application, they were not presented "in compliance with state procedural rules." *Martinez Ramirez*, 596 U.S. at 376. The Director's citation to the SHCR-03 record should not be construed as a concession that these reports are properly part of the state-court record.

report from Dr. Ouaou that was made in response to the Director's 2022 opposition to Balderas's motion to stay proceedings. SHCR-03 314–15.

Dr. Agharkar performed a psychiatric evaluation of Balderas and found that Balderas "exhibits compelling mood, trauma, and brain impairment symptoms that likely pre-date his trial." SHCR-03 291. He also opines that Balderas's trial experts "were the wrong types of experts to integrate the abundance of mental health data in this case, and misattributed symptom of major mental illness as trauma rather than a confluence of psychiatric, neurologic, and traumatic factors." *Id*. at 292. After reviewing Balderas's jail medical records and other expert reports, and interviewing Balderas and his wife, Dr. Agharkar diagnosed him with PTSD, schizoaffective disorder, bipolar type, and noted he might have organic brain impairment. *Id*. at 297.

Dr. Ouaou performed a neuropsychological evaluation "to assess Mr. Balderas's neurocognitive functioning secondary to a history of neurodevelopmental, neurological, and psychiatric disease and/or damage." SHCR-03 303. Based on his evaluation, Dr. Ouaou determined that Balderas has below average intelligence, cognitive defects consistent with central nervous system damage, learning and memory deficits, and impairments on measures of executive functioning associated with frontal-lobe brain damage and general neurological disease. *Id*. at 310–12. Dr. Ouaou also pointed to

Balderas's pre-trial jail records indicating depressive disorder with psychotic features, a history of inhalant dependence, and references to visual hallucinations, psychosis, suicidal ideation, and behavioral dyscontrol. *Id*. at 311. Based on this, he opined that Balderas's experts should have referred Balderas to an expert in neurology, psychiatry, and neuropsychology for an examination of these potential cognitive defects.

As for the opinions of Dr. Agharkar and Dr. Ouaou that trial counsel's experts should have alerted trial counsel to a potential schizoaffective diagnosis and cognitive or intellectual impairments, such an argument falls short of showing deficiency. The "duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005). Rather, counsel "should be permitted to rely upon the objectively reasonable evaluations and opinions of expert witnesses." *Segundo v. Davis*, 831 F.3d 345, 352 (5th Cir. 2016); *see also Dowthitt*, 230 F.3d. at 748 (counsel is not required to "canvass[] the field to find a more favorable defense expert"). Dr. Agharkar spends much time attacking trial counsel's experts for failing to consider Balderas's medical records and conducting incomplete evaluations. SHCR-03 298–99. But this type of argument is plainly foreclosed. *See Segundo,* 831 F.3d 345 (rejecting IATC claim where "none of the experts retained by trial counsel indicated that they

were missing information needed to form an accurate conclusion that Segundo is not intellectually disabled"). And, in any event, trial counsel's decision to focus on trauma instead of mood disorder or cognitive impairments is the paradigmatic example of a strategic choice. *See Hinton v. Alabama,* 571 U.S. 263, 275 (2014) ("The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of the law and facts' is 'virtually unchallengeable.'") (citation omitted)).

Moreover, trial counsel *did* present evidence that Balderas suffered from PTSD. 38.RR 170. Specifically, Dr. Mendel opined that Balderas was sexually assaulted multiple times during his childhood, including most brutally by his stepfather, Eleazar. 38.RR 130–48. Dr. Mendel further explained how this diagnosis might have led him to feel powerless, and thus turn to gang life and inhalants to make himself seem more powerful. 38.RR 160–68. Dr. Jolie Brams also testified that Balderas's trauma "markedly impacted his functioning" and that literature supported the notion that this level of trauma would affect "neurodevelopment, the development in the child's brain, as well as the behavior and mental health functioning over the course of time." 41.RR 268. She further explained that Balderas never learned to regulate his emotions, 42.RR 19, felt abandoned, 42.RR 21, and turned to gang life for protection. 42.RR 30. She also opined trauma can dysregulate the brain. 42.RR 35.

158

Thus, Balderas's new evidence is largely cumulative of the evidence trial counsel presented. *See Belmontes*, 558 U.S. at 22 (holding that adding cumulative evidence to "what was already there would have made little difference"); *Coble*, 496 F.3d at 436 (counsel not ineffective for failing to present witnesses that "would have presented testimony already provided by other witnesses"). Moreover, given the horrific evidence that Balderas was behind five separate murders or shootings, the aggravating evidence against Balderas "was overwhelming . . . which . . . makes it 'virtually impossible to establish prejudice.'" *Clark v. Thaler*, 673 F.3d 410, 424 (5th Cir. 2012) (quoting *Ladd*, 311 F.3d at 360).

And finally, it is also possible that Balderas's additional mental health evidence of schizoaffective disorder and brain damage would have been double-edged thus justifying a decision not to present it to the jury. *See Martinez v. Dretke*, 404 F.3d 878, 889 (5th Cir. 2005) ("As we have held, evidence of organic brain injury presents a 'double-edged' sword, and deference is accorded to counsel's informed decision to avert harm that may befall the defendant by not submitting evidence of this nature."). Especially so where, as here, part of the argument is that the brain damage was brought on by "inhalant abuse." *See Ayestas v. Davis*, 933 F.3d 384, 392 (5th Cir. 2019) (rejecting claim that trial counsel should have presented evidence of substance abuse because it was

"double-edged"). Trial counsel's decision to focus on trauma inflicted by others was reasonable.

For these reasons, Balderas fails to show both *Strickland* deficiency and prejudice. Also, if this new evidence were considered a new claim, it would be defaulted, and Balderas would fail to overcome the default because he cannot establish that habeas counsel were ineffective, *see infra* Part IV.B, and because any new IATC claim is not "substantial." *See Martinez*, 501 U.S. at 13. And for the same reasons, he cannot show actual prejudice. *Ramey v. Davis*, 942 F.3d 241, 255–56 (5th Cir. 2019).

## C.    Trial counsel's alleged failure to preserve the record

In the third sub-claim, Balderas alleges that (1) trial counsel failed to object to the State's comment on his failure to testify, Pet. at 211–14, and (2) trial counsel failed to preserve the record on the court's denial of funds to transport mitigation witnesses from Mexico to testify, *id*. at 214–20.

### 1.    Failure to object on Fifth Amendment grounds

Regarding the first allegation, Balderas's expert, Dr. Mendel, testified that Balderas's account of being sexually abused was convincing, as it appeared Balderas was reexperiencing the abuse as he told the story. 38.RR 142–44. On cross-examination, the State pointed out that the jury had to take Dr. Mendel's word for it because he did not record the interview. 39.RR 54. The

State accordingly asked Dr. Mendel if it would be more helpful if the jury got to hear and see the interviews for themselves. 39.RR 57–58; 40.RR 15–16. The State asked a similar question of Dr. Brams, asking if it "would be helpful to the jurors if they could see or hear the interviews that you conducted with [Balderas] so they could judge it for themselves how he sounded, maybe how he looked, if you could video it." 40.RR 15–16. The State brought the same point up at closing. 43.RR 67. According to Balderas, trial counsel should have objected to this questioning as violating Balderas's "right not to testify." Pet. at 212.

In state court, trial counsel Godinich attested that he "did not believe the prosecution was making a comment on [Balderas's] failure to testify" but rather "appeared to be attempting to undercut the witnesses' testimony and credibility and not [Balderas's] failure to testify." 5.SHCR-01 1473. Nunnery similarly stated that trial counsel "did not construe these as comments on Mr. Balderas's failure to testify. I believe these were fair points for cross-examination. I believe the State was entitled to question the experts as to why the jury should believe their assessments of Mr. Balderas's reactions. The State's questioning and argument was a fair attack on the credibility of the experts." *Id*. at 1488–89. The trial court concluded that Balderas failed to show trial counsel were ineffective. 10.SHCR-01 2927–28.

161

In conclusory fashion, Balderas merely responds to the trial court's denial of the claim by stating, "the transcript . . . suggests otherwise." Pet. at 212. But he fails to explain why trial counsel's appraisal of the questioning was unreasonable; he he fails to cite *a single Supreme Court case* on the Fifth Amendment right against self-incrimination.

And a review of Supreme Court law only supports trial counsel's decision. To be sure, the Supreme Court has held that the Fifth Amendment "prohibits the judge and prosecutor from suggesting to the jury that it may treat the defendant's silence as substantive evidence of guilt." *Baxter v. Palmigiano*, 425 U.S. 308, 319 (1976) (citing *Griffin v. California*, 380 U.S. 609 (1965)). *Griffin* involved a rather blatant and unprovoked comment on the defendant's failure to testify. 380 U.S. at 611 (commenting that the defendant "would know" the facts of the case but "has not seen fit to take the stand and deny or explain.").

But, "when the defendant uses his *Griffin* protection as a sword, rather than a shield, the prosecution may respond appropriately." *United States v. Isaac*, 134 F.3d 199, 206 (3d. Cir. 1998) (citing *United States v. Robinson*, 485 U.S. 25, 32 (1988)). For example, in *Robinson*, the prosecution was permitted to tell the jury that the defendant was free to testify in response to defense counsel's closing argument that "the Government had not allowed [the

162

defendant] to explain his side of the story[.]" 485 U.S. at 32. And "[t]he Supreme Court has also recognized that a defendant who asserts a mental status defense lacks a Fifth Amendment right to remain silent regarding the mental status that he has placed at issue." *Pawlyk v. Wood*, 248 F.3d 815, 825 (9th Cir. 2001) (citing *Buchanan v. Kentucky*, 483 U.S. 402, 422–23 (1987)). The Supreme Court further explained this rationale in *Kansas v. Cheever*:

> The admission of [] rebuttal testimony harmonizes with the principle that when a defendant chooses to testify in a criminal case, the Fifth Amendment does not allow him to refuse to answer related questions on cross-examination. A defendant "has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts."

571 U.S. 87, 94 (2013) (quoting *Fitzpatrick v. United States*, 178 U.S. 304, 315 (1900)). Thus, courts routinely "consider the challenged comment within the context of the facts of the case to evaluate its meaning." *Gomes v. Brady*, 564 F.3d 532, 538 (1st Cir. 2009) (citing *Robinson*, 485 U.S. at 33).

And doing so here, it is obvious that the State's questions and argument were not a comment on Balderas's refusal to testify but were rather permissive impeachment of Balderas's expert testimony. Balderas spoke with Dr. Brams and Dr. Mendel during their evaluations, and their expert opinions naturally rested in part on the veracity of his statements during the evaluations. Dr. Mendel went so far as to bolster Balderas's credibility during the interviews, describing Balderas's disclosure of sexual abuse to be "very credible, very

163

believable, and really very poignant. He told it with a lot of emotion and with, what, to me, was a very clear level of reexperiencing, remembering, in an emotional, visceral, powerful way rather than just recounting an event." 38.RR 131–32. Naturally, the State pointed out that the jury didn't "get to see that for themselves." 39.RR 54. Balderas is not permitted to put his demeanor and credibility at issue through his experts and then complain when the State astutely points out that the jury cannot evaluate his credibility and demeanor for themselves.

More importantly, because this is an IATC claim, all that matters is whether trial counsel's decision was a reasonable one. Counsel cannot be deficient for failing to raise an objection if counsel "reasonably could have determined" that the objection "would have failed." *Sexton v. Beaudreaux*, 585 U.S. 961, 965 (2018). As trial counsel's stated reason for not objecting was based on a correct analysis of self-incrimination jurisprudence, they were reasonable. More than that, the CCA's determination that trial counsel acted reasonably was *itself* reasonable. *Richter*, 562 U.S. at 105 (*Strickland* review under § 2254(d) is "doubly" deferential).

Trial counsel also cannot be ineffective "for failing to make an objection that would have been overruled." *Harper v. Lumpkin*, 64 F.4th 684, 699 (5th Cir. 2023) (citing *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994)). Balderas

164

argues that, had trial counsel objected, "it is likely that" he "would have prevailed in raising the issue on direct appeal." Pet. at 213. That seems unlikely though given that the CCA itself found that the challenged testimony did not "constitute[] a comment on [Balderas's] failure to testify, but rather appropriately raised questions concerning the credibility of the defense's sexual abuse evidence." 10.SHCR-01 2905, 2927–28. Thus, Balderas also fails because his proposed objection was meritless. And finally, Balderas's citation to a juror affidavit to demonstrate that a juror was convinced by this argument, Pet. at 213, is precluded from consideration under Rule 606(b). But that evidence is precluded under Federal Rule of Evidence 606(b)(1). *See Young*, 835 F.3d at 529.

### 2.    Failure to preserve denial of funding

In his second allegation that trial counsel failed to preserve the record, Balderas claims that trial counsel did not make a record of the trial court's denial of funding to transport witnesses from Mexico to testify. Pet. at 214. Balderas cobbles together emails to make it seem that the trial court denied funding to transport Balderas's family members from Mexico to testify. Pet. at 214–16.

But, according to trial counsel, no denial occurred. The only evidence is an email from trial counsel indicating that the trial court did not want to pay

to "bring in" the "witnesses from Mexico but would rather use something similar to skype." 3.SHCR-01 744. When mitigation specialist Adriana Helenek asked if she should stop the passport process, trial counsel Godinich told her not to cancel the passport requests because he preferred live testimony to virtual testimony. *Id*. According to Godinich, the trial team's plan was "foot the cost of the visitation fees" but "the witnesses were unable to coordinate among themselves who would be coming to Houston." 5.SHCR-01 1473–74. Godinich further attested that Balderas's "mother had previously communicated with her relatives in Mexico and told them not to come to Houston and testify for [] Balderas." *Id*. at 1474. Balderas's relatives in Mexico gave testimony over Skype and, when Skype encountered technical issues, over speakerphone. 10.SHCR-01 2903.

The CCA entered findings that, "any obstacle the defense faced [w]as a result of witness tampering with its witnesses in Mexico, was a result of [Balderas's] friends and family, and not the trial court's failure to fund travel expenses from Mexico." 10.SHCR-01 2903. Moreover, despite the virtual nature of the testimony presented, the CCA found that "the parties were nevertheless able to present direct and cross-examination testimony from [Balderas's] witnesses for the jury's consideration." *Id*. The CCA also concluded that Balderas failed "to show the trial court erred in denying the defense

funding to transport witnesses from Mexico to the United States." *Id*. The CCA denied the claim, concluding that the parties were able to question the witnesses "via telecommunication" and that "defense counsel offered to pay the expenses to transport the witnesses from Mexico to the United States but the witnesses could not coordinate plans amongst themselves." 10.SHCR-01 2928.

Thus, Balderas's claim rests on an incorrect premise—that trial counsel presented virtual testimony due to a lack of funding. Trial counsel established that they presented witnesses living in Mexico via telecommunication, not because of a lack of funding, but because the witnesses apparently refused to coordinate travel plans. The CCA's determination that trial counsel were credible in giving this explanation is presumed correct. § 2254(e)(1). Balderas offers nothing more than the feeble and conclusory statement that "[t]here are facts that directly contradict these statements, but Mr. Balderas was never given an opportunity to present them or to object to Mr. Godinich's affidavit." Pet. at 215. While Balderas doesn't elaborate on these facts, any evidence of them would be barred here under § 2254(d) and (e)(2). *See Pinholster*, 501 U.S. at 181; *Martinez Ramirez* 596 U.S. at 371.

Balderas's deficiency argument fails for a second reason: the CCA alternatively ruled that Balderas failed "to show that the trial court erred in denying the defense funding to transport witnesses from Mexico to the United

167

States." 10.SHCR-01 2903. Thus, Balderas cannot show deficiency for failing to preserve a claim through a funding motion. *See Evans v. Davis*, 875 F.3d 210, 218 (5th Cir. 2017) ("Obviously, counsel is not deficient for failing to make meritless suppression motions."). Nor can he show prejudice. *See United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument . . . cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue.").

Balderas claims that denial of the funding would have violated his due process rights, but points to no authority indicating that requiring two witnesses to testify through telecommunications—largely to facts already established through other witnesses—deprived him of his ability to put on a mitigation case.

Balderas also fails to show prejudice. He relies on a juror affidavit claiming to argue that "at least one juror" believed the Mexico witnesses weren't important because they didn't travel to Houston, Pet. at 220. But that affidavit cannot be considered. Federal Rule of Evidence 606(b)(1). *See Young*, 835 F.3d at 529. Other than relying on this improper affidavit, Balderas fails to argue prejudice at all. "Mere conclusory allegations are in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional

168

issue." *Green v. Johnson*, 160 F.3d 1029, 1042 (5th Cir. 1998). Moreover, even if Balderas could point to some aspect of the testimony that came through poorly over a virtual connection, the CCA found credible Godinich's allegations that the Mexico witnesses were responding to questions "much differently than expected" because Balderas's mother was calling those witnesses and telling "them how to respond to Godinich's questions." 10.SHCR-01 2903. Not only is this credibility determination presumed correct, *see* § 2254(e)(1), but it is also corroborated by trial counsel's email, which memorialized the issue. 5.SHCR-01 1482.

And finally, Balderas cannot show prejudice because he cannot overcome the CCA's determination that trial counsel were still able to question the Mexico witnesses via telecommunication technology. 10.SHCR-01 2928. Two witnesses testified from Mexico, Balderas's aunt, Marina Reyes, and his cousin, Paloma Reyes. 39.RR 6; 40.RR 193. Through their postconviction affidavits, Paloma and Marina mostly gave information about Balderas's life in Mexico after his mother left him there for a couple of years. 2.SHCR-02 626. Marina testified to the exact same information at trial. 39.RR 10–21. Thus, the CCA's no-prejudice finding was reasonable. *See Pinholster*, 563 U.S. at 200 (finding no prejudice where "[t]he 'new' evidence largely duplicated the mitigation evidence at trial").

**D.    Trial counsel's alleged behavior at punishment**

In his final sub-claim, Balderas alleges that (1) trial counsel made demeaning comments towards one of the prosecutors under his breath but within the earshot of the jurors, Pet. at 221–22; and (2) trial counsel antagonized the jury during closing argument, *id*. at 222–26.

Nunnery responded directly to these attacks in his affidavit:

> I have no personal recollection of calling State's counsel "a bitch", or saying that someone "doesn't like me because I'm black." Trials are intense battles between adversaries and in the course of battle words are often spoken by both parties. In punishment closing argument, I did remind the jurors of our conversations during jury selection and the oaths they took as jurors to have individual votes and keep to their personal convictions. During guilt-innocence deliberations, the jurors had sent notes that they were deadlocked and ultimately minds must have been changed to reach a guilty verdict. In response and as a matter of strategy, I reminded the jury that they are individuals and are entitled to own vote, and that if they changed their vote because of pressures they felt, then they had violated the oath they took. I believed it was very important to remind them to stick to their beliefs.

5.SHCR-01 1489.

The trial court found Nunnery's explanation credible. 10.SHCR-01 2904 ¶ 238. It also found that these comments were irrelevant to trial counsel's performance or the outcome of the proceeding. *Id*. at 2904 ¶ 240. As for closing argument, the court found Nunnery credible when he determined that reminding the jurors of their oaths was a "reasonable trial strategy" given the juror notes sent out during the guilt deliberations. *Id*. at 2904 ¶ 241. It noted

170

that Nunnery's closing argument "expressed appreciation and respect for the jury's efforts" and was overall a "reasonable trial strategy." *Id.* at 2904 ¶¶ 242–43. The Court therefore denied the claim, finding Nunnery's closing argument reasonable trial strategy, the juror affidavits "speculative and inadmissible," and the alleged conduct not enough to overcome the "totality of the State's punishment evidence against [Balderas]." *Id.* at 2928–29 ¶ 36.

Balderas fails to show this was unreasonable. Balderas's reference to the juror affidavits in support of this claim Pet. at 221–26, cannot be considered here. *See* Fed. R. Evid. 606(b)(1); *Young*, 835 F.3d at 529. And even if Nunnery made the alleged disparaging comments, that there is no reasonable probability that they affected the outcome at punishment. Balderas fails to show the CCA's determination that these alleged comments were not prejudicial in light of the "totality of the State's punishment evidence" was itself *not unreasonable*. 10.SHCR-01 2928–29 ¶ 36; *see also* § 2254(d).

Turning to Balderas's closing-argument claim, he fails there as well. "The right to effective assistance extends to closing arguments." *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (citing *Bell v. Cone*, 535 U.S. 685, 701–02 (2002) and *Herring v. New York*, 422 U.S. 853, 865 (1975)). But, as deferential as *Strickland* is, trial counsel is given especially wide latitude on how to conduct closing, given the "broad range of legitimate defense strategy at that stage."

171

*Id.* And "[j]udicial review of a defense attorney's summation is therefore highly deferential and *double deferential* when it is conducted through the lens of federal habeas." *Id.* (emphasis added). Indeed, the latitude is so wide, that trial counsel may reasonably waive closing altogether. *See Cone*, 535 U.S. at 701–02.

Applying this double deference, Balderas's claim fails. "[R]esidual doubt may be a reasonable, even highly beneficial, strategy in a capital case." *Martinez v. Quarterman*, 481 F.3d 249, 256 (5th Cir. 2007) (explaining the holding in *Moore v. Johnson*, 194 F.3d 586, 618 (5th Cir. 1999)). Nunnery's decision to seize on the fact that there were holdout votes, and to use this hesitation by some of the jurors to urge them to follow their oaths during the second phase, is exactly the type of strategic decision that is protected under *Strickland*. *See Lang v. Bobby*, No. 5:12 CV 2923, 2015 WL 1423490, at *28 (N.D. Ohio Mar. 27, 2015) (finding that defense counsel stating "If you act like a jury or if you act like a lynch mob" during argument was not ineffective). The fact that it may not have worked is irrelevant. "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Gentry*, 540 U.S. at 6.

Moreover, given the powerful evidence against Balderas, he cannot show a "reasonable probability" that, absent Nunnery's behavior, there is a

reasonable probability he would not have been sentenced to death. Balderas's criminal history was a nightmarish depiction of terror that he and his gang inflicted on the Southwest Houston area, consisting of several murders and aggravated assaults. *See supra* Statement of Facts. "[E]ven the most skillful of closing arguments—even one befitting Clarence Darrow—would not have created a reasonable probability of a different outcome in this case." *Smith v. Spisak*, 558 U.S. 139, 164 (2010) (Stevens, J., concurring).

## IV. Grounds Four and Five: Balderas's IATC-Competency and Standalone Competency Claims

In claims four and claim five, Balderas alleges that he was incompetent to stand trial and that trial counsel were ineffective for failing to investigate his competency to stand trial. Pet. at 226–38. Those claims are time-barred, procedurally defaulted, and substantively meritless.

### A. Claims four and five are time-barred.

Claims raised under § 2254 are subject to a one-year statute of limitations:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—
>
> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

Under the Federal Rules of Civil Procedure, a claim raised in an amended § 2254 petition may relate back to an original timely petition, so long as it relates back to a claim raised in the timely petition. Fed. R. Civ. P. 15(c)(1)(B). For a claim to relate back to a petition under Rule 15(c)(1)(B), it must "assert[] a claim or defense that arose out of the conduct, transaction, or occurrence, set out—or attempted to be set out—in the original pleading[.]" *Id*. The Supreme Court has construed this to mean it must be "tied to a common core of operative facts." *Mayle v. Felix*, 545 U.S. 644, 664 (2005).

174

Claims four and five do not relate back to any such claim. In his initial petition, Balderas never raised the issue of whether he had the ability to rationally communicate with trial counsel or understand the charges against him at trial. *See generally* ECF No. 2. In his reply in support of his *Rhines* motion, Balderas argued that this claim related back to his original petition, because he raised a claim that trial counsel failed to investigate and present mitigating evidence of his mental health and attached a psychiatric report from Dr. Bhushan Agharkar in support. ECF No. 55 at 12–13. But competency involves a much different core of operative facts than mitigation evidence. It involves evidence of whether a petitioner had the ability to understand the proceedings against him sufficient to assist his attorneys in their defense. *See Indiana v. Edwards*, 554 U.S. 164, 170 (2008). Mitigation involves no such analysis.

Balderas's COVID-related arguments don't help. He claims that Dr. Agharkar's preliminary analysis was impeded by the COVID-19 pandemic. ECF No. 55 at 12–13. But even Dr. Agharkar's preliminary findings noted possibility of the very same mental illnesses that undergird his current competency determination. ECF No. 2-1 at 8 (December 2020 report that Balderas suffered from potential "adolescent brain development, and brain damage" and that trial experts did not consider Balderas's symptoms as "a

confluence of psychiatric, neurologic, and traumatic factors"). On this, Balderas could have raised the same competency and IATC-competency claims he raises here. If the preliminary findings were unsupported, he always could have abandoned the claim. His failure to preserve it, though, renders it time-barred.[31]

## B.    Claims four and five are procedurally defaulted.

Upon return to state court, Balderas raised these two claims in his subsequent state-court application. SHCR-03 138–63. The CCA dismissed the claims under Texas's abuse-of-the-writ bar. *Balderas*, 2023 WL 7023648, at *1. Thus the claim is procedurally defaulted unless Balderas can overcome the default by showing cause and prejudice. *See Coleman*, 501 U.S. at 750; *Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008) (noting that Texas's abuse-of-the-writ bar is an independent and adequate state ground).

In a single paragraph, Balderas suggests that OCFW "did not investigate or plead claims related to Mr. Balderas's competency, despite awareness of Mr. Balderas's long history of mental illness and behavior consistent with those

---

[31]    Balderas accuses the Director of reneging on a July 2020 agreement not to assert a limitations defense. ECF No. 55 at 12–13. He misunderstands the agreement. The Director agreed to Balderas's right to amend his petition and agreed to "not assert a limitations defense against any later-filed amendment that relates back to those timely-filed claims." Obviously, the parties disagree on the relation-back argument. But accusing the Director of reneging on the agreement seems hyperbolic.

diagnoses. Pet. at 231 ¶ 1025. But Balderas cannot advance an ineffective-assistance-of-habeas-counsel (IAHC) claim to salvage his standalone competency claim; *Martinez* only applies to IATC claims. *See Davila*, 582 U.S. at 529 (declining to extend the *Martinez* exception to a non-IATC claim); *Mullis v. Lumpkin*, 47 F.4th 380, 393 (5th Cir. 2022) ("because the sole debatable cause for excusing Mullis's default is the *Martinez* exception for ineffective assistance of postconviction counsel, we are limited to constitutional claims concerning the ineffective assistance of trial counsel").

As for Balderas's IATC-competency claim, his cause argument still fails. In support of his IAHC-good-cause argument, Balderas presents two institutional complaints from his state-habeas counsel, Erin Eckhoff and Derek VerHagen, alleging that the Office of Capital and Forensic Writs (OCFW) lacked the "resources" needed to fully investigate potential claims. SHCR-03 190–93 (Ex. B) (Eckhoff declaration), 194–97 (Ex. C) (VerHagen declaration). Balderas points to those declarations, claiming that OCFW's excessive caseloads and lack of resources impeded its ability to investigate Balderas's competency claims. Pet. at 230–31.

Balderas's attempt to attack OCFW's funding and resources rather than attack OCFW's effectiveness is unpersuasive. Limited resources do not establish that counsel were ineffective; instead, the proper analysis is whether

trial counsel performed reasonably in light of the circumstances. *See Richter*, 562 U.S. at 107 ("Counsel [is] entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective . . . tactics and strategies."); *see also Newbury v. Stephens*, 756 F.3d 850, 872 (5th Cir. 2014) (applying the *Strickland* standard to an IAHC claim).

Here, nothing was unreasonable about state-habeas counsel's decisions. Eckhoff attests that she was aware of Balderas's mental health history, but that OCFW decided not to focus on those issues or issues of competency in their investigation. SHCR-03 192 ¶¶ 15–17. VerHagen said the same, including that Balderas "struck [him] as extremely traumatized." SHCR-03 196–97 ¶¶ 10–12. But, as OCFW focused on "investigating and developing claims" related to "trial counsel's deficient performance," SHCR-03 192 ¶ 14, it is reasonable and unsurprising that they did not think a mental-health-IATC claim would be wise given that trial counsel thoroughly investigated Balderas's mental health. Even if Balderas struck VerHagen as "extremely traumatized," trial counsel had already explored Balderas's allegedly traumatic past and presented expert witnesses to testify on the matter. *See supra* Statement of Facts Part II.B. Moreover, as discussed further below, Balderas has failed to cite to any evidence that his alleged mental illnesses deprived him of a rational understanding of his trial proceedings or of an ability to rationally

178

communicate with his counsel. *See infra* Part IV.D. So he fails to show that Claim IV is substantial under *Martinez*.

### C.    Balderas's new evidence is barred by § 2254(e)(2).

Finally, even if Balderas could obtain merits review of either claim four or five, his state-habeas counsel's admitted failure to make the Agharkar and Ouaou reports part of the state court record bars them under § 2254(e)(2). *See Martinez Ramirez*, 596 U.S. at 371. While Balderas attached these reports to his subsequent application, that application was dismissed as procedurally barred. SHCR-03 291–314. As these reports were attached to a barred application, they were not presented "in compliance with state procedural rules." *Martinez Ramirez*, 596 U.S. at 376. Thus, Balderas would have to overcome the requirements of § 2254(e)(2) to present these reports in state court. As these reports were available through due diligence and do not establish Balderas's innocence, he cannot meet that section's requirements.

### D.    Claim five is meritless.

In Claim five, Balderas argues that he was incompetent to stand trial. Pet. at 234–38. Because he fails to present any evidence of incompetency at the time of trial, his claim is plainly meritless.

### 1.    Competency standard

While due process requires competency for the trial and conviction of an accused person, a claim alleging a defendant was incompetent to stand trial should only be considered in habeas proceedings where the facts are "sufficient to positively, unequivocally and clearly generate a real, substantial and legitimate doubt as to the mental capacity of the petitioner" at the time of trial. *Bruce v. Estelle*, 536 F.2d 1051, 1058–59 (5th Cir. 1976) (quoting *Bruce v. Estelle*, 483 F.2d 1031, 1043 (5th 1973)); Indeed, "the [habeas] petitioner's initial burden is substantial." *Enriquez v. Procunier*, 752 F.2d 111, 114 (5th Cir. 1984).

The test for competency asks whether the defendant had (1) "a rational as well as factual understanding of the proceedings against him" and (2) a "sufficient . . . ability to consult with his lawyer with a reasonable degree of rational understanding.". *Edwards*, 554 U.S. at 170 (citing *Dusky v. United States*, 362 U.S. 402 (1960)). "Although the . . . standard refers to the 'ability to consult with [a] lawyer,' the crucial component of the inquiry is [whether]

the defendant[ ] possess[ed] 'a reasonable degree of rational understanding.' In other words, the focus . . . is on a particular level of mental functioning, which the ability to consult with counsel helps identify." *Godinez v. Moran*, 509 U.S. 389, 403–04 (1993) (Kennedy, J., concurring). "Not every manifestation of mental illness demonstrates incompetence to stand trial." *United States v. Ziegler*, 1 F.4th 219, 231 (4th Cir. 2021) (quoting *Burket v. Angelone*, 208 F.3d 172, 192 (4th Cir. 2000)); *accord United States v. Barraza*, 982 F.3d 1106, 1113 (8th Cir. 2020) (quoting *United States v. Whittington*, 586 F.3d 613, 618 (8th Cir. 2020)).

### 2.    Balderas's evidence of incompetency

As explained above, Balderas presents a psychiatric report and a neuropsychological report diagnosing him with PTSD, schizoaffective disorder, and cognitive and intellectual impairments. *See supra* Part III.B.4.b. Based on this, Dr. Agharkar concludes that Balderas's "psychotic and brain impairment symptoms would have negatively impacted his ability to rationally assist trial counsel and his understanding of the charges and proceedings." SHCR-03 292. For example, he explained that "symptoms such as Mr. Balderas's impact the ability to trust counsel, make rational, stable decisions, and be 'present' in court proceedings. That is, were he to be distracted by hallucinations or other bizarre thought processes as he has described to me, this would surely impact

his ability to rationally consult and assist his attorney in real-time during court proceedings, and pre-trial discussions with counsel." SHCR-03 299.

Looking to Balderas's neuropsychological deficits and his pretrial medical jail records, Dr. Ouaou concluded that there was a "likelihood" that these psychiatric symptoms, mental illnesses, and potential brain damage diminished Balderas's trial competency, SHCR-03 311, and that Balderas's cognitive defects "likely hampered" his "competency at the time of trial[.]" SHCR-03 312. In a supplemental report, Dr. Ouaou opined that, in his opinion, "it is more likely than not that [Balderas] suffered mental impairment at the time of trial that affected his ability to participate in the proceedings." SHCR-03 315.

### 3. Balderas's expert reports are unreliable given his experts' failures to consider his exaggeration of symptoms.

Both Dr. Agharkar and Dr. Ouaou rely extensively on Balderas's jail reports to argue that his psychotic symptoms and schizoaffective disorder were present at the time of trial. *See generally* SHCR-03 292–314. But what they fail to acknowledge is that there are multiple accounts in Balderas's records of him using his "symptoms" to manipulate authorities.

First, despite there being voluminous records of Balderas's mental health from 2001-02, before he murdered Hernandez, the Director has been

182

unable to find a single mention in those records of depression, psychotic symptoms, hallucinations, suicidal thoughts, or PTSD. 2.CR 317 (reporting no mental problems or depression); 4.CR 829, 830, 844, 850 (records from 2001-02 finding no depression, psychosis, hallucinations, delusions, PTSD, or suicidal thoughts). A clinical evaluation of Balderas in 2001 remarked, "no overt signs of delusions, hallucinations, or the presence of a thought disorder." 4.CR 846; *see also* 6.CR 1514 ("He did not exhibit any overt signs of a formal thought disorder."). In these records, it also appears he also denied childhood physical and sexual abuse, the very facts that led to a PTSD diagnosis. 4.CR 843.[32]

Apparently, it was only when Balderas was in jail facing a capital murder charge that he began to disclose these symptoms and this traumatic past. And even then, Balderas was often non-compliant in taking his medication, 10.CR 2678–797, and was written up for hoarding medications, with the report stating that, based on the packaging, Balderas intended to sell them. 7.CR 1996. In 2013, Balderas also first started reporting a childhood history of hallucinations, suspiciously urging his clinician, "make sure you write this down." 8.CR 2149. His urging was apparently forceful enough to

---

[32]    Balderas's IQ scores of 108 and 110 before the murder are also significantly different from the IQ score of 87 that Dr. Ouaou gave him. *Compare* SHCR-03 306, *with* 4.CR 842, 848.

183

raise concerns that he was "exaggerating his symptoms for secondary gains" given his upcoming court date. 8.CR 2149. And despite trial counsel hiring three separate mental health experts to evaluate Balderas, there is no evidence that any of them diagnosed him with schizoaffective disorder. *See supra* Statement of Facts Part II.B.

In sum, Balderas's past self-serving reports, along with Balderas and his wife's current biased self-reports, are suspect and unreliable. *See Eldridge v. Davis*, 661 F. App'x 253, 257–61 (5th Cir. 2016) (affirming district court's finding that petitioner failed to demonstrate that he was incompetent to be executed where the district court considered petitioner's mental health history, the self-serving nature of his complaints, and suspicions of malingering by treating professionals and expert witnesses who evaluated him); *Miles v. Dorsey*, 61 F.3d 1459, 1473 (10th Cir. 1995) (holding that petitioner failed to show that he was incompetent, despite expert's conclusion of incompetency, where there was evidence the petitioner malingered on tests administered by the prosecution).

The Director raised these arguments in his response to Balderas's motion to stay proceedings. ECF No. 47 at 54–57. Balderas responded that his experts applied screening for potential malingering. ECF No. 55 at 17. He provided a supplemental report from Dr. Ouaou, in which Dr. Ouaou states

that his neuropsychological testing incorporated measures to screen for "symptom exaggeration or malingering[.]" SHCR-03 314–15.

But Dr. Ouaou misapprehends his own report. Even if his neuropsychological findings screened for malingering, he used Balderas's self-reported history of symptoms to find that these neuropsychological deficits were likely present at the time of trial. *See* SHCR-03 303 (accepting as true that Balderas's brain damage was from "inhalant dependence, head injuries, in utero alcohol exposure, and . . . severe childhood physical and sexual trauma."), 304 (relying on prior diagnosis of "major depression with psychotic features," prior reports of childhood abuse, and reported blows to the head from physical abuse, accidents, and youth boxing), 311 (noting that Balderas "suffered from several etiologies of central nervous system damage that are related to cognitive, emotional, and behavioral impairments that were present at the time of trial"). Thus, Dr. Ouaou's claim that his neuropsychological findings screened for malingering does not account for the fact that—to establish that these deficits existed at trial—he attributed the *cause* of Balderas's deficits to a medical history that is highly suspect. His initial and supplement reports do not indicate that he ever considered Balderas's history of exaggerating symptoms.

Balderas also responded to the Director's argument, stating that "Dr. Agharkar concluded he believed Mr. Balderas was not malingering." ECF No. 55 at 17. Dr. Agharkar's screening of potential symptom exaggeration was plainly inadequate. He stated that he formed an "opinion" that Balderas did not malinger because of the "forthright manner" in which he answered questions, and that his answers appeared trustworthy.[33] SHCR-03 300. It does not appear Dr. Agharkar conducted any type of effort testing whatsoever. Thus, his report is unreliable. *See Eldridge*, 661 F. App'x at 259 (finding district court did not err in finding expert not credible where expert gave "inadequate responses to the 'numerous red flags indicating malingering'").

### 4. Even if he is mentally ill, Balderas has failed to submit any evidence that he was incompetent at the time of trial.

"A mentally ill defendant can still be competent to stand trial." *Thomas v. Lumpkin*, 995 F.3d 432, 451 (5th Cir. 2021) (citing *Mays v. Stephens*, 757 F.3d 211, 216 (5th Cir. 2014)). Notably, even assuming Dr. Agharkar and Dr. Ouaou's diagnoses are correct, those diagnoses do not establish that Balderas was in fact incompetent at the time of trial. Instead, these reports merely attest

---

[33] Dr. Agharkar reported that he asked Balderas two questions to screen for malingering: "How many legs does a dog have?" and "What are the colors of the United States flag?" SHCR-03 297. There is no evidence that these two questions constitute a proper controlled test for malingering. *See* SHCR-03 305 (Dr. Ouaou listing effort-testing he administered).

to how Balderas's current symptoms *could possibly* have affected his competency. SHCR-03 293 ("At the time of trial, Mr. Balderas's psychotic and brain impairment symptoms *would have* negatively impacted his ability to rationally assist trial counsel and his understanding of the charges and proceedings." (emphasis added)), 299 ("Symptoms such as Mr. Balderas's impact the ability to trust counsel, make rational, stable decisions, and be 'present' in court proceedings. That is *were he to be distracted* by hallucinations or other bizarre thought processes as he has described to me, *this would surely impact* his ability to rationally consult and assist his attorney in real-time during court proceedings and pre-trial discussions with counsel." (emphasis added)); SHCR-03 311–12, (referring to "*likelihood* that his mental illness and potential brain damage diminished his trial competency" and finding that "cognitive deficits *likely* hampered Mr. Balderas's competency at the time" (emphasis added)).

Such a hypothetical discussion of how Balderas's alleged mental impairments might have affected his competency falls short of Balderas's "substantial" burden. *See Johnson v. Estelle*, 704 F.2d 232, 238 (5th Cir. 1983) ("Even assuming that Johnson was in fact suffering from a mental illness or disability at the time of trial, on the present facts we are unable to conclude

187

that this mental deficiency precluded petitioner's meaningful participation in his defense.").

And Balderas could have done more. Neither of his experts bothered to ask Balderas about his communication with counsel. Nor do they mention reviewing any of trial counsel's files, court reports, witness statements, or other documents that might have indicated how Balderas aided trial counsel and whether his understanding of his case appeared rational. Nor did the experts or Balderas bother to obtain a statement from trial counsel, despite the fact that "legal competency is primarily a function of [a] defendant's role in assisting counsel in conducting the defense, [and] the defendant's attorney is in the best position to determine whether the defendant's competency is suspect." *Watts v. Singletary*, 87 F.3d 1282, 1288 (11th Cir. 1996); *see Medina v. California*, 505 U.S. 437, 450 (1992) (stating "defense counsel will often have the best-informed view of the defendant's ability to participate in his defense"); *see also Bryson v. Ward*, 187 F.3d 1193, 1201 (10th Cir. 1999) (same). Such a failure is fatal to Balderas's argument.

More than that, the trial counsel files already submitted in the state-court record are barren of any evidence that these alleged impairments affected Balderas's competency. For example, Balderas claimed to trial counsel that he only provided weapons to the gang, and that the "female witnesses" are "ex-

girlfriends of the gang ring leader who set the whole thing up." 3.SHCR-01 715.

The theory that Balderas had an exculpatory reason for holding the weapons

shows his rational understanding of his case. So does his theory that "female

witness[]" Wendy Bardales was not credible because she was the ex-girlfriend

of the gang member setting him up. *See* 2.SHCR 480 (Jesus Balderas affidavit

claiming that Bardales had relations with Diaz).[34] Balderas also filed a pro se

motion for substitute counsel, 1.CR 67, and even testified at his motion for

speedy trial hearing. At the hearing there is no sign that he did not understand

the nature of the proceeding. 22.RR 61–74. Dr. Mendel testified that Balderas

had no issued communicating as well. 39.RR 47–48 ("Q: He was able to

communicate with you, convey thoughts and meaning to you, you felt like he

understood what you were saying to him? A: Absolutely.").

---

[34]    And while it does appear that there was some difficulty getting Balderas to cooperate, *see* 3.SHCR-01 702–03, that alone does not establish incompetency, *see United States v. Flores-Martinez*, 677 F.3d 699, 707–08 (5th Cir. 2012) ("[T]here is something different between being unable and unwilling to assist counsel. Our precedents have concluded likewise, expressly holding that [a] defendant who has it within his voluntary control to . . . cooperat[e], is not incompetent merely because he refuses to cooperate." (second and third alterations in original) (internal quotation marks omitted) (quoting *United States v. Simpson*, 645 F.3d 300, 306 (5th Cir. 2011))). Balderas has presented no evidence that any lack of cooperation was due to incompetency.

Balderas cites to a few cases to support his argument (1) that his paranoid delusions affected his ability to effectively consult with counsel, and (2) that his paranoid delusions and cognitive impairments affected his ability to rationally understand the proceedings against him. Pet. at 232–34. But notably, *all* these cases have evidence contemporaneous with trial showing paranoid delusions that might have affected competency. *See United States v. Ghane*, 490 F.3d 1036, 1036–40 (8th Cir. 2007) (district court finding of incompetency based on well-documented paranoid and conspiratorial delusions arising before trial and pretrial expert evaluations on competency); *United States v. Boigegrain*, 155 F.3d 1181, 1189–90 (10th Cir. 1998) (district court finding that defendant was incompetent based on a pretrial competency evaluation in which it was determined that the defendant suffered from "paranoid ideation" causing conspiratorial delusions); *United States v. Hiebert*, 30 F.3d 1005, 1007–08 (8th Cir. 1994) (defendant was initially determined incompetent to stand trial based on a pretrial evaluation noting a delusional paranoid disorder but was later determined competent after an evaluation determining his mental order was in remission); *Green v. Davis*, 479 F. Supp. 3d 442, 451 (S. D. Tex. 2020), *reversed by Green v. Lumpkin*, No. 20-70021, 2023 WL 2941470, at *1–6 (5th Cir. Apr. 23, 2023) (standby counsel requested competency determination pretrial due to petitioner's growing paranoia).

190

These cases underscore the inadequacy of Balderas's current allegations. Based on the record, there is no evidence that Balderas was incompetent to stand trial. Balderas's retrospective guessing of how his current mental illness *might* have affected his mental state eight years prior does not meet the "substantial" burden of proving incompetency retrospectively.

### E.    Claim four is plainly meritless.

In claim four, Balderas argues that trial counsel were ineffective for failing to investigate evidence of Balderas's competency to stand trial. Pet. at 224–34. When assessing a competency IATC claim, the Fifth Circuit evaluates "whether counsel for [a] mentally suspect defendant[] erred in failing to investigate or pursue a defense of . . . incompetency to stand trial by appraising the facts known and available or with minimum diligence accessible to defense counsel and determining whether those raise reasonable doubt as to the defendant's mental condition." *Smith v. Maggio*, 696 F.2d 365, 368 (5th Cir. 1983) (quoting *United States v. Edwards*, 488 F.2d 1154, 1164 (5th Cir. 1974)).

Trial counsel investigated and found Balderas's history of familial mental illness and thus hired multiple expert witnesses. 5.SHCR 1473 (affidavit of Jerome Godinich), 1488 (affidavit of Alvin Nunnery). They hired Dr. Matthew Mendel, a psychologist, to investigate Balderas's allegations of childhood abuse. 38.RR 129. Dr. Mendel met with Balderas for eighteen to

twenty hours and reviewed his criminal, juvenile, and medical records. 38.RR 129–30. He also interviewed Balderas's family members and reviewed a report made by Dr. Jolie Brams. 38.RR 130. Trial counsel also hired Dr. Matthew Brams, a psychiatrist. 39.RR 144. Like Dr. Mendel, Dr. Matthew Brams met with Balderas "on several occasions." *Id.* Dr. Matthew Brams also reviewed documents sent by trial counsel, including a personality assessment inventory of Balderas and Balderas's juvenile and jail records. 39.RR 149, 154. Finally, trial counsel hired Dr. Jolie Brams, a psychologist. 41.RR 251. She interviewed Balderas six different times for a total of twenty-five hours. 41.RR 265. She also reviewed his jail and medical records and interviewed family members. 41.RR 262–64.

There is *zero* evidence that any of these experts doubted Balderas's competency. Trial counsel were entitled to rely on that. *See supra* Part III.B.3.b. Balderas similarly points to *zero* evidence from the time of trial that should have put trial counsel on notice that he might not have understood the charges against him or that he might not have been able to assist in his defense. *Edwards*, 554 U.S. at 170. As Balderas provides no evidence of these elements, he cannot show that trial counsel should have been aware of any potential competency issues. *See United States v. Perkins*, 99 F.4th 804, 812 (5th Cir. 2024) ("As to the latter part" of the competency determination,

"special consideration should generally be given to the opinions of defense counsel."). Moreover, because Balderas cannot show he would have prevailed on a competency motion, he cannot show prejudice. *See Strickland*, 466 U.S. at 694.

## V.    Claim Six: Ineffective Assistance of Appellate Counsel

Next, Balderas raises numerous claims of ineffective-assistance-of-appellate-counsel (IAAC). Pet. at 238–54. None of these claims are exhausted, and Balderas provides no argument to overcome the procedural default of these claims. Even more egregiously, Balderas attacks appellate counsel for failing to raise claims that appellate counsel raised. This claim should be denied in its entirety.

### A.    All of Balderas's IAAC claims are unexhausted and procedurally defaulted.

Balderas failed to raise any IAAC claims in his initial application. *See* 1.SHCR-01 2–396; *see also Balderas*, 2019 WL 6885361, at *1–3 (reciting claims raised). Despite obtaining permission to file a subsequent application, Balderas still never raised any IAAC claims upon return to state court. *See generally* SHCR-03. Thus, his claims are unexhausted. They would also be procedurally barred if raised in state court now. *See* Tex. Code Crim. Proc. art.

11.071 § 5. Thus, they are procedurally defaulted here. *See Coleman*, 501 U.S. at 735 n.1.

Balderas also cannot show cause for the default by alleging that his state-habeas counsel was ineffective. *See Davila*, 582 U.S. at 525 (declining to extend *Martinez* exception to IAAC claims). Confusingly, Balderas seems to acknowledge this contrary precedent, Pet. at 239–40, before launching into an argument that "the equitable principles of *Martinez* militate in favor of excusing default rather than enforcing it." *Id.* at 241. As *Davila* made clear, the Supreme Court disagreed with that very argument. That alone forecloses merits review of all these claims.

### B. Balderas's failure-to-investigate claims on direct appeal are meritless.

Balderas challenges his appellate counsel's failure to investigate and present outside-the-record claims that took years for postconviction counsel to develop. Pet. at 244–46, 250–51 (raising IATC, *Brady*, false-testimony, alibi, *Wiggins*, and competency claims as claims appellate counsel should have presented on appeal). As explained below, this claim is wholly meritless.

The Supreme Court has already held that "Texas procedure makes it 'virtually impossible for appellate counsel to adequately present an ineffective assistance [of trial counsel] claim' on direct appeal." *Trevino v. Thaler*, 569 U.S.

413, 423 (2013) (quoting *Robinson v. State*, 16 S.W.3d 808, 810–11 (Tex. Crim. App. 2000)). The outside-the-record nature of IATC claims renders the trial court record often insufficient to raise those claims on direct appeal. *Id*. at 423–24 (citing *Ex parte Torres*, 943 S.W.2d 469, 475 (1997)). And, while the trial record could theoretically be developed in between the verdict and appeal through a motion for new trial, the Supreme Court has determined that Texas's truncated deadlines for filing and resolving such motions renders it an "inadequate" vehicle for developing IATC claims. *Id*. at 424.

Appellate counsel certainly cannot be faulted for doing what the Supreme Court effectively said was all but impossible. Balderas flippantly cites to the entirety of his outside-the-record claims, developed over nearly *a decade*, Pet. at 244–46, 250–51, and then without explanation argues appellate counsel should have developed it within the motion for new trial deadline. State-habeas counsel filed their initial habeas application nearly two years after the verdict. 1.SHCR-01 2 (filed January 15, 2016). Balderas's current counsel took AEDPA's one year period to file a petition, and then *continued to supplement* the petition by amending it over the course of fifteen months. *See* ECF No. 38.

Balderas's claim that appellate counsel should have similarly developed any outside-the-record claims (both IATC and prosecutorial misconduct) in the truncated motion-for-new-trial posture cannot be taken seriously. *See Smith v.*

195

*Robbins*, 528 U.S. 259, 285 (2000) (noting that the *Strickland* standard of reasonableness governs IAAC claims); *Strickland*, 466 U.S. at 691 (assessing counsel's reasonableness in the context of "all the circumstances"). These arguments evidence the kitchen-sink approach that is replete in Balderas's petition instead of any kind of measured calculation regarding which claims to present. *See Jones v. Barnes*, 463 U.S. 745, 751–52 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or *at most* on a few key issues (emphasis added)).

In any event, Balderas obtained merits review of all the claims raised by state-habeas counsel (including the *Brady* claims mentioned by Balderas, Pet. at 244–45, 250–51),[35] and the CCA denied all his adjudicated outside-the-record claims; thus, Balderas cannot show appellate counsel was ineffective for failing to raise these claims. *See Tong*, 90 F.4th at 869 (rejecting IAAC claim because petitioner failed to show that the CCA "would likely have ruled in his favor on direct appeal"). As for Balderas's defaulted claims, the Director

---

[35]     In this section, Balderas only cites to the 2007-08 notes as a *Brady* claim appellate counsel should have raised. He does not argue that appellate counsel should have raised the *Brady* claims predicated on documents filed for the first time in federal court.

incorporates by reference his response to those claims to show that they are meritless as well. *See supra* Parts I, IV, VI.

### C.    Balderas's claims that appellate counsel should have raised claims that appellate counsel, in fact, *did* raise.

Bewilderingly, Balderas asserts that appellate counsel should have raised the issue of a suggestive identification procedure, Pet. at 247, and asserted Balderas's speedy trial claim. *Id*. at 248–49. Appellate counsel raised those claims. App. Br. at 24–37 (speedy trial claim),[36] 78–89 (suggestive identification claim). And the CCA denied those claims on the merits. *Balderas*, 517 S.W.3d at 767–73, 791–97. Thus, these arguments fail. *See Tong*, 90 F.4th at 869.

### D.    The remaining IAAC claims are meritless.

Balderas raised six additional IAAC claims. He argues that appellate counsel should have challenged the vagueness of the future danger instruction, the 10-12 rule, and the jury instruction on the definition of mitigating evidence.

---

[36]    The only argument Balderas musters here is that appellate counsel "gave the court the impression that defendant did not want a speedy trial." Pet. at 249. But he only cites to the record in support of this argument, specifically pointing to trial counsel's requests for continuances. *Id*. In filing his brief, appellate counsel, of course, cannot change the record. So this argument is more properly characterized as an attack on trial counsel's continuances, which is a separate claim Balderas raised in his second ground for relief. The Director addressed that claim above. *See supra* Part II.B.

Pet. at 249–50. But state-habeas counsel raised these claims in state-habeas proceedings, and the CCA barred them and, in the alternative, denied them on the merits. *See Ex parte Balderas*, 2019 WL 6885361, at *3 ("These claims have been repeatedly rejected by this Court and [Balderas] raises nothing new to persuade us to reconsider these holdings."). Therefore, these IAAC claims fail. *See Tong*, 90 F.4th at 869.

Balderas also raises three arguments that appellate counsel should have challenged the State's closing argument as improper. First, he argues that the prosecution impermissibly gave a personal anecdote to explain why Wendy Bardales initially didn't recognize the shooter, but then later recognized Balderas, a personal acquaintance, as the shooter. Pet. at 252. Second, he claims that the State impermissibly vouched for Diaz's credibility when they said he was "honest when he told you he didn't really care too much about what happened" to Hernandez." *Id*. And third, he claims the State impermissibly accused defense counsel of making inconsistent arguments. *Id*.

Balderas fails to address that trial counsel raised no objection to these claims.[37] Thus, they were forfeited on appeal. Tex. R. App. P. 33.1. Any reasonable appellate attorney would target claims of error that were preserved

---

[37]    Balderas has not raised a failure-to-object IATC claim on these grounds. Any such claim at this juncture would be time-barred and procedurally defaulted.

at trial to avoid the forfeiture bar. *See Jones*, 463 U.S. at 752 ("There can hardly be any question about the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review.").

As for the merits, Balderas fails to cite to any authority under Texas law that resorting to anecdotes constitutes error. "The law does not prohibit such rhetorical devices. 'Arguments may be forceful, colorful, or dramatic, without constituting reversible error. Counsel may resort to poetry, cite history, fiction, *personal experiences, anecdotes*, biblical stories, or tell jokes." *United States v. Gregory*, 54 F.4th 1183, 1210–11 (10th Cir. 2022) (emphasis added) (quoting *Whittenburg v. Wener Enters. Inc.,* 561 F.3d 1122, 1133 (10th Cir. 2009)). The Ninth Circuit rejected a similar argument:

> The prosecutor in this case told a personal story about her ability to recognize people and identify them in a photo line-up after having seen them only briefly once before. Because the prosecutor told the story in the first person, we can understand the argument that she technically used her own ability to identify people to disparage Gold's inability to identify Sloan in the photo line-up. However, a more reasonable characterization of the prosecutor's argument, in our view, is that she was expressing an ability of people in general to recognize those they have seen.

*United States v. Fails*, 51 F. App'x 211, 215 (9th Cir. 2002). While these cases may not be controlling in Texas, Balderas points to no definitive Texas authority establishing that the arguments were improper.

199

Same for the State's "he was honest" argument. The State was merely responding to defense counsel's credibility attack against Diaz. Trial counsel Shearer in initial argument called Diaz a "snitch" and said he was "bought and paid for." 30.RR 6, 9. Trial counsel Nunnery went further in his argument:

> Israel Diaz, also known as Cookie, is not worth a damn. It is not worth my time, wasting my time talking about him. He was, as Mr. Shearer said, bought and paid for; and he was purchased, ladies and gentlemen, just recently.

30.RR 15–16; *see also* 30.RR 29 (referring to "Israel Diaz's lying, bought-for testimony"). The State's "he was honest" statement occurred after these defense statements. 30.RR 52. Such responses are permissive under Texas law. *See Parker v. State*, No. 13-13-00128-CR, 2014 WL 6085584, at *10 (Tex. App.—Corpus Christi Nov. 13, 2014, pet ref'd) (holding that State's argument that witness "was honest" was a response "to a credibility argument made by [defendant's] counsel" and therefore permissible).

Lastly, Balderas complains that the State pointed out that trial counsel in some instances praised the police but in other instances was "tearing them down" depending on "what his purposes are[.]" Pet. at 252. Pointing to the logical inconsistencies of defense counsel's argument is not an attack on defense counsel; it is—quite literally—a proper "answer to an argument of

opposing counsel[.]" *Milton v. State*, 572 S.W.3d 234, 239 (Tex. Crim. App. 2019).

Finally, none of these comments was harmful. Even assuming they were improper, none were of constitutional dimension. Thus, harm would be reviewed under Tex. R. App. P. 44.2(b), which would require Balderas establish that they somehow violated a "substantial right[,]" meaning that the "error ha[d] a substantial and injurious effect or influence in determining the jury's verdict." *Rich v. State*, 160 S.W.3d 575, 577 (Tex. Crim. App. 2005). Neither of these brief comments during argument come close to meeting that standard.

For these reasons, lack of preservation, lack of error, and lack of harm, Balderas cannot show that appellate counsel was ineffective for failing to raise these challenges to the State's closing argument.

## VI. Claim Seven: Balderas Argues That Trial Counsel Violated His Autonomy Right to Put on an Alibi Defense.

In claim seven, Balderas argues that trial counsel violated his autonomy right to put on an alibi defense under the Sixth Amendment. Pet. at 254–57. This claim is procedurally defaulted. Also, because Balderas does not raise an existing claim of constitutional error, his claim is barred under non-retroactivity principles.

### A.    Claim seven is procedurally defaulted.

Balderas first raised this claim in state court in his subsequent state-habeas application. SHCR-03 163–68. The CCA dismissed the claim as an abuse of the writ and declined to review the claim on the merits. *Balderas*, 2023 WL 7023648, at *1. Thus, Balderas can only obtain merits review of these claims if he can show cause and prejudice. *Coleman*, 501 U.S. at 750.

Balderas attempts to do so through the *Martinez* exception. But that exception only applies to IATC claims. *See Davila*, 582 U.S. at 529; *Mullis*, 47 F.4th at 393, And Balderas *is not arguing* an IATC claim. His theory is predicated on an extension of a defendant's autonomy right to not concede guilt under *McCoy v. Louisiana*, 584 U.S. 414 (2018). The Supreme Court made clear that *McCoy* was not an application of *Strickland* jurisprudence. *Id*. at 426–27. Thus, *Martinez* is inapplicable here. Balderas cannot have it both ways by attempting to skirt *Strickland* prejudice by arguing *McCoy* but still availing himself of the procedural default exception available only to *Strickland* claims.

Even considering the IAHC claim, though, Balderas's cause and prejudice arguments still fail. Balderas makes the flatly untrue statement that state-habeas counsel "did not investigate or consider raising additional claims related to Mr. Balderas's alibi defense[.]" Pet. at 331. State-habeas counsel *did* investigate and present an IATC-alibi claim. 1.SHCR-01 92–98; 2.SHCR 481–

82 ¶¶ 21–22 (affidavit of Jesus Balderas), 527–29 ¶¶ 5–11 (affidavit of Octavio Cortes), 565–67 ¶¶ 3–14 (affidavit of Anali Garcia). They simply did it *correctly* under *Strickland* rather than raising it as a legally unsupported *McCoy*-alibi claim. *See infra* Part VI.B. (explaining why Balderas's *McCoy* claim is meritless). Given the investigative effort state-habeas counsel put into this claim, VerHagen's claim that he "overlooked" raising it as a *McCoy* claim is transparently disingenuous. And in any event, Balderas cannot show actual prejudice to overcome the default, *Coleman*, 501 U.S. at 750, because the state-court has already found his alibi witnesses not credible. *See supra* Part III.D.

## B.    Claim seven is meritless and *Teague*-barred.

New rules of criminal procedure are only applicable to cases on direct review—in essence, cases that are not yet final. *See Edwards*, 593 U.S. at 262 (citing *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987)). But such new rules do "not apply retroactively to overturn final convictions on federal *collateral* review." *Id*. (citing *Teague*, 489 U.S. at 310). And while there once was an exception to this doctrine of nonretroactivity for "watershed" rules of criminal procedure, that exception was explicitly overturned by the Supreme Court. *Id*. at 272 ("New procedural rules do not apply retroactively on federal collateral review. The watershed exception is moribund.").

So under *Teague*, petitioners are precluded from asking federal courts to create new rules of criminal procedure and apply them retroactively to their convictions. *See Teague*, 489 U.S. at 310. And as a corollary to this rule, a habeas petitioner's attempt to extend the rationale of an already existing procedural rule to situations not contemplated by the existing rule is in effect a request for retroactive relief that is barred under *Teague*. *See Shore v. Davis*, 845 F.3d 627, 634 (5th Cir. 2017) (holding that a petitioner's argument that his brain injury rendered his execution cruel and unusual was *Teague*-barred because the petitioner "seeks to extend the reasoning" of other Supreme Court cases).

Claim seven is *Teague*-barred because it does exactly that: The claim attempts to extend the rationale of *McCoy* to a completely different scenario. In *McCoy*, the Supreme Court held that "autonomy to decide that the object of the defense is to assert innocence belongs" in the category of decisions "reserved for the client" such as "whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." 584 U.S. at 422. The Court distinguished between a defendant's objectives (the province of the defendant) and the strategic choices of "how to best achieve a [defendant's] objectives." *Id*. And it decided that explicitly conceding guilt to the jury fell in

the former category, such that counsel cannot override a defendant's choice not to do so. *Id.*

Here, there was no conflict with the objective at trial. By all accounts, Balderas maintained he did not kill Hernandez, and that was the strategy trial counsel pursued. Balderas is simply complaining about trial counsel's effectiveness in carrying out this strategy. But the narrow holding in *McCoy* cannot be taken to mean that trial counsel's decision to not call certain witnesses violates some autonomy right of the defendant to decide which witnesses to call. That decision is plainly within the purview of counsel's strategic choice of how to best achieve a defendant's objects. *See McCoy*, 584 U.S. at 422–23.[38] It would also make no sense to apply *McCoy* to a situation such as this one, in which the state court has already determined that no credible alibi witnesses exist. *See supra* Part II.D. This situation falls squarely within the *Strickland* framework. Ineffectiveness in failing to call a witness can only warrant relief if proven under the ineffectiveness standard set out in *Strickland*. Thus, Claim VII is meritless.

---

[38]    There is also no evidence in the record that Balderas insisted on calling any of the alibi witnesses he has offered during postconviction proceedings.

## VII.  Ground Eight: Equal Protection

In his eighth ground for relief, Balderas claims that trial counsel and the State entered into an agreement to excuse a disproportionate number of minority venirepersons without voir dire. Pet. at 257–62. Balderas hinges his argument entirely on a statistical analysis, which he claims shows that a higher percentage of black venirepersons were excused by agreement than other venirepersons. *Id*. According to Balderas, this establishes the racially motivated agreement, as does Harris County's "[h]istory of racial discrimination." *Id*. at 262. This claim is procedurally defaulted and, in the alternative, meritless.

### A.    State court adjudication

Balderas raised this claim in state court. 1.SHCR-01 326–41. Prosecutor Traci Bennett responded through affidavit, that "[t]he agreement reached by the State and the defense to excuse certain prospective jurors without examination were based on the prospective jurors' answers in their juror questionnaires and not on those individuals' race or gender." 1.SHCR-01 Supp. 114. Trial counsel Godinich also denied the accusation of racist excusals. 5.SHCR-01 1474. And so did Nunnery. *Id*. at 1490.

The CCA found all three affidavits credible. 10.SHCR-01 2913 ¶¶ 280–81. It further found trial counsel's reason for the excusals by agreement were

"rooted in trial strategy" and "not race," and that Balderas failed to "present credible or persuasive evidence that trial counsel were deficient or harmful in the manner in which they conducted jury selection." *Id*. The CCA procedurally barred the claim because Balderas "stated he had no objection to the release of every potential juror the parties agreed to excuse without examination[.]" *Id*. at 2931 ¶ 48. In the alternative, the CCA denied the claim on the merits, finding that the decisions of trial counsel were "a matter of strategy, and irrespective of the race of the potential jurors." *Id*. ¶ 49.

## B.     Procedural default

The Fifth Circuit has "held that Texas applies its contemporaneous objection rule 'strictly and regularly' and that it is an 'independent and adequate state-law procedural ground sufficient to bar federal court habeas review of federal claims." *Hughes v. Johnson*, 191 F.3d 607, 614 (5th Cir. 1999) (quoting *Amos v. Scott*, 61 F.3d 333, 345 (5th Cir. 1995)).

Balderas makes the specious argument that he need not make a contemporaneous objection based on trial counsel's alleged conspiracy by pointing to *United States v. Huey*, 76 F.3d 638 (1996). Pet. at 262. There are several issues with this argument. First, "'a basic tenet of federal habeas review is that a federal court does not have license to question a state court's finding of procedural default [that is] based upon an adequate and independent

state ground.'" *Buntion v. Lumpkin*, 982 F.3d 945, 951 (5th Cir. 2020) (quoting *Smith v. Johnson*, 216 F.3d 521, 523 (5th Cir. 2000)). Obviously, whether Balderas sufficiently preserved his complaint at trial is an issue of state procedure that cannot be questioned in federal court.

And second, *Huey* is inapplicable, as it involved a direct appeal of a federal conviction. *Huey*, 76 F.3d at 639. Thus, the state-court procedural bar at play here was not at play in *Huey*. Balderas claims that "Huey's own counsel . . . did not make contemporaneous objections" but the Fifth Circuit heard the merits of his claims nonetheless. *Id.* But Huey's codefendant *and* the Government both objected to Huey's discriminatory strikes. *Id.* at 639–40. While there was "some irony" in letting Huey prevail based off his own strikes, *id*. at 641, it is clear that no party in *Huey* raised the issue that Huey did not preserve his argument for appeal. Similarly, *Mata v. Johnson*, 99 F.3d 1261 (5th Cir. 1996), the other case cited by Balderas, does not address a contemporaneous objection bar to a claim predicated on jury strikes.

Thus, Balderas cites no authority that would permit this Court to disregard the common cause and prejudice requirements under *Coleman*, 501 U.S. at 750. As he fails to lodge any argument that he can meet those requirements, the claim is defaulted.

### C.    In the alternative, the claim fails.

This claim is barred under the nonretroactivity principles of *Teague*, 489 U.S. at 310. While the defense is precluded from exercising racially motivated strikes, *Georgia v. McCollum*, 505 U.S. 42, 59 (1992), the Supreme Court has not held that a defendant can raise such an equal-protection claim predicated on his own conduct. In fact, in *Mata*, the Fifth Circuit found that the petitioner was not entitled to a new trial despite evidence of race-based excusals, and indicated that the petitioner might not even have standing to raise the claim, when he invited the error by agreeing to the excusals. 99 F.3d at 1270–71. As Balderas has not demonstrated that the Supreme Court has clearly held that a petitioner is entitled to benefit from his own racially-motivated conduct, or that he has standing to do so, the claim is barred under *Teague*.  Moreover, if the egregious racism in *Mata* was still determined to be harmless, 99 F.3d at 1268–71, then Balderas's baseless accusations of racism are certainly harmless as well.

In any event, even assuming this were a viable claim, Balderas must show that the CCA's determination that none of the excusals was racially motivated was an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2)); *see also Mata*, 99 F.3d at 1268 (only proceeding to harm analysis

upon conclusive proof that the excusals were racially motivated). And the discrete findings that the affidavits denying any racial motivation must be presumed "to be sound" unless Balderas "rebuts the 'presumption of correctness by clear and convincing evidence.'" *Id.* (quoting 28 U.S.C. § 2254(e)(1)).

Balderas's flimsy statistical analysis falls far short of this showing. First of all, his statistical analysis is conclusory—he cites to no evidence in the state-court record to support his statistical analysis. Pet. at 258–60; *Koch*, 907 F.2d at 530. Moreover, it does not appear that Balderas ever included the demographic information in the state-habeas clerk's record. Thus, any evidence he tries to present in federal court would be barred by § 2254(d)(2). *See* 28 U.S.C. § 2254(d)(2) (requiring petitioner to show "an unreasonable determination of the facts in light of *the evidence presented in the State court proceeding*" (emphasis added)).

Second, even considering Balderas's unsupported allegations, Balderas fails to meet his burden under § 2254(d)(2) and § 2254(e)(1). Balderas claims that "84.8 percent of the African American women in the venire were excused before they were ever questioned, and 75.0 percent of the African American men in the venire were excused without examination. By contrast, 72.1 percent of the white women, and 67.7% of the white men in the venire were excused

210

without questioning." Pet. at 259. This analysis is insufficient. With a mere sample size of 206 jurors, the slight increase in probability of an excusal is hardly striking. And that's before considering the fact that Balderas provides no analysis controlling for race-neutral characteristics—such as views on the death penalty.

Balderas does point out that jurors were ranked by their views on the death penalty and that the questionnaires screened for jurors who could presume the defendant innocent and consider the law and facts. Pet. at 261. And he alleges that African American jurors who answered these questions properly were nevertheless "not permitted to proceed to individual voir dir, even though they shared the same relevant characteristics as those who were." *Id*. But Balderas does not point out who these jurors were, nor does he provide any statistical analysis of how many of these unfairly excused jurors there were in comparison to the similarly situated white jurors that were questioned or seated on the jury.

For these reasons, Balderas's eighth claim is wildly conclusory, and even assuming the underlying data offered is true, his statistical analysis—devoid of any control for race-neutral reasons for excusal—is unreliable as to showing any racial animus. It therefore falls far short of rebutting the CCA's finding of

no racial motivation by clear and convincing evidence. *See* § 2254(e)(1). Thus, in addition to being procedurally defaulted, the claim fails under § 2254(d)(2).

## VIII. Ground Nine: Biased Jury Claim

In his ninth ground for relief Balderas claims that, due to external influences, his right to an impartial jury was violated. Pet. at 263–65. Among these allegations, Balderas claims that (1) a juror posted on social media about the trial, *id.* at 265–66; (2) the jury was improperly sequestered near the crime scene, *id.* at 266–68; and (3) Balderas's brother waved (perhaps in a threatening manner) at the jury bus as it departed the courthouse, *id.* at 268–71. Balderas also raises additional allegations concerning deliberations (as opposed to external influences): (1) that the jury prematurely discussed evidence and relied on the expertise of other jurors, *id.* at 275–83; (2) that the jury considered potential punishment at the guilt phase of deliberations, *id.* at 284–86; and (3) that some jurors decided how they would vote before hearing all the evidence, *id.* at 286–89.

### A.    Balderas's external influence claims

In *Remmer v. United States*, the Supreme Court held that "any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of

the court and the instructions and directions o the court made during the trial, with full knowledge of the parties." 347 U.S. 227, 229 (1954). A juror in that case had apparently been told by some unknown person that he "could profit by bringing in a verdict favorable to the petitioner." *Id.* at 228. The Court found that the trial court should have "determine[d] the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing withal interested parties permitted to participate." *Id.* at 229. It accordingly remanded the case so that the trial court could hold such a hearing. *Id.* at 230.

While *Remmer*'s requirement of some sort of open hearing has survived, its presumption of prejudice may not have. "Lower courts have decided over whether *Remmer*'s presumption of prejudice survived [*Smith v.*] *Philips* as well as the later decision of the Court in *United States v. Olano*." *Brooks v. Dretke*, 418 F.3d 430, 434 (5th Cir. 2005) (citing *Smith v. Philips*, 455 U.S. 209 (1982) and *United States v. Olano*, 507 U.S. 725 (1993)). Once the hearing complying with *Remmer* is held, a finding that a juror is unbiased—and therefore fit to serve on the jury—despite the external influence is "a determination of fact, subject to a presumption of correctness on collateral review[.]" *Fuller v. Johnson*, 114 F.3d 491, 500–01 (5th Cir. 1997).

### 1. The bus-waving incident

During the guilt phase of trial, Balderas alleges that his brother stood "near the street" and waved "at a bus that carried jurors from the courthouse to their hotel." 517 S.W.3d at 782. Balderas alleges that this constituted an "outside influence" on the jury by making them fearful and thus motivated to "reach a verdict quickly 'and escape the situation.'" *Id*. Balderas raised this claim twice in state court, on direct appeal and in postconviction proceedings. The claim was procedurally barred from habeas review because it was raised and rejected on direct appeal. 10.SHCR-01 2924 ¶19. But because it was rejected on the merits on direct appeal, § 2254(d) applies.

### a. Evidentiary hearing on the waving incident

In its opinion, the CCA pointed out that the trial court "had been apprised" of the incident early on the day that the jury found Balderas guilty. 517 S.W.3d at 783. After the jury announced the verdict and the trial court polled the jury, the trial court then held a hearing on the incident. *Id*. Deputy Henning testified that he was on the bus when the incident occurred. *Id*. While he did not see Balderas's brother waving, he heard some of the jurors mention the wave, including the fact that he had a "smirk on his face until the bus was all the way past." *Id*. He explained that "[e]verybody on the bus heard and understood what happened." *Id*. at 784. And five or six of the jurors identified

the waver as Balderas's brother based on seeing him in court. *Id*. Deputy Henning described several of the jurors as "very alarmed" and one of the jurors was "in somewhat of a panic" and "wanted to call her family because she was worried that somebody knew where she lived[.]" *Id*.

Defense counsel requested to examine the panicked juror, referred to as juror A.B. A.B. testified that she did not see the waving incident but heard a juror say, "he waved at us." *Id*. at 785. She felt like the wave was "potentially a tactic to intimidate or threaten perhaps." *Id*. When asked if she felt intimidated or threatened, she responded, "I felt cautious." *Id*. Upon the trial court's questioning, she unequivocally stated that the feeling of cautiousness did not "weigh in [her] deliberations" that morning. *Id*. Defense counsel probed A.B.'s level of panic. *Id*. She said she called her family because she was nervous that someone could look up her "address" or "personal information." *Id*. at 785–86. A.B. brought the incident up to another juror that morning before deliberations, asking "I wonder if that person would be in court today." *Id*. at 786. She looked into the audience during at some point but didn't see the waver in the gallery. *Id*. Again, she reiterated that she was "certain" that the incident did not affect her ability to serve as a juror. *Id*.

Finally, defense counsel requested to examine one of the jurors who had actually seen the waving incident. 517 S.W.3d at 786–87. Deputy Henning

identified juror D.T. "as 'the main one' who had been 'adamant that it was the brother[.]'" *Id.* at 787. D.T. was called to testify and she recounted the incident:

> We were right there by where the construction is where the bayou is where the coffee company, I guess, is. And somebody had said, Oh, my god, there's his brother. And I turned and he was standing on the curb with this smirk on his face and he just kind of was waving. And I was like, Oh, my god, that's him. He's waving at us.
>
> . . .
>
> He [Deputy Henning] told the driver to stop and he got off the bus. Then the lady deputy got off the bus and then the driver stood and guarded the door while they chased him down the street. But by then, he had already taken off.

*Id.* at 787. D.T. testified that they "just figured" the waver was Balderas's brother. *Id.* at 788. She had seen him in the courtroom during the trial. *Id.*

Upon questioning from defense counsel, D.T. elaborated that she didn't see the waver fleeing. *Id.* She said there was not much discussion of the incident on the bus "other than, oh, my god, there he is." *Id.* When asked what was going through her mind at the time, she said "I thought they were supposed to keep people away from us and there he was on the street." *Id.* She said there was no discussion of the incident at dinner, but she did voice her concern to two deputies at breakfast—specifically that she didn't "know what kind of information" the person "has of us" and that "[d]ue to the nature of the case, I just told them that I was going to hold my gun closer at night." *Id.* She

felt better though after talking to the deputy. *Id*. And she made crystal clear that "irregardless [sic] of what he did and what I saw, it's not going to change my decision in this case." *Id*.

Balderas moved for a mistrial based on outside influence and a violation of his right to an impartial jury, which the trial court denied. *Id*. The trial court took it upon itself to poll the jury on its verdict, and "[e]ach juror affirmed the verdict as his or her own." *Id*. at 789.

> ### b.    The CCA's denial of this claim was not an unreasonable application of Supreme Court law.

The CCA concluded, "[w]e doubt that Balderas's brother's conduct of waving and smirking at the jurors as their bus passed him on a public street constituted 'contact . . . about the matter pending before the jury.'" *Balderas*, 517 S.W.3d at 789–90 (quoting *Romo v. State*, 631 S.W.2d 504, 506 (Tex. Crim. App. 1982)). Nevertheless, the court alternatively entertained a presumption of prejudice in the alternative and found that "the evidence before the trial court rebutted any presumption of harm." *Id*. Specifically, it pointed out that the court questioned two witnesses who "indicated that their feelings about the incident did not affect their deliberations at the guilt phase and would not affect their deliberations at the punishment phase." *Id*. Finally, the Court rejected Balderas's speculation that the incident caused a previously deadlocked jury to convict him. *Id*. It noted that the day after the incident, the

jury continued to receive "read backs in response to five jury notes" and that the "jury deliberated for approximately three hours before reaching a verdict." *Id.* at 791. The CCA therefore concluded that the "record does not support Balderas's speculation that, as the result of fears generated by an outside influence, jurors abandoned their views in order to reach a verdict quickly." *Id.*

Balderas fails to explain why this analysis was an unreasonable application of Supreme Court law. First, he fails to address the CCA's determination that the waving did not constitute contact "about the matter pending before the jury." *Remmer* involved an overt bribe of a juror. 347 U.S. at 228. *Olano* involved the presence of alternate jurors during deliberation, albeit with a limited record making it unclear whether the alternates actually participated in deliberation. 507 U.S. at 739–40. Neither come close to the facts at hand here. Thus, the CCA was reasonable in determining that the wave did not rise to the level of conduct necessitating a live hearing under *Remmer*. *See Williams*, 529 U.S. at 405 (holding that a state-court decision is contrary to precedent "if the state court *confronts facts that are materially indistinguishable* from a relevant Supreme Court precedent and arrives at a result opposite to ours" (emphasis added)).

But even assuming a live hearing were warranted, Balderas's argument that the hearing was insufficient also fails. He complains that the hearing was

218

held after the verdict, but *Remmer* doesn't determine when such a hearing must take place. In fact, in *Remmer*, the Supreme Court vacated for a *post-trial* hearing on whether the jury was biased. 347 U.S. at 229–30. It's unclear why a post-verdict inquiry would be any less sufficient. And Balderas fails to point out why the trial court's presumptively correct finding that the jury was not biased would have been altered by holding the hearing sooner.

Balderas then complains that the trial court only questioned two jurors, as opposed to all the jurors, citing to opinions from federal courts of appeals. Pet. at 274. But the rules imposed by circuit courts upon federal district courts in federal criminal trials do not control on the issue of the reasonableness of the CCA's determinations. *See* 28 U.S.C. § 2254(d)(1) (requiring a petitioner show that a state court's decision was an unreasonable application of federal law "as determined by the *Supreme Court of the United States*" (emphasis added)).

And to be sure, no Supreme Court precedent sets out that every juror must be interviewed. *Remmer* only holds that, upon improper contact with a juror, a hearing should be held "to "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial . . . with all interested parties permitted to participate." 347 U.S. at 229. Here, the testimony of the two questioned witnesses and Deputy Henning was sufficient

219

to determine the circumstances of the event. It was undisputed that "five or six jurors had seen Balderas's brother waving, and made everyone on the bus aware of this incident." *Balderas*, 517 S.W.3d at 790. It is unclear what further testimony of the jurors would have revealed. Balderas gives no explanation as to any missing piece of the puzzle that could have been provided by further testimony. Thus, his claim that the hearing did not comply with *Remmer* is wholly conclusory, and he fails to show that the CCA's determination that the hearing sufficed was unreasonable. *See United States v. Ramos*, 71 F.3d 1150, 1153–54 (5th Cir. 1995) (finding that the trial judge has "broad discretion" to determine how to address "complained-of outside influence[.]").

Moreover, Balderas complains that the trial court did not assess prejudice "by reviewing the entire record[,]" Pet. at 275, but he ignores that the CCA *did* review the entire record—separate and apart from the jurors' testimony on their impartiality—and found it did not support a finding of prejudice:

> Thus, the record shows that, after the jury announced that it had exhausted its questions over testimony and evidence, the trial court provided read backs in response to five jury notes and the jury deliberated for approximately three hours before reaching a verdict. This record does not support Balderas's speculation that, as the result of fears generated by an outside influence, jurors abandoned their views in order to reach a verdict quickly.

*Balderas*, 517 S.W.3d at 791.

For these reasons, Balderas's claim fails under AEDPA. He fails to show that the CCA's decision was an unreasonable application of *Remmer* under § 2254(d)(1). He further fails to show that the CCA's determinations that no prejudice occurred was an unreasonable determinations of the facts under § 2254(d)(2),(e)(1). Moreover, Balderas's references to affidavits submitted in state-habeas proceedings, Pet. at 268–71, are barred from consideration, as they were not before the CCA when it adjudicated the claim on direct appeal. *See Pinholster*, 563 U.S. at 181; § 2254(d)(2). In any event, these affidavits would not render the CCA's determination of no prejudice unreasonable under §2254(d)(2) or incorrect by clear and convincing evidence under § 2254(e)(1).

### 2.    Hotel accommodations

In his next claim, Balderas claims that the jury was unduly influenced when they were sequestered in a "seedy" motel "located close to the crime scene and the area where Mr. Balderas grew up, in a neighborhood known for gang and other criminal activity." Pet. at 266–68. Jurors raised complaints to court staff, and the trial court apologized the following morning and promised better accommodations going forward. 31.RR 7. In a postconviction affidavit, Harris County Courts Administrator Vickie Long explained that procuring a hotel for the jury on the night in question was difficult due to the Houston Rodeo.

1.SHCR-01 Supp. 164. She further attested that the jury spent their second night of sequestration at a different hotel. *Id*. at 165.

Balderas raised this claim in state court, attaching affidavits from various jurors about their displeasure with the hotel accommodations. 1.SHCR-01 162–66; 3.SHCR-01 668–69, 675–76, 680–81, 684, 689, 695–96. The CCA found that "factors beyond the trial court's control caused difficulty in finding hotel accommodations for the jury on the evening of February 25, 2014." 10.SHCR-01 2883. It also denied the claim, finding that Balderas "fails to demonstrate by a preponderance of the evidence that he was prejudiced or that the results of his trial were affected in any way by the hotel accommodations secured for the jurors." *Id*. at 2924.

Balderas fails to show the CCA's determination was unreasonable. He faults the trial court for failing to hold a hearing but points to no authority requiring the court to do so. *Remmer* requires a hearing on external influence consisting of "any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the manner pending before the jury." 347 U.S. at 229. There is simply no logical way to stretch *Remmer* to cover the seediness of a motel. And Balderas fails to muster any argument that the CCA's finding of no prejudice was an unreasonable determination of the facts. Thus, this claim fails under § 2254(d).

### 3.     Social media posts

In his final external influence claim, Balderas argues that one juror posted about the trial on Facebook, in violation of the trial court's order. Pet. at 265. As this claim was adjudicated on the merits in state court, Balderas must meet his burden under § 2254(d).

### a.     Evidence of the social media posts

According to Balderas's state court application and state-court exhibits, this juror made multiple posts on Facebook. In two separate posts in January and February 2014, the juror posted generally about being selected for jury duty. 3.SHCR-01 896–97. He then posted more general status updates, calling jury duty "emotionally draining" and describing being "crushed at jury duty." *Id*. at 898–99. On February 27, 2014, he announced that he was being sequestered and said "[b]rain is like mush . . . after we are done with the trial, I will go into more detail." *Id*. at 900. Despite the juror's vague reference to jury duty—which *did not* include that he was serving in a capital case— another Facebook user responded with the distasteful comment, "Give them the chair!" *Id*. As the post shows, the juror did not respond to this comment.

> Greetings FaceBook! Part I of my jury trial is over... Part II started today. We have been sequestered this week, and today is the 1st day I can access a computer. Brain is like mush, so I was just giving a status update, and after we are done with the trial, I will go into more detail.

Patricia Armstrong, Rheanna Hinojosa, Scott McKenzie and 4 others like this.

 Nathan Boyce Yay...you exist!
February 27, 2014 at 5:37pm

 Steven Stephanie Skinner We miss you at work. Text me, I have another question.
February 27, 2014 at 5:41pm

 John Emanuel Give them the chair!
February 27, 2014 at 7:35pm

*Id.*

In the first week of March 2014, Juror Armstrong made further cryptic references to the emotional drain of jury duty. *Id.* He made further posts about himself and other jurors (all of whom were teachers) losing their spring breaks due to jury duty. *Id.* at 908–11. At no point, however, did the juror reveal the nature of the case or the substance of the testimony. On March 5, 2014, he made the following post:

> Well, the Judge today implied that we will more then likely carry on into next week. This means that I will lose some if not all of my spring break to Jury Duty... This case has been somewhat difficult for that those involved could have been my students... just drains one emotionally, and I am not really one whose emotions are shared easily, so that when I end up crying or becoming emotional, you know it is something serious.

3.SHCR-01 904. On March 10, 2014, he made the following post and response to comment:

224



Well, the 1st day of Spring break is over, and all I was able to do was jury duty (still). We are now on our 4th week, and do not look like ending until Thursday or Friday.... Insert appropriate language here ....

Robert Bickley Were any white Ford Broncos part of the testimony?
March 10, 2014 at 6:25pm ·  1

Patricia Armstrong "Keep the faith, no. 3. Xoxoxo
March 10, 2014 at 6:38pm

Steven Stephanie Skinner What???? I'm so sorry to hear that!
March 10, 2014 at 8:12pm

John R. Armstrong No white cars...just never ending testimony of "expert" witnesses...
March 10, 2014 at 8:15pm ·  1

3.SHCR-01 909. While these posts cryptically referenced people "involved" that could have been his students (indicating the age of people involved) and vaguely referenced the presentation of expert witnesses, they still did not reference the substance of any testimony, nor the nature of the case.

### b.  Balderas fails to show the state court decision was unreasonable.

The CCA entered findings regarding these posts. The court noted that the juror mostly posted general statements about "the jury selection process; updates on the stages of trial; the length of time the trial lasted; the emotionally draining aspects of jury service; and the fact that some jurors were missing vacations due to jury service." 10.SHCR-01 2887. It also noted that

225

most of the responses were general affirmations telling Juror Armstrong that "they missed him or told him to 'hang in there.'" *Id*. at 2887 ¶ 185.

The Court also evaluated specific posts. It found that Armstrong's comment that the trial involved "never ending testimony of 'expert' witnesses" was "ambiguous and could have referenced experts presented by either or both parties." 10.SHCR-01 2887. It also noted that Armstrong did not respond to the "give them the chair" comment from another poster. *Id*. In all, the CCA found no "evidence Armstrong was influenced by commentators' responses to his Facebook entries" and accordingly that Balderas failed "to demonstrate he was prejudiced" or "denied a fair and impartial trial." *Id*.

While Armstrong's posts are less than ideal, circuit courts have routinely found that mere mention of jury service on social networking sites falls short of showing jury partiality. Concerning Armstrong's posts about his emotional well-being and the day-to-day stages of jury deliberation, nothing he posted indicated any type of bias. The Third Circuit addressed a largely similar scenario, in which a juror posted vague updates about jury service and found no issue. *United States v. Fumo*, 655 F.3d 288, 298, 306 (3d Cir. 2011).

That leaves whether any of the comments could be deemed an external influence that rendered Armstrong biased against Balderas. Specifically, Balderas focuses on the comment asking any "white Ford Broncos" were part

226

of the testimony and the "give them the chair" comment. Pet. at 265. Balderas fails to explain how these comments prejudiced him. The white Ford Bronco comment was obviously a joke. And while the "give them the chair" comment is less humorous, there is no indication Armstrong took this as "advice" in any way. While Balderas obtained an affidavit from Armstrong, there is no indication in his affidavit that he ever read, considered, or relied on that statement. 3.SHCR-01 668–73. Nor is there any indication in all the juror affidavits provided in state court that Armstrong mentioned the comment during deliberations. 3.SHCR-01 668–99.

"Speculation and unsubstantiated allegations do not present a colorable claim of outside influence of a juror." *United States v. Wintermute*, 443 F.3d 993, 1003 (8th Cir. 2006). As Balderas offers nothing to connect the aforementioned Facebook comments to any plausible showing of juror bias, he fails to show the CCA's no-prejudice finding was unreasonable under § 2254(d)(2), (e)(1). *See United States v. Kechego*, 91 F.4th 845, 851 (6th Cir. 2024) (noting prior ruling that, even though some jurors may have read a news article about the gang involved at trial, there was "no allegation" that the article was discussed and the "claim of external influence was 'mere speculation'"); *Ross v. Yost*, No. 20-3477, 2020 WL 6440470, at *4 (6th Cir. 2020) (finding that petitioner failed to show evidence that a juror joining a

memorial page for the victim "influenced the juror's verdicts"). In a similar case, the Southern District of New York upheld a state court's determination that a juror was not biased, despite a comment on her Facebook post, which stated, "Hang 'em!" *Wilson v. Bradt*, Civ. No. 6973(KBF), 2014 WL 4116960, at *5, 19–20 (S.D.N.Y. Aug. 20, 2014).

Balderas cites to a single case in support of his argument, *Stockton v. Virginia*, 852 F.2d 740 (4th Cir. 1988). But comparing the intrusion in that case with the Facebook post here is comparing apples to oranges:

> During the sentencing deliberations, the jury broke for lunch. At least two groups of jurors, one group of three women and another of three or four men, ate at the Owl Diner, a restaurant near the courthouse. The atmosphere at the diner was a casual one. One juror recognized two court deputies at a nearby table and James Blackard, a witness subpoenaed to testify at the trial, was seated with his wife in a booth across the aisle from a group of male jurors. The Blackards testified that Glenn Puckett, the owner of the Owl Diner, approached the jurors and inquired whether they had reached a decision yet. One of the men replied that they had all decided except for "one damned woman." Puckett then commented to the jurors that he thought "they ought to fry the son of a bitch." According to the Blackards, Puckett remained and conversed with the jurors for several minutes.

*Id*. at 742. Such an inapposite case does not show that the CCA's decision was unreasonable.

228

### B.    Juror misconduct claims

### 1.    Improper expertise testimony

In one of his arguments, Balderas argues that two jurors shared their gun expertise with the other jurors both before and during deliberations. Pet. at 278–79. He raised this claim in state court, 1.SHCR-01 193–95, providing affidavits from various jurors. 3.SHCR-01 671–72, 683, 688, 697. According to the allegations, these jurors would help clarify firearm testimony based in part on their background knowledge of firearms. Pet. at 278–79.

The CCA found that, to the extent the affidavits concerned juror deliberations, they were barred under Texas Rule of Evidence 606(b). 10.SHCR-01 2887–88, 2924. It also found that Balderas failed "to establish the jury received any additional or impermissible evidence for consideration during deliberations." *Id.* at 2888. It further denied this claim finding that Balderas failed to show he "was denied the right to a fair and impartial jury because the jury received or considered evidence other than what was presented at trial." *Id.* at 2925.

First, Balderas's claim fails because the affidavits presented in state court cannot be considered here. *See Young*, 835 F.3d at 529 ("[W]e have repeatedly held that Rule 606(b) forbids consideration of juror affidavits in federal habeas cases."). While an exception to this rule exists for "extraneous"

influences on the jury, no such rule exists for the internal deliberations of a jury. Fed. R. Evid. 606(b). And the Supreme Court has held that "'internal' matters include the general body of experiences that jurors are understood to bring with them to the jury room." *Warger v. Shauers*, 574 U.S. 40, 52 (2014); *accord Grotemeyer v. Hickman*, 393 F.3d 871, 877–78 (9th Cir. 2004) (distinguishing between a claim of "*extrinsic* evidence being introduced into the jury room" and "a juror sharing her own experiences with her colleagues on the jury.").

Even considering the affidavits, Balderas's claim also fails because what he calls misconduct is in fact the proper deliberative process. "Jurors are not expected to come into the jury box and leave behind all that their human experience has taught them." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 149 (1994) (O'Connor, J., concurring).[39] Rather, "[j]uries are free to use their

---

[39]     Balderas briefly suggests that some of this ballistics discussion took place before deliberations. Pet. at 278. He also argues that one of the jurors that talked about firearms was an alternate, which constituted an "extraneous influence." *Id.* at 280. But Juror Orosz's affidavit only suggests that some of the jurors "had gun experience" and "talked about what they knew about the different styles guns. . . . Ron and Chad would tell us something about the guns, and then the ballistics expert would come in and repeat what Ron and Chad had told us." 3.SHCR-01 688 ¶ 3. There is no suggestion, though, they the gun-experienced jurors were discussing the trial evidence. It's hardly surprising that some jurors might discuss firearms, especially if they used them recreationally. And to the extent such discussion might overlap with the topics presented at trial, Balderas cannot show that this rebutted the presumption that the jury acted impartially.

common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life when giving effect to the inferences that may reasonably be drawn from the evidence." *United States v. Ramirez*, 954 F.2d 1035, 1039 (5th Cir. 1992) (citing *United States v. Cruz-Valdez*, 773 F.2d 1541, 1546–47 (11th Cir. 1985)); *accord United States v. Spano*, 421 F.3d 599, 605 (7th Cir. 2005) ("Jurors after all know many things that are not presented to them in the course of the trial, and doubtless use much of that background knowledge during their deliberations."). And they are even free to do so when they claim to be knowledgeable in a particular field. *Grotemeyer* 393 F.3d at 878 (finding no violation where juror brought up being a medical doctor in discussing defendant's mental disorders); *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1219, 1223 (10th Cir. 2005) (no violation where juror held herself out as an expert in police-dog training in dog bite case). Balderas seems to be complaining that, during jury deliberations, the jury *deliberated*.

## 2.    Issues with the translator

In his next claim, Balderas complains that some Spanish-speaking jurors raised their concerns that Spanish testimony was not being correctly translated. Pet. at 281–83. Apparently two of the jurors raised this concern to other jurors in the jury room. 3.SHCR-01 671, 685, 691. Two of the jurors then brought the concern to the attention of the trial court. 39.RR 25–30. The trial

court accordingly instructed the jury to consider the "translation" from the "translator" as "the official testimony from this witness" and to not further discuss until charged after closing arguments. 39.RR 34–35.

The CCA determined that the affidavits on this matter did not concern "outside influences" on the jury and thus could not be considered under Texas Rule of Evidence 606(b). 10.SHCR-01 2888, 2924. It also found that the affidavits failed to show any additional or impermissible evidence was presented to the jury during deliberations. *Id.* at 2888. And it found that Balderas failed to show he was denied a right to an impartial jury and that Balderas failed to rebut the presumption that the jury followed the trial court's instructions. *Id.* at 2925.

Balderas fails to show this was an unreasonable application of Supreme Court law or an unreasonable determination of the facts. To support his argument that these translation concerns biased the jury, Balderas makes the vague assertions that some of the jurors were bothered by the court's instruction to follow the translator because they trusted their Spanish-speaking fellow jurors more. Pet. at 282–83. But these are precisely the types of "mental processes" that are prohibited from consideration here. Fed. R. Evid. 606(b)(1).

232

Moreover, even considering the affidavits, Balderas's claim fails. The CCA's finding that that the jury followed the trial court's instructions— including that they only consider the translator's translation—is presumed correct here. 28 U.S.C. § 2254(e)(1). *See also Richardson v. Marsh*, 481 U.S. 200, 211 (1987) (noting "rule that juries are presumed to follow their instructions"); *United States v. Robinson*, 87 F.4th 658, 676 (5th Cir. 2023) ("Jurors are presumed to follow instructions"). In conclusory fashion, Balderas claims that it "is unreasonable to believe that [the jury] could simply disregard the fact that other jurors had forcefully asserted that the official translations were wrong." Pet. at 284. But Balderas's unsupported and self-serving argument that the jurors couldn't follow their oaths falls short of the rebutting the § 2254(e)(1) presumption. Indeed, none of the juror affidavits indicate that any jurors disregarded the official translation.

Finally, Balderas fails to show how this issue might have rendered his jury impartial or prejudiced him in any way. No juror claimed that it disregarded any Spanish speaking witness due to these complaints. Moreover, the complaining jurors raised two main pieces of testimony that they claim were not translated correctly. The first involved why Balderas wanted to stay with his mother's family in Mexico:

> When, I believe the defense had asked the question like, why did
> Juan want to stay there. And she said something to the effect of,
> well, he knew my kids and wanted to stay. And the translator said,
> He didn't know my kids and wanted to stay, something to that
> effect.

39.RR 26–27. It is unclear why this even matters. The mitigating fact was that

Balderas had grown acclimated to living in Mexico and was forced to leave

them against his will. *See supra* Statement of Facts Part II.B.2. Even assuming

the juror was correct, the translator got that mitigating point across. The

second complaining juror said that when Balderas's mother "was going over

the death of her son, that she said that he was killed or he had been killed but

it wasn't translated at any point that that's what she had stated." 39.RR 29.

But again, the fact that Balderas's brother had died was nevertheless

presented by the translator. 38.RR 54.

### 3.    Consideration of death penalty at punishment

Balderas also alleges that the jury considered the potential punishment

of the death penalty at the guilt phase of trial. Pet. at 285–86. In support he

points to the affidavits of jurors Armstrong and Orosz. Armstrong stated that

"at some point during out guilt/innocence phase deliberations, the possibility

of a death sentence came up with other jurors. Some had a hard time

separating the issues. I could not help but think about death when I voted

'guilty' because I knew that was the next step." 3.SHCR-01 670. Orosz similarly

stated, "I believe the death penalty was on all of the jury's minds during the guilt deliberations because it was the next step if we voted guilty. It was on my mind." *Id*. at 689.

Again, the CCA found these statements barred under Texas Rule of Evidence 606(b), and, in the alternative, found that they did not "refute a presumption that the jury followed the trial court's instructions." 10.SHCR-01 2888, 2924–25. It accordingly found that the affidavits failed to show Balderas's right to an impartial jury was violated. *Id*. at 2925.

Once again, Balderas presents evidence that that is barred. Fed. R. Evid. 606(b)(1). Moreover, the CCA's findings that the Armstrong and Orosz affidavits do not rebut the presumption that the jury followed its instructions is presumed correct here. 28 U.S.C. § 2254(e)(1); *See Marsh*, 481 U.S. at 211; *Robinson*, 87 F.4th at 676. And importantly, nothing about the consideration of a death sentence indicates that the jury was not impartial. No evidence has been presented that the possibility of a death sentence was considered a motivating factor to convict. Even assuming the affidavits were credible, the simple allegation that the death penalty "came up" and was on people's minds, does not establish a showing of bias against Balderas. More importantly, it does not establish that the CCA's finding of no juror bias was an unreasonable determination of the facts under § 2254(d)(2).

### 4.     Allegations of premature decisions

In his final juror misconduct allegation, Balderas claims that two jurors decided how they were going to vote before the close of evidence. Pet. at 288–89. Relying on their affidavits, he claims that Armstrong decided he was going to vote guilty when he heard the forensic ballistics evidence, 3.SHCR-01 670, and he claims that Orosz decided he was going to sentence Balderas to death "right after we found him guilty. *Id*. at 691–92.

Again, these affidavits are inadmissible for these purposes. Fed. R. Evid. 606(b). They clearly fall into the prohibited category of the "effect of anything on that juror's or another juror's vote" as well as "any juror's mental processes concerning the verdict or indictment." *Id*. Thus, the evidence is barred and Balderas cannot prevail.

Moreover, even considering the affidavits, Balderas could not prevail on this claim. A jury is already presumed impartial. *United States v. O'Keefe*, 722 F.2d 1175, 1179 (5th Cir. 1983). And the CCA rejected the credibility of the juror affidavits to the extent that they alleged that any jurors failed to follow the trial court's instructions. 3.SHCR-01 2888 (finding that the affidavits of Armstrong and Orosz are "not dispositive on the merits" and "do not refute a presumption that the jury followed the trial court's instructions"). In this case, the trial court properly instructed the jury at both guilt and punishment.

12.CR 3275–83, 3334–41. The trial court read the jury charge aloud as well. 30.RR 4; 43.RR 5. The jury presumptively followed these instructions. *O'Keefe*, 722 F.2d at 1179.

The CCA's decision that the affidavits failed to rebut that presumption cannot be second-guessed here. § 2254(e)(1). *See Greer v. Thaler*, 380 F. App'x 373, 382 (5th Cir. 2010) ("The trial judge's discretion is broadest when the allegation involves internal misconduct such as premature deliberations[.]"); *United States v. Gianakos*, 415 F.3d 912, 921–23 (8th Cir. 2005) (rejecting claim that juror mouthed "he's guilty" during government's presentation of evidence); *Macias v. Shinn*, No. C-21-02094-PHX-JJT(MTM), 2022 WL 20636347, at *8–9 (D. Ariz. Oct. 11, 2022) (finding state-court reasonable in rejecting claim that, halfway through trial, one juror said the petitioner "did this" and "he needs to go" because the Supreme Court there was no clear Supreme Court precedent addressing premature deliberations).

Thus, Balderas fails to meet his burden under AEDPA. His affidavits are barred from consideration here under Federal Rule of Evidence 606(b). And even if they could be considered, the CCA's determination that they did not rebut the presumption of jury impartiality is presumed correct and not an unreasonable determination of the facts. §§ 2254(d)(2) & (e)(1).

### C.    Balderas fails to show harm under *Brecht*.

Even if Balderas can show any type of juror misconduct or extraneous communications with the jury, he must show that the alleged error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 638. The *Brecht* harmless error test applies to claims of juror bias. *See Oliver v. Quarterman*, 541 F.3d 329, 341 (5th Cir. 2008).

Balderas cannot make such a showing. He fails to explain how the waving incident, hotel accommodations, Facebook posts, or discussion of ballistics during deliberations in any way had an impact on the jury's verdict at guilt. He similarly fails to show how any alleged misconduct injured him at punishment, especially given the horrific aggravating evidence the State presented. *See supra* Statement of Facts Part II. Thus, to the extent there was any jury misconduct or improper jury communications, Balderas fails to show harm on federal habeas review.

## IX.    Ground Ten: Balderas's Challenges to the Texas Special Issues.

Balderas next challenges Texas's special issues. He claims that his death sentence was "arbitrarily and capriciously imposed" given the jury's answers to the special issues, which he essentially claims are unconstitutional. Pet. at 294. Specifically, he alleges that (1) the future-danger special issue is unconstitutionally vague, *id.* at 292–96, and (2) that Texas's "10-12" rule is

unconstitutional because it "leads to misinformation and confusion and allows a jury to bring impermissible consideration to bear on the verdict," *id.* at 296–303. Regarding the latter claim, Balderas states that he has obtained juror affidavits that support his contention that the "10-12" rule is unconstitutional because "[b]y misleading jurors as to the result of a failure to reach a unanimous or ten vote agreement, the Texas statute essentially coerced the jury into a death sentence on the basis of reasoning that was divorced from the merits of the case." *Id.* at 303.

Balderas first raised these claims in his state habeas application. 1.SHCR-01 374–88. The CCA found the claims procedurally defaulted for failure to raise them on direct appeal and, in the alternative, the CCA denied the claims on the merits. 10.SHCR-01 2916–18, 2933–34. The CCA also made clear that the juror affidavits were barred from consideration because "they concern mental processes and do not establish that jurors considered any impermissible extraneous influences or impropriety in their deliberations. *Id.* at 2917.

## A.    This claim is procedurally defaulted

The CCA adopted the conclusions of law finding that these claims were barred because they should have been raised on direct appeal. 10.SHCR-01 2933–34. And this circuit has long "recognized this rule as an adequate state

239

ground that bars federal habeas relief[.]" *Harper*, 64 F.4th at 694 (citing *Aguilar v. Dretke*, 428 F.3d 526, 535 (5th Cir. 2005)). Thus, the claim is procedurally defaulted.

Balderas fails to acknowledge the default, let alone argue cause and prejudice. He cannot argue his state-habeas counsel were ineffective, as this is not an IATC claim. *See supra* Part IV.B. Perhaps he intends to allege that appellate counsel were ineffective, as "[t]he Supreme Court acknowledges that ineffective assistance of appellate counsel ('IAAC') for failing properly to preserve a constitutional claim for review in state court can provide cause to excuse procedural default." *Tong*, 90 F.4th at 868 (citing *Murray*, 477 U.S at 488–89).

But, "the claim of ineffective assistance of counsel on direct appeal . . . must itself be exhausted using state collateral review procedures" before "it can be used to establish cause for procedural default." *Hatten v. Quarterman*, 570 F.3d 595, 605 (5th Cir. 2009) (quoting *Murray*, 477 U.S. at 488–89 and citing *Edwards v. Carpenter*, 529 U.S. 446, 451–53 (2000)). Where a petitioner fails to "exhaust his ineffective appellate counsel argument, it is procedurally barred from review in [federal] court and cannot furnish the basis for cause and prejudice enabling federal review of the underlying unexhausted habeas claims." *Id*. Any hypothetical IAAC claim would therefore itself be

defaulted and fail to show cause. Moreover, as the CCA rejected these claims on the merits in the alternative, Balderas cannot show appellate counsel's ineffectiveness. *See Tong*, 90 F.4th at 869.

### B. Balderas's challenge to the future danger special issue is foreclosed by precedent.

Balderas's claim about the first special issue lacks merit. The Fifth Circuit has repeatedly rejected the same arguments about the failure to define the terms in this special issue. *See Sprouse v. Stephens*, 748 F.3d 609, 622–23 (5th Cir. 2014) (denying COA on complaints about the lack of definitions of "probability," "criminal acts of violence," and "continuing threat to society" in a Texas capital sentencing jury charge); *Paredes v. Quarterman*, 574 F.3d 281, 294 (5th Cir. 2009) (holding the terms "probability," "criminal acts of violence," and "continuing threat to society" "have a plain meaning of sufficient content that the discretion left to the jury is no more than that inherent in the jury system itself"); *Leal v. Dretke*, 428 F.3d 543, 552–53 (5th Cir. 2005) (listing numerous Fifth Circuit opinions rejecting complaints about the failure of Texas courts to define the terms "probability," "criminal acts of violence," and "continuing threat to society").

Likewise, the Fifth Circuit has held that the Texas scheme does not fail to narrow the class of defendants eligible for the death penalty. *White v. Thaler*,

522 F. App'x 226, 235 (5th Cir. 2013); *Taylor v. Thaler*, 397 F. App'x 104, 108–10 (5th Cir. 2010); *Sonnier*, 476 F.3d at 366–67. And because the Supreme Court has never held that this statute contains vague terms that require definitions, Balderas's claim is barred under non-retroactivity doctrine of *Teague*. *See Kerr v. Thaler*, 384 F. App'x 400, 404 (5th Cir. 2010) (finding petitioner's claim that the word "probability" is unconstitutionally vague and lowers the State's burden of proof on the first special issue *Teague*-barred).

## C.   Balderas's challenge to the 10-12 Rule is foreclosed by precedent.

Regarding Balderas's challenge to the "10-12" rule, the Supreme Court has rejected the theory that a trial court's failure to instruct the jury as to the consequences of deadlock gives rise to an Eighth Amendment violation. *Jones v. United States*, 527 U.S. 373, 381–82 (1999). Balderas's various complaints about the "10-12" rule have also been rejected on numerous occasions by the Fifth Circuit. *Davila v. Davis*, 650 F. App'x 860, 871–72 (5th Cir. 2016), *aff'd on other grounds*, 137 S. Ct. 2058 (2017); *Carter v. Stephens*, 805 F.3d 552, 556–57 (5th Cir. 2015); *Reed*, 739 F.3d at 779; *Blue*, 665 F.3d at 669–70; *Druery v. Thaler*, 647 F.3d 535, 542–45 (5th Cir. 2011) (explicitly rejecting argument that *Kubat v. Thieret*, 867 F.2d 351, 372–74 (7th Cir. 1989) superseded "Fifth Circuit precedent regarding challenges to Texas' 10-12 rule").

Balderas's claim that the "10-12" rule runs afoul of *Mills v. Maryland*, 486 U.S. 367 (1988), and *McCoy v. North Carolina,* 494 U.S. 433 (1990), has likewise been rejected by the Fifth Circuit. *Davila*, 650 F. App'x at 872 ("[W]e have considered the 10-12 Rule since the 1991 changes to Article 37.071 and have held that the mitigation special issue does not violate *Mills* or *McKoy*. The Texas death penalty scheme does not create the possibility that reasonable jurors would think they all had to agree on particular mitigating evidence like the statute in *Mills* did; instead, each juror can independently consider mitigating evidence.") (citation omitted); *see also Young v. Davis*, 860 F.3d 318, 324–32 (5th Cir. 2017); *Hughes v. Johnson*, 191 F.3d 607, 625 (5th Cir. 1999) ("We have distinguished *Mills* on the ground that the Texas system permits all jurors to consider any mitigating evidence and does not allow a single juror to preclude the entire jury from considering such evidence.") (citing *Jacobs v. Scott,* 31 F.3d 1319, 1329 (5th Cir. 1994)). And because the Supreme Court has never held that this particular rule is unconstitutional, Balderas's claim is *Teague*-barred. *Blue*, 665 F.3d at 670.

### D.    Balderas is precluded from relying on juror affidavits here.

As for Balderas's claim that juror affidavits support his claim that the "10-12" rule led to confusion among the jurors, Pet. at 300–03, Balderas is precluded from relying on this evidence. *See Young*, 835 F.3d at 529 ("[W]e

have repeatedly held that Rule 606(b) forbids consideration of juror affidavits in federal habeas cases."). Balderas offers no exception to the rule that would permit consideration of these affidavits. He refers to the statute as a "mistaken extraneous influence," Pet. at 301, but clearly the law is nothing "external to the jury." This is merely a case of jurors attempting to impeach their verdicts after the fact, which the rule was intended to prohibit. Habeas relief is not warranted.

## X.    Ground Eleven: Suggestive Identification

In his eleventh ground for relief, Balderas claims that his due process rights were violated when the trial court permitted evidence that Wendy Bardales identified him as the shooter based on a photo array shown to her shortly after Hernandez's murder. Pet. at 304–09. According to Balderas, the photo array was impermissibly suggestive, and thus the identification should have been excluded. *Id.* Balderas exhausted this claim on direct appeal, App. Br. at 78–88, and the CCA adjudicated the claim on the merits in its opinion affirming the judgment of the trial court. 517 S.W.3d at 791. Thus, to prevail, Balderas must show that the adjudication was an unreasonable application of Supreme Court law. § 2254(d).

## A.    Factual background of the identification

The CCA recounted the historical facts, starting with Wendy's initial description of the shooter. On the night of the shooting, Wendy gave a statement in which she stated,

> I got a good look at his face. I have never seen him before. He was Hispanic and about 16-17 years old. He was around 5 foot 5 inches to 5 foot 7 inches tall. I remember him having a dark birth mark on his face but I can't remember exactly where. He was very skinny and clean shaven. He had black hair, it was short. He had a fade type haircut. He was wearing a black sweat shirt hooded jacket and khaki pants.

*Id*. at 792. Based on Wendy's description, Officer Ruland put together an array containing a photo of Israel Diaz and five other individuals. *Id*. A couple of days after the shooting, Wendy was shown the array and "recognized Diaz as an acquaintance, but she stated that he was not the gunman." *Id*. Wendy did not recognize anyone in the array as the gunman. *Id*.

After a tip from a confidential informant implicating Balderas, Ruland obtained a photo array including a picture of Balderas. *Id*. at 792–93. The array had apparently been put together by another officer "during the investigation of another offense in which Balderas was a suspect." *Id*. at 793. On December 12, 2005, a little more than a week after the shooting, Ruland showed Wendy the array. *Id*. Despite the fact that Wendy had previously said she didn't

recognize the shooter, she recognized Balderas as an acquaintance and said his "face looked exactly like the shooter's face." *Id*. When asked what she meant by this, Wendy repeated that Balderas's face "looked exactly like" the shooter's face and stated that Balderas "could be the shooter." *Id*.

Officer Ruland felt confident that Wendy had positively identified Balderas as the shooter but wasn't sure if he could call it a "positive" identification given her odd phrasing (which he believed was caused by English being Wendy's second language). *Balderas*, 517 S.W.3d at 793. Thus, Ruland returned to Wendy's apartment a day later to seek further clarification. *Id*. Again, Wendy said Balderas and the shooter had the "same face." *Id*. This time, though, Wendy elaborated that the shooter was wearing a hood, which is why she kept referring to the "face" of the shooter." *Id*. Officer Ruland therefore asked Wendy to use her hands to "cover the hair of each subject." *Id*. When she covered Balderas's hair, "her eyes 'grew wide' and 'began to water.'" *Id*. "She covered her mouth and said that she was absolutely positive that the man in the photograph was the man who killed Hernandez." *Id*. On the back of the photo array Wendy wrote in Spanish "I'm positive that he's the one that killed Eduardo . . . I can understand English but I can't write it." *Id*.

The trial court held a hearing on Balderas's motion to suppress this identification. It entertained expert testimony from Dr. Roy Malpass, who

opined that the identification was unduly suggestive and unreliable. *Balderas*, 517 S.W.3d at 793–94. Specifically, he opined that Balderas stood out in the photo array, that Wendy was focused on the weapon and not the shooter's face, and that Wendy's identification seemed to evolve over time. *Id*. The trial court nevertheless denied the motion to suppress. *Id*. at 794. The CCA held that the trial court did not err. *Id*. at 797–98.

### B.     The law on out-of-court identifications

The Supreme Court has created "a due process check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of the crime." *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012). This approach is "used to determine whether the Due Process Clause requires suppression of an eyewitness identification tainted by police arrangement" and proceeds in two steps. *Id*. at 238. First, "due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." *Id*. (citing *Manson v. Brathwaite*, 432 U.S. 98, 107 (1977) and *Neil v. Biggers*, 409 U.S. 188, 198 (1972)).

Upon such a showing of unnecessary suggestiveness, courts proceed to the second step: For the court "to assess, on a case-by-case basis, whether

247

improper police conduct created a 'substantial likelihood of misidentification.'"

*Id*. (quoting *Biggers*, 409 U.S. at 201). The assessment relies on five factors:

> The Supreme Court has identified several factors to help determine the likelihood of misidentification: (1) the opportunity of the witness to view the criminal at the crime scene; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.

*Coleman v. Quarterman*, 456 F.3d 537, 544 (5th Cir. 2006) (citing *Biggers*, 409 U.S. at 199–200). A petitioner raising such a claim "cannot prevail in federal habeas unless he shows that the state court acted contrary to or unreasonably applied Supreme Court precedent in finding that the line-up was not impermissibly suggestive and that, even if it were, it did not taint" the identification. *Coleman*, 456 F.3d at 544.

### C.    The CCA's decision was not unreasonable.

#### 1.    The impermissibly suggestiveness determination

The CCA first took up the issue of whether the photo array was suggestive. The array was made part of the record at trial:



Looking to this exhibit, the CCA held that the array was not impermissibly suggestive:

> All of the photographs are "head shots" depicting Hispanic males who could be about 16 or 17 years old. Nothing in the photographs reveals the men's relative heights and weights. Four men are wearing black or dark grey shirts: one has a black t-shirt, another has a black sweatshirt or polo shirt, another has a grey hoodie, and Balderas has a black hoodie. Balderas's and the other man's hoodies are clearly off of their heads and behind their necks. All of the mens' faces are clearly visible. The men in the photographs are generally clean shaven, although one has a sparse mustache. No one in the array appears to have a "dark birth mark" on his face. Balderas has a mark on his cheek that appears to be a scratch, and two other men have marks on their faces that appear to be scratches or scars. All of the men have very short hair, and two

> men in addition to Balderas have haircuts that can fairly be
> described as "fade type."

*Balderas*, 517 S.W.3d at 795. Balderas fails to show that this finding was
unreasonable. No one could dispute that all six individuals are Hispanic males
of roughly the same age, with indeterminate height and weight. Generally
speaking, such a lineup passes constitutional muster. *See United States v.
Casey*, 825 F.3d 1, 18 (1st Cir. 2016) (finding array not suggestive where,
despite the defendant having "the darkest complexion" among the individuals,
"each individual could have been described as black, and they shared relatively
similar facial features, a near-identical haircut, and groomed eyebrows");
*United States v. Harris*, 281 F.3d 667, 670 (7th Cir. 2002) (finding line-up not
suggestive where the men in the line-up "were of similar age, height, weight,
and general complexion"); *see also Briscoe v. County of St. Louis, Missouri*, 690
F.3d 1004, 1014 (8th Cir. 2012) ("Participants in a lineup do not have to have
identical characteristics." (citing *United States v. Lewis*, 547 F.2d 1030, 1035
(8th Cir. 1976))).

Balderas contends, however, that the photo array was impermissible
because (1) Wendy described the shooter as wearing a black hoodie and having
a dark birthmark on his face, (2) Balderas was the only suspect with a "dark
birth mark" on his face, (3) Balderas was the only suspect wearing a black

hoodie, and (4) Officer Ruland emphasized these distinctions by covering the top half of Balderas's face. Pet. at 307.

As to the assertion of covering the top half of Balderas's face, Balderas misrepresents the record. Officer Ruland testified that he asked Wendy to cover the *hair* of Balderas and the fillers. 25.RR 100 ("I then asked her to view each of the photos again with the *hair covered*."). The purpose of this was to mimic the look she got of the shooter's face while he was wearing a hood. Thus, contrary to Balderas's claim, there is no evidence that the State ever emphasized the lower half of Balderas's face. The mere covering of hair in each photo is certainly not impermissible under Supreme Court law. *See Galloway v. County of Nassau*, No. 19-CV-5026 (AMD) (JMW), 2024 WL 1345634, at *11 (E.D.N.Y. Mar. 29, 2024) (holding that line-up in which the "plaintiff and fillers wore hats to cover their hair" was "not unduly suggestive"); *Ruiz v. Lawlyer*, No. 11-1993, 2012 WL 606722, at *10 n.12 (E.D. Penn. Feb. 2, 2012) (finding, in the alternative, that a photo array was not impermissibly suggestive when the witness identified the defendant "as the shooter after the hair on all of the photos was covered.").

Balderas's mark and hoodie arguments fail as well. "Photo arrays may be suggestive if the suspect is the only person closely resembling the description, or if the subjects of the photographs are 'grossly dissimilar in

251

appearance to the suspect.'" *United States v. Saenz*, 286 F. App'x 166, 169 (5th Cir. 2008) (quoting *United States v. Wade*, 388 U.S. 218, 233 (1967)). But on AEDPA review, Balderas must show more; he must show that the CCA's determination was unreasonable. *See* § 2254(d).

Wendy testified at the hearing on the motion to suppress the identification that the shooter had on a "black sweatshirt hooded jacket." 25.RR 50; 25.RR 183 (same testimony in front of jury). But, as the CCA pointed out, three of the other individuals "are wearing black or dark grey shirts: one has a black t-shirt, another has a black sweatshirt or polo shirt, another has a grey hoodie, and Balderas has a black hoodie." *Balderas*, 517 S.W.3d at 795. This was not unreasonable. "Many cases . . . indicate that a photo array is not suggestive where only the defendant is dressed in clothing or has a personal attribute that is expressly referenced by a witness." *Legenzoff v. Steckel*, 564 F. App'x 136, 144 (6th Cir. 2014) (citing *United States v. Washington*, 714 F.3d 962, 968 (6th Cir. 2013) & *United States v. Peterson*, 411 F. App'x 857, 864–65 (6th Cir. 2011)).

In a nearly identical case, the Second Circuit rejected a defendant's argument that he was wearing a black hoodie in a photo array when the witness described the shooter as "wearing a black hoodie[.]" *United States v. Gershman*, 31 F.4th 80, 94 (2d Cir. 2022). The court of appeals found the array

was not suggestive, noting that other individuals in the array "were depicted wearing similar clothing styles, including one person wearing a lighter colored hoodie and another wearing what appears to be a dark, collared jacket." *Id.*; *see also United States v. Daniels*, 97 F.4th 800, 810 (11th Cir. 2024) ("[U[nder our case law, even if [defendant] were the only person in the array wearing a black hoodie or certain hairstyle, that does not necessarily mean that the lineup was unduly suggestive); *Renteria v. Curry*, No. 1:08-cv-01209-AWI-DLB (HC), 2009 WL 2985674, at *9 (E.D. Cal. Sep. 16, 2009) ("In addition, the fact that Petitioner was the only suspect in the line-up wearing a hooded sweatshirt was not unduly suggestive given that two other suspects had high collared shirts and the hood was not covering his head to draw such dramatic attention to it.").

The CCA also pointed out that the hoodies in the array, including Balderas's hoodie, were "clearly off of their heads and behind their necks. All the mens' faces are clearly visible." *Balderas*, 517 S.W.3d at 756. As the Northern District of Georgia pointed out, these kinds of similar-clothing-as-the-suspect arguments are typically rejected where the clothing is not emphasized, and the photo array focuses on the defendant's face. *United States v. Brown*, Civ. No. 3:15-cr-00001-TCB-2, 2015 WL 5156193, at *5 (N.D. Ga. Sep. 2, 2015) (collecting cases); *see also Lee v. Davis*, No. 04CV74632-DT, 2006

WL 276732, at *5 (E.D. Mich. 2006) (finding state court decision reasonable where the state court "noted that the hood was down and that [the witness] based her identification upon the shape of Petitioner's head and the height of his forehead, not on his clothing."); *Renteria*, 2009 WL 2985674, at *9 ("In addition, the fact that Petitioner was the only suspect in the line-up wearing a hooded sweatshirt was not unduly suggestive given that two other suspects had high collared shirts and the hood was not covering his head to draw such dramatic attention to it."); *Lewis v. Horton*, No. 5:18-cv-12542, 2021 WL 4443346, at *8 (E.D. Mich. Sep. 28, 2021) ("Further, Petitioner does not point to any evidence in the record indicating that the witness relied on the fact he was wearing a hoodie when making the identification.").

These cases underscore the reasonableness of the CCA's determination that the black hoodie was not suggestive. While Wendy described the shooter as wearing a black hoodie, there is no evidence that she heavily relied on that article of clothing in making her identification. Quite the opposite, she said she identified Balderas by saying "he has the same face as the shooter." 25.RR 95–96, 113. Compound this with the fact that the hoodie was inconspicuously down, and that two other individuals in the array had a dark colored hood or collar, SX 56, Balderas cannot show the CCA's decision was unreasonable.

254

The CCA's rejection of the "dark birthmark" argument was also reasonable. The CCA noted that Balderas, as well as the other individuals, did not appear to have a dark birthmark in the picture, but that Balderas rather appeared to have a scratch on the left side of his face. *Balderas*, 517 S.W.3d at 795. The scratch on Balderas's face is hardly conspicuous, though, and as such it does not arise to the level of being unduly suggestive. *See United States v. Kelsey*, 917 F.3d 740, 750 (D.C. Cir. 2019) (finding ear tattoo on defendant was not impermissibly suggestive where it was "not clearly discernable in the photo" such that it was "'not clear . . . exactly what the discoloration is'"); *United States v. Fleming*, 216 F.3d 1084, 2000 WL 486265, at *2 (9th Cir. 2000) (unpublished) (finding mark on forehead not unduly suggestive where it "is only perceptible upon close examination and appears to form part of [the defendant's] hairline"); *Sok v. Romanowski*, 619 F. Supp. 2d 334, 352 (W.D. Mich. 2008) (finding defendant being the only depicted person with a "mole on his left cheek" was not unduly suggestive where the mole was "very light and not *glaringly* obvious" (emphasis added)); *see also United States v. Perkins*, 787 F.3d 1329, 1344 (11th Cir. 2015) (holding that photo array was not unduly suggestive where defendant was "the only man in the lineup with gold teeth").

The CCA also found that "two other men have marks on their faces that appear to be scratches or scars." 517 S.W.3d at 795. Balderas's own eyewitness

expert, Dr. Malpass, conceded that the scar next to the left eye of the individual in second position was prominent. 25.RR 169–70. Thus, the CCA was reasonable in relying on this factor as well. *See Winn v. Washburn*, Case No. 2:18-cv-02426-TLP-tmp, 2021 WL 4496952, at *17 (W.D. Tenn. Sep. 30, 2021) (finding lineup not suggestive where each individual had "some type of imperfection, mark, or discoloration on his face" even though they did not specifically have a "*birthmark* on the right side of the face" as the defendant did).

### 2.    Substantial-likelihood-of-misidentification determination.

The CCA made an alternative determination that, even assuming impermissible suggestiveness, Balderas also failed to show the suggestiveness resulted in a substantial likelihood of misidentification. *Balderas*, 517 S.W.3d at 795–96. Thus, Balderas must also show this determination was unreasonable under § 2254(d) to prevail on this claim.

In finding no substantial likelihood of misidentification, the CCA correctly applied the *Biggers* factors on direct appeal. *Balderas*, 517 S.W.3d at 792, 795–96. In looking to the first two factors (opportunity to view the suspect and degree of attention), the CCA took note of Wendy's statement to police, in which she stated that she "got a good look at [the shooter's] face." *Id*. at 792; SX 160 (Wendy Bardales 2005 statement). It also noted the following:

> Wendy testified that her eyes followed the gunman the entire time he was in the apartment, and she was focused on him throughout the offense. Although the living room light was off, the television in the living room was on and the kitchen light illuminated the area. Wendy testified that she could see the gunman as he ran through the apartment. The gunman initially wore a hood pulled up over his head, but the hood fell as he passed Wendy, and she got a good look at his face.

*Balderas*, 517 S.W.3d at 796.

Balderas points out that Wendy only viewed Balderas for "a matter of seconds" and would only have seen the shooter's face when his hoodie fell off "for what could be no more than a second or two." Pet. at 307. It's unclear where Balderas gets this one-to-two-second estimate from, and it appears that it is pure speculation. It is also unclear how he leaps from "the shooter was wearing a hoodie" to "Wendy couldn't have seen his face until the hoodie came off." Wendy stated that the reason she focused on the faces of the individuals in the array was because the shooter wore a hood, indicating she still got a good look at the shooter's face even when the hood was up. 26.RR 236.

In any event, courts have upheld identifications based on observations lasting only "a matter of seconds." *See United States v. Williams*, 35 F.3d 558, 1994 WL 477912, at *2 (4th Cir. 1994) (unpublished) (finding no risk of misidentification where witness "got a good look" at the perpetrator's "face for approximately five seconds" and she "immediately and unequivocally

identified" the defendant only three days after the crime); *Yearwood v. Keane*, 101 F.3d 685, 1996 WL 282134, at *1 (2d Cir. 1996) (unpublished) (finding identification reliable where the victim "looked his assailant in the face for up to six seconds" under the illumination of a street lamp and stated that he "got 'a good look at [his assailant's] face.'").

Balderas also tries to attack the factor of Wendy's attention by pointing to the fact that she "misdescribed the murder weapon" as a "large black automatic kind." Pet. at 308 ¶ 919. Wendy, however, was correct that the weapon was a large semiautomatic, and it did have a black handle. SX 75. She was merely incorrect in describing it as black instead of silver. But that's hardly surprising given that Wendy specifically stated that she focused on the shooter's face. SX 160. None of Balderas's arguments establish the CCA was unreasonable in finding the first two factors weighed against him.

And the other factors weigh in the State's favor as well. Wendy's description of the assailant as a skinny sixteen-to-seventeen-year-old Hispanic male, with black hair, a fade-type haircut, and no facial hair fits Balderas to a tee. SX 157 (picture of Balderas with side-fade haircut). Balderas tries to nit-pick this factor, pointing out that Wendy at first said that the shooter had a mark on his face but she didn't know exactly where, and then later stating that the mark was on his cheek. Pet. at 308. But this slight discrepancy doesn't

detract from the fact that Wendy gave a description of the assailant that was almost identical to Balderas.

Turning to the fourth factor, Wendy unequivocally and immediately identified Balderas in the photo array, stating "that his face 'looked exactly like' the gunman's face." *Balderas*, 517 S.W.3d at 796. Balderas distorts this record, stating that "[a]t first, Wendy could not positively identify Mr. Balderas as the shooter when she as shown the second photo spread." Pet. at 309. But Wendy immediately and unequivocally said Balderas had the same face as the shooter. And the CCA found that Wendy's "has the same face" statement was in fact a positive identification. *Balderas*, 517 S.W.3d at 796 ("To the extent that Balderas asserts that Wendy's uncertainty in her second identification was the product of police 'prompting,' we observe that Wendy had already identified Balderas as the gunman by that time."). In any event, regardless of how to characterize Wendy's first identification of Balderas, her immediate statement that Balderas "had the same face" of the shooter obviously supports the CCA's finding that the fourth factor—level of certainty—weighs against Balderas.

Finally, Balderas does not challenge the CCA's determination that the short five-day delay between the crime and the second photo array weighed against Balderas as well. *Balderas*, 517 S.W.3d at 796. Nor could he. *See*

*Herrera v. Collins*, 904 F.2d 944, 948 (5th Cir. 1990) (holding positive identification "a few days" after the incident did not "undermine the reliability of the identification); *Howard v. Bouchard*, 405 F.3d 459, 473–74 (6th Cir. 2005) (holding that "[t]hree months is not a great length of time between an observation and identification.").

Finally, the CCA addressed the peculiar fact that Wendy initially said she didn't recognize the shooter, but then identified Balderas—someone she did know—as the shooter when presented with the photo array. *Balderas*, 517 S.W.3d at 796. It recognized that the *Biggers* factors "are not a perfect fit for a situation like this one, where the eyewitness initially stated she did not recognize the gunman, but later, upon viewing a lineup, recognized an acquaintance and identified him as the gunman." *Id*. It nevertheless rejected the argument that the identification "under the totality of the circumstances, [was] unreliable." *Id*. As the CCA followed the well-worn *Biggers* test and found every factor weighed against Balderas, Balderas cannot show this interpretation was an unreasonable application of Supreme Court law. § 2254(d).

### D.    Balderas cannot show *Brecht* harm.

The admission of an unduly suggestive identification is reviewed for harmless error under the *Brecht* standard. *See Juluke v. Cain*, 134 F. App'x

684, 689 (5th Cir. 2005). Even if Balderas can show that the trial court erred in admitting Wendy's identification of Balderas, he must show the identification had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 638. The State presented a mountain of evidence against Balderas, including the (1) Balderas's suspicious phone call to Jose Vasquez (who discovered Hernandez's location) right before the murder, (2) Diaz's testimony that Balderas confessed, (3) Diaz's recounting of corroborative facts such as the color of the gun, Balderas's exchanging the magazine, and the clothes Balderas was wearing, and (4) Balderas's possession of the murder weapon at the time of his arrest. *See supra* Part I.D.3. Thus, Balderas cannot show Wendy's identification had a "substantial and injurious effect or influence" on the jury's verdict.

## XI.    Ground Twelve: Mitigation Special Issue

In his twelfth claim for relief, Balderas argues that the Texas mitigation special issue unconstitutionally narrows the evidence his jury could consider as "mitigating." Pet. at 309. Specifically, he takes issue with Texas's instruction that "mitigating evidence is 'evidence that a juror might regard as reducing the defendant's moral blameworthiness.'" Pet. at 312 (citing Tex. Code Crim. Proc. art. 37.071 § 2(f)(4)). Balderas first raised this claim in his initial state application. 1.SHCR-01 388–93. The habeas court found the claim

procedurally barred because Balderas should have raised it on direct appeal. 10.SHCR-01 2918 ¶311, 2934 ¶62. It alternatively denied the claim on the merits, finding that Balderas had failed to show the statute was unconstitutional or that Texas's mitigation special issue was unconstitutional as applied to him. *Id.* at 2934 ¶¶63–64.

### A.    Procedural default

Texas's should-have-been-raised-on-direct-appeal bar is routinely adopted as an independent and adequate state court ground that "satisfies the requirements for procedural default." *Buntion*, 982 F.3d at 951. Thus, the CCA's procedural bar of this claim on that specific ground triggers a procedural default. *See Coleman*, 501 U.S. at 750. Balderas cannot overcome the default as he has not exhausted any IAAC claim that would serve as cause to excuse the default, and any IAAC claim would be meritless because the underlying claim is itself meritless. *See supra* Part IX.A. He also cannot rely on any IAHC claim to overcome the default. *See supra* Part IV.B.

### B.     Alternatively, Balderas fails to meet his burden under § 2254(d).

As the CCA adjudicated this claim in the alternative, even if he could overcome the procedural default, Balderas would have to show the merits adjudication was an unreasonable application of Supreme Court law. § 2254(d). As his claim is foreclosed by precedent, he cannot do so.

The Fifth Circuit has routinely rejected the allegation that the Texas mitigation special issue limits the consideration of mitigating evidence. *Hummel v. Davis*, 908 F.3d 987, 994 (5th Cir. 2018) (holding that "[w]e have consistently concluded" that the mitigation statute does not unconstitutionally restrict the consideration of mitigating evidence); *Rockwell v. Davis*, 853 F.3d 758, 763 (5th Cir. 2017) ("We have rejected similar arguments multiple times. The statute does not unconstitutionally restrict the mitigating evidence that Texas juries are allowed to consider. In fact, the jury instructions required the jury to 'consider all evidence admitted at the guilt or innocence stage and the punishment stage,' a line that comes directly from the statute.") (footnote omitted); *Beazley v. Johnson*, 242 F.3d 248, 260 (5th Cir. 2001) ("The definition of mitigating evidence does not limit the evidence considered under the [mitigation] special issue" because "'[v]irtually *any* mitigating evidence is capable of being viewed as having some bearing on the defendant's 'moral culpability' apart from its relevance to the particular concerns embodied in the

Texas special issues.'") (quoting *Graham v. Collins*, 506 U.S. 461, 476 (1993) (emphasis added)).

Obviously, if the Fifth Circuit has rejected this argument, Balderas cannot show the CCA was unreasonable for rejecting it as well. *See* 28 U.S.C. § 2254(d). Moreover, because the Supreme Court has never held that Texas's mitigation special issue unconstitutionally limits the consideration of mitigating evidence, Balderas's claim is *Teague*-barred. *See* 489 U.S. at 310.

## XII. Ground Thirteen: Balderas Claims He Is Actually Innocent.

Balderas next claims that he is actually innocent of his conviction. He states that he was "erroneously convicted on the basis of various violations, including the withholding of evidence, false testimony, ineffectiveness of trial counsel, prosecutorial misconduct, and other constitutional errors and failures that occurred at the trial and which led to an erroneous conviction as discussed in this petition." Pet. at 314. He then broadly asserts that apart from these alleged constitutional violations, "the evidence would establish that, as a matter of fact, Mr. Balderas did not commit the offense for which he has been convicted—and, most critically, that someone else killed Powder." *Id.*

First, this claim is procedurally defaulted as Balderas never raised it in state court. Second, in this Circuit, claims of actual innocence are not cognizable on federal habeas review. *Reed*, 739 F.3d at 766; *Foster v.*

*Quarterman*, 466 F.3d 359, 367 (5th Cir. 2006). And the Supreme Court has never "resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence," *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013), thus, the claim is barred under the non-retroactivity doctrine of *Teague*.[40] Third, this claim is inadequately briefed. *Trevino v. Johnson*, 168 F.3d 173, 181 n.3 (5th Cir. 1999) ("Because they are inadequately argued, we consider these issues waived."). Balderas includes no citation to any case law, no standard of review, and no summary of what evidence he believes establishes his factual innocence.

And fourth, Balderas is not actually innocent "Actual innocence means 'factual innocence and not mere legal insufficiency.'" *United States v. Jones*, 172 F.3d 381, 384 (5th Cir. 1999) (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)). To establish actual innocence, a petitioner must demonstrate that, in light of all of the evidence, it is more likely than not that no reasonable juror would have convicted him. *Bousley*, 523 U.S. at 623 (quoting *Schlup*, 513

---

[40]     Moreover, the Fifth Circuit noted that in *Herrerra v. Collins*, 506 U.S. 390, 417 (1993), the Supreme Court "made clear that federal habeas relief would only be available if there was no state procedure for making such a claim." *Graves*, 351 F.3d at 151, rehearing granted in part and denied in part by *Graves v. Cockrell*, 351 F.3d 156 (2003). Texas has an avenue by which to pursue actual-innocence claims. *Ex parte Elizondo*, 947 S.W.2d 202, 208-09 (Tex. Crim. App. 1996).

U.S. at 328). Such a claim requires a petitioner to support his allegations with new reliable evidence not presented at trial "whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, [or] critical physical evidence." *Schlup*, 513 U.S. at 324. And even if a "truly persuasive" showing of actual innocence would warrant federal habeas relief, the threshold for such a claim would be "extraordinarily high." *Herrera*, 506 U.S. at 417.

The only evidence of "innocence" Balderas presents is his alibi evidence. But the CCA has already determined that those alibi accounts are not credible. *See supra* Part II.D.2. Where, as here, "'a state court look[ed] at the same body of relevant evidence and applie[d] essentially the same standard to that evidence that the federal court does under *Schlup*, [§] 2254(e)(1) requires that the state court's findings of fact not be casually cast aside.'" *Reed*, 739 F.3d at 768, 772, 777 & n.8 (quoting *Sharpe v. Bell*, 593 F.3d 372, 379 (4th Cir. 2010) and applying § 2254(e)(1) to the CCA's review of an actual innocence claim); *see also Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003) (applying presumption of correctness to alternative consideration of freestanding "claim" of innocence). Thus, applying those requisite presumptions of correctness, Balderas cannot prevail on any innocence claim here.

## XIII.  Ground Fourteen: Balderas's Challenge to Texas's Death Penalty Scheme

In his fourteenth ground for relief, Balderas challenges Texas's death-penalty scheme as set out in article 37 of the Texas Code of Criminal Procedure. Pet. at 315. Balderas raises a smorgasbord of various, inadequately briefed, and ultimately futile, challenges to the statute. Balderas's attempt to jam over ten various challenges into three pages of briefing with nary a cite to legal authority—including dispositive legal authority foreclosing some of the claims—is an egregious abuse of judicial resources and should be rejected outright. *See Trevino*, 168 F.3d at 181 n.3 ("Because they are inadequately argued, we consider these issues waived.").

Turning to the specific allegations, they are plenty:

- Ground 14(a): That article 37.071 is unconstitutionally vague in its failure to describe various terms, Pet. at 315 ¶¶ 946–47;

- Ground 14(b): That the State has failed to provide local district attorneys "with a uniform method for determining which cases will be prosecuted as death penalty cases," *id*. at 315 ¶ 948;

- Ground 14(c): That the statute requiring jurors to determine future dangerousness is "arbitrary and capricious" because use of the word "probability" distracts the jury from the beyond-a-reasonable-doubt burden of proof, *id*. at 316 ¶ 949;

- Ground 14(d): That article 37.071 is unconstitutional because "it fails to require that mitigation be considered[,]" *id*. at 316 ¶ 950;

267

- Ground 14(e): That article 37.071 violates the Due Process Clause and the Equal Protection Clause because it permits introduction at the punishment phase of "any matter that the court deems relevant to sentence[,]" *id.* at 316 ¶951;

- Ground 14(f): That article 37.071 "does not properly narrow the class of persons eligible for the death penalty upon conviction for a capital offense[,]" *id.* at 316 ¶952;

- Ground 14(g): That the Texas death penalty scheme "is not based on a uniform national standard[,]" *id.* at 316 ¶ 953;

- Ground 14(h): That the Texas death penalty scheme "does not provide for a proportionality review to determine if the penalty imposed is proportionate to other similar offenses[,]" *id.* at 316 ¶954;

- Ground 14(i): That Texas's failure to instruct jurors that failure to agree to a verdict at punishment will result in a life sentence (the 10-12 Rule) is unconstitutional, *id.* at 316–18 ¶¶ 955–60, 962;

- Ground 14(j): That execution by lethal injection is cruel and unusual under the Eighth Amendment, *id.* at 317 ¶ 961;

- Ground 14(k): That article 37.071 permits "the introduction of unadjudicated extraneous offenses at the punishment phase" that violates "the reliability required by the Eighth Amendment[,]" *id.* at 318 ¶ 963;

- Ground 14(l): That article 37.071 "permits introduction of juvenile offenses at the punishment phase" of trial, *id.* at 318 ¶ 964;

- Ground 14(m): That the CCA has failed to create "appellate standards for determining the sufficiency of the evidence to support the jury's answers to the special issues, *id.* at 218 ¶ 965;

- Ground 14(n): That the State is not required allege the special issues in the indictment, *id.* at 318 ¶ 966.

All these claims are frivolous and procedurally barred.

### A.    Some of the claims are duplicates of claims raised elsewhere in Balderas's petition.

Balderas has raised some of these allegations in separate claims in his petition. Claim 14(a), the failure to define various terms submitted to the jury, is raised in ground ten. Pet. at 292–96. Claim 14(d), the allegation that Texas fails to require the consideration of mitigating evidence, is raised in Ground Twelve. Pet. at 309–14. Claim 14(i), the challenge to Texas's 10-12 Rule, was likewise raised in Ground Ten. *Id*. at 295–303. And claim 14(j), that execution by lethal injection violates the Eighth Amendment, is raised in Ground nineteen. Pet. at 331–32. The Director rests on his responses to those particular grounds and incorporates them here by reference.[41]

### B.    All these claims are unexhausted and procedurally defaulted.

Aside from claims 14(a), (d), & (i), the remaining claims in this section cannot be found in Balderas's direct appeal brief or any state-habeas application filed in state court.[42] *See generally* App. Br.; 1.SHCR-01; SHCR-03.

---

[41]    To the extent the vague allegations raised in Ground 14(a), (d), (j), & (k) are interpreted as raising different arguments than those raised in elsewhere in the petition, the Director reserves the right to address those arguments.

[42]    The fact that Balderas obtained a *Rhines* stay and didn't even bother to exhaust these claims further underscores his lack of seriousness in raising these claims.

If Balderas returned to state court to exhaust these claims, they would be procedurally barred under Texas's abuse-of-the-writ statute, an independent and adequate state bar. *See* Tex. Code Crim. Proc. art. 11.071 § 5; *Hughes*, 530 F.3d at 342. And as these claims would be procedurally barred upon a return to state court, they are procedurally defaulted here. *Coleman*, 501 U.S. at 735 n.1. Balderas cannot show cause to overcome the default through any IAAC or IAHC claims. *See supra* Parts IV.B, IX.A.

### C.    All these claims are legally frivolous.

#### 1.    Ground 14(b): failure to provide district attorneys with a uniform method for determining which cases should be prosecuted as death penalty cases.

Balderas argues that Texas "statute is unconstitutional because the state legislature has failed to provide the local district attorneys with a uniform method for determining which cases will be prosecuted as death penalty cases and which will be prosecuted as non-death penalty capital cases." Pet. at 319, ¶ 941; *see also id.* at 320, ¶ 946. But, the Supreme Court expressly rejected the complaint that the "state prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense." *Gregg v. Georgia*, 428 U.S. 153, 199 (1976). In *Gregg*, "the Court found no constitutional problem with the wide latitude that Georgia gave prosecutors, jurors, and the governor to extend mercy." *Allen v. Stephens*, 805 F.3d 617, 630

(5th Cir. 2015) (citing *Gregg*, 428 U.S. at 199), *abrogated on other grounds by Ayestas v. Davis*, 584 U.S. 28 (2018). "The Constitution," *Gregg* concluded, "is concerned not with latitude in the decision to withhold the death penalty, but rather with latitude in the decision to impose it." *Id.* (citing *Gregg* 584 U.S. at 199).

Consistent with this permissive discretion, the Fifth Circuit has rejected some of the arguments raised here. Balderas argues that whether to seek death may turn on "how much money the county is willing or has to spend to prosecute and defend a death penalty case." Pet. at 315 ¶948. In *Allen*, the Fifth Circuit found the CCA reasonable in rejecting this very argument. 805 F.3d at 630–31 ("The [CCA] reasonably concluded that Texas's differential funding in consistent with these [Supreme Court] precedents."). And while Balderas is less than precise about *which* constitutional provision he is alleging is violated, the Fifth Circuit made clear that the claim was meritless whether it was packaged as an Equal Protection claim or "under a cruel and unusual rubric." *Id.* at 629.

Of course, a prosecutor's discretion is still "tempered [] by the Equal Protection Clause, meaning the selectivity in choosing when to seek the death penalty does not amount to a federal violation so long as it is not "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary

classification." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) (internal quotations and citation omitted). The Court reaffirmed this standard in *United States v. Armstrong*, 517 U.S. 456, 464–66 (1996).

But Balderas presents no fact-specific allegations of discriminatory impact or motive in his prosecution; thus his claim necessarily fails. He only asserts the vague and unsupported allegation that "who will face death is often a matter of . . . the social standing of the victim, the race of the Defendant, the race of the victim[.]" Pet. at 315. But this type of generic claim is foreclosed by *McCleskey v. Kemp*, 481 U.S. 279, 297 (1987) (holding that study showing racial disparity in imposition of death penalty was "insufficient to support an inference that any of the decisionmakers in McCleskey's case acted with discriminatory purpose"); *see also Coleman*, 456 F.3d at 542–43 (finding *McCleskey* is still good law). And Balderas points to no specific evidence that the decision to seek death in *his case* was based upon "an unjustifiable standard." *Armstrong*, 517 U.S. at 464; *McCleskey*, 481 U.S. at 292 ("Thus, to prevail under the Equal Protection Clause, McCleskey must prove that the decisionmakers in *his* case acted with discriminatory purpose.").

And finally, because the Supreme Court has never held that a "uniform" death-penalty scheme is required, Balderas's claim is *Teague*-barred. *See Allen*, 895 F.3d at 630 ("[T]he Supreme Court has specifically acknowledged

that differing law enforcement resources and prosecutorial discretion make uniform application of the death penalty impossible.").

### 2.    Ground 14(c): The use of the word "probability" in the future dangerousness special issue

Before a defendant may be sentenced to death, the jury must find, beyond a reasonable doubt, that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. art. 37.071 § 2(b)(1). Balderas claims that the statute's use of the term "probability" lowers the burden of proof and "causes a juror to focus, if at all, on the probability language rather than on the real burden of proof which should be beyond a reasonable doubt." Pet. at 316 ¶ 949.

The Fifth Circuit has rejected this argument and concluded that it is barred under *Teague*. *Scheanette v. Quarterman*, 482 F.3d 815, 827–28 (5th Cir. 2007) (rejecting petitioner's claim that the Texas future-dangerousness special issue "dilutes the State's burden of proof and fails to define 'probability'"); *Kerr*, 384 F. App'x at 404 (petitioner's claim that the word "probability" lowers the State's burden of proof on the first special issue is *Teague*-barred).

### 3.    Ground 14(e): Permitting judge to determine relevancy at sentencing.

Balderas claims that Texas's statute "denies the accused due process and equal protection of the law by permitting introduction at the punishment phase of 'any matter that the court deems relevant to sentence.'" Pet. at 316. Balderas does not elaborate regarding why this language is problematic, so, as stated above, his claim is conclusory. Moreover, it is undermined by *Jurek v. Texas*, where the Supreme Court stated: "A jury must be allowed to consider on the basis of *all relevant evidence* not only why a death sentence should be imposed, but also why it should not be imposed." 428 U.S. 262, 271 (1976) (emphasis added); *see also Eddings v. Oklahoma*, 455 U.S. 104, 117 (1982) ("the state courts must consider all relevant mitigating evidence").

And the language in the statute Balderas finds objectionable—"any matter that the court deems relevant to sentence"—is followed by: "including evidence of the defendant's background or character or the circumstances of the offense that mitigates against the imposition of the death penalty." Tex. Code Crim. Proc. art. 37.071 § 2(a)(1); *see also id.*, § 2(d)(1). Thus, Balderas challenges the constitutionality of language requiring the consideration of mitigating evidence, which is clearly meritless. *See Blue,* 665 F.3d at 666 (holding that Texas's statutory scheme does not limit consideration of mitigating evidence); *see also Blystone v. Pennsylvania*, 494 U.S. 299, 305

(1990) (holding "catchall" statutory provision that a jury may consider "[a]ny other evidence of mitigation" passes constitutional muster). And because the Supreme Court has never found this language unconstitutional, Balderas's allegation is *Teague*-barred.

### 4.     Ground 14(f): Failure to properly narrow the class of persons eligible for the death penalty.

In Ground 14(f), Balderas claims that Texas "statute does not properly narrow the class of persons eligible for the death penalty upon conviction for a capital offense." Pet. at 316, ¶ 952. The Fifth Circuit has expressly rejected this claim. *See Sonnier*, 476 F.3d at 364–67; *see also Woods v. Johnson*, 75 F.3d 1017, 1033 (5th Cir. 1996) (observing that the *Jurek* Court "held that the constitutionally required narrowing function . . . under the Texas scheme was adequately performed at the guilt/innocence stage by the narrow categories of murder meeting the statutory definition of capital murder."). And the Supreme Court expressly sanctioned as adequate Texas's method of applying the "narrowing function" at the guilt phase of trial—specifically by submitting aggravating elements to the jury as a precondition to capital murder. *Lowenfield v. Phelps*, 484 U.S. 231, 245–46 (1988) ("It seems clear to us from this discussion that the narrowing function required for a regime of capital punishment may be provided in either of these two ways: The legislature may

itself narrow the definition of capital offenses, as Texas and Louisiana have done, so that the jury finding of guilt responds to this concern . . .").

As this claim is refuted by precedent and Supreme Court law, it is meritless and barred under the non-retroactivity principles in *Teague*. 489 U.S. at 310.

### 5. Ground 14(g): Texas's death penalty is not based on a uniform national standard.

Balderas claims that Texas's death penalty scheme is "not based on a uniform national standard, resulting in arbitrary, capricious, freakish, and wanton imposition of the death penalty." Pet. at 316 ¶ 953. The Supreme Court, however, "has consistently upheld the right of states to set their own standards within the limits imposed by the United States Constitution." *Johnson v. State*, 691 S.W.2d 619, 624 (Tex. Crim. App. 1984) (citing *Furman v. Georgia*, 408 U.S. 238 (1972), *Jurek*, 428 U.S. at 262, and *Woodson v. North Carolina*, 428 U.S. 280 (1976)). Accordingly, Balderas's claim is clearly foreclosed by Supreme Court precedent, and it is also barred under *Teague*, 489 U.S. at 310.

### 6. Ground 14(h): Failure to provide for proportionality review of death sentences

In Ground 14(h), Balderas claims that Texas "statute does not provide for a proportionality review to determine if the penalty imposed is

276

proportionate to other similar offenses." Pet. at 316 ¶ 954. Both the Supreme Court and Fifth Circuit have rejected this argument. *Pulley v. Harris*, 465 U.S. 37, 50–51 (1984) ("There is [ ] no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death sentence is imposed and the defendant requests it."); *Martinez v. Johnson*, 255 F.3d 229, 241 n.17 (5th Cir. 2001) (recognizing there is no constitutional right to proportionality review); *Hughes*, 191 F.3d at 622 (holding a state appellate court was not required to conduct proportionality review of a capital sentence). Balderas's claim is also barred under *Teague*. *See Moore v. Quarterman*, 526 F.Supp.2d 654, 727 (W.D. Tex. 2007).

### 7.    Ground 14(k): Permitting introduction of unadjudicated offenses at punishment

Balderas alleges that article 37.071 is unconstitutional because it "permits the introduction of unadjudicated extraneous offenses at the punishment phase." Pet at 318, ¶963. The Fifth Circuit has routinely rejected this claim and found it *Teague*-barred. *Brown v. Dretke*, 419 F.3d 365, 376–77 (5th Cir. 2005) ("there is no constitutional prohibition on the introduction at a trial's punishment phase of evidence showing that the defendant has engaged in extraneous, unadjudicated criminal conduct"); *Hughes v. Dretke*, 412 F.3d 582, 592–93 (5th Cir. 2005) (holding *Teague* foreclosed claim that jury should not have been permitted to consider evidence of an unadjudicated capital

murder at the sentencing phase of trial absent proof beyond a reasonable doubt).

### 8.    Ground 14(l): Permitting introduction of juvenile offenses at punishment

Eleventh, Balderas claims that article 37.071 is unconstitutional because it "permits the introduction of juvenile offenses at the punishment phase." Pet. at 318 ¶ 964. Balderas cites no case law holding that juvenile offenses may not be introduced as evidence of future dangerousness at the punishment phase of a capital trial. Indeed, the Fifth Circuit has determined that Supreme Court precedent "does not clearly establish that [a juvenile] offense may not be used to elevate murder to capital murder." *Taylor*, 397 F. App'x at 108; *see also United States v. Wilks*, 464 F.3d 1240, 1243 (11th Cir. 2006) ("It is one thing to prohibit capital punishment for those under the age of eighteen, but an entirely different thing to prohibit consideration of prior youthful offenses when sentencing criminals who continue their illegal activity into adulthood. *Roper*[43] does not mandate that we wipe clean the records of every criminal on his or her eighteenth birthday."). A sister court in this district has likewise rejected this claim and held that "[e]xtending the constitutional protections in the manner proposed by [petitioner] would

---

43    *Roper v. Simmons*, 543 U.S. 551 (2005).

require the creation of new constitutional law in violation of *Teague*'s non-retroactivity principles." *Thompson v. Davis*, No. H-13-1900, 2017 WL 1092309, at *30 (S.D. Tex. Mar. 23, 2017). Thus, this claim should be denied.

### 9. Claim 14(m): Texas's alleged failure to create appellate standards regarding the special issues

Twelfth, Balderas claims that Texas law is unconstitutional because "there are no appellate standards for determining the sufficiency of the evidence to support the jury's answers to the special issues, and the [CCA] has repeatedly and consistently refused to conduct any meaningful appellate review of mitigation sufficiency." Pet. at 318. Regarding the future danger special issue, Balderas is incorrect because the CCA employs the *Jackson v. Virginia*, 443 U.S. 307 (1979) standard in assessing whether the evidence was sufficient to support the jury's finding of future dangerousness. *Woods v. Cockrell*, 307 F.3d 353, 357–58 (5th Cir. 2002). Balderas also fails to demonstrate any harm in his case because, on direct appeal, he did not raise a sufficiency claim regarding the punishment-phase evidence. *See generally Balderas*, 517 S.W.3d at 762–99; *see also* App. Br. at 5–99.

Regarding the mitigation special issue, the Fifth Circuit has consistently rejected arguments that the Constitution mandates appellate review of the sufficiency of the mitigating evidence. *Adams v. Thaler*, 421 F. App'x 322, 336–37 (5th Cir. 2011); *Woods*, 307 F.3d at 359–60; *Johnson v. Cockrell*, 306 F.3d

249, 256 (5th Cir. 2002). And because the Supreme Court has never held that appellate review of the mitigating evidence is required, Balderas's claim is *Teague*-barred. *Woods*, 307 F.3d at 360.

### 10. Claim 14(n): Failure to include the special issues in the indictment

Lastly, Balderas claims that Texas "statute does not require the indictment to allege special issues, i.e. the 'facts' relied upon to enhance the capital sentence from life to death, contrary to *Apprendi v. New Jersey*, 530 U.S. 466 (2000)." Pet. at 318 ¶966. In *Anderson v. Quarterman*, the Fifth Circuit rejected this very argument: "*Apprendi* does not require that the special sentencing issues for the death penalty be pleaded in the indictment. Anderson points to no law indicating such a requirement, and this court holds that the state habeas court was not unreasonable in rejecting such a requirement." 204 F. App'x 402, 409 (5th Cir. 2006); *see also Bigby v. Stephens*, 595 F. App'x 350, 354 (5th Cir. 2014) (rejecting argument that *Apprendi* requires that specific facts supporting a death sentence be alleged in the indictment); *Scheanette*, 482 F.3d at 828 (holding that Texas's death-penalty scheme did not violate *Apprendi* "by failing to require the state to prove beyond a reasonable doubt the absence of mitigating circumstances"); *United States v. Bourgeois*, 423 F.3d 501, 507 (5th Cir. 2005) ("neither we nor any other circuit court of appeals has ever held that non-statutory aggravating factors must be set forth in the

280

indictment"). And because the Supreme Court has never issued such a ruling, Balderas's claim is *Teague*-barred. *Thompson*, 2017 WL 1092309, at *19.

### D.     Conclusion

For these reasons all of Balderas's challenges to Texas's death penalty scheme are procedurally defaulted, meritless, and barred by non-retroactivity principles.

## XIV. Ground Fifteen: Balderas Alleges His State Habeas Proceedings Violated Due Process.

In his fifteenth ground, Balderas argues that his state-habeas proceedings failed to comply with due process requirements. Pet. at 320–24. He does not, however, explain what remedy he seeks through this claim. Surely, insufficient due process during a proceeding that is *collateral* to his trial cannot be used to vacate his conviction and sentence. *See Brown*, 419 F.3d at 378 ("[W]e have previously held that alleged infirmities in state habeas proceedings are not grounds for federal habeas relief."). Thus, the Director interprets this claim as an attack on the deference that must be accorded to state court findings and decisions under § 2254.

In this claim, Balderas primarily launches into an attack on the state court's alleged failure "to comply with Texas State Procedures." Pet. at 320. But "the proper interpretation of state law is *not* cognizable in federal habeas

proceedings." *Beazley*, 242 F.3d at 261. Thus, Balderas must do more than show Texas failed to follow its own law; he must show that the proceedings were so lacking that they violated his due process rights. Balderas claims that the state proceedings were so lacking because he was not permitted to confront trial counsel and cross examine them on the statements made in their affidavits, and because he was denied a full hearing. Pet. at 320–27.

The problem for Balderas, though, is that his argument is foreclosed by circuit precedent: The Fifth Circuit has "consistently held that 'a full and fair hearing is not a precondition to according § 2254(e)(1)'s presumption of correctness to state habeas court findings of fact nor to applying § 2254(d)'s standards of review." *Sandoval Mendoza v. Lumpkin*, 81 F.4th 461, 472 (5th Cir. 2023) (quoting *Boyer v. Vannoy*, 863 F.3d 428, 446 (5th Cir. 2017) (quoting *Valdez*, 274 F.3d at 951)).[44]

Balderas also raises the argument that the CCA's failure to remand his initial habeas proceedings—in light of newly disclosed interview notes

---

[44]     Moreover, Balderas fails to support his argument with any supporting precedent. The case he cites, *Evitts v. Lucey*, involves the due process afforded the direct appeal process, which is not a collateral proceeding but is considered an extension of the original trial proceedings. 469 U.S. 387, 396 (1985). Thus, the Supreme Court held, when the State creates a direct appeal as a matter of right, a defendant is entitled to an effective *appellate* attorney during those proceedings. *Id.* at 401.

provided by the State—violated due process. Pet. at 324. But Balderas misapprehends the nature of this disclosure. If the turned over notes were indeed *Brady* material, that would give rise to a brand-new *Brady* claim. *See Nelson*, 72 F.4th at 660 (noting that a *Brady* claim is specific to particular pieces of material evidence). The only *Brady* claim raised in Balderas's initial petition concerned interview notes from 2007 and 2008 interviews with Israel Diaz. 1.SHCR-01 59–71. As *Brady* claims are determined "on an item-by-item basis" *Nelson*, 72 F.4th at 660 (citing *United States v. Brown*, 650 F.3d 582, 588–93 (5th Cir. 2011)), that would be a different claim than any *Brady* claim premised on the disclosure of new interview notes from 2013 and 2014. The proper remedy for presenting a new and previously unavailable claim under Texas law is not a remand and supplement of the initial application, but it is rather a subsequent application filed directly with the CCA. Tex. Code Crim. Proc. art. 11.071 § 5(a)(1). Thus, the CCA in fact correctly followed Texas procedure in not remanding Balderas's initial habeas proceedings to the trial court. Balderas fails to show that the CCA failed to follow Texas procedural rules, let alone due process. In any event, "any deviation from the procedure in article 11.071, assuming it exists, does not alone provide relief in this Court." *Rockwell v. Davis*, Civ. No. 4:14-CV-1055-O, 2016 WL 4398378, at \*5 (N.D. Tex. Aug. 18, 2016).

As this claim is foreclosed by precedent, this Court should continue to apply § 2254(d) & (e)(1) deference to claims adjudicated on the merits in state court and factual determinations made in state court.

## XV.  Ground Sixteen: Balderas Alleges That His Right to Substitute Counsel was Violated.

Balderas alleges that the trial court violated his Sixth Amendment rights by failing to conduct a hearing on his pro se motion for a new counsel based on an alleged breakdown in communications with his trial counsel. Pet. at 327–29. Balderas filed a motion to substitute counsel in April 2011 claiming a lack of communication with trial counsel and that counsel had lied to him. 1.CR 71–72. Balderas argues that the trial court should have held a hearing on the matter, and its failure to do so violated his Sixth Amendment rights.[45] Pet. at 329.

Balderas never raised this claim in state court. It's not in his direct appeal brief, his initial application, or his subsequent application. And if he returned to state court to exhaust it, it would be procedurally defaulted. *See*

---

[45]    Balderas refers at one point to a "*pro se* motion for new trial" instead of a motion for substitute counsel. Pet. at 328. As there is no evidence of a pro se motion for new trial and given that the substance of the argument is geared towards the issue of substitute counsel, the Director interprets this as a simple mistake and only addresses the issue of substitute counsel.

Tex. Code Crim. Proc. art. 11.071 § 5. Accordingly, the claim is defaulted. *See supra* Parts IV.B, IX.A.

Turning to the merits of the claim, Balderas's argument can be properly bifurcated into two sub-arguments: First, he argues that the trial court should have further inquired into his pro se motion. Pet. at 328–29. Second, he argues that he was entitled to substitute counsel based on the breakdown in communication he raised in his pro se motion. *Id*. at 329.

Turning to the first argument, "Supreme Court case law has not 'clearly established' that a trial court must inquire about the reasons for dissatisfaction when a defendant requests appointment of new counsel." *Akins v. Easterling*, 648 F.3d 380, 397 (6th Cir. 2011) (citing *Morris v. Slappy*, 461 U.S. 1, 14 (1983)); *see also Gray v. Douglas*, No. 2:21-cv-11356, 2023 WL 6519259, at *5 (E.D. Mich. Oct. 5, 2023) ("There is no clearly established Supreme Court precedent requiring a trial court to inquire into the basis for a defendant's dissatisfaction when a defendant requests new counsel." (citing *Akins*, 648 F.3d at 397)); *Hawthorne v. Phelps*, Civ. No. 11-682-GMS, 2014 WL 4954300, at *7 (D. Del. Sep 23, 2014) ("[T]he Supreme Court has not addressed the level of inquiry required by a state court when a defendant presents a motion for substitute appointed counsel.").

Balderas cites *Martel v. Clair*, 565 U.S. 648, 663 (2012) in support of this argument. But *Clair* involved a substitution of counsel on federal habeas review pursuant to 18 U.S.C. § 3599 and the "interests of justice" standard to determine if substitution is warranted. *Id.* at 652–64. *Clair* has no bearing on whether the federal constitution mandates that state courts inquire into pro se motions to substitute, let alone whether a hearing is merited on the issue in state court. As just explained, the Supreme Court is silent on that issue. Thus, to the extent that Balderas argues that the trial court violated his constitutional rights by failing to inquire into his motion, that claim would require a new procedural rule; thus, it is barred under the non-retroactivity principles of *Teague*, 489 U.S. at 310.

Despite the lack of authority on the matter, most federal courts will simply analyze this type of complaint under the familiar rubric of whether "the petitioner's Sixth Amendment right to effective assistance of counsel was violated." *Hawthorne*, 2014 WL 4954300, at *8. For example, in *Schell v. Witek*, the Ninth Circuit found the trial court failed to appropriately process a pro se motion for new counsel, but ultimately decided that,

> the ultimate constitutional question the federal courts must answer here is not whether the state trial court "abused its discretion" in not deciding Schell's motion, but whether this error actually violated Schell's constitutional rights in that the conflict between Schell and his attorney had become so great that it

286

> resulted in a total lack of communication or other significant
> impediment that resulted in turn in an attorney-client
> relationship that fell short of that required by the Sixth
> Amendment.

218 F.3d 1017, 1026 (9th Cir. 2000); *see also Tolliver v. Dallman*, 57 F.3d 1070, 1995 WL 364176, at 3–4 (6th Cir. 1995) (finding defendant not prejudiced by insufficient inquiry into pro se motion for new trial where his "counsel was quite effective in his defense"). In fact, the case cited by Balderas reaches the same conclusion. *See United States v. Young*, 482 F.2d 993, 995 (5th Cir. 1973) (finding that federal district court should have further inquired into conflict of interest but reversal was not required because the defendant "received vigorous and able representation at trial").

Thus, either way, this claim boils down to whether Balderas can show a conflict or breakdown in communication that impeded his Sixth Amendment right to counsel. In humorous juxtaposition, Balderas claims "there was *zero* communication between Mr. Balderas and his counsel" a mere paragraph after describing Balderas's visit with trial counsel Godinch. His hyperbole can't change the facts though. In the letter, Balderas states that Godinich had visited him *twice* in the prior month. 1.CR 71. His claim that he appeared for a March 28, 2011 setting without counsel is contradicted by the docket entry

sheet. 1.CR 53 (indicating that, on March 28, 2011, Balderas "appeared with counsel, GODINICH, JEROME JR").

Balderas further was under the misapprehension that his case was going to trial in April 2011, and thus was apparently worried that Godinich would be starting *another* trial that same month. 1.CR 71. Whatever precipitated this miscommunication, it was obviously harmless. Godinich obtained a continuance on April 15, 2011. 1.CR 60. And, as evidenced by the record, counsel thoroughly investigated Balderas's case, kept in constant contact with Balderas and his family leading up to trial, and performed effectively. *See supra* Parts II and III. Indeed, Balderas fails to connect any of the complaints or miscommunications raised in his pro se motion to any defensive shortcoming at trial. Thus, his claim fails. *See Young*, 482 F.2d at 995.

## XVI. Ground Seventeen: Balderas Alleges That the Death Penalty Is Unconstitutional.

In his seventeenth claim for relief, Balderas argues that the death penalty violates the Sixth, Eighth, Fourteenth—and somehow, the Fourth and Ninth—Amendments to the United States Constitution. Pet. at 329. Balderas claims that his death sentence violates multiple constitutional provisions because the right to life is fundamental, that "[a]ny law that impinges upon a fundamental right is presumptively unconstitutional," that under a strict scrutiny analysis the State must prove that infringement of his right to life is

"necessary to promote a compelling state interest," and that the prosecution failed to do so in this case or show that there is "no less restrictive means of punishing him." *Id*. at 329–30.

This claim was never raised in state court. And it is accordingly procedurally defaulted. Balderas cannot overcome the default through showing cause and prejudice. *See supra* Parts IV.B, IX.A. Balderas's claim is also conclusory and inadequately briefed because he cites no case law or facts in support of his argument. *Koch*, 907 F.2d at 530. And because this claim consists of little more than baseless assertions, he has waived it. *Lookingbill v. Cockrell*, 293 F.3d 256, 263 (5th Cir. 2002).

Moreover, this allegation is ambiguous because Balderas is mixing various constitutional provisions in an attempt to invalidate his death sentence. By arguing that he has a fundamental right to life, he appears to claim that *any* death sentence is per se unconstitutional. But, as the Supreme Court said only five years ago, "the Constitution allows capital punishment." *Bucklew v. Precythe*, 587 U.S. 119, 129 (2019). Indeed, the Supreme Court has long rejected the argument that "the imposition of the death penalty under any circumstances is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments." *Roberts v. Louisiana*, 428 U.S. 325, 331 (1976) (citing *Gregg*, 428 U.S. at 168–87); *see also Wood*, 836 F.3d at 538 ("it is settled

that capital punishment is constitutional"). Further, in *In re West*, the petitioner argued that "his death sentence violates his substantive due process and equal protection rights guaranteed by the fourteenth amendment," and the Fifth Circuit rejected this argument holding that "[t]he Supreme Court has upheld both the constitutionality of the death penalty and Texas's capital sentencing procedures, and there has been no change in the law that favors West." 119 F.3d 295, 296 (5th Cir. 1997); *see also Jurek*, 428 U.S. at 276 (holding that Texas's capital sentencing scheme does not "violate the Eighth and Fourteenth Amendments").

Balderas's use of the terms "strict scrutiny" and "compelling state interest" invoke the Equal Protection Clause of the Fourteenth Amendment. *See e.g., Cooper v. Harris*, 581 U.S. 285, 292 (2017). However, it is settled that "capital defendants are not a suspect class for equal protection purposes." *Williams v. Lynaugh*, 814 F.2d 205, 208 (5th Cir. 1987) (citing *Gray v. Lucas*, 677 F.2d 1086, 1104 (5th Cir. 1982)). Regardless, the Supreme Court has held that a defendant claiming an equal protection violation in a death penalty case must prove that prosecutors acted with a discriminatory purpose in that defendant's case. *McCleskey*, 481 U.S. at 292. Balderas's bare accusations that the prosecution failed to show a justification for his death sentence, to the extent this is even a valid constitutional claim, clearly fail in that regard,

particularly considering the brutal nature of his offense and evidence of his future dangerousness. *See supra* Statement of Facts.

To the extent Balderas is seeking a new rule that the death penalty is unconstitutional based on a fundamental right to life or where the State allegedly fails to demonstrate there is no other means of deterrence, his claim is likewise *Teague*-barred. 489 U.S. at 310.

## XVII. Ground Eighteen: Habeas Counsel Ineffectiveness

In his eighteenth ground for relief, Balderas argues that his state-habeas counsel were ineffective. Pet. at 330–31. Balderas does not clarify if he intends to raise this as a standalone claim, or as a cause to overcome a procedural default. His invocation of the "Sixth, Eighth, and Fourteenth Amendments," *id*. at 330, indicates he intends to litigate it as its own constitutional violation. But that is plainly foreclosed by Supreme Court and Circuit precedent. *See, e.g., Martinez Ramirez*, 596 U.S. at 383 ("there is no constitutional right to counsel in state postconviction proceedings"); *Moody v. Lumpkin*, 70 F.4th 884, 891 (5th Cir. 2023) ("We agree with the State that *Martinez* and *Trevino* had no effect on the long-established rule that there is no constitutional right to counsel in postconviction proceedings.").

To the extent Balderas raises this allegation as a means of showing "cause" to overcome the default certain claims, the allegations come up short.

First, to the extent Balderas intends to rely on his IAHC claim to overcome the default of any unexhausted non-IATC claims, he cannot; IAHC can only serve as cause to overcome the default of an IATC claim. *See supra* Part IV.B. Second, to the extent Balderas properly relies on *Martinez/Trevino* to overcome the default of IATC claims, the Director addresses those arguments in the section addressing those particular IATC claims. *See supra* Parts IV, VI.

## XVIII. Ground Nineteen: Lethal Injection

Balderas alleges that death by lethal injection constitutes cruel and unusual punishment, in violation of the Sixth, Eighth, and Fourteenth Amendments. His claim can fairly be broken down into two arguments: First, he states that the procedure is fraught with human error, but, even when not, "the condemned suffers pain and suffering over and above that necessary to produce death, i.e. the condemned is tortured." Pet. at 331. Second, he argues that the use of compounded pentobarbital violates the federal Controlled Substances Act (CSA), and "creates a substantial risk of serious bodily harm and torture and therefore cannot be used consistent with the Eighth Amendment." Pet. at 331–32.

This claim is frivolous for multiple reasons. For starters, this challenge to the lethal-injection protocol is more appropriately raised as a civil rights action under 42 U.S.C. § 1983, rather than as a habeas corpus claim under 28

U.S.C. § 2254. *See Glossip v. Gross*, 576 U.S. 863, 879 (2015) ("a method-of-execution claim must be brought under § 1983 because such a claim does not attack the validity of the prisoner's conviction or death sentence") (citing *Hill v. McDonough*, 547 U.S. 573, 579–80 (2006)).[46] Thus, this claim should be denied.

Moreover, Balderas's first argument—generic and unsupported claims of pain and suffering—is both conclusory and foreclosed by precedent. Balderas does not cite to a single fact or legal authority to substantiate his pain-and-suffering argument. Pet. at 331. That alone warrants dispatching the claim. *See Koch*, 907 F.2d at 530.

Not only is Balderas's pain-and-suffering argument conclusory, but it is also refuted by the nearly universal denial of challenges to pentobarbital as a method of execution. He suggests that *any* execution method is per se violative of the Eighth Amendment, even if they "occur without human error." Pet. at 331. Such an argument can easily be rejected given the numerous cases indicating otherwise *See Wood*, 836 F.3d at 540 (rejecting claim that compounded pentobarbital would cause pain and suffering as "conjecture"); s*ee*

---

[46]    Such a claim brought in a § 1983 suit must also be exhausted through the "Texas prison grievance process[.]" *Ramirez v. Collier*, 595 U.S. 411, 421–22 (2022). Balderas has provided no evidence he has exhausted his lethal injection claim through such a grievance process.

*also Barr v. Lee*, 591 U.S. 979, 980–81 (2020) (noting pentobarbital has been "used to carry out over 100 executions, without incident" and "[h]as been upheld by numerous Courts of Appeals against Eighth Amendment challenges").

Nor do Balderas's wild and unsupported claims of the potential for human error carry any water. With citation to nothing, Balderas grotesquely speculates about potential human error "in which drugs are administered to the condemned in the wrong order [an impossibility under Texas's single drug protocol], persons are unable to locate a suitable vein and must therefore cut the condemned in his neck and/or groin, and needles once inserted in the condemned become loose and come out of the condemned during the execution procedure." Pet. at 331. To meet his burden, Balderas must show that his concerns demonstrate a "substantial risk of serious harm." *Glossip*, 576 U.S. at 877.

Balderas's allegations fail to do that. The Fifth Circuit has rejected the notion that a petitioner may plead hypothetical risks based on speculation alone. *See Raby v. Livingston*, 600 F.3d 552, 562 (5th Cir. 2010) ("[O]ur review of the constitutionality of Texas' lethal injection protocol is not concerned with a risk of accident. The focus of our inquiry is whether the protocol inherently imposes a constitutionally significant risk of pain."); *Bible v. Davis*, 739 F.

App'x 766, 771 (5th Cir. 2018) (petitioner's "claims that his veins could 'blow' are too speculative, especially in light of the undisputed fact that medical personnel have recently been able to draw blood from Bible"); *Whitaker v. Collier*, 862 F.3d 490, 499–500 (5th Cir. 2017) ("If pleading hypothetical risks was insufficient to state a claim in [an Eighth Circuit case] . . . then the claim that additional testing is required to identify an otherwise unknown risk is surely insufficient.") And Balderas's failure to offer any evidence to support his claim is also dispositive. *See Whitaker v. Livingston*, 732 F.3d 465, 468 (5th Cir. 2013) ("[Plaintiffs] must offer some proof that the state's own process— that its choice of pharmacy, that its lab results, that the training of its executioners, and so forth, are suspect. Plaintiffs have pointed to only hypothetical possibilities that the process was defective.").

The argument that the use of "compounded pentobarbital . . . creates a substantial risk of bodily harm and torture[,]" Pet. at 332, has also been routinely rejected as speculative. *See Ladd v. Livingston*, 777 F.3d 286, 289 (5th Cir. 2015) (plaintiff's argument that "compounded drugs are unregulated and subject to quality and efficacy problems . . . is essentially speculative, and the Supreme Court has held that 'speculation cannot substitute for evidence that the use of the drug is *sure or very likely* to cause serious illness and needless suffering.'" (quoting *Brewer v. Landrigan*, 562 U.S. 996, 996 (2010)));

*Sells v. Livingston*, 561 F. App'x 342, 345 (5th Cir. 2014) ("[P]laintiffs are speculating that the newly acquired pentobarbital being supplied by a new compounder may be different and may cause a risk of severe pain. Speculation is not enough."); *Whitaker*, 862 F.3d at 497 (holding that plaintiff failed to show a "substantial risk of severe pain" upon allegation that compounded Pentobarbital would be used after its beyond-use-date).[47]

As for Balderas's complaint that the use of compounded pentobarbital violates the Controlled Substances Act (CSA), Pet. at 331–32, Balderas points to no Supreme Court precedent, or any precedent for that matter, supporting that allegation. Indeed, in the last five years, the Supreme Court upheld the use of pentobarbital in executions. *Bucklew*, 587 U.S. at 122–23; *Lee*, 591 U.S.

---

[47]    It should also be noted that the only specific allegations made by Balderas about the effects of lethal injection—that "the condemned is first paralyzed and is then given a drug which suffocates him while conscious"—are completely false. Pet. at 331. Indeed, Texas's protocol used to include a three-drug cocktail, one of which was a paralytic (pancuronium bromide); but that protocol is no longer used. *Compare Raby v. Livingston*, 600 F.3d 552, 555 (5th Cir. 2010) (describing three-drug protocol) *with Wood v. Collier*, 836 F.3d 534, 537 (5th Cir. 2016) ("Since 2012 the State of Texas has done just that—execution via a single-drug protocol utilizing a five-gram dose of pentobarbital."). And even *assuming* this cocktail were still in effect, Balderas's allegation that the condemned remains "conscious" is false. *See Raby*, 600 F.3d at 555 (explaining that the first drug in the cocktail, sodium thiopental, is "a fast-acting barbiturate sedative that induces a deep, comalike *unconsciousness* when given in the amounts used for lethal injection" (emphasis added)). And finally, the final drug in the cocktail, potassium chloride, induces cardiac arrest, not "suffocation" as alleged by Balderas. *Id.*

at 979–81. And in the twelve years since Texas's 2012 change to Pentobarbital as its lethal injection drug, *Wood*, 836 F.3d at 537, no court has held that Texas's use of pentobarbital violates the CSA or federal law. That is unsurprising, as Balderas fails to explain how a violation of the CSA in any way meets the "substantial risk of harm" test. In fact, the Eleventh Circuit explicitly held that this very CSA argument failed to make such a showing. *Gissendaner v. Commissioner, Georgia Dept. of Corrections*, 779 F.3d 1275, 1279, 1283 (11th Cir. 2015).

Lastly, Balderas cannot succeed on this claim without identifying "an alternative [method of execution] that is 'feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain.'" *Glossip*, 576 U.S. at 877 (quoting *Baze v. Rees*, 553 U.S. 35, 52 (2008)); *see also Whitaker*, 862 F.3d at 497. Balderas does not even attempt to propose any alternative; he simply complains about the use of pentobarbital. Pet. at 331–32. Therefore, his claim is meritless.

## XIX. Ground Twenty: Incompetence to Be Executed.

Balderas claims that he is incompetent to be executed. Pet. at 332. This claim must be dismissed without prejudice as unripe because no execution date has been set and Balderas's execution is not imminent. *Panetti v. Quarterman*,

551 U.S. 930, 947 (2007); *Buntion v. Lumpkin*, 31 F.4th 952, 961 (5th Cir. 2022); *ShisInday v. Quarterman*, 511 F.3d 514, 521–22 (5th Cir. 2007).

## XX.   Ground Twenty-One: False Testimony

Balderas alleges that the State violated his due-process rights by presenting false-evidence under *Napue v. Illinois*, 360 U.S. 264 (1959). Pet. at 333. Specifically, he alleges that Diaz testified falsely when (a) he said he didn't ask the prosecutors for anything, (b) he described Balderas's confession to the murder, (c) he said the meeting to decide to kill Hernandez took place only three to four days before the murder, (d) he described hanging out with rival gangs as the "ultimate betrayal," and (e) he said he didn't care what happened to Hernandez. Pet. at 334–35. Claim 21(c) was adjudicated on the merits in state court. The remaining subclaims are procedurally defaulted, and in the alternative they are meritless.

### A.    The *Napue* standard

The Supreme Court has "held that due process is violated when the State knowingly offers false testimony to obtain a conviction and fails to correct testimony." *Tucker v. Johnson*, 242 F.3d 617, 625–26 (5th Cir. 2001) (citing *Napue*, 360 U.S. at 267–71). To prove such a violation, the petitioner must show that the testimony was "actually false," that the prosecution knew the testimony was false, and that the statements were material. *Id*. at 626.

Materially false testimony is testimony that, through nondisclosure of the falsity, creates a "reasonable probability" of a different outcome. *United States v. O'Keefe*, 128 F.3d 885, 894 (5th Cir. 1997) (quoting *Kyles*, 514 U.S. at 434).

### B. Except for claim 21(b), all of claim 21 is procedurally defaulted.

Balderas presented false-testimony claims 21(a), 21(c)–(e) in his subsequent application. SHCR-03 168–71. The CCA dismissed the claims as procedurally barred without addressing the merits. *See Balderas*, 2023 WL 7023648, at *1. The CCA's procedural bar of the claims establishes an implicit finding that these claims were previously available at the time Balderas filed his first application. *See Ford*, 910 F.3d at 235. Thus, Balderas must show cause and prejudice to overcome the default, *Coleman*, 501 U.S. at 750, which also entails rebutting the implicit finding that these claims were available when Balderas filed his first state-habeas application.

Balderas's false-testimony claims are predicated on three pieces of information: the 2007-2008 Diaz Notes, the 2014 Diaz notes, and the Diaz jail calls. As explained above, Balderas offers no evidence from trial counsel that the 2014 Diaz notes or Diaz jail calls were unavailable or unknown to trial counsel. *See supra* Part I. Thus, he fails to rebut the presumption of previous availability under § 2254(e)(1). Moreover, it was clearly established in state

299

court that trial counsel had reviewed the 2007-2008 Diaz Notes. *See supra* Part I. Thus, the false-testimony claims predicated on those notes were also available when Balderas filed his first state-habeas application.

For these reasons, Balderas cannot show cause to overcome the default. *See Coleman*, 501 U.S. at 750. Moreover, as these claims are meritless, *see infra* Part XXI.C, Balderas cannot show actual prejudice.

### C.    All the false-testimony claims are meritless.

#### 1.    False-testimony claims premised on the 2007-2008 Diaz Notes.

Balderas raises three alleged discrepancies arising from the 2007-2008 Diaz Notes. First, that Diaz's 2007-2008 descriptions of Hernandez's murder did not involve Balderas confessing. Second, that Diaz's 2007-2008 notes indicated that the meeting to decide to kill Hernandez was held nine months before Hernandez's murder, not three to four days before the murder. And third, that the 2007-2008 Diaz Notes contradicted Diaz's statement that he didn't care what happened to Hernandez.

##### a.    Diaz's testimony that Balderas confessed to murdering Hernandez.

The first of these arguments was exhausted and adjudicated on the merits in Balderas's first state-habeas application. Balderas raised the argument that Diaz's testimony that Balderas hugged and kissed him after

murdering Hernandez and said he "got him" was false. 1.SHCR-01 47–55. Balderas's false testimony claim raised in his first application was predicated around a theory that Diaz recanted this part of his testimony. *Id*.

The CCA already determined that Balderas failed to establish that Diaz's description of Balderas's confession was false. At an evidentiary hearing, Diaz did not recant his trial testimony and stated that he testified truthfully at Balderas's trial. 4.EHRR 186. The CCA found Diaz's testimony credible. 10.SHCR-01 2849 ¶ 40. It further found that Balderas "fail[ed] to present credible or persuasive testimony that Israel Diaz testified falsely at [Balderas's] trial." 10.SHCR-01 2857. And while the ultimate theory of falsity that Balderas raised in state court was recantation—not the 2007-2008 Diaz notes—the CCA considered the 2007-2008 Diaz notes in making its determination that Diaz did not testify falsely.[48] 10.SHCR-01 2848 ¶ 31 (finding that the 2007-2008 Diaz Notes were "materially consistent" with Diaz's testimony concerning Balderas's involvement). Thus, the CCA's determination that Balderas failed to show Diaz's testimony regarding

---

[48]    If this claim were construed as a new unadjudicated clam due to the new theory of falsity, it would be procedurally defaulted, and Balderas could not show cause because the 2007-08 Diaz notes were available to him when he filed his first state-habeas application. The Director reserves the right to argue as much if this Court finds the claim unadjudicated.

Balderas's confession was false is presumed correct and entitled to deference under § 2254(d)(2) and (e)(1).

Balderas cannot overcome this presumption by pointing to the 2007-2008 Diaz notes. It was well known that Diaz provided different versions of how he learned of Hernandez's murder before ultimately reaching a deal with the State that included Balderas's night-of-the-murder confession across the street from the murder scene. 5.SHCR-01 1471, 1486 (trial counsel were aware of the 2007-2008 Diaz Notes). Diaz admitted that he "went through a period where he did not want to cooperate with or testify for the State." 10.SHCR-01 2850 ¶ 41.b. That Diaz stonewalled the State for several years does not prove his trial testimony was false.

Moreover, Diaz was able to testify to facts that he only could have known if his night-of-the-murder-confession testimony were true. He saw Balderas holding a silver gun, consistent with the color of the murder weapon. 26.RR 160; SX 75. Diaz also said Balderas was exchanging the gun magazine when he confessed, 26.RR 160, which was consistent with the forensic evidence that the shooter emptied the magazine. Firearms examiner Kim Downs testified that the most cartridges the magazine of the murder weapon could hold would be ten, with one extra in the chamber. 28.RR 67–68. Ten casings were found in

302

the apartment. 24.RR 185–86; SX 16. That's also consistent with Wendy's statement that the shooter shot until the gun was empty. SX 160.

And finally, Diaz's description of Balderas's clothes exactly matched the shooter. He testified that Balderas was wearing a "darker shirt" that was "sweater-like" and that it was "blue or dark blue, kind of looks black." 26.RR 159. He also said Balderas was wearing "khaki pants." 26.RR 159. All the testifying witnesses to the shooting agreed the shooter was wearing a dark hooded sweatshirt. 24.RR 56, 253; 25.RR 183. And Edgar Ferrufino testified that the shooter was wearing khaki pants. 24.RR 253.

Thus, while the fact that Diaz changed his story is obviously impeaching, it by no means establishes that the testimony he gave at trial was false. More importantly, it does not rebut by clear and convincing evidence the presumption that he testified truthfully. § 2254(e)(1). Balderas therefore fails to show the CCA's denial of this claim was unreasonable.

### b. Diaz's statement that the meeting to decide whether to kill Hernandez took place nine months before the murder, not mere days.

Balderas also argues that Diaz testified falsely when he said the meeting where LTC decided to kill Hernandez was three to four days before the murder. 26.RR 152. This was false, he claims, because the 2007-2008 Diaz Notes reflect that LTC held a meeting nine to ten months before the shooting where LTC members "discussed shooting Powder [Hernandez]" because they "believed Powder put them in danger." 3.SHCR-01 788.

Balderas's argument that this shows the three-to-four-days-before meeting was false falls flat. Surely LTC could have held multiple meetings regarding Hernandez. The fact that LTC held a meeting about Hernandez nine to ten months prior—around the time Hernandez had snitched on Diaz—does not rule out a meeting being held three to four days before the murder. The argument is also disingenuous given that Balderas put on evidence that a meeting was held three to four days before the murder. 28.RR 170 (Benitez testimony that meeting was held on December 3, 2005). For the same reason, Balderas also cannot show materiality; his defensive theory centered around a meeting being held three days before the murder.

### c. Diaz's statement that he didn't care what happened to Hernandez.

Next, Balderas raises a *Napue* claim, alleging that the 2007-2008 notes show that Diaz testified falsely when he said he did not care whether LTC killed Hernandez, because the 2007-2008 Diaz notes show that Diaz said "everybody wanted Powder [Hernandez] dead." 3.SHCR-01 790. But it appears that Diaz was trying to convey LTC's hostility towards Hernandez due to his recent association with rival gangs. *Id*. In fact, a few lines above the "everyone wanted Powder dead" note is a note that says "not a big deal to W." 3.SHCR-01 789–90. This note was in the context of discussing Hernandez's murder. *Id*. Thus, it's clear from the notes that Diaz did not testify falsely when he said he did not care about what happened to Hernandez.

Even giving Balderas the benefit of the doubt here, he establishes at most a slight inconsistency, which is hardly evidence of falsity. *See United States v. Griley*, 814 F.2d 967, 971 (4th Cir. 1987) ("Mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." (citing *Overton v. United States,* 450 F.2d 919, 920 (5th Cir. 1971)); *United States v. Stanford*, 823 F.3d 814, 841 (5th Cir. 2016) (finding that, where alleged falsehoods were "based on apparent evidentiary inconsistencies, it is questionable whether one could describe the inconsistencies as false, let alone material").

Moreover, it is "axiomatic that not every lie is material." *O'Keefe*, 128 F.3d at 894. Here, Diaz's statement that everyone wanted Hernandez dead was still consistent with the State's theory that Balderas volunteered to kill Hernandez at a meeting held to address Hernandez's betrayal.

### 2.    That flashing rival gang signs is the "ultimate betrayal."

In his next argument, Balderas contends that Diaz testified falsely because he described hanging out with rival gang members as "the ultimate betrayal, but apparently told prosecutors that "[i]f caught w/ other gang member get checked (beat up)." SHCR-03 254. As explained above, because Balderas fails to rebut the finding that this information was previously known to trial counsel, *see supra* Part XX.B., this evidence is barred under § 2254(e)(2).

Balderas fails to assert any falsity. The mere fact that the words "ultimate betrayal" doesn't appear in the State's notes do not indicate that Diaz's testimony was false. Quite the opposite—the notes support Diaz's testimony. Diaz made clear that LTC had a "Rule-don't hang out w/ other gang members." SHCR-03 254. His statement that hanging out with other gang members could lead to getting "beat up" or something "more serious" was not in any way inconsistent with his "ultimate betrayal" characterization of breaking the rule.

306

Moreover, this testimony was not material. Diaz's testimony that hanging out with rival gangs was forbidden because it put LTC gang members in danger was consistent with his statements to prosecutors. SHCR-03 255 ("Powder knew where everyone lived"); 26.RR 147–50. Even if Diaz had not used the words "ultimate betrayal[,]" nothing would have changed given Diaz's credible testimony that Hernandez was breaking LTC rules by hanging around rival LTC gangs.

### 3.    That Diaz never asked the prosecutors for anything.

In his final argument, Balderas claims that jail calls reveal that Diaz had been discussing obtaining a plea deal with his family. Pet. at 333–34. As Balderas has never submitted these jail calls to any court, he fails to meet his burden of showing falsity. Moreover, the evidence is barred under § 2254(e)(2) because Balderas never submitted the jail calls in state court. *See Williams*, 529 U.S. at 433–34.

But even assuming the contents of the jail calls, Balderas cannot show falsity. Balderas claims that the State withheld impeachment evidence showing Diaz testified falsely when he said he "never asked [the prosecutors] for anything," Pet. at 333–34. This testimony was false, Balderas claims, because jail calls reveal Diaz talking to family members about his desperation

for a plea deal and makes some reference to negotiations with prosecutors for a plea deal. *Id*.

These jail calls do not establish falsity. As explained in Part I, the transcript shows that, when Diaz said he "never asked them for anything," Diaz was very specifically referring to his 2007 and 2008 interviews with prosecutors:

> Q:    Okay. So, from 2007 to 2008 there was no communication with the prosecution at all about what it would take to get you on board to participate; is that right?
>
> A:    Well, my attorney felt like it was wise for us not to be demanding this or that.
>
> . . .
>
> Q:    Back in 2007, 2008, what did you think would be a fair deal for you?
>
> A:    I never asked them for anything.

26.RR at 167–68. This narrow testimony could in no way be construed to mean Diaz had never reached out about a plea deal or that he was never "desperate" for a plea deal.

Balderas also cannot show materiality. First, he cannot show materiality for testimony he elicited on cross-examination. *See United States v. Fields*, 761 F.3d 443, 477 (5th Cir. 2014) ("As we have explained, 'we have limited material lies to those that occur as part of the prosecution's case . . . [.] [T]hus, when the

308

defense elicits the alleged perjury on cross-examination, no material falsehood has occurred because the government has not itself knowingly presented false testimony.'" (quoting *O'Keefe*, 128 F.3d at 894)). Second, evidence that Diaz wanted a plea deal would not be material given the fact that Diaz was thoroughly impeached by the fact that he was only testifying against Balderas to plead down from capital murder to aggravated robbery. 26.RR 124. And third, trial counsel did elicit from Diaz that he was hoping "to get the case reduced to something lesser, lesser charge." 26.RR 168. He admitted to "floating ideas" of what would be a good plea deal with his attorney. 26.RR 169. Thus, regardless of whether Diaz said he didn't ask the prosecution for a deal, the jury heard that he did want a plea deal, discussed getting a deal with his attorney, and ultimately received a deal to avoid a potential death sentence. Balderas's suggestion of falsity is entirely cumulative.

## XXI.  Ground Twenty-Two: Cumulative Error

In his final ground for relief, Balderas argues that this Court should cumulate the error from all the violations he alleges. Pet. at 335. Balderas has not raised this claim in any state habeas proceeding. *See generally* 1.SHCR-01; SHCR-03. The claim would be defaulted upon return to state court. Tex. Code Crim. Proc. art. 11.071 § 5. Thus, it is defaulted. *Coleman*, 501 U.S. at 730 n.1.

In addition to the default, the claim is meritless. Under this Circuit's precedent, a cumulative-error analysis is only warranted when: (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors so infected the entire trial that the resulting conviction violates due process or fundamental fairness. *Jackson v. Johnson*, 194 F.3d 641, 655 n.59 (1999); *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996). Claims that have no merit cannot be cumulated, regardless of the total number raised. *Westley*, 83 F.3d at 726; *United States v. Moye*, 951 F.2d 59, 63 n.7 (5th Cir. 1992) ("Because we find no merit to any of Moye's arguments of error, his claim of cumulative error must also fail."); *Mullen v. Blackburn*, 808 F.2d 1143, 1147 (5th Cir. 1987) ("Twenty times zero equals zero."). As all Balderas's claims either fail to show error or overcome a procedural default, he cannot cumulate any error.

But, even if Balderas is attempting to cumulate actual errors, while the Fifth Circuit has announced a rule espousing a cumulative-error analysis, the Supreme Court has never recognized such a claim. The Fifth Circuit has explained: "[t]hat the constitutionality of a state criminal trial can be compromised by a series of events none of which individually violated a defendant's constitutional rights seems a difficult theoretical proposition and

310

is one to which the Supreme Court has not directly spoken." *Derden v. McNeel*, 978 F.2d 1453, 1456 (5th Cir. 1992); *Hill v. Davis*, 781 F. App'x 277, 280–81 (5th Cir. 2019).

This Court should reject Balderas's novel and unwieldly attempt to cumulate error spanning across various types of constitutional violations. For example, in his petition, Balderas alleges various constitutional violations with various harm analyses (*Strickland*, *Brady*, *Brecht*). It is unclear what the harm standard would be if one were to cumulate these alleged errors. Moreover, Balderas fails to explain how this Court could cumulate errors that allegedly occurred at different stages of trial.

In any event, the evidence against Balderas at both stages of trial was overwhelming enough find to harm lacking under whatever standard could be envisioned here. *Cf. Ladd*, 311 F.3d at 360 ("[T]he evidence of [the defendant's] future dangerousness was overwhelming. When that is the case, it is virtually impossible to establish [*Strickland*] prejudice."). Ground twenty-two should be denied as defaulted and meritless.

## CONCLUSION

For the foregoing reasons, the Director respectfully requests that Balderas's petition and request for evidentiary development be denied. Furthermore, because the resolution of Balderas's claims is not debatable

among jurists of reason, the Court should sua sponte deny a certificate of appealability. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

 s/ Ali M. Nasser
ALI M. NASSER
Assistant Attorney General
*Counsel of Record*
State Bar No. 24098169
Southern District Admission No. 2936065

Post Office Box 12548, Capitol Station
Austin, Texas 78711
Tel: (512) 936-2134
Ali.Nasser@oag.texas.gov

*Counsel for Respondent*

## CERTIFICATE OF SERVICE

I do hereby certify that on June 22, 2024, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court, Southern District of Texas, using the electronic case-filing system of the Court. The electronic case-filing system sent a "Notice of Electronic Filing" (NEF) to the following counsel of record, who consented in writing to accept the NEF as service of this document by electronic means:

Ashley Carr
DLA Piper LLP
401 Congress Avenue
Suite 2500
Austin, TX 78701
512-457-7251
Ashley.carr@dlapiper.com

Jeffrey Tsai
DLA Piper LLP
555 Mission Street
Suite 2400
San Francisco, CA 94105
415-615-6055
Jeff.tsai@us.dlapiper.com

Marc Silverman
DLA Piper LLP
1251 Avenue of the Americas
New York, NY 10010
212-335-4828
Marc.silverman@us.dlapiper.com

      s/ Ali M. Nasser
      ALI M. NASSER
      Assistant Attorney General

313