**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| JUAN BALDERAS, | |
| Petitioner, | Case No. 4:20-CV-04262 |
| v. | **DEATH PENALTY CASE** |
| BOBBY LUMPKIN, | |
| Director, Texas Department of Criminal Justice, Institutional Division, | |
| Respondent. | |

**REPLY IN SUPPORT OF PETITION FOR**
**WRIT OF HABEAS CORPUS (SECOND AMENDED)**
**UNDER 28 U.S.C. § 2254 OF A PERSON IN STATE CUSTODY**

**DLA PIPER LLP (US)**
*Pro Bono Attorneys for Petitioner*

Jeffrey E. Tsai**
555 Mission Street, 24th Floor
San Francisco, California 94105
(415) 836-2500
jeff.tsai@us.dlapiper.com

Ashley Allen Carr (Tex. Bar No. 24082619)*
401 Congress Avenue, Suite 2500
Austin, Texas 78701
(512) 457-7251
ashley.carr@us.dlapiper.com

Marc A. Silverman**
Jessica Park Wright**
1251 Avenue of the Americas, 27th Floor
New York, New York 10020
(212) 335-4800
marc.silverman@us.dlapiper.com
jessica.wright@us.dlapiper.com

*Attorney-in-charge as required by Loal Rule 11.3
**Admitted Pro Hac Vice

# TABLE OF CONTENTS

**Page**

I.  CLAIM I:  THE STATE VIOLATED MR. BALDERAS'S DUE PROCESS RIGHTS
    UNDER *BRADY V. MARYLAND* AND ITS PROGENY ...................................................1
    A.  The Material Exculpatory and Impeachment Evidence .........................................2
        1.  The October 2015 Disclosure: The 2007 and 2008 Notes ...........................2
        2.  The May 2018 Disclosures: the Cookie Jail Calls and the First Twin
            Notes ...........................................................................................................4
        3.  The August 2018 Disclosures: the State's Self-Styled Brady
            Disclosure; the October 2020 Disclosures the Underlying 2013 Second
            Twin Notes ...................................................................................................7
        4.  The September 2020 Disclosure: the 2005 Cookie Notes ...........................8
        5.  The November 2020 Disclosures: the 2010 Quinones Notes and Third
            Twin Notes ...................................................................................................9
        6.  The December 2020 Disclosure: the 2014 Cookie Notes ..........................10
        7.  The Pool Termination Letter Obtained by State Habeas Counsel .............12
    B.  The Cumulative Effect of the Suppressed Evidence Undermines Confidence in
        the Verdict ............................................................................................................13
    C.  The State's Procedural Arguments .......................................................................14
        1.  The State Court's Conclusion that the 2007 and 2008 Notes Were Not
            Suppressed Was Unreasonable ..................................................................14
        2.  The 2014 Cookie Interview, the Twin Interviews, the Quinones
            Interview, and the Jail Calls Are Not Procedurally Barred Because
            They Were Not Available Before Filing the First State Habeas Petition ..16

II. CLAIM II:  TRIAL COUNSEL WERE INEFFECTIVE THROUGH THE
    GUILT/INNOCENCE PHASE ......................................................................................19
    A.  Jury Selection and Voir Dire ...............................................................................20
    B.  Speedy Trial Claim ..............................................................................................22
    C.  Failure to Investigate ...........................................................................................22
    D.  Alibi Defense .......................................................................................................24
    E.  Testimony of Eyewitness Identification Expert ..................................................26
    F.  Juror Misconduct Claim .......................................................................................26
    G.  Caseload and Flat Fee ..........................................................................................27

III. CLAIM III:  TRIAL COUNSEL WERE INEFFECTIVE AT THE PUNISHMENT
    PHASE ...........................................................................................................................28
    A.  Failure to Investigate Other Acts ........................................................................28
    B.  Failure to Investigate LTC's Retaliation Against Its Own Members ..................30
    C.  Mitigation Evidence .............................................................................................30
    D.  Failure to Preserve the Record .............................................................................34
    E.  Funding Travel for Witnesses in Mexico ............................................................34
    F.  Trial Counsel's Performance ................................................................................35

IV.   CLAIMS IV AND V:  TRIAL COUNSEL WERE INEFFECTIVE FOR FAILURE
TO RAISE THE ISSUE OF MR. BALDERAS'S MENTAL COMPETENCY AND
MR. BALDERAS WAS TRIED WHILE INCOMPETENT ............................................36
    A.   Mr. Balderas's Competency-Related Claims Relate Back to His Original
Timely Petition.......................................................................................................36
    B.   Claims IV and V Overcome Procedural Default. ...................................................37
        1.   Procedural default of Mr. Balderas's IACT-competency claim is
excused by cause and prejudice. ...............................................................37
        2.   Procedural Default of Mr. Balderas's standalone competency claim is
overcome.....................................................................................................38
    C.   Mr. Balderas Was Incompetent to Stand Trial.......................................................39
    D.   Trial Counsel Were Ineffective for Failing to Investigate Evidence of Mr.
Balderas's Competency to Stand Trial. ..................................................................40

V.    CLAIM VI:  APPELLATE COUNSEL WAS INEFFECTIVE ......................................41
    A.   Failure to Investigate Claims on Direct Appeal......................................................42
    B.   Failure to Raise Violations of Mr. Balderas's Constitutional Rights on Direct
Appeal ....................................................................................................................43

VI.   CLAIM VII:  TRIAL COUNSEL VIOLATED MR. BALDERAS'S SIXTH
AMENDMENT RIGHT TO AUTONOMY BY REFUSING TO PRESENT AN
ALIBI DEFENSE ...........................................................................................................43

VII.  CLAIM VIII:  MR. BALDERAS'S EQUAL PROTECTION RIGHTS WERE
VIOLATED BY THE AGREEMENT BETWEEN THE STATE AND THE
DEFENSE TO EXCLUDE AFRICAN AMERICANS FROM MR. BALDERAS'S
JURY...............................................................................................................................44
    A.   Mr. Balderas's Claim Regarding Exclusion of Jurors Is Not Procedurally
Defaulted................................................................................................................44
    B.   The Court Can Adjudicate the Claim on the Merits ...............................................45

VIII. CLAIM IX:  THE JURY'S DELIBERATIONS WERE PREJUDICED AND
IMPROPERLY INFLUENCED .....................................................................................47
    A.   The External Influences .........................................................................................47
    B.   The Juror Misconduct ...........................................................................................54

IX.   CLAIM X:  MR. BALDERAS'S DEATH SENTENCE WAS ARBITRARILY AND
CAPRICIOUSLY IMPOSED..........................................................................................60
    A.   The Sentence Was Arbitrary and Capricious Because of the Unconstitutional
Jury Instructions in Special Issue One ...................................................................60
    B.   The 10-12 Rule ......................................................................................................61

X.    CLAIM XI:  THE HIGHLY SUGGESTIVE PHOTO SPREAD VIOLATED MR.
BALDERAS'S DUE PROCESS RIGHTS .....................................................................64
    A.   The Photospread Was Impermissibly Suggestive...................................................64
    B.   The Suggestive Procedure Resulted in a Substantial Likelihood of
Misidentification ...................................................................................................66
    C.   Admission of Wendy's Identification Was Not Harmless Error. ...........................68

XI.   CLAIM XII:  THE JURY INSTRUCTION TO CONSIDER ONLY "MORAL BLAMEWORTHINESS" AS MITIGATING EVIDENCE.............................................68
     A.    Procedural Default ...........................................................................68
         1.     Mr. Balderas has met his burden under § 2254(d)....................69

XII.   CLAIM XIII:  ACTUAL INNOCENCE ..........................................................70

XIII.   CLAIM XIV:  TEXAS CODE CRIMINAL PROCEDURE ARTICLE 37 IS UNCONSTITUTIONAL ............................................................................................75
         1.     The statute is vague and overbroad for failure to define (i) "probability"; (ii) "criminal acts of violence"; (iii) "continuing threat to society"; (iv) "personal moral culpability"; and (v) "moral blameworthiness," which failure denies the jury the guidance necessary to exercise its discretion.  Gregg v. Georgia, 428 U.S. 153 (1976). ..........75
         2.     The requirement that jurors predict future probability of violence is arbitrary and capricious and violates the evolving standards of decency of our society..............................................................................................75
         3.     The statute's lack of a uniform method for determining which cases will be prosecuted as death penalty cases, and which will not, is arbitrary and capricious and violates the evolving standards of decency of our society..............................................................................................75
         4.     The standard of "probability" imposed on the jury by Art. 37.071(b)(1) is less stringent than proof beyond a reasonable doubt; that jurors must decide if a "probability has been established beyond a reasonable doubt" makes the application of Art. 37.071 arbitrary and capricious. .....75
         5.     The statute fails to require that mitigation be considered, which denies the accused due process and equal protection of the law..........................75
         6.     The statute does not properly narrow the class of persons eligible for the death penalty upon conviction for a capital offense. .........................75
         7.     The statute is not based on a uniform national standard, resulting in arbitrary, capricious, freakish and wanton imposition of the death penalty......................................................................................................75
         8.     The statute does not provide for a proportionality review to determine if the penalty imposed is proportionate to other similar offenses. ................75
         9.     The statute requires ten votes to answer the issue with a "no" response that would be in favor of a defendant and a life sentence. The false distinction between a "life" answer of ten or more jurors and a non-answer of less than ten jurors is impermissibly vague and arbitrary and violates due process and Simmons v. South Carolina, 512 U.S. 154, 171 (1994)...............................................................................................75
        10.    When jurors are instructed that they may not give a verdict of life unless ten or more agree upon a life answer in response to at least one of the two issues, this provides an incorrect picture of the state of the law.  In fact, if only one juror is able to conclude that sufficient mitigation exists to warrant the imposition of a life sentence, despite that juror's inability to convince nine other jurors of his or her position, a life sentence will be imposed. ...............................................................76

11.  Execution by lethal injection is cruel and unusual punishment and otherwise unconstitutional. ....................................................76
12.  The statute is unconstitutional because it prohibits the judge and the parties from informing the jury that a hung jury (failure to achieve unanimity on Special Issue No. 1 or less than ten "no" votes on Special Issue No. 2) will result in a life sentenc....................................76
13.  The statute permits the introduction of unadjudicated extraneous offenses at the punishment phase, in contravention of the requirement in capital cases a heightened need for reliability in the sentencing decision. Woodson v. North Carolina, 428 U.S. 280, 305 (1976). Allowing evidence of unadjudicated offenses, particularly in situations where those offenses would be inadmissible in a non-capital trial, denies the jury's verdict and the Court's sentence the reliability required by the Eighth Amendment to the United States Constitution......76
14.  The statute unconstitutionally permits the introduction of juvenile offenses at the punishment phase....................................76
15.  The statute is unconstitutional because there are no appellate standards for determining the sufficiency of the evidence to support the jury's answers to the special issues, and the Texas Court of Criminal Appeals has repeatedly and consistently refused o conduct any meaningful appellate review of mitigation sufficiency....................................76
16.  The statute does not require the indictment to allege special issues, i.e. the "facts" relied upon to enhance the capital sentence from life to death, contrary to Apprendi v. New Jersey, 530 U.S. 466 (2000). ............76

XIV.  CLAIM XV:  THE STATE HABEAS PROCEEDING VIOLATED DUE PROCESS RIGHTS ....................................................................................77

XV.  CLAIM XVI:  TRIAL COUNSEL VIOLATED MR. BALDERAS'S SIXTH AMENDMENT RIGHT TO SUBSTITUTE COUNSEL ................................78
      A.  The Court Performed No Inquiry Into Mr. Balderas's *Pro Se* Motion for New Counsel .........................................................................79
      B.  Mr. Balderas Was Prejudiced by The Court's Failure to Grant His *Pro Se* Motion for New Counsel .............................................79

XVI.  CLAIM XVII:  THE TEXAS DEATH PENALTY IS UNCONSTITUTIONAL AS APPLIED IN THIS CASE...........................................................81

XVII.  CLAIM XVIII:  POST-CONVICTION COUNSEL WERE INEFFECTIVE..................82

XVIII. CLAIM XIX:  LETHAL INJECTION IS UNCONSTITUTIONAL ................................82

XIX.  CLAIM XX:  MR. BALDERAS IS INCOMPETENT TO BE EXECUTED ..................83

XX.  CLAIM XXI:  THE STATE FAILED TO CORRECT FALSE TESTIMONY ................84
      A.  Procedural Default ...........................................................................84
      B.  The Cookie jail audio files underlying Claim XXI demonstrate the State failed to correct false testimony. ..............................................85

XXI.  CLAIM XXII:  CUMULATIVE ERROR ..............................................................86

iv

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abdul-Kabir v. Quarterman,*
    550 U.S. 233 (2007)....................................................................................70

*Ake v. Oklahoma,*
    470 U.S. 68 (1985)......................................................................................35

*Anderson v. Johnson,*
    338 F.3d 382 (5th Cir. 2003).......................................................................24

*Apprendi v. New Jersey,*
    530 U.S. 466 (2000)....................................................................................76

*Balderas v. State,*
    517 S.W.3d 756 (Tex. Crim. App. 2016)..................................... *passim*

*Ex parte Balderas,*
    No. WR-84,066-03, 2023 WL 7023648 (Tex. Crim. App. Oct. 25, 2023).......................17, 85

*Banks v. Dretke,*
    540 U.S. 668 (2004)....................................................................................19

*Barley v. State,*
    906 S.W.2d 27 (Tex. Crim. App. 1995).....................................................64

*Batson v. Kentucky,*
    467 U.S. 79 (1986)..............................................................................45, 46

*Bennett v. State,*
    738 S.W.2d 33 (Tex. App. – Texarkana 1987, no writ) ............................58

*Best v. Johnson,*
    714 F. App'x 404 (5th Cir. 2018)...............................................................54

*Billiot v. Epps,*
    671 F. Supp. 2d 840 (S.D. Miss. 2009).....................................................83

*Boddie v. Connecticut,*
    401 U.S. 371 (1971)....................................................................................77

*Brady v. Maryland,*
    373 U.S. 83 (1963)........................................................................... *passim*

*Brecht v. Abrahamson,*
    507 U.S. 619 (1993)..........................................................................60, 68

*Brumfield v. Cain,*
    576 U.S. 305 (2015).....................................................................20, 28, 31

*Bryant v. Scott,*
    28 F.3d 1411 (5th Cir. 1994)..............................................................22, 25

*Busby v. Dretke,*
    359 F.3d 708 (5th Cir. 2004) ...................................................................19

*Campos v. Johnson,*
    958 F. Supp. 1180 (W.D. Tex. 1997).............................................33, 38, 45

*Coleman v. Thompson,*
    501 U.S. 722 (1991) ................................................................... *passim*

*Davila v. Davis,*
    582 U.S. 521 (2017)......................................................................41, 68, 69

*Derden v. McNeel,*
    978 F.2d 1453 (5th Cir. 1992) .................................................................87

*DiLosa v. Cain,*
    279 F.3d 259 (5th Cir. 2002) ...................................................................16

*Dorsey v. Quarterman,*
    494 F.3d 527 (5th Cir. 2007) ...................................................................50

*Dretke v. Haley,*
    541 U.S. 386 (2004)........................................................................71, 74

*Drope v. Missouri,*
    420 U.S. 162 (1975)..............................................................................40

*Evitts v. Lucey,*
    469 U.S. 387 (1985)....................................................................41, 69, 77

*Florida v. Powell,*
    559 U.S. 50 (2010)................................................................................17

*Floyd v. Vannoy,*
    894 F.3d 143 (5th Cir. 2018) ..............................................................71, 74

*Ford v. Davis,*
    910 F.3d 232 (5th Cir. 2018) ..............................................................83, 84

*Giglio v. United States,*
    405 U.S. 150 (1972) ...................................................................................1, 10, 86

*Glossip v. Gross,*
    576 U.S. 863 (2015) .........................................................................................82, 83

*Gray v. Epps,*
    616 F.3d 436 (5th Cir. 2010) ...........................................................................20, 28

*Gray v. Mississippi,*
    481 U.S. 648 (1987) ................................................................................................21

*Green v. Davis,*
    479 F. Supp. 3d 442 (S.D. Tex. 2020) .............................................................40, 41

*Gregg v. Georgia,*
    428 U.S. 153 (1976) .................................................................................60, 61, 75

*Guillot v. Sec'y of the HHS,*
    No. 03-0775V, 2012 U.S. Claims LEXIS 1070 (Fed. Cl. Aug. 15, 2012) ..............59

*Haden v. Dir., TDCJ-CID,*
    No. 6:19-cv-566, 2022 WL 2349724 (E.D. Tex. Apr. 21, 2022) ...........................48

*Harrington v. Richter,*
    562 U.S. 86 (2011) ...........................................................................................20, 28

*Harrison v. Quarterman,*
    496 F.3d 419 (5th Cir. 2007) .................................................................................23

*Hill v. McDonough,*
    547 U.S. 573 (2006) ................................................................................................83

*Indiana v. Edwards,*
    554 U.S. 164 (2008) ................................................................................................36

*Irvin v. Dowd,*
    366 U.S. 717 (1961) ................................................................................................59

*Jackson v. Johnson,*
    194 F.3d 641 (1999) ................................................................................................86

*Knorpp v. State,*
    645 S.W.2d 892 (Tex. Crim. App. 1983) ...............................................................54

*Kubat v. Thieret,*
    867 F.2d 351 (3d Cir. 1989) ...................................................................................62

*Kuhlmann v. Wilson,*
    477 U.S. 436 (1986) ..................................................................................33, 38, 44

*Kutzner v. Cockrell,*
    303 F.3d 333 (5th Cir. 2002) .......................................................................3

*Kyles v. Whitley,*
    514 U.S. 419 (1995) ...........................................................................1, 2, 13

*Lawson v. Borg,*
    60 F.3d 608 (9th Cir. 1995) .......................................................................60

*Legenzoff v. Steckel,*
    564 F. App'x 136 (6th Cir. 2014) ...............................................................65

*Lockett v. Ohio,*
    438 U.S. 586 (1978) ....................................................................................70

*Madison v. Lumpkin,*
    No. 4:22-cv-809-O, 2023 U.S. Dist. LEXIS 101482 (N.D. Tex. June 12, 2023)....................14

*Martel v. Clair,*
    565 U.S. 648 (2012) ....................................................................................79

*Martinez v. Ryan,*
    566 U.S. 1 (2012) ................................................................................ *passim*

*Mata v. Johnson,*
    99 F.3d 1261 (5th Cir. 1996) .............................................................45, 46

*Mattox v. United States,*
    146 U.S. 140 (1892) ....................................................................................47

*Mayle v. Felix,*
    545 U.S. 644 (2005) ....................................................................................36

*Maynard v. Cartwright,*
    486 U.S. 356 (1988) ....................................................................................60

*McCleskey v. Kemp,*
    481 U.S. 279 (1987) ...............................................................................60, 61

*McCoy v. Louisiana,*
    584 U.S. 414 (2018) ...............................................................................43, 44

*McKoy v. North Carolina,*
    494 U.S. 433 (1990) ........................................................................61, 62, 63

*McQuarrie v. State*,
    380 S.W.3d 145 (Tex. Crim. App. 2012)........................................................63

*Medina v. California*,
    505 U.S. 437 (1992)........................................................................................40

*Michigan v. Long*,
    463 U.S. 1032 (1983)......................................................................................17

*Mills v. Maryland*,
    486 U.S. 367 (1988).............................................................................61, 62, 63

*Murray v. Carrier*,
    477 U.S. 478 (1986).....................................................................61, 68, 77, 82

*Napue v. Illinois*,
    360 U.S. 264 (1959)........................................................................................86

*Oliver v. Quarterman*,
    541 F.3d 329 (5th Cir. 2008)..........................................................27, 47, 48, 52

*Oswald v. Bertrand*,
    374 F.3d 475 (7th Cir. 2004) ....................................................................52, 59

*Panetti v. Quarterman*,
    551 U.S. 930 (2007)........................................................................................83

*Porter v. McCollum*,
    558 U.S. 30 (2009)..........................................................................................33

*Powell v. Quarterman*,
    536 F.3d 325 (5th Cir. 2008) ...........................................................................3

*Remmer v. United States*,
    347 U.S. 227 (1954)..................................................................................48, 52

*Richardson v. United States*,
    360 F.2d 366 (5th Cir. 1966) .....................................................................48, 52

*Ries v. Quarterman*,
    522 F.3d 517 (5th Cir. 2008) ..........................................................................41

*Rockwell v. Davis*,
    2016 U.S. Dist. LEXIS 109568 (N.D. Tex. Aug. 18, 2016)...........................77, 78

*Rogers v. State*,
    551 S.W.2d 369 (Tex. Crim. App. 1977)........................................................54

*Rompilla v. Beard*,
 545 U.S. 374 (2005).................................................................................................30, 32

*Rummel v. Estelle*,
 590 F.2d 103 (5th Cir. 1979) ................................................................................23

*Rushen v. Spain*,
 464 U.S. 114 (1983)..............................................................................................55

*Schell v. Witek*,
 218 F.3d 1017 (9th Cir. 2000) ..............................................................................80

*Schlup v. Delo*,
 513 U.S. 298 (1995)...................................................................................71, 72, 73

*Sears v. Upton*,
 561 U.S. 945 (2010) (per curiam) .........................................................................31

*Simmons v. South Carolina*,
 512 U.S. 154 (1994)..............................................................................................76

*Smith v. Robbins*,
 528 U.S. 259 (2000)........................................................................................41, 42

*Stockton v. Virginia*,
 852 F.2d 740 (4ᵗʰ Cir. 1988).................................................................................49

*Strickland v. Washington*,
 466 U.S. 668 (1984) ...................................................................................... *passim*

*Strickler v. Greene*,
 527 U.S. 263 (1999)...........................................................................................1, 19

*Stringer v. Black*,
 503 U.S. 222 (1992)..............................................................................................61

*Sturgeon v. Quarterman*,
 615 F. Supp. 2d 546 (S.D. Tex. 2009) ..................................................................43

*Trevino v. Thaler*,
 569 U.S. 413 (2013)....................................................................................... *passim*

*Turner v. Louisiana*,
 379 U.S. 466 (1965)..............................................................................................47

*United States v. Arthur Andersen, L.L.P.*,
 No. H-02-121, 2002 U.S. Dist. LEXIS 26871 (S.D. Tex. Sep. 11, 2002)..............59

*United States v. Bagley*,
    473 U.S. 667 (1985)................................................................................1, 10, 13

*United States v. Boigegrain*,
    155 F.3d 1181 (10th Cir. 1998) ...............................................................40

*United States v. Brown*,
    650 F.3d 581 (5th Cir. 2011) ....................................................................1

*United States v. Carr*,
    740 F.2d 339 (5th Cir. 1984)...................................................................23

*United States v. Davis*,
    393 F.3d 540 (5th Cir. 2004) ...................................................................50

*United States v. Gershman*,
    31 F. 4th 80 (2d Cir. 2022) ......................................................................65

*United States v. Ghane*,
    490 F.3d 1036 (8th Cir. 2007) .................................................................40

*United States v. Huey*,
    76 F.3d 638 (5th Cir. 1996) .....................................................................45

*United States v. Iles*,
    906 F.2d 1122 .........................................................................................79

*United States v. Jordan*,
    384 F. Supp. 3d 707 (E.D. Tex. 2019), *aff'd*, 958 F.3d 331 (5th Cir. 2020).....................47, 53

*United States v. Mix*,
    25 F. Supp. 3d 914 (E.D. La. 2014).........................................................54

*United States v. Phillips*,
    210 F.3d 345 (2000)................................................................................42

*United States v. Rutherford*,
    371 F.3d 634 (9th Cir. 2004) ...................................................................51

*United States v. Sipe*,
    388 F.3d 471 (5th Cir. 2004) ....................................................................1

*United States v. Temeck*,
    No. 1:17cr050, 2018 U.S. Dist. LEXIS 17446 (S.D. Ohio Feb. 2, 2018) .............................59

*United States v. Villalobos*,
    601 F. App'x 274 (5th Cir. 2015).............................................................48

*United States v. Williams,*
    35 F.3d 558 (4th Cir. 1994) ......................................................................................67

*United States v. York,*
    600 F.3d 347 (5th Cir. 2010) ...................................................................................54

*United States v. Young,*
    482 F.2d 993 (5th Cir. 1973) ...................................................................................79

*Virgil v. Dretke,*
    446 F.3d 598 (5th Cir. 2006)....................................................................................21

*Walbey v. Quarterman,*
    309 F. App'x 795 (5th Cir. 2009) ............................................................................33

*Washington v. Texas,*
    388 U.S. 14 (1967)...................................................................................................35

*Webb v. Texas,*
    409 U.S. 95 (1972)...................................................................................................35

*White v. Mitchell,*
    431 F.3d 517 (6th Cir. 2005) ...................................................................................58

*Wiggins v. Smith,*
    539 U.S. 510 (2003)...........................................................................................24, 31

*Will v. Lumpkin,*
    No. 15-CV-3474, 2024 U.S. Dist. LEXIS 61959 (S.D. Tex. Apr. 3, 2024) ............15

*Williams v. Alabama,*
    1:07-cv-1276, 2012 WL 1339905 (N.D. Ala. Apr. 12, 2012) .................................37

*Williams v. Taylor,*
    529 U.S. 362 (2000).....................................................................................19, 67, 69

*Winston v. Kelly,*
    592 F.3d 535 (4th Cir. 2010)....................................................................................25

*Woodson v. North Carolina,*
    428 U.S. 280 (1976).................................................................................................76

*Yearwood v. Keane,*
    101 F.3d 685 (2d Cir. 1996).....................................................................................67

**Statutes**

18 U.S.C. § 3599.............................................................................................................79

28 U.S.C. § 2254 ................................................................................ *passim*

Tex. Code Crim. Proc. art. 11.071 § 5(a) ........................ 17, 18, 77, 85, 86

Tex. Code Crim. Proc. art. 37 ................................................................ 75

Tex. Code Crim. Proc. art. 37.071 ........................................... 62, 70, 75

Tex. Code Crim. Proc. art. 40.03(7) ...................................................... 54

Tex. Code Crim. Proc. art. 43.14(a) ...................................................... 82

**Other Authorities**

Preparations for the Lethal Injection (April 2021), *available at* https://dpic-
    cdn.org/ ............................................................................................ 82

Texas Rule of Appellate Procedure 21.3(f) ........................................... 54

Texas Rule of Appellate Procedure 73.3(b) ........................................... 78

Texas Rule of Evidence 606 ............................................................ *passim*

Petitioner Juan Balderas, by and through undersigned counsel, respectfully submits this reply in further support of his Second Amended Petition for a Writ of Habeas Corpus ("Second Amended Petition") "declaring him in custody in violation of the Constitution of the United States and ordering his release because his conviction for murder as well as the resulting death sentence were unconstitutionally obtained." 28 U.S.C. §§ 2241(c)(3) & 2254(a).

## GROUNDS FOR PETITION

## I.    CLAIM I:  THE STATE VIOLATED MR. BALDERAS'S DUE PROCESS RIGHTS UNDER *BRADY V. MARYLAND* AND ITS PROGENY

The parties agree that a *Brady* violation occurs when the prosecution withholds material exculpatory and impeachment evidence from defense counsel that is material to either guilt or punishment. (Answer to Amended Petition, "Answer" at 44, ECF No. 86); *Brady v. Maryland,* 373 U.S. 83, 87; *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *United States v. Bagley,* 473 U.S. 667, 676 (1985); *see also Giglio v. United States,* 405 U.S. 150, 154 (1972). The Director, however, introduces an incorrect standard when he states that "*Brady* claims are conducted on an item-by-item basis." (Answer at 44).

While courts typically evaluate each claim as to whether it constitutes a *Brady* violation, the violations must be assessed cumulatively as to materiality. *United States v. Brown*, 650 F.3d 581, 588 (5th Cir. 2011) ("We assess the materiality of the suppressed evidence cumulatively, not item by item."); *United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004) ("When there are a number of *Brady* violations, a court must analyze whether the cumulative effect of all such evidence suppressed by the government raises a reasonable probability that its disclosure would have produced a different result."); *Kyles v. Whitley*, 514 U.S. 419, 440 (1995) ("cumulative materiality" is the "touchstone" of the analysis).

A court must review the suppressed evidence cumulatively to determine "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. at 433 (citation omitted). The "question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*. at 434.

Here, as shown below, each of the *Brady* violations are serious on their own, and cumulatively leave no doubt that the result of the proceeding would have been different had the evidence been disclosed. The Director's objections based on procedure likewise fails.

### A. The Material Exculpatory and Impeachment Evidence

#### 1. *The October 2015 Disclosure: The 2007 and 2008 Notes*

There are five pieces of evidence within the suppressed 2007 and 2008 notes that would have undermined the veracity of the State's star witness, Cookie, and supported Mr. Balderas's trial theory that he was not responsible for Powder's death. The Director claims these are "meaningless inconsistencies." Far from it.

*First*, the undisclosed evidence shows that Cookie gave multiple conflicting versions of Mr. Balderas's alleged confession, including statements where there was *no confession*. (2007 and 2008 Cookie Notes, Habeas Writ Record, Vol. III, 00782-804, at 00789-90). This evidence could have been used to impeach Cookie's false testimony that Mr. Balderas allegedly came up to him wearing a dark blue or black sweatshirt and khakis, hugged and kissed him, and joyfully said: "got him" while exchanging the magazine in a chrome gun. The Director does not meaningfully challenge that impeachment evidence of a statement by Cookie that did not include any confession by Mr. Balderas would have been material.

*Second*, the undisclosed evidence included that Cookie was among those who wanted Powder dead, including because Powder "snitched" on Cookie. (28 RR 169:3-13). This evidence could have been used to impeach Cookie's trial testimony that he "truly didn't care what" happened to Powder. (26 RR 152:2-153:17).

*Third*, the undisclosed evidence included that Cookie spoke to prosecutors about the murder of Powder in 2007 or 2008. This could have been used to impeach Cookie's false trial testimony where he falsely claimed that he only spoke to prosecutors about "different things that were not even related to this," implying that he never spoke to prosecutors about the murder of Powder in 2007 and 2008. (26 RR 167:10-13). The Director admits that the 2007 and 2008 notes contain a "brief discussion of [Powder's] murder," but claims that they were mostly "about other murders committed by LTC." (Answer at 49). This is irrelevant. The evidence admittedly contained evidence impeaching Cookie's testimony. Moreover, the Director's argument that it "didn't matter because the State put on its own evidence for the jury that [Cookie] discussed the [Powder] murder with law enforcement in 2007-2008" is specious. (*Id.* at 49-50). The Director quotes a line where investigator Tommy Ruland stated, "to the best of my memory" he spoke with Cookie "maybe in '07', or '08." (*Id.* at 50). This testimony does not state that Cookie spoke to *prosecutors*—it refers to speaking with an investigator. This is not a situation, as the State's cases indicate, where the State "turned over" the evidence during trial. *Cf. Kutzner v. Cockrell,* 303 F.3d 333, 336 (5th Cir. 2002) (finding the evidence was not suppressed when defense counsel cross-examined the witness with the alleged suppressed evidence; *see also Powell v. Quarterman,* 536 F.3d 325, 335 (5th Cir. 2008) ("The Supreme Court has never expressly held that evidence that is turned over to the defense during trial has been 'suppressed' within the meaning of *Brady.*").

*Fourth*, the undisclosed evidence included that a meeting concerning Powder occurred nine to 10 months before the murder, which was when Cookie had recently bonded out of jail and had gone on a crime spree with Powder. This evidence could have been used to impeach Cookie's testimony that the meeting concerning Powder came three to four days before the murder. The difference is critical. Powder was killed in December 2005. Nine months before that is April 2005. And it was April 2005 when Cookie was bonded out of jail on the crime that Powder "snitched" on him about. Accordingly, it would make sense that Cookie would call a meeting on Powder's betrayal of him as soon as he was able to. And this evidence would have undermined the State's theory that Powder was killed for hanging out with other gangs, and would have supported Mr. Balderas's theory that Powder was killed for snitching on Cookie (by Cookie or others supporting him).

*Fifth*, the undisclosed evidence included evidence that Cookie told prosecutors that, when Mr. Balderas was arrested, another gang member was "helping [Balderas] get rid of guns." (2007 and 2008 Cookie Notes, Habeas Writ Record, Vol. III, 00782-804, at 00787). This evidence could have been used to support Mr. Balderas's theory that the guns he was found with were not his, but rather that he was the holder of guns for the gang. Again, the Director makes no meaningful argument that this evidence is not material—because it is.

       2.     *The May 2018 Disclosures: the Cookie Jail Calls and the First Twin Notes*

The 560 prison calls withheld by the State include undisclosed evidence that Cookie had been seeking a plea deal for eight years prior to Mr. Balderas's trial.[1]   In these calls, Cookie

---

[1] These voluminous calls were disclosed to State Habeas on the eve of the state habeas hearing and counsel was unable to review these calls prior to the hearing. (Am. Pet. at ¶ 210; Letters from Harris County District Attorney's Office, May 4, 2018; Post-Conviction Writ Evidentiary Hearing Tr. ("EH"), Vol 2, at 9:14-11:3, 56:17-62:12, 76:16-78:11)). State habeas counsel requested a continuance to review this material, citing trouble accessing these files, but the State Habeas Court refused. (Am. Pet. at ¶ 211).

discusses potential and prior deals with prosecutors with his family members. Cookie repeatedly speaks with his father about his attempts over eight years to get a plea deal, including written letters to the prosecutor (that have still not been disclosed). He discusses four visits with prosecutors for two to three hours each visit. He discusses with his father a "prior deal" that he hoped they would honor. And he admits to his father in these calls that he will not testify against Mr. Balderas unless and until he is offered a deal. Had this information been disclosed, it would have been used to impeach Cookie's testimony that he "never asked [the prosecutors] for anything" and that the prosecutors came to him "just last week" before Mr. Balderas's trial. This evidence could have been used to impeach Cookie's testimony at trial that he "never asked [the prosecutors] for anything," and that he had made a deal with prosecutors "[j]ust last week" before trial. (26 RR 168:15); (26 RR 174:9-11).

The Director argues that the jail calls "were not presented in state court" and "cannot be considered here" under 28 U.S.C. § 2254(e)(2). Not so. Under § 2254(e)(2)(A)(ii), the Court can hold an evidentiary hearing on the claim if the applicant shows that the claim relies on a "factual predicate that could not have been previously discovered through the exercise of due diligence." That is precisely what occurred here. These calls were not disclosed to state habeas counsel until four days prior to the state court evidentiary hearing. In that disclosure were 561 audio copies of jail calls throughout 16 CDs including over a hundred hours of calls. It would have been impossible for OCFW to review these materials even if it had spent 24 hours a day reviewing them for four days. OCFW therefore requested a continuance to review the disclosed material. The court denied it. The information therefore could not have been previously discovered through the exercise of due diligence.

The Director then argues that the calls are not material because they would not have impeached Cookie's testimony that he "never asked [the prosecutors] for anything" because Cookie was "specifically referring to his 2007 and 2008 interviews with prosecutors." (Answer at 62). While many of the calls are not labeled individually as to time, there are relevant communications in Disc 10, which is labeled "DISC 10 – Israel Diaz 1/1/00 – 5/13/13." Thus, the calls showing Cookie's desperation for a plea deal could have been in 2007 and 2008. *Second*, Cookie's testimony that he "never asked them for anything" is not qualified by time. The Director interprets his answer as being related to 2007 and 2008, but a factfinder could reasonably determine that Cookie's unqualified answer may mean exactly what it says: he "*never* asked them for anything." The phone calls, therefore, would have been sufficient to impeach that testimony. Both of these factual issues can and should be resolved in an evidentiary hearing.

In May 2018, the State also provided prior undisclosed evidence that Prosecutor Bennett had an interview with Twin in December 2013 in which Twin told prosecutors that "everyone gave [Balderas] guns to hold." (2013 Bennett Garcia Notes, at 6, ECF No. 83-36). With the withheld evidence from the 2007 and 2008 Notes, this evidence further supports Mr. Balderas's defense that he was merely holding the guns for other gang members. Importantly, there was no testimony or other evidence that Mr. Balderas's fingerprints were found on the murder weapon. (30 RR 29:15-18). The Director responds that the December 2013 Twin interview evidence was not suppressed because if "Balderas was tasked with holding guns for everyone, he was surely aware of that fact." (Answer at 68). That is beside the point. To be sure, Mr. Balderas knew that, and it was a theory he presented at trial to explain why the murder weapon was in his possession with a number of other weapons. (30 RR 8:1-7, 29:12-23). The suppression, however, hid relevant *corroborative* evidence that Mr. Balderas could have used to support his defense.

3.    *The August 2018 Disclosures: the State's Self-Styled Brady Disclosure; the October 2020 Disclosures the Underlying 2013 Second Twin Notes*

In August 2018, the State issued a self-styled *Brady* disclosure including Alejandro "Twin" Garcia's 2013 interview in which he told prosecutors that Mr. Balderas never confessed to him that he killed Powder, and that Garcia believed that MS-13 killed Powder.  In October 2020, the State disclosed the actual notes of that interview.  The Director does not dispute that Twin's statement that Mr. Balderas never confessed to him would have been material.

Despite the admitted *Brady* disclosure, the Director appears to argue that the evidence was not suppressed by pointing to Section D.1. of the Answer.  But all that is present in that Section that could possibly be construed as replying to this claim is that Mr. Balderas's claim is precluded because he did not present an affidavit from trial counsel saying they did not have the information.  The Director presents no law, however, requiring an affidavit from trial counsel in a habeas petition.  To the contrary, under Rule 2(c) of the Rules Governing Section 2254 Cases, a petitioner must only: (1) specify all the grounds for relief available to the petitioner; (2) state the facts supporting each ground; [and], (3) state the relief requested."  28 U.S.C. § 2254 Cases R 2(c).  Mr. Balderas has done so.  Moreover, these files in the May and August 2018 Disclosures were not found in defense counsel's files.  And they were produced by the State to federal habeas counsel (or in the case of the jail calls, on the eve of the state habeas hearing).  Accordingly, they were not previously available.  To be sure, the Director does not "challenge the veracity" of federal habeas counsel's affidavit detailing the State's disclosures (Answer at 55) and admits that the 2014 Cookie Notes were "not turned over to trial counsel." (Answer at 55).  Instead, he speculates as to whether these facts were known to trial counsel.  Notably, the Director does not attach an affidavit from the prosecutors that this information was turned over.  This issue should be resolved in an evidentiary hearing.  Mr. Balderas has satisfied his pleading standards.

4.    *The September 2020 Disclosure: the 2005 Cookie Notes*

The September 2020 Disclosures included evidence that Cookie had a violent history with Powder, including a physical fight resulting from Powder's "snitching" on Cookie. This evidence could have been used to support Mr. Balderas's theory that he was set up for the murder by Cookie or others in the gang and to impeach Cookie's testimony that he had no ill will towards Powder.

The Director first responds that the evidence cannot be used because it was "not part of the state-court record." (Answer at 60-61). But again, this evidence was *suppressed* until September 2020, when it was first disclosed to federal habeas counsel. And to the extent the Director claims it is not attached to the petition, this evidence is within an audio recording that the Director produced to Mr. Balderas in September 2020. It is available to the Director and the Director has it.[2] As stated in Mr. Balderas's petition, he is prepared to provide these recordings to the Court.

In the audio recording, contrary to the Director's claim that the "fight" might have been just a verbal "argument," Cookie confirmed that he got into a *physical* altercation—an "assault"—with Powder. He further admitted that things were "not okay" between the two following that fight.

> **Sgt. Chavez**: Yeah, well, and you know what? And we wouldn't be here talking about this had your buddies not gone and snitched you off.
> **Diaz**: Well, let's look at them, too. Part of the reason we don't like each other and stuff is because of all [unintelligible]
> **Sgt. Carrillo:** Did you have a fight?
> **Diaz:** With the little guy.
> **Sgt. Chavez**: What Little guy?
> **Diaz**: Eduardo.
> **Sgt. Chavez**: You had a fight with him?
> **Diaz**: Yeah.
> **Sgt. Chavez**: How'd you have a fight with him, and you let him take the truck? How can you have a fight with him, and you let him borrow the truck?

---

[2] This evidence is within a recording on Disc 5 from the 28 discs provided by the state to federal habeas counsel in September 2020. The CD is titled "Disc 5 Israel Diaz Murder 7700 Corporate.wav." It contains an Interview of Israel Diaz by Officers H. Chavez and A. Carrillo at the Harris County Jail on February 1, 2005 re: case 179083204I (1:19:53).

**Diaz**: We fought. That's about it, you know. It was once.
**Sgt. Chavez**: When did you all fight?
**Diaz**: Like about a month - or three weeks before that.
**Sgt. Chavez**: Before what?
**Diaz**: Before I stole the truck.
**Sgt. Chavez**: So, a month or three weeks before you had that truck, you had a fight with Eduardo?
**Diaz**: Yes, sir.
**Sgt. Diaz**: And you all made up?
**Diaz**: We made up because we're in the same clique. We don't associate no more…
**Sgt. Chavez**: What'd you all fight about?
**Diaz**: The same thing, 'cause some older guy told him that I don't chill no more, and, dada dada dada, and I don't chill with them no more and that I switched to working, and he just came off and *assaulted me* - and some O.G. told him to give me a validation and we started to get into it and we fought.
**Sgt. Chavez**: And then everything was okay after that, huh?
**Diaz**: *Nah, it was not okay*, but we just - we're in the same clique, so we've got to show respect.

(Disc 5 at approximately 50:00-1:19:53).

Nor is this recording merely cumulative with other evidence concerning the "snitching." No other evidence showed that Cookie got into a physical fight with Powder before the murder. Indeed, the Director cites only to testimony showing that Cookie was "verbally upset" with Powder. (Answer at 61). But this suppressed evidence shows that Powder *assaulted* Cookie and Cookie fought back, which would have impeached Cookie's testimony that it was merely verbal. And it provides further evidence supporting Mr. Balderas's theory that Cookie may have been the murderer.

     5.     *The November 2020 Disclosures: the 2010 Quinones Notes and Third Twin Notes*

The November 2020 Disclosures included notes with undisclosed evidence from a witness, Angelina Quinones, who stated that the police played "Where's Waldo" with her, pressuring her to identify suspects, and that the officers put their fingers on photos of suspects. In particular, Ms. Quinones stated that an officer showed her a photospread and then "guided her hand to the photo kind of like playing Where's Waldo." She said the officer was "not really asking if they could ID

– telling them. Very clear – said only one on each spreadsheet." (2006 Quinones Notes, at 3-4, ECF No. 83-7). This evidence could have been used to support Mr. Balderas's theory that the officers improperly influenced Wendy Bardales's identification of him. Indeed, the evidence had already shown that the officers asked Wendy Bardales to place her finger over the top portion of each picture because the shooter was wearing a hood.

The Director responds that this information was disclosed in 2013 through a *Brady* notice. However, as previously stated, that *Brady* notice was insufficient because it did not include the underlying notes which contained the more specific—and stronger—allegations that Mr. Balderas relies upon here, including the "Where's Waldo" allegation and that the officer was "very clear" to pick "only one on each spreadsheet." (2006 Quinones Notes, at 3-4). The Director believes this is not suppression because he only has an obligation to turn over "relevant exculpatory evidence." Regardless of whether it is "exculpatory," the Director ignores that he has an obligation to turn over impeachment evidence—which this would have been, as to the officer's testimony concerning the photo identification. *Brady v. Maryland*, 373 U.S. 83 (1963); *United States v. Bagley,* 473 U.S. 667, 676 (1985); *see also Giglio v. United States,* 405 U.S. 150, 154 (1972) (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [the *Brady* rule].")). Evidence that would have impeached the veracity of the police's photo identification procedure at the relevant time went to the heart of Mr. Balderas's defense, which specifically included the defense that the photo identification was improperly suggestive.

6.    *The December 2020 Disclosure: the 2014 Cookie Notes*

The December 2020 Disclosures included evidence from notes of a statement by Cookie that the alleged gang punishment for hanging out with other gangs was not necessary murder. This evidence could have been used to impeach Cookie's testimony that "hang[ing] out with other gang

members . . . [was] the ultimate betrayal." (Second Amended Petition "(Am. Pet.") at 104). In withheld notes between prosecutors and Cookie on January 27, 2014, disclosed in December 2020, Cookie told prosecutors that "[i]f caught w/ other gang member get checked (beat up)." And if someone kept doing it, that would be "more serious." (2014 Cookie Notes, at 7, ECF No. 83-19). The Director claims this is not material because "something 'more serious'" could be "perhaps murder." (Answer at 57). This speculation does not make the evidence immaterial. Something "more serious" is not necessarily murder. But Mr. Balderas was unable to confront Cookie with this inconsistency. If anything, resolving this inconsistency requires an evidentiary hearing.

The undisclosed evidence also includes that Cookie met Powder in "secret" and told him that "if you tell on me, I'll tell on you," regarding the "Ice Cream Man" murder. (2014 Cookie Notes, at 2). This evidence could have been used to impeach Cookie's testimony that he merely told Powder it was "pointless" for Powder to testify against him. (26 RR 180:17-25). While, as the Director points out, Cookie testified that he had lectured Powder about this incident, Cookie did not disclose that he would have taken action against Powder if he did.

The undisclosed evidence also included that Cookie told prosecutors that the "group would fight over guns." (2014 Cookie Notes, at 4). This evidence would have supported Mr. Balderas's theory that he was merely holding the guns for others the day of his arrest. It would have further impeached Cookie's testimony the Director used to rebut Mr. Balderas's theory, where Cookie said that collective gun use was uncommon by the time of Powder's murder because "everybody purchased their own." (26 RR 190: 14-19).

The undisclosed evidence also included that Cookie told prosecutors that "tagging had ⊘ to do w/ Powder – saying LTC territory coincidence." (2014 Cookie Notes, at 6). This evidence could have been used to rebut testimony that the graffiti tagging had just been put on the wall, as

11

a signal that Powder was at the apartment. The Director responds that if it was "not a signal to LTC members, Balderas . . . would have known that" and therefore the evidence was not suppressed. (Answer at 59). This makes no sense. Mr. Balderas did not know that Cookie had told prosecutors that the tagging had nothing to do with Powder, which would have directly rebutted testimony from others that the tagging was a signal. Indeed, the Director points to testimony from others who noticed the "LTC graffiti outside the apartment" and thought "something 'bad' would happen." (Answer at 59-60). The implication was clearly that this was a signal to attack Powder at this location, but Cookie's testimony would have directly rebutted that.

7.   *The Pool Termination Letter Obtained by State Habeas Counsel*

The undisclosed evidence includes information that an officer who testified in the punishment phase against Mr. Balderas, Mr. Pool, was terminated as a consequence of an investigation into the death of a mentally ill, 72-year-old inmate. (Pool Termination Letter, Aug. 21, 2012, Habeas Writ Record, Vol. III, 00918-928; Pool Separation of Licensee Form, Aug. 24, 2012, Habeas Writ Record, Vol. III, 00930). The investigation revealed that Mr. Pool "used force" against this inmate (punching him in the face), left him "unmoving and unresponsive" and "face down" on the floor of his cell, and made no effort to secure any medical assistance to attend to his injuries. The inmate died six days later as a result of those injuries. The investigation report found that Mr. Pool was "untruthful" and made false statements, including flatly contradictory claims in sworn statements over the course of the investigation. The report concluded that Mr. Pool failed to "tell the truth throughout the course of [the] investigation." In addition to his failure to render aid, it was this "untruthfulness" that formed the basis for his "dishonorable discharge." This evidence could have been used to impeach Mr. Pool's credibility, as well as his specific testimony concerning the veracity of his statements about Mr. Balderas's jail infractions.

### B.    The Cumulative Effect of the Suppressed Evidence Undermines Confidence in the Verdict

Mr. Balderas has presented numerous pieces of suppressed evidence.  Each constitutes an independent *Brady* violation.  And while some of the single pieces of evidence alone could satisfy Mr. Balderas's burden, the cumulative effect of the withheld evidence leaves no doubt that the proceedings would have been materially different had it been disclosed.  Indeed, it is the "cumulative effect" that is the "touchstone" of *Brady*.  *Kyles,* 514 U.S. at 440.  A finding of non-materiality cannot be made on "a series of independent materiality evaluations," it must be based on "the cumulative evaluation required by *Bagley*."  *Id.* at 441.

The cumulative weight of the suppressed evidence would have undermined the three pillars of evidence the Director used to convict Mr. Balderas: (1) Cookie's testimony that Mr. Balderas confessed to him; (2) the photo identification by Wendy Bardales; and (3) Mr. Balderas's possession of the murder weapon, along with other weapons in a green box, when he was arrested.

In response, the Director invites this court into error by claiming that other evidence was sufficient to convict Mr. Balderas.  But when assessing the cumulative effect of suppressed evidence, it is "not a sufficiency of evidence test."  *Kyles,* 514 U.S. at 434.  A defendant "need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict."  *Id.*  "One does not show a Brady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Id.* at 435.  That is what Mr. Balderas has shown here.  The suppressed evidence undermines confidence in the verdict.  If anything, the Director's arguments demonstrate that an evidentiary hearing is warranted under Rule 8.  *See* 28 U.S.C. § 2254 Cases R 8(a).

### C.    The State's Procedural Arguments

1.    *The State Court's Conclusion that the 2007 and 2008 Notes Were Not Suppressed Was Unreasonable*

In response to Mr. Balderas's Petition, the Director claims that the 2007 and 2008 Notes were not suppressed because "[t]rial counsel and the prosecution submitted affidavits establishing that these notes were available to, and reviewed by, trial counsel."  (Answer at 46).  In doing so, the Director relies on affidavits submitted by trial counsel, and on prosecutors' and trial counsel's billing records.  None are sufficient to show that the information was "fully available" to defense counsel.  *See Madison v. Lumpkin*, No. 4:22-cv-809-O, 2023 U.S. Dist. LEXIS 101482, at *31-32 (N.D. Tex. June 12, 2023).  What's more, the affidavits are inconsistent and unreliable.  The Director's response has confirmed that an evidentiary hearing under Rule 8 is warranted.

As described above, there are numerous portions of the 2007 and 2008 Notes that are either exculpatory or contain impeachment evidence for Cookie's trial testimony.  Mr. Godinich's affidavit does not identify what portions of the 23 pages of notes he reviewed, nor does he state that he reviewed the specific inconsistencies offered during the state habeas trial.  While he claims that he "took these notes and any potential inconsistencies into account when preparing for trial," he points to Mr. Nunnery as responsible for cross-examining Cookie—not him. (Godinich Aff., Aug. 9, 2017, Habeas Writ Record, Vol V, 01471-75, at 1471).  Mr. Nunnery, in turn, does not state that he was aware of all the information in the 2007 and 2008 Notes, or even what information within those notes he was aware of.  To the contrary, he only states that he was "made aware of the existence of the notes" and that he "incorporated any information [he] thought was relevant and helpful in [his] cross-examination of [Cookie]."  (Nunnery Aff., Aug. 11, 2017, Habeas Writ Record, Vol V, 01486-91, at 1486).  He then states that he "believe[s]" that he had "adequate information to effectively cross-examine [Cookie]."  *Id.*  Of course, he cites no specifics.

14

As for the prosecutors' affidavits, neither affirmatively states that counsel reviewed the specific records and neither contain unequivocal statements that the records were available to defense counsel.  Prosecutor Spence Graham's affidavit does not state that defense counsel reviewed these files.  Instead, Mr. Graham states: "*I am sure* that trial counsel (Godinich, Nunnery or both) reviewed the Balderas prosecution file *although I have no memory* of when that specifically happened."  (Affidavit of Spence D. Graham, July 14, 2016, State's Ex. 3).  Likewise, prosecutor Traci Bennett states only that "*it is my understanding* that those notes were in the State's prosecution file and *available* for Balderas' attorneys to review when Balderas' case was assigned to former ADA Spence Graham."  (Affidavit of Traci Moore Bennett, Jul. 15, 2016, State's Ex. 2).

Finally, the "trial counsel billing records" do not support the conclusion that the 2007 and 2008 Notes information were fully available or reviewable.  The referenced records do not state that defense counsel reviewed the 2007 and 2008 Notes.  While the billing records contain multiple references to reviewing files supplied by the prosecutors, not one entry references the 2007 and 2008 Notes specifically.

The Director also claims that the state court's decision in state habeas proceedings finding that the notes had been turned over was not an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States. (Answer at 47).  Not so.

That decision is an unreasonable application of federal law because the state court did not assess the effect of the evidence cumulatively.  Instead, it merely recounted the aspects that were favorable to the Director.  The state court did not consider that the withheld evidence cumulatively undermined the main three pillars of the Director's case against Mr. Balderas.  *See Will v. Lumpkin*, No. 15-CV-3474, 2024 U.S. Dist. LEXIS 61959, at *33 (S.D. Tex. Apr. 3, 2024) ("This is a

15

case where the state court omitted a crucial component of the review required by Supreme Court precedent. The state court's decision that was based only on individual materiality determinations was 'contrary to' clearly established federal law.").  Moreover, the state court did not follow federal law because it did not consider how the evidence "reasonably could undermine the confidence of any reasonable jurist in the conviction." *DiLosa v. Cain*, 279 F.3d 259, 265 (5th Cir. 2002).  Instead, it simply reviewed the favorable evidence—that is "not simply a misconstruction of *Brady*, but one serious enough to be unreasonable." *Id.*  Had the Court examined the evidence cumulatively it could not have reasonably concluded that the evidence was not material.

The state court opinion also contained an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d)(2).  The state court findings of fact state: "the applicant's trial counsel were provided the opportunity to review the contents of the State's prosecution files, and did so." (SHR28944 at 15).  While Mr. Godinich states that he reviewed the notes, he largely passes the buck to Mr. Nunnery who actually conducted the cross-examination of Cookie.  Mr. Nunnery, in turn, does not state that he reviewed the notes; rather, only that he was made aware of the contents.  But what contents?  He does not say.  Neither do the prosecutors' affidavits.  Neither do the billing records.  If anything, a Rule 8 evidentiary hearing is warranted.  In short, the conclusion that defense counsel had an opportunity and did review the full contents of the notes is unreasonable and unsupported by the evidence.

2. *The 2014 Cookie Interview, the Twin Interviews, the Quinones Interview, and the Jail Calls Are Not Procedurally Barred Because They Were Not Available Before Filing the First State Habeas Petition*

The Director acknowledges that the 2014 Cookie Interview, the Twin Interviews, the Quinones Interview, and the Jail Calls were suppressed, but argues that the CCA's 2023 decision procedurally barred these claims.  The CCA's decision, however, failed to comply with the

requirements of Article 11.071 § 5(a), as it is internally inconsistent and vague. *Ex parte Balderas,* No. WR-84,066-03, 2023 WL 7023648 (Tex. Crim. App. Oct. 25, 2023).

The TCCA's one-sentence summary dismissal of Balderas's subsequent habeas admits it did not consider the "merits of the claims," while at the same time holding that Balderas failed to make a prima facie showing of eligibility under Article 11.071 § 5(a). But a decision under Section 5(a) is inextricably interwoven with a decision on the federal law merits of the claims. Indeed, the TCCA is explicitly required to make a determination as to whether a federal Constitutional violation has occurred under subsections (2) and (3) of Section 5(a).[3] It's one sentence decision not considering the "merits of the claim" and rejecting eligibility under Section 5 is an "ambiguous or obscure adjudications" by the state court that "do[es] not stand as barriers to a determination by [the federal] Court of the validity under the federal constitution of state action." *Florida v. Powell,* 559 U.S. 50, 56 (2010); *Michigan v. Long,* 463 U.S. 1032, 1040-41 (1983) ("when the adequacy and independence of any possible state law ground is not clear from the face of the opinion, [this Court] will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so.").

The ambiguous and inconsistent nature of the CCA's decision is underscored by the Director's arguments here. The Director argues that the CCA's decision "implicitly determine[d] that the petitioner 'knew or could have reasonabl[y] known' the factual predicate of the claim 'before filing his first petitions.'" (Answer at 53 (citing *Ford v. Davis,* 910 F.3d 232, 235 (5th Cir. 2018)). This is impossible: there is no question that the 2014 Cookie Interview, the Jail Calls, and

---

[3] Section 5(a)(2) permits the TCCA to consider a subsequent application if "by a preponderance of the evidence, *but for a violation of the United States Constitution* no rational juror could have found the applicant guilty beyond a reasonable doubt." Art. 11.071 § 5(a)(2) (emphasis added). Section 5(a)(3) permits the TCCA to consider a subsequent application if "by clear and convincing evidence, *but for a violation of the United States Constitution* no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial." Art. 11.071 § 5(a)(3) (emphasis added).

the Quinones Interviews were not disclosed prior to Mr. Balderas filing his first writ.  And Section 5(a)(1) permits the CCA to consider a subsequent application if "the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application." Art. 11.071 § 5(a)(1).  The CCA simply ignored that Section with its inconsistent ruling.  To be sure, the Director does not argue that these materials were available prior to filing the previous application; instead, the Director points to a presumption that the CCA must have found so because it held the claims were an abuse of the writ.  That presumption is rebutted by the undisputed fact that Mr. Balderas *did not have these materials* before filing his first petition.

The Director also asserts another procedural argument that, because the audio files were not attached to the petition, Mr. Balderas has not shown they were suppressed.  (Answer at 54). The Director presents no case law requiring these files be attached to the petition.  Mr. Balderas has complied with Rule 2(c) and presented non-conclusory and specific allegations concerning the contents of the audio files.  In addition, the audio files cannot be filed on the docket, and Mr. Balderas is prepared to present them to the court at an appropriate hearing.  To be sure, Mr. Balderas stated in his petition that he was prepared to provide these audio files and other voluminous documents "to the Court upon request."  (Am. Pet. 7 n.2).  Moreover, the Director is well-aware of these audio files—he has them.  Indeed, it was the Director who turned them over to federal habeas defense counsel in the first place.

The Director also turns Mr. Balderas's burden on its head by claiming that he has failed to show suppression by failing to include an affidavit from trial counsel stating they did not have the information.  (Answer at 54).  As shown above, this argument is meritless.

Finally, a procedural default "will be excused, for instance, if 'the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law' or if the default would work 'a fundamental miscarriage of justice.'"  *Busby v. Dretke*, 359 F.3d 708, 718 (5th Cir. 2004).  Mr. Balderas has demonstrated a cause for the default by the fact that the materials were unavailable to him, and actual prejudice that he could not use them at trial.  *See Strickler v. Greene*, 527 U.S. 263, 283 (1999) (a *Brady* violation is constitutes "just such factors that ordinarily establish the existence of cause for a procedural default"); *Banks v. Dretke*, 540 U.S. 668, 694 (2004) ("As a prosecution witness in the guilt and penalty phases of Banks's trial, Farr repeatedly misrepresented his dealings with police; each time Farr responded untruthfully, the prosecution allowed his testimony to stand uncorrected").

## II.    CLAIM II:  TRIAL COUNSEL WERE INEFFECTIVE THROUGH THE GUILT/INNOCENCE PHASE

The Director divides Mr. Balderas's ineffective assistance of trial counsel ("IATC") claim into several discrete subparts, asserting that each one does not individually entitle Mr. Balderas to relief.  The Court should reject the Director's claim-splitting approach.  *See Williams v. Taylor*, 529 U.S. 362, 399 (2000) (finding deficient performance based on multiple omissions by counsel and finding prejudice because "the entire post-conviction record, viewed as a whole" raised a reasonable probability of a different result).

Mr. Balderas can show that trial counsel's performance was deficient through the guilt/innocence phase, falling below an objective standard of reasonableness, and that the deficiency prejudiced his defense.  Indeed, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland v. Washington*, 466 U.S. 668, 694 (1984).  The test here for federal habeas purposes under § 2254(d) is whether the state court decision was "(1) contrary to, or involved an unreasonable application

19

of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Gray v. Epps*, 616 F.3d 436, 439 (5th Cir. 2010). Only one exception to the relitigation bar need be present. Where the relitigation bar is met, a federal court may review the merits *de novo* and based on all evidence put forth by the petitioner. *See Brumfield v. Cain*, 576 U.S. 305, 311 (2015).

As set forth below, the portions of the IATC claim that the Director contends were exhausted satisfy either § 2254 (d)(1) (an unreasonable application of clearly established federal law) or (d)(2) (an unreasonable determination of the facts), or both. Even considering that judicial scrutiny of counsel's performance must be deferential, there is no "reasonable argument that counsel satisfied *Strickland*'s deferential standard" here. *Harrington v. Richter*, 562 U.S. 86, 105 (2011). Indeed, the record shows that trial counsel's performance was deficient, and that the resulting prejudice was "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. This inquiry requires a reviewing court to ask "whether counsel's assistance was reasonable considering all the circumstances." *Id*. at 688.

### A.    Jury Selection and Voir Dire

The Director attempts to cast doubt on Mr. Balderas's IATC claim by painting trial counsel's failures as reasonable. The record shows otherwise. The primary focus of Mr. Balderas's punishment phase defense was the sexual abuse Mr. Balderas suffered as a child and the impact those experiences had on him for the rest of his life. Even though trial counsel retained a psychologist with expertise in working with male victims of sexual abuse—who testified at length during the punishment phase of the trial (38 RR at 156-57) —counsel failed to include this topic as part of jury selection and failed completely to address sexual abuse during individual voir dire. As a result, jurors were not receptive to this crucial testimony.

Had trial counsel performed adequately during jury selection, prospective jurors who were skeptical about the "abuse excuse" would not have been seated.  Instead, trial counsel allowed jurors to be seated on Mr. Balderas's case who had personal experiences with sexual abuse that they then discussed with other jurors.  (*See* Am. Pet. at ¶¶ 391-397).  It is now clear that not only were those individual jurors swayed by their own experience, but they also caused other jurors to be skeptical about the mitigating evidence in deciding whether he should be put to death.  There is a reasonable probability that had a jury been properly selected, it would have found the vicious childhood rapes perpetrated on Mr. Balderas by his mentally ill stepfather to be sufficiently mitigating to warrant sparing his life.  The Fifth Circuit has held that the seating of a biased juror establishes prejudice for ineffective assistance of counsel claim.  *See Virgil v. Dretke*, 446 F.3d 598, 613-14 (5th Cir. 2006).  A denial of the right to a fair jury can "never be treated as harmless." *Gray v. Mississippi*, 481 U.S. 648, 668 (1987) (citation omitted), and *Strickland* itself recognizes that a trial cannot be fair when the jury is not impartial.  *Strickland*, 466 U.S. at 685.

Further, trial counsel's failure to preserve the record during jury selection and voir dire was a dereliction of one of the "most fundamental duties of an attorney defending a capital case." *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Guideline 10.8(B)(2) (Am. Bar Ass'n rev. ed. 2003).  The Director points to trial counsel's excusals being noted on the record, but because trial counsel proffered the reason for excusing so many minority jurors without ever hearing from them, appellate counsel could not argue on direct appeal that Mr. Balderas's right to Equal Protection was violated.  Trial counsel's failure to properly preserve this issue for appeal prejudiced Mr. Balderas under state and federal Constitutions, state statutory law, and United States Supreme Court and state case law.

### B.      Speedy Trial Claim

The Director attempts to discredit Mr. Balderas's IATC speedy trial claim by pointing to statements made by trial counsel Mr. Godinich and Mr. Nunnery on the allegedly "time[-]consuming investigation," "ongoing negotiations," and delay as "a matter of trial strategy." (Answer at 86).  But trial counsel asserted Mr. Balderas's right to a speedy trial for the first time *eight years* into his incarceration, and only after Mr. Balderas had moved *pro se* for substitution of counsel in 2011 (*pro se* Motion to Appoint New Counsel, April 12, 2011, CCA Record, Vol. I, 00057-00058) and *pro se* for a speedy trial in 2014 (Defendant's Motion for a Speedy Trial, Jan. 17, 2014, CCA Record, Vol. II, 00496-00497).  During this eight-year span, Mr. Balderas maintained his innocence and repeatedly asked trial counsel to conduct a thorough investigation to establish his innocence.  Instead of investigating, however, trial counsel assumed Mr. Balderas's guilt and focused their efforts on convincing him to take a plea deal.  (*See* Am. Pet. ¶¶ 475-478).

Trial counsel's lack of preparedness and ignorance of basic legal ethical standards culminated in their failure to assert Mr. Balderas's right to a speedy trial.  As a result of that failure, Mr. Balderas was denied effective assistance of counsel.

### C.      Failure to Investigate

It was only in the final month before Mr. Balderas's trial that trial counsel conducted an investigation of any kind, conducted primarily by an inexperienced legal secretary, that included only three witness interviews.  (Am. Pet. ¶ 484).  It was trial counsel's responsibility to "engage in a reasonable amount of pretrial investigation and 'at a minimum, … interview potential witnesses and … make an independent investigation of the facts and circumstances in the case.'" *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994) (*quoting Nealy v. Cabana*, 764 F.2d 1173, 1177 (5th Cir. 1985)).  As post-conviction investigation evidence shows, trial counsel did not do so.  Had

they conducted a reasonable investigation, they would have discovered extensive and readily available evidence pointing to Mr. Balderas's innocence.

The Director points to the State's decision in April 2011 to seek the death penalty, arguing that it was reasonable for trial counsel to "wait and see how the State wanted to proceed so that they could potentially spare Balderas the death penalty." (Answer at 88). But Mr. Balderas had asserted his innocence from the outset, and even if trial counsel had waited until April 2011 to begin their investigation—instead of the eve of trial in 2014—they would have been in a better position to effectively impeach the state's witnesses and present vital alibi witnesses to support Mr. Balderas's innocence.

While counsel is not required to investigate "frivolous, implausible, or meritless defenses" (*United States v. Carr*, 740 F.2d 339, 349 (5th Cir. 1984)), counsel *must* engage in a reasonable amount of pretrial investigation and make an independent investigation of the facts and circumstances involved in the case to make a determination of what defenses are or are not plausible. *Harrison v. Quarterman*, 496 F.3d 419, 425 (5th Cir. 2007). Mr. Balderas's counsel did not do so. Instead, trial counsel presumed that Mr. Balderas was guilty and proceeded under that assumption. (Am. Pet. ¶¶ 408-465, 475). Taken together, the record evidence (*id.* at ¶¶ 445-465) shows that the CCA's prejudice finding was unreasonable.

The Director argues that trial counsel adequately investigated the inner workings of the LTC, and to the extent that they did not, for example, interview a key witness like Jose Perez, they argue this was because "not a single person – not Balderas or one of his friends or family – indicated an individual named Jose Perez might have information." (Answer at 94-95). But it is not Mr. Balderas's responsibility, nor his family or friends', to investigate and provide witnesses to counsel. *See Rummel v. Estelle*, 590 F.2d 103, 105 (5th Cir. 1979). Per *ABA Guidelines*, trial

23

counsel should have hired a qualified fact investigator in Mr. Balderas's capital murder case. (*ABA Guidelines*, Guideline 4.1 cmt). They did not.

Further, in instances where the Director claims that trial counsel did provide the testimony Mr. Balderas claims is missing, that testimony is severely underdeveloped. The Director states that trial counsel "did elicit testimony on the LTC hierarchy at trial through their witness, Walter Benitez" (Answer at 95), but even in the Director's own telling, that testimony was not robust. In any case, the testimony presented at trial does not cure counsel's failure to investigate. *See Anderson v. Johnson*, 338 F.3d 382, 393 (5th Cir. 2003).

Finally, the Director frames trial counsel's decisions on what to investigate as strategic, but the record shows that the jury did not understand material facts of the case. Nor did the jury understand the relevance and importance of certain alternative suspects, as evidenced by the jury notes sent out during deliberations. Trial counsel's lack of preparedness, untimely and incomplete investigation, and disregard of basic legal ethical standards all prejudiced Mr. Balderas. Counsel's failure to conduct a reasonable investigation for the guilt/innocent phase of the case constituted deficient performance. *Strickland*, 466 U.S. at 690-91; *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).

### D.    Alibi Defense

As to trial counsel's failure to investigate an alibi defense, the Director once again focuses on what Mr. Balderas and his friends and family allegedly should have provided to trial counsel instead of the glaring hole in the defense case: Mr. Balderas's whereabouts at the time of the crime. The record shows that Mr. Balderas did provide counsel with the names of alibi witnesses and even put two of them in contact with counsel. (Am. Pet. ¶ 500). Counsel, however, showed little interest in pursuing the defense. Instead of talking to the witnesses and investigating Mr. Balderas's alibi defense, counsel made no attempt to contact Oralia McCrary—the mother of Anali

and Octavio—despite being told she could provide an alibi for Mr. Balderas. (*Id.*) Counsel turned down other witnesses as well and failed to independently investigate the information presented to them on an alibi defense. (*Id.*) These failures are inexcusable considering that counsel's stated defense theory was "misidentification." (Dr. Roy Malpass Aff., Habeas Writ Record, Vol. II, 00403-474 ¶ 7).

The Director focuses on the trial court's finding that counsel adequately investigated the information provided to them (Answer at 109), but counsel provided constitutionally deficient assistance of counsel by not building on that information and searching for and interviewing potential alibi witnesses. *See Bryant*, 28 F.3d at 1417. In *Bryant*, the court reasoned that "counsel's failure to investigate potential alibi witnesses was not a 'strategic choice' that precludes claims of ineffective assistance." *Id.* (citing *Nealy*, 764 F.2d at 1178). Further, the court noted that because of the severity of the crime, counsel had a greater duty to attempt to investigate an alibi defense. *Bryant,* 28 F.3d at 1417-18. The same applies here.

As stated above, under § 2254(d), a federal district court may grant habeas relief on a claim "adjudicated on the merits in State court proceedings" when that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State proceeding." For a state court's factual determination to be unreasonable, "it must be sufficiently against the weight of the evidence that it is objectively unreasonable." *Winston v. Kelly*, 592 F.3d 535, 554 (4th Cir. 2010).

Here, both Ileana Cortes and Anali Garcia *made efforts* to speak with Mr. Balderas's trial counsel and were met with hostility. (Am. Pet. ¶ 503). Trial counsel informed both Cortes and Garcia on separate occasions that their testimony was not helpful, and that Mr. Balderas did not need any more character witnesses, indicating a clear misunderstanding of the evidence both were

trying to supply.  (*Id*.)  Trial counsel's failure to investigate and present alibi evidence at the guilt/innocence phase of trial constitutes ineffective assistance, prejudicing Mr. Balderas's rights under the state and federal Constitutions, state statutory law, and United States Supreme Court case law.

### E. Testimony of Eyewitness Identification Expert

The CCA's denial of Mr. Balderas's claim regarding failure to present testimony of an eyewitness identification expert was not reasonable.  The Director argues that Mr. Balderas's claim challenges the "fully informed decisions of trial counsel" and their "strategic decision not to present Dr. Malpass's testimony out of fear of opening the door" (Answer at 120), but the record shows that trial counsel refused to have Dr. Malpass testify even after the trial court ruled that Dr. Malpass's testimony would be helpful to the jury and that his testimony would *not* open the door to extraneous offenses.  (Am. Pet. ¶ 516).

The Director then points to the CCA's determination that trial counsel was able to accomplish "much of the same" through Wendy Bardales's cross-examination.  (Answer at 121). This is not true.  Dr. Malpass would have testified to a number of issues as to *both* eyewitness identification generally and Ms. Bardales's unreliable identification in particular.  One reason courts have repeatedly acknowledged the importance of expert testimony on eyewitness identification is that jurors are known to have a poor understanding of scientific principles that affect eyewitness identifications.  Had trial counsel presented the expert testimony of Dr. Malpass, it is likely that at least one of the jurors would have questioned the credibility of Ms. Bardales's memory and identification and changed his or her vote.

### F. Juror Misconduct Claim

The CCA's denial of Mr. Balderas's claim regarding juror misconduct was not reasonable. "The requirement that a jury's verdict 'must be based upon the evidence developed at the trial'

goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." *Oliver v. Quarterman*, 541 F.3d 329, 334 (5th Cir. 2008) (quoting *Turner v. Louisiana*, 379 U.S. 466, 472 (1965)).  As described in Mr. Balderas's amended petition, the extraneous influences to which Mr. Balderas's jury was exposed prejudiced Mr. Balderas.  Trial counsel's failure to investigate those occurrences and move for a new trial further prejudiced Mr. Balderas.  (Am. Pet. ¶¶ 530-533).  Had counsel properly investigated and presented evidence of extraneous influences on the jury in a motion for a new trial, it is likely that such motion would have been granted.

### G.    Caseload and Flat Fee

The CCA did not address Mr. Balderas's claim that trial counsel's unmanageable caseload and inappropriate fee structure should be considered concurrently with specific deficiencies and instead focused on whether counsel's representation fell below an objective standard of reasonableness.  It did.  The CCA's determination was an unreasonable application of *Strickland*.

In its argument, the Director cites to cases that are factually inapposite.  In *Woods*, for example, counsel was the lead attorney on only four other murder cases.  Here, in 2014 alone, Mr. Godinich carried a total of 330 adult felony cases, more than twice the acceptable load, *and* five capital murder cases, more than the average load by RPDO attorneys who work exclusively on capital trials.  Similarly, Mr. Nunnery worked on 140 adult felony cases in addition to six capital murder cases that same year.

As part of this argument, Mr. Balderas notes that the workload issue was compounded by the fact that counsel were paid a flat fee for their representation.  Had trial counsel represented Mr. Balderas while carrying an acceptable caseload and had trial counsel not been limited to a flat fee covering eight years of work, they likely would been better equipped to properly investigate Mr. Balderas's case and provide competent representation.

### III.     CLAIM III:  TRIAL COUNSEL WERE INEFFECTIVE AT THE PUNISHMENT PHASE

Mr. Balderas can show that trial counsel's performance was deficient through the punishment phase of trial, falling below an objective standard of reasonableness, and that the deficiency prejudiced his defense.  The test here for federal habeas purposes under § 2254(d) is whether the state court decision was "(1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  *Gray v. Epps*, 616 F.3d 436, 439 (5th Cir. 2010).  Only one exception to the relitigation bar need be present.  Where the relitigation bar is met, a federal court may review the merits *de novo* and based on all evidence put forth by the petitioner. *See Brumfield v. Cain*, 576 U.S. 305, 311 (2015).

As set forth below, the portions of the IATC claim that Director contends were exhausted satisfy either § 2254 (d)(1) (an unreasonable application of clearly established federal law) or (d)(2) (an unreasonable determination of the facts), or both.  Even considering that judicial scrutiny of counsel's performance must be deferential, there is no "reasonable argument that counsel satisfied *Strickland*'s deferential standard" here.  *Richter*, 562 U.S. at 105.  Here again, the record shows that trial counsel's performance was deficient at the punishment phase, and that the resulting prejudice was "so serious as to deprive him of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687.

### A.     Failure to Investigate Other Acts

There is no reasonable explanation for trial counsel's failure to investigate and present evidence rebutting the damaging extraneous offense evidence introduced at trial, especially considering that trial counsel knew the State's strategy would be to attempt to show that Mr.

Balderas was involved in several shootings that law enforcement attributed to the LTC between September and December 2005.

Regarding the Bunker Hill shooting, the State relied on testimony from an eyewitness, Courtney Altimore, to link Mr. Balderas to the crime, but there were significant deficiencies in Ms. Altimore's testimony, and her account was completely contradicted by another witness, Clemente Tovar Flores. Important aspects of Mr. Flores's account of the shooting were further corroborated by yet another eyewitness, Eduardo Tamayo. (Am. Pet. ¶¶ 549-552). However, inexplicably, trial counsel did not use Mr. Flores to impeach Ms. Altimore at trial. The CCA's conclusion that trial counsel conducted a thorough punishment investigation and "extensively cross-examined State's witnesses" (Answer at 131-132) is contradicted by the record. The Director argues that even if Ms. Altimore's version of the shooting was inaccurate, "she reported a license plate number that matched Balderas's vehicle to law enforcement." *Id*. However, had trial counsel investigated the incident more thoroughly, they would have been able to present evidence that the shooters exited the first car, not the third car, as Ms. Altimore testified. Mr. Flore's account was also later corroborated by Angelina Quinones, but her handwritten notes were never sent to trial or appellate counsel. (Am. Pet. ¶ 553). Had trial counsel presented this evidence to the jury it is unlikely that the State could have proven that Mr. Balderas was the Bunker Hill shooter.

Furthermore, had trial counsel conducted the requisite investigation of the alleged extraneous offenses as they were obligated to, they would have discovered other evidence to defeat the aggravating evidence presented by the State. For example, counsel did not present key evidence that Mr. Balderas often allowed other LTC members to borrow his car. (Am. Pet. ¶¶ 555-558). The Director points out that counsel cross-examined Lieutenant Mitch Weston, but trial

counsel did not support with crucial evidence the theory that someone other than Mr. Balderas was using his car because they had failed to conduct an independent investigation into the collateral offenses. *See Rompilla v. Beard*, 545 U.S. 374, 393 (2005).

Trial counsel also failed to conduct a sufficient investigation into Mr. Balderas's efforts to distance himself from the LTC. The Director points to Mr. Godinich's affidavit, which states that Mr. Balderas's "attempts at disassociation could not be verified." (Answer at 135). This statement, however, does not suggest that Mr. Godinich had conducted an investigation of any kind. The record, on the other hand, is replete with testimony concerning Mr. Balderas's disassociation. (*See* Am. Pet. ¶¶ 561-565).

### B.    Failure to Investigate LTC's Retaliation Against Its Own Members

Retaliation was the crux of the State's theory at Mr. Balderas's trial, but trial counsel failed to utilize any of the readily available evidence to establish the LTC's penchant for retaliation and infighting within its subgroups, including their willingness to frame members for crimes they did not commit. The Director frames trial counsel's decisions not to utilize any of the readily available evidence as strategic, but the record suggests that not only did trial counsel fail to investigate this theme, but that they also failed to utilize records and information already within their possession to rebut the State's use of the alleged extraneous offenses to obtain a death sentence. Trial counsel's failure to sufficiently investigate the claims and issues detailed in the petition constitutes deficient performance. (Am. Pet. ¶¶ 566-572).

### C.    Mitigation Evidence

The CCA held that trial counsel were not deficient and Mr. Balderas was not prejudiced by trial counsel's paltry investigation and reliance on excerpts on limited issues. Mr. Balderas can meet the relitigation bar under §2254(d) because the CCA's adjudication involved an unreasonable determination of clearly established federal law and was further impacted by unreasonable

determinations of fact under §2254(d)(2).  As such, this court can review Mr. Balderas's claim *de novo*.  *Brumfield*, 576 U.S. at 311.

The CCA based its adjudication of the punishment phase allegations of ineffectiveness on summary conclusions concerning cumulative evidence, the State's "powerful punishment case," the "strategic" decisions of trial counsel, and the alleged ineffectiveness of the mitigation issue. (10.SHCR-01 2925 ¶¶ 24-28).  This conclusion did not acknowledge or confront the specific omissions and errors by trial counsel alleged by Mr. Balderas to constitute ineffective assistance of counsel.  These findings of fact are thus simply a recitation of trial counsel's conduct during the punishment phase.

Under clearly established federal law, "[a] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct."  *Strickland*, 466 U.S. at 690.  A reviewing court may not assume the adequacy of trial counsel's representation and must inquire whether counsel's acts and omission "actually demonstrated reasonable professional judgment." *Wiggins*, 539 U.S. at 527 (finding that the state court unreasonably applied clearly established federal law when it failed to assess the reasonableness of trial counsel's conduct).  That trial counsel performed some basic tasks in their representation of Mr. Balderas does not answer the mandated inquiry under clearly established federal law as to whether the conduct challenged by Mr. Balderas was reasonable.

Based on the facts of Mr. Balderas's case and objectively viewed as of the time of counsel's conduct, trial counsel's acts and omissions do not reflect the exercise of reasonable professional judgment.  *See Wiggins*, 539 U.S. at 523; *Sears v. Upton*, 561 U.S. 945, 953-954 (2010) (per curiam) (holding that trial counsel cannot insulate their decision from collateral attack by claiming that it was a strategic choice to pursue or not pursue or present mitigating evidence if they failed

31

to first complete a reasonable investigation). Further, trial counsel must make reasonable efforts to obtain and review material it knows the prosecution will likely rely on as aggravation at the sentencing phase of trial. *Rompilla v. Beard*, 545 U.S. 374 (2005).

The Director argues that the defense team conducted a thorough pretrial mitigation investigation and made reasoned, strategic choices about what mitigation evidence was to be presented. That claim is false based on the record. Trial counsel did little to investigate and provide the jury with an accurate and complete picture of Mr. Balderas. The jury did not hear in detailed evidence about Mr. Balderas's upbringing. (Am. Pet. ¶¶ 584-598). Mr. Balderas was exposed to extreme violence, crime, and sexual abuse his entire life—had trial counsel properly investigated these issues, their focus would necessarily have been much broader and far reaching. Further, counsel failed to provide evidence of Mr. Balderas's well-known and documented good character (Am. Pet. ¶¶ 617-622), particularly in the important period leading up to Powder's murder. This failure left the jury with a distorted picture of who Mr. Balderas is and the nature and extent of his gang involvement. Accordingly, the State's highly misleading portrayal of Mr. Balderas was left mostly unrebutted.

Under clearly established federal law, trial counsel have a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigation unnecessary." *Strickland*, 466 U.S. at 691. Here, trial counsel flouted that duty by failing to pursue critical lines of mitigation investigation.

The Director argues that the mental health evidence that Mr. Balderas presents is barred from consideration. Trial counsel completely failed to present evidence concerning this crucial topic at trial, even though such information was readily available to counsel and should have been presented at both the guilt/innocence phase and at the punishment phase of trial.

Mr. Balderas may be excepted from the procedural default rule if he demonstrates that the federal court's failure to review the defaulted claim will result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991).  To do so, Mr. Balderas must provide this Court with evidence that would support a "colorable showing of factual innocence." *Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986).  Considering the evidence now available, the trier of fact would have entertained some reasonable doubt as to Mr. Balderas's guilt, sufficient to establish the factual innocence standard.  *Campos v. Johnson*, 958 F. Supp. 1180, 1195 (W.D. Tex. 1997).

In the six years since Mr. Balderas was sentenced to death, his condition has deteriorated. In November 2014, Mr. Balderas was enrolled in the Treatment and Relapse Prevention Program and prescribed various medications.  (Am. Pet. ¶¶ 611-616).  In March 2015, Mr. Balderas began refusing medical visits, medications, and x-rays, and continues to do so.  *Id.*  Counsel hired Dr. Bhushan Agharkar, a psychiatrist with extensive experience treating a wide range of conditions, to evaluate Mr. Balderas.  *Id.*  Further, the results of Dr. Ouaou's subsequent neuropsychological evaluation of Mr. Balderas, conducted on October 15, 2021, are consistent with Dr. Agharkar's psychiatric evaluation.  *Id.*  Both Dr. Ouaou and Dr. Agharkar's findings should have alerted trial counsel to cognitive and intellectual impairments, as well as serious mental health diagnoses. Evidence of mental illness is pertinent to culpability, and here, it would have been powerful evidence that would have affected the jury's evaluation of Mr. Balderas's culpability.

It is counsel's responsibility to conduct a thorough and searching inquiry into a client's background, and into the alleged extraneous offenses that heavily influence a jury's perception of a defendant.  *See Porter v. McCollum*, 558 U.S. 30, 39 (2009).  Counsel must also conduct an inquiry into a defendant's mental health issues.  *See Walbey v. Quarterman*, 309 F. App'x 795,

802 (5th Cir. 2009). Had all of the mitigating evidence been presented, there is a reasonable probability that at least one juror would have voted for a life sentence. *See Strickland*, 466 U.S. at 694.

### D.    Failure to Preserve the Record

As to preservation of the record, the Director points out: "all that matters is whether trial counsel's decision was a reasonable one." (Answer at 164). Trial counsel's failure to object and preserve error when the State emphasized Mr. Balderas's failure to testify during the questioning of his experts was not reasonable. The Director argues that the State's questions "were not a comment on Balderas's refusal to testify but were rather permissive impeachment of Balderas's expert testimony." (Answer at 163). The transcript of the cross examination, however, suggests otherwise. (*See* Am. Pet. ¶¶ 629-635). The State's questions were meant to penalize Mr. Balderas for choosing not to testify. And because the State's error implicated Mr. Balderas's rights under the United States Constitution, the appellate court would have applied a harmless error test. Because the reviewing court likely would have determined the error was not harmless and would have vacated Mr. Balderas's sentence on direct appeal, Mr. Balderas suffered prejudice as a result of defense counsel's failure to object to and properly preserve this issue.

### E.    Funding Travel for Witnesses in Mexico

Contrary to the CCA's finding, the obstacles faced in presenting witnesses in Mexico was the result of trial counsel's failure to arrange for their travel and formally seek funding from the court. As an indigent defendant, Mr. Balderas was unable to retain the legal and expert assistance necessary to investigate and present his defense, including the costs associated with producing out-of-country witnesses for testimony. Had trial counsel made a motion requesting funding on the record, and had the trial court denied it, the court's denial would have been appealable error. Specifically, the denial would have infringed on Mr. Balderas's rights to compulsory process and

due process under the Sixth and Fourteenth Amendments to the United States Constitution. *See Washington v. Texas*, 388 U.S. 14, 16 (1967); *Webb v. Texas*, 409 U.S. 95, 98 (1972).

Witness testimony through telecommunication was no substitute for live testimony, especially considering the technical difficulties encountered in presenting that testimony. Fundamental fairness dictates that Mr. Balderas was entitled to "the basic tools of an adequate defense" necessary to have "an adequate opportunity to present [his] claims fairly within the adversary system" and to have those tools provided at no cost to him. *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985). Trial counsel's failure to make a clear record of requests for funding to produce necessary mitigation witnesses from Mexico, and their failure to object to the court's denial of that funding, constitute ineffective assistance of counsel. This situation prejudiced Mr. Balderas. In fact, in the State's closing argument at punishment, the State pointed out to the jury that a certain witness "wasn't brought to you even though you know we have the ability to bring you witnesses from Mexico." (Am. Pet. ¶ 655).

### F.    Trial Counsel's Performance

Mr. Nunnery's behavior during the punishment phase of trial fell far below the standards of professional conduct and plainly constituted deficient performance. His repeated criticism of the jury's guilty verdict and their process for determining the verdict could serve no strategic purpose. Further, Mr. Nunnery's inappropriate behavior in the courtroom during his closing argument fell far below the standards of professional conduct and constituted deficient performance. Viewed as a whole, trial counsel's pattern of misconduct in this case resulted in a fundamentally unfair trial for Mr. Balderas. The punishment phase of Mr. Balderas's trial was prejudiced, and he is entitled to a new sentencing proceeding.

**IV.    CLAIMS IV AND V:  TRIAL COUNSEL WERE INEFFECTIVE FOR FAILURE TO RAISE THE ISSUE OF MR. BALDERAS'S MENTAL COMPETENCY AND MR. BALDERAS WAS TRIED WHILE INCOMPETENT**

**A.    Mr. Balderas's Competency-Related Claims Relate Back to His Original Timely Petition.**

For a claim to relate back to a petition under Rule 15(c)(1)(B), it must "assert[] a claim or defense that arose out of the conduct, transaction or occurrent, set out – or attempted to be set out – in the original pleading[.]" 28 U.S.C. § 2244(d).  The claim must be "tied to a common core of operative facts."  *Mayle v. Felix*, 545 U.S. 644, 664 (2005).

Here, Mr. Balderas's IATC-related and standalone competency claims share a common core of operative facts with Claim III of Mr. Balderas's Initial Petition, regarding ineffective assistance of trail counsel at the punishment phase for failure to investigate and present mitigation evidence.  The preliminary psychiatric report by Dr. Agharkar, offered in support of his claim that trial counsel failed to investigate and present mitigation evidence, contains evidence nearly identical to the evidence offered in Mr. Balderas's Amended Petition in support of his competency-related claims.

The Director urges that the issues of competency and mitigation involve a much different core of operative facts, but then points only to the ultimate conclusions of those issues which differ, *e.g.*, whether Mr. Balderas had the ability to understand the proceedings against him sufficient to assist his attorneys in their defense.  *Indiana v. Edwards*, 554 U.S. 164, 170 (2008).  However, while the ultimate conclusions reached in evaluating issues of competency to stand trial and mitigation maty differ, it is undisputed that Mr. Balderas here offers nearly identical evidence in support of both claims, thus his competency-related claims (Claims IV and V) are tied to a common core of operative facts and relate back to his timely petition.

36

**B.      Claims IV and V Overcome Procedural Default.**

1.      *Procedural default of Mr. Balderas's IACT-competency claim is excused by cause and prejudice.*

Mr. Balderas can overcome default by showing cause and prejudice.  *See Coleman*, 501 U.S. at 750; *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013).  A procedurally defaulted IATC claim may overcome the default if the underlying "cause" of the default is the ineffective assistance of state postconviction counsel and if the State's judicial system effectively forecloses direct review of trial ineffective assistance claims.  *See Trevino v. Thaler*, 569 U.S. 413, 414 (2013).  Ineffective assistance of appellate counsel is a claim analyzed under *Strickland* and therefore requires a harm analysis that includes an inquiry into the question of whether the appeal would have been set aside if appellate counsel would have raised different claims.  As such, this claim cannot be brought until the direct appeal is completed and a decision has been rendered.  An ineffective assistance of appellate counsel claim, therefore, can only be brought for the first time in a state habeas petition.  District courts in other jurisdictions have thus interpreted *Martinez* to encompass appellate ineffective assistance of counsel claims alleging that the direct appeal should have raised trial ineffective assistance claims.  *See, e.g., Williams v. Alabama*, 1:07-cv-1276, 2012 WL 1339905, at *62 (N.D. Ala. Apr. 12, 2012).

In violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, *Martinez* 566 U.S. at 1, and *Trevino*, 569 U.S. 413, Mr. Balderas's post-conviction counsel, OCFW, rendered ineffective assistance when they failed to adequately plead, prepare, investigate, and present compelling and substantial claims that Mr. Balderas was entitled to post-conviction relief, including but not limited to all of the claims presented in this petition.

OCFW's investigation was impeded internally by a lack of adequate resources to handle a case as large and complex as Mr. Balderas's.  At the time, OCFW only staffed its cases with a

team of two attorneys and one investigator.  (Am. Pet. ¶¶ 199-202).  Meanwhile, each of OCFW's attorneys were assigned to several cases at a time.  In addition to internal factors, OCFW's investigation was impeded externally by the State's delinquent and incomplete exculpatory evidence disclosures leading up to Mr. Balderas's evidentiary hearing in May 2018.  (*Id*. at ¶¶ 203-212).

As a result of these internal and external factors, OCFW did not investigate or plead claims related to Mr. Balderas's competency, despite awareness of Mr. Balderas's long history of mental illness and behavior consistent with those diagnoses.  Accordingly, Mr. Balderas was prejudiced by OCFW's failure to adequately plead, prepare, investigate, and present compelling and substantial claims, such as Mr. Balderas's competency claims.

2. *Procedural Default of Mr. Balderas's standalone competency claim is overcome.*

Mr. Balderas's standalone competency claim overcomes the procedural bar because the Court's refusal to consider the claim would result in a fundamental miscarriage of judice. *Coleman*, 501 U.S. 750-51.  To do so, Mr. Balderas must provide this Court with evidence that would support a "colorable showing of factual innocence."  *Kuhlmann,* 477 U.S. at 454. Considering the evidence now available, the trier of fact would have entertained some reasonable doubt as to Mr. Balderas's guilt, sufficient to establish the factual innocence standard.  *Campos v. Johnson*, 958 F. Supp. 1180, 1195 (W.D. Tex. 1997).  Evidence of mental illness is pertinent to culpability.  Here, the evidence of Mr. Balderas's continued mental health decline, in addition to the psychiatric and neuropsychological reports of Dr. Agharkar and Dr. Ouaou, respectively, would have been powerful evidence that would have affected the jury's evaluation of Mr. Balderas's culpability.

38

### C.    Mr. Balderas Was Incompetent to Stand Trial.

Mr. Balderas's mental incompetency at the time of trial is supported by substantial evidence available to trial counsel, including a family history of mental illness, lingering physical damage to his skull from childhood trauma, diagnoses of adjustment disorder, bipolar disorder, anxiety disorder, polysubstance abuse, and depression.  (Am. Pet. ¶¶ 678-679).  The reports by Dr. Agharkar and Dr. Ouaou concur that Mr. Balderas's cognitive deficits were likely manifest during the time of trial and likely impacted his judgment, reasoning, impulse control, problem solving, and rational decision making.  (Am. Pet. ¶ 680).

The Director attempts to cast doubt on the reliability of the Agharkar and Ouaou reports, arguing that neither examiner adequately accounted for malingering or exaggeration of symptoms.  (Answer at 182-186).    However, Dr. Ouaou expansively detailed the precautions against malingering in his report, including the administration of tests designed to reveal less than genuine performance on the part of the test subject.  (Report of Robert H. Ouaou, Ph.D. ("Ouaou Report"), Jan. 15, 2022, at 3-4, ECF No. 70-3).  Moreover, the Director inaccurately describes Dr. Ouaou's conclusion that Mr. Balderas's neuropsychological deficits were likely present at the time of trial, based on "Balderas's self-reported history."  (Answer at 185).  Rather, Dr. Ouaou's conclusion is independent of Mr. Balderas's own accounts, and is based on "evidence of residual cognitive deficits that are consistent with damage to the frontal-limbic areas of the brain . . . that were likely more debilitating at the time of trial in the context of his still maturing brain."  (Ouaou Report at 10).  The Director's contention that Dr. Agharkar did not appear to have "conducted any type of effort testing whatsoever" is plainly wrong.  (Answer at 186).  Dr. Agharkar asked "simple standard questions to detect overt malingering[.]"  (Report of Dr. Bhushan Agharkar, M.D., DFAPA, ("Agharkar Report") at 7, ECF No. 70-1).

The evidence of Mr. Balderas's mental incompetence at the time of trial, and the two expert reports by Dr. Agharkar and Dr. Ouaou, concurring as such supports the finding that Mr. Balderas was incompetent at the time of trial. *Green v. Davis*, 479 F. Supp. 3d 442, 489 (S.D. Tex. 2020). The Director's contention that the lack of contemporaneous evidence of incompetence, such as testimony by trial counsel, is fatal to Mr. Balderas's claim, but such a standard is belied by the Director's authorities. *See Medina v. California*, 505 U.S. 437, 450 (1992) (stating "defense counsel will often have the best-informed view of defendant's ability to participate in his defense", but not stating that defense counsel is entitled to the *only view* of defendant's ability). Further, the Director highlights the fact that Mr. Balderas claimed to trial counsel that he was set up by female witnesses who were ex-girlfriends of a gang ringleader. (Answer at 188-89). Mr. Balderas's conspiracy theories only lend credence to the conclusion that his hallucinations, paranoia, and delusions affected his ability to communicate with trial counsel and rationally understand the proceedings. *See United States v. Ghane*, 490 F.3d 1036, 1040 (8th Cir. 2007) (belief in government conspiracy was not rational); *United States v. Boigegrain*, 155 F.3d 1181, 1189 (10th Cir. 1998) (delusions and paranoid ideation prevented petitioner to believe his lawyer, the prosecutors, and the court were part of a conspiracy to incarcerate him).

### D.    Trial Counsel Were Ineffective for Failing to Investigate Evidence of Mr. Balderas's Competency to Stand Trial.

Evidence which raises a bona fide doubt as to a defendant's competence is not fixed in any rigid set of factors. *Drope v. Missouri*, 420 U.S. 162, 180 (1975). It is undisputed that trial counsel investigated and found Mr. Balderas's history of familial mental illness. (Answer at 191). Nevertheless, the Director argues that trial counsel's experts, Dr. Mendel and Dr. Brams, did not doubt Mr. Balderas's competency, and therefore trial counsel could not have been on notice that Mr. Balderas might not have understood the charges against him or was unable to assist in his

defense.  (Answer at 192).  However, the reliance on the evaluations of Dr. Mendel and Dr. Brams, to the exclusion of all other indicia of mental incompetency, is not the standard for determining whether trial counsel would have formed a bona fide doubt as to Mr. Balderas's competency. *Green v. Davis*, 479 F. Supp. 3d 442, 509 (S.D. Tex. 2020) (the standard is whether objectively reasonable counsel, in light of the evidence available to it, would have formed a bona fide doubt). Here, trial counsel had access to Mr. Balderas's long history of mental illness diagnoses, history of behavior consistent with those diagnoses, and periods of refusing to take his prescribed medication.  Based on all the evidence available to trial counsel, trial counsel were ineffective for not requesting a hearing on Mr. Balderas's competence to stand trial, or conducting further investigation of his mental illness.

## V.    CLAIM VI:  APPELLATE COUNSEL WAS INEFFECTIVE

The Director argues that because Mr. Balderas failed to raise any ineffective assistance of appellate counsel ("IAAC") claims in his initial application or upon his return to state court, his claims are unexhausted and procedurally defaulted.  Further, Director argues that Mr. Balderas cannot show cause for the default by alleging that his state habeas counsel was ineffective. However, if appellate counsel declines to raise a claim on appeal that was "plainly stronger than those actually presented to the appellate court," (*Davila v. Davis,* 582 U.S. 521, 533 (2017), Mr. Balderas may make out a substantial claim of ineffective assistance of appellate counsel based on *Strickland*.  *Smith v. Robbins*, 528 U.S. 259, 288 (2000).  Additionally, the Supreme Court has held that where, as in Texas, criminal defendants are entitled to appeal as a matter of law, the right to competent appellate counsel is indistinguishable in importance, for the purposes of due process, from the right to a competent trial attorney.  *Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *accord Ries v. Quarterman*, 522 F.3d 517, 531-32 (5th Cir. 2008).

The *Martinez* and *Trevino* exception to procedural default is an equitable remedy, and the equitable concerns contemplated in those cases are amplified in a situation, like Mr. Balderas's, where the prisoner has been confined on death row in the equivalent of solitary confinement for over six years and has been deprived of his Sixth Amendment right to competent trial, appellate, and habeas counsel.  In situations such as this, the equitable principles of *Martinez* are in favor of excusing default rather than enforcing it.

Under clearly established Supreme Court precedent, a petitioner must show (1) that direct-appeal counsel was deficient and (2) that this deficiency prejudiced the petitioner in order to prevail on a claim of ineffective assistance of direct-appeal counsel.  *Smith,* 528 U.S. at 285.  To constitute deficient performance, "the decision not to raise an issue must fall 'below an objective standard of reasonableness.'"  *United States v. Phillips*, 210 F.3d 345, 348 (2000) (quoting *Strickland*, 466 U.S. at 688).

### A.    Failure to Investigate Claims on Direct Appeal

The Director argues that appellate counsel cannot be faulted for failing to investigate and develop outside-the-record claims in the time period allotted for direct appeal or during the time between the verdict and appeal through a motion for new trial. (Answer at 195).  However, a significant amount of exculpatory punishment-phase evidence that was never presented to the jury was already available, including compelling mitigation evidence regarding Mr. Balderas's life and family history.  There was also an abundance of evidence indicating that Mr. Balderas suffers from psychotic disorders and brain impairment that trial counsel failed to raise.  Appellate counsel should have and could have developed outside-the-record claims.

In particular, appellate counsel should have presented evidence that Cookie's testimony about Mr. Balderas's alleged confession was false based on information discovered post-trial.  And

as further explained in Claim I, the exculpatory and impeachment evidence that the State failed to disclose was not sought by appellate counsel nor raised on appeal.

Appellate counsel also failed to raise the issue of trial counsel's failure to request a competency hearing and failed to raise the issue of a suggestive photo spread and suggestive identification procedure. Appellate counsel failed to raise the latter issue even though "conviction based on an eyewitness identification at trial following a pretrial photographic identification may be set aside 'if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Sturgeon v. Quarterman*, 615 F. Supp. 2d 546, 573 (S.D. Tex. 2009) (internal citations omitted).

### B. Failure to Raise Violations of Mr. Balderas's Constitutional Rights on Direct Appeal

Appellate counsel also failed to raise violations of Mr. Balderas's constitutional rights on direct appeal. The Director argues that these claims are meritless and barred by the CCA, but for the reasons stated above and in the amended petition, Mr. Balderas is entitled to bring these claims. (*See* Am. Pet. ¶¶ 722-745).

## VI. CLAIM VII: TRIAL COUNSEL VIOLATED MR. BALDERAS'S SIXTH AMENDMENT RIGHT TO AUTONOMY BY REFUSING TO PRESENT AN ALIBI DEFENSE

Mr. Balderas can overcome default by showing cause and prejudice. *See Coleman*, 501 U.S. at 750; *Martinez*, 566 U.S. 1; *Trevino*, 569 U.S. 413.

The Director argues that Mr. Balderas is "simply complaining about trial counsel's effectiveness" in carrying out his trial strategy (Answer at 205), but the record shows otherwise. The decision to present an alibi defense is within the sole prerogative of a defendant. If defense counsel refuses to present an alibi defense, it is a violation of defendant's Sixth Amendment autonomy right. *See McCoy v. Louisiana*, 584 U.S. 414, 425 (2018).

The record shows that Ileana Cortes, the mother of Mr. Balderas's niece, contacted Mr. Godinich in February 2014 to inform him that Mr. Balderas had been with her and her family at their apartment all afternoon and evening on the day Powder was killed.  (Am. Pet. ¶ 754).  But instead of further exploring that information and attempting to corroborate it, counsel told Ileana that her testimony was useless and sent her away.  (*Id*. at ¶ 755).

Similarly, counsel turned away Anali Garcia four days before trial, dismissing her information concerning an alibi as useless.  (*Id*. at ¶ 756).  Counsel did not present her alibi defense at trial.  Ignoring credible alibi witnesses is not "trial strategy," but rather a serious violation of Mr. Balderas's Sixth Amendment right to autonomy.

Mr. Balderas's claim is not *Teague*-barred as the Director claims. The Director argues that trial counsel's decision not to call certain witnesses does not violate Mr. Balderas's autonomy right because the decision was "within the purview of counsel's strategic choice of how to best achieve a defendant's objectives."  (Answer at 205).  But trial counsel's refusal to present an alibi defense is much more than that.  It is a structural error affecting "the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty."  *McCoy*, 584 U.S. at 425.

## VII.    CLAIM VIII:  MR. BALDERAS'S EQUAL PROTECTION RIGHTS WERE VIOLATED BY THE AGREEMENT BETWEEN THE STATE AND THE DEFENSE TO EXCLUDE AFRICAN AMERICANS FROM MR. BALDERAS'S JURY

### A.    Mr. Balderas's Claim Regarding Exclusion of Jurors Is Not Procedurally Defaulted

Mr. Balderas may be excepted from the procedural default rule if he demonstrates that the federal court's failure to review the defaulted claim will result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 731-32.  To do so, Mr. Balderas must provide this Court with evidence that would support a "colorable showing of factual innocence." *Kuhlmann*, 477 U.S. at

454.   Considering the evidence now available, the trier of fact would have entertained some reasonable double as to Mr. Balderas's guilt, sufficient to establish the factual innocence standard. *Campos,* 958 F. Supp. at 1195.

Alternatively, as *Huey* exemplifies, Mr. Balderas need not have made a contemporaneous objection. Because Mr. Balderas's trial counsel, in conjunction with the State, excluded African American veniremembers, Mr. Balderas did not raise any *Batson* objections at trial, nor during the direct appeal.   Similarly, in *Huey*, Huey's own counsel exercised peremptory challenges in a racially discriminatory manner and Huey did not make contemporaneous objections, but the Fifth Circuit nevertheless found a *Batson* violation and granted Huey a new trial.   *United States v. Huey*, 76 F.3d 638, 641 (5th Cir. 1996).   Just like Huey's failure to make contemporaneous objections did not bar him from being granted a new trial, Mr. Balderas's failure to make a contemporaneous objection due to the complicity of his trial counsel should not trigger the procedural bar to his claim.

### B.      The Court Can Adjudicate the Claim on the Merits

On the merits, the Director cites *Mata* for the proposition that Mr. Balderas might not even have standing to raise this claim, but the Fifth Circuit in *Mata* merely stated that "[s]tanding here is a close issue" and assumed *arguendo* that Mata had the requisite standing to proceed to answer the question of constitutional violations.   *Mata v. Johnson*, 99 F.3d 1261, 1270 (5th Cir. 1996). Moreover, the facts in *Mata* actually support Mr. Balderas's claim here.   In *Mata*, trial counsel and the Sate entered into an agreement to exclude all eight African American veniremembers from the jury, and the Court permitted the parties to strike them without articulating a non-discriminatory explanation or expending any peremptory challenge.   99 F.3d at 1268.   The Fifth Circuit found that the collusion among the prosecution, the defense, and the judge "unquestionably . . .

45

constitute[d] a flagrant violation of the Equal Protection clause of the Fourteenth Amendment." *Id.* The fact pattern and holding of *Mata* squarely support Mr. Balderas's *Batson* claim.

Second, the CCA's determination that none of the excusals was racially motivated was an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2). Pursuant to the three-part test outlined by *Batson v. Kentucky*, Mr. Balderas offers several indicia of purposeful discrimination, sufficient to meet the first requirement to "make out a prima facie case of purposeful discrimination by showing that the ***totality of the relevant facts*** gives rise to an inference of discriminatory purpose." 467 U.S. 79, 93-94 (1986) (emphasis added). Mr. Balderas offers evidence of: (1) prompting by the Court to conduct a speedy voir dire, resulting in the excusal of 206 of the 273 prospective jurors without examination; (2) a disproportionate number of excusals being people of color, as indicated through statistical analysis; (3) "acceptable juror" questionnaire answers offered by African American prospective jurors who were excused without questioning in individual voir dire; and (4) a recent history of discrimination in jury selection by Harris County District Attorney's Office. (Am. Pet. 258-262). The Director insists that Mr. Balderas "hinges his argument ***entirely on a statistical analysis***" (Answer at 206) (emphasis added), but in fact, the statistical analysis is just one piece of the totality of relevant facts which give rise to an inference of discriminatory purpose.

As to the statistical analysis itself, the Director excerpts snippets of Mr. Balderas's data, while omitting other data points, to conclude that Mr. Balderas's analysis is insufficient. For example, Director highlights that 84.8 percent of the African American women in the venire were excused before they were questioned, and 75.0 percent of the African American men in the venire were excused without examination, contrasted with the 72.1 percent of white women and 67.7 percent of white men in the venire excused without questioning. Concluding that this analysis is

wholly insufficient, the Director ignores that Mr. Balderas also posits that "African Americans comprised 23.6 percent of the venire, but only 7.1 percent of the jury," while "whites comprised 52.3 percent of the venire, but made up an overwhelming 71.4 percent of the jury." (Am. Pet. 260).

This disparity was accomplished by the State's use of two peremptory challenges and zero challenges for cause, because the State's challenges occurred safely off the record and in collusion with defense counsel. The question of whether the State and trial counsel colluded in the jury selection process to systematically exclude African Americans or practiced reasonable trial strategy is clearly disputed.  However, the CCA never designated this controverted issue of fact for evidentiary hearing, thus the CCA was not able to consider all relevant evidence and made an unreasonable determination of the facts.  On this basis, the Court can adjudicate the claim.

## VIII.  CLAIM IX:  THE JURY'S DELIBERATIONS WERE PREJUDICED AND IMPROPERLY INFLUENCED

### A.    The External Influences

It is undisputed that the right to judgment by an impartial jury is guaranteed to criminal defendants by the U.S. Constitution.  To safeguard this fundamental right, the Supreme Court has "established a constitutional rule forbidding a jury from being exposed to an external influence." *Oliver*, 541 F.3d at 336 ("The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." *Id.* at 334 (quoting, *inter alia*, *Turner v. Louisiana*, 379 U.S. 466, 472 (1965); *Mattox v. United States*, 146 U.S. 140, 149 (1892) ("in capital cases [ ] the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment").  "Evidence that the jury was subject to external influences consequently 'subvert[s] these basic guarantees of trial by jury.'"  *United States v. Jordan*, 384 F. Supp. 3d 707, 717 (E.D. Tex. 2019), *aff'd,* 958 F.3d 331 (5th Cir. 2020).

Under well-established Supreme Court precedent, in criminal cases, any "private communication, contact, or tampering" with the jury is presumptively prejudicial. *Remmer v. United States*, 347 U.S. 227, 229 (1954); *see also Richardson v. United States*, 360 F.2d 366, 369 (5th Cir. 1966). The Director wrongly suggests that *Remmer's* presumption of prejudice has not survived. In fact, the Fifth Circuit has stated that a "presumption of prejudice arises when the outside influence is brought to the attention of the trial court, and it is incumbent upon the Government to rebut that presumption at a hearing." *United States v. Villalobos*, 601 F. App'x 274, 277 (5th Cir. 2015) (*quoting Drew v. Collins*, 964 F.2d 411, 415 (5th Cir. 1992)); *Oliver*, 541 F.3d at 335 *("Remmer* thus prohibits jurors from being subjected to "private communication, contact, or tampering" and considers any such external influences "presumptively prejudicial"); *Haden v. Dir., TDCJ-CID*, No. 6:19-cv-566, 2022 WL 2349724, at \*19 (E.D. Tex. Apr. 21, 2022), *report and recommendation adopted,* No. 6:19-cv-566-JDK-JKNM, 2022 WL 2345742 (E.D. Tex. June 29, 2022), *certificate of appealability denied sub nom. Haden v. Lumpkin*, No. 22-40493, 2022 WL 19516989 (5th Cir. Nov. 30, 2022), *cert. denied,* 143 S. Ct. 2644, 216 L. Ed. 2d 1228 (2023) ("Reporting the conversation to the judge raised a rebuttable presumption of injury . . . .").

Mr. Balderas presented three instances of external influences that improperly influenced the jury:

(1) Juror Armstrong's social media commentary expressing his frustration and "emotional draining" at being in jury duty for a lengthy period of time, including comments that his "brain is like mush," complaining that he was losing his spring break due to jury duty, and responsive comments from others encouraging him to "give them the chair!" These comments indicate that Juror Armstrong was influenced to act on his need to end the trial as soon as possible by finding a guilty verdict, and ultimately impose a death sentence to assist him in getting back to spring break.

48

The Director's response merely underscores the prejudicial nature of these comments, showing the litany of comments Juror Armstrong made about his emotional state and the responses from commentors to "give them the chair," and that they "miss[ed] [him] at work." (Answer at 223-24); *See Stockton v. Virginia*, 852 F.2d 740 (4th Cir. 1988) (restaurant owner's comment to jurors during a capital sentencing phase that "they ought to fry the son-of-a-bitch" was harmful and required retrial).[4]   Indeed, one post shows a poster stating, "text me, I have another question."  This question could have been one about the case.  Another poster referenced the OJ Simpson trial, asking if there were "any white Ford Broncos [as] part of the testimony?"  Juror Armstrong responded with information *from the case* that "no white cars…just never ending testimony of 'expert' witnesses…" (Answer at 224-25).  Not only does this show Juror Armstrong divulging information from the trial, it shows he did not trust the experts by using scare quotes to indicate his suspicion of the experts.  Moreover, as the State acknowledges, Juror Armstrong may have been talking about the people involved being his own students.  (Answer at 225).

(2) The jury was improperly sequestered near the crime scene, which frightened and intimidated jurors, resulting in comments that they were aware that the "seedy" motel "had a reputation for gang activity," that it was "scary" and "dangerous," that they were "concerned about [their] safety," and that it was "not a great place to be."  After complaining to the Court, it "apologized" to them, but did nothing to make them feel safer.  As Juror Armstrong expressed, it was a lengthy sequestration that resulted in his emotional drain and desire to have it end as soon as possible.  The Director claims it is a "stretch" that *Remmer* "cover[s] the seediness of a motel."

---

[4] Contrary to the Director's argument, *Stockton* is remarkably similar to this case.  While the comment there about "fry[ing] the son of a bitch" occurred in a diner, and the comment about "giv[ing] them the chair" occurred on Facebook is of no moment.  Like *Stockton*, the comment is ""too serious to ignore."  *Stockton*, 852 F.2d at 745 (4th Cir. 1988).  Yet the CCA did ignore this comment and its application of the law is therefore unreasonable.

49

But the Sixth Amendment guaranty of a right to an impartial jury has been said to be impugned when "a jury is exposed to an outside influence." *Dorsey v. Quarterman*, 494 F.3d 527, 531 (5th Cir. 2007). To be sure, "the introduction of extrinsic evidence into the jury room requires a court to investigate the asserted impropriety." *United States v. Davis*, 393 F.3d 540, 549 (5th Cir. 2004). Placing the jury in a "seedy" motel that had a "reputation for gang activity" was introducing extrinsic evidence of the circumstances in which the murder occurred. One juror felt it was "freaky that we were down in that area" near the crime scene discussed in trial. (Affidavit of Christopher Norwood ("Juror Norwood Aff."), Sept. 25, 2015, Habeas Writ Record, Vol. III, 00683-86, ¶ 4). Another found the proximity to the crime scene "unnerving." (Affidavit of Chad Sullivan ("Juror Sullivan Aff."), Sept. 26, 2015, Habeas Writ Record, Vol. III, 00695-98 ¶ 3). Indeed, one juror stated that staying near the crime scene that night "*made me think of the crime.*" (Affidavit of John Armstrong ("Juror Armstrong Aff."), Sept. 25, 2015, Habeas Writ Record, Vol. III, 00668-73, ¶ 5). As a result, placing those jurors in a similar place to the murder was an extrinsic influence that unduly influenced the jury. While the Court "apologized" for this, it conducted no investigation of the incident and how it might have influenced the jury, and the CCA did not even analyze this argument, thus resulting in an unreasonable application of law.

(3) All of this fear and intimidation was heightened when the jurors perceived they were being threatened and intimidated by Mr. Balderas's brother. Just after the jury was mentioning how "close the motel was to the crime scene" and then deadlocked with a note that they were "exhausted," several jurors noticed Mr. Balderas's younger brother, Ivan, standing on the street corner and gesturing or waving at their bus. (Affidavit of Michael Orosz ("Juror Orosz Aff."), Sept. 25, 2015, Habeas Writ Record, Vol. III, 00688-93, ¶ 5-6); (Affidavit of Alison Birney ("Juror Birney Aff."), Sept. 26, 2015, Habeas Writ Record, Vol. III, 00675-78, ¶ 5; Juror Norwood Aff. ¶

5; Juror Armstrong Aff. ¶ 7; 32 RR at 12-13 [Deputy Henning testimony]).  Ivan's gestures caused "hysteria" among jurors, some of whom even considered the gesture to be life threatening.  (*See* Juror Armstrong Aff. ¶ 7-8).  After expressing their concern of being "afraid," "shaking," and "emotional" at the incident, the bailiff chased Ivan.  This heightened the jurors' concerns.  (Juror Birney Aff. ¶ 5; see also Juror Sullivan Aff. ¶ 6).  Juror Orosz expressed that the jurors immediately believed their "lives could be in jeopardy" and that the gang activity they were being immersed in both at the trial and at the place they were living "could actually be interjected into our personal lives and we could become victims."  (Juror Orosz Aff. ¶¶ 7-9).  Accordingly, it is unsurprising that these "panic[ked]" jurors then took steps to end their concern for their personal safety by finding Mr. Balderas guilty.

The trial court had an obligation to explore the possibility of prejudice as a result of these external influences, regardless of whether there was any intentional effort to influence the jurors. *See, e.g., United States v. Rutherford*, 371 F.3d 634, 634 (9th Cir. 2004) (vacating sentence and remanding for evidentiary hearing on defendants' claim that jurors were intimidated by the presence of numerous government agents in the courtroom during the trial).  The appropriate inquiry was whether unauthorized conduct "raises a risk of influencing the verdict" or "had an adverse effect on the deliberations."  *Id.* at 644.  As demonstrated above, these incidents together influenced the jury to end their deliberations as soon as possible and to find Mr. Balderas guilty to secure their own safety, rather than on the weight of the evidence.

In response, the Director addresses these claims separately, rather than cumulatively as it should.  This is the same error the CCA committed in its unreasonable application of the law.  The cumulative effect of the known extraneous influences, particularly in light of the considerable juror misconduct and as-yet-unknown external influences described above, created a "high probability

of jury bias" that required a diligent inquiry. *Oswald v. Bertrand*, 374 F.3d 475, 480-81 (7th Cir. 2004); *see also Richardson v. United States*, 360 F.2d 366 (5th Cir. 1966) (failure to conduct "thorough inquiry" into allegation regarding external influence before overruling motion for new trial constitute abuse of discretion). Yet no such inquiry was ever conducted, either at the trial stage or, as discussed below, in connection with the State Habeas proceeding. The failure to conduct this inquiry violated Mr. Balderas's due process right to a fair and impartial jury. *See Oliver*, 541 F.3d at 341. Mr. Balderas is entitled to habeas relief for these due process violations. *Id.*

Moreover, the CCA's decision was an unreasonable application of Supreme Court law. The CCA found that it "doubt[ed]" that the waving incident "constituted 'contact' . . . about a matter pending before the jury." *Balderas v. State*, 517 S.W.3d 756, 789 (Tex. Crim. App. 2016). Alternatively, the CCA also found that the contact was not "particularly threatening or intrusive." These conclusions are unreasonable on two grounds.

*First*, *Remmer* is not simply concerned with "contact"—it "prohibits jurors from being subjected to 'private communication, contact, or tampering' and considers any such external influences 'presumptively prejudicial.'" *Oliver*, 541 F.3d at 335. This waving was not just contact, it was private communication and tampering with the jury. *Second*, and similarly, the CCA wrongfully concluded that the communication was not "threatening or intrusive." To be sure, the record shows that not only was it a communication and tampering, but that the jurors themselves saw it as a "threat" and an intrusion as to the specific matter in front of the jury—the deliberations on whether to convict Mr. Balderas. Juror Birney testified that the bailiffs' decision to go after Ivan made her "realize[] that they perceived it as a threat." (Juror Birney Aff. ¶ 5; *see also* Juror Sullivan Aff. ¶ 6). After that, Juror Birney "felt like [the gesture] potentially was a tactic to

intimidate or threaten perhaps." *Balderas v. State*, 517 S.W.3d 756, 785 (2016). Juror Orosz agreed that the incident "smacked of intimidation." He further explained that it infected the entire jury: "***We talked about the incident and I believe some people were very afraid and everyone was concerned. Up until that point, the proceedings were seen by the jury as an everyday thing. In that moment, when the waving incident occurred, it became so real to us that our lives could be in jeopardy that the gang activity and frame of mind could actually be interjected into our personal lives and we could become victims*** in one way or another**

> . . .

> ***We were concerned with our personal safety.***

(Juror Orosz Aff. ¶¶ 7-9. (emphasis added)). The perceived intimidation incident was so significant that the jurors "were still talking about it" the next day in the jury room. While the CCA found that "both jurors" indicated that their feelings did not affect their deliberations," this does not take into account all jurors. As the Director acknowledges, "i[t] was undisputed that "five or six jurors had seen Balderas's brother waving, and made everyone on the bus aware of this incident." *Balderas,* 517 S.W.3d at 790.

Worse, the bailiff's response improperly influenced the jury by telling them "it should not be part of [the jury's] deliberations." (Juror Birney Aff. ¶ 7; *see also* Juror Armstrong Aff. ¶ 7-8; Juror Norwood Aff. ¶ 5; Juror Orosz Aff. ¶ 6). In *Jordan*, the Eastern District of Texas concluded that a bailiff's remarks to a juror as to the standard of proof and that the juror should "put her emotions aside" was sufficient to warrant a new trial. *United States v. Jordan*, 384 F. Supp. 3d 707, 720 (E.D. Tex. 2019), aff'd, 958 F.3d 331 (5th Cir. 2020).

To be sure, this incident directly affected the jury, which had been deadlocked. The morning after the incident, after two days of deadlock, the jury voted to convict Mr. Balderas of

murder in the first degree.  (32 RR 4-11); *see Best v. Johnson*, 714 F. App'x 404, 410–11 (5th Cir. 2018) (citing the pressure holdout voters already face as a reason why reading two Allen charges to the jury within twenty minutes was prejudicial).

### B.    The Juror Misconduct

In addition to the external influence described above, jury deliberations were prejudiced by numerous incidents of juror misconduct, including deliberating prior to the close of evidence. Jury deliberations prior to the close of evidence threaten a defendant's constitutional right to be tried by an impartial jury. *United States v. York*, 600 F.3d 347, 356 (5th Cir. 2010) (*citing United States v. Dominguez*, 226 F.3d 1235, 1243 (11th Cir. 2000)).

When jurors violate the court's admonitions and engage in premature deliberations that prejudice a defendant by introducing evidence outside the record and adverse to defendant, a new trial is warranted.  *Knorpp v. State*, 645 S.W.2d 892, 905 (Tex. Crim. App. 1983) (reversing and remanding for new trial because jurors prematurely discussed the case at lunch and during other breaks).[5]  *See also United States v. Mix*, 25 F. Supp. 3d 914, 931 (E.D. La. 2014) (finding that defendant was "not tried by an impartial jury" where a juror injected extraneous information that "likely affected the jury's deliberations and verdict").

Mr. Balderas presented four instances of juror misconduct that warranted a new trial:

(1) The jurors provided improper "expert evidence" on ballistics outside of deliberations. At least two jurors discussed case-related ballistics issues with the jury before the any of them had even heard expert testimony on the subject.  (*See* Juror Orosz Aff. ¶ 3; *see also* 28 RR 6-82, 37

---

[5] The *Knorpp* court found that the conduct of the jury in receiving and considering evidence outside the record was in contravention of Article 40.03(7) of the Code of Criminal Procedure (now codified as Texas Rule of Appellate Procedure 21.3(f)). "A new trial is mandated if the other evidence is adverse to the accused. It is the character of the evidence which controls, and it is not necessary to speculate on the probable effect upon the jury or to demonstrate that one or more jurors were persuaded to vote for guilt because of the improper information." *Knorpp*, 645 S.W.2d at 905; *see also Rogers v. State*, 551 S.W.2d 369, 370 (Tex. Crim. App. 1977).

RR 113-60).  For example, they "talked about what they knew about different styles of guns."

(Juror Orosz Aff. ¶ 3).  Juror Sullivan recalled answering questions from other jurors regarding

guns and ballistics, including calibers, casing type, sizing, rounds, types of guns, and "all stuff the

ballistics expert had gone over in court but people were confused about after."    (Juror Sullivan

Aff. ¶ 9).  Juror Armstrong likewise stated that "*When it came to the ballistics testimony, Chad

and I helped the rest of the jury understand stuff about what the experts were saying*. In the jury

room, we helped explain the ballistics to the rest of the jurors and answer questions they had."

(Juror Armstrong Aff. ¶ 13 (emphasis added)).  As other jurors acknowledged, such as Juror

Norwood, these jurors therefore became de facto experts to their fellow jurors.  (Am. Pet. ¶¶ 827-

30).

     The Director first responds that the CCA's opinion rejecting this argument was not

unreasonable because the Court cannot review the juror affidavits under Texas Rule of Evidence

606(b), or that the "jury received any additional or impermissible evidence for consideration

during deliberations."  (Answer at 229 (*citing* CCA, Habeas Writ Record, Vol. X at 2888).  The

Director is wrong.

     Rule 606(b)(2)(A) provides an exception—a juror may testify about whether "extraneous

prejudicial information was improperly brought to the jury's attention."    *Rushen v. Spain*, 464

U.S. 114, 121 (1983) ("A juror may testify concerning any mental bias in matters unrelated to the

specific issues that the juror was called upon to decide and whether extraneous prejudicial

information was improperly brought to the juror's attention.").  The affidavits expressly address

the "additional" and "extraneous" evidence the de facto "expert" jurors brought to the jury.  In

Juror Sullivan's affidavit, he explains that he brought extraneous information on "which guns were

used in other crimes," "what it meant to have one in the chamber," and "how many rounds each

gun would hold," and how "you could tell by the number on the bottom of the magazine." (Juror Sullivan Aff. ¶ 9). Juror Armstrong likewise confirmed he brought extraneous information to the jury's attention: "Other people on the jury had specialized backgrounds in certain topics that they would share with the rest of the jury. For example, Chad was really into guns and I was licensed through the NRA to teach gun classes." (Juror Armstrong Aff. ¶ 13). The information offered by these two jurors was not harmless and had direct influence on the panel. According to Juror Orosz, "Ron [Browning-McCauley] and Chad [Sullivan] *would tell us something about the guns, and then the ballistics expert would come in and repeat what Ron and Chad had told us*. ... Then, when the jury deliberated and we were looking at ballistics, jury members would ask Ron and Chad for clarification on our questions and get the information from them. We did not have to go back and get it from the expert's testimony." (Juror Orosz Aff., ¶ 3). This is more than simply applying one juror's "common sense," as the Director argues; it is providing outside information from these jurors to others that went beyond those juror's common sense, and thus influenced their verdict.

(2) The jurors provided improper Spanish to English language translations. While all parties agreed that there would be an instruction to jurors that they should only consider the official Spanish translations, it was never given. There is no indication in the record that the court instructed the seated jurors, including Juror Trujillo and Alternate Juror Palacios, that their understanding of the Spanish answers should be disregarded in favor of the official translations. And midway through the punishment phase, Juror Trujillo and Alternate Juror Palacios raised a concern with the court that the translators were not translating correctly. (39 RR at 26-32). For example, Juror Trujillo stated that, on a least one occasion, the translator had stated the opposite of the witness's statement. (*Id*. at 26:23-27:15). Juror Trujillo also noted that Mr. Balderas's "mother had said something on the stand and it was never translated, so it's not in the record."

(*Id.* at 27:24-28:1).  Alternate Juror Palacios confirmed that the court interpreters failed to actually translate some witness testimony and recounted that Mr. Balderas's mother had stated that her son had been killed, "but it wasn't translated at any point that that's what she had stated." (*Id*. at 29:2-7).  Significantly, the Spanish-speaking jurors reported the discrepancies and issues with the translations to their fellow jurors during trial.  Indeed, some jurors acknowledged that they gave greater credence to the opinions of Juror Trujillo and Alternate Juror Palacios about the Spanish translations than to the official translation: "It was nice to know that things were not being translated correctly. I knew it was a problem because I trusted Darlene and Lianna's judgment." (*See* Juror Orosz Aff. ¶ 11).  A subsequent admonishment was given to the jury by the Court but it was too late and actually bothered the jurors.  "The judge called Lianna and Darlene into a private meeting.  When they came back, they told us that they were told the translators had a lot of experience translating in court. Darlene was bothered by the court's reaction, telling us that she thought it was a cop-out." (*Id*.).

The Director again responds that these issues are barred by Rule 606(b) and that the admonishment was sufficient.  As he does above, the Director conflates the jurors who brought the extraneous information to the jury with the jurors who received it.  While the interpretations of the language were the Spanish speaking jurors internal mental processes, they were not the other jurors'.  And it is impossible to know the differences between what the jury heard from the Spanish speaking jurors and the actual witnesses, and the Court should presume it did, or hold an appropriate evidentiary hearing.

(3) The jurors considered potential punishment when deciding guilt.  The bifurcation of capital proceedings is undermined when jurors consider the issue of punishment while they are still supposed to be adjudicating guilt, and that conduct, standing alone, is jury misconduct

warranting a new trial. *See, e.g.*, *Bennett v. State*, 738 S.W.2d 33, 33-34 (Tex. App. – Texarkana 1987, no writ). Yet that is what happened here. As Juror Armstrong recalled: "At some point during our guilt/innocence phase deliberations, the possibility of a death sentence came up with other jurors. Some had a hard time separating the issues." (Juror Armstrong Aff. ¶ 9). Juror Orosz similarly stated, "I believe the death penalty was on all of the jury's minds during the guilt deliberations because it was the next step if we voted guilty. It was on my mind." (Juror Orosz Aff. ¶ 4).

The Director again relies on the CCA's decision that the evidence is barred by Rule 606(b) and that there is no rebuttal of the presumption that the jury followed the trial court's instructions. The Director is incorrect again. The evidence within the affidavits show extraneous evidence of the jurors considering the punishment during the guilt phase. The consideration of the "possibility of a death sentence" was extraneous to the guilt phase. (Juror Armstrong Aff. ¶ 9; *see also* Juror Orosz Aff. ¶ 4). As the trial court instructed, the punishment was outside of the considerations the jurors should have been considering and they did not follow that instructions. (*See* Jury Instructions, Mar. 13, 2014, CCA, Vol. XII, 03275-83, at 3282-83). The CCA's alternative conclusion that there was no rebuttal of the presumption that the jury followed this instruction is belied by the plain language of the affidavits: "Some had a hard time separating the issues." (Juror Armstrong Aff. ¶ 9; see also Juror Orosz Aff., ¶ 4).

(4) The jurors failed to consider all evidence before making guilt and punishment decisions. Where jurors acknowledge forming opinions on guilt or punishment before all the evidence has been presented has been the basis for granting federal habeas relief. *See, e.g.*, *White v. Mitchell*, 431 F.3d 517, 537-43 (6th Cir. 2005) (granting habeas relief to a death-sentenced defendant where a juror admitted that, before the penalty phase began, she had a strong inclination against the

defendant and that she was looking forward to participating in imposing a sentence); *Oswald v. Bertrand*, 374 F.3d 475, 480-81 (7th Cir. 2004) (affirming grant of habeas relief where jury misconduct included "the flagrant disobedience of the judge's instructions that the prospective jurors not discuss the case in advance of the trial"); *Irvin v. Dowd*, 366 U.S. 717, 723 (1961) (juror must "lay aside his impression or opinion and render a verdict based on the evidence presented in court.").

At least two jurors determined their verdicts, one at guilt and the other at punishment, before they heard all of the evidence presented. Juror Armstrong stated: "I knew I was going to vote 'guilty' when I saw the forensics evidence where the State matched the caliber and style to the known gun." (Juror Armstrong Aff. ¶ 9). At the punishment phase, a different juror similarly failed to adhere to the trial court's instruction to consider all the evidence and all relevant mitigating circumstances. Juror Orosz stated: "I decided that Mr. Balderas should get the death penalty right after we found him guilty." (Juror Orosz Aff. ¶ 12).

The Director's argument that this evidence is precluded by Rule 606 and that Mr. Balderas did not rebut the presumption of jury impartiality fails. Even assuming that Rule 606 applies here, the Court can consider affidavits under a "miscarriage of justice" standard. *United States v. Arthur Andersen, L.L.P.*, No. H-02-121, 2002 U.S. Dist. LEXIS 26871, at *4 (S.D. Tex. Sep. 11, 2002) (considering argument that Rule 606(b) could be overcome by "'such a magnitude of prejudice' that there was 'an obvious default of justice'"); *United States v. Temeck*, No. 1:17cr050, 2018 U.S. Dist. LEXIS 17446, at *7 (S.D. Ohio Feb. 2, 2018); *Guillot v. Sec'y of the HHS*, No. 03-0775V, 2012 U.S. Claims LEXIS 1070, at *12-13 (Fed. Cl. Aug. 15, 2012) ("Rule 60(b)(6) permits the decision maker to grant relief from judgment to a party in circumstances in which a 'grave miscarriage of justice' would otherwise result"). The jurors' express admissions of failure to be

impartial results in an obvious default and miscarriage of justice that warrants review. Their statements themselves rebut the presumption of impartiality and should be considered by the Court for the magnitude of their impact.

Taken together, the juror misconduct had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 638 (1993); *Lawson v. Borg*, 60 F.3d 608, 613 (9th Cir. 1995) ("We reject the state's alternative arguments that Scott's misconduct was harmless because the information imparted was either cumulative of properly admitted evidence or rendered insignificant by overwhelming evidence of guilt."). The "expert" jurors introduced extraneous information that improperly influenced other jurors, who were also receiving improper Spanish to English translations, which caused them to violate the trial court's instructions and make premature decisions on the death penalty and guilt. These are substantial and injurious effects on the jury's verdict that warrant a new trial. *See Lawson*, 60 F.3d at 612 (finding jury's "exposure to facts not in evidence" had a substantial and injurious effect on the jury's verdict).

## IX. CLAIM X:  MR. BALDERAS'S DEATH SENTENCE WAS ARBITRARILY AND CAPRICIOUSLY IMPOSED

### A. The Sentence Was Arbitrary and Capricious Because of the Unconstitutional Jury Instructions in Special Issue One

The U.S. Supreme Court has held that juror discretion must be suitably directed and limited in capital cases. *Gregg v. Georgia*, 428 U.S. 153, 189 (1976). That requires "specific and detailed guidance to the sentencer." *McCleskey v. Kemp*, 481 U.S. 279, 303 (1987) (citing *Proffitt v. Florida*, 428 U.S. 242, 253 (1976)); *see also Maynard v. Cartwright*, 486 U.S. 356, 362 (1988) ("Since *Furman*, our cases have insisted that the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action.").

60

On March 13, 2014, at the punishment phase of trial, the jury was charged with Special Issue One: "Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Juan Balderas also known as Apache, would commit criminal acts of violence that would constitute a continuing threat to society?" (Jury Charge and Verdict, March 14, 2014, Habeas Writ Record, Vol. XII, 03334-45, at 03342).

The Texas Code of Criminal Procedure does not define "probability" and "criminal acts of violence." By failing to provide any further instruction or definition with respect to the terms "probability" and "criminal acts of violence," the trial court did not provide specific and detailed guidance to the jury. *See McCleskey*, 481 U.S. at 303. The jury's discretion was not suitably directed and limited to further the narrowing of the class of death-eligible defendants. *Gregg*, 428 U.S. at 189.

Although courts have found that the key terms in Special Issue One require no special definition, such findings fly in the face of clearly established federal law, particularly since Special Issue One acts as a *de facto* determinant of a death sentence. *See Gregg*, 428 U.S. at 189. The U.S. Supreme Court has held that the use of vague, aggravating factors to be unconstitutional. *See Stringer v. Black*, 503 U.S. 222, 235 (1992).

The Director responds that the claim is procedurally defaulted. Not so. There is cause and prejudice for the failure to present this claim on direct appeal. *See Murray v. Carrier*, 477 U.S. 478 (1986). Specifically, the cause for the failure to present this claim on direct appeal was due to appellate counsel's ineffective assistance. *See* Claim VI.

### B. The 10-12 Rule

A capital sentencing scheme cannot unduly burden a sentencer before he or she has the opportunity to consider all mitigating evidence. *Mills v. Maryland*, 486 U.S. 367 (1988); *McKoy v. North Carolina*, 494 U.S. 433 (1990). Under Texas law, as detailed above, up to three special

issues are submitted to the jury during the sentencing phase of a capital trial. Tex. Code Crim. Proc. art. 37.071, § 2(b)(1)(2), (e)(1). The court must sentence a defendant to death if the jury unanimously answers "Yes" to the First and Second Special Issues and "No" to the Third Special Issue. By contrast, if the jury answers "No" to either the First or Second Special Issue, or "Yes" to the Third Special Issue, the court must sentence the defendant to life imprisonment without parole. Tex. Code Crim. Proc. art. 37.071, § 2(g).

The "10-12 Rule" states that if the jury finds against the First or Second Special Issue or *in favor of mitigating circumstances* in the Third Special issue, the answers need not be unanimous. Rather, so long as 10 or more jurors agree, the defendant will not receive a death sentence. Tex. Code Crim. Proc. art. 37.071, § 2(d)(2), (f)(2). Furthermore, the court must also sentence the defendant to life imprisonment without parole if the jury is unable to answer any of the special issues consistent with these guidelines. Tex. Code Crim. Proc. art. 37.071, § 2(g). In other words, the absence of unanimity does not result in a hung jury—it results in life imprisonment. Under Texas law, however, the jury cannot be informed of the consequences should it fail to answer a special issue. *Id.* at § 2(a)(1). Thus, jurors remain free to improperly speculate about what will happen if they fail to answer a special issue, or to be persuaded by their peers who are equally ignorant of the law's requirements.

As stated in Mr. Balderas's petition, as in *Mills*, *McKoy*, and *Kubat v. Thieret,* 867 F.2d 351 (3d Cir. 1989), the Texas capital sentencing scheme leads to misinformation and confusion and allows a jury to bring impermissible consideration to bear on the verdict. In Mr. Balderas's case, post-conviction investigation revealed that multiple jurors ultimately felt compelled to vote against their consciences because of the 10-12 rule, which they had been minimally and confusingly instructed on following the close of evidence by both parties at the punishment phase.

(43 RR at 5:1-4; CCA Record, Vol. XII, 3334-45 at 3334-41).  Jurors who did not believe Mr. Balderas represented a future danger and thought there were sufficient mitigating circumstances to warrant a life sentence were misled into yielding to other jurors because of their misunderstanding of the 10-12 Rule.  The jurors remained deadlocked and a fear of mistrial started to set in.  On the second day, Juror Norwood addressed the jurors saying: "Somebody's got to move... We are not going to go and hang this part because we have all suffered and we are not going to put someone else through what we just sat through because we cannot come to a decision." (Juror Sullivan Aff. ¶ 7).  At the time, the jurors genuinely believed that if they did not reach a unanimous vote for the death sentence or get ten jurors to vote for life imprisonment without parole, then a mistrial would be declared.  (*Id*. at ¶ 8; Juror Birney Aff. ¶ 10).  Under that pressure, and with this mistaken extraneous influence on their minds, some jurors began to change their votes. Juror Birney, one of the holdout jurors who changed her vote toward the end of deliberations, explained that the decision was "in part due to fatigue."  (*Id*.)  This evidence demonstrated "the 10-12 jury instruction violate[d] the United States and Texas Constitutions and the Supreme Court precedent of *Mills* and *McKoy*."  (FFCL, Habeas Writ Record, Vol. X, 02844-2938, at 02933 ¶ 57).

The Director disagrees and also states that Mr. Balderas is precluded from relying on juror affidavits.  However, while Texas Rule of Evidence 606(b) prohibits the admission of juror statements regarding the mental or emotional process by which a verdict is reached, the CCA has held that countervailing interests in maintaining "confidence in judgments" and protecting "the administration of public justice" can outweigh the prohibition of juror statements.  *McQuarrie v. State*, 380 S.W.3d 145, 153 (Tex. Crim. App. 2012) (internal citations omitted).

## X.    CLAIM XI:  THE HIGHLY SUGGESTIVE PHOTO SPREAD VIOLATED MR. BALDERAS'S DUE PROCESS RIGHTS

The CCA made an unreasonable determination of facts in analyzing Mr. Balderas's claims regarding the highly suggestive photo spread and unreasonably applied the law to those erroneous determinations.  As such, the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  Contrary to the Director's arguments, the photo identification was impermissibly suggestive and created a substantial likelihood that Wendy Bardales misidentified Mr. Balderas as the shooter.

### A.    The Photospread Was Impermissibly Suggestive

Five CCA justices, four in concurrence and one in dissent, agreed that the photo array shown to Wendy Bardales was impermissibly suggestive.  *See Balderas*, 517 S.W.3d at 801-80. The Director's arguments to the contrary focus on piecemeal attacks at the various indicia of suggestiveness.  The Director ignores, however, the *cumulative* effect of these issues.  *See Barley v. State*, 906 S.W.2d 27, 33 (Tex. Crim. App. 1995) (recognizing that "an individual procedure may be suggestive or the cumulative effect of the procedures may be suggestive").  Here, (1) Mr. Balderas was the only person in the photograph array wearing a black hoodie; (2) he was the only person in the photograph array with a dark mark on his check; (3) Wendy was unable to identify Mr. Balderas definitively in her first attempt despite knowing Mr. Balderas; and (4) the officers' suggested that Wendy cover the top portions of the photos.  The cumulative effect of these issues renders the identification procedure impermissibly suggestive.

The Director ignores the combined effect of Mr. Balderas being the only photograph in the array that closely resembled Wendy's description of the suspect as wearing a black hooded sweatshirt *and* having a dark birthmark on his face.  The cases cited by the Director, however, address only a single similarity between the pre-procedure description and the suspect's

photograph. Moreover, these cases often rely on other differences that enhance the reliability of the identification that are not present here. The Director cites, *Legenzoff v. Steckel*, 564 F. App'x 136, 144 (6th Cir. 2014), for example, where the pre-procedure description included that the suspect was "nicely dressed" and the suspect was one of only two photos that could be characterized as such. *Legenzoff*, however, is readily distinguishable in that there were *two* photographs matching the description. 564 F. App'x at 144. Moreover, the eyewitness described the suspect as having gray-white hair and there were "several" photos of men with that hair color in the array, which the Court found "contribut[ed] to the reliability of the identifications." *Id.*

Likewise, the Director cites *United States v. Gershman*, 31 F. 4th 80 (2d Cir. 2022) and claims that it is a "nearly identical case." (Answer at 252). The *Gershman* Court, however, looked past the fact that the suspect was the only one in the photograph array wearing a black hoodie as described by the witness because the defendant "appeared in the photograph with various features that differed markedly from how [the witness] described him shortly after the shooting: in the photograph, Gershman was not wearing glasses, had a different hairstyle, and had facial hair." *Gershman*, 31 F. 4th at 94. No such marked differences between Wendy's description of the shooter and Mr. Balderas are present here to excuse the fact that Mr. Balderas was the only photograph that closely resembled multiple aspects of the description.

The Director also attempts to dismiss the dark mark on Mr. Balderas's cheek as "hardly conspicuous" focusing on the fact that it was not a birthmark, but a scratch. (Answer at 255). But, as the concurring justices in the CCA determined, "Balderas was still the only person in the lineup with this distinctive type of mark on his face." *Balderas*, 517 S.W.3d at 802. The Director also echoes the CCA majority's determination that two others in the lineup had what appear to be scratches or scars on their faces. (Answer at 256). Relying on that determination was plainly

unreasonable given that *only* the mark on Mr. Balderas's cheek could be sincerely considered a "dark birth mark on his face" as described by Wendy.  517 S.W.3d at 792.

With respect to the dark facial mark, the Director again cites inapposite cases where the distinctive feature was not readily discernable in the photo, the distinctive feature was not a part of a pre-identification description, or there were other indicia of reliability that are not present here.  *See* Answer at 255-56 (citing *United States v. Kelsey*, 917 F.3d 740, 750 (D.C. Cir. 2019) (distinguishing feature, an ear tattoo, was "barely visible in the photo"); *United States v. Perkins*, 787 F.3d 1329, 1344 (11th Cir. 2015) (no evidence the distinguishing feature, gold teeth, was a part of the eyewitness's pre-identification description of the suspect); *Winn v. Washburn*, Case No. 2:18-cv-02426-TLP-tmp, 2021 WL 4496952, at *17 (W.D. Tenn. Sep. 30, 2021) (after eyewitness described the suspect as having a birthmark on his face, "the police were compelled … to create photo lineups containing individuals with similar such marks on their faces" and all of the individuals in the lineup had "some type of discoloration or imperfection on their faces")).

Based on the foregoing, the Court should find that the cumulative effect of these issues rendered the photo identification procedure impermissibly suggestive.

## B.    The Suggestive Procedure Resulted in a Substantial Likelihood of Misidentification

The Director next argues that Mr. Balderas failed to show that the suggestive procedure resulted in a substantial likelihood of misidentification.  (Answer at 256).  Not so.  To the contrary, the totality of the circumstances clearly supports a substantial likelihood that Wendy misidentified Mr. Balderas as the shooter.  Indeed, as Justice Acala of the CCA noted in her dissent, "here there were no factors that would make Wendy's identification otherwise reliable."  *Balderas*, 517 S.W.3d at 807.

Wendy, who was "in shock" during the shooting, only had an unobstructed view of the shooter's face in the brief moment when the shooter's hood fell down. (25 RR at 48:23-49:1, 58:21-23, 64:18). The Director tries to overcome this obvious issue with the reliability of Wendy's identification with distinguishable out-of-circuit cases. (Answer at 257-58). The Director quotes *United States v. Williams*, 35 F.3d 558 (4th Cir. 1994), where the Court upheld an identification where the witness saw the suspect's face for "for approximately five seconds" because the witness "immediately and unequivocally identified" the defendant three days later. *Williams* is plainly distinguishable, however, in that Wendy did not "immediately and unequivocally" identify Mr. Balderas after the crime. To the contrary, Wendy failed to positively identify Mr. Balderas the first time she was shown the photograph lineup. Likewise, the Director also cites *Yearwood v. Keane*, 101 F.3d 685 (2d Cir. 1996), where similarly the witness identified the defendant as the perpetrator "no more than 40 minutes" after the crime and where the witness also recognized the defendant's voice, rendering it "independently reliable." The record here does not render Wendy's identification independently reliable.

Next, the Director makes various attempts to dismiss the facts that (1) Wendy misdescribed the murder weapon; (2) Wendy made inconsistent statements regarding the dark mark on the shooter; and (3) Wendy failed to definitively identify Mr. Balderas as the shooter in her first attempt despite knowing him as "Apache" prior to the crime – a fact she did not share with police. The Director demurs that Wendy was "merely incorrect" in describing the gun as black instead of silver. (Answer at 258). But, the murder weapon is plainly and dominantly silver and the Director provides no argument or authority supporting the proposition that this obvious error should not undercut the reliability of Wendy's identification. Moreover, the Director concedes that Wendy's

failure to identify Mr. Balderas – someone she knew – as the shooter in her first attempt was "peculiar". (*Id.* at 260).

Under the totality of the circumstances, there was a substantial likelihood that Wendy misidentified Mr. Balderas as the perpetrator.

### C.    Admission of Wendy's Identification Was Not Harmless Error.

Finally, the Director incorrectly argues that Wendy's constitutionally deficient identification was harmless. *Id.* at 260-61. To the contrary, Wendy's identification was pivotal to the State's case at Mr. Balderas's trial and its admission had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 638. Without Wendy's identification the State would have had to rely on weak, circumstantial evidence or on evidence supplied by Cookie, a fellow gang member. Wendy's identification was pivotal in linking Mr. Balderas to the crime in that there was no other eyewitness identification and no forensic evidence. Wendy's identification undoubtedly contributed to the jury's guilty verdict and the admission of the identification was not harmless error.

## XI.    CLAIM XII:  THE JURY INSTRUCTION TO CONSIDER ONLY "MORAL BLAMEWORTHINESS" AS MITIGATING EVIDENCE

### A.    Procedural Default

While this claim was raised as Claim Fourteen in the State Habeas Motion, it was not raised on direct appeal.

However, there is cause and prejudice for the failure to present this claim on direct appeal. *See Murray v. Carrier*, 477 U.S. 478 (1986). Specifically, the cause for the failure to present this claim on direct appeal was due to appellate counsel's ineffective assistance. *See* Claim VI.

The Supreme Court declined to extend the *Martinez* and *Trevino* exception to ineffective assistance of appellate counsel claims in *Davila v. Davis*, 582 U.S. 521, 533 (2017), but if appellate

counsel declines to raise a claim on appeal that was "plainly stronger than those actually presented to the appellate court," the prisoner may make out a substantial claim of ineffective assistance of appellate counsel based on *Strickland*. *Davila*, 582 U.S. 521 at 533 (citing *Smith v. Robbins*, 528 U.S. 259, 288 (2000)). Further, in Texas, the right to competent appellate counsel is indistinguishable in importance, for purpose of due process, from the right to a competent trial attorney. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985).

Here, appellate counsel was ineffective due to the failure to present the meritorious argument that the trial court violated the Eighth and Fourteenth Amendments by prohibiting the jury from considering mitigating evidence that did not bear on Mr. Balderas's "moral blameworthiness" for the capital crime.

This failure prejudiced Mr. Balderas. If the CCA would have granted relief on this claim, Mr. Balderas would have been entitled to, at a minimum, a new punishment hearing, in which the jury would have been able to consider all mitigating evidence with respect to the death penalty.

### 1.    *Mr. Balderas has met his burden under § 2254(d)*

The CCA adjudicated Mr. Balderas's claim in the alternative. Mr. Balderas's claim may be considered by this Court, pursuant to § 2254(d), when the previous adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. The "contrary to" and "unreasonable application" clauses in § 2254(d) should be viewed independently. *See Williams v. Taylor*, 529 U.S. 362, 405-07 (2000).

A state court decision will be "contrary to" Supreme Court precedent if it is "substantially different from the relevant precedent." *Id.* Although Director argues that the Fifth Circuit has routinely rejected the allegation that the Texas mitigation special issue limits the consideration of mitigating evidence (Answer at 263), the adjudication of Mr. Balderas's claim here is substantially

different from relevant Supreme Court precedent, *Lockett v. Ohio*, 438 U.S. 586 (1978) and *Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007).

The required jury instruction under Texas law that mitigating evidence is "evidence that a juror might regard as reducing the defendant's moral blameworthiness" (Tex. Code Crim. Proc. art 37.071 § 2(f)(4)) is contrary to Supreme Court precedent in *Lockett* requiring that the sentencer "not be precluded from considering, as a mitigating factor, ***any aspect* of a defendant's character** or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604 (emphasis added). The statutorily mandated instruction and charge applied during the punishment phase of Mr. Balderas's trial reiterated the constraint on the jurors: "In answering Special Issue No. 2 you shall consider mitigating evidence to be evidence that a juror might regard as reducing Juan Balderas also known as Apache's moral blameworthiness." *See* CCA Record, Vol. XII, 3334-45, at 3338; *see also Abdul-Kabir*, 550 U.S. at 264-65 ("when the jury is not permitted to give meaningful effect or a 'reasoned moral response' to a defendant's mitigating evidence—because it is forbidden from doing so by statute or a judicial interpretation of a statute—the sentencing process is fatally flawed.").

As a result of the statutorily mandated jury instruction and constraint reiterated to the jury to consider only evidence of "moral blameworthiness", the jury was precluded from considering the mitigating evidence actually presented by Mr. Balderas during the punishment phase. The Court may therefore adjudicate the claim as contrary to relevant Supreme Court precedent, and also find that the result of Mr. Balderas's trail would have been different had a constitutionally adequate instruction been given.

## XII.    CLAIM XIII:  ACTUAL INNOCENCE

In a habeas corpus petition, an "application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim

70

that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d).

The Director claims that Mr. Balderas's claim of actual innocence is procedurally defaulted because it was never raised in state court. Procedurally barred claims may be reviewed in habeas corpus petitions by the petitioner if they can demonstrate (1) cause and actual prejudice to excuse the default or (2) that a "constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent' of the substantive offense." *Dretke v. Haley*, 541 U.S. 386, 393 (2004) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). Further, the Court has maintained that before reviewing a claim of actual innocence, in instances where there is a question of procedural default, all non-defaulted claims for comparable relief must be addressed for cause to excuse the procedural default. *Haley*, 541 U.S. at 393-94.

A claim of actual innocence requires that the petitioner demonstrate that in the light of the newly discovered evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt," *Schlup v. Delo*, 513 U.S. 298, 327 (1995). While the Fifth Circuit does not recognize freestanding claims of actual innocence on federal habeas review, the claim instead acts as a "gateway" for the petitioner to proceed on the merits of otherwise-barred constitutional claims. *Floyd v. Vannoy*, 894 F.3d 143 (5th Cir. 2018). Mr. Balderas seeks that very relief here.

As outlined in his habeas petition, Mr. Balderas's procedural and due process rights were violated by the State, trial court, and his appointed counsel such that he was not provided with

necessary legal recourse to assert and protect his actual innocence claim. As just one of many examples, the Director failed to provide counsel for Mr. Balderas with exculpatory and impeachment evidence—as it was required to do by law—until many years after Mr. Balderas's trial. The evidence withheld by the State includes precisely the basis upon which no reasonable juror would have found Mr. Balderas guilty beyond a reasonable doubt. *Schlup*, 513 U.S. at 327. Specifically, had the State produced evidence of Cookie's contradictory statements, a jury would not have reasonably believed Cookie's testimony that Mr. Balderas made a confession on the night of Powder's murder. The credibility of the State's star witness would and should have been called into question, ultimately calling the State's entire case against Mr. Balderas into question as well. As another example, had the State produced exculpatory evidence showing that Powder's brother had told investigators that Powder was killed by rival gang MS-13, that evidence would have likewise created a foundation upon which no reasonable juror would have found Mr. Balderas guilty beyond a reasonable doubt.

Additionally, Mr. Balderas's trial counsel was woefully incompetent and inadequate to the point that Mr. Balderas sought, pro se, to be assigned alternate counsel when it became evident to him that his attorney was not representing his best interests. The Director complains that Mr. Balderas never raised his actual innocence claim in state court. But Mr. Balderas's failure to raise this claim in state court is justified because the trial court never ruled on Mr. Balderas's motion for substitute counsel. Had the Court granted Mr. Balderas's motion for substitute counsel, Mr. Balderas would have—through new counsel—raised the actual innocence claim that his trial counsel ignored. Instead, Mr. Balderas's trial counsel insisted unilaterally on pursuing a trial strategy contrary to Mr. Balderas's desires, which included of utmost importance Mr. Balderas's

vehement assertion of his innocence. As such, both the trial court and trial counsel effectively *prevented* Mr. Balderas from asserting his innocence at the trial court level.

Throughout the eight years Mr. Balderas was forced to wait for his case to go to trial, he maintained his innocence while his attorneys consistently pressured him to take a plea. It was mere *months* before Mr. Balderas was finally scheduled to go to trial that his attorneys came to the stark realization that Mr. Balderas was intent on going to trial to prove his innocence. But they had no strategy in place to provide affirmative support for Mr. Balderas's defense. [Email from Terry Pelz, Dec. 30, 2013, Habeas Writ Record, Vol III, 00751]. Trial counsel did nothing to pursue Mr. Balderas's explanation that he had been framed for Powder's murder—a regular strategy of the LTC gang—because of his defiance of gang leadership and his desire to leave the gang altogether. Trial counsel even neglected the most crucial evidence of Mr. Balderas's innocence claim: the fact that he had an alibi at the time of the murder, which could have been corroborated by numerous credible witnesses, and as such, Mr. Balderas did not and could not have committed the crime.

Even Mr. Balderas's attorneys for his appeal were admittedly overwhelmed and did not have the capacity or ability to devote the necessary time to present the blatant, intentional violations by the State as well as Mr. Balderas's trial counsel on direct appeal. *See* Declarations of OCFW attorneys. Instead, appellate counsel had no choice but to prioritize only a small portion of Mr. Balderas's potential bases for relief, and thus were forced to elect not to vigorously advocate for his actual innocence. As a result, Mr. Balderas suffered a due process harm that is well within the scope of "new reliable evidence . . . that was not presented at trial," strongly reinforcing constitutional error. *Schlup*, 513 U.S. at 324. Mr. Balderas has presented and detailed that new evidence in his Petition, along with the grounds for each of Mr. Balderas's claims for violation of his due process rights.

Finally, the Director claims that Mr. Balderas is not actually innocent. The Director bases this argument solely on the State's egregious *Brady* violations committed against Mr. Balderas. Those violations do not nearly constitute the entire grounds for Mr. Balderas's actual innocence claim.  For instance, the Director glosses over the fact that the State's star witness, Cookie, was testifying pursuant to a negotiated plea deal with prosecutors and that Cookie even recanted his trial testimony while speaking with an OCFW investigator, confessing that that "Juan never told me he did it."  This alone is damning evidence of Mr. Balderas's innocence upon which no reasonable juror would convict.

Indeed, the standard of "in light of all of the evidence" would necessarily provide a reasonable juror with *all* of the information necessary to make an informed determination of a defendant's guilt or innocence.  But the jury here was not afforded access to "all of the evidence" that would have provided Mr. Balderas with a fair and accurate outcome, because the State neglected to disclose determinative evidence.  Had the jury truly been able to review "all of the evidence," it is more likely than not that Mr. Balderas would not have been found guilty beyond a reasonable doubt.

For these reasons, Mr. Balderas has sufficiently shown that "in the light of the newly-discovered evidence, no reasonable juror, considering the record as a whole, would vote to convict" him of Powder's murder.  *See Floyd*, 894 F.3d at 160.  Mr. Balderas has thus overcome any procedural bar to his actual innocence claim. *Id.*  Further, Mr. Balderas has established (1) cause and actual prejudice to excuse the default, and he has established (2) that a "constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent' of the substantive offense." *Dretke*, 541 U.S. at 393.

## XIII.   CLAIM XIV:  TEXAS CODE CRIMINAL PROCEDURE ARTICLE 37 IS UNCONSTITUTIONAL

In violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments, Mr. Balderas presented twenty-one reasons that the Texas death penalty statute set forth in Texas Code of Criminal Procedure, Article 37.071, is unconstitutional.   Mr. Balderas's Petition sets out the following non-exhaustive bases for the unconstitutionality of the statute:

1.   The statute is vague and overbroad for failure to define (i) "probability"; (ii) "criminal acts of violence"; (iii) "continuing threat to society"; (iv) "personal moral culpability"; and (v) "moral blameworthiness," which failure denies the jury the guidance necessary to exercise its discretion. *Gregg v. Georgia*, 428 U.S. 153 (1976).

2.   The requirement that jurors predict future probability of violence is arbitrary and capricious and violates the evolving standards of decency of our society.

3.   The statute's lack of a uniform method for determining which cases will be prosecuted as death penalty cases, and which will not, is arbitrary and capricious and violates the evolving standards of decency of our society.

4.   The standard of "probability" imposed on the jury by Art. 37.071(b)(1) is less stringent than proof beyond a reasonable doubt; that jurors must decide if a "probability has been established beyond a reasonable doubt" makes the application of Art. 37.071 arbitrary and capricious.

5.   The statute fails to require that mitigation be considered, which denies the accused due process and equal protection of the law.

6.   The statute does not properly narrow the class of persons eligible for the death penalty upon conviction for a capital offense.

7.   The statute is not based on a uniform national standard, resulting in arbitrary, capricious, freakish and wanton imposition of the death penalty.

8.   The statute does not provide for a proportionality review to determine if the penalty imposed is proportionate to other similar offenses.

9.   The statute requires ten votes to answer the issue with a "no" response that would be in favor of a defendant and a life sentence. The false distinction between a "life" answer of ten or more jurors and a non-answer of less than

ten jurors is impermissibly vague and arbitrary and violates due process and *Simmons v. South Carolina*, 512 U.S. 154, 171 (1994).

10.    When jurors are instructed that they may not give a verdict of life unless ten or more agree upon a life answer in response to at least one of the two issues, this provides an incorrect picture of the state of the law.  In fact, if only one juror is able to conclude that sufficient mitigation exists to warrant the imposition of a life sentence, despite that juror's inability to convince nine other jurors of his or her position, a life sentence will be imposed.

11.    Execution by lethal injection is cruel and unusual punishment and otherwise unconstitutional.

12.    The statute is unconstitutional because it prohibits the judge and the parties from informing the jury that a hung jury (failure to achieve unanimity on Special Issue No. 1 or less than ten "no" votes on Special Issue No. 2) will result in a life sentence.

13.    The statute permits the introduction of unadjudicated extraneous offenses at the punishment phase, in contravention of the requirement in capital cases a heightened need for reliability in the sentencing decision. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).  Allowing evidence of unadjudicated offenses, particularly in situations where those offenses would be inadmissible in a non-capital trial, denies the jury's verdict and the Court's sentence the reliability required by the Eighth Amendment to the United States Constitution.

14.    The statute unconstitutionally permits the introduction of juvenile offenses at the punishment phase.

15.    The statute is unconstitutional because there are no appellate standards for determining the sufficiency of the evidence to support the jury's answers to the special issues, and the Texas Court of Criminal Appeals has repeatedly and consistently refused to conduct any meaningful appellate review of mitigation sufficiency.

16.    The statute does not require the indictment to allege special issues, *i.e.* the "facts" relied upon to enhance the capital sentence from life to death, contrary to *Apprendi v. New Jersey,* 530 U.S. 466 (2000).

In response, the Director claims that some of these claims are "duplicates of claims raised elsewhere in Balderas's petition."  This is irrelevant.  As the Director recognizes, while these arguments may overlap, they are independent because it "rests on his responses to those particular

grounds and incorporates them here by reference." (Answer at 269). Just as those responses fail there, they fail here too.

The State further argues that the claims are unexhausted and procedurally defaulted. There is cause and prejudice for the failure to present this claim on direct appeal. *See Murray v. Carrier*, 477 U.S. 478 (1986). Specifically, the cause for the failure to present this claim on direct appeal was due to appellate counsel's ineffective assistance. *See* Claim VI. And Mr. Balderas would plainly be prejudiced by inability to challenge the very statute under which he was sentenced.

Further, the Director mistakenly argues that these claims are "frivolous." Not so. As articulated above, Mr. Balderas has grounds for each claim and should the Court find they are not procedurally defaulted, Mr. Balderas reserves the right to further respond to these arguments.

## XIV.  CLAIM XV:  THE STATE HABEAS PROCEEDING VIOLATED DUE PROCESS RIGHTS

Per the standard set forth in *Evitts v. Lucey*, 469 U.S. 387, 401 (1985), the procedures employed by the state during a collateral attack on a criminal conviction, such as state habeas proceedings, must comport with due process. Due process requires, at a minimum, notice and the opportunity to be heard in a manner appropriate to the nature of the case. *See, e.g., Boddie v. Connecticut*, 401 U.S. 371, 378 (1971). While deviations from the procedure in article 11.071 may not *alone* provide for relief, the procedure employed by the state habeas court place Mr. Balderas at a disadvantage and resulted in a fact-finding process that was arbitrarily and demonstrably unfair. *Rockwell v. Davis*, 2016 U.S. Dist. LEXIS 109568, at *14-15 (N.D. Tex. Aug. 18, 2016).

The Director argues that the CCA's failure to remand Mr. Balderas's initial habeas proceedings did not violate due process because the CCA followed Texas procedural rules under Article 11.071 section 5(a)(1) of the Texas Code of Criminal Procedure, under which the "proper

remedy" for presenting a new and previously unavailable claim under Texas law is a subsequent application filed directly with the CCA.  However, the Director's view is at odds with Rule 73.3(b) of the Texas Rules of Appellate Procedure, which provides for a stay of proceedings pending the filing of evidence in the trial court, which Mr. Balderas cites in support of his November 30, 2018, Motion for Remand.

Further, Mr. Balderas's claim is not foreclosed by precedent per the Director's cited authority, *Rockwell v. Davis*, 2016 U.S. Dist. LEXIS 109568.  There, the petitioner was afforded an opportunity to develop the factual record before the state habeas court which was not afforded Mr. Balderas here. *See Rockwell,* at *11-13 (allotting the petitioner 23 days to liberally supplement, correct, and upgrade the record with additional briefing and exhibits from trial counsel's file to evaluate material factual disputes).  In contrast here, the state habeas court and the CCA denied Mr. Balderas the opportunity to introduce evidence in support of his claims.  The deviations from the statutorily mandated post-conviction procedure resulted in demonstrably unfair fact-finding processes in violation of due process.

## XV.  CLAIM XVI:  TRIAL COUNSEL VIOLATED MR. BALDERAS'S SIXTH AMENDMENT RIGHT TO SUBSTITUTE COUNSEL

Mr. Balderas' Sixth Amendment right to substitute counsel was violated when the trial court failed to rule upon, let alone properly inquire into, his *pro se* motion for new trial counsel. As an initial matter, Mr. Balderas has shown cause and prejudice that overcome any procedural default. *See Coleman*, 501 U.S. at 750; *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013).  Indeed, as discussed in more detail in Claim VI, the claim was only not raised on direct appeal due to appellate counsel's ineffective assistance. On the merits, Mr. Balderas has established that the trial court violated his Sixth Amendment right when it ignored his motion for new counsel.

### A.    The Court Performed No Inquiry Into Mr. Balderas's *Pro Se* Motion for New Counsel

All Circuits, including this one, require that a trial court inquire as to a defendant's reason for wanting a new lawyer. *Martel v. Clair*, 565 U.S. 648, 664 (2012)[6]; see also *U.S. v. Iles*, 906 F.2d 1122, 1131 (6th Cir. 1990) (describing the "general principle that a district court usually must engage a defendant in person where he has expressed dissatisfaction with counsel and has sought to have him removed"). Here, the trial court did not acknowledge Mr. Balderas's motion at all. The Director argues that this failure by the trial court is of no moment because Mr. Balderas must additionally show that a breakdown in communication with his counsel that amounted to a Sixth Amendment violation. (Answer at 287). That is not true. The trial court's failure to acknowledge Mr. Balderas's motion for new counsel in and of itself constitutes reversible error and is sufficient grounds for this Court to grant Mr. Balderas's habeas petition. *See United States v. Young*, 482 F.2d 993, 995 (5th Cir. 1973).

### B.    Mr. Balderas Was Prejudiced by The Court's Failure to Grant His *Pro Se* Motion for New Counsel

But even if Mr. Balderas were required to show that his conflict with trial counsel impeded his Sixth Amendment rights, he has amply done so. The Director resorts to misrepresenting the facts in attempting to argue otherwise. Mr. Balderas's motion for new counsel stated that, as to one attorney (Mr. Godinich), Mr. Balderas had only seen him twice in the entire year. (Motion to Appoint New Counsel, Apr. 12, 2011, CCA Record, Vol. I, 00071-72). As to a second attorney,

---

[6] The Director questions Mr. Balderas's citation to *Clair* because, in *Clair*, the Court applied the 18 U.S.C. § 3599 "interests of justice" standard to the question of whether a motion for substitution of appointed counsel should have been granted by the trial court. *See* 565 U.S. at 654. Director points to a distinction without a difference. In fact, the Supreme Court in *Clair* stated that, as a general matter, and *not* only under § 3599, "courts cannot properly resolve substitution motions without probing why a defendant wants a new lawyer." *Id.* (citing 2 W. LaFave & J. Israel, Criminal Procedure § 11.4, p. 36 (1984) ("[i]t is hornbook law that when an indigent defendant makes a timely and good faith motion requesting that appointed counsel be discharged and new counsel appointed, the trial court clearly has a responsibility to determine the reasons for defendant's dissatisfaction…").

Mr. Balderas had not seen him for *multiple* years. (*Id.*) Yet the Director argues in Opposition that Godinich had sufficient communication with Mr. Balderas because Godinich visited his client twice in one month. As further evidence of the complete breakdown in communication between Mr. Balderas and trial counsel, Mr. Balderas stated that he had not received copies of any motions that his attorneys had filed on his behalf. And, as discussed in detail in Claim VII, Mr. Balderas's trial counsel ignored his pleas for them to investigate his actual innocence and the significant evidence in his favor.

The Director further errs in arguing that Mr. Balderas did not connect his complaints or miscommunication with counsel to any defensive shortcoming at trial. Not so. As Mr. Balderas has detailed in Sections II-V and VII, his trial counsel's failure to communicate with Mr. Balderas resulted in counsel's failure to interview key witnesses, investigate his alibi, challenge the credibility and bias of the State's witnesses, and otherwise generally prepare for trial. This amounted to "an attorney-client relationship that fell short of that required by the Sixth Amendment." *Schell v. Witek*, 218 F.3d 1017, 1029 (9th Cir. 2000).

Finally, the Director incorrectly argues that Mr. Balderas's *pro se* motion requesting substitute counsel represented a "miscommunication [that was] obviously harmless," and that his trial counsel "performed effectively" on Mr. Balderas's case. (Answer at 288). This is nothing but *ipse dixit*. The record is rife with instances of outright negligence by Mr. Balderas's attorneys, disregard to Mr. Balderas's requests, and mismanagement of his case by trial counsel. For example, in 2010, a member of his trial team acknowledged the need to initiate an investigation into Mr. Balderas's consistent claims of innocence and unwillingness to participate in plea negotiations. But absolutely no investigation was done regarding Mr. Balderas's innocence and alibi until much later, just prior to trial—and by then it was too late.

80

The trial court's failure to even hear Mr. Balderas's motion for new counsel was a violation of Mr. Balderas's constitutional rights. Had the trial court inquired into the reasons for the motion, it would have learned that Mr. Balderas's relationship with trial counsel had broken down to the point that there was virtually no communication occurring between Mr. Balderas and his attorneys, and that as such Mr. Balderas's insistence on his actual innocence—and the evidence to prove it— was ignored and never presented to the jury. This cause and prejudice overcomes any procedural default in Mr. Balderas's claim, and the resulting shortcomings at Mr. Balderas's trial warrant granting his Petition.

## XVI.   CLAIM XVII:  THE TEXAS DEATH PENALTY IS UNCONSTITUTIONAL AS APPLIED IN THIS CASE

Mr. Balderas has raised a claim that the Texas death penalty is unconstitutional because the right to life is a fundamental constitutional right and any law that impinges upon a fundamental right is presumptively unconstitutional.  Under fundamental rights strict scrutiny analysis under substantive due process and equal protection, the District Attorney's Office must prove that the infringement of the fundamental right to life is "necessary to promote a compelling state interest." The Harris County District Attorney's Office has shown no "compelling State interest" justifying the death penalty for Mr. Balderas.  The Harris County District Attorney's Office has failed to demonstrate that the use of life imprisonment (including without parole) does not promote any alleged interest in deterrence as well as the death penalty (even assuming the death penalty deters, which it does not).  The Harris County District Attorney's Office has not demonstrated that there are no less restrictive means of punishing him. In fact, there is a "reasonable less restrictive alternative to the death penalty" in this case: life imprisonment.

In response, the State argues again that this claim is procedurally defaulted.  As with the other claims, there is cause and prejudice for the failure to present this claim on direct appeal. *See*

*Murray v. Carrier*, 477 U.S. 478 (1986). Specifically, the cause for the failure to present this claim on direct appeal was due to appellate counsel's ineffective assistance. *See* Claim VI.

## XVII.  CLAIM XVIII:  POST-CONVICTION COUNSEL WERE INEFFECTIVE

The Director points out that the United States Supreme Court has never recognized a constitutional guarantee favoring the right to effective counsel in a state postconviction proceeding. Mr. Balderas does not disagree. Nevertheless, to protect the right to further review and to benefit from any change in the law, Mr. Balderas preserves his claim that the Sixth and Fourteenth Amendments *should* be held to apply to guarantee effective assistance of counsel in a first-tier state postconviction relief proceeding.

## XVIII. CLAIM XIX:  LETHAL INJECTION IS UNCONSTITUTIONAL

Mr. Balderas claims that Texas's use of compounded pentobarbital to perform his execution violates his Eighth and Fourteenth Amendment rights due to the resulting pain and suffering over and above that necessary to produce death. Under Texas law, lethal injection is the only permitted method of execution, effected by "intravenous injection of a substance or substances in a lethal quantity sufficient to cause death and until such convict is dead[.]" Tex Code Crim. Proc. art. 43.14(a). Although the substance used to cause death is not defined by statute, the Texas Department of Criminal Justice Correctional Institutions Division Execution Procedure designates "Pentobarbital – 100 millimeters of solution containing 5 grams of Pentobarbital" as the "lethal injection drug" and provides for no alternative substance to be used. *See* Section V. Preparations for the Lethal Injection (April 2021), *available at* https://dpic-cdn.org.

First, Mr. Balderas's claim is properly brought in the instant petition for habeas corpus, rather than under § 1983. The Director cites *Glossip v. Gross*, 576 U.S. 863 (2015) for the proposition that "a method-of-execution claim must be brought under § 1983 because such a claim does not attack the validity of the prisoner's conviction or death sentence." *Id.* at 879 (citing *Hill*

*v. McDonough*, 547 U.S. 573, 579-80 (2006)).  However, the Supreme Court in *Hill* reasoned that the complaint did not challenge the legal injection "as a general matter," but conceded that "other methods of lethal injection the Department could choose to use would be constitutional[.]"  *Hill*, 547 U.S. at 580 (internal quotations omitted).  Since Hill's challenge left the State free to use an alternative lethal injection procedure, a grant of injunctive relief could not be seen as barring the execution of Hill's sentence.  *Id.* at 580-81. The same cannot be said here because Texas law and the current Texas Department of Criminal Justice Execution Procedures *only* provide for the use of Pentobarbital to effect Mr. Balderas's execution. Therefore, Mr. Balderas's petition, if successful, would prevent the State from executing him by lethal injection, left with no alternative substance under the operative Execution Procedures, and his claim is properly before this Court in the instant petition.

Second, the Supreme Court in *Glossip* affirmed that an inmate may challenge an execution protocol through evidence that there is a substantial risk of severe pain. Here, Mr. Balderas cites the human error which plagues executions by lethal injection, necessitating cutting the condemned in his neck and/or groin, and cites the process of torturous paralysis and suffocation-while-conscious.

## XIX.    CLAIM XX:  MR. BALDERAS IS INCOMPETENT TO BE EXECUTED

The Director asserts that Mr. Balderas's claim that he is incompetent to be executed is unripe and must be dismissed without prejudice, because an execution date has not been set. However, the determination of ripeness of an incompetent-to-be-executed claim hinges whether the claimant's execution is *imminent*, and not whether an execution date has been set. *Panetti v. Quarterman,* 551 U.S. 930, 947 (2007); *see also Billiot v. Epps*, 671 F. Supp. 2d 840, 843 (S.D. Miss. 2009) (noting that the petitioner's *Ford* claim was found to be not unripe because, even if no execution date was set, state law required that an execution date be set as soon as the stay of

the case was lifted).  While no date has been set here, Mr. Balderas has been on death row for ten

years, since 2014, making an anticipated execution date imminent following the determination of

his exhaustive Second Amended Petition.

## XX.   CLAIM XXI:  THE STATE FAILED TO CORRECT FALSE TESTIMONY

### A.   Procedural Default

In his subsequent State application, Mr. Balderas presented false-testimony claims

regarding Diaz's testimony that (1) he didn't ask the prosecutor's for anything; (2) said the meeting

to decide to kill Hernandez took place only three to four days before the murder; (3) described

hanging out with rival gangs as the "ultimate betrayal," and (4) said he didn't care what happened

to Hernandez.  SHCR-03 168-71.  The Director argues that these claims are procedurally barred

by the CCA's perfunctory dismissal of Mr. Balderas's subsequent application under Texas's

abuse-of-the-writ statute because the CCA implicitly found that these claims were previously

available at the time Mr. Balderas filed his first application.  (*See* Answer at 299 (citing *Ford v.

Davis,* 910 F.3d 232, 235)).  However, the implicit factual findings of the CCA are not entitled to

the presumption of correctness under *Ford* because the CCA's decision provides no indication of

the legal basis for its denial of relief.  *See Ford* at 235.  In *Ford*, the CCA dismissed Ford's IAC

claim based on his attorney's failure to convey a plea offer to him at time-barred and procedurally

foreclosed under Texas's abuse-of-the-writ statute.  *Id.* at 233-34.  The Fifth Circuit held that the

CCA implicitly found that Ford knew or could have reasonably known about a plea deal before

filing his first petition because the CCA considered Ford's contradictory evidence consisting of:

(1) his trial attorney's affidavit claiming that Ford had knowingly rejected the eight-year plea deal;

and (2) Ford's sworn statement averring that he would have accepted the deal had counsel

conveyed it to him.  *Id.* at 236.  The CCA's decision here is not entitled to the same presumption

of correctness because the record before it *supports*, rather than contradicts, that the factual bases

for Mr. Balderas's false-testimony claims were unavailable when Mr. Balderas filed his first State petition.

The CCA summarily refused to review any of Mr. Balderas's subsequent application claims on the merits, and denied relief according to a one-sentence determination: "We have reviewed the subsequent application and find that Applicant has failed to make a prima facie showing that he satisfies the requirements of Article 11.071, §5(a)."  *See Ex Parte Balderas*, No. WR-84,066-03, 2023 WL 7023648, at *1.  The CCA made no factual findings and its conclusions are otherwise unsupported, and indeed are contradicted by the record before it. Mr. Balderas's false-testimony claim was authorized under Article 11.071 § 5(a)(1) because Mr. Balderas filed his Initial Habeas Corpus application in January 2016, but the State did not disclose the audio files and the prosecutor's notes until May 2018, therefore, the factual basis for his false-testimony claim was unavailable for over two years since Mr. Balderas filed his initial application despite the exercise of reasonable diligence to obtain it.  Because the CCA's implicit finding is not entitled to the presumption of correctness, and because Mr. Balderas alternatively establishes cause and prejudice to overcome the default—the factual bases were unavailable due to the State's withholding of the records—the Court may adjudicate the claim.

### B.    The Cookie jail audio files underlying Claim XXI demonstrate the State failed to correct false testimony.

The recently disclosed prosecutors' notes reveal both false testimony elicited by the State's star witness, Cookie, as well as several inconsistencies in Cookies' testimony that underscore his lack of credibility.

First, Cookie falsely testified at trial that he "never asked [the prosecutors] for anything" (26 RR 168:15), despite having discussed with his family members over prison phone calls that he communicated with prosecutors about having a plea deal. The Director argues that the prison

phone calls do not show falsity because it cannot be construed to mean Cookie never reached out about a plea deal, but the transcript specifically refers to "what it would take to get [Cookie] on board to participate" and "a fair *deal* for [Cookie]", to which Cookie responds "he never asked [prosecutors] for anything." (26 RR at 167-68 (emphasis added)). Per the standards set forth in *Giglio v. United States*, 405 U.S. 150 (1972) and *Napue v. Illinois*, 360 U.S. 264 (1959), Mr. Balderas has sufficiently shown that the State knowingly offered false testimony, which the State knew was false, and that the statements were material because they impeached the credibility of the State's key witness.

The Director characterizes the other supporting evidence as mere inconsistencies. The cumulative effect of these numerous conceded inconsistencies in Cookie's testimony underscores the likelihood that false testimony was not corrected in violation of Mr. Balderas's Due Process Rights.

## XXI.   CLAIM XXII:  CUMULATIVE ERROR

Mr. Balderas raises for the first time a claim for relief under cumulative error, which may be considered upon return to state court pursuant to Section 5(a)(1) of Article 11.071 of the Texas Code of Criminal Procedure, permitting review of claims which could not have been presented previously in a timely initial application because the factual basis of the claim was unavailable at that time. Here, several of Mr. Balderas's most significant claims are supported by *Brady* disclosures of exculpatory and impeachment evidence made several months after Mr. Balderas's prior state writ petition was denied, supporting Mr. Balderas's contention for the first time that the constitutional errors "so fatally infected the trial" that the resulting conviction violates due process or "fundamental fairness." *Jackson v. Johnson*, 194 F.3d 641, 655 n.59 (1999). Thus, Mr. Balderas's cumulative error claim is not defaulted.

Further, Mr. Balderas's claim for cumulative error, based on numerous constitutional violations, is neither "novel or unwieldly." (Answer at 311). To the contrary, it is well-settled law that courts in the Fifth Circuit evaluating a cumulative error claim "review the record as a whole to determine whether the errors more likely than not caused a suspect verdict." *Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir. 1992). Here, Mr. Balderas's guilty verdict is the result of several significant constitutional errors which permeate the record leading to his conviction.

Dated: November 4, 2024

Respectfully submitted,

DLA PIPER LLP (US)

By: /s/ Ashley Allen Carr
   Ashley Allen Carr (Tex. Bar No.
   24082619)*
   Jeffrey E. Tsai**
   Marc A. Silverman**
   Jessica Park Wright**

*Pro Bono Attorneys for Petitioner Juan Balderas*

**CERTIFICATE OF SERVICE**

I certify that on November 4, 2024, a true copy of the foregoing Reply in Support of

Petition for Writ of Habeas Corpus (Second Amended) was served via the ECF/CM system and

emailed to the following recipients:

Ali Mustapha Nasser
Office of the Attorney General
300 W. 15th Street
Austin, Texas 78701
ali.nasser@oag.texas.gov

/s/ Ashley Allen Carr
Ashley Allen Carr

89